UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

MCDONALD'S CORPORATION,

                 Plaintiff,

      v.

VANDERBILT ATLANTIC
HOLDINGS LLC,

                 Defendant.

------------------------------------------------------X

19 Civ. 06471(DLI) (SLT)

**DECLARATION OF
PINCHUS "SAM" ROTTENBERG**

PINCHUS "SAM" ROTTENBERG, under the penalties of perjury, declares:

1.      I am the principal of Defendant Vanderbilt Atlantic Holdings LLC ("Vanderbilt"). I make this declaration, based upon personal knowledge, in support of Vanderbilt's motion for summary judgment dismissing Plaintiff McDonald's Corporation's ("McDonald's") claims and granting Vanderbilt's counterclaim.

2.      In this action, McDonald's claims that Vanderbilt "failed to cooperate" with a fair market rental value rent re-set process set forth in an "Option Rent Addendum" (the "ORA") forming a part of the Lease (defined below) between Vanderbilt and McDonald's. The ORA provides the standards governing, as well as a mandatory (non-judicial) dispute resolution procedure for, the determination of the renewal rent that McDonald's must pay during the four five-year option terms under the Lease (running from 2019 to 2039) for the premises that McDonald's leases from Vanderbilt. Under the terms of the ORA, if one party "fails to cooperate" in the ORA's mandatory dispute resolution procedure, the appraisal of fair market rental value by the other party's appraiser governs. As such, McDonald's claims that the appraisal issued by its appraiser alone governs the fixing of rent during the (aggregate) twenty-year option term, and that

the dispute between the parties' dueling appraisers should not be resolved by the third (neutral) appraiser as would otherwise (absent a "failure to cooperate") take place under the ORA.

3.      Vanderbilt conversely claims (in its counterclaim) that, by refusing to submit — as and when required under a later agreement modifying the ORA (discussed below) — the dispute between the party-appraisers to the third, or neutral, appraiser (whom the parties designated in such later agreement), McDonald's is the only party who "failed to cooperate" and that, in consequence, Vanderbilt's appraiser's estimate of rent should govern.

Overview of Option Rent Addendum

4.      In brief, the ORA provides that at the commencement of the first option term (here in 2019), the rent will be set at eighty percent of the then fair market rental value of the leased premises (the "FMV") for the first five-year option term.   Thereafter, the rent increases an additional fifteen percent during each of the next three five-year periods.   Thus, the FMV determination controls the setting of rent for the entirety of the aggregate twenty-year optional term.   A true copy of the ORA appears as Exhibit D.[1]

5.      In determining FMV, the ORA explicitly states that rental value of the leased premises shall be assessed "exclusive of Tenant's improvements, knowing all the uses to which the property can be put…".   Exhibit D, page 2.   In other words, the FMV is predicated on the premises being valued as if it were vacant land taking into account the highest and best use to which the property can be put (*i.e.*, improved) under then applicable zoning laws and regulations.

6.      The ORA further provides that if Vanderbilt and McDonald's cannot agree on the FMV, each side must appoint a party-appraiser to estimate the FMV of the premises.   If the party-

---

[1] To ensure the exhibit references in this Declaration will match those in the deposition transcripts, the exhibit designations in this Declaration correspond to the exhibit designations the documents were assigned during the depositions in this action.

appraisers' estimates of the FMV differ by more than fifteen percent, the two party-appraisers are required to jointly appoint a third appraiser to resolve the dispute.

7.      If a third (neutral) appraiser is required, the ORA goes on to specify that the decision of the three appraisers of the FMV shall govern, or if they cannot reach a unanimous decision, the decision of a majority of the three appraisers shall govern.  If a majority decision cannot be reached, the ORA specifies that the separate (and conflicting) appraisals of FMV by the three appraisers shall be averaged and that average determines the FMV.  Exhibit D, page 1.

8.      In determining the FMV of the premises as if vacant, at the property's highest and best use, the ORA specifies that the party-appraisers (and the third appraiser if one is needed) shall utilize the "standard market data technique for valuing vacant land" (which, as I understand it, involves gathering and analyzing "comparable sales" from other actual recent past transactions for similar properties in similar neighborhoods) and thereafter adjusting for "comparable leases."  But if "adequate comparable leases are not available," the ORA specifies that the "land residual technique" shall be utilized.  Exhibit D, page 2.  In general, the land residual technique, again as I understand it, involves valuing the subject (hypothetically vacant) property as if developed to its highest and best use, and then, after deducting from that value the hard and soft costs of construction, fixing the vacant land value as the remaining or "residual" value.

Property Background

9.      The property at 840 Atlantic Avenue, located at the southeast corner of Vanderbilt and Atlantic Avenues (Block 1122, Lot 1, hereinafter the "Premises") is owned in fee simple by M.M.B. Associates LLC ("M.M.B.") as successor in interest to Anthony Musto.

10.     On March 18, 1998, Anthony Musto and McDonald's signed a lease for the Premises (the "Lease").  A true copy of the Lease appears at Exhibit C. The lease provides for a

twenty-year original term that expired April 9, 2019.  The McDonald's restaurant building did not

exist when the Lease was signed.  McDonald's built the restaurant building.

      11.     On November 30, 2017, M.M.B. as lessor and Vanderbilt as lessee entered into a

lease transaction pursuant to which Vanderbilt became the ground lessee of the Premises, subject

to the pre-existing Lease with McDonald's.  In consequence, McDonald's became Vanderbilt's

sublessee, and continued to occupy the Premises under the terms of the Lease.

The Controlling Option Rent Addendum Provisions

      12.     The Lease provides McDonald's with the option to extend the term of the Lease for

up to twenty years (in four five-year optional renewal terms) from 2019 to 2039.  The method (*i.e.*,

the standards and mandatory dispute-resolution procedures) for setting the rent during the option

term is set forth in the ORA, contained at Exhibit G to the Lease.  As noted, a true copy of the

ORA appears at Exhibit D hereto.

      13.     The ORA provides:

The annual rental that shall be payable during the first extension period described
in Article 13 of the Lease shall be equivalent to the greater of:

A.  Eighty percent (80%) of the Fair Market Rental Value of the Demised Premises
at the end of the primary term, exclusive of any and all improvements then existing
on the Demised Premises (called the "FMV"), as determined by written agreement
of Landlord and Tenant; or

B.  During the first five-year option, Tenant shall pay monthly rent of $16,032.58.

      14.     The ORA continues: "The annual rental that shall be payable during each

subsequent extension period after the first extension period shall be increased by an additional

fifteen percent (15%) over the previous period."  (Exhibit D, page 1.)

      15.     The ORA next provides: "Should Landlord and Tenant fail to reach an agreement

in writing as to the FMV …, the FMV shall be estimated by two qualified … real estate appraisers

… one to be appointed and compensated by Tenant and the other to be appointed and compensated by Landlord."  (Exhibit D, page 1.)

16.    Then the ORA states that:

If, … the two appraisers can agree to the FMV not differing by more than 15%, then an average of the two appraisals shall be used for the Fair Market Rental Value of the Demised Premises.  If the two appraisals differ by more than 15%, then the two appraisers shall appoint a third appraiser…  The three appraisers so appointed shall then … estimate, by means of a letter opinion of value, the FMV.  The decisions of the appraisers, or a majority of them, shall be binding upon the parties.  If the appraisers, or a majority of them, cannot agree on the FMV, it shall be determined by adding all three estimates and dividing the total of all three estimates by the number three.

(Exhibit D, page 1.)

17.    The ORA continues:

If one of the parties fails to chose [sic] an appraiser within the specified time period or fails to cooperate in any way so that the process described above cannot be completed prior to 120 days of the expiration of the primary term of this Lease, the FMV of the one appraiser chosen by the cooperating party shall be used to determine the rent during the extension periods.

(Exhibit D, page 2.)

18.    The ORA also contains instructions for the appraisers: "The rental value shall be established based upon a definition of Fair Market Rental Value as the price which an average well-informed tenant would pay and an average well-informed landlord would accept, exclusive of Tenant's improvements, knowing all of the uses to which the property can be put, without duress on either party."  (Exhibit D, page 2.)

19.    The ORA further provides:

The standard market data approach technique for valuing vacant land shall be used by the appraisers.  All comparable leases shall be appropriately adjusted, and the written reports shall indicate the reasons for the adjustment so made.  If adequate comparable leases are not available, then a land residual technique, as defined by the American Institute of Real Estate Appraisers, shall be used.  The real estate income component used in the residual

technique shall be economic rental for hypothetical improvements, but in no event shall any business income be considered in the analysis.

(Exhibit D, page 2.)

Overview of the Party-Appraisers' Appraisals

20.     Here, McDonald's appraiser, Sharon Locatell, estimated the FMV at $350,000 per year (making the rent, at 80% thereof, during the first five-year option term, $280,000 annually). Vanderbilt's appraiser, Thomas Tener, estimated the FMV at $1,348,000 per year (making the 80% rent during the first five-year option term $1,078,400).  But this difference does not establish a failure to cooperate, on the part of either party.  It only proves an honest difference of opinion between two professional appraisers.

