# EXHIBIT 4

**LEASE**

*BETWEEN*

**M.M.B. Associates, LLC, as Landlord**

*AND*

**Vanderbilt Atlantic Holdings LLC, as Tenant**

*FOR PREMISES LOCATED AT:*

**840 Atlantic Avenue**

**Brooklyn, New York**

---

{Ground Lease - Execution Version / 01692902.DOCX /}

Exhibit
P4

VA 010103

Table of Contents

|  |  | Page |
|---|---|---|
| **1.** | **DEFINITIONS** | 1 |
| **2.** | **TERM** | 20 |
| **3.** | **RENT** | 20 |
| | 3.1 *Fixed Rent* | 20 |
| | 3.2 *Fair Market Value Determination* | 21 |
| | 3.3 *Payment, Proration; Etc.* | 22 |
| | 3.4 *Additional Rent* | 22 |
| | 3.5 *No Offsets* | 23 |
| | 3.6 *Prepaid Fixed Rent* | 23 |
| | 3.7 *Transfer Taxes* | 23 |
| **4.** | **ADDITIONAL PAYMENTS BY TENANT; REAL ESTATE TAXES** | 23 |
| | 4.1 *Landlord's Net Return* | 23 |
| | 4.2 *Real Estate Taxes* | 24 |
| | 4.3 *Assessments in Installments* | 24 |
| | 4.4 *BID Decisions* | 24 |
| | 4.5 *Direct Payment by Landlord* | 24 |
| | 4.6 *Utilities* | 24 |
| **5.** | **USE** | 24 |
| | 5.1 *Permitted Use* | 24 |
| | 5.2 *Exclusive Control* | 25 |
| | 5.3 *Management Fees* | 25 |
| **6.** | **COMPLIANCE** | 25 |
| | 6.1 *Generally* | 25 |
| | 6.2 *Copies of Notices* | 25 |
| **7.** | **MAINTENANCE AND CONSTRUCTION** | 25 |
| | 7.1 *Obligation to Maintain* | 25 |
| | 7.2 *Construction* | 26 |
| | 7.3 *Plans and Specifications* | 26 |
| | 7.4 *Excavations* | 26 |
| | 7.5 *Applications* | 26 |
| **8.** | **PROHIBITED LIENS** | 27 |
| | 8.1 *Tenant's Covenant* | 27 |
| | 8.2 *Protection of Landlord* | 27 |

VA 010104

|  |  |  | Page |
|---|---|---|---|
| **9.** | **HAZARDOUS SUBSTANCES** | | 27 |
| | 9.1 | *Restrictions* | 27 |
| | 9.2 | *Compliance; Clean-Up* | 27 |
| **10.** | **INDEMNIFICATION; LIABILITY OF LANDLORD** | | 28 |
| | 10.1 | *Obligations* | 28 |
| | 10.2 | *Liability of Landlord* | 29 |
| | 10.3 | *Indemnification Procedures* | 29 |
| | 10.4 | *Indemnification Survival* | 30 |
| **11.** | **RIGHT OF CONTEST** | | 30 |
| | 11.1 | *Tenant's Right; Contest Conditions* | 30 |
| | 11.2 | *Landlord Obligations and Protections* | 31 |
| | 11.3 | *Miscellaneous* | 31 |
| | 11.4 | *Contest Security* | 31 |
| **12.** | **INSURANCE** | | 32 |
| | 12.1 | *Tenant to Insure* | 32 |
| | 12.2 | *Nature of Insurance Program* | 32 |
| | 12.3 | *Policy Requirements and Endorsements* | 32 |
| | 12.4 | *Deliveries to Landlord* | 32 |
| | 12.5 | *Tenant's Inability to Obtain Insurance* | 33 |
| | 12.6 | *Waiver of Certain Claims* | 33 |
| | 12.7 | *No Representation* | 33 |
| | 12.8 | *Additional Insurance* | 33 |
| **13.** | **LOSSES AND LOSS PROCEEDS** | | 34 |
| | 13.1 | *Loss* | 34 |
| | 13.2 | *Total Loss With Regard to Condemnation* | 34 |
| | 13.3 | *Termination Option Loss* | 34 |
| | 13.4 | *Revaluation* | 34 |
| | 13.5 | *Temporary Condemnation* | 34 |
| | 13.6 | *Restoration* | 34 |
| | 13.7 | *Disbursement* | 34 |
| **14.** | **REPRESENTATIONS AND WARRANTIES** | | 35 |
| | 14.1 | *Due Authorization and Execution* | 35 |
| | 14.2 | *No Litigation* | 35 |
| | 14.3 | *No Pending Condemnation* | 35 |

Table of Contents (continued)

Page

|   |   |   |   |
|---|---|---|---|
| | 14.4 | *FIRPTA* | 36 |
| | 14.5 | *No Other Tenants* | 36 |
| | 14.6 | *Prohibited Party* | 36 |
| **15.** | **LANDLORD'S TRANSFERS** | | 36 |
| | 15.1 | *Landlord's Right to Convey* | 36 |
| | 15.2 | *Release of Landlord* | 36 |
| **16.** | **FEE MORTGAGES** | | 36 |
| | 16.1 | *Fee Mortgage* | 36 |
| | 16.2 | *Successor to Landlord* | 37 |
| | 16.3 | *Notices and Cure Rights of Fee Mortgagee* | 37 |
| **17.** | **TENANT'S TRANSFERS** | | 37 |
| **18.** | **SUBLEASES** | | 38 |
| | 18.1 | *Tenant's Right* | 38 |
| | 18.2 | *Assignment of Subrents* | 38 |
| | 18.3 | *Required Provisions* | 38 |
| | 18.4 | *Conditions to Effectiveness of Certain Transactions* | 39 |
| **19.** | **EXISTING TENANTS** | | 39 |
| **20.** | **LEASEHOLD MORTGAGES** | | 39 |
| | 20.1 | *Leasehold Mortgages* | 40 |
| | 20.2 | *Lease Impairments* | 40 |
| | 20.3 | *Notices* | 40 |
| | 20.4 | *Opportunity to Cure* | 40 |
| | 20.5 | *Cure Rights Implementation* | 40 |
| | 20.6 | *New Lease* | 40 |
| | 20.7 | *Tenant's Rights* | 41 |
| | 20.8 | *Certain Proceedings* | 42 |
| | 20.9 | *No Merger* | 42 |
| | 20.10 | *No Personal Liability* | 42 |
| | 20.11 | *Multiple Leasehold Mortgagees* | 42 |
| | 20.12 | *Further Assurances* | 42 |
| | 20.13 | *Miscellaneous* | 43 |
| **21.** | **INTENTIONALLY OMITTED** | | 43 |
| **22.** | **QUIET ENJOYMENT; ACCESS AND INSPECTION; TITLE** | | 43 |

VA 010106

Page

22.1    Quiet Enjoyment ............................................................................................... 43
22.2    Access and Inspection ...................................................................................... 43
22.3    Title .................................................................................................................. 44

23.    EVENTS OF DEFAULT; REMEDIES ....................................................................... 44

23.1    Definition of "Event of Default" ..................................................................... 44
23.2    Remedies .......................................................................................................... 45
23.3    Proceeds of Reletting ....................................................................................... 47
23.4    Exculpation; Landlord's Sole and Exclusive Remedy ..................................... 47
23.5    Tenant's Late Payments; Late Charges ............................................................ 47
23.6    Landlord's Right to Cure ................................................................................. 48
23.7    Holding Over .................................................................................................... 48
23.8    Waivers ............................................................................................................ 48
23.9    Accord and Satisfaction; Partial Payments ..................................................... 48
23.10   Miscellaneous .................................................................................................. 49

24.    END OF TERM ............................................................................................................. 49

25.    NOTICES ....................................................................................................................... 50

26.    NO BROKER .................................................................................................................. 50

27.    NONRECOURSE ........................................................................................................... 51

28.    ADDITIONAL DELIVERIES; THIRD PARTIES ..................................................... 51

28.1    Estoppel Certificates ....................................................................................... 51
28.2    Further Assurances .......................................................................................... 51
28.3    Memorandum of Lease ..................................................................................... 51
28.4    Modification ..................................................................................................... 51
28.5    Successors and Assigns .................................................................................... 51

29.    MISCELLANEOUS ....................................................................................................... 52

29.1    Confidentiality ................................................................................................. 52
29.2    Costs and Expenses; Legal Costs .................................................................... 52
29.3    No Consequential Damages ............................................................................. 52
29.4    No Waiver by Silence ....................................................................................... 52
29.5    Performance Under Protest .............................................................................. 52
29.6    Survival ............................................................................................................ 52
29.7    Unavoidable Delay ........................................................................................... 53
29.8    Vault Space ...................................................................................................... 53

Page

30. **INTERPRETATION, EXECUTION, AND APPLICATION OF LEASE** ......................................................................................................................... 53

    30.1    *Captions* ............................................................................................................... 53
    30.2    *Counterparts* ....................................................................................................... 53
    30.3    *Delivery of Drafts* ............................................................................................... 53
    30.4    *Entire Agreement* ............................................................................................... 53
    30.5    *Governing Law*.................................................................................................... 53
    30.6    *Partial Invalidity* ............................................................................................... 53
    30.7    *Principles of Interpretation*............................................................................... 53
    30.8    *Reasonableness* .................................................................................................. 54
    30.9    *Exhibits* .............................................................................................................. 54

31. **INITIAL DEVELOPMENT AND MAJOR CONSTRUCTION** .............................. 54

    31.1    *Initial Development*............................................................................................. 54
    31.2    *Major Construction*............................................................................................ 54
    31.3    *Plans and Specifications*.................................................................................... 54
    31.4    *Prosecution and Completion*.............................................................................. 55
    31.5    *Approvals; Cooperation*..................................................................................... 55
    31.6    *License of Construction Documents* ................................................................... 55
    31.7    *Major Subcontracts* ........................................................................................... 55
    31.8    *Insurance During Major Construction* .............................................................. 56
    31.9    *Restriction on Transfer* ...................................................................................... 57
    31.10   *Certain Deliveries* ............................................................................................. 57

32. **STATE-SPECIFIC PROVISIONS**.......................................................................... 57

    32.1    *Delivery Of Premises* ......................................................................................... 57
    32.2    *Casualty* ............................................................................................................. 57
    32.3    *Statutory Right or Redemption*........................................................................... 58
    32.4    *Consumer Contract Statutes* .............................................................................. 58
    32.5    *Waiver Of Stay* ................................................................................................... 58
    32.6    *No Implied Consent To Remaining In Possession* .............................................. 58
    32.7    *Sidewalk Repairs*................................................................................................ 58

VA 010108

## LEASE

This **LEASE** (this "Lease") is made and entered into as of November 𝒟, 2017 (the "Commencement Date"), between M.M.B. Associates, LLC, a New York limited liability company ("Landlord"), and Vanderbilt Atlantic Holdings LLC, a New York limited liability company ("Tenant").

## *W I T N E S S E T H :*

**WHEREAS**, as of the Commencement Date, Landlord owns the following real property (collectively, the "Property"): (a) the land described in **Exhibit A** attached hereto (the "Land"), with an address of 840 Atlantic Avenue, Brooklyn, New York (Block 1122, Lots 1, 68 and 71); (b) all buildings, structures, and other improvements and appurtenances located on the Land; (c) all right, title, and interest of Landlord, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line of such street or highway; (d) the appurtenances and all the estate and rights of Landlord in and to the Land (including all right, title and interest of Landlord in or to any and all development rights, easement rights and rights of way, if any); and (e) any strips or gores adjoining the Land;

**WHEREAS**, Landlord desires to lease to Tenant the Property, including, but not limited to, the Land and the Improvements (as hereinafter defined) (the "Premises"), and Tenant desires to lease from Landlord the Premises;

**WHEREAS**, the Parties (as hereinafter defined) desire to enter into this Lease to set forth their rights and obligations to each other relating to the Premises; and

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, Landlord hereby leases the Premises to Tenant, and Tenant hereby leases the Premises from Landlord, subject only to the Permitted Exceptions (as hereinafter defined), for the Term (as hereinafter defined), upon the terms and conditions of this Lease.

## 1. DEFINITIONS

The following terms and phrases as used in this Lease shall be defined as set forth in this Section 1.

"Additional Rent" means all amounts, charges and sums that this Lease requires Tenant to pay to Landlord or a third party, whether or not expressly called Additional Rent, except Fixed Rent.

"Affiliate" of any specified Person means any other Person Controlling or Controlled by or under common Control with such specified Person. "Affiliated" shall have the correlative meaning.

"Application" means any agreement, application, certificate, document, or submission (or amendment of any of the foregoing): (a) necessary or appropriate for any Construction that this Lease requires or permits, including any application for any building permit, certificate of

VA 010109

occupancy, utility service or hookup, easement, covenant, condition, restriction, subdivision plat, or such other instrument as Tenant may from time to time reasonably request for such Construction; (b) to allow Tenant to obtain any abatement, deferral, or other benefit otherwise available for Real Estate Taxes; (c) to permit Tenant to change the use or zoning of the Premises; (d) to enable Tenant from time to time to seek any Approval or to use and operate the Premises in accordance with this Lease; or (e) otherwise reasonably necessary and appropriate to permit Tenant to realize the benefits of the Premises under this Lease.

"Approvals" means any and all licenses, permits (including building, demolition, alteration, use, and special permits), approvals, consents, certificates (including, without limitation, temporary certificate(s) of occupancy), rulings, variances, authorizations, or amendments to any of the foregoing as shall be required under any Law to commence, perform, or complete any Construction, or for the zoning, rezoning (to the extent this Lease permits), use, occupancy, maintenance, or operation of the Premises and/or the Improvements.

"Architect's Certificate" means a certificate of Tenant's Architect, certifying to Landlord as follows with respect to any Major Construction:

*Consent to License.* That Tenant's Architect consents to Tenant's granting Landlord a license to use the Plans and Specifications as permitted under this Lease;

*Costs.* The estimated cost of such Major Construction and of any related demolition; and

*Size.* The estimated net rentable area and cubic volume of the Buildings as they will exist after the Construction Completion Date for such Major Construction.

"Arbitration" means a proceeding under the commercial arbitration rules of the American Arbitration Association, as modified or replaced from time to time.

"Bankruptcy Law" means Title 11, United States Code, and any other or successor state or federal statute relating to assignment for the benefit of creditors, appointment of a receiver or trustee, bankruptcy, composition, insolvency, moratorium, reorganization, or similar matters.

"Bankruptcy Proceeding" means any proceeding, whether voluntary or involuntary, under any Bankruptcy Law.

"Bankruptcy Sale" means a sale of any property, or any interest in any property, under 11 U.S.C. §363 or otherwise in any bankruptcy, insolvency, or similar proceeding affecting the owner of such property.

"Bankruptcy Termination Option" means Tenant's right to treat this Lease as terminated under 11 U.S.C. §365(h)(1)(A)(i) or any comparable provision of law.

"BID" means any business improvement district or similar district or program, proposed or actual, which includes, may include, or affects any portion of the Premises.

"Broker" has the meaning set forth in Article 26.

{Ground Lease - Execution Version / 01692902.DOCX /}

"Builder" means one or more licensed construction company(ies).

"Buildings" means all buildings located or to be located on the Premises from time to time.

"Building Equipment" means all fixtures incorporated in the Buildings and used, useful, or necessary to operate the Buildings as such (including boilers; compactors; compressors; conduits; ducts; elevators; engines; equipment; escalators; fittings; heating, ventilating and air conditioning systems; machinery; and pipes).

"Business Day" means any weekday on which State-chartered banks are open to conduct regular banking business with bank personnel.

"Casualty" means any damage or destruction of any kind or nature, ordinary or extraordinary, foreseen or unforeseen, affecting any or all Improvements, whether or not insured or insurable.

"Completion Guaranty" shall mean the completion guaranty required by the Leasehold Mortgagee in connection with the Initial Development or in connection with any Major Construction (other than the Initial Development), and if there is no Leasehold Mortgagee at the time of any such Major Construction, the completion guaranty required hereunder substantially in the form attached hereto and made a part hereof as **Exhibit F**.

"Condemnation" means: (a) any temporary or permanent taking of (or of the right to use or occupy) any Premises by condemnation, eminent domain, or any similar proceeding; or (b) any action by any Government not resulting in an actual transfer of an interest in (or of the right to use or occupy) any Premises but creating a right to compensation, such as a change in grade of any street upon which the Premises abut.

"Condemnation Award" means any award(s) paid or payable (whether or not in a separate award) to either party or its Mortgagee after the Commencement Date because of or as compensation for any Condemnation, including: (1) any award made for any improvements that are the subject of the Condemnation; (2) the full amount paid or payable by the condemning authority for the estate that is the subject of the Condemnation, as determined in Condemnation; (3) any interest on such award; and (4) any other sums payable on account of such Condemnation, including for any prepayment premium under any Mortgage.

"Condemnation Effective Date" means, for any Condemnation, the first date when the condemning authority has acquired title to or possession of any portion of the Premises subject to the Condemnation.

"Construction" means any alteration, additional improvements, construction, demolition, excavation, development, expansion, reconstruction, redevelopment, repair, Restoration, or other work affecting any Improvements, including new construction of Improvements. Construction consists of Minor Construction and Major Construction.

{Ground Lease - Execution Version / 01692902.DOCX /}

W:\WDOX\CLIEN\7S\8937\2\LEAS\01692903.DOCX

3

"Construction Commencement Conditions means, for any Major Construction, the following conditions:

*Approvals.* Tenant shall have given Landlord copies of Approvals as required by Law sufficient for Tenant to start excavation, if applicable, and demolition, if applicable;

*Completion Guaranty.* Tenant shall have delivered to Landlord a Completion Guaranty with respect to such Major Construction from Guarantor or, with respect to any Major Construction following the Initial Development, a Qualified Replacement Guarantor.

*Construction Documents.* Tenant shall have entered into and given Landlord copies of the Construction Documents;

*Financing.* If Tenant obtains financing, Tenant shall have delivered to Landlord a copy of a fully executed loan commitment and, in the case of the Initial Development, Tenant shall have closed (or shall simultaneously close) the Initial Construction Loan, otherwise, Tenant shall have delivered to Landlord reasonable evidence and supporting documentation of availability of funds;

*Funds.* Tenant shall have given Landlord evidence reasonably satisfactory to Landlord of the commitment of funds to pay at least 70% of the cost of such Major Construction as set forth in the Architect's Certificate, any loan agreement for any construction loan or the Construction Contract, which funds may be in the form of equity and/or debt financing or any combination thereof;

*Insurance.* Tenant shall have delivered to Landlord evidence of such insurance policies as this Lease shall require for such Major Construction;

*Approval of Plans and Specifications by each Leasehold Mortgagee.* Tenant shall have given Landlord evidence that each Leasehold Mortgagee, to the extent it requires, has approved the Plans and Specifications;

*Performance by Tenant's Architect and Builder.* Tenant shall have furnished to Landlord agreements (subject to the rights of Leasehold Mortgagee) from Tenant's Architect and from Builder to continue to perform for Landlord all obligations of Tenant's Architect or Builder, as applicable, under its contract with Tenant if this Lease terminates or Landlord re-enters the Premises after an Event of Default (and expiration of Leasehold Mortgagee's right to require a New Lease pursuant to Section 20.6), provided that Tenant's Architect or Builder, as applicable, is paid for its services in accordance with its contract with Tenant.

*Plans and Specifications; Architect's Certificate.* Tenant's Architect shall have prepared the Plans and Specifications and given the same to Landlord with an Architect's Certificate with respect thereto; and

VA 010112

"Construction Commencement Date" means, for any Major Construction, the date on which Tenant has: (a) satisfied the Construction Commencement Conditions; and (b) started demolition of any existing Improvements, if applicable, or excavation work, if applicable.

"Construction Completion Date" means, for any Major Construction, the date on which Tenant has given Landlord:

*Architect's Certificate.* A certificate from Tenant's Architect in the AIA Form G704 Certificate of Substantial Completion (or its equivalent) certifying that such Major Construction (except Punchlist Work) has been substantially completed in accordance with the Plans and Specifications;

*Certificates of Occupancy.* A copy of the temporary certificate of occupancy for such Major Construction, to the extent Law requires; and

*Survey.* A survey of the Premises showing the Major Construction as-built, certified to Landlord by a licensed surveyor.

"Construction Documents" means, for any Major Construction, the following documents, as Tenant shall modify them from time to time but not in violation of this Lease:

*Architectural Contract.* A contract between Tenant and Tenant's Architect, relating to Tenant's Architect's preparation of the Plans and Specifications and supervision of such Major Construction in accordance with the Plans and Specifications;

*Construction Contract.* Contract(s) between Builder and Tenant, providing for Builder's performance of such Major Construction;

*Major Subcontracts.* To the extent entered into, the Major Subcontracts;

*Other Contracts and Permits.* All other agreements and Approvals in place as of the Construction Commencement Date to which Tenant or anyone claiming through Tenant is a party; and

*Approvals.* All applicable Approvals.

"Contest" shall be as defined in Section 11.1.

"Contest Conditions" shall be as defined in Section 11.1

"Control" means, with respect to any Person, possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether by ownership of Equity Interests, by contract, or otherwise.

"County" means the county where the Premises are located.

"CPI" means the United States Department of Labor, Bureau of Labor Statistics "Consumer Price Index" for Urban Wage Earners and Clerical Workers (CPI-W) published for
{Ground Lease - Execution Version / 01692902.DOCX /}

5

VA 010113

New York - Northern New Jersey - Long Island, NY-NJ-CT-PA, with a base of 1982-1984=100. If the CPI ceases to be published, with no successor index, then the parties shall reasonably agree upon a reasonable substitute index. The CPI for any date means the CPI last published before the calendar month that includes such date.

"CPI Adjustment Factor" means, as of every fifth anniversary of the Commencement Date (each an "Adjustment Date"), the greater of (a) 1.00 or (b) the CPI for such date divided by the CPI for the date occurring five (5) years prior to such Adjustment Date.

"Default" means any Monetary Default or Nonmonetary Default.

"Default Interest" means interest at an annual rate equal to the lesser of: (a) the Prime Rate plus four percent (4%) per annum; or (b) the Usury Limit.

"Environmental Law" means any Law regarding the following at, in, under, above, or upon the Premises or the Improvements: (a) air, environmental, ground water, or soil conditions; or (b) clean-up, control, disposal, generation, storage, release, transportation, or use of, or liability or standards of conduct concerning, Hazardous Substances.

"Equipment Lien" means any security interest, financing lease, personal property lien, conditional sales agreement, chattel mortgage, security agreement, title retention arrangement or any similar arrangement (including any related financing statement) for Tenant's acquisition or leasing of any Financed FF&E used in or at the Premises or the Improvements that is leased, purchased under conditional sale or installment sale arrangements, encumbered by a security interest, or used under a license, provided that each Equipment Lien encumbers or otherwise relates only to the Financed FF&E for which such secured party provides bona fide purchase-money financing or a bona fide equipment lease, after the Commencement Date. A Leasehold Mortgage is not an Equipment Lien.

"Equity Interest" means all or any part of any direct or indirect equity or ownership interest(s) (whether stock, partnership interest, beneficial interest in a trust, membership interest, or other interest of an ownership or equity nature) in any entity at any tier of ownership that directly or indirectly owns or holds any ownership or equity interest in a Person.

"Estoppel Certificate" means with regard to a request made by Landlord: a statement, addressed to Landlord or as Landlord directs, and stating whether or not to the best knowledge of Tenant (a) there is a continuing default by Landlord in the performance or observance of any covenant, agreement or condition contained in this Lease to be performed or observed by Landlord, (b) there is a continuing Default or Event of Default and, if so, specifying each such Default and Event of Default, (c) there shall have occurred any event which, with the giving of Notice or passage of time or both, would become a Default or Event of Default and, if so, specifying each such Default or occurrence of which Tenant may have knowledge, (d) the Fixed Rent amount and other Additional Rent currently payable under this Lease, (e) whether or not there are improvements or actions required under this Lease or other executory items that are prerequisite to Tenant's obligation to perform under this Lease, and if so, the nature thereof, (f) whether there is pending any action, Arbitration or proceeding between Landlord and Tenant arising under this Lease, and, if so, the nature thereof, (g) whether or not Tenant has
{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010114

counterclaims, defenses or right to offset against any amounts due to Landlord under this Lease and if so, the amount and nature thereof; and whether or not Tenant is entitled to any concessions, rebates or any rent reductions under this Lease for whatever reason as of the date the statement is given, and if so, the amount and nature thereof; (h) that the addresses for notices are as set out in this Lease or as stated in the statement; and (i) in the case of a request by a Fee Mortgagee, prospective Fee Mortgagee or prospective successor to Landlord's interest in this Lease, such other information as such party may reasonably require; and Estoppel Certificate means with regard to a request made by Tenant: a statement, addressed to Tenant or as Tenant directs, and stating whether or not to the best knowledge of Landlord (a) there is a continuing default by Tenant in the performance or observance of any covenant, agreement or condition contained in this Lease to be performed or observed by Tenant, (b) there is a continuing Default or Event of Default and, if so, specifying each such Default and Event of Default, (c) there shall have occurred any event which, with the giving of Notice or passage of time or both, would become a Default or Event of Default and, if so, specifying each such Default or occurrence of which Landlord may have knowledge, (d) the Fixed Rent amount and other Additional Rent currently payable under this Lease, (e) whether or not there are improvements or actions required under this Lease or other executory items that are prerequisite to Landlord's obligation to perform under this Lease, and if so, the nature thereof, (f) whether there is pending any action, Arbitration or proceeding between Landlord and Tenant arising under this Lease, and, if so, the nature thereof, (g) whether or not Landlord has counterclaims, defenses or right to offset against any amounts due to Tenant under this Lease and if so, the amount and nature thereof; and whether or not Landlord is entitled to any concessions, rebates or any rent reductions under this Lease for whatever reason as of the date the statement is given, and if so, the amount and nature thereof; (h) that the addresses for notices are as set out in this Lease or as stated in the statement; and (i) in the case of a request by a Leasehold Mortgagee, prospective Leasehold Mortgagee or prospective successor to Tenant's interest in this Lease, such other information as such party may reasonably require.

"Event of Default" shall be as defined in Section 23.

