# EXHIBIT AAA

Page 1

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF NEW YORK

3

4    ------------------------------x

5    MCDONALD'S CORPORATION,

6              Plaintiff,

7       vs.   Case No. 1:19-cv-06471(DLI)(SLT)

8    VANDERBILT ATLANTIC HOLDINGS

9    LLC,

10             Defendant.

11   ------------------------------x

12

13         VIDEOTAPE DEPOSITION OF

14          PINCHUS S. ROTTENBERG

15       VIA ZOOM VIDEOCONFERENCE

16           August 12, 2021

17             10:04 a.m.

18

19

20

21

22   Reported by:

23   Maureen Ratto, RPR, CCR

24

25

Page 2

1                    *  *  *

2

3        Videotape deposition of Pinchus S.

4   Rottenberg held virtually via Zoom

5   Teleconference, hosted from Veritext Legal

6   Solutions, pursuant to notice, before

7   Maureen Ratto, Certified Court Reporter,

8   License No. XI01165, Registered

9   Professional Reporter, License No. 817125,

10  and Notary Public.

11

12                    *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1   A P P E A R A N C E S:
 2   Counsel for the Plaintiff:
 3      PASHMAN STEIN WALDER HAYDEN, PC
 4      21 Main Street
 5      Hackensack, New Jersey 07601
 6      (201) 270-4948
 7      BY: BRENDAN M. WALSH, ESQ.
 8          bwalsh@pashmanstein.com
 9          DENISE ALVAREZ, ESQ. (New York)
10          Dalvarez@pashmanstein.com
11
12   Counsel for the Defendant:
13      MEISTER SEELIG & FEIN, LLP
14      125 Park Avenue
15      New York, New York 10017
16      (646) 242-8365
17      BY:  HOWARD KOH, ESQ.
18          hk@msf-law.com
19
20
21
22
23
24
25
```

Page 4

1  ALSO PRESENT:

2  STACY HOWARD, ESQ. Senior General Counsel

3  MICHAEL MEYER, ESQ., McDonalds Corporation

4  SHARYL AMOVITZ, Senior Paralegal McDonalds

5  Corporation

6  THOMAS LI, Vanderbilt Atlantic

7  JONATHAN POPHAM, Legal Video Specialist

8  TEVIN FRANK, Veritext Concierge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1              VIDEOGRAPHER:  Good morning. We
2         are going on the record at 10:04
3         Eastern Time on August 12, 2021.
4              Please note that the microphones
5         are sensitive and may pick up
6         whispering, private conversations and
7         cellular interference.  Audio and
8         video recording will continue unless
9         all parties agree to go off the
10        record.
11             This is Media Unit 1 of the
12        video deposition of Sam Rottenberg,
13        taken by counsel for Plaintiff in the
14        matter of McDonald's Corporation
15        versus Vanderbilt Atlantic Holdings,
16        LLC filed in the United States
17        District Court, for the Eastern
18        District of New York, Case No.
19        1:19-CV-06471 (DLI)(SLT).  This
20        deposition is being held in multiple
21        locations via videoconference.
22             My name is John Popham from
23        Veritext and I'm the videographer. The
24        court reporter is Maureen Ratto, also
25        from Veritext.

Page 6

```
 1              I'm not authorized to administer
 2         an oath, I'm not related to any party
 3         in this action, nor am I financially
 4         interested in the outcome.
 5              Counsel will now please state
 6         their appearances and affiliations for
 7         the record.
 8              MR. WALSH:  Good morning.
 9         Brendan Walsh from the law firm of
10         Pashman Stein Walder Hayden on behalf
11         of Plaintiff, McDonald's Corporation.
12              MR. KOH:  Howard Koh, Meister,
13         Seeling & Fein, representing the
14         Defendant, Vanderbilt Atlantic
15         Holdings, LLC.
16              MS. HOWARD:  Stacy Howard
17         present on behalf of McDonald's
18         Corporation.  I'm inhouse counsel.
19              MS. ALVAREZ:  Denise Alvarez
20         from Pashman Stein Walder Hayden
21         representing Plaintiff McDonald's.
22              MR. MEYER:  Mike Meyer present,
23         I am senior counsel with McDonald's.
24              VIDEOGRAPHER:  Anyone else?
25              Will the court reporter please
```

```
 1              PINCHUS S. ROTTENBERG
 2         affirm the witness?
 3                    * * *
 4   P I N C H U S   S.   R O T T E N B E R G,
 5   having affirmed according to law by the
 6   Officer, testifies as follows:
 7   DIRECT EXAMINATION BY MR. WALSH:
 8        Q.    Mr. Rottenberg, how are you
 9   today?
10        A.    I am doing fine. Thank you,
11   Brendan. How about yourself?
12        Q.    I'm doing all right. Thanks.
13              So although we're not in court
14   today, you're under oath and obligated to
15   tell the truth. Do you understand that?
16        A.    I do.
17        Q.    And you understand there is a
18   court reporter here taking down everything
19   that is also being videotaped?
20        A.    I do.
21        Q.    All right. So I'm going to ask
22   you questions today and if you don't
23   understand the question, please just let me
24   know. If you answer the question I'm going
25   to assume that you understood it.
```

```
 1              PINCHUS S. ROTTENBERG
 2              Even though you're being
 3    videotaped and we can all see you, please
 4    answer the questions verbally because the
 5    court reporter can't take down non-verbal,
 6    you know, nods or hand signals. Do you
 7    understand that?
 8         A.    I do.
 9         Q.    And just please make sure you
10    let me finish speaking before you start
11    speaking and I'll do the same for you.  The
12    court reporter can't take it all down if
13    more than one person is talking at the same
14    time.
15              Your attorney may object to some
16    of my questions. You'll still be required to
17    answer the question, unless your attorney
18    directs you not to. This is not -- you know,
19    we'll probably be here many hours today. If
20    you need a break, just let me know and we'll
21    take one, so long as there is not a question
22    pending.
23              Do you understand these
24    instructions?
25         A.    Yes.
```

1                    PINCHUS S. ROTTENBERG

2          Q.     Is there any reason, such as

3    medication, that would prevent you from

4    understanding my questions or giving

5    complete and accurate answers to my

6    questions today?

7          A.     No.

8          Q.     Where are you taking the

9    deposition from today?

10         A.     My office.

11         Q.     And where is that?

12         A.     In Brooklyn, New York.

13         Q.     Where specifically?

14         A.     266 Broadway.

15         Q.     Okay. Are you in the room alone?

16         A.     Yes.

17         Q.     Is the door closed?

18         A.     Yes.

19         Q.     Okay. Can you describe just your

20   setup is today; what screens are in front of

21   you; how you're doing this remotely; just

22   anything that you're going to be looking at

23   today?

24         A.     I see one screen, this Zoom call

25   that we're on and I see one screen the

```
                                      Page 10
 1              PINCHUS S. ROTTENBERG
 2   Veritext! Marked Exhibits.
 3        Q.    So you're set up and you're
 4   going to be able to use the Veritext Exhibit
 5   Share platform right now?
 6        A.    Correct.
 7        Q.    And you have all other programs
 8   closed, besides the Zoom?
 9        A.    No.
10        Q.    What other programs do you have
11   open?
12        A.    None.
13        Q.    Oh, okay. And do you feel that
14   you've got the proper technology and
15   bandwidth required to conduct this remote
16   deposition properly?
17        A.    Yes, sir.
18        Q.    Are you represented by counsel
19   today?
20        A.    Yes, sir.
21        Q.    And is that Mr. Koh?
22        A.    Yes.
23        Q.    You understand that you may not
24   have any private conversations or chats or
25   communications, you know, by text message,
```

```
 1              PINCHUS S. ROTTENBERG
 2  you know, basically while this deposition is
 3  ongoing and especially while a question is
 4  pending, except for determining whether a
 5  privilege should be asserted?
 6       A.    Yes.
 7       Q.    Okay. So have you ever been
 8  deposed before?
 9       A.    Yes.
10       Q.    When was that?
11       A.    I can't remember when.
12       Q.    How many times do you think
13  you've been deposed?
14       A.    I think two times.
15       Q.    Do you recall what types of
16  cases those were?
17       A.    Yes.
18       Q.    Can you tell me a little bit
19  about each case?
20       A.    One case was relating to -- I
21  think it was an investigation on a property
22  that they thought that I was related which
23  it wasn't related and the second one was
24  relating to another property sale in the
25  City that I was related as a broker, my role
```

```
                                                    Page 12
  1                  PINCHUS S. ROTTENBERG
  2    was just a broker.
  3          Q.     Okay. And the investigation that
  4    you mentioned for the first example, do you
  5    recall who was conducting that
  6    investigation?
  7          A.     No.
  8          Q.     But it was not a property that
  9    you were actually involved with?
 10          A.     No.
 11          Q.     Were you a named party in that
 12    litigation?
 13          A.     I wouldn't remember.
 14          Q.     And with the second property,
 15    what was the address of that property?
 16          A.     45 Rivington.
 17          Q.     And what was the nature of that
 18    dispute?
 19          A.     The nature of the dispute? It
 20    wasn't a dispute. It was an investigation
 21    about the restricted deed removal on a
 22    property.
 23          Q.     And who was conducting that
 24    investigation?
 25          A.     Oh, multiple people.
```

```
                                              Page 13
 1              PINCHUS S. ROTTENBERG
 2        Q.    Was it law enforcement?
 3        A.    Yes.
 4        Q.    And what City -- you said 45
 5   Rivington, I believe. What city is that
 6   address in?
 7        A.    New York City.
 8        Q.    In what borough?
 9        A.    Manhattan.
10        Q.    Manhattan. And it was being --
11   it was an investigation conducted by law
12   enforcement?
13        A.    Correct.
14        Q.    And are you aware if any civil
15   or criminal charges were brought?
16        A.    No.
17        Q.    Were you ever told that you were
18   a target of that investigation?
19        A.    No.
20        Q.    And what specific involvement
21   did you have? You said you were a broker?
22        A.    Correct.
23        Q.    And so if you could just briefly
24   explain, you know, what they were -- what
25   they wanted to talk to you about.
```

```
 1              PINCHUS S. ROTTENBERG
 2               MR. KOH:  Objection. You can go
 3        ahead and answer.
 4        A.    Like, I guess they wanted to
 5   know what my involvement was, the extent I
 6   had knowledge of whatever was going on.
 7        Q.    And do you recall why, you know,
 8   that law enforcement was investigating this.
 9               MR. KOH:  Objection. Go ahead
10        and answer.
11        A.    I guess there was a deed
12   removal.  So there was a restriction deed on
13   the property that was removed.
14        Q.    And law enforcement typically
15   doesn't get involved in that. Do you know
16   why law enforcement was involved.
17               MR. KOH:  Objection. Go ahead
18        and answer.
19        A.    I guess it has to do something
20   with the City.
21        Q.    So do you know why law
22   enforcement was involved?
23        A.    No.
24        Q.    Okay. And have you ever
25   testified in a court?
```

```
                                                  Page 15
 1                PINCHUS S. ROTTENBERG
 2         A.      No.
 3         Q.      Okay. Do you understand that
 4   you're being deposed today as Vanderbilt's
 5   corporate representative pursuant to Rule
 6   30(b)(6) of the Federal Rules of Civil
 7   Procedure?
 8         A.      I don't know what the definition
 9   of that numbers that you threw out there.
10         Q.      But are you aware that you're
11   being -- that you were designated as the
12   corporate representative for Vanderbilt
13   Atlantic Holdings?
14         A.      Yes.
15         Q.      Okay. During the deposition I'm
16   going to be referring to Vanderbilt Atlantic
17   Holdings, LLC primarily as Vanderbilt, just
18   so you are aware of that.
19                 If we could mark the 2021.07.21
20   Amended Rule 30(b)(6) notice to Vanderbilt
21   as Exhibit P1?
22                 (Plaintiff Exhibit 1, Amended
23          Rule 30(b)(6) notice to Vanderbilt
24          Atlantic Holdings was received and
25          marked on this date for
```

```
                                        Page 16
 1              PINCHUS S. ROTTENBERG
 2         identification.)
 3         Q.    And this is the amended notice
 4    of Rule 30(b)(6) deposition of Vanderbilt
 5    Atlantic Holdings, LLC issued by my office
 6    dated July 21st, 2021.
 7              So if you can pull that up,
 8    please? Actually, I don't think it's
 9    necessary to share on the screen.
10              Mr. Rottenberg, are you able to
11    pull that up through the Exhibit Share
12    technology?
13         A.    It should.
14         Q.    I think if you refresh that
15    folder you should see it there.
16         A.    Yeah.
17         Q.    Okay. Can you just quickly take
18    a look at this document and let me know if
19    you've seen this document before?
20         A.    Yes, sir.
21         Q.    You have?
22         A.    Yes.
23         Q.    And on the last two pages of the
24    document it lists 23 deposition topics. Have
25    you reviewed those topics?
```

```
                                          Page 17
 1              PINCHUS S. ROTTENBERG
 2        A.    Yes.
 3        Q.    Okay. And it's -- do you
 4   understand that you've been designated to
 5   answer questions on each of these topics on
 6   behalf of Vanderbilt?
 7        A.    Yes.
 8        Q.    Are you knowledgeable on each of
 9   these topics?
10        A.    I don't know if each of the
11   topics, but...
12        Q.    Well, what topics are you not
13   knowledgeable on?
14        A.    I guess if you go through that
15   we'll get to it.
16        Q.    Okay. If you could just tell us,
17   you know, because you've been designated as
18   the person most knowledgeable to answer
19   questions on behalf of Vanderbilt as to all
20   of these topics.  And it's very pertinent
21   that we understand if you don't have
22   knowledge as to certain of these topics.
23              MR. KOH:  I'm going to object,
24        Brendan. He was designated as the
25        person at Vanderbilt Atlantic who was
```

```
                                            Page 18
 1              PINCHUS S. ROTTENBERG
 2       most knowledgeable on these topics.
 3       Vanderbilt Atlantic, as I'm sure you
 4       will discover, is not a large company
 5       and we know what we know.
 6            MR. WALSH:  Well, yes, but he
 7       also has an obligation to educate
 8       himself on anything that he didn't
 9       have personal knowledge on --
10            MR. KOH:  I understand the
11       obligation.
12            MR. WALSH:  -- reasonably
13       available to Vanderbilt.
14            MR. KOH:  I understand.
15            MR. WALSH:  To the extent he
16       does not have knowledge on any
17       particular topic, I think it's
18       important that we understand right
19       now.
20            MR. KOH:  I agree with that. And
21       ask your questions. I was just making
22       my objection to the characterization,
23       but please go on.
24       Q.    Mr. Rottenberg, of these 23
25  deposition topics, are there any that you
```

```
                                            Page 19
 1              PINCHUS S. ROTTENBERG
 2   don't feel that you are knowledgeable on?
 3       A.    Again, as Howard alluded to, I
 4   should have knowledge, except if my attorney
 5   sought other kind of guys that I hired have
 6   more knowledge than I do.
 7       Q.    So I don't think you answered my
 8   question.
 9             Are there -- are there any
10   topics on this list that you are not
11   knowledgeable to speak about today?
12       A.    I have to go through that list.
13       Q.    Okay.
14       A.    I can't remember off the top of
15   my head, you know, all 23 items.
16       Q.    Okay. If you could just take a
17   couple minutes and review the list.
18             (Deponent reviews the document.)
19       A.    So what is your question?
20       Q.    So you've now had an opportunity
21   to review all the deposition topics?
22       A.    Yeah. I briefly glanced through
23   it, yes.
24       Q.    Okay. Are you knowledgeable on
25   each of the topics that are in this
```

```
                                            Page 20
 1              PINCHUS S. ROTTENBERG
 2    deposition notice?
 3         A.    Yes. I am knowledgeable of the
 4    topics, yes.
 5         Q.    Okay. Now, what did you do to
 6    educate yourself about these topics?
 7         A.    I'm not sure I understand the
 8    question.
 9         Q.    What did you do to prepare for
10    today's deposition?
11         A.    Just reviewed the documents.
12         Q.    Which documents?
13         A.    I talked to my attorney.
14         Q.    Okay. What documents do you
15    recall reviewing?
16         A.    The documents -- I don't know.
17    The files that were shared yesterday,
18    yesterday or the day before.
19         Q.    Okay. So the documents that we
20    sent over to your lawyer?
21         A.    Correct.
22         Q.    Okay.  And you got those
23    yesterday?
24         A.    I think so.
25         Q.    Did you review any documents
```

Page 21

```
 1                PINCHUS S. ROTTENBERG
 2   other than those documents?
 3          A.    No.
 4          Q.    And you said you met with your
 5   attorney?
 6          A.    Correct.
 7          Q.    Was anyone else present during
 8   that meeting?
 9          A.    No.
10          Q.    Okay. When was that?
11          A.    I think two days ago.
12          Q.    Okay. And did you review any
13   documents during that meeting?
14          A.    Yes.
15          Q.    Which documents?
16          A.    I don't know. Various documents.
17   I can't identify which documents.
18          Q.    Okay. And how long did that
19   meeting last?
20          A.    A couple hours.
21          Q.    And no one else was present at
22   that meeting, just you and Mr. Koh?
23          A.    Correct.
24          Q.    And did you have any other
25   meetings with Mr. Koh or anyone else to
```

Page 22

                    PINCHUS S. ROTTENBERG

1

2    prepare for today's deposition?

3         A.    No.

4         Q.    You didn't speak with anybody

5    else at Vanderbilt about any of these topics

6    included in the deposition notice?

7         A.    No. I spoke to I guess to Tom

8    about the fact that it is a deposition.

9    That's all.

10        Q.    Okay. But you didn't try to get

11   into the substance of any of these topics

12   with him?

13        A.    No. No.

14        Q.    Did you consider doing that?

15        A.    No.

16        Q.    Okay. And are there any topics

17   in this that you feel that you're not

18   prepared to testify about today?

19        A.    I don't think so.

20        Q.    Okay. Can you just share with us

21   just your educational background?

22        A.    Such as?

23        Q.    What degrees you have? Did you

24   go to college?  High school? Just your

25   general education background.

```
 1               PINCHUS S. ROTTENBERG
 2        A.    I didn't go to college. I didn't
 3   go to high school.
 4        Q.    So what was the last grade you
 5   completed?
 6        A.    I don't even know what's
 7   considered the last grade completed. I'm
 8   sorry.
 9        Q.    Okay. And how about your
10   employment history, when did you start
11   working after you stopped school?
12        A.    I start working?
13        Q.    Yes.
14        A.    I would say 18 years ago.
15        Q.    Okay. And how old are you?
16        A.    40.
17        Q.    40. So when you were around 22
18   years old you started working?
19        A.    I guess.
20        Q.    Okay. And can you just give me
21   just a summary of your employment history,
22   sort of where you've worked over the course
23   of the past 18 years?
24        A.    I don't have a summary of where
25   I worked. I never worked for somebody
```

Page 24

1                    PINCHUS S. ROTTENBERG
2   specifically.   I always was kind of doing
3   work just, doing work on my own.
4          Q.     And what type of work?
5          A.     Real estate brokerage.
6          Q.     So you're a real estate broker?
7          A.     Correct.
8          Q.     Are you licensed?
9          A.     Yes.
10         Q.     And when did you become
11  licensed?
12         A.     I can't remember.
13         Q.     Do you remember approximately
14  how long ago?
15         A.     I can't remember.
16         Q.     And is there -- and what states
17  are you licensed in?
18         A.     New York.
19         Q.     Okay. And so am I understanding
20  you correctly that for you've essentially
21  the last 18 years been a self-employed real
22  estate broker?
23         A.     Correct. I don't know the full
24  18 years but it was self-employed, so
25  generally.

```
                                          Page 25
 1               PINCHUS S. ROTTENBERG
 2        Q.     And when did you become involved
 3   with Vanderbilt Atlantic Holdings, LLC?
 4        A.     When Vanderbilt was created.
 5        Q.     And when was that?
 6        A.     I can't remember.
 7        Q.     Does November 2017 sound about
 8   right?
 9        A.     Could be.
10        Q.     And what is your position with
11   Vanderbilt?
12        A.     I am the general partner.
13        Q.     And what do you mean by "the
14   general partner"?
15        A.     The decisionmaking day-to-day
16   operations.
17        Q.     So you are responsible for all
18   of the decisions of the day-to-day
19   operations?
20        A.     Correct.
21        Q.     Are there any other general
22   partners?
23        A.     General partners, no.
24        Q.     Who are the other partners?
25        A.     Simon Dushinsky.
```

                    PINCHUS S. ROTTENBERG

1
2       Q.      And what is Mr. Dushinsky's role
3   with Vanderbilt?
4       A.      A limited partner.
5       Q.      And what does that mean?
6       A.      Just sitting and letting me do
7   the day-to-day operations.
8       Q.      So do you -- do you consult with
9   him about decisions before you make them?
10      A.      Sometimes.  Sometimes not,
11  sometimes yes.
12      Q.      What types of decisions would
13  you run past Mr. Dushinsky before making
14  them?
15      A.      There is no general rule. If
16  there is a type of decision, whatever, if it
17  comes along that happens.  If it doesn't,
18  not. It doesn't have, like, a rule what I
19  run by him and what's not.
20      Q.      So you have discretion as the
21  general partner to make decisions?
22      A.      Yes.
23      Q.      Okay. And can you tell me a
24  little bit about Mr. Dushinsky? Is he also
25  self-employed?

```
                                            Page 27
 1              PINCHUS S. ROTTENBERG
 2              MR. KOH:  Objection. Go ahead
 3        and answer.
 4        A.    I don't know what self-employed
 5   is described but he runs a development
 6   company, a real estate development company.
 7        Q.    And what is the name of that
 8   real estate?
 9        A.    Rabsky Group.
10        Q.    Do you receive compensation from
11   Vanderbilt for the work you do?
12        A.    No.
13        Q.    You don't?
14        A.    No.
15        Q.    Do you receive compensation from
16   any source for the work you're doing for
17   Vanderbilt?
18        A.    No.
19        Q.    So you have not received any
20   compensation for any of the work you've done
21   as the general partner for Vanderbilt?
22        A.    No.
23        Q.    Okay. So I guess if I can just
24   ask, you know, do you expect to receive
25   compensation for the work that you are doing
```

1              PINCHUS S. ROTTENBERG

2     and have done on behalf of Vanderbilt?

3          A.     We're partners, so I'm not sure

4     what the question is all about.

5          Q.     Well, do you expect to earn a

6     profit off of the work that you're doing for

7     Vanderbilt?

8          A.     Again, I'm not sure I follow the

9     question.

10          Q.     Okay. Do you expect to make

11     money from your involvement with Vanderbilt

12     Atlantic Holdings?

13          A.     Of course.

14          Q.     And how would you earn money?

15     What are the different sources that you

16     could potentially receive compensation for

17     the work you're performing at Vanderbilt?

18          A.     Adding value to the property,

19     refinancing, recapping, multiple ways.

20          Q.     Are there any other ways other

21     than the ones you just mentioned?

22          A.     No.

23          Q.     Okay. And does Vanderbilt own

24     any real estate other than 840 Atlantic

25     Avenue in Brooklyn, New York?

```
                                                    Page 29
 1              PINCHUS S. ROTTENBERG
 2         A.    No.
 3         Q.    Okay. And I just -- I may during
 4    the deposition refer to 840 Atlantic Avenue
 5    as "the property". Do you understand that?
 6         A.    Again?
 7         Q.    I may during the deposition
 8    refer to 840 Vanderbilt Avenue as "the
 9    property". Do you understand that?
10         A.    Yes.
11         Q.    Okay. So how many employees does
12    Vanderbilt have?
13         A.    Two.
14         Q.    Who are they?
15         A.    Myself and Tom Li.
16         Q.    And so it has two employees, you
17    and Tom Li; and two members, you and Simon
18    Dushinsky?
19         A.    Correct.
20         Q.    What percentage of the company
21    or the membership interest do you own and
22    what percentage does --
23         A.    50/50.
24         Q.    50/50. Okay. Is that how
25    compensation would be split between the two
```

```
                                              Page 30

 1                PINCHUS S. ROTTENBERG
 2      partners?
 3           A.    Yes.
 4           Q.    Okay. Have you ever -- are you a
 5      member of the Rabsky Group?
 6           A.    No.
 7           Q.    What is the Rabsky Group?
 8                 MR. KOH:  Objection. Go ahead
 9           and answer.
10           A.    A development company.
11           Q.    It's a real estate development
12      company?
13           A.    Correct.
14           Q.    Okay. And by the way, does Tom
15      Li, the other employee, earn a salary?
16           A.    Yes.
17           Q.    And what is his salary?
18           A.    It's not a salary on Vanderbilt.
19      So it's just a salary on -- under SPR Group
20      which is my company.
21           Q.    So SPR Group is your company?
22           A.    Correct.
23           Q.    How many employees of SPR Group
24      are there?
25           A.    Three.
```

```
                                                  Page 31

 1                 PINCHUS S. ROTTENBERG
 2         Q.     Who are they?
 3         A.     Tom Li, myself, and a gentleman
 4    named Dov Feder.
 5         Q.     Is Dov Feder involved with this
 6    property at all?
 7         A.     No.
 8         Q.     And what is the relationship
 9    between Vanderbilt and SPR Group?
10                MR. KOH:  Objection. Go ahead
11         and answer.
12         A.     No relationship.
13         Q.     There is no relationship, but
14    SPR Group is paying Tom Li's salary?
15         A.     No. SPR Group is paying Tom Li's
16    salary as SPR Group but he's not getting any
17    salary for Vanderbilt.
18         Q.     Okay. So if there is no
19    relationship between the two companies, why
20    is SPR Group paying Tom Li's salary for his
21    work for Vanderbilt?
22         A.     There is a lot of work at SPR
23    Group outside of Vanderbilt that Tom Li also
24    works for.
25         Q.     Okay. So the salary that he
```

                                        Page 32

 1                 PINCHUS S. ROTTENBERG

 2   earns is for multiple properties and other

 3   entities besides Vanderbilt?

 4         A.     Correct.

 5         Q.     Do you know what properties

 6   those are?

 7         A.     I mean, it's not property, it's

 8   just, you know, all the other stuff.

 9         Q.     So what other stuff are you

10   involved with at SPR Group?

11         A.     Just typical brokerage stuff.

12         Q.     I don't understand what you mean

13   by "typical brokerage stuff". If you could

14   just explain?

15         A.     As I said, I'm a professional

16   real estate broker, so this is my profession

17   and this is what I'm working with Tom Li on.

18         Q.     Is Tom -- are you or Tom working

19   on any other development projects?

20         A.     "Working on" in terms of?

21         Q.     Are you actively seeking to

22   develop or redevelop other properties other

23   than 840 Atlantic Avenue?

24                MR. KOH:  Objection, go ahead.

25         A.     I can't recall any other.

1               PINCHUS S. ROTTENBERG

2        Q.    You don't know or you can't

3   recall?

4        A.    I can't recall. I can't remember

5   at this point.

6        Q.    You don't know whether you're

7   actively working on any other developments

8   or redevelopments?

9        A.    No. No. So I'm not working, you

10  know, based on my knowledge, I'm not working

11  on any other.

12       Q.    Is Tom Li?

13       A.    I don't think so.

14             MR. KOH:  Objection.

15       Q.    So this is the only active

16  project that SPR Group -- the active

17  development or redevelopment project that

18  SPR is working on?

19       A.    Correct.

20       Q.    And so what else is Tom Li being

21  compensated for then?

22       A.    For the broker business related

23  that we're doing.

24       Q.    What percentage of his work

25  involves Vanderbilt versus the brokerage

1                    PINCHUS S. ROTTENBERG
2    related work?
3          A.    Oh, I don't know.
4          Q.    Can you just estimate for me?
5          A.    Very very small portion.
6          Q.    A very small portion of what?
7          A.    Of the overall work that he's
8    doing.
9          Q.    So let me just clarify. A very
10   small portion of Tom Li's work relates to
11   Vanderbilt?
12         A.    It's very hard to -- I don't
13   know which kind of percentage that is, so...
14         Q.    You said a very small
15   percentage. Is it a very small percentage of
16   work he does for Vanderbilt or a very small
17   percentage of his work relates to things
18   other than Vanderbilt?
19         A.    I'm not sure I understand the
20   question.
21         Q.    I'm trying to understand where
22   is the majority of Tom Li's time spent,
23   working on behalf of Vanderbilt or working
24   on behalf of other projects through SPR
25   Group?

Page 35

```
 1              PINCHUS S. ROTTENBERG
 2        A.    Working on behalf of other
 3   projects.
 4        Q.    So are you personally involved
 5   in any other development or redevelopment
 6   projects?
 7        A.    No.
 8        Q.    Okay. Do you hold a position
 9   with the Rabsky Group?
10        A.    No.
11        Q.    Do you receive compensation from
12   the Rabsky Group?
13        A.    No.
14              MR. WALSH:  Okay. I'd like to
15        mark the document that's Bates stamped
16        VA-029030 as Exhibit 2.
17              (Plaintiff Exhibit 2,
18        Organizational Chart for 840 Atlantic
19        Avenue, Bates VA-029030 was received
20        and marked on this date for
21        identification.)
22        Q.    Okay. Mr. Rottenberg, can you
23   just open that document? It's a two-page
24   PDF. It's a document that spans Bates
25   VA-029030 to -31. Do you see it?
```

```
 1                PINCHUS S. ROTTENBERG
 2        A.     Yes.
 3        Q.     Have you seen this document
 4   before?
 5        A.     I can't remember but I'm sure
 6   I've seen it.
 7        Q.     Do you know who prepared it?
 8        A.     No.
 9        Q.     And what is it?
10        A.     That's an org chart.
11        Q.     Okay. So the top of -- an org
12   chart for what?
13        A.     I don't know. I have to see. For
14   840 Atlantic Avenue.
15        Q.     Okay. On the very top it shows
16   Simon Dushinsky and it says 100% and there
17   is two arrows, one that goes to Vanderbilt
18   Atlantic Holdings, LLC a little further down
19   the org chart. Do you see that?
20        A.     Yeah.
21        Q.     So that's inaccurate? You said
22   you're both 50/50 owners of Vanderbilt
23   Atlantic Holdings?
24        A.     Yes, we are.
25        Q.     Okay. And what is 840 Atlantic,
```

```
                                                        Page 37

 1                  PINCHUS S. ROTTENBERG

 2     LLC?

 3           A.     That's Simon Dushinsky's entity.

 4           Q.     Are you a member of that entity?

 5           A.     No.

 6           Q.     So he's 100% owner of that

 7     entity?

 8           A.     Yes.

 9           Q.     Okay. And what is -- so right

10     below that it says 840 Atlantic Holdings,

11     LLC. What is that?

12           A.     I think that's my entity.

13           Q.     So you're the 100% owner of 840

14     Vanderbilt Atlantic, LLC?

15           A.     Yes.

16                  MR. KOH:  Objection. Go ahead.

17           Fine.

18           Q.     And then next to 840 Atlantic

19     Holdings, LLC it says Anthony Musto and A.M.

20     Musto Irrevocable Family. Do you see that?

21           A.     Yeah.

22           Q.     And then directly below those

23     boxes it says M.M.B. Associates, LLC. Do you

24     see that?

25           A.     Correct.
```

```
                                              Page 38
 1               PINCHUS S. ROTTENBERG
 2         Q.     So what is -- can you just
 3   explain to me the relationship between
 4   M.M.B. Associates, LLC and the three -- the
 5   names in the three boxes directly above
 6   that?
 7         A.     Which three boxes?
 8         Q.     A.M. Musto Irrevocable Family
 9   Trust, Anthony Musto and 840 Atlantic
10   Holdings, LLC.
11         A.     Again, which three boxes? I
12   didn't pay attention.
13         Q.     The three boxes directly above
14   M.M.B. Associates, LLC.
15         A.     Okay.
16         Q.     So what is the -- I'm just
17   trying to understand what the relationship
18   of the three names in the three boxes
19   directly above M.M.B. Associates are to
20   M.M.B.
21               Are those the three owners of
22   M.M.B. Associates, LLC?
23         A.     Yes.
24         Q.     Okay. So 840 Atlantic Holdings,
25   LLC is a 20% owner of M.M.B. Associates?
```

```
                                              Page 39

1             PINCHUS S. ROTTENBERG
2        A.      Again, this is all I think, so
3   -- but yeah, according to this document,
4   yes.
5        Q.      So what about now? Do you know
6   who the members of M.M.B. Associates are?
7        A.      It's the same members.
8        Q.      Okay.  So 840 Atlantic Holdings,
9   LLC is a 20% member of M.M.B. Associates?
10       A.      Yes.
11       Q.      And when did 840 Atlantic --
12       A.      I don't know, 20 or 25. So I'm
13   not sure.
14       Q.      Okay. When did 840 Atlantic
15   Holdings, LLC become a member of M.M.B.
16   Associates?
17       A.      I can't remember times.
18       Q.      Do you remember, was it around
19   the same time that Vanderbilt entered into
20   its lease with M.M.B.?
21       A.      I can't remember.
22       Q.      Was it -- do you remember in
23   your life when it happened? Was it 10 years
24   ago? 20 years ago? Five years ago?
25       A.      I can't remember.
```

```
                                              Page 40
 1              PINCHUS S. ROTTENBERG
 2        Q.    So was 840 Atlantic Holdings --
 3   I guess by virtue of its name, 840 Atlantic
 4   Holdings, does that give you any indication
 5   of when that entity became a member of
 6   M.M.B. Associates?
 7        A.    No.
 8        Q.    What is -- did you pay
 9   consideration or did that entity pay
10   consideration to become a member of M.M.B.
11   Associates?
12        A.    Yes.
13        Q.    And what was that?
14        A.    I don't remember.
15        Q.    Was it more than a million
16   dollars?
17        A.    I would not remember.
18        Q.    You wouldn't remember if it was
19   more or less than one million dollars?
20        A.    I think it was more.
21        Q.    Okay. Was it more than $5
22   million?
23        A.    No.
24        Q.    And Vanderbilt Atlantic
25   Holdings, LLC is not a member of M.M.B.
```

```
                                              Page 41
 1                    PINCHUS S. ROTTENBERG
 2       Associates, LLC, right?
 3            A.    Correct.
 4            Q.    And what is 9102 Ditmas
 5       Holdings, LLC?
 6            A.    That's a property located at
 7       9102 Ditmas Avenue in Brooklyn.
 8            Q.    That's an unrelated property to
 9       840 Atlantic Avenue?
10            A.    Correct.
11            Q.    And what is located on that
12       property?
13            A.    I don't know. Industrial
14       property.
15            Q.    So when did you first I guess
16       become affiliated or when did you first
17       start working, doing work related to the
18       property at 840 Atlantic Avenue?
19            A.    I don't remember when it was.
20            Q.    Do you know how you learned
21       about it?
22            A.    I talked to Tony Musto.
23            Q.    Who is Tony Musto?
24            A.    He's the owner of M.M.B.
25       Associates.
```

1                   PINCHUS S. ROTTENBERG

2          Q.     So he was the owner of M.M.B.

3    Associates at the time you learned about it?

4          A.     Correct.

5          Q.     Do you recall, did you approach

6    him about it? Did he approach you?

7          A.     I don't remember.

8          Q.     And do you remember

9    approximately when that was?

10         A.     No.

11         Q.     And why did you begin talking

12   about the property?

13         A.     I don't know.

14         Q.     You don't know?

15         A.     No.

16         Q.     You just started talking about

17   it?

18         A.     I guess.

19         Q.     Were you talking about

20   potentially redeveloping it with something

21   other than a McDonald's?

22         A.     I think so.

23         Q.     You were? So if you could just

24   tell me a little bit about what you were

25   discussing as far as redevelopment.

```
                                             Page 43
 1              PINCHUS S. ROTTENBERG
 2         A.    I don't have any specifics what
 3    I can tell you other than we talked about
 4    it, which I can't even remember what it was.
 5         Q.    Now, did -- was the Rabsky Group
 6    involved in those initial discussions you
 7    had with Tony Musto?
 8         A.    I can't remember. There might
 9    have been, might not have been, so...
10         Q.    Do you think there were?
11         A.    I can't remember.
12         Q.    Okay. If you could take -- I'd
13    like to mark the document VA-016544 as
14    Exhibit P3.
15              (Plaintiff Exhibit 3, email
16         string last dated June 19, 2017, Bates
17         VA-016544 was received and marked on
18         this date for identification.)
19         A.    Just a second.
20              CONCIERGE:  It's been uploaded.
21         Q.    So Exhibit P-3 is a document
22    that's Bates stamped VA-016544 through 548.
23              Mr. Rottenberg, if you could
24    just open that document and take a look at
25    it. I'd like to ask you some questions about
```

```
 1                 PINCHUS S. ROTTENBERG
 2    it.
 3           A.     Yeah.
 4           Q.     Do you have it?
 5           A.     I do.
 6           Q.     So the first page is an email
 7    from you to Jonathan Eiseman of Eiseman
 8    Levine, and Jay Levington with a cc to Simon
 9    Dushinsky and Tony Musto and
10    GroupRabsky@Gmail.com. Do you see that?
11           A.     I do.
12           Q.     So who is Jonathan Eiseman?
13           A.     He's the attorney.
14           Q.     The attorney for the Rabsky
15    Group?
16           A.     Vanderbilt Atlantic Holdings.
17           Q.     How about Jay Levington?
18           A.     Levington is the attorney for
19    M.M.B., Tony Musto.
20           Q.     And when you -- so this email is
21    dated June 2017. Were you or was your entity
22    a member of M.M.B. Associates at that time?
23           A.     I can't remember.
24           Q.     If you could turn to the first
25    page ending in Bates stamp 16545, there is a
```

```
                                          Page 45
 1                PINCHUS S. ROTTENBERG
 2    header about midway down the page that says
 3    the Rabsky Group. Do you see that?
 4          A.    Yes.
 5          Q.    And the second paragraph talks
 6    about "TRG" which is defined above as the
 7    Rabsky Group, "TRG's recent local
 8    acquisition and development experience." Do
 9    you see that?
10          A.    I do.
11          Q.    And so this -- and this is a
12    letter dated June 12th, 2017 from you to
13    M.M.B. Associates; is that correct?
14          A.    Which letter from me? Not from
15    me.
16          Q.    It's signed by you, correct?
17                MR. KOH:  It's not.
18          Q.    If you look at the last name,
19    last page --
20                MR. KOH:  Look at it.
21          Q.    -- do you see where it says
22    Simon Dushinsky?
23          A.    It's not me.
24          Q.    Oh, you're not Simon Dushinsky.
25    That's correct.
```

```
                                             Page 46

 1              PINCHUS S. ROTTENBERG
 2              So this is a letter from Simon
 3    Dushinsky to M.M.B. Associates. And this is
 4    a Letter of Intent where it says above, "An
 5    indication of interest to lease 840 Atlantic
 6    Avenue, Brooklyn, New York"; is that right?
 7         A.    Correct.
 8              MR. KOH:  Objection.
 9         Q.    And the letter touts -- or at
10    least describes the Rabsky Group's recent
11    local acquisition and development
12    experience, right?
13         A.    Correct.
14         Q.    Okay. And the very bottom of
15    that first page of the letter it talks about
16    how it's in the process to get approvals on
17    the old Pfizer parcel in Brooklyn to
18    potentially develop over one million square
19    feet of housing; is that correct?
20         A.    Correct.
21         Q.    And second page of the letter
22    ending in 546 it defines the property at 840
23    Atlantic Avenue, Brooklyn, New York,
24    correct, correct? Is that correct?
25         A.    Again, what was your question?
```

1          PINCHUS S. ROTTENBERG

2          Q.    The second page of the letter it

3    defines the property as 840 Atlantic Avenue,

4    Brooklyn, New York? Do you see that?

5          A.    Yes.

6          Q.    And the Rabsky Group was

7    proposing a 99-year lease of that property,

8    right?

9          A.    Correct.

10         Q.    So the next -- so section 5 it

11   says, the first sentence, "For so long as

12   the lease with McDonald's is in effect,

13   tenant shall pay to landlord the base rent

14   that McDonald's is required to pay under its

15   lease with tenant so that there shall be a

16   direct passthrough of the base rent under

17   the McDonald's lease." Do you see that?

18         A.    I do.

19         Q.    Okay. And am I correct in

20   understanding that what the Rabsky Group was

21   proposing was that so long as McDonald's was

22   on the property any rent that McDonald's

23   pays would be passed through to M.M.B.

24   Associates?

25         A.    Yes.

```
                                          Page 48
 1              PINCHUS S. ROTTENBERG
 2         Q.      Now, before this letter was
 3    sent, had there been any discussions between
 4    M.M.B. Associates and the Rabsky Group about
 5    this potential lease?
 6         A.      I'm sure it was. I can't
 7    remember, but...
 8         Q.      Do you know approximately when
 9    those -- when those discussions would have
10    started?
11         A.      No.
12         Q.      And is it -- is it fair to say
13    that these terms had been discussed with
14    M.M.B. before this Letter of Intent was sent
15    over?
16         A.      I don't know.
17         Q.      Do you know who was involved in
18    those negotiations?
19         A.      Yeah.  Of course, I was.
20         Q.      And who else?
21         A.      Maybe Simon Dushinsky.
22         Q.      And the Rabsky Group was
23    interested in this 99-year ground lease for
24    the property because it wanted to redevelop
25    the property with something other than
```

```
                                        Page 49
 1              PINCHUS S. ROTTENBERG
 2    McDonald's, right?
 3         A.    They wanted to maximize the
 4    value of the property.
 5         Q.    So I'll ask the question again.
 6              The Rabsky Group was interested
 7    in this property, obtaining a 99-year ground
 8    lease for the property, because it wanted to
 9    redevelop it with something other than a
10    McDonald's; is that correct?
11              MR. KOH:  Objection.
12         A.    Any development -- they wanted
13    to maximize the value to the extent
14    possible.  So yes.
15         Q.    So the Rabsky Group wanted to
16    redevelop the property with something other
17    than a McDonald's; is that correct?
18              MR. KOH:  Objection. You've
19         asked the question three times now,
20         please.
21              MR. WALSH:  And he hasn't
22         answered it.
23              MR. KOH:  He has. He -- he's not
24         accepting your characterization, which
25         he is free to do.
```

1              PINCHUS S. ROTTENBERG

2         Q.    Can you answer that question in

3    a yes or no answer. You said maybe?

4         A.    I said they wanted to maximize

5    the value to the extent possible on the

6    site.  Whether that means sell --

7         Q.    And the Rabsky Group would not

8    receive any money under McDonald's -- under

9    this proposal so long as McDonald's is on

10   the property, right?

11        A.    Correct.

12        Q.    So the Rabsky Group could not,

13   let alone maximize, earn any money so long

14   as McDonald's is on the property, right?

15        A.    I don't know.

16        Q.    Well, isn't that what we just

17   looked at, the base rent?

18        A.    I don't know. This is what you

19   see on the document.

20        Q.    I'm asking you. You were

21   involved, right?

22        A.    Right.

23        Q.    And it says so long as

24   McDonald's, the McDonald's lease is in

25   effect, there shall be a direct passthrough

```
                                             Page 51
 1              PINCHUS S. ROTTENBERG
 2    of the base rent under the McDonald's lease.
 3    And that's what was proposed, right?
 4         A.     Correct.
 5         Q.     So long as McDonald's is on the
 6    property the Rabsky Group does not earn any
 7    money off of this property?
 8         A.     I'm not sure. Maybe. I don't
 9    know. I don't know.
10         Q.     You don't know?
11         A.     No.
12         Q.     Well, are you aware of how they
13    might possibly? Because we just went through
14    the org chart and it didn't look like -- you
15    didn't indicate that M.M.B. -- that the
16    Rabsky Group or any entity affiliated with
17    them is a member of M.M.B. Associates.
18              So I'm just trying to understand
19    how could they earn any money off of this
20    property under this arrangement that's being
21    proposed?
22         A.     I don't know either.
23         Q.     Okay. So you said that they
24    acquired this property to maximize -- to
25    maximize what?
```

```
                                              Page 52
 1              PINCHUS S. ROTTENBERG
 2        A.    The value.
 3        Q.    The value. Can they maximize the
 4   value of this property while McDonald's is
 5   still on the property?
 6        A.    I don't know.
 7        Q.    You don't know?
 8        A.    If they can maximize the value?
 9   I don't know.
10        Q.    While McDonald's is on the
11   property.  In your opinion, how can the
12   Rabsky Group maximize the value of this
13   property?
14              MR. KOH:  Objection. Go ahead.
15        A.    By increasing rents, having
16   higher rents.
17        Q.    Okay. But as long as McDonald's
18   is on the property, the Rabsky Group won't
19   see any of those rents, right?
20        A.    So I am not making that
21   calculations for kind of -- for Vanderbilt
22   but...
23        Q.    Well, I'm asking you, the Rabsky
24   Group said that they wanted to acquire this
25   property to maximize the value of the
```

```
                                          Page 53

 1              PINCHUS S. ROTTENBERG
 2    property?
 3         A.    Correct.
 4         Q.    And I'm asking you in your view,
 5    you know, you're involved in this
 6    negotiation, how would they do that?
 7         A.    By virtue of rezoning the
 8    property and having a higher rent for the
 9    property being paid.  I don't know, many
10    other things that could happen.
11         Q.    But in order for the Rabsky
12    Group to maximize the value by increasing
13    rents, the Rabsky Group would need to get
14    those higher rents, right?  Otherwise, they
15    don't see any value from those higher rents?
16              MR. KOH:  Objection. That's a
17         conclusion which is just not true.
18         Please continue.
19              MR. WALSH:  Well, I'm asking.
20         A.    I'm not sure, again.
21         Q.    Would one way to maximize the
22    value of this be to redevelop this property
23    with something other than McDonald's?
24         A.    Yes.
25         Q.    Would you agree that this
```

1              PINCHUS S. ROTTENBERG

2      property is worth more to the Rabsky Group

3      if McDonald's were to leave the property and

4      terminate the lease?

5          A.    No.

6          Q.    Why not?

7          A.    It all depends what the rent is

8      going to be.

9          Q.    Okay. But are you aware of the

10     -- of any of the rent that McDonald's pays

11     for this property, are you aware that any of

12     that money goes to the Rabsky Group?

13         A.    If I'm aware?

14         Q.    Yes. Does any of the rent that

15     McDonald's pays for this property go to the

16     Rabsky Group?

17         A.    Yeah. You saw the org chart.

18         Q.    Right. And the org chart said it

19     goes to -- let's look at it again, it's

20     Exhibit 2.

21              M.M.B. Associates has three

22     members.  None of them -- is Vanderbilt

23     Atlantic Holdings, LLC a member of M.M.B.

24     Associates, LLC?

25         A.    No.

```
                                    Page 55
 1            PINCHUS S. ROTTENBERG
 2       Q.    Okay.  Is the Rabsky Group a
 3   member of M.M.B. Associates, LLC?
 4       A.    Not the Rabsky Group. But as you
 5   can see, 840 Atlantic is and 840 Atlantic
 6   Holdings and 840 Atlantic Holdings is a
 7   member of M.M.B.
 8       Q.    Okay.  But the Rabsky Group
 9   isn't on this org chart, is it?
10       A.    No.
11       Q.    Okay. And Vanderbilt Atlantic
12   Holdings is below -- is underneath M.M.B.
13   Associates on that org chart, right?
14       A.    Vanderbilt -- again?
15       Q.    Vanderbilt Atlantic Holdings is
16   not a member or at any point, you know,
17   down the stream a member in any way, shape
18   or form of M.M.B. Associates; is that right?
19       A.    That's correct.
20       Q.    Okay.  Now, underneath, second
21   paragraph underneath the base rent, going
22   back to -- I'm on page VA-16546, back to the
23   Letter of Intent, it says, "If the property
24   has not been rezoned prior to McDonald's
25   vacating the property, the base rent once
```

```
                                        Page 56
 1              PINCHUS S. ROTTENBERG
 2   McDonald's vacates the property shall be $10
 3   per the commercial FAR buildable square
 4   footage for the first year with such amount
 5   to increase by 2% per annum thereafter."  Do
 6   you see that?
 7        A.    I do.
 8        Q.    So can you explain to me what
 9   that means?
10        A.    You just read it, right?
11        Q.    Well, I'm just asking, what does
12   that mean to you?
13        A.    That the rent should be $10 a
14   foot.
15        Q.    If the property has not been
16   rezoned, right?
17        A.    Correct.
18        Q.    Okay.  So do you agree that, at
19   least for purposes of this agreement or this
20   proposal, the Rabsky Group was valuing the
21   property at its current zoning at $10 per
22   buildable square foot for the first year?
23        A.    I don't know at what they valued
24   it but this is on the document.
25        Q.    But that's what they were
```

1              PINCHUS S. ROTTENBERG

2      proposing, correct?

3          A.    Were proposing, yes.

4          Q.    They were proposing if

5      McDonald's left the property and it had not

6      been rezoned, then they would pay $10 per

7      square foot, according to the current zoning

8      as of the date of this letter; is that

9      right?

10         A.    Correct.

11         Q.    Okay. And in this paragraph, if

12     it had been rezoned then they would pay a

13     higher rent, is that correct, when

14     McDonald's vacates?

15         A.    If you saw it. I don't know. I

16     didn't read it.

17         Q.    Well, I'm asking you to look at

18     the document.

19         A.    Which paragraph of the document

20     are you referring to?

21         Q.    5(b)?

22         A.    5(b)? Same dollars per foot.

23         Q.    But it talks about a rezoning.

24     So presumably there would be a higher

25     buildable square footage on a rezoning,

```
                                              Page 58
 1              PINCHUS S. ROTTENBERG
 2    right?
 3         A.    I guess.
 4         Q.    This buildable square footage
 5    would almost certainly be higher if it's
 6    rezoned, right?
 7         A.    I don't know.
 8         Q.    Okay. If you can flip the page
 9    to ending in Bates stamp 547, up toward the
10    top second full paragraph it says, "If the
11    property is rezoned and McDonald's has
12    vacated the property any time after the 10
13    year period, the base rent shall reset to
14    the fair market value of the property not to
15    exceed $19 per market."  I won't read the
16    rest of the language. Do you see that?
17         A.    Again, which paragraph are you
18    talking about?
19         Q.    The second full paragraph on
20    page ending in Bates 547, "if the property
21    is rezoned".
22         A.    Yeah.
23         Q.    So if the property is rezoned
24    and McDonald's has vacated the property
25    after -- I guess within ten years of entry
```

```
                                                    Page 59
  1               PINCHUS S. ROTTENBERG
  2   of the lease, then the rent would go to the
  3   fair market value of that property, not to
  4   exceed $19, right?
  5          A.    Okay. Yeah.
  6          Q.    So if McDonald's were to vacate,
  7   according to this proposal, if McDonald's
  8   were to vacate the property within ten years
  9   of entry into the lease, it would pay the
 10   equivalent at least the first year of $10
 11   per square foot, right?
 12          A.    Again? Sorry.
 13          Q.    If McDonald's --
 14          A.    If the property --
 15          Q.    Hold.
 16               (Pending question is read back
 17          by the reporter.)
 18          A.    Correct.
 19          Q.    And if McDonald's doesn't vacate
 20   for more than ten years, then it would be
 21   either the fair market value or up to $19
 22   per square foot; is that right?
 23          A.    Correct.
 24          Q.    So this Letter of Intent would
 25   be to Rabsky Group's benefit, would you
```

```
                                              Page 60
 1              PINCHUS S. ROTTENBERG
 2    agree, if McDonald's were to vacate the
 3    property within ten years of entry of the
 4    lease proposed by this Letter of Intent?
 5         A.    It depends what it's rezoned to.
 6         Q.    What do you mean by that?
 7         A.    I don't know. I don't know why
 8    you make that assumption. I'm not sure what
 9    --
10         Q.    Let me ask, do you know why the
11    proposal was prepared this way with the ten
12    years, the two different values?
13         A.    I can't recall what was the
14    basis of this back then.
15         Q.    And do you recall why the rent
16    would be different whether or not McDonald's
17    had vacated?
18         A.    Rent is the same.  Isn't the
19    rent per foot the same?
20         Q.    Well, it depends.  It depends if
21    they vacated and it's been rezoned, right?
22    There's two variables.
23         A.    Okay.
24         Q.    I'm asking you.
25         A.    What is the question?
```

Page 61

1                PINCHUS S. ROTTENBERG

2          Q.     Are the two variables for the

3    rent; whether the property has been rezoned;

4    and whether McDonald's has vacated the

5    property?

6          A.     Yes.

7          Q.     Okay. If you could look at the

8    page ending in Bates stamp 547 under the

9    header 8, Development.

10         A.     Okay.

11         Q.     It says, "Following the

12   expiration of the McDonald's lease tenant

13   may, at its sole discretion, demolish the

14   property and constructing new mixed-use

15   property on the land (defined as the new

16   building) subject to compliance with

17   applicable law." Do you see that?

18         A.     Yes.

19         Q.     Okay. So the Rabsky Group was

20   negotiating to be able to demolish the

21   McDonald's and construct a new mixed-use

22   building as part of this proposal, correct?

23         A.     You see whatever is written in

24   here.

25         Q.     I'm asking you; is that correct?

```
                                        Page 62
 1              PINCHUS S. ROTTENBERG
 2       A.    I only know what's written in
 3  here.
 4       Q.    And is that what's written here?
 5       A.    Well, you can see it.
 6       Q.    I'm asking you, is that what's
 7  written here?
 8       A.    This is one of the options.
 9       Q.    Okay. So they may -- they may
10  demolish the McDonald's, right, and put a
11  mixed-use building on there?
12       A.    Right.
13       Q.    If you can flip to the next page
14  548, Brokers Commission.
15       A.    Yes.
16       Q.    It says, "Each landlord and
17  tenant warrants and represents to the other
18  that it is not engaged or dealt with any
19  other broker, salesman, finder or similar
20  intermediary in connection with the leasing
21  of the property which may claim a
22  commission, except for Sam Rottenberg", and
23  then it continues. Do you see that?
24       A.    I do.
25       Q.    So were you the broker for this
```

```
                                                    Page 63
 1                  PINCHUS S. ROTTENBERG
 2    proposed deal?
 3         A.     Yes.
 4         Q.     And what is your commission
 5    arrangement for this?
 6         A.     None.
 7         Q.     But it says right here it talks
 8    about a broker's commission and specifically
 9    identifies you as someone who would be
10    entitled to a commission.
11         A.     So there was no commission. It
12    was zero.
13         Q.     So what compensation would you
14    receive for your brokered services?
15         A.     I'm a partner, so...
16         Q.     So was that your compensation?
17         A.     There wasn't any compensation in
18    that broker role.  So no, there was not.
19         Q.     So you did not receive -- your
20    testimony is you did not receive any
21    compensation from anybody for brokering this
22    deal?
23         A.     Correct.
24         Q.     But as part of this deal you
25    became or an entity that you control became
```

```
                                            Page 64

 1              PINCHUS S. ROTTENBERG

 2    a member of M.M.B. Associates?

 3         A.    Correct -- no, no. Sorry. I take

 4    that back. I'm not sure. What was your

 5    question?

 6              (Pending question is read back

 7         by the reporter.)

 8         A.    That was no relation so this. I

 9    became a member of M.M.B. but there is no

10    relation to this.

11         Q.    So when -- did you become a

12    member of M.M.B. Associates before or after

13    this --

14         A.    You asked me that question

15    before and I said I don't remember.

16         Q.    But you said just that it's

17    unrelated.  So I'm just trying to understand

18    the timing.  You know --

19         A.    I don't remember the timing.

20    It's unrelated, but I don't remember the

21    timing.

22         Q.    So what was it related to? I

23    guess I'm just trying to understand.  You

24    know, why did you become a member, why did

25    that entity become a member of M.M.B.
```

```
                                          Page 65

 1              PINCHUS S. ROTTENBERG

 2   Associates?

 3        A.    Because I paid for it. There was

 4   consideration for it.

 5        Q.    And you don't remember if that

 6   was -- was it around the same time?

 7        A.    I can't remember, so...

 8        Q.    And would that have -- would you

 9   have been doing that if you were not a

10   member of M.M.B. Associates?

11              MR. KOH:  Objection. Go ahead.

12        A.    I don't know. I can't go back in

13   time.

14        Q.    Would you have done this for

15   free?

16              MR. KOH:  Objection. Go ahead.

17        A.    No.

18        Q.    Okay. And your testimony is you

19   were not entitled to a commission?

20        A.    I'm not saying that I wasn't

21   entitled. I didn't collect a commission.

22   There was no commission. There is no

23   commission arrangement.

24        Q.    Will you ever be entitled to a

25   commission?
```

Page 66

```
1                  PINCHUS S. ROTTENBERG
2          A.    I don't know.
3          Q.    You don't know?
4          A.    No.
5          Q.    Are you -- is there a separate
6    brokerage agreement?
7          A.    No.
8          Q.    So you're not aware if you're
9    entitled to a commission for this project at
10   any point in time?
11         A.    No.
12         Q.    When this Letter of Intent was
13   sent over are you aware of whether the
14   Rabsky Group had considered what rezoning it
15   may seek in connection --
16         A.    No.
17               MR. KOH:  Objection.
18         Q.    You don't? You're not sure?
19         A.    No.
20         Q.    Did you know what types of
21   mixed-use building was referenced in this
22   building and contemplated by the Rabsky
23   Group?
24               MR. KOH:  Objection.
25         A.    No.
```

```
                                              Page 67

 1               PINCHUS S. ROTTENBERG
 2        Q.     Were you aware of -- let me
 3   rephrase.
 4               Have you ever reviewed the lease
 5   with McDonald's before this Letter of Intent
 6   was sent?
 7        A.     I wouldn't remember. I can't
 8   recall.
 9        Q.     Do you recall when you first saw
10   the McDonald's lease?
11        A.     No.
12        Q.     Do you recall when you first
13   learned about the terms of the McDonald's
14   lease?
15        A.     No.
16        Q.     Do you recall ever sharing with
17   the Rabsky Group --
18        A.     No.
19               MR. KOH:  Let him finish the
20        question.
21        Q.     Before this Letter of Intent was
22   submitted, do you recall if you had shared
23   the terms of the McDonald's lease with the
24   Rabsky Group?
25        A.     No.
```

```
                                              Page 68
  1               PINCHUS S. ROTTENBERG
  2        Q.     Do you think that the terms of
  3   the McDonald's lease would be material
  4   information that's important for the Rabsky
  5   Group to be aware before it sends this
  6   Letter of Intent?
  7               MR. KOH:   Objection. Go ahead.
  8        A.     I don't know.
  9        Q.     Would you consider it material
 10   information if you were going to send a
 11   Letter of Intent like this?
 12        A.     I don't know.
 13        Q.     Would you want to know that
 14   McDonald's had the right to be on this
 15   property for another 20 years?
 16        A.     Of course.
 17        Q.     You would?
 18        A.     Of course.
 19        Q.     So do you believe the Rabsky
 20   Group was aware of that fact when it --
 21        A.     At the time that they submitted
 22   this offer?
 23        Q.     Yes.
 24        A.     No.
 25        Q.     If you were aware of it would
```

```
                                        Page 69
 1              PINCHUS S. ROTTENBERG
 2  you have shared that information with them?
 3        A.    I don't know. It depends on the
 4  setup, it depends if it were to come about
 5  or not.
 6              VIDEOGRAPHER:  Mr. Rottenberg,
 7         could you do me a favor and move over
 8         to the center of the shot?
 9              THE WITNESS: Pardon?
10              VIDEOGRAPHER:  Can I just
11         position you more towards the center
12         of the shot, could you move over a
13         bit.  I'm losing you in the shot.
14              THE WITNESS:  You are losing me?
15              MR. KOH:  Move in front of the
16         camera.
17              THE WITNESS:  Okay.  There is
18         nothing to see.
19        Q.    So did you -- were you involved
20  in any discussions with the Rabsky Group
21  about the possibility that McDonald's might
22  want to stay on the property until 2039?
23        A.    I can't remember.
24              MR. WALSH:  Okay. If we could
25         mark VA-010103, this is the final
```

```
                                          Page 70
 1            PINCHUS S. ROTTENBERG
 2       lease executed between Vanderbilt and
 3       M.M.B. Associates. It runs through
 4       010196. So that will become P-4.
 5            CONCIERGE:  010103?
 6            MR. WALSH:  Yes. 010103.
 7            (Plaintiff Exhibit 4, lease re:
 8       840 Atlantic Avenue, Brooklyn, New
 9       York, Bates VA-010103 was received and
10       marked on this date for
11       identification.)
12            CONCIERGE:  It should be there
13       now.
14       Q.    Okay. So Mr. Rottenberg, if you
15  could just open that document? I understand
16  it's very long --
17       A.    94 pages, my friend.
18       Q.    It's 94 pages and --
19       A.    You want me to go through that
20  now?
21       Q.    No, not particularly. But I'll
22  represent to you that this document was
23  produced to us in this litigation by
24  Vanderbilt. It's titled The Lease Between
25  M.M.B. Associates LLC As Landlord and
```

```
                                          Page 71

 1              PINCHUS S. ROTTENBERG

 2   Vanderbilt Atlantic Holdings, LLC As Tenant.

 3        A.    Okay. So what is your question,

 4   sir?

 5        Q.    Just be patient. And this lease,

 6   if you look at the page ending -- it's the

 7   first page of the lease after the table of

 8   contents.

 9        A.    Which page is it?

10        Q.    Ending in 109.

11        A.    109.

12        Q.    It's on the bottom.

13        A.    Okay. I'm looking at 109.

14        Q.    Would you agree it's dated

15   November 30, 2017?

16        A.    That's what the lease says.

17        Q.    Okay. Now, were you responsible

18   for negotiating this lease on behalf of

19   Vanderbilt Atlantic Holdings as the managing

20   member?

21        A.    I don't know what is

22   "responsible". I wasn't responsible. The

23   attorneys were responsible.

24        Q.    Well, were you the managing

25   member of Vanderbilt Atlantic Holdings at
```

1                PINCHUS S. ROTTENBERG
2    this time?
3         A.    Yeah.
4         Q.    And you testified earlier that
5    you have sole discretion to make decisions
6    on behalf of Vanderbilt Atlantic Holdings,
7    right?
8         A.    Correct.
9         Q.    Was anyone else working with you
10   on behalf of Vanderbilt Atlantic Holdings,
11   other than attorneys, to negotiate the terms
12   of this lease?
13        A.    I can't remember.
14        Q.    Was Simon Dushinsky involved?
15        A.    Again, depends on if it happens
16   to be or not.  Possible.  I don't know.
17        Q.    You don't recall whether he was
18   involved in negotiating --
19        A.    No. I don't know to the extent
20   of involvement, if involved. So I don't
21   know.
22        Q.    Before days deposition did you
23   try to review any communications or
24   documents to determine who was involved with
25   the negotiation of that lease?

1              PINCHUS S. ROTTENBERG

2        A.    Again? I didn't understand the

3   question.

4        Q.    Did you try to review any

5   documents or communications to determine who

6   was responsible for negotiating the lease?

7        A.    I'm not sure I understand the

8   question.

9        Q.    Did you do any, try to do any

10  research to determine, before this

11  deposition, who was responsible for

12  negotiating the lease on behalf of

13  Vanderbilt?

14       A.    I'm still -- so your question is

15  whether I did any research now?

16       Q.    Before this deposition to try

17  and refresh your recollection about who was

18  involved in the negotiation of the lease.

19       A.    No.

20       Q.    Okay. If we could turn to the

21  page ending in 128, it's the Rent provision,

22  Vanderbilt Atlantic Holdings, section 3.

23       A.    I'm not sure what you were

24  showing me on 109.

25              MR. KOH:  Mr. Rottenberg, the

                    PINCHUS S. ROTTENBERG

1

2          way this works is Mr. Walsh gets to

3          ask the questions today.

4          Q.    If you can flip to 128 section

5     3, Rent.

6                   THE WITNESS: I'm sorry, Howard.

7                   MR. KOH:  That's okay.

8                   THE WITNESS:  128, okay.

9                   MR. KOH:  We can talk about that

10         at a break or after the deposition is

11         over.

12         Q.    So Fixed Rent 3.1, it says "For

13    so long as the existing lease is in

14    effect" --

15         A.    Okay.

16         Q.    And existing lease, just for the

17    record, is defined on the page ending in

18    115, and I'll represent to you that it's the

19    McDonald's lease.  "So for so long as the

20    existing lease is in effect, tenant shall

21    pay to landlord as fixed rent and additional

22    rent, as applicable, the base rent and all

23    other charges required to be paid by the

24    existing tenant to landlord under the

25    existing lease so that there shall be a

```
 1              PINCHUS S. ROTTENBERG
 2    direct passthrough of base rent and all
 3    other charges required to be paid by the
 4    existing tenant to landlord under the
 5    existing lease."
 6              So am I correct that that
 7    provision requires Vanderbilt Atlantic
 8    Holdings to pay to M.M.B. Associates all
 9    rent that McDonald's pays to Vanderbilt so
10    long as the McDonald's lease remains in
11    effect?
12         A.    Yes. I see it the same way as
13    you read it.  So yes.
14         Q.    And then would you agree that in
15    the next two sections they discuss what
16    happens after that McDonald's lease
17    terminates, McDonald's vacates, correct?
18         A.    I have to read it.
19         Q.    So it's 3.11 and 3.12.
20              (Deponent reviews the document.)
21         A.    So what is your question?
22         Q.    Well, so do you agree that 3.11
23    and 3.12 talk about the rent that will be
24    owed after McDonald's vacates?
25              MR. KOH:  Objection.
```

Page 76

1                  PINCHUS S. ROTTENBERG
2        A.     I don't know.
3        Q.     That's why I asked you to read
4   --
5        A.     That's if it's rezoned or not
6   rezoned. That's all I see.
7        Q.     At the end of 3.1 the last
8   sentence is, "From and after the existing
9   tenant vacate date, fixed rent payable to
10  the tenant by tenant to landlord under this
11  lease" --
12       A.     I don't know what you're
13  reading.
14       Q.     The very last sentence of
15  section 3.1 the section we were just
16  reading.
17       A.     Okay.
18       Q.     "From and after the existing
19  tenant vacate date, fixed rent payable by
20  tenant to landlord under this lease shall be
21  as set forth in either 3.1 or 3.2 below as
22  applicable", right?  Do you see that?
23       A.     Yes. I see that.
24       Q.     So 3.11 and 3.12 cover the rent
25  payable by Vanderbilt after McDonald's

```
 1              PINCHUS S. ROTTENBERG
 2   vacates the property, correct?
 3        A.    That's what the section in 3.1,
 4   you just read it, says.
 5        Q.    Okay. And am I correct that the
 6   rent that Vanderbilt will owe after
 7   McDonald's vacates is dependent on first,
 8   whether the property has been rezoned; is
 9   that correct?
10        A.    I don't know.
11        Q.    Well, I'm asking you to review
12   the document and answer my question. You're
13   the managing member of Vanderbilt Atlantic
14   Holdings.
15        A.    You're asking me first. I don't
16   know what is first and what is second.
17        Q.    If you could -- if you could
18   refer back to Exhibit 1, which is the
19   30(b)(6) deposition notice.
20        A.    Exhibit 1?
21        Q.    Yes. And go to the very last
22   page of that, topic 18.
23        A.    Okay.
24        Q.    And before we get to that, would
25   you agree that the rent that Vanderbilt pays
```

```
                                        Page 78

 1                PINCHUS S. ROTTENBERG
 2   under this lease to M.M.B. is a financial
 3   term of the lease?
 4        A.    I'm not sure I understand the
 5   question. Sorry.
 6        Q.    Does the rent that Vanderbilt
 7   pays to M.M.B. under its lease with M.M.B.,
 8   that rent, is rent a financial term of that
 9   lease?
10        A.    Yes.
11        Q.    Okay. Looking back at Exhibit 1,
12   topic 18, we requested a person
13   knowledgeable about the financial terms of
14   the Vanderbilt lease. Do you see that?
15        A.    I do.
16        Q.    Are you knowledgeable about the
17   financial terms of the Vanderbilt lease?
18        A.    I should be.
19        Q.    Are you?
20        A.    Again, I'm not sure I remember
21   all of the -- all of the financial terms.
22        Q.    So are you or are you not
23   knowledgeable of the financial terms of the
24   Vanderbilt lease?
25        A.    Knowledgeable or remember?
```

```
 1                PINCHUS S. ROTTENBERG
 2    Remember, I'm not sure.
 3         Q.    Knowledgeable. Knowledgeable.
 4         A.    Yes.
 5         Q.    Okay. So you're knowledgeable of
 6    the financial terms of the lease?
 7         A.    Yes.
 8         Q.    So in advance of your deposition
 9    did you review this lease?
10         A.    No.
11         Q.    Did you review the financial
12    terms of the lease?
13         A.    I don't think so.
14         Q.    Did you do anything in
15    preparation for this deposition today --
16         A.    Yeah. I told you before --
17         Q.    Let me finish.
18               Did you do anything in advance
19    of your deposition today to testify about
20    the financial terms of the Vanderbilt lease?
21         A.    I looked through the documents
22    that were sent over.
23         Q.    That wasn't my question.
24               My question is, did you do
25    anything specifically to prepare to testify
```

```
                                      Page 80
 1              PINCHUS S. ROTTENBERG
 2    today about the financial terms of the
 3    Vanderbilt lease?
 4              MR. KOH:  Are you excluding
 5         meeting with me, Brendan?
 6              MR. WALSH:  It's a general
 7         question.
 8         Q.    I want to understand what did
 9    you do -- did you do anything to prepare to
10    testify on this topic?
11         A.    Yeah. I said before.  I don't
12    know about this topic specifically. I can't
13    talk to that topic specifically.
14         Q.    Well, I'm asking you
15    specifically about this topic.
16         A.    I can't answer to that question.
17    I don't know. I met with Howard and I went
18    through all the documents that were sent
19    over.
20         Q.    Okay.
21         A.    That's what I said before.
22         Q.    So you're not aware of any
23    preparation that you performed in advance of
24    today to talk about the financial terms of
25    the Vanderbilt lease?
```

```
                                        Page 81
 1              PINCHUS S. ROTTENBERG
 2                 MR. KOH:  Objection.
 3         A.    About any specific thing, I
 4    can't recall.
 5                 MR. WALSH:  Howard, we're going
 6            to reserve our rights to reopen this
 7            deposition, if necessary.
 8                 MR. KOH:  Okay. I don't think
 9            there's any dispute about the validity
10            of the documents and I don't think
11            anybody has alleged that it isn't
12            somehow clear, but go ahead. You can
13            reserve your rights.
14                 MR. WALSH:  I don't necessarily
15            think it's unclear. Mr. Rottenberg,
16            I'm asking questions about it, and he
17            keeps referring me back to it and I'm
18            just trying to understand, make sure
19            my understanding of the lease is
20            correct.
21         Q.    So let's go back to the lease,
22    section 3, Rent. Do you see that on page
23    ending in 112 on Exhibit P4?
24         A.    Exhibit 4, page 128, yes.
25         Q.    So this is what we were just
```

Page 82

1               PINCHUS S. ROTTENBERG
2    talking about earlier.
3         A.    Yes.
4         Q.    3.11 and 3.12 govern the rent
5    that is owed after McDonald's vacates the
6    property, right?
7         A.    Again, that's what 3.1 says,
8    correct.
9         Q.    So that's correct. And am I
10   correct that the rent that Vanderbilt pays
11   after McDonald's leaves the property is
12   dependent on whether the property has been
13   rezoned; is that correct?
14        A.    Yes.
15        Q.    And when the rezoning occurs; is
16   that correct?
17        A.    Yes.
18        Q.    And under section 3.12, if the
19   property is rezoned within the first ten
20   years of this Vanderbilt lease, Vanderbilt
21   will pay $10 per buildable square foot,
22   correct?
23        A.    Yes.
24        Q.    And if the property is rezoned
25   and McDonald's, you know, leaves after ten

```
                                              Page 83
 1                PINCHUS S. ROTTENBERG
 2   years from the time the lease is entered,
 3   Vanderbilt pays a different amount of rent,
 4   the fair market value, correct?
 5        A.    Where are you reading this?
 6        Q.    It's section 3.12. I'm just
 7   trying to make sure I understand that this
 8   is correct. Maybe just take a moment to read
 9   3.12.
10        A.    Yeah.
11              (Deponent reviews the document.)
12              VIDEOGRAPHER:  Counsel, when you
13        reach a convenient point?
14              MR. WALSH:  Sure.
15        Q.    Tell me when you've read 3.12.
16        A.    Yeah. I read it.
17        Q.    Okay. So am I correct that if
18   the property is rezoned and McDonald's
19   vacates after ten years from the date of the
20   lease, so after November 30, 2027, then the
21   rent will be determined by the fair market
22   value of the property, an increase by 2% per
23   year, with the fair market value not to
24   exceed $19 per buildable square foot?
25        A.    Correct.
```

1              PINCHUS S. ROTTENBERG
2        Q.     Okay. But if McDonald's were to
3   vacate the property before ten years, before
4   2027, Vanderbilt would pay -- and there's a
5   rezoning -- Vanderbilt would pay $10 per
6   buildable square foot; is that correct?
7        A.     Correct.
8        Q.     Okay. So under 3.11 and 3.12 if
9   McDonald's were to vacate the property
10  tomorrow, what rent would Vanderbilt be
11  required to pay to M.M.B. Associates?
12              MR. KOH:  Objection. Go ahead.
13       A.     I don't know.
14       Q.     Is that a financial term of the
15  lease?
16       A.     Yes, it is.
17       Q.     Okay. So I'm asking you as the
18  corporate representative of Vanderbilt, who
19  has been brought here to testify about,
20  among other things, the financial terms of
21  the Vanderbilt lease, if you could tell me
22  -- or at least tell me how would it be
23  calculated?
24       A.     You just look at the lease and
25  see how it's calculated. I can't -- I can't

Page 85

1                    PINCHUS S. ROTTENBERG
2    sit here -- again, what was the question?
3    Sorry.
4         Q.    If McDonald's vacated the
5    property tomorrow what rent would Vanderbilt
6    be required to pay M.M.B. Associates?
7                   MR. KOH:  Same objection.
8         Q.    Can you at least tell me how it
9    would be calculated?
10                  MR. KOH:  That's a different
11         question. Go ahead.
12        A.    It's like -- yeah, $10 a foot.
13        Q.    Under current zoning, correct?
14        A.    Correct.
15        Q.    So if Vanderbilt -- so if
16   McDonald's vacates the property tomorrow,
17   Vanderbilt would have to pay M.M.B.
18   Associates $10 per buildable square foot
19   under its current zoning; is that correct?
20        A.    Yes.
21        Q.    How many buildable square feet
22   are on the property?
23        A.    I can't remember exactly but
24   like 35,000 or so.
25        Q.    You're close. I believe it's

Page 86

1                PINCHUS S. ROTTENBERG
2    36,000.
3                Assuming it's 36,000, what
4    annual rent would Vanderbilt pay M.M.B.
5    Associates if McDonald's were to vacate the
6    property tomorrow?
7         A.    Whatever $10 plus 2% increase is
8    from the day the lease was signed,
9    equivalent.
10        Q.    So it would be $360,000 for the
11   first year increasing by 2%, correct?
12        A.    Yeah.
13             MR. WALSH:  Can we just take a
14        five minute break?
15             MR. KOH:  Fine with me.
16             VIDEOGRAPHER:  We're off at
17        11:38 a.m. and this marks the end of
18        media 1.
19             (Recess is taken.)
20             VIDEOGRAPHER:  We are back on
21        the record at 11:50 a.m.  This is the
22        start of media 2.
23        Q.    Mr. Rottenberg, as part of the
24   lease that Vanderbilt entered into with
25   M.M.B. Associates, M.M.B. Associates

Page 87

1               PINCHUS S. ROTTENBERG
2    assigned to Vanderbilt all of M.M.B.'s
3    rights and interests in the McDonald's
4    lease; isn't that correct?
5          A.    Yes.
6          Q.    And that assignment and
7    assumption of lease was memorialized in a
8    different agreement, correct?
9          A.    I don't know.
10          Q.    Let me ask you this, do you
11    know, was there any separate consideration,
12    aside from what may be included in the
13    lease, separate consideration paid for that
14    assignment and assumption of lease, the
15    McDonald's lease?
16          A.    Not that I'm aware of.
17          Q.    Do you know?
18          A.    No.
19          Q.    Who would know?
20          A.    I don't know.
21          Q.    Would Simon Dushinsky know?
22          A.    No.
23          Q.    Would Tom Li know?
24          A.    No.  If anybody, I should know.
25          Q.    But you don't know?

```
                                              Page 88

1                 PINCHUS S. ROTTENBERG

2        A.    No.

3        Q.    Okay.

4        A.    I don't think so, as I said.

5        Q.    Well, you do or you don't.

6              MR. WALSH:  So if we can mark

7        VA-021570. It's a document that spans

8        to Bates stamp 021588 and I believe

9        that will be P-5.

10             (Plaintiff Exhibit 5, email

11       string dated last November 21, 2017,

12       Bates VA-21570 was received and marked

13       on this date for identification.)

14             CONCIERGE:  There isn't a

15       021570.  There is no zero at the front

16       of it.

17             MR. WALSH:  I'm sorry. Let me

18       just confirm that's probably the same

19       document. Yes. That's it. My

20       apologies.

21       Q.    So the exhibit is now in Exhibit

22   Share. It's been identified as P-5.

23             Mr. Rottenberg, if you can just

24   please open up that document. It's an email

25   chain with an attachment.
```

```
                                          Page 89

 1              PINCHUS S. ROTTENBERG
 2        A.    That's Exhibit 5, right?
 3        Q.    Correct.
 4        A.    Okay.
 5        Q.    So it's an email chain that
 6   starts with from Devora Mondrowitz with a
 7   Reliable Abstract email address and it's
 8   sent to a number of people.  You're cc'd on
 9   there. There are a couple of attachments, an
10   image 001.JPG and ACRIS memo of lease.PDF.
11   Do you see that?
12        A.    Yes.
13        Q.    So who are -- who is Devora
14   Mondrowitz?  What was her role?
15        A.    The title company.
16        Q.    She didn't represent either
17   party, she just worked for the title
18   company?
19        A.    Yeah.
20        Q.    And how about Brad Bassuk?
21        A.    He is the attorney for
22   Vanderbilt Holdings.
23        Q.    And how about --
24        A.    Sorry. He's the attorney for
25   M.M.B.
```

```
                                        Page 90
 1              PINCHUS S. ROTTENBERG
 2        Q.    So Brad was the attorney for
 3   M.M.B.?
 4        A.    A-hum.
 5        Q.    Okay. Now, when this -- when the
 6   lease was being negotiated did you ever have
 7   the opportunity to consult with Brad Bassuk?
 8        A.    I don't know consult. I talked
 9   to him.
10        Q.    But did you -- did you think
11   that he was representing your interests in
12   that transaction?
13        A.    No. He represented Vanderbilt.
14        Q.    But you, an entity that you
15   control, is a member of M.M.B., right?
16        A.    Yeah.
17        Q.    Okay. So if you weren't
18   consulting with him, is it fair to conclude
19   from that that you -- your entity did not
20   become a member of M.M.B. until after this
21   transaction concluded?
22              MR. KOH:  Objection. Go ahead.
23        A.    I'm not sure. I'm not sure I
24   understood the question. What is the
25   question?
```

```
                                              Page 91
 1            PINCHUS S. ROTTENBERG
 2        Q.    So let me just put it this way,
 3   you're currently a member of Vanderbilt
 4   Atlantic Holdings, correct?
 5        A.    Right.
 6        Q.    An entity that you control is
 7   also currently a member of M.M.B.
 8   Associates, correct?
 9        A.    Yes.
10        Q.    Okay. And this is a transaction
11   between Vanderbilt and Atlantic -- I'm sorry
12   Vanderbilt Atlantic and M.M.B. Associates,
13   correct?
14        A.    Correct. Correct.
15        Q.    Two entities that you're
16   affiliated with?
17        A.    Correct.
18        Q.    Were you -- when the transaction
19   was being negotiated were you at the time on
20   both sides of the negotiations or only on
21   behalf of Vanderbilt?
22        A.    On behalf of Vanderbilt.
23        Q.    So you were not involved at the
24   time with any of the negotiations with
25   M.M.B.?
```

```
                                              Page 92
 1               PINCHUS S. ROTTENBERG
 2        A.    Yeah, I was.
 3        Q.    As a member of M.M.B.?
 4        A.    I don't know at which role. I
 5   just was involved without any specific role.
 6        Q.    So at the time -- I guess what
 7   I'm trying to understand is, at the time of
 8   this transaction, were you on both sides of
 9   the transaction or on only the Vanderbilt
10   side of the transaction?
11        A.    I was on the Vanderbilt side of
12   the transaction.
13        Q.    Only?
14        A.    I don't know what means "only".
15   I was on Vanderbilt.
16        Q.    So you can't answer that
17   question?
18        A.    What is the question? I was on
19   the Vanderbilt side of the transaction. That
20   is my answer.
21        Q.    Were you also on the M.M.B. side
22   of the transaction?
23        A.    Yeah. I might have been an
24   interest in the M.M.B. side.  But for this
25   transaction I was on the Vanderbilt side.
```

1              PINCHUS S. ROTTENBERG

2        Q.    Only; is that correct?

3        A.    I don't know. I can't remember

4   it was only or not only.

5        Q.    Okay. So if you could turn to

6   the third page of that email chain that's

7   ending in Bates stamp 572, at the very

8   bottom, the last part of that page.

9        A.    Yup.

10       Q.    It's an email dated November 21,

11  2017 from Murray Schneier.

12       A.    A-hum.

13       Q.    At Reliable Abstract and Rivky

14  Sicherman.

15       A.    Okay.

16       Q.    Who is Rivky Sicherman?

17       A.    I don't know.

18       Q.    And Murray Schneier was

19  Vanderbilt's counsel?

20       A.    Was representing Vanderbilt.

21       Q.    Okay. What is -- and so it says,

22  "We need the ACRIS" -- that's A-C-R-I-S, "We

23  need the ACRIS forms done ASAP for the

24  ground lease transaction. This is holding up

25  our deal.  The FMV is $10 million, so estate

```
 1              PINCHUS S. ROTTENBERG
 2   transfer tax is $40,000 and no NYC tax on
 3   ground leases but have to fill out form.
 4   Please call me when you are in. Thanks,
 5   Murray."  Do you see that?
 6        A.    I do.
 7        Q.    And the subject is 840 Atlantic
 8   Avenue, correct?
 9        A.    Yes.
10        Q.    Okay. So how did Vanderbilt's
11   attorney come up with the $10 million FMV
12   for the ground lease transaction?
13              MR. KOH:  Objection.
14        A.    I don't remember, sir.
15        Q.    So you don't know?
16        A.    I don't remember.
17        Q.    Did you do anything in advance
18   of your deposition to prepare to answer
19   questions on this topic?
20        A.    No. I reviewed this document but
21   that's the extent of it.
22        Q.    So you viewed the document?
23        A.    Yup.
24        Q.    Okay. By the way, what is an
25   ACRIS form?
```

```
                                          Page 95

                    PINCHUS S. ROTTENBERG
 1
 2          A.      To the extent I know, it's a
 3    recording document for the City.
 4          Q.      And does that form require the
 5    amount of consideration paid for a ground
 6    lease to be relisted?
 7                  MR. KOH:  Objection. Answer to
 8          the extent you know.
 9          A.      I don't know.
10          Q.      Okay. So if you could turn to
11    the first page of that email, which is the
12    page ending in 21570, the second email down
13    from Brad Bassuk.
14          A.      Yes.
15          Q.      And you're copied on this
16    Lehman, correct?
17          A.      Yes.
18          Q.      It says, "Devora, please revise
19    the consideration to 7 million instead of 10
20    million and send revised ACRIS forms ASAP."
21    Do you see that?
22          A.      I do.
23          Q.      So the consideration was changed
24    to $7 million, correct?
25                  MR. KOH:  Objection. Go ahead.
```

```
                                            Page 96

 1                PINCHUS S. ROTTENBERG
 2        A.     That's what I see. I don't
 3   remember. I don't remember.
 4        Q.     Okay. Do you remember how or why
 5   that number changed from 10 million to 7
 6   million?
 7        A.     No, sir.
 8        Q.     Were you involved in those
 9   discussions?
10        A.     I don't remember.
11        Q.     Who would have been?
12        A.     I would.
13        Q.     And you don't remember why a $3
14   million change was made?
15        A.     No.
16        Q.     Did Vanderbilt have any
17   appraiser or a broker involved at that point
18   that was valuing it?
19        A.     I don't think so.
20        Q.     But you're a broker, right?
21        A.     Yeah.
22        Q.     And you feel like you have
23   pretty good knowledge of New York City real
24   estate, correct?
25        A.     I don't know.
```

```
                                              Page 97
 1              PINCHUS S. ROTTENBERG
 2        Q.    You don't know?
 3        A.    No.
 4        Q.    Okay.
 5        A.    You have people say -- say you
 6   do and you have people say you have no clue
 7   what you're talking about.
 8        Q.    Did you object to the change
 9   from 10 million to 7 million?
10        A.    If I objected to it?
11        Q.    Yeah. Did you object?
12        A.    No.
13        Q.    Did anyone from Vanderbilt
14   object?
15        A.    I don't think so.
16        Q.    So Vanderbilt agreed that the $7
17   million was the consideration that should be
18   reported to the City for purposes of the
19   value of the ground lease, the 99-year
20   ground lease, correct?
21        A.    That's what the documents say.
22        Q.    And Vanderbilt wouldn't
23   knowingly misrepresent the value, would it?
24        A.    I don't know. I hope not.
25        Q.    You're not sure if it would
```

                                                    Page 98

1                    PINCHUS S. ROTTENBERG

2      knowingly misrepresent the value?

3            A.    They would not.

4                  MR. WALSH:   Okay. If we could

5            mark 2017.11.30, Memorandum of Lease

6            of Vanderbilt, and that will be P-6.

7                  (Plaintiff Exhibit 6, Memorandum

8            of Lease of Vanderbilt, was received

9            and marked on this date for

10           identification.)

11           Q.    Mr. Rottenberg, if you can open

12     up P-6.

13           A.    Yes.

14           Q.    And this is a document that we

15     obtained from a public records search. It's

16     a document that was filed with the City of

17     New York. It's a six-page document.  First

18     page says Recording and Endorsement cover

19     page and then it has a Memorandum of Lease

20     attached. Do you see that document?

21           A.    I do. Ten pages, right?

22           Q.    It looks like it's six pages.

23     Sorry.  10 pages.

24           A.    Okay.

25           Q.    And you agree that this is --

Page 99

```
 1              PINCHUS S. ROTTENBERG
 2   this was filed with the City to --
 3        A.    Yes.
 4        Q.    -- to record the lease between
 5   Vanderbilt and M.M.B. for the property at
 6   840 Atlantic Avenue; is that right?
 7        A.    That's right.
 8        Q.    Okay. And what amount of
 9   transfer tax is paid according to this -- or
10   what does this form indicate the transfer
11   tax that was paid for that lease? It's on
12   the bottom.
13        A.    I don't know.
14        Q.    Do you see on the bottom right
15   where it says NYS Real Estate Transfer Tax
16   $28,000?
17        A.    I'm trying to look.
18              MR. KOH:  First page.
19              THE WITNESS:  First page?
20        Q.    First page, bottom right.
21        A.    Okay. The filing fee of 100
22   bucks.
23        Q.    100 bucks filing fee and $28,000
24   in New York State real estate transfer tax,
25   right?
```

```
                                        Page 100
 1              PINCHUS S. ROTTENBERG
 2       A.     Yup.
 3       Q.     And so --
 4       A.     And recording fees of $63.
 5       Q.     And so the transfer tax that was
 6  paid for this lease was based on a $7
 7  million valuation; isn't that correct?
 8       A.     Correct.
 9       Q.     And Vanderbilt believed that to
10  be an appropriate and correct valuation,
11  correct?
12       A.     I don't know.
13       Q.     You don't know?
14       A.     I don't know. This is what was
15  then, so I don't know. I don't know what
16  that has to do with valuation. I don't know.
17       Q.     So Vanderbilt wouldn't knowingly
18  file false information with any governmental
19  entity, would it?
20       A.     No.
21       Q.     Okay. So is it fair to assume
22  then that Vanderbilt at the time had filed
23  -- or that this form was filed it believed
24  $7 million for the 99-year ground lease was
25  correct and appropriate?
```

                    PINCHUS S. ROTTENBERG

1

2          A.     No.

3          Q.     Why not?

4          A.     I don't know why not. Because --

5    I don't know whether they thought that

6    that's the value. This was the transaction

7    -- I don't know.  What is the consideration

8    that was recorded?

9          Q.     Well, what do you mean by "they

10   thought the value was"? Aren't you

11   Vanderbilt?

12         A.     Yes. So I don't know whether the

13   attorneys or among the parties, I don't know

14   how they came to that conclusion. There is

15   evidence that they thought that's the value

16   back then. That's all I'm saying.

17         Q.     I'm asking you, as the managing

18   member of Vanderbilt --

19         A.     So as I told you, I don't

20   remember what was the discussion back then.

21         Q.     Are you authorized to sign

22   documents on behalf of Vanderbilt?

23         A.     Yes, sir.

24         Q.     Okay. Who else is?

25         A.     Simon Dushinsky.

```
 1              PINCHUS S. ROTTENBERG
 2       Q.     Anyone else?
 3       A.     Tom Li.
 4       Q.     Okay.  And as the managing
 5  member do they have to clear with you before
 6  they sign anything on behalf of Vanderbilt?
 7       A.     Yeah. I mean not everyone, but
 8  yeah.
 9       Q.     What do you mean "not everyone"?
10       A.     I don't think Simon does have to
11  but, yes.
12       Q.     Even though -- so he can sign
13  documents without consulting with you?
14       A.     He could but he -- I don't know.
15  Yeah, they consult with me.
16       Q.     So could Simon Dushinsky bind
17  Vanderbilt without consulting with you?
18       A.     Pardon?
19       Q.     Could Simon Dushinsky bind
20  Vanderbilt --
21       A.     Which word are you using?
22       Q.     Let me finish my question.
23              Can he bind Vanderbilt without
24  consulting with you?
25       A.     I'm not sure I heard that word
```

```
                                              Page 103
 1              PINCHUS S. ROTTENBERG
 2    that you are using. What is that word?
 3                 MR. KOH:  You are referring to
 4         bind, b-i-n-d.
 5                 MR. WALSH:  Correct.
 6         A.    I'm not sure that I understand
 7    the question. What does it mean somebody can
 8    bind somebody?
 9         Q.    Can he make promises and
10    agreements on behalf of Vanderbilt without
11    consulting with you?
12         A.    No.
13         Q.    Who would know about the $7
14    million valuation or where that came from?
15         A.    I would.
16         Q.    Nobody else?
17         A.    No, except maybe attorneys and
18    the title company.
19         Q.    Are you aware of any other
20    documents that may exist that -- that would
21    indicate how that $7 million valuation was
22    created?
23         A.    No.
24                 MR. WALSH:  Okay. I'd like to
25         mark VA-21304, it's a two-page
```

```
                                    Page 104
 1              PINCHUS S. ROTTENBERG
 2         document ending in 305 and starts with
 3         an email from Tony@CTNYC.com dated
 4         February 10, 2017 to
 5         Sam.Rottenberg@email.com, Subject:
 6         FW: Atlantic. If you can pull that up.
 7              (Plaintiff Exhibit 7, email
 8         string last dated February 10, 2017,
 9         Bates VA-21304 was received and marked
10         on this date for identification.)
11         Q.   So this is a two-page document.
12    Do you see that, Mr. Rottenberg?
13         A.   Yes. Exhibit 7, right?
14         Q.   Correct.
15         A.   What is the question?
16         Q.   If you can just take a moment
17    and review this and just let me know when
18    you've had a chance to familiarize yourself
19    with this document.
20         A.   So what is the question?
21         Q.   So who is Adam Rothkrug?
22         A.   That's an attorney.
23         Q.   And who does he represent?
24         A.   Nobody that I'm aware of.
25         Q.   So do you know -- and then how
```

1                PINCHUS S. ROTTENBERG

2    about PJoel@AOL.com?

3         A.    That's a -- is that Philip

4    Kramer maybe?

5         Q.    Well, I'm asking you.

6         A.    Yeah, I guess. I don't know. It

7    says Phil/Tony so...

8         Q.    And does this -- the subject is

9    Atlantic Avenue. Does this email concern 840

10   Atlantic Avenue?

11        A.    Not only 840 Atlantic Avenue.

12        Q.    But does it concern, among other

13   properties, 840 Atlantic Avenue?

14        A.    Yeah.

15        Q.    And this is dated February 2017

16   which is nine months before Vanderbilt

17   entered into its lease with M.M.B., right?

18        A.    Okay.

19        Q.    I'm asking you; is that right?

20        A.    That's what is in the email.

21        Q.    So you, February of 2017, were

22   already working with Tony Musto on

23   discussions with City Planning and the

24   Community Board about 840 Atlantic Avenue,

25   right?

Page 106

1                   PINCHUS S. ROTTENBERG

2          A.     No.

3          Q.     Isn't that what this email

4    suggests, there is discussions with the City

5    Planning?

6          A.     Discussions, but it wasn't -- I

7    wasn't working with him.

8          Q.     Okay. So you were having

9    discussions with Tony about potential

10   meetings with the Community Board and City

11   Planning about 840 Atlantic Avenue; is that

12   right?

13         A.     I had multiple discussions with

14   Tony Musto about various things and maybe

15   that was one of them.

16         Q.     So are you aware of any

17   discussions or communications with either

18   City Planning or the local Community Board

19   about 840 Atlantic Avenue before November

20   2017?

21         A.     I wouldn't know dates.

22         Q.     So you don't know?

23         A.     I don't know the dates, no.

24         Q.     Do you recall if you were having

25   discussions with City Planning and either

1                PINCHUS S. ROTTENBERG

2    the Community Board or members of the

3    Community Board about 840 Atlantic Avenue

4    before Vanderbilt entered into its lease

5    with M.M.B.?

6         A.    No. I wouldn't recall.

7         Q.    Doesn't this -- wouldn't you

8    agree that this document suggests that that

9    was, in fact, happening in February 2017?

10              MR. KOH:  Objection. Go ahead.

11        A.    That what was happening?

12        Q.    That those discussions, so there

13   were some discussions between City Planning,

14   potentially the Community Board or members

15   of the Community Board, about 840 Atlantic

16   Avenue?

17        A.    I don't know. Again, what is

18   your question; if I had conversations?

19        Q.    Are you aware of any

20   conversations by anyone or communications

21   about discussions that anyone was having

22   with City Planning or a Community Board

23   about the property at 840 Atlantic Avenue

24   before November 2017?

25        A.    Again, I would never know dates

```
                                           Page 108
 1              PINCHUS S. ROTTENBERG
 2   and I would never know who would have
 3   conversations.
 4        Q.    But this email dated February
 5   2017, this doesn't refresh your recollection
 6   at all? It's talking about, for example, in
 7   the second email down --
 8        A.    It refreshes my recollection
 9   about this email and about Adam Rothkrug but
10   that is the extent of it, but it doesn't
11   refresh my recollection who had
12   conversations with any of these parties,
13   City Planning or Community Board or anything
14   else, so...
15        Q.    Okay. Do you know if the Rabsky
16   Group, if you were working at all with the
17   Rabsky Group in February of 2017 when Tony
18   Musto sent you this email chain?
19        A.    If I was working with the Rabsky
20   Group in general?
21        Q.    Yes, about 840 Atlantic Avenue.
22        A.    I don't remember.
23        Q.    Do you remember why Tony Musto
24   forwarded this email to you?
25              MR. KOH:  Objection.
```

1             PINCHUS S. ROTTENBERG

2        A.    No.

3        Q.    But you were having discussions

4   with Tony about 840 Atlantic Avenue at this

5   time, right?

6        A.    Again, as I said to you before,

7   I had multiple conversations with Tony Musto

8   about multiple things. And this could

9   definitely be one of them, so...

10             MR. WALSH:  If we can mark

11        VA-010383.

12             CONCIERGE:  010383?

13             MR. WALSH:  Correct.  It's a

14        five-page document, I believe five

15        pages ending in 388. It's an email

16        chain.

17             (Plaintiff Exhibit 8, email

18        string last dated January 17, 2018,

19        Bates VA-010383 was received and

20        marked on this date for

21        identification.)

22             CONCIERGE:  It's been uploaded.

23             MR. WALSH:  I can't see the

24        witness on the big screen. I don't

25        know if that can be fixed.

```
                                        Page 110
 1              PINCHUS S. ROTTENBERG
 2              VIDEOGRAPHER:  I put him back to
 3         spotlight. There is some glitch. I
 4         don't know why it's falling off like
 5         that.
 6              THE WITNESS: I'm glad somebody
 7         wants to see me big.
 8         Q.    So this is an email chain that
 9    you're copied on going back in January 2018.
10    Do you see that?
11         A.    Yeah.
12         Q.    Okay. And it looks like they're
13    attaching an engagement letter of Slater &
14    Beckerman 840 Atlantic 1.11.18.pdf. Do you
15    see that?
16         A.    Yeah.
17         Q.    And if you go to the back of
18    that document, there is a three-page
19    engagement letter between is Slater &
20    Beckerman and the Rabsky Group in connection
21    with 840 Atlantic Avenue, Brooklyn, New
22    York. Do you see that?
23         A.    Yes, I do.
24         Q.    So in January of 2018 the Rabsky
25    Group retained a lobbying firm to represent
```

```
1              PINCHUS S. ROTTENBERG
2    it in connection with 840 Atlantic Avenue,
3    right?
4              MR. KOH:  Objection.
5         Q.    I didn't get your answer.
6         A.    I guess this is what you see.
7         Q.    I'm asking you; is that correct?
8         A.    Whatever the document says, yes.
9         Q.    Well, I'm asking you if that's
10   correct. I'm not asking what the document
11   says.
12             MR. KOH:  The nature of the
13        objection was the characterization of
14        Slater & Beckerman as a lobbying firm.
15        A.    Yeah. So they hired an attorney.
16   That's what I see.
17        Q.    Okay. If you can flip to the
18   last page of that agreement titled Lobbying
19   Agreement, do you see that?
20        A.    I do.
21        Q.    So Slater & Beckerman was hired,
22   at least in part, to lobby on behalf of the
23   Rabsky Group, right?
24        A.    What do you mean "in part"?
25        Q.    Well, you seem to be disputing
```

1          PINCHUS S. ROTTENBERG

2     my characterization of this as a lobbying

3     agreement, but I'm looking at a document

4     entitled Lobbying Agreement and I'm

5     wondering if Slater & Beckerman was hired by

6     the Rabsky Group to lobby for 840 Atlantic

7     Avenue in January of 2018?

8          A.   I guess I confirm what the

9     document says.

10         Q.   So is that correct or is it not

11    correct?

12         A.   That's correct.

13         Q.   Thank you. And why did the

14    Rabsky Group need lobbyists for 840

15    Atlantic?

16              MR. KOH:  Objection.

17         A.   I don't know.

18         Q.   Who would know?

19         A.   I would.

20         Q.   Okay. Anyone else?

21         A.   I don't think so.

22         Q.   And as you sit here today, you

23    don't know why Vanderbilt entered into a

24    lobbying agreement for --

25         A.   No. I don't know.

```
                                    Page 113
1              PINCHUS S. ROTTENBERG
2                MR. KOH:  Objection. Vanderbilt
3          did not enter into a lobbying -- this
4          lobbying agreement.
5          Q.    Do you know why the Rabsky Group
6     would have entered into a lobbying agreement
7     for 840 Atlantic Avenue?
8          A.    No.
9          Q.    You're copied on these emails,
10    right?
11         A.    Yes.
12         Q.    Okay. Were you -- did you object
13    to the Rabsky Group entering into a lobbying
14    agreement for 840 Atlantic Avenue?
15         A.    No.
16         Q.    But you said that no one else
17    would know about this, other than you,
18    right?
19         A.    Correct.
20         Q.    Okay. Would the lobbying firm
21    have been hired to assist in getting a
22    rezoning for 840 Atlantic Avenue?
23         A.    I don't know.
24         Q.    If you could look at the first
25    page of that letter agreement dated -- I'm
```

Page 114

                         PINCHUS S. ROTTENBERG

1
2    sorry -- ending in 386, do you see where it
3    says, "Scope of Representation:  The firm
4    will advise and represent the client in
5    rezoning of the premises for greater
6    density." Do you see that?
7            A.     Yeah.
8            Q.     Does that refresh your
9    recollection about why Slater & Beckerman
10   was hired to lobby for 840 Atlantic Avenue?
11           A.     It refreshes my recollection
12   that this is why they hired an attorney.
13   That's the reason they hired an attorney. I
14   don't know --
15           Q.     But they weren't lobbyists, is
16   that what you are saying?
17           A.     No. I said I don't know what the
18   other part of it. That's all I'm saying.
19           Q.     So why would attorneys have been
20   hired then?
21           A.     It says here, "to engage the
22   firm to advise and represent in connection
23   with the premises located at 840 Atlantic
24   Avenue." That's what I read in the first
25   paragraph of this document.

Page 115

```
 1              PINCHUS S. ROTTENBERG
 2              MR. WALSH:  Now, if we can mark
 3         a document VA-49382 as P-9.
 4              (Plaintiff Exhibit 9, minutes of
 5         the Community Board M-CROWN
 6         Subcommittee dated April 30, 2018,
 7         Bates VA-49382 was received and marked
 8         on this date for identification.)
 9         Q.    Just to circle back, is there
10   any reason why the Rabsky Group would have
11   retained that firm other than to do work on
12   behalf of Vanderbilt Atlantic Holdings?
13              MR. KOH:  Objection. Go ahead
14         and answer.
15         A.    I'm not sure I understand the
16   question. I'm sorry.
17         Q.    Well, the Rabsky Group entered
18   into that lobbying agreement but would you
19   agree that that was really for the interests
20   of Vanderbilt Atlantic Holdings?
21         A.    I don't know what Rabsky Group's
22   relationship was with that law firm.
23         Q.    But you were copied on those
24   emails and you're not affiliated with the
25   Rabsky Group other than with Vanderbilt
```

```
 1                PINCHUS S. ROTTENBERG
 2   Atlantic Holdings, right?
 3        A.    Correct.
 4        Q.    Okay. So if you could look at
 5   P-8 --
 6        A.    P-8 or P-9?
 7        Q.    I'm sorry. P-9, it's a two-page
 8   document VA-049132 to 33. It's entitled
 9   Community Board Housing Committee M-CROWN
10   Subcommittee Minutes from a meeting on
11   4/30/2018. Do you see that?
12        A.    I do.
13        Q.    And if you look at the list of
14   attendees, do you see Tony Musto's name on
15   there?
16        A.    I do.
17        Q.    And Sam Rottenberg on there?
18        A.    Rottenberg, Sam, yes.
19        Q.    So you attended in April 2018
20   this M-CROWN Subcommittee Meeting of the
21   Community Board, right?
22        A.    Yes.
23        Q.    What is the M-CROWN
24   Subcommittee?
25        A.    It's a rezoning that -- I don't
```

PINCHUS S. ROTTENBERG

1

2    know -- that the community has been working

3    on, an M-CROWN zoning.

4          Q.    So why did you attend that

5    meeting with Tony Musto?

6          A.    Because I was meeting with Tony

7    Musto, I was talking to him and he went

8    there, so I went along.

9          Q.    And so you were there because

10   you -- you were there on behalf of

11   Vanderbilt for 840 Atlantic Avenue; is that

12   right?

13         A.    No. This was just in general, we

14   always try to talk about various things and,

15   you know...

16         Q.    You just went to the meetings --

17         A.    And the rezoning, the M-CROWN

18   rezoning was another topic that we wanted to

19   see what's -- what's there.

20         Q.    And would M-CROWN rezoning

21   impact 840 Atlantic Avenue?

22         A.    Yes.

23         Q.    And how would it impact it?

24         A.    840 Atlantic Avenue is part of

25   the M-CROWN map rezoning.

1                PINCHUS S. ROTTENBERG

2          Q.     Okay. So if the M-CROWN rezoning

3     were to go through, would the zoning for 840

4     Atlantic Avenue be changed?

5          A.     Yes.

6          Q.     And how would it be changed?

7          A.     I don't know.

8          Q.     Would it allow for more density?

9          A.     Yes.

10         Q.     How much more density?

11         A.     I don't know.

12         Q.     Would it be high density?

13         A.     I don't know what is high

14    density. High density in Manhattan is

15    different than here, so I don't know.

16         Q.     How about here high density here

17    in Brooklyn, this neighborhood?

18         A.     I don't know.

19         Q.     But a lot more density than is

20    currently permitted on the property, right?

21         A.     I don't know the definition of

22    "a lot more density". More density -- more

23    density than what it is today.

24         Q.     Okay. Are you working on any

25    other properties or at that time were you

1              PINCHUS S. ROTTENBERG

2    working on any other properties that had --

3    that were within the M-CROWN zone?

4        A.    I don't remember.

5        Q.    How about now?

6        A.    Like what?

7        Q.    I'm just trying to understand if

8    there was any other reason, other than 840

9    Atlantic Avenue, for you to be at that

10   meeting. Can you think of one?

11       A.    Oh, yeah.  I'm a real estate

12   broker.  So I always kind of look at

13   properties and this is what I do, of course.

14       Q.    Okay.

15       A.    So I'm always interested in

16   stuff like this. I think that a lot of

17   people on this list are brokers.

18       Q.    But you don't remember why you

19   were there?

20             MR. KOH:  Objection. Go ahead.

21       Q.    You don't remember why you were

22   there?

23       A.    No. That's -- that's the kind of

24   conversations with Tony along with having an

25   interest on just the M-CROWN framework.

```
                                        Page 120

 1            PINCHUS S. ROTTENBERG

 2              MR. WALSH:  Okay. If we could

 3       mark VA-010453. It's a three-page

 4       document ending in 455. That will be

 5       P-10.

 6              (Plaintiff Exhibit 10, email

 7       string last dated May 29, 2018, Bates

 8       VA-010453 was received and marked on

 9       this date for identification.)

10       Q.     It's up on Exhibit Share if you

11  can open that up. Do you have it open?

12       A.     It's loading. Exhibit 10?

13       Q.     Correct.

14       A.     Yes.

15       Q.     So it's an email from you to Tom

16  Li dated May 29th, 2018, Atlantic Meeting

17  No. 1 Notes and there is an attachment. Do

18  you see that?

19       A.     I see it. Okay.

20       Q.     And you're forwarding an email

21  that you had received from Eugene Mekhtiyev.

22  Do you see that?

23       A.     I do.

24       Q.     Who is -- and he's an architect?

25       A.     Yes.
```

```
 1              PINCHUS S. ROTTENBERG
 2         Q.     Is he an architect that -- that
 3    was doing work on behalf of Vanderbilt?
 4         A.     Yes.
 5         Q.     And what type of architectural
 6    work was he or his firm doing in May 2018?
 7         A.     Designing 840 Atlantic Avenue.
 8         Q.     And do you recall what those
 9    designs consisted of?
10         A.     Building development.
11         Q.     What kind of development?  A
12    mixed-use building?
13         A.     Yes.
14         Q.     With hundreds of residential
15    units?
16         A.     Yes.
17         Q.     Okay. And so in May of 2018
18    Vanderbilt was meeting with the Department
19    of City Planning about specific plans for a
20    mixed-use building on 840 Atlantic Avenue
21    that would have hundreds of residential
22    units; is that right?
23         A.     Yes.
24                MR. WALSH:  Okay. I'd like to
25         mark the document beginning VA-020147,
```

```
                                              Page 122

 1              PINCHUS S. ROTTENBERG

 2        it spans through 156, as P-11.

 3              (Plaintiff Exhibit 11, email

 4        string last dated March 13, 2018,

 5        Bates VA-020147 was received and

 6        marked on this date for

 7        identification.)

 8        Q.    It's available. If you can open

 9    that up, Mr. Rottenberg. It's a one-page

10    email chain beginning with an email from you

11    to Simon Dushinsky, March 13, 2018.

12        A.    I see that. Okay.

13        Q.    Subject:  547 Vanderbilt Draft

14    Analysis; is that correct?

15        A.    Right.

16        Q.    Is 547 Vanderbilt another name

17    for 840 Atlantic Avenue?

18        A.    Yes, sir.

19        Q.    So we're talking about the same

20    property, right?

21        A.    Yes, sir.

22        Q.    There is an attachment, a

23    property evaluation or I'll call it 840

24    Atlantic Avenue by TerraCRG; is that

25    correct?
```

```
                                      Page 123
 1              PINCHUS S. ROTTENBERG
 2      A.      Right.
 3      Q.      Now, what was the purpose of
 4  retaining TerraCRG to perform this analysis?
 5      A.      Just wanted to see what the
 6  opinion of what the value is.
 7      Q.      What do you mean, the opinion of
 8  what value?
 9      A.      Just to get a look of what the
10  property is value, in his eyes.
11      Q.      In whose eyes?
12      A.      In TerraCRG's eyes.
13      Q.      And this is not an analysis of
14  the value as the property is currently
15  zoned, right?
16      A.      Pardon?
17      Q.      This is not valuing the property
18  at its current zoning?
19      A.      I don't know. I have to look at
20  it.
21      Q.      If you could just take a look at
22  it for me. On the third page ending in 150
23  it says Development Analysis R60 Portion.
24      A.      Which page, page 3 ending in
25  20150?
```

```
                                            Page 124
 1              PINCHUS S. ROTTENBERG
 2       Q.    Yes.
 3       A.    It does state "the existing".
 4       Q.    So this is the existing zoning?
 5       A.    Yeah.
 6       Q.    Why were you forwarding this --
 7   strike that.
 8              So if you can flip to the page
 9   ending in 156, it's the last page of the
10   document.
11       A.    Yeah.
12       Q.    It says Summary. Can you just
13   explain to me in your words what this --
14   what the conclusion of TerraCRG was?
15       A.    The value of the property.
16       Q.    And what did they value the
17   property at?
18       A.    I'm not sure I follow your
19   question. I'm reading the document same as
20   you.
21              So the document says the
22   development value of X and a ground lease
23   summary value of X of Y or whatever.
24       Q.    So they valued the property at
25   what? I'm asking you.  There are multiple
```

Page 125

```
 1                PINCHUS S. ROTTENBERG
 2    numbers on here.  How did they value the
 3    property?
 4         A.    I don't know. I just see the
 5    conclusion it has.  One is 16,700,000 and
 6    the other one is 15,300,000, so...
 7         Q.    So you don't know?
 8         A.    No --
 9                MR. KOH:  Objection.
10         A.    -- I'm looking at this now,
11    so...
12         Q.    So do you know?
13         A.    Pardon?
14         Q.    Do you know what they valued the
15    property at?
16         A.    Which number they valued the
17    property at?
18         Q.    I'm asking you if you know what
19    they valued the property at?
20                MR. KOH:  Objection. Go ahead.
21         Q.    We'll move on.
22                Do you know if that -- if
23    Vanderbilt provided the McDonald's lease to
24    TerraCRG for purposes of its analysis?
25         A.    I can't recall, no.
```

1          PINCHUS S. ROTTENBERG
2              MR. WALSH:  Okay. So if we could
3      mark the document Bates stamped at
4      MCD-006083.  And Howard and
5      Mr. Rottenberg, this is a Bates
6      stamped version of the Environmental
7      Assessment Statement that was among
8      the documents I sent you yesterday. So
9      you should have a hardcopy of that as
10     well. It's just not -- the version I
11     sent yesterday I don't think was Bate
12     stamped.
13             MR. KOH:  It wasn't, but thank
14     you.  I have it. Has this been marked
15     yet? I don't see it on the list.
16             CONCIERGE:  A few more seconds.
17             MR. KOH:  I didn't mean to rush
18     you.  I wanted to make sure we
19     proceeded in an appropriate order.
20             CONCIERGE:  No problem.
21             (Plaintiff Exhibit 12, 840
22     Atlantic Avenue Rezoning Environmental
23     Assessment Statement, Bates MCD006083
24     was received and marked on this date
25     for identification.)

Page 127

1              PINCHUS S. ROTTENBERG
2        Q.    So that document has now been
3   marked as P-12. It begins with MCD006083 and
4   runs to 6318. It's entitled 840 Atlantic
5   Avenue Rezoning Environmental Assessment
6   Statement. It's got a CEQR number prepared
7   for Vanderbilt Atlantic Holdings, LLC
8   prepared by Philip Habib & Associates on
9   February 25th, 2021.
10             Do you see that, Mr. Rottenberg?
11       A.    The file is still loading. Yes.
12   I see that document, 236 pages.
13       Q.    Who is Philip Habib &
14   Associates?
15       A.    He's an environmental
16   consultant.
17       Q.    For 840 Atlantic Avenue?
18       A.    Vanderbilt Atlantic Holdings.
19       Q.    Okay. And have you seen this
20   document before?
21       A.    Yes.
22       Q.    And the date of February 25th,
23   2021, does that seem accurate to you?
24       A.    I'm not good at dates but this
25   is what the document says.

```
                                         Page 128
 1              PINCHUS S. ROTTENBERG
 2        Q.    So if you can turn to the first
 3   page of the form ending in 6085 --
 4        A.    Okay.
 5        Q.    -- Project Description. Do you
 6   see that?
 7        A.    Yes.
 8        Q.    And so this describes a rezoning
 9   application that Vanderbilt is seeking for
10   840 Atlantic Avenue, right?
11        A.    Right.
12        Q.    And it says about midway
13   through, "The applicant proposes to
14   construct a new 18 story mixed-use building
15   with approximately 376,432 gross square
16   feet." Do you see that?
17        A.    300 -- yeah, a-hum.
18        Q.    And it says, "The proposed
19   development would contain 312,917 GSF of
20   residential uses, comprising approximately
21   318 dwelling units of which approximately 95
22   would be affordable." Do you see that?
23        A.    I do.
24        Q.    And then it also talks about
25   some commercial retail uses on the first and
```

1               PINCHUS S. ROTTENBERG

2    second stories and a community facility

3    space on the first and second stories. Do

4    you see that?

5          A.    I do.

6          Q.    So is this an accurate

7    description of what Vanderbilt is -- is

8    seeking a rezoning for?

9          A.    Yes.

10          Q.    And Vanderbilt is actively

11    seeking a rezoning as described here; is

12    that correct?

13          A.    Right.

14          Q.    When did Vanderbilt begin

15    working on this rezoning?

16          A.    I don't know. I can't give you

17    dates. Sorry.

18          Q.    Is this what Slater & Beckerman

19    would have been hired for?

20          A.    Yes.

21          Q.    That is? So they were hired for

22    purposes of working on this rezoning,

23    correct?

24          A.    Right.

25          Q.    And what is the status of this

```
                                                    Page 130
 1                  PINCHUS S. ROTTENBERG
 2    zoning application?
 3          A.     It's going through the process.
 4          Q.     Where is it in the process?
 5          A.     It's going -- I don't know.
 6    It's, like, before the council.
 7          Q.     If you could look on the next --
 8    let's see, page ending 6086, the very bottom
 9    on your 8. Analysis here. Do you see that?
10          A.     Yeah.
11          Q.     And this environmental
12    assessment statement shows the anticipated
13    build year for this project of 2023. Do you
14    see that?
15          A.     I do.
16          Q.     If you could flip -- and then it
17    says, "See Appendix C for construction
18    schedule." Do you see that right next to
19    2023?
20          A.     Yeah. Okay.
21          Q.     If you go to the very last page
22    of this document, that's Exhibit C?
23          A.     Okay.
24          Q.     Actually, just go actually to
25    the second to last page.
```

```
                                            Page 131

 1              PINCHUS S. ROTTENBERG

 2        A.    Okay.

 3        Q.    It's a letter from Brian Hart.

 4        A.    A-hum.

 5        Q.    Who is Brian Hart?

 6        A.    I don't know.

 7        Q.    And it says "Dear Tom".  Do you

 8   know who "Tom" was referring to?

 9        A.    Yes.

10        Q.    Who is that?

11        A.    Tom Li.

12        Q.    Okay. So do you know who

13   Gardiner & Theobold is?

14        A.    No.

15        Q.    But this is a proposed

16   construction schedule for 840 Atlantic

17   Avenue; is that right?

18        A.    Right.

19        Q.    And do you see the second

20   paragraph?  It says, "The construction

21   schedule with a start date of 1/4/2022 and

22   anticipated end date of on or about

23   10/9/2023."  Do you see that?

24        A.    I do.

25        Q.    So Vanderbilt -- when does
```

```
                                    Page 132
 1              PINCHUS S. ROTTENBERG
 2   McDonald's have the right to be on the
 3   property until? It's April 2039, right?
 4        A.    Right. Right.
 5        Q.    Okay. So Vanderbilt can't begin
 6   construction on this property until
 7   McDonald's leaves, right?
 8        A.    Right.
 9        Q.    Do you know where this document
10   was submitted to?
11        A.    Pardon?
12        Q.    Do you know, this environmental
13   assessment statement, where was it submitted
14   to?
15        A.    I don't know.
16        Q.    Do you know why it was prepared?
17        A.    This is part of the rezoning
18   process.
19        Q.    So would this have been
20   submitted to the Department of City
21   Planning?
22              MR. KOH:  Objection. Go ahead.
23        Q.    So would this have been
24   submitted to the Department of City
25   Planning?
```

```
                                        Page 133
 1              PINCHUS S. ROTTENBERG
 2       A.    Yes, what I assume.
 3       Q.    Now, do you know why this
 4  document, why Vanderbilt didn't produce this
 5  document to McDonald's?
 6       A.    No.
 7             MR. KOH:  I'll object to that
 8        question but you've answered it. Go
 9        ahead.
10       Q.    And this -- before Philip Habib
11  & Associates submitted this document to DCP,
12  they would have been required to get
13  Vanderbilt's approval before they filed it;
14  isn't that correct?
15       A.    I don't know. I don't know
16  whether they need its approval or just file
17  it because they've been hired for this. I
18  don't know the answer.
19       Q.    Okay. Philip Habib & Associates
20  is working on behalf of Vanderbilt Atlantic
21  Holdings, right?
22       A.    Correct.
23       Q.    So after Vanderbilt acquired its
24  99-year ground lease for the property, and
25  the McDonald's lease for the property in
```

1               PINCHUS S. ROTTENBERG

2    November 2017, do you remember when

3    Vanderbilt first reached out to McDonald's?

4         A.    No.

5         Q.    Do you recall reaching out to

6    Katrina Rainey at McDonald's in January of

7    2018?

8         A.    I remember talking to some

9    folks. I can't remember what time that was,

10   what date.

11        Q.    And do you remember why you

12   contacted McDonald's?

13        A.    Yeah. To get an understanding of

14   what McDonald's plans is all about.

15        Q.    What do you mean, what their

16   plans were all about? Can you explain what

17   that means?

18        A.    What's the plan for the space.

19        Q.    So you were interested whether

20   McDonald's intended to stay on the property;

21   is that right?

22        A.    Right.

23        Q.    And you also asked Katrina or

24   somebody at McDonald's about potentially

25   moving to a new location; is that right?

Page 135

1                  PINCHUS S. ROTTENBERG

2          A.      I can't remember.

3          Q.      Would you have been interested

4     in McDonald's moving to a different

5     location?

6          A.      You know, very possible.

7          Q.      Would that have benefited

8     Vanderbilt if McDonald's moved to a new

9     location?

10         A.      Yeah. It could be part of

11    various other things that could have

12    benefited Vanderbilt and that is part of

13    that.

14         Q.      But if McDonald's moved to a new

15    location that would benefit Vanderbilt,

16    right?

17         A.      I'm not sure.

18         Q.      Okay. But if McDonald's moved,

19    then Vanderbilt could begin immediately

20    redeveloping the property; isn't that right?

21         A.      I'm not sure.

22         Q.      Can Vanderbilt redevelop the

23    property while McDonald's is on it?

24         A.      Again?

25         Q.      Can Vanderbilt redevelop the

```
 1              PINCHUS S. ROTTENBERG
 2   property while McDonald's is on it?
 3        A.    While McDonald's is --
 4        Q.    -- is still on the property?
 5        A.    No.
 6        Q.    Okay. So in order for Vanderbilt
 7   to redevelop the property it needs
 8   McDonald's to leave, correct?
 9        A.    Yeah.
10        Q.    Correct?
11        A.    Correct.
12        Q.    So do you remember when you
13   first spoke with Carol Demarco at
14   McDonald's?
15        A.    No.
16        Q.    Do you know who Carol is?
17        A.    Yeah.
18        Q.    Who is she?
19        A.    She works for McDonald's.
20              MR. WALSH:  I'd like to mark
21         MCD006379, an email chain ending in 82
22         that will be P-13.
23              (Plaintiff Exhibit 13, email
24         string last dated February 26, 2018,
25         Bates MCD006379 was received and
```

1            PINCHUS S. ROTTENBERG

2        marked on this date for

3        identification.)

4            CONCIERGE:  It's been uploaded.

5        Q.    If you can just flip to the

6    third page ending in 6381, it's an email

7    from Carol Demarco to you dated February

8    8th, 2018 with a copy to Michael Meyer at

9    McDonald's. Do you see that?

10       A.    I do.

11       Q.    In that email she says, "Hi Sam,

12   It was a pleasure to speak with you and

13   discuss your property in Brooklyn.

14   Congratulations on securing a 99-year lease.

15   As we discussed, the current lease expires

16   2019 and we have options through 2039.

17   McDonald's has a U.S. national initiative to

18   modernize all restaurants by 2020 and we

19   would like to plan for this site.  If you

20   have any questions regarding the language in

21   the lease you can have your attorney call

22   Mike Meyer to discuss. Mike is copied on

23   this email."  Do you see that?

24       A.    I do.

25       Q.    And does that refresh your

```
                                      Page 138
 1              PINCHUS S. ROTTENBERG
 2   recollection about when you spoke with
 3   Carol?
 4         A.    No.
 5         Q.    Okay.
 6         A.    I can see the date on this
 7   email. That's all.
 8         Q.    Do you remember what you
 9   discussed with her?
10         A.    I don't know. I think I had more
11   than one conversation for me to remember
12   what I discussed with her.
13         Q.    How about this email, does this
14   refresh your recollection about, you know,
15   Carol telling you that McDonald's had
16   options through 2039 and it intended to
17   modernize the site? Do you recall that?
18         A.    No, but I see it now.  So I'm
19   sure that that was -- that's what she wrote
20   to me.
21         Q.    Okay. And were you aware when
22   you began speaking with McDonald's, that
23   McDonald's had the right to stay on the
24   property through 2039?
25         A.    I don't know of what I was aware
```

1                 PINCHUS S. ROTTENBERG

2    at which time.

3         Q.    Was Vanderbilt --

4         A.    I don't know if I was aware, at

5    which point I reached out to Carol, I spoke

6    to her, I spoke to other people, so I don't

7    know.

8         Q.    Was Vanderbilt aware when it

9    acquired the 99-year ground lease for the

10   property that McDonald's had the option to

11   stay on the property through April 2039?

12        A.    Again, I'm not sure what I was

13   aware at which given time at which given

14   juncture throughout this whole kind of

15   transaction, so...

16        Q.    Would that have been a material

17   fact for Vanderbilt to be aware of when it

18   acquired the 99-year ground lease?

19        A.    I don't know.

20        Q.    So you don't think that whether

21   McDonald's had the right to be on the

22   property for 22 or 21 and a half more years

23   was material in Vanderbilt's decision to

24   acquire a 99-year ground lease for the

25   property?

```
                                          Page 140

 1              PINCHUS S. ROTTENBERG
 2         A.    No.
 3              MR. KOH:  Objection. He's
 4         answered.
 5         Q.    And you said it was not
 6  material?
 7         A.    I don't know whether at that
 8  point it was material or not. That's what I
 9  said.
10         Q.    Well, what would you need to
11  know whether it was material? I mean, I
12  don't understand your answer "I don't know".
13  Is it or is it not?
14         A.    I don't know what -- what went
15  into this.
16         Q.    Well, were you surprised --
17         A.    I can't remember the thinking
18  back then what went into this, so that's why
19  I said I don't know.
20         Q.    And you have no idea when
21  Vanderbilt learned about the McDonald's
22  lease?
23         A.    No, I can't recall that.
24         Q.    Would you be --
25         A.    I'm sure -- I am sure -- I'm
```

1            PINCHUS S. ROTTENBERG

2    sure if you have all the documents you see

3    it somewhere and if you can show it to me

4    the same as you're showing me all the other

5    stuff.

6          Q.    It's actually not my job to show

7    you all the documents.  It's your job to be

8    able to answer my questions as Vanderbilt's

9    corporate representative. That's why we're

10   here today.

11             MR. KOH:  I'll object to that

12        description of the law. Please

13        continue your examination by asking

14        questions, Mr. Walsh, not by

15        pontificating on what the law is. We

16        can do that another time.

17             MR. WALSH:  I'm sure we will.

18        Q.    Would you be surprised,

19   Mr. Rottenberg, if Vanderbilt was not aware

20   of the McDonald's lease when it acquired

21   this property?

22        A.    Again?

23             MR. WALSH:  Can you please read

24        that back.

25             (Pending question is read back

```
                                        Page 142

 1              PINCHUS S. ROTTENBERG
 2         by the reporter.)
 3         A.    No.
 4         Q.    The Vanderbilt lease refers to
 5    the McDonald's lease, right?
 6         A.    I have to see it.
 7         Q.    Well, didn't we talk about it
 8    before? Remember, we had the whole
 9    conversation about the financial terms?
10         A.    Yes, we did. But it doesn't
11    refer to the lease.  It just said what the
12    fact is going to be in the event of various
13    things.
14         Q.    Well, it defines the existing
15    tenant, talks about a lease.
16         A.    It defines the tenant not the
17    lease.
18         Q.    We'll move on. All right.
19              So in February 2018 you
20    understood, at least by that time, that
21    McDonald's had the right to be there through
22    2039 and planned to modernize the site;
23    isn't that correct?
24         A.    I'm not sure what I believed at
25    which given time or what I knew at given
```

```
 1              PINCHUS S. ROTTENBERG
 2   time. I'm not very good at dates and I don't
 3   remember dates, what's said at which time,
 4   so, you know...
 5        Q.    Okay.
 6        A.    I don't know my kids' birthdays,
 7   so...
 8              MR. KOH:  There is no pending
 9        question.
10        Q.    And let's go back to P-13, the
11   page ending in 6381, it's the last part of
12   that February 8, 2018 email from Carol
13   Demarco to you.  She wrote, "If you have any
14   questions regarding the language in the
15   lease you can have your attorney call Mike
16   Meyer to discuss."
17              Do you recall whether you
18   discussed the language in the lease with
19   Carol?
20        A.    No.
21        Q.    And do you recall if there was
22   any disagreement or I guess information that
23   you weren't aware of about the language in
24   the lease when you spoke with Carol?
25        A.    No.
```

```
 1              PINCHUS S. ROTTENBERG
 2       Q.    Who would know?
 3       A.    I would.
 4              MR. WALSH:  All right. If we
 5       could mark the document MCD08 -- sorry
 6       -- MCD008022, that will be P-14.
 7              (Plaintiff Exhibit 14, email
 8       string last dated February 16, 2018,
 9       Bates MCD008022 was received and
10       marked on this date for
11       identification.)
12       Q.    It's a one-page email from --
13  it's an email from Murray Schneier and you
14  had testified earlier he's Vanderbilt's
15  lawyer, correct?
16       A.    Right.
17       Q.    An email to Mike Meyer at
18  McDonald's with a cc to you, Sam Rottenberg
19  and Jonathan Eiseman. Do you see that?
20       A.    Yes.
21       Q.    The subject: Atlantic Avenue.
22  Have you seen this email before?
23       A.    I'm sure I've seen it but, you
24  know, it refreshes my recollection of this.
25  That's all.
```

Page 145

1                   PINCHUS S. ROTTENBERG

2        Q.     And do you recall why Murray

3    Schneier needed to reach out to Mike Meyer?

4        A.     I can only guess this is

5    relating to the previous email that you

6    showed me.

7        Q.     So was there -- was Vanderbilt

8    confused about the language of the lease?

9    I'm just trying to understand why at that

10   time Mr. Schneier would have been reaching

11   out.

12       A.     The only thing I can say, it has

13   something to do with the lease. What

14   specifically, I can't remember.

15       Q.     And in that second paragraph of

16   the email he said, "My client spoke with

17   Carol Demarco who suggested we reach out to

18   you to discuss the renewal options in the

19   lease." Do you see that?

20       A.     Yeah.

21       Q.     What did he mean "he wanted to

22   reach out to discuss the renewal options in

23   the lease"?

24            MR. KOH:  Objection. Go ahead.

25       A.     Exactly what is written in this

1               PINCHUS S. ROTTENBERG

2    email, you know, to discuss the renewal

3    options in this lease.

4          Q.    Was Vanderbilt trying to discuss

5    with McDonald's not renewing the -- renewing

6    the lease for the option terms?

7          A.    So there were multiple

8    conversations. I don't know what happened at

9    that juncture and what the conversation was

10   at that time at that given time, what the

11   nature was, so...

12         Q.    Do you know, does Murray

13   Schneier still represent Vanderbilt?

14         A.    I don't think so, no.

15         Q.    Do you know if anyone from

16   Vanderbilt reached out to Mr. Schneier to

17   see if he had any responsive documents to

18   our document requests?

19         A.    I have no idea.

20         Q.    Okay. Do you know if

21   Mr. Schneier had any notes about his calls

22   with Carol Demarco or Mike Meyer?

23         A.    I don't know.

24         Q.    Okay. Do you have any

25   handwritten notes about your calls with

```
                                          Page 147

 1                PINCHUS S. ROTTENBERG
 2    them?
 3         A.    No.
 4         Q.    Do you know if you ever did?
 5         A.    No.
 6         Q.    You are just not sure?
 7         A.    I probably didn't.
 8              MR. WALSH:  I'd like to mark a
 9         document MCD005479, it's a two-page
10         document ending in 5480.  It's a
11         letter on Vanderbilt to McDonald's
12         Corporation. That's now Exhibit P-15.
13              (Plaintiff Exhibit 15, letter
14         from Vanderbilt Atlantic Holdings to
15         McDonald's Corporation dated May 10,
16         2018, Bates MCD005479 was received and
17         marked on this date for
18         identification.)
19         Q.    Do you see that that document?
20         A.    I do.
21         Q.    If you could flip to the second
22    page, whose signature is that on behalf of
23    Vanderbilt Atlantic Holdings?
24         A.    Simon Dushinsky.
25         Q.    And Simon would have consulted
```

```
 1              PINCHUS S. ROTTENBERG
 2   with you before signing this letter?
 3        A.    Yes.
 4        Q.    And so you authorized him to
 5   send this letter?
 6        A.    Yes.
 7        Q.    How did Vanderbilt determine
 8   that the fair market value was $975,000?
 9        A.    I could not sit here now and
10   tell you how Vanderbilt came to that
11   conclusion back then.
12        Q.    What do you mean by
13   "Vanderbilt"? That would have been you,
14   right?
15        A.    Yes.
16        Q.    And you don't recall how you
17   came to that conclusion?
18        A.    No. I don't remember whether
19   this was due to appraisal or whether it was
20   due to a value. I don't know.
21        Q.    We looked at TerraCRG before, do
22   you recall that?
23        A.    I recall the TerraCRG analysis,
24   yes.
25        Q.    So would that have been used?
```

Page 149

1              PINCHUS S. ROTTENBERG
2         A.    Possible. As I told you, I don't
3    remember.
4         Q.    Other than TerraCRG, did
5    Vanderbilt consult with anyone else about
6    the value of the property around this time?
7         A.    Possible, but I don't remember.
8         Q.    Okay. What did you do in
9    preparation for today's deposition to
10   determine, you know, what Vanderbilt may
11   have done to value that property?
12        A.    Just try to kind of remember how
13   this -- how I came to that conclusion, but I
14   can't come up with anything to remember how
15   specifically I came up with this.
16        Q.    So you didn't look at any
17   documents?
18        A.    No.  Other than the ones you
19   sent me and that was sent -- we talked about
20   this before, right?
21        Q.    I'm just trying to make sure I
22   understand because, frankly, there is a lot
23   of stuff that you don't know that I'm just
24   surprised that you don't know.
25        A.    There is so many multiple

```
1                    PINCHUS S. ROTTENBERG
2    conversations that --
3                    MR. KOH:  I don't think there
4            was a question there. Mr. Walsh was
5            expressing his apparent surprise.
6                    Do you have a question,
7            Mr. Walsh?
8                    MR. WALSH:  I'll move on.
9                    MR. KOH:  Okay.
10        Q.    So were there discussions with
11   you and Mr. Dushinsky and anyone else at
12   Vanderbilt about what you expected
13   McDonald's response to be to this letter?
14        A.    Very possible. I don't know. I
15   can't remember.
16        Q.    And this would have represented
17   more than a 400% increase in McDonald's
18   rent, right?
19        A.    I didn't know the percentage,
20   but, you know, if you are telling me it's
21   400%...
22        Q.    And had Vanderbilt previously
23   discussed with McDonald's estimates of FMV
24   before this letter?
25        A.    I can't remember. This goes back
```

```
                                              Page 151
 1                PINCHUS S. ROTTENBERG
 2   to the question you asked me before, so...
 3        Q.    So you don't know?
 4        A.    I can't remember.
 5             MR. WALSH:  If we could mark the
 6        Option Rent Addendum pdf as Exhibit
 7        P-16? And this is Exhibit G to the
 8        McDonald's lease, it's the Option Rent
 9        Addendum. It's a two-page exhibit.
10             CONCIERGE:  Could you repeat the
11        file name?
12             MR. WALSH:  Option Rent Addendum
13        dot pdf.
14             (Plaintiff Exhibit 16,
15        McDonald's Option Rent Addendum, was
16        received and marked on this date for
17        identification.)
18             CONCIERGE:  It's uploaded.
19        Q.    Mr. Rottenberg, you've seen this
20   Option Rent Addendum before, right?
21        A.    It's still loading but --
22             MR. KOH:  I don't have it loaded
23        yet either.
24             MR. WALSH:  Okay.
25             MR. KOH:  Now I have it.
```

1              PINCHUS S. ROTTENBERG

2              MR. WALSH:  Okay.

3        A.    This was done in 1998. It's a

4   long time ago.

5        Q.    Not that long ago.

6              MR. KOH:  My children were

7         babies, they're now college graduates.

8         It's a long time ago.

9              THE WITNESS: I have 11 children

10        and none of them was born back then.

11        Q.    So this describes the process

12   that the rent -- this describes the process

13   for how the rent McDonald's will pay in the

14   option years will be determined; is that

15   right?

16        A.    Right.

17        Q.    Okay. And it provides that the

18   landlord shall notify tenant of landlord's

19   estimate of the FMV no later than 180 days

20   prior to the end of the primary term; is

21   that right?

22        A.    Yeah.

23        Q.    Yeah. And then if you can't

24   agree, then it provides for an appraisal

25   process; is that right?

```
 1              PINCHUS S. ROTTENBERG
 2       A.     Correct.
 3       Q.     Okay. So this May 10, 2018
 4  letter, was that -- was that Vanderbilt
 5  notifying McDonald's of its estimate of the
 6  FMV according to the Option Rent Addendum?
 7       A.     I assume so.
 8       Q.     And how did McDonald's respond
 9  to that letter, do you recall?
10       A.     I'm sure you know this through
11  the documents. It is the only way I recall
12  to remember that.
13       Q.     And you didn't do any
14  preparation to figure out how that happened,
15  right?
16       A.     How what happened?
17       Q.     You didn't prepare to discuss,
18  you didn't do any preparation, you didn't
19  review any documents to determine -- I'll
20  move on. You don't remember?
21       A.     I don't remember. If you have a
22  question you can show to me what the --
23       Q.     I have a lot of questions. You
24  just don't have a lot of answers, but I'll
25  move on.
```

1              PINCHUS S. ROTTENBERG
2                  Do you recall having a
3    discussion in May after this letter was sent
4    with Carol Demarco about this?
5         A.    I told you before I'm not sure
6    how many conversations I had with Carol
7    Demarco and at which given time.
8         Q.    And do you recall if you ever
9    asked Carol what McDonald's would do if it
10   did not like the rent or fair market value
11   determined by Vanderbilt?
12        A.    Do I remember that conversation?
13        Q.    Yes.
14        A.    No, but I'm just saying I'm not
15   remembering, I don't remember.
16              MR. WALSH:  Okay. I think now
17        would be a good time for a break.
18              THE WITNESS:  What are you going
19        to do at the break, have lunch?
20              MR. WALSH:  I need a short break
21        but we have to understand I guess from
22        the court reporter and all the others
23        involved. I don't need a very long
24        break.
25              MR. KOH:  It's 1:15. I think

```
                                    Page 155
 1            PINCHUS S. ROTTENBERG
 2        that the court reporter is probably a
 3        little tired.
 4              VIDEOGRAPHER:  Going off the
 5        record 1:12 p.m.  This marks the end
 6        of media 2.
 7              (Lunch recess is taken.)
 8              VIDEOGRAPHER:  We are back on
 9        the record at 1:48 p.m. and this
10        starts media 3.
11        Q.    Mr. Rottenberg, do you have any
12   other screens, any other programs on your
13   computer right now other than Zoom and the
14   Exhibit Share?
15        A.    Not in front of my screen, just
16   -- I'm just seeing Exhibit Share and Zoom.
17   That's all I'm seeing.
18        Q.    So what else do you have open?
19        A.    I don't know. I have internet
20   Outlook.
21        Q.    Okay. At the beginning of this
22   deposition I -- I believe I asked you if you
23   had everything closed and you said you did.
24   If you can close out of every other program
25   that is not required for this deposition, it
```

                    PINCHUS S. ROTTENBERG

1

2    should only be the Zoom link and the

3    Veritext Exhibit Share.

4           A.    Okay.

5           Q.    Now, on this break did you have

6    any discussions with anyone about this

7    deposition?

8           A.    Again?

9           Q.    On your break did you have any

10   discussions with anyone about your

11   deposition?

12          A.    No, just with Tom Li.

13          Q.    And what did you discuss with

14   Tom Li?

15          A.    Nothing.

16          Q.    Well, you just said you

17   discussed with him.

18          A.    I discussed with him, I just

19   said kind of we're doing this deposition.

20   That's it.

21          Q.    Really?

22          A.    Yeah. Really.

23          Q.    Okay. So you had a discussion

24   about nothing?

25          A.    I did not have a discussion. I

1              PINCHUS S. ROTTENBERG

2    just, you know, kind of -- I was alluding to

3    that deposition.

4         Q.    You know he's watching it,

5    though, right?

6         A.    Yeah.

7         Q.    Okay. And how about in the last

8    break before this one, did you have any

9    discussions with Mr. Li then?

10        A.    No.

11        Q.    So at what point -- we just went

12   through how in May 2018 Vanderbilt sent over

13   to McDonald's its estimate of the fair

14   market value of the rent and there were some

15   discussions that you don't recall anything

16   about; is that correct? You don't recall

17   anything about those discussions with

18   McDonald's in May 2018?

19        A.    I don't remember what happened

20   in May 2018. I can't remember dates and I

21   wouldn't remember dates.

22        Q.    Okay.

23        A.    No.

24        Q.    Putting aside the dates, you

25   don't remember what you discussed with

```
 1              PINCHUS S. ROTTENBERG
 2   McDonald's around the time that you sent
 3   them that letter?
 4        A.    No. I remember, you know, there
 5   were conversations, various conversations
 6   with McDonald's throughout this whole thing.
 7   I can't remember what was the conversation
 8   at which time.
 9        Q.    Okay. So at what point did
10   Vanderbilt reach the conclusion that it was
11   not going to be able to reach agreement with
12   McDonald's on the FMV for 840 Atlantic
13   Avenue?
14        A.    When we got a letter from you
15   guys.
16        Q.    And do you remember when that
17   was?
18        A.    No.
19        Q.    And so if the parties can't
20   agree on the fair market value, the Option
21   Rent Addendum required the parties to each
22   hire an appraiser, right?
23        A.    Yes.
24        Q.    And is that what Vanderbilt did?
25        A.    Yes.
```

1              PINCHUS S. ROTTENBERG

2        Q.     And ultimately selected Tom

3    Tener for that appraisal, to serve as its

4    appraiser, right?

5        A.     Yes.

6        Q.     Before it selected Tom Tener to

7    serve as its appraiser, what characteristics

8    was Vanderbilt looking for in deciding -- in

9    making its decision about which appraiser to

10   choose?

11       A.     However we felt comfortable. I

12   don't remember which one, why there was a

13   reason specifically why we choose one.

14       Q.     Who else at Vanderbilt would

15   know?

16       A.     Myself.

17       Q.     What other appraisers did

18   Vanderbilt consider retaining before it

19   retained Mr. Tener?

20       A.     I don't know. I don't know how

21   many things it could be, no.

22       Q.     Did it consider other appraisers

23   before it retained Mr. Tener?

24       A.     I don't know whether we

25   considered other appraisers but we talked to

```
                                        Page 160
  1              PINCHUS S. ROTTENBERG
  2    other appraisers.
  3         Q.    And you talked to other
  4    appraisers about potentially serving the
  5    role that Mr. Tener ultimately served; is
  6    that right?
  7         A.    Very possible. I don't remember
  8    but very possible.
  9         Q.    Who else would know?
 10         A.    Myself.
 11         Q.    Nobody else?
 12         A.    Maybe Morris Missry.
 13         Q.    Who is Morris Missry?
 14         A.    Morris Missry was the attorney
 15    -- yeah, he was my attorney.
 16         Q.    When you say "my attorney", he
 17    was Vanderbilt's attorney?
 18         A.    Yes.
 19         Q.    When did Vanderbilt retain
 20    Mr. Missry?
 21         A.    I don't remember the date.
 22         Q.    But ultimately, you were
 23    responsible for making all decisions on
 24    behalf of Vanderbilt; is that correct?
 25         A.    Yes.
```

```
 1              PINCHUS S. ROTTENBERG
 2        Q.    Did Mr. Missry have authority to
 3   make decisions on behalf of Vanderbilt
 4   without getting your approval?
 5        A.    Very possible. There was --
 6   again, this goes -- I don't know if you
 7   know, you get a sense how the way I operate.
 8   It's like, you know, I don't know, it
 9   depends on the moment, it depends on the
10   conversation, it depends on -- you know, so
11   it depends on the task, it could be, you
12   know.
13        Q.    So from Vanderbilt's
14   perspective, were you responsible for the
15   fair market value process under the Option
16   Rent Addendum?
17        A.    Yes.
18        Q.    Was anyone else at Vanderbilt
19   responsible for it?
20        A.    No.
21        Q.    And did you delegate any
22   responsibility for that process to anybody
23   else?
24        A.    Very possible that I delegate it
25   to attorneys and appraisers, yes.  But,
```

```
 1              PINCHUS S. ROTTENBERG
 2    again, I'm not sure at which juncture I
 3    delegated it to them or to which extent I
 4    delegated it to them. This goes like on a
 5    day-to-day thing. One day I can give them
 6    authority and other day -- this is no plans,
 7    there is no direct kind of protocol, if you
 8    will.
 9         Q.    Do you recall delegating
10    authority to anybody else?
11         A.    No. But at the same time, you
12    know, I could have, knowing the way I am.
13              MR. WALSH:  I'd like to mark as
14         Exhibit P-17 the document starting
15         with VA-015253, it spans through Bates
16         262.  It's an email from Tom Li to
17         Jerry Sullivan at BBG dated May 30,
18         2018 with an attachment which is a
19         signed retention agreement.
20              Tell me when you've had a chance
21         to open up that document,
22         Mr. Rottenberg.
23              (Plaintiff Exhibit 17, email
24         string last dated May 30, 2018,
25         attaching retention agreement, Bates
```

```
                                          Page 163

 1              PINCHUS S. ROTTENBERG

 2        VA-015253 was received and marked on

 3        this date for identification.)

 4        A.    Okay.

 5        Q.    So this is a retention

 6   agreement. This is a signed retention

 7   agreement between BBG and you, it says

 8   Mr. Sam Rottenberg, SPR Group. Do you see

 9   that?

10        A.    Yes.

11        Q.    And the re line on the letter,

12   which is ending in 256, the re line is 840

13   Atlantic Avenue. Do you see that?

14        A.    Yes.

15        Q.    And it says the intended user is

16   Vanderbilt Atlantic Holdings, LLC and it's

17   related entity successor assigns, right?

18        A.    Yes.

19        Q.    And who is BBG and what do they

20   do?

21        A.    They're an appraisal firm.

22        Q.    So they're appraisers?

23        A.    Yes.

24        Q.    And you retained BBG to perform

25   an appraisal of the fee simple interest on
```

Page 164

1              PINCHUS S. ROTTENBERG
2      the property, right?
3              A.    That's what I see, yes.
4              Q.    Do you recall or did Vanderbilt
5      provide a copy of the McDonald's lease to
6      BBG?
7              A.    I don't recall.
8              Q.    What was the purpose of
9      retaining BBG?
10             A.    Just for me to get another look
11     how they kind of viewed the value of the
12     property.
13             Q.    And so this is just within a
14     couple weeks of Vanderbilt sending its
15     letter to McDonald's notifying it of its
16     valuation and McDonald's rejecting it,
17     right?
18             A.    I'll take your word for it.
19             Q.    I'm asking you. You don't
20     remember?
21             A.    I don't remember the dates. I
22     wouldn't remember when you send a letter and
23     when I kind of hired BBG.  No, I don't
24     remember.
25             Q.    So did Vanderbilt retain BBG to

```
                                          Page 165
 1                PINCHUS S. ROTTENBERG
 2    help it determine the fair market value of
 3    the rent under the McDonald's ground lease?
 4              MR. KOH:  Objection. Go ahead.
 5         A.    I don't think so.
 6         Q.    So what were they retained for?
 7         A.    Just for me to kind of see what
 8    somebody else independently thinks the value
 9    is.
10         Q.    And why would that have been
11    helpful for Vanderbilt to know at that time?
12         A.    I just wanted to get a flavor
13    what people think the value is.
14         Q.    So this was not connected to the
15    fair market value process laid out in the
16    Option Rent Addendum?
17         A.    No. I don't think so.
18         Q.    But you can't think of any other
19    specific purpose than it would have been
20    for?
21         A.    Yes. For me to see what people
22    valued it.
23         Q.    So do you know if you retained
24    BBG before or after you contacted Tom Tener?
25         A.    No.
```

1              PINCHUS S. ROTTENBERG

2                MR. WALSH:  So if we can mark

3          VA-010599 as Exhibit P-18, it runs

4          through Bates number 010700. It's

5          appraisal report prepared by BBG,

6          requested by Mr. Sam Rottenberg, SPR

7          Group, date of value June 26, 2018 as

8          is. If you can just open that document

9          when it becomes available.

10               (Plaintiff Exhibit 18, Appraisal

11         Report value as of June 26, 2018,

12         Bates VA-010599 was received and

13         marked on this date for

14         identification.)

15         A.    Yes, P-17, right.

16         Q.    Yes.

17         A.    Okay.

18         Q.    No. It's actually P-18.

19         A.    Oh, I don't have it yet. Hold

20  on.

21               MR. KOH:  Refresh your screen.

22         I've got it.

23         A.    Okay.

24         Q.    Okay?

25         A.    Okay.

1              PINCHUS S. ROTTENBERG

2         Q.    So BBG prepared this appraisal

3    dated July 9, 2018 with a valuation date of

4    June 26, 2018 for the property 840 Atlantic

5    Avenue, right?

6         A.    Yes.

7         Q.    And if you could look at the

8    page ending, the second page of that letter

9    ending in 601, the very first line at the

10   top it says, "The subject is currently

11   leased to McDonald's. We've been asked to

12   provide an as is value of the subject

13   assuming the property can be developed as of

14   right."  Do you see that?

15        A.    Yes.

16        Q.    Did Vanderbilt give BBG

17   information about the McDonald's lease?

18        A.    I can't remember. I'm sure you

19   have it in emails if that's the case, but I

20   can't remember.

21        Q.    Okay. So don't assume -- I'm

22   asking you questions because I'm trying to

23   understand what the answer is. Don't assume

24   that I have all the answers. I wouldn't be

25   asking all these --

1              PINCHUS S. ROTTENBERG

2          A.    I get it.  But my point is there

3     is a lot of stuff like this that refreshes

4     my recollection just by seeing a document,

5     not through my recollection. That's why I

6     said the document would most of the time

7     kind of steer you to what happened, more

8     than I would remember personally, so...

9          Q.    Okay. But you're not aware

10    whether Vanderbilt provided the lease, the

11    McDonald's lease to BBG, right?

12         A.    No.

13         Q.    Okay. Do you know if BBG knew

14    that McDonald's had the right to renew the

15    lease through April 2039?

16              MR. KOH:  Objection. Go ahead.

17         A.    What was the question, if I knew

18    McDonald's has the right --

19         Q.    Did Vanderbilt give BBG

20    information that would have made BBG aware

21    that McDonald's had the right to renew its

22    lease through April 2039?

23         A.    I said before, I don't remember.

24         Q.    Okay. If you could turn to the

25    page ending in 010666 of the report, it

```
 1              PINCHUS S. ROTTENBERG
 2    indicates that BBG used the land sales
 3    comparison approach to value the property.
 4    Do you see that?
 5         A.    I'm not there yet. 66- what?
 6         Q.    Ending in 666.
 7         A.    666, yes.  I'm on that page.
 8         Q.    Do you know why BBG valued the
 9    property using the land sales -- the land
10    sales comparison approach?
11              MR. KOH:  Objection.
12         A.    No. You got to ask BBG that
13    question. I don't know.
14         Q.    Okay. Well, if you would turn
15    back to the page ending in 603, BBG
16    concluded that the fee simple interest of
17    840 Atlantic Avenue was valued at $18.8
18    million as of April 26, 2018.
19              Do you agree that that's what
20    they concluded?
21         A.    603?
22         Q.    Yes.
23         A.    Yeah.
24         Q.    Okay. And what was Vanderbilt's
25    reaction to that valuation?
```

1                PINCHUS S. ROTTENBERG

2          A.    I can't remember what the

3    reaction was.

4          Q.    Do you remember if it was higher

5    or lower than you anticipated?

6          A.    No. There were various other

7    appraisals, I don't know if at the same time

8    or different time. So that's why I can't

9    remember what my reaction was.

10         Q.    So what other appraisals,

11   besides the BBG one, did you look at?

12         A.    I can't even remember, like,

13   there were a few others.

14         Q.    Which ones?

15         A.    Well, I can't -- the document

16   would tell me which ones it was. I can't

17   remember the companies that have done it

18   back then.

19         Q.    And you didn't look at any of

20   those documents before this deposition, did

21   you?

22         A.    No.  I looked at the documents

23   that were sent.

24         Q.    And when you say you looked at

25   the documents that were sent, were those the

```
 1                PINCHUS S. ROTTENBERG
 2   documents that I sent to your attorney
 3   yesterday?
 4        A.    Yes.
 5        Q.    And you didn't look at any other
 6   documents besides those?
 7        A.    No.
 8             MR. KOH:  Are you excluding in
 9        that question any meeting that --
10             THE WITNESS: -- that I had with
11        you, Howard Koh.
12             MR. WALSH:  I'm not excluding
13        anything. I'm wanting to know what
14        other documents.  He said he only
15        reviewed the documents I sent. I want
16        to know if he reviewed any other
17        documents in preparation for his
18        deposition.
19             MR. KOH:  Okay. Answer the
20        question.
21        A.    I met with Howard before and I
22   don't remember looking at any other
23   documents.
24        Q.    Okay. Do you recall when
25   Vanderbilt first reached out to Tom Tener?
```

```
                                        Page 172
 1              PINCHUS S. ROTTENBERG
 2        A.     No.
 3        Q.     And how did you learn of -- how
 4   did Vanderbilt know of Tom Tener and his
 5   firm KTR?
 6        A.     Probably I've seen them from --
 7   through other assignments which I had
 8   previously done, which I don't remember what
 9   it was.
10        Q.     Have you ever worked with Tom
11   Tener or any other appraisers at KTR before
12   this assignment?
13        A.     No.
14        Q.     No? And you don't recall if he
15   was recommended by somebody else or --
16        A.     No.
17              MR. WALSH:  If you could mark
18        the document VA-02633, also a one-page
19        email from Tom Tener to Sam Rottenberg
20        with a cc to Shaun Kest at KTR and
21        Theresa Nygard dated June 7, 2018 with
22        the subject 840 Atlantic Avenue.
23              CONCIERGE:  Sorry. You cut out
24        during the file name. Can you repeat
25        that?
```

```
                                            Page 173

 1                PINCHUS S. ROTTENBERG
 2                MR. WALSH:  VA-022633.
 3                CONCIERGE:  It's been uploaded.
 4                (Plaintiff Exhibit 19, email
 5          string last dated June 7, 2018, Bates
 6          VA-022633 was received and marked on
 7          this date for identification.)
 8          Q.    If you can open up what's been
 9     marked as P-19, Mr. Rottenberg?
10          A.    Okay.
11          Q.    Does this refresh your
12     recollection about when Vanderbilt first
13     reached out to KTR about potentially doing
14     some appraisal work for 840 Atlantic Avenue?
15          A.    What, for the date?
16          Q.    Yeah. So there is a date --
17          A.    June 7, 2018.
18          Q.    So does that refresh your
19     recollection about when you started speaking
20     with KTR?
21          A.    No. It wouldn't refresh my
22     recollection, other than it's evidence right
23     here.
24          Q.    So would you agree that it
25     appears you reached out to KTR in June 2018?
```

1              PINCHUS S. ROTTENBERG

2        A.     Yes. Yes, I confirm that.

3        Q.     And it appears that Mr. Tener

4   was responding to an inquiry that was made

5   to Theresa, from the cc I assume is Theresa

6   Nygard at KTR and this is on the second

7   line, "a scope and fee structure for the

8   appraisal of your property at 840 Atlantic

9   Avenue." And he has some information about

10  his understanding of what that property is

11  zoned. And in the second paragraph he

12  writes, "Although the site is encumbered by

13  a ground lease dated November 30, 2017 you

14  have informed Theresa that the ground lease

15  is between related entities and that you

16  would like an appraisal of the fee simple

17  interest on the site without consideration

18  of the ground lease. It is also our

19  understanding that the lease with McDonald's

20  will be expiring in the near term."  Do you

21  see that?

22       A.     I do.

23       Q.     So you told KTR that the lease

24  with McDonald's will be expiring in the near

25  term?

```
 1            PINCHUS S. ROTTENBERG
 2       A.    Yes. That's what it says here.
 3       Q.    Why did you tell them that?
 4       A.    I don't remember the purpose.
 5       Q.    Okay. In the next paragraph you
 6  wrote -- Mr. Tener wrote to you, "It is my
 7  understanding that you would like an
 8  appraisal of the site based on the current
 9  zoning. You indicated to Theresa there is a
10  pending zoning change along Atlantic Avenue
11  that may impact the M11 zoning of the
12  subject site. You would also like the site
13  appraised under the assumption that this
14  proposed zoning is approved.  Lastly, you
15  would like us to investigate and opine on an
16  appropriate market ground rent for the
17  parcel based on typical ground lease
18  provisions in New York City."  Do you see
19  that?
20       A.    I do.
21       Q.    So do you agree that at this
22  time you had asked KTR to perform an
23  appraisal of the appropriate market ground
24  rent for the McDonald's lease?
25            MR. KOH:  Objection.
```

1           PINCHUS S. ROTTENBERG

2        A.    Why for the McDonald's?  It's

3    just an appropriate kind of rent.  That's

4    all.

5        Q.    Well, what other appropriate

6    ground rent could this be referring to?

7        A.    Just what a property like this

8    would -- would get in ground rent.

9        Q.    So this is not specific to the

10   McDonald's lease?  This was for an

11   appropriate ground lease --

12       A.    I'm -- I'm not sure when this

13   was. Again, I'm not sure if it's in

14   conjunction -- I know this is June 2018, but

15   still I cannot know in the context when this

16   conversation took place, whether this was in

17   the context of the McDonald's lease or just

18   to me, personally, to get familiar and know

19   -- get another sense of whether -- what in

20   their eyes they would value this.

21       Q.    Okay. But you had told them that

22   the lease with McDonald's would be expiring

23   in the near term, right?

24       A.    I guess -- I'm not sure Tom

25   Tener is lying, so...

```
                                        Page 177
 1              PINCHUS S. ROTTENBERG
 2       Q.     So you also state in there that
 3   -- and this is in the second paragraph --
 4              MR. KOH:   I think it's Mr. Tener
 5        who states it.
 6              MR. WALSH:   I'm sorry.
 7       Q.     Mr. Tener states that you have
 8   informed Theresa that the ground lease is
 9   between related entities.
10              Why did you tell Mr. Tener that
11   the ground lease was between related
12   entities?
13       A.     Pardon?
14       Q.     Why did you tell Mr. Tener that
15   the ground lease is between related
16   entities?
17       A.     I can't remember why.
18       Q.     What does that mean to you?
19       A.     It means nothing. I'm not sure
20   what it means.
21       Q.     You don't know what it means?
22       A.     No. What it means is, in terms
23   of related parties?
24       Q.     Yes.
25       A.     Oh, because I was a part of
```

1              PINCHUS S. ROTTENBERG

2    M.M.B.

3         Q.    And why was that important

4    information shared with Mr. Tener?

5         A.    I can't remember what the

6    context of the conversation or why that was

7    said back then.

8         Q.    And did you share that

9    information with him because you thought it

10   may affect his valuation?

11        A.    I don't know.

12        Q.    And by June of 2018, the ground

13   rent -- the rent that Vanderbilt was paying

14   to M.M.B. under the Vanderbilt ground lease

15   was already set, right?

16        A.    Sorry. I'm sorry?

17        Q.    By June 2018 the rent that

18   Vanderbilt had to pay to M.M.B. under the

19   Vanderbilt ground lease was already set,

20   right, because the lease was dated November

21   17 --

22        A.    Yes.

23        Q.    So when you say that you were

24   looking for an appropriate market ground

25   rent for the parcel, what could you have

                    PINCHUS S. ROTTENBERG

1 been asking him to do?

3         MR. KOH:  Objection.

4    A.    I don't know. This is Tom Tener

5 saying all of this. So I'm not sure what --

6 maybe Tom Tener would have a better idea.

7    Q.    Okay. But you were the one that

8 retained him, right?

9    A.    Right. So as I told you, I don't

10 know which context, whether I wanted to get

11 his -- just his third-party opinion, his --

12 or this was in conjunction or this was in

13 the context of. It was one of the two.

14    Q.    Even though you reached out to

15 Theresa you ended up working with Tom Tener,

16 right?

17    A.    Yeah.

18    Q.    And do you recall why that was?

19    A.    Oh, I think it's all just based

20 on their internal scheduling, KTR's internal

21 scheduling, whether anybody was available at

22 that given time.

23    Q.    Now, why would you have asked

24 them to value the property without

25 consideration of the ground lease?

1                PINCHUS S. ROTTENBERG

2        A.    I'm sure, as you can see, I've

3    asked various fore appraisals, various kind

4    of valuation, just me, just to get a sense

5    of how everybody is looking at it

6    differently from a different perspective.

7        Q.    Around this time were you

8    looking for financing? I'm just trying to

9    understand.

10              So let me ask you that, were you

11   looking for financing for the project at

12   this time?

13       A.    I don't remember but I don't

14   think so.

15       Q.    Can you think of any other

16   reason why you would want to have these

17   appraisals performed, other than in

18   connection with the FMV process under the

19   Option Rent Addendum?

20       A.    Yeah. For me to get familiar how

21   people are looking at it.

22       Q.    And any other reason besides

23   that?

24       A.    No.

25              MR. WALSH:   Okay. If we can mark

```
                                        Page 181
 1            PINCHUS S. ROTTENBERG
 2      VA-010580 as Exhibit P-20. It's a
 3      cover email by Molly.SPRGRP to Tom Li.
 4      It's attaching a June 27, 2018
 5      engagement letter from KTR Real Estate
 6      Advisors to Mr. Sam Rottenberg of
 7      Vanderbilt Atlantic Holdings. It ends
 8      at Bates number VA-010586.
 9              (Plaintiff Exhibit 20, email
10      attaching engagement letter dated June
11      27, 2018, Bates VA-010586 was received
12      and marked on this date for
13      identification.)
14      A.    That's P-19?
15            MR. KOH:  20.
16            MR. WALSH:  20. It just popped
17      up on my screen, so it should be there
18      momentarily.
19      A.    Okay.
20      Q.    Whose signature is that on the
21  third page of the agreement ending in 583?
22  Is that Tom Li's?
23      A.    That's Tom Li, yeah.
24      Q.    But you were the one that
25  requested this appraisal from KTR, right?
```

```
 1              PINCHUS S. ROTTENBERG
 2        A.    Yeah.
 3        Q.    And Tom would have needed to get
 4   your authority to enter into this agreement
 5   on behalf of Vanderbilt, right?
 6        A.    Yes.
 7        Q.    Okay. In the middle of the first
 8   paragraph under where it says, "Dear
 9   Mr. Rottenberg", the first page of that
10   agreement ending in 581, the engagement
11   letter from KTR states, "It is our
12   understanding that the lease with McDonald's
13   is expiring in the near term." Do you see
14   that?
15        A.    Yeah.
16        Q.    So whereas Mr. Tener had said
17   that he was told that in an email, he's now
18   put this into the engagement letter that
19   Vanderbilt signed, right?
20        A.    Yeah.
21        Q.    So you would agree that
22   Vanderbilt told KTR that the lease with
23   McDonald's would be expiring in the near
24   term, right?
25        A.    I would agree that that's what
```

```
                                        Page 183

 1              PINCHUS S. ROTTENBERG
 2   Tom Tener alludes to.
 3        Q.    But Vanderbilt signed it, right?
 4        A.    Yeah. Sure.  Vanderbilt signed
 5   but still I still agree this is Tom Tener
 6   that said it, yeah.
 7        Q.    Okay. But Vanderbilt didn't
 8   correct it, though, right?
 9        A.    No.
10        Q.    So on the next page, second full
11   paragraph, "It is understood that the
12   intended use of this report is" --
13        A.    Hold on. Where are you?
14        Q.    The second page of the letter.
15   It's Bates stamped 582, second paragraph,
16   "It is understood".
17        A.    Okay.
18        Q.    It says, "It is understood that
19   the intended use of this report is assist
20   Vanderbilt Atlantic Holdings, LLC with
21   certain asset management related decisions
22   and analysis."
23              What asset management related
24   decisions and analysis was this report for?
25              MR. KOH:  Objection. Go ahead.
```

PINCHUS S. ROTTENBERG

1

2          A.     I'm trying to refresh my

3     recollection what this could have been.

4     Maybe this could have been -- again, I don't

5     remember during this junction.  This could

6     have been which appraiser to hire.

7          Q.     But you don't know?

8          A.     No.

9          Q.     A little bit further down there

10    are some bullet points. Do you see that?

11         A.     Yes.

12         Q.     And above that it says, "In

13    addition, in order to initiate the

14    assignment the following information, if

15    available, should be provided as soon as

16    possible." And the first bullet is "Copies

17    of any leases that are on the properties."

18    Do you see that?

19         A.     I do.

20         Q.     Okay. Did Vanderbilt provide a

21    copy of the McDonald's lease to KTR?

22         A.     I think you asked me that

23    question before and I said I don't know.

24         Q.     And this doesn't refresh your

25    recollection?

1              PINCHUS S. ROTTENBERG

2         A.      Only refresh my recollection to

3    the extent that they asked that it should be

4    provided.

5         Q.      Okay. And if they asked for it

6    it would have been pretty simple to give it

7    to them, right?

8                 MR. KOH:  Objection. Go ahead.

9         A.      It should be but I don't know

10   whether that actually occurred. So I don't

11   know.

12        Q.      And can you think of a reason

13   why it wouldn't have been provided?

14        A.      No.

15        Q.      Because that would impact the

16   value of the property, right?

17        A.      I don't know.

18        Q.      Do you know if Vanderbilt

19   provided the Option Rent Addendum to KTR at

20   this time?

21        A.      No. No.

22                MR. WALSH:  Okay. If we could

23        mark VA-023216, it's an email chain

24        that goes to 023223.

25                (Plaintiff Exhibit 21, email

```
                                              Page 186

 1              PINCHUS S. ROTTENBERG

 2         string last dated August 9, 2018,

 3         Bates VA-023216 was received and

 4         marked on this date for

 5         identification.)

 6         Q.    If you could tell me when you've

 7    had an opportunity to open up P-21.

 8              CONCIERGE:   020216?

 9              MR. WALSH:   023216.

10              CONCIERGE:   It's now uploading.

11         Q.    Can you tell me when you're able

12    to open it, Mr. Rottenberg?   It's open on my

13    ends.

14         A.    I see it.

15         Q.    So this is an email chain

16    between you and others at KTR. On the second

17    page, page ending 217 there's an email from

18    Tom Tener to you and some colleagues at KTR.

19    It's dated August 9th, 2018.   He said "Sam,

20    Shaun related to me the focus of his

21    conversation with you about this

22    assignment."

23              Do you recall what conversation

24    you had with Tom's colleague Shaun about the

25    assignment?
```

Page 187

PINCHUS S. ROTTENBERG

1

2          A.     No.

3          Q.     In the second sentence Mr. Tener

4     wrote, "He", Shaun, "would like us to

5     include an analysis of the likely terms of a

6     ground lease (under the existing zoning)."

7     Do you see that.

8          A.     Yes.

9          Q.     Does that refresh your

10    recollection about your discussion that you

11    had with his colleague Shaun?

12         A.     In Tom Tener's words, I asked

13    Shaun to have an analysis of the terms of a

14    ground lease under the existing zoning.

15         Q.     Where do you see that?

16         A.     You just read it. He explained

17    that you would like us to include an

18    analysis of the likely terms of a ground

19    lease under the existing zoning.

20         Q.     So is that that you told Shaun

21    at KTR that Vanderbilt would like an

22    analysis of the likely terms of a ground

23    lease under existing zoning, correct?

24         A.     That's what Tom said I asked

25    for, so...

1              PINCHUS S. ROTTENBERG

2         Q.    Did you ask for that?

3         A.    I don't have the recollection

4    other than what it says in here.

5         Q.    Okay. Well, do you have -- I'm

6    sorry.

7         A.    Only the recollection that it

8    says in here that I did so.

9         Q.    So what terms of a ground lease

10   could that be referring to?

11        A.    Just how that would be under a

12   ground lease.

13        Q.    If you could look at the email,

14   it's an email from Tom Tener to you dated

15   August 9, 2018?

16        A.    It's the first page?

17        Q.    On the bottom of the first page.

18   It says "Sam, what are the number of years

19   the anticipated ground lease.  Broker pay

20   that you submitted says 99-year lease but

21   only presents a summation of 25 years

22   without any discounting."  Do you see that?

23        A.    Yeah.  I don't remember this

24   conversation, 99 years versus 25 years.

25        Q.    So you don't remember whether

                    PINCHUS S. ROTTENBERG

1

2   you were looking for the terms of a 99-year

3   ground lease?

4        A.    No. I can't even remember

5   looking at this now. I can't remember what

6   was the discussion back then.

7        Q.    And then the email above it

8   looks like Tom Li responded to Tom Tener and

9   said, "Tom, it should be a 99-year lease.

10  Not sure what's behind the BOV logic." Do

11  you see that?

12       A.    Yes.

13       Q.    And BOV, does that mean broker

14  opinion of value?

15       A.    Yes.

16       Q.    And so Vanderbilt told him that

17  it should be a 99-year lease, right?

18       A.    Yes.

19       Q.    And do you recall what other

20  instructions Vanderbilt gave to KTR about

21  that appraisal?

22       A.    No.

23       Q.    Okay. As a real estate broker,

24  do you have an opinion on whether McDonald's

25  lease would affect the value of the

1                  PINCHUS S. ROTTENBERG

2     property?

3                  MR. KOH:  Objection, you may

4          answer.

5          A.    That's not a question that --

6     given my role, I'm not sure I can answer

7     that question.  Just I'm not sure I would

8     have the answer to that question.

9          Q.    So you don't have an opinion as

10    a broker?

11         A.    No.

12         Q.    But KTR asked for that document,

13    right?  It asked for the ground lease with

14    McDonald's?

15         A.    You showed it to me in the

16    engagement letter that they asked for it,

17    right?

18         Q.    Right. So they asked for it,

19    right?

20         A.    Yeah.

21         Q.    So does that suggest to you that

22    the appraisers thought it could affect the

23    value?

24         A.    I think an appraiser looks at

25    all aspects of the properties, everything

1                PINCHUS S. ROTTENBERG

2    that's encumbered on the property, involved

3    or everything involved in the property an

4    appraiser looks at.

5         Q.    And that's because those things

6    affect the value, right?

7         A.    Yeah. It could have an affect on

8    the value one way or the other.  Everything

9    related to a property could impact the

10   value, of course.

11              MR. WALSH:  If we can mark

12        VA-000002?

13              THE WITNESS:  What is it?

14              MR. WALSH:  It's the August 30,

15        2018 KTR Appraisal Report for 840

16        Atlantic Avenue.  If we can mark that

17        as P-22.

18              (Plaintiff Exhibit 22, KTR

19        Appraisal Report dated August 30,

20        2018, Bates VA-000002 was received and

21        marked on this date for

22        identification.)

23              CONCIERGE:  This is a larger

24        file so it's taking a little bit

25        longer. Okay. It's been uploaded.

1              PINCHUS S. ROTTENBERG

2        Q.     Okay. Mr. Rottenberg, it's

3    available on my end. I know it's a big file

4    but if you can open up Exhibit 22.

5        A.     69 megabytes.

6              MR. KOH: I have it open.

7        A.     Yes. I have it open.

8        Q.     Okay. So this is appraisal

9    report from KTR Real Estate Advisors for 840

10   Atlantic Avenue dated August 30, 2018 and

11   it's addressed to you at Vanderbilt Atlantic

12   Holdings; is that right?

13       A.     Yes.

14       Q.     And the second -- if you can

15   turn to page ending in 16, it says Purpose

16   of Appraisal?

17       A.     Page 16, okay.

18       Q.     Do you see where it says Purpose

19   of Appraisal?

20       A.     The premises of the appraisal.

21       Q.     No, second part down on the

22   left-hand side.

23       A.     Yes.

24       Q.     And it says, "The purpose of the

25   appraisal is to provide an estimate of the

1              PINCHUS S. ROTTENBERG
2    market value of the fee simple interest in
3    the subject land breaking out values for the
4    M11 zoned portions of the site and the R6B
5    zoned portion of the site." Do you see
6    that?
7         A.    I do.
8         Q.    And so you would agree that is
9    at least one purpose of this appraisal,
10   right?
11        A.    Yeah. We talked about this
12   before. It's the same thing as before.
13        Q.    Okay. And the next sentence,
14   "The client has requested an opinion of the
15   market value of the fee simple interest in
16   the subject site under the hypothetical
17   condition that the entire site is rezoned
18   based on the current proposals represented
19   in the M-CROWN study." Do you see that?
20        A.    Yeah.
21        Q.    So that was the second purpose;
22   is that correct?
23        A.    That's what this says.
24        Q.    Okay. And then the last
25   sentence, the last sentence says, "The scope

Page 194

1                PINCHUS S. ROTTENBERG

2       of work also includes of the market ground

3       rent for the subject property."

4              A.    Yes.

5              Q.    So these were the three purposes

6       of the appraisal, correct?

7              A.    Yeah.

8              Q.    Now, if you go down to the

9       bottom of that page it includes a definition

10      of fee simple estate. And it says, in part,

11      "Absolute ownership unencumbered by any

12      other interest or estate." Do you see that?

13             A.    Yeah.

14             Q.    So Vanderbilt had asked KTR to

15      value the property as unencumbered by any

16      other interest or estate; is that right?

17             A.    A-hum.

18             Q.    Is that a "yes"?

19             A.    Yes, it's yes.

20             Q.    So if you go to the page ending

21      in VA-08.

22             A.    Which one?

23             Q.    -08. On the bottom of the page

24      it talks about a hypothetical conditions.

25             A.    Yeah.

Page 195

                      PINCHUS S. ROTTENBERG

1
2        Q.      And in the first bullet it talks
3   about that, "The client has requested an
4   appraisal of the subject land under the
5   following hypothetical condition."  And the
6   first hypothetical condition is that it
7   would be rezoned consistent with the M-CROWN
8   zoning. Do you see that?
9        A.      Yes.
10       Q.      And on the next page, the bottom
11  portion of that section says, "This
12  appraisal includes an opinion of the market
13  value of the fee simple interests in the
14  subject land under the hypothetical
15  condition that the subject property is
16  rezoned under the M-CROWN plan as described
17  above as of the effective date of this
18  appraisal."  Do you see that?
19       A.      Yes.
20       Q.      Why would that be relevant to
21  Vanderbilt?
22       A.      Similar reason why it was
23  relevant to look at all the other
24  appraisals, just to get a mosaic of opinions
25  and what people think about this stuff.

1               PINCHUS S. ROTTENBERG

2          Q.     So if you look lower on that

3     page where it says Extraordinary

4     Assumptions, and it says, "The included

5     market values and market ground rent of this

6     rental are based on the following

7     extraordinary exceptions:  The subject

8     property is improved with a McDonald's

9     restaurant.  At the time of the inspection

10    the restaurant continued operations. KTR

11    requested a copy of the McDonald's lease but

12    was not provided with a copy."  Do you see

13    that?

14         A.     Yeah.

15         Q.     Why didn't Vanderbilt provide

16    the McDonald's lease, as their requested?

17         A.     I don't know. You asked me that

18    question before. I said I don't know what

19    was behind this back then.

20         Q.     And then at the bottom of that

21    first Extraordinary Assumption it says, "The

22    value conclusions contained herein are based

23    on the extraordinary assumption that it has

24    not exercised its renewal option and the

25    premises is available for development to its

```
 1             PINCHUS S. ROTTENBERG
 2   highest and best use." Do you see that?
 3        A.    Yes.
 4        Q.    Okay.
 5        A.    You are reading what, "According
 6   to the memorandum of lease expired" --
 7        Q.    The sentence below that.
 8        A.    All right. The lease indicates
 9   the tenant has the option to extend the term
10   of the lease, expiration of the original
11   term, says in excess of aggregating 20
12   years, right?
13             MR. KOH:  Mr. Walsh, was
14        referring to the following sentence in
15        his question.
16        A.    Which sentence, the value
17   conclusion?
18        Q.    I'll cut to the chase.
19             This KTR appraisal was performed
20   under the assumption that McDonald's would
21   not exercise its renewable option, correct?
22        A.    I'm sorry?
23             MR. KOH:  Objection.
24        A.    I'm sorry, Brandon.  I didn't
25   hear your question.
```

1              PINCHUS S. ROTTENBERG

2                   (Pending question is read back

3         by the reporter.)

4         A.    I don't know.

5         Q.    Do you have any reason to

6    dispute what's included in this report?

7         A.    No.

8         Q.    And this report was prepared at

9    the request and under the instructions of

10   Vanderbilt, correct?

11        A.    Yes.

12        Q.    Okay. And in the next

13   Extraordinary Assumption it talks about how

14   the 99-year ground lease is between related

15   parties. So that was another assumption,

16   correct?

17        A.    That's what the appraisal says,

18   yes.

19        Q.    Did anyone at KTR ever ask

20   Vanderbilt why it wanted KTR to assume there

21   were no encumbrances on the lease when there

22   were encumbrances?

23        A.    Very possible. I don't remember.

24        Q.    You don't remember. KTR

25   performed this appraisal using the land

1              PINCHUS S. ROTTENBERG

2      sales comparison approach. Is that the

3      method that Vanderbilt directed them to

4      value the property at?

5             A.    No, I don't think so.

6             Q.    So they just did that on their

7      own?

8             A.    You'd have to ask that question

9      of Tom Tener.

10             Q.    Did Vanderbilt ever ask KTR to

11      search for comparable ground leases as part

12      of this appraisal?

13             A.    Very possible, but I couldn't

14      sit here and tell you one way or the other

15      now.

16             Q.    Okay. Did anyone at KTR ever

17      inform Vanderbilt how a encumbrance might

18      affect the value of the property?

19             A.    I don't recall.

20             Q.    So I'll ask it more

21      specifically. Did anyone at KTR ever inform

22      Vanderbilt that the McDonald's lease might

23      impact the value of the property?

24             A.    The same question as before, I

25      said I don't remember whether they informed

1                PINCHUS S. ROTTENBERG
2     us of such.
3          Q.    Okay. If you could turn to the
4     page ending in 82.
5          A.    82 of this last exhibit?
6          Q.    Yeah. It's the -- it says Ground
7     Rent Analysis at the top. Do you see that
8     page?
9          A.    Not yet. It takes time to look
10    close at this whole thing. Okay. I have that
11    page.
12         Q.    Okay. So this is Mr. Tener or
13    KTR's ground rent analysis. And the third
14    paragraph down it says, "KTR reviewed the
15    rent reset provisions of new ground leases
16    in Manhattan and the outer boroughs."
17              Would you agree this appears to
18    be trying to figure out what an appropriate
19    ground rent for the property would be?
20         A.    Okay.
21         Q.    Would you agree with me?
22         A.    Sure.
23         Q.    And for what purpose would this
24    be relevant to Vanderbilt if it was for
25    something other than the McDonald's lease?

```
 1              PINCHUS S. ROTTENBERG
 2         A.    We talked about that before.
 3    It's the same answer as I said before.
 4         Q.    Now, it says that KTR reviewed
 5    several ground leases and ground rent resets
 6    throughout Manhattan and the outer boroughs.
 7              Did Vanderbilt provide KTR with
 8    any ground leases and ground resets, ground
 9    rent resets?
10         A.    It's possible but I don't
11    remember.
12         Q.    The bottom paragraph of that, on
13    that page about three quarters of the way
14    down that paragraph it says, "If not for the
15    potential appreciation" -- tell me when
16    you're there and I'll start reading.
17         A.    I see a bolded portion.
18         Q.    Right above that, the two
19    sentences above that bolded portion starting
20    "If not for".
21         A.    Yes.
22         Q.    It says, "If not for the
23    potential appreciation in land value that
24    would result from the enactment of the
25    M-CROWN zoning, the subject land would
```

1           PINCHUS S. ROTTENBERG

2     likely command a ground rent of 4.0% to 5.0%

3     of the current land value." Do you see that?

4          A.    Yeah.

5          Q.    But because of the possibility

6     of the M-CROWN rezoning Mr. Tener included

7     that a base rent of 6.0% of the fair market

8     value would be consistent with the market,

9     right?

10         A.    Yeah. I guess that's what he's

11    saying.

12         Q.    Okay. So he concluded that the

13    property was more valuable because of the

14    possibility of the M-CROWN rezoning, right?

15         A.    Correct.

16         Q.    And if you go to the next page,

17    he concluded that the ground rent, the

18    market rental value of the ground rent, with

19    all the assumptions he was considering, was

20    $1,080,000 per year, right?

21         A.    Yes. I'm not sure why I'm being

22    questioned -- being questioned about the

23    work Tom Tener has done.

24              MR. KOH:  He can spend it

25         however he chooses, Mr. Rottenberg.

                       PINCHUS S. ROTTENBERG

1

2          Q.     Now, what did Vanderbilt do with

3    this report once it received it?

4          A.     I don't remember.

5          Q.     Did Vanderbilt use this report

6    in any way relating to the fair market value

7    as laid out in the Option Rent Addendum to

8    the McDonald's lease?

9          A.     I don't remember. Perhaps. I

10   don't remember.

11         Q.     Did you retain any other

12   appraisers other than BBG and KTR?

13         A.     I think I previously said that,

14   yes.

15         Q.     And who were they?

16         A.     I told you I don't remember who

17   it was. There was multiples, which I can't

18   remember who else it was. That's why I said

19   the document is always evidence of this more

20   than myself.

21               MR. WALSH: Just give me a

22         moment. I want to look at some

23         documents real quick.

24               Okay. If we can mark VA-011951,

25         it's an email chain with an

```
 1              PINCHUS S. ROTTENBERG
 2         attachment. It's a very long document,
 3         it spans through 012047.
 4              The attachment is a draft real
 5         estate appraisal report of a
 6         development site located at 838 to 844
 7         Atlantic Avenue, prepared by Republic
 8         Valuations, it's dated January 8th,
 9         2019 and says it was prepared for
10         Vanderbilt Atlantic Holdings.
11              (Plaintiff Exhibit 23, draft
12         real estate appraisal report dated
13         January 8th, 2019, Bates VA-011951 was
14         received and marked on this date for
15         identification.)
16              CONCIERGE:  I've uploaded it. It
17         should be there now.
18              MR. WALSH:  I see P-23.
19         A.    Okay.
20         Q.    So the cover, the first page,
21    it's an email chain that -- the most recent
22    email is an email from
23    Esty@RepublicValuations. It's dated February
24    15, 2019 and it's sent to you, Sam
25    Rottenberg with a cc to Tom Li, subject:
```

```
1              PINCHUS S. ROTTENBERG
2    840 Atlantic Avenue, Brooklyn. It says
3    "Attachments 840 Atlantic
4    Avenue-appraisal.PDF. Email says, "Please
5    see the completed draft report. Feel free to
6    contact me with any further questions or
7    concerns." Do you see that?
8         A.    Yes.
9         Q.    So Vanderbilt engaged another
10   firm by the name of Republic Valuations to
11   perform another appraisal of 840 Atlantic
12   Avenue; is that correct?
13        A.    That's correct.
14        Q.    And the report at 9:56 shows
15   it's dated January 8th, 2019. I'm not sure
16   why that is, given that it's sent in
17   February. Do you know why that is?
18        A.    Again?
19        Q.    The page ending in 956 shows a
20   report date of January 18 and the email was
21   sent February 15, 2019. Do you know why the
22   difference in the date?
23        A.    No idea.
24        Q.    Okay. Do you know why this was
25   sent to Vanderbilt in draft form?
```

```
 1              PINCHUS S. ROTTENBERG
 2         A.    No.
 3         Q.    Did Vanderbilt request that it
 4   be sent in draft form?
 5         A.    Oh, I know why. Because the way
 6   they do this is, they want to first get a
 7   deposit and they send a draft and when you
 8   pay in full they take off their draft
 9   portion of it.
10         Q.    Do you know if this was ever
11   paid for and you were given a final report?
12         A.    No. I won't remember.
13         Q.    Okay. If you could turn to the
14   page ending in 11970, and if you could tell
15   me when you're there?
16         A.    I'm there.
17         Q.    Okay. If you look at the very
18   bottom it talks about hypothetical
19   conditions and it says, "Based on the
20   assumption that the property is not
21   encumbered and the lease is ready for
22   development." Do you see that?
23         A.    Yes.
24         Q.    So you also directed Republic
25   Valuations in February 2019 to appraise the
```

1                PINCHUS S. ROTTENBERG
2    property as not encumbered by a lease and
3    ready for development?
4         A.    That's what Republic says that I
5    requested, yes.
6         Q.    Okay. And you don't have any
7    reason to think that's not what you
8    requested, right?
9         A.    No.
10              MR. WALSH:  All right. Actually,
11         if we can take a short break, I just
12         need five minutes or so. We've been
13         going for about an hour and 15
14         minutes, if we can just take a short
15         five minute break, I'd appreciate it.
16              MR. KOH:  Okay. We'll be back in
17         five minutes.
18              VIDEOGRAPHER:  We're off the
19         record at 3:01 p.m. and this is the
20         end of media 3.
21              (Recess is taken.)
22              VIDEOGRAPHER:  We are back on
23         the record at 3:14 p.m. and this is
24         the start of Media Unit 4.
25         Q.    Okay. Mr. Rottenberg, Vanderbilt

1                PINCHUS S. ROTTENBERG

2    had all of these appraisals performed for it

3    that value the property without the

4    encumbrance of the McDonald's lease. And my

5    understanding of your testimony is that it

6    was because Vanderbilt wanted to understand

7    what others were valuing the property

8    without those encumbrances; is that

9    accurate?

10         A.    Just how they valued the

11   property altogether.

12         Q.    But what purpose would that

13   serve to Vanderbilt, given that it actually

14   was encumbered by the McDonald's lease?

15         A.    Just to familiarize a little bit

16   with how people kind of valued the property.

17         Q.    But it was valuing the property

18   assuming a condition didn't exist that

19   existed, and that's what I'm trying to

20   understand.

21         A.    One -- one of the ways -- was

22   valued only one of the ways. It wasn't only

23   valued as unencumbered.  It was valued on

24   many different -- many different kind of

25   options or many different...

```
                                        Page 209
 1              PINCHUS S. ROTTENBERG
 2        Q.     None of the appraisals that
 3   we've been looking at considered the
 4   McDonald's lease and they all expressly
 5   actually stated that it was being valued as
 6   unencumbered.
 7              I'm just trying to understand if
 8   there was any purpose or what the value to
 9   Vanderbilt having that information was,
10   given that the encumbrance of the lease was
11   there?
12        A.     What was the value of Vanderbilt
13   to have various appraisals for the same
14   thing? It was the idea of seeing multiple
15   people looking at the same thing and how
16   everybody else is -- what's the point of
17   everybody individually. That was the idea.
18        Q.     I don't understand that, but
19   I'll just move on.
20              So do you recall if Vanderbilt
21   had any other appraisals, other than the
22   ones we've looked at, besides Tom Tener's
23   2019 reports?
24        A.     The last exhibit was Republic.
25   Wasn't the last exhibit Republic?
```

Page 210

1              PINCHUS S. ROTTENBERG
2                MR. WALSH:  Okay. So if you
3          could mark as P-24, VA-011918 and it
4          spans through 924.
5                (Plaintiff Exhibit 24, email
6          string dated February 14, 2019, Bates
7          VA011918 was received and marked on
8          this date for identification.)
9          Q.    Okay.  It's an email from
10   Molly.SPRGRP@gmail.com. It's an email from
11   her to Tom Li dated February 14th, 2019,
12   with an attachment. And the attachment is an
13   engagement letter between Metropolitan
14   Valuation Services and Vanderbilt Atlantic
15   Holdings dated February 14, 2019. If you
16   could tell me, P-24 is available on my end.
17        A.    I see it.
18        Q.    So in February of 2019
19   Vanderbilt engaged another appraiser,
20   Metropolitan Valuation Services to perform
21   another analysis on the property; is that
22   right?
23        A.    Yes.
24        Q.    And Vanderbilt retained
25   Metropolitan to conduct a review of the

1              PINCHUS S. ROTTENBERG

2    appraisals prepared by KTR and BBG in 2018,

3    correct?

4         A.    Sorry. I got distracted a bit

5    much. Sorry.

6         Q.    Vanderbilt, if you look back on

7    the page ending 919, it's addressed to

8    Vanderbilt and it's to Tom Li at Vanderbilt.

9    It's signed by Tom Li on the third page. And

10   its -- it indicates that Vanderbilt retained

11   Metropolitan to review the KTR and BBG

12   appraisals conducted in 2018; is that right?

13        A.    Yes.

14        Q.    And the bottom bullet says, "The

15   reviewer will opine on the reasonability and

16   credibility of the reported valued opinions

17   and suggest areas, if any, where such

18   conclusions maybe impacted or clarified." Do

19   you see that?

20        A.    Yes.

21        Q.    And that's Tom Li's signature on

22   the third page of the document?

23        A.    Yes.

24        Q.    Why did Vanderbilt -- never

25   mind.

```
                                            Page 212
 1              PINCHUS S. ROTTENBERG
 2                 So next I'd like to mark
 3    VA-012456 to 483 as P-25.
 4                 (Plaintiff Exhibit 25, email
 5          string last dated February 26, 2019,
 6          Bates VA-012456 was received and
 7          marked on this date for
 8          identification.)
 9          Q.    Mr. Rottenberg, do you have P-25
10    up?
11          A.    Yeah. I see it.
12          Q.    If you could flip to the page
13    ending in 464?
14          A.    Which one?
15          Q.    Ending in 464.
16          A.    Yes.
17          Q.    And this is a report dated
18    February 26, 2019, Metropolitan Valuation
19    Services to your colleague Tom Li, correct?
20          A.    Correct.
21          Q.    And the first paragraph
22    indicates that this is a comprehensive desk
23    review of the appraisal report prepared by
24    KTR. Do you see that?
25          A.    Which bullet point?
```

1          PINCHUS S. ROTTENBERG

2          Q.     Just the very first paragraph

3     under "Dear Mr. Li".

4          A.     I see that.

5          Q.     So that's correct?

6          A.     Yeah.

7          Q.     And this would have been the

8     August 2018 report from KTR, right?

9          A.     I don't know which one.

10         Q.     Well, did you have any other

11    reports prepared by KTR at this time?

12         A.     I don't know. I don't know

13    whether at this time or the time after. I

14    don't know.

15         Q.     Okay. If you could look, turn to

16    the page ending in 465.

17         A.     Okay.

18         Q.     And it goes over to 466.

19         A.     465 or --

20         Q.     Well, it's both. I'm starting on

21    the bottom of 465. I just want you to know

22    we're going to be looking at --

23         A.     The bullet point?

24         Q.     Right. So it talks about the

25    scope of the KTR appraisal.  Do you see that

Page 214

1    PINCHUS S. ROTTENBERG

2    on the bottom of 465?

3         A.    Yes. "Purpose and scope of the

4    KTR appraisal."

5         Q.    Yes.  Then it says, "The

6    appraisal notes the following hypothetical

7    conditions." And there's a bullet right

8    below that. Do you see that?

9         A.    Yes.

10        Q.    I'll represent to you that these

11   are verbatim from the August -- or the

12   August 2018 KTR report and you can actually

13   see in the header on the top left of each

14   page it says -- it explains that it's

15   looking at the KTR Real Estate Advisors as

16   of August 2018. Do you see that?

17        A.    Yeah.

18        Q.    And on the bottom of 466, so

19   after, you know, explaining the assumptions

20   and hypothetical conditions, Metropolitan

21   concluded, in the last sentence on the

22   bottom of 466, that, "As the proposed

23   rezoning initiative has not yet been

24   approved, it is our opinion that this

25   valuation scenario is highly speculative as

1                  PINCHUS S. ROTTENBERG
2    of both the effective date of value and the
3    date of the report." Do you see that?
4          A.    I do.
5          Q.    Do you know what Metropolitan
6    meant by that?
7                  MR. KOH:   Objection.
8          A.    I have no other definition, only
9    what I read on this paragraph.
10         Q.    Did you discuss that with or did
11   anyone at Vanderbilt discuss that --
12         A.    I don't remember. I don't
13   remember discussing this at all.
14         Q.    And would anyone else have
15   discussed it?
16         A.    No. Maybe Morris Missry, if
17   anybody.
18         Q.    Okay. If you can turn to the
19   page ending in 474.
20         A.    Okay.
21         Q.    You'll see, if you scroll up one
22   page, this is a discussion of KTR's ground
23   rent analysis and this is Metropolitan
24   Valuation's analysis of KTR ground rent
25   analysis. And at the bottom of that section

1               PINCHUS S. ROTTENBERG

2    on 474 it says, "While we concur with the

3    6.0 selection for a reset, we disagree that

4    this rate would be reflective of an initial

5    rate against the land valuation.  In this

6    location we are of the opinion that the

7    initial rate would be closer to 4.5 to 5.0%

8    and no consideration would be given to any

9    potential up-zoning as of the current date

10   of value as this would be highly speculative

11   without formal or at least anecdotal

12   municipal approval." Do you see that?

13        A.    I do.

14        Q.    Now, did you discuss that part

15   of Metropolitan's conclusion with

16   Metropolitan?

17        A.    No.

18        Q.    Did anyone else at Vanderbilt?

19        A.    Not as I'm aware of.

20        Q.    If you could turn to the page

21   ending in 468. Are you there?

22        A.    Yes.

23        Q.    So if you care to, you could see

24   from the page before, this is -- the top

25   part of 468 is the end of the executive

1                PINCHUS S. ROTTENBERG

2    summary of Metropolitan Valuation Services

3    findings. Point 4 on 468 says, "Should the

4    appraisal be utilized in conjunction with

5    the ground rent reset, the highest and best

6    use analysis as improved should consider the

7    encumbrances in place with respect to the

8    ground lease which precludes near term

9    demolition. Similarly, the tenant retains

10   additional option periods which would limit

11   any redevelopment opportunity." Do you see

12   that?

13        A.    I do.

14        Q.    Did you have any discussion with

15   Metropolitan about that?

16        A.    No. Same answer to what I

17   answered before.

18        Q.    And you reviewed this report

19   when it came out, right?

20        A.    I don't remember seeing this, as

21   you read it to me, but I'm not sure how

22   thoroughly I reviewed it, so...

23        Q.    Well, Vanderbilt paid for it,

24   right?

25        A.    Still doesn't mean that I

Page 218

```
 1              PINCHUS S. ROTTENBERG
 2   reviewed it thoroughly.
 3        Q.    It was sent to you, right?
 4        A.    What?
 5        Q.    Well, it was sent to you and
 6   you're the --
 7        A.    Yeah. It was sent to me. You see
 8   I don't remember a lot of stuff either,
 9   so...
10        Q.    Okay. And you were the managing
11   member of Vanderbilt and responsible for all
12   decisions, right?
13        A.    We've already kind of said that
14   a long time ago.
15        Q.    All right. And this is referring
16   to the McDonald's lease, right?
17        A.    I don't know.
18        Q.    Okay. Well, it talks about the
19   ground lease that precludes near term
20   demolition. McDonald's is the only building
21   on the property, right?
22        A.    I mean, I don't know.
23        Q.    You don't know?
24        A.    This is what -- yeah. I assume
25   the same way you see it I see it exactly.
```

Page 219

1              PINCHUS S. ROTTENBERG

2        Q.     Have you ever seen another

3   building besides the McDonald's at 840

4   Atlantic Avenue?

5        A.     No, sir.

6        Q.     Okay. So could it have been

7   talking about anything else, other than the

8   McDonald's lease?

9              MR. KOH:  Objection.

10       A.     Probably not.

11       Q.     Probably not? How can you not

12  answer that question definitively?

13             MR. KOH:  Objection. He's

14        answered the question. Please stop

15        badgering the witness. If you want to

16        make an argument, make an argument at

17        some other time.

18       Q.     So it's your testimony that

19  there may be other buildings besides

20  McDonald's on the property that you've never

21  seen?

22             MR. KOH:  Objection,

23        mischaracterizes the testimony.

24       A.     No.

25       Q.     Are you aware of any other

1              PINCHUS S. ROTTENBERG

2    ground leases for the property besides

3    Vanderbilt's own ground lease that this

4    could possibly be referring to?

5         A.    No.

6         Q.    So wouldn't you agree that in

7    February 2019 Metropolitan Valuation

8    Services told you that if you were going to

9    utilize KTR's appraisal, that they would

10   need to consider the encumbrance of the

11   McDonald's lease in its analysis for the

12   rent reset analysis?

13             MR. KOH:   Objection.

14        A.    Again, I didn't kind of hear the

15   last part of that statement or the question.

16             (Pending question is read back

17        by the reporter.)

18        Q.    Okay. Didn't you need to

19   consider the encumbrance of the McDonald's

20   lease in conjunction with the ground rent

21   reset process?

22             MR. KOH:   Same objection.

23        A.    I confirm they put it in the

24   report. That's what I confirm.

25        Q.    Okay. And this report was a

1              PINCHUS S. ROTTENBERG

2    report that Vanderbilt commissioned,

3    correct.

4         A.    Yes.

5         Q.    Did you ever share this report

6    with KTR?

7         A.    I can't recall.

8         Q.    If we could flip back to the

9    very first page of that exhibit, it's the

10   page ending in 456. Tell me when you're

11   there.

12        A.    12456?

13        Q.    Yes.

14        A.    Okay.

15        Q.    This report was sent to you by

16   David Lyon at Metropolitan Valuation

17   Services on February 26, 2019, right?

18        A.    Okay.

19        Q.    Is that right?

20        A.    Yeah. That's what the document

21   says.

22        Q.    And the report was also sent to

23   Morris Missry; isn't that right?

24        A.    Morris Missry I see is copied on

25   this email, yes.

```
                                              Page 222
 1              PINCHUS S. ROTTENBERG
 2        Q.     And Tom Li?
 3        A.     Yes.
 4        Q.     Did Vanderbilt have any followup
 5   discussions with Metropolitan Valuation
 6   Services about this analysis?
 7        A.     I don't remember.
 8        Q.     You don't remember?
 9        A.     No.
10        Q.     And in the second paragraph of
11   his email, the second sentence says, "If I
12   remember correctly, the issue of the ground
13   rent reset was intentionally not part of the
14   initial engagement for either KTR or BBG."
15   Do you see that?
16        A.     Yes.
17        Q.     So he's talking about the
18   McDonald's lease there, right?
19        A.     That's his assertion, I guess.
20        Q.     But he's talking about the
21   McDonald's lease and the Option Rent
22   Addendum, right?
23              MR. KOH:  Objection.
24        A.     I don't know what he's talking
25   about. I guess so.
```

1           PINCHUS S. ROTTENBERG

2           Q.    Okay.   The next sentence, "In

3     that regard, it would be my opinion that

4     both the appraisal reports or one or the

5     other depending on your decision to use

6     either or both in your preliminary

7     negotiations with McDonald's or if you are

8     prepared to exchange either or both as per

9     the ground lease reset schedule would need

10    to be updated to a current date of value and

11    additional market data would need to be

12    reviewed/included."  Do you see that?

13          A.    Yes.

14          Q.    So it seems that Vanderbilt

15    discussed the McDonald's Option Rent

16    Addendum with Metropolitan, correct?

17          A.    That's what it appears.

18          Q.    And did Vanderbilt provide

19    Metropolitan with the McDonald's lease?

20          A.    I don't know.

21          Q.    And in the closing paragraph he

22    concluded, "In my opinion the KTR in its

23    current form is slightly more credible." Do

24    you see that?

25          A.    The last paragraph you're

Page 224

1                PINCHUS S. ROTTENBERG
2    talking about, right?
3         Q.    Yeah.
4         A.    Yeah, I see that.
5         Q.    And so, did this form -- did
6    this report and analysis impact Vanderbilt's
7    decision to retain KTR for the fair market
8    value process under the Option Rent
9    Addendum?
10        A.    I don't know but it makes a ton
11   of sense, but I don't know whether that
12   triggered that. I can't remember.
13        Q.    Okay.
14        A.    How many breaks are we allowed
15   to have?
16        Q.    If you need a break, we can take
17   a break.
18        A.    No. I'm thinking out loud.  I
19   want to break at four o'clock.
20        Q.    That's absolutely fine. We can
21   plan on that.
22              If we could mark VA-012503, it
23   spans through 521. That will become P-26.
24              (Plaintiff Exhibit 26,
25         Metropolitan Desk Appraisal dated

Page 225

```
 1              PINCHUS S. ROTTENBERG
 2         February 27, 2019, Bates VA-012503 was
 3         received and marked on this date for
 4         identification.)
 5         Q.    This is a Metropolitan Valuation
 6    Services report dated February 27, 2019.
 7    It's addressed to Vanderbilt Atlantic
 8    Holdings, Tom Li, subject line:
 9    Comprehensive Desk Review of the Appraisal
10    of 840 Atlantic Avenue BBG with the report
11    date of July 9, 2018.
12              Tell me when you have that open,
13    Mr. Rottenberg.
14              MR. KOH:  It's not uploaded yet.
15              MR. WALSH:  I'm not seeing it
16         either.
17         A.    I'm getting tired this time of
18    day.
19         Q.    It's understandable.  So if we
20    need to take more frequent breaks, just
21    speak up. I'm not trying to wear you down
22    despite what you might think, I'm really
23    not. I'm getting tired too.
24         A.    This is a big file coming? The
25    anticipation leading up to this file --
```

1                PINCHUS S. ROTTENBERG

2        Q.    It's only 18 pages. It must just

3   be a large file.

4        A.    I'm holding my breath what's

5   coming.

6                MR. KOH:  What's the date on

7            this?

8                MR. WALSH:  It's dated February

9            27, 2019. It looks like it's only six

10           months. Actually, did we lose --

11           Tevin, is it just giving you a hard

12           time?

13               CONCIERGE:  I couldn't find it.

14           Could you repeat that file date?

15               MR. WALSH:  Sure. It's

16           VA-012503.

17               CONCIERGE:  Okay.

18               THE WITNESS: There is somebody

19           else joining previously that is not on

20           this call anymore.

21               MR. WALSH:  Okay. So P-26, it's

22           there. Okay.

23        Q.    Mr. Rottenberg, if you can open

24   up P-26.

25        A.    I see it.

Page 227

PINCHUS S. ROTTENBERG

1

2      Q.     And so, after that long wait,
3  you would agree that Vanderbilt also
4  received a report from Metropolitan
5  Valuation Services reviewing the 2018 BBG
6  report, right?

7      A.     Yes.

8      Q.     And this report, do you recall
9  reviewing this report?

10     A.     Actually, no.

11     Q.     Okay. So other than KTR, BBG,
12  Republic, the reviews performed by
13  Metropolitan Valuation Services, did
14  Vanderbilt retain any other appraisers to
15  appraise the property under any method or
16  for any reason during the 2018 to 2019 time
17  period?

18          MR. KOH:  Objection.

19     A.     Not to my knowledge.

20     Q.     Okay.

21     A.     Isn't that enough?

22          MR. KOH:  That's fine. Go ahead.

23     Q.     So you're not knowledgeable
24  about whether that is true or not?

25     A.     No. What I said is I don't know

Page 228

1            PINCHUS S. ROTTENBERG
2    of any others. That's what I said.
3        Q.    Who would know of any others?
4        A.    I would know and maybe Tom Li.
5        Q.    Did Vanderbilt ever ask
6    Metropolitan Valuation Services to review
7    Tom Tener's April 2019 letter opinion of
8    value?
9        A.    I'm sorry. Could you please
10   repeat that?
11       Q.    Did Vanderbilt ever engage
12   Metropolitan Valuation Services to review or
13   evaluate Tom Tener, KTR's April 2019 letter
14   opinion of value?
15       A.    I can't remember. I think the
16   document says what they -- what they were
17   assigned for.  So whatever is in the letter,
18   whatever is outlined. I wouldn't know.
19       Q.    I'm just asking because I have
20   not seen any other Metropolitan reviews and
21   this is dated February 2019. What I'm trying
22   to understand is whether Metropolitan was
23   ever engaged by Vanderbilt to review KTR's
24   April 2019 report?
25       A.    As I told you, I don't know.  I

                    PINCHUS S. ROTTENBERG
1   can't make a distinction the dates and

2   times, so that's why I don't know.

3       Q.    And did Vanderbilt ever ask

4   anyone else to engage either Metropolitan or

5   another appraiser to review any of KTR's

6   2019 reports?

7       A.    Not to my knowledge.

8       Q.    Okay. And do you know when

9   Vanderbilt shared the Option Rent Addendum

10  to the lease with KTR?

11      A.    No. I think that question was

12  asked before, no.

13          MR. WALSH:  If we could mark

14          VA-016358, it's 016358.

15          (Plaintiff Exhibit 27, email

16          string dated last February 25, 2019,

17          Bates VA-016358 was received and

18          marked on this date for

19          identification.)

20          CONCIERGE:  Please stand by.

21          There we are.

22      Q.    So this is a -- it's an email

23  with an attachment that spans through

24  016360. It's an email from Tom Li to Shaun

1              PINCHUS S. ROTTENBERG

2    test and Tom Tener at KTR dated February

3    25th, 2019, and attached to it is the

4    two-page Option Rent Addendum to the

5    McDonald's lease. Do you see that?

6         A.    It's still loading, actually.

7    It's giving me a signal that it's loading.

8    Now I have it.

9         Q.    So you're looking P-27?

10        A.    Yes.

11        Q.    Okay. So it appears that by

12   February 25th, 2019 Vanderbilt provided the

13   Option Rent Addendum to the McDonald's lease

14   to KTR, right?

15        A.    So that's the answer to the

16   question that you asked me before. That's

17   the date that it was.

18        Q.    So this is the first time that

19   Vanderbilt shared this Option Rent Addendum

20   to KTR?

21        A.    As I keep on saying, I would

22   only know what I see here.

23        Q.    And what did Vanderbilt share

24   with KTR about this Option Rent Addendum.

25              MR. KOH:  Objection?

1                PINCHUS S. ROTTENBERG

2        A.    I'm not sure I understand the

3   question.

4        Q.    So Vanderbilt sends the Option

5   Rent Addendum to KTR. What discussions did

6   Vanderbilt and KTR have about this Option

7   Rent Addendum?

8        A.    I guess go through the Option

9   Rent Addendum and go through what's in

10  there.

11       Q.    And who did that?

12       A.    Myself, probably and Tom.

13       Q.    So it would be the two of you?

14       A.    Yes.

15       Q.    And what do you remember about

16  that conversation?

17       A.    I don't know. I wouldn't

18  remember anything about that conversation

19  because that wasn't one conversation.

20       Q.    How many conversations --

21       A.    Many conversations.

22       Q.    And what do you remember about

23  those conversations generally?

24       A.    The discussion about the Option

25  Rent Addendum and how that Option Rent

Page 232

1              PINCHUS S. ROTTENBERG

2    Addendum.

3         Q.     What do you mean?  There were

4    many conversations about the Option Rent

5    Addendum.  So what specifically did you

6    discuss during those conversations?

7         A.     Like about market value.

8         Q.     So why did that take many

9    conversations?

10              MR. KOH:  Objection.

11         A.     I don't know why. I don't know

12   why it took many conversations but it took.

13         Q.     So did -- was KTR asking

14   questions about how the lease was supposed

15   to require the fair market value be

16   calculated?

17         A.     No. KTR didn't ask me any

18   questions.

19         Q.     Did they ask anyone at

20   Vanderbilt?

21         A.     I don't know. I don't think so.

22         Q.     If they didn't have any

23   questions about it what are all the

24   conversations about it? That's what I'm

25   trying to understand.

1                    PINCHUS S. ROTTENBERG

2          A.    Like, I don't know, like, what

3    the fair market value was and, like, you

4    know, how to calculate -- I don't know.

5          Q.    So they were asking questions

6    about how to calculate it?

7          A.    They were not asking any

8    questions.

9          Q.    Were you asking any questions?

10          A.    I don't remember.

11          Q.    And it was just you and Tom Li

12    that were involved in the conversations?

13          A.    Yes. Maybe Morris Missry, yes.

14               MR. WALSH: All right. If we

15          could mark VA-015989, it runs through

16          996. This will be P-28. It is an email

17          from Abel Santamaria at Wachtel

18          Missry.

19               (Plaintiff Exhibit 28, email

20          string last dated March 12, 2019,

21          Bates VA-015989 was received and

22          marked on this date for

23          identification.)

24          A.    Just keep in mind, the four

25    o'clock if you are going to be during a

```
                                              Page 234

1               PINCHUS S. ROTTENBERG
2     question, I think, so...
3          Q.    We'll --
4          A.    I just need, like, 10 to 15
5     minutes, if that's okay.
6          Q.    Sure. So this is an email from
7     Abel Santamaria from Wachtel Missry, LLP
8     sent on March 12, 2019 to Tom Tener at KTR
9     with a copy to Tom Li, Morris Missry and Sam
10    Rottenberg, subject:  Sent on behalf of
11    Morris Missry, and then it has an
12    attachment. The attachment is an engagement
13    letter from KTR to Morris Missry at Wachtel
14    Missry dated March 8, 2019. Tell me when you
15    have that up.
16         A.    I see it.
17         Q.    Okay. So unlike the other
18    agreements we looked at between -- for
19    appraisers, this retention -- this
20    engagement letter is between Vanderbilt's
21    counsel, Morris Missry and KTR. Do you
22    recall why that was?
23         A.    Why?
24         Q.    Why did Wachtel Missry engage
25    KTR for this as opposed to Vanderbilt?
```

```
 1              PINCHUS S. ROTTENBERG
 2      A.    I don't know.
 3      Q.    Who would know?
 4      A.    Tom Tener would know, Morris
 5  Missry would know and maybe Tom Li would
 6  know.
 7      Q.    Why wouldn't you know?
 8      A.    Because I don't remember. I
 9  should know too, I did know but I don't
10  remember.
11      Q.    And this is the retention
12  agreement for KTR to perform the work on
13  behalf of Vanderbilt required by the Option
14  Rent Addendum to the McDonald's lease,
15  correct?
16      A.    Yeah. I think so.
17      Q.    Is that a "yes"?
18      A.    Yes. I mean, I guess this is the
19  later one, right? I'm not sure about dates,
20  but it's the later one, that's why. I'm not
21  sure, but...
22      Q.    If you could look, second full
23  paragraph, about halfway down it says, "It
24  is anticipated that the FMV --."
25      A.    Which page?
```

1              PINCHUS S. ROTTENBERG

2         Q.    Page ending in 990, the first

3    page of the engagement letter.

4         A.    Second paragraph.

5         Q.    About halfway down the

6    right-hand side "It is anticipated that the

7    FMV --."

8         A.    Oh, yeah. I see it.

9         Q.    Okay. So it says, "It is

10   anticipated that the FMV will be based on a

11   standard market data approach technique for

12   valuing vacant land (the sales comparison

13   approach)." Did I read that right?

14        A.    Yes.

15        Q.    And do you know why the sales

16   comparison approach was identified in here?

17        A.    No.

18        Q.    Two lines down it says,

19   "Additionally, KTR will prepare a detailed

20   work file adequate to illustrate the sales

21   comparison approach and analysis of the

22   comparable ground leases utilized to

23   estimate the FM." Do you see that?

24        A.    Yes.

25        Q.    Do you know if KTR ever provided

Page 237

1                  PINCHUS S. ROTTENBERG

2    an analysis of the comparable ground leases

3    utilized to estimate the FMV?

4                  MR. KOH:   Objection. Go ahead

5         and answer.

6         A.    The question is whether KTR

7    valued this with sales -- with comps?

8                  (Pending question is read back

9         by the reporter.)

10        A.    Whether they used comps? Is that

11   the question?

12                 MR. KOH:   Listen to the question

13        and answer the question that was

14        asked. If you don't understand it ask

15        him to explain it again.

16                 (Pending question is read back

17        by the reporter.)

18        A.    I don't think so. I don't think

19   so but I don't know.

20        Q.    On the second page right above

21   the bullets it says, "In order to initiate

22   the assignment the following, if available,

23   should be provided as soon as possible."

24   And again they ask for any leases that

25   encumber the properties.

1                PINCHUS S. ROTTENBERG

2                Did Vanderbilt give a copy of

3       the McDonald's lease to KTR at that time?

4           A.    I believe they did. Although,

5       I'm not sure again the second one I believe

6       they did.

7           Q.    Okay. Did you or anyone else at

8       Vanderbilt ever ask KTR why they needed a

9       copy of any leases that encumbered the

10      properties?

11          A.    What?

12          Q.    Did you or anyone else at

13      Vanderbilt asked KTR why they needed copies

14      of leases that encumbered the properties?

15          A.    I don't know.

16              MR. WALSH:  We can take a break.

17          It's four o'clock. How much time do

18          you need, Mr. Rottenberg?

19              THE WITNESS: 15 minutes, please.

20              MR. WALSH:  We'll come back at

21          4:15. Thank you.

22              VIDEOGRAPHER:  We're off record

23          at four p.m.

24              (Recess is taken.)

25              VIDEOGRAPHER:  We are back on

1              PINCHUS S. ROTTENBERG

2          the record at 4:18 p.m. This starts

3          the beginning of media 5.

4          Q.    Mr. Rottenberg, did you have any

5     discussions with anyone during the break?

6          A.    About this?

7          Q.    Did you have any discussions

8     with anyone during the break?

9          A.    Yes.

10         Q.    Did you have any discussions

11    with Tom Li?

12         A.    No.

13         Q.    Anyone else at Vanderbilt?

14         A.    No.

15         Q.    Did you speak with anyone about

16    anything relating to 840 Atlantic during the

17    break?

18         A.    No.

19         Q.    Mr. Rottenberg, are you familiar

20    with the New York Court of Appeals decision

21    in 936 Second Avenue V. Second Corporate

22    Development Corp.?

23         A.    No.

24         Q.    I'll refer to it as the Second

25    Avenue case and it's described in our --

```
1                PINCHUS S. ROTTENBERG
2    have you reviewed our complaint in this
3    case?
4         A.    I know it's described but I'm
5    not sure what it is.
6         Q.    So it basically talks about, you
7    know, under what circumstances a property
8    that is encumbered by a lease, under what
9    circumstances appraisal needs to consider
10   the encumbrance of the lease in the
11   valuation.
12              Are you familiar with there
13   being a case that lays out some rules as to
14   when an encumbrance of a lease or zoning --
15        A.    I've heard that terminology
16   about that case but I'm not familiar with
17   that case and I have no idea what it is.
18        Q.    So --
19        A.    I leave this to the attorneys
20   and appraisals.
21        Q.    So have you ever been involved
22   in any discussions with KTR about whether
23   the encumbrance of the lease and current
24   zoning needs to be considered in the FMV
25   process under the Option Rent Addendum?
```

1                    PINCHUS S. ROTTENBERG

2           A.    I can only say what I remember

3    about that topic is that there has been

4    various discussions, whether you have to

5    take the encumbrance of the lease into

6    account or not, various opinions on that

7    matter and I can't even recall who had which

8    opinion at which point.  You know, kind of

9    to me this is...

10          Q.    So do you remember any specific

11   discussion with Tom Tener or anyone else at

12   KTR about that?

13          A.    No. I remember having general

14   discussions but not specific discussions.

15               MR. WALSH:  Okay. If we can mark

16          VA-000958. It's a one-page email from

17          Tom Tener to Morris Missry with a copy

18          to Sam Rottenberg dated April 1st,

19          2019. Subject:  Question.

20               (Plaintiff Exhibit 29, email

21          dated April 1, 2019, Bates VA-000958

22          was received and marked on this date

23          for identification.)

24          Q.    While we're waiting for that, it

25   looks like that document is now marked as

Page 242

1                PINCHUS S. ROTTENBERG
2    P-29.
3         A.    I see it.
4         Q.    So just before we get to this
5    document, who else was involved in those
6    discussions that you were just describing
7    about whether the encumbrance of the lease
8    needed to be considered?
9         A.    The same people that I said
10   before.
11        Q.    And who is that?
12        A.    It's myself, Morris Missry and
13   Tom Li.
14        Q.    And what about Tom Tener?
15        A.    And Tom Tener, yes.
16        Q.    So you have had discussions with
17   Tom Tener about this specific issue?
18        A.    Yeah.
19        Q.    Okay. So looking at what's been
20   marked as P-29, Tom Tener sent an email to
21   Morris Missry with a copy to you on April
22   1st saying, "Morris, are you available to
23   quickly discuss a question that I have about
24   the language of the lease?"  Do you see
25   that?

```
                                        Page 243
 1              PINCHUS S. ROTTENBERG
 2        A.    Yes.
 3        Q.    And you were copied. Do you
 4   recall what he wanted to talk about?
 5        A.    No. That was an email from Tom
 6   Tener to Morris Missry.
 7        Q.    Okay. But you were copied on it.
 8   So did you ever ask --
 9        A.    True.
10        Q.    Did you ever ask what the
11   question was about?
12        A.    I might have asked.
13        Q.    You just don't remember?
14        A.    No.
15        Q.    Do you know what his question
16   was?
17        A.    No.
18        Q.    Do you know if Morris Missry and
19   Tom discussed this question?
20              MR. KOH:  Objection. Go ahead.
21        A.    I don't know what it is, so I
22   don't know what they could have asked.
23        Q.    So in preparation for today's
24   deposition, did you have any discussions
25   about -- with Morris Missry about what this
```

1                PINCHUS S. ROTTENBERG

2   question was about?

3        A.     No.

4                MR. WALSH: So I'd like to mark

5        VA-000699 and it's a document that

6        goes through 703. It's an email from

7        Tom Tener to Morris Missry subject:

8        Confidential and attaching -- it's

9        sent Monday, April 1st, 2019 at 4:28

10       p.m.  And just as a reminder, P-29,

11       the document we were just looking at,

12       what is the same day but earlier at

13       9:46 a.m.

14               (Plaintiff Exhibit 30, email

15       dated April 1, 2019 with attached

16       Appellate Decision, Bates VA-000699

17       was received and marked on this date

18       for identification.)

19       Q.     Tell me when you have a chance

20   to look P-930.

21       A.     Yes.

22       Q.     And Tom says, "Morris, this is

23   the Appellate Court decision that I

24   mentioned in our conversation." And he

25   attaches a copy of that Second Avenue case

1              PINCHUS S. ROTTENBERG
2    that I mentioned earlier. Do you see that?
3         A.    Yes.
4         Q.    Does this refresh your
5    recollection about what question Tom Tener
6    asked about earlier that day?
7         A.    No. I never saw this. I don't
8    remember ever seeing this.
9         Q.    Did you have any discussions
10   with Tom that day about this case?
11        A.    It's possible but I don't
12   remember.
13        Q.    Did anyone ever make you aware
14   that Tom was asking questions about the
15   Second Avenue case?
16        A.    It's possible but I can't
17   remember.
18        Q.    Would anyone else at Vanderbilt
19   have been told that Tom was inquiring about
20   the Second Avenue case and its
21   applicability to --
22        A.    Same guys that I keep alluding
23   to.
24        Q.    So either you or Tom Li?
25        A.    Yeah.

1           PINCHUS S. ROTTENBERG

2       Q.     Nobody else?

3       A.     No, not as of -- not what I can

4    say, no.

5       Q.     Did you have any discussions

6    with Morris Missry to prepare for this

7    deposition?

8       A.     No.

9       Q.     And the conversation that's

10   mentioned in this P-30, do you recall if you

11   were part of that conversation, when it says

12   "this is the decision that I mentioned in

13   our conversation?"

14      A.     No.

15      Q.     You don't recall?

16      A.     No.

17      Q.     Is it possible that you were

18   part of that conversation?

19      A.     Sure.

20             MR. KOH:  Objection.

21      Q.     So if we can mark -- before I

22   mark something else, did you or did

23   Vanderbilt have conversations about whether

24   the Second Avenue case should apply to the

25   appraisal before Tom Tener completed his

                    PINCHUS S. ROTTENBERG

1

2    initial April 2019 letter opinion of value?

3        A.    I, to date, can't remember

4    having conversations about that altogether.

5    So I'm not sure what you're asking me for.

6              MR. WALSH: Okay. If we can mark

7         VA-001753 to 54 as P-31. It's email

8         chain between Tom Tener and Morris

9         Missry on April 1st. It's a

10        continuation of the email chain that

11        started at P-30.

12             CONCIERGE:  Could you repeat

13        that file name?

14             MR. WALSH:  Sure. It's

15        VA-001753.

16             (Plaintiff Exhibit 31, email

17        string dated last April 1, 2019, Bates

18        VA-001753 was received and marked on

19        this date for identification.)

20       Q.    So Mr. Rottenberg, can you tell

21    me when you've got that open?

22       A.    I have it open.

23       Q.    Okay. Have you ever seen this

24    email correspondence before?

25       A.    I never say to Tom Tener saying

1              PINCHUS S. ROTTENBERG

2    to Morris Missry like he's the best. Like,

3    where is that coming from? First time I'm

4    seeing this. I didn't know that they thought

5    about Morris Missry so highly, as he says

6    he's the best.

7         Q.    So you've never seen this email

8    chain before?

9         A.    I can't remember seeing it, no.

10   He probably wouldn't write this if I would

11   have seen it.

12        Q.    Why is that? Do you disagree

13   that Tom is the best?

14        A.    No. Just kidding. Just kidding.

15        Q.    So does this refresh your

16   recollection about whether you had any

17   conversations around this time, meaning

18   before Tom Tener completed his April 2019

19   letter opinion of value about the

20   applicability of the rule announced in the

21   Second Avenue case and whether encumbrances

22   needed to be considered in the analysis

23   required by the Option Rent Addendum to the

24   lease?

25        A.    I'm not sure I followed the

Page 249

1              PINCHUS S. ROTTENBERG
2    whole length of your question.  But is that
3    a different question than you asked before;
4    whether I have knowledge and I said I didn't
5    or --
6         Q.    Well, I'm asking if this
7    refreshes your recollection about whether
8    you had any discussions with anybody about
9    the applicability of the rule announced in
10   that case before Tom completed his April
11   2019 letter opinion of value?
12        A.    No. I told you I remembered
13   hearing about that case and referenced that
14   Second Avenue case but that's the extent I
15   bothered to know or wanted even to know,
16   so...
17        Q.    And the Metropolitan Valuation
18   Services report that we looked at before
19   specifically alerted you that encumbrance of
20   the lease would need to be considered by Tom
21   for purposes of his analysis under the
22   Option Rent Addendum to the lease, right?
23              MR. KOH:  Objection.
24        A.    You talked about that before, so
25   I don't know what's any different now, so...

```
 1              PINCHUS S. ROTTENBERG
 2         Q.     And did you have any
 3    conversation, did you share that factual
 4    information with Morris Missry about
 5    Metropolitan's conclusion?
 6         A.     Did I -- I thought he was -- I
 7    think he was a party -- I think he got it
 8    shared directly from them.
 9         Q.     So he saw it too, right?
10              MR. KOH:   Objection.
11         A.     I don't know what he saw and
12    what I didn't -- what he saw or what he
13    didn't saw.
14         Q.     All right. Do you remember
15    having any conversations --
16         A.     No.
17         Q.     Let me finish.
18              Do you remember having
19    conversations with Morris about
20    Metropolitan's conclusion that the fair
21    market value analysis under the Option Rent
22    Addendum needed to consider encumbrances?
23         A.     No. And I think when you read to
24    me that paragraph that you allude to, I said
25    then I didn't remember even kind of seeing
```

1                 PINCHUS S. ROTTENBERG
2    it, so but I don't think that is Meyer would
3    have agreed with Tom Tener's assertion that
4    you are the best addressed to Morris Missry.
5              MR. KOH:  Let's stay focused on
6         the questions here.
7              THE WITNESS: It's getting late
8         in the day, Howard. You know that,
9         right?
10             MR. KOH:  That's why I'm getting
11        nervous.
12        Q.    Do you have any understanding of
13   why Tom was asking about the applicability
14   of the case?
15        A.    If I have any idea?
16             MR. KOH:  Objection. Go ahead.
17        Q.    Yes.
18        A.    Yeah. It's whether you have to
19   take a lease into account or not,
20   encumbrances of the lease.
21        Q.    And Tom was asking that question
22   because it could affect value, right?
23             MR. KOH:  Objection.
24        A.    I guess. I don't know why the
25   reason. I can't talk to Tom Tener's

```
                                        Page 252
 1              PINCHUS S. ROTTENBERG
 2    thinking.
 3         Q.    And in his April 2019 letter
 4    opinion of value, Tom did not consider the
 5    encumbrance of the lease because Morris
 6    Missry told him not to, isn't that right?
 7              MR. KOH:  Objection.
 8         A.    You got to ask that question to
 9    Tom Tener, his reasonings.
10         Q.    But he didn't -- he didn't
11    consider it; isn't that right, he didn't
12    consider the encumbrances in his analysis?
13         A.    This is all that Tom did.
14              MR. KOH:  Objection.
15         A.    I'm not talking about what Tom
16    Tener did or did not do.
17         Q.    So what is your understanding of
18    what Tom did?
19         A.    I have no understanding other
20    than I got him to appraise the property and
21    he did whatever he needed to do.
22         Q.    And you had him appraise the
23    property without considering the
24    encumbrances, right?
25              MR. KOH:  Objection.
```

                PINCHUS S. ROTTENBERG

1

2       A.      Can you please repeat that

3   question?

4               (Pending question is read back

5       by the reporter.)

6               MR. WALSH:  And just to clarify,

7       I'm saying and you had him appraise

8       the value of the property without

9       considering the encumbrances; isn't

10      that right?

11              MR. KOH:  Same objection.

12      A.      I -- whatever he did, he did.  I

13  just had him appraise the property.

14      Q.      So you didn't give him any

15  instructions?

16      A.      No.

17      Q.      So how did Tom understand -- how

18  did Tom know what he needed to do if

19  Vanderbilt wasn't instructing him?

20      A.      He's an appraiser, not me.

21      Q.      So you left it to Tom to

22  determine how the property should be

23  appraised in accordance with the Option Rent

24  Addendum to the lease?

25      A.      I left it to Tom and to the

Page 254

```
 1              PINCHUS S. ROTTENBERG
 2    attorney, yes.
 3         Q.    So did you have discussions with
 4    your attorney about this?
 5              MR. KOH:  Can I get some
 6         clarification as to which attorney you
 7         are referring to?
 8         Q.    Well, I assume, Mr. Rottenberg,
 9    you are talking about -- you're saying you
10    left it to Tom Tener and the attorney; are
11    you referring to Morris Missry?
12         A.    Right.
13              MR. KOH:  Thank you.
14         Q.    So did you have discussions with
15    Tom -- with Morris Missry about the
16    instructions to be given to Tom Tener?
17         A.    I vaguely remember having
18    discussions about that.
19         Q.    And what do you remember about
20    those discussions?
21         A.    Just discussing it, whether to
22    take this into account or not. As I said
23    before, there is various opinions that I --
24    that, you know, went throughout this whole
25    process and I don't remember which opinion
```

1              PINCHUS S. ROTTENBERG

2    at which point anybody has and I think even

3    one party himself could have different

4    opinions at different times, so...

5         Q.    Okay. What is Vanderbilt's

6    position about whether the Option Rent

7    Addendum requires the fair market value to

8    be determined with consideration of the

9    encumbrances on the property?

10              MR. KOH:  Objection. Go ahead

11         and answer to the extent you can.

12         A.    I don't think Vanderbilt has an

13    opinion. It's an opinion of appraisers

14    and/or attorneys.

15         Q.    So Vanderbilt doesn't have a

16    position as to whether encumbrances needed

17    to be considered under the fair market value

18    process outlined in the Option Rent

19    Addendum?

20         A.    I don't think so. I mean, I

21    defer to attorneys and appraisers on that

22    matter.

23         Q.    But I'm asking you what

24    Vanderbilt's position is?

25         A.    I don't have a position, other

1                PINCHUS S. ROTTENBERG

2    than what I heard from my professionals.

3         Q.    So Vanderbilt doesn't have a

4    position?

5         A.    Other than what I heard from

6    third parties, from guys that I hired that I

7    defer to.

8         Q.    So what have you heard?

9         A.    I heard various discussions

10   relating to that matter.

11        Q.    And what do you mean by that?

12        A.    Various discussions, whether you

13   have to take into -- the encumbrances of the

14   lease into account or not.

15        Q.    And based upon those

16   discussions, what is your understanding?

17        A.    I have no understanding.

18              MR. KOH:  Objection. Go ahead.

19        A.    As I said, I defer to them,

20   so...

21        Q.    What is Vanderbilt's position

22   regarding whether a potential rezoning needs

23   to be considered in determining the FMV

24   under the Option Rent Addendum?

25        A.    It's the same answer as before,

Page 257

1             PINCHUS S. ROTTENBERG
2   I defer to --
3        Q.    You defer?  I'm sorry.
4        A.    I defer to the professionals
5   that I retained for this.
6        Q.    So Vanderbilt has no position?
7             MR. KOH:  Objection. Go ahead
8        and answer.
9        A.    Your question is an opinion
10  related to the fair market value?
11       Q.    I'm asking what is Vanderbilt's
12  position regarding whether a potential
13  rezoning of the property needs or can be
14  considered in determining the FMV on the
15  property under the Option Rent Addendum?
16            MR. KOH:  Same objection.
17       A.    I don't know.
18       Q.    So Vanderbilt doesn't have a
19  position?
20            MR. KOH:  Same objection.  And
21       we're asking and answering the same
22       question a lot now. You can answer it
23       one more time, Mr. Rottenberg.
24       A.    I don't know. I mean...
25            MR. WALSH:  So you don't know.

1                PINCHUS S. ROTTENBERG

2          Okay.  If we can mark VA-001940, it

3          spans through 1955. This is the KTR

4          report dated April 15, 2019.

5                (Plaintiff Exhibit 32, KTR

6          appraisal report dated April 15, 2019

7          Bates VA-001940 was received and

8          marked on this date for

9          identification.)

10         Q.    By the way, who did Morris

11    Missry represent in this process?

12         A.    Myself.

13         Q.    Vanderbilt?

14         A.    Oh, I can't remember who the

15    retainer was, whether it's Vanderbilt or

16    myself or SPR Group.

17         Q.    But Morris Missry was speaking

18    on behalf of Vanderbilt when he was talking

19    to Tom Tener, right?

20         A.    Again, I don't remember what was

21    the retainer necessarily, kind of how that

22    was outlined, whether it was SPR Group or

23    myself or Vanderbilt.

24         Q.    So you don't know whether Morris

25    Missry was --

Page 259

1                  PINCHUS S. ROTTENBERG

2          A.    I hired Morris Missry.  I don't

3     know which fashion that was, I need to say.

4     I don't know how that went, you know, how

5     that went about.

6          Q.    Okay. If you can look at P-32,

7     April 15, 2019 KTR.

8          A.    Yes.

9          Q.    So this is the first report that

10    Tom Tener of KTR prepared for the FMV

11    process under the McDonald's lease, right?

12         A.    I don't know which one is the

13    first, the second.  So I really don't know

14    the dates, but if you tell me that's the

15    first, okay.

16         Q.    And on the page ending in

17    VA-1944, KTR concludes that the fair market

18    rental value of the property as of April 8,

19    2019 is $1,348,000 per year.  So that the

20    annual rental for the first extension period

21    described in Article 13 of the McDonald's

22    lease is 80% of the FMV or $1,078,400 per

23    year; is that correct?

24         A.    Yes.

25         Q.    And KTR used the land sales

Page 260

                        PINCHUS S. ROTTENBERG

1

2    comparison approach to prepare this report;

3    is that correct?

4         A.    I don't know. I have to look.

5         Q.    Have you ever reviewed this

6    report?

7         A.    Yeah. I'm sure I did. I wouldn't

8    remember now but I'm sure I did.

9         Q.    Okay. And if you take a look at

10   the page ending in 942, the second full

11   paragraph, last sentence where it says "in

12   order to determine the market value", do you

13   see that?

14        A.    Yes.

15        Q.    So KTR wrote, "In order to

16   determine the market value of the subject

17   land, sales of similarly zoned development

18   sites in the immediate market have been

19   researched, analyzed and adjusted based on

20   relevant elements of comparison." Do you see

21   that?

22        A.    Yes.

23        Q.    So do you have any recollection

24   of whether Vanderbilt directed KTR to use

25   the land sales comparison approach?

```
                                              Page 261

1                    PINCHUS S. ROTTENBERG
2          A.      No.
3          Q.      Do you recall Vanderbilt having
4    any discussions with KTR about what
5    valuation approach should be used?
6          A.      Again, that goes back to what
7    exactly you asked before relating to another
8    question.  There was various discussions
9    about all of that.
10         Q.      And so Vanderbilt ultimately
11   directed KTR to use the land sales
12   comparison approach?
13         A.      No.
14               MR. KOH:  Objection. Come on.
15         That's not what he said. You're better
16         than that, Brendan.
17               MR. WALSH:  Relax, Howard.
18               MR. KOH:  I'm very relaxed.
19               MR. WALSH:  I'm trying to get an
20         answer from a witness who has very few
21         answers.
22               MR. KOH:  That doesn't mean you
23         get to ask a leading question that
24         completely mischaracterizes his prior
25         testimony. Let's move on.
```

Page 262

1                PINCHUS S. ROTTENBERG
2                MR. WALSH:  He can answer
3         however he wants, Howard.
4         Q.    So my question is --
5                MR. KOH:  That doesn't mean I
6         can't object.
7         Q.    -- do you recall being involved
8    in any discussions about or was Vanderbilt
9    involved in any discussions about whether an
10   approach, other than land sales comparison
11   approach, should be used?
12        A.    As I said, there's been various
13   conversations about that topic, so I can't
14   remember, like, what the conversation was
15   and the nature of it all, you know, all
16   throughout this.
17        Q.    Okay. Did Vanderbilt ever try to
18   research on its own potential comparable
19   ground leases?
20        A.    Probably.
21        Q.    And what did Vanderbilt find?
22        A.    I can't remember what I find.
23        Q.    If that work was performed,
24   would that be in your files somewhere?
25        A.    If I have it in files, if I have

                    PINCHUS S. ROTTENBERG

1

2    it you would have seen it. I handed you over

3    everything, so...

4         Q.    So if no information about

5    research on the part of Vanderbilt about

6    comparable ground leases has been produced,

7    does that suggest to you that Vanderbilt did

8    not do that work?

9              MR. KOH:   Objection. Go ahead.

10        A.    I'm not sure I understood the

11   question, Brendan.

12        Q.    Let's put it this way, we've

13   seen emails where Vanderbilt has provided

14   comparable land sales to Tom Tener?

15        A.    Okay.

16        Q.    I am not aware of any

17   communications between Vanderbilt and Tom

18   Tener providing comparable ground leases,

19   and I'm just wondering if you are aware of

20   any such communications?

21        A.    I'm not.

22        Q.    And are you aware of any work

23   done by Vanderbilt to identify comparable

24   ground leases?

25        A.    I vaguely remember thinking

1              PINCHUS S. ROTTENBERG

2    about this or having discussions about this

3    but I remember in my head discussing -- I

4    don't know even with who, discussing -- did

5    you say comps?

6         Q.    Comparable ground leases.

7         A.    Oh, ground leases, I don't know.

8    I don't know.

9         Q.    Who else at Vanderbilt would

10   have done that?

11        A.    Same guys; Tom Li, maybe Morris

12   Missry.

13        Q.    Are you aware of any

14   communications within Vanderbilt that there

15   were not any comparable ground leases?

16        A.    Again, I remember conversations.

17   I don't remember.  There was one

18   conversation, they were not comparables,

19   maybe it was ground leases, I can't

20   remember, but something was -- some comps

21   didn't exist, somebody said they did not

22   exist, so --

23        Q.    Okay. So if we could look at the

24   page ending in 1943.

25        A.    Okay.

Page 265

1                PINCHUS S. ROTTENBERG

2        Q.    It says under FMV Determination,

3   first sentence, "In order to estimate the

4   FMV of the demised premises, KTR analyzed

5   the economic terms of relevant ground leases

6   in Brooklyn, Queens and Manhattan." Do you

7   see that?

8        A.    Yes.

9        Q.    Do you know what ground leases

10   the report is referring to?

11        A.    No.

12        Q.    Would anyone at Vanderbilt know?

13        A.    Maybe.

14        Q.    Did you do anything to determine

15   whether anyone at Vanderbilt would know

16   about that?

17        A.    No.

18        Q.    And did KTR identify these

19   ground leases on its own?

20        A.    I don't know. You should ask

21   KTR.

22        Q.    I will.

23             MR. KOH:  No charge for the

24        suggestions on how to take

25        depositions.

1           PINCHUS S. ROTTENBERG
2              MR. WALSH:  I'm sorry. If we
3         could mark VA-001508, it's a two-page
4         document, an email chain, top email is
5         an email from Sam Rottenberg to Morris
6         Missry with a copy to Tom Tener and
7         Tom Li dated April 11, 2019 at 10:36
8         a.m., marked as P-33.
9              (Plaintiff Exhibit 33, email
10        string last dated April 11, 2019,
11        Bates VA-001508 was received and
12        marked on this date for
13        identification.)
14        Q.    Mr. Rottenberg, can you tell me
15   when you have that open?
16        A.    I have it open.
17        Q.    So on the bottom of this first
18   page it's an email from Tom Tener to Morris
19   Missry and to you dated April 10th and he
20   sends you a draft copy of his report, the
21   letter opinion of value, and he wanted to
22   know if either of you had any comments. Do
23   you see that?
24        A.    Yes.
25        Q.    And you responded, "Looks fine,

```
 1              PINCHUS S. ROTTENBERG
 2    Tom. The only comment to this, if I have
 3    one, is that perhaps there might be a little
 4    room to be a little bit more aggressive on
 5    the residential valuation. In any event,
 6    it's fine." Do you see that?
 7         A.    I do.
 8         Q.    So you thought that he actually
 9    had undervalued the property?
10         A.    That's what it looks like from
11    this email, yes.
12         Q.    Well, do you recall having that
13    impression?
14         A.    No.
15         Q.    So next I want to talk about a
16    meeting that was held on June 19th, 2019
17    between representatives of Vanderbilt and
18    representatives of McDonald's, including the
19    two appraisers. Do you remember that
20    meeting?
21         A.    Yes.
22         Q.    Who was at that meeting?
23         A.    Myself, Tom Li, Morris Missry,
24    Sharon Locatel, Carol Demarco, Mike Meyer.
25    That's what I remember. I don't know if
```

```
1              PINCHUS S. ROTTENBERG
2    somebody else was there, maybe Tom Tener.
3         Q.    And what do you recall being
4    discussed at that meeting?
5         A.    What are we trying to do back
6    then? The meeting was taking about a path
7    forward.  Is that what the meeting was?  Oh,
8    it's about the various opinion of values
9    between the two appraisers.
10        Q.    And was that the first time that
11   the two sides shared the valuations that
12   their appraisers had arrived at?
13        A.    According to my recollection,
14   yes, but I might not be right. It's
15   according to my recollection.
16             MR. WALSH:  Okay. I'd like to
17        mark VA-049199, it's a one-page
18        document of handwritten notes and
19        you'll need to rotate the screen in
20        order to view them.
21             (Plaintiff Exhibit 34,
22        handwritten notes, Bates VA-049199 was
23        received and marked on this date for
24        identification.)
25        Q.    That is now available?
```

```
                                         Page 269

 1              PINCHUS S. ROTTENBERG
 2       A.    I don't see it.
 3              CONCIERGE:  It should be there
 4       now.
 5       Q.    It's P-34.
 6       A.    Yes. I see this.
 7       Q.    Do you recognize that
 8  handwriting?
 9       A.    No.
10       Q.    So that's not your handwriting?
11       A.    No. That's not my handwriting,
12  no.
13       Q.    I need to rotate this. Hold on.
14              MR. KOH:  Put your mouse down to
15       the bottom of the screen, there is a
16       rotate button.
17       A.    That is not my handwriting. No,
18  sir.
19       Q.    That's not your handwriting?
20       A.    No.
21       Q.    Do you know if it's Tom Li's?
22       A.    No.
23       Q.    I'm not sure if you're able to
24  decipher what these notes reflect, but if
25  you could just take a look and see if this
```

1              PINCHUS S. ROTTENBERG

2    refreshes your recollection about what was

3    discussed at the meeting?

4         A.    Wasn't that what I told you

5    before the conversation was about?

6         Q.    Well, do you remember anyone

7    from McDonald's saying that the encumbrance

8    of the McDonald's lease has to be considered

9    in an appraisal during that meeting?

10        A.    Again, I remember it was talked

11   and I don't remember whether it was at that

12   meeting -- maybe it was at that meeting.

13        Q.    You don't remember?

14        A.    I remember it was discussed at

15   that meeting but I don't remember whether it

16   was the first time or the second time. So I

17   can't remember that part.

18        Q.    And had Vanderbilt discussed in

19   advance of that meeting what its position

20   would be about whether the --

21             MS. ALVAREZ:  Brendan's computer

22        just went black.

23             VIDEOGRAPHER: Do you want to go

24        off the record?

25             MR. KOH:  It looks like he might

```
1              PINCHUS S. ROTTENBERG
2         be back.
3                Only in America in the 21st
4         Century could rain interfere with an
5         internet connection.
6                THE WITNESS: Is it rain?
7                MR. WALSH:  There was a big bolt
8         of lightening and then our power went
9         out but it seems to be back on.
10               (Pending question is read back
11        by the reporter.)
12        Q.    -- whether the encumbrance of
13   the lease needed to be considered in the
14   appraisers' valuations under the Option Rent
15   Addendum?
16        A.    There was discussions. I'm not
17   sure if it was before the meeting or after
18   the meeting. There were discussions relating
19   to that.
20        Q.    And do you remember Tom Tener
21   telling Vanderbilt that he believed that the
22   encumbrance of the lease should be
23   considered?
24        A.    I don't remember what Tom Tener
25   said. I remember having this conversation.
```

1              PINCHUS S. ROTTENBERG

2    As I told you before, there is various

3    opinions throughout this thing by various

4    people, by the same people, different times,

5    different opinions. So I don't know.

6         Q.    And what do you recall Tom

7    Tener's criticisms being of McDonald's -- of

8    the report prepared by Sharon Locatel from

9    McDonald's?

10        A.    I don't know which approach.

11   There was one approach to it, that there is

12   a difference how, you know, you go about the

13   appraisal, which approach you take. That's

14   my understanding.

15        Q.    So what are Vanderbilt's --

16        A.    I don't remember. I have to go

17   look because I don't remember what it was.

18        Q.    So you don't know what

19   Vanderbilt's position is about --

20        A.    It was various approaches.

21        Q.    If you let me finish.  Please

22   let me finish.

23             (Pending question is read back

24        by the reporter.)

25        Q.    -- about the alleged deficiency

1              PINCHUS S. ROTTENBERG

2    with the analysis performed by Sharon

3    Locatel?

4         A.    Again, I always deferred -- you

5    asked me similar questions about other

6    matters or maybe this matter, which I defer

7    to the people that I hired for this.

8         Q.    Do you contend or does

9    Vanderbilt contend -- I'll move on. Never

10   mind.

11              So after this June 2019 meeting,

12   what instructions did Vanderbilt give to Tom

13   Tener about how to proceed?

14        A.    I don't remember whether we did

15   give them any direction.

16        Q.    So you don't know what

17   instructions were given to Tom Tener after

18   this meeting? Who would know?

19        A.    Myself or Tom Li.

20        Q.    Anybody else?

21        A.    Or maybe Morris Missry.

22        Q.    And do you recall discussing

23   with Tom Tener about him performing a land

24   residual analysis after this meeting?

25        A.    Not in words, no.

1                PINCHUS S. ROTTENBERG

2                  (Reporter clarification.)

3        Q.     You don't recall that?

4        A.     What was your question?

5                  (Pending question is read back

6        by the reporter.)

7        A.     I'm not sure whether it was

8    after the meeting, before the meeting,

9    whether a land residual or comps, now it

10   kind of -- it refreshes my memory the

11   differences between the comps or the land

12   residual or the sales comparison. So I don't

13   remember at which given juncture that

14   conversation took place.

15       Q.     And did Vanderbilt eventually

16   direct Tom Tener to prepare a land residual

17   analysis for this property?

18       A.     I did not direct him.

19       Q.     Did anyone at Vanderbilt?

20       A.     I don't think so.

21       Q.     Did anyone on behalf of

22   Vanderbilt?

23       A.     I don't know.

24       Q.     After the June 19 meeting did

25   Vanderbilt ask Tener to consider the

```
 1              PINCHUS S. ROTTENBERG
 2    encumbrances in his analysis?
 3         A.    I don't know Vanderbilt or
 4    anybody else. I don't think Vanderbilt
 5    asked.
 6         Q.    When I say Vanderbilt, just to
 7    be clear, I also mean people acting on
 8    behalf of Vanderbilt, including Morris
 9    Missry?
10         A.    Morris Missry might have asked.
11         Q.    Do you know if he did?
12         A.    I don't know whether he asked
13    him or there was a discussion. I'm not sure
14    how that went about but there was a
15    discussion about that, I think.
16         Q.    When was the last time you spoke
17    with Morris Missry?
18         A.    I can't remember.
19         Q.    Was it in the past month?
20         A.    No.
21         Q.    Past two months?
22         A.    No.
23         Q.    Past six months?
24         A.    Yeah, probably.
25         Q.    And what was the purpose of your
```

```
1              PINCHUS S. ROTTENBERG
2   last discussion with him?
3        A.    Not about this matter at all.
4              MR. WALSH:  Okay. I'd like to
5         mark VA-016196. It's a three-page
6         email chain with the top email being
7         an email from Sam Rottenberg to Tom
8         Tener and Morris Missry with a copy to
9         Tom Li on July 2nd, 2019 at 3:54 a.m.
10             (Plaintiff Exhibit 35, email
11        string last dated July 2, 2019, Bates
12        VA-016196 was received and marked on
13        this date for identification.)
14        A.    3:54 a.m.?
15        Q.    That's what it says.
16             CONCIERGE:  The document is
17        being uploaded.
18        Q.    If you could please refer to
19   P-35?
20        A.    I see it.
21        Q.    Are you looking at it?
22        A.    I'm looking at it, yes.
23        Q.    And --
24        A.    The letter isn't attached, the
25   one they refer to in this letter, so...
```

1              PINCHUS S. ROTTENBERG

2         Q.     Right. So this letter or this

3    email, this was dated I guess the second

4    email down, the long email, Thursday, June

5    27th, 10:59 a.m.  Do you see that email?

6         A.     Yes.

7         Q.     Okay. And would you agree that

8    the words in black ink appear to have been

9    written by Tom Tener and your comments are

10   below in red, according to the email above?

11        A.     That's what I'm thinking as you

12   talk to me, but kind of from this email

13   that's what it looks like.

14        Q.     So in the second bullet point,

15   reading your red writing, you conclude by

16   saying "and yes, I think it is important to

17   get the land residual analysis done." Do you

18   see that?

19        A.     I do.

20        Q.     And why did you think it was

21   important to get the land residual analysis

22   done?

23        A.     I can't remember why I thought

24   that back then.

25        Q.     Before this do you recall if you

1                PINCHUS S. ROTTENBERG

2    had previously discussed doing a land

3    residual analysis with Tom Tener?

4         A.    Again, there was discussions. I

5    don't know whether it was previously or

6    after kind of.

7         Q.    And why did you think it was a

8    good idea to do it now?

9         A.    You asked me that question a

10   second ago. I don't remember why what I

11   thought back then.

12        Q.    Do you remember why Tom Tener

13   suggested that it be done?

14        A.    No.

15        Q.    So looking at point two, second

16   sentence he says, "Based on the concerns

17   raised in the June '19 meeting it may be

18   prudent to supplement my FMR determination

19   with a land residual analysis, taking into

20   consideration the 20 term of the lease." Do

21   you see that?

22        A.    I do.

23        Q.    So Vanderbilt directed Tener to

24   perform a land residual analysis based upon

25   the concerns raised at the June 19 meeting,

1              PINCHUS S. ROTTENBERG

2    right?

3         A.    Yes.

4         Q.    And specifically about Tener's

5    failure to consider the encumbrance of the

6    lease in his original analysis, right?

7         A.    I don't know what that part is

8    coming from.

9         Q.    Do you see where it says "taking

10   into consideration the 20 term of the

11   lease"?

12        A.    In parenthesis, right?

13        Q.    Right. So wouldn't you agree

14   that it's because Tom was concerned about

15   his failure to consider the encumbrance of

16   the lease?

17        A.    Tom should be able -- Tom should

18   be able to answer this question. I can't

19   talk for Tom Tener. I can't talk for Tom

20   Tener. I don't know what he --

21        Q.    I'm asking you to talk to behalf

22   of Vanderbilt.

23              MR. KOH:  Okay. Same objection.

24        Q.    Did you have concerns about

25   Tom's failure to consider the encumbrance of

1                 PINCHUS S. ROTTENBERG
2    the lease in his original analysis?
3         A.    No.
4         Q.    Then why did you have him
5    prepare the land residual analysis?
6         A.    I had him prepare?  This is what
7    he's doing.
8         Q.    What do you mean by that?
9         A.    I'm not sure what -- why I did
10   it back then and what -- I cannot kind of --
11   Tom Tener does his own work, right?
12        Q.    What is a land residual
13   analysis?
14             MR. KOH:  Objection. Go ahead.
15             THE WITNESS:  You are waiting
16        for an answer from me?
17             MR. KOH:  Yes. The pending
18        question was; what is a land residual
19        analysis?
20             THE WITNESS:  My understanding
21        is you take the term of certain
22        encumbrances and you see what the
23        value is and what would be today based
24        on that.
25        Q.    Were you surprised to learn when

1              PINCHUS S. ROTTENBERG
2    you received Tom's updated report dated July
3    30, 2019 that his opinion of value had not
4    changed?
5          A.    No.
6          Q.    Why not?
7          A.    Because based on my research,
8    what I've done throughout this thing and
9    based on, you know, kind of knowing what I
10   know, I wasn't surprised.
11         Q.    So what research had you done?
12         A.    Based on -- you've seen the kind
13   of -- you alluded to some of the appraisals
14   before, so...
15         Q.    I'm asking you, you said based
16   upon your research you were not --
17         A.    Based on me being -- knowing
18   kind of the marketplace and knowing what
19   properties should be valued, I wasn't
20   surprised at all.
21         Q.    So you weren't surprised that
22   the fact that there was a 20-year -- I guess
23   20-plus-year lease on the property, you
24   weren't surprised that that lease didn't
25   impact the valuation analysis?

```
                                        Page 282
 1               PINCHUS S. ROTTENBERG
 2        A.     No.
 3        Q.     Now, did Vanderbilt ever
 4   consider directing Tom to redo his original
 5   analysis but taking into account the
 6   encumbrance of the lease?
 7        A.     Yes. I think this is what the
 8   email said. Again, what was the question?
 9        Q.     No. I guess what I'm asking is,
10   so Vanderbilt directed Tom to prepare a land
11   residual analysis?
12        A.     Vanderbilt or somebody else on
13   behalf, acting on behalf of Vanderbilt.
14        Q.     Right. So somebody --
15        A.     Again, I defer this to the
16   attorneys and their appraisers. I think they
17   were the ones actually making up for all of
18   this.
19             MR. KOH:  Slow down. Slow down.
20         Mr. Rottenberg, please answer the
21         question that Mr. Walsh asks you, not
22         the question that you think he's
23         asking you.
24        Q.     So the attorneys -- the
25   attorneys were making all the decisions for
```

Page 283

```
 1              PINCHUS S. ROTTENBERG
 2    you; is that correct?
 3         A.    I don't know all the decisions
 4    but they've been involved in these
 5    discussions, yes.
 6         Q.    And so I would need to talk to
 7    Morris Missry to understand Vanderbilt's
 8    position?
 9         A.    No.
10         Q.    Well, then how would I do it?
11    Who else would know?
12         A.    I would know.  To the extent I
13    remember I would know.
14         Q.    Okay. So did Vanderbilt ever
15    consider having Tom Tener redo his original
16    land sales comparison analysis but take into
17    account the encumbrances on the property?
18         A.    Yeah. That was said to him.
19         Q.    So he was told to do that?
20         A.    Yes.
21         Q.    And did he do that?
22         A.    I think so.
23         Q.    So maybe you're confusing
24    things, but I'm aware that -- so why don't
25    we take a look at --
```

1              PINCHUS S. ROTTENBERG

2              MR. KOH:  Hold on. The witness

3         is trying to answer the question. He's

4         not trying to confuse things.

5              MR. WALSH:  Well, I'm saying

6         maybe we're confused is all I'm

7         suggesting.

8              MR. KOH:  That's not what the

9         transcript says but I understand that

10        you may have misspoke. Go ahead.

11             MR. WALSH:  Let's mark

12        VA-001045, please.  This is the July

13        30, 2019 Tener letter opinion of

14        value.

15             (Plaintiff Exhibit 36, Tener

16        letter opinion of value dated July 30,

17        2019, Bates VA-001045 was received and

18        marked on this date for

19        identification.)

20             CONCIERGE:  That was 001 --

21             MR. WALSH:  -- 001045.

22        Q.   Let me know when that is

23   available to you, Mr. Rottenberg. That is

24   Exhibit P-36. It's available on my end.

25        A.   Okay.

PINCHUS S. ROTTENBERG

1

2          Q.     So if you take a look, and even

3     if you'd like you can compare it to his

4     prior report, which is P-32, wouldn't you

5     agree that he did not change anything with

6     his land sales comparison analysis and

7     simply added a land residual analysis at the

8     end?

9          A.     If you tell me that that's what

10    it is, okay.

11         Q.     Okay. So I guess what I'm trying

12    to understand is, was any consideration

13    given to having Mr. Tener redo his original

14    land sales comparison analysis while taking

15    into account the encumbrances rather than

16    having him do a separate analysis? Do you

17    understand my question?

18         A.     No, sir. Sorry.

19         Q.     Let me try again. In April of

20    2019 Mr. Tener valued the property using one

21    method, the land sales comparison approach,

22    correct?

23         A.     Okay.

24         Q.     I'm asking you. Let me ask you

25    this, when was the last time you reviewed

1                   PINCHUS S. ROTTENBERG

2    Mr. Tener's appraisals?

3          A.    Long time ago.

4          Q.    So you did not look at these

5    again in preparation for today's deposition?

6          A.    No.

7          Q.    Okay. Do you know, other than

8    the work that Mr. Tener did in his August

9    2019 report, which was to add a land

10   residual analysis to his April 2019 report,

11   did Vanderbilt consider having Mr. Tener

12   change his report or analysis in any other

13   way?

14         A.    I don't know. I don't remember.

15         Q.    Who would know?

16         A.    I would know but I don't

17   remember. Maybe.

18         Q.    Who else would know?

19         A.    Maybe Tom Li.

20         Q.    Would Morris Missry know?

21         A.    Perhaps, yeah.

22               MR. WALSH:  Give me one minute.

23         Hold on.

24         Q.    I'd like to talk about the

25   selection of the third appraiser of that

Page 287

1                    PINCHUS S. ROTTENBERG
2      process.
3                    Do you recall that the Option
4      Rent Addendum talks about if the parties
5      appraisers' appraisals differ by more than
6      15%, then the two appraisers shall appoint a
7      third appraiser?
8            A.    Yes.
9            Q.    Okay. Did Tom Tener conduct the
10     search for a third appraiser alone or did
11     Vanderbilt or someone else assist?
12           A.    I don't remember being involved
13     in that.
14           Q.    So Topic 3 in our deposition
15     notice asks you to be prepared to testify
16     about "communications between Vanderbilt and
17     Tener concerning the selection of a third
18     appraiser." Do you see that?
19           A.    Yes.
20           Q.    Well, you don't have to look at
21     it.
22           A.    That's Exhibit 1, right? That's
23     the first exhibit?
24           Q.    Yeah. It's Topic 3,
25     "communications between Vanderbilt and Tener

1                PINCHUS S. ROTTENBERG

2    concerning the selection of a third

3    appraiser."

4         A.    Okay.

5         Q.    So do you have any knowledge

6    about whether Vanderbilt participated in

7    that process with Mr. Tener?

8         A.    Yeah. As I said, I don't think I

9    participated in any of that.

10        Q.    I'm asking about Vanderbilt, not

11   you. You're here as a corporate

12   representative on behalf of Vanderbilt.

13            So did Vanderbilt -- was it

14   involved in that process?

15        A.    I can't remember.

16            MR. WALSH:  If we can mark

17        VA-019025, it's a nine-page email

18        chain that spans to 019034, and that

19        will be marked as P-37.

20            (Plaintiff Exhibit 37, email

21        string last dated April 25, 2019,

22        Bates VA-019025 was received and

23        marked on this date for

24        identification.)

25        A.    I see it.

1            PINCHUS S. ROTTENBERG

2       Q.     Okay. If you could go to the

3   second page ending in 026, bottom email,

4   it's an email April 23rd, 2019 at 12:45 p.m.

5   from Tom Tener to -- looks like Morris

6   Missry. Do you see that?

7       A.     Yes.

8       Q.     Tom writes, "Morris, I will be

9   speaking with Sharon Locatel tomorrow to go

10  over the logistics of this FMR determination

11  and to begin the discussion about the

12  selection of the third appraiser.  Please

13  send me the list of appraisers that Sam has

14  spoken with about this property.  Besides

15  Amanda Aaron, are there any other appraisers

16  that you do not want to be considered." Do

17  you see that?

18      A.     Yes.

19      Q.     So what appraisers had you

20  spoken to about this property that we

21  haven't already discussed today?

22      A.     I don't remember.  This goes

23  back to what you asked me a minute ago. I

24  don't remember. I'm kind of refreshing my

25  memory as you bring up this document.

```
                                              Page 290
 1              PINCHUS S. ROTTENBERG
 2         Q.    And did you have discussions
 3   with Amanda Aaron?
 4         A.    I don't remember.
 5         Q.    Do you know who she is?
 6         A.    No. I know she -- I don't know.
 7   There is an appraisal company.
 8         Q.    But Vanderbilt never hired her,
 9   right?
10         A.    No, I don't think so.
11         Q.    So if you -- if you could look
12   at the emails that are above this up to the
13   top of the first page, and rather than me
14   reading them, if you could quickly read them
15   and let me know when you've read to the top
16   of the first page.
17              (Deponent reviews the document.)
18         A.    So what is the question?
19         Q.    Are you done reading it?
20         A.    Yeah.
21         Q.    The top email -- and this is a
22   discussion about, you know, what names will
23   be suggested for the third appraiser, Morris
24   Missry said to Tom Tener on April 25th,
25   2019, with a copy to you saying, "You know
```

1                  PINCHUS S. ROTTENBERG
2     what we're looking for."  Do you see that?
3          A.    Yes.
4          Q.    What is -- what was Vanderbilt
5     looking for in a third appraiser?
6          A.    I have no idea what he refers
7     to.  I was only copied on this. This went
8     directly to Tom Tener.
9          Q.    And that doesn't say "what I'm
10    looking for", it says "what we're looking
11    for."
12         A.    Yeah. But I don't know what that
13    refers to.
14         Q.    And you're copied on it, right?
15         A.    I see the email that I was
16    copied, yes.
17         Q.    So did you have discussions with
18    Morris Missry about what Vanderbilt was
19    looking for in a third appraiser?
20         A.    I can't remember of any
21    discussions such as these.
22              MR. WALSH:  So if we can mark
23         VA-001321, it's a two-page email
24         chain. That would be marked as P-38.
25              (Plaintiff Exhibit 38, email

```
1              PINCHUS S. ROTTENBERG
2         string last dated May 6, 2019, Bates
3         VA-001321 was received and marked on
4         this date for identification.)
5         Q.    That would be marked as P-38.
6    If you could just open that up?
7         A.    Okay.
8         Q.    So in these emails that are
9    dated May 6, 2019 and it's emails that
10   you're copied on between Morris Missry and
11   Tom Tener and Tom indicates that he's
12   considering including Marc Nakleh on his
13   extended list and Mark said why and Tom
14   responded, "I reviewed one of his appraisal
15   reports they did for Brian Corcoran that
16   detailed numerous ground rent percentages
17   relative to land value. I will remind him of
18   this data that he has available in his
19   files. Some of this data is noted in my
20   report and is supportive of a high
21   percentage of the estimation of FMR."  Do
22   you see that?
23        A.    Yes.
24        Q.    Does this refresh your
25   recollection about what Vanderbilt was
```

```
 1              PINCHUS S. ROTTENBERG
 2    looking for in a third appraiser?
 3         A.    No.
 4         Q.    And do you recall whether
 5    Mr. Nakleh was ever formally retained by the
 6    parties?
 7         A.    Who?
 8              MR. KOH:  I think it's
 9         pronounced Nakleh.
10         Q.    Do you recall whether Mr. Nakleh
11    was formally retained by the parties?
12         A.    Nakleh I think it's pronounced.
13         Q.    Okay.
14         A.    I don't know whether -- if he
15    was retained?
16         Q.    Correct.
17         A.    I don't know where this went
18    off. I guess the reason why we're speaking
19    here makes me unsure whether he was ever
20    retained or...
21         Q.    And do you recall Vanderbilt
22    taking the position that the third appraiser
23    could not have any discussions with the
24    other two appraisers?
25         A.    The reasoning of that?
```

1              PINCHUS S. ROTTENBERG

2        Q.    Yes, if you recall that.

3        A.    There was various positions on

4   that, same as everything else, whether

5   according to the lease is that -- you know,

6   is that permitted or not permitted.

7        Q.    And at the time Vanderbilt took

8   the position that the three appraisers could

9   not speak with each other, right?

10       A.    I guess, yes, that was based on

11  the -- a terminology that somebody saw, some

12  of the attorneys saw from the lease.

13       Q.    And that was Vanderbilt's

14  position then, correct?

15       A.    I guess on the advice of the

16  attorneys, that was Vanderbilt's position.

17       Q.    What is Vanderbilt's position

18  now?

19       A.    I think it was discussed already

20  that we're talking about changing the

21  opinion of value.  I thought that was

22  already discussed, that that's going to be

23  shared or something, it's going to be shared

24  between the parties. I don't recall what it

25  was.

                    PINCHUS S. ROTTENBERG

1

2      Q.    Do you know what Vanderbilt's

3  position is on how the third appraiser can

4  put the other two appraisers, if that is

5  necessary, under the lease?

6            MR. KOH:  Objection. Go ahead

7       and answer to the extent you can

8       answer.

9      A.    I don't remember -- I don't

10  remember what it was. I remember there was

11  some understanding to share some of that

12  letter opinion of value. So I forgot whether

13  it was a letter opinion of value or the

14  appraiser but one of them was agreed to

15  share.

16      Q.    So is it fair to say that

17  Vanderbilt's position today is different

18  from the position it took in April 2019

19  about how the appraisers could work

20  together?

21      A.    I don't know how to categorize

22  this.

23      Q.    Do you believe that Vanderbilt's

24  position today is different from the

25  position it took in April 2019?

```
 1                PINCHUS S. ROTTENBERG
 2         A.    I don't think -- I don't know. I
 3    don't know.
 4         Q.    Who would know?
 5         A.    Maybe Morris.
 6         Q.    Morris Missry would know?  I
 7    thought you hadn't talked to him in six
 8    months.
 9              MR. KOH:  Is that a question?
10         Q.    Have you talked to him within
11    six months?
12         A.    I can't remember when I spoke to
13    him last.
14         Q.    But -- so the only other person
15    who might know whether Vanderbilt is taking
16    a different position that Vanderbilt --
17         A.    Or Tom Tener.  Sorry.  Tom Tener
18    too.
19         Q.    So Tom Tener would have been --
20    Vanderbilt has given Tom Tener authority to
21    make that determination on behalf of
22    Vanderbilt?
23         A.    No.
24              MR. KOH: Hold on. Hold on. Hold
25         on.
```

1                PINCHUS S. ROTTENBERG

2                    Can I get a clarification,

3           Mr. Walsh, as to whether you're

4           excluding counsel in the litigation

5           from the -- from the question?

6                    MR. WALSH:  Well, look, I can't

7           depose you, Howard, right? And --

8                    MR. KOH:  But you do know what

9           we said in our litigation papers.

10                   MR. WALSH:  No, but I'm trying

11          to understand who is making these

12          decisions at Vanderbilt.

13                   MR. KOH:  Not sure why it

14          matters. I'm not sure --

15                   MR. WALSH:  Howard, please let

16          me ask my questions.  Okay?

17          Q.    If Vanderbilt changed its

18     position from April 2019 to now, who at

19     Vanderbilt would have authorized that change

20     in position?

21          A.    As I told you, there is no

22     clarification who makes a decision at any

23     given time. There is no sets of rules and

24     regulations. This goes by, you know, by

25     virtue of that time of that day.  So I can't

```
 1              PINCHUS S. ROTTENBERG
 2   tell you who made the decision on any given
 3   time.
 4        Q.    Okay.
 5              MR. KOH:  Hold on a second.
 6              MR. WALSH:  No, Howard.
 7              MR. KOH:  There is an error in
 8         the transcript. That's all I want to
 9         correct.
10              MR. WALSH:  What error?
11              MR. KOH:  I'm quoting that "sure
12         it matters".  I did not say that.
13        Q.    So Mr. Rottenberg, you do not
14   know, as you sit here today, who would
15   authorize a change in position on
16   Vanderbilt's position as to how the three
17   appraisers worked together between April
18   2019 and now?
19        A.    I would be the one authorizing
20   that.
21        Q.    But you're not aware of any
22   position change?
23        A.    Position from?
24        Q.    From April 2019 to now?
25        A.    I said before, I remember there
```

```
 1              PINCHUS S. ROTTENBERG
 2    was an agreement that they would be able to
 3    share certain documents that the position
 4    before was -- could not be shared.
 5              MR. KOH:  I'm sorry. Are you
 6         laughing at something?
 7              MR. WALSH:  I'm exasperated.
 8              MR. KOH:  Keep it to yourself,
 9         please, and try not to do that.
10              MR. WALSH:  Howard, you can
11         object to my questions.  Okay? But --
12              MR. KOH:  I can object to your
13         behavior too, which I just did.
14              MR. WALSH:  Fine.
15              MR. KOH:  I'll speak when I feel
16         I need to.
17         Q.    So nobody else at Vanderbilt
18    would have been involved in those
19    discussions?
20         A.    Yes, there would be.
21         Q.    Who?
22         A.    Tom Li would have been involved
23    in those discussions, Morris Missry would
24    have been in those discussions, and Tom
25    Tener would have been involved in those
```

```
                                          Page 300
 1              PINCHUS S. ROTTENBERG
 2   discussions.
 3        Q.    Why did Vanderbilt change its
 4   position?
 5        A.    I don't remember. Again, this
 6   was conversations. I keep on saying the same
 7   thing. This is conversations that we have
 8   throughout this process that led I guess to
 9   have that change. I don't know what led to
10   it. I can't sit here and tell you why.
11              MR. WALSH:  Okay. If we can take
12         a five minute break.
13              THE WITNESS: How long are we
14         going to go today?
15              MR. WALSH:  I'm hoping I'm
16         wrapping up pretty soon.
17              MR. KOH:  Let's come back in
18         five minutes.
19              VIDEOGRAPHER:  We are off the
20         record at 5:39 p.m.  This is the end
21         of media 5.
22              (Recess is taken.)
23              VIDEOGRAPHER:  We are back on
24         the record at 5:50 p.m. and this marks
25         the beginning of media unit 6.
```

```
                                            Page 301

 1              PINCHUS S. ROTTENBERG
 2         Q.    Okay. Mr. Rottenberg, where are
 3    Vanderbilt's documents kept?
 4         A.    In my emails.
 5         Q.    I guess, let me -- so does
 6    Vanderbilt have an office separate and apart
 7    from -- does Vanderbilt have its own
 8    independent office where only Vanderbilt
 9    business is conducted?
10         A.    No.
11         Q.    And is Vanderbilt's business
12    conducted out of your office?
13         A.    Yes.
14         Q.    And that's for SPR Group?
15         A.    Yes.
16         Q.    And are Vanderbilt's documents
17    segregated in any way from other business
18    that you perform at your office?
19         A.    Yeah. Like everything else, they
20    are being kept separate.
21         Q.    How are they kept separate?
22         A.    Separate file.
23         Q.    What do you mean "a separate
24    file"?
25         A.    A separate file, separate.
```

1            PINCHUS S. ROTTENBERG
2        Q.    What kind of file, a folder?
3        A.    A-hum.
4        Q.    So you are talking about
5   physical documents?
6        A.    I don't have any more physical
7   documents than that's in the emails or
8   whatever was -- yeah, the physical documents
9   are documents stored just in my inbox.
10        Q.    So just to give me an idea of
11   quantity.  You know, how many -- how much
12   physical documents does Vanderbilt have?
13        A.    I have no idea.
14        Q.    A bankers box?
15        A.    What?
16        Q.    Is it like a bankers box of
17   documents?
18        A.    I don't know how big a bankers
19   box is, but it's one folder, probably.
20        Q.    So Vanderbilt has one folder of
21   physical documents?
22        A.    Correct.
23        Q.    And then the rest would be
24   electronic?
25        A.    Correct.

```
 1            PINCHUS S. ROTTENBERG
 2       Q.    And do you have -- does
 3  Vanderbilt or your firm have a document
 4  retention policy?
 5       A.    No, no policy.
 6       Q.    Did Vanderbilt issue a
 7  litigation hold with respect to this matter?
 8       A.    I'm sorry.  Could you ask that
 9  question again?
10       Q.    Did Vanderbilt issue a notice to
11  people who may have documents that are
12  relevant to this litigation?  Did Vanderbilt
13  tell people that may have documents relevant
14  to this litigation to preserve those
15  documents for this litigation?
16       A.    Yeah. We always preserve. I'm
17  not destroying any documents. I'm not
18  destroying anything at all.
19       Q.    That's not my question. My
20  question was, was a notice ever sent telling
21  people to preserve documents for this
22  litigation?
23       A.    I don't know whether there is a
24  notice or it was just discussed.
25       Q.    And when was that discussed?
```

```
                                        Page 304
1                PINCHUS S. ROTTENBERG
2          A.    I can't remember a date.
3          Q.    Who was involved in those
4   discussions?
5          A.    Myself and Tom Li.
6          Q.    And what was discussed?
7          A.    That we will have to hand over
8   all the documents.
9          Q.    Was that conversation in the
10  past six months?
11         A.    I can't remember. This was -- I
12  can't remember whether this was six months
13  or the beginning or throughout or both or
14  kind of -- this could have been in the
15  beginning of this process, throughout this
16  process, in the last six months.
17         Q.    Was it before we all started
18  working remotely in March 2020 or after
19  March 2020?
20         A.    I guess before and after.  I
21  think these conversations was at both times.
22         Q.    And were these conversations
23  documented anywhere, in notes or emails,
24  anything like that?
25         A.    I don't think so.
```

Page 305

PINCHUS S. ROTTENBERG

1

2          Q.     So there is nothing you can

3     provide to us to show that these

4     conversations actually occurred?

5          A.     I don't think so, no.

6          Q.     When did Vanderbilt begin

7     collecting documents to produce in this

8     litigation?

9          A.     When we were asked to.

10         Q.     When was that?

11         A.     I don't know the dates, the

12    times.

13         Q.     And going back to the

14    preservation issue about when you and Tom

15    had those conversations, was that before

16    McDonald's filed its Complaint in November

17    2019 or after McDonald's filed its Complaint

18    or you just don't remember?

19         A.     I don't remember.

20         Q.     Just to go back to my

21    previous -- to my other question before I

22    got sidetracked, approximately when did

23    Vanderbilt begin collecting documents to

24    produce in this litigation?

25         A.     When we were asked to.

```
 1              PINCHUS S. ROTTENBERG
 2       Q.    But my question is when?
 3       A.    I don't remember when we were
 4  asked to.  Whenever we were asked to collect
 5  documents, at that time we did it.
 6       Q.    Was that in 2021 or 2020 or
 7  2019?
 8       A.    It's either 2020 or 2021.
 9       Q.    And did you ever review the
10  requests for production served on Vanderbilt
11  by McDonald's in this litigation?
12       A.    I'm sorry?
13       Q.    So McDonald's served on
14  Vanderbilt document requests. Have you ever
15  seen those document requests?
16       A.    Yes.
17       Q.    And then you undertook the
18  process of trying to collect documents
19  responsive to that?
20       A.    Yes.
21       Q.    And so were the documents
22  collected before or after you saw those
23  document requests?
24       A.    I don't know when that happens,
25  which timeline that happens, when I was
```

1              PINCHUS S. ROTTENBERG

2    requested and all that.

3         Q.    Whose documents were collected?

4         A.    I guess we collected all the

5    documents that -- I collected my documents,

6    Tom collected his documents.

7         Q.    Okay. And were any other

8    documents collected from anyone else?

9         A.    Not what I know of. I don't know

10   the attorneys and appraisers.  I'm just

11   talking about us.

12        Q.    So did you have any

13   communications or discussions with Morris

14   Missry about collecting documents from him?

15        A.    No.

16        Q.    Do you know if anyone else at

17   Vanderbilt did?

18        A.    Maybe Howard but I don't know.

19        Q.    But other than attorneys?

20        A.    No.

21        Q.    And did you have conversations

22   with anyone at the Rabsky Group about

23   documents relating to Vanderbilt?

24        A.    No.

25        Q.    And do you know how documents

Page 308

1                PINCHUS S. ROTTENBERG
2    were reviewed and determined to be
3    responsive or not responsive to our
4    discovery demands?
5         A.    No.
6         Q.    And when you turned over
7    documents did you make the decision about
8    whether a particular document was responsive
9    or did your attorneys?
10        A.    My attorneys.
11        Q.    So you turned over all of your
12   documents?
13        A.    Yes.
14        Q.    And how did you determine what
15   documents to produce?
16        A.    I did not determine. I just
17   handed them over everything.
18        Q.    So you gave them access to every
19   file that you have in your office?
20        A.    Everything.
21        Q.    Whether it related to Vanderbilt
22   or not?
23        A.    Everything.
24        Q.    And then from there you don't
25   know what happened?

```
                                          Page 309

 1              PINCHUS S. ROTTENBERG
 2         A.    I don't know.
 3              MR. WALSH:  If I could just take
 4         two minutes, I think I'm just about
 5         done.  I want to look at my notes but
 6         if we can take a short two-minute
 7         break and put us in the breakout rooms
 8         and I'm just about wrapped up.
 9              VIDEOGRAPHER:  Going off at 6:01
10         p.m.
11              (Recess is taken.)
12              VIDEOGRAPHER:  We are back on
13         the record at 6:04 p.m.
14         Q.    Mr. Rottenberg, thank you for
15    your time today. I know it's been a long day
16    and I appreciate your patience.  Just a
17    couple of final questions.
18              Have you ever been convicted of
19    a crime?
20         A.    No.
21         Q.    Have you ever been sued in a
22    civil matter personally?
23         A.    No.
24         Q.    And have you ever been accused
25    of fraud in any, you know, civil or criminal
```

```
                                              Page 310
 1              PINCHUS S. ROTTENBERG
 2   proceeding?
 3        A.    No.
 4              MR. WALSH:  Okay. I don't have
 5        any further questions.
 6              MR. KOH:  Well, thank you very
 7        much, Mr. Walsh. This deposition is
 8        concluded and I guess we'll see
 9        everybody on Tuesday when Mr. Meyer is
10        deposed.
11              MR. WALSH:  Okay. Thank you and
12        everybody --
13              VIDEOGRAPHER:  Let me close out
14        the record, Mr. Rottenberg. This
15        concludes today's testimony of Sam
16        Rottenberg. We're going off the record
17        at 6:06 p.m.  This also concludes
18        media 6.
19              (The proceedings were adjourned
20   at 6:06 p.m.)
21
22
23
24
25
```

1          C E R T I F I C A T E

2          I, MAUREEN M. RATTO, a Registered

3    Professional Reporter, do hereby certify

4    that prior to the commencement of the

5    examination PINCHUS S. ROTTENBERG was

6    sworn by me to testify the truth, the

7    whole truth and nothing but the truth.

8          I DO FURTHER CERTIFY that the

9    foregoing is a true and accurate

10   transcript of the proceedings as taken

11   stenographically by and before me at the

12   time, place and on the date hereinbefore

13   set forth.

14          I DO FURTHER CERTIFY that I am

15   neither a relative nor employee nor

16   attorney nor counsel of any of the parties

17   to this action, and that I am neither a

18   relative nor employee of such attorney or

19   counsel, and that I am not financially

20   interested in this action.

21

22

          *Maureen Ratto*

23        MAUREEN M. RATTO, RPR

24        License No. 817125

25

Page 312

```
 1              I N D E X
 2    WITNESS: PINCHUS S. ROTTENBERG        7
 3    DIRECT EXAMINATION BY MR. WALSH       7
 4
 5            E X H I B I T S
 6    Plaintiff Exhibit 1, Amended Rule    15
 7    30(b)(6) notice to Vanderbilt
 8    Atlantic Holdings
 9    Plaintiff Exhibit 2,                 35
10    Organizational Chart for 840
11    Atlantic Avenue, Bates VA-029030
12    Plaintiff Exhibit 3, email string    43
13    last dated June 19, 2017, Bates
14    VA-016544
15    Plaintiff Exhibit 4, lease re: 840   70
16    Atlantic Avenue, Brooklyn, New
17    York, Bates VA-010103
18    Plaintiff Exhibit 5, email string    88
19    dated last November 21, 2017,
20    Bates VA-21570
21    Plaintiff Exhibit 6, Memorandum of   98
22    Lease of Vanderbilt,
23    Plaintiff Exhibit 7, email string    104
24    last dated February 10, 2017,
25    Bates VA-21304
```

Page 313

1    Plaintiff Exhibit 8, email string   109
2    last dated January 17, 2018, Bates
3    VA-010383
4    Plaintiff Exhibit 9, minutes of     115
5    the Community Board M-CROWN
6    Subcommittee dated April 30, 2018,
7    Bates VA-49382
8    Plaintiff Exhibit 10, email string  120
9    last dated May 29, 2018, Bates
10   VA-010453
11   Plaintiff Exhibit 11, email string  122
12   last dated March 13, 2018, Bates
13   VA-020147
14   Plaintiff Exhibit 12, 840 Atlantic  126
15   Avenue Rezoning Environmental
16   Assessment Statement, Bates
17   MCD006083
18   Plaintiff Exhibit 13, email string  136
19   last dated February 26, 2018,
20   Bates MCD006379
21   Plaintiff Exhibit 14, email string  144
22   last dated February 16, 2018,
23   Bates MCD008022
24   Plaintiff Exhibit 15, letter from   147
25   Vanderbilt Atlantic Holdings to

                                                  Page 314

1    McDonald's Corporation dated May

2    10, 2018, Bates MCD005479

3    Plaintiff Exhibit 16, McDonald's     151

4    Option Rent Addendum,

5    Plaintiff Exhibit 17, email string  162

6    last dated May 30, 2018, attaching

7    retention agreement, Bates

8    VA-015253

9    Plaintiff Exhibit 18, Appraisal      166

10   Report value as of June 26, 2018,

11   Bates VA-010599

12   Plaintiff Exhibit 19, email string  173

13   last dated June 7, 2018, Bates

14   VA-022633

15   Plaintiff Exhibit 20, email          181

16   attaching engagement letter dated

17   June 27, 2018, Bates VA-010586

18   Plaintiff Exhibit 21, email string  185

19   last dated August 9, 2018, Bates

20   VA-023216

21   Plaintiff Exhibit 22, KTR            191

22   Appraisal Report dated August 30,

23   2018, Bates VA-000002

24   Plaintiff Exhibit 23, draft real     204

25   estate appraisal report dated

1   January 8th, 2019, Bates VA-011951

2   Plaintiff Exhibit 24, email string   210

3   dated February 14, 2019, Bates

4   VA011918

5   Plaintiff Exhibit 25, email string   212

6   last dated February 26, 2019,

7   Bates VA-012456

8   Plaintiff Exhibit 26, Metropolitan   224

9   Desk Appraisal dated February 27,

10  2019, Bates VA-012503

11  Plaintiff Exhibit 27, email string   229

12  dated last February 25, 2019,

13  Bates VA-016358

14  Plaintiff Exhibit 28, email string   233

15  last dated March 12, 2019, Bates

16  VA-015989

17  Plaintiff Exhibit 29, email dated    241

18  April 1, 2019, Bates VA-000958

19  Plaintiff Exhibit 30, email dated    244

20  April 1, 2019 with attached

21  Appellate Decision, Bates

22  VA-000699

23  Plaintiff Exhibit 31, email string   247

24  dated last April 1, 2019, Bates

25  VA-001753

Page 316

```
 1   Plaintiff Exhibit 32, KTR              258
 2   appraisal report dated April 15,
 3   2019 Bates VA-001940
 4   Plaintiff Exhibit 33, email string  266
 5   last dated April 11, 2019, Bates
 6   VA-001508
 7   Plaintiff Exhibit 34, handwritten   268
 8   notes, Bates VA-049199
 9   Plaintiff Exhibit 35, email string  276
10   last dated July 2, 2019, Bates
11   VA-016196
12   Plaintiff Exhibit 36, Tener letter  284
13   opinion of value dated July 30,
14   2019, Bates VA-001045
15   Plaintiff Exhibit 37, email string  288
16   last dated April 25, 2019, Bates
17   VA-019025
18   Plaintiff Exhibit 38, email string  291
19   last dated May 6, 2019, Bates
20   VA-001321
21
22
23
24
25
```

Page 317

1                   J U R A T

2

3          I do hereby certify that I have
   read the foregoing transcript of my
4   deposition.

5

   _____
6              PINCHUS S. ROTTENBERG

7

8

9

10  Sworn and subscribed
   before me
11  this _____ day of
   _____, 2021

12

   _____
13  a Notary Public of
   the State of _____

14

15

16

17

18

19

20

21

22

23

24

25

Page 318

1                    **ERRATA SHEET**

       **I WISH TO MAKE THE FOLLOWING CHANGES:**

2        Page    Line          From              To

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| & | | |
|---|---|---|
| **&**   3:13 6:13 110:13,19 111:14 111:21 112:5 114:9 127:8,13 129:18 131:13 133:11,19 | | |

| 0 | | |
|---|---|---|
| **000002**   191:12,20 314:23 | | |

**000699**   244:5,16 315:22
**000958**   241:16,21 315:18
**001**   284:20
**001.jpg**   89:10
**001045**   284:12,17 284:21 316:14
**001321**   291:23 292:3 316:20
**001508**   266:3,11 316:6
**001753**   247:7,15 247:18 315:25
**001940**   258:2,7 316:3
**006083**   126:4
**010103**   69:25 70:5 70:6,9 312:17
**010196**   70:4
**010383**   109:11,12 109:19 313:3
**010453**   120:3,8 313:10
**010580**   181:2
**010586**   181:8,11 314:17
**010599**   166:3,12 314:11

**010666**   168:25
**010700**   166:4
**011918**   210:3
**011951**   203:24 204:13 315:1
**012047**   204:3
**012456**   212:3,6 315:7
**012503**   224:22 225:2 226:16 315:10
**015253**   162:15 163:2 314:8
**015989**   233:15,21 315:16
**016196**   276:5,12 316:11
**016358**   229:15,15 229:18 315:13
**016360**   229:25
**016544**   43:13,17 43:22 312:14
**019025**   288:17,22 316:17
**019034**   288:18
**020147**   121:25 122:5 313:13
**020216**   186:8
**021570**   88:7,15
**021588**   88:8
**022633**   173:2,6 314:14
**023216**   185:23 186:3,9 314:20
**023223**   185:24
**026**   289:3
**02633**   172:18
**029030**   35:16,19 35:25 312:11
**049132**   116:8

**049199**   268:17,22 316:8
**06471**   1:7 5:19
**07601**   3:5
**08**   194:21,23

| 1 | | |
|---|---|---|
| **1**   5:11 15:22 77:18 77:20 78:11 86:18 120:17 241:21 244:15 247:17 287:22 312:6 315:18,20,24 | | |

**1,078,400**   259:22
**1,080,000**   202:20
**1,348,000**   259:19
**1.11.18.pdf.**   110:14
**1/4/2022**   131:21
**10**   39:23 56:2,13 56:21 57:6 58:12 59:10 82:21 84:5 85:12,18 86:7 93:25 94:11 95:19 96:5 97:9 98:23 104:4,8 120:5,6,12 147:15 153:3 234:4 312:24 313:8 314:2
**10/9/2023**   131:23
**100**   36:16 37:6,13 99:21,23
**10017**   3:15
**104**   312:23
**109**   71:10,11,13 73:24 313:1
**10:59**   277:5
**10th**   266:19
**11**   122:2,3 152:9 266:7,10 313:11 316:5

**112**   81:23
**115**   74:18 313:4
**11970**   206:14
**11:38**   86:17
**11:50**   86:21
**12**   1:16 5:3 126:21 127:3 233:20 234:8 313:14 315:15
**120**   313:8
**122**   313:11
**12456**   221:12
**125**   3:14
**126**   313:14
**128**   73:21 74:4,8 81:24
**12:45**   289:4
**12th**   45:12
**13**   122:4,11 136:22 136:23 143:10 259:21 313:12,18
**136**   313:18
**14**   144:6,7 210:6 210:15 313:21 315:3
**144**   313:21
**147**   313:24
**14th**   210:11
**15**   147:12,13 204:24 205:21 207:13 234:4 238:19 258:4,6 259:7 287:6 312:6 313:24 316:2
**15,300,000**   125:6
**150**   123:22
**151**   314:3
**156**   122:2 124:9
**16**   144:8 151:7,14 192:15,17 313:22 314:3

[16,700,000 - 26]                                                    Page 2

**16,700,000** 125:5
**162** 314:5
**16545** 44:25
**16546** 55:22
**166** 314:9
**17** 109:18 162:14
  162:23 166:15
  178:21 313:2
  314:5
**173** 314:12
**17425** 311:22
**18** 23:14,23 24:21
  24:24 77:22 78:12
  128:14 166:3,10
  166:18 205:20
  226:2 314:9
**18.8** 169:17
**180** 152:19
**181** 314:15
**185** 314:18
**19** 43:16 58:15
  59:4,21 83:24
  173:4,9 181:14
  274:24 278:17,25
  312:13 314:12
**191** 314:21
**1943** 264:24
**1944** 259:17
**1955** 258:3
**1998** 152:3
**19th** 267:16
**1:12** 155:5
**1:15** 154:25
**1:19** 1:7 5:19
**1:48** 155:9
**1st** 241:18 242:22
  244:9 247:9

**2**

**2** 35:16,17 54:20
  56:5 83:22 86:7
  86:11,22 155:6

276:11 312:9
316:10
**20** 38:25 39:9,12
  39:24 68:15 181:2
  181:9,15,16
  197:11 278:20
  279:10 281:22,23
  314:15
**201** 3:6
**20150** 123:25
**2017** 25:7 43:16
  44:21 45:12 71:15
  88:11 93:11 104:4
  104:8 105:15,21
  106:20 107:9,24
  108:5,17 134:2
  174:13 312:13,19
  312:24
**2017.11.30** 98:5
**2018** 109:18 110:9
  110:24 112:7
  115:6 116:19
  120:7,16 121:6,17
  122:4,11 134:7
  136:24 137:8
  142:19 143:12
  144:8 147:16
  153:3 157:12,18
  157:20 162:18,24
  166:7,11 167:3,4
  169:18 172:21
  173:5,17,25
  176:14 178:12,17
  181:4,11 186:2,19
  188:15 191:15,20
  192:10 211:2,12
  213:8 214:12,16
  225:11 227:5,16
  313:2,6,9,12,19,22
  314:2,6,10,13,17
  314:19,23

**2019** 137:16 204:9
  204:13,24 205:15
  205:21 206:25
  209:23 210:6,11
  210:15,18 212:5
  212:18 220:7
  221:17 225:2,6
  226:9 227:16
  228:7,13,21,24
  229:7,17 230:3,12
  233:20 234:8,14
  241:19,21 244:9
  244:15 247:2,17
  248:18 249:11
  252:3 258:4,6
  259:7,19 266:7,10
  267:16 273:11
  276:9,11 281:3
  284:13,17 285:20
  286:9,10 288:21
  289:4 290:25
  292:2,9 295:18,25
  297:18 298:18,24
  305:17 306:7
  315:1,3,6,10,12,15
  315:18,20,24
  316:3,5,10,14,16
  316:19
**2020** 137:18
  304:18,19 306:6,8
**2021** 1:16 5:3 16:6
  127:9,23 306:6,8
  317:11
**2021.07.21** 15:19
**2023** 130:13,19
**2027** 83:20 84:4
**2039** 69:22 132:3
  137:16 138:16,24
  139:11 142:22
  168:15,22

**204** 314:24
**21** 3:4 88:11 93:10
  139:22 185:25
  186:7 312:19
  314:18
**210** 315:2
**212** 315:5
**21304** 103:25
  104:9 312:25
**21570** 88:12 95:12
  312:20
**217** 186:17
**21st** 16:6 271:3
**22** 23:17 139:22
  191:17,18 192:4
  314:21
**224** 315:8
**229** 315:11
**23** 16:24 18:24
  19:15 204:11,18
  314:24
**233** 315:14
**236** 127:12
**23rd** 289:4
**24** 210:3,5,16
  315:2
**241** 315:17
**242-8365** 3:16
**244** 315:19
**247** 315:23
**25** 39:12 188:21,24
  212:3,4,9 229:17
  288:21 315:5,12
  316:16
**256** 163:12
**258** 316:1
**25th** 127:9,22
  230:3,12 290:24
**26** 136:24 166:7,11
  167:4 169:18
  212:5,18 221:17

224:23,24 226:21
226:24 313:19
314:10 315:6,8
**262** 162:16
**266** 9:14 316:4
**268** 316:7
**27** 181:4,11 225:2
225:6 226:9
229:16 230:9
314:17 315:9,11
**270-4948** 3:6
**276** 316:9
**27th** 277:5
**28** 233:16,19
315:14
**28,000** 99:16,23
**284** 316:12
**288** 316:15
**29** 120:7 241:20
242:2,20 244:10
313:9 315:17
**291** 316:18
**29th** 120:16
**2nd** 276:9

**3**

**3** 43:15,21 73:22
74:5 81:22 96:13
123:24 155:10
207:20 287:14,24
312:12
**3.1** 74:12 76:7,15
76:21 77:3 82:7
**3.11** 75:19,22
76:24 82:4 84:8
**3.12** 75:23 76:24
82:4,18 84:8
**3.12.** 75:19 83:6,9
83:15
**3.2** 76:21
**30** 15:6,20,23 16:4
71:15 77:19 83:20

115:6 162:17,24
174:13 191:14,19
192:10 244:14
246:10 247:11
281:3 284:13,16
312:7 313:6 314:6
314:22 315:19
316:13
**300** 128:17
**305** 104:2
**31** 35:25 247:7,16
315:23
**312,917** 128:19
**318** 128:21
**32** 258:5 259:6
285:4 316:1
**33** 116:8 266:8,9
316:4
**34** 268:21 269:5
316:7
**35** 276:10,19 312:9
316:9
**35,000** 85:24
**36** 284:15,24
316:12
**36,000** 86:2,3
**360,000** 86:10
**37** 288:19,20
316:15
**376,432** 128:15
**38** 291:24,25 292:5
316:18
**386** 114:2
**388** 109:15
**3:01** 207:19
**3:14** 207:23
**3:54** 276:9,14

**4**

**4** 70:4,7 81:24
207:24 217:3
312:15

**4.0** 202:2
**4.5** 216:7
**4/30/2018** 116:11
**40** 23:16,17
**40,000** 94:2
**400** 150:17,21
**43** 312:12
**45** 12:16 13:4
**455** 120:4
**456** 221:10
**464** 212:13,15
**465** 213:16,19,21
214:2
**466** 213:18 214:18
214:22
**468** 216:21,25
217:3
**474** 215:19 216:2
**483** 212:3
**49382** 115:3,7
313:7
**4:15** 238:21
**4:18** 239:2

**5**

**5** 40:21 47:10
57:21,22 88:9,10
88:22 89:2 239:3
300:21 312:18
**5.0** 202:2 216:7
**50/50** 29:23,24
36:22
**521** 224:23
**54** 247:7
**546** 46:22
**547** 58:9,20 61:8
122:13,16
**548** 43:22 62:14
**5480** 147:10
**572** 93:7
**581** 182:10

**582** 183:15
**583** 181:21
**5:39** 300:20
**5:50** 300:24

**6**

**6** 15:6,20,23 16:4
77:19 98:6,7,12
292:2,9 300:25
310:18 312:7,21
316:19
**6.0** 202:7 216:3
**601** 167:9
**603** 169:15,21
**6085** 128:3
**6086** 130:8
**63** 100:4
**6318** 127:4
**6381** 137:6 143:11
**646** 3:16
**66** 169:5
**666** 169:6,7
**69** 192:5
**6:04** 309:13
**6:06** 310:17,20

**7**

**7** 95:19,24 96:5
97:9,16 100:6,24
103:13,21 104:7
104:13 172:21
173:5,17 312:2,3
312:23 314:13
**70** 312:15
**703** 244:6

**8**

**8** 61:9 109:17
116:5,6 130:9
143:12 234:14
259:18 313:1
**80** 259:22

[817125 - ago]

**817125** 2:9 311:24
**82** 136:21 200:4,5
**838** 204:6
**840** 28:24 29:4,8
32:23 35:18 36:14
36:25 37:10,13,18
38:9,24 39:8,11,14
40:2,3 41:9,18
46:5,22 47:3 55:5
55:5,6 70:8 94:7
99:6 105:9,11,13
105:24 106:11,19
107:3,15,23
108:21 109:4
110:14,21 111:2
112:6,14 113:7,14
113:22 114:10,23
117:11,21,24
118:3 119:8 121:7
121:20 122:17,23
126:21 127:4,17
128:10 131:16
158:12 163:12
167:4 169:17
172:22 173:14
174:8 191:15
192:9 205:2,3,11
219:3 225:10
239:16 312:10,15
313:14
**844** 204:6
**88** 312:18
**8th** 137:8 204:8,13
205:15 315:1

**9**

**9** 115:3,4 116:6,7
167:3 186:2
188:15 225:11
313:4 314:19
**9102** 41:4,7

**919** 211:7
**924** 210:4
**930** 244:20
**936** 239:21
**94** 70:17,18
**942** 260:10
**95** 128:21
**956** 205:19
**975,000** 148:8
**98** 312:21
**99** 47:7 48:23 49:7
97:19 100:24
133:24 137:14
139:9,18,24
188:20,24 189:2,9
189:17 198:14
**990** 236:2
**996** 233:16
**9:46** 244:13
**9:56** 205:14
**9th** 186:19

**a**

**a.m.** 1:17 37:19
38:8 86:17,21
244:13 266:8
276:9,14 277:5
**aaron** 289:15
290:3
**abel** 233:17 234:7
**able** 10:4 16:10
61:20 141:8
158:11 186:11
269:23 279:17,18
299:2
**absolute** 194:11
**absolutely** 224:20
**abstract** 89:7
93:13
**accepting** 49:24
**access** 308:18

**account** 241:6
251:19 254:22
256:14 282:5
283:17 285:15
**accurate** 9:5
127:23 129:6
208:9 311:9
**accused** 309:24
**acquire** 52:24
139:24
**acquired** 51:24
133:23 139:9,18
141:20
**acquisition** 45:8
46:11
**acris** 89:10 93:22
93:23 94:25 95:20
**acting** 275:7
282:13
**action** 6:3 311:17
311:20
**active** 33:15,16
**actively** 32:21
33:7 129:10
**adam** 104:21
108:9
**add** 286:9
**added** 285:7
**addendum** 151:6
151:9,12,15,20
153:6 158:21
161:16 165:16
180:19 185:19
203:7 222:22
223:16 224:9
229:10 230:4,13
230:19,24 231:5,7
231:9,25 232:2,5
235:14 240:25
248:23 249:22
250:22 253:24

255:7,19 256:24
257:15 271:15
287:4 314:4
**adding** 28:18
**addition** 184:13
**additional** 74:21
217:10 223:11
**additionally**
236:19
**address** 12:15
13:6 89:7
**addressed** 192:11
211:7 225:7 251:4
**adequate** 236:20
**adjourned** 310:19
**adjusted** 260:19
**administer** 6:1
**advance** 79:8,18
80:23 94:17
270:19
**advice** 294:15
**advise** 114:4,22
**advisors** 181:6
192:9 214:15
**affect** 178:10
189:25 190:22
191:6,7 199:18
251:22
**affiliated** 41:16
51:16 91:16
115:24
**affiliations** 6:6
**affirm** 7:2
**affirmed** 7:5
**affordable** 128:22
**aggregating**
197:11
**aggressive** 267:4
**ago** 21:11 23:14
24:14 39:24,24,24
152:4,5,8 218:14

[ago - appraisal]

278:10 286:3 289:23
**agree** 5:9 18:20 53:25 56:18 60:2 71:14 75:14,22 77:25 98:25 107:8 115:19 152:24 158:20 169:19 173:24 175:21 182:21,25 183:5 193:8 200:17,21 220:6 227:3 277:7 279:13 285:5
**agreed** 97:16 251:3 295:14
**agreement** 56:19 66:6 87:8 111:18 111:19 112:3,4,24 113:4,6,14,25 115:18 158:11 162:19,25 163:6,7 181:21 182:4,10 235:12 299:2 314:7
**agreements** 103:10 234:18
**ahead** 14:3,9,17 27:2 30:8 31:10 32:24 37:16 52:14 65:11,16 68:7 81:12 84:12 85:11 90:22 95:25 107:10 115:13 119:20 125:20 132:22 133:9 145:24 165:4 168:16 183:25 185:8 227:22 237:4 243:20 251:16 255:10 256:18 257:7

263:9 280:14 284:10 295:6
**alerted** 249:19
**alleged** 81:11 272:25
**allow** 118:8
**allowed** 224:14
**allude** 250:24
**alluded** 19:3 281:13
**alludes** 183:2
**alluding** 157:2 245:22
**altogether** 208:11 247:4
**alvarez** 3:9 6:19 6:19 270:21
**amanda** 289:15 290:3
**amended** 15:20,22 16:3 312:6
**america** 271:3
**amount** 56:4 83:3 95:5 99:8
**amovitz** 4:4
**analysis** 122:14 123:4,13,23 125:24 130:9 148:23 183:22,24 187:5,13,18,22 200:7,13 210:21 215:23,24,25 217:6 220:11,12 222:6 224:6 236:21 237:2 248:22 249:21 250:21 252:12 273:2,24 274:17 275:2 277:17,21 278:3,19,24 279:6 280:2,5,13,19

281:25 282:5,11 283:16 285:6,7,14 285:16 286:10,12
**analyzed** 260:19 265:4
**anecdotal** 216:11
**announced** 248:20 249:9
**annual** 86:4 259:20
**annum** 56:5
**answer** 7:24 8:4 8:17 14:3,10,18 17:5,18 27:3 30:9 31:11 50:2,3 77:12 80:16 92:16 92:20 94:18 95:7 111:5 115:14 133:18 140:12 141:8 167:23 171:19 190:4,6,8 201:3 217:16 219:12 230:15 237:5,13 255:11 256:25 257:8,22 261:20 262:2 279:18 280:16 282:20 284:3 295:7,8
**answered** 19:7 49:22 133:8 140:4 217:17 219:14
**answering** 257:21
**answers** 9:5 153:24 167:24 261:21
**anthony** 37:19 38:9
**anticipated** 130:12 131:22 170:5 188:19 235:24

236:6,10
**anticipation** 225:25
**anybody** 22:4 63:21 81:11 87:24 161:22 162:10 179:21 215:17 249:8 255:2 273:20 275:4
**anymore** 226:20
**aol.com** 105:2
**apart** 301:6
**apologies** 88:20
**apparent** 150:5
**appeals** 239:20
**appear** 277:8
**appearances** 6:6
**appears** 173:25 174:3 200:17 223:17 230:11
**appellate** 244:16 244:23 315:21
**appendix** 130:17
**applicability** 245:21 248:20 249:9 251:13
**applicable** 61:17 74:22 76:22
**applicant** 128:13
**application** 128:9 130:2
**apply** 246:24
**appoint** 287:6
**appraisal** 148:19 152:24 159:3 163:21,25 166:5 166:10 167:2 173:14 174:8,16 175:8,23 181:25 189:21 191:15,19 192:8,16,19,20,25

193:9 194:6 195:4
195:12,18 197:19
198:17,25 199:12
204:5,12 205:11
212:23 213:25
214:4,6 217:4
220:9 223:4
224:25 225:9
240:9 246:25
258:6 270:9
272:13 290:7
292:14 314:9,22
314:25 315:9
316:2
**appraisal.pdf.**
205:4
**appraisals** 170:7
170:10 180:3,17
195:24 208:2
209:2,13,21 211:2
211:12 240:20
281:13 286:2
287:5
**appraise** 206:25
227:15 252:20,22
253:7,13
**appraised** 175:13
253:23
**appraiser** 96:17
158:22 159:4,7,9
184:6 190:24
191:4 210:19
229:6 253:20
286:25 287:7,10
287:18 288:3
289:12 290:23
291:5,19 293:2,22
295:3,14
**appraisers** 159:17
159:22,25 160:2,4
161:25 163:22

172:11 190:22
203:12 227:14
234:19 255:13,21
267:19 268:9,12
271:14 282:16
287:5,6 289:13,15
289:19 293:24
294:8 295:4,19
298:17 307:10
**appreciate** 207:15
309:16
**appreciation**
201:15,23
**approach** 42:5,6
169:3,10 199:2
236:11,13,16,21
260:2,25 261:5,12
262:10,11 272:10
272:11,13 285:21
**approaches**
272:20
**appropriate**
100:10,25 126:19
175:16,23 176:3,5
176:11 178:24
200:18
**approval** 133:13
133:16 161:4
216:12
**approvals** 46:16
**approved** 175:14
214:24
**approximately**
24:13 42:9 48:8
128:15,20,21
305:22
**april** 115:6 116:19
132:3 139:11
168:15,22 169:18
228:7,13,24
241:18,21 242:21

244:9,15 247:2,9
247:17 248:18
249:10 252:3
258:4,6 259:7,18
266:7,10,19
285:19 286:10
288:21 289:4
290:24 295:18,25
297:18 298:17,24
313:6 315:18,20
315:24 316:2,5,16
**architect** 120:24
121:2
**architectural**
121:5
**areas** 211:17
**argument** 219:16
219:16
**arrangement**
51:20 63:5 65:23
**arrived** 268:12
**arrows** 36:17
**article** 259:21
**asap** 93:23 95:20
**aside** 87:12 157:24
**asked** 49:19 64:14
76:3 134:23 151:2
154:9 155:22
167:11 175:22
179:23 180:3
184:22 185:3,5
187:12,24 190:12
190:13,16,18
194:14 196:17
229:13 230:16
237:14 238:13
243:12,22 245:6
249:3 261:7 273:5
275:5,10,12 278:9
289:23 305:9,25
306:4,4

**asking** 50:20
52:23 53:4,19
56:11 57:17 60:24
61:25 62:6 77:11
77:15 80:14 81:16
84:17 101:17
105:5,19 111:7,9
111:10 124:25
125:18 141:13
164:19 167:22,25
179:2 228:19
232:13 233:5,7,9
245:14 247:5
249:6 251:13,21
255:23 257:11,21
279:21 281:15
282:9,23 285:24
288:10
**asks** 282:21
287:15
**aspects** 190:25
**asserted** 11:5
**assertion** 222:19
251:3
**assessment** 126:7
126:23 127:5
130:12 132:13
313:16
**asset** 183:21,23
**assigned** 87:2
228:17
**assignment** 87:6
87:14 172:12
184:14 186:22,25
237:22
**assignments** 172:7
**assigns** 163:17
**assist** 113:21
183:19 287:11
**associates** 37:23
38:4,14,19,22,25

39:6,9,16 40:6,11
41:2,25 42:3
44:22 45:13 46:3
47:24 48:4 51:17
54:21,24 55:3,13
55:18 64:2,12
65:2,10 70:3,25
75:8 84:11 85:6
85:18 86:5,25,25
91:8,12 127:8,14
133:11,19
**assume** 7:25
100:21 133:2
153:7 167:21,23
174:5 198:20
218:24 254:8
**assuming** 86:3
167:13 208:18
**assumption** 60:8
87:7,14 175:13
196:21,23 197:20
198:13,15 206:20
**assumptions** 196:4
202:19 214:19
**atlantic** 1:8 4:6
5:15 6:14 15:13
15:16,24 16:5
17:25 18:3 25:3
28:12,24 29:4
32:23 35:18 36:14
36:18,23,25 37:10
37:14,18 38:9,24
39:8,11,14 40:2,3
40:24 41:9,18
44:16 46:5,23
47:3 54:23 55:5,5
55:6,11,15 70:8
71:2,19,25 72:6,10
73:22 75:7 77:13
91:4,11,12 94:7
99:6 104:6 105:9

105:10,11,13,24
106:11,19 107:3
107:15,23 108:21
109:4 110:14,21
111:2 112:6,15
113:7,14,22
114:10,23 115:12
115:20 116:2
117:11,21,24
118:4 119:9
120:16 121:7,20
122:17,24 126:22
127:4,7,17,18
128:10 131:16
133:20 144:21
147:14,23 158:12
163:13,16 167:4
169:17 172:22
173:14 174:8
175:10 181:7
183:20 191:16
192:10,11 204:7
204:10 205:2,3,11
210:14 219:4
225:7,10 239:16
312:8,11,16
313:14,25
**attached** 98:20
230:3 244:15
276:24 315:20
**attaches** 244:25
**attaching** 110:13
162:25 181:4,10
244:8 314:6,16
**attachment** 88:25
120:17 122:22
162:18 204:2,4
210:12,12 229:24
234:12,12
**attachments** 89:9
205:3

**attend** 117:4
**attended** 116:19
**attendees** 116:14
**attention** 38:12
**attorney** 8:15,17
19:4 20:13 21:5
44:13,14,18 89:21
89:24 90:2 94:11
104:22 111:15
114:12,13 137:21
143:15 160:14,15
160:16,17 171:2
254:2,4,6,10
311:16,18
**attorneys** 71:23
72:11 101:13
103:17 114:19
161:25 240:19
255:14,21 282:16
282:24,25 294:12
294:16 307:10,19
308:9,10
**audio** 5:7
**august** 1:16 5:3
186:2,19 188:15
191:14,19 192:10
213:8 214:11,12
214:16 286:8
314:19,22
**authority** 161:2
162:6,10 182:4
296:20
**authorize** 298:15
**authorized** 6:1
101:21 148:4
297:19
**authorizing**
298:19
**available** 18:13
122:8 166:9
179:21 184:15

192:3 196:25
210:16 237:22
242:22 268:25
284:23,24 292:18
**avenue** 3:14 28:25
29:4,8 32:23
35:19 36:14 41:7
41:9,18 46:6,23
47:3 70:8 94:8
99:6 105:9,10,11
105:13,24 106:11
106:19 107:3,16
107:23 108:21
109:4 110:21
111:2 112:7 113:7
113:14,22 114:10
114:24 117:11,21
117:24 118:4
119:9 121:7,20
122:17,24 126:22
127:5,17 128:10
131:17 144:21
158:13 163:13
167:5 169:17
172:22 173:14
174:9 175:10
191:16 192:10
204:7 205:2,4,12
219:4 225:10
239:21,25 244:25
245:15,20 246:24
248:21 249:14
312:11,16 313:15
**aware** 13:14 15:10
15:18 51:12 54:9
54:11,13 66:8,13
67:2 68:5,20,25
80:22 87:16
103:19 104:24
106:16 107:19
138:21,25 139:4,8

139:13,17 141:19
143:23 168:9,20
216:19 219:25
245:13 263:16,19
263:22 264:13
283:24 298:21

**b**

**b** 7:4 15:6,20,23
16:4 57:21,22
77:19 103:4 312:5
312:7
**babies** 152:7
**back** 55:22,22
59:16 60:14 64:4
64:6 65:12 77:18
78:11 81:17,21
86:20 101:16,20
110:2,9,17 115:9
140:18 141:24,25
143:10 148:11
150:25 152:10
155:8 169:15
170:18 178:7
189:6 196:19
198:2 207:16,22
211:6 220:16
221:8 237:8,16
238:20,25 253:4
261:6 268:5 271:2
271:9,10 272:23
274:5 277:24
278:11 280:10
289:23 300:17,23
305:13,20 309:12
**background** 22:21
22:25
**badgering** 219:15
**bandwidth** 10:15
**bankers** 302:14,16
302:18

**base** 47:13,16
50:17 51:2 55:21
55:25 58:13 74:22
75:2 202:7
**based** 33:10 100:6
175:8,17 179:19
193:18 196:6,22
206:19 236:10
256:15 260:19
278:16,24 280:23
281:7,9,12,15,17
294:10
**basically** 11:2
240:6
**basis** 60:14
**bassuk** 89:20 90:7
95:13
**bate** 126:11
**bates** 35:15,19,24
43:16,22 44:25
58:9,20 61:8 70:9
88:8,12 93:7
104:9 109:19
115:7 120:7 122:5
126:3,5,23 136:25
144:9 147:16
162:15,25 166:4
166:12 173:5
181:8,11 183:15
186:3 191:20
204:13 210:6
212:6 225:2
229:18 233:21
241:21 244:16
247:17 258:7
266:11 268:22
276:11 284:17
288:22 292:2
312:11,13,17,20
312:25 313:2,7,9
313:12,16,20,23

314:2,7,11,13,17
314:19,23 315:1,3
315:7,10,13,15,18
315:21,24 316:3,5
316:8,10,14,16,19
**bbg** 162:17 163:7
163:19,24 164:6,9
164:23,25 165:24
166:5 167:2,16
168:11,13,19,20
169:2,8,12,15
170:11 203:12
211:2,11 222:14
225:10 227:5,11
**beckerman** 110:14
110:20 111:14,21
112:5 114:9
129:18
**began** 138:22
**beginning** 121:25
122:10 155:21
239:3 300:25
304:13,15
**begins** 127:3
**behalf** 6:10,17
17:6,19 28:2
34:23,24 35:2
71:18 72:6,10
73:12 91:21,22
101:22 102:6
103:10 111:22
115:12 117:10
121:3 133:20
147:22 160:24
161:3 182:5
234:10 235:13
258:18 274:21
275:8 279:21
282:13,13 288:12
296:21

**behavior** 299:13
**believe** 13:5 68:19
85:25 88:8 109:14
155:22 238:4,5
295:23
**believed** 100:9,23
142:24 271:21
**benefit** 59:25
135:15
**benefited** 135:7,12
**best** 197:2 217:5
248:2,6,13 251:4
**better** 179:6
261:15
**big** 109:24 110:7
192:3 225:24
271:7 302:18
**bind** 102:16,19,23
103:4,8
**birthdays** 143:6
**bit** 11:18 26:24
42:24 69:13 184:9
191:24 208:15
211:4 267:4
**black** 270:22
277:8
**board** 105:24
106:10,18 107:2,3
107:14,15,22
108:13 115:5
116:9,21 313:5
**bolded** 201:17,19
**bolt** 271:7
**born** 152:10
**borough** 13:8
**boroughs** 200:16
201:6
**bothered** 249:15
**bottom** 46:14
71:12 93:8 99:12
99:14,20 130:8

188:17 194:9,23 195:10 196:20 201:12 206:18 211:14 213:21 214:2,18,22 215:25 266:17 269:15 289:3
**bov**  189:10,13
**box**  302:14,16,19
**boxes**  37:23 38:5,7 38:11,13,18
**brad**  89:20 90:2,7 95:13
**brandon**  197:24
**break**  8:20 74:10 86:14 154:17,19 154:20,24 156:5,9 157:8 207:11,15 224:16,17,19 238:16 239:5,8,17 300:12 309:7
**breaking**  193:3
**breakout**  309:7
**breaks**  224:14 225:20
**breath**  226:4
**brendan**  3:7 6:9 7:11 17:24 80:5 261:16 263:11
**brendan's**  270:21
**brian**  131:3,5 292:15
**briefly**  13:23 19:22
**bring**  289:25
**broadway**  9:14
**broker**  11:25 12:2 13:21 24:6,22 32:16 33:22 62:19 62:25 63:18 96:17 96:20 119:12

188:19 189:13,23 190:10
**broker's**  63:8
**brokerage**  24:5 32:11,13 33:25 66:6
**brokered**  63:14
**brokering**  63:21
**brokers**  62:14 119:17
**brooklyn**  9:12 28:25 41:7 46:6 46:17,23 47:4 70:8 110:21 118:17 137:13 205:2 265:6 312:16
**brought**  13:15 84:19
**bucks**  99:22,23
**build**  130:13
**buildable**  56:3,22 57:25 58:4 82:21 83:24 84:6 85:18 85:21
**building**  61:16,22 62:11 66:21,22 121:10,12,20 128:14 218:20 219:3
**buildings**  219:19
**bullet**  184:10,16 195:2 211:14 212:25 213:23 214:7 277:14
**bullets**  237:21
**business**  33:22 301:9,11,17
**button**  269:16
**bwalsh**  3:8

## c

**c**  3:1 7:4 93:22 130:17,22 311:1,1
**calculate**  233:4,6
**calculated**  84:23 84:25 85:9 232:16
**calculations**  52:21
**call**  9:24 94:4 122:23 137:21 143:15 226:20
**calls**  146:21,25
**camera**  69:16
**care**  216:23
**carol**  136:13,16 137:7 138:3,15 139:5 143:12,19 143:24 145:17 146:22 154:4,6,9 267:24
**case**  1:7 5:18 11:19,20 167:19 239:25 240:3,13 240:16,17 244:25 245:10,15,20 246:24 248:21 249:10,13,14 251:14
**cases**  11:16
**categorize**  295:21
**cc**  44:8 144:18 172:20 174:5 204:25
**cc'd**  89:8
**ccr**  1:23
**cellular**  5:7
**center**  69:8,11
**century**  271:4
**ceqr**  127:6
**certain**  17:22 183:21 280:21 299:3

**certainly**  58:5
**certified**  2:7
**certify**  311:3,8,14 317:3
**chain**  88:25 89:5 93:6 108:18 109:16 110:8 122:10 136:21 185:23 186:15 203:25 204:21 247:8,10 248:8 266:4 276:6 288:18 291:24
**chance**  104:18 162:20 244:19
**change**  96:14 97:8 175:10 285:5 286:12 297:19 298:15,22 300:3,9
**changed**  95:23 96:5 118:4,6 281:4 297:17
**changes**  318:1
**changing**  294:20
**characteristics**  159:7
**characterization**  18:22 49:24 111:13 112:2
**charge**  265:23
**charges**  13:15 74:23 75:3
**chart**  35:18 36:10 36:12,19 51:14 54:17,18 55:9,13 312:10
**chase**  197:18
**chats**  10:24
**children**  152:6,9
**choose**  159:10,13

**chooses** 202:25
**circle** 115:9
**circumstances** 240:7,9
**city** 11:25 13:4,5,7 14:20 95:3 96:23 97:18 98:16 99:2 105:23 106:4,10 106:18,25 107:13 107:22 108:13 121:19 132:20,24 175:18
**civil** 13:14 15:6 309:22,25
**claim** 62:21
**clarification** 254:6 274:2 297:2,22
**clarified** 211:18
**clarify** 34:9 253:6
**clear** 81:12 102:5 275:7
**client** 114:4 145:16 193:14 195:3
**close** 85:25 155:24 200:10 310:13
**closed** 9:17 10:8 155:23
**closer** 216:7
**closing** 223:21
**clue** 97:6
**colleague** 186:24 187:11 212:19
**colleagues** 186:18
**collect** 65:21 306:4 306:18
**collected** 306:22 307:3,4,5,6,8
**collecting** 305:7 305:23 307:14

**college** 22:24 23:2 152:7
**come** 69:4 94:11 149:14 238:20 261:14 300:17
**comes** 26:17
**comfortable** 159:11
**coming** 225:24 226:5 248:3 279:8
**command** 202:2
**commencement** 311:4
**comment** 267:2
**comments** 266:22 277:9
**commercial** 56:3 128:25
**commission** 62:14 62:22 63:4,8,10,11 65:19,21,22,23,25 66:9
**commissioned** 221:2
**committee** 116:9
**communications** 10:25 72:23 73:5 106:17 107:20 263:17,20 264:14 287:16,25 307:13
**community** 105:24 106:10,18 107:2,3,14,15,22 108:13 115:5 116:9,21 117:2 129:2 313:5
**companies** 31:19 170:17
**company** 18:4 27:6,6 29:20 30:10,12,20,21

89:15,18 103:18 290:7
**comparable** 199:11 236:22 237:2 262:18 263:6,14,18,23 264:6,15
**comparables** 264:18
**compare** 285:3
**comparison** 169:3 169:10 199:2 236:12,16,21 260:2,20,25 261:12 262:10 274:12 283:16 285:6,14,21
**compensated** 33:21
**compensation** 27:10,15,20,25 28:16 29:25 35:11 63:13,16,17,21
**complaint** 240:2 305:16,17
**complete** 9:5
**completed** 23:5,7 205:5 246:25 248:18 249:10
**completely** 261:24
**compliance** 61:16
**comprehensive** 212:22 225:9
**comprising** 128:20
**comps** 237:7,10 264:5,20 274:9,11
**computer** 155:13 270:21
**concern** 105:9,12
**concerned** 279:14

**concerning** 287:17 288:2
**concerns** 205:7 278:16,25 279:24
**concierge** 4:8 43:20 70:5,12 88:14 109:12,22 126:16,20 137:4 151:10,18 172:23 173:3 186:8,10 191:23 204:16 226:13,17 229:21 247:12 269:3 276:16 284:20
**conclude** 90:18 277:15
**concluded** 90:21 169:16,20 202:12 202:17 214:21 223:22 310:8
**concludes** 259:17 310:15,17
**conclusion** 53:17 101:14 124:14 125:5 148:11,17 149:13 158:10 197:17 216:15 250:5,20
**conclusions** 196:22 211:18
**concur** 216:2
**condition** 193:17 195:5,6,15 208:18
**conditions** 194:24 206:19 214:7,20
**conduct** 10:15 210:25 287:9
**conducted** 13:11 211:12 301:9,12
**conducting** 12:5 12:23

confidential 244:8
confirm 88:18
112:8 174:2
220:23,24
confuse 284:4
confused 145:8
284:6
confusing 283:23
congratulations
137:14
conjunction
176:14 179:12
217:4 220:20
connected 165:14
connection 62:20
66:15 110:20
111:2 114:22
180:18 271:5
consider 22:14
68:9 159:18,22
217:6 220:10,19
240:9 250:22
252:4,11,12
274:25 279:5,15
279:25 282:4
283:15 286:11
consideration 40:9
40:10 65:4 87:11
87:13 95:5,19,23
97:17 101:7
174:17 179:25
216:8 255:8
278:20 279:10
285:12
considered 23:7
66:14 159:25
209:3 240:24
242:8 248:22
249:20 255:17
256:23 257:14
270:8 271:13,23

289:16
considering
202:19 252:23
253:9 292:12
consisted 121:9
consistent 195:7
202:8
construct 61:21
128:14
constructing
61:14
construction
130:17 131:16,20
132:6
consult 26:8 90:7
90:8 102:15 149:5
consultant 127:16
consulted 147:25
consulting 90:18
102:13,17,24
103:11
contact 205:6
contacted 134:12
165:24
contain 128:19
contained 196:22
contemplated
66:22
contend 273:8,9
contents 71:8
context 176:15,17
178:6 179:10,13
continuation
247:10
continue 5:8 53:18
141:13
continued 196:10
continues 62:23
control 63:25
90:15 91:6

convenient 83:13
conversation
138:11 142:9
146:9 154:12
158:7 161:10
176:16 178:6
186:21,23 188:24
231:16,18,19
244:24 246:9,11
246:13,18 250:3
262:14 264:18
270:5 271:25
274:14 304:9
conversations 5:6
10:24 107:18,20
108:3,12 109:7
119:24 146:8
150:2 154:6 158:5
158:5 231:20,21
231:23 232:4,6,9
232:12,24 233:12
246:23 247:4
248:17 250:15,19
262:13 264:16
300:6,7 304:21,22
305:4,15 307:21
convicted 309:18
copied 95:15
110:9 113:9
115:23 137:22
221:24 243:3,7
291:7,14,16
292:10
copies 184:16
238:13
copy 137:8 164:5
184:21 196:11,12
234:9 238:2,9
241:17 242:21
244:25 266:6,20
276:8 290:25

corcoran 292:15
corp 239:22
corporate 15:5,12
84:18 141:9
239:21 288:11
corporation 1:5
4:3,5 5:14 6:11,18
147:12,15 314:1
correct 10:6 13:13
13:22 20:21 21:6
21:23 24:7,23
25:20 29:19 30:13
30:22 32:4 33:19
37:25 41:3,10
42:4 45:13,16,25
46:7,13,19,20,24
46:24,24 47:9,19
49:10,17 50:11
51:4 53:3 55:19
56:17 57:2,10,13
59:18,23 61:22,25
63:23 64:3 72:8
75:6,17 77:2,5,9
81:20 82:8,9,10,13
82:16,22 83:4,8,17
83:25 84:6,7
85:13,14,19 86:11
87:4,8 89:3 91:4,8
91:13,14,14,17
93:2 94:8 95:16
95:24 96:24 97:20
100:7,8,10,11,25
103:5 104:14
109:13 111:7,10
112:10,11,12
113:19 116:3
120:13 122:14,25
129:12,23 133:14
133:22 136:8,10
136:11 142:23
144:15 153:2

[correct - decision]                                                      Page 12

157:16 160:24
183:8 187:23
193:22 194:6
197:21 198:10,16
202:15 205:12,13
211:3 212:19,20
213:5 221:3
223:16 235:15
259:23 260:3
283:2 285:22
293:16 294:14
298:9 302:22,25
**correctly** 24:20
222:12
**correspondence**
247:24
**council** 130:6
**counsel** 3:2,12 4:2
5:13 6:5,18,23
10:18 83:12 93:19
234:21 297:4
311:16,19
**couple** 19:17
21:20 89:9 164:14
309:17
**course** 23:22
28:13 48:19 68:16
68:18 119:13
191:10
**court** 1:1 2:7 5:17
5:24 6:25 7:13,18
8:5,12 14:25
154:22 155:2
239:20 244:23
**cover** 76:24 98:18
181:3 204:20
**created** 25:4
103:22
**credibility** 211:16
**credible** 223:23

**crime** 309:19
**criminal** 13:15
309:25
**criticisms** 272:7
**crown** 115:5 116:9
116:20,23 117:3
117:17,20,25
118:2 119:3,25
193:19 195:7,16
201:25 202:6,14
313:5
**ctnyc.com** 104:3
**current** 56:21 57:7
85:13,19 123:18
137:15 175:8
193:18 202:3
216:9 223:10,23
240:23
**currently** 91:3,7
118:20 123:14
167:10
**cut** 172:23 197:18
**cv** 1:7 5:19

**d**

**d** 103:4 312:1
**dalvarez** 3:10
**data** 223:11
236:11 292:18,19
**date** 15:25 35:20
43:18 57:8 70:10
76:9,19 83:19
88:13 98:9 104:10
109:20 115:8
120:9 122:6
126:24 127:22
131:21,22 134:10
137:2 138:6
144:10 147:17
151:16 160:21
163:3 166:7,13
167:3 173:7,15,16

181:12 186:4
191:21 195:17
204:14 205:20,22
210:8 212:7 215:2
215:3 216:9
223:10 225:3,11
226:6,14 229:19
230:17 233:22
241:22 244:17
247:3,19 258:8
266:12 268:23
276:13 284:18
288:23 292:4
304:2 311:12
**dated** 16:6 43:16
44:21 45:12 71:14
88:11 93:10 104:3
104:8 105:15
108:4 109:18
113:25 115:6
120:7,16 122:4
136:24 137:7
144:8 147:15
162:17,24 167:3
172:21 173:5
174:13 178:20
181:10 186:2,19
188:14 191:19
192:10 204:8,12
204:23 205:15
210:6,11,15 212:5
212:17 224:25
225:6 226:8
228:21 229:17
230:2 233:20
234:14 241:18,21
244:15 247:17
258:4,6 266:7,10
266:19 276:11
277:3 281:2
284:16 288:21

292:2,9 312:13,19
312:24 313:2,6,9
313:12,19,22
314:1,6,13,16,19
314:22,25 315:3,6
315:9,12,15,17,19
315:24 316:2,5,10
316:13,16,19
**dates** 106:21,23
107:25 127:24
129:17 143:2,3
157:20,21,24
164:21 229:2
235:19 259:14
305:11
**david** 221:16
**day** 20:18 25:15
25:15,18,18 26:7,7
86:8 162:5,5,5,6
225:18 244:12
245:6,10 251:8
297:25 309:15
317:11
**days** 21:11 72:22
152:19
**dcp** 133:11
**deal** 63:2,22,24
93:25
**dealt** 62:18
**dear** 131:7 182:8
213:3
**deciding** 159:8
**decipher** 269:24
**decision** 26:16
139:23 159:9
223:5 224:7
239:20 244:16,23
246:12 297:22
298:2 308:7
315:21

212-279-9424                                              212-490-3430

decisionmaking
  25:15
decisions   25:18
  26:9,12,21 72:5
  160:23 161:3
  183:21,24 218:12
  282:25 283:3
  297:12
deed   12:21 14:11
  14:12
defendant   1:10
  3:12 6:14
defer   255:21 256:7
  256:19 257:2,3,4
  273:6 282:15
deferred   273:4
deficiency   272:25
defined   45:6 61:15
  74:17
defines   46:22 47:3
  142:14,16
definitely   109:9
definition   15:8
  118:21 194:9
  215:8
definitively
  219:12
degrees   22:23
delegate   161:21,24
delegated   162:3,4
delegating   162:9
demands   308:4
demarco   136:13
  137:7 143:13
  145:17 146:22
  154:4,7 267:24
demised   265:4
demolish   61:13,20
  62:10
demolition   217:9
  218:20

denise   3:9 6:19
density   114:6
  118:8,10,12,14,14
  118:16,19,22,22
  118:23
department
  121:18 132:20,24
dependent   77:7
  82:12
depending   223:5
depends   54:7 60:5
  60:20,20 69:3,4
  72:15 161:9,9,10
  161:11
deponent   19:18
  75:20 83:11
  290:17
depose   297:7
deposed   11:8,13
  15:4 310:10
deposit   206:7
deposition   1:13
  2:3 5:12,20 9:9
  10:16 11:2 15:15
  16:4,24 18:25
  19:21 20:2,10
  22:2,6,8 29:4,7
  72:22 73:11,16
  74:10 77:19 79:8
  79:15,19 81:7
  94:18 149:9
  155:22,25 156:7
  156:11,19 157:3
  170:20 171:18
  243:24 246:7
  286:5 287:14
  310:7 317:4
depositions   265:25
describe   9:19
described   27:5
  129:11 195:16

239:25 240:4
  259:21
describes   46:10
  128:8 152:11,12
describing   242:6
description   128:5
  129:7 141:12
designated   15:11
  17:4,17,24
designing   121:7
designs   121:9
desk   212:22
  224:25 225:9
  315:9
despite   225:22
destroying   303:17
  303:18
detailed   236:19
  292:16
determination
  265:2 278:18
  289:10 296:21
determine   72:24
  73:5,10 148:7
  149:10 153:19
  165:2 253:22
  260:12,16 265:14
  308:14,16
determined   83:21
  152:14 154:11
  255:8 308:2
determining   11:4
  256:23 257:14
develop   32:22
  46:18
developed   167:13
development   27:5
  27:6 30:10,11
  32:19 33:17 35:5
  45:8 46:11 49:12
  61:9 121:10,11

123:23 124:22
  128:19 196:25
  204:6 206:22
  207:3 239:22
  260:17
developments
  33:7
devora   89:6,13
  95:18
differ   287:5
difference   205:22
  272:12
differences   274:11
different   28:15
  60:12,16 83:3
  85:10 87:8 118:15
  135:4 170:8 180:6
  208:24,24,25
  249:3,25 255:3,4
  272:4,5 295:17,24
  296:16
differently   180:6
direct   7:7 47:16
  50:25 75:2 162:7
  274:16,18 312:3
directed   199:3
  206:24 260:24
  261:11 278:23
  282:10
directing   282:4
direction   273:15
directly   37:22
  38:5,13,19 250:8
  291:8
directs   8:18
disagree   216:3
  248:12
disagreement
  143:22
discounting
  188:22

[discover - eiseman] Page 14

discover 18:4
discovery 308:4
discretion 26:20
61:13 72:5
discuss 75:15
137:13,22 143:16
145:18,22 146:2,4
153:17 156:13
215:10,11 216:14
232:6 242:23
discussed 48:13
137:15 138:9,12
143:18 150:23
156:17,18 157:25
215:15 223:15
243:19 268:4
270:3,14,18 278:2
289:21 294:19,22
303:24,25 304:6
discussing 42:25
215:13 254:21
264:3,4 273:22
discussion 101:20
154:3 156:23,25
187:10 189:6
215:22 217:14
231:24 241:11
275:13,15 276:2
289:11 290:22
discussions 43:6
48:3,9 69:20 96:9
105:23 106:4,6,9
106:13,17,25
107:12,13,21
109:3 150:10
156:6,10 157:9,15
157:17 222:5
231:5 239:5,7,10
240:22 241:4,14
241:14 242:6,16
243:24 245:9

246:5 249:8 254:3
254:14,18,20
256:9,12,16 261:4
261:8 262:8,9
264:2 271:16,18
278:4 283:5 290:2
291:17,21 293:23
299:19,23,24
300:2 304:4
307:13
dispute 12:18,19
12:20 81:9 198:6
disputing 111:25
distinction 229:2
distracted 211:4
district 1:1,2 5:17
5:18
ditmas 41:4,7
dli 1:7 5:19
document 16:18
16:19,24 19:18
35:15,23,24 36:3
39:3 43:13,21,24
50:19 56:24 57:18
57:19 70:15,22
75:20 77:12 83:11
88:7,19,24 94:20
94:22 95:3 98:14
98:16,17,20 104:2
104:11,19 107:8
109:14 110:18
111:8,10 112:3,9
114:25 115:3
116:8 120:4
121:25 124:10,19
124:21 126:3
127:2,12,20,25
130:22 132:9
133:4,5,11 144:5
146:18 147:9,10
147:19 162:14,21

166:8 168:4,6
170:15 172:18
190:12 203:19
204:2 211:22
221:20 228:16
241:25 242:5
244:5,11 266:4
268:18 276:16
289:25 290:17
303:3 306:14,15
306:23 308:8
documented
304:23
documents 20:11
20:12,14,16,19,25
21:2,13,15,16,17
72:24 73:5 79:21
80:18 81:10 97:21
101:22 102:13
103:20 126:8
141:2,7 146:17
149:17 153:11,19
170:20,22,25
171:2,6,14,15,17
171:23 203:23
299:3 301:3,16
302:5,7,8,9,12,17
302:21 303:11,13
303:15,17,21
304:8 305:7,23
306:5,18,21 307:3
307:5,5,6,8,14,23
307:25 308:7,12
308:15
doing 7:10,12 9:21
22:14 24:2,3
27:16,25 28:6
33:23 34:8 41:17
65:9 121:3,6
156:19 173:13
278:2 280:7

dollars 40:16,19
57:22
door 9:17
dot 151:13
dov 31:4,5
draft 122:13 204:4
204:11 205:5,25
206:4,7,8 266:20
314:24
due 148:19,20
dushinsky 25:25
26:13,24 29:18
36:16 44:9 45:22
45:24 46:3 48:21
72:14 87:21
101:25 102:16,19
122:11 147:24
150:11
dushinsky's 26:2
37:3
dwelling 128:21

e

e 3:1,1 7:4,4 311:1
311:1 312:1,5
earlier 72:4 82:2
144:14 244:12
245:2,6
earn 28:5,14 30:15
50:13 51:6,19
earns 32:2
eastern 1:2 5:3,17
economic 265:5
educate 18:7 20:6
education 22:25
educational 22:21
effect 47:12 50:25
74:14,20 75:11
effective 195:17
215:2
eiseman 44:7,7,12
144:19

**either** 51:22 59:21
76:21 89:16
106:17,25 151:23
218:8 222:14
223:6,8 225:16
229:5 245:24
266:22 306:8
**electronic** 302:24
**elements** 260:20
**email** 43:15 44:6
44:20 88:10,24
89:5,7 93:6,10
95:11,12 104:3,7
105:9,20 106:3
108:4,7,9,18,24
109:15,17 110:8
120:6,15,20 122:3
122:10,10 136:21
136:23 137:6,11
137:23 138:7,13
143:12 144:7,12
144:13,17,22
145:5,16 146:2
162:16,23 172:19
173:4 181:3,9
182:17 185:23,25
186:15,17 188:13
188:14 189:7
203:25 204:21,22
204:22 205:4,20
210:5,9,10 212:4
221:25 222:11
229:16,23,25
233:16,19 234:6
241:16,20 242:20
243:5 244:6,14
247:7,10,16,24
248:7 266:4,4,5,9
266:18 267:11
276:6,6,7,10 277:3
277:4,4,5,10,12

282:8 288:17,20
289:3,4 290:21
291:15,23,25
312:12,18,23
313:1,8,11,18,21
314:5,12,15,18
315:2,5,11,14,17
315:19,23 316:4,9
316:15,18
**email.com** 104:5
**emails** 113:9
115:24 167:19
263:13 290:12
292:8,9 301:4
302:7 304:23
**employed** 24:21
24:24 26:25 27:4
**employee** 30:15
311:15,18
**employees** 29:11
29:16 30:23
**employment** 23:10
23:21
**enactment** 201:24
**encumber** 237:25
**encumbered**
174:12 191:2
206:21 207:2
208:14 238:9,14
240:8
**encumbrance**
199:17 208:4
209:10 220:10,19
240:10,14,23
241:5 242:7
249:19 252:5
270:7 271:12,22
279:5,15,25 282:6
**encumbrances**
198:21,22 208:8
217:7 248:21

250:22 251:20
252:12,24 253:9
255:9,16 256:13
275:2 280:22
283:17 285:15
**ended** 179:15
**endorsement**
98:18
**ends** 181:7 186:13
**enforcement** 13:2
13:12 14:8,14,16
14:22
**engage** 114:21
228:11 229:5
234:24
**engaged** 62:18
205:9 210:19
228:23
**engagement**
110:13,19 181:5
181:10 182:10,18
190:16 210:13
222:14 234:12,20
236:3 314:16
**enter** 113:3 182:4
**entered** 39:19 83:2
86:24 105:17
107:4 112:23
113:6 115:17
**entering** 113:13
**entire** 193:17
**entities** 32:3 91:15
174:15 177:9,12
177:16
**entitled** 63:10
65:19,21,24 66:9
112:4 116:8 127:4
**entity** 37:3,4,7,12
40:5,9 44:21
51:16 63:25 64:25
90:14,19 91:6

100:19 163:17
**entry** 58:25 59:9
60:3
**environmental**
126:6,22 127:5,15
130:11 132:12
313:15
**equivalent** 59:10
86:9
**errata** 318:1
**error** 298:7,10
**especially** 11:3
**esq** 3:7,9,17 4:2,3
**essentially** 24:20
**estate** 24:5,6,22
27:6,8 28:24
30:11 32:16 93:25
96:24 99:15,24
119:11 181:5
189:23 192:9
194:10,12,16
204:5,12 214:15
314:25
**estimate** 34:4
152:19 153:5
157:13 192:25
236:23 237:3
265:3
**estimates** 150:23
**estimation** 292:21
**esty** 204:23
**eugene** 120:21
**evaluate** 228:13
**evaluation** 122:23
**event** 142:12
267:5
**eventually** 274:15
**everybody** 180:5
209:16,17 310:9
310:12

**evidence** 101:15 173:22 203:19
**exactly** 85:23 145:25 218:25 261:7
**examination** 7:7 141:13 311:5 312:3
**example** 12:4 108:6
**exasperated** 299:7
**exceed** 58:15 59:4 83:24
**exceptions** 196:7
**excess** 197:11
**exchange** 223:8
**excluding** 80:4 171:8,12 297:4
**executed** 70:2
**executive** 216:25
**exercise** 197:21
**exercised** 196:24
**exhibit** 10:4 15:21 15:22 16:11 35:16 35:17 43:14,15,21 54:20 70:7 77:18 77:20 78:11 81:23 81:24 88:10,21,21 89:2 98:7 104:7 104:13 109:17 115:4 120:6,10,12 122:3 126:21 130:22 136:23 144:7 147:12,13 151:6,7,9,14 155:14,16 156:3 162:14,23 166:3 166:10 173:4 181:2,9 185:25 191:18 192:4 200:5 204:11

209:24,25 210:5 212:4 221:9 224:24 229:16 233:19 241:20 244:14 247:16 258:5 266:9 268:21 276:10 284:15,24 287:22 287:23 288:20 291:25 312:6,9,12 312:15,18,21,23 313:1,4,8,11,14,18 313:21,24 314:3,5 314:9,12,15,18,21 314:24 315:2,5,8 315:11,14,17,19 315:23 316:1,4,7,9 316:12,15,18
**exhibits** 10:2
**exist** 103:20 208:18 264:21,22
**existed** 208:19
**existing** 74:13,16 74:20,24,25 75:4,5 76:8,18 124:3,4 142:14 187:6,14 187:19,23
**expect** 27:24 28:5 28:10
**expected** 150:12
**experience** 45:8 46:12
**expiration** 61:12 197:10
**expired** 197:6
**expires** 137:15
**expiring** 174:20 174:24 176:22 182:13,23
**explain** 13:24 32:14 38:3 56:8

124:13 134:16 237:15
**explained** 187:16
**explaining** 214:19
**explains** 214:14
**expressing** 150:5
**expressly** 209:4
**extend** 197:9
**extended** 292:13
**extension** 259:20
**extent** 14:5 18:15 49:13 50:5 72:19 94:21 95:2,8 108:10 162:3 185:3 249:14 255:11 283:12 295:7
**extraordinary** 196:3,7,21,23 198:13
**eyes** 123:10,11,12 176:20

**f**

**f** 311:1
**facility** 129:2
**fact** 22:8 68:20 107:9 139:17 142:12 281:22
**factual** 250:3
**failure** 279:5,15 279:25
**fair** 48:12 58:14 59:3,21 83:4,21,23 90:18 100:21 148:8 154:10 157:13 158:20 161:15 165:2,15 202:7 203:6 224:7 232:15 233:3 250:20 255:7,17 257:10 259:17

295:16
**falling** 110:4
**false** 100:18
**familiar** 176:18 180:20 239:19 240:12,16
**familiarize** 104:18 208:15
**family** 37:20 38:8
**far** 42:25 56:3
**fashion** 259:3
**favor** 69:7
**february** 104:4,8 105:15,21 107:9 108:4,17 127:9,22 136:24 137:7 142:19 143:12 144:8 204:23 205:17,21 206:25 210:6,11,15,18 212:5,18 220:7 221:17 225:2,6 226:8 228:21 229:17 230:2,12 312:24 313:19,22 315:3,6,9,12
**feder** 31:4,5
**federal** 15:6
**fee** 99:21,23 163:25 169:16 174:7,16 193:2,15 194:10 195:13
**feel** 10:13 19:2 22:17 96:22 205:5 299:15
**fees** 100:4
**feet** 46:19 85:21 128:16
**fein** 3:13 6:13
**felt** 159:11

**figure** 153:14 200:18

**file** 100:18 127:11 133:16 151:11 172:24 191:24 192:3 225:24,25 226:3,14 236:20 247:13 301:22,24 301:25 302:2 308:19

**filed** 5:16 98:16 99:2 100:22,23 133:13 305:16,17

**files** 20:17 262:24 262:25 292:19

**filing** 99:21,23

**fill** 94:3

**final** 69:25 206:11 309:17

**financial** 78:2,8,13 78:17,21,23 79:6 79:11,20 80:2,24 84:14,20 142:9

**financially** 6:3 311:19

**financing** 180:8,11

**find** 226:13 262:21 262:22

**finder** 62:19

**findings** 217:3

**fine** 7:10 37:17 86:15 224:20 227:22 266:25 267:6 299:14

**finish** 8:10 67:19 79:17 102:22 250:17 272:21,22

**firm** 6:9 110:25 111:14 113:20 114:3,22 115:11 115:22 121:6

163:21 172:5 205:10 303:3

**first** 12:4 41:15,16 44:6,24 46:15 47:11 56:4,22 59:10 67:9,12 71:7 77:7,15,16 82:19 86:11 95:11 98:17 99:18,19,20 113:24 114:24 128:2,25 129:3 134:3 136:13 167:9 171:25 173:12 182:7,9 184:16 188:16,17 195:2,6 196:21 204:20 206:6 212:21 213:2 221:9 230:18 236:2 248:3 259:9 259:13,15,20 265:3 266:17 268:10 270:16 287:23 290:13,16

**five** 39:24 86:14 109:14,14 207:12 207:15,17 300:12 300:18

**fixed** 74:12,21 76:9,19 109:25

**flavor** 165:12

**flip** 58:8 62:13 74:4 111:17 124:8 130:16 137:5 147:21 212:12 221:8

**fm** 236:23

**fmr** 278:18 289:10 292:21

**fmv** 93:25 94:11 150:23 152:19

153:6 158:12 180:18 235:24 236:7,10 237:3 240:24 256:23 257:14 259:10,22 265:2,4

**focus** 186:20

**focused** 251:5

**folder** 16:15 302:2 302:19,20

**folks** 134:9

**follow** 28:8 124:18

**followed** 248:25

**following** 61:11 184:14 195:5 196:6 197:14 214:6 237:22 318:1

**follows** 7:6

**followup** 222:4

**foot** 56:14,22 57:7 57:22 59:11,22 60:19 82:21 83:24 84:6 85:12,18

**footage** 56:4 57:25 58:4

**fore** 180:3

**foregoing** 311:9 317:3

**forgot** 295:12

**form** 55:18 94:3 94:25 95:4 99:10 100:23 128:3 205:25 206:4 223:23 224:5

**formal** 216:11

**formally** 293:5,11

**forms** 93:23 95:20

**forth** 76:21 311:13

**forward** 268:7

**forwarded** 108:24

**forwarding** 120:20 124:6

**four** 224:19 233:24 238:17,23

**framework** 119:25

**frank** 4:8

**frankly** 149:22

**fraud** 309:25

**free** 49:25 65:15 205:5

**frequent** 225:20

**friend** 70:17

**front** 9:20 69:15 88:15 155:15

**full** 24:23 58:10,19 183:10 206:8 235:22 260:10

**further** 36:18 184:9 205:6 310:5 311:8,14

**fw** 104:6

**g**

**g** 7:4 151:7

**gardiner** 131:13

**general** 4:2 22:25 25:12,14,21,23 26:15,21 27:21 80:6 108:20 117:13 241:13

**generally** 24:25 231:23

**gentleman** 31:3

**getting** 31:16 113:21 161:4 225:17,23 251:7 251:10

**give** 23:20 40:4 129:16 162:5 167:16 168:19

[give - handwritten]

185:6 203:21 238:2 253:14 273:12,15 286:22 302:10

**given** 139:13,13 142:25,25 146:10 154:7 179:22 190:6 205:16 206:11 208:13 209:10 216:8 254:16 273:17 274:13 285:13 296:20 297:23 298:2

**giving** 9:4 226:11 230:7

**glad** 110:6

**glanced** 19:22

**glitch** 110:3

**gmail.com.** 44:10 210:10

**go** 5:9 14:2,9,17 17:14 18:23 19:12 22:24 23:2,3 27:2 30:8 31:10 32:24 37:16 52:14 54:15 59:2 65:11,12,16 68:7 70:19 77:21 81:12,21 84:12 85:11 90:22 95:25 107:10 110:17 115:13 118:3 119:20 125:20 130:21,24 132:22 133:8 143:10 145:24 165:4 168:16 183:25 185:8 194:8,20 202:16 227:22 231:8,9 237:4 243:20 251:16

255:10 256:18 257:7 263:9 270:23 272:12,16 280:14 284:10 289:2,9 295:6 300:14 305:20

**goes** 36:17 54:12 54:19 150:25 161:6 162:4 185:24 213:18 244:6 261:6 289:22 297:24

**going** 5:2 7:21,24 9:22 10:4 14:6 15:16 17:23 54:8 55:21 68:10 81:5 110:9 130:3,5 142:12 154:18 155:4 158:11 207:13 213:22 220:8 233:25 294:22,23 300:14 305:13 309:9 310:16

**good** 5:1 6:8 96:23 127:24 143:2 154:17 278:8

**govern** 82:4

**governmental** 100:18

**grade** 23:4,7

**graduates** 152:7

**greater** 114:5

**gross** 128:15

**ground** 48:23 49:7 93:24 94:3,12 95:5 97:19,20 100:24 124:22 133:24 139:9,18 139:24 165:3 174:13,14,18

175:16,17,23 176:6,8,11 177:8 177:11,15 178:12 178:14,19,24 179:25 187:6,14 187:18,22 188:9 188:12,19 189:3 190:13 194:2 196:5 198:14 199:11 200:6,13 200:15,19 201:5,5 201:8,8,8 202:2,17 202:18 215:22,24 217:5,8 218:19 220:2,3,20 222:12 223:9 236:22 237:2 262:19 263:6,18,24 264:6 264:7,15,19 265:5 265:9,19 292:16

**group** 27:9 30:5,7 30:19,21,23 31:9 31:14,15,16,20,23 32:10 33:16 34:25 35:9,12 43:5 44:15 45:3,7 47:6 47:20 48:4,22 49:6,15 50:7,12 51:6,16 52:12,18 52:24 53:12,13 54:2,12,16 55:2,4 55:8 56:20 61:19 66:14,23 67:17,24 68:5,20 69:20 108:16,17,20 110:20,25 111:23 112:6,14 113:5,13 115:10,17,25 163:8 166:7 258:16,22 301:14 307:22

**group's** 46:10 59:25 115:21

**grouprabsky** 44:10

**gsf** 128:19

**guess** 14:4,11,19 17:14 22:7 23:19 27:23 40:3 41:15 42:18 58:3,25 64:23 92:6 105:6 111:6 112:8 143:22 145:4 154:21 176:24 202:10 222:19,25 231:8 235:18 251:24 277:3 281:22 282:9 285:11 293:18 294:10,15 300:8 301:5 304:20 307:4 310:8

**guys** 19:5 158:15 245:22 256:6 264:11

---

**h**

**h** 7:4 312:5

**habib** 127:8,13 133:10,19

**hackensack** 3:5

**half** 139:22

**halfway** 235:23 236:5

**hand** 8:6 192:22 236:6 304:7

**handed** 263:2 308:17

**handwriting** 269:8,10,11,17,19

**handwritten** 146:25 268:18,22 316:7

**happen** 53:10
**happened** 39:23 146:8 153:14,16 157:19 168:7 308:25
**happening** 107:9 107:11
**happens** 26:17 72:15 75:16 306:24,25
**hard** 34:12 226:11
**hardcopy** 126:9
**hart** 131:3,5
**hayden** 3:3 6:10 6:20
**head** 19:15 264:3
**header** 45:2 61:9 214:13
**hear** 197:25 220:14
**heard** 102:25 240:15 256:2,5,8,9
**hearing** 249:13
**held** 2:4 5:20 267:16
**help** 165:2
**helpful** 165:11
**hereinbefore** 311:12
**hi** 137:11
**high** 22:24 23:3 118:12,13,14,16 292:20
**higher** 52:16 53:8 53:14,15 57:13,24 58:5 170:4
**highest** 197:2 217:5
**highly** 214:25 216:10 248:5

**hire** 158:22 184:6
**hired** 19:5 111:15 111:21 112:5 113:21 114:10,12 114:13,20 129:19 129:21 133:17 164:23 256:6 259:2 273:7 290:8
**history** 23:10,21
**hk** 3:18
**hold** 35:8 59:15 166:19 183:13 269:13 284:2 286:23 296:24,24 296:24 298:5 303:7
**holding** 93:24 226:4
**holdings** 1:8 5:15 6:15 15:13,17,24 16:5 25:3 28:12 36:18,23 37:10,19 38:10,24 39:8,15 40:2,4,25 41:5 44:16 54:23 55:6 55:6,12,15 71:2,19 71:25 72:6,10 73:22 75:8 77:14 89:22 91:4 115:12 115:20 116:2 127:7,18 133:21 147:14,23 163:16 181:7 183:20 192:12 204:10 210:15 225:8 312:8 313:25
**hope** 97:24
**hoping** 300:15
**hosted** 2:5
**hour** 207:13

**hours** 8:19 21:20
**housing** 46:19 116:9
**howard** 3:17 4:2 6:12,16,16 19:3 74:6 80:17 81:5 126:4 171:11,21 251:8 261:17 262:3 297:7,15 298:6 299:10 307:18
**hum** 90:4 93:12 128:17 131:4 194:17 302:3
**hundreds** 121:14 121:21
**hypothetical** 193:16 194:24 195:5,6,14 206:18 214:6,20

**i**

**idea** 140:20 146:19 179:6 205:23 209:14,17 240:17 251:15 278:8 291:6 302:10,13
**identification** 16:2 35:21 43:18 70:11 88:13 98:10 104:10 109:21 115:8 120:9 122:7 126:25 137:3 144:11 147:18 151:17 163:3 166:14 173:7 181:13 186:5 191:22 204:15 210:8 212:8 225:4 229:20 233:23 241:23 244:18

247:19 258:9 266:13 268:24 276:13 284:19 288:24 292:4
**identified** 88:22 236:16
**identifies** 63:9
**identify** 21:17 263:23 265:18
**illustrate** 236:20
**image** 89:10
**immediate** 260:18
**immediately** 135:19
**impact** 117:21,23 175:11 185:15 191:9 199:23 224:6 281:25
**impacted** 211:18
**important** 18:18 68:4 178:3 277:16 277:21
**impression** 267:13
**improved** 196:8 217:6
**inaccurate** 36:21
**inbox** 302:9
**include** 187:5,17
**included** 22:6 87:12 196:4 198:6 202:6 223:12
**includes** 194:2,9 195:12
**including** 267:18 275:8 292:12
**increase** 56:5 83:22 86:7 150:17
**increasing** 52:15 53:12 86:11
**independent** 301:8

**independently** 165:8
**indicate** 51:15 99:10 103:21
**indicated** 175:9
**indicates** 169:2 197:8 211:10 212:22 292:11
**indication** 40:4 46:5
**individually** 209:17
**industrial** 41:13
**inform** 199:17,21
**information** 68:4 68:10 69:2 100:18 143:22 167:17 168:20 174:9 178:4,9 184:14 209:9 250:4 263:4
**informed** 174:14 177:8 199:25
**inhouse** 6:18
**initial** 43:6 216:4,7 222:14 247:2
**initiate** 184:13 237:21
**initiative** 137:17 214:23
**ink** 277:8
**inquiring** 245:19
**inquiry** 174:4
**inspection** 196:9
**instructing** 253:19
**instructions** 8:24 189:20 198:9 253:15 254:16 273:12,17
**intended** 134:20 138:16 163:15 183:12,19

**intent** 46:4 48:14 55:23 59:24 60:4 66:12 67:5,21 68:6,11
**intentionally** 222:13
**interest** 29:21 46:5 92:24 119:25 163:25 169:16 174:17 193:2,15 194:12,16
**interested** 6:4 48:23 49:6 119:15 134:19 135:3 311:20
**interests** 87:3 90:11 115:19 195:13
**interfere** 271:4
**interference** 5:7
**intermediary** 62:20
**internal** 179:20,20
**internet** 155:19 271:5
**investigate** 175:15
**investigating** 14:8
**investigation** 11:21 12:3,6,20,24 13:11,18
**involved** 12:9 14:15,16,22 25:2 31:5 32:10 35:4 43:6 48:17 50:21 53:5 69:19 72:14 72:18,20,24 73:18 91:23 92:5 96:8 96:17 154:23 191:2,3 233:12 240:21 242:5 262:7,9 283:4

287:12 288:14 299:18,22,25 304:3
**involvement** 13:20 14:5 28:11 72:20
**involves** 33:25
**irrevocable** 37:20 38:8
**issue** 222:12 242:17 303:6,10 305:14
**issued** 16:5
**items** 19:15

**j**

**j** 317:1
**january** 109:18 110:9,24 112:7 134:6 204:8,13 205:15,20 313:2 315:1
**jay** 44:8,17
**jerry** 162:17
**jersey** 3:5
**job** 141:6,7
**john** 5:22
**joining** 226:19
**jonathan** 4:7 44:7 44:12 144:19
**july** 16:6 167:3 225:11 276:9,11 281:2 284:12,16 316:10,13
**junction** 184:5
**juncture** 139:14 146:9 162:2 274:13
**june** 43:16 44:21 45:12 166:7,11 167:4 172:21 173:5,17,25 176:14 178:12,17

181:4,10 267:16 273:11 274:24 277:4 278:17,25 312:13 314:10,13 314:17

**k**

**katrina** 134:6,23
**keep** 230:21 233:24 245:22 299:8 300:6
**keeps** 81:17
**kept** 301:3,20,21
**kest** 172:20
**kidding** 248:14,14
**kids** 143:6
**kind** 19:5 24:2 34:13 52:21 119:12,23 121:11 139:14 149:12 156:19 157:2 162:7 164:11,23 165:7 168:7 176:3 180:3 208:16,24 218:13 220:14 241:8 250:25 258:21 274:10 277:12 278:6 280:10 281:9,12 281:18 289:24 302:2 304:14
**knew** 142:25 168:13,17
**know** 7:24 8:6,18 8:20 10:25 11:2 13:24 14:5,7,15,21 15:8 16:18 17:10 17:17 18:5,5 19:15 20:16 21:16 23:6 24:23 27:4 27:24 32:5,8 33:2 33:6,10 34:3,13

**[know - koh]**

| | | | |
|---|---|---|---|
| 36:7,13 39:5,12 | 139:4,7,19 140:7 | 258:24 259:3,4,4 | 30:8 31:10 32:24 |
| 41:13,20 42:13,14 | 140:11,12,14,19 | 259:12,13 260:4 | 33:14 37:16 45:17 |
| 48:8,16,17 50:15 | 143:4,6 144:2,24 | 262:15 264:4,7,8 | 45:20 46:8 49:11 |
| 50:18 51:9,9,10,22 | 146:2,8,12,15,20 | 265:9,12,15,20 | 49:18,23 52:14 |
| 52:6,7,9 53:5,9 | 146:23 147:4 | 266:22 267:25 | 53:16 65:11,16 |
| 55:16 56:23 57:15 | 148:20 149:10,23 | 269:21 272:5,10 | 66:17,24 67:19 |
| 58:7 60:7,7,10 | 149:24 150:14,19 | 272:12,18 273:16 | 68:7 69:15 73:25 |
| 62:2 64:18,24 | 150:20 151:3 | 273:18 274:23 | 74:7,9 75:25 80:4 |
| 65:12 66:2,3,20 | 153:10 155:19 | 275:3,11,12 278:5 | 81:2,8 84:12 85:7 |
| 68:8,12,13 69:3 | 157:2,4 158:4 | 279:7,20 281:9,10 | 85:10 86:15 90:22 |
| 71:21 72:16,19,21 | 159:15,20,20,24 | 283:3,11,12,13 | 94:13 95:7,25 |
| 76:2,12 77:10,16 | 160:9 161:6,7,8,8 | 284:22 286:7,14 | 99:18 103:3 |
| 80:12,17 82:25 | 161:10,12 162:12 | 286:15,16,18,20 | 107:10 108:25 |
| 84:13 87:9,11,17 | 165:11,23 168:13 | 290:5,6,6,15,22,25 | 111:4,12 112:16 |
| 87:19,20,21,23,24 | 169:8,13 170:7 | 291:12 293:14,17 | 113:2 115:13 |
| 87:25 90:8 92:4 | 171:13,16 172:4 | 294:5 295:2,21 | 119:20 125:9,20 |
| 92:14 93:3,17 | 176:14,15,18 | 296:2,3,4,6,15 | 126:13,17 132:22 |
| 94:15 95:2,8,9 | 177:21 178:11 | 297:8,24 298:14 | 133:7 140:3 |
| 96:25 97:2,24 | 179:4,10 184:7,23 | 300:9 302:11,18 | 141:11 143:8 |
| 99:13 100:12,13 | 185:9,11,17,18 | 303:23 305:11 | 145:24 150:3,9 |
| 100:14,15,15,16 | 192:3 196:17,18 | 306:24 307:9,9,16 | 151:22,25 152:6 |
| 101:4,5,7,12,13 | 198:4 205:17,21 | 307:18,25 308:25 | 154:25 165:4 |
| 102:14 103:13 | 205:24 206:5,10 | 309:2,15,25 | 166:21 168:16 |
| 104:17,25 105:6 | 213:9,12,12,14,21 | **knowing** 162:12 | 169:11 171:8,11 |
| 106:21,22,23 | 214:19 215:5 | 281:9,17,18 | 171:19 175:25 |
| 107:17,25 108:2 | 218:17,22,23 | **knowingly** 97:23 | 177:4 179:3 |
| 108:15 109:25 | 222:24 223:20 | 98:2 100:17 | 181:15 183:25 |
| 110:4 112:17,18 | 224:10,11 227:25 | **knowledge** 14:6 | 185:8 190:3 192:6 |
| 112:23,25 113:5 | 228:3,4,18,25 | 17:22 18:9,16 | 197:13,23 202:24 |
| 113:17,23 114:14 | 229:3,9 230:22 | 19:4,6 33:10 | 207:16 215:7 |
| 114:17 115:21 | 231:17 232:11,11 | 96:23 227:19 | 219:9,13,22 |
| 117:2,15 118:7,11 | 232:21 233:2,4,4 | 229:8 249:4 288:5 | 220:13,22 222:23 |
| 118:13,15,18,21 | 235:2,3,4,5,6,7,9,9 | **knowledgeable** | 225:14 226:6 |
| 123:19 125:4,7,12 | 236:15,25 237:19 | 17:8,13,18 18:2 | 227:18,22 230:25 |
| 125:14,18,22 | 238:15 240:4,7 | 19:2,11,24 20:3 | 232:10 237:4,12 |
| 129:16 130:5 | 241:8 243:15,18 | 78:13,16,23,25 | 243:20 246:20 |
| 131:6,8,12 132:9 | 243:21,22 248:4 | 79:3,3,5 227:23 | 249:23 250:10 |
| 132:12,15,16 | 249:15,15,25 | **koh** 3:17 6:12,12 | 251:5,10,16,23 |
| 133:3,15,15,18 | 250:11 251:8,24 | 10:21 14:2,9,17 | 252:7,14,25 |
| 135:6 136:16 | 253:18 254:24 | 17:23 18:10,14,20 | 253:11 254:5,13 |
| 138:10,14,25 | 257:17,24,25 | 21:22,25 27:2 | 255:10 256:18 |

257:7,16,20
261:14,18,22
262:5 263:9
265:23 269:14
270:25 279:23
280:14,17 282:19
284:2,8 293:8
295:6 296:9,24
297:8,13 298:5,7
298:11 299:5,8,12
299:15 300:17
310:6
**kramer** 105:4
**ktr** 172:5,11,20
173:13,20,25
174:6,23 175:22
181:5,25 182:11
182:22 184:21
185:19 186:16,18
187:21 189:20
190:12 191:15,18
192:9 194:14
196:10 197:19
198:19,20,24
199:10,16,21
200:14 201:4,7
203:12 211:2,11
212:24 213:8,11
213:25 214:4,12
214:15 215:24
221:6 222:14
223:22 224:7
227:11 229:11
230:2,14,20,24
231:5,6 232:13,17
234:8,13,21,25
235:12 236:19,25
237:6 238:3,8,13
240:22 241:12
258:3,5 259:7,10
259:17,25 260:15

260:24 261:4,11
265:4,18,21
314:21 316:1
**ktr's** 179:20
200:13 215:22
220:9 228:13,23
229:6

**l**

**laid** 165:15 203:7
**land** 61:15 169:2,9
169:9 193:3 195:4
195:14 198:25
201:23,25 202:3
216:5 236:12
259:25 260:17,25
261:11 262:10
263:14 273:23
274:9,11,16
277:17,21 278:2
278:19,24 280:5
280:12,18 282:10
283:16 285:6,7,14
285:21 286:9
292:17
**landlord** 47:13
62:16 70:25 74:21
74:24 75:4 76:10
76:20 152:18
**landlord's** 152:18
**language** 58:16
137:20 143:14,18
143:23 145:8
242:24
**large** 18:4 226:3
**larger** 191:23
**lastly** 175:14
**late** 251:7
**laughing** 299:6
**law** 6:9 7:5 13:2
13:11 14:8,14,16
14:21 61:17

115:22 141:12,15
**law.com** 3:18
**lawyer** 20:20
144:15
**lays** 240:13
**leading** 225:25
261:23
**learn** 172:3 280:25
**learned** 41:20 42:3
67:13 140:21
**lease** 39:20 46:5
47:7,12,15,17 48:5
48:23 49:8 50:24
51:2 54:4 59:2,9
60:4 61:12 67:4
67:10,14,23 68:3
70:2,7,24 71:5,7
71:16,18 72:12,25
73:6,12,18 74:13
74:16,19,20,25
75:5,10,16 76:11
76:20 78:2,3,7,9
78:14,17,24 79:6,9
79:12,20 80:3,25
81:19,21 82:20
83:2,20 84:15,21
84:24 86:8,24
87:4,7,13,14,15
90:6 93:24 94:12
95:6 97:19,20
98:5,8,19 99:4,11
100:6,24 105:17
107:4 124:22
125:23 133:24,25
137:14,15,21
139:9,18,24
140:22 141:20
142:4,5,11,15,17
143:15,18,24
145:8,13,19,23
146:3,6 151:8

164:5 165:3
167:17 168:10,11
168:15,22 174:13
174:14,18,19,23
175:17,24 176:10
176:11,17,22
177:8,11,15
178:14,19,20
179:25 182:12,22
184:21 187:6,14
187:19,23 188:9
188:12,19,20
189:3,9,17,25
190:13 196:11,16
197:6,8,10 198:14
198:21 199:22
200:25 203:8
206:21 207:2
208:4,14 209:4,10
217:8 218:16,19
219:8 220:3,11,20
222:18,21 223:9
223:19 229:11
230:5,13 232:14
235:14 238:3
240:8,10,14,23
241:5 242:7,24
248:24 249:20,22
251:19,20 252:5
253:24 256:14
259:11,22 270:8
271:13,22 278:20
279:6,11,16 280:2
281:23,24 282:6
294:5,12 295:5
312:15,22
**lease.pdf.** 89:10
**leased** 167:11
**leases** 94:3 184:17
199:11 200:15
201:5,8 220:2

236:22 237:2,24
238:9,14 262:19
263:6,18,24 264:6
264:7,15,19 265:5
265:9,19
**leasing** 62:20
**leave** 54:3 136:8
240:19
**leaves** 82:11,25
132:7
**led** 300:8,9
**left** 57:5 192:22
214:13 253:21,25
254:10
**legal** 2:5 4:7
**lehman** 95:16
**length** 249:2
**letter** 45:12,14
46:2,4,9,15,21
47:2 48:2,14
55:23 57:8 59:24
60:4 66:12 67:5
67:21 68:6,11
110:13,19 113:25
131:3 147:11,13
148:2,5 150:13,24
153:4,9 154:3
158:3,14 163:11
164:15,22 167:8
181:5,10 182:11
182:18 183:14
190:16 210:13
228:7,13,17
234:13,20 236:3
247:2 248:19
249:11 252:3
266:21 276:24,25
277:2 284:13,16
295:12,13 313:24
314:16 316:12

**letting** 26:6
**levine** 44:8
**levington** 44:8,17
44:18
**li** 4:6 29:15,17
30:15 31:3,23
32:17 33:12,20
87:23 102:3
120:16 131:11
156:12,14 157:9
162:16 181:3,23
189:8 204:25
210:11 211:8,9
212:19 213:3
222:2 225:8 228:4
229:25 233:11
234:9 235:5
239:11 242:13
245:24 264:11
266:7 267:23
273:19 276:9
286:19 299:22
304:5
**li's** 31:14,15,20
34:10,22 181:22
211:21 269:21
**license** 2:8,9
311:24
**licensed** 24:8,11
24:17
**life** 39:23
**lightening** 271:8
**limit** 217:10
**limited** 26:4
**line** 163:11,12
167:9 174:7 225:8
318:2
**lines** 236:18
**link** 156:2
**list** 19:10,12,17
116:13 119:17

126:15 289:13
292:13
**listen** 237:12
**lists** 16:24
**litigation** 12:12
70:23 297:4,9
303:7,12,14,15,22
305:8,24 306:11
**little** 11:18 26:24
36:18 42:24 155:3
184:9 191:24
208:15 267:3,4
**llc** 1:9 5:16 6:15
15:17 16:5 25:3
36:18 37:2,11,14
37:19,23 38:4,10
38:14,22,25 39:9
39:15 40:25 41:2
41:5 54:23,24
55:3 70:25 71:2
127:7 163:16
183:20
**llp** 3:13 234:7
**loaded** 151:22
**loading** 120:12
127:11 151:21
230:6,7
**lobby** 111:22
112:6 114:10
**lobbying** 110:25
111:14,18 112:2,4
112:24 113:3,4,6
113:13,20 115:18
**lobbyists** 112:14
114:15
**local** 45:7 46:11
106:18
**located** 41:6,11
114:23 204:6
**locatel** 267:24
272:8 273:3 289:9

**location** 134:25
135:5,9,15 216:6
**locations** 5:21
**logic** 189:10
**logistics** 289:10
**long** 8:21 21:18
24:14 47:11,21
50:9,13,23 51:5
52:17 70:16 74:13
74:19 75:10 152:4
152:5,8 154:23
204:2 218:14
227:2 277:4 286:3
300:13 309:15
**longer** 191:25
**look** 16:18 43:24
45:18,20 51:14
54:19 57:17 61:7
71:6 84:24 99:17
113:24 116:4,13
119:12 123:9,19
123:21 130:7
149:16 164:10
167:7 170:11,19
171:5 188:13
195:23 196:2
200:9 203:22
206:17 211:6
213:15 235:22
244:20 259:6
260:4,9 264:23
269:25 272:17
283:25 285:2
286:4 287:20
290:11 297:6
309:5
**looked** 50:17
79:21 148:21
170:22,24 209:22
234:18 249:18

**looking** 9:22 71:13
78:11 112:3
125:10 159:8
171:22 178:24
180:5,8,11,21
189:2,5 209:3,15
213:22 214:15
230:9 242:19
244:11 276:21,22
278:15 291:2,5,10
291:10,19 293:2
**looks** 98:22 110:12
189:8 190:24
191:4 226:9
241:25 266:25
267:10 270:25
277:13 289:5
**lose** 226:10
**losing** 69:13,14
**lot** 31:22 118:19
118:22 119:16
149:22 153:23,24
168:3 218:8
257:22
**loud** 224:18
**lower** 170:5 196:2
**lunch** 154:19
155:7
**lying** 176:25
**lyon** 221:16

**m**

**m** 3:7 115:5 116:9
116:20,23 117:3
117:17,20,25
118:2 119:3,25
193:19 195:7,16
201:25 202:6,14
311:2,23 313:5
**m.m.b.** 37:23 38:4
38:14,19,20,22,25
39:6,9,15,20 40:6

40:10,25 41:24
42:2 44:19,22
45:13 46:3 47:23
48:4,14 51:15,17
54:21,23 55:3,7,12
55:18 64:2,9,12,25
65:10 70:3,25
75:8 78:2,7,7
84:11 85:6,17
86:4,25,25 89:25
90:3,15,20 91:7,12
91:25 92:3,21,24
99:5 105:17 107:5
178:2,14,18
**m.m.b.'s** 87:2
**m11** 175:11 193:4
**main** 3:4
**majority** 34:22
**making** 18:21
26:13 52:20 159:9
160:23 282:17,25
297:11
**management**
183:21,23
**managing** 71:19
71:24 77:13
101:17 102:4
218:10
**manhattan** 13:9
13:10 118:14
200:16 201:6
265:6
**map** 117:25
**marc** 292:12
**march** 122:4,11
233:20 234:8,14
304:18,19 313:12
315:15
**mark** 15:19 35:15
43:13 69:25 88:6
98:5 103:25

109:10 115:2
120:3 121:25
126:3 136:20
144:5 147:8 151:5
162:13 166:2
172:17 180:25
185:23 191:11,16
203:24 210:3
212:2 224:22
229:14 233:15
241:15 244:4
246:21,22 247:6
258:2 266:3
268:17 276:5
284:11 288:16
291:22 292:13
**marked** 10:2
15:25 35:20 43:17
70:10 88:12 98:9
104:9 109:20
115:7 120:8 122:6
126:14,24 127:3
137:2 144:10
147:17 151:16
163:2 166:13
173:6,9 181:12
186:4 191:21
204:14 210:7
212:7 225:3
229:19 233:22
241:22,25 242:20
244:17 247:18
258:8 266:8,12
268:23 276:12
284:18 288:19,23
291:24 292:3,5
**market** 58:14,15
59:3,21 83:4,21,23
148:8 154:10
157:14 158:20
161:15 165:2,15

175:16,23 178:24
193:2,15 194:2
195:12 196:5,5
202:7,8,18 203:6
223:11 224:7
232:7,15 233:3
236:11 250:21
255:7,17 257:10
259:17 260:12,16
260:18
**marketplace**
281:18
**marks** 86:17 155:5
300:24
**material** 68:3,9
139:16,23 140:6,8
140:11
**matter** 5:14 241:7
255:22 256:10
273:6 276:3 303:7
309:22
**matters** 273:6
297:14 298:12
**maureen** 1:23 2:7
5:24 311:2,23
**maximize** 49:3,13
50:4,13 51:24,25
52:3,8,12,25 53:12
53:21
**mcd** 126:4
**mcd005479** 147:9
147:16 314:2
**mcd006083**
126:23 127:3
313:17
**mcd006379**
136:21,25 313:20
**mcd008022** 144:6
144:9 313:23
**mcd08** 144:5

[mcdonald's - mind]

**mcdonald's** 1:5
5:14 6:11,17,21,23
42:21 47:12,14,17
47:21,22 49:2,10
49:17 50:8,9,14,24
50:24 51:2,5 52:4
52:10,17 53:23
54:3,10,15 55:24
56:2 57:5,14
58:11,24 59:6,7,13
59:19 60:2,16
61:4,12,21 62:10
67:5,10,13,23 68:3
68:14 69:21 74:19
75:9,10,16,17,24
76:25 77:7 82:5
82:11,25 83:18
84:2,9 85:4,16
86:5 87:3,15
125:23 132:2,7
133:5,25 134:3,6
134:12,14,20,24
135:4,8,14,18,23
136:2,3,8,14,19
137:9,17 138:15
138:22,23 139:10
139:21 140:21
141:20 142:5,21
144:18 146:5
147:11,15 150:13
150:17,23 151:8
151:15 152:13
153:5,8 154:9
157:13,18 158:2,6
158:12 164:5,15
164:16 165:3
167:11,17 168:11
168:14,18,21
174:19,24 175:24
176:2,10,17,22
182:12,23 184:21

189:24 190:14
196:8,11,16
197:20 199:22
200:25 203:8
208:4,14 209:4
218:16,20 219:3,8
219:20 220:11,19
222:18,21 223:7
223:15,19 230:5
230:13 235:14
238:3 259:11,21
267:18 270:7,8
272:7,9 305:16,17
306:11,13 314:1,3
**mcdonalds** 4:3,4
**mean** 25:13 26:5
32:7,12 56:12
60:6 101:9 102:7
102:9 103:7
111:24 123:7
126:17 134:15
140:11 145:21
148:12 177:18
189:13 217:25
218:22 232:3
235:18 255:20
256:11 257:24
261:22 262:5
275:7 280:8
301:23
**meaning** 248:17
**means** 50:6 56:9
92:14 134:17
177:19,20,21,22
**meant** 215:6
**media** 5:11 86:18
86:22 155:6,10
207:20,24 239:3
300:21,25 310:18
**medication** 9:3

**meeting** 21:8,13
21:19,22 80:5
116:10,20 117:5,6
119:10 120:16
121:18 171:9
267:16,20,22
268:4,6,7 270:3,9
270:12,12,15,19
271:17,18 273:11
273:18,24 274:8,8
274:24 278:17,25
**meetings** 21:25
106:10 117:16
**megabytes** 192:5
**meister** 3:13 6:12
**mekhtiyev** 120:21
**member** 30:5 37:4
39:9,15 40:5,10,25
44:22 51:17 54:23
55:3,7,16,17 64:2
64:9,12,24,25
65:10 71:20,25
77:13 90:15,20
91:3,7 92:3
101:18 102:5
218:11
**members** 29:17
39:6,7 54:22
107:2,14
**membership**
29:21
**memo** 89:10
**memorandum**
98:5,7,19 197:6
312:21
**memorialized**
87:7
**memory** 274:10
289:25
**mentioned** 12:4
28:21 244:24

245:2 246:10,12
**message** 10:25
**met** 21:4 80:17
171:21
**method** 199:3
227:15 285:21
**metropolitan**
210:13,20,25
211:11 212:18
214:20 215:5,23
216:16 217:2,15
220:7 221:16
222:5 223:16,19
224:25 225:5
227:4,13 228:6,12
228:20,22 229:5
249:17 315:8
**metropolitan's**
216:15 250:5,20
**meyer** 4:3 6:22,22
137:8,22 143:16
144:17 145:3
146:22 251:2
267:24 310:9
**michael** 4:3 137:8
**microphones** 5:4
**middle** 182:7
**midway** 45:2
128:12
**mike** 6:22 137:22
137:22 143:15
144:17 145:3
146:22 267:24
**million** 40:15,19
40:22 46:18 93:25
94:11 95:19,20,24
96:5,6,14 97:9,9
97:17 100:7,24
103:14,21 169:18
**mind** 211:25
233:24 273:10

**minute** 86:14 207:15 286:22 289:23 300:12 309:6
**minutes** 19:17 115:4 116:10 207:12,14,17 234:5 238:19 300:18 309:4 313:4
**mischaracterizes** 219:23 261:24
**misrepresent** 97:23 98:2
**misspoke** 284:10
**missry** 160:12,13 160:14,20 161:2 215:16 221:23,24 233:13,18 234:7,9 234:11,13,14,21 234:24 235:5 241:17 242:12,21 243:6,18,25 244:7 246:6 247:9 248:2 248:5 250:4 251:4 252:6 254:11,15 258:11,17,25 259:2 264:12 266:6,19 267:23 273:21 275:9,10 275:17 276:8 283:7 286:20 289:6 290:24 291:18 292:10 296:6 299:23 307:14
**mixed** 61:14,21 62:11 66:21 121:12,20 128:14
**modernize** 137:18 138:17 142:22

**molly.sprgrp** 181:3 210:10
**moment** 83:8 104:16 161:9 203:22
**momentarily** 181:18
**monday** 244:9
**mondrowitz** 89:6 89:14
**money** 28:11,14 50:8,13 51:7,19 54:12
**month** 275:19
**months** 105:16 226:10 275:21,23 296:8,11 304:10 304:12,16
**morning** 5:1 6:8
**morris** 160:12,13 160:14 215:16 221:23,24 233:13 234:9,11,13,21 235:4 241:17 242:12,21,22 243:6,18,25 244:7 244:22 246:6 247:8 248:2,5 250:4,19 251:4 252:5 254:11,15 258:10,17,24 259:2 264:11 266:5,18 267:23 273:21 275:8,10 275:17 276:8 283:7 286:20 289:5,8 290:23 291:18 292:10 296:5,6 299:23 307:13

**mosaic** 195:24
**mouse** 269:14
**move** 69:7,12,15 125:21 142:18 150:8 153:20,25 209:19 261:25 273:9
**moved** 135:8,14 135:18
**moving** 134:25 135:4
**msf** 3:18
**multiple** 5:20 12:25 28:19 32:2 106:13 109:7,8 124:25 146:7 149:25 209:14
**multiples** 203:17
**municipal** 216:12
**murray** 93:11,18 94:5 144:13 145:2 146:12
**musto** 37:19,20 38:8,9 41:22,23 43:7 44:9,19 105:22 106:14 108:18,23 109:7 117:5,7
**musto's** 116:14

**n**

**n** 3:1 7:4,4 103:4 312:1
**nakleh** 292:12 293:5,9,10,12
**name** 5:22 27:7 40:3 45:18 116:14 122:16 151:11 172:24 205:10 247:13
**named** 12:11 31:4

**names** 38:5,18 290:22
**national** 137:17
**nature** 12:17,19 111:12 146:11 262:15
**near** 174:20,24 176:23 182:13,23 217:8 218:19
**necessarily** 81:14 258:21
**necessary** 16:9 81:7 295:5
**need** 8:20 53:13 93:22,23 112:14 133:16 140:10 154:20,23 207:12 220:10,18 223:9 223:11 224:16 225:20 234:4 238:18 249:20 259:3 268:19 269:13 283:6 299:16
**needed** 145:3 182:3 238:8,13 242:8 248:22 250:22 252:21 253:18 255:16 271:13
**needs** 136:7 240:9 240:24 256:22 257:13
**negotiate** 72:11
**negotiated** 90:6 91:19
**negotiating** 61:20 71:18 72:18 73:6 73:12
**negotiation** 53:6 72:25 73:18

**negotiations** 48:18
  91:20,24 223:7
**neighborhood**
  118:17
**neither** 311:15,17
**nervous** 251:11
**never** 23:25
  107:25 108:2
  211:24 219:20
  245:7 247:25
  248:7 273:9 290:8
**new** 1:2 3:5,9,15
  3:15 5:18 9:12
  13:7 24:18 28:25
  46:6,23 47:4
  61:14,15,21 70:8
  96:23 98:17 99:24
  110:21 128:14
  134:25 135:8,14
  175:18 200:15
  239:20 312:16
**nine** 105:16
  288:17
**nods** 8:6
**non** 8:5
**notary** 2:10
  317:13
**note** 5:4
**noted** 292:19
**notes** 120:17
  146:21,25 214:6
  268:18,22 269:24
  304:23 309:5
  316:8
**notice** 2:6 15:20
  15:23 16:3 20:2
  22:6 77:19 287:15
  303:10,20,24
  312:7
**notify** 152:18

**notifying** 153:5
  164:15
**november** 25:7
  71:15 83:20 88:11
  93:10 106:19
  107:24 134:2
  174:13 178:20
  305:16 312:19
**number** 89:8 96:5
  125:16 127:6
  166:4 181:8
  188:18
**numbers** 15:9
  125:2
**numerous** 292:16
**nyc** 94:2
**nygard** 172:21
  174:6
**nys** 99:15

**o**

**o** 7:4
**o'clock** 224:19
  233:25 238:17
**oath** 6:2 7:14
**object** 8:15 17:23
  97:8,11,14 113:12
  133:7 141:11
  262:6 299:11,12
**objected** 97:10
**objection** 14:2,9
  14:17 18:22 27:2
  30:8 31:10 32:24
  33:14 37:16 46:8
  49:11,18 52:14
  53:16 65:11,16
  66:17,24 68:7
  75:25 81:2 84:12
  85:7 90:22 94:13
  95:7,25 107:10
  108:25 111:4,13
  112:16 113:2

115:13 119:20
125:9,20 132:22
140:3 145:24
165:4 168:16
169:11 175:25
179:3 183:25
185:8 190:3
197:23 215:7
219:9,13,22
220:13,22 222:23
227:18 230:25
232:10 237:4
243:20 246:20
249:23 250:10
251:16,23 252:7
252:14,25 253:11
255:10 256:18
257:7,16,20
261:14 263:9
279:23 280:14
295:6
**obligated** 7:14
**obligation** 18:7,11
**obtained** 98:15
**obtaining** 49:7
**occurred** 185:10
  305:4
**occurs** 82:15
**offer** 68:22
**office** 9:10 16:5
  301:6,8,12,18
  308:19
**officer** 7:6
**oh** 10:13 12:25
  34:3 45:24 119:11
  166:19 177:25
  179:19 206:5
  236:8 258:14
  264:7 268:7
**okay** 9:15,19
  10:13 11:7 12:3

14:24 15:3,15
16:17 17:3,16
19:13,16,24 20:5
20:14,19,22 21:10
21:12,18 22:10,16
22:20 23:9,15,20
24:19 26:23 27:23
28:10,23 29:3,11
29:24 30:4,14
31:18,25 35:8,14
35:22 36:11,15,25
37:9 38:15,24
39:8,14 40:21
43:12 46:14 47:19
51:23 52:17 54:9
55:2,8,11,20 56:18
57:11 58:8 59:5
60:23 61:7,10,19
62:9 65:18 69:17
69:24 70:14 71:3
71:13,17 73:20
74:7,8,15 76:17
77:5,23 78:11
79:5 80:20 81:8
83:17 84:2,8,17
88:3 89:4 90:5,17
91:10 93:5,15,21
94:10,24 95:10
96:4 97:4 98:4,24
99:8,21 100:21
101:24 102:4
103:24 105:18
106:8 108:15
110:12 111:17
112:20 113:12,20
116:4 118:2,24
119:14 120:2,19
121:17,24 122:12
126:2 127:19
128:4 130:20,23
131:2,12 132:5

133:19 135:18
136:6 138:5,21
143:5 146:20,24
149:8 150:9
151:24 152:2,17
153:3 154:16
155:21 156:4,23
157:7,22 158:9
163:4 166:17,23
166:24,25 167:21
168:9,13,24
169:14,24 171:19
171:24 173:10
175:5 176:21
179:7 180:25
181:19 182:7
183:7,17 184:20
185:5,22 188:5
189:23 191:25
192:2,8,17 193:13
193:24 197:4
198:12 199:16
200:3,10,12,20
202:12 203:24
204:19 205:24
206:13,17 207:6
207:16,25 210:2,9
213:15,17 215:18
215:20 218:10,18
219:6 220:18,25
221:14,18 223:2
224:13 226:17,21
226:22 227:11,20
229:9 230:11
234:5,17 236:9
238:7 241:15
242:19 243:7
247:6,23 255:5
258:2 259:6,15
260:9 262:17
263:15 264:23,25

268:16 276:4
277:7 279:23
283:14 284:25
285:10,11,23
286:7 287:9 288:4
289:2 292:7
293:13 297:16
298:4 299:11
300:11 301:2
307:7 310:4,11
**old** 23:15,18 46:17
**once** 55:25 203:3
**ones** 28:21 149:18
170:14,16 209:22
282:17
**ongoing** 11:3
**open** 10:11 35:23
43:24 70:15 88:24
98:11 120:11,11
122:8 155:18
162:21 166:8
173:8 186:7,12,12
192:4,6,7 225:12
226:23 247:21,22
266:15,16 292:6
**operate** 161:7
**operations** 25:16
25:19 26:7 196:10
**opine** 175:15
211:15
**opinion** 52:11
123:6,7 179:11
189:14,24 190:9
193:14 195:12
214:24 216:6
223:3,22 228:7,14
241:8 247:2
248:19 249:11
252:4 254:25
255:13,13 257:9
266:21 268:8

281:3 284:13,16
294:21 295:12,13
316:13
**opinions** 195:24
211:16 241:6
254:23 255:4
272:3,5
**opportunity** 19:20
90:7 186:7 217:11
**opposed** 234:25
**option** 139:10
146:6 151:6,8,12
151:15,20 152:14
153:6 158:20
161:15 165:16
180:19 185:19
196:24 197:9,21
203:7 217:10
222:21 223:15
224:8 229:10
230:4,13,19,24
231:4,6,8,24,25
232:4 235:13
240:25 248:23
249:22 250:21
253:23 255:6,18
256:24 257:15
271:14 287:3
314:4
**options** 62:8
137:16 138:16
145:18,22 146:3
208:25
**order** 53:11
126:19 136:6
184:13 237:21
260:12,15 265:3
268:20
**org** 36:10,11,19
51:14 54:17,18
55:9,13

**organizational**
35:18 312:10
**original** 197:10
279:6 280:2 282:4
283:15 285:13
**outcome** 6:4
**outer** 200:16
201:6
**outlined** 228:18
255:18 258:22
**outlook** 155:20
**outside** 31:23
**overall** 34:7
**owe** 77:6
**owed** 75:24 82:5
**owner** 37:6,13
38:25 41:24 42:2
**owners** 36:22
38:21
**ownership** 194:11

## p

**p** 3:1,1 7:4 43:21
70:4 88:9,22 98:6
98:12 115:3 116:5
116:6,6,7 120:5
122:2 127:3
136:22 143:10
144:6 147:12
151:7 162:14
166:3,15,18 173:9
181:2,14 186:7
191:17 204:18
210:3,16 212:3,9
224:23 226:21,24
230:9 233:16
242:2,20 244:10
244:20 246:10
247:7,11 259:6
266:8 269:5
276:19 284:24
285:4 288:19

**[p - perform]**

291:24 292:5
**p.m.** 155:5,9
207:19,23 238:23
239:2 244:10
289:4 300:20,24
309:10,13 310:17
310:20
**p1** 15:21
**p3** 43:14
**p4** 81:23
**page** 35:23 44:6,25
45:2,19 46:15,21
47:2 55:22 58:8
58:20 61:8 62:13
71:6,7,9 73:21
74:17 77:22 81:22
81:24 93:6,8
95:11,12 98:17,18
98:19 99:18,19,20
103:25 104:11
109:14 110:18
111:18 113:25
116:7 120:3 122:9
123:22,24,24
124:8,9 128:3
130:8,21,25 137:6
143:11 144:12
147:9,22 151:9
167:8,8 168:25
169:7,15 172:18
181:21 182:9
183:10,14 186:17
186:17 188:16,17
192:15,17 194:9
194:20,23 195:10
196:3 200:4,8,11
201:13 202:16
204:20 205:19
206:14 211:7,9,22
212:12 213:16
214:14 215:19,22

216:20,24 221:9
221:10 230:4
235:25 236:2,3
237:20 241:16
259:16 260:10
264:24 266:3,18
268:17 276:5
288:17 289:3
290:13,16 291:23
318:2
**pages** 16:23 70:17
70:18 98:21,22,23
109:15 127:12
226:2
**paid** 53:9 65:3
74:23 75:3 87:13
95:5 99:9,11
100:6 206:11
217:23
**papers** 297:9
**paragraph** 45:5
55:21 57:11,19
58:10,17,19
114:25 131:20
145:15 174:11
175:5 177:3 182:8
183:11,15 200:14
201:12,14 212:21
213:2 215:9
222:10 223:21,25
235:23 236:4
250:24 260:11
**paralegal** 4:4
**parcel** 46:17
175:17 178:25
**pardon** 69:9
102:18 123:16
125:13 132:11
177:13
**parenthesis**
279:12

**park** 3:14
**part** 61:22 63:24
86:23 93:8 111:22
111:24 114:18
117:24 132:17
135:10,12 143:11
177:25 192:21
194:10 199:11
216:14,25 220:15
222:13 246:11,18
263:5 270:17
279:7
**participated** 288:6
288:9
**particular** 18:17
308:8
**particularly** 70:21
**parties** 5:9 101:13
108:12 158:19,21
177:23 198:15
256:6 287:4 293:6
293:11 294:24
311:16
**partner** 25:12,14
26:4,21 27:21
63:15
**partners** 25:22,23
25:24 28:3 30:2
**party** 6:2 12:11
89:17 179:11
250:7 255:3
**pashman** 3:3 6:10
6:20
**pashmanstein.com**
3:8,10
**passed** 47:23
**passthrough** 47:16
50:25 75:2
**path** 268:6
**patience** 309:16

**patient** 71:5
**pay** 38:12 40:8,9
47:13,14 57:6,12
59:9 74:21 75:8
82:21 84:4,5,11
85:6,17 86:4
152:13 178:18
188:19 206:8
**payable** 76:9,19
76:25
**paying** 31:14,15
31:20 178:13
**pays** 47:23 54:10
54:15 75:9 77:25
78:7 82:10 83:3
**pc** 3:3
**pdf** 35:24 151:6,13
**pending** 8:22 11:4
59:16 64:6 141:25
143:8 175:10
198:2 220:16
237:8,16 253:4
271:10 272:23
274:5 280:17
**people** 12:25 89:8
97:5,6 119:17
139:6 165:13,21
180:21 195:25
208:16 209:15
242:9 272:4,4
273:7 275:7
303:11,13,21
**percentage** 29:20
29:22 33:24 34:13
34:15,15,17
150:19 292:21
**percentages**
292:16
**perform** 123:4
163:24 175:22
205:11 210:20

| | | | |
|---|---|---|---|
| 235:12 278:24 301:18 | 35:1 36:1 37:1 38:1 39:1 40:1 | 158:1 159:1 160:1 161:1 162:1 163:1 | 281:1 282:1 283:1 284:1 285:1 286:1 |
| **performed**  80:23 180:17 197:19 198:25 208:2 227:12 262:23 273:2 | 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 | 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 | 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 |
| **performing**  28:17 273:23 | 56:1 57:1 58:1 59:1 60:1 61:1 | 179:1 180:1 181:1 182:1 183:1 184:1 | 302:1 303:1 304:1 305:1 306:1 307:1 |
| **period**  58:13 227:17 259:20 | 62:1 63:1 64:1 65:1 66:1 67:1 | 185:1 186:1 187:1 188:1 189:1 190:1 | 308:1 309:1 310:1 311:5 312:2 317:6 |
| **periods**  217:10 | 68:1 69:1 70:1 | 191:1 192:1 193:1 | **pjoel**  105:2 |
| **permitted**  118:20 294:6,6 | 71:1 72:1 73:1 74:1 75:1 76:1 | 194:1 195:1 196:1 197:1 198:1 199:1 | **place**  176:16 217:7 274:14 311:12 |
| **person**  8:13 17:18 17:25 78:12 296:14 | 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 | 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 | **plaintiff**  1:6 3:2 5:13 6:11,21 15:22 35:17 43:15 |
| **personal**  18:9 | 86:1 87:1 88:1 | 209:1 210:1 211:1 | 70:7 88:10 98:7 |
| **personally**  35:4 168:8 176:18 309:22 | 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 | 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 | 104:7 109:17 115:4 120:6 122:3 126:21 136:23 |
| **perspective** 161:14 180:6 | 98:1 99:1 100:1 101:1 102:1 103:1 | 221:1 222:1 223:1 224:1 225:1 226:1 | 144:7 147:13 151:14 162:23 |
| **pertinent**  17:20 | 104:1 105:1 106:1 | 227:1 228:1 229:1 | 166:10 173:4 |
| **pfizer**  46:17 | 107:1 108:1 109:1 | 230:1 231:1 232:1 | 181:9 185:25 |
| **phil**  105:7 | 110:1 111:1 112:1 | 233:1 234:1 235:1 | 191:18 204:11 |
| **philip**  105:3 127:8 127:13 133:10,19 | 113:1 114:1 115:1 116:1 117:1 118:1 | 236:1 237:1 238:1 239:1 240:1 241:1 | 210:5 212:4 224:24 229:16 |
| **physical**  302:5,6,8 302:12,21 | 119:1 120:1 121:1 122:1 123:1 124:1 | 242:1 243:1 244:1 245:1 246:1 247:1 | 233:19 241:20 244:14 247:16 |
| **pick**  5:5 | 125:1 126:1 127:1 | 248:1 249:1 250:1 | 258:5 266:9 |
| **pinchus**  1:14 2:3 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 | 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 | 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 | 268:21 276:10 284:15 288:20 291:25 312:6,9,12 312:15,18,21,23 313:1,4,8,11,14,18 313:21,24 314:3,5 314:9,12,15,18,21 314:24 315:2,5,8 315:11,14,17,19 315:23 316:1,4,7,9 |

316:12,15,18
**plan** 134:18
  137:19 195:16
  224:21
**planned** 142:22
**planning** 105:23
  106:5,11,18,25
  107:13,22 108:13
  121:19 132:21,25
**plans** 121:19
  134:14,16 162:6
**platform** 10:5
**please** 5:4 6:5,25
  7:23 8:3,9 16:8
  18:23 49:20 53:18
  88:24 94:4 95:18
  141:12,23 205:4
  219:14 228:9
  229:21 238:19
  253:2 272:21
  276:18 282:20
  284:12 289:12
  297:15 299:9
**pleasure** 137:12
**plus** 86:7 281:23
**point** 33:5 55:16
  66:10 83:13 96:17
  139:5 140:8
  157:11 158:9
  168:2 209:16
  212:25 213:23
  217:3 241:8 255:2
  277:14 278:15
**points** 184:10
**policy** 303:4,5
**pontificating**
  141:15
**popham** 4:7 5:22
**popped** 181:16
**portion** 34:5,6,10
  123:23 193:5

195:11 201:17,19
  206:9
**portions** 193:4
**position** 25:10
  35:8 69:11 255:6
  255:16,24,25
  256:4,21 257:6,12
  257:19 270:19
  272:19 283:8
  293:22 294:8,14
  294:16,17 295:3
  295:17,18,24,25
  296:16 297:18,20
  298:15,16,22,23
  299:3 300:4
**positions** 294:3
**possibility** 69:21
  202:5,14
**possible** 49:14
  50:5 72:16 135:6
  149:2,7 150:14
  160:7,8 161:5,24
  184:16 198:23
  199:13 201:10
  237:23 245:11,16
  246:17
**possibly** 51:13
  220:4
**potential** 48:5
  106:9 201:15,23
  216:9 256:22
  257:12 262:18
**potentially** 28:16
  42:20 46:18
  107:14 134:24
  160:4 173:13
**power** 271:8
**precludes** 217:8
  218:19
**preliminary** 223:6

**premises** 114:5,23
  192:20 196:25
  265:4
**preparation** 79:15
  80:23 149:9
  153:14,18 171:17
  243:23 286:5
**prepare** 20:9 22:2
  79:25 80:9 94:18
  153:17 236:19
  246:6 260:2
  274:16 280:5,6
  282:10
**prepared** 22:18
  36:7 60:11 127:6
  127:8 132:16
  166:5 167:2 198:8
  204:7,9 211:2
  212:23 213:11
  223:8 259:10
  272:8 287:15
**present** 4:1 6:17
  6:22 21:7,21
**presents** 188:21
**preservation**
  305:14
**preserve** 303:14
  303:16,21
**presumably** 57:24
**pretty** 96:23 185:6
  300:16
**prevent** 9:3
**previous** 145:5
  305:21
**previously** 150:22
  172:8 203:13
  226:19 278:2,5
**primarily** 15:17
**primary** 152:20
**prior** 55:24 152:20
  261:24 285:4

311:4
**private** 5:6 10:24
**privilege** 11:5
**probably** 8:19
  88:18 147:7 155:2
  172:6 219:10,11
  231:12 248:10
  262:20 275:24
  302:19
**problem** 126:20
**procedure** 15:7
**proceed** 273:13
**proceeded** 126:19
**proceeding** 310:2
**proceedings**
  310:19 311:10
**process** 46:16
  130:3,4 132:18
  152:11,12,25
  161:15,22 165:15
  180:18 220:21
  224:8 240:25
  254:25 255:18
  258:11 259:11
  287:2 288:7,14
  300:8 304:15,16
  306:18
**produce** 133:4
  305:7,24 308:15
**produced** 70:23
  263:6
**production** 306:10
**profession** 32:16
**professional** 2:9
  32:15 311:3
**professionals**
  256:2 257:4
**profit** 28:6
**program** 155:24
**programs** 10:7,10
  155:12

Case 1:19-cv-06471-DLI-ST Document 62-25 Filed 06/24/22 Page 350 of 369 PageID #: 2020

**project** 33:16,17
66:9 128:5 130:13
180:11
**projects** 32:19
34:24 35:3,6
**promises** 103:9
**pronounced** 293:9
293:12
**proper** 10:14
**properly** 10:16
**properties** 32:2,5
32:22 105:13
118:25 119:2,13
184:17 190:25
237:25 238:10,14
281:19
**property** 11:21,24
12:8,14,15,22
14:13 28:18 29:5
29:9 31:6 32:7
41:6,8,12,14,18
42:12 46:22 47:3
47:7,22 48:24,25
49:4,7,8,16 50:10
50:14 51:6,7,20,24
52:4,5,11,13,18,25
53:2,8,9,22 54:2,3
54:11,15 55:23,25
56:2,15,21 57:5
58:11,12,14,20,23
58:24 59:3,8,14
60:3 61:3,5,14,15
62:21 68:15 69:22
77:2,8 82:6,11,12
82:19,24 83:18,22
84:3,9 85:5,16,22
86:6 99:5 107:23
118:20 122:20,23
123:10,14,17
124:15,17,24
125:3,15,17,19

132:3,6 133:24,25
134:20 135:20,23
136:2,4,7 137:13
138:24 139:10,11
139:22,25 141:21
149:6,11 164:2,12
167:4,13 169:3,9
174:8,10 176:7
179:24 185:16
190:2 191:2,3,9
194:3,15 195:15
196:8 199:4,18,23
200:19 202:13
206:20 207:2
208:3,7,11,16,17
210:21 218:21
219:20 220:2
227:15 240:7
252:20,23 253:8
253:13,22 255:9
257:13,15 259:18
267:9 274:17
281:23 283:17
285:20 289:14,20
**proposal** 50:9
56:20 59:7 60:11
61:22
**proposals** 193:18
**proposed** 51:3,21
60:4 63:2 128:18
131:15 175:14
214:22
**proposes** 128:13
**proposing** 47:7,21
57:2,3,4
**protocol** 162:7
**provide** 164:5
167:12 184:20
192:25 196:15
201:7 223:18
305:3

**provided** 125:23
168:10 184:15
185:4,13,19
196:12 230:12
236:25 237:23
263:13
**provides** 152:17
152:24
**providing** 263:18
**provision** 73:21
75:7
**provisions** 175:18
200:15
**prudent** 278:18
**public** 2:10 98:15
317:13
**pull** 16:7,11 104:6
**purpose** 123:3
164:8 165:19
175:4 192:15,18
192:24 193:9,21
200:23 208:12
209:8 214:3
275:25
**purposes** 56:19
97:18 125:24
129:22 194:5
249:21
**pursuant** 2:6 15:5
**put** 62:10 91:2
110:2 182:18
220:23 263:12
269:14 295:4
309:7
**putting** 157:24

**q**

**quantity** 302:11
**quarters** 201:13
**queens** 265:6
**question** 7:23,24
8:17,21 11:3 19:8

19:19 20:8 28:4,9
34:20 46:25 49:5
49:19 50:2 59:16
60:25 64:5,6,14
67:20 71:3 73:3,8
73:14 75:21 77:12
78:5 79:23,24
80:7,16 85:2,11
90:24,25 92:17,18
102:22 103:7
104:15,20 107:18
115:16 124:19
133:8 141:25
143:9 150:4,6
151:2 153:22
168:17 169:13
171:9,20 184:23
190:5,7,8 196:18
197:15,25 198:2
199:8,24 219:12
219:14 220:15,16
229:12 230:16
231:3 234:2 237:6
237:8,11,12,13,16
241:19 242:23
243:11,15,19
244:2 245:5 249:2
249:3 251:21
252:8 253:3,4
257:9,22 261:8,23
262:4 263:11
271:10 272:23
274:4,5 278:9
279:18 280:18
282:8,21,22 284:3
285:17 290:18
296:9 297:5 303:9
303:19,20 305:21
306:2
**questioned** 202:22
202:22

[questions - recommended]

**questions** 7:22 8:4
8:16 9:4,6 17:5,19
18:21 43:25 74:3
81:16 94:19
137:20 141:8,14
143:14 153:23
167:22 205:6
232:14,18,23
233:5,8,9 245:14
251:6 273:5
297:16 299:11
309:17 310:5
**quick** 203:23
**quickly** 16:17
242:23 290:14
**quoting** 298:11

**r**

**r** 3:1 7:4,4 93:22
311:1 317:1
**r60** 123:23
**r6b** 193:4
**rabsky** 27:9 30:5,7
35:9,12 43:5
44:14 45:3,7
46:10 47:6,20
48:4,22 49:6,15
50:7,12 51:6,16
52:12,18,23 53:11
53:13 54:2,12,16
55:2,4,8 56:20
59:25 61:19 66:14
66:22 67:17,24
68:4,19 69:20
108:15,17,19
110:20,24 111:23
112:6,14 113:5,13
115:10,17,21,25
307:22
**rain** 271:4,6
**rainey** 134:6

**raised** 278:17,25
**rate** 216:4,5,7
**ratto** 1:23 2:7 5:24
311:2,23
**reach** 83:13 145:3
145:17,22 158:10
158:11
**reached** 134:3
139:5 146:16
171:25 173:13,25
179:14
**reaching** 134:5
145:10
**reaction** 169:25
170:3,9
**read** 56:10 57:16
58:15 59:16 64:6
75:13,18 76:3
77:4 83:8,15,16
114:24 141:23,25
187:16 198:2
215:9 217:21
220:16 236:13
237:8,16 250:23
253:4 271:10
272:23 274:5
290:14,15 317:3
**reading** 76:13,16
83:5 124:19 197:5
201:16 277:15
290:14,19
**ready** 206:21
207:3
**real** 24:5,6,21 27:6
27:8 28:24 30:11
32:16 96:23 99:15
99:24 119:11
181:5 189:23
192:9 203:23
204:4,12 214:15
314:24

**really** 115:19
156:21,22 225:22
259:13
**reason** 9:2 114:13
115:10 119:8
159:13 180:16,22
185:12 195:22
198:5 207:7
227:16 251:25
293:18
**reasonability**
211:15
**reasonably** 18:12
**reasoning** 293:25
**reasonings** 252:9
**recall** 11:15 12:5
14:7 20:15 32:25
33:3,4 42:5 60:13
60:15 67:8,9,12,16
67:22 72:17 81:4
106:24 107:6
121:8 125:25
134:5 138:17
140:23 143:17,21
145:2 148:16,22
148:23 153:9,11
154:2,8 157:15,16
162:9 164:4,7
171:24 172:14
179:18 186:23
189:19 199:19
209:20 221:7
227:8 234:22
241:7 243:4
246:10,15 261:3
262:7 267:12
268:3 272:6
273:22 274:3
277:25 287:3
293:4,10,21 294:2
294:24

**recapping** 28:19
**receive** 27:10,15
27:24 28:16 35:11
50:8 63:14,19,20
**received** 15:24
27:19 35:19 43:17
70:9 88:12 98:8
104:9 109:19
115:7 120:8,21
122:5 126:24
136:25 144:9
147:16 151:16
163:2 166:12
173:6 181:11
186:3 191:20
203:3 204:14
210:7 212:6 225:3
227:4 229:18
233:21 241:22
244:17 247:18
258:7 266:11
268:23 276:12
281:2 284:17
288:22 292:3
**recess** 86:19 155:7
207:21 238:24
300:22 309:11
**recognize** 269:7
**recollection** 73:17
108:5,8,11 114:9
114:11 138:2,14
144:24 168:4,5
173:12,19,22
184:3,25 185:2
187:10 188:3,7
245:5 248:16
249:7 260:23
268:13,15 270:2
292:25
**recommended**
172:15

**record** 5:2,10 6:7
74:17 86:21 99:4
155:5,9 207:19,23
238:22 239:2
270:24 300:20,24
309:13 310:14,16
**recorded** 101:8
**recording** 5:8 95:3
98:18 100:4
**records** 98:15
**red** 277:10,15
**redevelop** 32:22
48:24 49:9,16
53:22 135:22,25
136:7
**redeveloping**
42:20 135:20
**redevelopment**
33:17 35:5 42:25
217:11
**redevelopments**
33:8
**redo** 282:4 283:15
285:13
**refer** 29:4,8 77:18
142:11 239:24
276:18,25
**referenced** 66:21
249:13
**referring** 15:16
57:20 81:17 103:3
131:8 176:6
188:10 197:14
218:15 220:4
254:7,11 265:10
**refers** 142:4 291:6
291:13
**refinancing** 28:19
**reflect** 269:24
**reflective** 216:4

**refresh** 16:14
73:17 108:5,11
114:8 137:25
138:14 166:21
173:11,18,21
184:2,24 185:2
187:9 245:4
248:15 292:24
**refreshes** 108:8
114:11 144:24
168:3 249:7 270:2
274:10
**refreshing** 289:24
**regard** 223:3
**regarding** 137:20
143:14 256:22
257:12
**registered** 2:8
311:2
**regulations** 297:24
**rejecting** 164:16
**related** 6:2 11:22
11:23,25 33:22
34:2 41:17 64:22
163:17 174:15
177:9,11,15,23
183:21,23 186:20
191:9 198:14
257:10 308:21
**relates** 34:10,17
**relating** 11:20,24
145:5 203:6
239:16 256:10
261:7 271:18
307:23
**relation** 64:8,10
**relationship** 31:8
31:12,13,19 38:3
38:17 115:22
**relative** 292:17
311:15,18

**relax** 261:17
**relaxed** 261:18
**relevant** 195:20,23
200:24 260:20
265:5 303:12,13
**reliable** 89:7 93:13
**relisted** 95:6
**remains** 75:10
**remember** 11:11
12:13 19:14 24:12
24:13,15 25:6
33:4 36:5 39:17
39:18,21,22,25
40:14,17,18 41:19
42:7,8 43:4,8,11
44:23 48:7 64:15
64:19,20 65:5,7
67:7 69:23 72:13
78:20,25 79:2
85:23 93:3 94:14
94:16 96:3,3,4,10
96:13 101:20
108:22,23 119:4
119:18,21 134:2,8
134:9,11 135:2
136:12 138:8,11
140:17 142:8
143:3 145:14
148:18 149:3,7,12
149:14 150:15,25
151:4 153:12,20
153:21 154:12,15
157:19,20,21,25
158:4,7,16 159:12
160:7,21 164:20
164:21,22,24
167:18,20 168:8
168:23 170:2,4,9
170:12,17 171:22
172:8 175:4
177:17 178:5

180:13 184:5
188:23,25 189:4,5
198:23,24 199:25
201:11 203:4,9,10
203:16,18 206:12
215:12,13 217:20
218:8 222:7,8,12
224:12 228:15
231:15,18,22
233:10 235:8,10
241:2,10,13
243:13 245:8,12
245:17 247:3
248:9 250:14,18
250:25 254:17,19
254:25 258:14,20
260:8 262:14,22
263:25 264:3,16
264:17,20 267:19
267:25 270:6,10
270:11,13,14,15
270:17 271:20,24
271:25 272:16,17
273:14 274:13
275:18 277:23
278:10,12 283:13
286:14,17 287:12
288:15 289:22,24
290:4 291:20
295:9,10,10
296:12 298:25
300:5 304:2,11,12
305:18,19 306:3
**remembered**
249:12
**remembering**
154:15
**remind** 292:17
**reminder** 244:10
**remote** 10:15

remotely 9:21
304:18
removal 12:21
14:12
removed 14:13
renew 168:14,21
renewable 197:21
renewal 145:18,22
146:2 196:24
renewing 146:5,5
rent 47:13,16,22
50:17 51:2 53:8
54:7,10,14 55:21
55:25 56:13 57:13
58:13 59:2 60:15
60:18,19 61:3
73:21 74:5,12,21
74:22,22 75:2,9,23
76:9,19,24 77:6,25
78:6,8,8 81:22
82:4,10 83:3,21
84:10 85:5 86:4
150:18 151:6,8,12
151:15,20 152:12
152:13 153:6
154:10 157:14
158:21 161:16
165:3,16 175:16
175:24 176:3,6,8
178:13,13,17,25
180:19 185:19
194:3 196:5 200:7
200:13,15,19
201:5,9 202:2,7,17
202:18 203:7
215:23,24 217:5
220:12,20 222:13
222:21 223:15
224:8 229:10
230:4,13,19,24
231:5,7,9,25,25

232:4 235:14
240:25 248:23
249:22 250:21
253:23 255:6,18
256:24 257:15
271:14 287:4
292:16 314:4
rental 196:6
202:18 259:18,20
rents 52:15,16,19
53:13,14,15
reopen 81:6
repeat 151:10
172:24 226:14
228:10 247:12
253:2
rephrase 67:3
report 166:5,11
168:25 183:12,19
183:24 191:15,19
192:9 198:6,8
203:3,5 204:5,12
205:5,14,20
206:11 212:17,23
213:8 214:12
215:3 217:18
220:24,25 221:2,5
221:15,22 224:6
225:6,10 227:4,6,8
227:9 228:24
249:18 258:4,6
259:9 260:2,6
265:10 266:20
272:8 281:2 285:4
286:9,10,12
292:20 314:10,22
314:25 316:2
reported 1:22
97:18 211:16
reporter 2:7,9
5:24 6:25 7:18 8:5

8:12 59:17 64:7
142:2 154:22
155:2 198:3
220:17 237:9,17
253:5 271:11
272:24 274:2,6
311:3
reports 209:23
213:11 223:4
229:7 292:15
represent 70:22
74:18 89:16
104:23 110:25
114:4,22 146:13
214:10 258:11
representation
114:3
representative
15:5,12 84:18
141:9 288:12
representatives
267:17,18
represented 10:18
90:13 150:16
193:18
representing 6:13
6:21 90:11 93:20
represents 62:17
republic 204:7
205:10 206:24
207:4 209:24,25
227:12
republicvaluations
204:23
request 198:9
206:3
requested 78:12
166:6 181:25
193:14 195:3
196:11,16 207:5,8
307:2

requests 146:18
306:10,14,15,23
require 95:4
232:15
required 8:16
10:15 47:14 74:23
75:3 84:11 85:6
133:12 155:25
158:21 235:13
248:23
requires 75:7
255:7
research 73:10,15
262:18 263:5
281:7,11,16
researched 260:19
reserve 81:6,13
reset 58:13 200:15
216:3 217:5
220:12,21 222:13
223:9
resets 201:5,8,9
residential 121:14
121:21 128:20
267:5
residual 273:24
274:9,12,16
277:17,21 278:3
278:19,24 280:5
280:12,18 282:11
285:7 286:10
respect 217:7
303:7
respond 153:8
responded 189:8
266:25 292:14
responding 174:4
response 150:13
responsibility
161:22

| | | | |
|---|---|---|---|
| **responsible** 25:17 | **reviewed** 16:25 | 55:18 56:10,16 | 201:18 202:9,14 |
| 71:17,22,22,23 | 20:11 67:4 94:20 | 57:9 58:2,6 59:4 | 202:20 207:8,10 |
| 73:6,11 160:23 | 171:15,16 200:14 | 59:11,22 60:21 | 210:22 211:12 |
| 161:14,19 218:11 | 201:4 217:18,22 | 62:10,12 63:7 | 213:8,24 214:7 |
| **responsive** 146:17 | 218:2 223:12 | 68:14 72:7 76:22 | 217:19,24 218:3 |
| 306:19 308:3,3,8 | 240:2 260:5 | 82:6 89:2 90:15 | 218:12,15,16,21 |
| **rest** 58:16 302:23 | 285:25 292:14 | 91:5 96:20 98:21 | 221:17,19,23 |
| **restaurant** 196:9 | 308:2 | 99:6,7,14,20,25 | 222:18,22 224:2 |
| 196:10 | **reviewer** 211:15 | 104:13 105:17,19 | 227:6 230:14 |
| **restaurants** | **reviewing** 20:15 | 105:25 106:12 | 233:14 235:19 |
| 137:18 | 227:5,9 | 109:5 111:3,23 | 236:6,13 237:20 |
| **restricted** 12:21 | **reviews** 19:18 | 113:10,18 116:2 | 249:22 250:9,14 |
| **restriction** 14:12 | 75:20 83:11 | 116:21 117:12 | 251:9,22 252:6,11 |
| **result** 201:24 | 227:12 228:20 | 118:20 121:22 | 252:24 253:10 |
| **retail** 128:25 | 290:17 | 122:15,20 123:2 | 254:12 258:19 |
| **retain** 160:19 | **revise** 95:18 | 123:15 128:10,11 | 259:11 268:14 |
| 164:25 203:11 | **revised** 95:20 | 129:13,24 130:18 | 277:2 279:2,6,12 |
| 224:7 227:14 | **rezoned** 55:24 | 131:17,18 132:2,3 | 279:13 280:11 |
| **retained** 110:25 | 56:16 57:6,12 | 132:4,4,7,8 133:21 | 282:14 287:22 |
| 115:11 159:19,23 | 58:6,11,21,23 60:5 | 134:21,22,25 | 290:9 291:14 |
| 163:24 165:6,23 | 60:21 61:3 76:5,6 | 135:16,20 138:23 | 294:9 297:7 |
| 179:8 210:24 | 77:8 82:13,19,24 | 139:21 142:5,18 | **rights** 81:6,13 87:3 |
| 211:10 257:5 | 83:18 193:17 | 142:21 144:4,16 | **rivington** 12:16 |
| 293:5,11,15,20 | 195:7,16 | 148:14 149:20 | 13:5 |
| **retainer** 258:15,21 | **rezoning** 53:7 | 150:18 151:20 | **rivky** 93:13,16 |
| **retaining** 123:4 | 57:23,25 66:14 | 152:15,16,21,25 | **role** 11:25 26:2 |
| 159:18 164:9 | 82:15 84:5 113:22 | 153:15 155:13 | 63:18 89:14 92:4 |
| **retains** 217:9 | 114:5 116:25 | 157:5 158:22 | 92:5 160:5 190:6 |
| **retention** 162:19 | 117:17,18,20,25 | 159:4 160:6 | **room** 9:15 267:4 |
| 162:25 163:5,6 | 118:2 126:22 | 163:17 164:2,17 | **rooms** 309:7 |
| 234:19 235:11 | 127:5 128:8 129:8 | 166:15 167:5,14 | **rotate** 268:19 |
| 303:4 314:7 | 129:11,15,22 | 168:11,14,18,21 | 269:13,16 |
| **review** 19:17,21 | 132:17 202:6,14 | 173:22 176:23 | **rothkrug** 104:21 |
| 20:25 21:12 72:23 | 214:23 256:22 | 178:15,20 179:8,9 | 108:9 |
| 73:4 77:11 79:9 | 257:13 313:15 | 179:16 181:25 | **rottenberg** 1:14 |
| 79:11 104:17 | **right** 7:12,21 10:5 | 182:5,19,24 183:3 | 2:4 5:12 7:1,8 8:1 |
| 153:19 210:25 | 18:18 25:8 37:9 | 183:8 185:7,16 | 9:1 10:1 11:1 12:1 |
| 211:11 212:23 | 41:2 46:6,12 47:8 | 189:17 190:13,17 | 13:1 14:1 15:1 |
| 225:9 228:6,12,23 | 49:2 50:10,14,21 | 190:18,19 191:6 | 16:1,10 17:1 18:1 |
| 229:6 306:9 | 50:22 51:3 52:19 | 192:12 193:10 | 18:24 19:1 20:1 |
| | 53:14 54:18 55:13 | 194:16 197:8,12 | 21:1 22:1 23:1 |

| | | | |
|---|---|---|---|
| 24:1 25:1 26:1 | 140:1 141:1,19 | 239:19 240:1 | **rush**  126:17 |
| 27:1 28:1 29:1 | 142:1 143:1 144:1 | 241:1,18 242:1 | **s** |
| 30:1 31:1 32:1 | 144:18 145:1 | 243:1 244:1 245:1 | **s**  1:14 2:3 3:1 7:1,4 |
| 33:1 34:1 35:1,22 | 146:1 147:1 148:1 | 246:1 247:1,20 | 7:4 8:1 9:1 10:1 |
| 36:1 37:1 38:1 | 149:1 150:1 151:1 | 248:1 249:1 250:1 | 11:1 12:1 13:1 |
| 39:1 40:1 41:1 | 151:19 152:1 | 251:1 252:1 253:1 | 14:1 15:1 16:1 |
| 42:1 43:1,23 44:1 | 153:1 154:1 155:1 | 254:1,8 255:1 | 17:1 18:1 19:1 |
| 45:1 46:1 47:1 | 155:11 156:1 | 256:1 257:1,23 | 20:1 21:1 22:1 |
| 48:1 49:1 50:1 | 157:1 158:1 159:1 | 258:1 259:1 260:1 | 23:1 24:1 25:1 |
| 51:1 52:1 53:1 | 160:1 161:1 162:1 | 261:1 262:1 263:1 | 26:1 27:1 28:1 |
| 54:1 55:1 56:1 | 162:22 163:1,8 | 264:1 265:1 266:1 | 29:1 30:1 31:1 |
| 57:1 58:1 59:1 | 164:1 165:1 166:1 | 266:5,14 267:1 | 32:1 33:1 34:1 |
| 60:1 61:1 62:1,22 | 166:6 167:1 168:1 | 268:1 269:1 270:1 | 35:1 36:1 37:1 |
| 63:1 64:1 65:1 | 169:1 170:1 171:1 | 271:1 272:1 273:1 | 38:1 39:1 40:1 |
| 66:1 67:1 68:1 | 172:1,19 173:1,9 | 274:1 275:1 276:1 | 41:1 42:1 43:1 |
| 69:1,6 70:1,14 | 174:1 175:1 176:1 | 276:7 277:1 278:1 | 44:1 45:1 46:1 |
| 71:1 72:1 73:1,25 | 177:1 178:1 179:1 | 279:1 280:1 281:1 | 47:1 48:1 49:1 |
| 74:1 75:1 76:1 | 180:1 181:1,6 | 282:1,20 283:1 | 50:1 51:1 52:1 |
| 77:1 78:1 79:1 | 182:1,9 183:1 | 284:1,23 285:1 | 53:1 54:1 55:1 |
| 80:1 81:1,15 82:1 | 184:1 185:1 186:1 | 286:1 287:1 288:1 | 56:1 57:1 58:1 |
| 83:1 84:1 85:1 | 186:12 187:1 | 289:1 290:1 291:1 | 59:1 60:1 61:1 |
| 86:1,23 87:1 88:1 | 188:1 189:1 190:1 | 292:1 293:1 294:1 | 62:1 63:1 64:1 |
| 88:23 89:1 90:1 | 191:1 192:1,2 | 295:1 296:1 297:1 | 65:1 66:1 67:1 |
| 91:1 92:1 93:1 | 193:1 194:1 195:1 | 298:1,13 299:1 | 68:1 69:1 70:1 |
| 94:1 95:1 96:1 | 196:1 197:1 198:1 | 300:1 301:1,2 | 71:1 72:1 73:1 |
| 97:1 98:1,11 99:1 | 199:1 200:1 201:1 | 302:1 303:1 304:1 | 74:1 75:1 76:1 |
| 100:1 101:1 102:1 | 202:1,25 203:1 | 305:1 306:1 307:1 | 77:1 78:1 79:1 |
| 103:1 104:1,12 | 204:1,25 205:1 | 308:1 309:1,14 | 80:1 81:1 82:1 |
| 105:1 106:1 107:1 | 206:1 207:1,25 | 310:1,14,16 311:5 | 83:1 84:1 85:1 |
| 108:1 109:1 110:1 | 208:1 209:1 210:1 | 312:2 317:6 | 86:1 87:1 88:1 |
| 111:1 112:1 113:1 | 211:1 212:1,9 | **rpr**  1:23 311:23 | 89:1 90:1 91:1 |
| 114:1 115:1 116:1 | 213:1 214:1 215:1 | **rule**  15:5,20,23 | 92:1 93:1,22 94:1 |
| 116:17,18 117:1 | 216:1 217:1 218:1 | 16:4 26:15,18 | 95:1 96:1 97:1 |
| 118:1 119:1 120:1 | 219:1 220:1 221:1 | 248:20 249:9 | 98:1 99:1 100:1 |
| 121:1 122:1,9 | 222:1 223:1 224:1 | 312:6 | 101:1 102:1 103:1 |
| 123:1 124:1 125:1 | 225:1,13 226:1,23 | **rules**  15:6 240:13 | 104:1 105:1 106:1 |
| 126:1,5 127:1,10 | 227:1 228:1 229:1 | 297:23 | 107:1 108:1 109:1 |
| 128:1 129:1 130:1 | 230:1 231:1 232:1 | **run**  26:13,19 | 110:1 111:1 112:1 |
| 131:1 132:1 133:1 | 233:1 234:1,10 | **runs**  27:5 70:3 | 113:1 114:1 115:1 |
| 134:1 135:1 136:1 | 235:1 236:1 237:1 | 127:4 166:3 | 116:1 117:1 118:1 |
| 137:1 138:1 139:1 | 238:1,18 239:1,4 | 233:15 | 119:1 120:1 121:1 |

| | | | |
|---|---|---|---|
| 122:1 123:1 124:1 | 245:1 246:1 247:1 | 181:6 186:19 | 197:11 198:17 |
| 125:1 126:1 127:1 | 248:1 249:1 250:1 | 188:18 204:24 | 200:6,14 201:4,14 |
| 128:1 129:1 130:1 | 251:1 252:1 253:1 | 234:9 241:18 | 201:22 204:9 |
| 131:1 132:1 133:1 | 254:1 255:1 256:1 | 266:5 276:7 | 205:2,4 206:19 |
| 134:1 135:1 136:1 | 257:1 258:1 259:1 | 289:13 310:15 | 207:4 211:14 |
| 137:1 138:1 139:1 | 260:1 261:1 262:1 | **sam.rottenberg** | 214:5,14 216:2 |
| 140:1 141:1 142:1 | 263:1 264:1 265:1 | 104:5 | 217:3 221:21 |
| 143:1 144:1 145:1 | 266:1 267:1 268:1 | **santamaria** | 222:11 228:16 |
| 146:1 147:1 148:1 | 269:1 270:1 271:1 | 233:17 234:7 | 235:23 236:9,18 |
| 149:1 150:1 151:1 | 272:1 273:1 274:1 | **saw** 54:17 57:15 | 237:21 244:22 |
| 152:1 153:1 154:1 | 275:1 276:1 277:1 | 67:9 245:7 250:9 | 246:11 248:5 |
| 155:1 156:1 157:1 | 278:1 279:1 280:1 | 250:11,12,13 | 260:11 265:2 |
| 158:1 159:1 160:1 | 281:1 282:1 283:1 | 294:11,12 306:22 | 276:15 278:16 |
| 161:1 162:1 163:1 | 284:1 285:1 286:1 | **saying** 65:20 | 279:9 284:9 |
| 164:1 165:1 166:1 | 287:1 288:1 289:1 | 101:16 114:16,18 | 291:10 |
| 167:1 168:1 169:1 | 290:1 291:1 292:1 | 154:14 179:5 | **scenario** 214:25 |
| 170:1 171:1 172:1 | 293:1 294:1 295:1 | 202:11 230:21 | **schedule** 130:18 |
| 173:1 174:1 175:1 | 296:1 297:1 298:1 | 242:22 247:25 | 131:16,21 223:9 |
| 176:1 177:1 178:1 | 299:1 300:1 301:1 | 253:7 254:9 270:7 | **scheduling** 179:20 |
| 179:1 180:1 181:1 | 302:1 303:1 304:1 | 277:16 284:5 | 179:21 |
| 182:1 183:1 184:1 | 305:1 306:1 307:1 | 290:25 300:6 | **schneier** 93:11,18 |
| 185:1 186:1 187:1 | 308:1 309:1 310:1 | **says** 36:16 37:10 | 144:13 145:3,10 |
| 188:1 189:1 190:1 | 311:5 312:2,5 | 37:19,23 45:2,21 | 146:13,16,21 |
| 191:1 192:1 193:1 | 317:6 | 46:4 47:11 50:23 | **school** 22:24 23:3 |
| 194:1 195:1 196:1 | **salary** 30:15,17,18 | 55:23 58:10 61:11 | 23:11 |
| 197:1 198:1 199:1 | 30:19 31:14,16,17 | 62:16 63:7 71:16 | **scope** 114:3 174:7 |
| 200:1 201:1 202:1 | 31:20,25 | 74:12 77:4 82:7 | 193:25 213:25 |
| 203:1 204:1 205:1 | **sale** 11:24 | 93:21 95:18 98:18 | 214:3 |
| 206:1 207:1 208:1 | **sales** 169:2,9,10 | 99:15 105:7 111:8 | **screen** 9:24,25 |
| 209:1 210:1 211:1 | 199:2 236:12,15 | 111:11 112:9 | 16:9 109:24 |
| 212:1 213:1 214:1 | 236:20 237:7 | 114:3,21 123:23 | 155:15 166:21 |
| 215:1 216:1 217:1 | 259:25 260:17,25 | 124:12,21 127:25 | 181:17 268:19 |
| 218:1 219:1 220:1 | 261:11 262:10 | 128:12,18 130:17 | 269:15 |
| 221:1 222:1 223:1 | 263:14 274:12 | 131:7,20 137:11 | **screens** 9:20 |
| 224:1 225:1 226:1 | 283:16 285:6,14 | 163:7,15 167:10 | 155:12 |
| 227:1 228:1 229:1 | 285:21 | 175:2 182:8 | **scroll** 215:21 |
| 230:1 231:1 232:1 | **salesman** 62:19 | 183:18 184:12 | **search** 98:15 |
| 233:1 234:1 235:1 | **sam** 5:12 62:22 | 188:4,8,18,20 | 199:11 287:10 |
| 236:1 237:1 238:1 | 116:17,18 137:11 | 192:15,18,24 | **second** 11:23 |
| 239:1 240:1 241:1 | 144:18 163:8 | 193:23,25 194:10 | 12:14 43:19 45:5 |
| 242:1 243:1 244:1 | 166:6 172:19 | 195:11 196:3,4,21 | 46:21 47:2 55:20 |

58:10,19 77:16
95:12 108:7 129:2
129:3 130:25
131:19 145:15
147:21 167:8
174:6,11 177:3
183:10,14,15
186:16 187:3
192:14,21 193:21
222:10,11 235:22
236:4 237:20
238:5 239:21,21
239:24 244:25
245:15,20 246:24
248:21 249:14
259:13 260:10
270:16 277:3,14
278:10,15 289:3
298:5
**seconds**  126:16
**section**  47:10
73:22 74:4 76:15
76:15 77:3 81:22
82:18 83:6 195:11
215:25
**sections**  75:15
**securing**  137:14
**see**  8:3 9:24,25
16:15 35:25 36:13
36:19 37:20,24
44:10 45:3,9,21
47:4,17 50:19
52:19 53:15 55:5
56:6 58:16 61:17
61:23 62:5,23
69:18 75:12 76:6
76:22,23 78:14
81:22 84:25 89:11
94:5 95:21 96:2
98:20 99:14
104:12 109:23

110:7,10,15,22
111:6,16,19 114:2
114:6 116:11,14
117:19 120:18,19
120:22 122:12
123:5 125:4
126:15 127:10,12
128:6,16,22 129:4
130:8,9,14,17,18
131:19,23 137:9
137:23 138:6,18
141:2 142:6
144:19 145:19
146:17 147:19
163:8,13 164:3
165:7,21 167:14
169:4 174:21
175:18 180:2
182:13 184:10,18
186:14 187:7,15
188:22 189:11
192:18 193:5,19
194:12 195:8,18
196:12 197:2
200:7 201:17
202:3 204:18
205:5,7 206:22
210:17 211:19
212:11,24 213:4
213:25 214:8,13
214:16 215:3,21
216:12,23 217:11
218:7,25,25
221:24 222:15
223:12,24 224:4
226:25 230:5,22
234:16 236:8,23
242:3,24 245:2
260:13,20 265:7
266:23 267:6
269:2,6,25 276:20

277:5,18 278:21
279:9 280:22
287:18 288:25
289:6,17 291:2,15
292:22 310:8
**seeing**  155:16,17
168:4 209:14
217:20 225:15
245:8 248:4,9
250:25
**seek**  66:15
**seeking**  32:21
128:9 129:8,11
**seelig**  3:13
**seeling**  6:13
**seen**  16:19 36:3,6
127:19 144:22,23
151:19 172:6
219:2,21 228:20
247:23 248:7,11
263:2,13 281:12
306:15
**segregated**  301:17
**selected**  159:2,6
**selection**  216:3
286:25 287:17
288:2 289:12
**self**  24:21,24 26:25
27:4
**sell**  50:6
**send**  68:10 95:20
148:5 164:22
206:7 289:13
**sending**  164:14
**sends**  68:5 231:4
266:20
**senior**  4:2,4 6:23
**sense**  161:7 176:19
180:4 224:11
**sensitive**  5:5

**sent**  20:20 48:3,14
66:13 67:6 79:22
80:18 89:8 108:18
126:8,11 149:19
149:19 154:3
157:12 158:2
170:23,25 171:2
171:15 204:24
205:16,21,25
206:4 218:3,5,7
221:15,22 234:8
234:10 242:20
244:9 303:20
**sentence**  47:11
76:8,14 187:3
193:13,25,25
197:7,14,16
214:21 222:11
223:2 260:11
265:3 278:16
**sentences**  201:19
**separate**  66:5
87:11,13 285:16
301:6,20,21,22,23
301:25,25
**serve**  159:3,7
208:13
**served**  160:5
306:10,13
**services**  63:14
210:14,20 212:19
217:2 220:8
221:17 222:6
225:6 227:5,13
228:6,12 249:18
**serving**  160:4
**set**  10:3 76:21
178:15,19 311:13
**sets**  297:23
**setup**  9:20 69:4

shape  55:17
share  10:5 16:9,11
  22:20 88:22
  120:10 155:14,16
  156:3 178:8 221:5
  230:23 250:3
  295:11,15 299:3
shared  20:17
  67:22 69:2 178:4
  229:10 230:19
  250:8 268:11
  294:23,23 299:4
sharing  67:16
sharon  267:24
  272:8 273:2 289:9
sharyl  4:4
shaun  172:20
  186:20,24 187:4
  187:11,13,20
  229:25
sheet  318:1
short  154:20
  207:11,14 309:6
shot  69:8,12,13
show  141:3,6
  153:22 305:3
showed  145:6
  190:15
showing  73:24
  141:4
shows  36:15
  130:12 205:14,19
sicherman  93:14
  93:16
side  92:10,11,19
  92:21,24,25
  192:22 236:6
sides  91:20 92:8
  268:11
sidetracked
  305:22

sign  101:21 102:6
  102:12
signal  230:7
signals  8:6
signature  147:22
  181:20 211:21
  311:22
signed  45:16 86:8
  162:19 163:6
  182:19 183:3,4
  211:9
signing  148:2
similar  62:19
  195:22 273:5
similarly  217:9
  260:17
simon  25:25 29:17
  36:16 37:3 44:8
  45:22,24 46:2
  48:21 72:14 87:21
  101:25 102:10,16
  102:19 122:11
  147:24,25
simple  163:25
  169:16 174:16
  185:6 193:2,15
  194:10 195:13
simply  285:7
sir  10:17,20 16:20
  71:4 94:14 96:7
  101:23 122:18,21
  219:5 269:18
  285:18
sit  85:2 112:22
  148:9 199:14
  298:14 300:10
site  50:6 137:19
  138:17 142:22
  174:12,17 175:8
  175:12,12 193:4,5
  193:16,17 204:6

sites  260:18
sitting  26:6
six  98:17,22 226:9
  275:23 296:7,11
  304:10,12,16
slater  110:13,19
  111:14,21 112:5
  114:9 129:18
slightly  223:23
slow  282:19,19
slt  1:7 5:19
small  34:5,6,10,14
  34:15,16
sole  61:13 72:5
solutions  2:6
somebody  23:25
  103:7,8 110:6
  134:24 165:8
  172:15 226:18
  264:21 268:2
  282:12,14 294:11
soon  184:15
  237:23 300:16
sorry  23:8 59:12
  64:3 74:6 78:5
  85:3 88:17 89:24
  91:11 98:23 114:2
  115:16 116:7
  129:17 144:5
  172:23 177:6
  178:16,16 188:6
  197:22,24 211:4,5
  228:9 257:3 266:2
  285:18 296:17
  299:5 303:8
  306:12
sort  23:22
sought  19:5
sound  25:7
source  27:16

sources  28:15
space  129:3
  134:18
spans  35:24 88:7
  122:2 162:15
  204:3 210:4
  224:23 229:24
  258:3 288:18
speak  19:11 22:4
  137:12 225:21
  239:15 294:9
  299:15
speaking  8:10,11
  138:22 173:19
  258:17 289:9
  293:18
specialist  4:7
specific  13:20 81:3
  92:5 121:19
  165:19 176:9
  241:10,14 242:17
specifically  9:13
  24:2 63:8 79:25
  80:12,13,15
  145:14 149:15
  159:13 199:21
  232:5 249:19
  279:4
specifics  43:2
speculative  214:25
  216:10
spend  202:24
spent  34:22
split  29:25
spoke  22:7 136:13
  138:2 139:5,6
  143:24 145:16
  275:16 296:12
spoken  289:14,20
spotlight  110:3

**spr** 30:19,21,23
  31:9,14,15,16,20
  31:22 32:10 33:16
  33:18 34:24 163:8
  166:6 258:16,22
  301:14
**square** 46:18 56:3
  56:22 57:7,25
  58:4 59:11,22
  82:21 83:24 84:6
  85:18,21 128:15
**stacy** 4:2 6:16
**stamp** 44:25 58:9
  61:8 88:8 93:7
**stamped** 35:15
  43:22 126:3,6,12
  183:15
**stand** 229:21
**standard** 236:11
**start** 8:10 23:10,12
  41:17 86:22
  131:21 201:16
  207:24
**started** 23:18
  42:16 48:10
  173:19 247:11
  304:17
**starting** 162:14
  201:19 213:20
**starts** 89:6 104:2
  155:10 239:2
**state** 6:5 99:24
  124:3 177:2
  317:13
**stated** 209:5
**statement** 126:7
  126:23 127:6
  130:12 132:13
  220:15 313:16
**states** 1:1 5:16
  24:16 177:5,7

182:11
**status** 129:25
**stay** 69:22 134:20
  138:23 139:11
  251:5
**steer** 168:7
**stein** 3:3 6:10,20
**stenographically**
  311:11
**stop** 219:14
**stopped** 23:11
**stored** 302:9
**stories** 129:2,3
**story** 128:14
**stream** 55:17
**street** 3:4
**strike** 124:7
**string** 43:16 88:11
  104:8 109:18
  120:7 122:4
  136:24 144:8
  162:24 173:5
  186:2 210:6 212:5
  229:17 233:20
  247:17 266:10
  276:11 288:21
  292:2 312:12,18
  312:23 313:1,8,11
  313:18,21 314:5
  314:12,18 315:2,5
  315:11,14,23
  316:4,9,15,18
**structure** 174:7
**study** 193:19
**stuff** 32:8,9,11,13
  119:16 141:5
  149:23 168:3
  195:25 218:8
**subcommittee**
  115:6 116:10,20
  116:24 313:6

**subject** 61:16 94:7
  104:5 105:8
  122:13 144:21
  167:10,12 172:22
  175:12 193:3,16
  194:3 195:4,14,15
  196:7 201:25
  204:25 225:8
  234:10 241:19
  244:7 260:16
**submitted** 67:22
  68:21 132:10,13
  132:20,24 133:11
  188:20
**subscribed** 317:10
**substance** 22:11
**successor** 163:17
**sued** 309:21
**suggest** 190:21
  211:17 263:7
**suggested** 145:17
  278:13 290:23
**suggesting** 284:7
**suggestions**
  265:24
**suggests** 106:4
  107:8
**sullivan** 162:17
**summary** 23:21
  23:24 124:12,23
  217:2
**summation** 188:21
**supplement**
  278:18
**supportive** 292:20
**supposed** 232:14
**sure** 8:9 18:3 20:7
  28:3,8 34:19 36:5
  39:13 48:6 51:8
  53:20 60:8 64:4
  66:18 73:7,23

78:4,20 79:2
  81:18 83:7,14
  90:23,23 97:25
  102:25 103:6
  115:15 124:18
  126:18 135:17,21
  138:19 139:12
  140:25,25 141:2
  141:17 142:24
  144:23 147:6
  149:21 153:10
  154:5 162:2
  167:18 176:12,13
  176:24 177:19
  179:5 180:2 183:4
  189:10 190:6,7
  200:22 202:21
  205:15 217:21
  226:15 231:2
  234:6 235:19,21
  238:5 240:5
  246:19 247:5,14
  248:25 260:7,8
  263:10 269:23
  271:17 274:7
  275:13 280:9
  297:13,14 298:11
**surprise** 150:5
**surprised** 140:16
  141:18 149:24
  280:25 281:10,20
  281:21,24
**sworn** 311:6
  317:10

| **t** |
| --- |

**t** 7:4,4 311:1,1
  312:5 317:1
**table** 71:7
**take** 8:5,12,21
  16:17 19:16 43:12
  43:24 64:3 83:8

**[take - theobold]**

86:13 104:16
123:21 164:18
206:8 207:11,14
224:16 225:20
232:8 238:16
241:5 251:19
254:22 256:13
260:9 265:24
269:25 272:13
280:21 283:16,25
285:2 300:11
309:3,6
**taken** 5:13 86:19
155:7 207:21
238:24 300:22
309:11 311:10
**takes** 200:9
**talk** 13:25 74:9
75:23 80:13,24
117:14 142:7
243:4 251:25
267:15 277:12
279:19,19,21
283:6 286:24
**talked** 20:13 41:22
43:3 90:8 149:19
159:25 160:3
193:11 201:2
249:24 270:10
296:7,10
**talking** 8:13 42:11
42:16,19 58:18
82:2 97:7 108:6
117:7 122:19
134:8 219:7
222:17,20,24
224:2 252:15
254:9 258:18
294:20 302:4
307:11

**talks** 45:5 46:15
57:23 63:7 128:24
142:15 194:24
195:2 198:13
206:18 213:24
218:18 240:6
287:4
**target** 13:18
**task** 161:11
**tax** 94:2,2 99:9,11
99:15,24 100:5
**technique** 236:11
**technology** 10:14
16:12
**teleconference** 2:5
**tell** 7:15 11:18
17:16 26:23 42:24
43:3 83:15 84:21
84:22 85:8 148:10
162:20 170:16
175:3 177:10,14
186:6,11 199:14
201:15 206:14
210:16 221:10
225:12 234:14
244:19 247:20
259:14 266:14
285:9 298:2
300:10 303:13
**telling** 138:15
150:20 271:21
303:20
**ten** 58:25 59:8,20
60:3,11 82:19,25
83:19 84:3 98:21
**tenant** 47:13,15
61:12 62:17 71:2
74:20,24 75:4
76:9,10,10,19,20
142:15,16 152:18
197:9 217:9

**tener** 159:3,6,19
159:23 160:5
165:24 171:25
172:4,11,19 174:3
175:6 176:25
177:4,7,10,14
178:4 179:4,6,15
182:16 183:2,5
186:18 187:3
188:14 189:8
199:9 200:12
202:6,23 228:13
230:2 234:8 235:4
241:11,17 242:14
242:15,17,20
243:6 244:7 245:5
246:25 247:8,25
248:18 252:9,16
254:10,16 258:19
259:10 263:14,18
266:6,18 268:2
271:20,24 273:13
273:17,23 274:16
274:25 276:8
277:9 278:3,12,23
279:19,20 280:11
283:15 284:13,15
285:13,20 286:8
286:11 287:9,17
287:25 288:7
289:5 290:24
291:8 292:11
296:17,17,19,20
299:25 316:12
**tener's** 187:12
209:22 228:7
251:3,25 272:7
279:4 286:2
**term** 78:3,8 84:14
152:20 174:20,25
176:23 182:13,24

197:9,11 217:8
218:19 278:20
279:10 280:21
**terminate** 54:4
**terminates** 75:17
**terminology**
240:15 294:11
**terms** 32:20 48:13
67:13,23 68:2
72:11 78:13,17,21
78:23 79:6,12,20
80:2,24 84:20
142:9 146:6
177:22 187:5,13
187:18,22 188:9
189:2 265:5
**terracrg** 122:24
123:4 124:14
125:24 148:21,23
149:4
**terracrg's** 123:12
**test** 230:2
**testified** 14:25
72:4 144:14
**testifies** 7:6
**testify** 22:18 79:19
79:25 80:10 84:19
287:15 311:6
**testimony** 63:20
65:18 208:5
219:18,23 261:25
310:15
**tevin** 4:8 226:11
**text** 10:25
**thank** 7:10 112:13
126:13 238:21
254:13 309:14
310:6,11
**thanks** 7:12 94:4
**theobold** 131:13

theresa 172:21
174:5,5,14 175:9
177:8 179:15
thing 81:3 145:12
158:6 162:5
193:12 200:10
209:14,15 272:3
281:8 300:7
things 34:17 53:10
84:20 106:14
109:8 117:14
135:11 142:13
159:21 191:5
283:24 284:4
think 11:12,14,21
16:8,14 18:17
19:7 20:24 21:11
22:19 33:13 37:12
39:2 40:20 42:22
43:10 68:2 79:13
81:8,10,15 88:4
90:10 96:19 97:15
102:10 112:21
119:10,16 126:11
138:10 139:20
146:14 150:3
154:16,25 165:5
165:13,17,18
177:4 179:19
180:14,15 184:22
185:12 190:24
195:25 199:5
203:13 207:7
225:22 228:15
229:12 232:21
234:2 235:16
237:18,18 250:7,7
250:23 251:2
255:2,12,20
274:20 275:4,15
277:16,20 278:7

282:7,16,22
283:22 288:8
290:10 293:8,12
294:19 296:2
304:21,25 305:5
309:4
thinking 140:17
224:18 252:2
263:25 277:11
thinks 165:8
third 93:6 123:22
137:6 179:11
181:21 200:13
211:9,22 256:6
286:25 287:7,10
287:17 288:2
289:12 290:23
291:5,19 293:2,22
295:3
thomas 4:6
thoroughly 217:22
218:2
thought 11:22
101:5,10,15 178:9
190:22 248:4
250:6 267:8
277:23 278:11
294:21 296:7
three 30:25 38:4,5
38:7,11,13,18,18
38:21 49:19 54:21
110:18 120:3
194:5 201:13
276:5 294:8
298:16
threw 15:9
thursday 277:4
time 5:3 8:14
34:22 39:19 42:3
44:22 58:12 65:6
65:13 66:10 68:21

72:2 83:2 91:19
91:24 92:6,7
100:22 109:5
118:25 134:9
139:2,13 141:16
142:20,25 143:2,3
145:10 146:10,10
149:6 152:4,8
154:7,17 158:2,8
162:11 165:11
168:6 170:7,8
175:22 179:22
180:7,12 185:20
196:9 200:9
213:11,13,13
218:14 219:17
225:17 226:12
227:16 230:18
238:3,17 248:3,17
257:23 268:10
270:16,16 275:16
285:25 286:3
294:7 297:23,25
298:3 306:5
309:15 311:12
timeline 306:25
times 11:12,14
39:17 49:19 229:3
255:4 272:4
304:21 305:12
timing 64:18,19,21
tired 155:3 225:17
225:23
title 89:15,17
103:18
titled 70:24 111:18
today 7:9,14,22
8:19 9:6,9,20,23
10:19 15:4 19:11
22:18 74:3 79:15
79:19 80:2,24

112:22 118:23
141:10 280:23
289:21 295:17,24
298:14 300:14
309:15
today's 20:10 22:2
149:9 243:23
286:5 310:15
told 13:17 79:16
101:19 149:2
154:5 174:23
176:21 179:9
182:17,22 187:20
189:16 203:16
220:8 228:25
245:19 249:12
252:6 270:4 272:2
283:19 297:21
tom 22:7 29:15,17
30:14 31:3,14,15
31:20,23 32:17,18
32:18 33:12,20
34:10,22 87:23
102:3 120:15
131:7,8,11 156:12
156:14 159:2,6
162:16 165:24
171:25 172:4,10
172:19 176:24
179:4,6,15 181:3
181:22,23 182:3
183:2,5 186:18
187:12,24 188:14
189:8,8,9 199:9
202:23 204:25
209:22 210:11
211:8,9,21 212:19
222:2 225:8 228:4
228:7,13 229:25
230:2 231:12
233:11 234:8,9

235:4,5 239:11
241:11,17 242:13
242:14,15,17,20
243:5,19 244:7,22
245:5,10,14,19,24
246:25 247:8,25
248:13,18 249:10
249:20 251:3,13
251:21,25 252:4,9
252:13,15,18
253:17,18,21,25
254:10,15,16
258:19 259:10
263:14,17 264:11
266:6,7,18 267:2
267:23 268:2
269:21 271:20,24
272:6 273:12,17
273:19,23 274:16
276:7,9 277:9
278:3,12 279:14
279:17,17,19,19
280:11 282:4,10
283:15 286:19
287:9 289:5,8
290:24 291:8
292:11,11,13
296:17,17,19,20
299:22,24 304:5
305:14 307:6
**tom's**  186:24
279:25 281:2
**tomorrow**  84:10
85:5,16 86:6
289:9
**ton**  224:10
**tony**  41:22,23 43:7
44:9,19 104:3
105:7,22 106:9,14
108:17,23 109:4,7
116:14 117:5,6

119:24
**top**  19:14 36:11,15
58:10 167:10
200:7 214:13
216:24 266:4
276:6 290:13,15
290:21
**topic**  18:17 77:22
78:12 80:10,12,13
80:15 94:19
117:18 241:3
262:13 287:14,24
**topics**  16:24,25
17:5,9,11,12,20,22
18:2,25 19:10,21
19:25 20:4,6 22:5
22:11,16
**touts**  46:9
**transaction**  90:12
90:21 91:10,18
92:8,9,10,12,19,22
92:25 93:24 94:12
101:6 139:15
**transcript**  284:9
298:8 311:10
317:3
**transfer**  94:2 99:9
99:10,15,24 100:5
**trg**  45:6
**trg's**  45:7
**triggered**  224:12
**true**  53:17 227:24
243:9 311:9
**trust**  38:9
**truth**  7:15 311:6,7
311:7
**try**  22:10 72:23
73:4,9,16 117:14
149:12 262:17
285:19 299:9

**trying**  34:21 38:17
51:18 64:17,23
81:18 83:7 92:7
99:17 119:7 145:9
146:4 149:21
167:22 180:8
184:2 200:18
208:19 209:7
225:21 228:21
232:25 261:19
268:5 284:3,4
285:11 297:10
306:18
**tuesday**  310:9
**turn**  44:24 73:20
93:5 95:10 128:2
168:24 169:14
192:15 200:3
206:13 213:15
215:18 216:20
**turned**  308:6,11
**two**  11:14 16:23
21:11 29:13,16,17
29:25 31:19 35:23
36:17 60:12,22
61:2 75:15 91:15
103:25 104:11
116:7 147:9 151:9
179:13 201:18
230:4 231:13
236:18 266:3
267:19 268:9,11
275:21 278:15
287:6 291:23
293:24 295:4
309:4,6
**type**  24:4 26:16
121:5
**types**  11:15 26:12
66:20

**typical**  32:11,13
175:17
**typically**  14:14

**u**

**u**  7:4 317:1
**u.s.**  137:17
**ultimately**  159:2
160:5,22 261:10
**unclear**  81:15
**underneath**  55:12
55:20,21
**understand**  7:15
7:17,23 8:7,23
10:23 15:3 17:4
17:21 18:10,14,18
20:7 29:5,9 32:12
34:19,21 38:17
51:18 64:17,23
70:15 73:2,7 78:4
80:8 81:18 83:7
92:7 103:6 115:15
119:7 140:12
145:9 149:22
154:21 167:23
180:9 208:6,20
209:7,18 228:22
231:2 232:25
237:14 253:17
283:7 284:9
285:12,17 297:11
**understandable**
225:19
**understanding**  9:4
24:19 47:20 81:19
134:13 174:10,19
175:7 182:12
208:5 251:12
252:17,19 256:16
256:17 272:14
280:20 295:11

**understood** 7:25
90:24 142:20
183:11,16,18
263:10
**undertook** 306:17
**undervalued**
267:9
**unencumbered**
194:11,15 208:23
209:6
**unit** 5:11 207:24
300:25
**united** 1:1 5:16
**units** 121:15,22
128:21
**unrelated** 41:8
64:17,20
**unsure** 293:19
**updated** 223:10
281:2
**uploaded** 43:20
109:22 137:4
151:18 173:3
191:25 204:16
225:14 276:17
**uploading** 186:10
**use** 10:4 61:14,21
62:11 66:21
121:12,20 128:14
183:12,19 197:2
203:5 217:6 223:5
260:24 261:11
**user** 163:15
**uses** 128:20,25
**utilize** 220:9
**utilized** 217:4
236:22 237:3

**v**

**v** 239:21
**va** 35:16,19,25
43:13,17,22 55:22

69:25 70:9 88:7
88:12 103:25
104:9 109:11,19
115:3,7 116:8
120:3,8 121:25
122:5 162:15
163:2 166:3,12
172:18 173:2,6
181:2,8,11 185:23
186:3 191:12,20
194:21 203:24
204:13 210:3
212:3,6 224:22
225:2 226:16
229:15,18 233:15
233:21 241:16,21
244:5,16 247:7,15
247:18 258:2,7
259:17 266:3,11
268:17,22 276:5
276:12 284:12,17
288:17,22 291:23
292:3 312:11,14
312:17,20,25
313:3,7,10,13
314:8,11,14,17,20
314:23 315:1,7,10
315:13,16,18,22
315:25 316:3,6,8
316:11,14,17,20
**va011918** 210:7
315:4
**vacant** 236:12
**vacate** 59:6,8,19
60:2 76:9,19 84:3
84:9 86:5
**vacated** 58:12,24
60:17,21 61:4
85:4
**vacates** 56:2 57:14
75:17,24 77:2,7

82:5 83:19 85:16
**vacating** 55:25
**vaguely** 254:17
263:25
**validity** 81:9
**valuable** 202:13
**valuation** 100:7,10
100:16 103:14,21
164:16 167:3
169:25 178:10
180:4 210:14,20
212:18 214:25
216:5 217:2 220:7
221:16 222:5
225:5 227:5,13
228:6,12 240:11
249:17 261:5
267:5 281:25
**valuation's** 215:24
**valuations** 204:8
205:10 206:25
268:11 271:14
**value** 28:18 49:4
49:13 50:5 52:2,3
52:4,8,12,25 53:12
53:15,22 58:14
59:3,21 83:4,22,23
97:19,23 98:2
101:6,10,15 123:6
123:8,10,14
124:15,16,22,23
125:2 148:8,20
149:6,11 154:10
157:14 158:20
161:15 164:11
165:2,8,13,15
166:7,11 167:12
169:3 176:20
179:24 185:16
189:14,25 190:23
191:6,8,10 193:2

193:15 194:15
195:13 196:22
197:16 199:4,18
199:23 201:23
202:3,8,18 203:6
208:3 209:8,12
215:2 216:10
223:10 224:8
228:8,14 232:7,15
233:3 247:2
248:19 249:11
250:21 251:22
252:4 253:8 255:7
255:17 257:10
259:18 260:12,16
266:21 280:23
281:3 284:14,16
292:17 294:21
295:12,13 314:10
316:13
**valued** 56:23
124:24 125:14,16
125:19 165:22
169:8,17 208:10
208:16,22,23,23
209:5 211:16
237:7 281:19
285:20
**values** 60:12 193:3
196:5 268:8
**valuing** 56:20
96:18 123:17
208:7,17 236:12
**vanderbilt** 1:8 4:6
5:15 6:14 15:12
15:16,17,20,23
16:4 17:6,19,25
18:3,13 22:5 25:3
25:4,11 26:3
27:11,17,21 28:2,7
28:11,17,23 29:8

[vanderbilt - wachtel]

29:12 30:18 31:9
31:17,21,23 32:3
33:25 34:11,16,18
34:23 36:17,22
37:14 39:19 40:24
44:16 52:21 54:22
55:11,14,15 70:2
70:24 71:2,19,25
72:6,10 73:13,22
75:7,9 76:25 77:6
77:13,25 78:6,14
78:17,24 79:20
80:3,25 82:10,20
82:20 83:3 84:4,5
84:10,18,21 85:5
85:15,17 86:4,24
87:2 89:22 90:13
91:3,11,12,21,22
92:9,11,15,19,25
93:20 96:16 97:13
97:16,22 98:6,8
99:5 100:9,17,22
101:11,18,22
102:6,17,20,23
103:10 105:16
107:4 112:23
113:2 115:12,20
115:25 117:11
121:3,18 122:13
122:16 125:23
127:7,18 128:9
129:7,10,14
131:25 132:5
133:4,20,23 134:3
135:8,12,15,19,22
135:25 136:6
139:3,8,17 140:21
141:19 142:4
145:7 146:4,13,16
147:11,14,23
148:7,10,13 149:5

149:10 150:12,22
153:4 154:11
157:12 158:10,24
159:8,14,18
160:19,24 161:3
161:18 163:16
164:4,14,25
165:11 167:16
168:10,19 171:25
172:4 173:12
178:13,14,18,19
181:7 182:5,19,22
183:3,4,7,20
184:20 185:18
187:21 189:16,20
192:11 194:14
195:21 196:15
198:10,20 199:3
199:10,17,22
200:24 201:7
203:2,5 204:10
205:9,25 206:3
207:25 208:6,13
209:9,12,20
210:14,19,24
211:6,8,8,10,24
215:11 216:18
217:23 218:11
221:2 222:4
223:14,18 225:7
227:3,14 228:5,11
228:23 229:4,10
230:12,19,23
231:4,6 232:20
234:25 235:13
238:2,8,13 239:13
245:18 246:23
253:19 255:12,15
256:3 257:6,18
258:13,15,18,23
260:24 261:3,10

262:8,17,21 263:5
263:7,13,17,23
264:9,14 265:12
265:15 267:17
270:18 271:21
273:9,12 274:15
274:19,22,25
275:3,4,6,8 278:23
279:22 282:3,10
282:12,13 283:14
286:11 287:11,16
287:25 288:6,10
288:12,13 290:8
291:4,18 292:25
293:21 294:7
296:15,16,20,22
297:12,17,19
299:17 300:3
301:6,7,8 302:12
302:20 303:3,6,10
303:12 305:6,23
306:10,14 307:17
307:23 308:21
312:7,22 313:25
**vanderbilt's**  15:4
93:19 94:10
133:13 139:23
141:8 144:14
160:17 161:13
169:24 220:3
224:6 234:20
255:5,24 256:21
257:11 272:15,19
283:7 294:13,16
294:17 295:2,17
295:23 298:16
301:3,11,16
**variables**  60:22
61:2
**various**  21:16
106:14 117:14

135:11 142:12
158:5 170:6 180:3
180:3 209:13
241:4,6 254:23
256:9,12 261:8
262:12 268:8
272:2,3,20 294:3
**verbal**  8:5
**verbally**  8:4
**verbatim**  214:11
**veritext**  2:5 4:8
5:23,25 10:2,4
156:3
**version**  126:6,10
**versus**  5:15 33:25
188:24
**video**  4:7 5:8,12
**videoconference**
1:15 5:21
**videographer**  5:1
5:23 6:24 69:6,10
83:12 86:16,20
110:2 155:4,8
207:18,22 238:22
238:25 270:23
300:19,23 309:9
309:12 310:13
**videotape**  1:13 2:3
**videotaped**  7:19
8:3
**view**  53:4 268:20
**viewed**  94:22
164:11
**virtually**  2:4
**virtue**  40:3 53:7
297:25
**vs**  1:7

| w |
| --- |

**wachtel**  233:17
234:7,13,24

**wait** 227:2
**waiting** 241:24
  280:15
**walder** 3:3 6:10,20
**walsh** 3:7 6:8,9 7:7
  18:6,12,15 35:14
  49:21 53:19 69:24
  70:6 74:2 80:6
  81:5,14 83:14
  86:13 88:6,17
  98:4 103:5,24
  109:10,13,23
  115:2 120:2
  121:24 126:2
  136:20 141:14,17
  141:23 144:4
  147:8 150:4,7,8
  151:5,12,24 152:2
  154:16,20 162:13
  166:2 171:12
  172:17 173:2
  177:6 180:25
  181:16 185:22
  186:9 191:11,14
  197:13 203:21
  204:18 207:10
  210:2 225:15
  226:8,15,21
  229:14 233:14
  238:16,20 241:15
  244:4 247:6,14
  253:6 257:25
  261:17,19 262:2
  266:2 268:16
  271:7 276:4
  282:21 284:5,11
  284:21 286:22
  288:16 291:22
  297:3,6,10,15
  298:6,10 299:7,10
  299:14 300:11,15

309:3 310:4,7,11
  312:3
**want** 68:13 69:22
  70:19 80:8 171:15
  180:16 203:22
  206:6 213:21
  219:15 224:19
  267:15 270:23
  289:16 298:8
  309:5
**wanted** 13:25 14:4
  48:24 49:3,8,12,15
  50:4 52:24 117:18
  123:5 126:18
  145:21 165:12
  179:10 198:20
  208:6 243:4
  249:15 266:21
**wanting** 171:13
**wants** 110:7 262:3
**warrants** 62:17
**watching** 157:4
**way** 30:14 53:21
  55:17 60:11 74:2
  75:12 91:2 94:24
  153:11 161:7
  162:12 191:8
  199:14 201:13
  203:6 206:5
  218:25 258:10
  263:12 286:13
  301:17
**ways** 28:19,20
  208:21,22
**we've** 167:11
  207:12 209:3,22
  218:13 263:12
**wear** 225:21
**weeks** 164:14
**went** 51:13 80:17
  117:7,8,16 140:14

140:18 157:11
  254:24 259:4,5
  270:22 271:8
  275:14 291:7
  293:17
**whispering** 5:6
**wish** 318:1
**witness** 7:2 69:9
  69:14,17 74:6,8
  99:19 109:24
  110:6 152:9
  154:18 171:10
  191:13 219:15
  226:18 238:19
  251:7 261:20
  271:6 280:15,20
  284:2 300:13
  312:2
**wondering** 112:5
  263:19
**word** 102:21,25
  103:2 164:18
**words** 124:13
  187:12 273:25
  277:8
**work** 24:3,3,4
  27:11,16,20,25
  28:6,17 31:21,22
  33:24 34:2,7,10,16
  34:17 41:17
  115:11 121:3,6
  173:14 194:2
  202:23 235:12
  236:20 262:23
  263:8,22 280:11
  286:8 295:19
**worked** 23:22,25
  23:25 89:17
  172:10 298:17
**working** 23:11,12
  23:18 32:17,18,20

33:7,9,10,18 34:23
  34:23 35:2 41:17
  72:9 105:22 106:7
  108:16,19 117:2
  118:24 119:2
  129:15,22 133:20
  179:15 304:18
**works** 31:24 74:2
  136:19
**worth** 54:2
**wrapped** 309:8
**wrapping** 300:16
**write** 248:10
**writes** 174:12
  289:8
**writing** 277:15
**written** 61:23 62:2
  62:4,7 145:25
  277:9
**wrote** 138:19
  143:13 175:6,6
  187:4 260:15

|   x   |
| --- |

**x** 1:4,11 124:22,23
  312:1,5
**xi01165** 2:8

|   y   |
| --- |

**y** 124:23
**yeah** 16:16 19:22
  36:20 37:21 39:3
  44:3 48:19 54:17
  58:22 59:5 72:3
  79:16 80:11 83:10
  83:16 85:12 86:12
  89:19 90:16 92:2
  92:23 96:21 97:11
  102:7,8,15 105:6
  105:14 110:11,16
  111:15 114:7
  119:11 124:5,11

128:17 130:10,20
134:13 135:10
136:9,17 145:20
152:22,23 156:22
157:6 160:15
169:23 173:16
179:17 180:20
181:23 182:2,15
182:20 183:4,6
188:23 190:20
191:7 193:11,20
194:7,13,25
196:14 200:6
202:4,10 212:11
213:6 214:17
218:7,24 221:20
224:3,4 235:16
236:8 242:18
245:25 251:18
260:7 275:24
283:18 286:21
287:24 288:8
290:20 291:12
301:19 302:8
303:16
**year**  47:7 48:23
49:7 56:4,22
58:13 59:10 83:23
86:11 97:19
100:24 130:13
133:24 137:14
139:9,18,24
188:20 189:2,9,17
198:14 202:20
259:19,23 281:22
281:23
**years**  23:14,18,23
24:21,24 39:23,24
39:24 58:25 59:8
59:20 60:3,12
68:15 82:20 83:2

83:19 84:3 139:22
152:14 188:18,21
188:24,24 197:12
**yesterday**  20:17
20:18,23 126:8,11
171:3
**york**  1:2 3:9,15,15
5:18 9:12 13:7
24:18 28:25 46:6
46:23 47:4 70:9
96:23 98:17 99:24
110:22 175:18
239:20 312:17
**yup**  93:9 94:23
100:2

---

**z**

**zero**  63:12 88:15
**zone**  119:3
**zoned**  123:15
174:11 193:4,5
260:17
**zoning**  56:21 57:7
85:13,19 117:3
118:3 123:18
124:4 130:2 175:9
175:10,11,14
187:6,14,19,23
195:8 201:25
216:9 240:14,24
**zoom**  1:15 2:4
9:24 10:8 155:13
155:16 156:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.