# EXHIBIT CCC

Page 1

1

2          UNITED STATES DISTRICT COURT

3          EASTERN DISTRICT OF NEW YORK

4

5    MCDONALD'S CORPORATION,      )
                 Plaintiff,       )
6                                 )
            vs.                   )No.
7                                 )1:19-cv-06471
     VANDERBILT ATLANTIC          )(DLI)(SLT)
8    HOLDINGS LLC,                )
                 Defendant.       )
9    _____      )

10

11

12          REMOTE VIDEOTAPED DEPOSITION OF

13                   TOM LI

14              Brooklyn, New York

15           Tuesday, August 31, 2021

16

17

18

19   Reported By:

20   CATHI IRISH, RPR, CRR, CLVS

21

22

23

24

25

Page 2

1

2

3

4

5

6

7

8                    August 31, 2021

9                    10:02 a.m.

10

11        Remote videotaped deposition of

12     TOM LI, with all participants

13     appearing via videoconference, before

14     Cathi Irish, a Registered Professional

15     Reporter, Certified Realtime Reporter,

16     and Notary Public of the State of

17     New York.

18

19

20

21

22

23

24

25

Page 3

1

2    A P P E A R A N C E S:

3

4        PASHMA STEIN WALDER HAYDEN, P.C.

5        Attorneys for Plaintiff

6            2900 Westchester Avenue

7            Suite 204

8            Purchase, New York 10577

9        BY:  BRENDAN M. WALSH, ESQ.

10

11

12       MEISTER SEELIG & FEIN LLP

13       Attorneys for Defendant

14            125 Park Avenue

15            7th Floor

16            New York, New York 10017

17       BY:  HOWARD S. KOH, ESQ.

18

19

20   ALSO PRESENT:

21       KEVIN GALLAGHER, videographer

22       WALLACE ZACCAGNINO, Veritext concierge

23       MICHAEL MEYER

24       STACY HOWARD

25       SAM ROTTENBERG

1

2          THE VIDEOGRAPHER:  We're now

3     going on the record at approximately

4     10:02 a.m.  Today's date is August 31,

5     2021.

6          This is media unit number 1 of

7     the video recorded deposition of Tom

8     Li taken by plaintiff in the matter of

9     McDonald's Corporation versus

10    Vanderbilt Atlantic Holdings LLC.  It

11    is filed in the United States District

12    Court for the Eastern District of

13    New York.  The case number is

14    1:19-cv-06471(DLI)(SLT).

15         The deposition is being held via

16    Zoom virtual conferencing.

17         I'm the videographer.  My name is

18    Kevin Gallagher, the court reporter is

19    Cathi Irish, and our concierge as well

20    is Wallace Zaccagnino, and we're all

21    from the firm of Veritext Legal

22    Solutions.

23         All the appearances in this

24    deposition are on the written record.

25         At this time our court reporter

```
                                              Page 5

 1

 2        will swear the witness and we can

 3        proceed.

 4   T O M    L I,   called as a witness,

 5        having been duly sworn by a Notary

 6        Public, was examined and testified as

 7        follows:

 8   EXAMINATION

 9   BY MR. WALSH:

10        Q.   Good morning, Mr. Li, how are you

11   this morning?

12        A.   I am well, how are you?

13        Q.   Good, thanks.  So we haven't

14   formally met each other yet.  My name is

15   Brendan Walsh.  I'm an attorney from

16   Pashma Stein Walder Hayden and I represent

17   the plaintiff, McDonald's Corporation in

18   this matter.

19             So you've been sworn in by the

20   court reporter just now and although we're

21   not in court, you are under oath and

22   obligated to tell the truth.  Do you

23   understand that?

24        A.   I do.

25        Q.    There is a court reporter here
```

Page 6

1                          LI

2      who is taking everything down.  I just ask

3      that you answer the questions verbally and

4      slowly so the court reporter can take

5      everything down, and the court reporter

6      also cannot record any hand gestures and

7      the like.  Do you understand that?

8           A.    I do.

9           Q.    If you don't understand a

10     question, just let me know.  If you answer

11     the question, I'm going to assume you

12     understood the question.  And especially

13     with this remote format, it's important

14     that only one of us is speaking at a time

15     so please make sure you let me finish

16     speaking before you start speaking and

17     I'll do the same for you.  The court

18     reporter can't take it all down if we're

19     all talking at the same time.

20               Your attorney may object to some

21     of my questions.  Unless he directs you

22     not to answer, you should still go ahead

23     and answer.  If you need a break for any

24     reason today, just let me know and we'll

25     take one so long as there's not a question

```
 1                         LI

 2     pending.  So again I ask that before we

 3     take any break you answer any question

 4     that's on the table.

 5             Do you understand these

 6     instructions?

 7         A.   I do.

 8         Q.   Is there any reason today such as

 9     medication or anything else that would

10     prevent you from understanding my

11     questions or giving complete and accurate

12     answers to my questions today?

13         A.   No.

14         Q.   Where are you taking the

15     deposition from today?

16         A.    My office.

17         Q.    And where is your office?

18         A.    At 266 Broadway in Brooklyn.

19         Q.    Are you in the room alone?

20         A.    I am.

21         Q.    Does your room have a door?

22         A.    There is a door.

23         Q.    And is the door closed?

24         A.    It's closed and locked.

25         Q.    Can you describe what kind of
```

Page 8

1                        LI

2    screen setup you have in front of you and

3    what programs are open right now?

4         A.   I have two monitors.  There's a

5    camera on top of one of them which you're

6    seeing me through.  I have Zoom on one

7    screen and I have the Exhibit Share on the

8    other screen, and no other programs are

9    open.

10        Q.   Great.  I just ask that

11   throughout the deposition today, please

12   just keep any other programs closed so

13   there's not any problems with people

14   trying to communicate with you and

15   whatnot.  Do you feel that you've got the

16   technology and bandwidth to properly

17   conduct this remote deposition?

18        A.   I think so.

19        Q.   What did you do to prepare for

20   the deposition today?

21        A.   I met with Howard yesterday

22   briefly.

23        Q.   And is that it?

24        A.   That's about the extent of my

25   preparation.

```
                                                Page 9

 1                          LI

 2        Q.   And how long did you meet for?

 3        A.   I want to say maybe an hour.

 4        Q.   Was anyone else present?

 5        A.   No.

 6        Q.   Did you review any documents in

 7   preparation for the deposition today?

 8        A.   There were some documents that

 9   Howard showed me.

10        Q.   Do you recall what documents you

11   looked at?

12        A.   I remember there was a lease

13   between McDonald's and MMB.  I think there

14   were some appraisal reports we briefly

15   glanced at.  That's roughly the extent of

16   documents I saw.

17        Q.   And did you have any discussions

18   with Sam Rottenberg about his deposition?

19        A.   I don't think there were anything

20   that could be characterized as discussion.

21   Maybe some comments that I was probably

22   on.

23        Q.   Have you ever been deposed

24   before?

25        A.   I have not.
```

```
                                              Page 10
 1                        LI
 2        Q.    Have you ever testified in court
 3   before?
 4        A.    I have not.
 5        Q.    Can you please just briefly
 6   explain your education history, whether
 7   you went to college, any other degrees,
 8   where you went to college, that kind of
 9   stuff?
10        A.    I finished undergraduate school.
11        Q.    Where was that?
12        A.    At NYU.
13        Q.    When did you graduate?
14        A.    2009.
15        Q.    What was your degree in?
16        A.    Finance and there was management.
17        Q.    And did you have any additional
18   education beyond college?
19        A.    I've taken maybe a few random
20   courses on things that seemed interesting
21   but no formal programs.
22        Q.    Do you hold any professional
23   licenses or certifications?
24        A.    I'm a notary.  I had a licensed
25   salesperson.
```

1                    LI

2        Q.    And is that for real estate?

3        A.    For real estate.

4        Q.    So you're a licensed real estate

5    broker?

6        A.    Salesperson, not a broker.

7        Q.    Okay, so a licensed real estate

8    salesperson.  And when did you get that?

9        A.    A few years ago.

10       Q.    Where do you currently work?

11       A.    I currently work in 266 Broadway

12    in Brooklyn.

13       Q.    What company do you work for?

14       A.    I do a lot of work with SPR

15    Group.

16       Q.    So what do you mean you do a lot

17    of work with SPR Group?  Do you work for

18    SPR Group or not?

19       A.    I have an LLC which perhaps

20    qualifies me as an independent contractor.

21       Q.    What's the name of that LLC?

22       A.    S-H-I-M-M LLC.

23       Q.    And do you currently do work with

24    any other entities besides SPR Group?

25       A.    No.

Page 12

```
 1                    LI
 2      Q.   Tell me a little bit about SPR
 3   Group, what is SPR Group?
 4           MR. KOH:  Objection.  Go ahead
 5        and answer.
 6           THE WITNESS:  It's an LLC that I
 7        guess Sam and I identify with.
 8   BY MR. WALSH:
 9      Q.   Do you know when it was formed?
10      A.   I don't.
11      Q.   Are you a member of SPR Group?
12      A.   No.
13      Q.   When did you start working with
14   SPR Group?
15      A.   Sometime in the latter half of
16   2017.
17      Q.   How did you come to learn about
18   SPR Group?
19      A.   I knew Sam several years prior to
20   that and SPR Group is really just Sam.
21      Q.   And so you met Sam several years
22   ago and then decided to start working for
23   him?
24      A.   Yes.
25      Q.   What are -- when you first joined
```

```
 1                         LI
 2     SPR Group or started working for SPR
 3     Group, what did Sam explain to you that
 4     you'd be doing for SPR Group?
 5          A.   There wasn't much of an
 6     explanation, more that there was just a
 7     lot to do.  It was not specified in any
 8     way.
 9          Q.   How many other people work for
10     SPR Group, do you know?
11          A.   There's another person in the
12     office in addition to Sam and myself.
13          Q.   And what are your
14     responsibilities for SPR Group?
15          A.   There's no specific
16     responsibility.  It's very much a
17     generalist role.
18          Q.   So what types of things do you do
19     for SPR Group?
20          A.   Anything that comes up.
21          Q.   And SPR Group is in the real
22     estate business?
23          A.   Yes.
24          Q.   And how many different properties
25     does SPR Group work with, say right now?
```

Page 14

```
 1                        LI
 2      A.    Hard to describe.  It's multiple.
 3      Q.    And is 840 Atlantic Avenue in
 4   Brooklyn one of those properties?
 5      A.    Yes.
 6      Q.    How did you meet Sam?
 7      A.    I was working at a development
 8   firm previously.  Sam worked on a
 9   transaction where we purchased a
10   development site.
11      Q.    What site was that?
12      A.    It is in Long Island City in
13   Queens.  The address is 29-26 Northern
14   Boulevard.
15      Q.    And what type of projects did
16   that involve, was it a redevelopment?
17      A.    It was a residential development
18   site.
19      Q.    What was on the property before a
20   residential development?
21      A.    I don't recall exactly but
22   parking space maybe.
23      Q.    And what firm were you working
24   for at the time?
25      A.    It was a company called Simon
```

```
                                              Page 15

 1                        LI

 2    Baron Development.

 3         Q.    How long were you at Simon Baron?

 4         A.    Approximately eight years.

 5         Q.    So did you join Simon Baron right

 6    from your graduation at NYU?

 7         A.    Yes.

 8         Q.    Right now, does your compensation

 9    come from SPR Group?

10         A.    Yes.

11         Q.    And do you receive compensation

12    from any other entities?

13         A.    Not on a regular basis but

14    there's a possibility of other sources.

15    At the current time, no.

16         Q.    Can you describe what those other

17    possible sources are?

18         A.    It's unlikely but to the extent I

19    perform some kind of advisory service to

20    other parties, there would be potentially

21    compensation.

22         Q.    Have the terms of that potential

23    compensation already been negotiated?

24         A.    No.

25         Q.    So you're just saying that in the
```

```
 1                    LI
 2   future, you may do other work that you
 3   might then be compensated for?
 4        A.   It's a possibility.
 5        Q.   And right now, is your
 6   compensation equivalent to like a salary,
 7   you get a certain amount every month?
 8        A.   There's some amount, yes.
 9        Q.   So how is that amount determined?
10        A.   I think Sam said why don't we do
11   this and I think I said yes.
12        Q.   So is it a fixed amount every
13   year, every month?  If you could just
14   describe to me what your current
15   compensation structure is.
16        A.   It's quite hard to describe
17   because it's also subject to success rate
18   on some of the advisory work that SPR is
19   involved in.
20        Q.   What do you mean by success rate?
21        A.   If we are selling a property and
22   there would be a fee involved.
23        Q.   And what properties could you
24   earn a success rate from?
25        A.   Would you ask that again?
```

Page 17

```
 1                       LI
 2      Q.   You said that if you sell a
 3   property and there would be a fee
 4   involved.  For example, did you earn a
 5   success rate with the project at
 6   840 Atlantic Avenue in Brooklyn?
 7      A.   No.
 8      Q.   Will your compensation depend at
 9   any part on what happens with the property
10   at 840 Atlantic Avenue in Brooklyn?
11      A.   I don't think so, no.
12      Q.   So if the property is rezoned and
13   a large redevelopment takes place on that
14   property, you would not receive any
15   additional compensation?
16           MR. KOH:  Objection.  Go ahead
17      and answer.
18           THE WITNESS:  There's never been
19      a discussion on that topic.  The focus
20      I don't think is 840 Atlantic.
21   BY MR. WALSH:
22      Q.   What is the focus on?
23      A.   There's a lot of day-to-day work
24   that flows through.
25      Q.   What type of work?
```

```
                                    Page 18
 1                    LI
 2         A.    Looking at opportunities in real
 3     estate.
 4         Q.    I'm sorry, what types of
 5     opportunities?
 6         A.    In real estate.
 7         Q.    So potential acquisitions?
 8         A.    Yes.
 9         Q.    Okay.  What is your relationship
10     to Vanderbilt Atlantic Holdings LLC?  And
11     just so you know, I'm going to call
12     Vanderbilt Atlantic Holdings LLC just
13     Vanderbilt throughout this deposition to
14     make it easier.
15         A.    I'm an officer.
16         Q.    What is your title?
17         A.    I think at one point somebody
18     suggested managing director.  We don't
19     really go by titles in this office.
20         Q.    How many other officers are there
21     for Vanderbilt?
22         A.    I believe just one other.
23         Q.    Who is that?
24         A.    Sam Rottenberg.
25         Q.    What are your responsibilities
```

```
                                    Page 19

 1                         LI

 2      with Vanderbilt?

 3           A.    Managing the day-to-day

 4      activities.

 5           Q.    And what types of day-to-day

 6      activities does that entail?

 7           A.    I cut checks.

 8           Q.    Anything else besides cutting

 9      checks?

10           A.    I talk with the vendors,

11      architects, attorneys.

12           Q.    Are you the primary point of

13      contact for those vendors?

14           A.    For some of the vendors, yes.

15           Q.    Which ones?

16           A.    I don't know specifically.  It's

17      either me or Sam.

18           Q.    And you're not a member of

19      Vanderbilt; right?

20           A.    No.

21           Q.    Okay.  So a couple weeks ago, and

22      I know you were observing Sam Rottenberg

23      was deposed.  Do you recall that?

24           A.    What?

25           Q.    I said a couple weeks ago Sam
```

```
                                        Page 20
 1                      LI
 2    Rottenberg was deposed and I know you were
 3    observing; is that right?
 4         A.   Yes.
 5         Q.   I asked him some questions about
 6    an organizational chart for -- that we
 7    found in the production given by
 8    Vanderbilt in this litigation and there
 9    was some discussion about who the members
10    of MMB Associates LLC are.  Do you recall
11    that?
12         A.   I remember discussing the chart.
13    I don't remember specifically discussing
14    members of MMB but...
15         Q.   So do you know who the members of
16    MMB Associates are?
17         A.   I don't know all the members.  I
18    know there's one member at least.
19         Q.   Who is that?
20         A.   Tony Musto.
21         Q.   And Mr. Rottenberg testified that
22    he is the 100 percent owner of an LLC that
23    holds a 20 percent membership interest in
24    MMB.  That LLC is called 840 Atlantic
25    Holdings LLC.  Are you familiar with that
```

```
 1                    LI
 2   entity?
 3        A.   I'm not sure if that's accurate.
 4   I do think there's an entity by that name.
 5        Q.   What is your understanding of
 6   that entity?
 7        A.   I've seen paper with that entity
 8   written on it.
 9        Q.   And you said you're not sure if
10   what I said was accurate.  What do you
11   believe to be accurate?
12        A.   You said Sam testified to some
13   effect about the entity.  I'm just not
14   sure what was -- I don't remember what was
15   said at that time.
16        Q.   Okay.  So you don't remember what
17   was said.  You're not disputing that what
18   he said was accurate or inaccurate?
19        A.   I just don't -- I'm not
20   confirming what he said.  I don't know.  I
21   don't remember.
22        Q.   Do you know what consideration
23   Sam or his entity paid to become a member
24   of MMB Associates?
25        A.   I don't know.
```

Page 22

1                      LI

2        Q.   So I want to start talking a

3    little more about 840 Atlantic Avenue in

4    Brooklyn and as shorthand, I may just

5    refer to that property as the property.

6    Do you understand that?

7        A.   Yes.

8        Q.   When did you first learn about

9    the property?

10        A.   I don't remember the exact time

11    but it was probably sometime in 2017.

12        Q.   And was that around the time that

13    you joined SPR Group?

14        A.   I would think so.

15        Q.   And did Sam tell you about the

16    property?

17        A.   I think so.

18        Q.   What did he tell you about it?

19        A.   There's a property at

20    840 Atlantic Avenue.

21        Q.   And what did he tell you his

22    plans, if anything, were for the property?

23        A.   He doesn't really describe

24    opportunities like that.  It's more just

25    there's an address, take a look at it.

Page 23

```
 1                           LI
 2        Q.    And what did he tell you to do
 3    after you took a look at it?
 4        A.    Well, sometimes I take a look at
 5    it.  We may not visit it for several weeks
 6    until it comes back again.  There
 7    wasn't -- I don't think there was any
 8    action items.
 9        Q.    Now, were you involved in
10    Vanderbilt's acquisition of the 99-year
11    ground lease for the property?
12        A.    I remember seeing some e-mails at
13    the final stages of that process.
14        Q.    Did you have any other
15    involvement?
16        A.    No.
17        Q.    Did you join SPR Group during
18    those final stages of the negotiations?
19        A.    I think so.
20        Q.    So you think you joined SPR Group
21    around November 2017?
22        A.    Yes.
23              MR. WALSH:  If we can mark
24        VA 033610.  That will be P41.
25              (Exhibit P41, document Bates
```

Page 24

```
 1                        LI
 2        labeled VA 033610, marked for
 3        identification.)
 4             VERITEXT CONCIERGE:   Repeat that
 5        number, please.
 6             MR. WALSH:   VA 0033610.
 7             VERITEXT CONCIERGE:   P41 is being
 8        introduced in the marked exhibit
 9        folder.
10   BY MR. WALSH:
11        Q.   Mr. Li, this is a document
12   spanning from Bates number VA 033610 to
13   644.  It's a one-page e-mail with an
14   attachment entitled McDonaldsLease.pdf.
15   If you can take a moment, are you able to
16   view the document?
17        A.   Yes.
18        Q.   So the top e-mail is an e-mail
19   from Sam Rottenberg to you sent November
20   22, 2017 and he's forwarding you the
21   McDonald's lease.  Did he tell you why he
22   was forwarding you the McDonald's lease?
23        A.   He did not.
24        Q.   So what did you do with this when
25   you received it?
```

Page 25

1                              LI

2         A.    I probably created a file and

3    tucked it away.

4         Q.    And did you know why he was

5    sending it to you?

6         A.    Just so I'd have it.

7         Q.    Did you know that McDonald's had

8    a lease for the property?

9         A.    Yes.

10        Q.    And what did you know about the

11   lease at that time?

12        A.    Almost nothing.

13        Q.    Was this the first time you'd

14   seen the actual lease?

15        A.    I think so.

16        Q.    Did you read it?

17        A.    I think I flipped through some of

18   the pages.

19        Q.    Did you know that McDonald's had

20   the option to stay at the property through

21   April 2039?

22        A.    I don't remember if I knew that

23   at the time.

24        Q.    What did Sam tell you about

25   Vanderbilt's plans for McDonald's on the

```
                                            Page 26
 1                      LI
 2   property?
 3        A.    You cut off at the earlier part
 4   of the question, sorry.
 5        Q.    What did Sam tell you at the time
 6   about Vanderbilt's plans for McDonald's on
 7   the property?
 8        A.    I don't remember if he told me
 9   any plans.
10        Q.    Did Sam indicate whether he
11   wanted McDonald's to leave the property?
12        A.    I don't think so.
13        Q.    Has he ever told you that?
14        A.    No.
15        Q.    Did you ever have discussions
16   with Sam about finding a new location for
17   the McDonald's restaurant?
18        A.    I don't think so.
19        Q.    You thought a long time about
20   that?
21        A.    I don't remember because we
22   looked at other locations in other parts
23   of the city but for this particular
24   location, nothing comes to mind.
25        Q.    When did you first learn about
```

```
 1                    LI
 2   the fair market value process under the
 3   McDonald's lease?
 4        A.    Sometime subsequent to this
 5   e-mail, I think.
 6        Q.    And what did you -- what were you
 7   told about it?
 8        A.    There's a fair market re-set.
 9        Q.    And did Sam explain it to you?
10        A.    He probably just referenced the
11   lease.
12        Q.    And so then you reviewed that
13   portion of the lease?
14        A.    I might have.
15        Q.    Do you recall having discussions
16   with anyone else around this time about
17   the fair market value process on the
18   lease?
19        A.    I don't remember having any other
20   discussions.
21        Q.    Did Sam ever tell you that the
22   fair market value process could be a way
23   for Vanderbilt to get McDonald's to leave
24   the property?
25        A.    He did not say anything about
```

Page 28

1                          LI
2      getting McDonald's to leave.
3           Q.    So what did he say?
4           A.    That there's a fair market
5      recess.    He doesn't know what McDonald's
6      is going to do.
7           Q.    Did he ever talk about how
8      McDonald's might leave the property if
9      they thought the rent was too high?
10          A.    I don't believe he put those
11     words -- I don't believe he said those to
12     me, no.
13          Q.    Do you know how Sam learned about
14     the property?
15          A.    I don't know.
16          Q.    So you don't know if he
17     approached Tony Musto or Tony Musto
18     approached him or something else?
19          A.    I don't know the details.
20          Q.    Do you know when Sam first began
21     having discussions about the property?
22          A.    Sometime before 2017.
23          Q.    And what do you know about the
24     discussions that he was having before
25     2017?

```
                                         Page 29
 1                        LI
 2         A.   I don't know.
 3         Q.   So you just know that there were
 4    discussions but you don't know what was
 5    involved?
 6         A.   Yes.
 7         Q.   And do you know how far before
 8    2017 those discussions were?
 9         A.   I don't know exact.
10         Q.   When did Simon Dushinsky become
11    involved in the property?
12              MR. KOH:  Objection.  Go ahead.
13              THE WITNESS:  I don't know.
14    BY MR. WALSH:
15         Q.   And what is his role with respect
16    to Vanderbilt?
17         A.   He has been a passive member of
18    the LLC.
19         Q.   About how many times a month do
20    you speak with him about the property?
21         A.   This property?
22         Q.   Yes.
23         A.   I'm not sure if I've ever spoken
24    to him about this property.
25         Q.   So you don't think you've ever
```

```
                                              Page 30

 1                      LI
 2    spoken with him about this property?
 3         A.   No.
 4         Q.   You may remember from Sam's
 5    deposition there was a discussion about
 6    the real property transfer tax return for
 7    the 99-year ground lease between MMB
 8    Associates and Vanderbilt.  Do you recall
 9    that?
10         A.   Yes.
11         Q.   And do you recall that it shows a
12    seven million dollar valuation for the
13    amount of consideration for the conveyance
14    of the ground lease for MMB Associates to
15    Vanderbilt?
16         A.   Did you say 70 or seven?
17         Q.   Seven million.
18         A.   Yes.
19         Q.   What role, if any, did you have
20    in determining that consideration to be
21    reported to the government for transfer
22    tax purposes?
23         A.   I don't believe I had any role in
24    that.
25         Q.   Do you know how that amount was
```

```
                                         Page 31
 1                      LI
 2    determined?
 3         A.    I don't.
 4         Q.    Did you ever have conversations
 5    with Sam or anyone else about how the
 6    amount was determined?
 7         A.    No.
 8         Q.    Are you familiar with the M-Crown
 9    rezoning plan?
10         A.    I'm aware of there being M-Crown
11    framework.
12         Q.    What is your understanding of it?
13         A.    The community board of that area
14    had discussed with persons at City
15    Planning and perhaps other elected
16    officials about creating a framework to
17    rezone an area.
18         Q.    And the area includes
19    840 Atlantic Avenue; right?
20         A.    840 is within that area that's
21    proposed.
22         Q.    When did you first learn about
23    the M-Crown rezoning plan?
24         A.    Sometime after 2017.
25         Q.    So it was after you joined SPR
```

Page 32

1                        LI

2     Group?

3          A.   Yes.

4          Q.   So the Department of City

5     Planning engaged with the community to

6     prepare this M-Crown rezoning district;

7     right?

8               MR. KOH:  Objection.  Go ahead.

9               THE WITNESS:  I don't know if

10          City Planning was working with the

11          community board.  They were drafting

12          with each other.  I understand there

13          were conversations, discussions,

14          meetings.

15     BY MR. WALSH:

16          Q.   And the M-Crown rezoning district

17     is a six-block area that's mostly the

18     Crown Heights section of Brooklyn; is that

19     right?

20          A.   It's mostly in Crown Heights.  I

21     can't tell you how big exactly the area

22     is.

23          Q.   And the property sits at the

24     westernmost edge of the M-Crown rezoning

25     district; is that right?

```
                                                  Page 33

 1                        LI

 2         A.    I believe so.

 3         Q.    And historically the M-Crown

 4    rezoning district has consisted mostly of

 5    industrial and manufacturing uses; is that

 6    right?

 7         A.    That area has a lot of M zone

 8    sites.

 9         Q.    What is an M zone site?

10         A.    It's a site that permits

11    commercial and industrial developments,

12    uses.

13         Q.    And is the M-Crown rezoning plan

14    seeking to transform the area into a more

15    residential neighborhood?

16             MR. KOH:   Objection.  Go ahead.

17             THE WITNESS:   I'm not sure if

18         their aim is to transform it into a

19         residential neighborhood.

20    BY MR. WALSH:

21         Q.    What do you understand the plan

22    to be?

23         A.    I understand that the area

24    according to the community members has

25    been overlooked and they want -- they want
```

Page 34

1                        LI

2     to see some changes.

3          Q.    And one of those changes is to

4     add a lot more residential to that

5     neighborhood; right?

6          A.    I think their primary goal is to

7     actually add more commercial, hence the M

8     which I think stands for mixed use.

9          Q.    And the property at 840 Atlantic

10    Avenue is actually given unique treatment

11    under the M-Crown rezoning plans; is that

12    right?

13         A.    I think that really depends on

14    who you ask.

15         Q.    Well, I use that term because do

16    you know who Benjamin Stark is?

17         A.    Yes.

18         Q.    Who is Benjamin Stark?

19         A.    Benjamin Stark is an attorney for

20    Vanderbilt.

21         Q.    Okay.  And he represents

22    Vanderbilt in connection with its

23    application for rezoning of the property;

24    is that right?

25         A.    Yes.

Page 35

1                    LI

2       Q.   And he's presented at community

3   board meetings and for other officials; is

4   that right?

5       A.   He has presented the proposal for

6   840 Atlantic Avenue.

7       Q.   Okay.  And do you remember a

8   March 4, 2021 meeting before the community

9   board 8?

10      A.   There could have been a meeting

11  around that time.  I don't recall a

12  specific date or time.

13      Q.   It would have been the first

14  formal meeting with the community board

15  after Vanderbilt submitted its

16  application.  Do you recall the first

17  meeting in early March?

18      A.   I recall there was a first

19  meeting.  I don't know the exact date or

20  time.

21      Q.   And you attended that meeting, it

22  was a virtual meeting; right?

23      A.   I believe I was in attendance.

24      Q.   And during that meeting,

25  Mr. Stark told the board that the property

```
 1                    LI
 2   was given, quote, unique treatment under
 3   the M-Crown rezoning plan.  So do you
 4   disagree with his description of the
 5   treatment given to this property under the
 6   M-Crown rezoning plan?
 7        A.   I don't remember what he said so
 8   I can't comment on what he may or may not
 9   have said.
10        Q.   So do you disagree with that?
11             MR. KOH:  Objection.
12             THE WITNESS:  I don't know what
13        he said.
14   BY MR. WALSH:
15        Q.   Well, he said it's given unique
16   treatment.  Would you agree or disagree
17   with that statement?
18        A.   I think it really depends on who
19   you ask.
20        Q.   I'm asking you.
21        A.   I don't feel like there's any
22   unique treatment.
23             MR. WALSH:  If we could mark
24        VA 027098.
25             (Exhibit P42, document Bates
```

```
                                              Page 37

 1                        LI

 2         labeled VA 027098, marked for

 3         identification.)

 4              VERITEXT CONCIERGE:  This has

 5         been marked as Exhibit P42.

 6    BY MR. WALSH:

 7         Q.   Mr. Li, if you could just pull up

 8    that document, it spans from VA 027098

 9    through VA 027124.  It appears to be a

10    printout of a -- from a media PowerPoint

11    presentation.  It's entitled M-Crown

12    report from DCP discussion, February 12,

13    2018.

14              Mr. Li, this document was

15    produced to us by Vanderbilt.  You're

16    listed as the custodian and it -- the

17    metadata indicates that it was obtained

18    from a Dropbox folder with the path

19    840 Atlantic Ave Vanderbilt Atlantic

20    Holdings (547 Vanderbilt Ave)/zoning

21    M-Crown.

22              Have you seen this document

23    before?

24         A.   I have seen it.

25         Q.   And are you aware that Sam
```

```
                                        Page 38

 1                      LI
 2    Rottenberg forwarded this document to Tom
 3    Tener in June 2018?
 4         A.    Sam forwarded this file to me?
 5         Q.    Forwarded it to Tom Tener in June
 6    of 2018.
 7         A.    To Tom Tener?  I don't remember.
 8         Q.    If you could flip to 027100.  It
 9    says spring 2017.
10         A.    Yes.
11         Q.    So is it your -- then going
12    through the page ending in 106, is it your
13    understanding that this is a description
14    of the DCP's framework for M-Crown during
15    the spring of 2017?
16         A.    I see it says DCP 2017 framework
17    but I think there's a lot of confusion
18    between whose framework each of the
19    presentation has been.  So I take -- I see
20    here where it says DCP spring 2017
21    framework, that would be a DCP 2017 spring
22    framework.
23         Q.    Okay, if you could flip to the
24    page ending in 102.
25         A.    Um-hum.
```

```
                                          Page 39

 1                      LI

 2        Q.    So we're still in the spring 2017

 3   framework.  Do you see there's a little

 4   map of the district and you see the

 5   property at the very top left edge where

 6   it's next to Vanderbilt?

 7        A.    Yes.

 8        Q.    And at least at that time, the

 9   framework indicates that it's going to be

10   largely non-residential; is that right?

11        A.    I don't know if that's correct.

12        Q.    Well, do you see -- what color is

13   most of the property colored in this grid?

14        A.    Purple.

15        Q.    And what does the key say purple

16   represents?

17        A.    Non-residential.

18        Q.    Okay.  But that ultimately

19   changed; right?

20        A.    I would say the lots that are

21   currently Vanderbilt's are still

22   non-residential.

23        Q.    But the vision changed; isn't

24   that right, the framework ultimately

25   changed?
```

Page 40

1                          LI

2        A.    I'm not sure what this slide

3    exactly is.  It doesn't -- I don't know if

4    this describes the framework for existing

5    uses on those lots.

6        Q.    If you could turn to the page

7    ending in 108.  It's entitled DCP February

8    2018 presentation.

9        A.    Um-hum.

10        Q.    Do you see that slide?

11        A.    I do.

12        Q.    And do you see the property also

13    on this slide?

14        A.    I do.

15        Q.    And it's again sort of the -- on

16    the left-hand side in the dark shading, do

17    you see that?

18        A.    You said dark red?

19        Q.    Yeah, it's like a dark red

20    shading.  Do you see it?

21        A.    Yes.

22        Q.    With a little yellow underneath

23    it?

24        A.    Yes.

25        Q.    What is your understanding of

Page 41

1                          LI

2     what this is saying the vision for the

3     property is in this -- as of February

4     2018?

5          A.    What this image tells me?

6          Q.    Correct.

7          A.    That this is the area being

8     considered as part of the framework.

9          Q.    And what does it tell you about

10    the vision for the property at

11    840 Atlantic Avenue?

12         A.    I see it says high density C.

13         Q.    What does that mean?

14         A.    I don't know what C stands for,

15    maybe commercial.

16         Q.    And right next to high density C

17    it says significant new residential and

18    commercial.  Do you see that?

19         A.    Yes.

20         Q.    Is there anything else on that

21    map that's the same color?

22         A.    I don't think so.

23         Q.    So it looks like in February

24    2018, DCP shared its vision that the

25    property would have significant new

```
                                    Page 42

 1                     LI
 2    residential and commercial zoning attached
 3    to it; right?  That would be the vision?
 4          MR. KOH:  Objection.  Go ahead.
 5          THE WITNESS:  I know there's a
 6       slide here that says DCP February 2018
 7       presentation.  I'm not sure exactly
 8       where DCP stands in this.  Somebody
 9       made this slide.
10    BY MR. WALSH:
11       Q.   Well, do you have any reason to
12    believe it's inaccurate?
13       A.   Inaccurate to what?
14       Q.   Are you aware, is this at least
15    for 840 Atlantic Avenue, is this your
16    understanding of what DCP's vision for
17    what the zoning for this property will
18    look like?
19          MR. KOH:  Objection.  Go ahead.
20          THE WITNESS:  I think some person
21       at DCP may have produced this.  I
22       don't know if that represents DCP's
23       overall vision.
24    BY MR. WALSH:
25       Q.   And you've had conversations with
```

Page 43

1                          LI

2      DCP officials over the year about this

3      property; right?

4          A.    I was present at the meetings

5      with DCP.

6          Q.    And did anyone from DCP say that

7      they did not want significant new

8      residential and commercial on this

9      property?

10         A.    No.

11         Q.    So is it your understanding that

12     DCP would like to see significant new

13     residential and commercial on this

14     property?

15              MR. KOH:   Objection.   Go ahead.

16              THE WITNESS:   I don't know what

17         DCP wants besides what they produced

18         and shared with the community board.

19     BY MR. WALSH:

20         Q.    Has anyone from DCP ever

21     indicated that they would not like to see

22     significant new residential and commercial

23     on this property?

24         A.    I don't remember what exactly DCP

25     has indicated about this particular site

```
 1                    LI
 2   or the extent of any change.
 3        Q.    Okay.  Has the zoning for the
 4   property changed since Vanderbilt acquired
 5   it in November 2017?
 6        A.    I don't believe so.
 7        Q.    Are you aware of any
 8   communications between representatives of
 9   Vanderbilt and DCP about the property
10   before Vanderbilt acquired its ground
11   lease in November 2017?
12        A.    I'm not.
13        Q.    Who is Eugene Mekhtiyev?
14        A.    He is an architect for
15   Vanderbilt.
16        Q.    And he works at a firm called IMC
17   Architecture; right?
18        A.    Yes.
19        Q.    And Vanderbilt retained IMC
20   Architecture to prepare plans for a mixed
21   use building on the property in the event
22   of rezoning; right?
23        A.    He prepared I believe what is
24   called zoning massing studies for the
25   property.
```

```
                                         Page 45

 1                      LI
 2       Q.   Can you describe what a zoning
 3   massing study is?
 4       A.   He analyzes the zoning of the
 5   site and produces a massing.
 6       Q.   And when Vanderbilt retained IMC,
 7   did they ask IMC to prepare this study
 8   based upon the current zoning or a
 9   different zoning?
10       A.   There I believe was a study based
11   on the higher zoning.
12       Q.   And is the higher zoning
13   consistent or at least roughly consistent
14   with the DCP's vision under the M-Crown
15   rezoning plan?
16       A.   I don't know.
17            MR. WALSH:  If we could mark
18       VA 017719.  It's an e-mail from
19       Jonathan Imani at IMC Architecture to
20       Eugene Mekhtiyev and a number of other
21       people.  It was sent March 13, 2017,
22       has an attachment entitled -- I'm
23       sorry.
24            VERITEXT CONCIERGE:  I'm now
25       introducing P43.  It's taking a while
```

```
                                              Page 46

 1                      LI

 2      to load.

 3               (Exhibit P43, document Bates

 4      labeled VA 017719, marked for

 5      identification.)

 6   BY MR. WALSH:

 7      Q.   So there's an attachment that is

 8   also attached to this exhibit and the

 9   exhibit runs through VA 017729.  The

10   attachment is called 180313, 840 Atlantic

11   Ave ULURP.pdf.

12               Do you see that, Mr. Li?

13      A.   Which page am I supposed to be

14   on?

15      Q.   Just the first page, very first

16   page at the top.

17      A.   I see an e-mail from Jonathan

18   Imani.

19      Q.   And it indicates there's an

20   attachment, do you see that?

21      A.   It says current file attached.

22      Q.   Do you see the file name under

23   attachments, it ends with the phrase

24   ULURP?

25      A.   Yes.
```

```
                                        Page 47

 1                    LI
 2       Q.   What is ULURP?
 3       A.   I believe it stands for Uniform
 4  Land Use Review Process.
 5       Q.   And what is the process for?
 6       A.   It's a process for rezoning
 7  sites.
 8       Q.   So if someone who controls a
 9  property wants to get a private rezoning
10  of that property, they would have to go
11  through this ULURP process; is that right?
12            MR. KOH:  Objection.  Go ahead.
13            THE WITNESS:  Can you ask the
14       question again?
15  BY MR. WALSH:
16       Q.   So if someone who controls a
17  property wants to get a private rezoning
18  of that property, they would have to go
19  through the ULURP process; is that right?
20            MR. KOH:  Objection.
21            THE WITNESS:  That's one of the
22       avenues to achieve a rezoning.
23  BY MR. WALSH:
24       Q.   And do you know when Vanderbilt
25  retained IMC?
```

                                                          Page 48

    1                              LI
    2         A.    I don't remember exact time.
    3         Q.    Okay.  Based upon this e-mail,
    4    would you agree that they had been
    5    retained at least by March of 2018?
    6         A.    Yes.
    7         Q.    And would you agree that they
    8    were retained in connection with a
    9    potential ULURP application for the
   10    property?
   11         A.    They were retained to perform
   12    zoning massing studies.
   13         Q.    Okay, but the attachment
   14    references ULURP, it doesn't reference a
   15    massing zoning study.
   16         A.    I think what they produced is the
   17    zoning massing studies.
   18         Q.    Do you know -- and so in March
   19    of -- March 13, 2018, they circulated what
   20    they called a progress set of plans for
   21    the property; right?
   22         A.    Where does it say progress at?
   23         Q.    On the first page, the first
   24    e-mail.  It says all, please find attached
   25    the 840 Atlantic progress set.

