# EXHIBIT DDD

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------X

MCDONALD'S CORPORATION,

                  Plaintiff,

      -against-                Index No.:

                                 1:19-cv-06471

VANDERBILT ATLANTIC HOLDINGS LLC,

                  Defendant.

----------------------------------------X

                            September 17, 2021

                            10:02 A.M.

    EXAMINATION BEFORE TRIAL of CAROL DEMARCO, the

Witness herein, taken by the attorney for the

Defendant, pursuant to Notice, held remotely, before

Melissa Leonetti, RPR, a Notary Public of the State

of New York.

                        - - - -



Page 2

1

2                    A P P E A R A N C E S:

3

4     PASHMAN STEIN WALDER HAYDEN, PC
           Attorneys for the Plaintiff
5          2900 Westchester Avenue, Suite 204
           Purchase, New York 10577

6

      BY:  BRENDAN M. WALSH, ESQ.

7

8     MEISTER SEELIG & FEIN, LLP
           Attorneys for the Defendant
9          125 Park Avenue, 7th Floor
           New York, New York 10017

10

      BY:  HOWARD S. KOH, ESQ.

11

12

13

14    ALSO PRESENT:

15    STACY HOWARD

16    MICHAEL MEYER

17    NAT LOPEZ

18

19

20

21

22

23

24

25



1

2          F E D E R A L    S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED, by and

5     between the parties hereto, through their

6     respective Counsel, that the certification,

7     sealing and filing of the within examination will

8     be and the same are hereby waived;

9          IT IS FURTHER STIPULATED AND AGREED that all

10    objections, except as to the form of the question,

11    will be reserved to the time of the trial;

12         IT IS FURTHER STIPULATED AND AGREED that the

13    within examination may be signed before any Notary

14    Public with the same force and effect as though

15    signed and sworn to before this Court.

16

17

18

19

20

21

22

23

24

25



Page 4

1                          C. DEMARCO

2     C A R O L   D E M A R C O, after having first been

3     duly sworn by a Notary Public of the State of New

4     York, was examined and testified as follows:

5     EXAMINATION BY

6     HOWARD S. KOH, ESQ.:

7          Q.    Good morning, Ms. DeMarco.  My name is

8     Howard Koh.  I'm counsel for Vanderbilt Atlantic

9     Holdings, LLC, in this action that McDonald's, your

10    employer, has brought against my client.

11              I'm going to be taking your deposition

12    today.  As we discussed before we went on the

13    record, it's important that we all speak one at a

14    time and to take a pause before we speak, so

15    please remember to do that.

16              Is that fair?

17         A.    Yes.

18         Q.    Have you ever been deposed before, Ms.

19    DeMarco?

20         A.    No.

21         Q.    Okay.  Well, I will be asking you a

22    series of questions that relate to this case.  Be

23    sure that you hear and understand the question.  If

24    you do not hear or understand the question, please

25    ask me to repeat or rephrase and I will be happy to



Page 5

```
1                          C. DEMARCO
2    do that.
3               Does that sound fair?
4         A.    Yes.
5         Q.    If you would like to take a break at any
6    time, I'm happy to do that.  Just please answer the
7    pending question and we can arrange to take a break
8    on the record if you let me know that's what you
9    would like to do.
10              Does that sound fair?
11        A.    Yes.
12        Q.    Let's begin, then.
13              What, if anything, did you do to
14   prepare for today's deposition?
15        A.    I looked at the lease documents to
16   refresh my recollection of the lease and all the
17   option rent addendums and reviewed my file.
18        Q.    When you say you reviewed your file, what
19   are you referring to specifically?
20        A.    I reviewed my file that I keep on a deal
21   that I'm negotiating.
22        Q.    Is that a paper file?  A computer file?
23   Something else?
24        A.    I would have reviewed details that I
25   would have saved on my computer as well as a paper
```



Page 6

1                         C. DEMARCO

2     file.

3         Q.    So it's both computer and paper.  Where

4     is this paper file kept?

5         A.    Where is it kept?

6         Q.    Is it in an office somewhere?  In your

7     house?

8         A.    My remote home office.

9         Q.    Did you turn this file over to McDonald's

10    counsel in this case for production?

11        A.    Yes.

12        Q.    Did you arrange for electronic -- for

13    access to McDonald's counsel to your computer files?

14        A.    Yes.

15        Q.    This computer file, is it kept on a

16    McDonald's server or somewhere else?

17        A.    I only have a McDonald's computer.  I do

18    not have any other personal computer, personal

19    email.  I don't have anything like that.  So I don't

20    have a personal phone.  I don't have a personal

21    email.  So it would be on a McDonald's computer.

22        Q.    So you own no personal cell phone?

23        A.    I own no personal cell phone.

24        Q.    Did McDonald's have access to your --

25    well, do you have a McDonald's-issued cell phone?



Page 7

```
 1                      C. DEMARCO
 2      A.    Yes, I have a McDonald's-issued cell
 3   phone.
 4      Q.    And did McDonald's have access to it to
 5   review in advance of this deposition?
 6            MR. WALSH:  Objection to the form.
 7      Q.    Go ahead and answer if you understand the
 8   question.
 9      A.    McDonald's has access to all equipment
10   McDonald's issues to its employees.
11      Q.    Did you meet with anybody to discuss this
12   deposition prior to appearing here today?
13      A.    I don't understand.  Could you clarify
14   the question.
15      Q.    Did you have either a personal meeting or
16   an online meeting or telephone call with anyone to
17   discuss your deposition prior to appearing here
18   today?
19      A.    Yes.
20      Q.    Who was that?
21      A.    I met with in-house counsel and outside
22   counsel.
23      Q.    Tell us the names of those people.  I'm
24   not interested in what you discussed, just the
25   names.
```



Page 8

```
 1                        C. DEMARCO
 2        A.    Brendan Walsh, Stacy Howard, and Mike
 3   Meyer.
 4        Q.    Other than the three people you've just
 5   listed, have you discussed your deposition with
 6   anyone else?
 7        A.    No.
 8        Q.    Where are you sitting now giving this
 9   deposition?
10        A.    I'm sitting in a conference room in the
11   Stamford field office at 695 East Main Street in
12   Stamford, Connecticut.
13        Q.    Is anybody else in the room with you?
14        A.    There's no one else in the building.
15        Q.    Okay.
16              Do you have your McDonald's-issued cell
17   phone with you?
18        A.    Yes, I do.
19        Q.    Can you turn it off and put it away for
20   the duration of this deposition, please.
21        A.    It has been turned off and put away.
22   Prior to the start of the deposition, I turned it
23   off.
24        Q.    Other than the Zoom app for this
25   deposition, the AgileLaw app, do you have any open
```



Page 9

1                     C. DEMARCO

2    applications in the computer you're sitting in front

3    of?

4         A.    No.

5         Q.    Did you do anything to search for

6    documents relating to this case before coming here

7    today?

8              MR. WALSH:  Objection to the form.  And

9         if you can clarify the time frame.

10        Q.    At any time prior to coming here today,

11   did you, in response to a request from a lawyer from

12   McDonald's, do anything to search for documents

13   relevant to this case?

14        A.    Can you repeat the question.

15        Q.    Sure.

16              Prior to coming here today, did you do

17   anything to search for documents at the request of

18   a McDonald's lawyer or outside counsel that are

19   relevant to this case?

20        A.    No, I didn't search for documents at the

21   request of a lawyer in connection with this case.

22   They have access to my computer and my files, so I

23   didn't search anything else.

24        Q.    Is there anything that you're aware of

25   that would prevent you from testifying truthfully



Page 10

```
 1                        C. DEMARCO
 2   here today?
 3        A.    No.
 4        Q.    Can you describe your educational
 5   background for us.
 6        A.    I have an associate's degree from Post
 7   College.  I have taken courses at University of
 8   Connecticut and short of a language requirement
 9   didn't complete my bachelor's and left the college.
10              I completed my curriculum to graduate
11   with an economics degree, bachelor's degree in
12   economics, short of one language requirement that
13   I did not complete.  So my degree is an
14   associate's degree from Post College in marketing.
15        Q.    What is your current position at
16   McDonald's?
17        A.    I'm an asset manager.
18        Q.    How long have you held that position?
19        A.    15 years.
20        Q.    What are your responsibilities as an
21   asset manager for McDonald's?
22        A.    I'm responsible for lease portfolio of
23   about 320 properties.
24        Q.    Are those properties located in a
25   specific geographic region?
```



1                          C. DEMARCO

2        A.    Yes.

3        Q.    Tell us what that region is.

4        A.    It's the New York Metro region including

5   the five boroughs, 13 counties in New Jersey,

6   Fairfield County, Connecticut, and like eight

7   counties in New York State as well as Long Island.

8   So the New York City market.  I've had the five

9   boroughs for 15 years in the New York City market.

10       Q.    So during the entire 15 years you've been

11  employed by McDonald's as an asset manager, you've

12  always had the same territory?

13       A.    That's correct.

14       Q.    Does anybody report to you in your role

15  as an asset manager?

16             MR. WALSH:  Objection to the form.

17       Q.    You can answer if you understand.

18       A.    Not currently.  No one reports to me.

19       Q.    In the past, has anybody reported to you?

20       A.    Yes.

21       Q.    Can you tell me when that changed?

22       A.    I don't recall.  It was years ago.  It

23  was just over the 15 years I've had people report to

24  me as a training exercise and developing new asset

25  managers.



Page 12

```
 1                        C. DEMARCO
 2        Q.    Do you report to anybody?
 3              MR. WALSH:  Objection.
 4        A.    Yes, I do.
 5        Q.    To whom do you report?
 6        A.    To Dave Kearns.
 7        Q.    What is his position?
 8        A.    He's a director of asset management.
 9        Q.    Do you know how long Mr. Kearns has held
10   that position?
11        A.    At least 15 years since he hired me.
12        Q.    That helps.  Thank you.
13              MR. KOH:  Let's bring up the 1998 0318
14        ground lease, Exhibit 1 to the complaint.
15              Nat can you do that, please.
16        Q.    Now, that we all have the document, have
17   you seen what's been previously marked as Exhibit C
18   before, Ms. DeMarco?
19        A.    It's a ground lease -- yes, I have seen
20   the ground lease before.
21        Q.    Were you working at McDonald's when the
22   ground lease was negotiated?
23        A.    Yes, I was.
24        Q.    What was your title at the time?
25        A.    So let me clarify.  I was working with
```



1                    C. DEMARCO

2    McDonald's.  I was not handling or working for what

3    was the New York region at the time.  I worked in

4    the New Jersey office as a new site acquisition

5    manager.

6              So although I was with McDonald's when

7    this lease was signed, I had no knowledge of this

8    at this time because I worked in a different

9    office and had a different geography.

10       Q.    Is it accurate to say you didn't

11   participate in the negotiation of the ground lease

12   we're looking at?

13             MR. KOH:  Objection to the form.

14       Q.    You can answer if you understand it.

15       A.    I did not negotiate this ground lease.

16       Q.    Do you know who did?

17       A.    No, I do not know who did.

18             MR. KOH:  Let's bring up the next

19             document, please, which is -- I believe it

20             should be marked as my Exhibit 3.  It's the

21             rent term addendum.

22             MR. WALSH:  Are you able to see it?

23             It's showing up as document 1 on mine.

24             THE WITNESS:  I see it.

25       Q.    Are you familiar with what had been



Page 14

```
 1                        C. DEMARCO
 2    previously marked as Exhibit D?
 3         A.    Yes.
 4         Q.    Tell us what Exhibit D is.
 5               MR. WALSH:  Objection to the form.
 6         Q.    You may answer.
 7         A.    Exhibit -- it's -- I'm still not great at
 8    this split screen thing.  Exhibit D is the option
 9    rent addendum.
10         Q.    That's part of the lease for the property
11    at 840 Atlantic Avenue in Brooklyn, New York,
12    correct?
13         A.    The option rent addendum is part of the
14    original ground lease for 840 Atlantic.
15         Q.    I would like to look at the second page
16    of the option rent addendum marked as Exhibit D.  I
17    would like to focus on the second paragraph there.
18               It reads:  The rental value shall be
19    established based upon a definition of fair market
20    rental value as the price which an average
21    well-informed tenant would pay to an average
22    well-informed landlord.
23               Let me start again.
24               The rental value shall be established
25    based upon a definition of fair rental market
```



```
1                          C. DEMARCO
2    value which an average well-informed tenant would
3    pay and an average well-informed landlord would
4    accept exclusive of tenant's improvements, knowing
5    all of the uses to which the property can be put
6    without duress on either party.
7              What does that paragraph mean to you?
8              MR. WALSH:  Objection to the form and
9         to the extent that it asks this witness for a
10        legal conclusion.
11             MR. KOH:  I understand.
12   Q.   What does the paragraph mean to you?
13   A.   I read it in the plain language that it's
14   written.  I would interpret it to mean what it says.
15   Having done this for 15 years, I'm very familiar
16   with language similar to this.  I take it for the
17   language as its written.  I'm not sure what you're
18   looking for.
19   Q.   Have you heard of the term "highest and
20   best use"?
21   A.   Yes.  In the 28 years I've been with
22   McDonald's, I've heard of the term "highest and best
23   use."
24             MR. WALSH:  Objection to the form.
25   Q.   What do you understand "highest and best
```



Page 16

```
 1                         C. DEMARCO
 2    use" to mean?
 3              MR. WALSH:  Objection to the form.
 4         Q.    You can answer.
 5         A.    I'll go back to the document.  It means
 6    knowing all the uses to which a property can be put.
 7    So that, to me, is a short simplistic version of
 8    "highest and best use," considering all zoning
 9    subject to the lease, knowing all uses to which the
10    property can be put without duress on either party.
11         Q.    Is it fair to say that what this clause
12    that we're looking at is telling us is the
13    definition of fair rental market value is the
14    highest and best use considering the existing zoning
15    at the property?
16              MR. WALSH:  Objection to the form and
17              to the extent it calls for a legal
18              conclusion.
19         Q.    You may answer.
20         A.    I'm not clear with what you're asking.
21         Q.    Well, what I'm trying to get at is:  Does
22    this clause tell us that the fair market rental
23    value is defined as the "highest and best use"?
24              MR. WALSH:  Objection.
25         Q.    Given existing zoning.
```



Page 17

```
 1                    C. DEMARCO
 2            MR. WALSH:  Objection to the form and
 3        to the extent it calls for a legal
 4        conclusion.
 5            MR. KOH:  You can object.
 6        A.    So, Howard, I'm not an appraiser and I'm
 7    not an attorney.  Can I ask you to repeat the
 8    question.  I'm sorry.  I know what you were
 9    thinking, but just if you can repeat your question.
10        Q.    Absolutely.
11            What I'm trying to get at it is:  Does
12    this clause tell us that the fair market rental
13    value is defined as the "highest and best use,"
14    taking into account all existing zoning?
15            MR. WALSH:  Same objection.
16        Q.    Go ahead.
17        A.    Existing zoning New York law, I mean,
18    it's just not as narrowly defined as you're
19    describing it, so I don't agree with how you're
20    describing it.
21            It doesn't say "highest and best use"
22    here, so to say does this imply that this is the
23    highest and best use is making an assumption.  I
24    would just read the language as it's written and
25    that's how I would proceed.
```



Page 18

1                       C. DEMARCO

2        Q.    Tell me how you would distinguish the

3   language as is written from "highest and best use."

4              MR. WALSH:  Objection to the form and

5        to the extent that the phrase hasn't been

6        defined.

7        A.    I'm not an appraiser, Howard, so I

8   couldn't articulate that for you.  Again, I'm

9   focused on the language that was in the lease, and

10  that's what we worked with.

11             You know, I can't answer what your

12  question is.

13       Q.    In your view, how should this property be

14  appraised in light of this definition of fair market

15  rental value?

16             MR. WALSH:  Objection to the form to

17       the extent it calls for a legal conclusion.

18       Q.    You may answer.

19       A.    Can you repeat the question.

20       Q.    In your view, how should this property be

21  appraised, given this definition of fair rental

22  market value?

23             MR. WALSH:  Same objection.

24       A.    (No verbal response given.)

25       Q.    Do you understand the question?



1                        C. DEMARCO

2        A.    I'm not an appraiser, so I can't

3   interpret what you're trying to connect.  I read the

4   option rent addendum extensively and I read it as

5   you read it to me and I read it as it's written that

6   the fair market -- I'm sorry -- the rental value

7   shall be established based upon the definition of

8   fair market rental value as the price which an

9   average well-informed tenant would pay and an

10  average well-informed landlord would accept

11  exclusive of tenant's improvements, knowing all of

12  the uses to which the property can be put without

13  duress on either party.

14            And it goes on to say, you know, the

15  standard market data approach -- I mean, there's

16  more language to that.  You just want to ask

17  questions on that one piece, but I think you have

18  to look at the entire document to fully understand

19  how this should be completed.

20       Q.    In your view, how should the appraisal be

21  completed?

22            MR. WALSH:  Objection to the form and

23       to the extent it calls for a legal

24       conclusion.

25            MR. KOH:  I'm not asking for a legal



Page 20

```
1                         C. DEMARCO
2        conclusion.  You can please drop that.  It's
3        coaching.
4               MR. WALSH:  I'm not coaching.  I'm
5        making my objection.
6               Howard, you're asking a witness to
7        interpret a document.
8               MR. KOH:  You're still doing it.
9               MR. WALSH:  I stand by my objection.
10              MR. KOH:  And I will ask the question.
11       Q.     How should this property be appraised,
12   given -- my question is:  In your view, how should
13   the appraisal for this property be completed?
14              MR. WALSH:  Same objection.
15       A.     (No verbal response given.)
16       Q.     You may answer, Ms. DeMarco.
17       A.     I'm trying to understand what you're
18   asking me.  We have an option rent addendum which
19   defines how the process should work if the parties
20   cannot agree on the value.
21              And I was guided by the document, which
22   is more than the one paragraph and two sentences
23   or one long sentence that you and I read to each
24   other.
25       Q.     I'm now giving you the opportunity to
```



Page 21

```
 1                      C. DEMARCO
 2   tell me based on the entire document how you believe
 3   the appraisal should be completed.
 4              MR. WALSH:  Objection to the form.
 5      Q.    You may answer.
 6      A.    It should be completed for the purposes
 7   of establishing the rent for the option based on the
 8   option rent addendum.
 9      Q.    I understand.
10              Do you have to be an appraiser or a
11   lawyer to be able to tell whether an appraisal was
12   completed in accordance with the option rent
13   addendum?
14              MR. WALSH:  Objection to the form.
15      A.    I don't understand the question.
16      Q.    I'll come back to it.  Why don't we move
17   on to some other questions.
18              Have you been involved in -- are you
19   familiar with appraisals for other properties
20   beyond 840 Atlantic Avenue in Brooklyn?
21              MR. WALSH:  Objection to the form.
22      A.    Can you repeat the question.
23      Q.    Have you been involved or are you
24   familiar with other appraisals beyond 840 Atlantic
25   Avenue in Brooklyn?
```



Page 22

1                        C. DEMARCO

2       A.    Yes, I'm familiar with valuations.  Not

3   always appraisals, but yes, I'm familiar with

4   valuations and appraisals for other properties.

5             Again, I've handled Brooklyn as part of

6   the New York City area for 15 years, so yes, I'm

7   familiar with appraisals.

8       Q.    Can you describe how you're familiar with

9   appraisals.

10            MR. WALSH:  Objection to the form.

11      A.    Can you be more specific.

12      Q.    How many appraisals have you read in your

13  career at McDonald's?

14      A.    Well, so I've been at McDonald's for 28

15  years.  I've been in the New York City market for

16  15.  I've reviewed a fair amount of appraisals over

17  the 15 years in the boroughs as well as 28 years at

18  McDonald's.  I don't have an exact number.

19      Q.    So more than 100?

20      A.    I don't even think it was 100.

21      Q.    So more than 50?

22      A.    I don't want to speculate, Howard.  I've

23  reviewed a fair amount over the course of -- I would

24  review an appraisal if one was done for any number

25  of reasons, so...



Page 23

1                          C. DEMARCO

2              I never thought to stop and count,

3    Howard.  I'm sorry.

4         Q.   It's okay.  Is it more than ten?

5         A.   Yeah.

6         Q.   Okay.

7              Have you ever ordered appraisals be

8    completed on McDonald's behalf?

9              MR. WALSH:  Objection to the form.

10        Q.   Have you ever requested appraisals be

11   completed for properties on behalf of McDonald's?

12        A.   I've ordered appraisals on behalf of

13   McDonald's in connection with requirements in the

14   lease, yeah.

15        Q.   Does McDonald's have any methodology that

16   it uses to track the fair market rental value of the

17   properties that it leases?

18             MR. WALSH:  Objection to the form.

19        A.   Can you repeat the question.

20        Q.   Yes.

21             Does McDonald's have any system whereby

22   it tracks the fair market rental value of the

23   properties that it leases?

24             MR. WALSH:  Same objection.

25        A.   Not specifically to your question, no.



Page 24

```
 1                          C. DEMARCO
 2    We do track sites that have -- I track sites that
 3    have fair market value options coming up.  I track
 4    all leases for the 320 sites that I manage in the
 5    New York Metro market, and I track them on a
 6    three-year basis, five-year basis, ten-year basis.
 7              So there's all sorts of information
 8    that I track, Howard.
 9        Q.   What do you track about the fair market
10    rental value specifically?  Do you track those on a
11    three-year basis?
12              MR. WALSH:  Objection to the form.
13        A.   I track critical dates, and the critical
14    dates could be a lease ending with no options.  It
15    could be a lease that has an unstated or undefined
16    rent.  It might be a CPI adjustment that would need
17    to come in the future.
18              So I track all -- very date-driven
19    situations.  I track all dates three years out,
20    five years out, ten years out.  So I would know
21    any critical dates that were coming up on a
22    property.
23              And that critical date may not be just
24    something that has a rent reset.  It could be just
25    ending no options.  It could be an exercise of a
```



Page 25

```
 1                         C. DEMARCO
 2    stated rent option or a CPI option.
 3         Q.    And is the information that you track
 4    limited to the dates or does it include other
 5    information as well?
 6         A.    It includes other information.
 7         Q.    Can you tell us what that other
 8    information is.
 9         A.    It includes the location.  It includes
10    all term expires, so current term expires, all term
11    expires, an option exercise date, whether the site's
12    been modernized or not, how old the building is, the
13    address, the city, the state.  Things like that.
14         Q.    Did there come a time when you learned
15    that my client, Vanderbilt Atlantic Holdings, LLC,
16    had acquired the ground lease at 840 Atlantic
17    Avenue?
18         A.    Yes.  Your client told me he acquired the
19    property at 840 Atlantic Avenue in February of 2018.
20         Q.    Was that on a telephone call?
21         A.    Yes, it was on a call.
22         Q.    Tell us everything you can remember that
23    was said on that call.
24         A.    So Sam reached out to me to advise that
25    he entered into a 99-year lease for the property.  I
```



MAGNA
LEGAL SERVICES

```
 1                          C. DEMARCO
 2      don't remember the exact date, but it was February
 3      of 2018.
 4                  We had a conversation around the
 5      upcoming option.  We had a conversation about the
 6      lease.  He was very happy to tell me that he had a
 7      99-year lease and that this property was a
 8      redevelopment site and what would McDonald's do if
 9      we didn't like the rent for the option.
10                  I discerned very quickly in my short
11      conversation with him that he was trying to
12      develop an exit strategy for me and I'm trying to
13      talk about our plans to modernize the restaurant,
14      that we had, you know, ten years through 2039, and
15      the kids were all excited that we were going to
16      modernize the restaurant.  You know, we started
17      modernizing the restaurant in January of 2018.
18                  So we talked about -- I was very
19      excited to share with him.  I congratulated him on
20      acquiring a 99-year lease, and it was nice to meet
21      him and I was very happy to tell him we were
22      modernizing the restaurant.  And that had actually
23      started in January of 2018, and the kids at the
24      restaurant were very excited about it.  They take
25      a lot of pride in when we modernize a restaurant.
```



1                    C. DEMARCO

2    I was happy to share that with him.

3              He pivoted the conversation back to,

4    well, this is a redevelopment site and what would

5    you do if you don't like the rent.

6              And I said, well, it's a little -- we

7    didn't really start a conversation about rent on

8    that call.  I said, it's a little premature to

9    have that conversation, Sam, but that, you know,

10   we're very happy at this restaurant.

11   Congratulations on acquiring the 99-year lease.

12   We're continuing to modernize.

13             And he didn't have any information on

14   that call about rent.  I said the first step is

15   let's have a conversation about values.

16             But I was very disheartened, Howard,

17   that on the very first call he wanted to talk to

18   me about what I am going to do if McDonald's

19   didn't like the rent.

20             So just from the very first

21   conversation, he was talking about McDonald's

22   leaving and I'm trying to talk about how we're

23   here for the long-term, that we were looking to

24   modernize.

25             So we left the call and he was going to



Page 28

```
 1                      C. DEMARCO

 2    do some research and look at values.  So that's

 3    what I can remember.

 4              Sorry for all the detail.

 5        Q.    I appreciate as much detail as you

 6    provided.  I appreciate the answer.

 7              Did there come a time after this

 8    conversation where you again spoke to Mr.

 9    Rottenberg?

10        A.    Yes.

11        Q.    And when was that?

12        A.    That was in May of 2018.  We had received

13    a letter with his opinion of value or of rent that

14    he was thinking, and so we had a call to discuss

15    that in May.  I don't recall the exact date.

16    Shortly after he sent us that letter, he and I got

17    on a call to discuss that.

18              MR. WALSH:  Nat, can you bring up what

19         I had designated Exhibit Number 10.

20        Q.    Is this the letter to which you just

21    referred?

22        A.    Yes.

23        Q.    Am I correct to assume that the

24    conversation that you had started to describe

25    occurred sometime in May, after May 10, 2018?
```



1                          C. DEMARCO

2         A.    Yes.  After we received this letter, I

3   reached out to Sam to have a conversation.  I

4   reached out a couple of times.  We connected and we

5   had a conversation about this and his valuation.

6   I'll leave it there.

7         Q.    Describe this conversation for me.

8         A.    Well, I was, you know, surprised that he

9   had, you know, come up with a value of 975,000, and

10  the 80 percent, you know, is what's stipulated in

11  the lease, so that's a calculation.

12              But his value was 975,000, so I asked

13  him, Sam, can you help me understand how you came

14  up with this?  Like, you know, what was your

15  methodology?  What was your research?

16              And he said, well, I talked to brokers.

17  He didn't have comps.  He didn't have a report.

18  He didn't have anything.  Sam's response to me was

19  "I had a conversation with brokers."

20              And so I said we talked about this

21  letter and there was conversation at that very

22  first call that based on information that I had,

23  this was wildly in excess of what I personally

24  valued the site at in late 2017 for the purposes

25  of a reinvestment plan.



Page 30

```
 1                          C. DEMARCO
 2               So I was sharing with Sam -- I said,
 3     Sam, you and I are like worlds apart in this.  I
 4     need to understand how you came up with this.  And
 5     I said, you know, can you share with me your
 6     research.
 7               He basically said he didn't have any
 8     research.  He didn't have a report.  He didn't
 9     have comparables.  It was all based on
10     conversations with brokers.
11               There was no research, no reports, no
12     comps.  Just conversations with brokers.
13          Q.    And you said that this was wildly in
14     excess of what you personally valued the site in
15     late 2017 for purposes of a reinvestment plan; is
16     that correct?
17          A.    Yeah, that's correct.  Because if you
18     recall, when I spoke to Sam in February of 2018, I
19     mentioned to Sam that we were modernizing the
20     restaurant.  So as part of that, we would -- you
21     know, I had done a value myself prior to January of
22     2018 before we started.
23          Q.    And was this value reduced to writing?
24          A.    Yes.  It was an email that I gave to the
25     field office.
```



Page 31

1                          C. DEMARCO

2        Q.     What did you value the rent at in that

3   2017 email that you gave to the field office?

4              MR. WALSH:  Objection to the form.

5        Q.     Go ahead.  Answer the question if you

6   can.

7        A.     I'd rather you clarify.  I mean, I have

8   nothing here.  You know, I'm doing this off memory

9   and this was 2017.  I valued it -- and I could be

10  off slightly -- in the under 300,000 -- in the 250,

11  300, 325 -- something like that range.

12             But his value of 975 was two times what

13  I was thinking, so I was trying to understand from

14  Sam, like help me understand why you're thinking

15  this.