21.     As a threshold matter, the ORA explicitly provides that the Premises are to be valued as if vacant "knowing *all* of the uses to which the property can be put…".  Exhibit D, page 2 (emphasis added.)  Of course, zoning and other laws regulating the improvement of real property (in effect on the commencement of the first option term) control the universe of uses to which the property can be put.  It is therefore clear from the text of the ORA that the drafter of the ORA wanted "all" the legal uses under zoning and related laws to be considered by the appraisers.  Full stop.  However, as discussed in more detail below, McDonald's has taken the position that under *936 Second Ave. L.P. v. Second Corp. Dev. Co*., 10 N.Y.3d 628 (2008), the fact that the Lease has a limited term, and that, in McDonald's view, the full zoning potential of the property cannot be feasibly exploited over the remaining term of the Lease, means that the appraisers must **not** take into account all the uses allowable.  This is a perverted reading of *936 Second Avenue,* which really requires that use limitations in a lease be taken into account, and in any event not when doing so contravenes the express terms of the Lease, as that ends up frustrating rather than implementing the intent of the drafter.  Again, here the Lease (via the ORA) explicitly requires that "all" uses be

considered by the appraisers (and all lawful uses are explicitly allowed under the Lease.) Nevertheless, as discussed more fully below, in a good faith effort to resolve the matter, Vanderbilt — without prejudice to its contention that McDonald's misreads *936 Second Avenue* — agreed that its appraiser would take into account the remaining term of the Lease.

22.     The difference of opinion between the party-appraisers resulted because, once it was agreed (again without prejudice) that the Lease term would be considered, the two appraisers disagreed over the highest and best use to which the (hypothetically vacant) property could feasibly be put during the remaining twenty-year option term.

23.     Ms. Locatell concluded that the highest and best use to which the (hypothetically vacant) property could be put was as it is currently used, namely a "pad rental site" for a quick service restaurant with ground level customer parking or other similar tenant.  In other words, relying on *936 Second Avenue*, Ms. Locatell explicitly refused to consider "all" uses to which the property could be put, because she believed that the property had already been improved to the highest and best use to which it could feasibly be put over the remaining term of the Lease.

24.     Thus, Ms. Locatell relied on *936 Second Avenue* to read out of the ORA the words "knowing all of the uses to which the property can be put."  This was wrong.  The ORA drafter knew, when the drafter drafted the ORA, that only 20 years would remain as of the end of the original term, and would never have expressly directed the appraisers to consider "all of the uses to which the property could be put," if the drafter intended that those very uses then not be considered based on the twenty years remaining under the Lease.  Had that been the ORA drafter's intent, the drafter would have written "knowing all of the uses to which the property can be *feasibly put over the remaining term of the Lease*."

25.     Putting aside the tension between the express terms of the ORA and applying *936 Second Avenue* to make the remaining term a limiting condition, in coming to the conclusion she did, Ms. Locatell indefensibly considered the remaining term as five years rather than twenty years, because only the first of the four five-year option terms had been exercised.  But all four optional terms remain solely in McDonald's control.  Ms. Locatell's assumption was blatantly wrong.

26.     Under the zoning law applicable to the Premises in 2019 when the first option term commenced, the leased premises could be developed for a building of up to two stories.

27.     In contrast to Ms. Locatell, Mr. Tener (Vanderbilt's appraiser) concluded that the highest and best use to which the (hypothetically vacant) property could be put, would be to develop it to the full extent allowed under applicable zoning law as a two-story retail project.  That is, Mr. Tener concluded that because the maximum zoning potential of the property was only a two-story structure, such a small, inexpensive structure could be feasibly built by a tenant who had only twenty years of remaining term.

28.     To be clear, both party-appraisers agreed that what the zoning law allowed was a higher and better use than the degree to which the land is now improved.  However, while Mr. Tener believed that higher and better use could be feasibly developed with twenty years of term left, Ms. Locatell believed that the full zoning potential could not be feasibly exploited within the remaining term (which she erroneously said was only five years).  I elaborate on this disagreement below but, again, say that *936 Second Avenue* cannot be applied as McDonald's contends it should be, because doing so contravenes the express terms of the ORA.

<u>McDonald's Blocks the Agreed-upon Neutral Appraiser from Resolving the Dispute in Blatant
Violation of a 2019 Amendatory Agreement, and Pays Only the Original Term Rent, Refusing to
Pay even the Rent Determined by its Own Appraiser</u>

29.     Because the party-appraisers' FMV estimates differed by more than fifteen percent,
the party-appraisers discussed and agreed upon a neutral third party appraiser — namely, Marc
Nakleh.  While there is no dispute that the two party-appraisers designated Mr. Nakleh to be the
third appraiser (the parties actually agreed in writing in 2019 to his designation and engagement as
discussed below), McDonald's has refused to engage Mr. Nakleh as and when unconditionally
required under such 2019 agreement.

30.     Indeed, on September 16, 2019, the parties signed an agreement on McDonald's
letterhead (the "September 2019 Agreement"), which, among other things, designated Mr. Nakleh
as the agreed upon third appraiser and unconditionally obligated both parties to "engage" Mr.
Nakleh within 21 days, *i.e.*, by October 7, 2019.  A true copy of the September 2019 Agreement
appears at <u>Exhibit AA</u>.

31.     To be clear, though the parties, at the time of the September 2019 Agreement, had
not agreed upon the procedures to be followed by the three appraisers (including most notably how
and when the appraisers collaborated, as discussed below), the parties nevertheless expressly
agreed, *without condition or qualification,* that they each would "engage" Mr. Nakleh within 21
days of the September 2019 Agreement, or by October 7, 2019.  There is no dispute that Vanderbilt
was committed to engaging Mr. Nakleh by October 7, 2019 but McDonald's refused to do so.

32.     McDonald's however did not, as it could have, seek a court order tolling or staying
its time to perform its unconditional express obligation under the September 2019 Agreement to
"engage" Mr. Nakleh by October 7, 2019, pending the resolution of the parties' dispute over
procedures.  Instead, McDonald's simply allowed the deadline to pass, refusing to engage Mr.

9

Nakleh.  This was a clear-cut violation of the September 2019 Agreement and as such a "failure to cooperate" on the part of McDonald's.

33.     By refusing to engage Mr. Nakleh as and when required under the September 2019 agreement, McDonald's blocked the ORA's mandatory dispute resolution process from proceeding. Had McDonald's complied with the ORA, as modified by the September 2019 agreement, the parties would have engaged the neutral third appraiser by October 7, 2019, and permitted him to resolve the parties' dispute and set the FMV, as required by the ORA.  But McDonald's flouted the ORA as modified by the September 2019 agreement by refusing to engage the third, neutral appraiser and suing in this Court (in November 2019) for a declaration that Vanderbilt failed to cooperate and, as a result, that Ms. Locatell's opinion alone would set the FMV.  As noted, McDonald's did not seek, let alone obtain, from this Court, in furtherance of this action, an order staying or tolling its unconditional obligation under the September 2019 agreement to engage Mr. Nakleh by October 7, 2019.  That is, McDonald's volitionally decided to violate the September 2019 agreement.

34.     McDonald's may now complain that it was somehow excused from engaging Mr. Nakleh by October 7, 2019 because the parties had not by then resolved their dispute over the appraisal procedures (mainly "collaboration"); however, that excuse falls flat.  McDonald's knew full well about the procedures dispute when it signed the September 2019 Agreement and easily could have written that the obligation to engage Mr. Nakleh would have to await the resolution of the dispute over procedures.  But Vanderbilt bargained for and got a firm outside date as a deadline for Mr. Nakleh's engagement.  McDonald's then simply decided to flout that agreement.  That was a failure to cooperate by McDonald's.

35.     As a result, though we are more than halfway through the first five-year option term (which runs from 2019 to 2024), not only has the FMV still not been determined — and it was supposed to have been set in 120 days under the ORA's streamlined mandatory dispute resolution procedure — but worse, during all that time, McDonald's, a $175 billion corporate behemoth, has paid only the last rent payable under the original term ($16,032.58 per month), refusing to even pay the rent determined by its own party-appraiser, Ms. Locatell ($23,333.33 per month).   Said differently, McDonald's currently pays nearly a third less rent than its own appraiser says it should pay.

36.     By blocking the third appraiser from resolving the dispute for all this time, McDonald's, in addition to defaulting under the September 2019 agreement, betrayed its concern that Ms. Locatell's appraisal would not be found persuasive by Mr. Nakleh, and correspondingly that Mr. Tener's appraisal might be found persuasive by Mr. Nakleh.

37.     If McDonald's truly believed in the credibility of Ms. Locatell's estimate of the FMV — and the supposed lack of credibility of Mr. Tener's estimate — then McDonald's would be as anxious to have the neutral third appraiser resolve the dispute between the party-appraisers as Vanderbilt is.   Clearly, McDonald's does not have confidence that the neutral third appraiser would decide in its favor.   That McDonald's refused to engage Mr. Nakleh in contravention of the September 2019 agreement, and filed this action to stop the ORA's mandatory dispute resolution process from continuing (again without seeking an order tolling its time to engage Mr. Nakleh), demonstrates that, despite its bravado, McDonald's is not confident in Ms. Locatell's work.