"Existing Lease" means that certain Ground Lease dated March 18, 1998 between Anthony N. Musto (Landlord's predecessor in interest) and McDonald's Corporation, and all renewals, modifications and amendments thereto, as evidenced by that certain Memorandum of Lease dated April 14, 1998 and recorded on August 24, 1998 in the City Registrar's Office in Reel 4264, File 1854, and that certain Supplement to Lease dated August 12, 1999 and recorded on February 2, 2000 1998 in the City Registrar's Office in Reel 4748, File 1809.

"Existing Tenant" means McDonald's Corporation, and its successors and assigns.

"Existing Tenant Vacate Date" means the date on which the Existing Lease has terminated or expired, and Existing Tenant has vacated the Premises.

"Expiration Date" means the date upon which this Lease terminates or expires in accordance with its terms of this Lease, whether on the Scheduled Expiration Date, by Landlord's exercise of remedies for an Event of Default, or otherwise.

VA 010115

"Fair Market Value" shall be as defined in Section 3.2.

"Fee Debt Service" means all payments required from time to time under any Fee Mortgage, including principal, interest, late charges, costs of collection, reimbursement of protective advances, and any other sums secured by a Fee Mortgage.

"Fee Estate" means Landlord's fee estate in the Premises, including Landlord's reversionary interest in the Premises after the Expiration Date.

"Fee Mortgage" means any Mortgage, deed of trust, collateral assignment or other voluntary lien (as amended from time to time) that encumbers all or part of the Fee Estate. A Fee Mortgage shall not be superior to this Lease.

"Fee Mortgagee" means any Mortgagee holding a Fee Mortgage.

"FF&E" means all movable furniture, furnishings, equipment, and personal property of Tenant or anyone claiming through Tenant (excluding Building Equipment) that may be removed without material damage to the Improvements and without adversely affecting: (a) the structural integrity of the Improvements; (b) any electrical, plumbing, mechanical, or other system in the Improvements; (c) the present or future operation of any such system; or (d) the present or future provision of any utility service to the Improvements. FF&E includes items such as factory equipment, furniture, movable equipment, telephone, telecommunications and facsimile transmission equipment, point of sale equipment, televisions, radios, network racks, and computer systems and peripherals.

"Financed FF&E" means any FF&E subject to an Equipment Lien in favor of a lessor or lender that: (a) is not an Affiliate of Tenant, and (b) actually provides bona fide financing or a bona fide equipment lease after the Commencement Date for Tenant's acquisition or use of such FF&E.

"Foreclosure Event" means any: (a) foreclosure sale (or trustee's sale, assignment in lieu of foreclosure, Bankruptcy Sale, or similar transfer) affecting the Leasehold Estate; or (b) Leasehold Mortgagee's exercise of any other right or remedy under a Leasehold Mortgage (or applicable law) that divests Tenant of the Leasehold Estate.

"Government" means each and every governmental agency, authority, bureau, department, quasi-governmental body, or other entity or instrumentality having or claiming jurisdiction over the Premises or the Improvements (or any activity this Lease permits), including the United States government, the State and County governments and their subdivisions and municipalities, the New York City government and their subdivisions, Brooklyn Community Board 8, and all other applicable governmental agencies, authorities, and subdivisions thereof. "Government" shall also include any planning commission, board of standards and appeals, department of buildings, city council, zoning board of appeals, or similar body having or claiming jurisdiction over the Premises or the Improvements or any activities on or at the Premises or the Improvements.

"Guarantor" means Simon Dushinsky.

{Ground Lease - Execution Version / 01692902.DOCX /}

8

"Hazardous Substances" means all flammable substances, explosives, radioactive materials, asbestos, asbestos-containing materials, polychlorinated biphenyls, chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, hazardous wastes, medical wastes, toxic substances or related materials, explosives, petroleum and petroleum products, and any "hazardous" or "toxic" material, substance or waste that is defined by those or similar terms or is regulated as such under any Law, including any material, substance or waste that is: (i) defined as a "hazardous substance" under Section 311 of the Water Pollution Control Act (33 U.S.C. §1317), as amended; (ii) defined as a "hazardous waste" under Section 1004 of the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §6901, et seq., as amended; (iii) defined as a "hazardous substance" or "hazardous waste" under Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Reauthorization Act of 1986, 42 U.S.C. §9601 et seq. or any so-called "superfund" or "superlien" law; (iv) defined as a "pollutant" or "contaminant" under 42 U.S.C.A. §9601(33); (v) defined as "hazardous waste" under 40 C.F.R. Part 260; (vi) defined as a "hazardous chemical" under 29 C.F.R. Part 1910; or (vii) subject to any other Law regulating, relating to or imposing obligations, liability or standards of conduct concerning protection of human health, plant life, animal life, natural resources, property or the enjoyment of life or property free from the presence in the environment of any solid, liquid, gas, odor or any form of energy from whatever source.

"Hazardous Substances Discharge" means any deposit, discharge, generation, release, or spill of Hazardous Substances that occurs at or from the Premises or the Improvements, or on or into the Land, or the Property, or that arises at any time from the use, occupancy, or operation of the Premises or the Improvements or any activities conducted therein or thereon or any adjacent or nearby real property, or resulting from seepage, leakage, or other transmission of Hazardous Substances from other real property to the Land or the Property, whether or not caused by a Party to this Lease and whether occurring before or after the Commencement Date.

"Improvements" means all Buildings, structures, landscaping, driveways, parking areas, sidewalks and other improvements and appurtenances located or to be located on the Premises from time to time.

"Indemnify" means, where this Lease states that any Indemnitor shall "Indemnify" any Indemnitee from, against, or for a particular matter (the "Indemnified Risk"), that the Indemnitor shall indemnify the Indemnitee and defend and hold the Indemnitee harmless from and against any and all actual out of pocket loss, cost, claims, liability, penalties, judgments, damages, and other injury, detriment, or expense (including Legal Costs, interest and penalties) that the Indemnitee suffers or incurs: (a) from, as a result of, or on account of the Indemnified Risk; or (b) in enforcing the Indemnitor's indemnity. Any indemnity contained in this Lease shall not include any consequential, special, indirect or punitive damages. Indemnitor's counsel shall be subject to Indemnitee's approval, not to be unreasonably withheld. Any counsel satisfactory to Indemnitor's insurance carrier shall be automatically deemed satisfactory.

"Indemnitee" means any Party entitled to be Indemnified under this Lease and its agents, directors, employees, Equity Interest holders, mortgagees, and officers.

VA 010117

"Indemnitor" means a Party that agrees to Indemnify any other Person.

"Initial Construction Loan" means construction loan(s) from Leasehold Mortgagee(s) in an aggregate amount that, with any equity investment to be provided by Tenant, Affiliates of Tenant, or a third party, equals at least one hundred percent (100%) of the estimated cost set forth in the Construction Documents for the Initial Development.

"Initial Development" means the construction of a mixed use building on the Land in compliance with all Laws. The Initial Development includes all Construction that this Lease requires Tenant to complete as a condition to the Construction Completion Date for the Initial Development. Tenant need not complete interior work by the Construction Completion Date for the Initial Development.

"Initial Development Commencement Deadline" means the date that is thirty-six (36) months after the later of (i) the Existing Tenant Vacate Date, or (ii) the date the Premises has been Rezoned, extended as follows: In the event of Unavoidable Delay(s), the Initial Development Commencement Deadline shall be extended by the number of days by which such Unavoidable Delay(s) delayed commencement of construction of the Initial Development.

"Initial Development Completion Deadline" means the date that is sixty (60) months after the Construction Commencement Date for the Initial Development, extended as follows: In the event of Unavoidable Delay(s), the Initial Development Completion Deadline shall be extended by the number of days by which such Unavoidable Delay(s) delayed completion of construction of the Initial Development.

"Institutional Lender" shall mean a savings bank, a savings and loan association, a commercial bank or trust company (whether acting individually or in a fiduciary capacity), a pension or retirement fund, Commercial Mortgage Backed Securitized Lender and/or its Trustee, an accredited college or university, an insurance company organized and existing under the laws of the United States or any state thereof, an investment bank, a private equity or hedge fund, a real estate investment trust existing in compliance with Sections 856 through 860 of the Internal Revenue Code of 1986, as amended, a religious or eleemosynary institution and any other entity then in the business of making loans secured by mortgages on properties similar to the Premises, or any combination of the foregoing; provided, however, that each of the above entities shall not be a Prohibited Person or an Affiliate of Tenant, and other than a Commercial Mortgage Backed Securitized Lender and/or its Trustee, shall qualify as an Institutional Lender for purposes of this Lease only if it has, at the time of making its loan to Tenant and at the time of such entity's acquisition of a loan made to Tenant, as the case may be, a net worth of not less than Two Hundred Fifty Million and 00/100 Dollars ($250,000,000.00) or assets of not less than Five Hundred Million and 00/100 Dollars ($500,000,000.00) (each time multiplied by the CPI Adjustment Factor).

"Landlord" initially means the Person identified in the opening paragraph of this Lease as the "Landlord". After every Transfer of the Fee Estate, "Landlord" means only the owner(s) of the Fee Estate at the time in question. If any former Landlord no longer has any interest in the Fee Estate or a Transfer of the Fee Estate occurs (in all cases in compliance with this Lease,

{Ground Lease - Execution Version / 01692902.DOCX /}

10

VA 010118

including requirements regarding any Trust Funds), the transferor (including a Fee Mortgagee, or anyone acting for a Fee Mortgagee, that has acquired and then disposed of the Fee Estate) shall be and hereby is entirely freed and relieved of all obligations of Landlord under this Lease accruing from and after the date of such Transfer, provided that the new Landlord has assumed, in a written instrument, memorialized by a memo of such written instrument in recordable form, all of the obligations of any transferor hereunder. It shall be deemed and construed without further agreement between the Parties or their successors in interest or between the Parties and the Person who acquires or owns the Premises, including the Transferee (including a Fee Mortgagee taking title to the Fee Estate or a Person taking title to the Fee Estate from a Fee Mortgagee) on any such Transfer, that such Person has assumed and agreed to carry out any and all agreements, covenants, and obligations of Landlord under this Lease accruing from and after the date of such Transfer.

"Landlord's Percentage" means the percentage represented by a fraction, the numerator of which is the Leased Fee Value and the denominator of which is the sum of the Leased Fee Value plus the Leased Leasehold Value.

"Laws" means all laws, ordinances, requirements, orders, proclamations, directives, rules, and regulations of any Government affecting the Premises, the Improvements, this Lease, or any Construction in any way, including any use, maintenance, taxation, operation, or occupancy of, or environmental conditions affecting, the Premises, the Improvements or relating to any Real Estate Taxes, or otherwise relating to this Lease or any Party's rights and remedies under this Lease, or any Transfer of any of the foregoing, whether in force at the Commencement Date or passed, enacted, or imposed at some later time, subject in all cases, however, to any applicable waiver, variance, or exemption.

"Lease Impairment" means Tenant's: (a) canceling, surrendering, or terminating this Lease, including upon Loss; (b) consenting, or failing to object, to a Bankruptcy Sale of any portion of the Premises; (c) determining that a Total Loss has occurred; (d) exercising any Bankruptcy Termination Option; or (e) subordinating this Lease or the Leasehold Estate to any other estate or interest in the Premises.

"Lease Termination Notice" means a notice stating this Lease has terminated and describing in reasonable detail any uncured Defaults.

"Lease Year" means: (a) the one (1) year period starting on the Commencement Date; and (b) every subsequent period of one (1) year during the Term; provided, however, if the Commencement Date does not fall on the first day of a month, then the first Lease Year shall include the partial month, commencing on the Commencement Date through and including the last day of the calendar month in which the Commencement Date occurs.

"Leased Fee Value" means the fair market value of the Fee Estate determined as if such Fee Estate is unencumbered by any lien representing a monetary obligation (such as a Fee Mortgage) but inclusive of (i) all rights of Landlord under this Lease including, without limitation, the Fee Estate, and (ii) the value of Landlord's reversionary interest in the Building as of the date of such determination, considered as if unimproved and subject to this Lease.

{Ground Lease - Execution Version / 01692902.DOCX /}

11

"Leasehold Estate" means Tenant's leasehold estate, and all of Tenant's rights, privileges, and Preemptive Rights, under this Lease, upon and subject to all the terms and conditions of this Lease, and any direct or indirect interest in such leasehold estate.

"Leased Leasehold Value" means the fair market value of the Leasehold Estate determined as if such Leasehold Estate is unencumbered by any lien representing a monetary obligation (such as a Leasehold Mortgage) but inclusive of (i) all rights of Tenant under this Lease including, without limitation, the Leasehold Estate, and (ii) the value of Tenant's interest in the Building then in existence as of the date of such determination; provided, the Leased Leasehold Value shall exclude the value of Landlord's reversionary interest as of such date in the land and Building upon the expiration of the Term.

"Leasehold Mortgage" means any mortgage, deed of trust, collateral assignment or other voluntary lien (as modified from time to time) encumbering this Lease, the Leasehold Estate and/or the Preemptive Rights. A Leasehold Mortgage shall not attach to the Fee Estate.

"Leasehold Mortgagee" means a holder of a Leasehold Mortgage (and its successors and assigns), provided: (a) such holder is not an Affiliate of Tenant; (b) such holder is an Institutional Lender, and (c) Landlord has received notice of the name and address of such holder and a copy of its Leasehold Mortgage.

"Legal Costs" of any Person means all reasonable actual out of pocket costs and expenses such Person incurs in any legal proceeding (or other matter for which such Person is entitled to be reimbursed for its Legal Costs), and in or as a result of any Bankruptcy Proceeding, including reasonable attorneys' fees, court costs, and expenses.

"Liability Insurance" means commercial general liability insurance against claims for personal injury, death, or property damage occurring upon, in, or about the Premises, the Improvements or adjoining streets and passageways, providing coverage for a combined single limit of $15,000,000.00 for any one occurrence. Landlord may increase such limit up to once every five (5) years, upon at least ninety (90) days' Notice to Tenant, provided that any increased limit: (a) does not exceed the limit initially set forth times the CPI Adjustment Factor, rounded to the nearer multiple of $1,000,000; and (b) generally conforms to the limits customarily required by prudent landlords or Institutional Lenders for similar properties in the County.

"Loss" means a Casualty or a Condemnation.

"Loss Proceeds" means any Property Insurance Proceeds or Condemnation Award paid or payable for a Loss.

"Major Construction" means the Initial Development or any other Construction (including any coordinated series of related projects of Construction) whose estimated cost exceeds $10,000,000.00, times the CPI Adjustment Factor.

"Major Subcontracts" means the following subcontracts whose cost is more than $1,000,000.00 and entered into, or to be entered into, by the Builder(s) for any Major Construction: concrete, masonry, carpentry/drywall, plumbing, electrical, and

{Ground Lease - Execution Version / 01692902.DOCX /}

heating/ventilation/air-conditioning, as such contracts may from time to time be modified, amended, waived, cancelled, terminated, substituted, or replaced in good faith.

"Memorandum of Lease" means a memorandum of this Lease, in the form attached hereto as **Exhibit G**.

"Minor Construction" means any Construction that Tenant elects in its discretion, or this Lease requires Tenant, to undertake from time to time, except Major Construction.

"Modification" means any abandonment, amendment, cancellation, discharge, extension, modification, rejection, renewal, replacement, restatement, substitution, supplement, surrender, termination, or waiver of a specified agreement, document, plans or specifications or of any of its terms or provisions, or the acceptance of any cancellation, rejection, surrender, or termination of such agreement, document, or such terms or provisions.

"Modify" means agree to, cause, make, or permit any Modification.

"Monetary Default" means Tenant's failure to pay any Rent or other money (including Real Estate Taxes and insurance premiums) when and as this Lease requires, subject to any applicable notice and cure period set forth in this Lease.

"Mortgage" means either a Fee Mortgage or a Leasehold Mortgage.

"Mortgagee" means the holder of any Mortgage and its successors and assigns.

"New Lease" means a new lease of the Premises and related customary documents such as a memorandum of lease and a deed of the Improvements. Any New Lease shall: (a) commence immediately after this Lease is terminated with substantially the same covenants, conditions and agreements as contained in this Lease; (b) continue for the entire remaining Term of this Lease, as if no termination had occurred, subject to any Preemptive Rights; (c) give New Tenant the same rights to the Improvements that this Lease gave Tenant; (d) have the same terms, including Preemptive Rights, and the same lien priority, as this Lease, subject to any subsequent written amendments made with Leasehold Mortgagee's consent; and (e) require New Tenant to cure, with reasonable diligence and continuity, within a reasonable time, all Defaults (except Tenant-Specific Defaults) not otherwise cured or waived.

"New Tenant" means Leasehold Mortgagee or its designee or nominee, and any of their successors and assigns, as tenant under the New Lease.

"Nonmonetary Default" means Tenant's: (a) failure to comply with any affirmative or negative covenant or obligation in this Lease, except a Monetary Default; or (b) breach of any representation or warranty set forth in this Lease (as of the date made or deemed made), subject to any applicable notice and cure period set forth in this Lease.

"Nonrecourse Clause" shall have the meaning set forth in Article 27.

VA 010121

"Notice" means any consent, demand, designation, election, notice, or request relating to this Lease, including any Notice of Default. Notices shall be delivered, and shall become effective, only in accordance with the "Notices" Article of this Lease.

"Notify" means give a Notice.

"Notice of Default" means any Notice claiming or giving Notice of a Default or alleged Default.

"Parties" means, collectively, Landlord and Tenant.

"Party" means either Landlord or Tenant.

"Permitted Equity Owner" means:

*Until Completion.* Until the Construction Completion Date for the Initial Development and subject to Section 31.9 of this Lease: (a) any Principal, any Person that a Principal Controls, any immediate family member (including a domestic partner) of any Principal, a trust for the benefit of any of the foregoing, or any transferee upon the death of any of the foregoing; (b) any other holder of an Equity Interest in Tenant, which other holder Landlord has approved in its reasonable discretion; and (c) any holder of an Equity Interest that is of a purely passive and nonvoting nature; and

*After Completion.* Thereafter, any Person that holds or acquires an Equity Interest in Tenant.

"Permitted Exceptions" means only: (1) the recorded title exceptions affecting the Fee Estate and prior to this Lease as of the Commencement Date, listed as exceptions in Tenant's leasehold policy of title insurance for this Lease; (2) any title exceptions (including Subleases) caused by Tenant's acts or omissions, consented to or requested by Tenant, or resulting from Tenant's Default; (3) intentionally omitted; (4) this Lease and its terms and provisions; (5) any state of facts that an accurate survey would show; and (6) the additional matters listed in **Exhibit D** attached hereto.

"Permitted Use" means, initially, from and after the Commencement Date until the Existing Tenant Vacate Date, a McDonald's restaurant or any use allowed in accordance with the Existing Lease. At any time on or after the Existing Tenant Vacate Date, any lawful use permitted by applicable zoning regulations except for the Prohibited Uses set forth on **Exhibit B**. Tenant may change the use of the Premises to any other use(s) in compliance with Law (and such use(s) shall then constitute a "Permitted Use"). In no event shall the Premises or the Improvements be used for, or shall the Permitted Uses include use for, any of the Prohibited Uses set forth on **Exhibit B**.

"Person" means any individual, association, corporation, Government, joint venture, joint-stock company, limited liability company, partnership, trust, unincorporated organization, or other entity of any kind. (This does not limit any Transfer restriction.)

VA 010122

"Plans and Specifications" means, for any Major Construction, plans and specifications prepared by Tenant's Architect, submitted in such machine-readable format as is then customary in the architectural profession, consisting of architectural plans; elevations and sections indicating principal areas, core design and location; location, number, and capacity of elevators; basic structural system; minimum estimated electrical capacity and distribution system; general type of plumbing system; façade, placement, and orientation; gross and rentable square foot analysis; and principal types of HVAC systems; provided, that with respect to the Initial Development only, the Plans and Specifications reflect a quality that equals or exceeds the standard of quality of the building commonly known as Halo LIC and located at 44-41 Purves Street, Long Island City, New York, as the same may be modified or changed at any time or from time to time, so long as such Plans and Specifications with respect to the Initial Development only, as so modified or changed, are of a quality that equals or exceeds the standard of quality of the building commonly known as Halo LIC and located at 44-41 Purves Street, Long Island City, New York.

"Preemptive Right" means any expansion, extension, purchase, or renewal option; right of first refusal or first offer; or other preemptive right, if any, that this Lease gives Tenant.

"Prepaid Fixed Rent" shall be as defined in Section 3.6.

"Prime Rate" means the prime rate or equivalent "base" or "reference" rate for corporate loans that, at Tenant's election, by Notice to Landlord, is from time to time: (a) published in the Wall Street Journal; (b) announced by any large United States "money center" commercial bank that Tenant designates; or (c) if such rate is no longer so published or announced, then a reasonably equivalent rate published by an authoritative third party that Tenant reasonably designates. Notwithstanding anything to the contrary in this paragraph, the Prime Rate shall never exceed the Usury Limit.

"Principals" of Tenant means, until the Construction Completion Date for the Initial Development and subject to Section 31.9, Simon Dushinsky, and, thereafter, means the owners of Equity Interests in Tenant (if any) as Tenant shall have designated by Notice to Landlord from time to time.

"Prohibited Lien" means any mechanic's, vendor's, laborer's, or material supplier's statutory lien or other similar lien arising from work, labor, services, equipment, or materials supplied, or claimed to have been supplied, to Tenant (or anyone claiming through Tenant), but only if such lien attaches (or may attach upon termination of this Lease) to the Fee Estate. An Equipment Lien is not a Prohibited Lien.

"Property Insurance" means insurance providing coverage for the Buildings and the Building Equipment, against loss, damage, or destruction by fire and other hazards encompassed under the broadest form of property insurance coverage then customarily used for like properties in the County (except earthquake or war risk) from time to time during the Term, in an amount equal to one hundred percent (100%) of the replacement value (without deduction for depreciation) of the Buildings and the Building Equipment (excluding excavations and foundations) and in any event sufficient to avoid co-insurance, with "ordinance or law"

{Ground Lease - Execution Version / 01692902.DOCX /}

15

coverage. Such insurance may contain a deductible clause not exceeding $100,000.00 times the CPI Adjustment Factor. To the extent customary for like properties in the County at the time, such insurance shall include coverage for explosion of steam and pressure boilers and similar apparatus located on the Premises; coverage for terrorism; an "increased cost of construction" endorsement; and an endorsement covering demolition and cost of debris removal. Property Insurance shall also include rental or business interruption insurance in an amount at least equal to one hundred percent (100%) of the annual Fixed Rent and Real Estate Taxes and providing for a twelve (12) month extended period of indemnity.

"Property Insurance Proceeds" means net proceeds (after reasonable costs of adjustment and collection, including Legal Costs) of Property Insurance, when and as received by Landlord, Tenant, or any Mortgagee, excluding proceeds of Tenant's business interruption insurance in excess of Rent.

"Punchlist Work" means Construction, of an insubstantial nature, the noncompletion of which will not delay issuance of a temporary certificate of occupancy for the applicable Improvements or the applicable portion thereof or materially interfere with use of the applicable Improvements as this Lease contemplates.

"Qualified Replacement Guarantor" means any Person reasonably satisfactory to Landlord with a net worth determined in accordance with generally accepted accounting principles consistently applied of at least $10,000,000.00, times the CPI Adjustment Factor. Upon Landlord's request, Tenant shall deliver a certificate from a certified public accountant reasonably satisfactory to Landlord certifying that the Qualified Replacement Guarantor complies with the requirements of the immediately preceding sentence, which certificate shall include a copy of the financial statements relied upon by such certified public accountant in providing such certification.

"Real Estate Taxes" means all general and special real estate taxes (including taxes on FF&E, sales taxes, use taxes, and the like), BID payments, assessments, municipal water and sewer rents, rates and charges, excises, levies, license and permit fees, fines, penalties and other Governmental charges and any interest or costs with respect thereto, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever that at any time during the Term and applicable to the Term or any part of it may be assessed, levied, imposed upon, or become due and payable out of or in respect of, or charged with respect to or become a lien on, the Premises, the Improvements or the sidewalks or streets in front of or adjoining the Premises, or any vault, passageway or space in, over or under such sidewalk or street, or any other appurtenances of the Premises, the Improvements or any FF&E, Building Equipment or other facility used in the operation thereof, or the rent or income received therefrom, or any use or occupancy thereof. "Real Estate Taxes" shall not, however, include any of the following, all of which Landlord shall pay before delinquent or payable only with a penalty: (a) any franchise, income, excess profits, estate, inheritance, succession, transfer, gift, corporation, business, capital levy, or profits tax, or license fee, of Landlord; (b) any item listed in this paragraph that is levied, assessed, or imposed during the Term based on the recapture or reversal of any previous tax abatement or tax subsidy, or compensating for any previous tax deferral or reduced assessment or valuation, or correcting a miscalculation or misdetermination,

VA 010124

relating to any period(s) before the Commencement Date; and (c) interest, penalties, and other charges for items "a" and "b." If at any time during the Term the method of taxation prevailing at the Commencement Date shall be altered so that any new tax, assessment, levy (including any municipal, state or federal levy), imposition, or charge, or any part thereof, shall be measured by or be based in whole or in part upon the Premises and imposed upon Landlord, then all such new taxes, assessments, levies, Real Estate Taxes, or charges, or the part thereof to the extent that they are so measured or based, shall be deemed to be included within the term "Real Estate Taxes," to the extent that such Real Estate Taxes would be payable if the Premises were the only property of Landlord subject to such Real Estate Taxes.

"Rent" means Fixed Rent and Additional Rent.

"Restoration" means, after a Loss, the alteration, clearing, rebuilding, reconstruction, repair, replacement, restoration, and safeguarding of the damaged or remaining Improvements, subject to such Construction as Tenant shall perform in conformity with this Lease, subject to any changes in Law that would limit the foregoing.

"Restoration Funds" means any Loss Proceeds (and deposits by Tenant) to be applied to Restoration.

"Restore" means accomplish a Restoration.

"Rezoned" means all or a portion of the Property that is rezoned for residential purposes.

"Rezoned Floor Area" – means all as-of-right floor area (as defined in the Zoning Resolution) excluding floor area of uses required by Government as a result of, or in connection with, a rezoning process (such as, without limitation, affordable housing provided in accordance with New York City's Mandatory Inclusionary Housing Program (MIH); light industrial and manufacturing uses set forth in zoning Use Groups 11A, 16A, 16B, 17B and 17C; and community facility uses set forth in zoning Use Groups 3 and 4).