Page 49

                        LI

 1
 2          Do you see that?
 3     A.   Yes.
 4     Q.   And on the next page, the page
 5   ending in 720, on the bottom it says
 6   Atlantic Ave rezoning.
 7          Do you see that?
 8     A.   I'm sorry, what did you say?
 9     Q.   On the next page, the page ending
10   in 720 on the bottom, it says Atlantic Ave
11   rezoning.
12          Do you see that?
13     A.   Yes.
14     Q.   Who is paying IMC?
15     A.   Vanderbilt Atlantic Holdings LLC.
16     Q.   And you don't recall when they
17   were retained?
18     A.   I don't recall exact time.
19          MR. WALSH:  If we can pull up
20      what's previously marked as Exhibit
21      P9.  It's a two-page document,
22      VA 049132 to 133 entitled Community
23      Board 8 Housing Committee M-Crown
24      Subcommittee Minutes from a Meeting on
25      4/30/2018.

1                         LI
2              VERITEXT CONCIERGE:   P9 is now in
3         the marked exhibit folder.
4    BY MR. WALSH:
5         Q.   Mr. Li, have you ever seen this
6    document before?
7         A.   I believe so.
8         Q.   And it appears to show that Tony
9    Musto and Sam Rottenberg attended an
10   M-Crown subcommittee meeting on April 30,
11   2018.
12             Do you see that?
13        A.   That's what it looks like.
14        Q.   Did Sam share with you why he
15   attended the meeting?
16        A.   He didn't tell me exactly his
17   reason for attending the meeting.
18        Q.   Are you aware of any reason other
19   than 840 Atlantic Avenue that Sam would
20   have attended this meeting?
21             MR. KOH:   Objection.  Go ahead.
22             THE WITNESS:  I don't know.
23             MR. WALSH:  If we could show
24        Mr. Li what's previously been marked
25        as Exhibit P10.  It spans Bates

```
                                          Page 51

 1                    L I
 2       numbers VA 010453 to 455.
 3             VERITEXT CONCIERGE:  P10 has been
 4       moved to market exhibits.
 5  BY MR. WALSH:
 6       Q.   So Mr. Li, this is an e-mail
 7  chain.  The top e-mail is an e-mail from
 8  Sam Rottenberg to you on May 29, 2018.
 9  It's got an attachment that appears to
10  have been prepared by IMC Architecture.
11             Do you see it?
12       A.   Yes.
13       Q.   Attached to the e-mail are notes
14  from a meeting with the Department of City
15  Planning on May 22, 2018; is that right?
16       A.   I see notes from IMC for May 22,
17  2018.
18       Q.   Do you know why Sam forwarded
19  this -- these notes to you?
20       A.   It looks like I wasn't copied on
21  the previous e-mail.
22       Q.   Okay.  Do you know what the
23  purpose of this meeting between
24  representatives of Vanderbilt and DCP was?
25       A.   To discuss Vanderbilt.
```

Page 52

```
 1                    LI
 2      Q.   And the potential rezoning for
 3   the property; right?
 4      A.   I don't remember what was
 5   discussed exactly.  I'm trying to read the
 6   e-mail here.
 7      Q.   Do you see on the top left of the
 8   page ending in 454, it's the first page of
 9   the memo, under meeting memo it says
10   Project:  Atlantic Rezoning?
11      A.   Yes.
12      Q.   So it appears that this was the
13   meeting to discuss a rezoning for the
14   property; right?
15           MR. KOH:  Objection.
16           THE WITNESS:  I see that's what
17       IMC labeled it as.  I also see below
18       it's meeting number 1 with DCP and I'm
19       just trying to remember exactly what
20       was discussed.
21   BY MR. WALSH:
22      Q.   Item number 1 says RL provided an
23   overview of the project.  The lots are
24   currently in contract.
25           RL appears to be Ray Levin.  Who
```

Page 53

```
 1                      LI
 2   is Ray Levin?
 3       A.   He was a zoning attorney at a law
 4   firm that Vanderbilt was working with.
 5       Q.   So he was one of Vanderbilt's
 6   attorneys?
 7       A.   At that time.
 8       Q.   And what does it mean by the lots
 9   are currently in contract?
10           MR. KOH:  Objection.  Go ahead.
11           THE WITNESS:  I'm not sure what
12       exactly they mean.  Maybe they are
13       referencing the ground lease.  I think
14       the phrase lots are in contract is
15       probably not accurate.
16   BY MR. WALSH:
17       Q.   Why do you say that?
18       A.   I think that would imply that we
19   were in purchase and sale agreements.
20       Q.   But by this time you believe that
21   Vanderbilt controlled all of the lots that
22   would be part of this project?
23       A.   I'm not sure if we control all of
24   the lots.
25       Q.   Does Vanderbilt control all of
```

Page 54

```
 1                       LI
 2     the lots now that are part of the proposed
 3     redevelopment plan?
 4              MR. KOH:   Objection.  Go ahead.
 5              THE WITNESS:   Vanderbilt controls
 6         a total of seven lots on the corner of
 7         Vanderbilt and Atlantic Avenue.
 8     BY MR. WALSH:
 9         Q.   And 840 Atlantic Avenue, those
10     are how many, seven lots?
11         A.   I believe that's three lots.
12         Q.   So there are four additional lots
13     that Vanderbilt also controls?
14         A.   Yes.
15         Q.   And how does it have control of
16     those lots?
17         A.   Ground leases.
18         Q.   When were those ground leases
19     entered into?
20         A.   I don't know the exact times.
21         Q.   Were they entered into before or
22     after Vanderbilt acquired its 99-year
23     ground lease for the property 840 Atlantic
24     Avenue?
25         A.   After.
```

Page 55

1                          LI

2       Q.   And so was 840 Atlantic Avenue,

3   were those the first lots that Vanderbilt

4   gained control of?

5       A.   Yes.

6       Q.   Vanderbilt submitted an

7   application into the ULURP process earlier

8   this year; right?

9       A.   I don't remember exactly when

10  that was submitted.

11      Q.   At the March 4, 2021 meeting your

12  attorney indicated that it was certifying

13  to ULURP on March 4, 2021.  Does that

14  sound right?

15      A.   That sounds generally correct.  I

16  don't know the exact time.

17      Q.   Do you know how long the ULURP

18  process is supposed to last?

19      A.   My understanding is it's roughly

20  seven months.

21      Q.   And Vanderbilt is seeking zoning

22  changes that would allow the construction

23  of an 18-story building with 316 dwelling

24  units as well as commercial and community

25  facilities on the first and second floors;

Page 56

1                          LI
2    right?
3         A.    We forwarded a proposal that
4    generally matches that description.
5         Q.    And before -- and McDonald's has
6    actually submitted proposed plans and
7    renderings of what the building would look
8    like on the property; is that right?
9              MR. KOH:  Objection.
10             THE WITNESS:  I don't follow the
11        question.
12   BY MR. WALSH:
13        Q.    Has Vanderbilt submitted proposed
14   renderings of what its building or a
15   building would look like if its proposed
16   rezoning were to be approved?
17        A.    We have as part of the
18   presentation renderings that show
19   Vanderbilt Atlantic under a different
20   zoning.
21        Q.    And there's a pretty large
22   building in those renderings; right?
23        A.    There's a bigger building.
24        Q.    And about an 18-story building at
25   points?

```
                                        Page 57

 1                    LI
 2        A.    I believe it's 18 stories at the
 3   highest.
 4        Q.    Could that building as shown in
 5   those renderings be built with the
 6   McDonald's restaurant on the property?
 7        A.    That exact building?
 8        Q.    Yes.
 9        A.    That could not be built with the
10   McDonald's.
11        Q.    Who is Jamel Gaines?
12        A.    Jamel Gaines is the creative
13   director for a nonprofit organization.
14        Q.    And is that nonprofit called
15   Creative Outlet Dance Theatre of Brooklyn?
16        A.    I know it's Creative Outlets.  I
17   don't know the second half of -- I don't
18   know exactly what they called them.  It's
19   more Jamel Gaines Creative Outlets.
20        Q.    Part of Vanderbilt's proposal is
21   for the building on the property to
22   include a community use facility; right?
23        A.    The proposal includes a space for
24   a facility.
25        Q.    And do you recall Mr. Gaines
```

```
 1                           LI
 2      speaking during the March 4, 2021
 3      community board meeting about Vanderbilt's
 4      proposed rezoning?
 5           A.    I don't remember.
 6           Q.    So he disclosed at the meeting
 7      that his organization, Creative Outlet,
 8      had been working with Vanderbilt to design
 9      plans for a headquarters at the property
10      that would be built specifically for his
11      organization.  Is that accurate?
12           A.    I don't remember what he said or
13      whether he spoke at the meeting but
14      there --
15           Q.    I'm sorry.
16           A.    There's a space intended for, if
17      it's ever built, for Jamel Gaines Creative
18      Outlets.
19           Q.    What kind of space is it?
20           A.    It's a community facility space.
21           Q.    How large?
22           A.    The number I think has changed
23      but roughly 8,000 square feet.
24           Q.    When did Vanderbilt begin
25      discussing this plan with Creative Outlet?
```

```
                                                Page 59

 1                          LI

 2        A.   I don't remember exact time.

 3        Q.   Has Vanderbilt entered into an

 4   agreement with Creative Outlet?

 5        A.   They have not signed a lease with

 6   Creative Outlets.

 7        Q.   But you discussed a lease with

 8   Creative Outlet; correct?

 9        A.   We've discussed structure.

10        Q.   And what have you discussed with

11   them?

12        A.   We discussed their occupying a

13   space if it's ever developed.

14        Q.   And they would be given below

15   market rent; right?

16        A.   We've been asked to make that

17   accommodation.

18        Q.   And is that something Vanderbilt

19   would do if its plan was approved?

20        A.   We will be open to --

21             MR. KOH:   Objection.  Go ahead.

22   BY MR. WALSH:

23        Q.   You said we will be open and

24   then --

25        A.   We would be open to provide a
```

```
 1                         LI
 2    below market rent to Creative Outlets.
 3         Q.   And the community board has also
 4    asked Vanderbilt for some kind of a deed
 5    restriction that would allow Creative
 6    Outlet to stay there a long time; right?
 7         A.   I think what they are asking for
 8    is for that space if it's ever built to
 9    permanently serve nonprofit uses.
10         Q.   Has Vanderbilt discussed with
11    Creative Outlet that this building can't
12    be built until potentially 2039 if
13    McDonald's stays on the property?
14         A.   We made sure they are aware
15    there's a McDonald's on the site.
16         Q.   That wasn't my question.  My
17    question was if Vanderbilt has discussed
18    with Creative Outlet that the building may
19    not be able to be built until 2039 if
20    McDonald's stays on the property.
21         A.   I don't remember exact
22    discussions or the time frame we may have
23    referenced.
24         Q.   Okay.  Have draft leases been
25    exchanged with Creative Outlet?
```

Page 61

1                        LI
2        A.    No.
3        Q.    So it's all just been
4    discussions?
5        A.    We've prepared summarized terms
6    based on discussions.
7        Q.    So has a letter of intent been
8    signed?
9        A.    They did not sign a letter of
10   intent.
11       Q.    Have drafts of a letter of intent
12   been circulated?
13       A.    Yes.
14       Q.    Have you ever heard the term
15   reasonable worst case development?
16       A.    There was a horn outside.  Could
17   you repeat the question?
18       Q.    Sure.
19              Have you ever heard the term
20   reasonable worst case development
21   scenario?
22       A.    I've heard the term before.
23       Q.    What is it?
24       A.    To be honest, I'm not quite sure.
25       Q.    Okay.  Are you aware that the

Page 62

1                         LI

2    Department of City Planning requires

3    developers seek a rezoning to disclose the

4    reasonable worst case development scenario

5    for the proposed development?

6         A.   I think it's part of the overall

7    package leading up to certification.

8         Q.   Okay.  Did Vanderbilt submit a

9    reasonable worst case development scenario

10   to the DCP?

11        A.   I believe our consultant prepared

12   something to cover the requirement.

13        Q.   Were you involved in that

14   process?

15        A.   I've been on e-mails with the

16   consultants.  I don't believe I've

17   personally seen whatever analysis that

18   they prepared.

19             MR. WALSH:  If we could mark

20        VA 018774.

21             (Exhibit P44, document Bates

22        labeled VA 018774, marked for

23        identification.)

24   BY MR. WALSH:

25        Q.   It spans through 18779.  It's an

```
                                            Page 63

 1                      LI

 2   e-mail from Christina Szczepanski at

 3   Philip Habib & Associates to a number of

 4   people, subject 840 Atlantic Avenue

 5   Rezoning - Draft RWCDS (18-109) and it's

 6   got some attachments.

 7             So Mr. Li, if you could open up

 8   the document that's been marked as P44.

 9             MR. KOH:  It's not uploaded yet.

10             THE WITNESS:  It is at my end.

11   BY MR. WALSH:

12       Q.   Who is Christina Szczepanski?

13       A.   She is a consultant for

14   Vanderbilt.

15       Q.   What kind of consultant?

16       A.   Environmental related.

17       Q.   And she works for a firm called

18   Philip Habib & Associates?

19       A.   Yes.

20       Q.   So are they Vanderbilt's

21   environmental consultants for the proposed

22   rezoning at the property?

23       A.   Yes.

24       Q.   Okay.  And from this e-mail, it

25   looks like in November of 2018, she
```

Page 64

1                         LI

2    circulated a draft reasonable worst case

3    development scenario to a number of people

4    including Sam Rottenberg; is that right?

5         A.    Yes.

6         Q.    Do you know if you ever reviewed

7    this draft?

8         A.    I don't believe I've reviewed

9    this.  Even if it was sent to me, I don't

10   think I've opened it.

11        Q.    Have you been involved in

12   discussions about a potential build year

13   for the new development proposed for

14   840 Atlantic Avenue?

15        A.    I believe that's part of the

16   package that makes certain assumptions.

17        Q.    If you could turn to the page

18   ending in 778.

19        A.    Yes.

20        Q.    Do you see about halfway down, it

21   says section 5, build year and then what

22   is the proposed build year in this draft

23   document?

24        A.    It says 2022.

25        Q.    And it says it is expected that

Page 65

1                         LI
2       the proposed development would be
3       constructed over an approximately 18- to
4       22-month period following approval with
5       completion and occupancy expected to occur
6       in 2022.  This build year was determined
7       in consideration of the amount of time
8       necessary for the development site to be
9       reasonably redeveloped.
10              Do you see that?
11      A.   I see the words you just read.
12      Q.   So did either you or Sam let
13      Philip Habib & Associates know that
14      McDonald's would have to be off the
15      property in order for this project to be
16      completed and occupied in 2022?
17              MR. KOH:  Objection.  Go ahead.
18              THE WITNESS:  I don't remember
19          ever having discussion.
20      BY MR. WALSH:
21      Q.   Do you remember hearing that this
22      2022 build year was being discussed?
23      A.   This is the first time I'm seeing
24      this.
25      Q.   Okay.  So I guess were you aware

```
                                        Page 66

 1                        LI

 2      that 2022 was being discussed at this time

 3      for a possible date for the project to be

 4      completed and occupied?

 5           A.   Am I aware if 2022 was used?  I

 6      was not.

 7                MR. WALSH:  If we can mark

 8           VA 026381.  It's a three-page document

 9           ending in 383.

10                (Exhibit P45, document Bates

11           labeled VA 026381, marked for

12           identification.)

13                VERITEXT CONCIERGE:  This will be

14           marked as Exhibit P45.

15      BY MR. WALSH:

16           Q.   Mr. Li, if you could open up P45

17      when it becomes available.

18           A.   Yes.

19           Q.   Okay.  This appears to be another

20      draft of the reasonable worst case

21      development scenario document; is that

22      right?

23           A.   I see the date of February 26,

24      2019.

25           Q.   Okay.  So I'll represent to you
```

```
1                      LI

2    that this document was produced to us in

3    this litigation.  The metadata indicates

4    that you were the custodian and the

5    metadata indicates the document was

6    created on March 25, 2019.

7              There's some handwriting on the

8    document.  Whose handwriting is that?

9         A.   I don't know.

10        Q.   That's not your handwriting?

11        A.   No.  My handwriting is much

12   worse.

13        Q.   Do you recall receiving a draft

14   reasonable worst case development

15   scenario?

16        A.   I don't remember receiving this.

17   If I saved it, perhaps it was in the

18   e-mail and I just never opened up the

19   attachments.

20        Q.   If you could flip to the second

21   page of the document, and here the build

22   year is listed as 2023.

23              Do you see that?

24        A.   Yes.

25        Q.   Okay, so it seems that in the
```

Page 68

```
 1                           LI
 2      months from the previous draft we were
 3      looking at, the build year had moved from
 4      2022 to 2023; is that right?
 5           A.    Seems like the number has been
 6      changed from 2022 to 2023.
 7           Q.    Do you know what the reason for
 8      that change was?
 9           A.    I do not.
10           Q.    And there's some proposed edits
11      throughout this document; right?
12           A.    Yes.
13           Q.    Are there any proposed edits to
14      the build year?
15           A.    I'm not sure.  I see some green
16      marking around the section but I don't
17      know exactly what they mean.
18           Q.    No obvious edits were made to
19      this section; right?
20           A.    No text was crossed out.
21           Q.    So would you agree that somebody
22      at Vanderbilt was telling Philip Habib &
23      Associates that 2023 was a potential year
24      for this project to be completed and
25      occupied?
```

```
                                              Page 69

 1                        LI
 2            MR. KOH:  Objection.  Go ahead.
 3            THE WITNESS:  I don't know if
 4        anybody at Vanderbilt told persons at
 5        Philip Habib about 2023.
 6    BY MR. WALSH:
 7        Q.   Who has been dealing primarily
 8    with Philip Habib & Associates?
 9        A.   I think there's a group e-mail in
10    which e-mails are exchanged.
11        Q.   You said earlier that it's
12    primarily you and Sam at Vanderbilt;
13    right?
14        A.   Doing?
15        Q.   Running Vanderbilt.
16        A.   Yes.
17        Q.   So which of the two of you is
18    primarily responsible for dealing with
19    Philip Habib & Associates?
20        A.   I think if there's any e-mails,
21    we would both be on the e-mails.
22        Q.   And who is giving them
23    instructions?
24        A.   I think Philip Habib could be
25    communicating with any person on such
```

Page 70

                              LI

1
2      e-mail chains.  They send out e-mails and
3      if people have input, they would provide
4      it.
5          Q.    So especially given that the date
6      was changed from the prior draft, it seems
7      somebody at Vanderbilt had directed them
8      to change the date from 2022 to 2023; is
9      that right?
10                MR. KOH:  Objection.  Go ahead.
11                THE WITNESS:  I don't know if
12          that's the case.
13     BY MR. WALSH:
14         Q.    Do you know what the current
15     or -- strike that.
16                Do you know what build year was
17     included in the file document that was
18     submitted to the Department of City
19     Planning for reasonable worst case
20     development scenario?
21         A.    I don't know.
22         Q.    Were you involved in the
23     preparation of the environmental
24     assessment statement for the property?
25         A.    To the extent I've been copied on

Page 71

```
 1                        LI
 2   e-mails.
 3       Q.   So have you had any involvement
 4   in the preparation of a construction
 5   schedule that was included in the
 6   environmental assessment statement?
 7       A.   I remember working on a
 8   construction schedule.
 9       Q.   And do you remember what that
10   construction schedule contemplated as far
11   as when would construction begin and when
12   it would end?
13       A.   I don't remember.
14            MR. WALSH:  We've been going for
15       about an hour and 20 minutes.  I
16       propose we take about a five-minute
17       break if that's acceptable to
18       everybody unless, Mr. Li, if you need
19       longer.
20            THE WITNESS:  It's good for me.
21            THE VIDEOGRAPHER:  We're going
22       off the record now at approximately
23       11:28 a.m.
24            (Recess taken from 11:28 a.m. to
25       11:36 a.m.)
```

```
                                        Page 72

 1                      LI
 2            THE VIDEOGRAPHER:  This is the
 3       beginning of media unit 2.  We're
 4       going back on the record at
 5       approximately 11:36 a.m.
 6  BY MR. WALSH:
 7       Q.   Mr. Li, when did you first learn
 8  about the fair market value process under
 9  the lease?
10       A.   Sometime after I started in 2017
11  with SPR Group.
12       Q.   What has your role been in that
13  process?
14       A.   More of a generalist role at the
15  company, just anything that comes across
16  that needs to be worked on I would get
17  involved.
18       Q.   So have you been -- have you been
19  involved in the fair market value process
20  for Vanderbilt?
21       A.   I believe so.
22       Q.   Who else has been involved in the
23  process for Vanderbilt?
24       A.   Sam.
25       Q.   And anybody else?
```

```
                                        Page 73
 1                      LI
 2        A.    There's -- no.
 3        Q.    Have you ever had discussions
 4    with Tony Musto about the fair market
 5    value process?
 6        A.    I don't remember.
 7        Q.    When was the last time you spoke
 8    with Tony Musto?
 9        A.    Several weeks ago, maybe a few
10    months ago, over phone.
11        Q.    And what was the purpose of that
12    discussion?
13        A.    I don't remember.
14        Q.    Has Vanderbilt been keeping
15    Mr. Musto or anybody else at MMB
16    Associates apprised of the status of this
17    litigation?
18        A.    I'm not aware.
19        Q.    And how about with the fair
20    market evaluation process generally?
21        A.    I think if you ask, we would
22    respond but there's no reporting.
23        Q.    And have you ever had any
24    discussions with him about it?
25        A.    About the fair market re-set?
```

```
                                              Page 74

 1                        LI

 2        Q.   Yes.

 3        A.   No.

 4             MR. WALSH:  If we could pull up

 5        what's been previously marked as P15.

 6        It's a letter from Vanderbilt to

 7        McDonald's dated May 10, 2018.

 8             VERITEXT CONCIERGE:  15 is now

 9        loaded.

10             THE WITNESS:  Which item?

11   BY MR. WALSH:

12        Q.   P15.  Have you seen this document

13   before?

14        A.   Yes.

15        Q.   Whose signature is that on the

16   second page under Vanderbilt's name?

17        A.   I'm not sure.

18        Q.   Were you involved in the

19   preparation of this letter?

20        A.   I don't remember.

21        Q.   How did Vanderbilt determine that

22   the FMV is $975,000?

23             MR. KOH:  Objection.  Go ahead.

24             THE WITNESS:  I don't remember.

25   ///
```

```
                                        Page 75

 1                      LI

 2    BY MR. WALSH:

 3        Q.    Were you involved in the process?

 4        A.    I believe I was.

 5        Q.    And who else was involved in the

 6    process?

 7        A.    Sam.

 8        Q.    Was an appraiser involved at that

 9    time?

10        A.    I don't remember.

11        Q.    So what information would

12    Vanderbilt have used to come up with this

13    $975,000 valuation?

14              MR. KOH:  Objection.  Go ahead.

15              THE WITNESS:  I don't remember.

16    BY MR. WALSH:

17        Q.    In arriving at this valuation,

18    did Vanderbilt consider the encumbrance of

19    the McDonald's lease on the property?

20              MR. KOH:  Objection.  Go ahead.

21              THE WITNESS:  I don't remember

22        what was considered or wasn't

23        considered at the time.

24    BY MR. WALSH:

25        Q.    You don't recall whether this
```

```
 1                    LI
 2   valuation considered current zoning or a
 3   potential upzoning?
 4        A.   Would you ask that again?
 5        Q.   So you don't recall whether this
 6   $975,000 valuation valued the property
 7   under current zoning or under a potential
 8   upzoning?
 9        A.   I believe the letter is prepared
10   in accordance with the exhibit and the
11   lease.
12        Q.   Do you know what assumptions were
13   made in arriving at that --
14        A.   I don't remember.
15        Q.   -- value?
16        A.   I don't remember.
17        Q.   Did you participate in any
18   discussions with anyone else about how
19   Vanderbilt expected McDonald's to react to
20   its $975,000 estimate?
21        A.   I don't remember having
22   discussion.
23        Q.   Was Vanderbilt hoping McDonald's
24   would decide not to exercise its right to
25   stay on the property for its first option
```

```
                                            Page 77
 1                         LI
 2    term?
 3              MR. KOH:  Objection.  Go ahead.
 4              THE WITNESS:  No.
 5    BY MR. WALSH:
 6        Q.   So Vanderbilt didn't care whether
 7    McDonald's stayed or not?
 8              MR. KOH:  Objection.  Go ahead.
 9              THE WITNESS:  I personally did
10        not care whether McDonald's stayed or
11        not.
12    BY MR. WALSH:
13        Q.   And did anyone or did Sam ever
14    indicate whether he wanted McDonald's to
15    stay or to go?
16        A.   He didn't communicate a
17    preference to me.
18        Q.   Has he ever?
19        A.   I don't remember.
20        Q.   So Sam has never told you he
21    hopes McDonald's leaves before 2039?
22        A.   I don't think so.
23        Q.   Did you speak with Sam about the
24    discussions he had with Carol Demarco at
25    McDonald's in early 2018?
```

Page 78

1                          LI
2          A.    He mentioned he had spoken or
3      e-mailed with Carol Demarco.  I don't
4      remember the exact time.  I know they
5      communicated.
6          Q.    Did he tell you anything about
7      those discussions?
8          A.    I don't remember what he told me.
9      I got the impression Carol was very busy.
10         Q.    And did he say after those
11     discussions whether he believed McDonald's
12     was going to stay or go?
13         A.    Can you repeat the question?
14         Q.    Did Sam say after those
15     discussions with Carol whether he believed
16     McDonald's was going to stay or go when
17     its original term expired in April of
18     2019?
19         A.    He didn't tell me what McDonald's
20     was thinking.
21         Q.    When did Vanderbilt come to the
22     conclusion that it wasn't going to reach
23     agreement with McDonald's on the fair
24     market value of the property --
25              MR. KOH:   Objection.  Go ahead.

```
                                          Page 79

 1                         LI
 2             THE WITNESS:  I'm sorry.
 3        Q.    -- without going through the
 4    formal process?
 5             MR. KOH:  Objection.  Go ahead.
 6             THE WITNESS:  Could you repeat
 7        the question again?
 8    BY MR. WALSH:
 9        Q.   At what point did Vanderbilt come
10    to the conclusion that it wasn't going to
11    be able to reach agreement with McDonald's
12    on fair market value of the property
13    without going through the formal process
14    described in the option rent addendum to
15    the lease?
16             MR. KOH:  Same objection.  Go
17        ahead.
18             THE WITNESS:  I don't remember.
19    BY MR. WALSH:
20        Q.   And the option rent addendum
21    requires the parties each to appoint an
22    appraiser; is that right?
23        A.   Yes.
24        Q.   So when did Vanderbilt begin
25    looking for appraisers to serve as its
```

```
                                    Page 80

 1                      LI

 2      appraiser for this fair market value

 3      process?

 4           A.    I don't remember exactly when.

 5           Q.    Was it in 2018 or 2019 that it

 6      began looking?

 7           A.    2018 feels more likely than 2019.

 8           Q.    And Vanderbilt ultimately

 9      selected Tom Tener at KTR to serve as its

10      appraiser; correct?

11           A.    Yes.

12           Q.    How many appraisers did

13      Vanderbilt speak to about this potential

14      engagement?

15           A.    There were a few other

16      appraisers.

17           Q.    Do you recall which ones?

18           A.    I remember there was a company

19      called BBG.  There were other companies.

20           Q.    And when Vanderbilt was speaking

21      with these other appraisers such as BBG,

22      was it considering possibly using them as

23      the appraiser for the FMV process under

24      the lease?

25                 MR. KOH:  Objection.  Go ahead.
```

```
 1                        LI
 2            THE WITNESS:  I don't remember
 3        exactly what we were considering with
 4        each of the appraisers.
 5            MR. WALSH:  If we could pull up
 6        what's been previously marked as P17.
 7   BY MR. WALSH:
 8        Q.   So Mr. Li, this is an e-mail or
 9   an e-mail chain between you and Jerry
10   Sullivan at BBG from May of 2018.
11            Do you see that?
12        A.   Yes.
13        Q.   And so you were sending back a
14   signed proposal for BBG to do some
15   appraisal work for the property; right?
16        A.   Yes.
17        Q.   What was the purpose of
18   Vanderbilt retaining BBG at this time?
19            MR. KOH:  Objection.  Go ahead.
20            THE WITNESS:  I see the purpose
21        here is to form an opinion of the as
22        is market value.
23   BY MR. WALSH:
24        Q.   And where do you see that?
25        A.   On 256.
```

Page 82

1                          LI

2        Q.    And it indicates that right

3    underneath that that Vanderbilt asked BBG

4    to appraise the fee simple interest; is

5    that right?

6        A.    I see it says fee simple

7    interest.

8        Q.    Now, why would Vanderbilt want to

9    understand the value of the fee simple

10   interest of the property in May of 2018?

11            MR. KOH:  Objection.  Go ahead.

12            THE WITNESS:  I don't remember.

13   BY MR. WALSH:

14       Q.    Okay, under scope of work/report

15   type, it says we will provide value of the

16   land based on -- I'll start over.  It says

17   we will provide the value of the land

18   based on comparable land sales and a

19   residual analysis if necessary in addition

20   to an analysis of the projected ground

21   rent for McDonald's.

22            Do you see that?

23       A.    Yes.

24       Q.    So it looks like at least part of

25   this analysis was to try to get an

Page 83

1                           LI

2      estimate of the ground rent for

3      McDonald's; right?

4           A.    There was analysis for the

5      projected ground rent for McDonald's.

6           Q.    Would that have been for the FMV

7      process under the McDonald's lease?

8           A.    I don't remember.

9           Q.    And do you remember who decided

10     that BBG would use the comparable land

11     sale analysis, if necessary the residual

12     analysis?

13          A.    I don't remember.

14          Q.    Do you know if BBG was provided

15     with a copy of McDonald's lease?

16          A.    I don't remember.

17          Q.    And BBG ultimately prepared an

18     appraisal report; is that correct?

19          A.    I believe so.

20          Q.    Did you review it?

21          A.    I looked at maybe a few pages.

22          Q.    And what did Vanderbilt do once

23     it -- with the appraisal once it received

24     it?

25          A.    I created a folder and saved the

```
                                          Page 84

 1                    LI
 2   file.
 3        Q.   For what purpose or purposes was
 4   the appraisal report used for?
 5             MR. KOH:  Objection.  Go ahead.
 6             THE WITNESS:  I don't remember.
 7   BY MR. WALSH:
 8        Q.   So you just received it and saved
 9   it in a folder?
10        A.   Yes.
11        Q.   You don't remember doing anything
12   else with it?
13        A.   I don't remember doing anything
14   with it.
15        Q.   Now did you have any discussions
16   with Sam Rottenberg about it?
17        A.   I don't remember having any
18   specific discussions about the BBG
19   appraisal.
20        Q.   Do you recall if BBG was informed
21   that McDonald's had the right to renew its
22   lease through April 2039?
23        A.   I don't remember exactly what
24   they were told or weren't told.  They
25   probably have all the relevant
```

Page 85

1                          LI
2      information.
3          Q.    What do you mean other relevant
4      information?
5          A.    I said all the relevant
6      information.
7          Q.    And would the relevant
8      information include the McDonald's lease?
9          A.    I don't remember what was
10     included or not included.
11         Q.    When did Vanderbilt first reach
12     out to Tom Tener?
13         A.    I think it was sometime in 2018.
14     I don't remember exactly what time.
15         Q.    And were you involved in those
16     discussions with Tom Tener?
17         A.    I remember either being on
18     e-mails or calls or other communication
19     with Tom Tener.
20              MR. WALSH:  I'd like to show
21         Mr. Li what's previously been marked
22         P19.  It's a one-page e-mail,
23         VA 022633.
24              VERITEXT CONCIERGE:  P19 is being
25         moved over to the marked folder now.

```
                                                  Page 86

 1                         LI
 2      BY MR. WALSH:
 3           Q.    Okay, Mr. Li, if you could pull
 4      up P19.  So it's a June 7th e-mail, June
 5      7, 2018 e-mail from Tom Tener to Sam
 6      Rottenberg with a cc to Shaun Kest at KTR
 7      and to Theresa Nygard at KTR, subject
 8      840 Atlantic Avenue.
 9                Do you see that?
10           A.    I do.
11           Q.    And Tom is discussing a potential
12      scope of work for an appraisal for
13      Vanderbilt for 840 Atlantic; is that
14      right?
15           A.    Yes.
16           Q.    Were you involved in the initial
17      discussion with Tom Tener?
18           A.    I believe so.
19           Q.    So at the bottom, the second
20      sentence of the second paragraph, it says,
21      "It's also our understanding the lease
22      with McDonald's will be expiring in the
23      near term."
24                Do you recall you or Sam telling
25      KTR that the McDonald's lease would be
```

Page 87

```
 1                      LI
 2    expiring in the near term?
 3         A.    Sorry, where does it say that?
 4         Q.    Bottom of the second paragraph.
 5         A.    Yes, I see the sentence.
 6         Q.    So do you recall you or Sam
 7    telling KTR that McDonald's lease would be
 8    expiring in the near term?
 9         A.    I don't remember exactly what was
10    conveyed to Tom Tener at the time.
11         Q.    Did you believe that the
12    McDonald's lease would be expiring in the
13    near term in June 2018?
14         A.    I understand there was a
15    structure within the lease that governed
16    the process.
17         Q.    Did you believe the lease would
18    be terminating in the near term?
19         A.    I don't remember why I believed
20    it at the time.
21         Q.    Do you recall having any
22    discussions with Sam Rottenberg about --
23    at the time about telling KTR that the
24    McDonald's lease would be expiring in the
25    near term?
```

1                    LI

2       A.   I don't remember having

3    discussions about what to tell KTR.

4            MR. WALSH:  If we could pull up

5       P20.

6            VERITEXT CONCIERGE:  P20 has

7       moved to the folder.

8    BY MR. WALSH:

9       Q.   Mr. Li, do you have P20 pulled

10   up?

11      A.   I do.

12      Q.   First of all, who is

13   molly.sprgrp@gmail.com?

14      A.   She's a printer, scanner.

15      Q.   So not an actual person, just

16   a -- that's a name of a printer or scanner

17   in your office?

18      A.   At that time.

19      Q.   If you could turn to the page

20   ending in 583, it's page 3 of the

21   engagement letter with KTR dated June 27,

22   2018.