16             And he didn't have any facts to support

17  that number, and so I think we knew very quickly

18  this was not going to be something that he and I

19  could negotiate together.

20       Q.     Do you recall how you came to the

21  understanding or belief that the property at 840

22  Atlantic Avenue would have a fair market rental

23  value of less than $300,000 per year?

24             MR. WALSH:  Objection to the form.

25       A.     Can you repeat the question, please.



1                          C. DEMARCO

2        Q.     Do you recall how you came to the

3    understanding or belief that the property at 840

4    Atlantic Avenue would have a rental value of less

5    than $300,000 per year?

6                MR. WALSH:   Objection to the form to

7           the extent it mischaracterizes the testimony.

8                MR. KOH:   It doesn't mischaracterize

9           the testimony.

10       Q.     You can answer.

11       A.     I'm thinking.   What Sam did share with

12   me, Howard, was that he was -- you know, early on

13   when you recall the February 2018 call where Sam

14   said "this is a redevelopment site."   Right?

15               That was then brought up again to me

16   when he -- when we talked about this letter of May

17   of 2018 again that that was a redevelopment site,

18   and so -- considering the zoning.

19               So when I valued the property in

20   October of 2017, approximately 2/4 of 2017

21   sometime, I was doing research on comparable

22   ground leases in the area and trying to understand

23   the value.

24               So I did my own internal research,

25   Howard, looking at LoopNet, looking at, you know,



Page 33

1                              C. DEMARCO

2    brokers' websites, getting information, just my 15

3    years' experience in Brooklyn and the deals I'm

4    familiar with.

5              So, I mean, I did my own research,

6    Howard, and I came up with that value prior to any

7    conversation with Sam.  In October of 2017, I

8    didn't even know Sam had brought the property.  I

9    didn't talk to Sam until February of 2018.

10        Q.    Did anyone assist you with this research

11   that you were doing in October or the fourth quarter

12   of 2017?

13        A.    No.  That's part of what I do as an asset

14   manager.

15        Q.    After you had this conversation with Sam

16   Rottenberg in May of 2018, what did you do next with

17   respect to the property at 840 Atlantic Avenue?

18              MR. WALSH:  Objection to the form.

19        Q.    Do you understand the question?

20        A.    No.  Can you repeat the question.

21        Q.    Sure.

22              After you had this conversation with

23   Sam Rottenberg in May of 2018, what did you do

24   next with respect to the property at 840 Atlantic

25   Avenue?



Page 34

1                    C. DEMARCO

2        A.    I don't -- I don't recall exactly what I

3   did shortly after that.  I don't recall.

4        Q.    Okay.  When was the next time that you

5   spoke to Mr. Rottenberg concerning the property at

6   840 Atlantic Avenue?

7        A.    I actually don't recall when we talked

8   after that.  I think he and I both knew this was

9   going to be a very different -- I would tell you,

10  Howard, 90 percent of what I do as an asset manager

11  is I negotiate these types of fair market value rent

12  resets with landlords directly outside of not

13  needing to use the formal process as dictated in the

14  lease.

15              This is, you know, an exception and one

16  of the few times we've done that.  Other times

17  I've done that actually, Howard, is if it's an

18  unsophisticated landlord and they're just not

19  comfortable negotiating on their own.

20              But typically, in the 15 years I've

21  been here, 90 percent or more of these fair market

22  value deals, I negotiate directly with the

23  landlord.

24              And from Sam's first conversation with

25  me in February of 2018 where he said, Carol, well,



1                          C. DEMARCO

2     what is McDonald's going to do if they don't like

3     the rent, he was trying to talk about an exit

4     strategy with me, not trying to work through a

5     rent with me.

6                Then I get this letter in May of 2018

7     which was wildly excessive where I came up with a

8     value which only then further confirms my

9     feelings, that he's -- without any documentations

10    for him, that he's trying to make a rent that's

11    something then we won't want to stay there.

12                So after this letter and our call in

13    May, I said, well, we are so far apart, we're

14    going to need to use the formal process, and he

15    agreed.  And then I don't recall the next time I

16    spoke to him.

17         Q.    I assume you know who Sharon Locatell is,

18    correct?

19         A.    Yes, I know Sharon Locatell.  She's the

20    president of Appraisers and Planners.

21         Q.    Were you the person who on McDonald's

22    behalf retained Sharon Locatell for this project?

23         A.    I don't believe I retained her.  I had

24    reached out to discuss with her that I would need --

25    I reached out to see if she would be available, but



1                     C. DEMARCO

2    I believe the retention -- I don't know if I

3    retained her.  Usually I do that in connection with

4    an engagement letter that's done by legal.

5         Q.    But were you the person at McDonald's who

6    made the initial contact with Sharon Locatell

7    concerning the property at 840 Atlantic Avenue?

8         A.    I don't recall who had the first

9    conversation with her, Howard.

10        Q.    Okay.

11              Had you worked with Sharon Locatell

12   before?

13        A.    Yes, I have.

14        Q.    On how many occasions?

15              MR. WALSH:  Objection to the form.

16        Q.    You can answer that question.

17        A.    I don't know exactly how many times I've

18   worked with Sharon, but I've worked with Sharon at

19   least ten years, maybe.  It would typically only be

20   in connection if I needed an appraiser for

21   something.

22              I don't always get an appraisal,

23   Howard, on all the deals I touch during the year.

24   It's on a select basis.

25        Q.    I understand.



C. DEMARCO

1

2          MR. KOH:  Let's bring up what I have

3     designated as Document Number 8.  It was

4     previously marked as Exhibit E at Mr. Meyer's

5     deposition.

6     Q.    Let me know when that's in front of you.

7     A.    I opened Exhibit E, yes.

8     Q.    Let me know when you have had a chance to

9     review that and I will ask some questions.

10     A.    Okay.

11     Q.    Do you see in -- well, first of all, tell

12     us who Brooke Sugaski-Hartman is.

13          Who is that?

14     A.    She's a real estate person with

15     McDonald's.

16     Q.    What do her responsibilities entail?

17     A.    She supports the field office.  I don't

18     know exactly what her role is, but she is the real

19     estate lead, I guess you would say, for the Stamford

20     -- the New York Metro area that I cover in the

21     Stamford field office.

22     Q.    Let's first focus on your email to

23     Ms. Hartman where you say:  Subject of valuation --

24     and this is in the fourth paragraph of your email.

25          "Subject of valuation.  I would



Page 38

1                           C. DEMARCO

2    estimate range based on other deals in Brooklyn,

3    not in this exact area.  I would value land of 250

4    to 300 ground lease today."

5               How did you come up with that number

6    for that range?

7         A.    I did research on -- you know, based on

8    my 15 years of experience in handling Brooklyn and

9    the five boroughs, I, you know, considered based on

10   my knowledge, and I also researched, you know,

11   platforms that have information on ground leases

12   like LoopNet and also markets.

13              You know, there's many brokerage

14   websites that would offer information on values,

15   so that in addition to my experience in this area

16   for 15 years.

17        Q.    And you then write:  If you assume 4

18   percent per year appreciation for rent in 2019, rent

19   estimate 270,000 to 325,000 per the lease, our rent

20   would be 80 percent, or 216,000 to 260,000 in 2019.

21              Why did you choose the 4 percent

22   appreciation rate?

23        A.    It was conservative.  You know, land

24   values haven't appreciated more than 3 percent a

25   year over the last 20 years historically across the



Page 39

1                          C. DEMARCO

2    country.  But I was trying to be more conservative

3    and I said 4 percent of the land appreciation value.

4         Q.    What about in Brooklyn?  What do you know

5    of the appreciation of land values in Brooklyn

6    during this time period?

7              MR. WALSH:  Objection to the form.

8         Q.    You can answer.

9         A.    For this particular property, I thought

10   that that was a conservative appreciation value to

11   use in this preliminary analysis.

12        Q.    Why?

13        A.    Because, again, values have not

14   appreciated more -- why don't you repeat your

15   question so I'll try to help you get to what -- what

16   are you asking.

17        Q.    I'm asking why you think 4 percent was a

18   conservative number to use for the appreciation.

19        A.    I thought it was more aggressive than 3

20   percent, which is what I would use typically in

21   other areas outside the boroughs.

22        Q.    Did you do anything to study what was

23   happening in terms of of appreciation or

24   depreciation of land values, specifically in the

25   Brooklyn land market, as opposed to what was



Page 40

```
 1                          C. DEMARCO
 2   happening nationally?
 3              MR. WALSH:  Objection to the form.
 4        Q.    You may answer.
 5        A.    I didn't study anything.  I don't accept
 6   your question as outlined.
 7              Again, I had the Brooklyn market for 15
 8   years.  I renegotiated properties in Brooklyn.
 9   I'm familiar with the Brooklyn market.  I don't --
10   I don't know what else you're asking me.
11        Q.    Okay.  I think you've answered the
12   question.  Thank you.
13              Did you have a conversation with Ms.
14   Hartman as this email seems to indicate?
15        A.    I don't recall if we had a conversation,
16   but there was conversation about -- you could see in
17   the subject line of my email from October of 2017,
18   it says approval requested tenure exception, so
19   there was discussion about it because we didn't have
20   an established rent for the next option and we
21   needed to understand or have a comfort level of what
22   that could be so we could go forward with the
23   modernization of the restaurant.
24              So I don't recall when there -- there
25   were conversation.
```



1                      C. DEMARCO

2       Q.    What do you recall of these

3  conversations?

4       A.    I don't recall specifically.  Again, it

5  was me sharing with her my valuation, and you'll see

6  in October I said I can add this to my list.  I said

7  there's a formal process with appraisers if the

8  parties cannot agree to the rent.  I said I can add

9  this to my list and call and see if the landlord

10  would be interested.

11            (Reporter clarification.)

12       A.    Meaning I can add this site to the list

13  and call the landlord to see if he would be

14  interested to convert options to firm terms to

15  eliminate the fair market value process.

16            Because again, Howard, we had one fair

17  market value reset and then we had three

18  additional five-year options at stated increases.

19       Q.    Those were the 15 -- I'm sorry.  I didn't

20  mean to cut you off.

21       A.    That's okay.  They were at 15 percent

22  over what was the first of four- or five-year

23  options.  Very often landlords are very interested

24  in having McDonald's commit to a longer term, and so

25  I was saying that we could look to do that.



Page 42

```
 1                      C. DEMARCO

 2      Q.    Okay.

 3      A.    And then in this email on the top from

 4   February 8 of 2018, it says:  Brooke, let me know

 5   when you have time to discuss.  The new landlord

 6   reached out to me to discuss the fair market value

 7   rent and the upcoming option and I would like to

 8   discuss.

 9           So, as I said to you, when I first

10   discussed my conversation with Sam in February of

11   2018, I wanted to let the field office be aware

12   that the landlord was asking to discuss an exit

13   strategy, not to establish the rent, and that we

14   would likely end up proceeding in accordance with

15   the lease with a formal process.

16      Q.    Understood.  Thank you.

17           THE WITNESS:  Can we take a break soon?

18           MR. KOH:  We can take a break now.  How

19      long would you like?

20           THE WITNESS:  Five minutes.

21           (Whereupon, there was a pause in the

22      proceeding.)

23      Q.    So we were looking at what had been

24   previously marked as Exhibit E, and in the subject

25   line here there's a term called "ten-year
```



Page 43

```
 1                        C. DEMARCO

 2    exception."

 3               What is a ten-year exception?

 4        A.    It's a -- it's a request -- well, a

 5    ten-year exception comes up -- when you want to

 6    reinvest in a restaurant, you need -- there's a

 7    financial matrix that we consider for investment to

 8    the amount of term at stated rents.

 9               And when you do not have enough term at

10    stated rents -- in this case, because we had a

11    fair market rent option coming up -- we would need

12    what's called a ten-year exception from that

13    matrix.

14        Q.    Who is responsible for granting the

15    ten-year exceptions, if anyone?

16        A.    It's approved through the field office,

17    and the US controller group, the finance group.

18    There's several people, but it's those three

19    departments effectively.

20        Q.    We'll come to the approval shortly.

21               MR. KOH:  Let's bring up what I had

22         marked as Exhibit 9, which is a February 26,

23         2018, email from Jared Jones to Ms. DeMarco.

24        A.    Let me familiarize myself with Exhibit F.

25        Q.    Okay.
```



Page 44

1                          C. DEMARCO

2          A.    I'm ready.

3          Q.    Jared Jones, what company does he work

4     for?

5          A.    Bohler Engineering.

6          Q.    Why were you contacting Mr. Jones and

7     Bohler Engineering with respect to the property at

8     840 Atlantic Avenue?

9          A.    I was initially contacting Jared to

10    understand the zoning based on my conversation with

11    Sam in that same month.  Earlier you recall I spoke

12    to Sam in February of 2018 and then May of 2018.

13    But in February of 2018, specifically February 8th,

14    I think, he was talking about this being a

15    redevelopment site, so I wanted to get more

16    information.

17               I subsequently didn't have Jared

18    prepare anything for us, so this was just asking

19    for, you know, a proposal, but Bohler Engineering

20    did not prepare anything on this site.

21         Q.    Did anybody do an evaluation of the

22    zoning of this site at your request?

23               MR. WALSH:  Objection to the form.

24         Q.    Let me rephrase.

25               To your knowledge, did anybody at the



Page 45

```
 1                      C. DEMARCO
 2   request of McDonald's do a valuation of the zoning
 3   at the site of 840 Atlantic Avenue?
 4              MR. WALSH:  Same objection.
 5        Q.    Go ahead.  You may answer, Ms. DeMarco.
 6        A.    The -- when we ultimately retained the
 7   MAI appraiser, they would have looked at the zoning
 8   as part of their analysis.  We did some preliminary
 9   -- she did some preliminary review of that.  Zoning
10   would have been considered part of the appraisal,
11   Howard.  That's the short story.
12        Q.    Did you discuss the zoning issues with
13   Sharon Locatell?
14              MR. WALSH:  Objection to the form.
15        A.    I don't think there were zoning issues,
16   Howard.  I don't understand your question.  There
17   wasn't an issue with the zoning.
18        Q.    Did you discuss the zoning status with
19   Sharon Locatell?
20              MR. WALSH:  Objection to the form.
21        A.    I don't understand "status," either.
22        Q.    What, if anything, did you discuss with
23   Sharon Locatell concerning zoning at 840 Atlantic
24   Avenue?
25              MR. WALSH:  Objection to the form.
```





1                        C. DEMARCO

2        A.     I don't recall exactly.  Just that

3   because of my conversation with Sam that it was his

4   opinion that it was a redevelopment site, and

5   understanding that the language in the option rent

6   addendum that we reviewed earlier says considering

7   all uses, I wanted to make sure that we looked at

8   the zoning -- what's the FAR available under the

9   existing zoning at that time.

10       Q.     You used the term "FAR."  Can you tell us

11  what that means to you.

12       A.     It's floor area ratio.

13       Q.     How does that affect zoning?

14              MR. WALSH:  Objection to the form.

15       Q.     How do you understand floor area ratio to

16  affect zoning issues?

17              MR. WALSH:  Objection to the form.

18       Q.     You can answer that one.

19       A.     So you would -- I have -- the zoning

20  impacts the ability to build density on a property.

21  It's what's allowable to be built based on the FAR.

22  If the -- his property is split-zoned into M1-1 and

23  R6B, so -- and they have different FAR for each of

24  the zones.

25              Again, Howard, I'm not an appraiser,



Page 47

```
 1                         C. DEMARCO
 2    but I just want to -- just to give some context,
 3    we wanted to make sure we looked at the FAR or
 4    available buildable on that property in that split
 5    zone.
 6              So I didn't have Jared Jones.  He did
 7    nothing.  He didn't do anything for McDonald's.
 8    But Sharon would have looked at that.
 9              MR. WALSH:  Let's bring up what's been
10         marked as Number 13.  It was a document
11         marked as Exhibit H.
12         Q.    Let me know when you have that in front
13    of you.
14         A.    I have it.  I'm just going to familiarize
15    myself with it.
16         Q.    Okay.
17         A.    It's 13 pages.  Just give me one minute.
18         Q.    Take your time.
19         A.    Okay, Howard.  I'm ready.
20         Q.    Do you recognize what Exhibit H is?
21         A.    Yes, I do.
22         Q.    Can you tell us what it is, please.
23         A.    It's a letter from Appraisers and
24    Planners.
25         Q.    Right, and you got a copy of it?
```



Page 48

1                        C. DEMARCO

2       A.    Yes, I was copied on it.

3       Q.    There's handwriting on the first page.

4  Do you know whose handwriting that is?

5       A.    No idea.

6       Q.    Okay.

7       A.    Not mine.

8       Q.    But you received Exhibit H without the

9  handwriting and you read it?

10            MR. WALSH:  Objection to the form.

11      A.    Yes.

12      Q.    Okay.

13      A.    I have read this letter dated December

14 12, 2018, from Appraisers and Planners, yes.

15      Q.    Did you ask for this letter to be

16 prepared?

17      A.    I asked Sharon to evaluate this, assuming

18 the zoning, which is what she did.  This was just

19 preliminary information in connection with our

20 option, so again --

21            I will back up.  We had a blind option

22 exercise, which means that we would have to make a

23 decision to not terminate the lease.  Because the

24 options are automatic.  They automatically extend

25 with no notice required by the tenant.



Page 49

1               C. DEMARCO

2               But as part of my process as an asset

3    manager, we evaluate all sites that have options.

4    So this had an option, and I had done preliminary

5    review of the values in October of 2017 and then I

6    spoke to Sam in February of 2018 and May of 2018.

7               We had an option and he, you know,

8    wanted to know what we would do if we didn't like

9    the rent, if we left, that this was a

10   redevelopment site.

11              So I asked Sharon for -- understanding

12   the value based on the FAR as a worst case

13   scenario.  Because I was very confident that the

14   option rent addendum language was very clear that

15   it would be -- the rent for the option would be

16   determined using comparable ground leases.

17              But in trying to understand where Sam

18   was coming from, I asked Sharon to prepare a value

19   using the zoning so I could understand the worst

20   case scenario.

21        Q.    On page 6, there's the bold language, and

22   it's Bates-stamped number MCD 00299.  It says Sales

23   Comparison Approach.

24              What does that mean to you?

25        A.    You're on page 6?



Page 50

1                         C. DEMARCO

2        Q.     Yes.

3        A.     So first off, I didn't -- I had requested

4   Sharon do this for my internal purposes of

5   exercising -- you know, we call it exercising an

6   option, but internally that we would not be electing

7   to terminate.  Right?

8               So I put forth a recommendation, and as

9   part of that, I try to get as much detail as

10  possible.  Although the lease -- I wanted to

11  understand the sales comparison approach and the

12  fee value.

13              And just so you know, Howard, for

14  everything I do at McDonald's, all the leasing I

15  do, we get a fee value on the property whether --

16  so this wasn't -- me requesting this from Sharon

17  was not in connection with the formal process.  It

18  was part of what I needed to provide additional

19  context to the field office with my recommendation

20  to exercise the option blind.  I wanted to

21  understand the fee value as well as the ground

22  lease value.

23              So this sales comparison approach was

24  done, a fee value in this case.  I get a fee value

25  on everything I negotiate, even if it's



Page 51

```
 1                    C. DEMARCO
 2   dead-ending, no option.
 3            Anyway, I just wanted to provide some
 4   context of this sales comparison approach that I
 5   asked Sharon to do was to evaluate the zoning and
 6   understand that better.  It was not in connection
 7   with what we would ultimately need to do for the
 8   option rent addendum.  It was the internal package
 9   approval so I could show best case/worst case.
10            Does that make sense?
11      Q.    It's your answer, and yes, I think I
12   follow it.
13            I'm curious.  Why do you get a fee
14   value on everything?
15      A.    It's required by the US controller group
16   based on accounting.  They wanted -- I think it's
17   only changed in the last couple of years based on
18   accounting.  We do it for all sites that we're
19   negotiating.
20      Q.    So it's a McDonald's overall policy?
21      A.    Correct.  I don't know that it's a
22   policy.  You know, I don't know if there's a form
23   somewhere that it says that, so I don't know that
24   it's a policy, but it's something that we do on all
25   renegotiations whether it's -- I would get it even
```



Page 52

```
1                        C. DEMARCO
2    if it's a CPI adjustment.  The only time we do
3    not -- a CPI adjustment.  So we get it on all lease
4    renegotiations regardless of the reason for the
5    renegotiation.
6         Q.    Do you understand why this is a
7    requirement of McDonald's?
8         A.    I think it's -- they want to have the fee
9    -- I think there's new accounting rules that came
10   out as well that it's important to have that.
11   There's new financial FASB accounting, and I don't
12   know all that.
13           (Reporter clarification.)
14        Q.    Financial --
15        A.    New accounting -- yeah.
16           MR. KOH:  She said FASB, F-A-S-B.
17        Q.    Financial Accounting Standards Board.  Is
18   that correct, Ms. DeMarco?
19        A.    Yes.
20           MR. WALSH:  So I'm looking at the feed.
21        A question was asked.  I believe she
22        answered.  It doesn't look like that full
23        answer has been captured.
24           THE COURT STENOGRAPHER:  I did ask for
25        a clarification, and please be assured that
```



Page 53

```
 1                        C. DEMARCO

 2         every word will be in the final transcript.

 3         Q.    Let me try to ask the question again.

 4               Just so I understand, if you could tell

 5    us one more time, Ms. DeMarco, do you understand

 6    why McDonald's requires a fee valuation in these

 7    situations?

 8         A.    It's not in this situation.  For all

 9    lease renegotiations at McDonald's, we get a fee

10    value and a ground lease value, and I think it has

11    to do with new requirements, putting ground leases

12    on your books.

13               I think it's a tax thing.  I'm not an

14    accountant or CPA, so I don't have the formal

15    answer to that, but I think it has to do with

16    accounting requirements and reporting requirements

17    for ground leases.

18               MR. WALSH:  Let's bring up what I've

19               marked as Number 14.  This has been

20               previously marked as Exhibit I.

21         Q.    Let me know when you have that, Ms.

22    DeMarco, and have had a chance to look at it.

23         A.    I had -- there's H up there.  My exhibits

24    are not marked on my screen.  It says like document

25    1, document 2, document 3.  Do you know what
```



Page 54

```
 1                        C. DEMARCO
 2    document it is?
 3              MR. KOH:  Is it up yet, Nat?
 4              MR. WALSH:  I don't believe it is.
 5        A.    I do have document 7.  Just give me a
 6    minute.
 7        Q.    Sure.
 8        A.    Okay, Howard.
 9        Q.    Can you tell us what's previously been
10    marked as Exhibit I.
11        A.    This is Exhibit I that I have up.
12        Q.    Right.  This is a letter which you were
13    copied on.  It's dated December 12, 2018, also from
14    Sharon Locatell, purporting to do a valuation of the
15    property at 840 Atlantic Avenue, correct?
16        A.    Yes.
17        Q.    But it uses -- I think you would agree --
18    a different methodology; is that right?
19        A.    Yes.  This letter considers ground lease
20    comps.  That's correct.  That would have been in
21    accordance with the option rent addendum.
22        Q.    Other than what you have told us about a
23    requirement of McDonald's or an accounting
24    requirement, is there any other reasons why
25    McDonald's opted to have two different valuations
```


MAGNA
LEGAL SERVICES

Page 55

```
 1                         C. DEMARCO
 2    prepared?
 3               MR. WALSH:  Objection to the form.
 4         Q.    You can answer.
 5         A.    They were for two different purposes,
 6    Howard.
 7         Q.    Okay.
 8         A.    So the land sales comparison approach
 9    that I asked Sharon to prepare -- and I believe
10    these both have the same date on them --
11         Q.    They do.
12         A.    Yes.  It's internally for the internal
13    approvals -- and I'm sure you have a copy of that --
14    that was in December, so I included the zoning, the
15    fair market value.
16               So it was for a different purpose.  The
17    sales comparison approach was not done for the
18    formal process in accordance with the option rent
19    addendum.
20               The land sales comparison approach was
21    done for internal purposes to understand the range
22    and risk, highest and worst case scenario, based
23    on conversations with Sam.
24               So this report that you're looking at,
25    this letter, was something that started
```



Page 56

1                          C. DEMARCO

2    preliminarily.  So this was done early in December

3    of 2018.  The date of value per the lease is April

4    of 2019, so this was in the very early stages of

5    the process.

6                  So there were two different reports

7    completed, and this was the beginning of the

8    process, Howard.

9                  But I think what's important to note is

10   the sales comparison approach was done only for

11   the purposes of an internal review and approval to

12   confirm to exercise the option.  It was not done

13   -- it wasn't -- it's not applicable.  It's not

14   appropriate to be done for the process.  It's not

15   an option to be done for the purpose.

16        Q.    I appreciate that answer.

17             MR. KOH:  Nat, can you please bring up

18        Number 16, which was previously been marked

19        as Exhibit L.  Wait.  That was the wrong

20        number.  Number 21, Nat, previously marked as

21        Exhibit M.  This is Exhibit 9.

22        Q.    Take a moment to look at what's been

23   previously marked as Exhibit M on your Agilelaw

24   screen.  Tell me when you have had a chance to

25   review it and we can ask some questions about it.



Page 57

1                        C. DEMARCO

2        A.     Okay.

3        Q.     Tell us what Exhibit M is that's on the

4   screen in front of you.

5        A.     What is it called?  It's called an Asset

6   Management Reacquisition Package.

7        Q.     Is this a form that is standard at

8   McDonald's or was at the time it was completed?

9        A.     It's a form that was completed at that

10  time.  It was a standard form at that time, yes.

11       Q.     And what do you understand the purpose of

12  completing this form to be?

13       A.     The purpose is to -- for the asset

14  manager to submit a recommendation to the necessary

15  approvers on a decision.

16       Q.     So you were the asset manager.  Did you

17  prepare this form?

18       A.     Yes, I did.

19       Q.     And you prepared it and submitted it on

20  or about December 18, 2018?  I think that's in the

21  top box.

22       A.     So yes.  Well, I signed it -- if you look

23  on the first page, I signed it on December 18th, so

24  that's when it was kicked off.

25       Q.     These were done electronically; is that



Page 58

1                         C. DEMARCO

2    right?

3         A.    Yes.  I signed it on December 18th, so

4    that would be the correct date that it was kicked

5    off, yes.

6         Q.    There are six people here who have signed

7    off by -- it appears to be DocuSign in the approval

8    section.

9               Can you go through each person's role

10   in approving this asset management reacquisition

11   package.  So starting with Ms. Hartman, the first

12   one.  What were her role in this approval?

13        A.    I'm sorry.  So back then, the field

14   office, real estate lead and development director

15   and finance manager, as well as the field vice

16   president, so those four signatures at that point in

17   2018 were still part of an approval process for a

18   reacquisition package.

19              Brooke was the real estate lead.  She

20   worked for Rita Nocito, who was a development

21   director in 2018; Brian Cheung is the field

22   finance manager; Gino Potesta was the field vice

23   president.

24              So back in 2018, the approval process

25   for a package like this would require the field



Page 59

```
 1                        C. DEMARCO
 2   office signatures with those particular roles, and
 3   they were the people in those roles.
 4            And then because it was an unstated
 5   rent, the rent had not yet been determined, it
 6   would also require approval by a senior
 7   development director through Crown as well as --
 8   the last approver was the director of finance,
 9   corporate finance, and I could spell his name.
10   It's Mark Huelskoetter, H-U-E-L-S-K-O-E-T-T-E-R.
11        Q.   Apparently all of these people who you've
12   just listed, in fact, approved the asset management
13   reacquisition package, correct?
14        A.   They approved my recommendation to
15   continue with the option and not terminate the
16   lease.
17        Q.   Okay.
18            And how does a tenure exception relate,
19   if at all, to an asset management reacquisition
20   package?
21        A.   They're very different.
22        Q.   Okay.
23        A.   This package -- the purpose of this
24   package is to recommend that we not terminate the
25   lease and exercise the next option.
```



Page 60

1                          C. DEMARCO

2          Q.     And the purpose of the tenure exception

3     is to allow for redevelopment where certain

4     information is not available; is that correct?

5                 MR. WALSH:  Objection to the form.

6          A.     No, not correct.

7          Q.     What's the purpose of a tenure exception?

8     Please refresh my recollection.

9          A.     The tenure exception is for reinvestment

10    planning.  As I had mentioned to Sam, we were doing

11    modernization across the US system, and all

12    restaurants were planning for modernization.