38.     It is therefore McDonald's, not Vanderbilt, that has failed to cooperate in the ORA's mandatory dispute resolution process.   Hence, the Court should grant summary judgment to Vanderbilt and rule that McDonald's, not Vanderbilt, failed to cooperate.   The Court should direct

that the FMV be set at Mr. Tener's estimated $1,348,000 annually (making the rent during the first five years of the option term $1,078,400).

The FMV Appraisal Process

39.     On May 10, 2018 Vanderbilt commenced the process for setting the rent under the ORA by writing to McDonald's stating that Vanderbilt had estimated the FMV of the Premises at $975,000, making the rent for the first five-year extension period $780,000.  (*See* Exhibit G.)  On April 15, 2019, McDonald's wrote to Vanderbilt and noted the parties could not agree on the FMV and commenced the appraisal process contemplated by the ORA by appointing Sharon Locatell as McDonald's appraiser.  (*See* Exhibit O.)  Thereafter, Vanderbilt appointed Thomas Tener as its appraiser.

40.     Ms. Locatell and Mr. Tener then prepared their respective estimates of the FMV of the Premises, which differed by more than fifteen percent.  In compliance with the mandatory dispute resolution process specified in the ORA, Ms. Locatell and Mr. Tener agreed to designate Marc Nakleh as the neutral third appraiser (which, as noted above, the parties later memorialized in the September 2019 agreement).  As stated above, McDonald's (in contravention of the September 2019 Agreement) refused to move forward with engaging Mr. Nakleh as the appraiser claiming that Vanderbilt has to agree to a process by which Mr. Nakleh would perform his duties as the neutral third appraiser.

The June 19, 2019 Meeting

41.     With the parties at a standstill, a meeting was scheduled in the office of Vanderbilt's counsel, Morris Missry of the law firm Wachtel Missry, on June 19, 2019 (the "June 2019 Meeting").  In addition to Mr. Missry and myself, the meeting was attended by Carol DeMarco, an

12

asset manager at McDonalds, Michael Meyer, an in-house attorney for McDonald's, Tom Li, an agent for Vanderbilt, Ms. Locatell and Mr. Tener.

42.     At this meeting, the parties, their counsel, and their respective party-appraisers discussed each side's Letter Opinion of Value.  Mr. Tener's Letter Opinion of Value dated April 15, 2019 estimated the FMV at $1,348,000 (making the rent at 80% thereof for the first five-year option period $1,078,000) and appears at Exhibit 32 hereto.  Ms. Locatell's Letter Opinion of Value dated June 17, 2019 estimated the FMV of the Premises at $350,000 per annum (making the rent for the first five-year option period $280,000) and appears at Exhibit W hereto.

43.     During the June 2019 meeting, McDonald's in-house counsel, Michael Meyer, argued that Mr. Tener's April 15, 2019 estimate of the FMV was improperly prepared because it did not follow the rule stated in *936 Second Ave. L.P. v. Second Corp. Dev. Co*., 10 N.Y.3d 628 (2008).  In that case, the Court of Appeals held that, on the facts present there, "*absent an agreement to the contrary*, the effect of a net lease must be considered in valuing property for the purpose of setting rent for a renewal lease term."  *Id.* at 633 (emphasis added).

44.     Notably, nothing in the ORA requires that the term of the Lease (or the encumbrance represented by the Lease) should be considered in determining the FMV.  To the contrary, as I mentioned above, the ORA requires the exact opposite, by expressly stating that the appraisers must consider "all of the uses to which the property can be put."

45.     Prior to the June 2019 Meeting, and in light of the ORA's failure to address this question, Mr. Tener asked Vanderbilt's counsel, Morris Missry, if Mr. Tener should apply the rule in *936 Second Avenue* to his FMV appraisal.  In response, Mr. Missry told Mr. Tener that *936 Second Avenue* did not apply to the FMV appraisal.  (*See* Exhibit 31.)  After hearing Mr. Meyer's presentation at the June 2019 Meeting, however, Vanderbilt agreed — in the spirit of cooperation

and in an effort, without prejudice, to break the impasse — to instruct Mr. Tener to redo his appraisal and apply the rule set forth in *936 Second Avenue*.  Mr. Tener completed his redone appraisal on July 30, 2019 (the "Final Tener Appraisal").  A true copy of the Final Tener Appraisal appears at <u>Exhibit SS</u>.  Mr. Tener's conclusion that the annual FMV of the Premises was $1,348,000 did not change in the Final Tener Appraisal.

46.    Meanwhile, Mr. Missry on behalf of Vanderbilt, and Mr. Meyer on behalf of McDonald's, began to discuss a way to move the mandatory FMV dispute-resolution process forward.  Ultimately, on September 16, 2019, McDonald's and Vanderbilt signed the September 2019 Agreement, printed on McDonald's' letterhead, that outlined the process by which the mandatory FMV dispute-resolution process would continue to move forward.  (*See* Exhibit AA.)

47.    The September 2019 Agreement provides in relevant part (emphasis added):

1.    Within three (3) weeks from the date of this letter, each Party's appraiser will send to the other Party's appraiser his or her respective (i) updated letter opinion of value estimating each appraiser's Fair Market Rental Value as defined in the Option Rent Addendum and stating the methodology of valuation and conclusions; and (ii) identifying the comparable transactions on which the conclusions are based.
*** 
3.    The Parties have selected Mark [sic] Nakleh as the third appraiser pursuant to the terms of the Lease **and agree to engage Mr. Nakleh within 21 days of this agreement.**  The parties further agree that their appraisers shall jointly communicate with Mr. Nakleh that the Parties intend to retain him upon agreement regarding the process set forth in the Lease. Neither Party, their appraisers, nor other representatives shall engage in ex parte oral or written communications with the third appraiser without the presence of the other Party or its representative.

 (Exhibit AA, page 1).

48.    Ms. Locatell prepared an updated letter opinion of value dated September 20, 2019 (the "Final Locatell Appraisal").  A true copy of the Final Locatell Appraisal appears as <u>Exhibit BB</u>.  In late September 2019, well within the three-week period specified in the September 2019 Agreement, Mr. Tener and Ms. Locatell met in Ms. Locatell's office.  At this meeting Mr. Tener

and Ms. Locatell exchanged the Final Tener Appraisal and the Final Locatell Appraisal.  Ms. Locatell did not change her estimate of the FMV of the Premises at $350,000 per annum in the Final Locatell Appraisal.

49.     As mentioned above, the nub of the dispute between Ms. Locatell and Mr. Tener is that while both agree the Premises, assumed vacant, could be developed under prevailing zoning laws to a substantially greater degree than the current improvements, Mr. Tener believes the maximum improvement allowed under zoning law could be feasibly constructed and the investment returned with a profit with only 20 years of remaining term, while Ms. Locatell believes the remaining term is too short to make that development feasible.  Thus, the appraisers understandably disagree on FMV because even taking the rule of *936 Second Avenue* into account (and Vanderbilt does not concede it applies though it "agreed" to apply the rule), the appraisers disagree on the economic feasibility of making those improvements given the remaining term.

50.     However, notably, while Mr. Tener appropriately took into consideration the four five-year option terms (for a total of 20 years), Ms. Locatell erroneously took only the first five-year term into account.[2]  All four terms are controlled by McDonald's.  That is, if McDonald's exercises the successive renewals, it is entitled to a remaining term of 20 years.  Nevertheless, even backtracking on the term length (*see* Deposition of Sharon Locatell at page 45),[3] Ms. Locatell disagrees with Mr. Tener's conclusion that the zoning potential could be feasibly exploited with 20 years of remaining term.  This of course is precisely the sort of technical appraisal dispute the parties agreed would be expeditiously resolved by Mr. Nakleh.

---

[2]  The Final Locatell Appraisal states: "We are specifically tasked with determining the FMV of the subject land as unimproved based on highest and best use, and in consideration of a 5-year renewal term and other provisions of the lease."  (Exhibit BB at page 2.)

[3]  A copy of the transcript of Ms. Locatell's deposition testimony is attached as Exhibit FFF to the accompanying Declaration of Howard S. Koh dated April 29, 2022 ("Koh Declaration").

51.    Despite the unconditional obligation to which each party expressly agreed, in the September 2019 Agreement, to "engage" Mr. Nakleh by October 7, 2019, McDonald's refused to engage Marc Nakleh as the third, neutral appraiser within twenty-one days of the September 2019 Agreement (or at any time thereafter).  Instead, McDonald's commenced this action on November 15, 2019.

52.    Since May 2019, the first month after the original term of the Lease expired, McDonald's has paid Vanderbilt rent in an amount equal to the last rent payable under the primary term, *i.e.*, $16,032.58 per month, or $192,390.96 annually, which is nearly $100,000 per year and nearly one-third less than the $280,000 annual rent that even Ms. Locatell estimated.