"Scheduled Expiration Date" means 11:59 p.m. on the day prior to the ninety-ninth (99th) anniversary of the last day of the calendar month in which the Commencement Date occurs.

"State" means the State of New York.

"Structure" of a Building means only the concrete floors, footings, foundation, load-bearing walls, roof, roof support system, and structural steel or other structural support system of such Building.

"Sublease" means, for the Premises and the Improvements, any: (a) sublease; (b) agreement or arrangement (including a concession, license, management, or occupancy agreement) allowing any Person to occupy, use or possess; (c) subsublease or any further level of subletting; or (d) Modification or assignment of "a" through "c." (Any reference to Subleases does not diminish, impair, limit, or waive any limit on Subleases.)

"Subrent" means all money due and payable by Subtenants under Subleases.

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010125

"Subtenant" means any Person entitled to occupy, use, or possess any portion of the Premises or the Improvements under a Sublease.

"Temporary Condemnation" means a Condemnation of the temporary right to use or occupy all or part of the Premises or the Improvements.

"Tenant's Percentage" means the percentage represented by a fraction, the numerator of which is the Leased Leasehold Value and the denominator of which is the sum of the Leased Fee Value plus the Leased Leasehold Value

"Tenant-Specific Default" means any Default that: (a) arises from any lien or encumbrance attaching solely to the Leasehold Estate (not the Fee Estate) but junior to the Leasehold Mortgage; or (b) Leasehold Mortgagee or New Tenant cannot reasonably cure.

"Tenant's Architect" means an architect that is: (a) selected by Tenant and licensed in the State; and (b) reasonably qualified and experienced in overseeing projects similar to the Major Construction for which such architect is engaged. Tenant may replace Tenant's Architect at any time, subject to the foregoing provisions of this paragraph.

"Term" shall be as defined in Section 2.

"Termination Option Loss" means any Loss that occurs during the last sixty (60) months of the Term or would cost more than $10,000,000.00 times the CPI Adjustment Factor (beyond Loss Proceeds to be made available) to Restore. For purposes hereof and for purposes of Section 13.4, a Casualty occurs on the date of such Casualty and a Condemnation occurs on the Condemnation Effective Date for such Condemnation.

"Total Loss" means any Condemnation that affects all or substantially all of the Premises and/or the Improvements or, in Tenant's reasonable determination (with Leasehold Mortgagee's consent), any: (a) Loss after which Tenant cannot legally Restore the Improvements as an architectural whole for economic use for their previous purpose; or (b) Casualty after which, because of changes in Laws, Tenant cannot legally Restore the Improvements to substantially their previous size; or (c) any Condemnation resulting in a taking of a portion of the Premises (due either to the area so taken or the location of the part so taken in relation to the part not so taken) which renders the balance of the Premises (under economic conditions or any applicable Laws) incapable of being operated for such purposes that the Premises are then being used in an economically feasible manner after taking into account any restoration work; or (d) in the event that the Initial Development has not yet been substantially completed, any Condemnation which renders such Initial Development or any subsequent Improvements incapable of being constructed for the Permitted Use.

"Transfer" of any property means any of the following, whether by operation of law or otherwise, whether voluntary or involuntary, and whether direct or indirect: (a) any assignment, conveyance, grant, hypothecation, mortgage, pledge, sale, or other transfer, whether direct or indirect, of all or any part of such property, or of any legal, beneficial, or equitable interest or estate in such property or any part of it (including the grant of any easement, lien, or other encumbrance); (b) any conversion, exchange, issuance, modification, reallocation, sale, or other
{Ground Lease - Execution Version / 01692902.DOCX /}

18

VA 010126

transfer of any direct or indirect Equity Interest(s) in the owner of such property by the holders of such Equity Interest(s); (c) any transaction described in "b" affecting any Equity Interest(s) or any other interest in such property or in any such owner (or in any other direct or indirect owner at any higher tier of ownership) through any manner or means whatsoever; or (d) any transaction that is in substance equivalent to any of the foregoing. A transaction affecting Equity Interests, as referred to in clauses "b" through "d," shall be deemed a Transfer by Tenant even though Tenant is not technically the transferor. A "Transfer" shall not, however, include any of the foregoing (provided that the other party to this Lease has received Notice thereof) relating to any Equity Interest: (a) one that constitutes a mere change in form of ownership with no material change in beneficial ownership and constitutes a tax-free transaction under federal income tax law and the State real estate transfer tax; (b) one to a member(s) of the immediate family(ies) of the transferor(s) or trusts for their benefit; or (c) one to any Person that, as of the Commencement Date, holds an Equity Interest in the entity whose Equity Interest is being transferred.

"Trust Funds" means any funds that this Lease requires or allows Landlord (or anyone acting for Landlord) to hold, and in which Tenant has an interest.

"Unavoidable Delay" means delay in performing any obligation under this Lease (except payment of money) arising from or on account of any cause whatsoever beyond the obligor's reasonable control, despite such obligor's reasonable diligent efforts, including, without limitation, weather delays, industry-wide strikes, labor troubles or other union activities (but only to the extent such actions affect similar premises at that time and do not result from an act or omission of the obligor), the obligor's inability to obtain required labor or materials after commercially reasonable efforts to do so, litigation (unless caused by the obligor), Loss, accidents, Laws, governmental preemption, war, riots or acts of domestic or international terrorism. Unavoidable Delay shall exclude delay caused by the obligor's financial condition, illiquidity, or insolvency other than delays caused by the failure of any Leasehold Mortgagee to fund the periodic draws other than as a result of a default by Tenant; provided, however, that in no event shall the foregoing be deemed an Unavoidable Delay if Tenant fails to pay any amount due Landlord under this Lease for the failure of any Leasehold Mortgagee to fund any periodic draw. Any obligor claiming Unavoidable Delay shall Notify the obligee: (a) within thirty (30) days after such obligor knows of any such Unavoidable Delay (and the only consequence of the failure to provide such timely notice shall be the delay in the deemed accrual of such delay until such notice is actually given); and (b) within ten (10) days after such Unavoidable Delay ceases to exist. To be effective, any such Notice must describe the Unavoidable Delay in reasonable detail. Where this Lease states that performance of any obligation is subject to Unavoidable Delay(s) or words of similar import, such Unavoidable Delay(s) shall extend the time for such performance only by the number of days by which such Unavoidable Delay(s) actually delayed such performance.

"Usury Limit" means the highest rate of interest, if any, that Law allows under the circumstances.

"Waiver of Subrogation" means a provision in, or endorsement to, any property insurance policy, by which the carrier agrees to waive rights of recovery by way of subrogation against either party to this Lease for any loss such policy covers.

{Ground Lease - Execution Version / 01692902.DOCX /}

19

**2. TERM**

The term of this Lease (the "Term") shall: (a) commence on the Commencement Date; and (b) continue until the Scheduled Expiration Date, unless terminated sooner as provided in this Lease.

**3. RENT**

3.1 *Fixed Rent.* For so long as the Existing Lease is in effect, Tenant shall pay to Landlord, as Fixed Rent and Additional Rent, as applicable, the base rent and all other charges required to be paid by the Existing Tenant to Landlord under the Existing Lease so that there shall be a direct pass through of base rent and all other charges required to be paid by the Existing Tenant to Landlord under the Existing Lease. From and after the Existing Tenant Vacate Date, Fixed Rent payable by Tenant to Landlord under this Lease shall be as set forth in either 3.1.1 or 3.1.2 below, as applicable.

3.1.1 *Fixed Rent if the Property has not been Rezoned.* If the Property has not been Rezoned by the Existing Tenant Vacate Date, the Fixed Rent payable hereunder shall be $10.00 per buildable square foot that is "as of right" for the portion of the Lease Year following the last day of the calendar month in which the Existing Tenant Vacate Date occurs, increasing by two percent (2%) per annum for each Lease Year thereafter. If the Property has not been Rezoned within ten (10) years after the Existing Tenant Vacate Date (the "Ten Year Period"), the Fixed Rent payable hereunder shall reset upon the expiration of the Ten Year Period to the Fair Market Value of the Property (not to exceed $19.00 per buildable square foot that is "as of right" for the portion of the Lease Year beginning on the first day after the Ten Year Period, increasing by two percent (2%) per annum each Lease Year thereafter. If the Property is not Rezoned within ten (10) years after the Ten Year Period (the "Second Ten Year Period"), the Fixed Rent payable hereunder shall reset upon the expiration of the Second Ten Year Period to the Fair Market Value of the Property (not to exceed $22.00 per buildable square foot that is "as of right" for the portion of the Lease Year beginning on the first day after the Second Ten Year Period, increasing by two percent (2%) per annum each Lease Year thereafter. Notwithstanding anything to the contrary contained herein, in the event the Property is not Rezoned within thirty (30) years from the Effective Date, this Lease shall terminate on the date following such thirty (30) year period, the Fixed Rent and Additional Rent shall be prorated and adjusted as of such termination date, and both parties shall be released of all obligations pursuant to this Lease, except for those obligations which are expressly meant to survive the expiration or termination of this Lease.

3.1.2 *Fixed Rent if the Property has been Rezoned.* If within the first ten (10) Lease Years (the "10 Lease Year Period") the Property has been Rezoned prior to the Existing Tenant Vacate Date, the Fixed Rent payable hereunder commencing on the day after the Existing Tenant Vacate Date shall be an amount equal to $10.00 per buildable square foot of the Rezoned Floor Area (regardless of whether the Property is being used for residential and/or commercial purposes), increased by 2% each Lease Year, from the first year of the 10 Lease Year Period until the Existing Tenant Vacate Date occurs. For example, if the Existing Tenant Vacate Date occurs in year five (5) of the 10 Lease Year Period, the Fixed Rent payable by Tenant starting in year five (5) shall be $10.00 per buildable square foot of Rezoned Floor Area (which it would be

VA 010128

in year one (1) of the 10 Lease Year Period), increased by 2% each Lease Year for the next four (4) years (which is the increase each year until the fifth (5th) year of the 10 Lease Year Period). Thereafter, Fixed Rent shall increase at the rate of 2% each Lease Year. If, after the 10 Lease Year Period, the Premises is Rezoned and the Existing Tenant Vacate Date occurs, the Fixed Rent payable hereunder shall reset to the Fair Market Value of the Premises (not to exceed $19.00 per buildable square foot for of Rezoned Floor Area and regardless of whether the Property is being used for residential and/or commercial purposes), commencing on the later of (i) the day after the Existing Tenant Vacate Date occurs, and (ii) the day the Property is Rezoned, increasing by two percent (2%) each Lease Year thereafter.

      3.2    *Fair Market Value Determination.*    The Fair Market Value shall be determined as follows:

          (i)    Landlord shall provide Tenant with written notice of Landlord's determination of the Fair Market Value for the Premises ("Landlord's Determination") assuming that (a) the Premises is encumbered by this Lease for the then remaining Term of this Lease and (b) on the basis of its then current use of the Premises.

          (ii)    Tenant shall give Landlord written notice ("Tenant's Notice"), within sixty (60) days after Tenant's receipt of the Landlord's Determination, of whether Tenant accepts or disputes Landlord's Determination. If Tenant in Tenant's Notice accepts Landlord's Determination or if Tenant fails or refuses to give Tenant's Notice as aforesaid, Tenant shall be deemed to have accepted Landlord's Determination in accordance with the terms of this Section 3,2. If Tenant in Tenant's Notice disputes Landlord's Determination, Tenant shall deliver to Landlord in Tenant's Notice Tenant's determination of the Fair Market Value ("Tenant's Determination") as determined by an independent real estate appraiser ("Tenant's Appraiser"), together with a copy of the appraisal prepared by Tenant's Appraiser.

          (iii)    Landlord shall give Tenant written notice ("Landlord's Notice"), within thirty (30) days after Landlord's receipt of Tenant's Determination, of whether Landlord accepts or disputes Tenant's Determination. If Landlord in Landlord's Notice accepts Tenant's Determination or if Landlord fails or refuses to timely give Landlord's Notice as aforesaid. Landlord shall be deemed to have accepted Tenant's Determination. If Landlord in Landlord's Notice disputes Tenant's Determination, Landlord shall appoint an independent real estate appraiser ("Landlord's Appraiser"). Within thirty (30) days after Tenant's receipt of Landlord's Notice in dispute, Landlord's Appraiser and Tenant's Appraiser shall mutually agree upon the determination (the "Mutual Determination") of the Fair Market Value, their determination shall be final and binding upon the parties. If Landlord's Appraiser and Tenant's Appraiser shall be unable to reach a Mutual Determination within said thirty (30) day period, both of the appraisers shall jointly select a third independent real estate appraiser ("Third Appraiser") whose fee shall be borne equally by Landlord and Tenant. In the event that Landlord's Appraiser and Tenant's Appraiser shall be unable to jointly agree on the designation of the Third Appraiser within five (5) days after they are requested to do so by either party, then the parties agree to allow the American Arbitration Association, or any successor organization to designate the Third Appraiser in accordance with the rules, regulations and/or procedures then obtaining of the American Arbitration Association or any successor organization.

(iv) The Third Appraiser shall conduct such hearings and investigations as he/she may deem appropriate and shall, within thirty (30) days after the date of designation of the Third Appraiser, choose either Landlord's or Tenant's Determination, and such choice by the Third Appraiser shall be conclusive and binding upon Landlord and Tenant. Each party shall pay its own counsel fees and expenses if any, in connection with any Arbitration under this Section 3.2, including the expenses and fees of any appraiser selected by it in accordance with provisions of this Section 3.2. Any appraiser appointed pursuant to this Section 3.2 shall be an independent real estate appraiser with at least ten (10) years' experience in leasing and valuation of properties which are similar in character to the Premises, and a member of the American Institute of Appraisers of the National Association of Real Estate Boards and a member of the Society of Real Estate Appraisers and shall not otherwise be affiliated with the party so appointing such appraiser. The appraisers shall not have the power to add to, modify or change any of the provisions of this Lease.

(v) In the event the Fair Market Value is not agreed upon or decided in accordance with the provisions of this Section 3.2 when needed, then the monthly installments of the then Fixed Rent shall be made on the basis of the annual rental rate then in effect (together with all items constituting Additional Rent hereunder), until the Fair Market Value is agreed upon or decided in accordance with the provisions of this Section 3.2, at which time the monthly installment of the Fixed Rent next due shall be computed on the basis of the Fair Market Value calculation increased or decreased, as the case may be, to retroactively adjust the Fixed Rent paid during the period prior to the determination of Fair Market Value, and all subsequent monthly Fixed Rent payments in such period shall be at the new rate.

3.3 *Payment; Proration; Etc.* Tenant shall pay Fixed Rent in equal monthly installments in advance on the first day of each month beginning on the Commencement Date; provided, however, and notwithstanding anything to the contrary contained herein, Fixed Rent shall be abated for the one hundred eighty (180) day period immediately after the Existing Tenant Vacate Date. Tenant shall pay all Rent payable to Landlord by good and sufficient check payable to Landlord or by wire transfer, at such address as Landlord shall designate from time to time. Notwithstanding anything to the contrary contained in Sections 3.1.1 and 3.1.2 above, Fixed Rent shall not be increased during the first three (3) Lease Years after the Existing Tenant Vacate Date.

3.4 *Additional Rent.* In addition to Fixed Rent, Tenant shall pay Landlord (or the appropriate third party, as applicable), as additional rent under this Lease, all Additional Rent. Except where this Lease provides otherwise, Tenant shall pay all Additional Rent within thirty (30) days after receipt of an invoice and reasonable backup documentation.

3.5 *No Offsets.* Tenant shall pay all Rent without offset, defense, claim, counterclaim, reduction, or deduction of any kind whatsoever, except as otherwise set forth in this Lease.

3.6 *Prepaid Fixed Rent.* Within thirty (30) days after the Existing Tenant Vacate Date, Tenant shall pay to Landlord an amount equal to two (2) years of the Fixed Rent (the

{Ground Lease - Execution Version / 01692902.DOCX /}

WWDOXXCLIENT\9869712\LEASE\01692902.DOCX 22

"Prepaid Fixed Rent"). Landlord shall apply such Prepaid Fixed Rent towards Fixed Rent payable by Tenant hereunder following the Existing Tenant Vacate Date.

3.7     *Transfer Taxes.* Landlord shall timely pay upon the execution of this Lease, any transfer taxes payable in connection with this Lease, including, without limitation, in connection with the recording of the Memorandum of Lease; provided, however, that Tenant shall pay to Landlord, as Additional Rent, one-half of the amount paid by Landlord for any transfer taxes in connection with this Lease (as evidenced by paid invoices or other reasonable written documentation) which amount shall be paid by Tenant within thirty (30) days from Landlord's Notice therefor.

## 4.     ADDITIONAL PAYMENTS BY TENANT; REAL ESTATE TAXES

4.1     *Landlord's Net Return.* This Lease shall constitute an absolutely "net" lease. The Fixed Rent shall give Landlord an absolutely "net" return for the Term, free of any expenses or charges for the Premises, except as this Lease expressly provides. During the Term, Tenant shall pay as Additional Rent and discharge (subject to Tenant's right of Contest as this Lease expressly provides), before failure to pay creates a material risk of forfeiture or penalty, each and every item of expense, of every kind and nature whatsoever, related to or arising from the Premises and/or the Improvements, or by reason of or in any manner connected with or arising from the leasing, operation, management, maintenance, repair, use, or occupancy of, or Construction affecting, the Premises and/or the Improvements. Notwithstanding anything to the contrary in this Lease, Tenant need not pay, and Tenant may offset against Rent any sums paid by Tenant on account of, and Landlord shall Indemnify Tenant against payment of, the following items payable, accrued, or incurred by Landlord: (a) Fee Debt Service; (b) depreciation, amortization, brokerage commissions, financing or refinancing costs, management fees, or leasing expenses for the Fee Estate or the Premises; (c) consulting, overhead, accounting, tax preparation, other professional fees, travel, legal and staff costs, bank service charges, and other costs incidental to Landlord's ownership of the Premises and administration and monitoring of this Lease, including such costs Landlord incurs in reviewing anything Tenant delivers under this Lease (except where this Lease expressly provides otherwise) or determining whether Tenant is in compliance with this Lease; (d) any costs or expenses that Landlord incurs in or for any Arbitration, except to the extent that this Lease requires Tenant to pay such costs or expenses; (e) any costs arising from or under any instrument or agreement affecting the Premises (but not a Permitted Exception) and to which Landlord is a party and Tenant is not a party; (f) any insurance premiums, Real Estate Taxes (as defined below), utilities, operating expenses, or other costs related to the Premises that accrued before the Commencement Date; (g) any sums payable by Landlord under this Lease or expressly excluded from the definition of Real Estate Taxes; and (h) all other costs or expenses that, by their nature, are personal to Landlord or Landlord's business of investing in real estate or ownership of the Fee Estate.

4.2     *Real Estate Taxes.* Tenant shall pay and discharge all Real Estate Taxes payable or accruing for all period(s) within the Term, before failure to pay creates a material risk to Landlord of forfeiture or penalty, subject however to Tenant's right of Contest as this Lease expressly provides. Tenant shall also pay all interest and penalties any Government assesses for late payment of any Real Estate Taxes, except late payment because Landlord failed to remit any

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010131

payment for Real Estate Taxes (paid to Landlord by Tenant) in accordance with Tenant's reasonable instructions (provided they involve only ministerial functions) or failed to promptly cause all tax bills to be sent directly to Tenant from the appropriate taxing authority. In the latter case, Landlord shall pay such interest and penalties. Tenant shall, within a reasonable time after Notice from Landlord, give Landlord reasonable proof that Tenant has paid any Real Estate Taxes that this Lease requires Tenant to pay. Tenant shall have the sole right and authority to contest Real Estate Taxes, but only in strict compliance with the Contest Conditions.

4.3    *Assessments in Installments.* To the extent Law allows, Tenant may apply to have any assessment payable in installments. Upon approval of such application, Tenant shall pay and discharge only such installments as become due and payable during the Term.

4.4    *BID Decisions.* If any proposal is made to include the Premises in any BID (or to Modify the terms of any BID, including the amount or calculation of any required payments or assessments) and the owner of the Premises is entitled to vote in favor of or against such proposal, then Tenant shall decide how to vote, the parties shall cooperate to effectuate such decision, and Tenant shall have full power to represent the Premises in all matters regarding the BID, provided that at the time of determination: (a) no uncured Event of Default exists; and (b) the unexpired Term is five (5) years or more.

4.5    *Direct Payment by Landlord.* If any Additional Rent must be paid directly by Landlord, then: (a) Landlord appoints Tenant as Landlord's attorney-in-fact to make such payment; and (b) if the payee nevertheless refuses to accept payment from Tenant, then Tenant shall Notify Landlord and shall pay such amount to Landlord in a timely manner with reasonable instructions on remittance of such payment. Landlord shall with reasonable promptness comply with Tenant's reasonable instructions. Landlord shall Indemnify Tenant against Landlord's failure to do so.

4.6    *Utilities.* Tenant shall arrange and pay for all fuel, gas, light, power, water, sewage, garbage disposal, telephone, telecommunications, and other utility services to the Premises and the Improvements, and the expenses of installation, maintenance, repair and replacement of such services during the Term. Landlord shall have absolutely no liability or responsibility for the arranging or paying for any such utility services or for the installation, maintenance, repair, replacement and use of such services and such equipment and facilities.

## 5.    USE

5.1    *Permitted Use.* Tenant may use the Premises and the Improvements for the Permitted Use. Tenant need not operate the Premises or the Improvements, or conduct business of any nature in the Premises or the Improvements, or use or operate the Premises or the Improvements in any particular manner. Tenant may discontinue operation of the Premises or the Improvements at any time or from time to time. Tenant may vacate the Premises or the Improvements.

5.2    *Exclusive Control.* Tenant shall have exclusive control, possession, occupancy, use, and management of the Premises and the Improvements or, subject only to Permitted Exceptions. After the Existing Tenant Vacate Date, Tenant shall have the exclusive right to

{Ground Lease - Execution Version / 01692902.DOCX /}

install signage on or at the Premises and the Improvements, or to Transfer the right to install such signage during the Term, subject to and in compliance with all Laws. Tenant may enter into, terminate, or Modify any existing or future contract for management or operation of the Premises and the Improvements or provision of services to the Premises and the Improvements. Any such contracts shall automatically expire on the Expiration Date. Tenant may cancel and terminate any management contracts that exist on the Commencement Date. Landlord shall Indemnify Tenant for any such cancellation or termination.

5.3    *Management Fees.* Tenant shall timely pay and discharge all fees, costs, and expenses related to or arising from the management or operation of the Premises and the Improvements and the provision of services to the Premises and the Improvements.

## 6. COMPLIANCE

6.1    *Generally.* Tenant shall during the Term, at Tenant's expense, in all material respects, subject to Tenant's right of Contest: (a) comply with all Laws and Permitted Exceptions; and (b) procure and comply with all Approvals required by Law.

6.2    *Copies of Notices.* Landlord shall promptly give Tenant a copy of any notice of any kind regarding the Premises or the Improvements or any Real Estate Taxes (including any bill or statement), and any notice of nonrenewal or threatened nonrenewal of any Approval that Landlord receives from any Government, utility company, insurance carrier, or insurance rating bureau.

## 7. MAINTENANCE AND CONSTRUCTION

7.1    *Obligation to Maintain.* Except to the extent that (a) this Lease otherwise expressly provides or allows or (b) Tenant is performing Construction in compliance with this Lease, Tenant shall during the Term keep and maintain the Premises, the Improvements and the Building Equipment in a condition of order and repair sufficient to comply with Law and otherwise in good order, condition, and repair, subject to Loss (governed by other provisions of this Lease), reasonable wear and tear, and any other condition that this Lease does not require Tenant to repair. Tenant's obligation to maintain the Premises, the Improvements and the Building Equipment, includes an obligation to make all repairs that the Premises, the Improvements and the Building Equipment, (including plumbing, heating, air conditioning, ventilating, electrical, lighting, fixtures, walls, Structure, building systems, ceilings, floors, windows, doors, plate glass, skylights, landscaping, driveways, site improvements, curb cuts, parking lots, fences and signs located in, on or at the Premises, together with any sidewalks and streets adjacent to the Premises) may require by Law from time to time during the Term, whether structural or nonstructural, foreseen or unforeseen, capital or operating. Tenant shall remove trash, snow, and debris from the Premises, the Improvements and the Building Equipment, and the adjoining sidewalk, and maintain them in a reasonably clean condition and as required by Laws.

7.2    *Construction.* At Tenant's sole cost and expense, Tenant may but need not perform any Construction, as Tenant shall consider necessary or appropriate, provided that before Tenant starts any Major Construction, Tenant shall: (a) obtain Landlord's consent, not to
{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010133

be unreasonably withheld, conditioned or delayed (based solely on whether Tenant's proposed Major Construction would materially diminish the value of the Fee Estate); (b) give Landlord copies of all necessary Approvals; and (c) in connection with a Major Construction in which there is no Leasehold Mortgage, give Landlord the Completion Guaranty set forth on **Exhibit F** annexed hereto. To the extent that Tenant commences any Construction, Tenant shall complete it with reasonable diligence and within a reasonable time. Tenant shall pay for all Construction when and as required by the parties that perform such Construction.

7.3     *Plans and Specifications.*   To the extent that Tenant obtains plans and specifications or surveys (including working plans and specifications and "as-built" plans and specifications and surveys) for any Construction, Tenant shall promptly upon Landlord's request give Landlord a copy, subject to the terms of any agreement between Tenant and the applicable architect, engineer, or surveyor. Tenant shall exercise commercially reasonable efforts to cause its agreements with such professionals to permit these deliveries, which are for Landlord's information only except to the extent, if any, this Lease otherwise expressly states.

7.4     *Excavations.*   If an excavation shall be made (or authorized) upon land adjacent to the Premises, then Tenant shall either: (a) afford to the Person causing or authorized to cause such excavation a license to enter the Premises and the Improvements, in accordance with Tenant's reasonable instructions, to perform such work as such Person shall reasonably deem necessary or desirable, and as Tenant shall reasonably approve, provided that such Person agrees to preserve and protect the Premises and the Improvements, from injury or damage and to support the Premises and the Improvements, by proper foundations, obtain insurance and other reasonable protections requested by Tenant, and such Person or Persons shall use best efforts to minimize interference with Tenant and any Subtenants, and shall exercise such right under the supervision of Tenant's (and any such Subtenant's) employees, agents or designees; or (b) perform or cause to be performed, without cost or expense to Landlord in its capacity as Landlord under this Lease, work as described in clause "a" to the extent reasonably necessary under the circumstances. Notwithstanding anything to the contrary in this paragraph, Tenant shall comply with all Law that requires access to the Premises and the Improvements, for any excavation on adjacent land. Tenant shall not, because of any excavation or work described in this paragraph, have any claim against Landlord in its capacity as such for damages, indemnity, or suspension, diminution, abatement, or reduction of Rent. Any payment made because of any excavation described in this paragraph during the Term shall belong to Tenant free of any claim by Landlord.