23      A.   I'm on the page.

24      Q.   Is that your signature under

25   Vanderbilt Atlantic Holdings?

```
                                                 Page 89

 1                      LI

 2        A.    Yes.

 3        Q.    So you signed this document on

 4   July 2, 2018; is that right?

 5        A.    Yes.

 6        Q.    And before you signed the

 7   document, you reviewed it and believed it

 8   to be accurate?

 9        A.    I reviewed it and made sure that

10   financial exposure was omitted.

11        Q.    Okay.  In the first paragraph of

12   that letter, the page ending in 581,

13   middle of that paragraph, it says, "It is

14   our understanding that the lease with

15   McDonald's is expiring in the near term."

16             Do you see that?

17        A.    I see where you just read.

18        Q.    And you didn't cross that out or

19   correct it, did you?

20        A.    I did not cross it out as I see

21   it here.

22        Q.    Did you ever tell Mr. Tener that

23   that may not be accurate?

24        A.    I don't remember exactly what was

25   conveyed but I think he has the relevant
```

```
                                    Page 90

  1                     LI
  2    information to make a determination of the
  3    facts.
  4        Q.   Okay.  On the second page, there
  5    are some bullet points about
  6    three-quarters of the way down and the
  7    letter says, "In order to initiate the
  8    assignment, the following information, if
  9    available, should be provided as soon as
 10    possible."  The first bullet is "Copies of
 11    any leases that encumber the properties."
 12             Do you see that?
 13        A.   Yes.
 14        Q.   Did McDonald's at this time
 15    provide Mr. Tener with a copy of the
 16    McDonald's lease?
 17        A.   I don't think McDonald's provided
 18    anything --
 19        Q.   I'm sorry, did Vanderbilt at this
 20    time provide Mr. Tener with a copy of
 21    McDonald's lease?
 22        A.   I don't remember exactly what or
 23    when it was provided but I think Tom Tener
 24    has all the information that he needs.
 25        Q.   Now if Vanderbilt did not provide
```

```
                                    Page 91

 1                      LI
 2     Mr. Tener with a copy of the McDonald's
 3     lease, do you still believe he would have
 4     had all the relevant information he needed
 5     for his assignment?
 6               MR. KOH:  Objection.
 7               THE WITNESS:  The question is a
 8          little confusing for me, sorry.
 9     BY MR. WALSH:
10          Q.    So you said you believe he had
11     all of the relevant information; correct?
12          A.    Yes.
13          Q.    Would that include a copy of the
14     McDonald's lease?
15          A.    Yes.
16          Q.    And if Mr. Tener was not given a
17     copy of the McDonald's lease at this time,
18     he would not have had all of the relevant
19     information; is that correct?
20               MR. KOH:  Objection.  Go ahead.
21               THE WITNESS:  I don't remember
22          exactly what or when each individual
23          file was shared with Tom Tener.
24     BY MR. WALSH:
25          Q.    That wasn't my question.  I said
```

```
                                         Page 92
 1                        LI
 2      if Mr. Tener was not given a copy of the
 3      McDonald's lease at that time, he would
 4      not have had all the relevant information
 5      at that time; correct?
 6              MR. KOH:  Objection.  Go ahead.
 7              THE WITNESS:  I think you're
 8         asking for each piece of information
 9         and if he needs it, depends on which
10         stage of the process he's working on.
11      BY MR. WALSH:
12         Q.   And he asked for it in this
13      letter; right?
14         A.   He did.
15         Q.   So on the second page of the
16      letter ending in 512, it says, "It is
17      understood that the intended use of this
18      report is assist Vanderbilt Atlantic
19      Holdings LLC with certain asset
20      management-related decisions and
21      analysis."
22              What do you understand that to
23      mean?
24         A.   I'm trying to find the sentence.
25      It means whatever the sentence means.
```

```
                                              Page 93
 1                          LI
 2          Q.    Well, I'm asking you what is your
 3     understanding of what that sentence means?
 4          A.    Tom Tener had put a sentence
 5     here.
 6          Q.    So you signed the letter but you
 7     didn't know what he meant by that?
 8          A.    I don't remember what I
 9     understood at the time.
10          Q.    What was the intended use -- I'm
11     sorry, what was the intended use of this
12     report?
13          A.    I don't remember the intended use
14     at the time.
15          Q.    If it had been anything other
16     than for the fair market valuation process
17     under the McDonald's lease?
18               MR. KOH:  Objection.  Go ahead.
19               THE WITNESS:  I don't remember
20          what use it was intended for at the
21          time.
22     BY MR. WALSH:
23          Q.    That wasn't my question.  Could
24     it have been for anything other than the
25     fair market valuation process under the
```

```
                                        Page 94

 1                       LI

 2   McDonald's lease?

 3            MR. KOH:  Objection.  Go ahead.

 4            THE WITNESS:  I don't remember if

 5        it could have or could not have been

 6        for any other purposes.

 7   BY MR. WALSH:

 8        Q.   Can you think of any other

 9   purpose that it could have been for?

10        A.   Sorry, I'm printing something and

11   it's making noise.  One second.  Could you

12   repeat the question?

13        Q.   Can you think of any other

14   purpose that it could have been for?

15        A.   I don't know --

16            MR. KOH:  Same objection.

17            THE WITNESS:  -- what the -- any

18        of the purposes could have been.

19   BY MR. WALSH:

20        Q.   What discussions did you have

21   with Sam about the KTR retention, do you

22   recall?

23        A.   I don't remember having any

24   specific discussion with Sam about KTR

25   retention.
```

                                                    Page 95

 1                         LI

 2              MR. WALSH:  If we can pull up

 3         what's been previously marked as P21.

 4                 VERITEXT CONCIERGE:  P21 is now

 5         in the marked exhibit folder.

 6     BY MR. WALSH:

 7         Q.    Mr. Li, this is an e-mail chain

 8     between Vanderbilt and KTR.  The first

 9     e-mail is June 7, 2018 and then the last

10     e-mail in the chain is August 9, 2018.

11     It's an e-mail from you to Tom Tener.

12              Do you see that?

13         A.    I see an e-mail August 9, 2018.

14         Q.    And at the bottom of that first

15     page Tom writes an e-mail, "Sam, what are

16     the number of years in the anticipated

17     ground lease?  The broker opinion that you

18     submitted says 99-year lease but only

19     presents a summation of 25 years without

20     any discounting."

21              Do you see that?

22         A.    I do.

23         Q.    And then you say, "Tom, it should

24     be a 99-year lease.  Not sure what's

25     behind the BOV logic."  And then several

Page 96

```
 1                        L I
 2    hours later you say, "I misunderstood the
 3    question.  I'll call you to discuss."
 4             What was Mr. Tener asking about,
 5    what lease?
 6        A.   In which e-mail?
 7        Q.   He asked you a question at the
 8    bottom of the first page about what are
 9    the number of years in the anticipated
10    ground lease?
11        A.   Yes.
12        Q.   So I'm asking you, do you recall
13    at least what he was asking about?
14        A.   I don't remember.
15        Q.   You say I misunderstood the
16    question.  I'll call you to discuss.  Do
17    you remember what your misunderstanding
18    was or what you called to discuss?
19        A.   I don't remember.
20        Q.   So you don't recall if this was
21    the McDonald's ground lease or some other
22    lease?
23        A.   I don't remember what the
24    discussion was.
25        Q.   And you don't recall what
```

```
 1                    LI
 2   instructions were given to KTR; is that
 3   right?
 4        A.   I don't recall and I don't know
 5   if any instruction was given.  I'm not
 6   sure which is that time you're referring
 7   to.
 8             MR. WALSH:  If we could pull up
 9        the document VA 027486.  It's a
10        two-page document ending in 487.
11             (Exhibit P46, document Bates
12        labeled VA 027486, marked for
13        identification.)
14   BY MR. WALSH:
15        Q.   The top e-mail is an e-mail from
16   Tom Li to Tom Tener, copy to Sam
17   Rottenberg, August 8, 2018.
18        A.   Which exhibit is this?
19        Q.   I believe it should be P46?
20        A.   So 027486?
21        Q.   Yes.
22             MR. WALSH:  So is there a way to
23        correct the exhibit sticker on that to
24        make it P46?
25             VERITEXT CONCIERGE:  Yeah, I'm
```

```
                                    Page 98
 1                        LI
 2        putting a new one in there now and
 3        that old one will be deleted.
 4   BY MR. WALSH:
 5        Q.    So Mr. Li, if you could please
 6   look at P46.
 7        A.    Um-hum.
 8        Q.    It's an e-mail from you to Tom
 9   Tener and you're saying I want to check if
10   the appraisal for 840 Atlantic Ave is
11   nearing completion.  We're looking forward
12   to seeing your valuation.
13        A.    Yes.
14        Q.    Do you recall why you were
15   looking forward to seeing the valuation?
16        A.    It must have been some time since
17   he started working on it.
18        Q.    And you still don't remember why
19   Vanderbilt wanted that valuation?
20        A.    I don't remember what the
21   valuation there is.
22        Q.    Were you auditioning Mr. Tener
23   for potential use as the appraiser under
24   the FMV process for the McDonald's lease?
25        A.    I don't know if there's any
```

Page 99

                              LI

1                             LI

2       audition process but Tom Tener was being

3       considered.

4            Q.    At that time?

5            A.    At that time.

6                 MR. WALSH:  If we can look at

7            what's been marked as P22, it's the

8            August 30, 2018 KTR appraisal.

9                 VERITEXT CONCIERGE:  P22 has been

10           moved into the folder.

11      BY MR. WALSH:

12           Q.    Mr. Li, if you could open up that

13      document.

14           A.    Yes.

15           Q.    And you've seen this document

16      before; correct?

17           A.    I believe so.

18           Q.    So if you can turn to VA all 0s

19      and then 8.

20           A.    Yes.

21           Q.    And do you see at the bottom it

22      talks about hypothetical conditions?  Do

23      you see that?

24           A.    I see a hypothetical condition.

25           Q.    Now below that it says the client

```
 1                        LI
 2    has requested an appraisal of the subject
 3    land under the following hypothetical
 4    condition.
 5         A.   I see that sentence.
 6         Q.   On the next page, so it's talking
 7    about the M-Crown rezoning.
 8              Do you see that?
 9         A.   I see M-Crown.
10         Q.   And it says at the top of the
11    next page, bottom of that first paragraph,
12    it says this appraisal includes an opinion
13    of the market value of the fee simple
14    interest in the subject land under the
15    hypothetical condition that the subject
16    property is rezoned under the M-Crown plan
17    as described above as of the effective
18    date of this appraisal.
19              Do you see that?
20         A.   I see the sentence.
21         Q.   Do you know why Vanderbilt was
22    interested in the appraised value of the
23    property under that hypothetical condition
24    at that time?
25         A.   I don't remember exactly why or
```

```
 1                     LI
 2   why not -- why we weren't interested in
 3   the hypothetical condition.
 4        Q.    Okay.  On that same page, this is
 5   the page ending in 09, it talks about
 6   extraordinary assumptions.
 7             Do you see this?
 8        A.    I see extraordinary assumptions.
 9        Q.    Point 1, it says the subject
10   property is improved with McDonald's
11   restaurant.  At the time of the inspection
12   the restaurant continued operations.  KTR
13   requested a copy of McDonald's lease but
14   was not provided with a copy.
15             Do you see that?
16        A.    I see the sentence.
17        Q.    And do you recall earlier that
18   Mr. Tener had requested a copy of all
19   leases in his engagement letter?
20        A.    I remember there was a request
21   list within the letter.
22        Q.    And you said that you wanted to
23   provide Mr. Tener with copies of all
24   relevant information; right?
25        A.    I don't remember exactly what I
```

```
 1                        LI
 2    said but yes.
 3         Q.   Do you know why Vanderbilt didn't
 4    provide KTR with a copy of the McDonald's
 5    lease even though he asked for it?
 6              MR. KOH:  Objection.  Go ahead.
 7              THE WITNESS:  I don't remember
 8         what happened at the time.
 9    BY MR. WALSH:
10         Q.   And at the bottom, the last
11    sentence of that point 1, it says the
12    value conclusions contained herein are
13    based on the extraordinary assumption that
14    the tenant has not exercised its renewal
15    option and the site is available for
16    development to its highest and best use.
17              Do you see that?
18         A.   Which paragraph?
19         Q.   It's the bottom of that point 1
20    under extraordinary assumptions, the last
21    sentence three lines up from point 2.
22         A.   The value conclusions contained
23    herein are based on extraordinary
24    assumption that the tenant has not
25    exercised its renewal option.
```

Page 103

1                        LI

2        Q.    Do you see that?

3        A.    I see the sentence.

4        Q.    Do you have any knowledge or

5    understanding about why Vanderbilt

6    directed Mr. Tener to prepare the

7    appraisal with that assumption?

8              MR. KOH:  Objection.

9              THE WITNESS:  I don't remember if

10        we directed or did not direct him to

11        use that assumption.

12   BY MR. WALSH:

13       Q.    When you reviewed this appraisal,

14   did you ever ask him to correct his

15   appraisal because he had made an incorrect

16   assumption?

17       A.    I don't remember how I reviewed

18   the appraisal.

19       Q.    Do you remember telling Mr. Tener

20   or anyone else at KTR that it made an

21   incorrect assumption?

22       A.    I don't remember what I told KTR

23   or anyone at KTR.

24       Q.    Under point 2 on that page ending

25   in 09, point 2 under extraordinary

1                          LI

2     assumptions it talks about the lease

3     between MMB Associates and Vanderbilt

4     Atlantic Holding.

5               Do you see that?

6          A.   I see point 2.

7          Q.   The last three sentences it says,

8     "According to the client, this ground

9     lease is between related parties.  This

10    appraisal assumes no division of interest

11    is created by this ground lease.  The

12    values developed herein reflect the fee

13    simple estate, exclusive of the noted

14    ground lease."

15              Do you see that?

16         A.   I see that sentence.

17         Q.   Do you know why Vanderbilt told

18    Mr. Tener to assume that MMB and

19    Vanderbilt are related parties?

20         A.   I don't remember if we told Tom

21    Tener what or what not to assume.

22         Q.   Do you believe that MMB

23    Associates and Vanderbilt Atlantic

24    Holdings are related parties?

25         A.   I don't know exactly what the

```
                                          Page 105

 1                    LI

 2    relationship is between those two

 3    entities.

 4         Q.    So as an officer of Vanderbilt

 5    Atlantic Holdings, you don't know what the

 6    relationship is?

 7         A.    MMB is the key owner to which

 8    Vanderbilt Atlantic Holdings pays rent.

 9         Q.    And is that the extent of the

10    relationship?

11         A.    I don't know.  There could be

12    other relations.

13         Q.    But you don't know?

14         A.    I don't know what you're asking

15    exactly.

16         Q.    Well, I'm just trying to

17    understand, this appraisal refers to MMB

18    Associates and Vanderbilt are related and

19    I'm trying to understand what that means

20    and whether you believe that's correct or

21    not correct.

22              MR. KOH:  Objection.

23              THE WITNESS:  I don't remember

24        what I believed at the time.

25    ///
```

Page 106

1                          LI
2    BY MR. WALSH:
3        Q.    What do you believe now?
4        A.    I don't know what I believe now
5    about this particular sentence.
6        Q.    So do you believe the lease
7    between MMB Associates and Vanderbilt
8    Atlantic Holdings is a ground lease
9    between related parties?
10            MR. KOH:  Objection.
11            THE WITNESS:  I think it's a
12       ground lease between two parties.
13   BY MR. WALSH:
14       Q.    This uses the term related
15   parties.  Do you believe that's an
16   accurate statement?
17       A.    I don't know --
18            MR. KOH:  Objection.  Go ahead.
19            THE WITNESS:  -- accurate or
20       inaccurate statements.
21   BY MR. WALSH:
22       Q.    Do you know why Tom Tener used
23   the land sales comparison approach for
24   this appraisal?
25       A.    I don't know why.

```
 1                    LI
 2       Q.    Did Vanderbilt discuss with Tom
 3    or anyone else at KTR which methodology to
 4    use?
 5            MR. KOH:   Objection.
 6            THE WITNESS:   I don't remember
 7       exactly what we discussed with Tom
 8       Tener.
 9    BY MR. WALSH:
10       Q.    You don't remember any specific
11    discussions about how he should appraise
12    the property?
13       A.    I don't remember.
14       Q.    Do you know if anyone at
15    Vanderbilt tried to assist KTR with
16    identifying potentially comparable leases?
17       A.    I don't remember.
18       Q.    When Vanderbilt received this
19    appraisal, what did it do with it once it
20    was ready?
21       A.    Probably something similar to the
22    other appraisals that was filed and
23    stored.
24       Q.    Did you share it with anyone?
25       A.    I don't remember who the report
```

Page 108

1                          LI

2    may or may not have been shared with.

3              MR. WALSH:  If we could mark the

4         document VA 049246.

5              (Exhibit P47, document Bates

6         labeled VA 049246, marked for

7         identification.)

8    BY MR. WALSH:

9         Q.   So this is an e-mail chain

10   between individuals at Vanderbilt,

11   specifically Tom Li and Sam Rottenberg,

12   and individuals at Slater Beckerman.

13        A.   Which exhibit is this?  I'm not

14   sure I see it yet.

15             VERITEXT CONCIERGE:  This will be

16        marked as Exhibit P47.

17             THE WITNESS:  I see it now.

18   BY MR. WALSH:

19        Q.   So do you see at the bottom of

20   the first page continuing on to the second

21   page, there's an e-mail from Stefanie

22   Marazzi --

23        A.   Yes.

24        Q.   -- at Beckerman.  And Slater

25   Beckerman has a lobbying contract with

Page 109

1                           LI

2    Vanderbilt; right?

3         A.    They have an engagement letter

4    with Vanderbilt.

5         Q.    And they are engaged as lobbyists

6    for Vanderbilt for purposes of this

7    proposed redevelopment; right?

8         A.    They are engaged as attorneys.

9         Q.    So on August 13, Stefanie asked

10   Sam Rottenberg, it's on the top of the

11   second page, "Who should we list as the

12   chief administrative office for Vanderbilt

13   Atlantic Holdings LLC (the person who has

14   legal capacity to enter into a contract on

15   behalf of the organization)?"

16           Do you see that?

17        A.    I see it.

18        Q.    And later that day, "Hi,

19   Stefanie, I will be the chief admin for

20   Vanderbilt Atlantic."

21           Do you see that?

22        A.    I see that.

23        Q.    So do you have legal capacity to

24   enter into contracts on behalf of

25   Vanderbilt?

```
                                              Page 110

 1                       LI

 2        A.    Yes.

 3        Q.    And before you enter into

 4   contracts, do you need to get approval

 5   from anybody?

 6        A.    We would probably make sure

 7   there's a brief conversation about

 8   contracts.

 9        Q.    And who would you have that

10   conversation about with?

11        A.    Sam.

12        Q.    Anyone else?

13        A.    I don't think so.

14        Q.    So does Sam need to give you

15   approval before you sign contracts on

16   behalf of Vanderbilt?

17        A.    I don't know exactly what

18   approval he needs to provide.

19        Q.    And how is it determined that you

20   would be listed as the chief

21   administrative officer for Vanderbilt?

22        A.    I think -- I don't remember

23   exactly how it was determined.

24        Q.    Do you believe that title

25   accurately captures your role at
```

1                      LI

2    Vanderbilt?

3        A.   I don't know what the title fully

4    encompasses besides what Stefanie put in

5    the parentheses so I don't know.

6            MR. WALSH:  Okay, if we can mark

7        VA 023820, it's an e-mail chain ending

8        in 828.  That's e-mails between

9        Vanderbilt and KTR.

10           (Exhibit P48, document Bates

11       labeled VA 023820, marked for

12       identification.)

13           VERITEXT CONCIERGE:  That's been

14       marked as P48.

15   BY MR. WALSH:

16       Q.   And these are from August 2018.

17   You can open P48 when it becomes

18   available.

19       A.   I have it open.

20       Q.   Okay.  So on August 9th, Shaun

21   Kest at KTR e-mailed Sam Rottenberg with a

22   copy to Tom Tener saying "Hi, Sam, would

23   it be possible to send us a copy of either

24   the lease or the lease abstract for the

25   McDonald's on the site?"

Page 112

```
 1                    LI
 2          Do you see that?
 3      A.   I see that.
 4      Q.   Who is Shaun Kest?
 5      A.   He's a senior vice president at
 6  KTR Real Estate Advisors as I see here on
 7  the e-mail.
 8      Q.   Was he working with Tom Tener on
 9  the appraisal?
10      A.   It seems that he's working with
11  Tom Tener.
12      Q.   And Sam forwarded that e-mail to
13  you.
14          Do you see that?
15      A.   I see it.
16      Q.   What did Sam ask you to do, if
17  anything, with this request?
18      A.   I don't recall if he asked
19  anything specifically.
20      Q.   Do you recall having any
21  discussions with Sam about KTR's request
22  for the McDonald's lease or an abstract?
23      A.   I don't remember having any
24  discussion about KTR's request with Sam.
25          MR. WALSH:  Okay, if we can mark
```

Page 113

```
 1                        LI
 2      VA 028037 as P49.  And that's a
 3      continuation from the e-mail chain but
 4      now just with Tom Li and Sam
 5      Rottenberg.
 6              (Exhibit P49, document Bates
 7      labeled VA 028037, marked for
 8      identification.)
 9              VERITEXT CONCIERGE:  It will be
10      introduced as P49.
11   BY MR. WALSH:
12      Q.   Mr. Li, can you tell me when you
13   have P49 open?
14      A.   I have it open.
15      Q.   So minutes after Tom Li [sic]
16   sent you that e-mail from Shaun Kest, you
17   responded providing details about the
18   McDonald's lease to Sam Rottenberg only.
19   Do you see that?
20      A.   You said Tom Li sent the e-mail
21   earlier.  I think you meant to say Sam
22   Rottenberg sent the e-mail.  I see I
23   responded to Sam Rottenberg there.
24      Q.   Okay.  And you provided him with
25   an abstract of the McDonald's lease;
```

Page 114

1                        LI

2    right?

3        A.    I provided him with what I call

4    an abstract.

5        Q.    And this information that you

6    sent to Sam only references extension

7    options.

8              Do you see that?

9        A.    Yes.

10       Q.    Do you recall why this

11   information was not shared with KTR even

12   though Tom Tener's firm had asked for it

13   and you had provided it to Sam Rottenberg?

14       A.    I don't remember.

15       Q.    Did Sam tell you not to share

16   this information?

17       A.    I don't remember what he told me

18   or did not tell me.

19       Q.    Would you have asked or do you

20   recall if you asked Sam for permission to

21   send this information?

22       A.    I don't remember asking Sam for

23   permission.

24       Q.    Does it look like you were asking

25   him for permission in this e-mail?

```
 1                          LI
 2       A.    This e-mail is me saying I have
 3   this available.
 4       Q.    But then you don't remember
 5   having any further discussions with Sam
 6   about it?
 7       A.    I don't remember what may or may
 8   not have been discussed.
 9       Q.    Did Sam ever affirmatively tell
10   you that he did not want KTR to have this
11   information?
12       A.    I don't remember what Sam may or
13   may not have told me.
14            MR. WALSH:  If we can mark
15       VA 044862.
16            (Exhibit P50, document Bates
17       labeled VA 044862, marked for
18       identification.)
19            MR. WALSH:  It's an e-mail from
20       Stefanie Marazzi to a number of people
21       dated October 12, 2018, Tom Li is
22       copied and there are some attachments.
23       It spans through 044891.
24            VERITEXT CONCIERGE:  This will be
25       marked as P50.
```

Page 116

1                          LI

2    BY MR. WALSH:

3        Q.    Please tell me when you have P50

4    open.

5        A.    I have it open.

6        Q.    So she says "Hello, attached is

7    the pre-application statement and

8    attachments for 840 Atlantic Avenue."

9              What is this a pre-application

10   statement for?

11       A.    I think it's some paperwork with

12   City Planning.

13       Q.    What is a pre-application

14   statement?

15       A.    I don't know what the exact

16   definition of the pre-application

17   statement is but I think it has some

18   general information about the --

19       Q.    So this would be information

20   submitted in advance of a formal

21   application for a rezoning application for

22   840 Atlantic Avenue?

23              MR. KOH:   Objection.

24              THE WITNESS:   This is paperwork

25       that we filed with City Planning.   I

Page 117

```
 1                    LI
 2      don't know what purpose or stage it
 3      reflects.
 4  BY MR. WALSH:
 5      Q.   Now, if you can flip to the page
 6  ending in 044886.
 7           Do you see that?
 8      A.   It's loading for me.
 9           886, yes.
10      Q.   So on the very top it says, "Has
11  an informational meeting with the
12  appropriate borough office or division
13  been held?"  And the box is checked yes,
14  Jonah Rogoff, date of meeting, September
15  17, 2018.
16           Do you see that?
17      A.   I see.
18      Q.   So did Vanderbilt or
19  representatives of Vanderbilt meet with
20  Jonah Rogoff at DCP in September of 2018?
21      A.   I don't remember exactly what
22  time but I do remember at some point there
23  having been a meeting with Jonah Rogoff.
24      Q.   And what would the purpose of
25  that meeting have been?
```

Page 118

```
 1                         LI
 2        A.    I don't remember.
 3        Q.    Would it have been about a
 4   proposed rezoning at 840 Atlantic Avenue?
 5        A.    I don't remember.
 6        Q.    Under 1A it says prospective
 7   applicant name, the Rabsky Group,
 8   prospective applicant, contact person
 9   Simon Dushinsky.
10             Do you see that?
11        A.    I do.
12        Q.    Do you know why the Rabsky Group
13   is listed as the prospective applicant and
14   Simon Dushinsky the contact person?
15        A.    I don't know why.  It looks like
16   a mistake.
17        Q.    Earlier you described
18   Mr. Dushinsky as a passive investor.  Do
19   you recall that?
20        A.    Yes, a passive member.
21        Q.    Was he a passive member at this
22   time in 2018?
23        A.    Yes.
24        Q.    And even though he was a passive
25   member, Slater Beckerman thought that he
```

Page 119

```
 1                        LI
 2   would be an appropriate contact person?
 3             MR. KOH:  Objection.
 4             THE WITNESS:  I don't know what
 5          they thought was appropriate or not
 6          appropriate.  I think they filled out
 7          this form incorrectly.
 8   BY MR. WALSH:
 9        Q.   If you could flip to the last
10   page ending in 891.  The bottom of section
11   4, description of the proposed project
12   area, second paragraph, it says currently
13   the development site contains McDonald's
14   fast food establishment with a
15   drive-through fronting on Atlantic Avenue
16   and Vanderbilt Avenue.
17             Do you see that?
18        A.   Yes.
19        Q.   Then the next section describes
20   the proposed development as an 18-story
21   mixed residential and commercial building
22   with approximately 307,273 square feet of
23   floor area.
24             Do you see that?
25        A.   I do.
```

```
                                        Page 120

 1                        LI

 2        Q.    So do you know if McDonald's --

 3   Vanderbilt or representatives of

 4   Vanderbilt told DCP in 2018 that

 5   McDonald's had the right to be at the

 6   property through 2039?

 7        A.    I don't remember what was or

 8   wasn't told.

 9             MR. WALSH:   If we can mark what's

10        a document with the Bates stamp

11        VA 011088.

12             (Exhibit P51, document Bates

13        labeled VA 011088, marked for

14        identification.)

15             MR. WALSH:   It's a continuation

16        of the same e-mail chain that we were

17        just looking at.

18             VERITEXT CONCIERGE:   This has

19        been marked as P51.

20   BY MR. WALSH:

21        Q.    Mr. Li, if you could open up P51,

22   it's an October 14, 2018 e-mail from Sam

23   Rottenberg to Stefanie Marazzi and Raymond

24   Levin at Slater Beckerman with a copy to

25   you.
```

```
                                           Page 121

 1                     LI

 2           Do you see that?

 3      A.    Sam wrote an e-mail to Stefanie

 4   and Raymond, yes.

 5      Q.    And Sam wrote, "Not sure whether

 6   we discussed not having the Rabsky name on

 7   this application.  Thought it was

 8   previously mentioned.  Please insert

 9   entity name as applicant."

10           Do you see that?

11      A.    Yes.

12      Q.    What discussions did Vanderbilt

13   have about not having the Rabsky name on

14   the application?

15      A.    I don't remember what

16   discussions.

17      Q.    Is there a reason why Vanderbilt

18   would not want to have the Rabsky name on

19   the application?

20           MR. KOH:  Objection.  Go ahead.

21           THE WITNESS:  Because Vanderbilt

22      was the applicant.

23   BY MR. WALSH:

24      Q.    Any other reason?

25      A.    I don't know if there's any other
```

```
                                        Page 122

 1                      LI

 2     reason.

 3              MR. WALSH:  If we could mark

 4         VA 027972.

 5              (Exhibit P52, document Bates

 6         labeled VA 027972, marked for

 7         identification.)

 8              MR. WALSH:  This consists of some

 9         e-mails between Vanderbilt and KTR,

10         the most recent of which are e-mails

11         between Tom Li and Shaun Kest on

12         October 17, 2018.

13              VERITEXT CONCIERGE:  This will be

14         P52.

15     BY MR. WALSH:

16         Q.  If you could open up P52, please.

17     So on the bottom of the first page, you

18     wrote an e-mail to Shaun Kest, October 17,

19     2018.  "Hi Shaun, Sam asked me to work on

20     840 Atlantic.  I think there has been some

21     communication I wasn't cc'd on.  Do you

22     have a minute to speak today?"

23              Do you see that?

24         A.  Yes.

25         Q.  And Sam -- sorry, Shaun responds
```

```
                                          Page 123
 1                      LI
 2     just tried calling you back and you're
 3     free to call him.
 4              Do you see that?
 5        A.   Yes.
 6        Q.   Why were you reaching out in
 7     October of 2018 to KTR?
 8        A.   I don't remember why I was
 9     reaching out.
10        Q.   So you don't recall what work Sam
11     asked you to perform?
12        A.   I don't remember what Sam asked
13     me to do exactly.
14        Q.   So you don't have any
15     recollection of the conversation you had
16     with Shaun in October 2018?
17        A.   Zero.
18              MR. WALSH:  If we can mark
19        VA 028067.
20              (Exhibit P53, document Bates
21        labeled VA 028067, marked for
22        identification.)
23              VERITEXT CONCIERGE:  This will be
24        marked as P53.
25     ///
```

Page 124

```
 1                    LI
 2   BY MR. WALSH:
 3       Q.    If you can open up P53.
 4       A.    Yes.
 5       Q.    It's a document with NYC
 6   Planning, Department of City Planning,
 7   City of New York letterhead.
 8             Do you see that?
 9       A.    Yes.
10       Q.    Do you recognize this document?
11       A.    I may have seen it before.
12       Q.    Do you know what it is?
13       A.    It looks like an agenda for a
14   meeting.
15       Q.    So it looks like an agenda for a
16   meeting between Vanderbilt and the
17   Department of City Planning on November
18   19, 2018; right?
19       A.    That's what it looks like.
20       Q.    To discuss the proposed project;
21   is that right?
22       A.    That's what it says.
23       Q.    And you're listed as an attendee,
24   do you see that?
25       A.    I'm listed as an architect.
```

Page 125

1                    LI

2        Q.    Do you recall if you attended the

3    meeting?

4        A.    I believe I was at the meeting.

5        Q.    And what was the purpose of the

6    meeting?

7        A.    To discuss the proposed projects.

8        Q.    And do you recall if anyone at

9    the meeting mentioned that the project

10   wouldn't proceed if McDonald's exercised

11   its option to stay on the property?

12       A.    I don't remember what was

13   discussed at the meeting exactly.

14            MR. WALSH:  If we could mark

15        VA 028077 as P54.

16            (Exhibit P54, document Bates

17        labeled VA 028077, marked for

18        identification.)

19            VERITEXT CONCIERGE:  P54 is now

20        introduced.

21   BY MR. WALSH:

22       Q.    Mr. Li, if you could open up P54.

23   It's also on DCP letterhead and has the

24   title Interdivisional Meeting Record.

25            Do you see that?

Page 126

1                       LI

2          A.    I do.

3          Q.    Now, the metadata for this

4     document identifies you as the custodian

5     and the file source as TLi/users/SL/

6     Dropbox/1.principal/840 Atlantic

7     Ave-Vanderbilt Atlantic Holdings (547

8     Vanderbilt Ave)/zoning-DCP application.

9              Who has access to this Dropbox

10    folder?

11         A.    Me.

12         Q.    Anyone else?

13         A.    I don't believe so.

14         Q.    Okay, so the TLi Dropbox folder,

15    those are exclusively in your possession?

16         A.    Exclusively on the computer that

17    I'm using.

18         Q.    And you're the only one who has

19    access to those?

20         A.    I believe so.

21         Q.    Okay.  So are these the minutes

22    of a meeting -- of the meeting that we

23    just talked about on November 19 between

24    Vanderbilt and DCP?

25         A.    It looks like it's a meeting

Page 127

```
 1                      LI
 2    record.
 3         Q.    So it looks like that meeting
 4    went forward and Vanderbilt discussed its
 5    plans with DCP; right?
 6         A.    We discussed whatever topics at
 7    the meeting with DCP.
 8         Q.    If you could flip to the fourth
 9    page of that document, it's the page
10    ending in 080.
11         A.    Yes.
12         Q.    Do you see the paragraph towards
13    the bottom, the development site is
14    comprised of five tax lots?
15         A.    I don't see that exact sentence.
16         Q.    It's the paragraph above proposed
17    development that's underlined.  It's the
18    last paragraph under proposed project area
19    and development site.
20         A.    Five tax lots.  Yes, I see now.
21         Q.    So the development site is
22    comprised of five tax lots under the
23    applicant's ownership.  The development
24    site contains a McDonald's fast food
25    establishment with a drive-through and
```

```
 1                         LI
 2    parking lot, but there's no discussion in
 3    this document about McDonald's potentially
 4    staying on the property through 2039.  Do
 5    you recall if that was brought up at this
 6    meeting?
 7        A.    I don't remember what was or
 8    wasn't brought up at the meeting.
 9        Q.    At the top of that page, it says
10    -- the very top, the Brooklyn DCP office
11    has been working with the community board
12    and its M-Crown subcommittee and recently
13    shared a framework in February.
14            Do you see that?
15        A.    I see that sentence.
16        Q.    And is that -- is the framework
17    that we were discussing earlier in that
18    PowerPoint presentation that we marked as
19    Exhibit P42; right?
20            MR. KOH:  Objection.
21            THE WITNESS:  It says February
22        framework as the reference here.  It's
23        not very specific exactly which one
24        they are talking about.
25    ///
```

Page 129

```
 1                    LI
 2   BY MR. WALSH:
 3        Q.   So P42, the title of the document
 4   is M-Crown report from DCP discussion
 5   February 12, 2018.  So it seems to be
 6   referring to the same framework; is that
 7   correct?
 8             MR. KOH:  Objection.
 9             THE WITNESS:  It's possible.
10   BY MR. WALSH:
11        Q.   Are you aware of any other
12   framework it could be relating to?
13        A.   I don't know.
14        Q.   Do you know if DCP asked during
15   the meeting when Vanderbilt intended to
16   complete the project?
17        A.   I don't remember what they asked
18   at the meeting.
19             MR. WALSH:  If we could pull up
20        what was previously marked as P23.
21             VERITEXT CONCIERGE:  It's now in
22        the folder.
23   BY MR. WALSH:
24        Q.   If you could pull up P23, it's an
25   e-mail from someone at Republic Valuations
```

Page 130

```
 1                         LI
 2   to you and Sam Rottenberg sent February
 3   15, 2019.  It says please see the
 4   completed draft report.
 5           Do you see that?
 6       A.   Yes.
 7       Q.   Why did Vanderbilt retain
 8   Republic Valuations to perform another
 9   appraisal to the property?
10       A.   I don't remember why Vanderbilt
11   retained Republic.
12       Q.   And the draft report is dated
13   January 8, 2019; is that right?  You can
14   look at VA 011956.
15       A.   I see a date of January 8, 2019.
16       Q.   So this was after Vanderbilt had
17   already received reports from at least KTR
18   and BBG; right?
19       A.   I think so.
20       Q.   Do you know if Republic ever
21   prepared a final report that was not in
22   draft form?
23       A.   I don't remember whether they
24   prepared a final form.
25       Q.   And you don't remember why
```

```
 1                         LI
 2    Vanderbilt had this prepared?
 3         A.    I don't remember why.
 4              MR. WALSH:   If we could mark
 5         VA 027997.
 6              (Exhibit P55, document Bates
 7         labeled VA 027997, marked for
 8         identification.)
 9              MR. WALSH:   It's a four-page
10         e-mail chain spanning through 028000.
11              VERITEXT CONCIERGE:   This to be
12         marked as P55.
13    BY MR. WALSH:
14         Q.    If you could open up P55, please.
15    So the top e-mails are e-mails between
16    Vanderbilt and KTR from January 2019.
17              Do you see that?
18         A.    I see a January 10, 2019 e-mail.
19         Q.    The second e-mail on that first
20    page is an e-mail from Shaun Kest to Sam
21    Rottenberg copied to you and to Tom Tener
22    on January 9, 2019.  And Shaun writes,
23    "Hi, Sam, based on our conversation this
24    morning, we can change the addressee to
25    Tom Li."
```

```
                                    Page 132

 1                       LI

 2             Do you know why Vanderbilt wanted

 3    the addressee of the report changed to

 4    you?

 5        A.    I don't remember why.

 6        Q.    The next sentence says, "We can

 7    update the report to reflect the market

 8    value of the fee simple interest in the

 9    subject property as if vacant,

10    unencumbered and available for development

11    to its highest and best use.  Under this

12    scope, we would not need the extraordinary

13    assumption.  We would have to state that

14    the property is leased to McDonald's and

15    that this encumbrance is not considered in

16    the appraisal.

17             Do you see that?

18        A.    I see the sentences you just

19    read.

20        Q.    Do you know why Vanderbilt and

21    KTR were discussing updating the report at

22    the time?

23        A.    I don't remember why or what we

24    discussed with KTR.

25        Q.    And on the top e-mail, January
```

```
                                         Page 133
 1                        LI
 2     10th, it's an e-mail from you to Shaun,
 3     the whole group, saying you're sending out
 4     the payment and it should reach your
 5     office by early next week.  Can you work
 6     on the update for $3500 with delivery in
 7     around three weeks.
 8              Does this refresh your
 9     recollection about why you wanted the
10     update and why you needed it around three
11     weeks?
12         A.   It does not.
13              MR. WALSH:  If we could mark
14         VA 027814.
15              (Exhibit P56, document Bates
16         labeled VA 027814, marked for
17         identification.)
18              VERITEXT CONCIERGE:  This will be
19         marked as P56.
20     BY MR. WALSH:
21         Q.   You can open up P56.  It's a
22     continuation of the e-mail chain we were
23     just looking at.
24              The top e-mail is an e-mail from
25     Sam Rottenberg to Shaun Kest with a copy
```

1                           LI
2      to you and Tom Tener January 16, 2019.
3      And he says, "Looking forward to get the
4      revisions tomorrow.  We would like to
5      proceed on the full update based on the
6      M-Crown and Comp set updates."
7                Do you know what update Sam is
8      referring to there?
9           A.   I don't remember.
10          Q.   And you can't remember why
11     Vanderbilt wanted it at that time?
12          A.   I cannot remember.
13               MR. WALSH:  If we could mark
14          VA 027838.
15               (Exhibit P57, document Bates
16          labeled VA 027838, marked for
17          identification.)
18               MR. WALSH:  It spans all the way
19          to 027958.
20               VERITEXT CONCIERGE:  It will be
21          marked as P57.
22     BY MR. WALSH:
23          Q.   You can open up P57 when it's
24     available and let me know.
25          A.   I don't see it yet.