13                So for planning for modernization,

14    there's a balance between the amount of real

15    estate tenure you have as stated rent versus how

16    much money you want to spend.

17                So this site, although it had 20 years

18    of tenure, which was fantastic, it had one reset

19    for one five-year period.  So three of the five

20    years were stated rent, state increases, but there

21    was one unstated option.  So because of that, that

22    would be submitted as a tenure exception.

23                One was in reinvestment, Howard, and

24    one was to exercise the option.  Two different

25    processes.



Page 61

```
 1                         C. DEMARCO

 2       Q.      Right.

 3               And as of December 18, 2018, what was

 4    the status of the request for tenure exception

 5    with respect to this restaurant at 840 Atlantic

 6    Avenue?

 7       A.     I don't exactly recall what the status

 8    was, although the restaurant modernization went

 9    forward, started in January and then I believe was

10    completed in December, so I think based on the

11    preliminary information and the estimates that I

12    gave and recommended to the field office, they got

13    the waiver and exceptions to go forward with the

14    modernization.  So that was already in process.

15       Q.     You said -- and it's important that I

16    understand the dates here, so let's take our time.

17               You said the modernization started in

18    January and continued through December.  Can you

19    tell me what years we're talking about.

20       A.     I believe it started in 2018.

21       Q.     So is it accurate that say that by

22    December of 2018 when you recommended the asset

23    management reacquisition package, the modernization

24    had already been completed or was close to being

25    completed?
```



Page 62

1                          C. DEMARCO

2              MR. WALSH:  Objection to the form.

3        Q.    Is that fair to say?

4        A.    Can you repeat the question.

5        Q.    Let me try to phrase it again.

6              At the time on December 18th when you

7    recommended for approval this asset management

8    reacquisition package, am I correct that the

9    modernization of this restaurant at 840 Atlantic

10   Avenue was, in fact, complete or almost complete?

11       A.    The modernization started in January of

12   2018 and I believe continued through the end of the

13   year, so the decision to modernize the restaurant,

14   based on the approval from the US controller group

15   in the field, based on my estimate that I have given

16   them in October of 2017, I think they made the

17   decision because there was only one fair market

18   value reset.

19              There were three five-year options.  So

20   we had tenure through 2039 and we only had one

21   fair market value reset.  I believe these things

22   were happening at the same time, Howard, as I

23   think what you're asking me, so the store was --

24   the decision to modernize the restaurant, they

25   were already in the process of modernizing based



Page 63

```
 1                        C. DEMARCO
 2    on the information that I had done preliminarily
 3    in October of 2017.
 4         Q.    So the order of operations, just to make
 5    sure I have it right, is first McDonald's started to
 6    modernize this restaurant at 840 Atlantic Avenue,
 7    and then after that had been set, you then
 8    recommended that the asset management reacquisition
 9    package be approved; is that correct?
10              MR. WALSH:  Objection to the form.
11         A.    And I appreciate you don't understand
12    McDonald's internal process, but I had submitted a
13    recommendation to Brooke -- which I'm sure you have
14    a copy of.  I think we looked at it earlier today --
15    from October of 2017.  And often when we need a
16    tenure exception, the field office comes to me to
17    get an opinion and discuss what is the rent
18    potentially.
19              In that email, I gave that to Brooke in
20    October of 2017 what I thought the rent estimate
21    would be, and based on the fact of it being three
22    five-year options at stated increases with only
23    one rent reset with 20 years of tenure, I was
24    recommending at that point that we go forward with
25    the modernization.
```



Page 64

```
 1                      C. DEMARCO

 2              They don't have to happen exactly at

 3   the same time.  The decision to modernize was

 4   done, I think, in the fourth quarter of 2017.

 5   That's why they started in January of 2018.  But I

 6   was recommending they go forward with an almost $2

 7   million, 1.5 million reinvestment.

 8              I was, in my mind, recommending even

 9   back then -- I had not submitted the paperwork at

10   that time.  I hadn't done all the preliminary

11   background work that you recall that happened in

12   October of 2017, and then there were -- and the

13   option is automatic unless McDonald's elects to

14   terminate.

15       Q.    The first recommendation you made in

16   October 2017 was to modernize, and then in December

17   of 2018, you recommended that the reacquisition

18   package be approved, right?

19              MR. WALSH:  Objection to the form.

20       Q.    Is that correct?

21       A.    So I submitted a recommendation to the

22   field office.  I don't think it's a yes-or-no.  I

23   submitted a recommendation to the field office based

24   on evaluating the rent and the market to go forward

25   with the modernization.
```



Page 65

```
 1                         C. DEMARCO

 2              And then this is the package that I

 3   submitted because -- this is a package I submitted

 4   to get the formal signatures in the process to

 5   confirm that we were not going to be terminating

 6   the lease and that, in effect, we were going

 7   forward with a blind option.

 8                 That's why included in this package is

 9   the fee value and the zoning detail that was

10   included in that -- that's all I was saying -- to

11   look at the worst case scenario.

12        Q.    And the budget for the modernization was

13   between a million and a half and $2 million?

14                 MR. WALSH:  Objection to the form.

15        A.    It was -- yes.  It was -- the

16   modernization, the last cost estimate I saw was

17   1 million 552 something.

18        Q.    Okay.

19        A.    It could have been more.  That was the

20   last recap, cost recap I saw on the investment at

21   1 million 552 and change.

22        Q.    Let's start to the second page of this

23   asset management reacquisition package that we

24   previously marked as Exhibit M.

25                 Did you draft this proposal summary?
```



Page 66

```
 1                         C. DEMARCO

 2        A.    I prepared this, Howard.

 3        Q.    Right.  Okay.

 4              Towards the bottom, you said:

 5    Appraisal $9.9 million; range 4 to 6 percent as

 6    reflected.

 7              Where did you get the $9.9 million?

 8    Was that from one of the December letters from Ms.

 9    Locatell?

10        A.    The land value, it says dash MAI.  Do you

11    see that?

12        Q.    Yes.

13        A.    It says the MAI appraisal -- if you look

14    -- Howard, if you read that part of the package, it

15    defines what is below the box below.

16        Q.    Just to make sure that we've tied this up

17    neatly, the MAI business appraisal was Ms. Locatell,

18    right?

19        A.    Sharon Locatell is the MAI appraiser that

20    did that valuation for me, correct.

21        Q.    Got it.

22              And you have a rent range that says

23    dash MAI 4 percent to 6 percent.

24              Why did you choose those ranges?

25              MR. WALSH:  Objection to the form.
```



Page 67

```
 1                      C. DEMARCO
 2        A.     That was given to me by -- this was,
 3   again, all in the report dated December that you
 4   have from Sharon Locatell.  So that was the range
 5   that she provided as a -- effectively a return rate
 6   on the fee value that would be -- and you'll see
 7   that I have boxes of 100 percent and 80 percent.
 8        Q.     Yes.
 9        A.     At the bottom, you'll see that it says 7
10   to 8 percent, and I put that in there just to be
11   worst case scenario for a potential range if there
12   was the formal process which could allow for the
13   average of 3.
14               It was just -- I extrapolated it out
15   further just to be -- for the risk.
16        Q.     My question was who picked the 7 and 8
17   percent ranges, and I take it you did?
18        A.     Yes.
19        Q.     Okay.
20        A.     The purpose of this was just for internal
21   approval, and it was just for sort of a worst case
22   scenario to look at "what if" scenarios, and so
23   that's what that was for.
24        Q.     I would like to turn to page 4 of this
25   document.  It's Bates number 6328, and there's a box
```



Page 68

```
 1                    C. DEMARCO
 2    that's headed Sales History.
 3             Can you tell us what's represented in
 4    that box.
 5        A.    Sorry.  It was fuzzy.  Hold on.
 6             The sales history, that shows you the
 7    trailing 12-month sales at that restaurant as of
 8    that point in time going back years to 2013.
 9        Q.    Are sales gross sales there or some other
10    sales number?
11        A.    That's the trailing 12-month gross sales.
12        Q.    Thank you.
13             And then there's a box that says
14    Financials, and I would like to go through each
15    line here.  The first line here says real estate
16    income.
17             What does that mean?
18        A.    Real estate income is the income to
19    McDonald's from the operator.
20        Q.    And where did the amount 537,974 come
21    from?
22        A.    It's the rent calculation based on the
23    site.
24        Q.    Is it computed as 14 percent of some
25    number?
```



Page 69

                                    C. DEMARCO

1

2      A.    It's usually a percent.  There's multiple

3  components to rent, and this is expressed as a

4  percentage of sales.

5      Q.    So is this the real estate income to

6  McDonald's for this restaurant?  Was that an

7  estimate or an actual number of what the real estate

8  income would be?

9            MR. WALSH:  Objection to the form.

10     Q.    Can you answer.

11     A.    Can you repeat the question.

12     Q.    Sure.

13           This $537,974, is that the real estate

14  income for a particular year?

15     A.    You'll see above that it says a primary

16  income and expense information for the period of

17  November 30th of 2018.

18     Q.    Was that annual?  Monthly?  Daily?

19  That's what I'm trying to figure out.

20     A.    That would be annually.

21     Q.    Okay.

22           So McDonald's received from this

23  property in real estate income $537,974 in real

24  estate income for the year ending November 30,

25  2018, right?



Page 70

1                        C. DEMARCO

2            MR. WALSH:  Objection to the form.

3       Q.    Is that what that's telling me?

4       A.    This is telling you the real estate

5  income as of November 30, 2018, on a trailing

6  12-month basis.  It's not a calendar.

7       Q.    Got it.

8       A.    Okay.

9       Q.    Who received this money?  McDonald's?

10  The franchisee?  Was it split?  Some other person?

11            MR. WALSH:  Objection to the form.

12       A.    This is real estate income to McDonald's.

13  This is McDonald's income as a --

14       Q.    Got it.

15       A.    It's a percentage of sales.  14 percent

16  of sales was the real estate income at that trailing

17  12-month period at that number 537,974.

18       Q.    And all that money went to McDonald's,

19  right?

20            MR. WALSH:  Objection to the form.

21       A.    It's income to McDonald's.  When you say

22  it went to McDonald's, I don't agree with how you're

23  saying that.  That's income to McDonald's.

24       Q.    Thank you for clarifying.

25            What is meant by rent expense?



Page 71

```
 1                          C. DEMARCO
 2        A.     Rent expense is the rent we pay to the
 3   landlord.  In this case, it would be Sam
 4   Rottenberg's company, I guess.  That's per the
 5   lease.  That's the contractual amount per the lease.
 6        Q.     Okay.  What is OCC expense?
 7        A.     I'm not sure.
 8        Q.     Do you know what net before D&I is?
 9        A.     That's real estate net before
10   depreciation and interest.  So I think you take the
11   income and you subtract the expense.  I'm sorry,
12   Howard.  Total OCC expense, you'll see that that is
13   the same as the rent expense, so that is total
14   occupancy cost, I believe.
15              So in this case, there's no other --
16   there's just the rent expense on this to the
17   landlord.  So the income less the expense is the
18   real estate net before depreciation and interest.
19        Q.     Then the next line says Owner Predebt
20   Cash Flow.
21              What is that referring to?
22        A.     That's -- the owner predebt cash flow
23   refers to the operator cash flow predebt, and you'll
24   see underneath that it says 12 months as of October
25   31st of 2018.  So that was a month earlier.
```



Page 72

1                          C. DEMARCO

2                You'll see that's also a negative

3    number, and that's negative because the restaurant

4    was closed for a period of time during

5    modernization.

6         Q.    And do you know how long the closure was?

7         A.    I'm not sure.

8         Q.    Okay.

9                What is meant by percentage rent?  I

10   think I know.  What is service fees?

11        A.    Service fees is a fee that's charged for

12   all restaurants.  At this restaurant, it opened in

13   1998 or 1999.  4 percent was the service fee.

14        Q.    That is also income to McDonald's?

15              MR. WALSH:  Objection to the form.

16        Q.    Is that also --

17        A.    The service fee is -- I wouldn't say it's

18   income.  It's a fee that's paid by the operator for

19   certain services provided by McDonald's.

20        Q.    So the fee is paid to McDonald's?

21        A.    Correct.

22        Q.    What's meant by total system cash flow?

23        A.    Again, that's a math calculation, and I

24   didn't bring a calculator here with me today, but

25   it's the income less the expenses, so income and



Page 73

```
1                      C. DEMARCO
2    service fee less expenses should be your -- and less
3    the operator.
4              So system cash flow refers to cash flow
5    of the system which would be both the operator and
6    McDonald's Corporation.
7         Q.    And can you tell me how it's split
8    between the operator and McDonald's Corporation.
9         A.    I don't understand the question.
10        Q.    Well, you said that -- let me get this
11   right -- system cash flow refers to the cash flow of
12   the system, which would be both the operator and
13   McDonald's Corporation.
14             I want to know how much was allocated
15   to the operator and how much was allocated to
16   McDonald's Corporation.
17             Can you tell that from this document?
18        A.    No.  I think this document is a snapshot
19   in time.  I mean, you can look at the operator's
20   cash flow was negative here, right, and McDonald's
21   Corporation cash flow was positive.
22             But the restaurant was closed for
23   modernization, so I can't tell you what the split
24   of the system cash flow is for this restaurant
25   specifically based on this snapshot.
```



Page 74

1                        C. DEMARCO

2        Q.    Let's turn to page 5, which is the next

3   page.  There's a chart on that page which has some

4   numbers and it also has a column -- well, it has

5   several columns that say #value with an exclamation

6   point.

7              Can you tell us why it's presented that

8   way?

9        A.    This is one page of the form and it

10  really doesn't reflect a site that's not a fair

11  market value reset.  We don't know the rent when I

12  was submitting this.

13             You'll see that the lease -- it says

14  existing lease on the left and then it says

15  proposal exercise one five-year option on the

16  right.  The reason it comes back #value is because

17  we don't know the value yet, so it could be

18  calculated.

19       Q.    I understand.

20       A.    This form wasn't built for unknowns, but

21  I wanted to make sure that we included this -- the

22  form is included on all deals.  It doesn't get

23  selectivity included or not.

24             On the left-hand column, you'll see

25  that the end date is April 8th of 2019, and then



1                        C. DEMARCO

2    at that point when I was submitting this in

3    December, there was four months, approximately,

4    left, and so that calculates the present value.

5             On the bottom on that same side, it

6    shows there are four five-year options with tenure

7    through 2039 and that the first five-year option

8    is FMV.  And then the second, third, and fourth

9    options are, as stated, 15 percent increases with

10   tenure through 2039.

11            And the proposal this reacquisition

12   package was recommending was the fair market

13   value.  It was the first option.  It says #value

14   because it's a fair market.  There is no rent in

15   there.  So you really can't calculate down.  It's

16   more to just outline that it was an unknown --

17        Q.    Okay.

18             Was this asset management reacquisition

19   package ultimately approved?

20        A.    I refer you to page 1 where the

21   signatures indicate when it was approved.

22        Q.    So other than the people who signed here,

23   was anybody else's approval required?

24        A.    The approvers that signed off on here are

25   the necessary approvers to exercise the -- and you



1                          C. DEMARCO

2    can see on the first page of the asset reacquisition

3    package, there's a line that says proposed deal

4    type, non-stated rent, so I was recommending we

5    exercise a non-stated rent option, and it was

6    approved by the required approvers at that time.

7         Q.    Is a non-stated rent the same option as a

8    blind option?

9         A.    Not necessarily.

10        Q.    Explain to me the difference.

11        A.    Well, so a non-stated rent option can be

12   a blind option or not a blind option.  It's a

13   function of when the rent for that option needs to

14   be determined.

15             If the rent for the option is

16   determined prior to the start of the option, then

17   it's -- or before we have to exercise the option

18   or make that decision, then it's not considered a

19   blind option.

20             It's a blind option if we have to make

21   the decision to exercise or terminate prior to the

22   rent determination for that option.  Not all fair

23   market value options are blind options.

24        Q.    Was this one or was it a non-stated rent

25   option that wasn't a blind option?



Page 77

1                              C. DEMARCO

2                    MR. WALSH:  Objection to the form.

3          A.    This was a blind option and a non-stated

4     rent option, right, because they don't -- not all

5     non-stated rent options are blind.

6                    In this case, this is a non-stated rent

7     option and it was a blind option.  So we had to

8     make a decision.  It was automatically extended

9     unless the tenant gave notice to terminate.

10                   So we had to make the decision to

11    extend the lease or terminate the lease prior to

12    knowing what the rent was for that five-year

13    period.

14         Q.    Before you recommended for approval this

15    asset management reacquisition package, did you

16    discuss that subject with David Kearns?

17         A.    I review all my work plans with my

18    directors.  So he -- yes.  He was aware that I was

19    recommending we exercise the option.

20         Q.    What, if anything, do you remember

21    discussing with Mr. Kearns about the exercise of

22    this option?

23         A.    Well, this would have been back in, you

24    know, 2017 and 2018.  I would have had -- I would

25    have given him an update on the status of my value.



Page 78

```
 1                        C. DEMARCO
 2   I would have given him an update on the fact we had
 3   a new landlord who was trying to negotiate an exit
 4   strategy for us and that he had, you know, without
 5   any facts presented a very wildly crazy number.
 6              I would make him aware of some of the
 7   detail around that.  Based on the fact that we had
 8   20 years of tenure with three five-year options as
 9   stated rent -- based on the fact that we had 20
10   years of tenure with 15 years as stated rent with
11   15 percent increases, so I went over with him that
12   I would be submitting this and what was my
13   decision and recommendation about --
14              I want to make sure if we don't
15   understand, I'm happy to repeat it.  I discuss my
16   work plan with my director on all deals that I do,
17   and so I would have absolutely made him aware of
18   what I was recommending on this particular site.
19        Q.    Let's turn to another area.
20              Who is George Michelle?
21        A.    George Michelle is the franchisee of this
22   restaurant at 840 Atlantic Avenue.
23              MR. WALSH:  I'm going to ask within the
24         next five minutes if we can take a lunch
25         break.
```



```
 1                        C. DEMARCO
 2            (Whereupon, a lunch recess was taken.)
 3       Q.    Ms. DeMarco, where we left off before we
 4  broke for lunch is I was starting to ask you about
 5  George Michelle, and you told me he was the
 6  franchisee of the restaurant at 840 Atlantic Avenue.
 7            Does he operate sometimes through a
 8  company called Michelle Enterprises?
 9       A.    I don't know his company.
10       Q.    Is George Michelle associated with any
11  other McDonald's restaurants besides this one at 840
12  Atlantic Avenue?
13            MR. WALSH:  Objection to the form.
14       Q.    Is George Michelle a franchisee of any
15  McDonald's restaurants besides the one at 840
16  Atlantic Avenue?
17       A.    I'm not sure where else he is an operator
18  at other restaurants.
19       Q.    But do you know whether or not he has
20  other restaurants?
21       A.    I know of one, yes, but I don't know of
22  how many he has or where he has them.  It's not my
23  area, the franchising side.
24       Q.    Whose area is it?
25       A.    Franchising.
```



Page 80

```
 1                    C. DEMARCO

 2      Q.    Is there a person in the New

 3  York/Connecticut/New Jersey area who is responsible

 4  for that at McDonald's?

 5            MR. WALSH:  Objection to the form.

 6      A.    I don't know who the franchising lead is

 7  for that area you defined.  I don't get involved in

 8  franchising.

 9      Q.    Understood.

10            MR. KOH:  Let's bring up Exhibit 27,

11      Nat.

12            MR. WALSH:  It looks like it was

13      previously marked as Exhibit N.

14            MR. KOH:  Correct.

15      Q.    Have you ever seen any part or all of

16  Exhibit N, which is Document Number 10 in the Agile

17  platform?

18            MR. WALSH:  Objection to the form.

19      Q.    Just tell me if you have seen this

20  document.

21      A.    Not before now, no.

22      Q.    Okay.

23            There's a cover letter and some

24  attachments.  I'd like to know whether you have

25  seen any of the attachments before.
```



1                      C. DEMARCO

2       A.     I'll go through and look at this and see.

3  How many pages is this?  Oh, wow.  I wouldn't been

4  privy to franchise documents.  I'm going to go

5  through this.

6       Q.     I would like you to scroll through it.

7       A.     The first two pages is a letter from

8  Christine.  I don't even know who she is.  It says

9  Franchise Agreement on the top of 3.

10      Q.     It has a franchise agreement and a number

11 of attachments.  Before just now, had you seen the

12 franchise agreement for 840 Atlantic Avenue?

13      A.     No, I did not.

14      Q.     Okay.  We can leave that document on the

15 screen or put it aside.

16             At the time you recommended the

17 modernization of the franchise at 840 Atlantic

18 Avenue, did you speak to anybody on the franchisee

19 side?

20      A.     No, I did not.  I didn't speak to anyone

21 on the franchisee leasing side.

22      Q.     What about the actual franchise operator?

23 Did you speak to Mr. Michelle or anybody who worked

24 for or with him?

25             MR. WALSH:  Objection to the form.



Page 82

```
 1                        C. DEMARCO
 2        A.    I don't recall speaking with him at that
 3   time, no.  What period of time -- I mean, this has
 4   been going on a couple of years.  I would have had
 5   conversations with him at some point.
 6              Can you rephrase your question as to
 7   the time period.
 8        Q.    Sure.
 9              As you were making the decision to
10   recommend the modernization at 840 Atlantic
11   Avenue, did you speak to Mr. Michelle about that
12   subject?
13        A.    No, I did not.
14        Q.    Okay.
15        A.    But just to clarify, Howard, that was --
16   the operator was aware that when he -- when
17   operators get a copy of the underlying lease, he
18   would know that he had a rent reset in the first of
19   the four- or five-year options, so he would know
20   that.
21              And I think at some point we would have
22   discussed -- I think even before October of 2017
23   we would have discussed as part of just vision
24   plan and operator planning that there was a rent
25   reset.  I wouldn't have gotten into specifics with
```



Page 83

```
 1                        C. DEMARCO
 2    him.  That's only discussed with finance.
 3              MR. WALSH:  Howard, I'm sorry.  I made
 4         an objection to that last question.  I want
 5         to make sure it was noted.
 6              Thank you.
 7         Q.    You told us earlier for some period of
 8    time, the restaurant at 840 Atlantic Avenue was
 9    closed because it was being modernized, right?
10         A.    I believe so, yes.  I believe the
11    restaurant was closed for a portion of time for
12    modernization, yes.
13         Q.    Who would interface with the operator
14    about the need to close for modernization?
15         A.    The construction lead who is working with
16    the operator on the reinvestment.  And just to give
17    you some understanding, because we're a restaurant
18    business, you can't be -- it's difficult to do
19    internal dining room improvements.
20              You're not going to start cooking in
21    your kitchen if you're doing a kitchen remodel.  I
22    think the same holds true in a restaurant that
23    they would have to close for a period of time to
24    do the proper renovations and be careful that it's
25    done correctly and not be selling food at that
```



Page 84

1                          C. DEMARCO

2    time.

3               So our restaurants typically close for

4    a period of time during a renovation.  That's not

5    uncommon.

6         Q.    I understand.  That's all handled through

7    the construction division at McDonald's?  Is that

8    what you told me?

9               MR. WALSH:  Objection to the form.

10        Q.    Who handles that at McDonald's?

11        A.    What is your question again?

12        Q.    Who handles the facilitating of the

13   modernization of the restaurant at McDonald's?  You

14   used the phrase, I believe, "construction lead."  Is

15   that the point of contact between the operator and

16   McDonald's?

17              MR. WALSH:  Objection to the form.

18        A.    So McDonald's has -- with regard to

19   construction element, the construction -- the area

20   construction manager would be one of potentially,

21   you know, support for the operator.

22              And the area construction manager would

23   be the lead for -- you know, that's not their

24   title, but they would be the lead for coordinating

25   and facilitating the modernization of a particular



Page 85

```
 1                      C. DEMARCO

 2    restaurant.

 3         Q.    Who paid for the modernization of the

 4    restaurant at 840 Atlantic Avenue, if you know?

 5              MR. WALSH:  Objection to the form.

 6         A.    I don't know how that's broken down.

 7         Q.    Okay.

 8              MR. KOH:  Let's bring up Number 28, and

 9         that's previously been marked Exhibit O.

10         Q.    Let me know when you have that in front

11    of you.

12         A.    I have it in front of me.  I'll just take

13    a minute to read it.

14         Q.    Sure.

15         A.    Okay.

16         Q.    So tell us what Exhibit O is, please.

17         A.    Exhibit O is a letter from McDonald's

18    Corporation to Tom Lee at Vanderbilt Atlantic

19    Holdings, LLC.

20         Q.    Am I correct that the purpose of this

21    letter was to provide notice to Vanderbilt Atlantic

22    Holdings that the parties were to appoint their

23    appraisers and begin the FMV process?

24              MR. WALSH:  Objection to the form.

25         Q.    What is the purpose of this letter?
```



Page 86

1                    C. DEMARCO

2      A.    Paragraph 3 states that this letter

3  constitutes notice pursuant to Exhibit G to the

4  lease, that the parties have been unable to reach

5  agreement.  Agreement as to the FMV, period.  I'm

6  just reading.  I'll keep reading.

7           "Accordingly, the parties shall appoint

8  their appraisers.  McDonald's has appointed

9  Appraisers and Planners."

10          So it was us planning with Sharon

11 Locatell with Appraisers and Planners.  Then it

12 goes on to say more detail about the process in

13 the next paragraph.  I'm not going to read it all.

14     Q.    Is it fair to say this was the formal

15 beginning of the fair market value process

16 contemplated in the option rent addendum?

17          MR. WALSH:  Objection to the form.

18     A.    Can you repeat the question, Howard?

19     Q.    Yes.

20          Is it fair to say that this was the

21 formal beginning of the fair market value process

22 contemplated in the option rent addendum?

23     A.    I don't know that I understand your

24 question, but I think the letter is pretty clear in

25 the plain language of what the intent of the notice



Page 87

1                              C. DEMARCO

2      to the landlord, that we could not agree, Sam and I

3      couldn't agree, and that we were going to start the

4      formal process, that we all were going to start the

5      formal process.

6           Q.    It is your understanding that this letter

7      went out on or about April 15, 2019?

8           A.    The letter is dated April 15, 2019, via

9      certified mail return receipt requested.

10          Q.    Okay.

11                MR. KOH:  Please bring up Number 30,

12          which is an April 25, 2019, email previously

13          marked as Exhibit P.

14          Q.    Let me know when you're ready for

15      questions on that.

16          A.    Okay.

17          Q.    Do you recognize Exhibit P as an email

18      that you received from Sharon Locatell?

19          A.    Yes, Exhibit P is an email from Sharon

20      Locatell to me and Ellen Benderman, subject Tom

21      Tener, 840 Atlantic call.

22          Q.    And Ms. Locatell told you that Mr. Tener

23      was pushing for the selection of the third

24      appraiser, correct?

25                MR. WALSH:  Objection to the form.



Page 88

1                        C. DEMARCO

2        Q.    Is that what it says?

3        A.    I'd rather not read it, but yes.  It

4   says:  I spoke to Tom Tener.  His side is pushing

5   for us to select the third appraiser.

6        Q.    My question is:  Are you aware of any

7   reason why McDonald's at this time wasn't prepared

8   to select -- or Ms. Locatell wasn't prepared to

9   select the third appraiser?

10            MR. WALSH:  Objection to the form.

11       Q.    Can you answer that question?

12       A.    I'm not exactly clear why she was not --

13   I mean, the reason we had to select the -- to really

14   understand all this, we have to go back and

15   understand that -- I believe Tom had done a

16   valuation based on the land sales comparison

17   approach, so I don't think -- well, let me strike

18   that.

19            I'm considering time frames here.  Her

20   response was:  I told him I'm not ready, that I

21   need to do work, and I'll circle back with him the

22   first full week of May.