McDonald's Cannot Carry Its Burden of Proof

53.    I understand that McDonald's must prove its case, and correspondingly Vanderbilt must prove its case.  That is, to win, each party must prove the other party "failed to cooperate."  If one party does so, then its party-appraiser's FMV appraisal alone governs; but if neither party carries its burden of proof, then neither party will have proved that the other "failed to cooperate," and the dispute between the party-appraisers will then have to go to the designated third appraiser, Mr. Nakleh, even though the first option term commenced three years ago and the dispute was supposed to have been resolved within 120 days.  (I suppose it is theoretically possible that each side will be able to prove the other failed to cooperate.  The ORA does not specify what happens in such event, but presumably, in that case, neither side's appraisal alone would govern and the matter would go to the neutral third appraiser.)

54.    Discovery, which is now complete, demonstrates McDonald's cannot show Vanderbilt failed to cooperate.  Despite having collected thousands of documents from Vanderbilt and taken my deposition and the depositions of Vanderbilt's agent Tom Li, Vanderbilt's party-

16

appraiser Tom Tener, Vanderbilt's attorney Morris Missry, and Vanderbilt's expert witness Michael Hedden, McDonald's has not uncovered a scintilla of evidence that Vanderbilt failed to cooperate in the mandatory rent re-set process spelled out in the ORA.

55.     To prove that Vanderbilt "failed to cooperate," McDonald's must show more than a mere disagreement between the party-appraisers; it must show that Vanderbilt directed Mr. Tener to intentionally disregard the standards set forth in the ORA in an effort to manipulate Mr. Tener's conclusion in a manner favorable to Vanderbilt.  In short, given there is no claim that Vanderbilt delayed the mandatory ORA dispute-resolution process and instead moved ahead with it (unlike McDonald's), McDonald's must show that Vanderbilt somehow corrupted the appraisal process.

56.     It bears repeating that Vanderbilt is not charged with proving that Mr. Tener "came to his own conclusions" (though he clearly did); that is, Vanderbilt need not prove that it "**did** cooperate."  Rather, McDonald's must prove that Mr. Tener was somehow improperly influenced by Vanderbilt and that as a result Vanderbilt "failed to cooperate."

57.     McDonald's cannot make this showing.

58.     Though I will not here cite "chapter and verse" on the testimony given by the deponents (which will be detailed by Vanderbilt's attorneys), there is no disputing that Mr. Tener unambiguously testified that he was not told or directed by me, or any other agent of Vanderbilt including Vanderbilt's attorney, Morris Missry, what value conclusion he should reach or even what appraisal method to use.  Consistently, I testified, and am now again affirming under penalty of perjury, I did not direct Mr. Tener to reach any value conclusion or to use any particular appraisal method.  Mr. Li and Mr. Missry likewise testified that they did not seek to influence Mr. Tener as to his conclusion of appraisal method.

17

59.     In other words, this is not a "he said, she said" case, but rather only a "he said" case. There is no conflicting testimony.

60.     Nor did McDonald's uncover any "smoking gun" emails, correspondence or text messages whereby anyone acting on Vanderbilt's behalf sought to improperly influence Mr. Tener. That's because there are no such emails, correspondence or text messages.

61.     Notably, Vanderbilt did not hide behind the assertion of attorney-client privilege. Instead, it produced all the relevant communications that Mr. Missry, Mr. Li, and I had with Mr. Tener.

62.     As explained in detail below and in Mr. Tener's declaration and report, he and Ms. Locatell simply disagreed, most fundamentally, about whether the premises could be developed as a retail site consistent with prevailing zoning law, and have the required investment returned with a reasonable profit during the remaining term. Because Mr. Tener believed the answer to that question was "yes," while Ms. Locatell believed it was "no," the two appraisers undertook different approaches concluding to different FMV values.  That is a simply a disagreement between appraisers — not a failure to cooperate — and exactly the sort of disagreement that the parties plainly agreed would be resolved by the third neutral appraiser in a streamlined, mandatory non-judicial dispute-resolution process.

63.     Plus, as stated above, *936 Second Avenue* does not even apply, to begin with.

64.     Because there is no — and I mean absolutely no — evidence, whether testimony or documentary, that Vanderbilt directed Mr. Tener toward any particular conclusion or even toward any particular appraisal methodology, McDonald's has retreated to a paper-thin, circumstantial "evidentiary showing" — if it can be called that — based on "expert" opinion evidence that Mr. Tener is wrong, and meaningless "motive" evidence.

18

65.     McDonald's has now hired an additional expert appraiser, Amanda Aaron, as has Vanderbilt.  Unsurprisingly, McDonald's' testifying expert says that Tener is wrong and Locatell is right.  But what does this really add?  Which party-appraiser got it right is precisely the question the parties agreed — in a binding and enforceable contract (the ORA, as modified by the September 2019 Agreement) — would be resolved non-judicially by the third appraiser.

66.     Consider the perverse position we are now in: the Court is reduced to considering the opinions of two additional appraisers — neither of whom is the agreed upon third appraiser, Mr. Nakleh — and must assess which one of those two additional appraisers is right in assessing which party-appraiser is right.  But the parties agreed that if the party-appraisers disagreed by 15% or more, as they do, that a single agreed upon third appraiser would decide the matter, respectfully not a Judge relying on the opinions of two other appraisers.

67.     McDonald's also will point out that Vanderbilt hopes one day to redevelop the property to a higher and better use and therefore it wants McDonald's out.  So what?  All landlords want the highest rent possible, and all tenants want the lowest rent possible.  There is nothing inappropriate or wrong in Vanderbilt harboring a desire to maximize its rent, or even in "wanting" McDonald's out.  Indeed, Vanderbilt's wanting to advance its own interests is precisely the motive Vanderbilt is supposed to have.

68.     In short, McDonald's has not been able to uncover a shred of competent evidence demonstrating that Vanderbilt ran a corrupted process and in so doing "failed to cooperate."

69.     Did McDonald's uncover evidence showing that a neutral appraiser might not agree with the conclusions of Vanderbilt's appraiser, Mr. Tener?  Yes.  Did McDonald's uncover evidence that Vanderbilt believed that the highest and best use of the Premises is as a more fully developed retail site, not as a pad rental site?  Yes.  Did McDonald's uncover evidence that

Vanderbilt hopes one day to develop the Premises if and when McDonald's surrenders possession of the property?  Yes.  Vanderbilt has never denied any of this, and none of that evidence enables McDonald's to carry its burden.

70.    For all its bluster, McDonald's has not—and cannot—establish any evidentiary facts showing Vanderbilt failed to cooperate.  All McDonald's can show is that Ms. Locatell and Mr. Tener disagree.

71.    Indeed, if the Court were to entertain McDonald's' "expert opinion" and "motive" evidence and find it sufficient to warrant going to trial, there would be nothing left of the parties' mandatory dispute resolution clause — it would in such case be gutted.  Think about it:  there is literally not a single underlying appraisal factor upon which the two party-appraisers could disagree — propriety of comparables, assumed rates of return or discount rates, highest and best use, etc. — that would not escape the mandatory dispute resolution process and end up adjudicated in a long drawn-out and expensive court battle, exactly what the parties agreed would not happen.  Either party would always be able to say, as McDonald's does here, that the landlord's party-appraiser is not "cooperating" because the landlord harbors a "motive" to get to an undeservedly high rent, and we have found another licensed appraiser who agrees with us.  Nothing would ever make its way to the third appraiser.  The parties' obvious contractual intent would be endlessly frustrated.

72.    At bottom, Vanderbilt simply wants to have the rent at the property reset.  At that point McDonald's will either have to pay that rent or leave the Premises.  If, after the rent is reset, McDonald's chooses to pay that rent, then McDonald's will have the right to remain at the Premises for the remainder of the twenty-year optional term, unless Vanderbilt can induce McDonald's to leave by buying out McDonald's lease rights.  True, under the right circumstances, Vanderbilt might *propose* a buyout amount that McDonald's finds acceptable.  But McDonald's never has to accept

20

such a proposal, so there is nothing "non-cooperative" about this.  In fact, such lease buyouts happen every day. That a lease buyout might be one business strategy Vanderbilt will consider proves nothing about whether Vanderbilt cooperated.

73.     The inconvenient truth is that McDonald's has failed to cooperate by refusing to engage the neutral third appraiser as and when the parties agreed they would do so, and by filing this action to prevent the Option Rent Addendum's mandatory dispute resolution process from running its course, all without seeking an order tolling McDonald's unconditional contractual obligation to have engaged Mr. Nakleh by October 7, 2019 under the September 2019 Agreement. Thus, the Court should grant Vanderbilt summary judgment dismissing the Complaint and grant Vanderbilt summary judgment on its Counterclaim.