7.5     *Applications.*   Upon Tenant's request, Landlord shall, without cost to Landlord, promptly join in and execute any Application as Tenant reasonably requests, provided that: (a) such Application is in customary form and imposes no material obligations (beyond obligations ministerial in nature or merely requiring compliance with Law) upon Landlord; (b) no uncured Event of Default exists; and (c) Tenant reimburses Landlord's Legal Costs in connection therewith.     Promptly upon Tenant's request and without charge (except reimbursement of Landlord's Legal Costs in connection therewith), Landlord shall furnish all information in its possession that Tenant reasonably requests for any Application.

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010134

## 8. PROHIBITED LIENS

8.1 *Tenant's Covenant.* If a Prohibited Lien is filed, then Tenant shall, within thirty (30) days after receiving Notice of such filing (but in any case within fifteen (15) days after the commencement of foreclosure proceedings), commence appropriate action to cause such Prohibited Lien to be paid, discharged, bonded, or cleared from title. Tenant shall thereafter prosecute such action with reasonable diligence and continuity. If Landlord receives notice of any such filing, then Landlord shall promptly Notify Tenant. Nothing in this Lease shall be construed to: (a) limit Tenant's right of Contest; or (b) obligate Tenant regarding any lien that results from any act or omission by Landlord.

8.2 *Protection of Landlord.* NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR OR MATERIALS FURNISHED OR TO BE FURNISHED TO TENANT UPON CREDIT, AND THAT NO MECHANIC'S OR OTHER LIEN FOR ANY SUCH LABOR OR MATERIALS SHALL ATTACH TO OR AFFECT THE FEE ESTATE. NOTHING IN THIS LEASE SHALL BE DEEMED OR CONSTRUED IN ANY WAY TO CONSTITUTE LANDLORD'S CONSENT OR REQUEST, EXPRESS OR IMPLIED, BY INFERENCE OR OTHERWISE, TO ANY CONTRACTOR, SUBCONTRACTOR, LABORER, EQUIPMENT OR MATERIAL SUPPLIER FOR THE PERFORMANCE OF ANY LABOR OR THE FURNISHING OF ANY MATERIALS OR EQUIPMENT FOR ANY CONSTRUCTION, NOR AS GIVING TENANT ANY RIGHT, POWER OR AUTHORITY TO CONTRACT FOR, OR PERMIT THE RENDERING OF, ANY SERVICES, OR THE FURNISHING OF ANY MATERIALS THAT WOULD GIVE RISE TO THE FILING OF ANY LIENS AGAINST THE FEE ESTATE. TENANT SHALL INDEMNIFY LANDLORD AGAINST ANY CONSTRUCTION UNDERTAKEN BY TENANT OR ANYONE CLAIMING THROUGH TENANT, AND AGAINST ALL PROHIBITED LIENS.

## 9. HAZARDOUS SUBSTANCES

9.1 *Restrictions.* Tenant shall not cause or permit to occur on, under or at the Premises during the Term: (a) any violation of any Environmental Law; or (b) the use, generation, release, manufacture, refining, production, processing, storage, or disposal of any Hazardous Substance, or transportation to or from the Premises of any Hazardous Substance, unless both: (i) reasonably necessary and customary to conduct any legal business in the Premises in accordance with customary standards in such business, or to operate and maintain the Premises for uses this Lease permits and (ii) in compliance with all Environmental Laws.

9.2 *Compliance; Clean-Up.* Tenant shall, during the Term with respect to acts not caused by Landlord or its agents, servants, contractors or employees, at Tenant's expense: (a) comply with Environmental Law and, to the extent Environmental Law requires, clean up any Hazardous Substance Discharge; (b) make all submissions to, deliver all information required by, and otherwise fully comply with all requirements of any Government under Environmental Laws; (c) if any Government requires any clean-up plan or clean-up because of a Hazardous Substances Discharge, prepare and submit the required plans and all related bonds and other financial assurances; (d) promptly and diligently carry out all such clean-up plans; and

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010135

(e) Indemnify Landlord against any Hazardous Substances Discharge or violation of Environmental Law; provided, however, Tenant shall not be required to Indemnify Landlord for any Hazardous Substance Discharge that occurred prior to the Commencement Date or any migration of Hazardous Substances from any neighboring land owners. Landlord, at its sole cost and expense, shall with respect to any acts or omissions caused solely by Landlord or its agents, servants, contractors or employees, clean up any discharge of Hazardous Substances on the Premises caused solely by Landlord or its agents, servants, contractors or employees.

## 10. INDEMNIFICATION; LIABILITY OF LANDLORD

10.1 *Obligations.* Landlord and Tenant shall each Indemnify the other resulting from the: (a) wrongful act, wrongful omission, or negligence of the Indemnitor (and anyone claiming by or through the Indemnitor) or its or their partners, members, directors, officers, or employees; (b) breach or default by the Indemnitor under this Lease; or (c) breach of any representation or warranty Indemnitor makes in this Lease. Tenant shall Indemnify Landlord against the following during the Term and so long as Tenant remains in possession after the Expiration Date: (i) any Contest Tenant initiates; (ii) any Application made at Tenant's request, including, without limitation, the rezoning of the Premises; (iii) use, occupancy, control, management, operation, and possession of the Premises or the Improvements; (iv) any Construction and any agreements that Tenant (or anyone claiming through Tenant) makes for any Construction; (v) the condition of the Premises or the Improvements or any street, curb or sidewalk adjoining the Premises, or of any vaults, tunnels, passageways or space under, adjoining or appurtenant to the Premises; and (vi) any accident, injury or damage whatsoever caused to any person in or on the Premises or upon or under the sidewalks adjoining the Premises or the Improvements. In addition, Tenant shall Indemnify Landlord resulting from Tenant's obligations as landlord under the Existing Lease first arising after the Commencement Date, and Landlord shall Indemnify Tenant resulting from Landlord's obligations as landlord under the Existing Lease arising prior to the Commencement Date. Notwithstanding anything to the contrary in this Lease, no Indemnitor shall be required to Indemnify any Indemnitee regarding the Indemnitee's acts or omissions or negligence. This paragraph does not apply to Environmental Law and Hazardous Substances Discharges, which are covered elsewhere.

10.2 *Liability of Landlord.* During the Term: (a) other than the Existing Tenant, Tenant is and shall be in exclusive control and possession of the Premises and the Improvements; and (b) Landlord shall not be liable for any injury or damage to any property (of Tenant or any other Person) or to any person occurring on or about the Premises or the Improvements, except to the extent caused by Landlord's intentional act, omission, or negligence. Landlord's right to enter and inspect the Premises and the Improvements is intended solely to allow Landlord to ascertain whether Tenant is complying with this Lease and (to the extent this Lease allows) to cure any Default. To the extent that Landlord undertakes any such work or repairs, such work or repairs shall be commenced and completed in a good and workmanlike manner, and with reasonable diligence, and in such a manner as not to unreasonably interfere with the conduct of business in or use of the Premises. Such provisions shall not impose upon Landlord any liability to third parties. Nothing in this Lease shall be construed to exculpate, relieve, or Indemnify Landlord from or against any liability of Landlord: (y) to third parties existing at or before the Commencement Date; or (z) arising from Landlord's intentional acts or omissions or negligence.

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010136

10.3   *Indemnification Procedures.*   Wherever this Lease requires any Indemnitor to Indemnify any Indemnitee:

10.3.1   *Prompt Notice.*   Indemnitee shall promptly Notify Indemnitor of any claim. To the extent, and only to the extent, that Indemnitee fails to give prompt Notice and such failure materially prejudices Indemnitor, Indemnitor shall be relieved of its indemnity obligations for such claim.

10.3.2   *Selection of Counsel.*   Indemnitor shall select counsel reasonably acceptable to Indemnitee. Counsel to Indemnitor's insurance carrier shall be deemed satisfactory. Even though Indemnitor shall defend the action, Indemnitee may, at its option and its own expense, engage separate counsel to advise it regarding the claim and its defense. Such counsel may attend all proceedings and meetings. Indemnitor's counsel shall actively consult with Indemnitee's counsel, at Indemnitee's cost and expense. Indemnitor and its counsel shall, however, fully control the defense.

10.3.3   *Cooperation.*   Indemnitee shall reasonably cooperate with Indemnitor's defense.

10.3.4   *Settlement.*   Indemnitor may, with Indemnitee's consent, not to be unreasonably withheld, settle the claim. Indemnitee's consent shall not be required for any settlement by which: (w) Indemnitor procures (by payment, settlement, or otherwise) a release of Indemnitee by which Indemnitee need not make any payment to the claimant; (x) neither Indemnitee nor Indemnitor on behalf of Indemnitee admits liability; (y) the continued effectiveness of this Lease is not jeopardized in any way; and (z) Indemnitee's interest in the Premises is not jeopardized in any way.

10.3.5   *Insurance Proceeds.*   Indemnitor's obligations shall be reduced by net insurance proceeds Indemnitee actually receives for the matter giving rise to indemnification.

*10.4   Indemnification Survival.*   The indemnification provisions of this Lease shall survive the Expiration Date with respect to any liability, suit, obligation, fine, damage, penalty, claim, cost, charge or expense arising out of or in connection with any matter which is the subject of indemnification under this Lease that accrued prior to the Expiration Date.

## 11.   RIGHT OF CONTEST

11.1   *Tenant's Right; Contest Conditions.*   Notwithstanding anything to the contrary in this Lease, Tenant shall have the exclusive right to contest, at its sole cost, by appropriate legal proceedings diligently conducted in good faith, the amount or validity of any Real Estate Taxes or Prohibited Lien; the valuation, assessment, or reassessment (whether proposed, phased, or final) of the Premises and/or the Improvements for Real Estate Taxes; the amount of any Real Estate Tax; the validity of any Law or its application to the Premises and/or the Improvements; the terms or conditions of, or requirements for, any Approval; or the validity or merit of any claim against which this Lease requires Tenant to Indemnify Landlord (any of the foregoing, a "Contest"). Tenant may defer payment or performance of the contested obligation pending outcome of the Contest, provided that Tenant causes the following conditions (collectively, the

{Ground Lease - Execution Version / 01692902.DOCX /}

29

"Contest Conditions") to remain satisfied (and any dispute about Tenant's satisfaction of the Contest Conditions shall be resolved by Arbitration). Notwithstanding anything contained herein to the contrary, Landlord agrees to reasonably cooperate with Tenant in connection with any Contest hereunder at no cost or expense to Landlord.

11.1.1 *No Criminal Act.* Such deferral or noncompliance shall not constitute a criminal act by Landlord or subject Landlord to a material risk of any fine or penalty, except civil penalties for which Tenant has given Landlord a bond, letter of credit, or other security reasonably satisfactory to Landlord (the "Contest Security") in an amount equal to the reasonably estimated amount of such civil penalties.

11.1.2 *No Liability.* Such deferral or noncompliance creates no imminent risk of a lien, charge, or other liability of any kind against the Fee Estate, unless Tenant has given Landlord Contest Security equal to the reasonably estimated amount of such lien, charge, or other liability.

11.1.3 *No Forfeiture.* Such deferral or noncompliance will not place the Fee Estate in imminent danger of being forfeited or lost.

11.1.4 *No Cost to Landlord.* Such Contest shall be without cost, liability, or expense to Landlord.

11.1.5 *Diligence.* Tenant shall prosecute such Contest with reasonable diligence and in good faith.

11.1.6 *Payment.* If required for such Contest, Tenant shall have paid the Contested Real Estate Taxes or other matter.

11.1.7 *Collection of Real Estate Taxes.* If such Contest relates to any Real Estate Tax, then such Contest shall suspend its collection from Landlord and the Fee Estate.

11.1.8 *No Tax Deed.* If, at any time, payment of any Real Estate Taxes is necessary to prevent the imminent (i.e., within thirty (30) days) delivery of a tax deed of the Fee Estate for nonpayment, then Tenant shall pay or cause to be paid the sums in sufficient time to prevent delivery of such deed.

11.1.9 *No Event of Default.* No Uncured Event of Default shall exist under this Lease at the time of such Contest.

11.1.10 *Security.* Except for any Contest involving the Real Estate Taxes, if the amount at issue in such Contest (and all other Contests then pending) exceeds an amount equal to $100,000.00 times the CPI Adjustment Factor, then Tenant shall, before proceeding with such Contest, give Landlord Contest Security equal to such excess (less any Contest Security otherwise provided for the same Contest).

{Ground Lease - Execution Version / 01692902.DOCX /}

W:\WDOX\CLIENTS\8857\202\EA3E\01692902.DOCX                    30

VA 010138

11.1.11 *Named Parties.* If Landlord has been named as a party in any action, then Tenant shall use commercially reasonable efforts to cause Landlord to be removed as such party and Tenant substituted in Landlord's place, if permissible under the circumstances.

11.2 *Landlord Obligations and Protections.* Landlord need not join in any Contest unless (a) Tenant has complied with the Contest Conditions; and (b) such Contest must be initiated or prosecuted in Landlord's name. In such case, Landlord shall cooperate, as Tenant reasonably requests, to permit the Contest to be prosecuted in Landlord's name. Landlord shall give Tenant any documents, deliveries, and information in Landlord's control and reasonably necessary for Tenant to prosecute its Contest. Landlord shall otherwise assist Tenant in such Contest as Tenant reasonably requires. Tenant shall pay all reasonable costs and expenses, including Legal Costs, of any Contest.

11.3 *Miscellaneous.* Tenant shall be entitled to any refund of any Real Estate Taxes (and penalties and interest paid by Tenant), to the extent attributable to periods within the Term, whether such refund is made during or after the Term. When Tenant concludes Tenant's Contest of any Real Estate Taxes, Tenant shall pay the amount of such Real Estate Taxes (if any) as has been finally determined in such Contest to be due, to the extent attributable to periods within the Term, and any costs, interest, penalties, or other liabilities in connection with such Real Estate Taxes. Upon final determination of Tenant's Contest of a Law, Tenant shall comply with such final determination. So long as the Contest Conditions remain satisfied, Landlord shall enter no objection to any Contest. Landlord may contest any matter for which Tenant is entitled to (but does not) prosecute a Contest, but only if: (a) Landlord Notifies Tenant of Landlord's intention to do so; (b) Tenant fails to commence such Contest within thirty (30) days after receipt of such Notice; and (c) Landlord's contest complies with all conditions and covenants that would apply to a Contest by Tenant, transposing references to the parties and their interests as appropriate.

11.4 *Contest Security.* Landlord shall promptly release any Contest Security to Tenant after the Contest has been resolved and Tenant has performed its obligations, if any, as determined by such resolution. Landlord shall hold any Contest Security in the same manner as a prudent landlord would hold a security deposit under a commercial lease in New York City.

## 12. INSURANCE

12.1 *Tenant to Insure.* Tenant shall, at its sole expense, during the Term, maintain the following insurance (or its then reasonably available equivalent): (a) Property Insurance; and (b) Liability Insurance.

12.2 *Nature of Insurance Program.* All insurance policies this Lease requires shall be issued by carriers that: (a) have a policyholders' rating of "A+VIII" or better, based on the latest rating publication of Property and Casualty Insurers by A.M. Best Company (or its equivalent if such publication ceases to be published); and (b) are lawfully doing business in the State or are permitted and authorized or licensed to insure properties in the State. Tenant may provide any insurance under a "blanket" or "umbrella" insurance policy, provided that (i) such policy or a certificate of such policy shall specify the amount(s) of the total insurance allocated to the

VA 010139

Premises, which amount(s) shall equal or exceed the amount(s) required by this Lease and shall not be reduced for claims made for other properties; and (ii) such policy otherwise complies with this Lease.

12.3    *Policy Requirements and Endorsements.* All insurance policies this Lease requires shall contain (by endorsement or otherwise) the following provisions:

12.3.1    *Insureds.* Liability Insurance policies shall name Landlord, Landlord's managing agent, and all Mortgagees this Lease allows as "additional insureds." Property Insurance policies shall name Tenant or its designee as loss payee as its interest may appear and each Mortgagee this Lease allows under a standard noncontributing mortgagee clause. Notwithstanding anything to the contrary in this paragraph, all Property Insurance Proceeds shall be paid and applied as this Lease provides.

12.3.2    *Primary Coverage.* All policies shall be written as primary policies not contributing to or in excess of any coverage that Landlord may carry and shall contain a waiver of subrogation in favor of Landlord.

12.3.3    *Contractual Liability.* Liability Insurance policies shall contain contractual liability coverage, for Tenant's indemnity obligations under this Lease, to the extent covered by customary contractual liability insurance coverage. Tenant's failure to obtain such contractual liability coverage shall not relieve Tenant from any indemnity obligation under this Lease.

12.3.4    *Notice to Landlord.* Tenant shall (and shall use commercially reasonable efforts to have the insurance carrier) give Landlord thirty (30) days' prior Notice of cancellation or nonrenewal, except for nonpayment of premiums, provided that failure to give such Notice shall not adversely affect the rights or increase the obligations of the insurance carrier.

12.4    *Deliveries to Landlord.* On the Commencement Date and/or upon written request by Landlord, and no later than ten (10) days before any Liability Insurance or Property Insurance expires or is cancelled, Tenant shall deliver to Landlord certificates of insurance evidencing Tenant's maintenance of all Liability Insurance and Property Insurance this Lease requires, in each case providing coverage for at least one year from the date delivered. In the event of any dispute regarding Tenant's compliance with the insurance requirements of this Lease, Tenant may at Tenant's option obtain a certificate from a reputable insurance broker confirming such compliance. Such certificate shall be dispositive.

12.5    *Tenant's Inability to Obtain Insurance.* So long as (a) any insurance (except Property Insurance) this Lease requires is, after diligent effort by Tenant, unobtainable at commercially reasonable rates through no act or omission by Tenant; (b) a Leasehold Mortgagee that is an Institutional Lender has waived the provision or maintenance of such insurance; and (c) Tenant obtains the maximum insurance coverage reasonably obtainable and Notifies Landlord of the extent of Tenant's inability to obtain the full insurance this Lease requires, Tenant's obligation to procure and maintain such insurance as is unobtainable shall be excused, but only so long as conditions "a" through "c" are satisfied. Notwithstanding the foregoing, if
{Ground Lease - Execution Version / 01692902.DOCX /}

Landlord at any time can procure for Tenant such insurance at commercially reasonable rates at any time after Tenant's Notice of inability to do so (and before Tenant has withdrawn such Notice), then Landlord shall obtain and maintain such insurance at Tenant's expense and reimburse Landlord for the cost of such insurance, plus, on the first occasion only, a one-time administrative fee equal to four percent (4%) of the annual premium. Any dispute regarding this paragraph shall be resolved by Arbitration.

12.6     *Waiver of Certain Claims.* To the extent that Landlord or Tenant purchases any policy of property insurance, the party purchasing such insurance (the "Insurance Purchaser") shall attempt to cause the insurance carrier to agree to a Waiver of Subrogation, if not already in the policy. If any insurance policy cannot be obtained with a Waiver of Subrogation, or a Waiver of Subrogation is obtainable only by paying an additional premium, then the Insurance Purchaser shall so Notify the other party. The other party shall then have ten (10) Business Days after receipt of such Notice either to (a) direct the Insurance Purchaser to place such insurance with a company reasonably satisfactory to the other party and willing to issue the insurance with a Waiver of Subrogation at no greater or additional cost; or (b) agree to pay the additional premium if such a policy can be obtained only at additional cost. To the extent that the parties actually obtain insurance with a Waiver of Subrogation, the parties release each other, and their respective authorized representatives, from any claims for damage to any person or the Premises that are caused by or result from risks insured against under such insurance policies.

12.7     *No Representation.* Neither party makes any representation that the limits, scope, or forms of insurance coverage this Lease requires are adequate or sufficient.

12.8     *Additional Insurance.* Upon thirty (30) days' written notice, Tenant shall obtain and deliver reasonably satisfactory evidence of such other reasonable insurance and in such reasonable amounts as Landlord, not more than once every five (5) years, may request and is then customarily maintained by owners of properties in the Borough of Brooklyn for the Permitted Uses.

## 13.     LOSSES AND LOSS PROCEEDS

13.1     *Loss.* If a Loss occurs: (a) the Party that first becomes aware of such Loss shall notify the other Party; (b) Leasehold Mortgagee may participate in negotiating and settling any claim to, and supervise and control the receipt of, Loss Proceeds; (c) the Parties shall direct the payor to pay all Loss Proceeds to Leasehold Mortgagee and if there is no Leasehold Mortgagee to an Institutional Lender pursuant to a mutually acceptable escrow agreement; (d) Loss Proceeds shall be applied as set forth below until exhausted; (e) Tenant's rights to receive Loss Proceeds shall be subject to the rights of Leasehold Mortgagee(s); (f) Landlord's rights to receive Loss Proceeds shall be subject to rights of Fee Mortgagee(s); and (g) the Parties shall have the following rights and obligations.

13.2     *Total Loss With Regard to Condemnation.* If a Total Loss occurs with regard to a Condemnation, this Lease shall terminate effective as of the date of the Condemnation Effective Date. The Loss Proceeds with regard to a Condemnation shall be disbursed to Landlord and Tenant with Landlord receiving Landlord's Percentage of the Loss Proceeds and Tenant

{Ground Lease - Execution Version / 01692902.DOCX /}

W:\WDOX\CLIENTS\857\2\LEASE\01692902.DOCX          33

receiving Tenant's Percentage of the Loss Proceeds. Any amounts payable to the Landlord shall be subject to the rights of any Fee Mortgagee under any applicable Fee Mortgage and payable from Landlord's Percentage of the Loss Proceeds; and any amounts payable to the Tenant shall be subject to the rights of any Leasehold Mortgagee under any applicable Leasehold Mortgage and payable from Tenant's Percentage of the Loss Proceeds.

13.3    *Termination Option Loss.* If a Termination Option Loss occurs or a Total Loss with regard to a Casualty, Tenant may (subject to the provisions of this Lease with respect to Lease Impairments) terminate this Lease by Notice to Landlord within thirty (30) days after the date that such Termination Option Loss occurs, time being of the essence with respect to the giving of such Notice. If Tenant timely exercises such right to terminate in connection with a Termination Option Loss, then Landlord shall receive all Loss Proceeds. If Tenant timely exercises such right to terminate in connection with a Total Loss the Loss Proceeds shall be disbursed to Landlord and Tenant as follows: Landlord receiving Landlord's Percentage of the Loss Proceeds and Tenant receiving Tenant's Percentage of the Loss Proceeds. Any amounts payable to the Landlord shall be subject to the rights of any Fee Mortgagee under any applicable Fee Mortgage and payable from Landlord's Percentage of the Loss Proceeds; and any amounts payable to the Tenant shall be subject to the rights of any Leasehold Mortgagee under any applicable Leasehold Mortgage and payable from Tenant's Percentage of the Loss Proceeds; provided, however, that with respect to a Total Loss with regard to a Casualty, Leasehold Mortgagee, to the extent required under the Leasehold Mortgage, the Leasehold Mortgagee shall be paid the insurance proceeds for the Initial Development in full prior to any disbursement to Landlord or Tenant, with Tenant receiving all remaining Loss Proceeds, if any.

13.4    *Revaluation.* Upon any Condemnation of the Premises or any portion thereof and/or the Improvements or any portion thereof, except a Temporary Condemnation or a Total Loss, and this Lease does not terminate on account of a Loss, Tenant shall receive and apply Loss Proceeds to Restore the Improvements to a Permitted Use (comparable in size and quality, subject to then existing market conditions), to the extent Law permits and to the extent reasonably possible under the circumstances and the remaining Loss Proceeds shall be disbursed to Tenant. In such event, future Rent under this Lease shall decrease by the product of such future Rent (measured as if the Condemnation had not occurred) multiplied by the percentage of the Premises so taken.

13.5    *Temporary Condemnation.* In the event of a Temporary Condemnation, all Loss Proceeds shall be payable to Tenant.

13.6    *Restoration.* If this Lease does not terminate on account of a Casualty, subject to the terms of any Leasehold Mortgage, Tenant shall apply Loss Proceeds to Restore the Improvements to a Permitted Use (comparable in size and quality, subject to then existing market conditions), to the extent Law permits and to the extent reasonably possible under the circumstances.

13.7    *Disbursement.* To the extent that this Lease requires Tenant to apply Loss Proceeds for a specified purpose, such Loss Proceeds shall (except as this Lease otherwise provides) be disbursed: (a) from time to time under reasonable and customary disbursement

{Ground Lease - Execution Version / 01692902.DOCX /}

procedures as Leasehold Mortgagee (or, absent any Leasehold Mortgagee, Landlord) reasonably requires; and (b) to Tenant, only if and when Tenant has accomplished the specified purpose.

## 14.    REPRESENTATIONS AND WARRANTIES

Landlord represents and warrants to Tenant that the following facts and conditions exist and are true as of the Commencement Date. In addition, Tenant makes, for the benefit of Landlord, certain reciprocal representations and warranties as set forth below.

14.1    *Due Authorization and Execution.* Landlord has full right, title, authority, and capacity to execute and perform this Lease, the Memorandum of Lease, and any other agreements and documents to which Landlord is a party and referred to or required by this Lease (collectively, the "Lease-Related Documents"); the execution and delivery of the Lease-Related Documents have been duly authorized by all requisite actions of Landlord; the Lease-Related Documents constitute valid, binding, and enforceable obligations of Landlord; and neither the execution of the Lease-Related Documents nor the consummation of the transactions contemplate thereby violates any agreement (including Landlord's organizational documents), contract, or other restriction to which Landlord is a party or is bound. Tenant makes to Landlord representations and warranties reciprocal to those in the preceding sentence.