Page 135

1                          LI

2       Q.   It just popped up on mine.  So on

3   January 17, 2019, Shaun Kest sent what he

4   called a revised appraisal to Sam

5   Rottenberg with a copy to you and Tom

6   Tener, do you see that?

7       A.   I do.

8       Q.   If you can flip to the first page

9   of that revised report, it ends in 027847.

10      A.   Yes.

11      Q.   And so unlike the August 30, 2018

12  report, this one is now addressed to you.

13  Does this refresh your recollection about

14  why Vanderbilt wanted to change from Sam

15  Rottenberg to you?

16      A.   I don't remember.

17      Q.   And this report seems to be

18  essentially identical to the August 30,

19  2018 report with some small changes.  So,

20  for example, the bottom of the first

21  paragraph of that letter, the last three

22  sentences of the first paragraph, it says,

23  "It is noted that the property is

24  currently leased to McDonald's with an

25  expiration date of April 8, 2019.  The

```
 1                         LI
 2     tenant has the option to extend the term
 3     of the lease at the expiration of the
 4     original term for successive periods
 5     aggregating 20 years.  It is further noted
 6     that this encumbrance is not considered in
 7     the appraisal."
 8             Do you see that?
 9         A.   I see the sentence you just read.
10         Q.   So do you recall whether KTR
11     insisted on issuing this revised report or
12     if this was something that Vanderbilt
13     requested?
14         A.   I don't remember.
15             MR. WALSH:  So it's just about 1
16         o'clock.  We have been going for about
17         an hour and 25 minutes since we last
18         started.  I propose that we take a
19         lunch break.  I don't know how that
20         sounds to everybody else.
21             MR. KOH:  That sounds fine to me.
22         How long would you like to take?
23             MR. WALSH:  I don't need much.
24         Maybe a half hour should be sufficient
25         but whatever Mr. Li and the court
```

Page 137

1                    LI

2        reporter and everybody else would

3        like.

4              THE VIDEOGRAPHER:  Stand by.

5        I'll go off the record.  We're now off

6        the record at 1 p.m.

7              (Discussion off the record.)

8              THE VIDEOGRAPHER:  We're now

9        going back on the record at

10       approximately 1 p.m.

11             MR. WALSH:  Okay, I'm sorry.  I

12       wanted to ask Howard and Mr. Li in the

13       first section of the deposition,

14       Mr. Li referenced draft -- a draft

15       letter of intent that was shared with

16       I believe the name of the entity is

17       Creative Outlet.  I believe that's

18       responsive to our discovery request

19       and I don't believe that was produced

20       to us, so I'm just putting on the

21       record that I would like Vanderbilt to

22       produce the letter of intent and any

23       other responsive documents that were

24       not produced to us.

25             MR. KOH:  Okay.  Well, we'll take

Page 138

1                         LI

2        the request for the draft letter of

3        intent under advisement.  And at least

4        at this stage, we certainly do not

5        agree that that was called for under

6        the discovery request so that's our

7        response.

8              MR. WALSH:  Okay, so we'll follow

9        up with a letter but I just wanted to

10       put that on the record.

11             MR. KOH:  Fine with me.  We'll

12       see you in about half an hour.

13             MR. WALSH:  Okay.  So we can go

14       off the record.

15             THE VIDEOGRAPHER:  We're off the

16       record at 1:01 p.m.

17             (Lunch recess taken at 1:01 p.m.)

18

19

20

21

22

23

24

25

Page 139

                         LI

          A F T E R N O O N    S E S S I O N

                (Time noted:  1:36 p.m.)

 1

 2

 3

 4   T O M   L I,    resumed and testified as

 5       follows:

 6            THE VIDEOGRAPHER:  This is the

 7       beginning of media 4.  We're going

 8       back on record at approximately

 9       1:36 p.m.

10   CONTINUED EXAMINATION

11   BY MR. WALSH:

12       Q.   Mr. Li, during this break did you

13   have any discussions with anyone other

14   than your attorney?

15       A.   I didn't have any discussions.

16       Q.   Did you speak with Sam

17   Rottenberg?

18       A.   Only to ask if he was the person

19   on the call previously.

20       Q.   And was he the person on the

21   call?

22       A.   I believe he was.

23       Q.   He was, okay.  And for the

24   record, it looks like the unknown

25   participant who appears to have been

Page 140

                              LI
2   Mr. Rottenberg is no longer on the Zoom.
3              MR. WALSH:  Okay, if we can mark
4       VA 027808.
5              (Exhibit P58, document Bates
6       labeled VA 027808, marked for
7       identification.)
8              VERITEXT CONCIERGE:  This will be
9       marked as P58.
10  BY MR. WALSH:
11      Q.   Mr. Li, if you could open up P58,
12  it runs through 027813.  It's a letter on
13  KTR Real Estate Advisors letterhead.  It's
14  dated January 22, 2019.  On the third page
15  it's signed by Tom Tener but does not have
16  the signature of anyone from Vanderbilt
17  Atlantic Holdings.
18              Do you see it?
19      A.   I see it.
20      Q.   Do you recall why KTR sent this
21  letter to Vanderbilt in January 2019?
22      A.   I don't remember.
23      Q.   Now we were looking -- before the
24  lunch break, we were looking at some
25  e-mails where there were e-mails between

```
1                       LI
2    Vanderbilt and KTR talking about update of
3    the August 2018 appraisal.  Do you recall
4    that?
5         A.   I remember looking at e-mail.
6         Q.   And do you believe that this,
7    what appears to be a draft retention
8    letter, related to that update that
9    Vanderbilt was e-mailing about earlier in
10   January 2019?
11        A.   It may or may not be.
12        Q.   So you don't know?
13        A.   I don't know.
14        Q.   The draft retention letter is
15   addressed to you.  By the way, do you know
16   if this document was ever signed?
17        A.   I don't know.
18        Q.   You don't know.
19             So do you know if Vanderbilt ever
20   engaged KTR to do the update that had been
21   discussed in the e-mails we were looking
22   at earlier?
23        A.   I don't remember.
24        Q.   Okay, so in the bottom of the
25   first paragraph, actually the middle of
```

```
 1                          LI
 2     the first paragraph, it says it is our
 3     understanding that the lease with
 4     McDonald's is expiring in the near term.
 5     Furthermore, although the subject property
 6     is encumbered by a long-term ground lease
 7     dated January 30, 2017, the ground lease
 8     is reportedly between related entities.
 9     The purpose of this appraisal is to
10     estimate the market value of the fee
11     simple interest in the subject property as
12     if vacant, unencumbered and available for
13     development to its highest and best use.
14             Do you see that?
15         A.   I see the sentences that you just
16     read.
17         Q.   Now, does any of this refresh
18     your recollection about why Vanderbilt at
19     this time was looking for KTR to prepare
20     an updated appraisal?
21         A.   I don't.
22             MR. KOH:  Tom, I'm not sure we
23         got all your answer.  Could you repeat
24         please?
25             THE WITNESS:  I don't remember.
```

Page 143

1                          LI

2     BY MR. WALSH:

3          Q.   Was this potential retention

4     related to the FMV process under the

5     McDonald's lease?

6          A.   I don't know.

7          Q.   What other purpose could it have

8     served?

9          A.   I don't know.

10         Q.   If we can view the document that

11    was previously marked as P25.  It's the

12    cover e-mail from David Lyon at

13    Metropolitan Valuation Services.  It's an

14    e-mail dated February 26, 2019 from David

15    Lyon to Sam Rottenberg, Morris Missry and

16    Tom Li.  Let me know when you've had a

17    chance to look at the document.

18         A.   I have it open.

19         Q.   The e-mail states, "Gentlemen,

20    attached is the review of the KTR

21    appraisal report."

22              Do you recall why Vanderbilt

23    engaged Metropolitan Valuation in February

24    2019?

25         A.   I don't remember.

1                       LI

2        Q.    The second paragraph, it says,

3    "In general, both reports are deemed

4    credible, though enhancements/

5    clarifications/additional data would

6    strengthen the credibility and confidence

7    in each.  If I remember correctly, the

8    issue of the ground rents re-set was

9    intentionally not part of the initial

10   engagement for either KTR or BBG."

11             Do you see that?

12       A.    I see the sentence you just read.

13       Q.    Do you recall if the ground rent

14   re-set was intentionally not part of KTR's

15   initial engagement?

16       A.    I don't recall.

17       Q.    You don't remember ever

18   discussing that with David Lyon at

19   Metropolitan?

20       A.    I don't recall having discussion

21   with David Lyon.

22       Q.    Now, in the next sentence it

23   says, "In that regard, it would be my

24   opinion that both of the appraisal reports

25   (or one or the other, depending on your

Page 145

1                          LI

2     decision to use either, or both in your

3     preliminary negotiations with McDonald's,

4     or if you are prepared to exchange either

5     or both as part of the ground lease re-set

6     schedule) would need to be updated to a

7     current date of value and additional

8     market data would need to be

9     reviewed/included."

10             Do you see that?

11        A.    I see the sentence you just read.

12        Q.    What is your understanding of

13    what David Lyon was trying to tell you

14    there?

15             MR. KOH:  Objection.  Go ahead.

16             THE WITNESS:  He was saying that

17        both the appraisal reports would need

18        to be updated to the current date of

19        value and perhaps some additional

20        market data to be included.

21    BY MR. WALSH:

22        Q.    Did he tell you what additional

23    market data he felt would need to be

24    reviewed and included?

25        A.    I don't remember what he's

Page 146

                              LI
1
2    referencing.
3         Q.    But it looks like Vanderbilt
4    discussed the McDonald's lease and rent
5    re-set process with David Lyon; is that
6    right?
7         A.    We may or may not have discussed
8    it.
9         Q.    Do you know if Mr. Lyon was given
10   any instructions about what method the
11   option rent addendum requires the parties
12   to appraise the property under?
13        A.    I don't remember what
14   instructions precisely that may or may not
15   been provided to David Lyon.
16        Q.    If you can turn to page of his --
17   of the appraisal report dated February 26,
18   2019, it's the page ending 464.  Tell me
19   when you're there.
20        A.    I'm on 464.
21        Q.    Okay.  And who is this appraisal
22   report addressed to?
23        A.    To Vanderbilt Atlantic Holdings
24   LLC, attention Tom Li.
25        Q.    So this was addressed to your

Page 147

                              LI

1

2    attention specifically; right?

3         A.    Yes.

4         Q.    And this is what they call a

5    comprehensive desk review of the appraisal

6    report prepared by KTR Real Estate

7    Advisors of 840 Atlantic Avenue.

8              Do you see that?

9         A.    I see the reference.

10        Q.    Do you know which of the two

11   appraisal reports Metropolitan was looking

12   at, either the August 30 report or the

13   updated January 17, 2019 version?

14             MR. KOH:  Objection.  Go ahead.

15             THE WITNESS:  I don't know.

16   BY MR. WALSH:

17        Q.    Now, do you know if Metropolitan

18   at any point recommended to Vanderbilt

19   that that KTR report from August 2018

20   should be updated to reflect the changes

21   that they ultimately made in January of

22   2019?

23        A.    I apologize, could you repeat the

24   question?

25        Q.    Yeah.  So KTR updated its August

Page 148

```
1                        LI
2      2018 report in January 2019; right?
3           A.    I see two dates.
4           Q.    Do you remember that we talked
5      about it before in January of 2019, KTR
6      updated its prior appraisal report to
7      address it to you and then included some
8      additional sentences in the bottom of the
9      first paragraph of that first page, do you
10     recall that?
11          A.    I remember there were some
12     changes.
13          Q.    So I guess what I'm asking is,
14     was Metropolitan Valuation Services
15     involved in any way in the decision to
16     have KTR issue that revised report in
17     January 2019?
18          A.    I don't remember.
19          Q.    If you could turn to the page
20     ending in 468.
21          A.    I'm there.
22          Q.    Actually, if you could turn to
23     465, I'm sorry.
24          A.    Um-hum.
25          Q.    On the bottom it says the
```

1               LI

2    appraisal notes the following hypothetical

3    conditions.  And on this page and on the

4    page that follows, the page ending 466,

5    Lyon or Metropolitan Valuation Services

6    describes the hypothetical conditions and

7    extraordinary assumptions made in Tener's

8    report.

9           Do you see that?

10     A.   465?

11     Q.   So bottom of 465 to 466 and it

12   talks about the -- it says the following

13   hypothetical conditions and the following

14   extraordinary assumptions.

15          Do you see that?

16     A.   I see the two sections.

17     Q.   So in this part of the report,

18   Metropolitan is discussing the

19   hypothetical conditions and extraordinary

20   assumptions made by KTR; right?

21     A.   Yes.

22     Q.   And at the bottom of 466,

23   Metropolitan writes, "We note that MVS

24   conducted only a cursory review of the

25   valuation of subject property by KTR under

Page 150

1                          LI

2      the M-Crown rezoning.  As the proposed

3      rezoning initiative has not yet been

4      approved, it is our opinion that this

5      valuation scenario is highly speculative

6      as of both the effective date of value and

7      the date of the report."

8              Do you see that?

9          A.   I do.

10         Q.   And do you agree with the

11     conclusion that the scenario for the

12     upzoning is highly speculative?

13             MR. KOH:  Objection.

14             THE WITNESS:  I don't know if I

15         agree with MVS's opinion.

16     BY MR. WALSH:

17         Q.   Did anyone at -- or did you or to

18     your knowledge Sam Rottenberg have any

19     discussions with Metropolitan about this

20     highly speculative nature of the M-Crown

21     rezoning?

22         A.   I don't remember ever having

23     discussion about characterizing this as

24     highly speculative.

25         Q.   If you could turn to the page

1                        LI

2     ending in 474.  The third paragraph down,

3     it says, "While we concur."

4             Do you see that?

5        A.    I do.

6        Q.    You write -- while we concur with

7     the 6.0 percent selection for a re-set, we

8     disagree that this rate would be

9     reflective of an initial rate against the

10    land valuation.  Location, we are of the

11    opinion that the initial rate would be

12    closer to 4.5 to 5.0 and no consideration

13    would be given to any potential upzoning

14    as of the current date of value as this

15    would be highly speculative without formal

16    or at least anecdotal municipal approval."

17            Do you see that?

18       A.    I see the sentences you just

19    read.

20       Q.    Has Vanderbilt ever received

21    formal approval or anecdotal municipal

22    approval for the potential upzoning?

23       A.    We have not received municipal

24    approval.

25       Q.    So Vanderbilt has not received

Page 152

```
 1                         LI
 2    either formal approval or anecdotal
 3    municipal approval; is that right?
 4         A.    We have not received formal
 5    municipal approval.  I don't know what
 6    anecdotal approval is.
 7         Q.    Okay.  Do you know if this
 8    conclusion in the report or this opinion
 9    in this Metropolitan report was shared
10    with Tom Tener?
11         A.    I don't remember if we shared
12    this with Tom Tener.
13         Q.    Do you recall having any
14    discussions with anyone about whether you
15    shared this conclusion or any other
16    conclusion in this report with Tom Tener?
17         A.    I don't remember having
18    discussions whether to share with Tom
19    Tener.  I'm sure I saved it.
20         Q.    If you could turn to the page
21    ending 468, and specifically point 4.  Let
22    me know when you're there.
23         A.    I'm there.
24         Q.    It says, "Should the appraisal be
25    utilized in conjunction with the ground
```

```
 1                         LI
 2    rent re-set, the highest and best use
 3    analysis as approved should consider the
 4    encumbrance in place with respect to the
 5    ground lease which precludes near term
 6    demolition.  Similarly, the tenant retains
 7    additional option periods which would
 8    limit any redevelopment opportunity."
 9            Do you see that?
10       A.    I do.
11       Q.    And the ground rent re-set he's
12    referring to is the ground rent re-set
13    under the McDonald's lease; right?
14            MR. KOH:   Objection.
15            THE WITNESS:   I'm not sure
16       exactly which one he's referring to.
17    BY MR. WALSH:
18       Q.    What other ground rent re-set
19    could he have been referring to?
20            MR. KOH:   Objection.
21            THE WITNESS:   I don't know.
22    BY MR. WALSH:
23       Q.    So you're not aware of any other
24    ground rent re-set he could have been
25    referring to?
```

Page 154

```
1                    LI
2           MR. KOH:  Objection.
3           THE WITNESS:  I don't know.
4    BY MR. WALSH:
5      Q.   Did you say no?
6      A.   I don't know.
7      Q.   Did you discuss this specific
8    conclusion with anyone at any time?
9      A.   I'm sorry, this conclusion?
10     Q.   Yeah, the conclusion that I just
11   read to you in point 4.
12     A.   I don't remember discussing
13   conclusions, this conclusion with anyone.
14     Q.   And who else received a copy of
15   this report?
16     A.   This particular report, I'm sure
17   Sam had access to it.
18     Q.   And Morris Missry is listed as a
19   cc on here so he would have received it as
20   well; right?
21     A.   That is possible.
22     Q.   Do you recall having any
23   discussions with Morris about this
24   document?
25     A.   I don't remember having
```

Page 155

1                    LI

2    discussions with Morris Missry about this

3    document.

4        Q.   And when you received this

5    report, what did you do with it?

6        A.   I filed it.

7        Q.   Did you review it?

8        A.   I may or may not have looked at

9    portions of it.

10       Q.   Do you know how much Vanderbilt

11   had to pay for this report?

12       A.   I don't remember the amounts.

13       Q.   And do you recall why Vanderbilt

14   wanted this report from Metropolitan?

15       A.   I don't remember the exact

16   reason.

17           MR. WALSH:  If we could mark

18       027513.

19           (Exhibit P59, document Bates

20       labeled VA 027513, marked for

21       identification.)

22           VERITEXT CONCIERGE:  This will be

23       introduced as P59.

24   BY MR. WALSH:

25       Q.   Look at P59 when you have a

                        LI

2   moment.

3        A.   I have it open.

4        Q.   So this is a series of e-mails

5   between Vanderbilt and KTR.  The top

6   e-mail is an e-mail from you to Shaun Kest

7   and Tom Tener dated February 25, 2019, and

8   you write, "Here is the attorney

9   information," and you provide Morris

10  Missry's contact information.

11            Do you see that?

12       A.   I do.

13       Q.   Do you recall why you were

14  sharing Morris Missry's information with

15  them at that point?

16       A.   I don't remember why.

17       Q.   If you could please pull up what

18  was previously marked as P27.

19       A.   P27?

20       Q.   We'll have to upload it for you

21  because it was from Sam Rottenberg's

22  deposition.  So this is actually the

23  e-mail that directly preceded the e-mail

24  that we were just looking at, P59, and

25  it's an e-mail from you dated February 25,

```
 1                      LI
 2    2019 to Shaun Kest and Tom Tener at KTR
 3    and you're attaching a copy of the option
 4    rent addendum to the McDonald's lease.
 5             Do you see that?
 6       A.   I see the attachment in the
 7    e-mail.
 8       Q.   So does this refresh your
 9    recollection about why you were sharing
10    Morris Missry's contact information with
11    them around that time?
12       A.   Not at all.
13       Q.   It appears that you were
14    discussing retaining KTR for purposes of
15    the fair market value process under the
16    lease; right?
17             MR. KOH:  Objection.
18             THE WITNESS:  I don't remember
19       what the purpose was.
20    BY MR. WALSH:
21       Q.   If we can mark -- actually,
22    before we do that, do you know if this was
23    the first time period that either you or
24    Sam discussed the fair market value
25    process under the McDonald's lease with
```

Page 158

1                          LI

2    KTR?

3         A.    I don't remember.

4         Q.    And what role did Morris Missry

5    serve during the interview process?

6         A.    He was an attorney for

7    Vanderbilt.

8         Q.    And did Morris Missry have

9    authority to make decisions on behalf of

10   Vanderbilt relating to the FMV process

11   without consulting with either you or Sam

12   Rottenberg?

13             MR. KOH:   Objection.

14             THE WITNESS:   I think it depends

15        on what kind of decisions but I don't

16        believe so.

17   BY MR. WALSH:

18        Q.    And what do you mean depends on

19   what kinds of decisions?

20        A.    He's sending an e-mail.  I don't

21   think he has to ask us if he (inaudible).

22        Q.    But you would have expected him

23   to consult with Vanderbilt before making

24   decisions about the FMV process; is that

25   right?

Page 159

```
 1                        LI
 2           MR. KOH:  Objection.
 3           THE WITNESS:  If you could give
 4       an example what kind of decision
 5       you're talking about.
 6   BY MR. WALSH:
 7       Q.   For example, about the
 8   instructions to give KTR.
 9       A.   I think Morris may or may not
10   have an opinion on certain matters at any
11   time.  He would be entitled to send his
12   e-mails.
13       Q.   So he's entitled to send e-mails
14   but you're not sure what decisions, if
15   any, he has authority to make on behalf of
16   Vanderbilt?
17       A.   I don't remember.
18       Q.   Do you remember having any
19   discussions with Sam about what discretion
20   to give Morris during the course of this
21   FMV process?
22       A.   I don't remember having
23   discussions with Sam about what
24   discretions to provide.
25       Q.   Did you have any types of
```

Page 160

```
 1                         LI
 2   discussions like that with Morris Missry?
 3       A.   I don't remember having
 4   discussions.
 5            MR. WALSH:  If we can mark
 6       VA 027432.
 7            (Exhibit P60, document Bates
 8       labeled VA 027432, marked for
 9       identification.)
10            VERITEXT CONCIERGE:  This will be
11       introduced as Exhibit P60.
12   BY MR. WALSH:
13       Q.   Mr. Li, P60 is one page.  It
14   looks like appointment --
15       A.   Yes.
16       Q.   -- calendar entry.  Looks like it
17   was sent by Tom Tener to you and Shaun
18   Kest on February 25, 2019, re a meeting at
19   Wachtel Missry on February 28, 2019.
20            Do you see that?
21       A.   I see it.
22       Q.   And Tom Tener writes, "Tom, Shaun
23   and I will attend the meeting.  As
24   detailed in our engagement letter, the
25   meeting and the additional services will
```

Page 161

```
 1                       LI
 2    be billed at KTR's standard hourly rates."
 3              Did you attend what appears to
 4    have been this February 28, 2019 meeting
 5    with Wachtel Missry and KTR?
 6         A.   I may or may not have attended
 7    the meeting, I don't remember.
 8         Q.   Do you remember what was
 9    discussed at that meeting?
10         A.   I don't remember.
11         Q.   Do you remember the purpose of
12    the meeting?
13         A.   It says 840 Atlantic Ave so I'm
14    assuming there was discussion about
15    840 Atlantic Avenue.
16         Q.   Do you recall having any
17    discussions with anyone around this time
18    period about the instructions to be given
19    to KTR for purposes of preparing the
20    letter opinion of value for the FMV
21    process?
22         A.   I don't remember discussing.
23         Q.   So you don't remember having
24    those discussions?
25         A.   I don't remember having or not
```

```
                                      Page 162

 1                       LI
 2   having those discussions.
 3            MR. WALSH:  If we could please
 4       pull up what's been previously marked
 5       as P28.  That's from Sam Rottenberg's
 6       deposition.  It's a cover e-mail with
 7       the March 8, 2019 retention letter
 8       between KTR and Wachtel Missry.
 9            VERITEXT CONCIERGE:  It is in the
10       marked exhibit folder.
11   BY MR. WALSH:
12       Q.   Can you please pull it out,
13   Mr. Li?
14       A.   I've got it.
15       Q.   If you could turn to the page
16   ending in 92.
17       A.   Yes.
18       Q.   Whose signature is that under
19   Vanderbilt Atlantic Holdings?
20       A.   It's my signature.
21       Q.   And it says for payment
22   indemnification purposes.  Do you know
23   what that means?
24       A.   I don't remember.
25       Q.   Do you recall why you were asked
```

Page 163

1                          LI

2    to sign this letter?

3         A.    There was Vanderbilt Atlantic

4    Holdings on the signature.

5         Q.    Now, the previous engagement

6    letters that we looked at between the

7    various appraisers for the property at

8    840 Atlantic Avenue were addressed to

9    someone at Vanderbilt but this one is

10   addressed to Morris Missry at Wachtel

11   Missry.  Do you know why that is?

12        A.    I don't remember why.

13        Q.    Do you recall having discussions

14   with Sam or anybody about having an

15   attorney retain them at Vanderbilt?

16        A.    I don't remember discussions.

17        Q.    Did you review a draft of this

18   letter before Wachtel Missry sent it

19   out -- I'm sorry, before KTR sent it out?

20   Let me rephrase.

21             Did you review any drafts of this

22   letter before it was executed by Wachtel

23   Missry and Vanderbilt?

24        A.    I had the letter before I signed

25   it.

Page 164

1                          LI
2      Q.   Do you recall reviewing any prior
3  drafts of the letter?
4      A.   I don't know if there were any
5  prior drafts.  There may or may not have
6  been any prior drafts.
7      Q.   Did you play any role in the
8  language that's included in this letter?
9      A.   I don't remember playing a role
10  in the language in this letter.
11     Q.   On the bottom of the first page
12  of the letter, it's the page ending 990,
13  there's a sentence that says it is
14  anticipated that the FMV will be based on
15  the standard market data approach
16  technique for valuing vacant land (the
17  sales comparison approach.)
18          Do you see that?
19     A.   Which page, 990?
20     Q.   Yeah.  It's in the second large
21  paragraph halfway down.
22     A.   I see the sentence now.
23     Q.   Do you know why the engagement
24  letter indicates that the sales comparison
25  approach will be used?

Page 165

1                          LI

2        A.   I don't know why.

3        Q.   Couple sentences later it says,

4    "Additionally, KTR will prepare a detailed

5    work file adequate to illustrate the sales

6    comparison approach and analysis of the

7    comparable ground leases utilized to

8    estimate the FMV."

9             Do you know if KTR ever analyzed

10   comparable ground leases under this?

11       A.   I don't know.

12       Q.   You don't know?  Have they made

13   any effort to try to identify comparable

14   ground leases?

15       A.   I don't know what extent they

16   worked on this.

17       Q.   Are you familiar with the

18   New York Court of Appeals decision 936

19   Second Avenue v. Second Corporate

20   Development Department?

21       A.   I've heard it being mentioned.

22       Q.   What do you know about that case?

23       A.   Very little, almost nothing.

24       Q.   When was the first time you heard

25   about that case?

1                       LI

2       A.   I don't remember exactly when I

3   first heard of it.  I don't remember.

4       Q.   Have you had discussions with

5   Morris Missry about that case?

6       A.   I have heard him mention it.  I

7   don't think I've had any discussions with

8   him about it that I remember.

9       Q.   In what context was it brought

10  up?

11      A.   I keep hearing Second Avenue

12  case, Second Avenue case.

13      Q.   When did you keep hearing that?

14      A.   I don't remember exactly when.

15      Q.   Was it before the litigation was

16  filed or after the litigation was filed?

17      A.   I'm not sure.  I don't remember.

18      Q.   Have you ever been involved with

19  any discussions with Tom Tener about the

20  case?

21      A.   I don't remember having been

22  involved in any discussions.

23      Q.   When did you become aware that

24  Tom Tener asked Morris Missry about the

25  Second Avenue case in April of 2019?

```
                                        Page 167

  1                     LI
  2          MR. KOH:  Objection.  Go ahead.
  3          THE WITNESS:  I don't remember
  4      whether or not it happened.
  5   BY MR. WALSH:
  6      Q.   So you're not sure?
  7      A.   I don't remember.
  8      Q.   So you don't remember any
  9   discussions around the time period of the
 10   Second Avenue case specifically?
 11      A.   I don't remember specifics of any
 12   discussion.
 13      Q.   Do you -- putting aside the
 14   Second Avenue case, do you remember any
 15   discussions with anyone around this April
 16   time period, April 2019 time period of
 17   whether the encumbrance of the McDonald's
 18   lease should be considered in Tom Tener's
 19   analysis?
 20      A.   I don't remember discussions.
 21          MR. WALSH:  If we could bring up
 22      what's been previously marked as P32.
 23      It's the April 15, 2019 KTR report.
 24          VERITEXT CONCIERGE:  Did you say
 25      P32?
```

```
 1                        LI
 2            MR. WALSH:  P32, yes.
 3            VERITEXT CONCIERGE:  I don't have
 4       that in this folder.
 5            MR. WALSH:  So it's actually
 6       under Pinchus S. Rottenberg.
 7            VERITEXT CONCIERGE:  Moving that
 8       right now.
 9            MR. WALSH:  And if there's a way,
10       I don't know if you can rename that
11       P32.
12            VERITEXT CONCIERGE:  Moving P32
13       to the marked exhibit folder now.
14   BY MR. WALSH:
15       Q.   If you could please open up P32.
16       A.   I have it open.
17       Q.   So this is the first appraisal
18   report that Tom Tener prepared for the FMV
19   process under the McDonald's lease; right?
20       A.   This is an appraisal that --
21   restricted appraisal that Tom Tener
22   prepared.
23       Q.   And it was for the FMV process
24   under the McDonald's lease; right?
25       A.   I see there are references to the
```

Page 169

1                          LI

2     fair market value.

3          Q.   Okay.  By the way, I see this is

4     also addressed to Morris Missry as opposed

5     to Vanderbilt.  Do you know whether any

6     other appraisers prepared reports similar

7     to this that were sent to Morris Missry?

8          A.   I don't remember.

9          Q.   In this report, Tom values the

10    property using only the land sales

11    comparison approach.  Do you know why he

12    elected to use that method?

13         A.   I don't know if -- how Tom Tener

14    valuated the property here.

15         Q.   Did Vanderbilt attempt to

16    identify comparable ground leases for Tom

17    Tener as he was preparing this report?

18         A.   I don't remember.

19              MR. WALSH:  If we can mark

20         VA 026610.

21              (Exhibit P61, document Bates

22         labeled VA 026610, marked for

23         identification.)

24              VERITEXT CONCIERGE:  This will be

25         introduced as P61.  It's loading now.

Page 170

                              LI

1

2        It might take a few seconds.

3    BY MR. WALSH:

4        Q.    This spans all the way through

5    VA 026709 and appears to be a draft

6    environmental assessment statement for

7    840 Atlantic Avenue.  Let me know when

8    you're able to open it.

9        A.    I have it open.

10       Q.    So this is a document produced by

11   Vanderbilt.  You're identified as the

12   custodian of the metadata.  The file name

13   is called 840 Atlantic Avenue-partial

14   draft EAS.pdf.  The meta indicates it was

15   created on May 16, 2019 and the original

16   e-file source is the TLi/users/desktop/840

17   Atlantic Ave.  And you're looking at this

18   document now?

19       A.    I'm looking at the exhibit.

20       Q.    So what is this exactly?

21       A.    It's a form with New York City.

22       Q.    And was this another -- was this

23   a draft environmental assessment statement

24   prepared by Philip Habib Associates?

25       A.    I don't know who filled this out

Page 171

1                          LI

2      exactly.

3           Q.   So the metadata indicates that

4      the document author is PHA workstation.

5      Does that sound like it's Philip Habib

6      Associates?

7           A.   It's possible.

8           Q.   And they are your environmental

9      consultant for the project; right?

10          A.   Yes.

11          Q.   And so it looks like they were

12     continuing to do environmental work for

13     the project in May 2019.  If you could

14     flip to the second page of the document on

15     the bottom it says 8 analysis year.  It

16     says anticipated build year (date the

17     project would be completed and

18     operational) 2023.  And then underneath

19     it, it says anticipated period of

20     construction in months 18 to 22 months.

21               Do you see that?

22          A.   I do.

23          Q.   Do you ever recall having any

24     conversations with Philip Habib Associates

25     either around this time or any other time

```
 1                        LI
 2   letting him know that 2023 may not be a
 3   realistic date for completion of this
 4   project if McDonald's exercises its right
 5   to stay on the property?
 6        A.   I don't remember having any
 7   specific discussions.
 8        Q.   Are you aware that they were
 9   listing 2023 as a potential completion
10   date?
11        A.   I see the date right now.
12        Q.   Well, were you aware before today
13   that they were listing 2023 as a potential
14   completion date?
15        A.   I don't remember if I was aware
16   at the time.
17        Q.   Do you believe 2023 is a
18   realistic date for the project to be
19   completed and operational?
20             MR. KOH:  Objection.  Go ahead.
21             THE WITNESS:  I don't know.
22   BY MR. WALSH:
23        Q.   And by May 2019, McDonald's had
24   already notified Vanderbilt that it
25   intended to stay or to exercise its option
```

Page 173

                         LI

1

2    to stay on the property from April 2019

3    through April 2024; right?

4        A.    I don't remember exactly when the

5    letter from McDonald's was sent by

6    McDonald's.

7        Q.    But May 2019 is already into the

8    first option period; right?

9             MR. KOH:  Objection.  I'll

10        withdraw that.

11            THE WITNESS:  I don't remember

12        what exact date the extension term

13        starts.

14   BY MR. WALSH:

15       Q.    Do you recall a meeting between

16   representatives of McDonald's and

17   Vanderbilt on June 19, 2019?

18       A.    I remember there was a meeting at

19   Morris Missry's office around that time,

20   maybe on that date.

21       Q.    Who was there?

22       A.    The meeting that I'm remembering,

23   I was there, Sam was there, Morris Missry

24   was there, I believe Carol Demarco was

25   there, I believe Mike Meyer was there.  I

Page 174

```
 1                           LI
 2      think the appraisers were also there.
 3           Q.   Tom Tener and Sharon Locatel were
 4      also there?
 5           A.   Yes.
 6                MR. WALSH:  If we could pull up
 7           what's been previously marked as P34.
 8           It's a document containing some
 9           handwritten notes.
10                VERITEXT CONCIERGE:  P34 is now
11           in the marked exhibit folder.
12      BY MR. WALSH:
13           Q.   So you're going to want to rotate
14      this document.
15                Okay, do you recognize this
16      document?
17           A.   I don't remember if I've seen
18      this.
19           Q.   Do you know whose handwriting
20      this is?
21           A.   I don't.
22           Q.   So this is not your handwriting?
23           A.   Doesn't look like it.
24                MR. WALSH:  Can we just take a
25           five-minute break, please?
```

Page 175

1                        LI

2              MR. KOH:  Sure.

3              THE WITNESS:  Sure.

4              THE VIDEOGRAPHER:  We're off the

5         record now at approximately 2:26 p.m.

6              (Recess taken from 2:26 p.m. to

7         2:30 p.m.)

8              THE VIDEOGRAPHER:  We're now

9         going back on the record at

10        approximately 2:30 beginning media 5.

11   BY MR. WALSH:

12        Q.   Mr. Li, I was just looking back

13   at metadata for this document and you're

14   identified as the original custodian of

15   this document.  Do you know why that would

16   be if these were not your notes?

17        A.   I may have had a piece of paper

18   which I scanned.

19        Q.   Do you recall anyone sending you

20   notes from that meeting?

21        A.   I don't remember how I obtained

22   these notes.

23        Q.   And you have no idea whose notes

24   they are?

25        A.   I don't know whose handwriting

Page 176

1                          LI

2     this is.