23            So I don't know exactly why she was not

24   ready.  I know she was handling multiple other

25   formal matters, and so I think she wanted to



Page 89

```
 1                        C. DEMARCO
 2    complete her -- you know, her evaluation of
 3    potential neutral thirds.
 4              And she's pretty good about monitoring
 5    critical dates, and so she was taking the time
 6    that she was allowed per the lease to do her, you
 7    know, research to get ready to recommend and
 8    select a neutral third.
 9              I think it's she said she wasn't ready.
10    I don't know why she wasn't ready, but I do recall
11    that she had multiple projects and matters going
12    on at this time, but she's incredibly diligent and
13    careful in monitoring dates, so she knew she had
14    time to further evaluate and select her
15    recommendation for the neutral third.
16         Q.   Did you have discussions with Ms.
17    Locatell concerning who to select as the neutral
18    third?
19         A.   I did not have any conversations with
20    Sharon Locatell about who to select as the neutral
21    third.  That would be something that the appraisers
22    would do, not anything I would be involved in.
23         Q.   Do you know if anybody else at McDonald's
24    had conversations with Ms. Locatell concerning the
25    selection of the neutral third?
```



Page 90

```
 1                        C. DEMARCO

 2            MR. WALSH:  Objection to the form.

 3       Q.    You can answer.

 4            MR. KOH:  I asked if she knew.

 5       A.    The neutral third is selected, you know,

 6  by each appraiser.  Each party-appointed appraiser

 7  comes up with a list of potential neutral thirds and

 8  then the two party-appointed appraisers select a

 9  neutral third.

10            There's no involvement from our side.

11  I can't speak to Sam's, but there was no

12  involvement on McDonald's side about who to select

13  for the neutral third.  That's all within the

14  appraiser's scope of what they would be doing.

15       Q.    So did there come a point in time where

16  Ms. Locatell said to you or anybody else in

17  McDonald's, if you know, in substance, here are some

18  of the people I wish to propose to Mr. Tener as

19  neutral thirds?

20       A.    I don't recall.  It wouldn't be uncommon

21  for her to advise that she had several, because you

22  also want to conflict out if someone has a conflict.

23  So it wouldn't be uncommon for her to tell me who

24  she's considering, but I don't have any input on her

25  ultimate decision of who to consider.
```



Page 91

```
 1                        C. DEMARCO
 2        Q.    Do you have any specific recollection of
 3   any of those kinds of conversations with respect to
 4   this option rent addendum?
 5        A.    I don't remember any specific
 6   conversations.
 7        Q.    Okay.
 8             MR. KOH:  Let's bring up a document
 9        that's not been marked.  Let's mark this as
10        Exhibit FF.
11             (Whereupon, an email dated 5/21/19 was
12        marked as Exhibit FF for identification, as
13        of this date.)
14             MR. KOH:  It is an email from Carol
15        DeMarco to David Kearns dated Tuesday,
16        November 1, 2019.  It's number 42.
17        Q.    You should have FF in front of you.
18        A.    I'm just opening it.  Give me a minute to
19   familiarize myself.
20        Q.    Sure.  Let me know when you're ready to
21   answer some questions about it.
22        A.    Bear with me a minute.
23             MR. WALSH:  Just so I'm aware, are
24        these the attachments to that first email
25        that's the first page of this document?
```



Page 92

```
 1                     C. DEMARCO
 2              MR. KOH:  I believe so.  I can tell
 3         that you the Bates numbers are sequential and
 4         I think that the attachment description
 5         matches.
 6              MR. WALSH:  Okay.  I just wanted to
 7         understand if that's how it was produced,
 8         since our production would have separated all
 9         that stuff out.
10    A.    Okay.
11    Q.    Is this an email that you sent to Dave
12  Kearns with a copy to Michael Meyer?
13    A.    Yes.  We are looking at an exhibit which
14  is an email from me to David Kearns copying Mike
15  Meyer regarding 840 Atlantic Avenue in Brooklyn.
16    Q.    And you sent this email Tuesday, May 21,
17  2019, correct?
18    A.    May 21, 2019, at 6:38 p.m. central.
19    Q.    You asked for a discussion with Mr.
20  Kearns, right?
21    A.    I was suggesting we have a call, yes.
22    Q.    Did that call occur?
23    A.    I do not recall, but I'm sure we had a
24  call.  I keep my director updated on all projects,
25  so yes.  I have multiple calls with my director.
```



Page 93

1                        C. DEMARCO

2        Q.     Did you discuss 840 Atlantic Avenue in

3   Brooklyn and these attachments with Mr. Kearns in or

4   about May of 2019?

5        A.     Hold on.  I don't know if it says in here

6   when we scheduled the call.  But it would have been

7   in that -- it would have been sometime after that

8   email was sent.  I don't know exactly when it was.

9        Q.     And who was on this call?

10              MR. WALSH:  Objection to the form.

11       A.     I don't recall exactly who was on the

12   call, Howard.  You know, I -- it could have just

13   been Dave and I.  I mean, I don't recall if Mike was

14   on that call or not.

15       Q.     So in or around -- I'm sorry.  Please

16   finish.

17       A.     I don't want to speculate.  I've had

18   calls with Dave to give him a status update and

19   background.  It says:  I would appreciate it if we

20   can schedule a call to discuss and give you

21   background and update.

22              So that was the purpose.  It might have

23   just been Dave and I.

24       Q.     What do you recall discussing with Mr.

25   Kearns concerning this property in or around May of



Page 94

```
 1                           C. DEMARCO

 2    2019?

 3              MR. WALSH:  Objection to the form.

 4              And I just want to caution the witness

 5         not to share any information that would be

 6         protected by the attorney-client privilege,

 7         including advice that may have been shared by

 8         Mr. Meyer or a request for legal advice asked

 9         by Mr. Meyer.

10              To the extent you can answer without

11         revealing privileged information, you can

12         feel free to do so.

13         Q.   Please don't reveal any privileged

14    information, but in your previous answer you said

15    you didn't even know if Mike was on, so I don't know

16    how privileged it could be, but go ahead and answer

17    the question.

18              MR. WALSH:  And she also said she

19         doesn't remember if she had a call, so --

20              MR. KOH:  I would like the witness to

21         answer to the extent she can.

22         A.   So I would have had a call with my

23    director to give him an update.  And you can see by

24    the 65 pages included as attachments, I gave him

25    background, so it was really just a status update
```



Page 95

1                        C. DEMARCO

2      call, which I do regularly with my director on all

3      the deals I'm negotiating or that I'm handling.

4              I don't remember the specifics, but I

5      would have discussed the details, you know, just

6      an update and a status of where we were in the

7      process.

8          Q.    Did Mr. Kearns, your director, give you

9      any instructions as to how to proceed?

10         A.    No.  We had -- Dave did not give me

11     instructions on how to proceed.  I was giving him an

12     update on the status of the process.

13             I think the exhibit you showed me

14     before this exhibit or one of the exhibits was the

15     letter from Mike Meyer to Tom Lee advising that we

16     could not agree and that we were selecting our

17     appraiser.

18             So this is obviously -- this email is

19     after we had identified our party-appointed

20     appraisers, so I was just giving him an update,

21     which I do regularly on all the deals I negotiate.

22             I negotiate, you know, 30, 40 deals in

23     a given year and I give him regular updates on the

24     status of sites that I'm working on.  What you're

25     showing me is my request for a call, "please



Page 96

```
 1                        C. DEMARCO
 2    provide him an update and background status."
 3         Q.    When you say you regularly give Mr.
 4    Kearns updates, do you do that by email, by phone,
 5    or in some other manner?
 6         A.    It could be email.  It could be phone.
 7    It could be email or phone.  That would be the only
 8    two.  This is a common thing that I would do,
 9    Howard, as part of my job, to provide an update,
10    background status of something I was working on.
11         Q.    After you provided this update, did you
12    get any kind of feedback or response from Mr. Kearns
13    at all?
14         A.    Can you repeat the question.  I don't
15    understand your question.
16         Q.    After you provided this update, did Mr.
17    Kearns respond to you, give you any kind of feedback
18    at all?
19         A.    I don't recall.  Again, I believe we had
20    a call because I requested a call and he's an
21    excellent director and he makes himself available
22    for his people.  We had a call at some point.  I
23    sent -- to give him detail in advance of the call.
24              But no, he didn't tell me to do
25    something after that.  I don't understand your
```



Page 97

```
 1                    C. DEMARCO
 2   question.
 3        Q.    Did he tell or make a suggestion as to
 4   how to proceed next?
 5        A.    No, he did not.  I wasn't asking for
 6   directions in this email.
 7        Q.    What was the point of the email, then?
 8        A.    "I would appreciate if we can schedule a
 9   call and discuss and give me a background and
10   status."
11             It was just informational.
12        Q.    Okay.
13             MR. KOH:  Let's bring up the next
14        document, please.  It's Number 53.  That's
15        before previously marked as Exhibit W.
16        A.    I'm just reviewing it, Howard, for a
17   minute.
18        Q.    Sure.
19        A.    Bear with me one second.
20             Okay.  Thank you.
21        Q.    So this is a letter to you from
22   Appraisers and Planners signed by Ms. Locatell dated
23   June 17, 2019.
24             Did you request this -- and it purports
25   to recommend or make a conclusion as to the fair
```



Page 98

```
 1                          C. DEMARCO
 2    market rental value at the premises.
 3                Did you request this letter?
 4                MR. WALSH:  Objection to the form.
 5        Q.    I'll make it simple.
 6                Did you ask Sharon Locatell to send you
 7    this letter?
 8                MR. WALSH:  Objection to the form.
 9        A.    Sharon was retained as the appraiser in
10    this process, so this would be typical for her to
11    send us her, you know, this type of letter.
12                When you say did I request it, it's
13    almost like I requested it separate and distinct
14    from the process.  That's not the case.  This
15    was -- you know, she was retained as an appraiser
16    in this matter and she sent me this letter that
17    you're showing me right now with her opinions,
18    right.
19                Don't make me read all this.
20        Q.    I'm not going to do all that.
21        A.    W is Sharon -- and then I went to her
22    page 3, so she -- she's -- based on the option rent
23    addendum, she's completed an analysis of comparable
24    ground leases and concluded a value for the property
25    at 840 Atlantic, and that's communicated to me in
```



                         C. DEMARCO
1
2    this letter dated June 17, 2019.

3              MR. KOH:  Let's bring up Exhibit 54,

4         please, which was previously marked as

5         Exhibit X.

6         A.    I have it up.  I'm just reviewing it.

7         Q.    What's the date on the letter you have

8    up, to make sure it's the right one?

9         A.    June 17th of 2019, and it's marked on the

10   bottom right as Exhibit X.  That's the document I

11   have up before me, and it's 23 pages.  Give me one

12   second.

13        Q.    Now I have it as well.

14        A.    Okay.  So Exhibit W from Appraisers and

15   Planners dated June 17, 2019, is nine pages.  And

16   then the follow-up, Exhibit X, also dated June 17,

17   2019, is 23 pages.

18             It includes more detail and

19   information.  You'll see there's lots of pictures

20   around the comps, lots of detail.  I just wanted

21   to call your attention to that.

22        Q.    I understand that.  My question is:  Do

23   you understand why there's two different versions of

24   the June 17th letter?

25             MR. WALSH:  Objection to the form.



Page 100

1                          C. DEMARCO

2        A.      Can you repeat your question.

3        Q.      You pointed out some differences between

4    these two signed letters from Ms. Locatell that are

5    both dated June 17, 2019.  I guess my first question

6    is:  Did you get both of these, Exhibit W and

7    Exhibit X, or did you only get one of them?

8                MR. WALSH:  Objection to the form.

9        A.      Appraisers and Planners has prepared both

10   of these letters, and I was copied on the second

11   one.  I received both of them.  I received the first

12   one that was nine pages and I also received the

13   second one that was 23 pages.

14               Do I understand the difference?  Yes, I

15   understand the difference.

16       Q.      Do you understand why there were two

17   different letters, though?

18               MR. WALSH:  Objection to the form.

19       A.      Yes, I understand why there were two

20   letters about the same topic.  Because the second

21   letter is 23 pages and includes a lot of background

22   and detail on the properties that she used, the

23   ground leases that she used.

24       Q.      And why wouldn't just one letter, the

25   more complete one, Exhibit X, suffice?  Why were two



Page 101

```
 1                    C. DEMARCO
 2   created, if you know?
 3              MR. WALSH:  Objection to the form.
 4        A.   I don't want to speculate why she had
 5   two.  I can only speak to my experience that you
 6   want to have the detail and the backup.
 7              As you notice in Tom Tener's report, it
 8   would say his work file.  So this is detail that
 9   would be something we would want to see but may
10   not be what you would present subsequently as just
11   your letter.
12              But I'm not -- I'm just saying based on
13   my experience, not for this case specifically.
14   I'm not exactly sure.  But I can certainly tell
15   you I've read both of these letters.  I understand
16   the difference in these letters.  And Sharon did a
17   very thorough job analyzing ground lease comps in
18   accordance with the option rent addendum.
19        Q.   How do you know that?
20        A.   Because the option rent addendum
21   specifically calls out that comparable ground leases
22   would be used in the analysis.
23        Q.   How do you know her job was thorough?
24        A.   Well, we spent -- you know, she spent
25   time researching comparables, so I think she spent a
```



Page 102

```
 1                        C. DEMARCO
 2   considerable amount of time, and based on my at
 3   least ten years' experience with her, everything's
 4   she's prepared has been -- you know, she's very
 5   diligent about being extremely thorough, and I
 6   thought the work product that you have up on the
 7   screen right now is very thorough with regard to the
 8   detail.  My opinion.
 9        Q.   Do you have any qualifications other than
10   your work experience for you to be able to opine on
11   the thoroughness of an MAI appraisal?
12             MR. WALSH:  Objection to the form.
13        A.   Can you repeat.
14        Q.   What are your qualifications, if any, to
15   be able to opine on the thoroughness of an MAI
16   appraisal?
17        A.   Again, I've ordered multiple MAI
18   appraisals in my role at McDonald's as an asset
19   manager in 15 years.  And based on the appraisals
20   that I've read and reviewed, it was my personal
21   opinion I thought this was thorough.
22             I'm not an MAI appraiser.  I'm not
23   claiming to be an MAI appraiser.  I'm just
24   claiming based on my 15 years' experience.  So,
25   Howard, my opinion of the thoroughness of her
```



Page 103

```
 1                        C. DEMARCO

 2   appraisal is not based on my -- I'm not an

 3   appraiser.  My opinion of her thoroughness is

 4   based on my 15 years of experience in the five

 5   boroughs and reading multiple appraisals from

 6   other MAI appraisers as a point of comparison.  I

 7   think she's incredibly thorough.

 8        Q.    Let's go back to the second document we

 9   looked at today, which was marked as number 1 as

10   Exhibit D in a previous deposition.  It should be

11   number 1 on your screen.  It's the option rent term

12   addendum.  Turn to the second paragraph on the

13   second page.

14              Please tell me, based on your 15 years'

15   experience as an asset manager and all the

16   appraisals that you've read and reviewed, what the

17   meaning of that second paragraph is.

18              MR. WALSH:  Objection to the form.

19        Q.    You can answer.

20              MR. KOH:  Well, it was answered and it

21         was I didn't have enough experience to

22         answer, so I'm probing that a little bit.

23        A.    I'm trying to find where that is, Howard.

24        Q.    It should be document number 1.  Second

25   page, second paragraph beginning "rental value."
```



Page 104

```
 1                    C. DEMARCO
 2      A.     What's your question?
 3      Q.     What does that paragraph mean based on
 4 your 15 years of experience?  Well let me ask it a
 5 different way.
 6             Based on your 15 years of experience
 7 and the multiple amount of appraisals that you've
 8 read and your ability to tell Ms. Locatell's work
 9 was thorough, what is required in order to
10 properly appraise the property at 840 Atlantic
11 Avenue under the option rent addendum?
12             MR. WALSH:  Objection to the form.
13      A.     Do you want me to read the second
14 paragraph?
15      Q.     I want you to tell me what an appraiser
16 has to do to in order to thoroughly and properly
17 appraise the property at 840 Atlantic Avenue as
18 provided under the option rent term addendum.
19             MR. WALSH:  Objection to the form.
20      A.     I'm not -- I can read this all to you if
21 you would like me to, Howard.  It will take a while.
22      Q.     What steps must the appraiser take?  You
23 were able to determine Ms. Locatell's appraisal was
24 thorough, so how would a thorough appraisal be done
25 here according to this, the option rent term
```



Page 105

```
 1                        C. DEMARCO
 2    addendum?
 3              MR. WALSH:  Objection to the form.
 4        A.    The option rent addendum speaks to:  The
 5    rental value shall be established based upon a
 6    definition of fair market rental value as the price
 7    which an average well-informed tenant would pay and
 8    an average well-informed landlord would accept
 9    exclusive of tenant's improvements, knowing all the
10    uses to which the property can be put without duress
11    on either party.
12              Continued in paragraph 3:  The standard
13    market data approach technique for valuing vacant
14    land shall be used by the appraisers.  All
15    comparable leases shall be appropriately adjusted
16    and written reports shall indicate the reasons for
17    such adjustments so made.
18              I'm going to stop there.  She had 11, I
19    believe, comparable leases that she made
20    adjustments to as part of this analysis.
21        Q.    And the --
22        A.    Howard, let me just offer something for
23    you.  Typically when we -- you see an appraisal, we
24    might only get something with three comps or four
25    comps.  The universe of comps might be very small.
```



Page 106

                              C. DEMARCO

1

2              In this case she had 11 comparables

3    available in the universe to consider for this.

4    So it was much more extensive of an analysis in

5    the comparable data than what I had seen in the

6    past.

7              When I had gotten appraisals, it may be

8    three comps, four comps.  This had 11 comparables

9    with adjustments made for each one.  So just based

10   on the number of comparables she was unable to

11   undercover, comparable ground leases, the

12   adjustments she made.  She took particular note to

13   the M11 zoning and the R6B zone, so she considered

14   all that as part of what she was analyzing and

15   adjusting.

16        Q.   I would like to read the next sentence to

17   you.  It says:  If adequate comparable leases are

18   not available, then a land residual technique as

19   defined by the American Institute of Real Estate

20   Appraisers shall be used.

21              You see that, right?

22        A.   Yes, I do.  But, Howard, though, let me

23   just stop you for a second.  So yes, it does say "if

24   adequate comparable leases are not available, then

25   the land residual technique as defined by the



Page 107

```
 1                         C. DEMARCO
 2      American Institute of Real Estate Appraisers shall
 3      be used."
 4              And so -- it goes on to say:  The real
 5      estate income component used in the residual
 6      technique shall be an economic rental for a
 7      hypothetical improvement, but in no event shall
 8      any business income be considered in the analysis.
 9              So it does provide, Howard, that if
10      comparable leases were not available, the
11      alternate approach was a land residual technique.
12      But that wasn't necessary here because there was
13      many ground lease properties available.
14              Even Tom Tener indicated at a meeting
15      on June 19th that he had 50 ground leases that he
16      looked at, but he elected to do a sales comparison
17      as opposed to adjusting ground leases.
18              So there were adequate ground leases
19      available for this assignment in setting the rent,
20      so there was no need to look at the land residual
21      technique.
22      Q.    Who made the determination that there
23      were adequate ground leases available?
24      A.    Sharon Locatell prepared the appraisal,
25      so she evaluated it in her professional MAI opinion
```


MAGNA
LEGAL SERVICES

Page 108

1                          C. DEMARCO

2    that she had adequate ground leases available that

3    were similar in zoning, because it was the zoning as

4    of that date of value that would comparable ground

5    leases to be used.

6              So the appraisers would be the people

7    -- and I can't speak to Tom Tener.  He said he

8    found 50 ground leases, but he didn't use any of

9    them.  I'm not sure why he didn't use -- he didn't

10   use --

11   Q.    We'll cut to the June 19th meeting and

12   what Tom Tener may or may not have said and in what

13   context he said it shortly.

14             I'm asking the question:  Who made the

15   determination that there were adequate comparable

16   leases available?

17   A.    For the report that Sharon Locatell

18   prepared from Appraisers and Planners, she would be

19   the one to identify if they were comparable based on

20   the zoning, based on the lease, based on New York

21   law if they were appropriate and can be used in this

22   case.

23   Q.    Did you agree with Ms. Locatell that

24   there were adequate ground leases available?

25             MR. WALSH:  Objection to the form.



Page 109

1                        C. DEMARCO

2        A.    It wasn't my decision to tell her what

3   ground leases.  I didn't give her any -- I didn't

4   tell her what ground lease to use.  I would have no

5   input on that, Howard.

6        Q.    And that's because only an MAI can make

7   that determination as to whether a particular ground

8   lease is a good comparable?

9              MR. WALSH:  Objection to the form.

10       Q.    You can answer.

11       A.    Can you repeat your question.

12       Q.    Is that because only an MAI can make the

13  determination that a particular ground lease is a

14  good comparable?

15       A.    In this case, I would say the MAI would

16  be the one to -- Sharon, since she was the one

17  preparing the report, she would be the one to make

18  the decision if it was an adequate comparable based

19  on the lease, New York law, and the zoning.

20       Q.    And Mr. Tener on behalf of the landlord

21  would make that determination?

22             MR. WALSH:  Objection to the form.

23       A.    I can't answer what Mr. Tener is doing

24  for Sam.

25       Q.    Did you have an understanding that it was



Page 110

```
 1                      C. DEMARCO
 2   Mr. Tener who was supposed to make the determination
 3   on behalf of the landlord as to whether there were
 4   adequate ground lease comps?
 5        A.    I can't answer that.
 6        Q.    You said there was a meeting on June 19th
 7   where Mr. Tener was present.  That was June 19,
 8   2019, right?
 9        A.    There was a meeting on June 19, 2019, at
10   Morris Missry's office, yes.
11        Q.    Who was present besides you and Mr. Tener
12   and Mr. Missry?
13        A.    Mike Meyer.  So for McDonald's, it was
14   Sharon Locatell, Michael Meyer, and myself.  For Sam
15   Rottenberg, it was Sam Rottenberg, Tom Lee, Tom
16   Tener, and Morris Missry.
17        Q.    How did you get to this meeting?
18        A.    I don't understand your question.
19        Q.    Well, right now you're in the McDonald's
20   field office in Stamford, Connecticut, right?
21        A.    Yes.
22        Q.    Is that where you're based now or were
23   you based in Illinois or somewhere else?
24              MR. WALSH:  Objection to the form.
25        Q.    Where do you live?
```



Page 111

1                         C. DEMARCO

2          A.    I live in Eastchester, New York.

3          Q.    How long have you lived there?

4          A.    20 years.

5          Q.    Did you drive to this meeting?  Take the

6     train?

7          A.    I believe I took the train to Grand

8     Central.

9          Q.    How did Mr. Meyer get to this meeting, if

10    you know?

11               MR. WALSH:  Objection to the form and

12          relevance.

13         A.    I don't know how Mike --

14         Q.    Okay.

15               Is he based in the New York area or is

16    he based somewhere else?

17         A.    He's based somewhere else.

18         Q.    Would that be in Illinois, if you know?

19         A.    Our office is in Chicago.  If you want to

20    know where our corporate office is, it's in Chicago.

21         Q.    That's all I need to know.

22               So prior to meeting with all these

23    people in Morris Missry's office, did you meet

24    separately with Ms. Locatell?

25         A.    Yes.



Page 112

```
 1                        C. DEMARCO
 2       Q.    For about how long?
 3       A.    I don't recall.
 4       Q.    Was that on the same day of the meeting
 5  or was it a few days before?
 6       A.    I don't recall.
 7       Q.    What do you recall?
 8       A.    It might have been the day before.  Might
 9  have been two days before.  I don't know, Howard.
10  It was -- before the meeting, I definitely met with
11  her briefly.
12       Q.    And briefly, when you met, what did you
13  talk about?
14       A.    We talked about we were going to have a
15  meeting on June 19th.  We talked about that Tom
16  Tener had prepared, you know, a land sales
17  comparison approach, which was not in accordance
18  with the lease, and so we just talked about that --
19  you know, what we knew so far and we were hopeful
20  that we were going to have a good meeting and be
21  able to try to find some common ground and have a
22  conversation with them.
23            It was more about -- I had already had
24  her detail.  It was really what was the landlord
25  thinking, what did Tom prepare.  And she updated
```



Page 113

```
 1                         C. DEMARCO
 2    us as to what Tom had done, which unfortunately it
 3    was not in accordance with the lease.  It was not
 4    in accordance with the law.  It wasn't a valid
 5    appraisal, unfortunately.
 6              We just talked briefly.
 7         Q.   At this time, had Tom provided a written
 8    appraisal that you had determined was not valid?
 9         A.   I don't recall that I saw something from
10    Tom before the meeting, but I was aware that the
11    methodology Tom used was not in accordance with the
12    option rent addendum.
13              The option rent addendum specifically
14    speaks to analyzing comparable ground leases which
15    would be appropriately adjusted.
16              And from what I understood from Sharon
17    was that Tom prepared a land sale comparison
18    approach which was not even an option on the
19    lease.
20         Q.   So your understanding of what Mr. Tener
21    did was based on what Sharon Locatell told you?
22         A.   Based on her conversations with Tom.
23         Q.   Was it based on anything else?
24         A.   I don't know what she received from him.
25    Again, once we start the process, I'm not involved.
```



Page 114

```
 1                     C. DEMARCO
 2    It's the appraisers talking, so I'm not as involved.
 3    So I don't know exactly what Sharon had at that
 4    point.
 5        Q.    But all your information about what Mr.
 6    Tener may or may not have done, had that come from
 7    Sharon?
 8        A.    That's correct.  Sharon is the one that
 9    informed me Tom was looking at it based on a land
10    sales comparison approach, not based on ground
11    leases.
12        Q.    Can you tell us what happened at the June
13    19, 2019, meeting at Morris Missry's office.
14        A.    Can you repeat the question.  What
15    happened?
16        Q.    Yes.  Tell us what happened at the June
17    19, 2019, meeting at Morris Missry's office.
18              MR. WALSH:  Objection to the form.
19        A.    So it was hostile from hello, Howard.  It
20    was pretty aggressive, unnecessarily, in my opinion.
21    The purpose of the meeting was to speak to the
22    option rent addendum and the fair market rental
23    value determination and the methodology, the New
24    York law as encumbered by the lease.
25              And we very quickly turned into sort of
```



Page 115

```
 1                        C. DEMARCO
 2    an argumentative attack from Morris Missry to
 3    Sharon, and then so there was a stop.  We stopped
 4    and tried to regroup and say, okay, let's just
 5    stop.  Let's let the appraisers discuss their
 6    valuation.
 7                 So Tom Tener went first and he talked
 8    about that he used a land sales comparison
 9    approach, which was consistent with what I had
10    understood he did.
11                 He indicated he used 50 ground leases
12    to come up with what he called a cap rate, which I
13    didn't understand if he could find 50 comparable
14    leases, I wasn't clear why he couldn't adjust
15    those.  But we just listened.
16                 So tom went through his analysis.  I
17    think his total valuation for the land was
18    16,850,000, which it blew me away because Sam --
19    that was in June of 2019, and Sam purchased the
20    property, what, in October of 2018 for 7 million.
21                 Now his appraiser's indicating it's
22    worth 16,850,000, and then he goes on to conclude
23    that he researched 50 comparable ground leases and
24    determined that an 8 percent cap rate is
25    applicable, which that's not how cap rates are
```



Page 116

```
 1                      C. DEMARCO
 2    used.  If he's looking at a return rate, it
 3    wouldn't be that.
 4             I'm explaining to you what happened as
 5    you requested.  And then he concluded his value --
 6    I'm doing it off the top of my head -- like a
 7    1,348- for annual rent and 80 percent of that as
 8    the rent to the landlord.
 9             So we listened to him go through his
10    analysis.  We responded.  You know, there was
11    discussion that that was not a method that could
12    be used in accordance with the option rent
13    addendum, that the methodology that could be used
14    was either adjusting comparable ground leases.
15             We went over that previously, Howard.
16    We know the two methodologies that are permitted
17    in the option rent addendum, and what he had done
18    was neither of those.
19             So we objected to the methodology that
20    Tom used.  We asked him if he did it as encumbered
21    by the McDonald's lease, and he said, no, he did
22    not or -- I don't know.  I think he said he didn't
23    consider that.
24             Howard, Morris Missry objected to us
25    even considering the 936 Second Avenue case, and
```



```
 1                         C. DEMARCO
 2    so there was a lot of back-and-forth discussion on
 3    that.
 4                 So the headline was that Tom went over
 5    his valuation and concluded 16,850,000, and I
 6    believe at that meeting he said, no, he actually
 7    didn't consider as encumbered by the lease.
 8                 So we listened and we objected and at
 9    least just shared with the group our concerns that
10    the report was not in compliance with the lease
11    and that it needed to reflect as encumbered by the
12    lease and it did not do that and it wasn't a
13    methodology outlined as acceptable by the option
14    rent addendum.
15                 So there was a lot of conversation that
16    was back and forth, and Morris disagreed with
17    everything we said.
18                 Then Sharon attempted to go over her
19    methodology and Morris interrupted her every
20    several minutes, and it was very difficult for her
21    to even talk without -- it was very aggressive and
22    very hostile, Howard.  I never in 28 years
23    experienced a lease or a meeting like that that
24    was that aggressive and hostile, unnecessarily.
25    We had contemplated getting up and leaving several
```