The "Collaboration" Issue is a Red Herring

74.     Although McDonald's did not focus extensively on the issue during discovery, McDonald's' complaint alleges that Vanderbilt "failed to cooperate" when its lawyer, Morris Missry, offered his view that the ORA required the three appraisers to separately issue their opinions on the FMV.   McDonald's conversely contended that the three appraisers could collaborate before the third appraiser issued his opinion of FMV.  *See* Complaint ¶¶ 54-56, 85-94.

75.     As stated above, the ORA provides in relevant part:

> If, … the two appraisers can agree to the FMV not differing by more than 15%, then an average of the two appraisals shall be used for the Fair Market Rental Value of the Demised Premises.  If the two appraisals differ by more than 15%, then the two appraisers shall appoint a third appraiser…  The three appraisers so appointed shall then … estimate, by means of a letter opinion of value, the FMV. The decisions of the appraisers, or a majority of them, shall be binding upon the parties.  If the appraisers, or a majority of them, cannot agree on the FMV, it shall be determined by adding all three estimates and dividing the total of all three estimates by the number three.

 (Exhibit D, page 1.)

76.     In other words, the ORA prescribes a process whereby initially, when only the two party-appraisers are involved, they at first collaborate and see if they can each agree upon a FMV that does not differ from the other's (then unwritten) FMV assessment by more than 15% and if that happens, the average of the two party-appraisers' unwritten FMV assessments governs.  But, if the two party-appraisers' unwritten FMV assessments differ by more than 15%, then they must agree upon a third neutral appraiser.  Once the third neutral appraiser is agreed upon and engaged, then "the three appraisers so appointed shall then … estimate by means of a letter opinion of value, the FMV."  Thus, it is only once a third appraiser is appointed that each of three appraisers (including the two party-appraisers) issue their respective *written* FMV opinions.

77.     When it comes time to issuing their written FMV assessments, the ORA does not state that the three appraisers should collaborate, nor does it state that they should issue their written FMV opinions only after meeting with the other appraisers.  While, to be fair, the ORA does not explicitly ban collaboration, the drafter of the ORA was clear when describing the earlier (unwritten FMV assessment) process — between the two party-appraisers — that they should see if "they can agree" upon FMV values that do not differ by more than 15%.  Notably the words "if they can agree" do not appear in the relevant ORA text when it describes the process of the three appraisers issuing written FMV opinions (in the event the two party-appraisers determining they cannot agree on FMV values that do not differ by more than 15% and the third appraiser is appointed).  In other words, though the ORA drafter did not use the word "collaborate" or "consult," the drafter made clear through the words "if they can agree" when a collaborative unwritten process was contemplated and did not use those words when a non-collaborative written process was contemplated.

78.     Once the three appraisers issue their respective written FMV opinions, the ORA calls for them to collaborate (once again), stating: "the decision of the appraisers or a majority of them, shall be binding upon the parties.  If the appraisers, or a majority of them, *cannot agree on the FMV,* [an average of the three written FMV opinions controls]."  (Exhibit D, page 1.)

79.     In other words, the ORA contemplates initially a collaborative process between the two party-appraisers to see if they can reach agreement on unwritten FMV assessments that do not differ by more than 15%, and if that fails, a non-collaborative process by which each of the then three appraisers separately issues written FMV opinions, followed by a collaborative process in which an attempt is made to have at least two of the three appraisers reconcile their potentially disparate views and agree on a single FMV, and if that fails, an average of the three written FMV opinions controls.  That is, the drafter wanted to be sure that if the average needed to be employed, it would be an average of each appraiser's *independent* FMV opinion uncolored by the opinions of the other two appraisers.

80.     In short, Mr. Missry's reading of the ORA was not wrong.

81.     In any event, after the June 2019 Meeting (at which the collaboration issue was discussed), McDonald's insisted on a further written agreement before proceeding.  That agreement, dated September 16, 2019, modified the ORA in part.  This later agreement specifies, in relevant part, that the two party-appraisers would issue "updated" written FMV opinions (following the parties' agreement, without prejudice, at the meeting that the *936 Second Avenue* case would be followed), and that those written party-appraiser FMV opinions would disclose "methodology of valuations" and identify the "comparables" used.

82.     The September 2019 Agreement went on to require that following the issuance by the party-appraisers of their updated written FMV opinions, they would engage in discussions in

an attempt to agree on FMV.  The agreement also specified that the parties agreed to appoint Marc Nakleh as the third appraiser and explicitly — and unconditionally — agreed they would "engage" him within 21 days of September 19, 2019, *i.e.*, by October 7, 2019.

83.     Betraying its concern that the third appraiser would agree with Mr. Tener — and demonstrating the parties were actively considering/debating their respective views on the collaboration issue when they signed the September 2019 Agreement — McDonald's insisted that the September 2019 Agreement specify that the two party appraisers would not have any "ex parte" communications with the third appraiser, and that neither would release their written FMV opinion to the third appraiser unless and until both parties agreed in writing that the party-appraisers' updated written FMV opinions could be disclosed to the third appraiser.  McDonald's insistence was contrary to the terms of the ORA.

84.     McDonald's then breached the September 2019 Agreement by refusing to engage Mr. Nakleh within 21 days (or ever).

85.     However one interprets the ORA on the "collaboration" issue, it is undisputed that Mr. Missry's view was that, following the two party-appraisers being unable to reach agreement on FMV values that do not differ by more than 15%, the third appraiser would issue his written FMV opinion, and then they "can discuss it" and failing a majority agreement the average governs. (Deposition of Morris Missry at page 187.)[4]

86.     In sum, at a minimum, the ORA is reasonably susceptible of an interpretation that, following the failure of the party-appraisers to reach agreement on FMV within the 15% disparity tolerance, the three appraisers then each non-collaboratively issue their written FMV opinions, and only thereafter collaboratively attempt to reach a "majority" agreement.  This way, the ORA drafter

---

[4]  A copy of the transcript of Mr. Missry's deposition testimony is attached as Exhibit GGG to the Koh Declaration.

assured that if an average was used, it would be an average of each appraiser's independent FMV opinion uncolored by the other appraisers' views.  In all events, Vanderbilt cannot be said to have been non-cooperative by advancing that interpretation.  Regardless, the parties entered into the September 2019 Agreement, which modified the ORA, specifying that the party-appraisers would not interact on an *ex parte* basis with the third appraiser and there is no allegation (let alone evidence) that Vanderbilt failed to comply with that agreement.  However, there is no question that McDonald's breached the September 2019 Agreement by refusing to engage Mr. Nakleh.

87.     Most important of all, regardless of how one interprets the ORA insofar as the collaboration issue is concerned, the parties modified and supplemented the ORA in September 2019 by agreeing in writing: (a) that there would be no *ex parte* conversations between the party-appraisers and the third appraiser, (b) that the party-appraisers would update their FMV opinions, (c) that those updated FMV opinions would not be given to the third appraiser unless and until both parties agreed that could happen, and (d) that Mr. Nakleh would be engaged by the parties by October 7, 2019.

88.     Given that the parties were then actively debating the collaboration issue, and that the September 2019 Agreement carefully preserves their rights in that regard (by banning *ex parte* conversations and the disclosure to the third appraiser of the party-appraisers' updated FMV opinions) and yet, at the same time, unconditionally obligates the parties to engage Mr. Nakleh within just three weeks of the September 2019 Agreement being signed, it is clear that the parties intended to resolve, or at least attempted to resolve, the collaboration issue *after* Mr. Nakleh's engagement.  This only makes sense, as Mr. Nakleh — a neutral appraiser — would have been given the ORA and been able to offer his opinion on the collaboration issue.

89.     But then, McDonald's abruptly breached the clear unconditional mandate of hiring Mr. Nakleh by October 7, 2021, and thus he never got to read and offer his opinion on the collaboration issue.  Instead, McDonald's simply let the October 7, 2019 deadline pass without engaging Mr. Nakleh, and without seeking a Court order tolling its time to perform.  Then on November 15, 2019, McDonald's filed its complaint.  By allowing the agreed deadline to pass without hiring Mr. Nakleh, McDonald's breached the September 2019 Agreement and cut off the agreed upon process for resolving the collaboration issue.  Thus, it is McDonald's not Vanderbilt who failed to cooperate with respect to the collaboration issue.

The M.M.B.-Vanderbilt Ground Lease was Never Requested by the Party-Appraisers Because it is Irrelevant

90.     In its complaint, McDonald's alleges in sum and substance that Vanderbilt as ground lessee had entered into a ground lease with the fee owner, M.M.B., in 2017, "for the sum of $7 million" and that Mr. Tener in 2019 — McDonald's alleges inconsistently — valued the Premises (as of the 2019 commencement of the first option term) at $16.85 million when determining the FMV (rent).  The relevant allegations, taken out of order to make "more" sense, appear below:

27.     Public records indicate that Vanderbilt entered into its 99-year ground lease for the Property with the current fee owner of the Property, M.M.B. Associates, LLC, on November 30, 2017 for the sum of $7 million.