14.2    *No Litigation.* There is no existing or, to Landlord's knowledge, pending or threatened litigation, suit, action, or proceeding before any court or administrative agency affecting Landlord or the Premises that would, if adversely determined, materially adversely affect Landlord, the Premises, this Lease, the Leasehold Estate, or Tenant's ability to develop and operate the Premises.

14.3    *No Pending Condemnation.* There is no existing or, to Landlord's knowledge, pending or threatened Condemnation affecting any portion of the Premises that will materially adversely affect the use and operation of the Premises, the value of the Premises or access to the Premises.

14.4    *FIRPTA.* Landlord is not a "foreign person" within the meaning of United States Internal Revenue Code §1445(f)(3).

14.5    *No Other Tenants.* Except for the Existing Tenant, Tenant is the only lessee of the Premises. Except for the Existing Tenant, no other Person has any right to lease, use, or occupy the Premises.

14.6    *Prohibited Party.* Landlord and Tenant are not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order of the President of the United States of America (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department, as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, or nation pursuant to any law that is enforced or administered by the United States Office of Foreign Assets Control, and is not engaging in this transaction, directly or indirectly, on behalf

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010143

of, or instigating or facilitating this transaction, directly or indirectly, on behalf of, any such person, group, entity or nation.

## 15.    **LANDLORD'S TRANSFERS**

15.1    *Landlord's Right to Convey.* Landlord (or the holder of any Equity Interest in Landlord) may Transfer the Fee Estate (or such Equity Interest) from time to time. Landlord shall notify Tenant of such Transfer.

15.2    *Release of Landlord.* Upon any Transfer of the entire Fee Estate, the grantor shall be automatically freed and relieved from all liability (excluding liability previously accrued) for performance of any covenants or obligations to be performed by Landlord after the Transfer, provided that: (i) Landlord delivers and turns over to the grantee all Trust Funds; and (ii) such successor Landlord acknowledges to Tenant receipt of such Trust Funds and assumes Landlord's past, present, and future obligations under this Lease, subject to the Nonrecourse Clause in a written instrument. This Lease shall bind Landlord only while Landlord owns the Fee Estate, except as to any liabilities and obligations accrued before the date of Transfer of the Fee Estate or arising from failure to turn over Trust Funds.

## 16.    **FEE MORTGAGES**

16.1    *Fee Mortgage.* Subject to the further provisions of this Article 16, Landlord shall have the unqualified right, from time to time and at any time, to grant one or more Fee Mortgages. This Lease and Tenant's Leasehold Estate in this Lease, as the same may be modified, amended or renewed, and any New Lease or the leasehold interest of the Tenant under a New Lease as provided for in Article 20 hereof shall be superior to any Fee Mortgage placed on the Premises after the Commencement Date. Notwithstanding anything to the contrary contained herein, Tenant acknowledges that the Premises is currently encumbered by a Fee Mortgage held by Webster Bank (the "Existing Mortgage"). Landlord covenants to have such Fee Mortgage discharged and/or removed from record prior to Tenant's filing of its application to have the Premises Rezoned; provided that Tenant delivers to Landlord written notice at least ninety (90) days prior to Tenant's filing of its application to have the Premises Rezoned.

16.2    *Successor to Landlord.* If any Fee Mortgagee, or any of its successors or assigns, or any other person claiming by or through any such Fee Mortgagee or by or through any foreclosure proceeding pursuant to any such Fee Mortgage, shall succeed to the rights of Landlord under this Lease, Tenant shall attorn to and recognize such successor as Tenant's landlord under this Lease, and Tenant shall promptly execute and deliver at any time any instrument that may be necessary to evidence such attornment. Upon such attornment, this Lease shall continue in full force and effect as a direct lease between Tenant and such successor landlord, upon and subject to all of the then executory terms, covenants and conditions of this Lease. The provisions of this Section shall be self-operative, and no instrument of any such attornment shall be required or needed by the holders of any such Fee Mortgage.    In confirmation of any such attornment Tenant shall, at Landlord's request or at the request of any such Fee Mortgagee, promptly execute and deliver such further instruments as may be reasonably required by any such Fee Mortgagee. Notwithstanding anything to the contrary

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010144

contained in this Lease, in the event any default notice is received pursuant to the Existing Mortgage by Landlord, Landlord shall provide Tenant with a copy of any notice of default issued by the holder of the Existing Mortgage. In the event of any such default notice, the substance of which remains uncured by Landlord beyond the expiration of any applicable notice, grace and/or cure period, Tenant may, in its sole discretion, cure such default of Landlord under the Existing Mortgage and offset the actual amount expended by Tenant in connection with the curing of such default against Tenant's Fixed Rent payments due under this Lease until Tenant has recovered the actual amount expended in connection with such cure.

16.3    *Notices and Cure Rights of Fee Mortgagee*. If Landlord or a Fee Mortgagee gives Tenant Notice of the name and address of a Fee Mortgagee, then Tenant hereby agrees to give to any such Fee Mortgagee copies of all notices sent by Tenant to Landlord under this Lease at the same time and in the same manner as and whenever Tenant shall give any such Notice to Landlord, and no such Notice shall be deemed given to Landlord hereunder unless and until a copy of such Notice shall have been so delivered to such Fee Mortgagee. Such Fee Mortgagee shall have the right to remedy any default of Landlord under this Lease, or to cause any default of Landlord under this Lease to be remedied and, for such purpose, Tenant hereby grants such Fee Mortgagee such additional period of time as may be reasonable to enable such Fee Mortgagee to remedy, or cause to be remedied, any such default in addition to the period given to Landlord for remedying, or causing to be remedied, any such default. Tenant shall accept performance by such Fee Mortgagee of any term, covenant, condition or agreement to be performed by Landlord under this Lease with the same force and effect as though performed by Landlord. No default under this Lease shall exist or shall be deemed to exist as long as such Fee Mortgagee, in good faith, shall have commenced to cure such default and shall be prosecuting the same to completion with reasonable diligence, subject to Force Majeure. In the event of the termination of this Lease by reason of Landlord's default hereunder, upon such Fee Mortgagee's written request, given within thirty (30) days after any such termination, Tenant, within thirty (30) days after receipt of such request, shall execute and deliver to such Fee Mortgagee or its designee or nominee a new lease of the Premises upon substantially all of the terms contained herein for the remainder of the Term of this Lease upon all of the terms, covenants and conditions of this Lease. Neither such Fee Mortgagee nor its designee or nominee shall become liable under this Lease unless and until such Fee Mortgagee or its designee or nominee becomes, and then only for so long as such Fee Mortgagee or its designee or nominee remains, the fee owner of the Premises. Such Fee Mortgagee shall have the right, without Tenant's consent, to foreclose the Fee Mortgage or to accept a deed in lieu of foreclosure of such Fee Mortgage.

## 17.    TENANT'S TRANSFERS

Tenant may Transfer this Lease or the Leasehold Estate without Landlord's consent, except to any Person that is (or can elect to be) immune from civil process. Any assignee of Tenant shall assume all obligations and liabilities of Tenant under this Lease from and after the effective date of the assignment. Tenant shall pay all transfer and other taxes payable on account of any Transfer by Tenant or any holder of any Equity Interest in Tenant. Tenant shall promptly Notify Landlord of any Transfer. After Tenant assigns this Lease and the assignee assumes this Lease, the assignor shall have no obligation or liability under this Lease, except:  (a) any obligation to hold and apply Restoration Funds held by the assignor at the date of the assignment

VA 010145

(unless transferred to the assignee); and (b) any unperformed obligations that arose before the assignment (unless assumed in writing, in recordable form, by the assignee). If Tenant assigns this Lease, then as between Landlord and Tenant, Tenant shall be deemed to have assigned to the assignee or transferee all claims against Landlord then existing, and the assignee shall be deemed, by assuming this Lease, to have assumed all liabilities and obligations of Tenant then existing or thereafter arising under this Lease (except as this Lease otherwise expressly states). Notwithstanding the foregoing, this Article 17 is subject to the provisions of Section 31.9.

## 18. SUBLEASES

18.1 *Tenant's Right*. Tenant may enter into or Modify any Sublease, terminate any Sublease or evict any Subtenant, and grant any consent under any Sublease, all without Landlord's consent. No Sublease shall affect any obligations of Tenant or rights of Landlord under this Lease, all of which shall continue in full force and effect notwithstanding any Sublease. Any Sublease shall expire no later than one hour before the Expiration Date. Tenant shall take all steps commercially reasonable and necessary to prevent any such Default.

18.2 *Assignment of Subrents*. To secure Tenant's performance, Tenant assigns, transfers, and sets over to Landlord, subject to the conditions in this paragraph (and the rights of Leasehold Mortgagees), Tenant's right, title, and interest in and to all Subleases and Subrent. Tenant grants to Landlord, and its agents and representatives, a right to enter, and sufficient possession of, the Premises to permit and assure Landlord's collection of Subrent. Landlord's exercise of such rights shall not constitute an eviction of Tenant. Unless and until this Lease has terminated, Tenant shall have a license to exercise its right, title, and interest in and to all Subleases and Subrent. Landlord may revoke such license, at its option, if and only if this Lease has terminated. Upon any such revocation, Landlord may collect Subrent directly from Subtenants, and apply the net amount collected to the Rent. No such collection shall be, or be deemed to be, Landlord's waiver of any terms of this Lease, acceptance of any Subtenant as Tenant, or release of Tenant from any obligations under this Lease. Any sums that Landlord collects in excess of the net amount Landlord applies against Rent shall (so long as this Lease has not been terminated) belong to Tenant and be promptly refunded to Tenant (subject to the rights of Leasehold Mortgagee).

18.3 *Required Provisions*. Each Sublease shall contain provisions in form and substance substantially as set forth below in this Section. By executing its Sublease, each Subtenant shall be deemed to have agreed to these provisions, which reflect the definitions in this Lease. All such defined terms shall be modified in the Sublease as appropriate to reflect the definitions in the Sublease.

All terms, covenants, and provisions of this Sublease and all rights, remedies, and options of Subtenant under this Sublease are and shall at all times remain fully subject and subordinate in all respects to the Lease. If the Lease and the Leasehold Estate terminate, then this Sublease shall terminate. In that event, Subtenant, only at the option and request of Landlord (except as Landlord has agreed otherwise in writing), shall attorn to Landlord and recognize Landlord as Subtenant's direct landlord under this Sublease. Subtenant shall execute and

{Ground Lease - Execution Version / 01692902.DOCX /}

deliver, at any time and from time to time, upon the request of Tenant, Landlord, or any Mortgagee, any instrument necessary or appropriate to evidence such attornment. Subtenant appoints each of the foregoing as Subtenant's attorney-in-fact, irrevocably, with full power of substitution, to execute and deliver any such instrument. This appointment is coupled with an interest and is irrevocable. Subtenant waives any Law that may allow Subtenant to terminate this Sublease or surrender possession of the demised subpremises if the Lease terminates.

18.4 *Conditions to Effectiveness of Certain Transactions.* No assignment of this Lease or Sublease of (substantially) the entire Premises and the Improvements shall be effective or have any validity unless and until such assignment or Sublease otherwise complies with this Lease and Landlord has received: (a) in the case of an assignment, an executed counterpart of the assignment and an assumption of this Lease by the assignee, in recordable form, effective as of the date of assignment; (b) in the case of a Sublease of all or substantially all the Premises and the Improvements, a copy of the executed Sublease complying with this Lease; and (c) Notice of the assignee or Subtenant.

## 19. EXISTING TENANT.

Tenant acknowledges and agrees that the Premises are subject to the Existing Lease, and for so long as the Existing Lease is in effect, this Lease is and shall be subject and subordinate to the Existing Lease, the terms and conditions thereof, and the rights, title and interest of the Existing Tenant therein. Simultaneously upon the Commencement Date, Landlord shall assign to Tenant all of its rights, title and interest in and to the Existing Lease pursuant to the Assignment and Assumption of Lease set forth on **Exhibit H** annexed hereto and made a part hereof. Tenant acknowledges and agrees to perform all of the obligations of the landlord under the Existing Lease, and to abide by the terms and conditions set forth therein. Tenant shall keep Landlord apprised of its negotiations, and promptly provide copies of all correspondences with, the Existing Tenant in connection with Tenant's and the Existing Tenant's determination of the fair market value for each option period under the Existing Lease. From and after the Commencement Date, Landlord shall be released from all liability and obligations of the landlord under the Existing Lease with respect to matters first arising after the Commencement Date. In the event of any conflict between the Existing Lease and this Lease, the Existing Lease shall in all respects control.

## 20. LEASEHOLD MORTGAGES.

20.1 *Leasehold Mortgages.* Without Landlord's consent, at any time(s): (a) provided that any monetary or material nonmonetary Event of Default has been, or simultaneously is, cured, Tenant may grant Leasehold Mortgage(s); (b) any Leasehold Mortgagee may initiate and complete any Foreclosure Event and exercise any other rights and remedies against Tenant and the Leasehold Estate (but not the Fee Estate) under its Leasehold Mortgage; and (c) any transferee through a Foreclosure Event, and its successors and assigns, may assign this Lease.

{Ground Lease - Execution Version / 01692902.DOCX /}

W:\WLDOX\CLI\ENTS\0957\JLEA\S\01692902.DOCX                39

VA 010147

20.2    *Lease Impairments.* Any Lease Impairment made without Leasehold Mortgagee's consent shall (at Leasehold Mortgagee's option) be null, void, and of no force or effect, and not bind Tenant, Leasehold Mortgagee or New Tenant.

20.3    *Notices.* Any Notice from Landlord to Tenant shall have no effect unless Landlord gives a copy of such Notice to Leasehold Mortgagee. If any Default occurs for which Landlord intends to exercise any remedy, Landlord shall promptly give Leasehold Mortgagee a Notice of Default.

20.4    *Opportunity to Cure. Landlord shall accept Leasehold Mortgagee's cure of any* Default at any time until sixty (60) days after both: (a) Tenant and Leasehold Mortgagee have received the Notice of Default for that Default; and (b) Landlord has notified Leasehold Mortgagee that Tenant's cure period for that Default has expired. If Leasehold Mortgagee cannot reasonably cure the Default within Leasehold Mortgagee's cure period set forth in the preceding sentence, Leasehold Mortgagee shall have such further time as Leasehold Mortgagee reasonably needs so long as Leasehold Mortgagee proceeds with reasonable diligence. If Leasehold Mortgagee cannot reasonably cure a Default without possession, or if any Tenant-Specific Default(s) occur(s), Leasehold Mortgagee shall be entitled to such additional time as Leasehold Mortgagee reasonably needs to consummate a Foreclosure Event and obtain possession, provided Leasehold Mortgagee timely exercises its cure rights for all other Defaults other than Defaults described in clause (b) of the definition of Tenant-Specific Defaults. If Leasehold Mortgagee consummates a Foreclosure Event, Landlord shall waive all Tenant-Specific Defaults. During the period that Leasehold Mortgagee is exercising its cure rights, including, without limitation, a Foreclosure Event, the time periods set forth in this Lease for the Initial Development Commencement Deadline and the Initial Development Completion Deadline, as applicable, shall be tolled. Furthermore, Landlord acknowledges that as soon as practicable after the conclusion of the exercise of its rights hereunder, Leasehold Mortgagee shall cause New Tenant to continue the construction in accordance with the terms of this Lease or a New Lease, as the case may be.

20.5    *Cure Rights Implementation.* During the period that Leasehold Mortgagee's time to cure a Default or consummate a Foreclosure Event has not expired, Landlord shall not terminate this Lease, accelerate any rent, or otherwise interfere with Tenant's or Leasehold Mortgagee's possession and quiet enjoyment of the Premises and/or the Improvements. Leasehold Mortgagee may enter the Premises and/or the Improvements to seek to cure a Default. This right or its exercise shall not be deemed to give Leasehold Mortgagee possession.

20.6    *New Lease.* If this Lease terminates for any reason (except with Leasehold Mortgagee's consent or because of a Total Loss), even if Leasehold Mortgagee failed to timely exercise its cure rights for a Default, Landlord shall promptly give Leasehold Mortgagee a Lease Termination Notice. By giving notice to Landlord on or before the day that is forty-five (45) days after Leasehold Mortgagee receives the Lease Termination Notice, Leasehold Mortgagee may require Landlord to promptly enter into a New Lease with New Tenant. Landlord need not do so, however, unless New Tenant has, consistent with the Lease Termination Notice: (a) cured all reasonably curable Defaults other than Tenant-Specific Defaults; and (b) reimbursed

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010148

Landlord's reasonable costs and expenses (including reasonable attorneys' fees and expenses) to terminate this Lease, recover the Premises and the Improvements, and enter into the New Lease.

      20.6.1 *New Lease Implementation*. If Leasehold Mortgagee timely requests a New Lease in conformity with this Lease, then, from the date that this Lease terminates until the date that Landlord and New Tenant execute and deliver a New Lease, Landlord shall not: (a) operate the Premises or the Improvements in an unreasonable manner; (b) terminate or materially Modify any Sublease except in the case of a Subtenant's default and in such event only pursuant to the terms of its sublease; or (c) lease any portion of the Premises or any portion of the Improvements except to New Tenant. When Landlord and New Tenant execute and deliver a New Lease, Landlord shall transfer to New Tenant all Subleases (together with any security or other deposits held by Tenant and not applied under such Subleases to the extent Landlord has actually received the same), service contracts, operation of the Premises and the Improvements, and net income Landlord collected from the Premises and the Improvements during the period described in the previous sentence, and Landlord shall cause every Fee Mortgagee to subordinate unconditionally to the New Lease. Landlord agrees to execute, and shall use commercially reasonable efforts to cause any Fee Mortgagee to execute, any instruments reasonably necessary to maintain the priority of the New Lease over any Fee Mortgage; all at Tenant's cost and expense. In addition, Landlord shall assign to the New Tenant all of its right, title and interest in and to Loss Proceeds or any other monies Tenant is entitled to under this Lease, if any, then held by, or payable to, or previously paid to Landlord that Tenant would have been entitled to receive but for the occurrence of an Event of Default and the expiration of any cure periods.

      In the event of rejection in connection with a bankruptcy proceeding by Tenant, a trustee in a bankruptcy or such other party to such proceeding on behalf of Tenant, as applicable, such rejection shall be deemed an assignment by Tenant to Leasehold Mortgagee of all of Tenant's right, title and interest in and to the Lease and the Lease shall not terminate. In connection therewith, Leasehold Mortgagee shall have all of the right, title and interest of the Tenant as if such bankruptcy proceeding has not occurred, unless Leasehold Mortgagee shall reject such deemed assignment by notice in writing to Landlord within sixty (60) days following rejection of the Lease by Tenant, the trustee in bankruptcy or such other party to such proceeding, as applicable. If any court of competent jurisdiction shall determine that, notwithstanding the terms of the preceding sentences, the Lease shall have been terminated as a result of a rejection by Tenant, the trustee in the bankruptcy or such other party to such proceeding, as applicable or the Lease shall have been terminated by Landlord for any other reason, Landlord shall, on Leasehold Mortgagee's written election, enter into a New Lease with the Leasehold Mortgagee in accordance with the provisions of this Article 20, it being the intention of the parties to preserve the Lease and the leasehold estate created by the Lease for the benefit of Leasehold Mortgagee without interruption of this Lease in bankruptcy by Tenant, or of any succeeding Lease made pursuant to the provisions of this Article 20 prior to the Expiration Date.

      20.7 *Tenant's Rights*. If Tenant's period to exercise any Preemptive Right expires, Landlord shall promptly Notify Leasehold Mortgagee thereof. Until forty-five (45) days after Leasehold Mortgagee receives such Notice, Leasehold Mortgagee may exercise such Preemptive Right for Tenant. Notwithstanding anything to the contrary in this Lease, so long as Leasehold

{Ground Lease - Execution Version / 01692902.DOCX /}

41

Mortgagee's time to obtain a New Lease has not expired, Leasehold Mortgagee may exercise Tenant's rights (including Preemptive Rights) under this Lease, even if a Default exists or Tenant has otherwise not satisfied conditions within Tenant's control. Tenant irrevocably assigns to Leasehold Mortgagee: (a) to the exclusion of Tenant and any other Person, any right to exercise any Bankruptcy Termination Option; and (b) any right of Tenant to object to any Bankruptcy Sale by Landlord.

20.8    *Certain Proceedings.* If Landlord or Tenant initiates any appraisal, Arbitration, litigation, or other dispute resolution proceeding affecting this Lease, then the Parties shall simultaneously notify Leasehold Mortgagee. Leasehold Mortgagee may participate in such proceedings on Tenant's behalf, or exercise any or all of Tenant's rights in such proceedings, in each case (at Leasehold Mortgagee's option) to the exclusion of Tenant. No settlement shall be effective without Leasehold Mortgagee's consent, unless Tenant simultaneously pays the settlement, the amount at issue does not exceed $1,000,000.00, and the claimant has released (or does not assert) any claim against Leasehold Mortgagee.

20.9    *No Merger.* If the Leasehold Estate and the Fee Estate are ever commonly held, they shall remain separate and distinct estates (and not merge) without Leasehold Mortgagee's and Fee Mortgagee's consent.

20.10    *No Personal Liability.* No Leasehold Mortgagee or New Tenant shall ever have any liability under this Lease beyond its interest in this Lease and the Improvements, even if it becomes Tenant hereunder or assumes this Lease. Any such liability shall: (a) not extend to any Default that occurred before such Tenant became the tenant under this Lease (or the New Tenant under a New Lease), except as identified in a Notice of Default (or Lease Termination Notice) delivered to Leasehold Mortgagee before such Tenant became the tenant under this Lease (or the New Tenant under a New Lease) and then only with respect to Defaults that are not Defaults described in clause (b) of the definition of Tenant-Specific Defaults; and (b) terminate if and when any such Tenant assigns (and the assignee assumes) or abandons this Lease (or a New Lease).

20.11    *Multiple Leasehold Mortgagees.* If at any time multiple Leasehold Mortgagees exist: (a) any consent by or notice to a Leasehold Mortgagee refers to all Leasehold Mortgagees; (b) the most senior Leasehold Mortgagee may exercise all rights of Leasehold Mortgagees, to the exclusion of junior Leasehold Mortgagees; (b) to the extent that the most senior Leasehold Mortgagee declines to do so, any other Leasehold Mortgagee may exercise those rights, in order of priority; and (c) if Leasehold Mortgagees do not agree on priorities, a written determination of priority issued by a title insurance company licensed in the State shall govern.

20.12    *Further Assurances.* Upon request from Tenant or any Leasehold Mortgagee (prospective or current), Landlord shall promptly, under documentation reasonably satisfactory to the requesting Person: (a) acknowledge any Subtenant's nondisturbance and recognition rights (provided such Subtenant joins in such agreement); (b) agree directly with Leasehold Mortgagee that it may exercise against Landlord all Leasehold Mortgagee's rights in this Lease; (c) certify (subject to any then exception reasonably specified) that this Lease is in full force and effect, that no Lease Impairment has occurred, that, to Landlord's knowledge, no Default exists, the date

VA 010150

through which Rent has been paid, and other similar matters as reasonably requested; and (d) provided Tenant reimburses Landlord's reasonable attorneys' fees and expenses, amend this Lease as any current or prospective Leasehold Mortgagee reasonably requests, provided such amendment does not materially adversely affect Landlord or reduce any payment required hereunder.

20.13   *Miscellaneous.* Notwithstanding anything to the contrary in this Lease, Leasehold Mortgagee may: (a) exercise its rights through an Affiliate, assignee, designee, nominee, subsidiary or other Person, acting in its own name or in Leasehold Mortgagee's name (and anyone acting under this clause "a" shall automatically have the same protections, rights, and limitations of liability as Leasehold Mortgagee); (b) refrain from curing any Default; (c) abandon such cure or Foreclosure Event at any time; or (d) withhold consent or approval for any reason or no reason, except where this Lease states otherwise. Any such consent or approval must be written. To the extent any Leasehold Mortgagee's rights under this Lease apply after this Lease terminates, such rights shall survive such termination. No holder of a Leasehold Mortgage shall become liable under the provisions of this Lease unless and until such time as it becomes, and then only for so long as it remains, the owner of a leasehold estate created hereby or in accordance with a New Lease. A default by Tenant under a Leasehold Mortgage shall not constitute an Event of Default hereunder, except to the extent Tenant's acts or omissions constitute an Event of Default pursuant to the terms hereof. Furthermore, a Foreclosure Event pursuant to the terms of any Leasehold Mortgage shall not require Landlord's consent, violate the terms of this Lease or in and of itself constitute an Event of Default hereunder.

## 21.   INTENTIONALLY OMITTED

## 22.   QUIET ENJOYMENT; ACCESS AND INSPECTION; TITLE

22.1   *Quiet Enjoyment.* So long as this Lease has not been terminated, Landlord covenants that Tenant shall and may peaceably and quietly have, hold, and enjoy the Premises for the Term, subject to the terms of this Lease, without molestation, hindrance, or disturbance by or from Landlord or anyone claiming by or through Landlord or having title to the Premises paramount to Landlord, and free of any encumbrance created or suffered by Landlord, except Permitted Exceptions.

22.2   *Access and Inspection.* Notwithstanding anything to the contrary in this Lease, Landlord and its agents, representatives, and designees may enter the Premises and the Improvements upon reasonable Notice during regular business hours, solely to: (a) ascertain whether Tenant is complying with this Lease; (b) cure Tenant's Defaults after the expiration of the applicable cure period; (c) inspect the Premises and any Construction; (d) upon reasonable suspicion of a Hazardous Substance Discharge and Landlord provides thirty (30) days Notice of its intention to conduct an environmental audit together with a statement setting forth the reasons therefor and Tenant fails to conduct an environmental audit of the Premises during such thirty (30) day period, perform such tests, borings, and other analyses as Landlord reasonably determines may be necessary or appropriate relating to (non)compliance with any Law or possible Hazardous Substances Discharge; or (e) show the Premises and the Improvements to a prospective Transferee or Fee Mortgagee. In entering the Premises and the Improvements,

VA 010151

Landlord and its designees shall not unreasonably interfere with operations on the Premises and the Improvements, any such work or repairs shall be commenced and completed in a good and workmanlike manner and shall comply with Tenant's reasonable instructions. Notwithstanding anything to the contrary contained herein, prior to obtaining access in connection with subsection (d), Landlord shall provide Tenant with reasonable prior written notice, shall use commercially reasonable efforts to ensure that such tests borings and other analyses is performed in a manner that will minimize disruption to Tenant and any Subtenants and shall be responsible for all required repairs resulting from same. Following a request from Landlord, Tenant shall exercise commercially reasonable efforts to obtain such access from any Subtenants or occupants in possession.