3          Q.   Okay.  During that meeting, do

4     you recall Mike Meyer from McDonald's

5     saying that Tom Tener had failed to

6     consider the encumbrance in the McDonald's

7     lease in his valuation and that McDonald's

8     wanted him to consider that, do you

9     recall?

10         A.   I don't remember exactly what

11    Mike Meyer said at the meeting.

12         Q.   Do you recall what McDonald's

13    concerns were about KTR's appraisal?

14         A.   Seems like they were concerned

15    the number was higher than the appraisal

16    they produced.

17         Q.   And do you recall specifically

18    anything that anyone from McDonald's said

19    they believed was wrong with the way in

20    which KTR prepared its appraisal?

21         A.   I don't remember what anyone from

22    McDonald's was saying at the meeting about

23    that.

24         Q.   Okay.  And what do you remember

25    about that meeting?

Page 177

                              LI

1

2      A.   I remember there was a heated

3   discussion between Morris and Sharon.

4      Q.   And what was the nature of that

5   heated discussion?

6      A.   There was some kind of

7   disagreement between the two of them.

8      Q.   Do you recall what that

9   disagreement was?

10     A.   I don't remember exactly what

11  that disagreement was.

12     Q.   Do you recall how long the

13  meeting lasted?

14     A.   I don't remember.

15     Q.   And do you recall whether

16  Vanderbilt raised any concerns with Sharon

17  Locatel's analysis?

18     A.   I remember Sharon mentioned that

19  her primary comparable was a property in

20  Staten Island.

21     Q.   What else do you recall?

22     A.   I remember Carol saying that

23  McDonald's is making a mistake of

24  proceeding with the extension without

25  knowing themselves what the rent would be.

```
 1                      LI

 2      Q.    Carol Demarco said that?

 3      A.    Yes.

 4      Q.    And what else, if anything, do

 5  you remember about the meeting?

 6      A.    I can't remember anything at the

 7  moment.

 8      Q.    Do you recall how the meeting

 9  ended and like what the next steps were

10  going to be?

11      A.    I don't remember.

12      Q.    Did Vanderbilt eventually agree

13  to have Tom Tener redo his appraisal while

14  considering the encumbrance of the

15  McDonald's lease?

16      A.    Could you repeat the question?

17      Q.    Did Vanderbilt eventually agree

18  to have Tom Tener redo his appraisal while

19  considering the encumbrance of the

20  McDonald's lease?

21          MR. KOH:   Objection.

22          THE WITNESS:   We didn't agree or

23      disagree to allow Tom Tener to do

24      anything.   I think Tom Tener was

25      working based on his own understanding
```

Page 179

1                      LI

2       of what's required to obtain the

3       value.

4    BY MR. WALSH:

5       Q.   Do you agree that Tom Tener

6    should have considered the encumbrance of

7    the lease in his letter opinion of value?

8             MR. KOH:  Objection.

9             THE WITNESS:  I don't remember

10       whether or not he considered it.

11   BY MR. WALSH:

12      Q.   Whether he considered it or not,

13   do you agree that he should have

14   considered it?

15            MR. KOH:  Objection.

16            THE WITNESS:  I don't remember

17       having one opinion or another about

18       that item.

19   BY MR. WALSH:

20      Q.   Do you agree that Tom Tener

21   should have performed his appraisal while

22   only considering current zoning

23   regulations?

24            MR. KOH:  Objection.

25            THE WITNESS:  I don't remember

```
                                        Page 180

 1                      LI

 2         having an opinion on how Tom Tener

 3         should have valued the property.

 4   BY MR. WALSH:

 5         Q.   Who would have had those

 6   discussions with Tom Tener then?

 7              MR. KOH:  Objection.

 8              THE WITNESS:  I don't remember

 9         whether or not there were such

10         discussions.

11              MR. WALSH:  If we could mark

12         VA 019581.  It's an e-mail chain

13         between Vanderbilt, KTR and Morris

14         Missry from July 2019.

15              (Exhibit P62, document Bates

16         labeled VA 019581, marked for

17         identification.)

18              VERITEXT CONCIERGE:  This will be

19         introduced as P62.

20   BY MR. WALSH:

21         Q.   And it spans through 019583.

22              Do you see that the top e-mail is

23   an e-mail from you sending comps that you

24   had found to Tom Tener?

25         A.   I see an e-mail I sent to Tom
```

Page 181

1                        LI

2    Tener.

3         Q.   You say here are a few comps we

4    found; right?

5         A.   I see the sentence, yes.

6         Q.   So these are comps that

7    Vanderbilt found that it was sending to

8    Tom Tener; right?

9         A.   I found comps which I sent to Tom

10   Tener.

11        Q.   If you can flip to the second

12   page of that document, page ending in 582.

13        A.   Um-hum.

14        Q.   It's an e-mail from Tom Tener to

15   Sam Rottenberg with a copy to Morris

16   Missry on July 9, 2019.  Now you're not

17   copied on this particular e-mail but four

18   paragraphs down, Tom writes comparable

19   leases in the 90 to $100 per square foot

20   range (about 75 NNN) would support our

21   concluded FMR for a 20 year term.

22              Do you see that?

23        A.   I see the sentence you just read.

24        Q.   So going back to the first page,

25   you say in your e-mail, I think some of

Page 182

1                          LI

2    the retail 550 Vanderbilt was north of

3    $100 per square foot but haven't been able

4    to confirm yet.

5              Do you see that?

6        A.   I see the sentence you just read.

7        Q.   Now, how did you decide what

8    comps to send to Tom Tener?

9        A.   I don't know if I made a specific

10   decision.

11       Q.   And Tom had specifically told you

12   that comps in the 90 to $100 square foot

13   range would support his concluded fair

14   market value; right?

15       A.   I think Tom attached an e-mail on

16   which at the time I wasn't copied on.

17       Q.   But ultimately you saw it because

18   now you're responding to that same chain.

19             Do you see that?

20             MR. KOH:  Objection.

21             THE WITNESS:  I don't recall if I

22        saw or considered what Tom wrote in

23        that e-mail when I sent my e-mail.

24   BY MR. WALSH:

25       Q.   Now, did you find any potential

Page 183

```
 1                        LI
 2    comps that you decided not to send to Tom?
 3         A.    I don't remember what comps I
 4    found that may or may not have incidents.
 5         Q.    What did you do to come up with
 6    this list?
 7         A.    I used Google.
 8         Q.    And did you consult with any
 9    brokers or appraisers?
10         A.    I don't remember consulting
11    brokers or appraisers.
12         Q.    How did you find this information
13    using Google?
14         A.    I searched various terms relating
15    to retail.
16         Q.    And you can't remember whether
17    there were some results that you found
18    that you did not pass on?
19         A.    I don't remember what I found or
20    didn't find that wasn't shared.
21              MR. WALSH:   If we can mark
22         VA 028154.
23              (Exhibit P63, document Bates
24         labeled VA 028154, marked for
25         identification.)
```

Page 184

```
 1                        LI
 2           MR. WALSH:  It's a one-page
 3      document entitled notes-reset.txt.
 4      Mr. Li, you're listed as the
 5      custodian.  It says it was created
 6      July 24, 2019 and modified July 24,
 7      2019.  The original e-file source is
 8      TLi/users/ SL/Dropbox, I won't
 9      continue, in another path.
10           VERITEXT CONCIERGE:  Can you
11      repeat that number one more time?
12           THE WITNESS:  It's VA 028154.
13           VERITEXT CONCIERGE:  This will be
14      introduced as P63.
15   BY MR. WALSH:
16      Q.   Mr. Li, do you recognize this
17   document?
18      A.   I don't remember this exact
19   document.
20      Q.   You testified earlier that that
21   Dropbox with your initials TLi, that you
22   believe you were the only one who had
23   access to that.  Do you recall if this is
24   a document you authored?
25      A.   It's possible.  I don't remember.
```

```
 1                        LI
 2       Q.   Okay.  About halfway down the
 3   page, reason to sell, even if we prevail
 4   at 1M -- presumably one million dollars --
 5   per year rent, found it doesn't create
 6   enough benefit.  It's not so much the next
 7   few years but the longer term 15 to 20
 8   years.
 9            What do you mean when you wrote
10   million dollars a year in rent wouldn't
11   create enough benefit?
12            MR. KOH:  Objection.
13            THE WITNESS:  I don't remember
14       why -- if I wrote that.
15   BY MR. WALSH:
16       Q.   Okay.  Do you believe that even
17   at a million dollars a year for McDonald's
18   rent, it wouldn't create enough benefit
19   for Vanderbilt?
20            MR. KOH:  Objection.
21            THE WITNESS:  I don't know what I
22       believed at the time.
23   BY MR. WALSH:
24       Q.   Well, you have exclusive access
25   to this Dropbox folder.  Who else could
```

```
                                    Page 186

1                        LI

2     have drafted this?

3          A.   I could have drafted this.  I

4     just don't remember why I did if that's

5     the case.

6          Q.   It says not so much the next few

7     years but the longer term 15 to 20 years.

8     What does that mean?

9          A.   Looks kind of like gibberish to

10    me so I'm not sure what it means.

11         Q.   But Vanderbilt can't redevelop

12    the property as it wants to so long as

13    McDonald's stays on the property; right?

14         A.   Correct.

15         Q.   And every year that McDonald's

16    stays, Vanderbilt loses the benefit of

17    another year of its 99-year lease; right?

18         A.   Can you say the question again?

19         Q.   I said in every year that

20    McDonald's stays on the property,

21    Vanderbilt loses the benefit of another

22    year of its 99-year lease; right?

23              MR. KOH:  Objection.

24              THE WITNESS:  I don't know if

25         that characterization is correct.
```

```
                                        Page 187

 1                       LI

 2    BY MR. WALSH:

 3         Q.   Well, Vanderbilt obtained a

 4    99-year ground lease for the property in

 5    November of 2017; right?

 6         A.   Sure, yes.

 7         Q.   And the 99-year term isn't

 8    dependent on when McDonald's leaves;

 9    right?

10         A.   I don't remember exactly how the

11    term is determined.

12         Q.   Okay.  You're the chief

13    administrative officer of Vanderbilt and

14    you don't know the terms of that lease?

15              MR. KOH:  Objection.

16              THE WITNESS:  There could be

17         provisions that make it a variable.  I

18         don't know off the top of my head what

19         that is.

20    BY MR. WALSH:

21         Q.   Are you aware of any such

22    provision?

23         A.   I don't know off the top of my

24    head.

25         Q.   And under the lease that
```

```
 1                          LI
 2     Vanderbilt has with MMB, Vanderbilt
 3     doesn't actually get to keep any of the
 4     rent that McDonald's pays; isn't that
 5     right?
 6               MR. KOH:  Objection.
 7               THE WITNESS:  I don't remember
 8          exactly what the structure is within
 9          the lease off the top of my head.
10     BY MR. WALSH:
11          Q.   Okay.  What are Vanderbilt's
12     current revenue streams?
13          A.   There are rent payments from
14     McDonald's.
15          Q.   Okay.  And those get passed
16     through to MMB Associates, hundred
17     percent; right?
18          A.   At the moment an equivalent
19     amount is paid to MMB.
20          Q.   So essentially even though that
21     money comes in, a hundred percent of it
22     gets sent back out to MMB; right?
23          A.   That's currently the structure,
24     yes.
25          Q.   And so Vanderbilt doesn't
```

1                         LI

2      actually get to keep any of that revenue;

3      right?

4          A.   The rent payments that are

5      received from McDonald's is currently

6      equivalent to the payments to MMB.

7          Q.   Okay.  Besides the McDonald's

8      rent, are there any other revenue streams

9      that Vanderbilt can collect revenue on

10     this property?

11         A.   There are currently no other

12     revenue streams that I'm aware of.

13         Q.   Okay.  Are you aware of any other

14     revenue streams so long as McDonald's

15     remains on the property?

16         A.   I don't know.

17         Q.   And as long as McDonald's stays

18     on the property, Vanderbilt can't

19     redevelop the property; right?

20         A.   Correct.

21         Q.   And if Vanderbilt is able to

22     redevelop the property, it can then

23     actually start generating positive revenue

24     from the property; right?

25         A.   I don't know what would happen if

Page 190

1                         LI
2      or when the redevelopment happens.
3          Q.    So in order to make money off
4      this property, Vanderbilt needs McDonald's
5      off the property; isn't that right?
6          A.    Not necessarily.
7          Q.    Why do you say not necessarily?
8          A.    Because I think you're assuming
9      that we're trying to generate a revenue.
10         Q.    What other reason would
11     Vanderbilt have in acquiring this property
12     if not to generate revenue off of it?
13         A.    There could be some kind of
14     appreciation.  We don't necessarily need
15     cash flow on a revenue stream.
16         Q.    Would you agree that the property
17     is more valuable with McDonald's off of
18     the property than it is with McDonald's on
19     the property?
20             MR. KOH:  Objection.
21             THE WITNESS:  I don't know if I
22         agree or disagree with that.
23     BY MR. WALSH:
24         Q.    You don't know?
25         A.    I just don't know if I agree or

Page 191

```
 1                        LI
 2    disagree with that.
 3        Q.   Has anyone at Vanderbilt that
 4    you're aware of done that analysis?
 5        A.   Well, not that I'm aware of.
 6             MR. WALSH:  If we can take just a
 7        five-minute break, I think I'm
 8        wrapping up.  I'm getting fairly close
 9        to being done.
10             MR. KOH:  Okay, let's take a
11        break.
12             MR. WALSH:  Why don't we say come
13        back at 3 o'clock.
14             MR. KOH:  Okay.
15             THE VIDEOGRAPHER:  We're now
16        going off the record at approximately
17        2:52 p.m.
18             (Recess taken from 2:52 p.m. to
19        3:02 p.m.)
20             THE VIDEOGRAPHER:  We're now
21        going back on the record,
22        approximately 3:02 p.m.
23    BY MR. WALSH:
24        Q.   Mr. Li, do you remember May 2019
25    when Tom Tener and Sharon Locatel were
```

Page 192

```
 1                         LI
 2    trying to identify a third appraiser that
 3    the parties could retain as the third
 4    appraiser under the option rent addendum?
 5         A.    I remember there were some
 6    e-mails regarding a third appraiser.
 7         Q.    And what was your involvement in
 8    that process of trying to identify a third
 9    appraiser?
10         A.    I believe I was on e-mails.
11         Q.    Other than just being copied on
12    e-mails, did you do anything to actively
13    try to identify other appraisers that
14    could be used as the third appraiser?
15         A.    I don't remember if I was
16    involved in identifying any third
17    appraiser.
18         Q.    Were you involved in any
19    discussions with Tom Tener or anyone else
20    at KTR about what Vanderbilt was looking
21    for in a third appraiser?
22         A.    I don't remember how I was
23    involved, whether or not I was involved in
24    those discussions.
25         Q.    Were you ever involved in any
```

1                        LI

2    discussions about the role of the third

3    appraiser and how the third appraiser's

4    letter opinion of value would be used to

5    determine the fair market value of the

6    property?

7        A.    I don't remember having those

8    discussions.

9        Q.    Are you aware that Vanderbilt has

10   changed its position about how the third

11   appraiser's letter opinion of value would

12   be used to determine the fair market

13   value?

14            MR. KOH:   Objection.   Go ahead.

15            THE WITNESS:   I don't know

16        whether or not Vanderbilt has changed

17        its position.

18   BY MR. WALSH:

19        Q.    So you have no knowledge about

20   whether or not Vanderbilt's position today

21   is different from the position it took in

22   2019?

23        A.    I don't remember what the

24   position was in 2019, how that might be

25   different from current position, whether

Page 194

1                          LI

2    that's accurate or not.

3              MR. WALSH:  Okay.  If we can mark

4         VA 027625.

5              (Exhibit P64, document Bates

6         labeled VA 027625, marked for

7         identification.)

8              VERITEXT CONCIERGE:  This will be

9         marked as Exhibit P64.

10   BY MR. WALSH:

11        Q.    So this is an e-mail chain that

12   spans through 027630?

13        A.    What's the exhibit number, sorry?

14        Q.    P64.

15        A.    I have it open.

16        Q.    So on the bottom of that first

17   page, there's an e-mail from Tom Tener to

18   Sam Rottenberg and Morris Missry and Tom

19   Tener writes, "Sam, please send me the

20   list of owners and ownership entities for

21   the conflict check.  This is all I need to

22   get this rolling."

23              Do you see that?

24        A.    I see the sentence.

25        Q.    And if you go, you scroll through

Page 195

1                         LI

2     this page, this document, there's a

3     discussion about potentially retaining an

4     appraiser by the name of Marc Nakleh,

5     that's N-A-K-L-E-H, Marc with a C.

6          A.    I see the name.

7          Q.    And it looks like Tom looked for

8     a list of owners and entities that Marc

9     could run a conflict check.  Do you agree

10    with that?

11         A.    I see his e-mail asking for a

12    list of owners and ownership entities for

13    the conflict check.

14         Q.    And then Sam Rottenberg forwards

15    that e-mail to you when he gets it; right?

16         A.    It's forwarded to me.

17         Q.    And then you respond a few hours

18    later just to Sam and you say is there any

19    problem showing all these, and you list a

20    number of entities including several for

21    the fee owner entities and then under

22    leasehold entities you include Vanderbilt,

23    you include 840 Atlantic Holdings, LLC,

24    840 Atlantic LLC Sam Rottenberg, SPR

25    Group, Simon Dushinsky, the Rabsky Group.

Page 196

1                          LI

2              Why were you checking with Sam if

3      there would be any problem showing Marc

4      all of these names of entities that were

5      involved?

6          A.   I don't remember exactly what I

7      was asking but I suppose I wanted to check

8      if there were any mistakes.

9          Q.   Because these as far as you're

10     aware are all the entities that are

11     involved in this property; right?

12         A.   I don't remember what I was or

13     wasn't aware of at the time.

14         Q.   Now did Sam ever express to you

15     some concern about revealing all of the

16     individuals and entities who had some type

17     of an interest in this property?

18         A.   I don't remember what Sam had or

19     hadn't expressed.

20         Q.   So why would you have been asking

21     him if there was any problem showing all

22     of these entities?

23         A.   I think I was asking if I had

24     made any mistakes.

25         Q.   Are you aware of any mistakes on

Page 197

```
 1                        LI
 2     this list as you look at it today?
 3          A.    I'm not aware of whether or not
 4     there are any mistakes.
 5          Q.    Does it look accurate to you?
 6          A.    The entities and names look
 7     familiar.
 8          Q.    But does it look accurate to you?
 9          A.    I don't know whether or not it's
10     accurate for a list of conflict check.
11          Q.    As the chief administrative
12     officer of Vanderbilt and one of the two
13     people that are involved in the day-to-day
14     decisions of Vanderbilt, you can't answer
15     whether this is a complete list, complete
16     and accurate list of all the individuals
17     and entities who have an ownership
18     interest in the property?
19               MR. KOH:   Objection.
20               THE WITNESS:   There are other
21          entities referenced here including the
22          fee owner and tenant entities beyond
23          Vanderbilt Atlantic Holdings.
24     BY MR. WALSH:
25          Q.    And how about the leasehold
```

```
 1                          LI
 2     entities, does that list look complete and
 3     accurate?
 4          A.   I recognize each of the entities
 5     and names that's listed here for
 6     leasehold.
 7          Q.   That wasn't my question.  Is it
 8     complete and accurate to the best of your
 9     knowledge?
10          A.   I don't know if it's accurate or
11     not that this list should be included for
12     the conflict check.
13          Q.   So where would you have gone to
14     get these names?
15          A.   I don't --
16               MR. KOH:  Objection.
17               THE WITNESS:  -- understand the
18          question.
19     BY MR. WALSH:
20          Q.   Well, you provided these names to
21     Sam.  Where would you have obtained them?
22               MR. KOH:  Objection.
23               THE WITNESS:  I don't remember
24          how I obtained those names at the
25          time.
```

```
 1                      LI
 2           MR. WALSH:  Okay.  If we could
 3      mark VA 028018.
 4           (Exhibit P65, document Bates
 5      labeled VA 028018, marked for
 6      identification.)
 7           VERITEXT CONCIERGE:  This will be
 8      marked as P65.
 9  BY MR. WALSH:
10      Q.   It's an e-mail chain that spans
11  through VA 028023.  Let me know when you
12  have it opened up.
13      A.   I have it open.
14      Q.   So this is an e-mail from you to
15  Tom Tener dated May 21, 2019.  And you
16  write, "Tom, here are the entities for
17  840 Atlantic Ave.  Please let me know if
18  you need other info."  But this list is
19  noticeably shorter and excludes many of
20  the individuals and entities that you had
21  included in your e-mail to Sam Rottenberg.
22  Do you see that?
23      A.   I see it's a different list.
24      Q.   Why did you send a different list
25  to Tom Tener?
```

Page 200

1                         LI

2          A.    I don't remember why.

3          Q.    Does this refresh your

4    recollection about whether Sam ever

5    expressed to you concern about revealing

6    all of the entities that were involved in

7    the ownership of this property?

8          A.    I don't remember Sam expressing

9    anything on that particular topic.  He may

10   or may not have expressed anything.

11         Q.    Do you know why you would have

12   provided an incomplete list to Tom?

13              MR. KOH:  Objection.

14              THE WITNESS:  I don't know

15        whether or not it was incomplete.

16   BY MR. WALSH:

17         Q.    Well, but this doesn't list all

18   the other entities that you previously

19   identified as involved with the property.

20         A.    I didn't know --

21              MR. KOH:  Hold on, was there a

22        question there?  It's an observation.

23   BY MR. WALSH:

24         Q.    Would you agree that this is an

25   incomplete list?

```
 1                    LI
 2          MR. KOH:  Objection.
 3          THE WITNESS:  I don't know
 4      whether or not that's an incomplete
 5      list.
 6   BY MR. WALSH:
 7      Q.    Have you ever been convicted of a
 8   crime?
 9      A.    I have not.
10          MR. WALSH:  I believe I'm done.
11      If I could just have one minute, I'll
12      come right back but I believe I'm
13      done.
14          MR. KOH:  We'll stand by.
15          THE VIDEOGRAPHER:  Now off the
16      record at 3:13 p.m.
17          (Recess taken from 3:13 p.m. to
18      3:15 p.m.)
19          THE VIDEOGRAPHER:  Now back on
20      the record at 3:15 p.m.
21          MR. WALSH:  Mr. Li, I don't have
22      any further questions at this time.
23          MR. KOH:  I have no questions.
24      This deposition is concluded.
25          MR. WALSH:  Thank you for your
```

**Page 202**

                              LI

1

2       time today, Mr. Li.

3              THE WITNESS:  Thank you.

4              MR. KOH:  Thank you, Tom.

5              THE VIDEOGRAPHER:  Now going off

6       the record at approximately 3:15 p.m.

7              (Time noted:  3:15 p.m.)

8

9    _____

10   TOM LI

11

12   Subscribed and sworn to before me

13   this ___ day of _____, 20___.

14

15   _____

16   Notary Public

17

18

19

20

21

22

23

24

25

Page 203

1

2                    C E R T I F I C A T E

3      STATE OF NEW YORK      )

4                            : ss.

5      COUNTY OF NASSAU       )

6

7           I, CATHI IRISH, a Registered

8      Professional Reporter, Certified Realtime

9      Reporter, and Notary Public within and for

10     the State of New York, do hereby certify:

11          That TOM LI, the witness whose

12     deposition is hereinbefore set forth, was

13     duly sworn by me and that such deposition

14     is a true record of the testimony given by

15     the witness.

16          I further certify that I am not

17     related to any of the parties to this

18     action by blood or marriage, and that I am

19     in no way interested in the outcome of

20     this matter.

21          IN WITNESS WHEREOF, I have hereunto

22     set my hand this 1st day of September,

23     2021.

24

                    _____

25                  CATHI IRISH, RPR, CRR, CLVS

```
 1
 2    --------------- I N D E X ---------------
 3    WITNESS                EXAMINATION BY      PAGE
 4    TOM LI                 MR. WALSH           5
 5
 6
 7    --------------- EXHIBITS ---------------
 8    EXHIBIT NUMBER      DESCRIPTION         PAGE
 9    Exhibit P41, document Bates labeled   23
10    VA 033610
11    Exhibit P42, document Bates labeled   36
12    VA 027098
13    Exhibit P43, document Bates labeled   46
14    VA 017719
15    Exhibit P44, document Bates labeled   62
16    VA 018774
17    Exhibit P45, document Bates labeled   66
18    VA 026381
19    Exhibit P46, document Bates labeled   97
20    VA 027486
21    Exhibit P47, document Bates labeled   108
22    VA 049246
23    Exhibit P48, document Bates labeled   111
24    VA 023820
25
```

Page 205

1

2    Exhibit P49, document Bates labeled    113

3    VA 028037

4    Exhibit P50, document Bates labeled    115

5    VA 044862

6    Exhibit P51, document Bates labeled    120

7    VA 011088

8    Exhibit P52, document Bates labeled    122

9    VA 027972

10   Exhibit P53, document Bates labeled    123

11   VA 028067

12   Exhibit P54, document Bates labeled    125

13   VA 028077

14   Exhibit P55, document Bates labeled    131

15   VA 027997

16   Exhibit P56, document Bates labeled    133

17   VA 027814

18   Exhibit P57, document Bates labeled    134

19   VA 027838

20   Exhibit P58, document Bates labeled    140

21   VA 027808

22   Exhibit P59, document Bates labeled    155

23   VA 027513

24   Exhibit P60, document Bates labeled    160

25   VA 027432

1

2    Exhibit P61, document Bates labeled    169

3    VA 026610

4    Exhibit P62, document Bates labeled    180

5    VA 019581

6    Exhibit P63, document Bates labeled    183

7    VA 028154

8    Exhibit P64, document Bates labeled    194

9    VA 027625

10   Exhibit P65, document Bates labeled    199

11   VA 028018

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 207

1          ** ERRATA SHEET **

2     CASE: MCDONALD'S vs. VANDERBILT

      DEPOSITION DATE: 8/31/2021

3     DEPONENT: TOM LI

4     PAGE LINE(S)   CHANGE              REASON

5     _____|_____|_____|_____

6     _____|_____|_____|_____

7     _____|_____|_____|_____

8     _____|_____|_____|_____

9     _____|_____|_____|_____

10    _____|_____|_____|_____

11    _____|_____|_____|_____

12    _____|_____|_____|_____

13    _____|_____|_____|_____

14    _____|_____|_____|_____

15    _____|_____|_____|_____

16    _____|_____|_____|_____

17    _____|_____|_____|_____

18    _____|_____|_____|_____

19    _____|_____|_____|_____

20

21                    _____

                      TOM LI

22

      SUBSCRIBED AND SWORN TO BEFORE ME

23    THIS _____ DAY OF _____, 20___.

24

      _____    _____

25    (NOTARY PUBLIC)          MY COMMISSION EXPIRES:

**[& - 2018]**                                                                 Page 1

| **&** |
|---|
| **&**   3:12 63:3,18 65:13 68:22 69:8 69:19 |

| **0** |
|---|
| **0033610**   24:6 |
| **010453**   51:2 |
| **011088**   120:11,13 205:7 |
| **011956**   130:14 |
| **017719**   45:18 46:4 204:14 |
| **017729**   46:9 |
| **018774**   62:20,22 204:16 |
| **019581**   180:12,16 206:5 |
| **019583**   180:21 |
| **022633**   85:23 |
| **023820**   111:7,11 204:24 |
| **026381**   66:8,11 204:18 |
| **026610**   169:20,22 206:3 |
| **026709**   170:5 |
| **027098**   36:24 37:2 37:8 204:12 |
| **027100**   38:8 |
| **027124**   37:9 |
| **027432**   160:6,8 205:25 |
| **027486**   97:9,12,20 204:20 |
| **027513**   155:18,20 205:23 |
| **027625**   194:4,6 206:9 |
| **027630**   194:12 |

**027808**   140:4,6 205:21
**027813**   140:12
**027814**   133:14,16 205:17
**027838**   134:14,16 205:19
**027847**   135:9
**027958**   134:19
**027972**   122:4,6 205:9
**027997**   131:5,7 205:15
**028000**   131:10
**028018**   199:3,5 206:11
**028023**   199:11
**028037**   113:2,7 205:3
**028067**   123:19,21 205:11
**028077**   125:15,17 205:13
**028154**   183:22,24 184:12 206:7
**033610**   23:24 24:2 24:12 204:10
**044862**   115:15,17 205:5
**044886**   117:6
**044891**   115:23
**049132**   49:22
**049246**   108:4,6 204:22
**06471**   1:7 4:14
**080**   127:10
**09**   101:5 103:25
**0s**   99:18

| **1** |
|---|
| **1**   4:6 52:18,22 101:9 102:11,19 136:15 137:6,10 |
| **1.principal**   126:6 |
| **10**   74:7 131:18 |
| **100**   20:22 181:19 182:3,12 |
| **10017**   3:16 |
| **102**   38:24 |
| **10577**   3:8 |
| **106**   38:12 |
| **108**   40:7 204:21 |
| **10:02**   2:9 4:4 |
| **10th**   133:2 |
| **111**   204:23 |
| **113**   205:2 |
| **115**   205:4 |
| **11:28**   71:23,24 |
| **11:36**   71:25 72:5 |
| **12**   37:12 115:21 129:5 |
| **120**   205:6 |
| **122**   205:8 |
| **123**   205:10 |
| **125**   3:14 205:12 |
| **13**   45:21 48:19 109:9 |
| **131**   205:14 |
| **133**   49:22 205:16 |
| **134**   205:18 |
| **14**   120:22 |
| **140**   205:20 |
| **15**   74:8 130:3 167:23 185:7 186:7 |
| **155**   205:22 |
| **16**   134:2 170:15 |
| **160**   205:24 |
| **169**   206:2 |

**17**   117:15 122:12 122:18 135:3 147:13
**18**   55:23 56:24 57:2 65:3 119:20 171:20
**18-109**   63:5
**180**   206:4
**180313**   46:10
**183**   206:6
**18779**   62:25
**19**   124:18 126:23 173:17
**194**   206:8
**199**   206:10
**1:01**   138:16,17
**1:19**   1:7 4:14
**1:36**   139:3,9
**1a**   118:6
**1m**   185:4
**1st**   203:22

| **2** |
|---|
| **2**   72:3 89:4 102:21 103:24,25 104:6 |
| **20**   20:23 71:15 136:5 181:21 185:7 186:7 202:13 207:23 |
| **2009**   10:14 |
| **2017**   12:16 22:11 23:21 24:20 28:22 28:25 29:8 31:24 38:9,15,16,20,21 39:2 44:5,11 45:21 72:10 142:7 187:5 |
| **2018**   37:13 38:3,6 40:8 41:4,24 42:6 48:5,19 50:11 51:8,15,17 63:25 74:7 77:25 80:5,7 |

81:10 82:10 85:13
86:5 87:13 88:22
89:4 95:9,10,13
97:17 99:8 111:16
115:21 117:15,20
118:22 120:4,22
122:12,19 123:7
123:16 124:18
129:5 135:11,19
141:3 147:19
148:2
**2019**   66:24 67:6
78:18 80:5,7
130:3,13,15
131:16,18,22
134:2 135:3,25
140:14,21 141:10
143:14,24 146:18
147:13,22 148:2,5
148:17 156:7
157:2 160:18,19
161:4 162:7
166:25 167:16,23
170:15 171:13
172:23 173:2,7,17
180:14 181:16
184:6,7 191:24
193:22,24 199:15
**2021**   1:15 2:8 4:5
35:8 55:11,13
58:2 203:23
**2022**   64:24 65:6,16
65:22 66:2,5 68:4
68:6 70:8
**2023**   67:22 68:4,6
68:23 69:5 70:8
171:18 172:2,9,13
172:17
**2024**   173:3
**2039**   25:21 60:12
60:19 77:21 84:22

120:6 128:4
**204**   3:7
**21**   199:15
**22**   24:20 51:15,16
65:4 140:14
171:20
**23**   204:9
**24**   184:6,6
**25**   67:6 95:19
136:17 156:7,25
160:18
**256**   81:25
**26**   66:23 143:14
146:17
**266**   7:18 11:11
**27**   88:21
**28**   160:19 161:4
**29**   51:8
**29-26**   14:13
**2900**   3:6
**2:26**   175:5,6
**2:30**   175:7,10
**2:52**   191:17,18

## 3

**3**   88:20 191:13
**30**   50:10 99:8
135:11,18 142:7
147:12
**307,273**   119:22
**31**   1:15 2:8 4:4
**316**   55:23
**3500**   133:6
**36**   204:11
**383**   66:9
**3:02**   191:19,22
**3:13**   201:16,17
**3:15**   201:18,20
202:6,7

## 4

**4**   35:8 55:11,13
58:2 119:11 139:7
152:21 154:11
**4.5**   151:12
**4/30/2018**   49:25
**454**   52:8
**455**   51:2
**46**   204:13
**464**   146:18,20
**465**   148:23 149:10
149:11
**466**   149:4,11,22
**468**   148:20 152:21
**474**   151:2
**487**   97:10

## 5

**5**   64:21 175:10
204:4
**5.0**   151:12
**5027**   203:24
**512**   92:16
**547**   37:20 126:7
**550**   182:2
**581**   89:12
**582**   181:12
**583**   88:20

## 6

**6.0**   151:7
**62**   204:15
**644**   24:13
**66**   204:17

## 7

**7**   86:5 95:9
**70**   30:16
**720**   49:5,10
**75**   181:20
**778**   64:18
**7th**   3:15 86:4

## 8

**8**   35:9 49:23 97:17
99:19 130:13,15
135:25 162:7
171:15
**8,000**   58:23
**8/31/2021**   207:2
**828**   111:8
**840**   14:3 17:6,10
17:20 20:24 22:3
22:20 31:19,20
34:9 35:6 37:19
41:11 42:15 46:10
48:25 50:19 54:9
54:23 55:2 63:4
64:14 86:8,13
98:10 116:8,22
118:4 122:20
126:6 147:7
161:13,15 163:8
170:7,13,16
195:23,24 199:17
**886**   117:9
**891**   119:10

## 9

**9**   95:10,13 131:22
181:16
**90**   181:19 182:12
**92**   162:16
**936**   165:18
**97**   204:19
**975,000**   74:22
75:13 76:6,20
**99**   23:10 30:7
54:22 95:18,24
186:17,22 187:4,7
**990**   164:12,19
**9th**   111:20

| a | | | |
|---|---|---|---|

**a.m.**  2:9 4:4 71:23
71:24,25 72:5
**able**  24:15 60:19
79:11 170:8 182:3
189:21
**abstract**  111:24
112:22 113:25
114:4
**acceptable**  71:17
**access**  126:9,19
154:17 184:23
185:24
**accommodation**
59:17
**accurate**  7:11 21:3
21:10,11,18 53:15
58:11 89:8,23
106:16,19 194:2
197:5,8,10,16
198:3,8,10
**accurately**  110:25
**achieve**  47:22
**acquired**  44:4,10
54:22
**acquiring**  190:11
**acquisition**  23:10
**acquisitions**  18:7
**action**  23:8 203:18
**actively**  192:12
**activities**  19:4,6
**actual**  25:14 88:15
**add**  34:4,7
**addendum**  79:14
79:20 146:11
157:4 192:4
**addition**  13:12
82:19
**additional**  10:17
17:15 54:12 144:5
145:7,19,22 148:8

153:7 160:25
**additionally**  165:4
**address**  14:13
22:25 148:7
**addressed**  135:12
141:15 146:22,25
163:8,10 169:4
**addressee**  131:24
132:3
**adequate**  165:5
**admin**  109:19
**administrative**
109:12 110:21
187:13 197:11
**advance**  116:20
**advisement**  138:3
**advisors**  112:6
140:13 147:7
**advisory**  15:19
16:18
**affirmatively**
115:9
**agenda**  124:13,15
**aggregating**  136:5
**ago**  11:9 12:22
19:21,25 73:9,10
**agree**  36:16 48:4,7
68:21 138:5
150:10,15 178:12
178:17,22 179:5
179:13,20 190:16
190:22,25 195:9
200:24
**agreement**  59:4
78:23 79:11
**agreements**  53:19
**ahead**  6:22 12:4
17:16 29:12 32:8
33:16 42:4,19
43:15 47:12 50:21
53:10 54:4 59:21

65:17 69:2 70:10
74:23 75:14,20
77:3,8 78:25 79:5
79:17 80:25 81:19
82:11 84:5 91:20
92:6 93:18 94:3
102:6 106:18
121:20 145:15
147:14 167:2
172:20 193:14
**aim**  33:18
**allow**  55:22 60:5
178:23
**amount**  16:7,8,9
16:12 30:13,25
31:6 65:7 188:19
**amounts**  155:12
**analysis**  62:17
82:19,20,25 83:4
83:11,12 92:21
153:3 165:6
167:19 171:15
177:17 191:4
**analyzed**  165:9
**analyzes**  45:4
**anecdotal**  151:16
151:21 152:2,6
**answer**  6:3,10,22
6:23 7:3 12:5
17:17 142:23
197:14
**answers**  7:12
**anticipated**  95:16
96:9 164:14
171:16,19
**anybody**  69:4
72:25 73:15 110:5
163:14
**apologize**  147:23
**appeals**  165:18