Page 118

```
 1                        C. DEMARCO
 2    times.  It was just that aggressive.
 3              We left the meeting again restating we
 4    felt that the methodology that Tom had used was
 5    not in compliance with the lease, that it's got to
 6    be in accordance with the option rent addendum and
 7    it needs to be, you know, as encumbered by the
 8    lease considering the existing zoning as of the
 9    date of value.
10              Sorry for the long -- but that's how
11    that went.
12              MR. KOH:  Let's take a short break.
13              (Whereupon, there was a pause in the
14         proceeding.)
15         Q.    At this June 19, 2019, meeting, did
16    anybody take any notes?
17         A.    I don't know.
18         Q.    Did you take any notes?
19         A.    I don't remember if I took notes at the
20    meeting.  There was not much to note about.  It was
21    argumentative from the beginning, as I mentioned,
22    so -- I wouldn't write that about Morris, so I don't
23    recall if I took notes.
24         Q.    Okay.
25              You mentioned something, I think,
```



Page 119

```
 1                     C. DEMARCO
 2   called the 936 Second Avenue case.  Am I correct
 3   about that?
 4        A.    I did mention the 936 Second Avenue case,
 5   yes.
 6        Q.    Okay.  And you said that Mr. Missry said
 7   that that case didn't apply, right?
 8        A.    I can't speak to what he exactly said,
 9   but he disagreed with our position that that case is
10   relevant in this process.
11        Q.    And you believe the case was relevant?
12        A.    Yes, I do.
13        Q.    Tell me why.
14              MR. WALSH:  I'm going to object insofar
15        as it calls for Ms. DeMarco to share the
16        contents of any privileged legal advice that
17        was given to her by counsel.
18              If you can answer that question without
19        divulging privileged information, you can.
20        Q.    Can you answer the question following Mr.
21   Walsh's instruction?
22        A.    Yes.
23              It was my understanding of the -- and
24   I'm not an attorney and I'm not an appraiser.  I'm
25   just a businessperson with 15 years' experience in
```



Page 120

```
 1                         C. DEMARCO
 2    the New York City market, and my understanding of
 3    the 936 Second Avenue case is that -- and I'm
 4    paraphrasing.  You probably have a copy of that
 5    case.  You could look at that.
 6              I'm paraphrasing that unless it's
 7    specifically stated to exclude the lease, then the
 8    lease would be a relevant factor in the concluded
 9    value.
10        Q.    And how did you gain your understanding
11    of the 936 Second Avenue case?
12              MR. WALSH:  Same instructions and
13          advice to my witness.
14        A.    Can you repeat your question.
15        Q.    How did you get this understanding of
16    this 936 Second Avenue case?  If it's entirely what
17    McDonald's lawyers told you, I'd like to know that.
18    If you got it from another source, I'd like to know
19    what that other source was.
20              MR. WALSH:  Carol, as a reminder, don't
21          reveal the contents of any privileged
22          discussions you may have had with McDonald's
23          counsel.
24              But if you have an understanding of
25          that decision from someone that is other than
```



Page 121

```
 1                         C. DEMARCO
 2        counsel, you can certainly share that without
 3        waiving any privilege.
 4               THE WITNESS:  Thank you, Brendan.
 5        A.    Howard, I'm happy to answer.  Can you
 6   repeat the question.  Then I will answer.
 7        Q.    Sure.
 8               My question is:  How did you gain your
 9   understanding of the 936 Second Avenue case?
10        A.    So I gained my understanding of the 936
11   Second Avenue case by appraisers several years
12   before in another rent reset case that KTR was part
13   of McDonald's witness group in acknowledging that
14   the 936 Second Avenue case was relevant.
15               So the appraiser -- I heard this from
16   an appraiser and then I read the language, so it
17   was in connection with the appraisal that the
18   language stated that if -- unless it specifically
19   excludes that the language for your option rent
20   addendum says it's to specifically exclude the
21   lease, then the lease needs to be considered as a
22   relevant factor in the --
23               (Reporter clarification.)
24        A.    I think we need to restart that question
25   and answer.
```



Page 122

1                         C. DEMARCO

2        Q.    Let me try this again.

3        A.    Okay.

4        Q.    Let me ask the question.  The question

5   was:  How did you gain your understanding of the 936

6   Second Avenue case?

7        A.    From an appraiser.

8        Q.    And who was that appraiser?

9        A.    It was two appraisers.  It was Sharon

10  Locatell and -- Sharon Locatell was the first person

11  who told me about it.

12       Q.    And who was the second?

13       A.    I believe it was KTR, a woman at KTR

14  firm.

15       Q.    And who was KTR working for?

16       A.    They were retained by McDonald's as an

17  expert witness in an arbitration matter in

18  Manhattan.

19       Q.    Do you remember the location of the

20  McDonald's that was the subject of this arbitration?

21       A.    It was 1560 Broadway in Manhattan.

22       Q.    That's Times Square, right?

23       A.    1560 Broadway in Manhattan is in the

24  Times Square area.  Times Square is bigger than one

25  site.  It's not one site in Times Square.



Page 123

1                              C. DEMARCO

2        Q.     Am I correct that the woman at KTR was

3   Theresa Nygard?

4        A.     Yes, it was Theresa Nygard.  And also

5   Terry Tener was involved as well.  So both Terry

6   Tener and Theresa Nygard.

7        Q.     Was one of the issues in this appraisal

8   the value of certain signage, if you recall?

9        A.     I don't recall.  I'm not comfortable.  I

10  don't recall the specifics of that case.  I wanted

11  to answer your question as to when I became aware of

12  the 936 Second Avenue case, and that, I think, is

13  what I answered.

14       Q.     Yes, and I appreciate that.  I think I

15  have some familiarity with this arbitration myself.

16              After this meeting on June 19, 2019,

17  concluded, what happened next with respect to the

18  fair market value appraisal process for 840

19  Atlantic Avenue?

20              MR. WALSH:  Objection to the form.

21       Q.     Can you answer the question?

22       A.     Can you repeat the question.

23       Q.     After the meeting on June 19, 2019,

24  concluded, what happened next with respect to the

25  fair market rental value appraisal process for 840



Page 124

```
 1                         C. DEMARCO
 2    Atlantic Avenue?
 3         A.    As a result of that meeting, I believe
 4    there was a discussion and we were trying to work
 5    through an agreement with the landlord side, Morris
 6    Missry, and the landlord's group, the proper
 7    methodology to value.
 8              So we couldn't go forward with the
 9    process because the process was already corrupted
10    because he used -- Tom used the wrong approach.
11              So we were trying to -- at the end of
12    meeting, there was discussion that we would try to
13    come to agreement on a couple of things.  One, the
14    methodology that needed to be used in accordance
15    with the option rent addendum.  Number two, that
16    it took into consideration the existing ground
17    lease, and that's where that 936 Second Avenue
18    matter was important.
19              And three, we were trying to work on
20    some agreement with the other side as to the
21    process for the neutral thirds, that the process
22    as described to us by Morris Missry in the meeting
23    was not our understanding of how the process of
24    the neutral thirds should work.  And so we were
25    trying to work through, one, that Tom was going to
```



Page 125

```
 1                      C. DEMARCO
 2   revise his -- we were hopeful and believe Tom was
 3   going to be preparing an appraisal in connection
 4   with the option rent addendum, and two, reach some
 5   kind of an agreement with them on the process for
 6   the neutral thirds.
 7             I'm going to stop there.
 8        Q.    Okay.
 9             Do you recall if any kind of agreement
10   was reached?
11             MR. WALSH:  Objection to the form.
12        Q.    Was any kind of agreement reached, to
13   your knowledge?
14        A.    I don't recall the specifics of any
15   agreement.  I think there was discussion on both
16   parties of what needed to happen next, and I believe
17   that we were going to work towards an agreement
18   subsequent to that June 19th meeting.
19             That was the -- both parties were going
20   to try to work through an agreement understanding
21   McDonald's concerns, the landlord's concerns.  But
22   I don't believe there was a -- I think there was
23   going to be some preparation of such an agreement.
24             I don't believe there was one as we
25   walked out of there.  It was hard to get a full
```



Page 126

```
 1                        C. DEMARCO

 2    sentence in there.

 3         Q.    I understand that there wasn't an

 4    agreement when you walked out.

 5              My question is:  Do you know if an

 6    agreement was reached subsequent to the meeting?

 7              MR. WALSH:  Objection to the form.

 8         A.    I believe that -- I think there was

 9    agreement on one aspects or two aspects.  There was

10    not agreement on how to handle the neutral third.

11    So there was not agreement on that.

12              We were told that Tom Tener would

13    revise his appraisal and that he was going to be

14    using the land residual technique and -- I think

15    that was -- and had to be encumbered by the lease,

16    so he was going to -- they accepted and

17    acknowledged that it should be.

18              So, Howard, I believe there was

19    agreement that the other side agreed that the 936

20    Second Avenue case was relevant and that Tom Tener

21    would revise his appraisal to reflect as

22    encumbered by the lease.

23              But there was not, Howard -- very

24    importantly, there was not agreement with the

25    parties of how the neutral third was supposed to
```



Page 127

```
 1                         C. DEMARCO

 2    work, and we could talk about that.

 3         Q.    Did there come a time when you saw a

 4    written appraisal prepared by Mr. Tener?

 5         A.    I believe I did.  I don't recall exactly

 6    when, but I believe I might have seen his revised

 7    appraisal, which I believe included both his

 8    original and his revised, and the numbers were

 9    exactly the same.

10              His concluded value was exactly the

11    same under the land residual technique and under

12    the land sales comparison approach.  Two different

13    techniques, one considering as uncumbered by the

14    lease, but he concluded the exact same value to

15    the dollar for both.

16         Q.    And did you believe that was improper?

17         A.    I believe that that was statistically

18    impossible.

19         Q.    Do you have any training in statistics?

20         A.    No.  No, I do not.

21         Q.    Why did you believe it was impossible?

22         A.    Because they considered different

23    factors.  So one considered as encumbered by the

24    lease and one did not, so you're not apples to

25    apples as far as your factors of consideration into
```



Page 128

```
 1                        C. DEMARCO
 2    the concluded value.
 3         Q.    How do you know that a different value
 4    would result depending on which methodology you
 5    used?
 6         A.    Can you repeat the question.
 7         Q.    Yes.
 8               How do you know that if he used these
 9    two competing methodologies, it would be
10    impossible for them to come up with the same
11    value?
12         A.    Because again, one was including as
13    encumbered -- they had different considerations that
14    they were -- so one considered as encumbered by the
15    lease and one did not.
16               So again, I'm not an appraiser.  15
17    years' experience in the boroughs.  I've reviewed
18    multiple appraisals.  I've never seen someone do
19    two different methodologies and come up with the
20    exact same number to the dollar.  I've just never
21    seen that.
22               I didn't know how that could be
23    possible when your factors of consideration are
24    very different.
25         Q.    Did you ask anybody?
```



Page 129

```
 1                        C. DEMARCO

 2       A.    Did I ask anybody what?

 3       Q.    Whether it was possible.

 4       A.    Did I ask anybody if what was possible?

 5       Q.    That -- all right.

 6             Did you ask anybody if it was possible

 7    that these two different appraisal methodologies

 8    could come up with the same value?

 9       A.    I didn't ask anybody.  We had

10    conversation that it seemed unusual that that could

11    be the case.

12             But again, it's my experience that, you

13    know, I've never seen two different methodologies,

14    especially when one's considering the encumbrance

15    of a 20-year lease be the exact same valuation to

16    the dollar of a methodology that does not reflect

17    as encumbered by the lease.

18       Q.    You said we had conversations that it

19    seemed unusual.

20             Who did you have these conversations

21    with?

22       A.    I discussed with Sharon.  When I read

23    that, I said is that -- is that common that you

24    would see different methodologies with different --

25    I don't recall exactly, Howard, what I discussed
```



```
 1                    C. DEMARCO
 2    with her.
 3           But I did discuss when I read his
 4    updated report, which I think was dated in
 5    September of 2019 -- I'm not exactly sure.
 6           I had a conversation with her about it.
 7    I don't remember exactly what the conversation
 8    was.  I was very suspect and surprised to see that
 9    Tom did that.
10      Q.   As best as you can recall, tell me
11    everything that was said during this conversation
12    you had with Sharon Locatell.
13           MR. WALSH:  Objection to the form.
14      A.   I don't recall, Howard.  It wasn't -- I
15    don't recall, Howard.  It wasn't -- I don't recall
16    what the conversation specifically -- just again
17    that he did two methodologies, right?
18           He did the land sales comparison
19    approach not as encumbered by the lease.  Then he
20    did the land residuals approach as encumbered by
21    the lease.  And then they came out, concluded the
22    exact same valuation.
23           We did more than that.  We did have
24    conversation about his land residual technique
25    and, you know, some of the assumptions he had in
```



Page 131

1                        C. DEMARCO

2    there seemed flawed.

3        Q.    Have you now told me everything you can

4    remember about this conversation you had with Ms.

5    Locatell?

6                MR. WALSH:  Objection to the form.

7        A.    I just described to you what I recall

8    from my conversation with Sharon.

9        Q.    Did you take any notes of this

10   conversation?

11       A.    No, I didn't take any notes in the

12   conversation.

13       Q.    Besides you and Sharon, who else

14   participated in this conversation, if anybody?

15       A.    No one else participated in the

16   conversation that I recall.

17                MR. KOH:  Let's bring up 67.  It is a

18            letter from Appraisers and Planners to Ms.

19            DeMarco dated September 20, 2019.  It's

20            marked as Exhibit BB from a previous

21            deposition.

22       A.    I have it up.  I'm just reviewing it.

23       Q.    Okay.

24       A.    Okay.  Go ahead.

25       Q.    Do you recognize this document?



Page 132

```
 1                      C. DEMARCO

 2      A.    I don't recall, but -- I don't recall.

 3      Q.    Do you know if this document that was

 4  dated September 20th was ever given to Mr. Tener?

 5      A.    Can you repeat your question.  You're

 6  asking if this was ever given to Tom?

 7      Q.    Yes.

 8      A.    I don't know.

 9      Q.    Okay.

10            MR. KOH:  I've covered the areas I want

11      to cover in today's deposition.

12            Mr. Walsh, do you have questions?

13            MR. WALSH:  If we could just take maybe

14      a ten-minute break.  I want to review my

15      notes.

16            (Whereupon, there was a pause in the

17      proceeding.)

18            MR. WALSH:  So I don't have any

19      questions, and as far as we're concerned, the

20      deposition is concluded.

21            MR. KOH:  Ms. DeMarco, thank you very

22      much for your appearance today, and we

23      appreciate your time.

24            THE COURT STENOGRAPHER:  Brendan, are

25      you ordering?
```



Page 133

1                          C. DEMARCO

2              MR. KOH:  I will give it to you.

3              THE COURT STENOGRAPHER:  Howard, do you

4         want to order an immediate rough?

5              MR. KOH:  Yes, I'll take a rough.

6              (Whereupon, the within examination was

7         concluded.  Time Noted, 3:17 P.M.)

8

9    STATE OF NEW YORK)

10                   ) SS.:

11   COUNTY OF        )

12

13    I have read the foregoing record of my testimony

14   taken at the time and place noted in the heading

15   hereof and I do hereby acknowledge it to be a true

16   and correct transcript of same.

17

18                              _____

19                              CAROL DEMARCO

20   Subscribed and sworn to before me

21   on this _____ day of _____, 2021.

22

23   _____

                            NOTARY PUBLIC

24

25



2                         I N D E X

3

4    EXAMINATION OF       BY                   PAGE

5    Carol DeMarco        Howard Koh           4-132

6

7                      E X H I B I T S

8

9    DEFENDANT'S           DESCRIPTION         PAGE

10   FF                    Email               91

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 135

2              C E R T I F I C A T E

3

4              I, Melissa Leonetti, RPR, a Notary

5    Public of the State of New York, do hereby certify:

6              That the testimony in the within proceeding was

7    held before me at the aforesaid time and place.

8    That said witness was duly sworn before the

9    commencement of the testimony, and that the

10   testimony was taken stenographically by me, then

11   transcribed under my supervision, and that the

12   within transcript is a true record of the testimony

13   of said witness.

14              I further certify that I am not related

15   to any of the parties to this action by blood or

16   marriage, that I am not interested directly or

17   indirectly in the matter in controversy, nor am I in

18   the employ of any of the counsel.

19              IN WITNESS WHEREOF, I have hereunto

20   signed this 3rd day of October, 2021.

21

22

23   *Melissa Leonetti*

24   Melissa Leonetti

25



## A

**ability** 46:20 104:8
**able** 13:22 21:11
102:10,15 104:23
112:21
**absolutely** 17:10
78:17
**accept** 15:4 19:10
40:5 105:8
**acceptable** 117:13
**accepted** 126:16
**access** 6:13,24 7:4,9
9:22
**account** 17:14
**accountant** 53:14
**accounting** 51:16
51:18 52:9,11,15
52:17 53:16 54:23
**accurate** 13:10
61:21
**acknowledge**
133:15
**acknowledged**
126:17
**acknowledging**
121:13
**acquired** 25:16,18
**acquiring** 26:20
27:11
**acquisition** 13:4
**action** 4:9 135:15
**actual** 69:7 81:22
**add** 41:6,8,12
**addendum** 13:21
14:9,13,16 19:4
20:18 21:8,13
46:6 49:14 51:8
54:21 55:19 86:16
86:22 91:4 98:23
101:18,20 103:12
104:11,18 105:2,4
113:12,13 114:22
116:13,17 117:14
118:6 121:20
124:15 125:4

**addendums** 5:17
**addition** 38:15
**additional** 41:18
50:18
**address** 25:13
**adequate** 106:17,24
107:18,23 108:2
108:15,24 109:18
110:4
**adjust** 115:14
**adjusted** 105:15
113:15
**adjusting** 106:15
107:17 116:14
**adjustment** 24:16
52:2,3
**adjustments**
105:17,20 106:9
106:12
**advance** 7:5 96:23
**advice** 94:7,8
119:16 120:13
**advise** 25:24 90:21
**advising** 95:15
**affect** 46:13,16
**aforesaid** 135:7
**aggressive** 39:19
114:20 117:21,24
118:2
**Agile** 80:16
**AgileLaw** 8:25
56:23
**ago** 11:22
**agree** 17:19 20:20
41:8 54:17 70:22
87:2,3 95:16
108:23
**agreed** 3:4,9,12
35:15 126:19
**agreement** 81:9,10
81:12 86:5,5
124:5,13,20 125:5
125:9,12,15,17,20
125:23 126:4,6,9
126:10,11,19,24
**ahead** 7:7 17:16

31:5 45:5 94:16
131:24
**allocated** 73:14,15
**allow** 60:3 67:12
**allowable** 46:21
**allowed** 89:6
**alternate** 107:11
**American** 106:19
107:2
**amount** 22:16,23
43:8 60:14 68:20
71:5 102:2 104:7
**analysis** 39:11 45:8
98:23 101:22
105:20 106:4
107:8 115:16
116:10
**analyzing** 101:17
106:14 113:14
**annual** 69:18 116:7
**annually** 69:20
**answer** 5:6 7:7
11:17 13:14 14:6
16:4,19 18:11,18
20:16 21:5 28:6
31:5 32:10 36:16
39:8 40:4 45:5
46:18 51:11 52:23
53:15 55:4 56:16
69:10 88:11 90:3
91:21 94:10,14,16
94:21 103:19,22
109:10,23 110:5
119:18,20 121:5,6
121:25 123:11,21
**answered** 40:11
52:22 103:20
123:13
**anybody** 7:11 8:13
11:14,19 12:2
44:21,25 75:23
81:18,23 89:23
90:16 118:16
128:25 129:2,4,6
129:9 131:14
**Anyway** 51:3

**apart** 30:3 35:13
**app** 8:24,25
**Apparently** 59:11
**appearance** 132:22
**appearing** 7:12,17
**appears** 58:7
**apples** 127:24,25
**applicable** 56:13
115:25
**applications** 9:2
**apply** 119:7
**appoint** 85:22 86:7
**appointed** 86:8
**appraisal** 19:20
20:13 21:3,11
22:24 36:22 45:10
66:5,13,17 102:11
102:16 103:2
104:23,24 105:23
107:24 113:5,8
121:17 123:7,18
123:25 125:3
126:13,21 127:4,7
129:7
**appraisals** 21:19,24
22:3,4,7,9,12,16
23:7,10,12 102:18
102:19 103:5,16
104:7 106:7
128:18
**appraise** 104:10,17
**appraised** 18:14,21
20:11
**appraiser** 17:6 18:7
19:2 21:10 36:20
45:7 46:25 66:19
87:24 88:5,9 90:6
90:6 95:17 98:9
98:15 102:22,23
103:3 104:15,22
119:24 121:15,16
122:7,8 128:16
**appraisers** 35:20
41:7 47:23 48:14
85:23 86:8,9,11
89:21 90:8 95:20

**97:22 99:14 100:9**
103:6 105:14
106:20 107:2
108:6,18 114:2
115:5 121:11
122:9 131:18
**appraiser's** 90:14
115:21
**appreciate** 28:5,6
56:16 63:11 93:19
97:8 123:14
132:23
**appreciated** 38:24
39:14
**appreciation** 38:18
38:22 39:3,5,10
39:18,23
**approach** 19:15
49:23 50:11,23
51:4 55:8,17,20
56:10 88:17
105:13 107:11
112:17 113:18
114:10 115:9
124:10 127:12
130:19,20
**appropriate** 56:14
108:21
**appropriately**
105:15 113:15
**approval** 40:18
43:20 51:9 56:11
58:7,12,17,24
59:6 62:7,14
67:21 75:23 77:14
**approvals** 55:13
**approved** 43:16
59:12,14 63:9
64:18 75:19,21
76:6
**approver** 59:8
**approvers** 57:15
75:24,25 76:6
**approving** 58:10
**approximately**
32:20 75:3



**April** 56:3 74:25
87:7,8,12
**arbitration** 122:17
122:20 123:15
**area** 22:6 32:22
37:20 38:3,15
46:12,15 78:19
79:23,24 80:3,7
84:19,22 111:15
122:24
**areas** 39:21 132:10
**argumentative**
115:2 118:21
**arrange** 5:7 6:12
**articulate** 18:8
**aside** 81:15
**asked** 29:12 48:17
49:11,18 51:5
52:21 55:9 90:4
92:19 94:8 116:20
**asking** 4:21 16:20
19:25 20:6,18
39:16,17 40:10
42:12 44:18 62:23
97:5 108:14 132:6
**asks** 15:9
**aspects** 126:9,9
**asset** 10:17,21
11:11,15,24 12:8
33:13 34:10 49:2
57:5,13,16 58:10
59:12,19 61:22
62:7 63:8 65:23
75:18 76:2 77:15
102:18 103:15
**assignment** 107:19
**assist** 33:10
**associated** 79:10
**associate's** 10:6,14
**assume** 28:23 35:17
38:17
**assuming** 48:17
**assumption** 17:23
**assumptions**
130:25
**assured** 52:25

**Atlantic** 1:8 4:8
14:11,14 21:20,24
25:15,16,19 31:22
32:4 33:17,24
34:6 36:7 44:8
45:3,23 54:15
61:5 62:9 63:6
78:22 79:6,12,16
81:12,17 82:10
83:8 85:4,18,21
87:21 92:15 93:2
98:25 104:10,17
123:19 124:2
**attachment** 92:4
**attachments** 80:24
80:25 81:11 91:24
93:3 94:24
**attack** 115:2
**attempted** 117:18
**attention** 99:21
**attorney** 1:16 17:7
119:24
**Attorneys** 2:4,8
**attorney-client**
94:6
**automatic** 48:24
64:13
**automatically**
48:24 77:8
**available** 35:25
46:8 47:4 60:4
96:21 106:3,18,24
107:10,13,19,23
108:2,16,24
**Avenue** 2:5,9 14:11
21:20,25 25:17,19
31:22 32:4 33:17
33:25 34:6 36:7
44:8 45:3,24
54:15 61:6 62:10
63:6 78:22 79:6
79:12,16 81:12,18
82:11 83:8 85:4
92:15 93:2 104:11
104:17 116:25
119:2,4 120:3,11

120:16 121:9,11
121:14 122:6
123:12,19 124:2
124:17 126:20
**average** 14:20,21
15:2,3 19:9,10
67:13 105:7,8
**aware** 9:24 42:11
77:18 78:6,17
82:16 88:6 91:23
113:10 123:11
**A.M** 1:13

## B

**B** 134:7
**bachelor's** 10:9,11
**back** 16:5 21:16
27:3 48:21 58:13
58:24 64:9 68:8
74:16 77:23 88:14
88:21 103:8
117:16
**background** 10:5
64:11 93:19,21
94:25 96:2,10
97:9 100:21
**backup** 101:6
**back-and-forth**
117:2
**balance** 60:14
**based** 14:19,25
19:7 21:2,7 29:22
30:9 38:2,7,9
44:10 46:21 49:12
51:16,17 55:22
61:10 62:14,15,25
63:21 64:23 68:22
73:25 78:7,9
88:16 98:22
101:12 102:2,19
102:24 103:2,4,14
104:3,6 105:5
106:9 108:19,20
108:20 109:18
110:22,23 111:15
111:16,17 113:21

113:22,23 114:9
114:10
**basically** 30:7
**basis** 24:6,6,6,11
36:24 70:6
**Bates** 67:25 92:3
**Bates-stamped**
49:22
**BB** 131:20
**Bear** 91:22 97:19
**beginning** 56:7
86:15,21 103:25
118:21
**behalf** 23:8,11,12
35:22 109:20
110:3
**belief** 31:21 32:3
**believe** 13:19 21:2
35:23 36:2 52:21
54:4 55:9 61:9,20
62:12,21 71:14
83:10,10 84:14
88:15 92:2 96:19
105:19 111:7
117:6 119:11
122:13 124:3
125:2,16,22,24
126:8,18 127:5,6
127:7,16,17,21
**Benderman** 87:20
**best** 15:20,22,25
16:8,14,23 17:13
17:21,23 18:3
51:9 130:10
**better** 51:6
**beyond** 21:20,24
**bigger** 122:24
**bit** 103:22
**blew** 115:18
**blind** 48:21 50:20
65:7 76:8,12,12
76:19,20,23,25
77:3,5,7
**blood** 135:15
**Board** 52:17
**Bohler** 44:5,7,19

**bold** 49:21
**books** 53:12
**boroughs** 11:5,9
22:17 38:9 39:21
103:5 128:17
**bottom** 66:4 67:9
75:5 99:10
**box** 57:21 66:15
67:25 68:4,13
**boxes** 67:7
**break** 5:5,7 42:17
42:18 78:25
118:12 132:14
**Brendan** 2:6 8:2
121:4 132:24
**Brian** 58:21
**briefly** 112:11,12
113:6
**bring** 12:13 13:18
28:18 37:2 43:21
47:9 53:18 56:17
72:24 80:10 85:8
87:11 91:8 97:13
99:3 131:17
**Broadway** 122:21
122:23
**broke** 79:4
**broken** 85:6
**brokerage** 38:13
**brokers** 29:16,19
30:10,12 33:2
**Brooke** 37:12 42:4
58:19 63:13,19
**Brooklyn** 14:11
21:20,25 22:5
33:3 38:2,8 39:4,5
39:25 40:7,8,9
92:15 93:3
**brought** 4:10 32:15
33:8
**budget** 65:12
**build** 46:20
**buildable** 47:4
**building** 8:14 25:12
**built** 46:21 74:20
**business** 66:17