34.     On May 10, 2018—less than six months after it entered into a 99-year ground lease for the Property for the sum of $7 million—Vanderbilt sent McDonald's a letter stating, in pertinent part:

[I]n accordance with the Option Rent Addendum . . . , Landlord has determined that the Fair Market Value of the Demised Premises ("FMV") is $975,000.00.  Therefore, the annual rent payable during the first extension period shall be $780,000.00 (80% of the FMV). If you are in agreement with the determination of FMV kindly acknowledge by signing below.

26

66.     And neither Vanderbilt nor Mr. Tener has explained the basis for their contention that the value of the Property has more than doubled in value in less than a year-and-a-half—from approximately $7 million in November 2017 when Vanderbilt entered into a 99-year lease for the Property, to more than $16 million in April 2019 under Vanderbilt's current analysis.

91.     These allegations are so confused and mistaken, it is difficult to know where to begin.  In the first instance, the M.M.B.-Vanderbilt ground lease was not entered into "for the sum of $7 million" (or for any other sum).  To understand how McDonald's came to make this demonstrably false (presumably mistaken) allegation, some brief background is in order.

92.     Both New York State and New York City charge a transfer tax upon a transfer of real property.  Besides fee ownership interests transferred by deed, the creation and transfer of long-term ground leases qualify as the transfer of taxable real property interests for state and city transfer tax laws.  However, for reasons here irrelevant, no tax is due upon the creation of a ground lease for city transfer tax purposes (because the city charges a commercial rent tax and thus exempts transfer taxes whereas here the rent payments are taxed under the city's commercial rent tax).

93.     While ground leases can be, and often are, transferred (*i.e.*, "assigned") by the ground lessee *after* their creation (the assignee becoming the new ground lessee), and in such cases, the transaction is generally for cash consideration (like deed transfers), the original "entering into" of a ground lease typically does not involve an up-front cash payment (or "key money"), but rather, as with any lease, the payment of periodic (monthly or quarterly, for example) rent during the term of the ground lease.  Nevertheless, because under the state transfer tax laws even the initial creation of a long-term ground lease is a taxable "transfer" of real property, the ground lessor and lessee — upon the entering into of a ground lease — are required to file tax forms (under oath) "valuing" the ground lease and paying the appropriate transfer tax based on such (non-cash) valuation.

94.     Of course, the valuation of a 99 year ground lease involves assessing the "equity" inherent or implied in the lease by estimating how much a buyer would pay for the lease, which, in turn, requires an assessment of the level of rent payable under the lease over time, and the term of the lease, along with other terms of the lease (*e.g.*, assignability).

95.     If a market rental rate for raw land (at a given point in time, based on then inflation rates) is, say, 6 percent of the value of land, and the rent under a newly created ground lease is a bit less than 6 percent, or is fixed at 6 percent but the escalations in rent are moderate over the 99-year term, the lease may be viewed as having some initial "equity" and it is that *implied (non-cash)* equity value — and not cash consideration — that the lessor and lessee will report on the relevant tax filings and pay transfer tax on.

96.     In this case, M.M.B. and Vanderbilt filed state tax forms paying transfer taxes which, by simply dividing the applicable tax rates by the amount of transfer tax paid, yielded a value assigned to the ground lease of approximately $7 million.  (*See* Exhibit 6 hereto.)  As the complaint avers, those tax payments are a public record.

97.     Apparently, McDonald's saw the amount of tax paid and concluded (incorrectly) that $7 million was actually paid in cash by Vanderbilt to M.M.B. upon the entering into the ground lease, and McDonald's thus alleged that the ground lease was entered into "for the sum of $7 million."

98.     That is not true.  Vanderbilt did not pay $7 million or any money to M.M.B. — other than the ongoing rent payable under the ground lease over the term of the ground lease.

99.     The complaint thus erroneously conflates the value of the ground lease with the value of the land.  That is, the ORA requires that the FMV be set at 80 percent of "the Fair Market Rental Value of the *Demised Premises*" as of the commencement of the first option term.  Recall

28

that the Lease was entered into in 1998, two decades before the M.M.B.-Vanderbilt "sandwich" ground lease was entered into, and therefore at that time Anthony Musto (the original lessor) owned the land, and the land was the "Demised Premises." (McDonald's built the building after entering into the Lease with Mr. Musto.) As such, the appraisals by both party-appraisers (Mr. Tener and Ms. Locatell) value the *land* (and the rental value of the land), which has nothing whatever to do with the value of the M.M.B.-Vanderbilt *ground lease*.

100.    If a ground lease, at the time it is entered into, is entered into at a high rental rate in comparison to the value of the land, or at a reasonable rate but the escalations in rent over time are high, or for that matter other terms are onerous (*e.g.*, assignability), the value of the ground lease will be greatly impacted. The point is that the value of the ground lease does not equal — and indeed is largely untethered to — the value of the land.

101.    The entire premise of the complaint — insofar as the $7 million value of M.M.B.-Vanderbilt ground lease is concerned — is just plain wrong. Vanderbilt did not enter into the ground lease "for the sum of $7 million" and the parties' (M.M.B. and Vanderbilt's) valuation of the ground lease at $7 million for transfer tax purposes has no bearing on the valuation of the fee title interest in the land (*i.e.*, the Demised Premises).

102.    Thus, there is no inconsistency between Mr. Tener's "land" valuation in 2019 of $16.85 million and the $7 million "leasehold" valuation on the state transfer tax returns in 2017.

103.    Of course, as a general proposition, the parties to any non-cash real estate transaction — where the transfer taxes are dependent upon a valuation — are typically going to estimate value, within reason, to minimize not maximize transfer taxes. Here, discovery has revealed that originally the transfer tax forms showed a $10 million valuation on the ground lease, and that later, and in the final forms filed with the state, that value was listed as $7 million, and that

is the value upon which the transfer taxes were based and paid.  This shows that the $7 million was not cash consideration but rather a value estimate of the leasehold, which again as nothing to do with the land, and the land is the property interest being valued under the ORA.  *See* Rottenberg Deposition at p. 95-96 and Exhibit 5 hereto.)[5]

104.    I listened (remotely) to the March 24, 2022 pre-motion court conference. McDonald's attorney, Mr. Walsh, switched around entirely McDonald's theory of Vanderbilt's alleged non-cooperation, based on the M.M.B.-Vanderbilt ground lease.  At that conference, Mr. Walsh said, in substance, that rent under the M.M.B.-Vanderbilt ground lease was very close to the rent estimated by Ms. Locatell and that Vanderbilt had failed to cooperate by refusing to turn over the ground lease to Ms. Locatell or for that matter Mr. Tener.

105.    In other words, McDonald's abandoned entirely its mistaken theory, in the complaint, that the ground lease had been entered into "for the sum of $7 million" and that the cash consideration was inconsistent with the nearly $17 million value Mr. Tener had placed on the land in 2019, and instead focused on the rent stated in the 2017 ground lease.  There is no allegation in the complaint about the rent stated in the 2017 ground lease.  In essence, now, under McDonald's' revised theory, the 2017 ground lease is a "comp" that Vanderbilt withheld.

106.    McDonald's is lying.  As discovery shows, Vanderbilt was never asked for the 2017 ground lease, and did not withhold it.

107.    There is no evidence, not a shred, showing that Ms. Locatell requested the M.M.B.-Vanderbilt ground lease, but did not get it.  Not only is there no email or other record of her requesting it, as there surely would be had she in fact wanted it, but worse, there is clear testimony that she believed the 2017 ground lease was irrelevant and would have no impact on her valuation:

---

[5]  A copy of the transcript of my deposition testimony is attached as Exhibit AAA to the Koh Declaration.

Q. Would it surprise you to learn that Vanderbilt Atlantic Holdings was a ground lessee of the subject property?

A. No, that wouldn't surprise me.

Q. And knowing that information, would it effect [sic] your conclusions in your reports in any way?

A. No, not at all.

Q. Did you ever look –

MR. WALSH: I just -- my microphone was muted.  I objected to attempted to object to the form of the previous question.  I just want that on the record.

Q. Did you ever make any attempt to find out who owns the property at 840 Atlantic Avenue by say looking it upon ACRIS?

A. I personally did not.  As a matter of course, the appraiser working on this would have done that.  I know we were given a copy of the lease and given that this assignment was to determine value subject to the lease, that would have been our primary understanding of who the landlord was and who tenant was.  Ms. Benjamin [Ms. Locatell's junior colleague], in her normal course of appraisal work, will typically look up a deed on ACRIS, but I can't tell you whether she did or not.

(Deposition of Sharon Locatell page 174, line 3 to page 175, line 7.)

108.   Moreover, Ms. Locatell's original and updated FMV opinions do not contain any disclaimer language — as they would if McDonald's spoke the truth — that the appraisal was done without the appraiser having been given a copy of the 2017 ground lease.

109.   As for Mr. Tener, he likewise never requested a copy of the 2017 ground lease in connection with either his original or updated FMV assessment.  It is true that before he did his FMV assessment, Vanderbilt asked Mr. Tener to appraise the land (even though Vanderbilt does not own the land).  This appraisal had nothing whatever to do with the FMV opinion.  Vanderbilt simply wanted to know the value of the land without taking into account the 2017 ground lease (because as explained below, Vanderbilt is required to redevelop the land when McDonald's leaves).  Vanderbilt had every right to seek this valuation and it has no bearing on the FMV process.