22.3    *Title.* Notwithstanding anything to the contrary in this Lease, all Improvements, Building Equipment, and FF&E located in, on, or at the Premises shall, during the Term, be owned by, and belong to, Tenant. All benefits and burdens of ownership of the foregoing, including title, depreciation, tax credits, and all other tax items, shall be and remain in Tenant during the Term. Tenant shall be treated as the owner of the Improvements, Building Equipment, and FF&E and all materials and equipment incorporated therein for federal, state and local income tax purposes under applicable law. Landlord shall, upon reasonable request and at the cost of Tenant, take such reasonable actions as may be reasonably requested by Tenant to confirm such ownership in Tenant of the Improvements, Building Equipment, and FF&E for such purposes and in no event shall Landlord knowingly take any tax position contrary to the foregoing.

## 23.    EVENTS OF DEFAULT; REMEDIES

23.1    *Definition of "Event of Default.* An "Event of Default" means the occurrence of any one or more of the following

23.1.1    *Monetary Default.* If a Monetary Default occurs and continues for thirty (30) days after Notice from Landlord, specifying in reasonable detail the amount of money not paid and the nature and calculation of each such payment.

23.1.2    *Prohibited Liens.* If Tenant fails to comply with any obligation regarding Prohibited Liens and does not remedy such failure within thirty (30) days after Notice from Landlord.

23.1.3    *Bankruptcy or Insolvency.* If Tenant ceases to do business as a going concern, ceases to pay its debts as they become due or admits in writing that it is unable to pay its debts as they become due, or becomes subject to any Bankruptcy Proceeding (except an involuntary Bankruptcy Proceeding dismissed within one hundred twenty (120) days after commencement), or a custodian or trustee is appointed to take possession of, or an attachment, execution or other judicial seizure is made with respect to, substantially all of Tenant's or Guarantor's assets or Tenant's interest in this Lease (unless such appointment, attachment, execution, or other seizure was involuntary and is contested with diligence and continuity and vacated and discharged within one hundred (120) days).

VA 010192

23.1.4    *Nonmonetary Default.* If any other Nonmonetary Default occurs and Tenant does not cure it within sixty (60) days after Notice from Landlord describing it in reasonable detail, or, in the case of a Nonmonetary Default that cannot with due diligence be cured within sixty (60) days from such Notice, if Tenant shall not (x) within sixty (60) days from Landlord's Notice advise Landlord of Tenant's intention to take all reasonable steps to cure such Nonmonetary Default; (y) duly commence such cure within such period, and then diligently prosecute such cure to completion; and (z) complete such cure within a reasonable time under the circumstances.

23.1.5    *Initial Development.* Subject to an Unavoidable Delay and any delays caused by Landlord, if Tenant fails to cause the following for the Initial Development: (a) the Construction Commencement Date to occur on or before the Initial Development Commencement Deadline; and (b) the Construction Completion Date to occur on or before the Initial Development Completion Deadline, and such failure shall continue for a period of ninety (90) days after Notice thereof by Landlord to Tenant specifying such failure.

23.2    *Remedies.* If an Event of Default occurs, then Landlord shall, subject to the rights of Leasehold Mortgagee(s), at Landlord's option, have any or all of the following remedies, all cumulative (so exercise of one remedy shall not preclude exercise of another remedy), in addition to such other remedies as may be available at law or in equity or under any other terms of this Lease. Landlord's remedies include:

23.2.1    *Termination of Tenant's Rights.* Landlord may terminate Tenant's right to possess the Premises and the Improvements by any lawful means, in which case this Lease and the Term shall terminate, such date of termination shall be the Expiration Date, and Tenant shall immediately surrender possession thereof to Landlord.

23.2.2    *Taking Possession.* Landlord may re-enter and take possession of the Premises and the Improvements with process of law, whether by summary proceedings or otherwise, and remove Tenant, with or without having terminated this Lease, and without thereby being liable for damages or guilty of trespass. This is intended to constitute an express right of re-entry by Landlord. Except as expressly provided in this Lease or prohibited by Law, Tenant, for and on behalf of itself and all persons claiming by, through or under Tenant, expressly waives any right to service of notice of intention to re-enter provided in any Law and any and all right of redemption provided by any Law, or re-entry or repossession or to restore the operation of this Lease if Tenant is dispossessed by a judgment or by warrant of any court or judge or in case of re-entry or repossession by Landlord or any expiration or termination of this Lease. No re-entry by Landlord, whether had or taken under summary proceedings or otherwise, shall absolve or discharge Tenant from liability under this Lease. The terms "enter," "re-enter," "entry," and "re-entry," as used in this Lease, are not restricted to their technical legal meanings.

23.2.3    *Suits Before Expiration Date.* Landlord may sue for damages or to recover Rent from time to time at Landlord's election.

23.2.4    *Receipt of Moneys.* No receipt of money by Landlord from Tenant after termination of this Lease, or after the giving of any notice of termination of this Lease, shall

{Ground Lease - Execution Version / 01692902.DOCX /}

reinstate, continue, or extend this Lease or affect any notice theretofore given to Tenant, or waive Landlord's right to enforce payment of any Rent payable or later falling due, or Landlord's right to recover possession by proper remedy, except as this Lease expressly states otherwise, it being agreed that after service of notice to terminate this Lease or the commencement of suit or summary proceedings, or after final order or judgment for possession, Landlord may demand, receive, and collect any moneys due or thereafter falling due without in any manner affecting such notice, proceeding, order, suit or judgment, all such moneys collected being deemed payments on account of use and occupation or, at Landlord's election, on account of Tenant's liability.

      23.2.5    *No Waiver.* No failure by Landlord or Tenant to insist upon strict performance of any covenant, agreement, term, or condition of this Lease or to exercise any right or remedy upon a Default, and no acceptance of full or partial Rent during continuance of any such Default, shall waive any such Default or such covenant, agreement, term, or condition. No covenant, agreement, term, or condition of this Lease to be performed or complied with by Landlord or Tenant, and no Default, shall be Modified except by a written instrument executed by Landlord or Tenant, as applicable. No waiver of any Default shall Modify this Lease. Each and every covenant, agreement, term, and condition of this Lease shall continue in full force and effect with respect to any other then-existing or subsequent Default of such covenant, agreement, term or condition of this Lease.

      23.2.6    *Damages.* Landlord may recover from Tenant all damages Landlord incurs by reason of Tenant's Default, including reasonable costs of recovering possession, reletting the Premises and the Improvements, and any and all other damages legally recoverable by Landlord, and reimbursement of Landlord's reasonable out of pocket costs, including Legal Costs and bank fees for dishonored checks. Such damages shall include, at Landlord's election, either (a) the present value, calculated at a discount rate equal to the then-current Prime Rate, of the excess of the total Fixed Rent under this Lease over the Fair Market Value of the Premises for the balance of the Term; or (b) the Rent payable to Landlord provided for in this Lease, when and as due and payable under this Lease, less Landlord's actual proceeds of reletting the Premises, less (in the case of this clause "b" only) Landlord's actual reasonable costs of reletting the Premises. Landlord may recover such damages at any time after Tenant's default, including after expiration of the Term. Notwithstanding any Law to the contrary, (x) Landlord need not commence separate actions to enforce Tenant's obligations for each month's Rent not paid, or each month's accrual of damages for Tenant's Default, but may bring and prosecute a single combined action for all such Rent and damages; and (y) Landlord may not recover any consequential damages for Tenant's Default.

      23.2.7    *Injunction of Breaches.* Whether or not an Event of Default has occurred, Landlord may obtain a court order enjoining Tenant from continuing any Default or from committing any threatened Default. Tenant specifically and expressly acknowledges that damages would not constitute an adequate remedy for any Nonmonetary Default.

      23.2.8    *Continue Lease.* Landlord may at Landlord's option maintain Tenant's right to possession. In that case, this Lease shall continue and Landlord may continue to enforce it, including the right to collect Rent when due and any remedies for nonpayment.

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010154

23.2.9    *Restoration Funds.* Upon any termination of this Lease, to the extent that Landlord or Depository then holds any Restoration Funds, they shall be applied solely as Landlord directs, including as a payment toward any sums then payable to Landlord.

23.3    *Proceeds of Reletting.* Landlord shall apply any proceeds of any reletting as follows, without duplication, but including Default Interest on all such sums:

23.3.1    *Landlord's Costs.* First, to pay to itself the reasonable cost and expense of terminating this Lease, re-entering, retaking, repossessing, repairing, performing any Construction, and the reasonable cost and expense of removing all persons and property therefrom, including in such costs reasonable and customary brokerage commissions and Legal Costs;

23.3.2    *Preparation for Reletting.* Second, to pay to itself the cost and expense reasonably sustained in securing any new tenants and other occupants, including in such costs all reasonable and customary brokerage commissions, Legal Costs, and any other reasonable costs of preparing the Premises for reletting;

23.3.3    *Costs of Maintenance and Operation.* Third, to the extent that Landlord shall maintain and operate the Premises and the Improvements, to pay to itself the reasonable cost and expense of doing so; and

23.3.4    *Residue.* Fourth, to pay to itself any balance remaining on account of Tenant's liability to Landlord.

23.4    *Exculpation; Landlord's Sole and Exclusive Remedy.* Notwithstanding anything to the contrary in this Lease, Landlord's right to terminate this Lease and re-enter the Premises and the Improvements and take possession of the Premises and the Improvements (and collect damages from Tenant, but only to the extent of Tenant's interest in the Premises and the Improvements) shall constitute Landlord's sole and exclusive remedy for any Default or Event of Default. Landlord expressly waives, releases, and relinquishes any and all right to recover damages or any other sum, or have any other remedy against Tenant, except to the extent of Tenant's interest in the Premises.

23.5    *Tenant's Late Payments; Late Charges.* If Tenant fails to make any payment to Landlord required under this Lease within twenty (20) days after such payment is first due and payable, then, in addition to any other remedies of Landlord, and without reducing or adversely affecting any of Landlord's other rights and remedies, Tenant shall pay Landlord, within twenty (20) days after written demand, Default Interest on such late payment, beginning on the date such payment was first due and payable and continuing until the date when Tenant actually makes such payment. In addition, and without limiting any other rights or remedies of Landlord, Tenant shall pay Landlord, as Additional Rent, an administrative charge equal to four percent (4%) of any payment that Tenant fails to pay within twenty (20) days after such payment is first due and payable, however, such charge shall be waived by Landlord for the first late payment by Tenant occurring during any 12 month period. Such administrative charge is intended to compensate Landlord for the inconvenience and staff time incurred by Landlord to handle the

VA 010155

late or missed payment, shall not be deemed a penalty or compensation for use of funds, and shall not be credited against any other obligations of Tenant under this Lease.

23.6     *Landlord's Right to Cure.* If Tenant at any time fails to make any payment or take any action this Lease requires, then Landlord, after thirty (30) days' Notice to Tenant, or in an emergency with such notice (if any) as is reasonably practicable under the circumstances, and without waiving or releasing Tenant from any obligation or Default and without waiving Landlord's right to take such action as this Lease may permit as a result of such Default, may (but need not) make such payment or take such action, but only if Tenant's failure will likely have a material adverse impact on the Premises that would not be readily curable. Tenant shall reimburse Landlord, as Additional Rent, for an amount equal to (a) all reasonable sums paid, and reasonable costs and expenses (including Legal Costs) incurred, by Landlord in exercising its cure rights under this paragraph; and (b) Default Interest on "a.".

23.7     *Holding Over.* If for any reason or no reason Tenant remains in the Premises or the Improvements after the Expiration Date, then Landlord will suffer injury that is substantial, difficult, or impossible to measure accurately. Therefore, if Tenant remains in the Premises or the Improvements after the Expiration Date, for any reason or no reason, then, in addition to any other rights or remedies of Landlord, Tenant shall pay to Landlord, as liquidated damages and not as a penalty, for each month (prorated daily for partial months) during which Tenant holds over after the Expiration Date, a sum equal to:  one hundred twenty percent (120%) for the second full month of holding over, one hundred fifty percent (150%) for the third full month of holding over, and two hundred percent (200%) for each subsequent month of holding over, times the monthly Rent, including Additional Rent, payable under this Lease during the year preceding the Expiration Date.

23.8     *Waivers.*     LANDLORD AND TENANT IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, COUNTERCLAIM, OR OTHER LITIGATION ARISING OUT OF OR RELATING TO THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT REGARDING THE PREMISES AND THE IMPROVEMENTS, ENFORCEMENT OF THIS LEASE, TENANT'S USE OR OCCUPANCY OF THE PREMISES, ANY CLAIM OF INJURY OR DAMAGE ARISING BETWEEN LANDLORD AND TENANT, OR ANY ACTIONS OF LANDLORD IN CONNECTION WITH OR RELATING TO THE ENFORCEMENT OF THIS LEASE. TENANT WAIVES ANY RIGHT OF REDEMPTION PROVIDED FOR BY LAW. TENANT WAIVES ANY RIGHT TO INTERPOSE ANY COUNTERCLAIM (OTHER THAN A COMPULSORY COUNTERCLAIM) IN ANY ACTION BY LANDLORD TO ENFORCE THIS LEASE OR LANDLORD'S RIGHTS AND REMEDIES UNDER THIS LEASE.

23.9     *Accord and Satisfaction; Partial Payments.* No payment by Tenant or receipt by Landlord of a lesser amount than the amount owed under this Lease shall be deemed to be other than a part payment on account by Tenant. Any endorsement or statement on any check or letter accompanying any check or payment of Rent shall not be deemed an accord or satisfaction. Landlord may accept any such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy.

23.10 *Miscellaneous.* Landlord and Tenant further agree as follows with respect to any Defaults and Landlord's rights and remedies.

23.10.1 *Survival.* No termination of this Lease and no taking possession of or reletting the Premises or the Improvements shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession, or reletting, but subject to any limitations on personal liability or recourse in this Lease.

23.10.2 *Multiple Suits.* Landlord may sue to recover damages, or sum(s) equal to any installment(s) of Rent payable by Tenant, from time to time at Landlord's election. Nothing in this Lease requires Landlord to await the date when this Lease or the Term would have expired absent an Event of Default and a resulting termination of this Lease.

23.10.3 *Receipt of Monies.* Unless such payment shall fully cure all Monetary Defaults, no receipt of moneys by Landlord from Tenant after the giving of a termination notice or a notice to obtain possession, or after the retaking of possession by Landlord as aforesaid, shall reinstate, continue, or extend the Term or affect any notice previously given to Tenant, waive Landlord's right to enforcement of Rent payable by Tenant or thereafter falling due, or waive Landlord's right to recover possession of the Premises and the Improvements. After the service of any such notice, or commencement of any suit or summary proceedings, or after a final order or judgment for possession of the Premises and the Improvements, Landlord may demand, receive, and collect any moneys due or thereafter falling due without in any manner affecting such notice, proceeding, order, suit, or judgment, unless such payments fully cure all Monetary Defaults. Any sums so collected (without thereby curing all Monetary Defaults) shall instead be deemed payments on account of Tenant's liability under this Lease.

23.10.4 *No Double Recovery.* In no event shall Landlord be entitled, directly or indirectly, to recover twice for the same element of Landlord's damages.

## 24.   END OF TERM

Upon the expiration or earlier termination of the Term: (a) all Improvements, and Building Equipment, to the extent then existing, shall become Landlord's property and Tenant waives any and all claims for compensation resulting from Landlord's retention or disposition of same; (b) Tenant shall deliver to Landlord possession of the Premises and the Improvements in the condition that this Lease requires, subject to reasonable wear and tear and any Loss that this Lease does not require Tenant to Restore; (c) Tenant shall surrender any right, title, or interest in and to the Premises and the Improvements and deliver such evidence and confirmation thereof as Landlord reasonably requires; (d) Tenant shall deliver the Premises and the Improvements free and clear of all: (i) Subleases, and (ii) liens except (1) Permitted Exceptions and (2) liens that Landlord or any of its agents caused; (e) Tenant shall assign to Landlord, without recourse, and give Landlord copies or originals of, all assignable licenses, permits, contracts, warranties, and guarantees then in effect for the Premises and the Improvements; (f) the parties shall cooperate to achieve an orderly transition of operations from Tenant to Landlord without interruption, including delivery of such books and records (or copies thereof) as Landlord reasonably requires; (g) the parties shall adjust for Real Estate Taxes and all other expenses and income of the

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010157

Premises and the Improvements and any prepaid Rent and shall make such payments as shall be appropriate on account of such adjustment in the same manner as for a sale of the Premises (but any sums otherwise payable to Tenant shall first be applied to cure any Default(s) then existing); (h) the parties shall terminate the Memorandum of Lease; and (i) Tenant shall assign to Landlord, and Landlord shall reimburse Tenant for, all utility and other service provider deposits for the Premises. Notwithstanding anything to the contrary in this paragraph, Tenant may remove from the Premises any FF&E and Building Equipment, but Tenant must do so, if at all, before or within forty-five (45) days after the expiration or earlier termination of the Term. Tenant shall repair any material damage from any such removal. During such forty-five (45) day period: (x) Tenant may enter the Premises for such purposes, without being deemed a holdover; (y) Landlord shall have no obligation to preserve or protect such FF&E or Building Equipment; and (z) in entering the Premises, Tenant shall comply with Landlord's reasonable instructions. Tenant's FF&E and Building Equipment not removed within forty-five (45) days after the Expiration Date shall be deemed abandoned.

## 25. NOTICES

All Notices shall be in writing and addressed to Landlord and Tenant (and their designated copy recipients) as set forth in **Exhibit E** attached hereto. Notices (including any required copies as set forth in **Exhibit E** attached hereto) shall be delivered by Federal Express or other overnight (one-night) courier service to the addresses set forth in **Exhibit E** attached hereto, in which case they shall be deemed delivered on the date of delivery (or when delivery has been attempted twice, as evidenced by the written report of the courier service) to such address(es). Notwithstanding the foregoing, Notices for the regular payment of Rent under this Lease (as opposed to late payments, for example) may be sent by first class mail, in which case they shall be deemed delivered three (3) Business Days after deposit in the United States mail, provided that no postal strike (or other event likely to disrupt postal service) is then in effect. Either party may change its address by Notice in compliance with this Lease. Notice of such a change shall be effective only upon receipt. Any party giving a Notice may request the recipient to acknowledge receipt of such Notice. The recipient shall promptly comply with any such request, but failure to do so shall not limit the effectiveness of any Notice. Any attorney may give any Notice on behalf of its client.

## 26. NO BROKER

Each of Tenant and Landlord represents and warrants that it has not dealt or negotiated with any brokers, agents or finders in connection with this Lease and the negotiations therefor other than SPR Group LLC ("Broker"). The execution and delivery of this Lease by Landlord and Tenant shall be conclusive evidence that each has relied upon the foregoing representation and warranty. The representations, warranties and indemnities set forth in this Article 26 shall survive the expiration or earlier termination of this Lease. Tenant agrees to Indemnify and save Landlord harmless from and against any breach of its representation in this Article 26. Landlord agrees to Indemnify and save Tenant harmless from and against any breach by Landlord of its representation in this Article 26. This Article shall survive the expiration or earlier termination of this Lease.

VA 010158

## 27. NONRECOURSE

Notwithstanding anything to the contrary in this Lease, the liability under this Lease of Landlord or Tenant and each of their parent(s), subsidiary(ies), or affiliated corporations or other entities, and any of its constituent partners, joint venturers, or tenants-in-common, for damages or otherwise, shall be enforceable against, and shall not extend beyond, their interests in the Premises (including the proceeds thereof). No property or assets whatsoever, except Landlord's and Tenant's interest in the Premises (including the proceeds thereof), respectively, shall be subject to levy, execution or any other enforcement procedure for the satisfaction of any remedies (monetary or otherwise) of the other party arising under or in connection with this Lease. No shareholder, officer, member, manager, director, agent, or employee of Landlord or Tenant shall have any liability under this Lease. (This Lease sometimes refers to this paragraph as the "Nonrecourse Clause.")

## 28. ADDITIONAL DELIVERIES; THIRD PARTIES

28.1     *Estoppel Certificates.* Up to twice a year (or as many times as reasonably needed by Tenant in connection with a Leasehold Mortgage or subleasing of the Premises or any portion thereof), each Party (a "Requesting Party") may require the other Party (a "Certifying Party") to execute, acknowledge, and deliver to the Requesting Party (or directly to a designated third party) up to four original counterparts of an Estoppel Certificate. The Certifying Party shall sign, acknowledge, and return such Estoppel Certificate within fifteen (15) days after request therefor, even if the Requesting Party is in Default. Any Estoppel Certificate shall bind the Certifying Party.

28.2     *Further Assurances.* Each Party shall execute and deliver such further documents, and perform such further acts, as may be reasonably necessary to achieve the Parties' intent in entering into this Lease.

28.3     *Memorandum of Lease.* Upon request by either, the Parties shall promptly execute, acknowledge, and deliver duplicate originals of a Memorandum of Lease. Either Party may record such Memorandum of Lease. Any taxes imposed upon such recording shall be paid by Tenant. If the Parties amend this Lease, then the Parties shall have the same rights and obligations regarding a memorandum of such amendment as they do for the Memorandum of Lease. Tenant may at any time by Notice to Landlord elect to require the Memorandum of Lease to be terminated.

28.4     *Modification.* Any Modification of this Lease must be in writing signed by the party to be bound.

28.5     *Successors and Assigns.* This Lease shall bind and benefit Landlord and Tenant and their successors and assigns, but this shall not limit or supersede any Transfer restrictions. Nothing in this Lease confers on any Person (except Landlord, Tenant, Leasehold Mortgagees, and Fee Mortgagees) any right to insist upon, or to enforce against Landlord or Tenant, the performance or observance by either party of its obligations under this Lease.

## 29. MISCELLANEOUS

29.1    *Confidentiality.*  Landlord shall maintain the confidentiality of any information that Tenant gives Landlord about the Premises.  Landlord shall require any actual or prospective Fee Mortgagee or Transferee to maintain the confidentiality of such materials, all under a direct confidentiality agreement between Tenant and such actual or prospective Fee Mortgagee or Transferee, in normal and customary form reasonably satisfactory to Tenant.

29.2    *Costs and Expenses; Legal Costs.*  In the event of any litigation or dispute between the parties, or claim made by either party against the other, arising from this Lease or the landlord-tenant relationship under this Lease, or Landlord's enforcement of this Lease upon a Default, or to enforce or interpret this Lease or seek declaratory or injunctive relief in connection with this Lease, or to exercise any right or remedy under or arising from this Lease, or to regain or attempt to regain possession of the Premises or terminate this Lease, or in any Bankruptcy Proceeding affecting the other party to this Lease, the prevailing party shall be entitled to reimbursement of its Legal Costs with Default Interest and all other reasonable costs and expenses incurred in enforcing this Lease or curing the other party's default.  If either party requests any amendment or modification to this Lease, then such party shall reimburse the other party's Legal Costs incurred in considering, reviewing, and otherwise processing such request.

29.3    *No Consequential Damages.*  Whenever either party may seek or claim damages against the other party (whether by reason of a breach of this Lease by such party, in enforcement of any indemnity obligation, for misrepresentation or breach of warranty, or otherwise), neither Landlord nor Tenant shall seek, nor shall there be awarded or granted by any court, arbitrator, or other adjudicator, any speculative, consequential, collateral, special, punitive, or indirect damages, whether such breach shall be willful, knowing, intentional, deliberate, or otherwise. The parties intend that any damages awarded to either party shall be limited to actual, direct damages sustained by the aggrieved party. Neither party shall be liable for any loss of profits suffered or claimed to have been suffered by the other.

29.4    *No Waiver by Silence.*  Failure of either party to complain of any act or omission on the part of the other party shall not be deemed a waiver by the noncomplaining party of any of its rights under this Lease.  No waiver by either party at any time, express or implied, of any breach of this Lease shall waive such breach or any other breach.

29.5    *Performance Under Protest.*  If a dispute arises about performance of any obligation under this Lease, the party against which such obligation is asserted shall have the right to perform it under protest, which shall not be regarded as voluntary performance. A party that has performed under protest may institute appropriate proceedings to recover any amount paid or the reasonable cost of otherwise complying with any such obligation, with interest at the Prime Rate.

29.6    *Survival.*  All rights and obligations that by their nature are to be performed after any termination of this Lease shall survive any such termination.

29.7  *Unavoidable Delay.*  Each party's obligation to perform or observe any nonmonetary obligation under this Lease shall be suspended during such time as such performance or observance is prevented or delayed by Unavoidable Delay.

29.8  *Vault Space.*  Any vaults and other areas now existing or later built extending beyond the building line of the Premises are not part of the Premises, but Tenant may occupy and use them during the Term, subject to applicable Law and payment of applicable Real Estate Taxes.  No revocation by any Government of any license or permit to maintain and use any such vault shall in any way affect this Lease or the Rent.  Landlord makes no representation or warranty about any such vault or Tenant's right to use or occupy it for any purpose, or any fees or taxes that may be imposed on account of such use or occupancy.

## 30.  INTERPRETATION, EXECUTION, AND APPLICATION OF LEASE

30.1  *Captions.*  The captions of this Lease are for convenience and reference only. They in no way affect this Lease.

30.2  *Counterparts.*  This Lease may be executed in counterparts.

30.3  *Delivery of Drafts.*  Neither party shall be bound by this Lease unless and until such party shall have executed and delivered at least one counterpart of this Lease.  The submission of draft(s) or comment(s) on drafts shall bind neither party in any way.  Such draft(s) and comment(s) shall not be considered in interpreting this Lease.

30.4  *Entire Agreement.*  This Lease contains all terms, covenants, and conditions about the Premises.  The parties have no other understandings or agreements, oral or written, about the Premises or the Improvements or Tenant's use or occupancy of, or any interest of Tenant in, the Premises or the Improvements.

30.5  *Governing Law.*  This Lease, its interpretation and performance, the relationship between the parties, and any disputes arising from or relating to any of the foregoing, shall be governed, construed, interpreted, and regulated under the laws of the State, without regard to principles of conflict of laws.

30.6  *Partial Invalidity.*  If any term or provision of this Lease or its application to any party or circumstance shall to any extent be invalid or unenforceable, then the remainder of this Lease, or the application of such term or provision to persons or circumstances except those as to which it is invalid or unenforceable, shall not be affected by such invalidity.  All remaining provisions of this Lease shall be valid and be enforced to the fullest extent Law allows.