**appearances**  4:23
**appearing**  2:13
**appears**  37:9 50:8
51:9 52:12,25
66:19 139:25
141:7 157:13
161:3 170:5
**applicant**  118:7,8
118:13 121:9,22
**applicant's**  127:23
**application**  34:23
35:16 48:9 55:7
116:7,9,13,16,21
116:21 121:7,14
121:19 126:8
**appoint**  79:21
**appointment**
160:14
**appraisal**  9:14
81:15 83:18,23
84:4,19 86:12
98:10 99:8 100:2
100:12,18 103:7
103:13,15,18
104:10 105:17
106:24 107:19
112:9 130:9
132:16 135:4
136:7 141:3 142:9
142:20 143:21
144:24 145:17
146:17,21 147:5
147:11 148:6
149:2 152:24
168:17,20,21
176:13,15,20
178:13,18 179:21
**appraisals**  107:22
**appraise**  82:4
107:11 146:12

[appraised - ave]                                                                     Page 4

appraised   100:22
appraiser   75:8
  79:22 80:2,10,23
  98:23 192:2,4,6,9
  192:14,17,21
  193:3 195:4
appraiser's   193:3
  193:11
appraisers   79:25
  80:12,16,21 81:4
  163:7 169:6 174:2
  183:9,11 192:13
appreciation
  190:14
apprised   73:16
approach   106:23
  164:15,17,25
  165:6 169:11
approached   28:17
  28:18
appropriate
  117:12 119:2,5,6
approval   65:4
  110:4,15,18
  151:16,21,22,24
  152:2,3,5,6
approved   56:16
  59:19 150:4 153:3
approximately   4:3
  15:4 65:3 71:22
  72:5 119:22
  137:10 139:8
  175:5,10 191:16
  191:22 202:6
april   25:21 50:10
  78:17 84:22
  135:25 166:25
  167:15,16,23
  173:2,3
architect   44:14
  124:25

architects   19:11
architecture   44:17
  44:20 45:19 51:10
area   31:13,17,18
  31:20 32:17,21
  33:7,14,23 41:7
  119:12,23 127:18
arriving   75:17
  76:13
aside   167:13
asked   20:5 59:16
  60:4 82:3 92:12
  96:7 102:5 109:9
  112:18 114:12,19
  114:20 122:19
  123:11,12 129:14
  129:17 162:25
  166:24
asking   36:20 60:7
  92:8 93:2 96:4,12
  96:13 105:14
  114:22,24 148:13
  195:11 196:7,20
  196:23
assessment   70:24
  71:6 170:6,23
asset   92:19
assignment   90:8
  91:5
assist   92:18
  107:15
associates   20:10
  20:16 21:24 30:8
  30:14 63:3,18
  65:13 68:23 69:8
  69:19 73:16 104:3
  104:23 105:18
  106:7 170:24
  171:6,24 188:16
assume   6:11
  104:18,21

assumes   104:10
assuming   161:14
  190:8
assumption
  102:13,24 103:7
  103:11,16,21
  132:13
assumptions   64:16
  76:12 101:6,8
  102:20 104:2
  149:7,14,20
atlantic   1:7 4:10
  14:3 17:6,10,20
  18:10,12 20:24
  22:3,20 31:19
  34:9 35:6 37:19
  37:19 41:11 42:15
  46:10 48:25 49:6
  49:10,15 50:19
  52:10 54:7,9,23
  55:2 56:19 63:4
  64:14 86:8,13
  88:25 92:18 98:10
  104:4,23 105:5,8
  106:8 109:13,20
  116:8,22 118:4
  119:15 122:20
  126:6,7 140:17
  146:23 147:7
  161:13,15 162:19
  163:3,8 170:7,13
  170:17 195:23,24
  197:23 199:17
attached   42:2 46:8
  46:21 48:24 51:13
  116:6 143:20
  182:15
attaching   157:3
attachment   24:14
  45:22 46:7,10,20
  48:13 51:9 157:6

attachments   46:23
  63:6 67:19 115:22
  116:8
attempt   169:15
attend   160:23
  161:3
attendance   35:23
attended   35:21
  50:9,15,20 125:2
  161:6
attendee   124:23
attending   50:17
attention   146:24
  147:2
attorney   5:15 6:20
  34:19 53:3 55:12
  139:14 156:8
  158:6 163:15
attorneys   3:5,13
  19:11 53:6 109:8
audition   99:2
auditioning   98:22
august   1:15 2:8
  4:4 95:10,13
  97:17 99:8 109:9
  111:16,20 135:11
  135:18 141:3
  147:12,19,25
author   171:4
authored   184:24
authority   158:9
  159:15
available   66:17
  90:9 102:15
  111:18 115:3
  132:10 134:24
  142:12
ave   37:19,20 46:11
  49:6,10 98:10
  126:7,8 161:13
  170:17 199:17

**avenue**   3:6,14 14:3
  17:6,10 22:3,20
  31:19 34:10 35:6
  41:11 42:15 50:19
  54:7,9,24 55:2
  63:4 64:14 86:8
  116:8,22 118:4
  119:15,16 147:7
  161:15 163:8
  165:19 166:11,12
  166:25 167:10,14
  170:7,13
**avenues**   47:22
**aware**   31:10 37:25
  42:14 44:7 50:18
  60:14 61:25 65:25
  66:5 73:18 129:11
  153:23 166:23
  172:8,12,15
  187:21 189:12,13
  191:4,5 193:9
  196:10,13,25
  197:3

**b**

**back**   23:6 72:4
  81:13 123:2 137:9
  139:8 175:9,12
  181:24 188:22
  191:13,21 201:12
  201:19
**bandwidth**   8:16
**baron**   15:2,3,5
**based**   45:8,10 48:3
  61:6 82:16,18
  102:13,23 131:23
  134:5 164:14
  178:25
**basis**   15:13
**bates**   23:25 24:12
  36:25 46:3 50:25
  62:21 66:10 97:11

108:5 111:10
  113:6 115:16
  120:10,12 122:5
  123:20 125:16
  131:6 133:15
  134:15 140:5
  155:19 160:7
  169:21 180:15
  183:23 194:5
  199:4 204:9,11,13
  204:15,17,19,21
  204:23 205:2,4,6,8
  205:10,12,14,16
  205:18,20,22,24
  206:2,4,6,8,10
**bbg**   80:19,21
  81:10,14,18 82:3
  83:10,14,17 84:18
  84:20 130:18
  144:10
**beckerman**   108:12
  108:24,25 118:25
  120:24
**began**   28:20 80:6
**beginning**   72:3
  139:7 175:10
**behalf**   109:15,24
  110:16 158:9
  159:15
**believe**   18:22
  21:11 28:10,11
  30:23 33:2 35:23
  42:12 44:6,23
  45:10 47:3 50:7
  53:20 54:11 57:2
  62:11,16 64:8,15
  72:21 75:4 76:9
  83:19 86:18 87:11
  87:17 91:3,10
  97:19 99:17
  104:22 105:20

106:3,4,6,15
  110:24 125:4
  126:13,20 137:16
  137:17,19 139:22
  141:6 158:16
  172:17 173:24,25
  184:22 185:16
  192:10 201:10,12
**believed**   78:11,15
  87:19 89:7 105:24
  176:19 185:22
**benefit**   185:6,11
  185:18 186:16,21
**benjamin**   34:16
  34:18,19
**best**   102:16 132:11
  142:13 153:2
  198:8
**beyond**   10:18
  197:22
**big**   32:21
**bigger**   56:23
**billed**   161:2
**bit**   12:2
**block**   32:17
**blood**   203:18
**board**   31:13 32:11
  35:3,9,14,25 43:18
  49:23 58:3 60:3
  128:11
**borough**   117:12
**bottom**   49:5,10
  86:19 87:4 95:14
  96:8 99:21 100:11
  102:10,19 108:19
  119:10 122:17
  127:13 135:20
  141:24 148:8,25
  149:11,22 164:11
  171:15 194:16

**boulevard**   14:14
**bov**   95:25
**box**   117:13
**break**   6:23 7:3
  71:17 136:19
  139:12 140:24
  174:25 191:7,11
**brendan**   3:9 5:15
**brief**   110:7
**briefly**   8:22 9:14
  10:5
**bring**   167:21
**broadway**   7:18
  11:11
**broker**   11:5,6
  95:17
**brokers**   183:9,11
**brooklyn**   1:14
  7:18 11:12 14:4
  17:6,10 22:4
  32:18 57:15
  128:10
**brought**   128:5,8
  166:9
**build**   64:12,21,22
  65:6,22 67:21
  68:3,14 70:16
  171:16
**building**   44:21
  55:23 56:7,14,15
  56:22,23,24 57:4,7
  57:21 60:11,18
  119:21
**built**   57:5,9 58:10
  58:17 60:8,12,19
**bullet**   90:5,10
**business**   13:22
**busy**   78:9

| c | | | |
|---|---|---|---|
| **c**  3:2 41:12,14,16<br>  195:5 203:2,2<br>**calendar**  160:16<br>**call**  18:11 96:3,16<br>  114:3 123:3<br>  139:19,21 147:4<br>**called**  5:4 14:25<br>  20:24 44:16,24<br>  46:10 48:20 57:14<br>  57:18 63:17 80:19<br>  96:18 135:4 138:5<br>  170:13<br>**calling**  123:2<br>**calls**  85:18<br>**camera**  8:5<br>**capacity**  109:14<br>  109:23<br>**captures**  110:25<br>**care**  77:6,10<br>**carol**  77:24 78:3,9<br>  78:15 173:24<br>  177:22 178:2<br>**case**  4:13 61:15,20<br>  62:4,9 64:2 66:20<br>  67:14 70:12,19<br>  165:22,25 166:5<br>  166:12,12,20,25<br>  167:10,14 186:5<br>  207:2<br>**cash**  190:15<br>**cathi**  1:20 2:14<br>  4:19 203:7,25<br>**cc**  86:6 154:19<br>**cc'd**  122:21<br>**certain**  16:7 64:16<br>  92:19 159:10<br>**certainly**  138:4<br>**certification**  62:7<br>**certifications**<br>  10:23 | **certified**  2:15<br>  203:8<br>**certify**  203:10,16<br>**certifying**  55:12<br>**chain**  51:7 81:9<br>  95:7,10 108:9<br>  111:7 113:3<br>  120:16 131:10<br>  133:22 180:12<br>  182:18 194:11<br>  199:10<br>**chains**  70:2<br>**chance**  143:17<br>**change**  44:2 68:8<br>  70:8 131:24<br>  135:14 207:4<br>**changed**  39:19,23<br>  39:25 44:4 58:22<br>  68:6 70:6 132:3<br>  193:10,16<br>**changes**  34:2,3<br>  55:22 135:19<br>  147:20 148:12<br>**characterization**<br>  186:25<br>**characterized**<br>  9:20<br>**characterizing**<br>  150:23<br>**chart**  20:6,12<br>**check**  98:9 194:21<br>  195:9,13 196:7<br>  197:10 198:12<br>**checked**  117:13<br>**checking**  196:2<br>**checks**  19:7,9<br>**chief**  109:12,19<br>  110:20 187:12<br>  197:11<br>**christina**  63:2,12 | **circulated**  48:19<br>  61:12 64:2<br>**city**  14:12 26:23<br>  31:14 32:4,10<br>  51:14 62:2 70:18<br>  116:12,25 124:6,7<br>  124:17 170:21<br>**clarifications**<br>  144:5<br>**client**  99:25 104:8<br>**close**  191:8<br>**closed**  7:23,24<br>  8:12<br>**closer**  151:12<br>**clvs**  1:20 203:25<br>**collect**  189:9<br>**college**  10:7,8,18<br>**color**  39:12 41:21<br>**colored**  39:13<br>**come**  12:17 15:9<br>  75:12 78:21 79:9<br>  183:5 191:12<br>  201:12<br>**comes**  13:20 23:6<br>  26:24 72:15<br>  188:21<br>**comment**  36:8<br>**comments**  9:21<br>**commercial**  33:11<br>  34:7 41:15,18<br>  42:2 43:8,13,22<br>  55:24 119:21<br>**commission**<br>  207:25<br>**committee**  49:23<br>**communicate**  8:14<br>  77:16<br>**communicated**<br>  78:5<br>**communicating**<br>  69:25 | **communication**<br>  85:18 122:21<br>**communications**<br>  44:8<br>**community**  31:13<br>  32:5,11 33:24<br>  35:2,8,14 43:18<br>  49:22 55:24 57:22<br>  58:3,20 60:3<br>  128:11<br>**comp**  134:6<br>**companies**  80:19<br>**company**  11:13<br>  14:25 72:15 80:18<br>**comparable**  82:18<br>  83:10 107:16<br>  165:7,10,13<br>  169:16 177:19<br>  181:18<br>**comparison**<br>  106:23 164:17,24<br>  165:6 169:11<br>**compensated**  16:3<br>**compensation**<br>  15:8,11,21,23 16:6<br>  16:15 17:8,15<br>**complete**  7:11<br>  129:16 197:15,15<br>  198:2,8<br>**completed**  65:16<br>  66:4 68:24 130:4<br>  171:17 172:19<br>**completion**  65:5<br>  98:11 172:3,9,14<br>**comprehensive**<br>  147:5<br>**comprised**  127:14<br>  127:22<br>**comps**  180:23<br>  181:3,6,9 182:8,12<br>  183:2,3 |

computer   126:16
concern   196:15
  200:5
concerned   176:14
concerns   176:13
  177:16
concierge   3:22
  4:19 24:4,7 37:4
  45:24 50:2 51:3
  66:13 74:8 85:24
  88:6 95:4 97:25
  99:9 108:15
  111:13 113:9
  115:24 120:18
  122:13 123:23
  125:19 129:21
  131:11 133:18
  134:20 140:8
  155:22 160:10
  162:9 167:24
  168:3,7,12 169:24
  174:10 180:18
  184:10,13 194:8
  199:7
concluded   181:21
  182:13 201:24
conclusion   78:22
  79:10 150:11
  152:8,15,16 154:8
  154:9,10,13
conclusions
  102:12,22 154:13
concur   151:3,6
condition   99:24
  100:4,15,23 101:3
conditions   99:22
  149:3,6,13,19
conduct   8:17
conducted   149:24
conferencing   4:16

confidence   144:6
confirm   182:4
confirming   21:20
conflict   194:21
  195:9,13 197:10
  198:12
confusing   91:8
confusion   38:17
conjunction
  152:25
connection   34:22
  48:8
consider   75:18
  153:3 176:6,8
consideration
  21:22 30:13,20
  65:7 151:12
considered   41:8
  75:22,23 76:2
  99:3 132:15 136:6
  167:18 179:6,10
  179:12,14 182:22
considering   80:22
  81:3 178:14,19
  179:22
consisted   33:4
consistent   45:13
  45:13
consists   122:8
constructed   65:3
construction
  55:22 71:4,8,10,11
  171:20
consult   158:23
  183:8
consultant   62:11
  63:13,15 171:9
consultants   62:16
  63:21
consulting   158:11
  183:10

contact   19:13
  118:8,14 119:2
  156:10 157:10
contained   102:12
  102:22
containing   174:8
contains   119:13
  127:24
contemplated
  71:10
context   166:9
continuation
  113:3 120:15
  133:22
continue   184:9
continued   101:12
  139:10
continuing   108:20
  171:12
contract   52:24
  53:9,14 108:25
  109:14
contractor   11:20
contracts   109:24
  110:4,8,15
control   53:23,25
  54:15 55:4
controlled   53:21
controls   47:8,16
  54:5,13
conversation
  110:7,10 123:15
  131:23
conversations
  31:4 32:13 42:25
  171:24
conveyance   30:13
conveyed   87:10
  89:25
convicted   201:7

copied   51:20
  70:25 115:22
  131:21 181:17
  182:16 192:11
copies   90:10
  101:23
copy   83:15 90:15
  90:20 91:2,13,17
  92:2 97:16 101:13
  101:14,18 102:4
  111:22,23 120:24
  133:25 135:5
  154:14 157:3
  181:15
corner   54:6
corporate   165:19
corporation   1:5
  4:9 5:17
correct   39:11 41:6
  55:15 59:8 80:10
  83:18 89:19 91:11
  91:19 92:5 97:23
  99:16 103:14
  105:20,21 129:7
  186:14,25 189:20
correctly   144:7
county   203:5
couple   19:21,25
  165:3
course   159:20
courses   10:20
court   1:2 4:12,18
  4:25 5:20,21,25
  6:4,5,17 10:2
  136:25 165:18
cover   62:12
  143:12 162:6
create   185:5,11,18
created   25:2 67:6
  83:25 104:11
  170:15 184:5

**creating** 31:16
**creative** 57:12,15
  57:16,19 58:7,17
  58:25 59:4,6,8
  60:2,5,11,18,25
  137:17
**credibility** 144:6
**credible** 144:4
**crime** 201:8
**cross** 89:18,20
**crossed** 68:20
**crown** 31:8,10,23
  32:6,16,18,20,24
  33:3,13 34:11
  36:3,6 37:11,21
  38:14 45:14 49:23
  50:10 100:7,9,16
  128:12 129:4
  134:6 150:2,20
**crr** 1:20 203:25
**current** 15:15
  16:14 45:8 46:21
  70:14 76:2,7
  145:7,18 151:14
  179:22 188:12
  193:25
**currently** 11:10,11
  11:23 39:21 52:24
  53:9 119:12
  135:24 188:23
  189:5,11
**cursory** 149:24
**custodian** 37:16
  67:4 126:4 170:12
  175:14 184:5
**cut** 19:7 26:3
**cutting** 19:8
**cv** 1:7 4:14

**d**

**d** 204:2
**dance** 57:15
**dark** 40:16,18,19
**data** 144:5 145:8
  145:20,23 164:15
**date** 4:4 35:12,19
  66:3,23 70:5,8
  100:18 117:14
  130:15 135:25
  145:7,18 150:6,7
  151:14 171:16
  172:3,10,11,14,18
  173:12,20 207:2
**dated** 74:7 88:21
  115:21 130:12
  140:14 142:7
  143:14 146:17
  156:7,25 199:15
**dates** 148:3
**david** 143:12,14
  144:18,21 145:13
  146:5,15
**day** 17:23,23 19:3
  19:3,5,5 109:18
  197:13,13 202:13
  203:22 207:23
**dcp** 37:12 38:16
  38:20,21 40:7
  41:24 42:6,8,21
  43:2,5,6,12,17,20
  43:24 44:9 51:24
  52:18 62:10
  117:20 120:4
  125:23 126:8,24
  127:5,7 128:10
  129:4,14
**dcp's** 38:14 42:16
  42:22 45:14
**dealing** 69:7,18

**decide** 76:24 182:7
**decided** 12:22
  83:9 183:2
**decision** 145:2
  148:15 159:4
  165:18 182:10
**decisions** 92:20
  158:9,15,19,24
  159:14 197:14
**deed** 60:4
**deemed** 144:3
**defendant** 1:8
  3:13
**definition** 116:16
**degree** 10:15
**degrees** 10:7
**deleted** 98:3
**delivery** 133:6
**demarco** 77:24
  78:3 173:24 178:2
**demolition** 153:6
**density** 41:12,16
**department** 32:4
  51:14 62:2 70:18
  124:6,17 165:20
**depend** 17:8
**dependent** 187:8
**depending** 144:25
**depends** 34:13
  36:18 92:9 158:14
  158:18
**deponent** 207:3
**deposed** 9:23
  19:23 20:2
**deposition** 1:12
  2:11 4:7,15,24
  7:15 8:11,17,20
  9:7,18 18:13 30:5
  137:13 156:22
  162:6 201:24
  203:12,13 207:2

**describe** 7:25 14:2
  15:16 16:14,16
  22:23 45:2
**described** 79:14
  100:17 118:17
**describes** 40:4
  119:19 149:6
**description** 36:4
  38:13 56:4 119:11
  204:8
**design** 58:8
**desk** 147:5
**desktop** 170:16
**detailed** 160:24
  165:4
**details** 28:19
  113:17
**determination**
  90:2
**determine** 74:21
  193:5,12
**determined** 16:9
  31:2,6 65:6
  110:19,23 187:11
**determining** 30:20
**developed** 59:13
  104:12
**developers** 62:3
**development** 14:7
  14:10,17,20 15:2
  61:15,20 62:4,5,9
  64:3,13 65:2,8
  66:21 67:14 70:20
  102:16 119:13,20
  127:13,17,19,21
  127:23 132:10
  142:13 165:20
**developments**
  33:11
**different** 13:24
  45:9 56:19 193:21

[different - e]                                                                                           Page 9

193:25 199:23,24
**direct** 103:10
**directed** 70:7
  103:6,10
**directly** 156:23
**director** 18:18
  57:17
**directs** 6:21
**disagree** 36:4,10
  36:16 151:8
  178:23 190:22
  191:2
**disagreement**
  177:7,9,11
**disclose** 62:3
**disclosed** 58:6
**discounting** 95:20
**discovery** 137:18
  138:6
**discretion** 159:19
**discretions** 159:24
**discuss** 51:25
  52:13 96:3,16,18
  107:2 124:20
  125:7 154:7
**discussed** 31:14
  52:5,20 59:7,9,10
  59:12 60:10,17
  65:22 66:2 107:7
  115:8 121:6
  125:13 127:4,6
  132:24 141:21
  146:4,7 157:24
  161:9
**discussing** 20:12
  20:13 58:25 86:11
  128:17 132:21
  144:18 149:18
  154:12 157:14
  161:22

**discussion** 9:20
  17:19 20:9 30:5
  37:12 65:19 73:12
  76:22 86:17 94:24
  96:24 112:24
  128:2 129:4 137:7
  144:20 150:23
  161:14 167:12
  177:3,5 195:3
**discussions** 9:17
  26:15 27:15,20
  28:21,24 29:4,8
  32:13 60:22 61:4
  61:6 64:12 73:3
  73:24 76:18 77:24
  78:7,11,15 84:15
  84:18 85:16 87:22
  88:3 94:20 107:11
  112:21 115:5
  121:12,16 139:13
  139:15 150:19
  152:14,18 154:23
  155:2 159:19,23
  160:2,4 161:17,24
  162:2 163:13,16
  166:4,7,19,22
  167:9,15,20 172:7
  180:6,10 192:19
  192:24 193:2,8
**disputing** 21:17
**district** 1:2,3 4:11
  4:12 32:6,16,25
  33:4 39:4
**division** 104:10
  117:12
**dli** 1:7 4:14
**document** 23:25
  24:11,16 36:25
  37:8,14,22 38:2
  46:3 49:21 50:6
  62:21 63:8 64:23

66:8,10,21 67:2,5
  67:8,21 68:11
  70:17 74:12 89:3
  89:7 97:9,10,11
  99:13,15 108:4,5
  111:10 113:6
  115:16 120:10,12
  122:5 123:20
  124:5,10 125:16
  126:4 127:9 128:3
  129:3 131:6
  133:15 134:15
  140:5 141:16
  143:10,17 154:24
  155:3,19 160:7
  169:21 170:10,18
  171:4,14 174:8,14
  174:16 175:13,15
  180:15 181:12
  183:23 184:3,17
  184:19,24 194:5
  195:2 199:4 204:9
  204:11,13,15,17
  204:19,21,23
  205:2,4,6,8,10,12
  205:14,16,18,20
  205:22,24 206:2,4
  206:6,8,10
**documents** 9:6,8
  9:10,16 137:23
**doing** 13:4 69:14
  84:11,13
**dollar** 30:12
**dollars** 185:4,10
  185:17
**door** 7:21,22,23
**draft** 60:24 63:5
  64:2,7,22 66:20
  67:13 68:2 70:6
  130:4,12,22
  137:14,14 138:2

141:7,14 163:17
  170:5,14,23
**drafted** 186:2,3
**drafting** 32:11
**drafts** 61:11
  163:21 164:3,5,6
**drive** 119:15
  127:25
**dropbox** 37:18
  126:6,9,14 184:8
  184:21 185:25
**duly** 5:5 203:13
**dushinsky** 29:10
  118:9,14,18
  195:25
**dwelling** 55:23

**e**

**e** 3:2,2 23:12 24:13
  24:18,18 27:5
  45:18 46:17 48:3
  48:24 51:6,7,7,13
  51:21 52:6 62:15
  63:2,24 67:18
  69:9,10,20,21 70:2
  70:2 71:2 78:3
  81:8,9 85:18,22
  86:4,5 95:7,9,10
  95:11,13,15 96:6
  97:15,15 98:8
  108:9,21 111:7,8
  111:21 112:7,12
  113:3,16,20,22
  114:25 115:2,19
  120:16,22 121:3
  122:9,10,18
  129:25 131:10,15
  131:15,18,19,20
  132:25 133:2,22
  133:24,24 139:2,2
  140:25,25 141:5,9
  141:21 143:12,14

143:19 156:4,6,6
156:23,23,25
157:7 158:20
159:12,13 162:6
170:16 180:12,22
180:23,25 181:14
181:17,25 182:15
182:23,23 184:7
192:6,10,12
194:11,17 195:5
195:11,15 199:10
199:14,21 203:2,2
204:2
**earlier** 26:3 55:7
69:11 101:17
113:21 118:17
128:17 141:9,22
184:20
**early** 35:17 77:25
133:5
**earn** 16:24 17:4
**eas.pdf.** 170:14
**easier** 18:14
**eastern** 1:3 4:12
**edge** 32:24 39:5
**edits** 68:10,13,18
**education** 10:6,18
**effect** 21:13
**effective** 100:17
150:6
**effort** 165:13
**eight** 15:4
**either** 19:17 65:12
85:17 111:23
144:10 145:2,4
147:12 152:2
157:23 158:11
171:25
**elected** 31:15
169:12

**encompasses**
111:4
**encumber** 90:11
**encumbered** 142:6
**encumbrance**
75:18 132:15
136:6 153:4
167:17 176:6
178:14,19 179:6
**ended** 178:9
**ends** 46:23 135:9
**engaged** 32:5
109:5,8 141:20
143:23
**engagement** 80:14
88:21 101:19
109:3 144:10,15
160:24 163:5
164:23
**enhancements**
144:4
**entail** 19:6
**enter** 109:14,24
110:3
**entered** 54:19,21
59:3
**entities** 11:24
15:12 105:3 142:8
194:20 195:8,12
195:20,21,22
196:4,10,16,22
197:6,17,21,22
198:2,4 199:16,20
200:6,18
**entitled** 24:14
37:11 40:7 45:22
49:22 159:11,13
184:3
**entity** 21:2,4,6,7
21:13,23 121:9
137:16

**entry** 160:16
**environmental**
63:16,21 70:23
71:6 170:6,23
171:8,12
**equivalent** 16:6
188:18 189:6
**errata** 207:1
**especially** 6:12
70:5
**esq** 3:9,17
**essentially** 135:18
188:20
**establishment**
119:14 127:25
**estate** 11:2,3,4,7
13:22 18:3,6
104:13 112:6
140:13 147:6
**estimate** 76:20
83:2 142:10 165:8
**eugene** 44:13
45:20
**evaluation** 73:20
**event** 44:21
**eventually** 178:12
178:17
**everybody** 71:18
136:20 137:2
**exact** 22:10 29:9
35:19 48:2 49:18
54:20 55:16 57:7
59:2 60:21 78:4
116:15 127:15
155:15 173:12
184:18
**exactly** 14:21
32:21 40:3 42:7
43:24 50:16 52:5
52:19 53:12 55:9
57:18 68:17 80:4

81:3 84:23 85:14
87:9 89:24 90:22
91:22 100:25
101:25 104:25
105:15 107:7
110:17,23 117:21
123:13 125:13
128:23 153:16
166:2,14 170:20
171:2 173:4
176:10 177:10
187:10 188:8
196:6
**examination** 5:8
139:10 204:3
**examined** 5:6
**example** 17:4
135:20 159:4,7
**exchange** 145:4
**exchanged** 60:25
69:10
**excludes** 199:19
**exclusive** 104:13
185:24
**exclusively** 126:15
126:16
**executed** 163:22
**exercise** 76:24
172:25
**exercised** 102:14
102:25 125:10
**exercises** 172:4
**exhibit** 8:7 23:25
24:8 36:25 37:5
46:3,8,9 49:20
50:3,25 62:21
66:10,14 76:10
95:5 97:11,18,23
108:5,13,16
111:10 113:6
115:16 120:12

122:5 123:20
125:16 128:19
131:6 133:15
134:15 140:5
155:19 160:7,11
162:10 168:13
169:21 170:19
174:11 180:15
183:23 194:5,9,13
199:4 204:8,9,11
204:13,15,17,19
204:21,23 205:2,4
205:6,8,10,12,14
205:16,18,20,22
205:24 206:2,4,6,8
206:10
**exhibits**  51:4
204:7
**existing**  40:4
**expected**  64:25
65:5 76:19 158:22
**expiration**  135:25
136:3
**expired**  78:17
**expires**  207:25
**expiring**  86:22
87:2,8,12,24 89:15
142:4
**explain**  10:6 13:3
27:9
**explanation**  13:6
**exposure**  89:10
**express**  196:14
**expressed**  196:19
200:5,10
**expressing**  200:8
**extend**  136:2
**extension**  114:6
173:12 177:24
**extent**  8:24 9:15
15:18 44:2 70:25

105:9 165:15
**extraordinary**
101:6,8 102:13,20
102:23 103:25
132:12 149:7,14
149:19

**f**

**f**  139:2 203:2
**facilities**  55:25
**facility**  57:22,24
58:20
**facts**  90:3
**failed**  176:5
**fair**  27:2,8,17,22
28:4 72:8,19 73:4
73:19,25 78:23
79:12 80:2 93:16
93:25 157:15,24
169:2 182:13
193:5,12
**fairly**  191:8
**familiar**  20:25
31:8 165:17 197:7
**far**  29:7 71:10
196:9
**fast**  119:14 127:24
**february**  37:12
40:7 41:3,23 42:6
66:23 128:13,21
129:5 130:2
143:14,23 146:17
156:7,25 160:18
160:19 161:4
**fee**  16:22 17:3 82:4
82:6,9 100:13
104:12 132:8
142:10 195:21
197:22
**feel**  8:15 36:21
**feels**  80:7

**feet**  58:23 119:22
**fein**  3:12
**felt**  145:23
**file**  25:2 38:4
46:21,22 70:17
84:2 91:23 126:5
165:5 170:12,16
184:7
**filed**  4:11 107:22
116:25 155:6
166:16,16
**filled**  119:6 170:25
**final**  23:13,18
130:21,24
**finance**  10:16
**financial**  89:10
**find**  48:24 92:24
182:25 183:12,20
**finding**  26:16
**fine**  136:21 138:11
**finish**  6:15
**finished**  10:10
**firm**  4:21 14:8,23
44:16 53:4 63:17
114:12
**first**  12:25 22:8
25:13 26:25 28:20
31:22 35:13,16,18
46:15,15 48:23,23
52:8 55:3,25
65:23 72:7 76:25
85:11 88:12 89:11
90:10 95:8,14
96:8 100:11
108:20 122:17
131:19 135:8,20
135:22 137:13
141:25 142:2
148:9,9 157:23
164:11 165:24
166:3 168:17

173:8 181:24
194:16
**five**  71:16 127:14
127:20,22 174:25
191:7
**fixed**  16:12
**flip**  38:8,23 67:20
117:5 119:9 127:8
135:8 171:14
181:11
**flipped**  25:17
**floor**  3:15 119:23
**floors**  55:25
**flow**  190:15
**flows**  17:24
**fmr**  181:21
**fmv**  74:22 80:23
83:6 98:24 143:4
158:10,24 159:21
161:20 164:14
165:8 168:18,23
**focus**  17:19,22
**folder**  24:9 37:18
50:3 83:25 84:9
85:25 88:7 95:5
99:10 126:10,14
129:22 162:10
168:4,13 174:11
185:25
**follow**  56:10 138:8
**following**  65:4
90:8 100:3 149:2
149:12,13
**follows**  5:7 139:5
149:4
**food**  119:14
127:24
**foot**  181:19 182:3
182:12
**form**  81:21 119:7
130:22,24 170:21

**formal**  10:21 35:14 79:4,13 116:20 151:15,21 152:2,4
**formally**  5:14
**format**  6:13
**formed**  12:9
**forth**  203:12
**forward**  98:11,15 127:4 134:3
**forwarded**  38:2,4 38:5 51:18 56:3 112:12 195:16
**forwarding**  24:20 24:22
**forwards**  195:14
**found**  20:7 180:24 181:4,7,9 183:4,17 183:19 185:5
**four**  54:12 131:9 181:17
**fourth**  127:8
**frame**  60:22
**framework**  31:11 31:16 38:14,16,18 38:21,22 39:3,9,24 40:4 41:8 128:13 128:16,22 129:6 129:12
**free**  123:3
**front**  8:2
**fronting**  119:15
**full**  134:5
**fully**  111:3
**further**  115:5 136:5 201:22 203:16
**furthermore** 142:5
**future**  16:2

**g**

**gained**  55:4
**gaines**  57:11,12,19 57:25 58:17
**gallagher**  3:21 4:18
**general**  116:18 144:3
**generalist**  13:17 72:14
**generally**  55:15 56:4 73:20
**generate**  190:9,12
**generating**  189:23
**gentlemen**  143:19
**gestures**  6:6
**getting**  28:2 191:8
**gibberish**  186:9
**give**  110:14 159:3 159:8,20
**given**  20:7 34:10 36:2,5,15 59:14 70:5 91:16 92:2 97:2,5 146:9 151:13 161:18 203:14
**giving**  7:11 69:22
**glanced**  9:15
**gmail.com**  88:13
**go**  6:22 12:4 17:16 18:19 29:12 32:8 33:16 42:4,19 43:15 47:10,12,18 50:21 53:10 54:4 59:21 65:17 69:2 70:10 74:23 75:14 75:20 77:3,8,15 78:12,16,25 79:5 79:16 80:25 81:19 82:11 84:5 91:20 92:6 93:18 94:3

102:6 106:18 121:20 137:5 138:13 145:15 147:14 167:2 172:20 193:14 194:25
**goal**  34:6
**going**  4:3 6:11 18:11 28:6 38:11 39:9 71:14,21 72:4 78:12,16,22 79:3,10,13 136:16 137:9 139:7 174:13 175:9 178:10 181:24 191:16,21 202:5
**good**  5:10,13 71:20
**google**  183:7,13
**governed**  87:15
**government**  30:21
**graduate**  10:13
**graduation**  15:6
**great**  8:10
**green**  68:15
**grid**  39:13
**ground**  23:11 30:7 30:14 44:10 53:13 54:17,18,23 82:20 83:2,5 95:17 96:10,21 104:8,11 104:14 106:8,12 142:6,7 144:8,13 145:5 152:25 153:5,11,12,18,24 165:7,10,14 169:16 187:4
**group**  11:15,17,18 11:24 12:3,3,11,14 12:18,20 13:2,3,4 13:10,14,19,21,25

15:9 22:13 23:17 23:20 32:2 69:9 72:11 118:7,12 133:3 195:25,25
**guess**  12:7 65:25 148:13

**h**

**h**  11:22 195:5
**habib**  63:3,18 65:13 68:22 69:5 69:8,19,24 170:24 171:5,24
**half**  12:15 57:17 136:24 138:12
**halfway**  64:20 164:21 185:2
**hand**  6:6 40:16 203:22
**handwriting**  67:7 67:8,10,11 174:19 174:22 175:25
**handwritten** 174:9
**happen**  189:25
**happened**  102:8 167:4
**happens**  17:9 190:2
**hard**  14:2 16:16
**hayden**  3:4 5:16
**head**  187:18,24 188:9
**headquarters**  58:9
**heard**  61:14,19,22 165:21,24 166:3,6
**hearing**  65:21 166:11,13
**heated**  177:2,5
**heights**  32:18,20
**held**  4:15 117:13

**hello** 116:6
**hereinbefore** 203:12
**hereunto** 203:21
**hi** 109:18 111:22 122:19 131:23
**high** 28:9 41:12,16
**higher** 45:11,12 176:15
**highest** 57:3 102:16 132:11 142:13 153:2
**highly** 150:5,12,20 150:24 151:15
**historically** 33:3
**history** 10:6
**hold** 10:22 200:21
**holding** 104:4
**holdings** 1:8 4:10 18:10,12 20:25 37:20 49:15 88:25 92:19 104:24 105:5,8 106:8 109:13 126:7 140:17 146:23 162:19 163:4 195:23 197:23
**holds** 20:23
**honest** 61:24
**hopes** 77:21
**hoping** 76:23
**horn** 61:16
**hour** 9:3 71:15 136:17,24 138:12
**hourly** 161:2
**hours** 96:2 195:17
**housing** 49:23
**howard** 3:17,24 8:21 9:9 137:12
**hum** 38:25 40:9 98:7 148:24

181:13
**hundred** 188:16 188:21
**hypothetical** 99:22,24 100:3,15 100:23 101:3 149:2,6,13,19