83:18 107:8
**businessperson**
119:25

---

**C**

**C** 2:2 4:1,2,2 5:1
6:1 7:1 8:1 9:1
10:1 11:1 12:1,17
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1

127:1 128:1 129:1
130:1 131:1 132:1
133:1 135:2,2
**calculate** 75:15
**calculated** 74:18
**calculates** 75:4
**calculation** 29:11
68:22 72:23
**calculator** 72:24
**calendar** 70:6
**call** 7:16 25:20,21
25:23 27:8,14,17
27:25 28:14,17
29:22 32:13 35:12
41:9,13 50:5
87:21 92:21,22,24
93:6,9,12,14,20
94:19,22 95:2,25
96:20,20,22,23
97:9 99:21
**called** 42:25 43:12
57:5,5 79:8
115:12 119:2
**calls** 16:17 17:3
18:17 19:23 92:25
93:18 101:21
119:15
**cap** 115:12,24,25
**captured** 52:23
**career** 22:13
**careful** 83:24 89:13
**Carol** 1:15 34:25
91:14 120:20
133:19 134:5
**case** 4:22 6:10 9:6
9:13,19,21 43:10
49:12,20 50:24
51:9 55:22 65:11
67:11,21 71:3,15
77:6 98:14 101:13
106:2 108:22
109:15 116:25
119:2,4,7,9,11
120:3,5,11,16
121:9,11,12,14
122:6 123:10,12

126:20 129:11
**case/worst** 51:9
**cash** 71:20,22,23
72:22 73:4,4,11
73:11,20,21,24
**caution** 94:4
**cell** 6:22,23,25 7:2
8:16
**central** 92:18 111:8
**certain** 60:3 72:19
123:8
**certainly** 101:14
121:2
**certification** 3:6
**certified** 87:9
**certify** 135:5,14
**chance** 37:8 53:22
56:24
**change** 65:21
**changed** 11:21
51:17
**charged** 72:11
**chart** 74:3
**Cheung** 58:21
**Chicago** 111:19,20
**choose** 38:21 66:24
**Christine** 81:8
**circle** 88:21
**city** 11:8,9 22:6,15
25:13 120:2
**claiming** 102:23,24
**clarification** 41:11
52:13,25 121:23
**clarify** 7:13 9:9
12:25 31:7 82:15
**clarifying** 70:24
**clause** 16:11,22
17:12
**clear** 16:20 49:14
86:24 88:12
115:14
**client** 4:10 25:15,18
**close** 61:24 83:14
83:23 84:3
**closed** 72:4 73:22
83:9,11

**closure** 72:6
**coaching** 20:3,4
**college** 10:7,9,14
**column** 74:4,24
**columns** 74:5
**come** 21:16 24:17
25:14 28:7 29:9
38:5 43:20 68:20
90:15 114:6
115:12 124:13
127:3 128:10,19
129:8
**comes** 43:5 63:16
74:16 90:7
**comfort** 40:21
**comfortable** 34:19
123:9
**coming** 9:6,10,16
24:3,21 43:11
49:18
**commencement**
135:9
**commit** 41:24
**common** 96:8
112:21 129:23
**communicated**
98:25
**company** 44:3 71:4
79:8,9
**comparable** 32:21
49:16 98:23
101:21 105:15,19
106:5,11,17,24
107:10 108:4,15
108:19 109:8,14
109:18 113:14
115:13,23 116:14
**comparables** 30:9
101:25 106:2,8,10
**comparison** 49:23
50:11,23 51:4
55:8,17,20 56:10
88:16 103:6
107:16 112:17
113:17 114:10
115:8 127:12

130:18
**competing** 128:9
**complaint** 12:14
**complete** 10:9,13
62:10,10 89:2
100:25
**completed** 10:10
19:19,21 20:13
21:3,6,12 23:8,11
56:7 57:8,9 61:10
61:24,25 98:23
**completing** 57:12
**compliance** 117:10
118:5
**component** 107:5
**components** 69:3
**comps** 29:17 30:2
54:20 99:20
101:17 105:24,25
105:25 106:8,8
110:4
**computed** 68:24
**computer** 5:22,25
6:3,13,15,17,18
6:21 9:2,22
**concerned** 132:19
**concerning** 34:5
36:7 45:23 89:17
89:24 93:25
**concerns** 117:9
125:21,21
**conclude** 115:22
**concluded** 98:24
116:5 117:5 120:8
123:17,24 127:10
127:14 128:2
130:21 132:20
133:7
**conclusion** 15:10
16:18 17:4 18:17
19:24 20:2 97:25
**conference** 8:10
**confident** 49:13
**confirm** 56:12 65:5
**confirms** 35:8
**conflict** 90:22,22



congratulated
26:19
**Congratulations**
27:11
connect 19:3
connected 29:4
Connecticut 8:12
10:8 11:6 110:20
connection 9:21
23:13 36:3,20
48:19 50:17 51:6
121:17 125:3
conservative 38:23
39:2,10,18
consider 43:7 90:25
106:3 116:23
117:7
considerable 102:2
consideration
124:16 127:25
128:23
considerations
128:13
considered 38:9
45:10 76:18
106:13 107:8
121:21 127:22,23
128:14
considering 16:8
16:14 32:18 46:6
88:19 90:24
116:25 118:8
127:13 129:14
considers 54:19
consistent 115:9
constitutes 86:3
construction 83:15
84:7,14,19,19,20
84:22
contact 36:6 84:15
contacting 44:6,9
contemplated
86:16,22 117:25
contents 119:16
120:21
context 47:2 50:19

51:4 108:13
**continue** 59:15
continued 61:18
62:12 105:12
continuing 27:12
contractual 71:5
controller 43:17
51:15 62:14
controversy 135:17
conversation 26:4
26:5,11 27:3,7,9
27:15,21 28:8,24
29:3,5,7,19,21
33:7,15,22 34:24
36:9 40:13,15,16
40:25 42:10 44:10
46:3 112:22
117:15 129:10
130:6,7,11,16,24
131:4,8,10,12,14
131:16
conversations
30:10,12 41:3
55:23 82:5 89:19
89:24 91:3,6
113:22 129:18,20
convert 41:14
cooking 83:20
coordinating 84:24
copied 48:2 54:13
100:10
copy 47:25 55:13
63:14 82:17 92:12
120:4
copying 92:14
corporate 59:9
111:20
**Corporation** 1:5
73:6,8,13,16,21
85:18
correct 11:13 14:12
28:23 30:16,17
35:18 51:21 52:18
54:15,20 58:4
59:13 60:4,6 62:8
63:9 64:20 66:20

72:21 80:14 85:20
87:24 92:17 114:8
119:2 123:2
133:16
correctly 83:25
corrupted 124:9
cost 65:16,20 71:14
counsel 3:6 4:8
6:10,13 7:21,22
9:18 119:17
120:23 121:2
135:18
count 23:2
counties 11:5,7
country 39:2
County 11:6
133:11
couple 29:4 51:17
82:4 124:13
course 22:23
courses 10:7
Court 1:2 3:15
52:24 132:24
133:3
cover 37:20 80:23
132:11
covered 132:10
CPA 53:14
CPI 24:16 25:2
52:2,3
crazy 78:5
created 101:2
critical 24:13,13,21
24:23 89:5
Crown 59:7
curious 51:13
current 10:15
25:10
currently 11:18
curriculum 10:10
cut 41:20 108:11

--- **D** ---
D 3:2 4:2 14:2,4,8
14:16 103:10
134:2

**Daily** 69:18
dash 66:10,23
data 19:15 105:13
106:5
date 24:23 25:11
26:2 28:15 55:10
56:3 58:4 74:25
91:13 99:7 108:4
118:9
dated 48:13 54:13
67:3 87:8 91:11
91:15 97:22 99:2
99:15,16 100:5
130:4 131:19
132:4
dates 24:13,14,19
24:21 25:4 61:16
89:5,13
date-driven 24:18
Dave 12:6 92:11
93:13,18,23 95:10
David 77:16 91:15
92:14
day 112:4,8 133:21
135:20
days 112:5,9
dead-ending 51:2
deal 5:20 76:3
deals 33:3 34:22
36:23 38:2 74:22
78:16 95:3,21,22
December 48:13
54:13 55:14 56:2
57:20,23 58:3
61:3,10,18,22
62:6 64:16 66:8
67:3 75:3
decision 48:23
57:15 62:13,17,24
64:3 76:18,21
77:8,10 78:13
82:9 90:25 109:2
109:18 120:25
Defendant 1:9,17
2:8
**DEFENDANT'S**

134:9
defined 16:23
17:13,18 18:6
80:7 106:19,25
defines 20:19 66:15
definitely 112:10
definition 14:19,25
16:13 18:14,21
19:7 105:6
degree 10:6,11,11
10:13,14
DeMarco 1:15 4:1
4:7,19 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1,18 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1,16
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1,23 44:1
45:1,5 46:1 47:1
48:1 49:1 50:1
51:1 52:1,18 53:1
53:5,22 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1,3
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1,15
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1



107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1,15 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1,19 132:1,21 133:1,19 134:5
**density** 46:20
**departments** 43:19
**depending** 128:4
**deposed** 4:18
**deposition** 4:11 5:14 7:5,12,17 8:5 8:9,20,22,25 37:5 103:10 131:21 132:11,20
**depreciation** 39:24 71:10,18
**describe** 10:4 22:8 28:24 29:7
**described** 124:22 131:7
**describing** 17:19 17:20
**description** 92:4 134:9
**designated** 28:19 37:3
**detail** 28:4,5 50:9 65:9 78:7 86:12 96:23 99:18,20 100:22 101:6,8 102:8 112:24
**details** 5:24 95:5
**determination** 76:22 107:22 108:15 109:7,13 109:21 110:2 114:23
**determine** 104:23
**determined** 49:16 59:5 76:14,16

113:8 115:24
**develop** 26:12
**developing** 11:24
**development** 58:14 58:20 59:7
**dictated** 34:13
**difference** 76:10 100:14,15 101:16
**differences** 100:3
**different** 13:8,9 34:9 46:23 54:18 54:25 55:5,16 56:6 59:21 60:24 99:23 100:17 104:5 127:12,22 128:3,13,19,24 129:7,13,24,24
**difficult** 83:18 117:20
**diligent** 89:12 102:5
**dining** 83:19
**directions** 97:6
**directly** 34:12,22 135:16
**director** 12:8 58:14 58:21 59:7,8 78:16 92:24,25 94:23 95:2,8 96:21
**directors** 77:18
**disagreed** 117:16 119:9
**discerned** 26:10
**discuss** 7:11,17 28:14,17 35:24 42:5,6,8,12 45:12 45:18,22 63:17 77:16 78:15 93:2 93:20 97:9 115:5 130:3
**discussed** 4:12 7:24 8:5 42:10 82:22 82:23 83:2 95:5 129:22,25
**discussing** 77:21

93:24
**discussion** 40:19 92:19 116:11 117:2 124:4,12 125:15
**discussions** 89:16 120:22
**disheartened** 27:16
**distinct** 98:13
**distinguish** 18:2
**DISTRICT** 1:2,3
**division** 84:7
**divulging** 119:19
**document** 12:16 13:19,23 16:5 19:18 20:7,21 21:2 37:3 47:10 53:24,25,25 54:2 54:5 67:25 73:17 73:18 80:16,20 81:14 91:8,25 97:14 99:10 103:8 103:24 131:25 132:3
**documentations** 35:9
**documents** 5:15 9:6 9:12,17,20 81:4
**DocuSign** 58:7
**doing** 20:8 31:8 32:21 33:11 60:10 83:21 90:14 109:23 116:6
**dollar** 127:15 128:20 129:16
**draft** 65:25
**drive** 111:5
**drop** 20:2
**duly** 4:3 135:8
**duration** 8:20
**duress** 15:6 16:10 19:13 105:10
**D&I** 71:8

─────────
E
─────────
E 2:2,2 3:2,2 4:2

37:4,7 42:24 134:2,7 135:2,2
**earlier** 44:11 46:6 63:14 71:25 83:7
**early** 32:12 56:2,4
**East** 8:11
**Eastchester** 111:2
**EASTERN** 1:3
**economic** 107:6
**economics** 10:11,12
**educational** 10:4
**effect** 3:14 65:6
**effectively** 43:19 67:5
**eight** 11:6
**either** 7:15 15:6 16:10 19:13 45:21 105:11 116:14
**elected** 107:16
**electing** 50:6
**electronic** 6:12
**electronically** 57:25
**elects** 64:13
**element** 84:19
**eliminate** 41:15
**Ellen** 87:20
**else's** 75:23
**email** 6:19,21 30:24 31:3 37:22,24 40:14,17 42:3 43:23 63:19 87:12 87:17,19 91:11,14 91:24 92:11,14,16 93:8 95:18 96:4,6 96:7 97:6,7 134:10
**employ** 135:18
**employed** 11:11
**employees** 7:10
**employer** 4:10
**encumbered** 114:24 116:20 117:7,11 118:7 126:15,22 127:23 128:13,14 129:17

130:19,20
**encumbrance** 129:14
**engagement** 36:4
**Engineering** 44:5,7 44:19
**entail** 37:16
**entered** 25:25
**Enterprises** 79:8
**entire** 11:10 19:18 21:2
**entirely** 120:16
**equipment** 7:9
**especially** 129:14
**ESQ** 2:6,10 4:6
**establish** 42:13
**established** 14:19 14:24 19:7 40:20 105:5
**establishing** 21:7
**estate** 37:14,19 58:14,19 60:15 68:15,18 69:5,7 69:13,23,24 70:4 70:12,16 71:9,18 106:19 107:2,5
**estimate** 38:2,19 62:15 63:20 65:16 69:7
**estimates** 61:11
**evaluate** 48:17 49:3 51:5 89:14
**evaluated** 107:25
**evaluating** 64:24
**evaluation** 44:21 89:2
**event** 107:7
**everything's** 102:3
**exact** 22:18 26:2 28:15 38:3 127:14 128:20 129:15 130:22
**exactly** 34:2 36:17 37:18 46:2 61:7 64:2 88:12,23 93:8,11 101:14



114:3 119:8 127:5
127:9,10 129:25
130:5,7
**examination** 1:15
3:7,13 4:5 133:6
134:4
**examined** 4:4
**excellent** 96:21
**exception** 34:15
40:18 43:2,3,5,12
59:18 60:2,7,9,22
61:4 63:16
**exceptions** 43:15
61:13
**excess** 29:23 30:14
**excessive** 35:7
**excited** 26:15,19,24
**exclamation** 74:5
**exclude** 120:7
121:20
**excludes** 121:19
**exclusive** 15:4
19:11 105:9
**exercise** 11:24
24:25 25:11 48:22
50:20 56:12 59:25
60:24 74:15 75:25
76:5,17,21 77:19
77:21
**exercising** 50:5,5
**exhibit** 12:14,17
13:20 14:2,4,7,8
14:16 28:19 37:4
37:7 42:24 43:22
43:24 47:11,20
48:8 53:20 54:10
54:11 56:19,21,21
56:23 57:3 65:24
80:10,13,16 85:9
85:16,17 86:3
87:13,17,19 91:10
91:12 92:13 95:13
95:14 97:15 99:3
99:5,10,14,16
100:6,7,25 103:10
131:20

**exhibits** 53:23
95:14
**existing** 16:14,25
17:14,17 46:9
74:14 118:8
124:16
**exit** 26:12 35:3
42:12 78:3
**expense** 69:16
70:25 71:2,6,11
71:12,13,16,17
**expenses** 72:25
73:2
**experience** 33:3
38:8,15 101:5,13
102:3,10,24 103:4
103:15,21 104:4,6
119:25 128:17
129:12
**experienced** 117:23
**expert** 122:17
**expires** 25:10,10,11
**Explain** 76:10
**explaining** 116:4
**expressed** 69:3
**extend** 48:24 77:11
**extended** 77:8
**extensive** 106:4
**extensively** 19:4
**extent** 15:9 16:17
17:3 18:5,17
19:23 32:7 94:10
94:21
**extrapolated** 67:14
**extremely** 102:5

---
**F**
---
**F** 3:2 43:24 135:2
**facilitating** 84:12
84:25
**fact** 59:12 62:10
63:21 78:2,7,9
**factor** 120:8 121:22
**factors** 127:23,25
128:23
**facts** 31:16 78:5

**fair** 4:16 5:3,10
14:19,25 16:11,13
16:22 17:12 18:14
18:21 19:6,8
22:16,23 23:16,22
24:3,9 31:22
34:11,21 41:15,16
42:6 43:11 55:15
62:3,17,21 74:10
75:12,14 76:22
86:14,15,20,21
97:25 105:6
114:22 123:18,25
**Fairfield** 11:6
**familiar** 13:25
15:15 21:19,24
22:2,3,7,8 33:4
40:9
**familiarity** 123:15
**familiarize** 34:4
47:14 91:19
**fantastic** 60:18
**far** 35:13 46:8,10
46:21,23 47:3
49:12 112:19
127:25 132:19
**FASB** 52:11,16
**February** 25:19
26:2 30:18 32:13
33:9 34:25 42:4
42:10 43:22 44:12
44:13,13 49:6
**fee** 50:12,15,21,24
50:24 51:13 52:8
53:6,9 65:9 67:6
72:11,13,17,18,20
73:2
**feed** 52:20
**feedback** 96:12,17
**feel** 94:12
**feelings** 35:9
**fees** 72:10,11
**FEIN** 2:8
**felt** 118:4
**FF** 91:10,12,17
134:10

**field** 8:11 30:25
31:3 37:17,21
42:11 43:16 50:19
58:13,15,21,22,25
61:12 62:15 63:16
64:22,23 110:20
**figure** 69:19
**file** 5:17,18,20,22
5:22 6:2,4,9,15
101:8
**files** 6:13 9:22
**filing** 3:7
**final** 53:2
**finance** 43:17 58:15
58:22 59:8,9 83:2
**financial** 43:7
52:11,14,17
**Financials** 68:14
**find** 103:23 112:21
115:13
**finish** 93:16
**firm** 41:14 122:14
**first** 4:2 27:14,17
27:20 29:22 34:24
36:8 37:11,22
41:22 42:9 48:3
50:3 57:23 58:11
63:5 64:15 68:15
75:7,13 76:2 81:7
82:18 88:22 91:24
91:25 100:5,11
115:7 122:10
**five** 11:5,8 24:20
38:9 42:20 60:19
78:24 103:4
**five-year** 24:6
41:18,22 60:19
62:19 63:22 74:15
75:6,7 77:12 78:8
82:19
**flawed** 131:2
**floor** 2:9 46:12,15
**flow** 71:20,22,23
72:22 73:4,4,11
73:11,20,21,24
**FMV** 75:8 85:23

86:5
**focus** 14:17 37:22
**focused** 18:9
**follow** 51:12
**following** 119:20
**follows** 4:4
**follow-up** 99:16
**food** 83:25
**force** 3:14
**foregoing** 133:13
**form** 3:10 7:6 9:8
11:16 13:13 14:5
15:8,24 16:3,16
17:2 18:4,16
19:22 21:4,14,21
22:10 23:9,18
24:12 31:4,24
32:6 33:18 36:15
39:7 40:3 44:23
45:14,20,25 46:14
46:17 48:10 51:22
55:3 57:7,9,10,12
57:17 60:5 62:2
63:10 64:19 65:14
66:25 69:9 70:2
70:11,20 72:15
74:9,20,22 77:2
79:13 80:5,18
81:25 84:9,17
85:5,24 86:17
87:25 88:10 90:2
93:10 94:3 98:4,8
99:25 100:8,18
101:3 102:12
103:18 104:12,19
105:3 108:25
109:9,22 110:24
111:11 114:18
123:20 125:11
126:7 130:13
131:6
**formal** 34:13 35:14
41:7 42:15 50:17
53:14 55:18 65:4
67:12 86:14,21
87:4,5 88:25



forth 50:8 117:16
forward 40:22 61:9
 61:13 63:24 64:6
 64:24 65:7 124:8
found 108:8
four 41:22 58:16
 75:3,6 82:19
 105:24 106:8
fourth 33:11 37:24
 64:4 75:8
frame 9:9
frames 88:19
franchise 81:4,9,10
 81:12,17,22
franchisee 70:10
 78:21 79:6,14
 81:18,21
franchising 79:23
 79:25 80:6,8
free 94:12
front 9:2 37:6
 47:12 57:4 85:10
 85:12 91:17
full 52:22 88:22
 125:25
fully 19:18
function 76:13
further 3:9,12 35:8
 67:15 89:14
 135:14
future 24:17
fuzzy 68:5
F-A-S-B 52:16

G

G 86:3
gain 120:10 121:8
 122:5
gained 121:10
geographic 10:25
geography 13:9
George 78:20,21
 79:5,10,14
getting 33:2 117:25
Gino 58:22
give 47:2,17 54:5

83:16 91:18 93:18
 93:20 94:23 95:8
 95:10,23 96:3,17
 96:23 97:9 99:11
 109:3 133:2
given 16:25 18:21
 18:24 20:12,15
 62:15 67:2 77:25
 78:2 95:23 119:17
 132:4,6
giving 8:8 20:25
 95:11,20
go 7:7 16:5 17:16
 31:5 40:22 45:5
 58:9 61:13 63:24
 64:6,24 68:14
 81:2,4 88:14
 94:16 103:8 116:9
 117:18 124:8
 131:24
goes 19:14 86:12
 107:4 115:22
going 4:11 26:15
 27:18,25 31:18
 34:9 35:2,14
 47:14 65:5,6 68:8
 78:23 81:4 82:4
 83:20 86:13 87:3
 87:4 89:11 98:20
 105:18 112:14,20
 119:14 124:25
 125:3,7,17,19,23
 126:13,16
good 4:7 89:4 109:8
 109:14 112:20
gotten 82:25 106:7
graduate 10:10
Grand 111:7
granting 43:14
great 14:7
gross 68:9,11
ground 12:14,19,20
 12:22 13:11,15
 14:14 25:16 32:22
 38:4,11 49:16
 50:21 53:10,11,17

54:19 98:24
 100:23 101:17,21
 106:11 107:13,15
 107:17,18,23
 108:2,4,8,24
 109:3,4,7,13
 110:4 112:21
 113:14 114:10
 115:11,23 116:14
 124:16
group 43:17,17
 51:15 62:14 117:9
 121:13 124:6
guess 37:19 71:4
 100:5
guided 20:21

H

H 47:11,20 48:8
 53:23 134:7
half 65:13
handle 126:10
handled 22:5 84:6
handles 84:10,12
handling 13:2 38:8
 88:24 95:3
handwriting 48:3,4
 48:9
happen 64:2
 125:16
happened 64:11
 114:12,15,16
 116:4 123:17,24
happening 39:23
 40:2 62:22
happy 4:25 5:6
 26:6,21 27:2,10
 78:15 121:5
hard 125:25
Hartman 37:23
 40:14 58:11
HAYDEN 2:4
head 116:6
headed 68:2
heading 133:14
headline 117:4

hear 4:23,24
heard 15:19,22
 121:15
held 1:17 10:18
 12:9 135:7
hello 114:19
help 29:13 31:14
 39:15
helps 12:12
hereof 133:15
hereto 3:5
hereunto 135:19
highest 15:19,22,25
 16:8,14,23 17:13
 17:21,23 18:3
 55:22
hired 12:11
historically 38:25
history 68:2,6
Hold 68:5 93:5
Holdings 1:8 4:9
 25:15 85:19,22
holds 83:22
home 6:8
hopeful 112:19
 125:2
hostile 114:19
 117:22,24
house 6:7
Howard 2:10,15
 4:6,8 8:2 17:6
 18:7 20:6 22:22
 23:3 24:8 27:16
 32:12,25 33:6
 34:10,17 36:9,23
 41:16 45:11,16
 46:25 47:19 50:13
 54:8 55:6 56:8
 60:23 62:22 66:2
 66:14 71:12 82:15
 83:3 86:18 93:12
 96:9 97:16 102:25
 103:23 104:21
 105:22 106:22
 107:9 109:5 112:9
 114:19 116:15,24

117:22 121:5
 126:18,23 129:25
 130:14,15 133:3
 134:5
Huelskoetter 59:10
hypothetical 107:7
H-U-E-L-S-K-O-...
 59:10

I

idea 48:5
identification 91:12
identified 95:19
identify 108:19
Illinois 110:23
 111:18
immediate 133:4
impacts 46:20
imply 17:22
important 4:13
 52:10 56:9 61:15
 124:18
importantly 126:24
impossible 127:18
 127:21 128:10
improper 127:16
improvement
 107:7
improvements 15:4
 19:11 83:19 105:9
include 25:4
included 55:14
 65:8,10 74:21,22
 74:23 94:24 127:7
includes 25:6,9,9
 99:18 100:21
including 11:4 94:7
 128:12
income 68:16,18,18
 69:5,8,14,16,23
 69:24 70:5,12,13
 70:16,21,23 71:11
 71:17 72:14,18,25
 72:25 107:5,8
increases 41:18
 60:20 63:22 75:9



78:11
**incredibly** 89:12
  103:7
**Index** 1:7
**indicate** 40:14
  75:21 105:16
**indicated** 107:14
  115:11
**indicating** 115:21
**indirectly** 135:17
**information** 24:7
  25:3,5,6,8 27:13
  29:22 33:2 38:11
  38:14 44:16 48:19
  60:4 61:11 63:2
  69:16 94:5,11,14
  99:19 114:5
  119:19
**informational**
  97:11
**informed** 114:9
**initial** 36:6
**initially** 44:9
**input** 90:24 109:5
**insofar** 119:14
**Institute** 106:19
  107:2
**instruction** 119:21
**instructions** 95:9
  95:11 120:12
**intent** 86:25
**interest** 71:10,18
**interested** 7:24
  41:10,14,23
  135:16
**interface** 83:13
**internal** 32:24 50:4
  51:8 55:12,21
  56:11 63:12 67:20
  83:19
**internally** 50:6
  55:12
**interpret** 15:14
  19:3 20:7
**interrupted** 117:19
**investment** 43:7

65:20
**involved** 21:18,23
  80:7 89:22 113:25
  114:2 123:5
**involvement** 90:10
  90:12
**in-house** 7:21
**Island** 11:7
**issue** 45:17
**issues** 7:10 45:12
  45:15 46:16 123:7

———————
**J**
**January** 26:17,23
  30:21 61:9,18
  62:11 64:5
**Jared** 43:23 44:3,9
  44:17 47:6
**Jersey** 11:5 13:4
  80:3
**job** 96:9 101:17,23
**Jones** 43:23 44:3,6
  47:6
**June** 97:23 99:2,9
  99:15,16,24 100:5
  107:15 108:11
  110:6,7,9 112:15
  114:12,16 115:19
  118:15 123:16,23
  125:18

———————
**K**
**Kearns** 12:6,9
  77:16,21 91:15
  92:12,14,20 93:3
  93:25 95:8 96:4
  96:12,17
**keep** 5:20 86:6
  92:24
**kept** 6:4,5,15
**kicked** 57:24 58:4
**kids** 26:15,23
**kind** 96:12,17
  125:5,9,12
**kinds** 91:3
**kitchen** 83:21,21

**knew** 31:17 34:8
  89:13 90:4 112:19
**know** 5:8 12:9
  13:16,17 17:8
  18:11 19:14 24:20
  26:14,16 27:9
  29:8,9,10,14 30:5
  30:21 31:8 32:12
  32:25 33:8 34:15
  35:17,19 36:2,17
  37:6,8,18 38:7,9
  38:10,13,23 39:4
  40:10 42:4 44:19
  47:12 48:4 49:7,8
  50:5,13 51:21,22
  51:22,23 52:12
  53:21,25 71:8
  72:6,10 73:14
  74:11,17 77:24
  78:4 79:9,19,21
  79:21 80:6,24
  81:8 82:18,19
  84:21,23 85:4,6
  85:10 86:23 87:14
  88:23,24 89:2,7
  89:10,23 90:5,17
  91:20 93:5,8,12
  94:15,15 95:5,22
  98:11,15 101:2,19
  101:23,24 102:4
  111:10,13,18,20
  111:21 112:9,16
  112:19 113:24
  114:3 116:10,16
  116:22 118:7,17
  120:17,18 126:5
  128:3,8,22 129:13
  130:25 132:3,8
**knowing** 15:4 16:6
  16:9 19:11 77:12
  105:9
**knowledge** 13:7
  38:10 44:25
  125:13
**Koh** 2:10 4:6,8
  12:13 13:13,18

15:11 17:5 19:25
  20:8,10 32:8 37:2
  42:18 43:21 52:16
  54:3 56:17 80:10
  80:14 85:8 87:11
  90:4 91:8,14 92:2
  94:20 97:13 99:3
  103:20 118:12
  131:17 132:10,21
  133:2,5 134:5
**KTR** 121:12
  122:13,13,15
  123:2