In connection with that land valuation, Mr. Tener did ask for the 2017 ground lease and Vanderbilt responded that it wanted an independent valuation of the land having nothing to do with the 2017 ground lease.

110.   Then, when Mr. Tener got hired by Vanderbilt to do his FMV opinion pursuant to the ORA, he, like Ms. Locatell, never asked for the 2017 ground lease.

111.   Nor is there any question that McDonald's knew about the 2017 ground lease when its appraiser was rendering her FMV opinion.

112.   After Vanderbilt entered into the 2017 ground lease with M.M.B., I contacted Carol DeMarco, McDonald's Asset Manager for the 840 Atlantic Avenue McDonald's location, to inform her that Vanderbilt had ground leased the property and wanted to try to resolve the then upcoming FMV re-set.  Plus, the recorded real estate records not only reveal that M.M.B. remains the fee owner (there is no deed from M.M.B.) but in addition there is a recorded memorandum of lease disclosing the 2017 ground lease.  All this information was available on ACRIS to McDonald's and both party-appraisers.

113.   In short, neither party-appraiser ever asked Vanderbilt for the 2017 ground lease. Vanderbilt had no reason to and did not withhold it.

114.   And, it is no wonder, neither party-appraiser asked for the 2017 ground lease.  It is completely irrelevant to the FMV.

115.   To understand why the 2017 M.M.B. ground lease is irrelevant, a bit of background on that lease is in order.  The Court should understand that while the M.M.B.-Vanderbilt ground lease runs for 99 years from 2017 when it was entered into (*i.e.*, until 2116), the 1998 Musto-McDonald's Lease runs (with all option terms) for twenty years beyond 2019, until 2039.  Thus, Vanderbilt's ground lease runs 77 years after the McDonald's' Lease ends.  Yet, for the entire time

McDonald's is in possession (presumably until 2039), Vanderbilt's ground lease calls for a dollar-for-dollar pass-through in the rent McDonald's pays Vanderbilt (in other words Vanderbilt remits that rent to M.M.B.).  This only further highlights why the value of the Vanderbilt leasehold interest has no bearing on the value of the Demised Premises.  A true copy of the M.M.B.- Vanderbilt lease appears at Exhibit 4.

116.   While it is true that after McDonald's leaves, the M.M.B.-Vanderbilt lease provides for a sliding scale of rent subject to a floor of $10 per buildable square foot per year or approximately $360,000 per year assuming no change in zoning, the heart of the bargain between M.M.B. and Vanderbilt was that Vanderbilt would re-zone the land to enable a more substantial development once McDonald's leaves.  Indeed, Vanderbilt promised M.M.B. in the ground lease to spend at least $500,000 cash on the re-zoning process. (*See* Exhibit 4 at page 54.)

117.   Of course, once the property is re-zoned by Vanderbilt and McDonald's leaves, Vanderbilt will redevelop the property in accordance with the rezoning.  The rezoning would allow for the property's residential use and would permit a significant increase in the number of buildable square feet.  Thus, the heart of the bargain between M.M.B. and Vanderbilt requires Vanderbilt to rezone and redevelop the land.  Vanderbilt would spend millions redeveloping the land, and of course, that new building would revert to M.M.B. upon the conclusion of the term of the 2017 ground lease.  And, if Vanderbilt is unsuccessful in re-zoning the property, the 2017 ground lease comes to an end no later than 10 years after McDonald's leaves, and Vanderbilt loses all its time and money.  So, yes, there is an accommodative rent specified for the period after McDonald's leaves, while Vanderbilt is redeveloping the rezoned land, but that rent is utterly irrelevant as a "comp" because the ground lease has all these other terms including those compelling Vanderbilt

to spend millions on rezoning and redevelopment and clearly the rent during the construction period was set at an accommodative level.

118.  That is precisely why neither party-appraiser asked for the M.M.B.-Vanderbilt lease when rendering their FMV opinions.

119.  Finally, the Court should understand that, when Vanderbilt entered into the ground lease with M.M.B., I owned an interest in M.M.B.  Thus, the M.M.B.-Vanderbilt transaction was a related-party transaction, further underscoring the questionable probative value of the $7 million leasehold valuation (originally estimated at $10 million) and the irrelevant accommodative rent during the redevelopment period.

120.  In all events, there appears of record on ACRIS a recorded memorandum of the M.M.B.-Vanderbilt lease, a copy of which is attached at Exhibit 6.  That recorded memorandum of lease, which is a public record and as such was readily available to each party-appraiser, unambiguously discloses the existence of the M.M.B.-Vanderbilt lease.  Thus, both party-appraisers must have known of the lease, yet there is no written communication from them asking for the lease, and they each issued their FMV opinions with no disclaimer claiming they sought but did not get this lease, or that the FMV opinions were subject to change based on a future disclosure of the lease.

121.  Again, each party has the burden of proving its case.  Vanderbilt does not need to prove that it did cooperate, McDonald's must prove Vanderbilt did not cooperate.  McDonald's cannot do that on this record.

122.  In short, this claim by McDonald's of Vanderbilt's alleged non-cooperation is knowingly misleading and entirely baseless.

Vanderbilt Has Made an Irrefutable Case of McDonald's Failure to Cooperate

123.   In contrast to McDonald's, Vanderbilt's case rests upon incontrovertible direct evidence.   Vanderbilt's "failure to cooperate" case is based simply on McDonald's failure and refusal to submit the dispute between the party-appraisers to the agreed upon third appraiser, Mr. Nakleh, as and when unconditionally required by the September 2019 Agreement (which modified and supplemented the ORA).

124.   It is clear from even a cursory reading of the ORA that, when it came to a "failure to cooperate," the drafter's focus was on delay:   In relevant part, the ORA provides that a party "fails to cooperate" if that party "fails to cooperate in any way so that the process described above cannot be completed prior to 120 days of the expiration of the primary term of this Lease…". Exhibit D, page 2.)

125.   The primary term expired on April 9, 2019, putting the 120-day mark at August 7, 2019.  It is now nearly three years since the 120-day deadline.

126.    While McDonald's will undoubtedly say that it brought suit, and this Court retained jurisdiction in order to determine whether there was any truth to McDonald's allegation that Vanderbilt had failed to cooperate, that alone does not inoculate McDonald's from a finding that it failed to cooperate.  Vanderbilt does not contend that McDonald's has liability to Vanderbilt under some civil malicious prosecution theory.  Thus, the issue, as I understand it, is not whether Vanderbilt can prove that McDonald's had some ulterior bad faith motive in filing suit — though it plainly did, delaying the rent reset process while it continued to pay the old rent — but rather whether McDonald's acted (or failed to act) "in any way" that violated its obligations under the ORA and September 2019 Agreement, which ended up causing delay.

127.   McDonald's had absolutely no evidence when it filed suit — and still has none now even after discovery has been completed — demonstrating that Vanderbilt failed to cooperate. Indeed, the record here shows just the opposite: that Vanderbilt (unlike McDonald's) acted swiftly and with alacrity at every step of the way to comply with the streamlined deadlines built into the ORA.   Indeed, Vanderbilt went above and beyond its contractual duty to cooperate by making compromises it did not have to make (*e.g.*, agreeing to apply *936 Second Avenue*) in a good faith effort to resolve the dispute.   After Tener completed Vanderbilt's appraisal on April 15, 2019, the parties and their appraisers met at Mr. Missry's office of June 19, 2019.  After agreeing to apply *936 Second Avenue*, Mr. Tener delivered the updated Final Appraisal to Ms. Locatell in late September 2019, and thereafter Vanderbilt sought to get McDonald's to engage Mr. Nakleh as McDonald's had promised to do by October 7, 2019.

128.   But McDonald's refused to engage Mr. Nakleh.

129.   Thus, the case for McDonald's failure to cooperate is "black and white."  As stated above, the parties entered into an agreement — on McDonald's letterhead — on September 16, 2019.   That agreement was entered into after Tener's original FMV valuation was issued, so McDonald's knew of Tener's FMV estimate when it entered into the September 2019 Agreement. That agreement unconditionally states (emphasis added):

> The parties have selected Mark [sic] Nakleh as the third appraiser pursuant to the terms of the Lease and agree to *engage* Mr. Nakleh within 21 days of the date of this agreement.

(Exhibit AA, page 1)

130.   The 21-day deadline lapsed on October 7, 2019 but McDonald's failed and refused to "engage" Mr. Nakleh, who to this day has not been engaged.  McDonald's could have easily written into the September 2019 Agreement that it was excused from engaging Mr. Nakleh if it

concluded, after reviewing Mr. Tener's updated appraisal, that Vanderbilt was "not cooperating." But the agreement contains no such proviso. Instead, there appears an absolute and unqualified obligation of the parties to "engage" Mr. Nakleh by October 7, 2019. That is what Vanderbilt bargained for, that is what McDonald's agreed to, and the September 2019 Agreement modifies the Lease and ORA to reflect that unconditional obligation.