30.7  *Principles of Interpretation.*  No inference in favor of or against any party shall be drawn from the fact that such party has drafted any part of this Lease.  The parties have both participated substantially in its negotiation, drafting, and revision, with advice from counsel and other advisers.  A term defined in the singular may be used in the plural, and vice versa, all in accordance with ordinary principles of English grammar, which also govern all other language in this Lease.  The words "include" and "including" shall be construed to be followed by the words: "without limitation."  Each of these terms shall be interpreted as if followed by the words "(or

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010161

any part of it)" except where the context clearly requires otherwise: Building Equipment; FF&E; Fee Estate; Improvements; Land; Leasehold Estate; Premises; Structure; and any other similar collective noun. Every reference to any document, including this Lease, refers to such document as Modified from time to time (except, at Landlord's option, any Modification that violates this Lease), and includes all exhibits, schedules, and riders to such document. The word "or" includes the word "and."

30.8    *Reasonableness.* Wherever this Lease states that a party shall not unreasonably withhold approval: (a) such approval shall not be unreasonably delayed or conditioned; (b) no withholding of approval shall be deemed reasonable unless withheld by Notice specifying reasonable grounds, in reasonable detail, for such withholding, and indicating specific reasonable changes in the proposal under consideration that would make it acceptable; (c) if a party grants its consent (or fails to object) to any matter, this shall not waive its rights to require such consent for any further or similar matter; and (d) any dispute on the withholding or delay of consent shall be determined by Arbitration.

30.9    *Exhibits.* The Exhibits attached hereto are incorporated herein by this reference.

## 31. INITIAL DEVELOPMENT AND MAJOR CONSTRUCTION

31.1    *Initial Development.* After the Existing Tenant Vacate Date, Tenant shall, in compliance with this Lease, cause the Construction Commencement Conditions to be satisfied, and the Construction Commencement Date to occur, for the Initial Development, on or before the Initial Development Commencement Deadline. Any dispute about whether the Construction Commencement Conditions have been satisfied shall be resolved by Arbitration and during such Arbitration all time periods shall be tolled. Tenant shall cause the Construction Completion Date for the Initial Development to occur on or before the Initial Development Completion Deadline. As a material inducement for Landlord to enter into this Lease, Tenant must commence the process to have the Premises Rezoned within one (1) year following the Commencement Date, and shall thereafter use best efforts to pursue the completion of the rezoning of the Property. Tenant shall pay for any and all costs in connection with having the Property Rezoned including, without limitation, Landlord's reasonable legal fees and out of pocket costs. Tenant shall be required to spend at least Five Hundred Thousand and 00/100 Dollars ($500,000.00) in connection with having the Property Rezoned, which amount may include, without limitation, expeditor fees, architect fees, engineer fees, consulting fees, legal fees and other costs typically incurred in connection with the rezoning of a property. Tenant shall provide Landlord with evidence of the foregoing within fifteen (15) Business Days from Landlord's written request thereof.

31.2    *Major Construction.*    Tenant shall not commence demolition of existing Improvements, excavation, or any other substantial work with respect to any Major Construction unless Tenant has satisfied the Construction Commencement Conditions for such Major Construction, and the Existing Tenant Vacate Date has occurred.

31.3    *Plans and Specifications.* After Landlord receives any Plans and Specifications, Landlord shall have fifteen (15) Business Days in which to Notify Tenant that such Plans and

Specifications do not comply with this Lease. If Landlord does not give such Notice within such period, then Landlord shall thereby have waived any right to assert such noncompliance regarding: (a) the Plans and Specifications received by Landlord; or (b) any Construction performed substantially in compliance with such Plans and Specifications. If Tenant materially changes the Plans and Specifications for any Major Construction by adding a building(s), or increasing the size of such Major Construction by more than ten percent (10%) from the size set forth on the Plans and Specifications, or changing the appearance of the exterior, or materially and adversely affecting the building's operating systems, then Tenant shall promptly deliver copies of such changes to Landlord. After Landlord receives such changes, Landlord shall have fifteen (15) Business Days in which to Notify Tenant whether such changes do not comply with this Lease. If Landlord does not give such Notice within such period, then Landlord shall thereby have waived any right to assert such noncompliance regarding: (a) changes to the Plans and Specifications received by Landlord; or (b) any Construction performed substantially in compliance with such changes to the Plans and Specifications and Landlord will be deemed to have approved such Plans and Specifications, as changed. Neither the retention of any Plans and Specifications nor any other action Landlord takes regarding any Plans and Specifications shall constitute an opinion or representation by Landlord as to their accuracy or sufficiency.

31.4   *Prosecution and Completion.*   If Tenant, in connection with any Major Construction, starts to demolish any existing Improvements, or starts excavation, then Tenant shall prosecute such work with reasonable diligence. When Tenant completes such work, Tenant shall, with reasonable promptness and reasonable diligence, commence, prosecute and complete such Major Construction in a good and workmanlike manner and in compliance with Law and this Lease.

31.5   *Approvals; Cooperation.* Tenant shall apply to each applicable Government for such Approvals as any Construction shall require. Landlord shall reasonably cooperate with Tenant in obtaining such Approvals. Landlord shall otherwise reasonably cooperate with any Construction as Tenant shall reasonably request, including in connection with the rezoning of the Property (and any zoning lot mergers or acquisition of development rights, if any), but Tenant shall reimburse Landlord for any actual out of pocket third-party costs and expenses incurred by Landlord in connection with such cooperation. Landlord assumes no liability by cooperating with any Construction. Tenant shall Indemnify Landlord regarding such cooperation.

31.6   *License of Construction Documents.* Subject to the Architect's consent (which consent shall not be unreasonably withheld, conditioned or delayed), Tenant grants Landlord a license to use all Construction Documents and all Plans and Specifications for purposes of any law related to intellectual property. Such license includes the right to modify or amend the Plans and Specifications and the right to grant sublicenses. Landlord shall not exercise its rights under any license of Construction Documents or Plans and Specifications granted to Landlord under this Lease unless this Lease has terminated and the period during which Leasehold Mortgagee may require a New Lease pursuant to Section 20.6 has expired without a request for a New Lease.

31.7   *Major Subcontracts.* Promptly after Builder enters into any Major Subcontract, Tenant shall direct Builder to give Landlord a copy thereof. Upon Landlord's request, but no

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010163

more than once every ninety (90) days, Tenant shall direct Builder to give Landlord copies of any material Modifications of each Major Subcontract. Builder may modify Major Subcontracts, provided Builder acts in good faith.

31.8 *Insurance During Major Construction*. Before Tenant commences (and at all times during the performance of) any Major Construction or any related excavation or demolition, terminating on the Construction Completion Date for such Major Construction, Tenant shall, at its expense, procure and maintain, or cause to be procured and maintained, the following insurance coverage (by separate policy or endorsement(s) to other policies required under this Lease, if such required coverage is not included in such other policies), all in compliance with the requirements of this Lease:

31.8.1 *Builder's Risk Insurance*. "All risk" builder's risk insurance on a completed value (nonreporting) basis, in an amount sufficient to prevent coinsurance, but in any event not less than one hundred percent (100%) of replacement value, including cost of debris removal, but excluding foundation and excavations, naming Landlord and Tenant, as their interests may appear. Such insurance shall also: (a) contain a waiver of subrogation against subcontractors; (b) state that "permission is granted to complete and occupy"; (c) cover, for replacement value, all materials and equipment on or about any offsite storage location intended for use for the Premises; and (d) provide for a deductible not exceeding $20,000, times the CPI Adjustment Factor, however, such amount shall not exceed an amount that generally conforms to the limits customarily required of prudent tenants or by Institutional Lenders for similar properties in the County.

31.8.2 *Liability and Property Insurance*. Contractor's commercial general liability and automobile liability insurance, each for not less than $15,000,000.00 per occurrence for the Initial Development and $10,000,000.00 per occurrence times the CPI Adjustment Factor for all other Major Construction provided the latter generally conforms to the limits customarily required by prudent landlords or Institutional Lenders for similar properties in the County, in each case, including premises-operations liability, contractor's protective liability for all subcontractors' operations, completed operations, contractual liability (referring to the indemnity provisions of the applicable construction contract(s)), and automobile liability (owned and non-owned), and for any foundation, excavation, or demolition work, an endorsement that such operations are covered and that the "XCU Exclusions" have been deleted, naming Tenant, Landlord, Landlord's managing agent and Fee Mortgagee as additional insureds on a primary and non-contributory basis.

31.8.3 *Workers' Compensation Insurance*. Workers' compensation and disability benefits insurance covering all Persons employed in the performance of such Major Construction.

31.8.4 *Demolition*. During any demolition or excavation, such additional liability insurance as shall be reasonably customary to cover the added risks of demolition or excavation.

31.8.5 *Increases in Insurance*. To the extent that the foregoing required insurance provides less coverage than that normally and customarily maintained for properties

{Ground Lease - Execution Version / 01692902.DOCX /}

similar to the Premises during construction similar to such Major Construction, Landlord may, from time to time, increase the required coverage to an amount then normally and customarily maintained for properties similar to the Premises during construction similar to such Major Construction, upon at least thirty (30) days' prior Notice to Tenant, but Landlord shall not require such increases more than once every five (5) years.

31.9    *Restriction on Transfer.* Notwithstanding anything to the contrary in this Lease, until the Construction Completion Date for the Initial Development: (a) Tenant may not Transfer this Lease without Landlord's consent, which consent Landlord may withhold in its sole and absolute discretion, except (i) to an Affiliate of Tenant (provided that the Principals Control such Affiliate), (ii) as security under Leasehold Mortgage(s) that comply with this Lease, (iii) through a Foreclosure Event, and/or (iv) any Transfer(s) made by any New Tenant and its successors and assigns; and (b) no Equity Interest in Tenant shall be subject to any Transfer without Landlord's consent, which consent Landlord may withhold in its sole and absolute discretion, unless such Transfer is made: (i) to a Permitted Equity Owner, (ii) to a Leasehold Mortgagee assigned such Equity Interest(s) as security for a Leasehold Mortgage, or pursuant to any exercise of remedies thereunder, or (iii) by anyone who obtains such Equity Interest(s) through "ii" and their successors and assigns. Notwithstanding anything contained herein to the contrary, prior to the Construction Completion Date for the Initial Development: (i) a Transfer(s) of Equity Interest(s) in Tenant is permitted without Landlord's consent provided Simon Dushinsky directly or indirectly, retains a 5% ownership interest in Tenant and Control of Tenant and (ii) Tenant may Transfer this Lease to another entity provided Simon Dushinsky directly or indirectly holds a 5% ownership interest in transferee and Control of such entity. Tenant shall provide reasonable proof within fifteen (15) days of Landlord's written request to evidence that such requirements are being met.

31.10    *Certain Deliveries.* When Tenant has obtained a temporary certificate of occupancy for the Buildings constructed as part of the Initial Development, as evidenced by a certificate of Tenant's Architect (a copy of which Tenant shall give Landlord), Tenant shall thereafter obtain and give Landlord copies of: (a) within eighteen (18) months thereafter, two complete sets of "as-built" plans and specifications for the entire Initial Development (except commercial Subtenant improvements) and an "as-built" survey showing no encroachments except as the Development Criteria permit; and (b) within forty eight (48) months thereafter, a final certificate of occupancy for the entire Initial Development.

## 32.    STATE-SPECIFIC PROVISIONS

32.1    *Delivery Of Premises.* Tenant waives the provisions of New York Real Property Law (the "RPL") §223-a. The provisions of this Lease on Landlord's delivery of the Premises constitute "an express provision to the contrary" under RPL §223-a.

32.2    *Casualty.* The provisions of this Lease on Casualty are an express agreement as to damage or destruction of the Premises or the Improvements by Casualty. RPL §227, providing for such a contingency absent an express agreement, shall not apply.

VA 010165

32.3 *Statutory Right or Redemption.* Tenant specifically waives the right of redemption provided for in New York Real Property Actions and Proceedings Law ("RPAPL") §761.

32.4 *Consumer Contract Statutes.* Tenant acknowledges that this Lease is not entered into for personal, family or household purposes, and therefore GOL §5-327 (and any other Law whose effect is limited to transactions entered into for personal, family, or household purposes) has no application to this Lease.

32.5 *Waiver Of Stay.* Tenant expressly waives, for every Indemnitee of Tenant, any rights under Civil Practice Law and Rules §2201, in connection with any holdover proceeding or other action or proceeding about this Lease or Tenant's rights as a tenant of the Premises.

32.6 *No Implied Consent To Remaining In Possession.* Notwithstanding anything to the contrary in RPAPL §711(2) or any other applicable Law or rule of procedure, Landlord's acceptance of any partial payment on account of Rent, even if acknowledged in writing, shall not be deemed to constitute Landlord's "express consent in writing to permit the tenant to continue in possession" as referred to in RPAPL §711(2). Landlord shall not be deemed to have granted such "express consent in writing to permit the tenant to continue in possession" unless such alleged written consent by Landlord expressly refers to RPAPL §711(2) and expressly states (i.e., contains substantially the following words): "Landlord consents to Tenant's remaining in possession notwithstanding nonpayment of Rent."

32.7 *Sidewalk Repairs.* To the extent that this Lease requires Tenant to maintain or repair any sidewalk, Tenant shall perform all obligations of Landlord (and shall Indemnify Landlord against any liability) under City Administrative Code §§2-710 and -711.

*[Signatures on Next Page.]*

VA 010166

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Lease as of the Commencement Date.

**LANDLORD:**

**M.M.B. ASSOCIATES, LLC**
a New York limited liability company

By: _____

Name: Anthony Musto

Title: Managing Member

**TENANT**

**VANDERBILT ATLANTIC HOLDINGS LLC**
a New York limited liability company

By: _____

Name:

Title:

*Exhibits:*

**Exhibit A** Legal Description of the Land

**Exhibit B** Prohibited Uses

**Exhibit C** [Reserved]

**Exhibit D** Additional Permitted Exceptions

**Exhibit E** Notice Addresses (Including Required Copy Recipients)

**Exhibit F** Completion Guaranty

**Exhibit G** Form of Memorandum of Lease

VA 010167

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Lease as of the Commencement Date.

**LANDLORD:**

**M.M.B. ASSOCIATES, LLC**
a New York limited liability company

By: _____
  Name:
  Title:

**TENANT**

**VANDERBILT ATLANTIC HOLDINGS LLC**
a New York limited liability company

By: _____
  Name: Simon Dushinsky
  Title: Member

*Exhibits:*

**Exhibit A** Legal Description of the Land

**Exhibit B** Prohibited Uses

**Exhibit C** [Reserved]

**Exhibit D** Additional Permitted Exceptions

**Exhibit E** Notice Addresses (Including Required Copy Recipients)

**Exhibit F** Completion Guaranty

**Exhibit G** Form of Memorandum of Lease

VA 010168

## EXHIBIT A

### LEGAL DESCRIPTION OF THE LAND

#### SCHEDULE A:

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point at the corner formed by the intersection of the Southerly side of ATLANTIC AVENUE, (as now open and in use, 120.00 feet wide) with the easterly side of VANDERBILT AVENUE (as now open and in use, 100.00 feet wide);

RUNNING THENCE: Easterly along the southerly side of ATLANTIC AVENUE, 170.00 feet;

THENCE: Southerly at right angles to the southerly side of ATLANTIC AVENUE, 200.00 feet to the northerly side of PACIFIC STREET (as now open and in use, 70.00 feet wide);

THENCE: Westerly at right angles to the last mentioned line and along the northerly side of PACIFIC STREET, 75.00 feet;

THENCE: Northerly at right angles to the northerly side of PACIFIC STREET, 100.00 feet;

THENCE: Westerly at right angles to the last mentioned line, 50.00 feet;

THENCE: Southerly at right angles to the last mentioned line, 100.00 feet to the northerly side of PACIFIC STREET;

THENCE: Westerly at right angles to the last mentioned line and along the northerly side of PACIFIC STREET, 45.00 feet to the easterly side of VANDERBILT AVENUE;

THENCE: northerly at right angles to the northerly side of PACIFIC STREET and along the easterly side of VANDERBILT AVENUE, 200.00 feet to the place or point of BEGINNING

*Block 1122*
*for 1, 68 + 71*

VA 010169

## EXHIBIT B

### PROHIBITED USES

- the commercial preparation, storage, manufacture or sale of tobacco or drugs;
- the business of multilith or offset printing;
- an amusement arcade or a billiard parlor (specifically excluding, however, any pool tables or other games which are customary in a game room or entertainment room serving residential buildings);
- a casino, gaming hall, off-track betting parlor or any other gambling operation;
- a funeral parlor, mortuary, or crematorium;
- a so-called "flea market";
- a dry cleaning facility (provided, however, drop-off and pick-up areas for off-premises dry cleaning facilities and services are permitted);
- a pawn shop;
- a strip club;
- for the sale or distribution of indecent literature or as an adult book store or adult video tape rental or sales store;
- a so called "head shop" or for the sale of drug paraphernalia;
- a massage parlor;
- an automobile repair shop, gasoline station, or car wash; an automobile dealership;
- offices of any foreign government, the United Nations, or any agency or department of the foregoing;
- a drug treatment or other addiction facility or a hospital of any kind;
- for the performance of abortions;
- the dumping or disposing of garbage or refuse;
- any so-called "Closeout" "Odd-Lot" or "99 Cent" store;
- a cabaret or night-club;
- for the conduct of any obscene, nude or semi-nude live performance, nude modeling, or as a sex club of any sort;
- the conduct of any gambling;
- the offices of any agency, department or bureau of the United States Government or for any state, county or municipality within the United States or any foreign government, or any political subdivision of any of them;
- a halfway house;
- a gas station or auto/vehicle repair station;
- a used or new car lot;
- a church, synagogue, mosque or other area of worship;
- a fire department; or
- an on-site manufacturing facility.

VA 010170

## EXHIBIT C

[Reserved]

VA 010171

## EXHIBIT D

### ADDITIONAL PERMITTED EXCEPTIONS

Permitted Exceptions shall include all of the following, as they existed on the Effective Date:

1. the Existing Lease;

2. All rights, if any, for electricity, gas, telephone, water, cable television, and any other utilities to maintain and operate lines, cables, poles, and distribution boxes in, over, and upon the Premises, provided that none of those rights impose any monetary obligation on Tenant;

3. Possible de minimis projections or encroachments of stoops, areas, steps, sills, trim, cornices, standpipes, fire escapes, coal chutes, casings, ledges, lintels, porticos, keystones, windows, hedges, copings, or objects upon, under, or above any adjoining buildings or streets or avenues or those belonging to adjoining premises which encroach upon the Premises;

4. Variations between the tax diagram or the tax map and the record description;

5. All notes or notices of any violation of law or municipal ordinances, orders, or requirements noted in or issued by any governmental or quasi-governmental authority or departments having or asserting jurisdiction, now or hereafter affecting the Premises; and

6. Real property taxes, charges, rents, assessments, and any other governmental charges which are not yet due and payable.

7. Covenants, conditions, easements, restrictions, leases, agreements of record

A. Terms and conditions as set forth in Nuisance C&R's in Liber 201 Page 231.

B. Terms and conditions as set forth in the Memorandum of Lease in Reel 4264 Page 1854.

C. Terms and conditions as set forth in Waiver of Legal Grade in Reel 4309 Page 704.

D. Terms and conditions as set forth in Covenant Not to Compete in Reel 4394 Page 469.

E. Terms and conditions as set forth in Supplement to Lease in Reel 4748 Page 1809.

F. Terms and conditions as set forth in Subordination, No-Disturbance Agreement in CRFN 2016000119749.

VA 010172

8.      UCC-1 Financing Statement with M.M.B. Associates LLC as the debtor, and Webster Bank, National Association as the secured party, filed March 29, 2016 in CRFN 2016000109831 (subject to Article 16).

9.      Assignment of Leases and Rents with M.M.B. Associates LLC as assignor, and Webster Bank, National Association as the assignee, recorded on April 6, 2016, in CRFN 201600011748 (subject to Article 16).

10.     Mortgage with M.M.B. Associates LLC as the mortgagor, and Webster Bank, National Association as mortgagee, in the amount of $1,200,000.00, dated March 23, 2016, and recorded on April 6, 2016 in CRFN 2016000119747 (subject to Article 16).

VA 010173

## EXHIBIT E

### NOTICE ADDRESSEES
(INCLUDING REQUIRED COPY RECIPIENTS)

| Party: | Notice Address: | With a Copy to: |
|---|---|---|
| Landlord | M.M.B. Associates, LLC<br>c/o Crosstown Companies<br>97-77 Queens Boulevard<br>Suite 1120<br>Rego Park, New York 11374<br>Attn: Anthony Musto | Westerman Ball Ederer Miller Zucker<br>& Sharfstein, LLP<br>1201 RXR Plaza<br>Uniondale, New York 11556<br>Attn: Jay Levinton, Esq. |
| Tenant | Vanderbilt Atlantic Holdings LLC<br>390 Berry Street<br>Suite 201<br>Brooklyn, New York 11249<br>Attn: Simon Dushinsky | Eiseman Levine Lehrhaupt & Kakoyiannis<br>805 Third Avenue, 10th Floor<br>New York, New York 10022<br>Attn: Jonathan Eiseman, Esq. |

VA 010174

## EXHIBIT F

## NOTE: THIS COMPLETION GUARANTY WILL ONLY BE EXECUTED IN THE EVENT TENANT DOES NOT OBTAIN A LEASEHOLD MORTGAGE

## GUARANTY OF COMPLETION

THIS GUARANTY OF COMPLETION (this "Guaranty") is dated as of November __, 2017 by Simon Dushinsky, having an address at 505 Flushing Avenue, Suite 1D, Brooklyn, New York 11205 ("Guarantor") for the benefit of M.M.B. Associates, LLC, a New York limited liability company, having an address at c/o Crosstown Companies, 97-77 Queens Boulevard, Suite 1120, Rego Park, NY 11374 ("Landlord").

## W I T N E S S E T H:

WHEREAS, this Guaranty is given in connection with that certain Agreement of Lease dated as of the date hereof by and between Landlord and Vanderbilt Atlantic Holdings LLC, a New York limited liability company ("Tenant") (as the same may be amended, restated, extended, replaced, supplemented or otherwise modified from time to time, the "Lease");

WHEREAS, Guarantor is the owner, directly or indirectly, of a membership interest in Tenant, and Guarantor will directly or indirectly benefit from Landlord's execution and delivery of the Lease and the other undertakings and agreements of Landlord provided therein; and

WHEREAS, Landlord is not willing to enter into the Lease unless Guarantor unconditionally guarantees payment and performance to Landlord of the Guaranteed Obligations (as hereinafter defined).

NOW, THEREFORE, in consideration of the Lease, the performance thereof, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Guarantor, Guarantor hereby represents, warrants, covenants and agrees as follows:

## ARTICLE I
## NATURE AND SCOPE OF GUARANTY

Section 1.1    Certain Definitions.  Capitalized terms that are used herein but not defined herein shall have the respective meanings ascribed thereto in the Lease, and the following terms shall have the following meanings:

(a)    "Bankruptcy Laws" means the U.S. Bankruptcy Code and any other Federal, state or other bankruptcy, insolvency, reorganization, receivership or other debtor relief law.

(b)    "Guarantor Claims" shall have the meaning set forth in Section 5.1 below.

(c)    "Guaranteed Obligations" shall have the meaning set forth in Section 1.2 below.

VA 010175

Section 1.2    Completion.   Guarantor unconditionally and irrevocably guarantees to Landlord the following (collectively, the "Guaranteed Obligations"):

(a)   subject to Unavoidable Delays, all Major Construction including, without limitation, the occurrence of the Construction Completion Date of the Initial Development by the Initial Development Completion Deadline, in accordance with all requirements of the Lease;

(b)   that the Premises shall be and remain free and clear of all Prohibited Liens arising in connection with the Major Construction, except as may be permitted by the Lease; and

(c)   that all construction costs related to the Initial Development shall be paid when due.

Section 1.3    Remedies of Landlord.   Upon a breach by Tenant of Tenant's obligations under the Lease with respect to the Initial Development (or otherwise relating to the Guaranteed Obligations), Landlord shall have the right (in its sole discretion), but not the obligation, to:

## LANDLORD CAN ONLY ELECT CLAUSE A AFTER GUARANTOR HAS BEEN GIVEN AN OPPORTUNITY TO PERFORM UNDER CLAUSE B

(a)   elect to complete (or cause the completion of) the Guaranteed Obligations, in which case Guarantor shall, within thirty (30) days of written demand by Landlord, pay to Landlord the out of pocket costs and expenses actually incurred by Landlord to perform the Guaranteed Obligations in an amount not to exceed the construction budget for the Initial Development and in accordance with the Plans and Specifications for the Initial Development, including any amounts due to Contractors, material suppliers and for permits and licenses; and/or

(b)   require Guarantor to perform the Guaranteed Obligations, in which case Guarantor shall, within thirty (30) days after written demand by Landlord, but subject to Unavoidable Delays, commence performance of the Guaranteed Obligations and diligently pursue and complete performance thereof. If Guarantor fails to commence and pursue diligently the performance of the Guaranteed Obligations within thirty (30) days after written demand by Landlord for any reason other than Unavoidable Delays, then, either before or after pursuing any other remedy of Landlord against Guarantor or Tenant and regardless of whether Landlord shall ever pursue any such other remedy, Landlord shall have the right to perform (or cause to be performed) the Guaranteed Obligations in accordance with Section 1.3(a) above. Landlord at any time may require Guarantor to perform or supervise the performance of such work in lieu of Landlord or any party engaged by the Landlord.

Section 1.4    Nature of Guaranty.   This Guaranty is an irrevocable, unconditional, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's

VA 010176

estate and legal representatives, executors, administrators and heirs). The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Landlord with respect to the Guaranteed Obligations. Guarantor's obligations hereunder shall not be affected by any errors or omissions of Tenant, any Contractor, the Architect, or any agent or employee of any of them in design, supervision or performance of the Guaranteed Obligations, it being understood that such risk is assumed by Guarantor.

Section 1.5    Intentionally Omitted.

Section 1.6    Enforcement By One Or Multiple Actions.  Landlord (or any constituent member of Landlord) may bring one or a series of actions to enforce Guarantor's payment and performance of all or any portion of the Guaranteed Obligations.