**i**

**idea** 175:23
**identical** 135:18
**identification** 24:3 37:3 46:5 62:23 66:12 97:13 108:7 111:12 113:8 115:18 120:14 122:7 123:22 125:18 131:8 133:17 134:17 140:7 155:21 160:9 169:23 180:17 183:25 194:7 199:6
**identified** 170:11 175:14 200:19
**identifies** 126:4
**identify** 12:7 165:13 169:16 192:2,8,13
**identifying** 107:16 192:16
**illustrate** 165:5
**image** 41:5
**imani** 45:19 46:18
**imc** 44:16,19 45:6 45:7,19 47:25 49:14 51:10,16 52:17
**imply** 53:18
**important** 6:13
**impression** 78:9

**improved** 101:10
**inaccurate** 21:18 42:12,13 106:20
**inaudible** 158:21
**incidents** 183:4
**include** 57:22 85:8 91:13 195:22,23
**included** 70:17 71:5 85:10,10 145:9,20,24 148:7 164:8 198:11 199:21
**includes** 31:18 57:23 100:12
**including** 64:4 195:20 197:21
**incomplete** 200:12 200:15,25 201:4
**incorrect** 103:15 103:21
**incorrectly** 119:7
**indemnification** 162:22
**independent** 11:20
**indicate** 26:10 77:14
**indicated** 43:21,25 55:12
**indicates** 37:17 39:9 46:19 67:3,5 82:2 164:24 170:14 171:3
**individual** 91:22
**individuals** 108:10 108:12 196:16 197:16 199:20
**industrial** 33:5,11
**info** 199:18
**information** 75:11 85:2,4,6,8 90:2,8 90:24 91:4,11,19

92:4,8 101:24 114:5,11,16,21 115:11 116:18,19 156:9,10,14 157:10 183:12
**informational** 117:11
**informed** 84:20
**initial** 86:16 144:9 144:15 151:9,11
**initials** 184:21
**initiate** 90:7
**initiative** 150:3
**input** 70:3
**insert** 121:8
**insisted** 136:11
**inspection** 101:11
**instruction** 97:5
**instructions** 7:6 69:23 97:2 146:10 146:14 159:8 161:18
**intended** 58:16 92:17 93:10,11,13 93:20 129:15 172:25
**intent** 61:7,10,11 137:15,22 138:3
**intentionally** 144:9,14
**interdivisional** 125:24
**interest** 20:23 82:4 82:7,10 100:14 104:10 132:8 142:11 196:17 197:18
**interested** 100:22 101:2 203:19
**interesting** 10:20

interview 158:5
introduced 24:8
  113:10 125:20
  155:23 160:11
  169:25 180:19
  184:14
introducing 45:25
investor 118:18
involve 14:16
involved 16:19,22
  17:4 23:9 29:5,11
  62:13 64:11 70:22
  72:17,19,22 74:18
  75:3,5,8 85:15
  86:16 148:15
  166:18,22 192:16
  192:18,23,23,25
  196:5,11 197:13
  200:6,19
involvement 23:15
  71:3 192:7
irish 1:20 2:14
  4:19 203:7,25
island 14:12
  177:20
issue 144:8 148:16
issuing 136:11
item 52:22 74:10
  179:18
items 23:8

j

jamel 57:11,12,19
  58:17
january 130:13,15
  131:16,18,22
  132:25 134:2
  135:3 140:14,21
  141:10 142:7
  147:13,21 148:2,5
  148:17

jerry 81:9
join 15:5 23:17
joined 12:25 22:13
  23:20 31:25
jonah 117:14,20
  117:23
jonathan 45:19
  46:17
july 89:4 180:14
  181:16 184:6,6
june 38:3,5 86:4,4
  87:13 88:21 95:9
  173:17

k

k 195:5
keep 8:12 166:11
  166:13 188:3
  189:2
keeping 73:14
kest 86:6 111:21
  112:4 113:16
  122:11,18 131:20
  133:25 135:3
  156:6 157:2
  160:18
kevin 3:21 4:18
key 39:15 105:7
kind 7:25 10:8
  15:19 58:19 60:4
  63:15 158:15
  159:4 177:6 186:9
  190:13
kinds 158:19
knew 12:19 25:22
know 6:10,24 12:9
  13:10 18:11 19:16
  19:22 20:2,15,17
  20:18 21:20,22,25
  25:4,7,10,19 28:5
  28:13,15,16,19,20
  28:23 29:2,3,4,7,9

29:13 30:25 32:9
34:16 35:19 36:12
39:11 40:3 41:14
42:5,22 43:16
45:16 47:24 48:18
50:22 51:18,22
54:20 55:16,17
57:16,17,18 64:6
65:13 67:9 68:7
68:17 69:3 70:11
70:14,16,21 76:12
78:4 83:14 93:7
94:15 97:4 98:25
100:21 102:3
104:17,25 105:5
105:11,13,14
106:4,17,22,25
107:14 110:17
111:3,5 116:15
117:2 118:12,15
119:4 120:2
121:25 124:12
129:13,14 130:20
132:2,20 134:7,24
136:19 141:12,13
141:15,17,18,19
143:6,9,16 146:9
147:10,15,17
150:14 152:5,7,22
153:21 154:3,6
155:10 157:22
162:22 163:11
164:4,23 165:2,9
165:11,12,15,22
168:10 169:5,11
169:13 170:7,25
172:2,21 174:19
175:15,25 182:9
185:21 186:24
187:14,18,23
189:16,25 190:21

190:24,25 193:15
197:9 198:10
199:11,17 200:11
200:14,20 201:3
knowing 177:25
knowledge 103:4
  150:18 193:19
  198:9
koh 3:17 12:4
  17:16 29:12 32:8
  33:16 36:11 42:4
  42:19 43:15 47:12
  47:20 50:21 52:15
  53:10 54:4 56:9
  59:21 63:9 65:17
  69:2 70:10 74:23
  75:14,20 77:3,8
  78:25 79:5,16
  80:25 81:19 82:11
  84:5 91:6,20 92:6
  93:18 94:3,16
  102:6 103:8
  105:22 106:10,18
  107:5 116:23
  119:3 121:20
  128:20 129:8
  136:21 137:25
  138:11 142:22
  145:15 147:14
  150:13 153:14,20
  154:2 157:17
  158:13 159:2
  167:2 172:20
  173:9 175:2
  178:21 179:8,15
  179:24 180:7
  182:20 185:12,20
  186:23 187:15
  188:6 190:20
  191:10,14 193:14
  197:19 198:16,22

200:13,21 201:2
201:14,23 202:4
**ktr** 80:9 86:6,7,25
87:7,23 88:3,21
94:21,24 95:8
97:2 99:8 101:12
102:4 103:20,22
103:23 107:3,15
111:9,21 112:6
114:11 115:10
122:9 123:7
130:17 131:16
132:21,24 136:10
140:13,20 141:2
141:20 142:19
143:20 144:10
147:6,19,25 148:5
148:16 149:20,25
156:5 157:2,14
158:2 159:8 161:5
161:19 162:8
163:19 165:4,9
167:23 176:20
180:13 192:20
**ktr's** 112:21,24
144:14 161:2
176:13

**l**

**l** 5:4 139:4 195:5
**labeled** 24:2 37:2
46:4 52:17 62:22
66:11 97:12 108:6
111:11 113:7
115:17 120:13
122:6 123:21
125:17 131:7
133:16 134:16
140:6 155:20
160:8 169:22
180:16 183:24
194:6 199:5 204:9

204:11,13,15,17
204:19,21,23
205:2,4,6,8,10,12
205:14,16,18,20
205:22,24 206:2,4
206:6,8,10
**land** 47:4 82:16,17
82:18 83:10 100:3
100:14 106:23
151:10 164:16
169:10
**language** 164:8,10
**large** 17:13 56:21
58:21 164:20
**largely** 39:10
**lasted** 177:13
**law** 53:3
**leading** 62:7
**learn** 12:17 22:8
26:25 31:22 72:7
**learned** 28:13
**lease** 9:12 23:11
24:21,22 25:8,11
25:14 27:3,11,13
27:18 30:7,14
44:11 53:13 54:23
59:5,7 72:9 75:19
76:11 79:15 80:24
83:7,15 84:22
85:8 86:21,25
87:7,12,15,17,24
89:14 90:16,21
91:3,14,17 92:3
93:17 94:2 95:17
95:18,24 96:5,10
96:21,22 98:24
101:13 102:5
104:2,9,11,14
106:6,8,12 111:24
111:24 112:22
113:18,25 136:3

142:3,6,7 143:5
145:5 146:4 153:5
153:13 157:4,16
157:25 167:18
168:19,24 176:7
178:15,20 179:7
186:17,22 187:4
187:14,25 188:9
**leased** 132:14
135:24
**leasehold** 195:22
197:25 198:6
**leases** 54:17,18
60:24 90:11
101:19 107:16
165:7,10,14
169:16 181:19
**leave** 26:11 27:23
28:2,8
**leaves** 77:21 187:8
**left** 39:5 40:16
52:7
**legal** 4:21 109:14
109:23
**letter** 61:7,9,11
74:6,19 76:9
88:21 89:12 90:7
92:13,16 93:6
101:19,21 109:3
135:21 137:15,22
138:2,9 140:12,21
141:8,14 160:24
161:20 162:7
163:2,18,22,24
164:3,8,10,12,24
173:5 179:7 193:4
193:11
**letterhead** 124:7
125:23 140:13
**letters** 163:6

**letting** 172:2
**levin** 52:25 53:2
120:24
**li** 1:13 2:12 4:8
5:10 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1,11
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1,7,14 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1,12 47:1
48:1 49:1 50:1,5
50:24 51:1,6 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1,7 64:1
65:1 66:1,16 67:1
68:1 69:1 70:1
71:1,18 72:1,7
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1,8
82:1 83:1 84:1
85:1,21 86:1,3
87:1 88:1,9 89:1
90:1 91:1 92:1
93:1 94:1 95:1,7
96:1 97:1,16 98:1
98:5 99:1,12
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
108:11 109:1

110:1 111:1 112:1
113:1,4,12,15,20
114:1 115:1,21
116:1 117:1 118:1
119:1 120:1,21
121:1 122:1,11
123:1 124:1 125:1
125:22 126:1
127:1 128:1 129:1
130:1 131:1,25
132:1 133:1 134:1
135:1 136:1,25
137:1,12,14 138:1
139:1,12 140:1,11
141:1 142:1 143:1
143:16 144:1
145:1 146:1,24
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1,13
161:1 162:1,13
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1,12 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1,4,16
185:1 186:1 187:1
188:1 189:1 190:1
191:1,24 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
201:21 202:1,2,10
203:11 204:4
207:3,21

**licensed**   10:24
   11:4,7
**licenses**   10:23
**limit**   153:8
**line**   207:4
**lines**   102:21
**list**   101:1 109:11
   183:6 194:20
   195:8,12,19 197:2
   197:10,15,16
   198:2,11 199:18
   199:23,24 200:12
   200:17,25 201:5
**listed**   37:16 67:22
   110:20 118:13
   124:23,25 154:18
   184:4 198:5
**listing**   172:9,13
**litigation**   20:8
   67:3 73:17 166:15
   166:16
**little**   12:2 22:3
   39:3 40:22 91:8
   165:23
**llc**   1:8 4:10 11:19
   11:21,22 12:6
   18:10,12 20:10,22
   20:24,25 29:18
   49:15 92:19
   109:13 146:24
   195:23,24
**llp**   3:12
**load**   46:2
**loaded**   74:9
**loading**   117:8
   169:25
**lobbying**   108:25
**lobbyists**   109:5
**locatel**   174:3
   191:25

**locatel's**   177:17
**location**   26:16,24
   151:10
**locations**   26:22
**locked**   7:24
**logic**   95:25
**long**   6:25 9:2
   14:12 15:3 26:19
   55:17 60:6 136:22
   142:6 177:12
   186:12 189:14,17
**longer**   71:19 140:2
   185:7 186:7
**look**   22:25 23:3,4
   42:18 56:7,15
   98:6 99:6 114:24
   130:14 143:17
   155:25 174:23
   197:2,5,6,8 198:2
**looked**   9:11 26:22
   83:21 155:8 163:6
   195:7
**looking**   18:2 68:3
   79:25 80:6 98:11
   98:15 120:17
   133:23 134:3
   140:23,24 141:5
   141:21 142:19
   147:11 156:24
   170:17,19 175:12
   192:20
**looks**   41:23 50:13
   51:20 63:25 82:24
   118:15 124:13,15
   124:19 126:25
   127:3 139:24
   146:3 160:14,16
   171:11 186:9
   195:7
**loses**   186:16,21

**lot**   11:14,16 13:7
   17:23 33:7 34:4
   38:17 128:2
**lots**   39:20 40:5
   52:23 53:8,14,21
   53:24 54:2,6,10,11
   54:12,16 55:3
   127:14,20,22
**lunch**   136:19
   138:17 140:24
**lyon**   143:12,15
   144:18,21 145:13
   146:5,9,15 149:5

**m**

**m**   3:9 5:4 11:22,22
   31:8,10,23 32:6,16
   32:24 33:3,7,9,13
   34:7,11 36:3,6
   37:11,21 38:14
   45:14 49:23 50:10
   100:7,9,16 128:12
   129:4 134:6 139:4
   150:2,20
**mail**   24:13,18,18
   27:5 45:18 46:17
   48:3,24 51:6,7,7
   51:13,21 52:6
   63:2,24 67:18
   69:9 70:2 81:8,9
   85:22 86:4,5 95:7
   95:9,10,11,13,15
   96:6 97:15,15
   98:8 108:9,21
   111:7 112:7,12
   113:3,16,20,22
   114:25 115:2,19
   120:16,22 121:3
   122:18 129:25
   131:10,18,19,20
   132:25 133:2,22
   133:24,24 141:5

143:12,14,19
156:6,6,23,23,25
157:7 158:20
162:6 180:12,22
180:23,25 181:14
181:17,25 182:15
182:23,23 194:11
194:17 195:11,15
199:10,14,21
**mailed** 78:3
111:21
**mailing** 141:9
**mails** 23:12 62:15
69:10,20,21 70:2
71:2 85:18 111:8
122:9,10 131:15
131:15 140:25,25
141:21 156:4
159:12,13 192:6
192:10,12
**making** 94:11
158:23 177:23
**management**
10:16 92:20
**managing** 18:18
19:3
**manufacturing**
33:5
**map** 39:4 41:21
**marazzi** 108:22
115:20 120:23
**marc** 195:4,5,8
196:3
**march** 35:8,17
45:21 48:5,18,19
55:11,13 58:2
67:6 162:7
**mark** 23:23 36:23
45:17 62:19 66:7
108:3 111:6
112:25 115:14

120:9 122:3
123:18 125:14
131:4 133:13
134:13 140:3
155:17 157:21
160:5 169:19
180:11 183:21
194:3 199:3
**marked** 24:2,8
37:2,5 46:4 49:20
50:3,24 62:22
63:8 66:11,14
74:5 81:6 85:21
85:25 95:3,5
97:12 99:7 108:6
108:16 111:11,14
113:7 115:17,25
120:13,19 122:6
123:21,24 125:17
128:18 129:20
131:7,12 133:16
133:19 134:16,21
140:6,9 143:11
155:20 156:18
160:8 162:4,10
167:22 168:13
169:22 174:7,11
180:16 183:24
194:6,9 199:5,8
**market** 27:2,8,17
27:22 28:4 51:4
59:15 60:2 72:8
72:19 73:4,20,25
78:24 79:12 80:2
81:22 93:16,25
100:13 132:7
142:10 145:8,20
145:23 157:15,24
164:15 169:2
182:14 193:5,12

**marking** 68:16
**marriage** 203:18
**massing** 44:24
45:3,5 48:12,15,17
**matches** 56:4
**matter** 4:8 5:18
203:20
**matters** 159:10
**mcdonald's** 1:5
4:9 5:17 9:13
24:21,22 25:7,19
25:25 26:6,11,17
27:3,23 28:2,5,8
56:5 57:6,10
60:13,15,20 65:14
74:7 75:19 76:19
76:23 77:7,10,14
77:21,25 78:11,16
78:19,23 79:11
82:21 83:3,5,7,15
84:21 85:8 86:22
86:25 87:7,12,24
89:15 90:14,16,17
90:21 91:2,14,17
92:3 93:17 94:2
96:21 98:24
101:10,13 102:4
111:25 112:22
113:18,25 119:13
120:2,5 125:10
127:24 128:3
132:14 135:24
142:4 143:5 145:3
146:4 153:13
157:4,25 167:17
168:19,24 172:4
172:23 173:5,6,16
176:4,6,7,12,18,22
177:23 178:15,20
185:17 186:13,15
186:20 187:8

188:4,14 189:5,7
189:14,17 190:4
190:17,18 207:2
**mcdonaldslease....**
24:14
**mean** 11:16 16:20
41:13 53:8,12
68:17 85:3 92:23
158:18 185:9
186:8
**means** 92:25,25
93:3 105:19
162:23 186:10
**meant** 93:7 113:21
**media** 4:6 37:10
72:3 139:7 175:10
**medication** 7:9
**meet** 9:2 14:6
117:19
**meeting** 35:8,10
35:14,17,19,21,22
35:24 49:24 50:10
50:15,17,20 51:14
51:23 52:9,13,18
55:11 58:3,6,13
117:11,14,23,25
124:14,16 125:3,4
125:6,9,13,24
126:22,22,25
127:3,7 128:6,8
129:15,18 160:18
160:23,25 161:4,7
161:9,12 173:15
173:18,22 175:20
176:3,11,22,25
177:13 178:5,8
**meetings** 32:14
35:3 43:4
**meister** 3:12
**mekhtiyev** 44:13
45:20

**member** 12:11
19:18 20:18 21:23
29:17 118:20,21
118:25
**members** 20:9,14
20:15,17 33:24
**membership**
20:23
**memo** 52:9,9
**mention** 166:6
**mentioned** 78:2
121:8 125:9
165:21 177:18
**met** 5:14 8:21
12:21
**meta** 170:14
**metadata** 37:17
67:3,5 126:3
170:12 171:3
175:13
**method** 146:10
169:12
**methodology**
107:3
**metropolitan**
143:13,23 144:19
147:11,17 148:14
149:5,18,23
150:19 152:9
155:14
**meyer** 3:23 173:25
176:4,11
**michael** 3:23
**middle** 89:13
141:25
**mike** 173:25 176:4
176:11
**million** 30:12,17
185:4,10,17
**mind** 26:24

**mine** 135:2
**minute** 71:16
122:22 174:25
191:7 201:11
**minutes** 49:24
71:15 113:15
126:21 136:17
**missry** 143:15
154:18 155:2
158:4,8 160:2,19
161:5 162:8
163:10,11,18,23
166:5,24 169:4,7
173:23 180:14
181:16 194:18
**missry's** 156:10,14
157:10 173:19
**mistake** 118:16
177:23
**mistakes** 196:8,24
196:25 197:4
**misunderstanding**
96:17
**misunderstood**
96:2,15
**mixed** 34:8 44:20
119:21
**mmb** 9:13 20:10
20:14,16,24 21:24
30:7,14 73:15
104:3,18,22 105:7
105:17 106:7
188:2,16,19,22
189:6
**modified** 184:6
**molly.sprgrp**
88:13
**moment** 24:15
156:2 178:7
188:18

**money** 188:21
190:3
**monitors** 8:4
**month** 16:7,13
29:19 65:4
**months** 55:20 68:2
73:10 171:20,20
**morning** 5:10,11
131:24
**morris** 143:15
154:18,23 155:2
156:9,14 157:10
158:4,8 159:9,20
160:2 163:10
166:5,24 169:4,7
173:19,23 177:3
180:13 181:15
194:18
**moved** 51:4 68:3
85:25 88:7 99:10
**moving** 168:7,12
**multiple** 14:2
**municipal** 151:16
151:21,23 152:3,5
**musto** 20:20 28:17
28:17 50:9 73:4,8
73:15
**mvs** 149:23
**mvs's** 150:15

**n**

**n** 3:2 139:2,2,2
195:5 204:2
**nakleh** 195:4
**name** 4:17 5:14
11:21 21:4 46:22
74:16 88:16 118:7
121:6,9,13,18
137:16 170:12
195:4,6
**names** 196:4 197:6
198:5,14,20,24

**nassau** 203:5
**nature** 150:20
177:4
**near** 86:23 87:2,8
87:13,18,25 89:15
142:4 153:5
**nearing** 98:11
**necessarily** 190:6
190:7,14
**necessary** 65:8
82:19 83:11
**need** 6:23 71:18
110:4,14 132:12
136:23 145:6,8,17
145:23 190:14
194:21 199:18
**needed** 91:4
133:10
**needs** 72:16 90:24
92:9 110:18 190:4
**negotiated** 15:23
**negotiations** 23:18
145:3
**neighborhood**
33:15,19 34:5
**never** 17:18 67:18
77:20
**new** 1:3,14 2:17
3:8,16,16 4:13
26:16 41:17,25
43:7,12,22 64:13
98:2 124:7 165:18
170:21 203:3,10
**nnn** 181:20
**noise** 94:11
**non** 39:10,17,22
**nonprofit** 57:13
57:14 60:9
**north** 182:2
**northern** 14:13

**notary** 2:16 5:5
  10:24 202:16
  203:9 207:25
**note** 149:23
**noted** 104:13
  135:23 136:5
  139:3 202:7
**notes** 51:13,16,19
  149:2 174:9
  175:16,20,22,23
  184:3
**noticeably** 199:19
**notified** 172:24
**november** 23:21
  24:19 44:5,11
  63:25 124:17
  126:23 187:5
**number** 4:6,13
  24:5,12 45:20
  52:18,22 58:22
  63:3 64:3 68:5
  95:16 96:9 115:20
  176:15 184:11
  194:13 195:20
  204:8
**numbers** 51:2
**nyc** 124:5
**nygard** 86:7
**nyu** 10:12 15:6

**o**

**o** 5:4 139:2,2,2,4
**o'clock** 136:16
  191:13
**oath** 5:21
**object** 6:20
**objection** 12:4
  17:16 29:12 32:8
  33:16 36:11 42:4
  42:19 43:15 47:12
  47:20 50:21 52:15
  53:10 54:4 56:9

  59:21 65:17 69:2
  70:10 74:23 75:14
  75:20 77:3,8
  78:25 79:5,16
  80:25 81:19 82:11
  84:5 91:6,20 92:6
  93:18 94:3,16
  102:6 103:8
  105:22 106:10,18
  107:5 116:23
  119:3 121:20
  128:20 129:8
  145:15 147:14
  150:13 153:14,20
  154:2 157:17
  158:13 159:2
  167:2 172:20
  173:9 178:21
  179:8,15,24 180:7
  182:20 185:12,20
  186:23 187:15
  188:6 190:20
  193:14 197:19
  198:16,22 200:13
  201:2
**obligated** 5:22
**observation**
  200:22
**observing** 19:22
  20:3
**obtain** 179:2
**obtained** 37:17
  175:21 187:3
  198:21,24
**obvious** 68:18
**occupancy** 65:5
**occupied** 65:16
  66:4 68:25
**occupying** 59:12
**occur** 65:5

**october** 115:21
  120:22 122:12,18
  123:7,16
**office** 7:16,17
  13:12 18:19 88:17
  109:12 117:12
  128:10 133:5
  173:19
**officer** 18:15
  105:4 110:21
  187:13 197:12
**officers** 18:20
**officials** 31:16
  35:3 43:2
**okay** 11:7 18:9
  19:21 21:16 34:21
  35:7 38:23 39:18
  44:3 48:3,13
  51:22 60:24 61:25
  62:8 63:24 65:25
  66:19,25 67:25
  82:14 86:3 89:11
  90:4 101:4 111:6
  111:20 112:25
  113:24 126:14,21
  137:11,25 138:8
  138:13 139:23
  140:3 141:24
  146:21 152:7
  169:3 174:15
  176:3,24 185:2,16
  187:12 188:11,15
  189:7,13 191:10
  191:14 194:3
  199:2
**old** 98:3
**omitted** 89:10
**once** 83:22,23
  107:19
**ones** 19:15 80:17

**open** 8:3,9 59:20
  59:23,25 63:7
  66:16 99:12
  111:17,19 113:13
  113:14 116:4,5
  120:21 122:16
  124:3 125:22
  131:14 133:21
  134:23 140:11
  143:18 156:3
  168:15,16 170:8,9
  194:15 199:13
**opened** 64:10
  67:18 199:12
**operational**
  171:18 172:19
**operations** 101:12
**opinion** 81:21
  95:17 100:12
  144:24 150:4,15
  151:11 152:8
  159:10 161:20
  179:7,17 180:2
  193:4,11
**opportunities** 18:2
  18:5 22:24
**opportunity** 153:8
**opposed** 169:4
**option** 25:20 76:25
  79:14,20 102:15
  102:25 125:11
  136:2 146:11
  153:7 157:3
  172:25 173:8
  192:4
**options** 114:7
**order** 65:15 90:7
  190:3
**organization**
  57:13 58:7,11
  109:15

**organizational** 20:6
**original** 78:17 136:4 170:15 175:14 184:7
**outcome** 203:19
**outlet** 57:15 58:7 58:25 59:4,8 60:6 60:11,18,25 137:17
**outlets** 57:16,19 58:18 59:6 60:2
**outside** 61:16
**overall** 42:23 62:6
**overlooked** 33:25
**overview** 52:23
**owner** 20:22 105:7 195:21 197:22
**owners** 194:20 195:8,12
**ownership** 127:23 194:20 195:12 197:17 200:7

**p**

**p** 3:2,2
**p.c.** 3:4
**p.m.** 137:6,10 138:16,17 139:3,9 175:5,6,7 191:17 191:18,19,22 201:16,17,18,20 202:6,7
**p10** 50:25 51:3
**p15** 74:5,12
**p17** 81:6
**p19** 85:22,24 86:4
**p20** 88:5,6,9
**p21** 95:3,4
**p22** 99:7,9
**p23** 129:20,24

**p25** 143:11
**p27** 156:18,19
**p28** 162:5
**p32** 167:22,25 168:2,11,12,15
**p34** 174:7,10
**p41** 23:24,25 24:7 204:9
**p42** 36:25 37:5 128:19 129:3 204:11
**p43** 45:25 46:3 204:13
**p44** 62:21 63:8 204:15
**p45** 66:10,14,16 204:17
**p46** 97:11,19,24 98:6 204:19
**p47** 108:5,16 204:21
**p48** 111:10,14,17 204:23
**p49** 113:2,6,10,13 205:2
**p50** 115:16,25 116:3 205:4
**p51** 120:12,19,21 205:6
**p52** 122:5,14,16 205:8
**p53** 123:20,24 124:3 205:10
**p54** 125:15,16,19 125:22 205:12
**p55** 131:6,12,14 205:14
**p56** 133:15,19,21 205:16
**p57** 134:15,21,23 205:18

**p58** 140:5,9,11 205:20
**p59** 155:19,23,25 156:24 205:22
**p60** 160:7,11,13 205:24
**p61** 169:21,25 206:2
**p62** 180:15,19 206:4
**p63** 183:23 184:14 206:6
**p64** 194:5,9,14 206:8
**p65** 199:4,8 206:10
**p9** 49:21 50:2
**package** 62:7 64:16
**page** 24:13 38:12 38:24 40:6 46:13 46:15,16 48:23 49:4,4,9,9,21 52:8 52:8 64:17 66:8 67:21 74:16 85:22 88:19,20,23 89:12 90:4 92:15 95:15 96:8 97:10 100:6 100:11 101:4,5 103:24 108:20,21 109:11 117:5 119:10 122:17 127:9,9 128:9 131:9,20 135:8 140:14 146:16,18 148:9,19 149:3,4,4 150:25 152:20 160:13 162:15 164:11,12,19 171:14 181:12,12 181:24 184:2

185:3 194:17 195:2 204:3,8 207:4
**pages** 25:18 83:21
**paid** 21:23 188:19
**paper** 21:7 175:17
**paperwork** 116:11 116:24
**paragraph** 86:20 87:4 89:11,13 100:11 102:18 119:12 127:12,16 127:18 135:21,22 141:25 142:2 144:2 148:9 151:2 164:21
**paragraphs** 181:18
**parentheses** 111:5
**park** 3:14
**parking** 14:22 128:2
**part** 17:9 26:3 41:8 53:22 54:2 56:17 57:20 62:6 64:15 82:24 144:9 144:14 145:5 149:17
**partial** 170:13
**participant** 139:25
**participants** 2:12
**participate** 76:17
**particular** 26:23 43:25 106:5 154:16 181:17 200:9
**parties** 15:20 79:21 104:9,19,24 106:9,12,15 146:11 192:3 203:17

parts  26:22
pashma  3:4 5:16
pass  183:18
passed  188:15
passive  29:17
  118:18,20,21,24
path  37:18 184:9
pay  155:11
paying  49:14
payment  133:4
  162:21
payments  188:13
  189:4,6
pays  105:8 188:4
pending  7:2
people  8:13 13:9
  45:21 63:4 64:3
  70:3 115:20
  197:13
percent  20:22,23
  151:7 188:17,21
perform  15:19
  48:11 123:11
  130:8
performed  179:21
period  65:4
  157:23 161:18
  167:9,16,16
  171:19 173:8
periods  136:4
  153:7
permanently  60:9
permission  114:20
  114:23,25
permits  33:10
person  13:11
  42:20 69:25 88:15
  109:13 118:8,14
  119:2 139:18,20
personally  62:17
  77:9

persons  31:14
  69:4
pha  171:4
philip  63:3,18
  65:13 68:22 69:5
  69:8,19,24 170:24
  171:5,24
phone  73:10
phrase  46:23
  53:14
piece  92:8 175:17
pinchus  168:6
place  17:13 153:4
plaintiff  1:5 3:5
  4:8 5:17
plan  31:9,23 33:13
  33:21 36:3,6
  45:15 54:3 58:25
  59:19 100:16
planning  31:15
  32:5,10 51:15
  62:2 70:19 116:12
  116:25 124:6,6,17
plans  22:22 25:25
  26:6,9 34:11
  44:20 48:20 56:6
  58:9 127:5
play  164:7
playing  164:9
please  6:15 8:11
  10:5 24:5 48:24
  98:5 116:3 121:8
  122:16 130:3
  131:14 142:24
  156:17 162:3,12
  168:15 174:25
  194:19 199:17
point  18:17 19:12
  79:9 101:9 102:11
  102:19,21 103:24
  103:25 104:6

117:22 147:18
  152:21 154:11
  156:15
points  56:25 90:5
popped  135:2
portion  27:13
portions  155:9
position  193:10,17
  193:20,21,24,25
positive  189:23
possession  126:15
possibility  15:14
  16:4
possible  15:17
  66:3 90:10 111:23
  129:9 154:21
  171:7 184:25
possibly  80:22
potential  15:22
  18:7 48:9 52:2
  64:12 68:23 76:3
  76:7 80:13 86:11
  98:23 143:3
  151:13,22 172:9
  172:13 182:25
potentially  15:20
  60:12 107:16
  128:3 195:3
powerpoint  37:10
  128:18
pre  116:7,9,13,16
preceded  156:23
precisely  146:14
precludes  153:5
preference  77:17
preliminary  145:3
preparation  8:25
  9:7 70:23 71:4
  74:19
prepare  8:19 32:6
  44:20 45:7 103:6

142:19 165:4
prepared  44:23
  51:10 61:5 62:11
  62:18 76:9 83:17
  130:21,24 131:2
  145:4 147:6
  168:18,22 169:6
  170:24 176:20
preparing  161:19
  169:17
present  3:20 9:4
  43:4
presentation
  37:11 38:19 40:8
  42:7 56:18 128:18
presented  35:2,5
presents  95:19
president  112:5
presumably  185:4
pretty  56:21
prevail  185:3
prevent  7:10
previous  51:21
  68:2 163:5
previously  14:8
  49:20 50:24 74:5
  81:6 85:21 95:3
  121:8 129:20
  139:19 143:11
  156:18 162:4
  167:22 174:7
  200:18
primarily  69:7,12
  69:18
primary  19:12
  34:6 177:19
printer  88:14,16
printing  94:10
printout  37:10
prior  12:19 70:6
  148:6 164:2,5,6

**private** 47:9,17
**probably** 9:21
  22:11 25:2 27:10
  53:15 84:25
  107:21 110:6
**problem** 195:19
  196:3,21
**problems** 8:13
**proceed** 5:3
  125:10 134:5
**proceeding** 177:24
**process** 23:13 27:2
  27:17,22 47:4,5,6
  47:11,19 55:7,18
  62:14 72:8,13,19
  72:23 73:5,20
  75:3,6 79:4,13
  80:3,23 83:7
  87:16 92:10 93:16
  93:25 98:24 99:2
  143:4 146:5
  157:15,25 158:5
  158:10,24 159:21
  161:21 168:19,23
  192:8
**produce** 137:22
**produced** 37:15
  42:21 43:17 48:16
  67:2 137:19,24
  170:10 176:16
**produces** 45:5
**production** 20:7
**professional** 2:14
  10:22 203:8
**programs** 8:3,8,12
  10:21
**progress** 48:20,22
  48:25
**project** 17:5 52:10
  52:23 53:22 65:15
  66:3 68:24 119:11

124:20 125:9
127:18 129:16
171:9,13,17 172:4
172:18
**projected** 82:20
  83:5
**projects** 14:15
  125:7
**properly** 8:16
**properties** 13:24
  14:4 16:23 90:11
**property** 14:19
  16:21 17:3,9,12,14
  22:5,5,9,16,19,22
  23:11 25:8,20
  26:2,7,11 27:24
  28:8,14,21 29:11
  29:20,21,24 30:2,6
  32:23 34:9,23
  35:25 36:5 39:5
  39:13 40:12 41:3
  41:10,25 42:17
  43:3,9,14,23 44:4
  44:9,21,25 47:9,10
  47:17,18 48:10,21
  52:3,14 54:23
  56:8 57:6,21 58:9
  60:13,20 63:22
  65:15 70:24 75:19
  76:6,25 78:24
  79:12 81:15 82:10
  100:16,23 101:10
  107:12 120:6
  125:11 128:4
  130:9 132:9,14
  135:23 142:5,11
  146:12 149:25
  163:7 169:10,14
  172:5 173:2
  177:19 180:3
  186:12,13,20

187:4 189:10,15
189:18,19,22,24
190:4,5,11,16,18
190:19 193:6
196:11,17 197:18
200:7,19
**proposal** 35:5 56:3
  57:20,23 81:14
**propose** 71:16
  136:18
**proposed** 31:21
  54:2 56:6,13,15
  58:4 62:5 63:21
  64:13,22 65:2
  68:10,13 109:7
  118:4 119:11,20
  124:20 125:7
  127:16,18 150:2
**prospective** 118:6
  118:8,13
**provide** 59:25
  70:3 82:15,17
  90:15,20,25
  101:23 102:4
  110:18 156:9
  159:24
**provided** 52:22
  83:14 90:9,17,23
  101:14 113:24
  114:3,13 146:15
  198:20 200:12
**providing** 113:17
**provision** 187:22
**provisions** 187:17
**public** 2:16 5:6
  202:16 203:9
  207:25
**pull** 37:7 49:19
  74:4 81:5 86:3
  88:4 95:2 97:8
  129:19,24 156:17

162:4,12 174:6
**pulled** 88:9
**purchase** 3:8
  53:19
**purchased** 14:9
**purple** 39:14,15
**purpose** 51:23
  73:11 81:17,20
  84:3 94:9,14
  117:2,24 125:5
  142:9 143:7
  157:19 161:11
**purposes** 30:22
  84:3 94:6,18
  109:6 157:14
  161:19 162:22
**put** 28:10 93:4
  111:4 138:10
**putting** 98:2
  137:20 167:13

**q**

**qualifies** 11:20
**quarters** 90:6
**queens** 14:13
**question** 6:10,11
  6:12,25 7:3 26:4
  47:14 56:11 60:16
  60:17 61:17 78:13
  79:7 91:7,25
  93:23 94:12 96:3
  96:7,16 147:24
  178:16 186:18
  198:7,18 200:22
**questions** 6:3,21
  7:11,12 20:5
  201:22,23
**quite** 16:16 61:24
**quote** 36:2

**r**

**r** 3:2 139:2 203:2
**rabsky** 118:7,12
  121:6,13,18
  195:25
**raised** 177:16
**random** 10:19
**range** 181:20
  182:13
**rate** 16:17,20,24
  17:5 151:8,9,11
**rates** 161:2
**ray** 52:25 53:2
**raymond** 120:23
  121:4
**reach** 78:22 79:11
  85:11 133:4
**reaching** 123:6,9
**react** 76:19
**read** 25:16 52:5
  65:11 89:17
  132:19 136:9
  142:16 144:12
  145:11 151:19
  154:11 181:23
  182:6
**ready** 107:20
**real** 11:2,3,4,7
  13:21 18:2,6 30:6
  112:6 140:13
  147:6
**realistic** 172:3,18
**really** 12:20 18:19
  22:23 34:13 36:18
**realtime** 2:15
  203:8
**reason** 6:24 7:8
  42:11 50:17,18
  68:7 121:17,24
  122:2 155:16
  185:3 190:10