———————
**L**
**L** 3:2,2 4:2 56:19
**land** 38:3,23 39:3,5
  39:24,25 55:8,20
  66:10 88:16
  105:14 106:18,25
  107:11,20 112:16
  113:17 114:9
  115:8,17 126:14
  127:11,12 130:18
  130:20,24
**landlord** 14:22
  15:3 19:10 34:18
  34:23 41:9,13
  42:5,12 71:3,17
  78:3 87:2 105:8
  109:20 110:3
  112:24 116:8
  124:5
**landlords** 34:12
  41:23
**landlord's** 124:6
  125:21
**language** 10:8,12
  15:13,16,17 17:24
  18:3,9 19:16 46:5
  49:14,21 86:25
  121:16,18,19
**late** 29:24 30:15
**law** 17:17 108:21
  109:19 113:4
  114:24

**lawyer** 9:11,18,21
  21:11
**lawyers** 120:17
**lead** 37:19 58:14,19
  80:6 83:15 84:14
  84:23,24
**learned** 25:14
**lease** 5:15,16 10:22
  12:14,19,20,22
  13:7,11,15 14:10
  14:14 16:9 18:9
  23:14 24:14,15
  25:16,25 26:6,7
  26:20 27:11 29:11
  34:14 38:4,19
  42:15 48:23 50:10
  50:22 52:3 53:9
  53:10 54:19 56:3
  59:16,25 65:6
  71:5,5 74:13,14
  77:11,11 82:17
  86:4 89:6 101:17
  107:13 108:20
  109:4,8,13,19
  110:4 112:18
  113:3,19 114:24
  116:21 117:7,10
  117:12,23 118:5,8
  120:7,8 121:21,21
  124:17 126:15,22
  127:14,24 128:15
  129:15,17 130:19
  130:21
**leases** 23:17,23
  24:4 32:22 38:11
  49:16 53:11,17
  98:24 100:23
  101:21 105:15,19
  106:11,17,24
  107:10,15,17,18
  107:23 108:2,5,8
  108:16,24 109:3
  113:14 114:11
  115:11,14,23
  116:14
**leasing** 50:14 81:21



leave 29:6 81:14
leaving 27:22
    117:25
Lee 85:18 95:15
    110:15
left 10:9 27:25 49:9
    74:14 75:4 79:3
    118:3
left-hand 74:24
legal 15:10 16:17
    17:3 18:17 19:23
    19:25 36:4 94:8
    119:16
Leonetti 1:18 135:4
    135:24
letter 28:13,16,20
    29:2,21 32:16
    35:6,12 36:4
    47:23 48:13,15
    54:12,19 55:25
    80:23 81:7 85:17
    85:21,25 86:2,24
    87:6,8 95:15
    97:21 98:3,7,11
    98:16 99:2,7,24
    100:21,24 101:11
    131:18
letters 66:8 100:4
    100:10,17,20
    101:15,16
let's 5:12 12:13
    13:18 27:15 37:2
    37:22 43:21 47:9
    53:18 61:16 65:22
    74:2 78:19 80:10
    85:8 91:8,9 97:13
    99:3 103:8 115:4
    115:5 118:12
    131:17
level 40:21
light 18:14
limited 25:4
line 40:17 42:25
    68:15,15 71:19
    76:3
list 41:6,9,12 90:7

listed 8:5 59:12
listened 115:15
    116:9 117:8
little 27:6,8 103:22
live 110:25 111:2
lived 111:3
LLC 1:8 4:9 25:15
    85:19
LLP 2:8
located 10:24
Locatell 35:17,19
    35:22 36:6,11
    45:13,19,23 54:14
    66:9,17,19 67:4
    86:11 87:18,20,22
    88:8 89:17,20,24
    90:16 97:22 98:6
    100:4 107:24
    108:17,23 110:14
    111:24 113:21
    122:10,10 130:12
    131:5
Locatell's 104:8,23
location 25:9
    122:19
long 10:18 11:7
    12:9 20:23 42:19
    72:6 111:3 112:2
    118:10
longer 41:24
long-term 27:23
look 14:15 19:18
    28:2 41:25 52:22
    53:22 56:22 57:22
    65:11 66:13 67:22
    73:19 81:2 107:20
    120:5
looked 5:15 45:7
    46:7 47:3,8 63:14
    103:9 107:16
looking 13:12
    15:18 16:12 27:23
    32:25,25 42:23
    52:20 55:24 92:13
    114:9 116:2
looks 80:12

LoopNet 32:25
    38:12
LOPEZ 2:17
lot 26:25 100:21
    117:2,15
lots 99:19,20
lunch 78:24 79:2,4

—————————
M
—————————

M 2:6 4:2 56:21,23
    57:3 65:24
MAI 45:7 66:10,13
    66:17,19,23
    102:11,15,17,22
    102:23 103:6
    107:25 109:6,12
    109:15
mail 87:9
Main 8:11
making 17:23 20:5
    82:9
manage 24:4
management 12:8
    57:6 58:10 59:12
    59:19 61:23 62:7
    63:8 65:23 75:18
    77:15
manager 10:17,21
    11:11,15 13:5
    33:14 34:10 49:3
    57:14,16 58:15,22
    84:20,22 102:19
    103:15
managers 11:25
Manhattan 122:18
    122:21,23
manner 96:5
mark 59:10 91:9
marked 12:17
    13:20 14:2,16
    37:4 42:24 43:22
    47:10,11 53:19,20
    53:24 54:10 56:18
    56:20,23 65:24
    80:13 85:9 87:13
    91:9,12 97:15

99:4,9 103:9
    131:20
market 11:8,9
    14:19,25 16:13,22
    17:12 18:14,22
    19:6,8,15 22:15
    23:16,22 24:3,5,9
    31:22 34:11,21
    39:25 40:7,9
    41:15,17 42:6
    43:11 55:15 62:17
    62:21 64:24 74:11
    75:12,14 76:23
    86:15,21 98:2
    105:6,13 114:22
    120:2 123:18,25
marketing 10:14
markets 38:12
marriage 135:16
matches 92:5
math 72:23
matrix 43:7,13
matter 98:16
    122:17 124:18
    135:17
matters 88:25
    89:11
MCD 49:22
McDonald's 1:5
    4:9 6:9,13,16,17
    6:21,24 7:4,9,10
    9:12,18 10:16,21
    11:11 12:21 13:2
    13:6 15:22 22:13
    22:14,18 23:8,11
    23:13,15,21 26:8
    27:18,21 35:2,21
    36:5 37:15 41:24
    45:2 47:7 50:14
    51:20 52:7 53:6,9
    54:23,25 57:8
    63:5,12 64:13
    68:19 69:6,22
    70:9,12,13,18,21
    70:22,23 72:14,19
    72:20 73:6,8,13

73:16,20 79:11,15
    80:4 84:7,10,13
    84:16,18 85:17
    86:8 88:7 89:23
    90:12,17 102:18
    110:13,19 116:21
    120:17,22 121:13
    122:16,20 125:21
McDonald's-issued
    6:25 7:2 8:16
mean 15:7,12,14
    16:2 17:17 19:15
    31:7 33:5 41:20
    49:24 68:17 73:19
    82:3 88:13 93:13
    104:3
meaning 41:12
    103:17
means 16:5 46:11
    48:22
meant 70:25 72:9
    72:22
meet 7:11 26:20
    111:23
meeting 7:15,16
    107:14 108:11
    110:6,9,17 111:5
    111:9,22 112:4,10
    112:15,20 113:10
    114:13,17,21
    117:6,23 118:3,15
    118:20 123:16,23
    124:3,12,22
    125:18 126:6
MEISTER 2:8
Melissa 1:18 135:4
    135:24
memory 31:8
mention 119:4
mentioned 30:19
    60:10 118:21,25
met 7:21 112:10,12
method 116:11
methodologies
    116:16 128:9,19
    129:7,13,24



130:17
**methodology** 23:15
29:15 54:18
113:11 114:23
116:13,19 117:13
117:19 118:4
124:7,14 128:4
129:16
**Metro** 11:4 24:5
37:20
**Meyer** 2:16 8:3
92:12,15 94:8,9
95:15 110:13,14
111:9
**Meyer's** 37:4
**Michael** 2:16 92:12
110:14
**Michelle** 78:20,21
79:5,8,10,14
81:23 82:11
**Mike** 8:2 92:14
93:13 94:15 95:15
110:13 111:13
**million** 64:7,7
65:13,13,17,21
66:5,7 115:20
**mind** 64:8
**mine** 13:23 48:7
**minute** 47:17 54:6
85:13 91:18,22
97:17
**minutes** 42:20
78:24 117:20
**mischaracterize**
32:8
**mischaracterizes**
32:7
**Missry** 110:12,16
115:2 116:24
119:6 124:6,22
**Missry's** 110:10
111:23 114:13,17
**modernization**
40:23 60:11,12,13
61:8,14,17,23
62:9,11 63:25

64:25 65:12,16
72:5 73:23 81:17
82:10 83:12,14
84:13,25 85:3
**modernize** 26:13
26:16,25 27:12,24
62:13,24 63:6
64:3,16
**modernized** 25:12
83:9
**modernizing** 26:17
26:22 30:19 62:25
**moment** 56:22
**money** 60:16 70:9
70:18
**monitoring** 89:4,13
**month** 44:11 71:25
**Monthly** 69:18
**months** 71:24 75:3
**morning** 4:7
**Morris** 110:10,16
111:23 114:13,17
115:2 116:24
117:16,19 118:22
124:5,22
**move** 21:16
**multiple** 69:2 88:24
89:11 92:25
102:17 103:5
104:7 128:18
**M1-1** 46:22
**M11** 106:13

---

**N**

N 2:2 3:2 80:13,16
134:2
**name** 4:7 59:9
**names** 7:23,25
**narrowly** 17:18
**Nat** 2:17 12:15
28:18 54:3 56:17
56:20 80:11
**nationally** 40:2
**neatly** 66:17
**necessarily** 76:9
**necessary** 57:14

75:25 107:12
**need** 24:16 30:4
35:14,24 43:6,11
51:7 63:15 83:14
88:21 107:20
111:21 121:24
**needed** 36:20 40:21
50:18 117:11
124:14 125:16
**needing** 34:13
**needs** 76:13 118:7
121:21
**negative** 72:2,3
73:20
**negotiate** 13:15
31:19 34:11,22
50:25 78:3 95:21
95:22
**negotiated** 12:22
**negotiating** 5:21
34:19 51:19 95:3
**negotiation** 13:11
**neither** 116:18
**net** 71:8,9,18
**neutral** 89:3,8,15
89:17,20,25 90:5
90:7,9,13,19
124:21,24 125:6
126:10,25
**never** 23:2 117:22
128:18,20 129:13
**new** 1:3,19 2:5,9,9
4:3 11:4,5,7,8,9
11:24 13:3,4,4
14:11 17:17 22:6
22:15 24:5 37:20
42:5 52:9,11,15
53:11 78:3 80:2
108:20 109:19
111:2,15 114:23
120:2 133:9 135:5
**nice** 26:20
**nine** 99:15 100:12
**Nocito** 58:20
**non-stated** 76:4,5,7
76:11,24 77:3,5,6

**Notary** 1:18 3:13
4:3 133:23 135:4
**note** 56:9 106:12
118:20
**noted** 83:5 133:7,14
**notes** 118:16,18,19
118:23 131:9,11
132:15
**notice** 1:17 48:25
77:9 85:21 86:3
86:25 101:7
**November** 69:17
69:24 70:5 91:16
**number** 22:18,24
28:19 31:17 37:3
38:5 39:18 47:10
49:22 53:19 56:18
56:20,20 67:25
68:10,25 69:7
70:17 72:3 78:5
80:16 81:10 85:8
87:11 91:16 97:14
103:9,11,24
106:10 124:15
128:20
**numbers** 74:4 92:3
127:8
**Nygard** 123:3,4,6

---

**O**

**O** 3:2 4:2,2 85:9,16
85:17
**object** 17:5 119:14
**objected** 116:19,24
117:8
**objection** 7:6 9:8
11:16 12:3 13:13
14:5 15:8,24 16:3
16:16,24 17:2,15
18:4,16,23 19:22
20:5,9,14 21:4,14
21:21 22:10 23:9
23:18,24 24:12
31:4,24 32:6
33:18 36:15 39:7
40:3 44:23 45:4

45:14,20,25 46:14
46:17 48:10 55:3
60:5 62:2 63:10
64:19 65:14 66:25
69:9 70:2,11,20
72:15 77:2 79:13
80:5,18 81:25
83:4 84:9,17 85:5
85:24 86:17 87:25
88:10 90:2 93:10
94:3 98:4,8 99:25
100:8,18 101:3
102:12 103:18
104:12,19 105:3
108:25 109:9,22
110:24 111:11
114:18 123:20
125:11 126:7
130:13 131:6
**objections** 3:10
**obviously** 95:18
**OCC** 71:6,12
**occasions** 36:14
**occupancy** 71:14
**occur** 92:22
**occurred** 28:25
**October** 32:20 33:7
33:11 40:17 41:6
49:5 62:16 63:3
63:15,20 64:12,16
71:24 82:22
115:20 135:20
**offer** 38:14 105:22
**office** 6:6,8 8:11
13:4,9 30:25 31:3
37:17,21 42:11
43:16 50:19 58:14
59:2 61:12 63:16
64:22,23 110:10
110:20 111:19,20
111:23 114:13,17
**Oh** 81:3
**okay** 4:21 8:15 23:4
23:6 34:4 36:10
37:10 40:11 41:21
42:2 43:25 47:16



47:19 48:6,12
54:8 55:7 57:2
59:17,22 65:18
66:3 67:19 69:21
70:8 71:6 72:8
75:17 80:22 81:14
82:14 85:7,15
87:10,16 91:7
92:6,10 97:12,20
99:14 111:14
115:4 118:24
119:6 122:3 125:8
131:23,24 132:9
**old** 25:12
**once** 113:25
**one's** 129:14
**online** 7:16
**open** 8:25
**opened** 37:7 72:12
**opening** 91:18
**operate** 79:7
**operations** 63:4
**operator** 68:19
71:23 72:18 73:3
73:5,8,12,15
79:17 81:22 82:16
82:24 83:13,16
84:15,21
**operators** 82:17
**operator's** 73:19
**opine** 102:10,15
**opinion** 28:13 46:4
63:17 102:8,21,25
103:3 107:25
114:20
**opinions** 98:17
**opportunity** 20:25
**opposed** 39:25
107:17
**opted** 54:25
**option** 5:17 14:8,13
14:16 19:4 20:18
21:7,8,12 25:2,2
25:11 26:5,9
40:20 42:7 43:11
46:5 48:20,21

49:4,7,14,15 50:6
50:20 51:2,8
54:21 55:18 56:12
56:15 59:15,25
60:21,24 64:13
65:7 74:15 75:7
75:13 76:5,7,8,11
76:12,12,13,15,16
76:17,19,20,22,25
76:25 77:3,4,7,7
77:19,22 86:16,22
91:4 98:22 101:18
101:20 103:11
104:11,18,25
105:4 113:12,13
113:18 114:22
116:12,17 117:13
118:6 121:19
124:15 125:4
**options** 24:3,14,25
41:14,18,23 48:24
49:3 62:19 63:22
75:6,9 76:23,23
77:5 78:8 82:19
**order** 63:4 104:9,16
133:4
**ordered** 23:7,12
102:17
**ordering** 132:25
**original** 14:14
127:8
**outline** 75:16
**outlined** 40:6
117:13
**outside** 7:21 9:18
34:12 39:21
**overall** 51:20
**owner** 71:19,22

---
**P**
---
**P** 2:2,2 3:2 87:13,17
87:19
**package** 51:8 57:6
58:11,18,25 59:13
59:20,23,24 61:23
62:8 63:9 64:18

65:2,3,8,23 66:14
75:12,19 76:3
77:15
**page** 14:15 48:3
49:21,25 57:23
65:22 67:24 74:2
74:3,3,9 75:20
76:2 91:25 98:22
103:13,25 134:4,9
**pages** 47:17 81:3,7
94:24 99:11,15,17
100:12,13,21
**paid** 72:18,20 85:3
**paper** 5:22,25 6:3,4
**paperwork** 64:9
**paragraph** 14:17
15:7,12 20:22
37:24 86:2,13
103:12,17,25
104:3,14 105:12
**paraphrasing**
120:4,6
**Park** 2:9
**part** 14:10,13 22:5
30:20 33:13 45:8
45:10 49:2 50:9
50:18 58:17 66:14
80:15 82:23 96:9
105:20 106:14
121:12
**participate** 13:11
**participated**
131:14,15
**particular** 39:9
59:2 69:14 78:18
84:25 106:12
109:7,13
**parties** 3:5 20:19
41:8 85:22 86:4,7
125:16,19 126:25
135:15
**party** 15:6 16:10
19:13 105:11
**party-appointed**
90:6,8 95:19
**PASHMAN** 2:4

**pause** 4:14 42:21
118:13 132:16
**pay** 14:21 15:3 19:9
71:2 105:7
**PC** 2:4
**pending** 5:7
**people** 7:23 8:4
11:23 43:18 58:6
59:3,11 75:22
90:18 96:22 108:6
111:23
**percent** 29:10
34:10,21 38:18,20
38:21,24 39:3,17
39:20 41:21 66:5
66:23,23 67:7,7
67:10,17 68:24
69:2 70:15 72:13
75:9 78:11 115:24
116:7
**percentage** 69:4
70:15 72:9
**period** 39:6 60:19
69:16 70:17 72:4
77:13 82:3,7 83:7
83:23 84:4 86:5
**permitted** 116:16
**person** 35:21 36:5
37:14 70:10 80:2
122:10
**personal** 6:18,18,20
6:20,22,23 7:15
102:20
**personally** 29:23
30:14
**person's** 58:9
**phone** 6:20,22,23
6:25 7:3 8:17 96:4
96:6,7
**phrase** 18:5 62:5
84:14
**picked** 67:16
**pictures** 99:19
**piece** 19:17
**pivoted** 27:3
**place** 133:14 135:7

**plain** 15:13 86:25
**Plaintiff** 1:6 2:4
**plan** 29:25 30:15
78:16 82:24
**Planners** 35:20
47:24 48:14 86:9
86:11 97:22 99:15
100:9 108:18
131:18
**planning** 60:10,12
60:13 82:24 86:10
**plans** 26:13 77:17
**platform** 80:17
**platforms** 38:11
**please** 4:15,24 5:6
8:20 12:15 13:19
20:2 31:25 47:22
52:25 56:17 60:8
85:16 87:11 93:15
94:13 95:25 97:14
99:4 103:14
**point** 58:16 63:24
68:8 74:6 75:2
82:5,21 84:15
90:15 96:22 97:7
103:6 114:4
**pointed** 100:3
**policy** 51:20,22,24
**portfolio** 10:22
**portion** 83:11
**position** 10:15,18
12:7,10 119:9
**positive** 73:21
**possible** 50:10
128:23 129:3,4,6
**Post** 10:6,14
**potential** 67:11
89:3 90:7
**potentially** 63:18
84:20
**Potesta** 58:22
**predebt** 71:19,22
71:23
**preliminarily** 56:2
63:2
**preliminary** 39:11



45:8,9 48:19 49:4
61:11 64:10
**premature** 27:8
**premises** 98:2
**preparation** 125:23
**prepare** 5:14 44:18
44:20 49:18 55:9
57:17 112:25
**prepared** 48:16
55:2 57:19 66:2
88:7,8 100:9
102:4 107:24
108:18 112:16
113:17 127:4
**preparing** 109:17
125:3
**present** 2:14 75:4
101:10 110:7,11
**presented** 74:7
78:5
**president** 35:20
58:16,23
**pretty** 86:24 89:4
114:20
**prevent** 9:25
**previous** 94:14
103:10 131:20
**previously** 12:17
14:2 37:4 42:24
53:20 54:9 56:18
56:20,23 65:24
80:13 85:9 87:12
97:15 99:4 116:15
**price** 14:20 19:8
105:6
**pride** 26:25
**primary** 69:15
**prior** 7:12,17 8:22
9:10,16 30:21
33:6 76:16,21
77:11 111:22
**privilege** 94:6
121:3
**privileged** 94:11,13
94:16 119:16,19
120:21

**privy** 81:4
**probably** 120:4
**probing** 103:22
**proceed** 17:25 95:9
95:11 97:4
**proceeding** 42:14
42:22 118:14
132:17 135:6
**process** 20:19
34:13 35:14 41:7
41:15 42:15 49:2
50:17 55:18 56:5
56:8,14 58:17,24
61:14 62:25 63:12
65:4 67:12 85:23
86:12,15,21 87:4
87:5 95:7,12
98:10,14 113:25
119:10 123:18,25
124:9,9,21,21,23
125:5
**processes** 60:25
**produced** 92:7
**product** 102:6
**production** 6:10
92:8
**professional** 107:25
**project** 35:22
**projects** 89:11
92:24
**proper** 83:24 124:6
**properly** 104:10,16
**properties** 10:23,24
21:19 22:4 23:11
23:17,23 40:8
100:22 107:13
**property** 14:10
15:5 16:6,10,15
18:13,20 19:12
20:11,13 24:22
25:19,25 26:7
31:21 32:3,19
33:8,17,24 34:5
36:7 39:9 44:7
46:20,22 47:4
50:15 54:15 69:23

93:25 98:24
104:10,17 105:10
115:20
**proposal** 44:19
65:25 74:15 75:11
**propose** 90:18
**proposed** 76:3
**protected** 94:6
**provide** 50:18 51:3
85:21 96:2,9
107:9
**provided** 28:6 67:5
72:19 96:11,16
104:18 113:7
**Public** 1:18 3:14
4:3 133:23 135:5
**Purchase** 2:5
**purchased** 115:19
**purporting** 54:14
**purports** 97:24
**purpose** 55:16
56:15 57:11,13
59:23 60:2,7
67:20 85:20,25
93:22 114:21
**purposes** 21:6
29:24 30:15 50:4
55:5,21 56:11
**pursuant** 1:17 86:3
**pushing** 87:23 88:4
**put** 8:19,21 15:5
16:6,10 19:12
50:8 67:10 81:15
105:10
**putting** 53:11
**p.m** 92:18 133:7

### Q

**qualifications**
102:9,14
**quarter** 33:11 64:4
**question** 3:10 4:23
4:24 5:7 7:8,14
9:14 17:8,9 18:12
18:19,25 20:10,12
21:15,22 23:19,25

31:5,25 33:19,20
36:16 39:15 40:6
40:12 45:16 52:21
53:3 62:4 67:16
69:11 73:9 82:6
83:4 84:11 86:18
86:24 88:6,11
94:17 96:14,15
97:2 99:22 100:2
100:5 104:2
108:14 109:11
110:18 114:14
119:18,20 120:14
121:6,8,24 122:4
122:4 123:11,21
123:22 126:5
128:6 132:5
**questions** 4:22
19:17 21:17 37:9
56:25 87:15 91:21
132:12,19
**quickly** 26:10
31:17 114:25

### R

**R** 2:2 3:2 4:2,2
135:2
**range** 31:11 38:2,6
55:21 66:5,22
67:4,11
**ranges** 66:24 67:17
**rate** 38:22 67:5
115:12,24 116:2
**rates** 115:25
**ratio** 46:12,15
**reach** 86:4 125:4
**reached** 25:24 29:3
29:4 35:24,25
42:6 125:10,12
126:6
**reacquisition** 57:6
58:10,18 59:13,19
61:23 62:8 63:8
64:17 65:23 75:11
75:18 76:2 77:15
**read** 15:13 17:24

19:3,4,5,5 20:23
22:12 48:9,13
66:14 85:13 86:13
88:3 98:19 101:15
102:20 103:16
104:8,13,20
106:16 121:16
129:22 130:3
133:13
**reading** 86:6,6
103:5
**reads** 14:18
**ready** 44:2 47:19
87:14 88:20,24
89:7,9,10 91:20
**real** 37:14,18 58:14
58:19 60:14 68:15
68:18 69:5,7,13
69:23,23 70:4,12
70:16 71:9,18
106:19 107:2,4
**really** 27:7 74:10
75:15 88:13 94:25
112:24
**reason** 52:4 74:16
88:7,13
**reasons** 22:25
54:24 105:16
**recall** 11:22 28:15
30:18 31:20 32:2
32:13 34:2,3,7
35:15 36:8 40:15
40:24 41:2,4
44:11 46:2 61:7
64:11 82:2 89:10
90:20 92:23 93:11
93:13,24 96:19
112:3,6,7 113:9
118:23 123:8,9,10
125:9,14 127:5
129:25 130:10,14
130:15,15 131:7
131:16 132:2,2
**recap** 65:20,20
**receipt** 87:9
**received** 28:12 29:2



48:8 69:22 70:9
87:18 100:11,11
100:12 113:24
**recess** 79:2
**recognize** 47:20
87:17 131:25
**recollection** 5:16
60:8 91:2
**recommend** 59:24
82:10 89:7 97:25
**recommendation**
50:8,19 57:14
59:14 63:13 64:15
64:21,23 78:13
89:15
**recommended**
61:12,22 62:7
63:8 64:17 77:14
81:16
**recommending**
63:24 64:6,8
75:12 76:4 77:19
78:18
**record** 4:13 5:8
133:13 135:12
**redevelopment**
26:8 27:4 32:14
32:17 44:15 46:4
49:10 60:3
**reduced** 30:23
**refer** 75:20
**referred** 28:21
**referring** 5:19
71:21
**refers** 71:23 73:4
73:11
**reflect** 74:10
117:11 126:21
129:16
**reflected** 66:6
**refresh** 5:16 60:8
**regard** 84:18 102:7
**regarding** 92:15
**regardless** 52:4
**region** 10:25 11:3,4
13:3

**regroup** 115:4
**regular** 95:23
**regularly** 95:2,21
96:3
**reinvest** 43:6
**reinvestment** 29:25
30:15 60:9,23
64:7 83:16
**relate** 4:22 59:18
**related** 135:14
**relating** 9:6
**relevance** 111:12
**relevant** 9:13,19
119:10,11 120:8
121:14,22 126:20
**remember** 4:15
25:22 26:2 28:3
77:20 91:5 94:19
95:4 118:19
122:19 130:7
131:4
**reminder** 120:20
**remodel** 83:21
**remote** 6:8
**remotely** 1:17
**renegotiated** 40:8
**renegotiation** 52:5
**renegotiations**
51:25 52:4 53:9
**renovation** 84:4
**renovations** 83:24
**rent** 5:17 13:21
14:9,13,16 19:4
20:18 21:7,8,12
24:16,24 25:2
26:9 27:5,7,14,19
28:13 31:2 34:11
35:3,5,10 38:18
38:18,19 40:20
41:8 42:7,13
43:11 46:5 49:9
49:14,15 51:8
54:21 55:18 59:5
59:5 60:15,20
63:17,20,23 64:24
66:22 68:22 69:3

70:25 71:2,2,13
71:16 72:9 74:11
75:14 76:4,5,7,11
76:13,15,22,24
77:4,5,6,12 78:9
78:10 82:18,24
86:16,22 91:4
98:22 101:18,20
103:11 104:11,18
104:25 105:4
107:19 113:12,13
114:22 116:7,8,12
116:17 117:14
118:6 121:12,19
124:15 125:4
**rental** 14:18,20,24
14:25 16:13,22
17:12 18:15,21
19:6,8 23:16,22
24:10 31:22 32:4
98:2 103:25 105:5
105:6 107:6
114:22 123:25
**rents** 43:8,10
**repeat** 4:25 9:14
17:7,9 18:19
21:22 23:19 31:25
33:20 39:14 62:4
69:11 78:15 86:18
96:14 100:2
102:13 109:11
114:14 120:14
121:6 123:22
128:6 132:5
**rephrase** 4:25
44:24 82:6
**report** 11:14,23
12:2,5 29:17 30:8
55:24 67:3 101:7
108:17 109:17
117:10 130:4
**reported** 11:19
**Reporter** 41:11
52:13 121:23
**reporting** 53:16
**reports** 11:18 30:11

56:6 105:16
**represented** 68:3
**request** 9:11,17,21
43:4 44:22 45:2
61:4 94:8 95:25
97:24 98:3,12
**requested** 23:10
40:18 50:3 87:9
96:20 98:13 116:5
**requesting** 50:16
**require** 58:25 59:6
**required** 48:25
51:15 75:23 76:6
104:9
**requirement** 10:8
10:12 52:7 54:23
54:24
**requirements**
23:13 53:11,16,16
**requires** 53:6
**research** 28:2
29:15 30:6,8,11
32:21,24 33:5,10
38:7 89:7
**researched** 38:10
115:23
**researching** 101:25
**reserved** 3:11
**reset** 24:24 41:17
60:18 62:18,21
63:23 74:11 82:18
82:25 121:12
**resets** 34:12
**residual** 106:18,25
107:5,11,20
126:14 127:11
130:24
**residuals** 130:20
**respect** 33:17,24
44:7 61:5 91:3
123:17,24
**respective** 3:6
**respond** 96:17
**responded** 116:10
**response** 9:11
18:24 20:15 29:18