131. Thus, McDonald's "failed to cooperate" by breaching the ORA, as modified and supplemented by the September 2019 Agreement, when, in contravention of that agreement, McDonald's refused to engage Mr. Nakleh.

132. Having drafted the September 2019 Agreement in an unconditional manner with respect to Mr. Nakleh's engagement, and McDonald's having signed that agreement, if McDonald's wanted to bring suit and not engage Mr. Nakleh, it was incumbent upon McDonald's to have sought from this Court an order — in furtherance of the relief it is seeking in this action — staying or tolling its time to engage Mr. Nakleh. This is akin to a "Yellowstone" injunction in New York real estate practice, which tolls a tenant's time to perform while disputes about the nature of the performance are adjudicated. McDonald's counsel surely knows of Yellowstone relief and could easily sought such a tolling order but failed to do so. Having failed to seek much less obtain such a tolling order, McDonald's must live with the unilateral decision it made to breach the ORA, as modified by the September 2019 Agreement. The only conclusion that can be reached from that indisputable breach is that McDonald's "failed to cooperate." What else is an intentional breach but a failure to cooperate?

133. Accordingly, the Court, after dismissing McDonald's claim for the reasons set forth above, should grant Vanderbilt's counterclaim and rule that Mr. Tener's appraisal alone governs the FMV determination.

<u>If the Court Finds that Neither Party Has Carried its Burden, it Should Direct the Parties to Submit the Dispute to Nakleh Instead of Holding a Trial, as Per the Second Circuit Decision</u>

134.   Logically speaking, there are four possible outcomes here.   1) Vanderbilt cooperated but McDonald's failed to cooperate; 2) McDonald's cooperated but Vanderbilt failed to cooperate; 3) both parties cooperated; 4) neither party cooperated.   The ORA deals with the first three possibilities but not the fourth.   That said, it is obvious that if both parties failed to cooperate, neither's appraisal alone governs and the matter must go to the third appraiser.   Thus, in cases 3 and 4, the matter goes to the third appraiser to resolve the dispute.   In cases 1 and 2, the cooperating party's appraisal alone governs.   Of course, the fact that those are the only four possible outcomes, does not mean that there are no issues of fact and that the correct outcome can be determined by the Court now without a trial.

135.   Vanderbilt believes, for the reasons set forth above, that there are no issues of fact precluding the entry now of a summary judgment order dismissing McDonald's claim and granting summary judgment on Vanderbilt's counterclaim (*i.e.*, outcome 1).

136.   Outcome 2 is not now sought by McDonald's as it has stated that it is not now moving for summary judgment in its favor on its claim.   Similarly, outcome 4 (neither party cooperated) is not under consideration now, for the same reason: McDonald's is not now seeking a finding (without the need for a trial) that Vanderbilt failed to cooperate.

137.   That leaves outcome 3 (both parties cooperated).

138.   Of course, the Court may simply conclude that issues of fact exist on both the claim and counterclaim (since Vanderbilt is moving for summary judgment on both).

139.   Should the Court conclude that (A) outcome 3 (both parties cooperated) is the correct result (though it is hard to see how the Court could do so given McDonald's blatant breach of the September 2019 Agreement) or (B) issues of fact exist on <u>both</u> the claim and counterclaim

(thus requiring a trial), Vanderbilt respectfully asks the Court to follow the guidance laid down by the Second Circuit Court of Appeals.

140.   When McDonald's filed suit, while Vanderbilt was aware that McDonald's had refused to cooperate by failing to engage Mr. Nakleh, Vanderbilt, at that long-past point, was willing to look past that claim (*i.e.*, its counterclaim) if it could quickly move the dispute to the agreed upon third appraiser, Mr. Nakleh.  Thus, as the Court is aware, Vanderbilt appealed the Court's decision denying Vanderbilt's earlier motion to dismiss in favor of compelling arbitration as was Vanderbilt's right (I am advised, under 9 U.S.C. § 16(a)(1)(c)).

141.   Though the Second Circuit agreed with and affirmed the Court's decision, it seems the Circuit Court recognized the prospect of discovery eventually substantiating the point being made by Vanderbilt that all that was truly at stake was a technical disagreement between the party-appraisers.  Thus, the Second Circuit wrote:

> We agree with the District Court's interpretation of the lease. Vanderbilt insists that McDonald's has, as a cynical stalling tactic, reframed what is clearly a technical dispute over appraisal methodology as a dispute over the Cooperation Clause…. Therefore, substantially for the reasons stated by the District Court in its Memorandum, we affirm the October 8, 2020 order of the District Court.  We emphasize that this disposition does not preclude the District Court from referring the cause to arbitration at a later stage of the litigation, if warranted by development of the facts and issues in the case.

*McDonald's Corp. v. Vanderbilt Atl. Holdings LLC*, 851 F. App'x 259, 261 (2d Cir. 2021) (Summary Order).

142.   Because the facts developed in discovery strongly support the proposition that there is only a dispute between appraisers, and that McDonald's cannot carry its burden of proving that Vanderbilt failed to cooperate, the Court should, as requested above, dismiss McDonald's' claim. Similarly, for the reasons stated above, Vanderbilt has made out the case on its counterclaim and no issues of fact preclude summary judgment in its favor on its counterclaim.

143.   However, should the Court conclude that issues of fact preclude *both* the dismissal of McDonald's claim and the granting of Vanderbilt's counterclaim, Vanderbilt respectfully asks that the Court consider whether the "development of the facts and issues in the case" is sufficiently advanced (discovery having been completed), in the Court's view, to order the matter referred to Mr. Nakleh, in lieu of, in such event, holding a trial (which would only and substantially further delay the resolution of this matter in contravention of the parties' intent); and, if upon such consideration, the Court agrees that the case is sufficiently so advanced, it in such event enter such referral order.

144.   Of course, should the Court conclude to outcome 3 (that both parties cooperated) that referral would also be in order.

145.   If the Court refers the dispute to the third appraiser, Mr. Nakleh, it should do so together with a direction that *936 Second Avenue* does not apply, as applying the case here contravenes the express direction in the ORA that the appraisers consider "all uses to which the property can be put" and the *936 Second Avenue* holding expressly states that the case should not be read to require the lease restrictions (particularly lease term) be taken into account when the express words of the lease state otherwise.

146.   To be clear, however, if the Court finds that McDonald's cannot carry its burden (of proving that Vanderbilt failed to cooperate) and dismisses McDonald's claim, but finds issues of fact preclude the granting of Vanderbilt's counterclaim (that McDonald's failed to cooperate), Vanderbilt respectfully asks that the trial be held.

Conclusion

147.   McDonald's cannot carry its burden of proof.  There is not a shred of evidence supporting the claim that Vanderbilt failed to cooperate.  All relevant witnesses have testified that

no improper directions were given to Mr. Tener and Mr. Tener has confirmed that his conclusions were his own.  Vanderbilt did not assert privilege and turned over all of Mr. Missry's relevant communications with Mr. Tener.  In all events, the *936 Second Avenue* case does not apply here, as McDonald's urges, as doing so requires that the Court disregard the express terms for the ORA, which call for the appraiser to consider "all of the uses to which the property can be put…"

148.    Similarly, the "collaboration" issue does not raise a triable issue of fact because the text of the ORA supports the reading that the appraisers' written FMV opinions were to be issued non-collaboratively, and in any event, the parties agreed to hire Mr. Nakleh and then address that issue, but McDonald's refused to hire Mr. Nakleh and thus cut off the process.

149.    Nor does the M.M.B.-Vanderbilt ground lease raise a triable issue.  The valuation of the ground lease has nothing to do with the valuation of the land.  Even under McDonald's revised theory, the rent payable under the ground lease is not a "comp."  That rent begins after McDonald's leaves and is an accommodative construction period rent, which recognizes Vanderbilt's multi-million-dollar commitment to re-zone and redevelop the property.  In any event, there is no evidence the party-appraisers sought but were denied the ground lease, both of whom issued their written FMV opinions without any disclaimer mentioning the alleged non-furnishing of the M.M.B.-Vanderbilt ground lease.

150.    In contrast, Vanderbilt has made out an irrefutable case for the granting of summary judgment on its counterclaim.  The parties entered into an agreement on September 16, 2019 unconditionally obligating both parties to engage Mr. Nakleh by October 7, 2019.  McDonald's violated that agreement, which modified and supplemented the ORA, without first seeking a tolling order or stay order from the Court.  As a result, McDonald's caused vast delays and failed to cooperate.

151. In consequence, the Court should enter an order granting Vanderbilt summary judgment dismissing McDonald's claim and granting Vanderbilt summary judgment on its counterclaim, finding that McDonald's failed to cooperate and that Vanderbilt's appraisal alone controls the FMV determination.


I declare under the penalty of perjury that the foregoing is true and correct.

Executed on April 28, 2022

PINCHUS "SAM" ROTTENBERG

42