Section 1.7    No Duty To Pursue Others.  It shall not be necessary for Landlord (and Guarantor hereby waives any rights which Guarantor may have to require Landlord), in order to enforce the obligations of Guarantor hereunder, first to (a) institute suit or exhaust its remedies against Tenant or others liable on the Lease or the Guaranteed Obligations or any other Person, (b) enforce Landlord's rights against any collateral, deposit or other credit enhancement which shall ever have been given to secure the Guaranteed Obligations, (c) enforce Landlord's rights against any other guarantors of the Guaranteed Obligations, (d) join Tenant or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (e) exhaust any remedies available to Landlord against any collateral, deposit or other credit enhancement which shall ever have been given to secure the Guaranteed Obligations, or (f) resort to any other means of obtaining payment of the Guaranteed Obligations.  To the extent permitted by law, Landlord shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations against Tenant or any other Person.

Section 1.8    Waivers.  Guarantor waives notice of (a) acceptance of this Guaranty, (b) any amendment or modification of the Lease, (the execution and delivery by Tenant of any other documents arising under or in connection with the Lease, (d) the occurrence of any breach by Tenant under the Lease, (e) Landlord's transfer or disposition of the Guaranteed Obligations, or any part thereof, (f) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral, deposit or other credit enhancement for the Guaranteed Obligations, (g) protest, proof of non-payment or default by Tenant, or (h) any other action at any time taken or omitted by Landlord in accordance with the terms of the Lease, and, generally, all demands and notices of every kind in connection with the Lease.

Section 1.9    Payment of Expenses.  In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty for more than thirty (30) days after written notice from Landlord, Guarantor shall, within ten (10) days after written demand by Landlord, pay Landlord all reasonable and actual out of pocket costs and expenses (including court costs and reasonable attorneys' fees and disbursements) incurred by Landlord in the successful enforcement hereof.  The covenant contained in this Section 1.9 shall survive the payment and performance of the Guaranteed Obligations.

Section 1.10   Effect of Bankruptcy.   In the event that pursuant to any Bankruptcy Law or any judgment, order or decision thereunder, Landlord must rescind or restore any payment or any part thereof received by Landlord in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Landlord shall be without effect and this Guaranty shall remain in full force and effect. It is the intention of Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

Section 1.11   Waiver   of   Subrogation,   Reimbursement   and   Contribution. Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably subordinates and agrees to defer until after the actual receipt by Landlord of performance in full of all Guaranteed Obligations and all rights it may now or hereafter have under any agreement, at law, in equity or otherwise (including, without limitation, any law subrogating Guarantor to the rights of Landlord), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Tenant or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

## ARTICLE II
## EVENTS AND CIRCUMSTANCES NOT REDUCING
## OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

Section 2.1   Modifications.   Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Lease, or any other document, instrument, contract or understanding between Tenant and Landlord or any other parties pertaining to the Guaranteed Obligations or any failure of Landlord to notify Guarantor of any such action.

Section 2.2   Adjustment.   Any adjustment, indulgence, forbearance or compromise that might be granted or given by Landlord to Tenant or Guarantor.

Section 2.3   Condition of Tenant or Guarantor.   The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Tenant, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Tenant or Guarantor or any sale, lease or transfer of any or all of the assets of Tenant or Guarantor or any changes in the shareholders, partners or members of Tenant or Guarantor; or any reorganization of Tenant or Guarantor.

Section 2.4   Invalidity of Guaranteed Obligations.   The invalidity, illegality or unenforceability of the Lease and/or all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (a) the Guaranteed Obligations or any part

VA 010178

thereof exceeds the amount permitted by law, (b) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (c) the officers or representatives executing or otherwise creating the Guaranteed Obligations acted in excess of their authority, (d) the Guaranteed Obligations violate applicable usury laws, (e) the Tenant has valid defenses, claims or offsets (whether at law, in equity, by agreement or otherwise) which render the Guaranteed Obligations wholly or partially uncollectible, (f) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (g) the Lease or any of the other instruments evidencing the Guaranteed Obligations have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Tenant or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

Section 2.5    Release of Obligors. Any full or partial release of the liability of Tenant with respect to the Guaranteed Obligations or any part thereof, or of any co-guarantors, or of any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party or of any source of financing, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Landlord will look to other parties to pay or perform the Guaranteed Obligations.

Section 2.6    Other Collateral. The taking or acceptance of any deposit, other security, collateral or guaranty, or other assurance of payment or credit enhancement, for all or any part of the Guaranteed Obligations.

Section 2.7    Release of Collateral. Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

Section 2.8    Care and Diligence. The failure of Landlord or any other Person to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Landlord (a) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (b) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (c) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

Section 2.9    Unenforceability. The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the

VA 010179

Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

Section 2.10    Offset.    The Guaranteed Obligations and the liabilities and obligations of Guarantor to Landlord hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Tenant or Guarantor against Landlord, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise; provided, however, notwithstanding the foregoing, Guarantor shall have all the defenses and claims that Tenant has under the Lease and the Guaranteed Obligations shall be reduced by any abatement of rent or offset that Tenant actually receives under the Lease.

Section 2.11    Merger.    The reorganization, merger or consolidation of Tenant into or with any other Person.

Section 2.12    Preference.    Any payment by Tenant or any other Person to Landlord is held to constitute a preference under any Bankruptcy Law(s) or for any reason Landlord is required to refund such payment or pay such amount to Tenant or any other Person.

Section 2.13    Other Actions Taken or Omitted.    Any other action taken or omitted to be taken with respect to the Guaranteed Obligations, or the security and collateral therefor, whether or not such act or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof; it being the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Guarantor represents and warrants to Landlord as follows:

Section 3.1    Benefit.    Guarantor is the owner of a direct or indirect interest in Tenant, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

Section 3.2    Familiarity and Reliance.    Guarantor is familiar with the financial condition of Tenant and is familiar with the value of any and all collateral intended to be created as security for the payment of the Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

VA 010180

Section 3.3     No Representation By Landlord.  Neither Landlord nor any other Person has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

Section 3.4     Guarantor's Financial Condition.  As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

Section 3.5     Legality.  The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor.  This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

Section 3.6     Consents.  No consent, approval, authorization or order of any court or Governmental Authority or other Person is required for the execution, delivery and performance by Guarantor of, or compliance by Guarantor with, this Guaranty or the consummation of the transactions contemplated hereby, other than those which have been obtained by Guarantor.

Section 3.7     Litigation.  There is no action, suit, proceeding or investigation pending or, to Guarantor's knowledge, threatened against Guarantor in any court or by or before any other Governmental Authority, or labor controversy affecting Guarantor or any of its properties, businesses, assets or revenues, which would reasonably be expected to (i) materially and adversely affect the ability of Guarantor to carry out the transactions contemplated by this Guaranty, (ii) materially and adversely affect the value of its property, taken as a whole, (iii) impair the use and operation of its property, taken as a whole or (iv) impair Guarantor's ability to pay its obligations in a timely manner.

Section 3.8     Information.  All financial statements and other financial information heretofore submitted by Guarantor to Landlord, if any, and all statements of fact made by Guarantor in this Guaranty are accurate, complete and correct in all material respects.  There has been no material change in the financial condition of Guarantor from that set forth in said financial statements.  There has been no material change in any condition, fact, circumstance or event that would make any of the information delivered by or on behalf of Guarantor inaccurate, incomplete or otherwise misleading in any material respect.

Section 3.9     Tax Filings.  Guarantor has filed (or has obtained effective extensions for filing) all federal, state or local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Guarantor.  Guarantor's tax returns properly reflect the income and taxes of Guarantor for the

VA 010181

periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

Section 3.10   Prohibited Person.   Guarantor is not a Prohibited Person.

All representations and warranties made by Guarantor herein shall survive the execution hereof and shall be deemed to have been relied upon by Landlord notwithstanding any investigation heretofore or hereafter made by Landlord.

## ARTICLE IV
## COVENANTS

Section 4.1   Principal Place of Business.   Guarantor shall not change his principal place of business, which as of the date hereof is Guarantor's address set forth in the preamble to this Guaranty, without giving Landlord written notice thereof no later than thirty (30) days after such change.

## ARTICLE V
## SUBORDINATION OF CERTAIN INDEBTEDNESS

Section 5.1   Subordination of All Guarantor Claims.   As used herein, the term "Guarantor Claims" shall mean all debts and liabilities of Tenant to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Tenant thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor. The Guarantor Claims shall include without limitation all rights and claims of Guarantor against Tenant (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. Until payment and performance in full of all Guaranteed Obligations, Guarantor shall not receive or collect, directly or indirectly, from Tenant or any other party any amount upon the Guarantor Claims.

Section 5.2   Claims in Bankruptcy.   In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings or any other proceedings under any Bankruptcy Law involving Guarantor as debtor, Landlord shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon the Guarantor Claims. Guarantor hereby assigns such dividends and payments to Landlord.   Should Landlord receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Tenant and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Landlord in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Landlord to the extent that such payments to Landlord on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation

VA 010182

shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Landlord had not received dividends or payments upon the Guarantor Claims.

Section 5.3 Payments Held in Trust. In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Landlord an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Landlord, and Guarantor covenants promptly to pay the same to Landlord.

Section 5.4 Liens Subordinate. Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Tenant's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Tenant's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Landlord presently exist or are hereafter created or attach. Without the prior written consent of Landlord, Guarantor shall not (a) exercise or enforce any creditor's right it may have against Tenant, or (b) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Tenant held by Guarantor.

## ARTICLE VI
## NOTICES

Section 6.1 Notices. All notices or other written communications hereunder shall be delivered in writing and shall not be effective for any purpose unless given or served as follows: (a) by personal delivery (with receipt acknowledged), or (b) delivered by reputable, national overnight delivery service, next Business Day delivery specified, in each case to the parties as follows:

If to Guarantor:

Simon Dushinsky
505 Flushing Avenue
Suite 1D
Brooklyn, New York 11205

with a copy to:

Eiseman Levine Lehrhaupt & Kakoyiannis
805 Third Avenue, 10th Floor
New York, New York 10022
Attn: Jonathan Eiseman, Esq.

VA 010183

If to Landlord:

M.M.B. Associates, LLC
c/o Crosstown Companies
97-77 Queens Boulevard
Suite 1120
Rego Park, New York 11374
Attn: Anthony Musto

with a copy to:

Westerman Ball Ederer Miller Zucker & Sharfstein, LLP
1201 RXR Plaza
Uniondale, New York 11556
Attention: Jay H. Levinton, Esq.

Either party may change the address(es) to which any such notice is to be delivered by furnishing ten (10) days written notice of such change(s) to the other party in accordance with the provisions of this Section 6.1. Every notice shall be deemed to have been given or served upon delivery thereof, with failure to accept delivery to constitute delivery for such purpose.

## ARTICLE VII
## **APPLICABLE LAW; WAIVER OF JURY TRIAL**

Section 7.1    GOVERNING LAW. (A) THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GUARANTOR AND ACCEPTED BY LANDLORD IN THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY AND THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(B)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LANDLORD OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY AT LANDLORD'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND GUARANTOR WAIVES ANY

OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING.

Section 7.2 Provisions Subject to Applicable Law. All rights, powers and remedies provided in this Guaranty may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Guaranty invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law. If any term of this Guaranty or any application thereof shall be invalid, illegal or unenforceable in any respect, the remainder of this Guaranty shall be construed without such provision and this Guaranty and any other application of the term shall not be affected thereby.

Section 7.3 TRIAL BY JURY. GUARANTOR AND LANDLORD EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, SUIT, COUNTERCLAIM, CROSSCLAIM OR OTHERWISE, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY, TO THIS GUARANTY, THE PROPERTY OR ANY ACTS OR OMISSIONS OF GUARANTOR OR LANDLORD, AND EACH OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND LANDLORD, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. GUARANTOR AND LANDLORD ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

## ARTICLE VIII
## **ADDITIONAL DEFINITIONS; CONSTRUCTION**

Section 8.1 Additional Definitions and Construction. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Guaranty may be used interchangeably in singular or plural form and the word "Guarantor" shall include any new or successor corporation, association, partnership (general or limited), limited liability company, joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of the applicable Guarantor and any heir, successor, assign and legal representative," and shall mean "any or all of the Persons comprising Guarantor" when appropriate under the applicable context, the word "Landlord" shall mean any successor of Landlord, the word "Tenant"" shall include any new or successor corporation, association, partnership (general or limited), limited liability company, joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Tenant, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all reasonable out-of-pocket attorneys', paralegal, legal assistant and law clerk fees and disbursements, and including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Landlord enforcing its rights hereunder and/or under the Lease. Wherever pursuant to this Guaranty it is

{Ground Lease - Execution Version / 0169292.DOCX /} W:\W\DOX\CLIENT\089572\L55\A5E\01692392.DOCX

provided that Guarantor shall pay any costs and expenses, such costs and expenses shall include, but not be limited to, legal fees as defined above. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa. All references to sections, subsections, paragraphs, schedules and exhibits are to sections, subsections, paragraphs, schedules and exhibits in or to this Guaranty unless otherwise specified. The headings and captions of various Articles and Sections of this Guaranty are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof. Unless otherwise specified, the words "hereof", "herein" and "hereunder" and words of similar import when used in this Guaranty shall refer to this Guaranty as a whole and not to any particular provision of this Guaranty. The words "includes", "including" and similar terms shall be construed as if followed by the words "without limitation". Whenever in this Guaranty any consent, approval, determination or decision of Landlord is to be made by Landlord, or any matter is to be satisfactory to Landlord, then unless expressly provided to the contrary, such provision shall be deemed to mean that such consent, approval, determination or decision of Landlord or determination whether a matter is satisfactory shall be made by Landlord in its sole discretion. In the event that a claim or adjudication is made that Landlord or its agents have acted unreasonably or unreasonably delayed (or refrained from) acting in any case where, by law or under this Guaranty, Landlord or its agent, as the case may be, has an obligation to act reasonably or promptly, neither Landlord nor its agents shall be liable for any monetary damages, and Guarantor's sole remedy shall be limited to commencing an action seeking injunctive relief or declaratory judgment. Any action or proceeding to determine whether Landlord or its agent has acted reasonably shall be determined by an action seeking declaratory judgment. Any reference in this Guaranty to the Lease shall be deemed to include references to such document as the same may hereafter be amended, modified, supplemented, extended, replaced and/or restated from time to time (and, in the case of any note or other instrument, to any instrument issued in substitution therefor). The parties hereto acknowledge that they were represented by counsel in connection with the negotiation and drafting of this Guaranty and that this Guaranty shall not be subject to the principle of construing its meaning against the party which drafted same.

## ARTICLE IX
## **MISCELLANEOUS PROVISIONS**

Section 9.1     No Oral Change. This Guaranty, and any provisions hereof, may not be modified, amended, waived, extended, restated, changed, discharged or terminated orally or by any act or failure to act on the part of Guarantor or Landlord, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, restatement, change, discharge or termination is sought.

Section 9.2     Successors and Assigns. This Guaranty shall be binding upon Guarantor and its respective successors, heirs and legal representatives, and shall inure to the benefit of Landlord and their respective successors and assigns forever. Guarantor is prohibited from assigning its rights or obligations hereunder without Landlord's consent.

VA 010186

Section 9.3    Recitals. The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

Section 9.4    Rights and Remedies. If Guarantor becomes liable for any amounts owing by Tenant to Landlord other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Landlord hereunder shall be cumulative of any and all other rights that Landlord may ever have against Guarantor. The exercise by Landlord of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

Section 9.5    Entirety. THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LANDLORD WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR, AND LANDLORD AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LANDLORD, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LANDLORD.

Section 9.6    Delay Not a Waiver. Neither any failure nor any delay on the part of any party hereto in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or any other document or instrument entered into or delivered in connection herewith or pursuant hereto, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. A waiver of one default with respect to any Person shall not be construed to be a waiver of any subsequent default with respect to such Person or any other Person or to impair any remedy, right or power consequent thereon.

Section 9.7    No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)    Guarantor and Landlord intend that the relationships created hereunder be solely that of guarantor and beneficiary. Nothing herein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Guarantor and Landlord.

(b)    Landlord is not the agent or representative of Guarantor and this Guaranty shall not make Landlord liable to any Person for goods delivered to or services performed by Tenant or Guarantor upon or for the Premises, or for debts or claims accruing to such parties against Tenant and there is no contractual relationship, either express or implied, between Landlord and any Person supplying any work, labor or materials for or to the Premises.

VA 010187

Section 9.8   Limitation on Agent's Responsibility.   No provision of this Guaranty shall operate to place any obligation or liability for the management or repair of the Premises upon Landlord, nor shall it operate to make Landlord responsible or liable for any waste committed on the Premises by the subtenants, licensees or other occupants thereof or any other Person, or for any dangerous or defective condition of the Premises, or for any negligence in the management, upkeep, repair or control of the Premises resulting in loss or injury or death to any subtenant, licensee, employee or stranger.

Section 9.9   Time of the Essence.   Time is of the essence with respect to the performance by Guarantor of each of Guarantor's obligations pursuant to this Guaranty.

Section 9.10   Duplicate Originals, Counterparts.   This Guaranty may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Guaranty may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Guaranty.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK.]

VA 010188

IN WITNESS WHEREOF, Guarantor has duly executed this Guaranty as of the day and year first written above.

GUARANTOR:

_____

SIMON DUSHINSKY

ACKNOWLEDGEMENT

STATE OF NEW YORK )

                                            ) ss.:

COUNTY OF                    )

On the _____ day of November in the year 2017 before me, the undersigned, a Notary Public in and for said State, personally appeared Simon Dushinsky, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____

Notary Public

VA 010189

## EXHIBIT G

### FORM OF MEMORANDUM OF LEASE

### **MEMORANDUM OF LEASE**

THIS MEMORANDUM OF LEASE (the "Memorandum") is entered into as of _____, 20__ (the "Effective Date") by and between M.M.B. Associates, LLC ("Landlord"), having an address at c/o Crosstown Companies, 97-77 Queens Boulevard, Suite 1120, Rego Park, New York 11374 and Vanderbilt Atlantic Holdings LLC, a New York limited liability company ("Tenant"), having an address at 390 Berry Street, Suite 201, Brooklyn, New York 11249.

*1.     Premises.* Landlord owns the parcel of real property commonly known as 840 Atlantic Avenue, Brooklyn, New York 11238, more particularly described in Exhibit A (the "Premises").

*2.     Lease.* Landlord and Tenant entered into a Lease for the Premises with an effective date of November ___, 2017 (the "Lease").

*3.     Demise of Tenant's Premises.* For good and valuable consideration, Landlord has demised the Premises to Tenant as described in the Lease.

*4.     Term.* The "Commencement Date" is November ___, 2017. The Term of the Lease began on the Commencement Date and expires on the day prior to the ninety-ninth (99th) anniversary of the last day of the calendar month in which the Commencement Date occurs, unless the Lease is terminated earlier, as provided therein.

*5.     Successors and Assigns.* The Lease and this Memorandum will bind and benefit the parties and their successors and permitted assigns. The foregoing is not intended to, and is not to be construed so as to, affect any restrictions or limitations on assignment or other transfers pursuant to the Lease.

*6.     Further Assurances.* Each party agrees to execute, acknowledge (where necessary), and deliver such further documents, and perform such further acts, as may be reasonably necessary to achieve the intent of the parties as expressed in the Lease and this Memorandum. If the Lease terminates, then Tenant will execute, acknowledge (where necessary), and deliver such documents that are required by Landlord or by any title insurance, abstract company, or institutional lender to remove this Memorandum of record.

*7.     Counterparts.* This Memorandum may be executed in counterparts.

### **[Executions on Following Page]**

IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum as of the Effective Date.

| LANDLORD | TENANT |
|---|---|
| M.M.B. Associates, LLC | Vanderbilt Atlantic Holdings LLC |
| By: _____ | By: _____ |
| Its: _____ | Its: _____ |
| Date Executed: _____ | Date Executed: _____ |

### ACKNOWLEDGEMENTS

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF )

On the _____ day of _____ in the year 2017 before me, the undersigned, a Notary Public in and for said State, personally appeared Anthony Musto, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF )

On the _____ day of _____ in the year 2017 before me, the undersigned, a Notary Public in and for said State, personally appeared Simon Dushinsky, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

{Ground Lease - Execution Version / 01692902.DOCX /}

Exhibit A

## SCHEDULE A:

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point at the corner formed by the intersection of the Southerly side of ATLANTIC AVENUE, (as now open and in use, 120.00 feet wide) with the easterly side of VANDERBILT AVENUE (as now open and in use, 100.00 feet wide);

RUNNING THENCE: Easterly along the southerly side of ATLANTIC AVENUE, 170.00 feet;

THENCE:   Southerly at right angles to the southerly side of ATLANTIC AVENUE, 200.00 feet to the northerly side of PACIFIC STREET (as now open and in use, 70.00 feet wide);

THENCE:   Westerly at right angles to the last mentioned line and along the northerly side of PACIFIC STREET, 75.00 feet;

THENCE:   Northerly at right angles to the northerly side of PACIFIC STREET, 100.00 feet;

THENCE:   Westerly at right angles to the last mentioned line, 50.00 feet;

THENCE:   Southerly at right angles to the last mentioned line, 100.00 feet to the northerly side of PACIFIC STREET;

THENCE:   Westerly at right angles to the last mentioned line and along the northerly side of PACIFIC STREET, 45.00 feet to the easterly side of VANDERBILT AVENUE;

THENCE:   northerly at right angles to the northerly side of PACIFIC STREET and along the easterly side of VANDERBILT AVENUE, 200.00 feet to the place or point of BEGINNING

*Block 1122*
*Lot 1, 68 + 71*

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010192

## EXHIBIT H

### FORM OF ASSIGNMENT OF LEASE

### **ASSIGNMENT AND ASSUMPTION OF LEASE**

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment and Assumption") between M.M.B. ASSOCIATES, LLC, a New York limited liability company with an address at c/o Crosstown Companies, 97-77 Queens Boulevard, Suite 1120, Rego Park, New York 11374 ("Assignor"), in consideration of the sum of One Dollar ($1.00) and other valuable consideration paid by VANDERBILT ATLANTIC HOLDINGS LLC, a New York limited liability company with an address at 390 Berry Street, Suite 201, Brooklyn, New York 11249 ("Assignee"), the receipt whereof is hereby acknowledged, does hereby sell, assign, transfer and set over unto Assignee, its successors and assigns, all of its right, title and interest in the Existing Lease (defined below).

**WHEREAS**, Assignor has ground leased the real property located at 840 Atlantic Avenue, Brooklyn, New York, and more particularly described in Schedule A annexed hereto and made a part hereof (the "Property") to Assignee pursuant to a Lease dated November __, 2017 (the "Ground Lease"); and

**WHEREAS**, Assignee has ground leased the Property from Assignor pursuant to the Ground Lease; and

**WHEREAS**, Assignor desires to assign, and Assignee desires to assume, all of the rights, interests, and obligations of Assignor, as landlord, which arise under that certain Ground Lease dated March 18, 1998 between Anthony N. Musto (Landlord's predecessor in interest) and McDonald's Corporation, and all renewals, modifications and amendments thereto, as evidenced by that certain Memorandum of Lease dated April 14, 1998 and recorded on August 24, 1998 in the City Registrar's Office in Reel 4264, File 1854, and that certain Supplement to Lease dated August 12, 1999 and recorded on February 2, 2000 1998 in the City Registrar's Office in Reel 4748, File 1809 from and after the date of this Assignment and Assumption (the "Existing Lease").

**NOW, THEREFORE**, in consideration of the foregoing, and other good and valuable consideration, the receipt of which is hereby acknowledged, Assignor and Assignee hereby agree as follows:

1. Assignor does hereby assign to Assignee all of its right, title and interest in and to the Existing Lease.

2. Assignee hereby assumes from Assignor and agrees to be bound by the terms, covenants and conditions of the Existing Lease from and after the date hereof.

3. This Assignment and Assumption inures to the benefit of and binds all parties hereto, together with their respective successors and assigns.

{Ground Lease - Execution Version / 01692902.DOCX /}

      4.     This Assignment and Assumption shall become effective upon its delivery. It may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

      5.     If any clause, provision or section of this Assignment and Assumption shall be ruled invalid by any court of competent jurisdiction, the invalidity of such clause, provision or section shall not affect any of the remaining provisions hereof.

      6.     This Assignment and Assumption shall be interpreted, governed by, and construed in accordance with the applicable laws of the State of New York.

*Signature Page Follows*

VA 010194

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment and Assumption to be executed in their respective names, all as of the _____ day of _____, 2017.

ASSIGNOR:

M.M.B. ASSOCIATES, LLC

By: _____

Name:

Title:

ASSIGNEE:

VANDERBILT ATLANTIC HOLDINGS LLC

By: _____

Name:

Title:

{Ground Lease - Execution Version / 01692902.DOCX /}

Schedule A

## PROPERTY DESCRIPTION

### SCHEDULE A:

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point at the corner formed by the intersection of the southerly side of ATLANTIC AVENUE, (as now open and in use, 120.00 feet wide) with the easterly side of VANDERBILT AVENUE (as now open and in use, 100.00 feet wide);

RUNNING THENCE: Easterly along the southerly side of ATLANTIC AVENUE, 170.00 feet;

THENCE:  Southerly at right angles to the southerly side of ATLANTIC AVENUE, 200.00 feet to the northerly side of PACIFIC STREET (as now open and in use, 70.00 feet wide);

THENCE:  Westerly at right angles to the last mentioned line and along the northerly side of PACIFIC STREET, 75.00 feet;

THENCE:  Northerly at right angles to the northerly side of PACIFIC STREET, 100.00 feet;

THENCE:  Westerly at right angles to the last mentioned line, 50.00 feet;

THENCE:  Southerly at right angles to the last mentioned line, 100.00 feet to the northerly side of PACIFIC STREET;

THENCE:  Westerly at right angles to the last mentioned line and along the northerly side of PACIFIC STREET, 45.00 feet to the easterly side of VANDERBILT AVENUE;

THENCE:  northerly at right angles to the northerly side of PACIFIC STREET and along the easterly side of VANDERBILT AVENUE, 200.00 feet to the place or point of BEGINNING

*Block 1122*
*Lot 1, 68 + 71*

{Ground Lease - Execution Version / 01692902.DOCX /}

VA 010196