207:4
**reasonable** 61:15
  61:20 62:4,9 64:2
  66:20 67:14 70:19
**reasonably** 65:9
**recall** 9:10 14:21
  19:23 20:10 27:15
  30:8,11 35:11,16
  35:18 49:16,18
  57:25 67:13 75:25
  76:5 80:17 84:20
  86:24 87:6,21
  94:22 96:12,20,25
  97:4 98:14 101:17
  112:18,20 114:10
  114:20 118:19
  123:10 125:2,8
  128:5 136:10
  140:20 141:3
  143:22 144:13,16
  144:20 148:10
  152:13 154:22
  155:13 156:13
  161:16 162:25
  163:13 164:2
  171:23 173:15
  175:19 176:4,9,12
  176:17 177:8,12
  177:15,21 178:8
  182:21 184:23
**receive** 15:11
  17:14
**received** 24:25
  83:23 84:8 107:18
  130:17 151:20,23
  151:25 152:4
  154:14,19 155:4
  189:5
**receiving** 67:13,16
**recess** 28:5 71:24
  138:17 175:6

191:18 201:17
**recognize** 124:10
  174:15 184:16
  198:4
**recollection**
  123:15 133:9
  135:13 142:18
  157:9 200:4
**recommended**
  147:18
**record** 4:3,24 6:6
  71:22 72:4 125:24
  127:2 137:5,6,7,9
  137:21 138:10,14
  138:16 139:8,24
  175:5,9 191:16,21
  201:16,20 202:6
  203:14
**recorded** 4:7
**red** 40:18,19
**redevelop** 186:11
  189:19,22
**redeveloped** 65:9
**redevelopment**
  14:16 17:13 54:3
  109:7 153:8 190:2
**redo** 178:13,18
**refer** 22:5
**reference** 48:14
  128:22 147:9
**referenced** 27:10
  60:23 137:14
  197:21
**references** 48:14
  114:6 168:25
**referencing** 53:13
  146:2
**referring** 97:6
  129:6 134:8
  153:12,16,19,25

**refers** 105:17
**reflect** 104:12
  132:7 147:20
**reflective** 151:9
**reflects** 117:3
**refresh** 133:8
  135:13 142:17
  157:8 200:3
**regard** 144:23
**regarding** 192:6
**registered** 2:14
  203:7
**regular** 15:13
**regulations** 179:23
**related** 63:16
  92:20 104:9,19,24
  105:18 106:9,14
  141:8 142:8 143:4
  203:17
**relating** 129:12
  158:10 183:14
**relations** 105:12
**relationship** 18:9
  105:2,6,10
**relevant** 84:25
  85:3,5,7 89:25
  91:4,11,18 92:4
  101:24
**remains** 189:15
**remember** 9:12
  20:12,13 21:14,16
  21:21 22:10 23:12
  25:22 26:8,21
  27:19 30:4 35:7
  36:7 38:7 43:24
  48:2 52:4,19 55:9
  58:5,12 59:2
  60:21 65:18,21
  67:16 71:7,9,13
  73:6,13 74:20,24
  75:10,15,21 76:14

76:16,21 77:19
78:4,8 79:18 80:4
80:18 81:2 82:12
83:8,9,13,16 84:6
84:11,13,17,23
85:9,14,17 87:9,19
88:2 89:24 90:22
91:21 93:8,13,19
94:4,23 96:14,17
96:19,23 98:18,20
100:25 101:20,25
102:7 103:9,17,19
103:22 104:20
105:23 107:6,10
107:13,17,25
110:22 112:23
114:14,17,22
115:4,7,12 117:21
117:22 118:2,5
120:7 121:15
123:8,12 125:12
128:7 129:17
130:10,23,25
131:3 132:5,23
134:9,10,12
135:16 136:14
140:22 141:5,23
142:25 143:25
144:7,17 145:25
146:13 148:4,11
148:18 150:22
152:11,17 154:12
154:25 155:12,15
156:16 157:18
158:3 159:17,18
159:22 160:3
161:7,8,10,11,22
161:23,25 162:24
163:12,16 164:9
166:2,3,8,14,17,21
167:3,7,8,11,14,20

169:8,18 172:6,15
173:4,11,18
174:17 175:21
176:10,21,24
177:2,10,14,18,22
178:5,6,11 179:9
179:16,25 180:8
183:3,10,16,19
184:18,25 185:13
186:4 187:10
188:7 191:24
192:5,15,22 193:7
193:23 196:6,12
196:18 198:23
200:2,8
**remembering**
173:22
**remote**   1:12 2:11
6:13 8:17
**rename**   168:10
**renderings**   56:7
56:14,18,22 57:5
**renew**   84:21
**renewal**   102:14,25
**rent**   28:9 59:15
60:2 79:14,20
82:21 83:2,5
105:8 144:13
146:4,11 153:2,11
153:12,18,24
157:4 177:25
185:5,10,18 188:4
188:13 189:4,8
192:4
**rents**   144:8
**repeat**   24:4 61:17
78:13 79:6 94:12
142:23 147:23
178:16 184:11
**rephrase**   163:20

**report**   37:12 82:14
83:18 84:4 92:18
93:12 107:25
129:4 130:4,12,21
132:3,7,21 135:9
135:12,17,19
136:11 143:21
146:17,22 147:6
147:12,19 148:2,6
148:16 149:8,17
150:7 152:8,9,16
154:15,16 155:5
155:11,14 167:23
168:18 169:9,17
**reported**   1:19
30:21
**reportedly**   142:8
**reporter**   2:15,15
4:18,25 5:20,25
6:4,5,18 137:2
203:8,9
**reporting**   73:22
**reports**   9:14
130:17 144:3,24
145:17 147:11
169:6
**represent**   5:16
66:25
**representatives**
44:8 51:24 117:19
120:3 173:16
**represents**   34:21
39:16 42:22
**republic**   129:25
130:8,11,20
**request**   101:20
112:17,21,24
137:18 138:2,6
**requested**   100:2
101:13,18 136:13

**required**   179:2
**requirement**
62:12
**requires**   62:2
79:21 146:11
**reset.txt.**   184:3
**residential**   14:17
14:20 33:15,19
34:4 39:10,17,22
41:17 42:2 43:8
43:13,22 119:21
**residual**   82:19
83:11
**respect**   29:15
153:4
**respond**   73:22
195:17
**responded**   113:17
113:23
**responding**   182:18
**responds**   122:25
**response**   138:7
**responsibilities**
13:14 18:25
**responsibility**
13:16
**responsible**   69:18
**responsive**   137:18
137:23
**restaurant**   26:17
57:6 101:11,12
**restricted**   168:21
**restriction**   60:5
**results**   183:17
**resumed**   139:4
**retail**   182:2
183:15
**retain**   130:7
163:15 192:3
**retained**   44:19
45:6 47:25 48:5,8

48:11 49:17
130:11
**retaining** 81:18
157:14 195:3
**retains** 153:6
**retention** 94:21,25
141:7,14 143:3
162:7
**return** 30:6
**revealing** 196:15
200:5
**revenue** 188:12
189:2,8,9,12,14,23
190:9,12,15
**review** 9:6 47:4
83:20 143:20
147:5 149:24
155:7 163:17,21
**reviewed** 27:12
64:6,8 89:7,9
103:13,17 145:9
145:24
**reviewing** 164:2
**revised** 135:4,9
136:11 148:16
**revisions** 134:4
**rezone** 31:17
**rezoned** 17:12
100:16
**rezoning** 31:9,23
32:6,16,24 33:4,13
34:11,23 36:3,6
44:22 45:15 47:6
47:9,17,22 49:6,11
52:2,10,13 56:16
58:4 62:3 63:5,22
100:7 116:21
118:4 150:2,3,21
**right** 8:3 13:25
15:5,8 16:5 19:19
20:3 31:19 32:7

32:19,25 33:6
34:5,12,24 35:4,22
39:10,19,24 41:16
42:3 43:3 44:17
44:22 47:11,19
48:21 51:15 52:3
52:14 55:8,14
56:2,8,22 57:22
59:15 60:6 64:4
66:22 68:4,11,19
69:13 70:9 76:24
79:22 81:15 82:2
82:5 83:3 84:21
86:14 89:4 92:13
97:3 101:24 109:2
109:7 114:2 120:5
124:18,21 127:5
128:19 130:13,18
146:6 147:2 148:2
149:20 152:3
153:13 154:20
157:16 158:25
168:8,19,24 171:9
172:4,11 173:3,8
181:4,8 182:14
186:13,17,22
187:5,9 188:5,17
188:22 189:3,19
189:24 190:5
195:15 196:11
201:12
**rl** 52:22,25
**rogoff** 117:14,20
117:23
**role** 13:17 29:15
30:19,23 72:12,14
110:25 158:4
164:7,9 193:2
**rolling** 194:22
**room** 7:19,21

**rotate** 174:13
**rottenberg** 3:25
9:18 18:24 19:22
20:2,21 24:19
38:2 50:9 51:8
64:4 84:16 86:6
87:22 97:17
108:11 109:10
111:21 113:5,18
113:22,23 114:13
120:23 130:2
131:21 133:25
135:5,15 139:17
140:2 143:15
150:18 158:12
168:6 181:15
194:18 195:14,24
199:21
**rottenberg's**
156:21 162:5
**roughly** 9:15
45:13 55:19 58:23
**rpr** 1:20 203:25
**run** 195:9
**running** 69:15
**runs** 46:9 140:12
**rwcds** 63:5

### s

**s** 3:2,17 11:22
139:2,2,2 168:6
207:4
**salary** 16:6
**sale** 53:19 83:11
**sales** 82:18 106:23
164:17,24 165:5
169:10
**salesperson** 10:25
11:6,8
**sam** 3:25 9:18 12:7
12:19,20,21 13:3
13:12 14:6,8

16:10 18:24 19:17
19:22,25 21:12,23
22:15 24:19 25:24
26:5,10,16 27:9,21
28:13,20 31:5
37:25 38:4 50:9
50:14,19 51:8,18
64:4 65:12 69:12
72:24 75:7 77:13
77:20,23 78:14
84:16 86:5,24
87:6,22 94:21,24
95:15 97:16
108:11 109:10
110:11,14 111:21
111:22 112:12,16
112:21,24 113:4
113:18,21,23
114:6,13,15,20,22
115:5,9,12 120:22
121:3,5 122:19,25
123:10,12 130:2
131:20,23 133:25
134:7 135:4,14
139:16 143:15
150:18 154:17
156:21 157:24
158:11 159:19,23
162:5 163:14
173:23 181:15
194:18,19 195:14
195:18,24 196:2
196:14,18 198:21
199:21 200:4,8
**sam's** 30:4
**saved** 67:17 83:25
84:8 152:19
**saw** 9:16 182:17
182:22
**saying** 15:25 41:2
98:9 111:22 115:2

133:3 145:16
176:5,22 177:22
**says** 38:9,16,20
41:12,17 42:6
46:21 48:24 49:5
49:10 52:9,22
64:21,24,25 82:6
82:15,16 86:20
89:13 90:7 92:16
95:18 99:25
100:10,12 101:9
102:11 104:7
116:6 117:10
118:6 119:12
124:22 128:9,21
130:3 132:6 134:3
135:22 142:2
144:2,23 148:25
149:12 151:3
152:24 161:13
162:21 164:13
165:3 171:15,16
171:19 184:5
186:6
**scanned** 175:18
**scanner** 88:14,16
**scenario** 61:21
62:4,9 64:3 66:21
67:15 70:20 150:5
150:11
**schedule** 71:5,8,10
145:6
**school** 10:10
**scope** 82:14 86:12
132:12
**screen** 8:2,7,8
**scroll** 194:25
**searched** 183:14
**second** 55:25
57:17 67:20 74:16
86:19,20 87:4

90:4 92:15 94:11
108:20 109:11
119:12 131:19
144:2 164:20
165:19,19 166:11
166:12,25 167:10
167:14 171:14
181:11
**seconds** 170:2
**section** 32:18
64:21 68:16,19
119:10,19 137:13
**sections** 149:16
**see** 34:2 38:16,19
39:3,4,12 40:10,12
40:17,20 41:12,18
43:12,21 46:12,17
46:20,22 49:2,7,12
50:12 51:11,16
52:7,16,17 64:20
65:10,11 66:23
67:23 68:15 81:11
81:20,24 82:6,22
86:9 87:5 89:16
89:17,20 90:12
95:12,13,21 99:21
99:23,24 100:5,8,9
100:19,20 101:7,8
101:15,16 102:17
103:2,3 104:5,6,15
104:16 108:14,17
108:19 109:16,17
109:21,22 112:2,3
112:6,14,15
113:19,22 114:8
117:7,16,17
118:10 119:17,24
121:2,10 122:23
123:4 124:8,24
125:25 127:12,15
127:20 128:14,15

130:3,5,15 131:17
131:18 132:17,18
134:25 135:6
136:8,9 138:12
140:18,19 142:14
142:15 144:11,12
145:10,11 147:8,9
148:3 149:9,15,16
150:8 151:4,17,18
153:9 156:11
157:5,6 160:20,21
164:18,22 168:25
169:3 171:21
172:11 180:22,25
181:5,22,23 182:5
182:6,19 194:23
194:24 195:6,11
199:22,23
**seeing** 8:6 23:12
65:23 98:12,15
**seek** 62:3
**seeking** 33:14
55:21
**seelig** 3:12
**seen** 21:7 25:14
37:22,24 50:5
62:17 74:12 99:15
124:11 174:17
**selected** 80:9
**selection** 151:7
**sell** 17:2 185:3
**selling** 16:21
**send** 70:2 111:23
114:21 159:11,13
182:8 183:2
194:19 199:24
**sending** 25:5
81:13 133:3
158:20 175:19
180:23 181:7

**senior** 112:5
**sent** 24:19 45:21
64:9 113:16,20,22
114:6 130:2 135:3
140:20 160:17
163:18,19 169:7
173:5 180:25
181:9 182:23
188:22
**sentence** 86:20
87:5 92:24,25
93:3,4 100:5,20
101:16 102:11,21
103:3 104:16
106:5 127:15
128:15 132:6
136:9 144:12,22
145:11 164:13,22
181:5,23 182:6
194:24
**sentences** 104:7
132:18 135:22
142:15 148:8
151:18 165:3
**september** 117:14
117:20 203:22
**series** 156:4
**serve** 60:9 79:25
80:9 158:5
**served** 143:8
**service** 15:19
**services** 143:13
148:14 149:5
160:25
**set** 27:8 48:20,25
73:25 134:6 144:8
144:14 145:5
146:5 151:7 153:2
153:11,12,18,24
203:12,22

**setup**  8:2
**seven**  30:12,16,17
  54:6,10 55:20
**shading**  40:16,20
**share**  8:7 50:14
  107:24 114:15
  152:18
**shared**  41:24
  43:18 91:23 108:2
  114:11 128:13
  137:15 152:9,11
  152:15 183:20
**sharing**  156:14
  157:9
**sharon**  174:3
  177:3,16,18
  191:25
**shaun**  86:6 111:20
  112:4 113:16
  122:11,18,19,25
  123:16 131:20,22
  133:2,25 135:3
  156:6 157:2
  160:17,22
**sheet**  207:1
**shorter**  199:19
**shorthand**  22:4
**show**  50:8,23
  56:18 85:20
**showed**  9:9
**showing**  195:19
  196:3,21
**shown**  57:4
**shows**  30:11
**sic**  113:15
**side**  40:16
**sign**  61:9 110:15
  163:2
**signature**  74:15
  88:24 140:16
  162:18,20 163:4

**203**:24
**signed**  59:5 61:8
  81:14 89:3,6 93:6
  140:15 141:16
  163:24
**significant**  41:17
  41:25 43:7,12,22
**similar**  107:21
  169:6
**similarly**  153:6
**simon**  14:25 15:3
  15:5 29:10 118:9
  118:14 195:25
**simple**  82:4,6,9
  100:13 104:13
  132:8 142:11
**site**  14:10,11,18
  33:9,10 43:25
  45:5 60:15 65:8
  102:15 111:25
  119:13 127:13,19
  127:21,24
**sites**  33:8 47:7
**sits**  32:23
**six**  32:17
**sl**  126:5 184:8
**slater**  108:12,24
  118:25 120:24
**slide**  40:2,10,13
  42:6,9
**slowly**  6:4
**slt**  1:7 4:14
**small**  135:19
**solutions**  4:22
**somebody**  18:17
  42:8 68:21 70:7
**soon**  90:9
**sorry**  18:4 26:4
  45:23 49:8 58:15
  79:2 87:3 90:19
  91:8 93:11 94:10

**122**:25 137:11
  148:23 154:9
  163:19 194:13
**sort**  40:15
**sound**  55:14 171:5
**sounds**  55:15
  136:20,21
**source**  126:5
  170:16 184:7
**sources**  15:14,17
**space**  14:22 57:23
  58:16,19,20 59:13
  60:8
**spanning**  24:12
  131:10
**spans**  37:8 50:25
  62:25 115:23
  134:18 170:4
  180:21 194:12
  199:10
**speak**  29:20 77:23
  80:13 122:22
  139:16
**speaking**  6:14,16
  6:16 58:2 80:20
**specific**  13:15
  35:12 84:18 94:24
  107:10 128:23
  154:7 172:7 182:9
**specifically**  19:16
  20:13 58:10
  108:11 112:19
  147:2 152:21
  167:10 176:17
  182:11
**specifics**  167:11
**specified**  13:7
**speculative**  150:5
  150:12,20,24
  151:15

**spoke**  58:13 73:7
**spoken**  29:23 30:2
  78:2
**spr**  11:14,17,18,24
  12:2,3,11,14,18,20
  13:2,2,4,10,14,19
  13:21,25 15:9
  16:18 22:13 23:17
  23:20 31:25 72:11
  195:24
**spring**  38:9,15,20
  38:21 39:2
**square**  58:23
  119:22 181:19
  182:3,12
**ss**  203:4
**stacy**  3:24
**stage**  92:10 117:2
  138:4
**stages**  23:13,18
**stamp**  120:10
**stand**  137:4
  201:14
**standard**  161:2
  164:15
**stands**  34:8 41:14
  42:8 47:3
**stark**  34:16,18,19
  35:25
**start**  6:16 12:13,22
  22:2 82:16 189:23
**started**  13:2 72:10
  98:17 136:18
**starts**  173:13
**state**  2:16 132:13
  203:3,10
**statement**  36:17
  70:24 71:6 106:16
  116:7,10,14,17
  170:6,23

**statements** 106:20
**staten** 177:20
**states** 1:2 4:11
  143:19
**status** 73:16
**stay** 25:20 60:6
  76:25 77:15 78:12
  78:16 125:11
  172:5,25 173:2
**stayed** 77:7,10
**staying** 128:4
**stays** 60:13,20
  186:13,16,20
  189:17
**stefanie** 108:21
  109:9,19 111:4
  115:20 120:23
  121:3
**stein** 3:4 5:16
**steps** 178:9
**sticker** 97:23
**stored** 107:23
**stories** 57:2
**story** 55:23 56:24
  119:20
**stream** 190:15
**streams** 188:12
  189:8,12,14
**strengthen** 144:6
**strike** 70:15
**structure** 16:15
  59:9 87:15 188:8
  188:23
**studies** 44:24
  48:12,17
**study** 45:3,7,10
  48:15
**stuff** 10:9
**subcommittee**
  49:24 50:10
  128:12

**subject** 16:17 63:4
  86:7 100:2,14,15
  101:9 132:9 142:5
  142:11 149:25
**submit** 62:8
**submitted** 35:15
  55:6,10 56:6,13
  70:18 95:18
  116:20
**subscribed** 202:12
  207:22
**subsequent** 27:4
**success** 16:17,20
  16:24 17:5
**successive** 136:4
**sufficient** 136:24
**suggested** 18:18
**suite** 3:7
**sullivan** 81:10
**summarized** 61:5
**summation** 95:19
**support** 181:20
  182:13
**suppose** 196:7
**supposed** 46:13
  55:18
**sure** 6:15 21:3,9
  21:14 29:23 33:17
  40:2 42:7 53:11
  53:23 60:14 61:18
  61:24 68:15 74:17
  89:9 95:24 97:6
  108:14 110:6
  121:5 142:22
  152:19 153:15
  154:16 159:14
  166:17 167:6
  175:2,3 186:10
  187:6
**swear** 5:2

**sworn** 5:5,19
  202:12 203:13
  207:22
**szczepanski** 63:2
  63:12

**t**

**t** 5:4 139:2,4 203:2
  203:2
**table** 7:4
**take** 6:4,18,25 7:3
  22:25 23:4 24:15
  38:19 71:16
  136:18,22 137:25
  170:2 174:24
  191:6,10
**taken** 4:8 10:19
  71:24 138:17
  175:6 191:18
  201:17
**takes** 17:13
**talk** 19:10 28:7
**talked** 126:23
  148:4
**talking** 6:19 22:2
  100:6 128:24
  141:2 159:5
**talks** 99:22 101:5
  104:2 149:12
**tax** 30:6,22 127:14
  127:20,22
**technique** 164:16
**technology** 8:16
**tell** 5:22 12:2
  22:15,18,21 23:2
  24:21 25:24 26:5
  27:21 32:21 41:9
  50:16 78:6,19
  88:3 89:22 113:12
  114:15,18 115:9
  116:3 145:13,22
  146:18

**telling** 68:22 86:24
  87:7,23 103:19
**tells** 41:5
**tenant** 102:14,24
  136:2 153:6
  197:22
**tener** 38:3,5,7 80:9
  85:12,16,19 86:5
  86:17 87:10 89:22
  90:15,20,23 91:2
  91:16,23 92:2
  93:4 95:11 96:4
  97:16 98:9,22
  99:2 101:18,23
  103:6,19 104:18
  104:21 106:22
  107:8 111:22
  112:8,11 131:21
  134:2 135:6
  140:15 152:10,12
  152:16,19 156:7
  157:2 160:17,22
  166:19,24 168:18
  168:21 169:13,17
  174:3 176:5
  178:13,18,23,24
  179:5,20 180:2,6
  180:24 181:2,8,10
  181:14 182:8
  191:25 192:19
  194:17,19 199:15
  199:25
**tener's** 114:12
  149:7 167:18
**term** 34:15 61:14
  61:19,22 77:2
  78:17 86:23 87:2
  87:8,13,18,25
  89:15 106:14
  136:2,4 142:4,6
  153:5 173:12

181:21 185:7
186:7 187:7,11
**terminating** 87:18
**terms** 15:22 61:5
183:14 187:14
**testified** 5:6 10:2
20:21 21:12 139:4
184:20
**testimony** 203:14
**text** 68:20
**thank** 201:25
202:3,4
**thanks** 5:13
**theatre** 57:15
**theresa** 86:7
**things** 10:20 13:18
**think** 8:18 9:13,19
16:10,11 17:11,20
18:17 21:4 22:14
22:17 23:7,19,20
25:15,17 26:12,18
27:5 29:25 34:6,8
34:13 36:18 38:17
41:22 42:20 48:16
53:13,18 58:22
60:7 62:6 64:10
69:9,20,24 73:21
77:22 85:13 89:25
90:17,23 92:7
94:8,13 106:11
110:13,22 113:21
116:11,17 119:6
122:20 130:19
158:14,21 159:9
166:7 174:2
178:24 181:25
182:15 190:8
191:7 196:23
**thinking** 78:20
**third** 140:14 151:2
192:2,3,6,8,14,16

192:21 193:2,3,10
**thought** 26:19
28:9 118:25 119:5
121:7
**three** 54:11 66:8
90:6 102:21 104:7
133:7,10 135:21
**time** 4:25 6:14,19
14:24 15:15 21:15
22:10,12 25:11,13
25:23 26:5,19
27:16 35:11,12,20
39:8 48:2 49:18
53:7,20 55:16
59:2 60:6,22 65:7
65:23 66:2 73:7
75:9,23 78:4
81:18 85:14 87:10
87:20,23 88:18
90:14,20 91:17
92:3,5 93:9,14,21
97:6 98:16 99:4,5
100:24 101:11
102:8 105:24
117:22 118:22
132:22 134:11
139:3 142:19
154:8 157:11,23
159:11 161:17
165:24 167:9,16
167:16 171:25,25
172:16 173:19
182:16 184:11
185:22 196:13
198:25 201:22
202:2,7
**times** 29:19 54:20
**title** 18:16 110:24
111:3 125:24
129:3

**titles** 18:19
**tli** 126:5,14 170:16
184:8,21
**today** 6:24 7:8,12
7:15 8:11,20 9:7
122:22 172:12
193:20 197:2
202:2
**today's** 4:4
**told** 26:8,13 27:7
35:25 69:4 77:20
78:8 84:24,24
103:22 104:17,20
114:17 115:13
120:4,8 182:11
**tom** 1:13 2:12 4:7
38:2,5,7 80:9
85:12,16,19 86:5
86:11,17 87:10
90:23 91:23 93:4
95:11,15,23 97:16
97:16 98:8 99:2
104:20 106:22
107:2,7 108:11
111:22 112:8,11
113:4,15,20
114:12 115:21
122:11 131:21,25
134:2 135:5
140:15 142:22
143:16 146:24
152:10,12,16,18
156:7 157:2
160:17,22,22
166:19,24 167:18
168:18,21 169:9
169:13,16 174:3
176:5 178:13,18
178:23,24 179:5
179:20 180:2,6,24
180:25 181:8,9,14

181:18 182:8,11
182:15,22 183:2
191:25 192:19
194:17,18 195:7
199:15,16,25
200:12 202:4,10
203:11 204:4
207:3,21
**tomorrow** 134:4
**tony** 20:20 28:17
28:17 50:8 73:4,8
**top** 8:5 24:18 39:5
46:16 51:7 52:7
97:15 100:10
109:10 117:10
128:9,10 131:15
132:25 133:24
156:5 180:22
187:18,23 188:9
**topic** 17:19 200:9
**topics** 127:6
**total** 54:6
**transaction** 14:9
**transfer** 30:6,21
**transform** 33:14
33:18
**treatment** 34:10
36:2,5,16,22
**tried** 107:15 123:2
**true** 203:14
**truth** 5:22
**try** 82:25 165:13
192:13
**trying** 8:14 52:5
52:19 92:24
105:16,19 145:13
190:9 192:2,8
**tucked** 25:3
**tuesday** 1:15
**turn** 40:6 64:17
88:19 99:18

146:16 148:19,22
150:25 152:20
162:15
**two**  8:4 49:21
69:17 97:10 105:2
106:12 147:10
148:3 149:16
177:7 197:12
**type**  14:15 17:25
82:15 196:16
**types**  13:18 18:4
19:5 159:25

**u**

**ultimately**  39:18
39:24 80:8 83:17
147:21 182:17
**ulurp**  46:24 47:2
47:11,19 48:9,14
55:7,13,17
**ulurp.pdf.**  46:11
**um**  38:25 40:9
98:7 148:24
181:13
**undergraduate**
10:10
**underlined**  127:17
**underneath**  40:22
82:3 171:18
**understand**  5:23
6:7,9 7:5 22:6
32:12 33:21,23
82:9 87:14 92:22
105:17,19 198:17
**understanding**
7:10 21:5 31:12
38:13 40:25 42:16
43:11 55:19 86:21
89:14 93:3 103:5
142:3 145:12
178:25

**understood**  6:12
92:17 93:9
**unencumbered**
132:10 142:12
**uniform**  47:3
**unique**  34:10 36:2
36:15,22
**unit**  4:6 72:3
**united**  1:2 4:11
**units**  55:24
**unknown**  139:24
**update**  132:7
133:6,10 134:5,7
141:2,8,20
**updated**  142:20
145:6,18 147:13
147:20,25 148:6
**updates**  134:6
**updating**  132:21
**upload**  156:20
**uploaded**  63:9
**upzoning**  76:3,8
150:12 151:13,22
**use**  34:8,15 44:21
47:4 57:22 83:10
92:17 93:10,11,13
93:20 98:23
102:16 103:11
107:4 132:11
142:13 145:2
153:2 169:12
**users**  126:5 170:16
184:8
**uses**  33:5,12 40:5
60:9 106:14
**utilized**  152:25
165:7

**v**

**v**  165:19
**va**  23:24 24:2,6,12
36:24 37:2,8,9

45:18 46:4,9
49:22 51:2 62:20
62:22 66:8,11
85:23 97:9,12
99:18 108:4,6
111:7,11 113:2,7
115:15,17 120:11
120:13 122:4,6
123:19,21 125:15
125:17 130:14
131:5,7 133:14,16
134:14,16 140:4,6
155:20 160:6,8
169:20,22 170:5
180:12,16 183:22
183:24 184:12
194:4,6 199:3,5,11
204:10,12,14,16
204:18,20,22,24
205:3,5,7,9,11,13
205:15,17,19,21
205:23,25 206:3,5
206:7,9,11
**vacant**  132:9
142:12 164:16
**valuable**  190:17
**valuated**  169:14
**valuation**  30:12
75:13,17 76:2,6
93:16,25 98:12,15
98:19,21 143:13
143:23 148:14
149:5,25 150:5
151:10 176:7
**valuations**  129:25
130:8
**value**  27:2,17,22
72:8,19 73:5
76:15 78:24 79:12
80:2 81:22 82:9
82:15,17 100:13

100:22 102:12,22
132:8 142:10
145:7,19 150:6
151:14 157:15,24
161:20 169:2
179:3,7 182:14
193:4,5,11,13
**valued**  76:6 180:3
**values**  104:12
169:9
**valuing**  164:16
**vanderbilt**  1:7
4:10 18:10,12,13
18:21 19:2,19
20:8 27:23 29:16
30:8,15 34:20,22
35:15 37:15,19,20
39:6 44:4,9,10,15
44:19 45:6 47:24
49:15 51:24,25
53:4,21,25 54:5,7
54:13,22 55:3,6,21
56:13,19 58:8,24
59:3,18 60:4,10,17
62:8 63:14 68:22
69:4,12,15 70:7
72:20,23 73:14
74:6,21 75:12,18
76:19,23 77:6
78:21 79:9,24
80:8,13,20 81:18
82:3,8 83:22
85:11 86:13 88:25
90:19,25 92:18
95:8 98:19 100:21
102:3 103:5 104:3
104:17,19,23
105:4,8,18 106:7
107:2,15,18
108:10 109:2,4,6
109:12,20,25

110:16,21 111:2,9
117:18,19 119:16
120:3,4 121:12,17
121:21 122:9
124:16 126:7,8,24
127:4 129:15
130:7,10,16 131:2
131:16 132:2,20
134:11 135:14
136:12 137:21
140:16,21 141:2,9
141:19 142:18
143:22 146:3,23
147:18 151:20,25
155:10,13 156:5
158:7,10,23
159:16 162:19
163:3,9,15,23
169:5,15 170:11
172:24 173:17
177:16 178:12,17
180:13 181:7
182:2 185:19
186:11,16,21
187:3,13 188:2,2
188:25 189:9,18
189:21 190:4,11
191:3 192:20
193:9,16 195:22
197:12,14,23
207:2
**vanderbilt's**  23:10
  25:25 26:6 39:21
  53:5 57:20 58:3
  63:20 74:16
  188:11 193:20
**variable**  187:17
**various**  163:7
  183:14
**vendors**  19:10,13
  19:14

**verbally**  6:3
**veritext**  3:22 4:21
  24:4,7 37:4 45:24
  50:2 51:3 66:13
  74:8 85:24 88:6
  95:4 97:25 99:9
  108:15 111:13
  113:9 115:24
  120:18 122:13
  123:23 125:19
  129:21 131:11
  133:18 134:20
  140:8 155:22
  160:10 162:9
  167:24 168:3,7,12
  169:24 174:10
  180:18 184:10,13
  194:8 199:7
**version**  147:13
**versus**  4:9
**vice**  112:5
**video**  4:7
**videoconference**
  2:13
**videographer**  3:21
  4:2,17 71:21 72:2
  137:4,8 138:15
  139:6 175:4,8
  191:15,20 201:15
  201:19 202:5
**videotaped**  1:12
  2:11
**view**  24:16 143:10
**virtual**  4:16 35:22
**vision**  39:23 41:2
  41:10,24 42:3,16
  42:23 45:14
**visit**  23:5
**vs**  1:6 207:2

## w

**wachtel**  160:19
  161:5 162:8
  163:10,18,22
**walder**  3:4 5:16
**wallace**  3:22 4:20
**walsh**  3:9 5:9,15
  12:8 17:21 23:23
  24:6,10 29:14
  32:15 33:20 36:14
  36:23 37:6 42:10
  42:24 43:19 45:17
  46:6 47:15,23
  49:19 50:4,23
  51:5 52:21 53:16
  54:8 56:12 59:22
  62:19,24 63:11
  65:20 66:7,15
  69:6 70:13 71:14
  72:6 74:4,11 75:2
  75:16,24 77:5,12
  79:8,19 81:5,7,23
  82:13 84:7 85:20
  86:2 88:4,8 91:9
  91:24 92:11 93:22
  94:7,19 95:2,6
  97:8,14,22 98:4
  99:6,11 102:9
  103:12 106:2,13
  106:21 107:9
  108:3,8,18 111:6
  111:15 112:25
  113:11 115:14,19
  116:2 117:4 119:8
  120:9,15,20
  121:23 122:3,8,15
  123:18 124:2
  125:14,21 129:2
  129:10,19,23
  131:4,9,13 133:13
  133:20 134:13,18

134:22 136:15,23
137:11 138:8,13
139:11 140:3,10
143:2 145:21
147:16 150:16
153:17,22 154:4
155:17,24 157:20
158:17 159:6
160:5,12 162:3,11
167:5,21 168:2,5,9
168:14 169:19
170:3 172:22
173:14 174:6,12
174:24 175:11
179:4,11,19 180:4
180:11,20 182:24
183:21 184:2,15
185:15,23 187:2
187:20 188:10
190:23 191:6,12
191:23 193:18
194:3,10 197:24
198:19 199:2,9
200:16,23 201:6
201:10,21,25
204:4
**want**  9:3 22:2
  33:25,25 43:7
  82:8 98:9 115:10
  121:18 174:13
**wanted**  26:11
  77:14 98:19
  101:22 132:2
  133:9 134:11
  135:14 137:12
  138:9 155:14
  176:8 196:7
**wants**  43:17 47:9
  47:17 186:12
**way**  13:8 27:22
  90:6 97:22 134:18

141:15 148:15
168:9 169:3 170:4
176:19 203:19
**we've**   59:9,16 61:5
71:14
**week**   133:5
**weeks**   19:21,25
23:5 73:9 133:7
133:11
**went**   10:7,8 127:4
**westchester**   3:6
**westernmost**
32:24
**whatnot**   8:15
**whereof**   203:21
**withdraw**   173:10
**witness**   5:2,4 12:6
17:18 29:13 32:9
33:17 36:12 42:5
42:20 43:16 47:13
47:21 50:22 52:16
53:11 54:5 56:10
63:10 65:18 69:3
70:11 71:20 74:10
74:24 75:15,21
77:4,9 79:2,6,18
81:2,20 82:12
84:6 91:7,21 92:7
93:19 94:4,17
102:7 103:9
105:23 106:11,19
107:6 108:17
116:24 119:4
121:21 128:21
129:9 142:25
145:16 147:15
150:14 153:15,21
154:3 157:18
158:14 159:3
167:3 172:21
173:11 175:3

178:22 179:9,16
179:25 180:8
182:21 184:12
185:13,21 186:24
187:16 188:7
190:21 193:15
197:20 198:17,23
200:14 201:3
202:3 203:11,15
203:21 204:3
**words**   28:11 65:11
**work**   11:10,11,13
11:14,17,17,23
13:9,25 16:2,18
17:23,25 81:15
82:14 86:12
122:19 123:10
133:5 165:5
171:12
**worked**   14:8 72:16
165:16
**working**   12:13,22
13:2 14:7,23
32:10 53:4 58:8
71:7 92:10 98:17
112:8,10 128:11
178:25
**works**   44:16 63:17
**workstation**   171:4
**worse**   67:12
**worst**   61:15,20
62:4,9 64:2 66:20
67:14 70:19
**wrapping**   191:8
**write**   151:6 156:8
199:16
**writes**   95:15
131:22 149:23
160:22 181:18
194:19

**written**   4:24 21:8
**wrong**   176:19
**wrote**   121:3,5
122:18 182:22
185:9,14

**x**

**x**   204:2

**y**

**yeah**   40:19 97:25
147:25 154:10
164:20
**year**   16:13 23:10
30:7 43:2 54:22
55:8 64:12,21,22
65:6,22 67:22
68:3,14,23 70:16
95:18,24 171:15
171:16 181:21
185:5,10,17
186:15,17,17,19
186:22,22 187:4,7
**years**   11:9 12:19
12:21 15:4 95:16
95:19 96:9 136:5
185:7,8 186:7,7
**yellow**   40:22
**yesterday**   8:21
**york**   1:3,14 2:17
3:8,16,16 4:13
124:7 165:18
170:21 203:3,10

**z**

**zaccagnino**   3:22
4:20
**zero**   123:17
**zone**   33:7,9
**zoning**   37:20 42:2
42:17 44:3,24
45:2,4,8,9,11,12
48:12,15,17 53:3

55:21 56:20 76:2
76:7 126:8 179:22
**zoom**   4:16 8:6
140:2

Case 1:19-cv-06471-DLI-ST   Document 62-27   Filed 06/24/22   Page 240 of 242 PageID #: 2539

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.