88:20 96:12
**responsibilities**
10:20 37:16
**responsible** 10:22
43:14 80:3
**restart** 121:24
**restating** 118:3
**restaurant** 26:13
26:16,17,22,24,25
27:10 30:20 40:23
43:6 61:5,8 62:9
62:13,24 63:6
68:7 69:6 72:3,12
73:22,24 78:22
79:6 83:8,11,17
83:22 84:13 85:2
85:4
**restaurants** 60:12
72:12 79:11,15,18
79:20 84:3
**result** 124:3 128:4
**retained** 35:22,23
36:3 45:6 98:9,15
122:16
**retention** 36:2
**return** 67:5 87:9
116:2
**reveal** 94:13 120:21
**revealing** 94:11
**review** 7:5 22:24
37:9 45:9 49:5
56:11,25 77:17
132:14
**reviewed** 5:17,18
5:20,24 22:16,23
46:6 102:20
103:16 128:17
**reviewing** 97:16
99:6 131:22
**revise** 125:2 126:13
126:21
**revised** 127:6,8
**right** 32:14 47:25
50:7 54:12,18
58:2 61:2 63:5
64:18 66:3,18



69:25 70:19 73:11
73:20 74:16 77:4
83:9 92:20 98:17
98:18 99:8,10
102:7 106:21
110:8,19,20 119:7
122:22 129:5
130:17
**risk** 55:22 67:15
**Rita** 58:20
**role** 11:14 37:18
58:9,12 102:18
**roles** 59:2,3
**room** 8:10,13 83:19
**Rottenberg** 28:9
33:16,23 34:5
110:15,15
**Rottenberg's** 71:4
**rough** 133:4,5
**RPR** 1:18 135:4
**rules** 52:9
**R6B** 46:23 106:13

---

**S**

**S** 2:2,10 3:2,2 4:6
134:7
**sale** 113:17
**sales** 49:22 50:11
50:23 51:4 55:8
55:17,20 56:10
68:2,6,7,9,9,10,11
69:4 70:15,16
88:16 107:16
112:16 114:10
115:8 127:12
130:18
**Sam** 25:24 27:9
29:3,13 30:2,3,18
30:19 31:14 32:11
32:13 33:7,8,9,15
33:23 42:10 44:11
44:12 46:3 49:6
49:17 55:23 60:10
71:3 87:2 109:24
110:14,15 115:18
115:19

**Sam's** 29:18 34:24
90:11
**saved** 5:25
**saw** 65:16,20 113:9
127:3
**saying** 41:25 65:10
70:23 101:12
**says** 15:14 40:18
42:4 46:6 49:22
51:23 53:24 66:10
66:13,22 67:9
68:13,15 69:15
71:19,24 74:13,14
75:13 76:3 81:8
88:2,4 93:5,19
106:17 121:20
**scenario** 49:13,20
55:22 65:11 67:11
67:22
**scenarios** 67:22
**schedule** 93:20
97:8
**scheduled** 93:6
**scope** 90:14
**screen** 14:8 53:24
56:24 57:4 81:15
102:7 103:11
**scroll** 81:6
**sealing** 3:7
**search** 9:5,12,17,20
9:23
**second** 14:15,17
65:22 75:8 97:19
99:12 100:10,13
100:20 103:8,12
103:13,17,24,25
104:13 106:23
116:25 119:2,4
120:3,11,16 121:9
121:11,14 122:6
122:12 123:12
124:17 126:20
**section** 58:8
**see** 13:22,24 35:25
37:11 40:16 41:5
41:9,13 66:11

67:6,9 69:15
71:12,24 72:2
74:13,24 76:2
81:2 94:23 99:19
101:9 105:23
106:21 129:24
130:8
**SEELIG** 2:8
**seen** 12:17,19 80:15
80:19,25 81:11
106:5 127:6
128:18,21 129:13
**select** 36:24 88:5,8
88:9,13 89:8,14
89:17,20 90:8,12
**selected** 90:5
**selecting** 95:16
**selection** 87:23
89:25
**selectivity** 74:23
**selling** 83:25
**send** 98:6,11
**senior** 59:6
**sense** 51:10
**sent** 28:16 92:11,16
93:8 96:23 98:16
**sentence** 20:23
106:16 126:2
**sentences** 20:22
**separate** 98:13
**separated** 92:8
**separately** 111:24
**September** 1:13
130:5 131:19
132:4
**sequential** 92:3
**series** 4:22
**server** 6:16
**service** 72:10,11,13
72:17 73:2
**services** 72:19
**set** 63:7
**setting** 107:19
**share** 26:19 27:2
30:5 32:11 94:5
119:15 121:2

**shared** 94:7 117:9
**sharing** 30:2 41:5
**Sharon** 35:17,19,22
36:6,11,18,18
45:13,19,23 47:8
48:17 49:11,18
50:4,16 51:5
54:14 55:9 66:19
67:4 86:10 87:18
87:19 89:20 98:6
98:9,21 101:16
107:24 108:17
109:16 110:14
113:16,21 114:3,7
114:8 115:3
117:18 122:9,10
129:22 130:12
131:8,13
**short** 10:8,12 16:7
26:10 45:11
118:12
**shortly** 28:16 34:3
43:20 108:13
**show** 51:9
**showed** 95:13
**showing** 13:23
95:25 98:17
**shows** 68:6 75:6
**side** 75:5 79:23
81:19,21 88:4
90:10,12 124:5,20
126:19
**signage** 123:8
**signatures** 58:16
59:2 65:4 75:21
**signed** 3:13,15 13:7
57:22,23 58:3,6
75:22,24 97:22
100:4 135:20
**similar** 15:16 108:3
**simple** 98:5
**simplistic** 16:7
**site** 13:4 26:8 27:4
29:24 30:14 32:14
32:17 41:12 44:15
44:20,22 45:3

46:4 49:10 60:17
68:23 74:10 78:18
122:25,25
**sites** 24:2,2,4 49:3
51:18 95:24
**site's** 25:11
**sitting** 8:8,10 9:2
**situation** 53:8
**situations** 24:19
53:7
**six** 58:6
**slightly** 31:10
**small** 105:25
**snapshot** 73:18,25
**soon** 42:17
**sorry** 17:8 19:6
23:3 28:4 41:19
58:13 68:5 71:11
83:3 93:15 118:10
**sort** 67:21 114:25
**sorts** 24:7
**sound** 5:3,10
**source** 120:18,19
**speak** 4:13,14
81:18,20,23 82:11
90:11 101:5 108:7
114:21 119:8
**speaking** 82:2
**speaks** 105:4
113:14
**specific** 10:25
22:11 91:2,5
**specifically** 5:19
23:25 24:10 39:24
41:4 44:13 73:25
101:13,21 113:13
120:7 121:18,20
130:16
**specifics** 82:25 95:4
123:10 125:14
**speculate** 22:22
93:17 101:4
**spell** 59:9
**spend** 60:16
**spent** 101:24,24,25
**split** 14:8 47:4



70:10 73:7,23
**split-zoned** 46:22
**spoke** 28:8 30:18
34:5 35:16 44:11
49:6 88:4
**Square** 122:22,24
122:24,25
**SS** 133:10
**Stacy** 2:15 8:2
**stages** 56:4
**Stamford** 8:11,12
37:19,21 110:20
**stand** 20:9
**standard** 19:15
57:7,10 105:12
**Standards** 52:17
**start** 8:22 14:23
27:7 65:22 76:16
83:20 87:3,4
113:25
**started** 26:16,23
28:24 30:22 55:25
61:9,17,20 62:11
63:5 64:5
**starting** 58:11 79:4
**state** 1:18 4:3 11:7
25:13 60:20 133:9
135:5
**stated** 25:2 41:18
43:8,10 60:15,20
63:22 75:9 78:9
78:10 120:7
121:18
**states** 1:2 86:2
**statistically** 127:17
**statistics** 127:19
**status** 45:18,21
61:4,7 77:25
93:18 94:25 95:6
95:12,24 96:2,10
97:10
**stay** 35:11
**STEIN** 2:4
**STENOGRAPH...**
52:24 132:24
133:3

**stenographically**
135:10
**step** 27:14
**steps** 104:22
**stipulated** 3:4,9,12
29:10
**stop** 23:2 105:18
106:23 115:3,5
125:7
**stopped** 115:3
**store** 62:23
**story** 45:11
**strategy** 26:12 35:4
42:13 78:4
**Street** 8:11
**strike** 88:17
**study** 39:22 40:5
**stuff** 92:9
**subject** 16:9 37:23
37:25 40:17 42:24
77:16 82:12 87:20
122:20
**submit** 57:14
**submitted** 57:19
60:22 63:12 64:9
64:21,23 65:3,3
**submitting** 74:12
75:2 78:12
**Subscribed** 133:20
**subsequent** 125:18
126:6
**subsequently** 44:17
101:10
**substance** 90:17
**subtract** 71:11
**suffice** 100:25
**Sugaski-Hartman**
37:12
**suggesting** 92:21
**suggestion** 97:3
**Suite** 2:5
**summary** 65:25
**supervision** 135:11
**support** 31:16
84:21
**supports** 37:17

**supposed** 110:2
126:25
**sure** 4:23 9:15
15:17 33:21 46:7
47:3 54:7 55:13
63:5,13 66:16
69:12 71:7 72:7
74:21 78:14 79:17
82:8 83:5 85:14
91:20 92:23 97:18
99:8 101:14 108:9
121:7 130:5
**surprised** 29:8
130:8
**suspect** 130:8
**sworn** 3:15 4:3
133:20 135:8
**system** 23:21 60:11
72:22 73:4,5,11
73:12,24

---

**T**

**T** 3:2,2 134:7 135:2
135:2
**take** 4:14 5:5,7
15:16 26:24 42:17
42:18 47:18 56:22
61:16 67:17 71:10
78:24 85:12
104:21,22 111:5
118:12,16,18
131:9,11 132:13
133:5
**taken** 1:16 10:7
79:2 133:14
135:10
**talk** 26:13 27:17,22
33:9 35:3 112:13
117:21 127:2
**talked** 26:18 29:16
29:20 32:16 34:7
112:14,15,18
113:6 115:7
**talking** 27:21 44:14
61:19 114:2
**tax** 53:13

**technique** 105:13
106:18,25 107:6
107:11,21 126:14
127:11 130:24
**techniques** 127:13
**telephone** 7:16
25:20
**tell** 7:23 11:3,21
14:4 16:22 17:12
18:2 21:2,11 25:7
25:22 26:6,21
34:9 37:11 46:10
47:22 53:4 54:9
56:24 57:3 61:19
68:3 73:7,17,23
74:7 80:19 85:16
90:23 92:2 96:24
97:3 101:14
103:14 104:8,15
109:2,4 114:12,16
119:13 130:10
**telling** 16:12 70:3,4
**ten** 23:4 24:20
26:14 36:19 102:3
**tenant** 14:21 15:2
19:9 48:25 77:9
105:7
**tenant's** 15:4 19:11
105:9
**Tener** 87:21,22
88:4 90:18 107:14
108:7,12 109:20
109:23 110:2,7,11
110:16 112:16
113:20 114:6
115:7 123:5,6
126:12,20 127:4
132:4
**Tener's** 101:7
**tenure** 40:18 59:18
60:2,7,9,15,18,22
61:4 62:20 63:16
63:23 75:6,10
78:8,10
**ten-minute** 132:14
**ten-year** 24:6 42:25

43:3,5,12,15
**term** 13:21 15:19
15:22 25:10,10,10
41:24 42:25 43:8
43:9 46:10 103:11
104:18,25
**terminate** 48:23
50:7 59:15,24
64:14 76:21 77:9
77:11
**terminating** 65:5
**terms** 39:23 41:14
**territory** 11:12
**Terry** 123:5,5
**testified** 4:4
**testifying** 9:25
**testimony** 32:7,9
133:13 135:6,9,10
135:12
**thank** 12:12 40:12
42:16 68:12 70:24
83:6 97:20 121:4
132:21
**Theresa** 123:3,4,6
**thing** 14:8 53:13
96:8
**things** 25:13 62:21
124:13
**think** 19:17 22:20
31:17 34:8 39:17
40:11 44:14 45:15
51:11,16 52:8,9
53:10,13,15 54:17
56:9 57:20 61:10
62:16,23 63:14
64:4,22 71:10
72:10 73:18 82:21
82:22 83:22 86:24
88:17,25 89:9
92:4 95:13 101:25
103:7 115:17
116:22 118:25
121:24 123:12,14
125:15,22 126:8
126:14 130:4
**thinking** 17:9 28:14



31:13,14 32:11
112:25
**third** 75:8 87:23
88:5,9 89:8,15,18
89:21,25 90:5,9
90:13 126:10,25
**thirds** 89:3 90:7,19
124:21,24 125:6
**thorough** 101:17
101:23 102:5,7,21
103:7 104:9,24,24
**thoroughly** 104:16
**thoroughness**
102:11,15,25
103:3
**thought** 23:2 39:9
39:19 63:20 102:6
102:21
**three** 8:4 24:19
41:17 43:18 60:19
62:19 63:21 78:8
105:24 106:8
124:19
**three-year** 24:6,11
**tied** 66:16
**time** 3:11 4:14 5:6
9:9,10 12:24 13:3
13:8 25:14 28:7
34:4 35:15 39:6
42:5 46:9 47:18
52:2 53:5 57:8,10
57:10 61:16 62:6
62:22 64:3,10
68:8 72:4 73:19
76:6 81:16 82:3,3
82:7 83:8,11,23
84:2,4 88:7,19
89:5,12,14 90:15
101:25 102:2
113:7 127:3
132:23 133:7,14
135:7
**times** 29:4 31:12
34:16,16 36:17
118:2 122:22,24
122:24,25

**title** 12:24 84:24
**today** 4:12 7:12,18
9:7,10,16 10:2
38:4 63:14 72:24
103:9 132:22
**today's** 5:14 132:11
**told** 25:18 54:22
79:5 83:7 84:8
87:22 88:20
113:21 120:17
122:11 126:12
131:3
**tom** 85:18 87:20
88:4,15 95:15
101:7 107:14
108:7,12 110:15
110:15 112:15,25
113:2,7,10,11,17
113:22 114:9
115:7,16 116:20
117:4 118:4
124:10,25 125:2
126:12,20 130:9
132:6
**top** 42:3 57:21 81:9
116:6
**topic** 100:20
**total** 71:12,13
72:22 115:17
**touch** 36:23
**track** 23:16 24:2,2
24:3,5,8,9,10,13
24:18,19 25:3
**tracks** 23:22
**trailing** 68:7,11
70:5,16
**train** 111:6,7
**training** 11:24
127:19
**transcribed** 135:11
**transcript** 53:2
133:16 135:12
**trial** 1:15 3:11
**tried** 115:4
**true** 83:22 133:15
135:12

**truthfully** 9:25
**try** 39:15 50:9 53:3
62:5 112:21 122:2
124:12 125:20
**trying** 16:21 17:11
19:3 20:17 26:11
26:12 27:22 31:13
32:22 35:3,4,10
39:2 49:17 69:19
78:3 103:23 124:4
124:11,19,25
**Tuesday** 91:15
92:16
**turn** 6:9 8:19 67:24
74:2 78:19 103:12
**turned** 8:21,22
114:25
**two** 20:22 31:12
54:25 55:5 56:6
60:24 81:7 90:8
96:8 99:23 100:4
100:16,19,25
101:5 112:9
116:16 122:9
124:15 125:4
126:9 127:12
128:9,19 129:7,13
130:17
**type** 76:4 98:11
**types** 34:11
**typical** 98:10
**typically** 34:20
36:19 39:20 84:3
105:23

———— **U** ————
**U** 3:2
**ultimate** 90:25
**ultimately** 45:6
51:7 75:19
**unable** 86:4 106:10
**uncommon** 84:5
90:20,23
**uncumbered**
127:13
**undefined** 24:15

**undercover** 106:11
**underlying** 82:17
**underneath** 71:24
**understand** 4:23,24
7:7,13 11:17
13:14 15:11,25
18:25 19:18 20:17
21:9,15 29:13
30:4 31:13,14
32:22 33:19 36:25
40:21 44:10 45:16
45:21 46:15 49:17
49:19 50:11,21
51:6 52:6 53:4,5
55:21 57:11 61:16
63:11 73:9 74:19
78:15 84:6 86:23
88:14,15 92:7
96:15,25 99:22,23
100:14,15,16,19
101:15 110:18
115:13 126:3
**understanding**
31:21 32:3 46:5
49:11 83:17 87:6
109:25 113:20
119:23 120:2,10
120:15,24 121:9
121:10 122:5
124:23 125:20
**understood** 42:16
80:9 113:16
115:10
**unfortunately**
113:2,5
**UNITED** 1:2
**universe** 105:25
106:3
**University** 10:7
**unknown** 75:16
**unknowns** 74:20
**unnecessarily**
114:20 117:24
**unsophisticated**
34:18
**unstated** 24:15

59:4 60:21
**unusual** 129:10,19
**upcoming** 26:5
42:7
**update** 77:25 78:2
93:18,21 94:23,25
95:6,12,20 96:2,9
96:11,16
**updated** 92:24
112:25 130:4
**updates** 95:23 96:4
**use** 15:20,23 16:2,8
16:14,23 17:13,21
17:23 18:3 34:13
35:14 39:11,18,20
108:8,9,10 109:4
**uses** 15:5 16:6,9
19:12 23:16 46:7
54:17 105:10
**usually** 36:3 69:2

———— **V** ————
**vacant** 105:13
**valid** 113:4,8
**valuation** 29:5
37:23,25 41:5
45:2 53:6 54:14
66:20 88:16 115:6
115:17 117:5
129:15 130:22
**valuations** 22:2,4
54:25
**value** 14:18,20,24
15:2 16:13,23
17:13 18:15,22
19:6,8 20:20
23:16,22 24:3,10
28:13 29:9,12
30:21,23 31:2,12
31:23 32:4,23
33:6 34:11,22
35:8 38:3 39:3,10
41:15,17 42:6
49:12,18 50:12,15
50:21,22,24,24
51:14 53:10,10



55:15 56:3 62:18
62:21 65:9 66:10
67:6 74:5,11,16
74:17 75:4,13,13
76:23 77:25 86:15
86:21 98:2,24
103:25 105:5,6
108:4 114:23
116:5 118:9 120:9
123:8,18,25 124:7
127:10,14 128:2,3
128:11 129:8
**valued** 29:24 30:14
31:9 32:19
**values** 27:15 28:2
38:14,24 39:5,13
39:24 49:5
**valuing** 105:13
**Vanderbilt** 1:18 4:8
25:15 85:18,21
**verbal** 18:24 20:15
**version** 16:7
**versions** 99:23
**versus** 60:15
**vice** 58:15,22
**view** 18:13,20
19:20 20:12
**vision** 82:23

**W**

**W** 97:15 98:21
99:14 100:6
**Wait** 56:19
**waived** 3:8
**waiver** 61:13
**waiving** 121:3
**WALDER** 2:4
**walked** 125:25
126:4
**Walsh** 2:6 7:6 8:2
9:8 11:16 12:3
13:22 14:5 15:8
15:24 16:3,16,24
17:2,15 18:4,16
18:23 19:22 20:4
20:9,14 21:4,14

21:21 22:10 23:9
23:18,24 24:12
28:18 31:4,24
32:6 33:18 36:15
39:7 40:3 44:23
45:4,14,20,25
46:14,17 47:9
48:10 52:20 53:18
54:4 55:3 60:5
62:2 63:10 64:19
65:14 66:25 69:9
70:2,11,20 72:15
77:2 78:23 79:13
80:5,12,18 81:25
83:3 84:9,17 85:5
85:24 86:17 87:25
88:10 90:2 91:23
92:6 93:10 94:3
94:18 98:4,8
99:25 100:8,18
101:3 102:12
103:18 104:12,19
105:3 108:25
109:9,22 110:24
111:11 114:18
119:14 120:12,20
123:20 125:11
126:7 130:13
131:6 132:12,13
132:18
**Walsh's** 119:21
**want** 19:16 22:22
35:11 43:5 47:2
52:8 60:16 73:14
78:14 83:4 90:22
93:17 94:4 101:4
101:6,9 104:13,15
111:19 132:10,14
133:4
**wanted** 27:17 42:11
44:15 46:7 47:3
49:8 50:10,20
51:3,16 74:21
88:25 92:6 99:20
123:10
**wasn't** 45:17 50:16

56:13 74:20 76:25
88:7,8 89:9,10
97:5 107:12 109:2
113:4 115:14
117:12 126:3
130:14,15
**way** 74:8 104:5
**websites** 33:2 38:14
**week** 88:22
**well-informed**
14:21,22 15:2,3
19:9,10 105:7,8
**went** 4:12 61:8
70:18,22 78:11
87:7 98:21 115:7
115:16 116:15
117:4 118:11
**Westchester** 2:5
**We'll** 43:20 108:11
**we're** 13:12 16:12
27:10,12,22 35:13
51:18 61:19 83:17
132:19
**we've** 34:16 66:16
**WHEREOF**
135:19
**wildly** 29:23 30:13
35:7 78:5
**wish** 90:18
**witness** 1:16 13:24
15:9 20:6 42:17
42:20 94:4,20
120:13 121:4,13
122:17 135:8,13
135:19
**woman** 122:13
123:2
**word** 53:2
**work** 20:19 35:4
44:3 64:11 77:17
78:16 88:21 101:8
102:6,10 104:8
124:4,19,24,25
125:17,20 127:2
**worked** 13:3,8
18:10 36:11,18,18

58:20 81:23
**working** 12:21,25
13:2 83:15 95:24
96:10 122:15
**worlds** 30:3
**worst** 49:12,19
55:22 65:11 67:11
67:21
**worth** 115:22
**wouldn't** 72:17
81:3 82:25 90:20
90:23 100:24
116:3 118:22
**wow** 81:3
**write** 38:17 118:22
**writing** 30:23
**written** 15:14,17
17:24 18:3 19:5
105:16 113:7
127:4
**wrong** 56:19
124:10

**X**

**X** 1:4,10 99:5,10,16
100:7,25 134:2,7

**Y**

**yeah** 23:5,14 30:17
52:15
**year** 31:23 32:5
36:23 38:18,25
62:13 69:14,24
95:23
**years** 10:19 11:9,10
11:22,23 12:11
15:15,21 22:6,15
22:17,17 24:19,20
24:20 26:14 33:3
34:20 36:19 38:8
38:16,25 40:8
51:17 60:17,20
61:19 63:23 68:8
78:8,10,10 82:4
102:3,19,24 103:4
103:14 104:4,6

111:4 117:22
119:25 121:11
128:17
**yes-or-no** 64:22
**York** 1:3,19 2:5,9,9
4:4 11:4,7,8,9
13:3 14:11 17:17
22:6,15 24:5
37:20 108:20
109:19 111:2,15
114:24 120:2
133:9 135:5
**York/Connecticu...**
80:3

**Z**

**zone** 47:5 106:13
**zones** 46:24
**zoning** 16:8,14,25
17:14,17 32:18
44:10,22 45:2,7,9
45:12,15,17,18,23
46:8,9,13,16,19
48:18 49:19 51:5
55:14 65:9 106:13
108:3,3,20 109:19
118:8
**Zoom** 8:24

**$**

**$2** 64:6 65:13
**$300,000** 31:23
32:5
**$537,974** 69:13,23
**$9.9** 66:5,7

**0**

**00299** 49:22
**0318** 12:13

**1**

**1** 12:14 13:23 53:25
65:17,21 75:20
91:16 103:9,11,24
**1,348** 116:7
**1.5** 64:7



**1:19-cv-06471** 1:7
**10** 28:19,25 80:16
**10:02** 1:13
**100** 22:19,20 67:7
**10017** 2:9
**10577** 2:5
**11** 105:18 106:2,8
**12** 48:14 54:13
   71:24
**12-month** 68:7,11
   70:6,17
**125** 2:9
**13** 11:5 47:10,17
**14** 53:19 68:24
   70:15
**15** 10:19 11:9,10,23
   12:11 15:15 22:6
   22:16,17 33:2
   34:20 38:8,16
   40:7 41:19,21
   75:9 78:10,11
   87:7,8 102:19,24
   103:4,14 104:4,6
   119:25 128:16
**1560** 122:21,23
**16** 56:18
**16,850,000** 115:18
   115:22 117:5
**17** 1:13 97:23 99:2
   99:15,16 100:5
**17th** 99:9,24
**18** 57:20 61:3
**18th** 57:23 58:3
   62:6
**19** 110:7,9 114:13
   114:17 118:15
   123:16,23
**19th** 107:15 108:11
   110:6 112:15
   125:18
**1998** 12:13 72:13
**1999** 72:13

**2**

**2** 53:25
**2/4** 32:20

**20** 38:25 60:17
   63:23 78:8,9
   111:4 131:19
**20th** 132:4
**20-year** 129:15
**2013** 68:8
**2017** 29:24 30:15
   31:3,9 32:20,20
   33:7,12 40:17
   49:5 62:16 63:3
   63:15,20 64:4,12
   64:16 77:24 82:22
**2018** 25:19 26:3,17
   26:23 28:12,25
   30:18,22 32:13,17
   33:9,16,23 34:25
   35:6 42:4,11
   43:23 44:12,12,13
   48:14 49:6,6
   54:13 56:3 57:20
   58:17,21,24 61:3
   61:20,22 62:12
   64:5,17 69:17,25
   70:5 71:25 77:24
   115:20
**2019** 38:18,20 56:4
   74:25 87:7,8,12
   91:16 92:17,18
   93:4 94:2 97:23
   99:2,9,15,17
   100:5 110:8,9
   114:13,17 115:19
   118:15 123:16,23
   130:5 131:19
**2021** 1:13 133:21
   135:20
**2039** 26:14 62:20
   75:7,10
**204** 2:5
**21** 56:20 92:16,18
**216,000** 38:20
**23** 99:11,17 100:13
   100:21
**25** 87:12
**250** 31:10 38:3
**26** 43:22

**260,000** 38:20
**27** 80:10
**270,000** 38:19
**28** 15:21 22:14,17
   85:8 117:22
**2900** 2:5

**3**

**3** 13:20 38:24 39:19
   53:25 67:13 81:9
   86:2 98:22 105:12
**3rd** 135:20
**3:17** 133:7
**30** 69:24 70:5 87:11
   95:22
**30th** 69:17
**300** 31:11 38:4
**300,000** 31:10
**31st** 71:25
**320** 10:23 24:4
**325** 31:11
**325,000** 38:19

**4**

**4** 38:17,21 39:3,17
   66:5,23 67:24
   72:13
**4-132** 134:5
**40** 95:22
**42** 91:16

**5**

**5** 74:2
**5/21/19** 91:11
**50** 22:21 107:15
   108:8 115:11,13
   115:23
**53** 97:14
**537,974** 68:20
   70:17
**54** 99:3
**552** 65:17,21

**6**

**6** 49:21,25 66:5,23
**6:38** 92:18

**6328** 67:25
**65** 94:24
**67** 131:17
**695** 8:11

**7**

**7** 54:5 67:9,16
   115:20
**7th** 2:9

**8**

**8** 37:3 42:4 67:10
   67:16 115:24
**8th** 44:13 74:25
**80** 29:10 38:20 67:7
   116:7
**840** 14:11,14 21:20
   21:24 25:16,19
   31:21 32:3 33:17
   33:24 34:6 36:7
   44:8 45:3,23
   54:15 61:5 62:9
   63:6 78:22 79:6
   79:11,15 81:12,17
   82:10 83:8 85:4
   87:21 92:15 93:2
   98:25 104:10,17
   123:18,25

**9**

**9** 43:22 56:21
**90** 34:10,21
**91** 134:10
**936** 116:25 119:2,4
   120:3,11,16 121:9
   121:10,14 122:5
   123:12 124:17
   126:19
**975** 31:12
**975,000** 29:9,12
**99-year** 25:25 26:7
   26:20 27:11



MAGNA
LEGAL SERVICES