# EXHIBIT EEE

Page 1

1

2             UNITED STATES DISTRICT COURT

3             EASTERN DISTRICT OF NEW YORK

4

5   MCDONALD'S CORPORATION,      )

              Plaintiff,       )

6                               )

              vs.               )No.

7                               )1:19-cv-06471

    VANDERBILT ATLANTIC         )(DLI)(SLT)

8   HOLDINGS LLC,               )

              Defendant.        )

9   _____    )

10

11

12       REMOTE VIDEOTAPED DEPOSITION OF

13            THOMAS J. TENER

14           New York, New York

15        Tuesday, September 21, 2021

16

17

18

19   Reported By:

20   CATHI IRISH, RPR, CRR, CLVS

21

22

23

24

25

Page 2

1

2

3

4

5

6

7

8                        September 21, 2021

9                        10:00 a.m.

10

11          Remote videotaped deposition of

12      THOMAS J. TENER, with all participants

13      appearing via videoconference, before

14      Cathi Irish, a Registered Professional

15      Reporter, Certified Realtime Reporter,

16      and Notary Public of the State of

17      New York.

18

19

20

21

22

23

24

25

Page 3

1

2   A P P E A R A N C E S:

3

4       PASHMA STEIN WALDER HAYDEN, P.C.

5       Attorneys for Plaintiff

6            2900 Westchester Avenue

7            Suite 204

8            Purchase, New York 10577

9       BY:  BRENDAN M. WALSH, ESQ.

10

11      MEISTER SEELIG & FEIN LLP

12      Attorneys for Defendant

13           125 Park Avenue

14           7th Floor

15           New York, New York 10017

16      BY:  HOWARD S. KOH, ESQ.

17

18   ALSO PRESENT:

19       Thomas Devine, videographer

20       Wallace Zaccagino, Veritext concierge

21       MICHAEL MEYER

22       STACY HOWARD

23

24

25

Page 4

1

2           THE VIDEOGRAPHER:  Good morning.

3    We are going on the record at

4    approximately 10:01 a.m. on September

5    21, 2021.

6           This is media unit 1 of the video

7    recorded deposition of Thomas J. Tener

8    taken by counsel for the plaintiff in

9    the matter of McDonald's Corp. v.

10   Vanderbilt Atlantic Holdings LLC filed

11   in the U.S. District Court for the

12   Eastern District of New York, Civil

13   Action Number 1:19-cv-06471

14   (DLI)(SLT).

15          This deposition is being held

16   online as a Zoom videoconference with

17   all parties appearing remotely.

18          My name is Thomas Devine from the

19   firm Veritext New York and I am the

20   videographer.  The court reporter is

21   Cathi Irish also with Veritext

22   New York.

23          I am not authorized to administer

24   an oath.  I am not related to any

25   party in this action, nor am I

1

2      financially interested in the outcome.

3          Counsel appearing remotely will

4      now please state their appearances and

5      affiliations for the record.  If there

6      are any objections to proceeding,

7      please state them at the time of your

8      appearance beginning with the noticing

9      attorney.  After the appearances are

10     noted, the court reporter will swear

11     in the witness and we may proceed.

12          MR. WALSH:  Good morning.

13     Brendan Walsh with the law firm

14     Pashman Stein Walder Hayden P.C. on

15     behalf of plaintiff McDonald's

16     Corporation.

17          MR. KOH:  Good morning, Howard

18     Koh, Meister Seelig & Fein

19     representing the defendant Vanderbilt

20     Atlantic Holdings LLC.

21  T H O M A S    J.    T E N E R,    called

22     as a witness, having been duly sworn

23     by a Notary Public, was examined and

24     testified as follows:

25  ///

```
                                             Page 6

 1

 2    EXAMINATION

 3    BY MR. WALSH:

 4        Q.    Good morning, Mr. Tener.  How are

 5    you today?

 6        A.    I'm well, sir.

 7        Q.    Thanks for coming today.  So

 8    you've just been sworn in by the court

 9    reporter and although we're not in court,

10    you understand that you're under oath and

11    obligated to tell the truth; right?

12        A.    I do.

13        Q.    Okay.  So there's a court

14    reporter here who is taking everything

15    down.  I'm going to ask you questions

16    today.  You will provide the answers.  If

17    you don't understand a question for any

18    reason, please let me know.  If you answer

19    I will assume you understood the question.

20            Please answer questions verbally

21    with words.  The court reporter can't take

22    down any nods or hand signals.  And

23    especially because we're taking the

24    deposition today remotely via Zoom, please

25    make sure you let me finish speaking
```

```
 1                    TENER
 2   before you start speaking and I'll do the
 3   same for you.  It just gets very confusing
 4   and complicated when everyone starts
 5   talking at once because the court reporter
 6   can't take it all down if we're speaking
 7   at the same time.  Does that sound all
 8   right to you?
 9        A.   It does.
10        Q.   So Vanderbilt's attorney may
11   object to some of my questions.  You
12   should understand unless it involves
13   privilege or something I guess else that
14   would prevent you from answering the
15   question, you must still answer the
16   question notwithstanding the objection.
17   Do you understand?
18        A.   I do.
19        Q.   And if you need a break for any
20   reason today just let me know.  The only
21   thing I ask is that we don't take a break
22   so long as there's a question pending.  Do
23   you understand these instructions?
24        A.   I do.
25        Q.   Is there any reason such as
```

Page 8

```
 1                    TENER

 2    medication that would prevent you from

 3    understanding my questions or giving

 4    complete and accurate answers to my

 5    questions today?

 6         A.   No, sir.

 7         Q.   Where are you taking the

 8    deposition from today?

 9         A.   In my office at 551 Madison

10    Avenue, New York, New York 10022, Suite

11    301.

12         Q.   And are you in the room alone

13    today?

14         A.   I am.

15         Q.   Okay.  Can you describe the

16    screens that are in front of you right

17    now, like what are you looking at?

18         A.   I am looking at a laptop in front

19    of me that is open only to Zoom meeting.

20    And there is a screen to my left which is

21    my desktop which is open to the Veritext

22    file share which is showing the folder is

23    empty.

24         Q.   All right, great.  Are you

25    represented by counsel today?
```

1                    TENER

2        A.    I am.

3        Q.    And who is that?

4        A.    Howard Koh.

5        Q.    And when did you retain Mr. Koh?

6        A.    I guess that's a misstatement.  I

7    am not -- he represents the defendant.  I

8    am a witness.  I have not retained

9    counsel.

10        Q.    Okay.  So do you understand that

11   you may not have any private

12   communications or chats with anyone while

13   a question is pending?

14        A.    Correct.

15        Q.    Okay.  And my office sent you two

16   binders containing all of the documents

17   that Vanderbilt produced to McDonald's

18   during phase one of discovery in this

19   case.  Did you receive those binders?

20        A.    I have them in front of me, yes.

21        Q.    Okay.  So that production spans

22   from Bates numbers VA 00001 to VA 002265.

23   It's not necessary that you look at those

24   right now but we wanted to make sure that

25   you had those in the event you need them.

Page 10

```
 1                      TENER

 2    I'll be showing you exhibits today through

 3    Veritext's Exhibit Share platform but if

 4    you want to look at a hard copy of the

 5    documents, some of those documents I show

 6    you today may be in that binder.  I just

 7    ask that if you are looking at documents,

 8    you just let us know what you're looking

 9    at just so since we're not all in the same

10    room.  Did Vanderbilt's counsel request

11    that you have your entire work file for

12    this matter available to you today?

13         A.   No, he did not.

14         Q.   Okay.  Do you have it available

15    to you today?

16         A.   Yeah, I believe on the computer.

17    If you want me to log into it, I can get

18    to it.

19         Q.   Not right now.  I guess Howard

20    and I can deal with that at a later time.

21              MR. WALSH:  So if we could just

22         mark VA 001059.

23              (Exhibit P66, document Bates

24         labeled VA 001059, marked for

25         identification.)
```

```
 1                    TENER
 2   BY MR. WALSH:
 3       Q.   And Mr. Tener, this is -- it's
 4   entitled Professional Qualifications.  It
 5   looks like a résumé of sorts that was
 6   attached to your July 30, 2019 --
 7       A.   Can I stop you for a second, sir?
 8   You faded out and my Internet connection
 9   is now unstable which was not a problem
10   before.
11            VERITEXT CONCIERGE:  And can you
12       please repeat that number for me?
13       It's VA 00 what?
14            MR. WALSH:  001059.
15            VERITEXT CONCIERGE:  This will be
16       introduced as Exhibit P66.
17            MR. KOH:  Mr. Tener, it should be
18       coming up on the screen.
19   BY MR. WALSH:
20       Q.   You just need to refresh.
21       A.   I'm concerned that I should try
22   to -- it's up.
23       Q.   Okay.  So this is -- it looks
24   like a résumé that was attached to your
25   July 30, 2019 report.  Do you recognize
```

```
                                    Page 12

 1                      TENER

 2    this?

 3         A.    I do, sir.

 4         Q.    So it says that you graduated

 5    from the United States Merchant Marine

 6    Academy with a BS in marine engineering

 7    and mechanical engineering.  When was

 8    that?

 9         A.    1986.

10         Q.    And do you have any formal

11    education beyond that?

12         A.    Only relative to my designation

13    as a member of the Appraisal Institute and

14    licensing as a certified general

15    appraiser.

16         Q.    So how long have you been a

17    licensed appraiser?

18         A.    I don't recall the first year but

19    I believe it was in the late '90s that I

20    first got my license.

21         Q.    And what's been marked as P66

22    says that you were previously a licensed

23    engineer with I guess the U.S. Coast

24    Guard; is that right?

25         A.    Yes, sir.
```

                              TENER

1
2      Q.    That's inactive?

3      A.    Yes.

4      Q.    And how long has that been

5   inactive for?

6      A.    Since the '90s.  I did not sail

7   on my license long enough to maintain it

8   so after the initial licensing, the first

9   cycle, it would have gone inactive.

10     Q.    What is a third assistant

11  engineer?

12     A.    It's a designation as one of the

13  officers on board a ship to stand watch as

14  a third assistant engineer that would be

15  fourth in charge in the engine department

16  and it is a -- it requires an education

17  and formal testing of about a week-long

18  testing to pass.

19     Q.    And this document also says that

20  you're a licensed real estate broker in

21  New York?

22     A.    I am, sir.

23     Q.    How long have you been a licensed

24  real estate broker?

25     A.    For about -- since the early

```
 1                    TENER
 2    '90s.
 3        Q.    And you mentioned before that
 4    you're a member of the Appraisal
 5    Institute?
 6        A.    I am.
 7        Q.    What is the Appraisal Institute?
 8        A.    It's a professional organization
 9    made up of highly educated and designated
10    professionals in the appraisal industry.
11    Its goal is to promulgate the highest
12    quality of appraisal services in the field
13    and to promote a sense of faith in the
14    quality of professionals that provide
15    those services to the public.
16        Q.    Is the Appraisal Institute an
17    authoritative source for appraisal
18    standards?
19        A.    No.  They do have -- they have
20    recently issued a standards similar to the
21    Uniform Standards of Professional
22    Appraisal Practice.  They have an ethics
23    and standards for members of the Appraisal
24    Institute but the Uniform Standards of
25    Professional Appraisal Practice is the
```

Page 15

1                    TENER

2       standards that all appraisers in the

3       United States operate on.

4          Q.   Is the Appraisal Institute the

5       organization that issues the MAI

6       designation?

7          A.   Yes, sir.

8          Q.   And when did you become an MAI

9       appraiser?

10         A.   About seven years ago, sir.

11         Q.   Approximately how many times have

12      you been qualified by a court to testify

13      as an expert in appraisal?

14         A.   Court?  I believe I have only

15      testified once in court.  I have been

16      called to court another time to work on

17      mediation but it was not testimony and I

18      have been deposed for court proceedings

19      several times but I've only had to testify

20      once in court.

21         Q.   Okay.  And have you ever been

22      designated as an expert in an arbitration

23      hearing?

24         A.   Yes, sir.

25         Q.   About how many times?

1                    TENER

2       A.    Similar between five and 15

3    times.  Not all of them have been

4    testimony.  I've been designated in more

5    that have not yet been testified on.

6       Q.    Approximately what percentage of

7    your work involves matters that require

8    testimony in some form?

9       A.    Probably about 10 to 20 percent

10   but it's rising.

11      Q.    Your résumé says that you served

12   as a neutral or party appraiser for ground

13   rent and fair market rent determinations.

14   Approximately how many times have you

15   served in that capacity?

16      A.    As an arbitrator, a neutral --

17   no, in ground rent determinations as a

18   party appointed appraiser, I have -- in

19   ground rent determinations I have served

20   about five or six times that I can recall

21   but I'd have to look, it may be more.

22      Q.    When you say five or six times,

23   are you referring to just as a party

24   appraiser or as either a party appraiser

25   or a neutral?

1              **TENER**

2      A.   As a party appraiser.  As a

3   neutral, it was not a ground rent

4   determination.  It was an office building

5   valuation.

6      Q.   So in the other matters where you

7   served as a party appraiser in a fair

8   market rent process, did you come across

9   the case 936 Second Avenue LP versus

10   Second Corporate Development Co.?  It's a

11   New York Court of Appeals decision from

12   2008.

13      A.   I'm familiar with that, sir.

14      Q.   And what is your understanding of

15   that case in the rule and outset?

16        MR. KOH:  Objection.  You may

17        answer.

18        THE WITNESS:  My understanding is

19        it set a precedent that can be

20        surmised as that which is not

21        specifically excluded would deem to be

22        included in a lease.

23   BY MR. WALSH:

24      Q.   And what do you mean by that,

25   practically what does that mean to you?

Page 18

1                    TENER

2      A.   Practically it means that the

3   specific wording of a lease is required to

4   exclude certain provisions.  Whether they

5   were intended or not, you have to state it

6   within the four corners of the lease.

7      Q.   And how does that rule impact

8   whether the encumbrance of a lease needs

9   to be considered in a fair market rent

10  determination?

11           MR. KOH:  Objection.  You may

12       answer.

13           THE WITNESS:  Practically if it

14       does not state that the lease

15       encumbrance is excluded, then the

16       lease encumbrance should be

17       considered.

18  BY MR. WALSH:

19      Q.   Understood.  And is that a case

20  that you think all MAI appraisers working

21  in New York need to be aware of?

22           MR. KOH:  Objection.  Go ahead.

23           THE WITNESS:  I don't know if all

24       MAIs should be aware of it.  I think

25       those that are informed by counsel

Page 19

```
 1                    TENER
 2      would be aware of it.
 3   BY MR. WALSH:
 4      Q.    And you're the managing member of
 5   KTR real estate advisors; right?
 6      A.    I am one of two managing members,
 7   yes.
 8      Q.    Who is the other?
 9      A.    Terence Tener.
10      Q.    And he's your brother?
11      A.    He is.
12      Q.    When did you found KTR?
13      A.    KTR Real Estate Advisors LLC was
14   founded in January of 2009.  It is a
15   successor-in-interest of several firms
16   that existed prior to that.  It stretches
17   back to 1989.
18      Q.    And how many members does KTR
19   have?
20      A.    Two.
21      Q.    Just you and your brother?
22      A.    Yes, sir.
23      Q.    And how many appraisers currently
24   work at KTR?  Just an estimate is all I
25   need.
```

1              TENER

2      A.   About 20.

3      Q.   And besides appraisal work, what

4  other type of real estate work does KTR

5  do?

6      A.   Basically all the work that we

7  perform is valuation related.  It could be

8  market studies, it could be best use

9  analyses.  In some cases we've been asked

10  to opine on the value of mortgage

11  interests, partial interests in real

12  estate but it's primarily

13  valuation-related services.

14      Q.   Would valuation-related services

15  include cost construction estimates?

16      A.   Well, in a cost approach we will

17  derive cost estimates.  Historically KTR

18  in a prior company had an engineering and

19  environmental and construction consulting

20  business that did provide cost estimates.

21      Q.   Does KTR still do that?

22      A.   Only in the realm of the

23  performing cost approaches.

24      Q.   Okay.  And that cost construction

25  estimation work, is that done for third

Page 21

1                    TENER
2    parties or only for valuations that KTR
3    itself is performing?
4           MR. KOH:   Objection.  Go ahead.
5           THE WITNESS:   It's I believe it's
6        only performed for valuations that we
7        are performing.  We've been asked to
8        do insurable values that require a
9        cost estimating that are only -- that
10       is the only purpose of the assignment.
11   BY MR. WALSH:
12       Q.   Has KTR worked for the law firm
13   Wachtel Missry before this matter?
14       A.   No, sir.
15       Q.   So this was the first time you
16   that ever worked with Morris Missry?
17       A.   As far as I recall, sir.
18       Q.   Had KTR worked with Sam
19   Rottenberg or Tom Li before this matter?
20       A.   We had appraised the subject
21   property in the year prior to this matter
22   for Sam and Tom Li's firm.  I don't know
23   if we worked for him for any other
24   assignments.  I know that the referral
25   came through one of my associates, Theresa

```
                                              Page 22
 1                  TENER
 2     Nygard.  I don't know if she's done any
 3     work for them directly but I can check.
 4          Q.   But this was the first time that
 5     you worked with Sam and Tom, and when I
 6     say this, meaning your work for
 7     840 Atlantic Avenue?
 8          A.   This combined with the appraisal
 9     that was performed prior to it, yes, sir.
10          Q.   So you view those as separate
11     assignments?
12          A.   Yes, sir.
13          Q.   And has KTR done work for
14     McDonald's before?
15          A.   Yes.
16          Q.   And when was that?
17          A.   You know, I hadn't personally
18     done work for it.  I recall that Terry
19     worked, Terry and Theresa Nygard worked on
20     an assignment in Times Square for
21     McDonald's.  I've also been told many
22     years ago Terry worked on an assignment
23     for McDonald's, I believe in Queens, but I
24     also believe that we have done other work
25     for McDonald's that I am not aware of but
```

Page 23

                         TENER
1
2    those two I can't tell you exactly.  I
3    have heard conversations that we have
4    worked for them.
5         Q.   So the document we were looking
6    at earlier that's been marked as P66, it
7    mentions that a prior firm that you led
8    provided engineering and construction
9    consultation on thousands of investment
10   grade properties annually.  Is that the
11   work that we were discussing earlier?
12        A.   It was, sir.
13        Q.   And when was the last time you
14   provided engineering and construction
15   consultation services?
16        A.   Would have been in 2008, although
17   I would have been the chief operating
18   officer at that point in time so I was not
19   personally performing.
20        Q.   And if you can again just sort of
21   generally describe what those engineering
22   and consultation services that you did
23   consisted of.
24        A.   Sure.  They were primarily plan
25   and cost review services for proposed

Page 24

1                    TENER

2    construction where you review plans,

3    budgets, and other factors to allow a

4    construction lender to make a decision

5    about a construction loan.  Once a

6    construction loan is approved and the

7    lending institution is funding the

8    construction, our -- we would provide site

9    observation reports and review progress on

10   reports and authorize progress payments on

11   behalf of the bank.

12       Q.    And where was that construction

13   work geographically?

14       A.    Geographic --

15       Q.    Was it in the five boroughs?

16       A.    Yes, sir.

17       Q.    Okay.  Did that include Brooklyn?

18       A.    Yes, sir.

19       Q.    And in your role as an appraiser,

20   do you occasionally retain firms to assist

21   with engineering and construction

22   services?

23       A.    I do, sir.

24       Q.    And how about construction cost

25   estimators?

Page 25

1                    TENER

2       A.   Yes, sir.

3       Q.   How regularly do you retain

4   construction cost estimators?

5       A.   I've only retained one and

6   actually the contracts I've been assigned

7   on a current assignment, most of the time

8   counsel will retain those experts and I

9   will work with them so I believe my prior

10  statement is probably inaccurate.  I've

11  never retained them.  We have proposals

12  out for one presently but I have worked

13  with those types of experts where counsel

14  has retained them.

15      Q.   So how regularly do you work with

16  construction cost estimators?

17      A.   Whenever I am involved with land

18  residual techniques and it's a complex

19  assignment that requires the testimony of

20  an expert in those fields, that is when we

21  will consider whether it is worth the

22  economics to have that additional

23  expertise involved.

24      Q.   So you said when it's a complex

25  assignment.  What constitutes a complex

Page 26

                    TENER

1    assignment?

2         A.    Something where the construction

3    details or multi-story, multiple types of

4    uses, different types of below grade

5    design that are complex as part of the

6    assignment, oftentimes these involve

7    luxury mixed use developments of high-end

8    residential.  I've worked on ones where we

9    weren't sure with what the design would be

10   and complex I guess is a -- can be vague

11   in this sense but it is along the lines of

12   anything that requires what I would

13   consider multi-story design and multiple

14   use, multipurpose uses.

15        Q.    Have you ever worked with

16   construction cost estimators in simpler

17   matters that don't involve multi-story

18   design?

19        A.    None that I recall.

20        Q.    You mentioned earlier that

21   Theresa Nygard from your firm was

22   contacted about this matter first; is that

23   right?

24        A.    That's my recollection that she

1                    TENER

2    was on the initial e-mails that referred

3    Mr. Rottenberg.

4              MR. WALSH:  If we could please

5         pull up P19.

6              VERITEXT CONCIERGE:  Copying over

7         P19 in our exhibit folder and it

8         should be in there now.

9    BY MR. WALSH:

10        Q.    If you could please pull up

11   what's been previously marked as P19.

12        A.    Yes, sir.

13        Q.    So this is an e-mail that you

14   sent to Sam Rottenberg with a copy to

15   Shaun Kest and Theresa Nygard, both of

16   whom work at your firm, on June 7, 2018.

17   Do you see it?

18        A.    I do, sir.

19        Q.    And in the second paragraph, you

20   wrote, "Although the site is encumbered by

21   a ground lease dated November 30, 2017,

22   you have informed Theresa that the ground

23   lease is between related entities and you

24   would like an appraisal of the fee simple

25   interest in the site without consideration

```
                                        Page 28
 1                    TENER
 2    of the ground lease."
 3             Do you see that?
 4        A.   I do, sir.
 5        Q.   What did Theresa specifically
 6    tell you about that conversation?
 7        A.   I think that's the extent of it,
 8    sir.
 9        Q.   So you don't recall her giving
10    you any other information about the
11    November 30, 2017 ground lease?
12        A.   I don't even recall the
13    conversation other than this reference in
14    the e-mail.
15        Q.   And Theresa told you that she had
16    been told that the lease with McDonald's
17    would be expiring in the near term; is
18    that right?
19        A.   I guess so.  That's what I stated
20    so it must have been told to me.
21        Q.   So going back to the November 30,
22    2017 ground lease, you use the phrase
23    related parties.  How do you define the
24    phrase related parties in the context of
25    the ground lease?
```

                    TENER

1

2       A.    I don't think the context of a

3   ground lease matters.  It's related

4   parties is someone that shares ownership

5   interest in some fashion.

6       Q.    And are there any sort of minimum

7   characteristics that need to be present in

8   order for you to consider something

9   between related parties?

10      A.    Can you explain the question?

11      Q.    I guess you said overlapping --

12  you said the shares of ownership interest.

13  Is there sort of a threshold percentage or

14  is there any percentage of shared

15  ownership?

16      A.    I have never considered the fine

17  tuning of that point.  I think any

18  ownership interest would be something that

19  you would consider a related entity.

20      Q.    Now, could you imagine a spectrum

21  of relationships where there may be some

22  overlapping interest but it wouldn't

23  really impact the valuation, whereas if

24  there was a hundred percent overlap in

25  another relationship, that may impact a

Page 30

1                    TENER

2      valuation?

3              MR. KOH:  Objection.  Go ahead

4          and answer.

5              THE WITNESS:  I think that there

6          could be partial ownership related

7          entities that would not impact it but

8          you need to -- you would want to

9          investigate it.

10     BY MR. WALSH:

11         Q.   Moving down to the third

12     paragraph of P19, it looks like you

13     understood the assignment to include three

14     separate parts.  First, an appraisal of

15     the site based on current zoning; right?

16         A.   Yes.

17         Q.   Second, an appraisal under the

18     assumption that there would be a change in

19     zoning consistent with what was then being

20     considered as part of the pending M-Crown

21     rezoning district; right?

22         A.   Can you repeat the question?

23         Q.   Second, an appraisal under the

24     assumption that there would be a change in

25     zoning consistent with the pending M-Crown

```
                              TENER
 1
 2    rezoning district; is that right?
 3         A.   I don't know if I knew the
 4    M-Crown at that point in time but that
 5    there was a pending zoning change.  We
 6    investigated that during the process but I
 7    don't know if it was known at that time.
 8         Q.   Okay.  And then third, you
 9    understood them to be asking for a
10    valuation of the appropriate market ground
11    rent for the property and this is a quote,
12    "based on typical ground lease provisions
13    in New York City"; is that right?
14         A.   It says that but I don't recall
15    us doing that in the first assignment.
16         Q.   Okay.
17         A.   I would have to look at -- my
18    memory is it doesn't remember that right
19    now.
20              MR. WALSH:  And if we could mark
21         VA 017901.
22              VERITEXT CONCIERGE:  Did you say
23         017901?
24              MR. WALSH:  Yes.
25              VERITEXT CONCIERGE:  I don't have
```

```
                                                    Page 32
 1                        TENER
 2           that exhibit in here.
 3                MR. WALSH:  Okay, let me move it
 4           over.  Give me one second.  I'm going
 5           to have to come back to that.
 6      BY MR. WALSH:
 7           Q.   Did Sam Rottenberg confirm that
 8      your understanding was correct?
 9           A.   Which understanding, sir?
10           Q.   Your understanding as you
11      described it to him in your June 7th
12      e-mail that we just looked.
13           A.   I don't recall but the engagement
14      letter for the assignment specified what
15      the understanding was.
16           Q.   Okay.  And before you prepared
17      that engagement letter, do you recall if
18      you spoke with Sam?
19           A.   I don't recall but -- I just
20      don't recall whether it was a telephone
21      conversation or not.
22           Q.   Okay.  And when you first spoke
23      with Sam, do you recall what specifically
24      you discussed?
25           A.   No, sir.
```

```
                                          Page 33
 1                    TENER
 2       Q.    Do you remember if anyone was on
 3   the phone with you and Sam when you first
 4   spoke?
 5       A.    I don't recall, sir.
 6            MR. WALSH:  Okay.  If we could
 7       please pull up P20.  This is the June
 8       27, 2018 engagement letter.
 9            VERITEXT CONCIERGE:  That's being
10       copied over to the marked exhibit
11       folder and it should be in there now.
12   BY MR. WALSH:
13       Q.    And if you flip to the signature
14   page, it looks like you and Tom Li signed
15   this.  Who is Tom Li?
16       A.    He works with Mr. Rottenberg.  I
17   don't know what his position is.
18       Q.    And did you work with him closely
19   throughout the work you've been doing with
20   Vanderbilt?
21       A.    He's been on a lot of the e-mails
22   and a lot of the correspondence would have
23   been between himself and Shaun Kest, the
24   MAI that worked on the appraisals with
25   him.
```

Page 34

1                          **TENER**

2        Q.    Between Tom Li and Sam

3    Rottenberg, who did you interface with the

4    most?

5        A.    I think early on it was Tom Li.

6    I think since this has moved to the

7    current state of affairs, it was more

8    Mr. Rottenberg.

9        Q.    So in first paragraph of that

10   June 27, 2018 letter, you once again say

11   that it's your "understanding that the

12   lease with McDonald's is expiring in the

13   near term.  Furthermore, although the

14   subject property is encumbered by a

15   long-term ground lease dated November 30,

16   2017, the ground lease is reportedly

17   between related entities."

18             Do you see that?

19       A.    I do, sir.

20       Q.    What did you do to confirm that

21   these representations were accurate?

22       A.    I do not recall what was done.

23   That would have been done by Shaun Kest.

24       Q.    But you ultimately signed all of

25   the appraisal reports that were prepared

Page 35

1                    **TENER**

2    for Vanderbilt; right?

3        A.   I did.

4        Q.   And you're responsible for

5    completely the contents of those

6    appraisals; right?

7        A.   I am, sir, but I don't do all the

8    work, I review them.

9        Q.   So if you flip to the second page

10   of this engagement letter, about

11   three-quarters of the way down, you ask

12   for copies of any leases that encumber the

13   properties.

14       A.   Yes, sir.

15       Q.   Did Vanderbilt provide KTR with

16   either the McDonald's ground lease or the

17   Vanderbilt ground lease in 2018?

18       A.   I don't know.  If they did, it

19   would be in the files we shared with you.

20       Q.   Okay.  And so if they are not in

21   the files, can I assume that they were not

22   provided?

23       A.   I believe so, I would have to ask

24   Shaun Kest but I would think that we've

25   given you everything we had.  So I think

```
 1                    TENER
 2   that would be a reasonable assumption.
 3       Q.   And you just can't recall whether
 4   that information was provided or not?
 5       A.   No, sir.
 6       Q.   Would there be any sort of
 7   notation somewhere in your file that the
 8   information was provided or anything like
 9   that?
10       A.   It should be in the work file or
11   it should state in the appraisal if we
12   reviewed the lease that we considered.
13       Q.   Okay.  And if they are not in the
14   file, you would have just taken
15   Vanderbilt's representations on these
16   points as true?
17       A.   It's possible that we would have.
18   Normally we will include assumptions and I
19   know some of the appraisals, these earlier
20   appraisals had extraordinary assumptions.
21       Q.   So although the June 7th e-mail
22   that we looked at earlier talked about
23   some work on determining the terms of a
24   potential ground lease, this June 27, 2018
25   letter does not reference any work on
```

1                    TENER

2    terms for a ground lease.  Do you recall

3    why that was?

4              MR. KOH:  Objection.  Go ahead.

5              THE WITNESS:  No, I don't recall.

6    BY MR. WALSH:

7       Q.   And this letter says that you're

8    going to estimate the market value of the

9    fee simple interest in three things, the

10   M1-1 zoned portion of the site, this is on

11   page 1, the R6B portion of the site and

12   three, the entire site under the

13   assumption that the entire site is rezoned

14   based on a current proposals represented

15   in the M-Crown study.  Do you see that?

16      A.   I do, sir.

17      Q.   What is M1-1 zoning?

18      A.   It's a low-density industrial

19   zoning, manufacture.

20      Q.   What types of things can be built

21   on it?

22      A.   Retail, industrial, you would

23   have to go through the uses in zoning that

24   are specified.

25      Q.   And how about R6B zoning?

Page 38

1                           TENER
2        A.    It's primarily residential.  Both
3    of which I believe have in addition to
4    both the M1 and the R6B in addition to the
5    uses that I mentioned include community
6    facility uses as well.
7        Q.    And would you consider R6B a
8    low-density residential zoning?
9        A.    It's moderate.  I think I believe
10   it was -- is it 3.44?  I have to look at
11   my notes.
12       Q.    It's not necessary.
13             On the second page, second full
14   paragraph, you write, "It is understood
15   that the intended use of this report is to
16   assist Vanderbilt Atlantic Holdings LLC
17   with certain asset management related
18   decisions and analysis."
19             What does that mean?
20             MR. KOH:  Objection.  Go ahead.
21             THE WITNESS:  The client wasn't
22        specific.  They said they want it for
23        their internal use and to determine
24        investment analyses.  That's as clear
25        as they were.

```
                                              Page 39
 1                      TENER
 2    BY MR. WALSH:
 3        Q.    Okay.   So was that their phrase
 4    or was it your phrase?
 5        A.    It was a combination of how they
 6    explained it and how I would traditionally
 7    write a purpose for which may have been
 8    described by them as needing it for their
 9    own analysis of that property.   It might
10    have been a slightly different wording but
11    that would be the generic term that we
12    would use for that.
13        Q.    And the next paragraph down, last
14    sentence, it says, "The report will be
15    prepared subject to the attached basic
16    assumptions and limiting conditions."   And
17    then the basic assumptions and limiting
18    conditions, the third bullet down is "The
19    property is appraised free and clear of
20    any or all liens or encumbrances unless
21    otherwise stated."
22              Do you see that?
23        A.    Yes, sir.
24        Q.    So what does that mean?
25        A.    That is a standard basic
```

```
                                     Page 40

1                      TENER

2    assumption that we don't appraise a

3    property subject to mortgage financing or

4    any other encumbrances unless we identify

5    them within the report.  So the assumption

6    is that there are none unless they are

7    identified in the report.

8         Q.   And so how were you instructed to

9    treat the McDonald's ground lease and the

10   November 30, 2017 Vanderbilt ground lease?

11        A.   In the initial assignment, this

12   is -- this particular assignment, we were

13   under the -- I think we were informed that

14   the lease was either expiring or expired

15   and that we weren't considering that

16   lease.  So we were appraising the fee

17   simple interest which would have been

18   unencumbered by any leases.

19        Q.   Okay.  If you could please pull

20   up P21.  That should be available

21   momentarily.

22             VERITEXT CONCIERGE:  Exhibit

23        Share is being a little slow.  It's

24        loading in there now.  Okay, P21 is

25        now loaded in marked exhibit folder.
```

1                         TENER

2              THE WITNESS:  Sorry, I lost my

3         connection.  Here we go.

4              MR. WALSH:  If you could turn to

5         the second page.

6              MR. KOH:  I still don't have it

7         loaded yet.  There we go, thank you.

8              THE WITNESS:  I have it, sir.

9              MR. KOH:  So do I.

10             VERITEXT CONCIERGE:  Mr. Walsh,

11        we can't hear you.

12             MR. WALSH:  Sorry about that.  I

13        may have muted my headset.  Can you

14        hear me now?

15             THE WITNESS:  Yes.

16   BY MR. WALSH:

17        Q.   So if you could look at the

18   August 9, 2018 e-mail at 11:34 from Tom

19   Tener to Sam Rottenberg, it's on the

20   second page there and you say, "Sam, Shaun

21   relayed to me the focus of his

22   conversation with you about this

23   assignment.  He explained that you would

24   like us to include an analysis of the

25   likely terms of a ground lease (under the

```
                                                      Page 42
 1                         TENER
 2      existing zoning)."
 3               Did Sam or anyone else at
 4      Vanderbilt explain to you why they now
 5      wanted this work done even though it
 6      wasn't included in the original retention
 7      letter?
 8          A.    Not that I recall.
 9          Q.    By the time of this e-mail,
10      August 9, 2018, had KTR shared its
11      impression of the fee values of the
12      property with Vanderbilt even in just
13      preliminary form?
14          A.    I don't recall.
15          Q.    And if you look to the first page
16      of that e-mail, it looks like Vanderbilt
17      told you to assume it was a 99-year ground
18      lease.  Do you see that?
19          A.    It says it should be a 99-year
20      lease.
21          Q.    Okay.  So they told you to assume
22      it was a 99-year ground lease?
23          A.    Looks like the question before
24      that suggests that Mr. Rottenberg had sent
25      a broker opinion showing a 25-year lease
```

```
                                              Page 43
 1                        TENER
 2     without discounting it, so there was
 3     obviously some confusion and we were
 4     asking him to clarify.
 5          Q.    And why did you need
 6     clarification about the term?
 7          A.    Just looking for facts of what
 8     the -- what we would be valuing.
 9          Q.    So would the valuation, could
10     that depend on the term?
11          A.    Yes, sir.
12          Q.    And how could the term impact
13     value?
14          A.    The -- anything over a 49-year
15     lease is treated as a taxable event in
16     terms of capital gains.  It is roughly
17     equivalent to a sale of the property.  I
18     can't speak to the specifics of how it
19     would impact the value but there are
20     certainly factors that need to be
21     considered in terms of control of the
22     asset.
23              MR. WALSH:  Okay.  Let's see if
24          we can pull up.  Just bear with me one
25          second.
```

1                          TENER

2              I'm sorry, can we just take a

3        five-minute break?  I'm having some

4        problems here with the documents.  I

5        just need to get it squared away.

6              MR. KOH:  Okay, should we come

7        back at 11 o'clock?

8              MR. WALSH:  Why don't we say 11

9        o'clock.  I'll just try to get this

10       squared away.  It's just my documents

11       are giving me a little bit of a

12       problem right now.

13             MR. KOH:  Okay.

14             MR. WALSH:  Thanks so much.

15             THE VIDEOGRAPHER:  The time is

16       10:51.  We're going off the record.

17             (Recess taken from 10:51 a.m. to

18       11:00 a.m.)

19             THE VIDEOGRAPHER:  The time is

20       approximately 11 a.m.  We're back on

21       the record.  This is the beginning of

22       media 2.

23             MR. WALSH:  If we could mark what

24       bears the Bates stamp VA 023239.

25             VERITEXT CONCIERGE:  This will be

Page 45

1                    **TENER**

2          introduced as P67 and it should be in

3          there now.

4               (Exhibit P67, document Bates

5          labeled VA 023239, marked for

6          identification.)

7     BY MR. WALSH:

8          Q.   Mr. Tener, if you could please

9     pull up P67, it's an e-mail chain between

10    Vanderbilt and KTR from August 2018.  And

11    I'd like to direct you to the second page

12    of that e-mail, and again number 240, it

13    looks like an August 9, 2018 e-mail from

14    Tom Li to you and Shaun Kest and it's a

15    discussion of comps.

16              Do you see that?

17         A.   Yes, sir.

18         Q.   So he sent you some comps that

19    they had found and then I guess Shaun

20    subsequently provided some of the comps

21    that KTR was looking at.  In that August

22    9, 2018 e-mail, Tom Li wrote, "The two

23    M1-1 sites are much higher $/zsf than the

24    2 FAR sites."

25              What did you understand that to

1                    TENER

2    mean?

3              MR. KOH:   Objection.   Go ahead.

4              THE WITNESS:   That M1-1 sites

5         with a 1 FAR trade at a higher price

6         per square foot buildable area than do

7         the 2 FAR sites.

8    BY MR. WALSH:

9         Q.   And what do you mean the 2 FAR

10   sites?

11        A.   An M1-2 site and an M2-1 I

12   believe are 2 FAR sites.   In other words,

13   it could be built twice the floor area of

14   the site, the floor area ratio.   M1 sites

15   which can only be built to a single

16   multiple of the lot area when analyzed on

17   price per square foot of zoning floor area

18   tend to trade at higher prices per square

19   foot than do those with multiple FARs for

20   M zone sites.

21        Q.   Got it.   And then in the next

22   sentence you wrote, "And for all the

23   M2-1/M1-2 sites around Gowanus, almost

24   none will be developed at 2.0 commercial."

25              What do you understand that to

```
                                              Page 47

 1                    TENER

 2   mean?

 3           MR. KOH:  Objection.  Go ahead.

 4           THE WITNESS:  It means that Tom

 5       Li was under the impression that they

 6       were not going to be built to anything

 7       more than a 1 FAR or wouldn't be built

 8       to fully 2 FAR, that they were being

 9       purchased for a development of

10       somewhat less than that.  I'm not sure

11       what his rationale was for that, if he

12       looked up filed building plans or how

13       Shaun followed up or if he didn't use

14       them.

15   BY MR. WALSH:

16       Q.   And could he have been indicating

17   that they were going to be developed at a

18   higher density?

19       A.   No, sir.

20       Q.   Why is that?

21       A.   The only way, I think he was

22   trying to say is they would not be

23   developed to the maximum which would be 2.

24   The only way it would go beyond 2 is if

25   they were zoning development agreements
```

Page 48

1                        TENER
2     that acquired development sites or excess
3     development rights from potential sites
4     around them.  I don't believe that was the
5     context of his communication.
6          Q.   Are you aware of a rezoning
7     proposal that was happening around
8     Gowanus?
9               MR. KOH:  Objection.  Go ahead.
10              THE WITNESS:  As I sit here, I'm
11         not sure which zoning analysis or
12         zoning change you're referring to.
13    BY MR. WALSH:
14         Q.   Okay.  So I guess just a general
15    question, if you come across information
16    that a property is being bought with the
17    goal of redevelopment at a higher zoning,
18    how would that -- then the property you're
19    valuing, how would that information factor
20    into your valuation analysis?
21              MR. KOH:  Objection.  Go ahead.
22              THE WITNESS:  I'm going to need
23         that clarified.
24    BY MR. WALSH:
25         Q.   So for example, if someone is

```
                                    Page 49

 1                   TENER
 2   buying an M1-1 site but intends to file a
 3   private rezoning application and build
 4   high density residential on it instead of
 5   M1-1, would that be information that's
 6   relevant to whether or not you use that
 7   specific property as a comp in your
 8   analysis?
 9       A.   The potential for it being
10   rezoned or go through the process to get a
11   variance should be considered and if the
12   end use is inconsistent with your end use,
13   you would have to determine whether those
14   factors influence the price that was paid.
15       Q.   Okay.  And you can't remember
16   what information Vanderbilt gave to you
17   about the McDonald's lease, is that right,
18   other than that it was expiring in the
19   near term?
20       A.   I don't recall information they
21   shared with us.
22       Q.   If we could please pull up P22,
23   this is your August 30, 2018 appraisal
24   report.
25               VERITEXT CONCIERGE:  P22 has been
```

```
                                              Page 50
 1              TENER
 2      moved into the marked exhibit folder.
 3   BY MR. WALSH:
 4      Q.    If you can just tell me when you
 5   have that opened up.
 6      A.    It's open, sir.
 7      Q.    This is the appraisal report KTR
 8   issued to Vanderbilt on August 30, 2018;
 9   right?
10      A.    Yes, sir.
11      Q.    And it's addressed to Sam
12   Rottenberg at Vanderbilt?
13      A.    It is.
14      Q.    And both you and Shaun Kest
15   signed this report; right?
16      A.    Yes, sir.
17      Q.    On page 2 it says you valued the
18   fee simple interest of the property at
19   current zoning at 18.3 million; right?
20      A.    Yes, sir.
21      Q.    And you valued the fee simple
22   interest of the property under the
23   hypothetical condition that the entire
24   site is rezoned in accordance with the
25   M-Crown study at 38.8 million; right?
```

```
                                          Page 51

 1                  TENER

 2        A.    Yes, sir.

 3        Q.    And both valuations were

 4   determined assuming that the property was

 5   free and clear of the encumbrance of any

 6   lease including the McDonald's lease;

 7   right?

 8        A.    Yes, that's the fee simple, sir.

 9        Q.    Why was there such a large

10   difference in the valuations under the two

11   zoning scenarios?

12        A.    That would be detailed within the

13   report but there is a significantly higher

14   density and different use under the

15   proposed M-Crown for the subject site.

16        Q.    So in other words, a lot more

17   could be built on the property under the

18   M-Crown proposal than the current zoning

19   allowed?

20        A.    It would be a higher density more

21   buildable area and less restrictions on

22   the uses.

23        Q.    And that impacts the value;

24   right, makes it more valuable?

25        A.    Yes, sir.
```

Page 52

1                        TENER
2       Q.    Okay.   If you could flip to the
3    page ending in 09.   Paragraph 1 under
4    Extraordinary Assumptions.   Second
5    sentence, or third sentence, KTR --
6       A.    I'm not sure where you are, sir.
7    Are you on Extraordinary Assumptions page
8    B?
9       Q.    Correct, the first numbered
10   bullet, it says, "The subject property is
11   improved with a McDonald's restaurant."
12      A.    Yes, sir.
13      Q.    Third sentence, it says, "KTR
14   requested a copy of the McDonald's lease
15   but was not provided with a copy."
16           Does this refresh your
17   recollection at all about why Vanderbilt
18   didn't give you a copy of the McDonald's
19   lease at this time?
20      A.    I'm not sure why they didn't give
21   me a copy.   You would have to ask
22   Vanderbilt but they did not.   We uncovered
23   a memorandum of lease.   I believe we
24   shared that with them.   That memorandum
25   said that they had exercised their option

Page 53

```
 1                          TENER
 2     which was inconsistent I believe with what
 3     we had been communicated by the client
 4     prior.  In order to be clear and not
 5     communicate a misleading result, we
 6     included this extraordinary assumption.
 7          Q.   And do you recall having any
 8     conversations with Vanderbilt about that
 9     conflicting information?
10          A.   I don't recall whether it was
11     myself or Shaun but we definitely -- there
12     was definitely some communication and I
13     don't know whether it was telephone or
14     e-mail.
15          Q.   And did they give any explanation
16     for the conflicting information?
17          A.   I don't believe so at that time.
18          Q.   And how about at a later time?
19          A.   Later when we were engaged for
20     the -- by Wachtel Missry or when we
21     interviewed with Wachtel Missry to be
22     engaged, the purpose of the next
23     assignment which you're involved in now
24     was explained to KTR.
25          Q.   But they never explained why they
```

```
                                                          Page 54
  1                        TENER
  2    gave you incorrect information in 2018?
  3            MR. KOH:  Objection.  Go ahead.
  4            THE WITNESS:  As I said, they
  5         never explained why this was withheld
  6         or why they -- why the information
  7         about the renewal -- the exercise
  8         renewal was withheld from us.
  9    BY MR. WALSH:
 10       Q.   Okay.  The next paragraph down,
 11    it talks about the Vanderbilt lease dated
 12    November 30, 2017.  About halfway down you
 13    wrote, "According to the client, this
 14    ground lease is between related parties."
 15            Did you believe that to be
 16    accurate at the time?
 17       A.   The only information I had was
 18    what was told to us and we had no way of
 19    confirming that it was not accurate or was
 20    accurate.
 21       Q.   And you use the land sales
 22    comparison approach to value the fee
 23    simple interest of the property under both
 24    scenarios; right?
 25       A.   Sales comparison approach.
```

Page 55

1                    TENER

2        Q.    Sales comparison approach.    And

3    why did you use that approach?

4        A.    That was appropriate to the scope

5    of work.

6        Q.    Which was to value the fee simple

7    interests of the land; correct?

8        A.    It was the fee simple interest

9    in -- let me make sure, in the property, I

10   believe.  Subject site.  I'm not quite

11   sure whether we took off demolition or

12   not.  I would have to check but that would

13   be the only difference, whether it was the

14   value of the property or the value of the

15   land, underlying land.

16       Q.    Do you recall if Vanderbilt asked

17   you specifically to use that approach?

18       A.    No, I don't believe they did.  I

19   believe we just determined it based on the

20   scope of work.

21       Q.    Okay.  If you could turn to the

22   page ending in 082, it is page 69 of that

23   report.  It's called Ground Rent Analysis.

24       A.    You said page 82 of the pdf?

25       Q.    It's -- the Bates number on the

Page 56

1                    TENER

2    bottom is 082 but it's page 69 of the

3    report.

4         A.    It's not coming up.  It's

5    refreshing.  I'm sorry, nothing is coming

6    up.

7              MR. KOH:  It's taking awhile to

8         load on my end, too.

9    BY MR. WALSH:

10        Q.    Actually, you've got a physical

11   copy in that binder, the binders that I

12   sent.  It will be in the first binder.

13   It's ending in 082.  I believe they are

14   double-sided to save paper.

15        A.    It came up.

16        Q.    Okay.

17        A.    So page?

18        Q.    So it's page 69 and page 70.  It

19   looks like a two-page analysis for ground

20   rent.

21              Do you see that?

22        A.    At page 70 where it says M-Crown

23   rezoning.  Tell me again what.

24        Q.    It's page 69 and it's the Bates

25   stamp ending in 082.  It may actually just

1                    TENER

2    be simpler to look at the hard copy.

3         A.   I'm getting there.  It's just I

4    had the wrong 69.  The ground rent

5    analysis, I have it, sir.

6         Q.   What was KTR attempting to do in

7    the analysis that's reflected on these two

8    pages?

9         A.   Do you mind if I read it?

10        Q.   Of course, no, go ahead.

11        A.   (Witness perusing document.)

12             Looks like we were trying to

13   provide them with an understanding of what

14   a ground rent multiplier would be based on

15   these two land determinations, the land

16   value determinations back in 2018.

17        Q.   And that was with a hypothetical

18   99-year term; right?

19        A.   I don't recall what term.

20        Q.   If you look at the top of page

21   70, the second page.

22        A.   Typically they are from 50 to 99

23   based on discussion -- a 99-year term is

24   anticipated, yes.

25        Q.   And how did KTR perform its

Page 58

```
 1              TENER
 2   valuation of the potential ground rent
 3   because at the bottom of the second page
 4   of this analysis you arrive at a market
 5   rental value of the subject land of
 6   $1,098,000 per year.
 7        A.   Based on what I'm reading, we
 8   concluded that a rent multiplier based on
 9   this, it concluded 18 million three would
10   be 6 percent at the initial ground rent
11   with steps based on flat rent for 20 to 25
12   years and rent resets at a percentage of
13   land value thereafter.
14        Q.   Now, why didn't KTR value the
15   property using comparable ground leases
16   instead?
17        A.   That scenario?  I don't know why
18   we did not at that point in time but I
19   believe the -- this seemed to be the
20   easiest way to get a significant amount of
21   data where we already had the value of the
22   land determined.
23        Q.   Well, wouldn't ground leases,
24   comparable ground leases provide a more
25   accurate valuation?
```

1                     TENER

2      A.    If you had current ground leases

3   that reflected similar uses, that would be

4   certainly a viable approach.  I don't

5   believe we had current relevant ground

6   leases but I don't want to speculate.

7      Q.    Well, at the very top of page 69,

8   second sentence, it says, "For the

9   purposes of this analysis KTR reviewed

10  several ground leases and ground rent

11  resets throughout Manhattan and the outer

12  boroughs."

13           So it looks like you actually did

14  have ground leases though; right?

15     A.    But they were not current.  They

16  were over many periods of time with

17  different ground rent resets.  We provided

18  those, too.

19     Q.    And if those leases weren't

20  current, how could you then use that data

21  in 2018 to convert the land value to an

22  accurate ground rent value?

23     A.    Because of the inclusion of these

24  fair market rent resets within them that

25  is based on rent multipliers, what we were

```
 1                    TENER
 2   looking for was a market indication of
 3   what rent multipliers should be used for
 4   different property types.
 5       Q.   And that doesn't change over
 6   time?
 7       A.   It -- I believe it can but if you
 8   look at the data, it doesn't seem to show
 9   significant changes.
10       Q.   Are you familiar with the book
11   The Appraisal of Real Estate that the
12   Appraisal Institute publishes?
13       A.   Yes.
14            MR. WALSH:  If we can pull up
15       what I've called ARE 1 and mark that
16       as an exhibit.
17            (Exhibit P68, document entitled
18       The Appraisal of Real Estate, marked
19       for identification.)
20            VERITEXT CONCIERGE:  This will be
21       marked as Exhibit P68.
22   BY MR. WALSH:
23       Q.   So Mr. Tener, this is an excerpt
24   from the 14th edition of The Appraisal of
25   Real Estate book published by the
```

Page 61

1                          TENER
2       Appraisal Institute.  You said you're
3       familiar with it?
4            A.    I am.  I have the 15th edition
5       but I'm familiar with it.
6            Q.    And I believe the 14th edition
7       was the most current version as of the
8       time of this appraisal; right?
9            A.    I don't know.  I'd have to look
10      at when 15 came out.
11           Q.    And do you consider this an
12      authoritative text for appraisers?
13           A.    It certainly referenced and
14      influences.  I'm not sure I would say
15      authoritative.
16           Q.    But the Appraisal Institute, they
17      are the ones that issue the MAI
18      designation; right?
19           A.    They are, sir.
20           Q.    So you would certainly take what
21      they say seriously; right?
22           A.    Yes, sir.
23           Q.    So if you could at page 466,
24      third page of the pdf, first full
25      paragraph, it says, "When a market rent

Page 62

1                    TENER
2    estimate for the subject property is
3    required, the appraiser gathers, compares
4    and adjusts comparable rent data."
5          Do you see that?
6       A.   Yes.
7       Q.   So what did you do in August 2018
8    to try to gather, compare and adjust
9    comparable rent data?
10      A.   What I did is I identified the
11   two factors that set rent for a ground
12   lease, the first of which was the land
13   value, gathered, adjusted and concluded to
14   the land value.  I analyzed the rent
15   multipliers for different types of assets
16   depending on what they were intended to be
17   developed to.  I considered them, analyzed
18   them and concluded to an appropriate rent
19   multiplier which is a component of the
20   ground rent under this approach to
21   determine market value.
22      Q.   So I understand what you did but
23   I guess my question was what did you do in
24   August 2018 to try to gather, compare and
25   adjust comparable rent data?

```
                                         Page 63
 1                    TENER
 2       A.    I just explained it to you.   I
 3    gathered the component of the rent data --
 4    the component of the rent data that I
 5    analyzed that required analysis was
 6    twofold.   One was the land value, two was
 7    the rent multiplier, both of which were
 8    gathered, analyzed, adjusted and
 9    concluded.   They are components of the
10    rent determination as such.
11       Q.    But you didn't gather or compare
12    and adjust comparable ground leases;
13    right?
14       A.    No.
15            MR. KOH:   Objection.
16            THE WITNESS:   No, I did not.   I
17       analyzed components of it.   It's not
18       a -- it is not a -- there's not only
19       one method of performing this
20       analysis.
21    BY MR. WALSH:
22       Q.    Okay.   So the next sentence in
23    that same page we were just looking at
24    says the parties to each lease should be
25    identified to ensure that the party held
```

Page 64

1                         TENER
2    responsible for payment is actually a
3    party to the lease.  It then goes on to
4    talk about leases.
5              So your testimony is that the
6    Appraisal Institute is not contemplating
7    that an appraiser would gather, compare
8    and adjust comparable leases?
9              MR. KOH:  Objection.  Go ahead.
10             THE WITNESS:  That's not my
11         testimony.  This is a generic
12         paragraph about market rent largely
13         dealing with improved assets and they
14         are advising methodology that you
15         should use to determine that you don't
16         use comparables that are not arm's
17         length, that are impacted by other
18         factors.  You're taking a generic
19         paragraph and applying it to a
20         specific task.  That is not what
21         appraisers do.  They don't take
22         generic.  They work within the data
23         and the appraisal problem presented.
24    BY MR. WALSH:
25         Q.   Well, there were certainly

Page 65

TENER

1

2    comparable 99-year ground leases that you

3    could have used for this analysis; right?

4        A.   None that occurred within five

5    years of the subject matter that I was

6    aware of.

7        Q.   What did you do to look for them

8    because I've looked through your file and

9    I haven't seen any indication at all that

10   you searched for comparable ground leases.

11   What did you do?

12       A.   Well, initially I searched for

13   ground leases using CoStar that occurred

14   within a period of time, was not able to

15   find any, but since there was no result it

16   wouldn't be in my file.  I also know that

17   Shaun initially did the same thing or

18   either one of us that I can't remember.

19   But I know that we searched for ground

20   leases.  There's an option within the

21   transactions to discuss lease, that it's a

22   lease transaction rather than a sale.

23       Q.   Okay, going back to the 14th

24   edition of The Appraisal of Real Estate,

25   that same page, the second full paragraph

1                    TENER

2    about halfway down on the right-hand side,

3    it says, "Recent leases for the subject

4    property may be a good indication of

5    market rent."

6            Do you see that?

7        A.   Yes, sir.

8        Q.   But Vanderbilt did not provide

9    you a copy of its ground lease dated

10   November 30, 2017; right?

11       A.   I don't think so.  I don't recall

12   but I don't think so.  I think based on

13   what we said we didn't have it at that

14   time.

15       Q.   Do you know if you've ever seen

16   it?

17       A.   I don't recall ever seeing it.

18           MR. WALSH:  If we could pull up

19       what's been marked as P4.

20           VERITEXT CONCIERGE:  P4 has been

21       copied over.

22   BY MR. WALSH:

23       Q.   So this is the Vanderbilt lease

24   dated November 30, 2017.  And if you could

25   turn to -- it's the page 20 of the lease,

```
 1                    TENER
 2    section 3.  It's entitled Rent.  It's the
 3    page ending with the Bates stamp 128.
 4         A.   It's loading.  I have it.
 5         Q.   So this is the first time you're
 6    ever seeing this document; right?
 7         A.   I don't recall.  If I have it, it
 8    would be in my files.
 9         Q.   And if it's not in your files, it
10    means you don't have it; right?
11         A.   Yes, sir.
12         Q.   Okay.  By the way, are ground
13    leases between related parties usually
14    this long?
15              MR. KOH:  Objection.
16              THE WITNESS:  I am not aware of
17         any ground leases between related
18         parties.  I reviewed the lease.
19    BY MR. WALSH:
20         Q.   So section 3.1, this is the rent
21    provision lease.  It provides that so long
22    as McDonald's remains on the property,
23    which it has the right to do until 2039,
24    the rent Vanderbilt must pay to MMB
25    Associates is exactly equal to the rent
```

```
 1              TENER
 2    that McDonald's pays to Vanderbilt under
 3    the McDonald's lease.  In other words,
 4    it's a complete pass through of rent from
 5    McDonald's to MMB Associates.  Vanderbilt
 6    doesn't get to keep any of it.  Were you
 7    aware of that fact before today?
 8         A.   Where were you reading this?
 9         Q.   I'm summarizing what 3.1 says.
10              MR. KOH:  I'm going to object.
11         Go ahead and answer.
12    BY MR. WALSH:
13         Q.   Where it says there shall be a
14    direct pass through of the base rent and
15    all other charges.
16         A.   Yes, sir.  What is the question?
17         Q.   So were you aware of the fact,
18    that fact today that Vanderbilt actually
19    doesn't get to keep any of the rent that
20    McDonald's pays?
21         A.   No, sir.
22         Q.   And the next couple of sections
23    talk about what happens once McDonald's
24    terminates its lease.  And so in section
25    3.1.1 it talks about if McDonald's leaves
```

Page 69

```
 1                    TENER
 2    the property and the property has not been
 3    rezoned.  And if McDonald's leaves and the
 4    property has not been rezoned, it's the
 5    same zoning as when you were looking at
 6    it, McDonald's would pay to MMB Associates
 7    rent in the amount of $10 per buildable
 8    square foot per year.  Do you recall what
 9    the amount of buildable square footage was
10    at the time of your August 30, 2018
11    appraisal, was it 36,000?
12         A.    I would have to look.
13         Q.    I'll tell you at page -- it's the
14    page ending in VA 35.  It says it's
15    36,000.
16         A.    I'm sure it's in my appraisal as
17    well.
18         Q.    So at $10 per square foot, that
19    would mean that if McDonald's left, and
20    the property has not been rezoned,
21    Vanderbilt would pay MMB Associates
22    $360,000 a year in rent.  How would that
23    information have impacted your August 30,
24    2018 analysis if you had had it?
25               MR. KOH:  Objection.  Go ahead.
```

```
 1              TENER
 2         THE WITNESS:  I would have
 3    analyzed it in the rent history.  I
 4    can't tell you what my conclusion
 5    would be because I have not read this
 6    entire lease, but this sounds like a
 7    provision where the two parties were
 8    entered trying to rezone this property
 9    for redevelopment and it rewarded the
10    parties for success and sort of
11    punished them for lack of success in
12    rezoning, but it would have to be
13    analyzed.
14  BY MR. WALSH:
15      Q.   Okay.  But would you have liked
16  to know that information when were
17  conducting your analysis of ground rent?
18         MR. KOH:  Objection.
19         THE WITNESS:  In which --
20  BY MR. WALSH:
21      Q.   In August 30, 2018 report.
22      A.   I'm not sure if it mattered.
23  They were asking us to appraise the fee
24  simple interest which you are permitted to
25  do.  This is a lease encumbrance that does
```

```
 1                    TENER
 2   have economic terms.  It would be -- I
 3   would have had to analyze it within the
 4   sales history and would have had to
 5   reconcile and determine whether it was
 6   market or not.
 7        Q.   And your valuation in August 30,
 8   2018, was that the rent was almost --
 9   annual rent would be almost 1.1 million a
10   year, that was your fair market valuation;
11   right?
12        A.   I believe so.
13        Q.   And this was $360,000 a year, a
14   lot lower; right?
15        A.   Yes, sir.
16             MR. KOH:  Objection.  It's lower.
17             THE WITNESS:  Lower.  Thank you.
18   BY MR. WALSH:
19        Q.   And I guess again, can you
20   explain exactly what you would have done
21   with this information if you had had it at
22   the time?
23             MR. KOH:  Objection.
24             THE WITNESS:  I would have
25        interviewed the parties, I would have
```

```
                                        Page 72

 1                      TENER
 2          analyzed the economics, tried to
 3          understand the rationale and the
 4          reasoning for these tranched call it
 5          conditional rent provisions within it
 6          and I would have looked at how the
 7          rent, what the rent went up to.  I
 8          would have tried to understand the
 9          non-arm's length nature of that lease
10          that was reported.  There would have
11          been multiple considerations but I
12          would have to have read the entire --
13          or at least the pertinent parts of the
14          lease.
15    BY MR. WALSH:
16          Q.   But you never got that chance
17    because Vanderbilt never gave you the
18    lease; right?
19          A.   Yes, sir.
20          Q.   Even though you asked for it?
21          A.   Yes, sir.
22          Q.   Can you think of any reasons why
23    they wouldn't have provided it to you?
24               MR. KOH:  Objection.
25               THE WITNESS:  I can't speculate,
```

```
                                        Page 73

 1                     TENER

 2        sir.

 3    BY MR. WALSH:

 4        Q.   Do you wish they had provided it

 5    to you?

 6              MR. KOH:  Objection.

 7              THE WITNESS:  I have no thoughts

 8        on that subject.

 9    BY MR. WALSH:

10        Q.   You don't have any thoughts?

11        A.   At this point, I do not.  What's

12    been done is done.

13        Q.   Well, I'm asking you if you could

14    do it over again, wouldn't you have liked

15    to have had this information?

16              MR. KOH:  Objection.

17              THE WITNESS:  I asked for it, I

18        was not provided.  All I can speak to

19        is that.

20    BY MR. WALSH:

21        Q.   What I'm asking for is if you

22    would have liked to have had it at the

23    time.  You can't answer that question?

24              MR. KOH:  Same objection.  He's

25        answered it twice now.  You can answer
```

```
                                                    Page 74

  1                    TENER

  2        it again.

  3                THE WITNESS:  I asked for it.  I

  4        don't know if it would have -- if I

  5        can tell you I wish that I would have

  6        had it.  I don't know if that was the

  7        emotion.

  8   BY MR. WALSH:

  9        Q.   And you say going back to your

 10   August 2018 report, which has been marked

 11   as P22, I'm back at the ground rent

 12   analysis at page 69, about halfway down

 13   the bottom paragraph, you say, "If not for

 14   the potential appreciation in land value

 15   that would result from the enactment of

 16   the M-Crown zoning, the subject land would

 17   likely command a ground rent of 4 percent

 18   to 5 percent of the current land value."

 19                Do you see that?

 20        A.   Yeah, it's loading.

 21        Q.   So again, you have a hard copy of

 22   it.  It may just be simpler for you to

 23   look at the hard copy.  It's ending in

 24   082.

 25        A.   I've got it, sir.
```

1                    TENER

2        Q.   So at the bottom of the page

3    ending in 082 about halfway down that last

4    paragraph, it says, "If not for the

5    potential appreciation in land value that

6    would result from the enactment of the

7    M-Crown zoning, the subject land would

8    likely command a ground rent of 4 percent

9    to 5 percent of the current land value."

10            Do you see that?

11       A.   Yes, sir.

12       Q.   But because of the strong

13   likelihood of a rezoning consistent with

14   M-Crown, you determined that a rent of 6

15   percent of the fair market value would be

16   consistent with the market; right?

17       A.   Yes, sir.

18       Q.   Now, can you just briefly explain

19   why is that, because of what we discussed

20   earlier, that it allows for higher density

21   and so it had become more valuable?

22       A.   The use changes under the M-Crown

23   to be more predominantly residential,

24   sliding the percentage rent multiplier

25   down.  Under the first one it is largely

Page 76

1                           TENER
2       M1 which can be commercial, it can be
3       facility, with the RA which can be
4       residential and community facility.  That
5       mixed use is more slid towards the
6       commercial retail.  It is the higher or
7       predominant use in that development which
8       would have been a higher percentage of
9       land value based on my comparable
10      analysis.
11           Q.   At the top of the next page, we
12      looked at this before, you said that
13      ground leases are typically long term
14      ranging between 50 and 99 years.  The
15      leases that you looked at for purposes of
16      this analysis, were they all between 50
17      and 99 years?
18           A.   I believe so.
19           Q.   Would you have used a different
20      set of ground leases if you had been asked
21      to determine an appropriate rent for a
22      shorter period of time like 20 years?
23           A.   Yeah.  I'm not aware of any
24      comparables or any transactions of ground
25      leases of 20 years or even materially less

1                    TENER

2    than 49 years, so I don't believe there

3    would be a -- based on our research, I

4    don't believe there would be a pool of

5    comparables to analyze.

6        Q.   So you issued your report in

7    August 2018 and who did you speak with

8    about the report after you issued it?

9        A.   I don't recall.

10       Q.   You don't recall if you spoke

11   with Sam Rottenberg or Tom Li?

12       A.   I remember having conversations

13   with them.  Again, I don't recall.

14       Q.   Do you recall what the reaction

15   was to your estimate of value?

16       A.   No, sir.

17            MR. WALSH:  If we could mark --

18       or not mark but pull up what's been

19       previously marked as P52.

20            VERITEXT CONCIERGE:  P52 has been

21       copied over.

22   BY MR. WALSH:

23       Q.   So this is --

24       A.   I don't have it.

25       Q.   Okay.

```
 1                      TENER
 2        A.   I have it now.
 3        Q.   So this is an e-mail exchange
 4   between Shaun Kest and Tom Li in October
 5   of 2018 so a little less than two months
 6   after you issued the report.  Were you
 7   aware that Tom had reached out to Shaun in
 8   October of 2018?
 9        A.   Yes, sir.
10        Q.   And do you know why he reached
11   out and what they discussed?
12        A.   I think that they gave him this
13   additional comparables to consider.
14        Q.   And just to be clear, the
15   comparables that are behind this are from
16   August 2018, they were sent earlier.
17             MR. KOH:  Objection.
18   BY MR. WALSH:
19        Q.   I don't know if that changes your
20   recollection.
21        A.   You know, my recollection is not
22   changing but what is the question?
23        Q.   I'm trying to recall if you knew
24   why Tom and Shaun were speaking in October
25   of 2018 about two months after you issued
```

```
                                          Page 79
 1                       TENER
 2    your report.
 3         A.   I believe that they wanted us to
 4    consider other comparables.  That was the
 5    gist of the communication.
 6              MR. WALSH:  Okay, if we could
 7         mark VA 000313.
 8              (Exhibit P69, document Bates
 9         labeled VA 000313, marked for
10         identification.)
11              VERITEXT CONCIERGE:  This will be
12         introduced as Exhibit P69.
13         Introducing now.
14    BY MR. WALSH:
15         Q.   So you can look at the hard copy.
16    This document spans from 313 to 357.  It's
17    an e-mail from Tom Li to Shaun Kest with a
18    copy to Sam Rottenberg, January 9, 2019,
19    and Tom Li wrote, "Shaun, please see
20    attached McDonald's lease."
21              So do you recall why Tom sent KTR
22    the McDonald's lease in January of 2019?
23              MR. KOH:  Objection.
24              THE WITNESS:  I don't recall why.
25              MR. WALSH:  If we can pull up
```

Page 80

1                    TENER

2         what's been previously marked as P55.

3              VERITEXT CONCIERGE:  P55 has been

4         copied over.

5    BY MR. WALSH:

6         Q.   So this is an e-mail chain.  On

7    the first page there are e-mails -- an

8    e-mail dated January 9, 2019 from Shaun

9    Kest to Sam Rottenberg with a copy to you

10   and to Tom Li.  Do you see that?

11        A.   I do, sir.

12        Q.   So this is a few hours after Tom

13   Li sent over the McDonald's lease and

14   Shaun wrote, "Based on our conversation

15   this morning, we can change the addressee

16   to Tom Li.  We can update the report to

17   reflect the market value of the fee simple

18   interest in the subject property, as if

19   vacant, unencumbered and available for

20   development to its highest and best use.

21   Under this scope, we would not need the

22   extraordinary assumption.  We would have

23   to state that the property is leased to

24   McDonald's and that this encumbrance is

25   not considered in the appraisal."

Page 81

1                     TENER
2              Does this refresh your
3      recollection about conversations you may
4      have had with Vanderbilt in January of
5      2019?
6         A.    I'm not sure if it's the timing
7      but I recall a question about the need for
8      extraordinary assumptions.  And I recall
9      speaking with Shaun about what we were
10     permitted to do in terms of when we're
11     engaged to do a fee simple and that --
12     it's not -- you're permitted to appraise a
13     fee simple even if it's encumbered by
14     leases.  But I believe I recall telling
15     him similar to what was communicated in
16     this e-mail, that we would just disclose
17     that there was a lease and it wasn't
18     considered in the valuation of the fee
19     simple.
20        Q.    But you had issued your report
21     months earlier.  Do you know why you were
22     having these discussions more than four
23     months later?
24              MR. KOH:  Objection.
25              THE WITNESS:  I don't recall.  I

```
                                              Page 82

 1                      TENER
 2         think they were asking about the
 3         extraordinary assumption.  I don't
 4         know if we were yet contacted about
 5         the McDonald's rent reset yet.  I
 6         don't know when we had the meeting
 7         with Wachtel Missry.
 8    BY MR. WALSH:
 9         Q.   When you say they were asking
10    about the extraordinary assumption, is
11    that the paragraph we looked at earlier
12    that disclosed the existence of the
13    McDonald's lease?
14         A.   It was all the extraordinary
15    assumptions.  I don't know whether -- I
16    can't recall in detail but I believe there
17    was questions about why we needed
18    extraordinary assumptions.
19         Q.   And do you recall why they wanted
20    to change the addressee from Sam
21    Rottenberg to Tom Li?
22              MR. KOH:  Objection.
23              THE WITNESS:  I don't recall.
24    BY MR. WALSH:
25         Q.   And KTR ultimately issued a
```

Page 83

1                          TENER
2     revised version of the August 30, 2018
3     report; right?
4          A.   I believe so, yes.
5          Q.   And do you recall that they were
6     also asking for an update of that report?
7          A.   I don't recall.
8          Q.   I'm sorry, what did you say?
9          A.   I don't recall.
10              MR. WALSH:  Okay.  If we could
11         pull up what's been marked as P56.
12              VERITEXT CONCIERGE:  P56 has been
13         copied over.
14    BY MR. WALSH:
15         Q.   It's an e-mail chain from January
16    2019 between Vanderbilt and KTR.  The top
17    e-mail is an e-mail --
18         A.   It doesn't -- now it is.
19         Q.   The top e-mail is an e-mail from
20    Sam Rottenberg to Shaun Kest on January
21    16, 2019.  He says, "Shaun, looking
22    forward to get the revisions tomorrow.  We
23    would like to proceed on the full update,
24    based on the M-Crown and comp set
25    updates."

Page 84

1                    TENER

2          Does that refresh your

3    recollection about what type of update, if

4    any, Vanderbilt was looking for?

5        A.   It states what it was.  I don't

6    have a clear memory of these

7    communications but that period of time I

8    guess, they wanted us to look at those and

9    update our values considering the

10   additional set of comps that they helped

11   us or made us aware of.

12       Q.   Understood.

13          MR. WALSH:  And if we can pull up

14       what's been previously marked as P57,

15       this is the revised report dated

16       January 17, 2019.

17          VERITEXT CONCIERGE:  P57 has been

18       moved over.

19   BY MR. WALSH:

20       Q.   So this was not produced to us in

21   the first phase of discovery so you'll

22   just have an electronic copy of this

23   document.  It's P57.  And if I could

24   direct your attention, there's a cover

25   e-mail on top.  I just want to talk about

Page 85

1                    TENER

2    the first page of this revised report

3    dated January 17, 2019.  It's the page

4    ending in Bates stamp 847.

5         A.    Okay.

6         Q.    And so just so I'm clear, was

7    this a revision that KTR insisted on

8    issuing or was this a revision that

9    Vanderbilt requested?

10        A.    I honestly don't recall.

11        Q.    Because as best as I can tell,

12   the report is essentially identical to the

13   August 30, '18 report except for the

14   bottom of the first paragraph of that

15   letter beginning with "The scope of work

16   also includes an opinion of the market

17   ground rent for the subject property" and

18   then it talks about the McDonald's lease.

19   You don't recall why that language was

20   added?

21        A.    I think we took it -- are one of

22   the extraordinary assumptions out as well?

23        Q.    Looks like the ground lease for

24   Vanderbilt -- actually no.  So the first

25   extraordinary assumption about McDonald's

Page 86

```
 1                          TENER
 2     and the McDonald's lease is out.  So is
 3     that the purpose of the change?
 4          A.    I think so.  I think it was -- I
 5     think it had to do with us seeing the
 6     memorandum that was filed and them wanting
 7     to remove that extraordinary assumption
 8     and this is how I believe we handled it.
 9               MR. WALSH:  Okay.  If we could
10          pull up what's been previously marked
11          as P58.  It's a -- what appears to be
12          a proposed engagement letter from KTR
13          dated January 22, 2019.
14               VERITEXT CONCIERGE:  P58 has been
15          copied over.
16     BY MR. WALSH:
17          Q.    If you'd just pull that up and
18     let me know when you have it open.
19          A.    Okay.
20          Q.    All right.  So it says as
21     requested KTR --
22          A.    It's still buffering.  All right.
23          Q.    It says, "As requested, KTR Real
24     Estate Advisors LLC intends to prepare an
25     update of a prior KTR appraisal of the
```

Page 87

1                    TENER

2    above referenced properties."  About

3    halfway down that paragraph, it says, "It

4    is our understanding that the lease with

5    McDonald's is expiring in the near term."

6          Do you see that?

7       A.   Yes, sir.

8       Q.   Now, had Vanderbilt not shared

9    with KTR that McDonald's had already

10   advised Vanderbilt by that time that it

11   would be exercising its option for the

12   first option period beginning in April

13   2019?

14      A.   I don't recall.

15      Q.   But it seems like you were under

16   the impression that it would be expiring

17   in the near term so I assume if they told

18   you that McDonald's had already exercised

19   its option term that would have been

20   reflected in this letter; right?

21          MR. KOH:  Objection.  Go ahead.

22          THE WITNESS:  I don't know

23      what -- I can't tell you what I would

24      have written but it seems to imply

25      that I did not know at that time.

Page 88

1                        TENER

2    BY MR. WALSH:

3        Q.    It certainly seems inconsistent;

4    right?

5              MR. KOH:  Objection.

6              THE WITNESS:  It seems that I did

7        not know at that time.

8    BY MR. WALSH:

9        Q.    Okay.  And at the bottom of that

10   first page, again it says, "No

11   consideration will be given to the impact

12   of the McDonald's lease or ground lease."

13             So they had asked you to once

14   again not consider the encumbrance of the

15   McDonald's lease or the Vanderbilt lease;

16   right?

17       A.    I believe that they wanted the

18   fee simple without any consideration of

19   those leases.

20       Q.    On page 2 you wrote, "It is

21   understood that the intended use of this

22   report is to assist Vanderbilt Atlantic

23   Holdings LLC with certain asset management

24   related decisions and analysis."

25             So had they just told you that

```
                                           Page 89
 1                     TENER
 2    they kind of just wanted it for internal
 3    purposes again without being specific?
 4         A.    Yes, sir.
 5              MR. WALSH:  If we can pull up
 6         what's been marked as P24.
 7              VERITEXT CONCIERGE:  P24 has been
 8         moved over.
 9    BY MR. WALSH:
10         Q.    By the way, before we get to P24,
11    did Vanderbilt ever proceed with the
12    update that you had proposed in that
13    January 22, 2019 letter?
14         A.    I don't recall.
15         Q.    So pulling up P24, this is an
16    engagement letter between Vanderbilt
17    Atlantic Holdings and Metropolitan
18    Valuation Services dated February 14,
19    2019.  Did you know that Vanderbilt
20    retained Metropolitan Valuation Services
21    to perform a review of KTR's August 30,
22    2018 appraisal?
23         A.    No, sir.
24         Q.    So is this the first you're
25    learning of that?
```

```
                                          Page 90

 1                      TENER

 2          A.   Yes, sir.

 3          Q.   Did you know that Vanderbilt had

 4    also retained BBG to perform an appraisal

 5    of 840 Atlantic Avenue in 2018?

 6          A.   I don't think so, sir.

 7          Q.   So that's also the first time

 8    you're learning this?

 9          A.   I believe so.

10          Q.   Okay.  Is it common for the same

11    owner of a property to get multiple

12    appraisals of the same property in the

13    same time period?

14               MR. KOH:  Objection.

15               THE WITNESS:  No, I have

16          certainly seen that happen.  I don't

17          know if it's common.

18    BY MR. WALSH:

19          Q.   Can you think why that would be

20    necessary?

21               MR. KOH:  Objection.

22    BY MR. WALSH:

23          Q.   I'm sorry, what was your answer?

24          A.   No, sir.

25          Q.   And back in 2018, Vanderbilt had
```

Page 91

1                     TENER

2    provided KTR with a copy of a 2018 report

3    from TerraCRG.  That was in your file.  Do

4    you recall that?

5         A.    Not particularly, sir.

6         Q.    What do you know about

7    Metropolitan Valuation Services?

8         A.    The real estate appraisal company

9    formerly owned by Marty Levine who is now

10   deceased and Steve Schleider, who was his

11   partner, both of which historically had

12   worked at KTR when they founded that

13   company.  They are predominantly a

14   multi-family -- that's their -- more their

15   expertise.  They originally -- when they

16   first formed the company it was

17   multi-family valuation services and they

18   renamed it to Metropolitan Valuation

19   Services.

20        Q.    Do you know Dave Lyons?

21        A.    No, sir.

22              MR. WALSH:  If we can pull up

23        what's been previously marked as P27.

24              VERITEXT CONCIERGE:  P27 has been

25        moved over.

1                      TENER

2    BY MR. WALSH:

3        Q.   This is an e-mail chain between

4    Vanderbilt and KTR from February 25, 2019.

5    And Tom Li on that day sent to you and

6    Shaun Kest the option rent addendum to the

7    McDonald's lease.  Do you see that?

8        A.   Yes, sir.

9        Q.   And it looks like there was a

10   phone call that day.  Do you recall that

11   phone call?

12       A.   I don't recall it.  I really

13   don't.

14       Q.   Do you recall the first time that

15   you spoke with Tom Li or anyone else at

16   Vanderbilt about the option rent addendum

17   to the lease?

18       A.   I have no clear recollection.

19           MR. WALSH:  Okay.  If we could

20       pull up what's been marked as P59.

21           VERITEXT CONCIERGE:  P59 has been

22       moved over.

23   BY MR. WALSH:

24       Q.   So this is an e-mail from the

25   same day from Tom Li to you and Shaun Kest

```
                                              Page 93
 1                    TENER
 2    and he's providing you with Morris
 3    Missry's contact information.  Does that
 4    refresh your recollection about what Tom
 5    wanted to talk to you about and why he
 6    sent you the option rent addendum?
 7         A.   I don't have clear recollections
 8    of this was going on but there was a
 9    period of time around this where we were
10    brought in to interview with Morris Missry
11    to potentially work as an expert in an
12    upcoming rent reset.
13              MR. WALSH:  So if we could pull
14         up P60, please.
15              VERITEXT CONCIERGE:  P60 has been
16         moved over.
17    BY MR. WALSH:
18         Q.   This is a calendar invite dated
19    February 25th for a meeting at Wachtel
20    Missry on February 28, 2019.  Is this that
21    interview with Morris Missry that you just
22    described?
23         A.   Yes, sir.
24         Q.   Who else was at that interview?
25         A.   I think Shaun Kest.  I can't
```

Page 94

                          TENER

1    recall though.

2        Q.    Anyone else besides Morris Missry

3    for Vanderbilt?

4        A.    Yeah, I believe Sam Rottenberg

5    was at it.  I don't recall if Mr. Li was

6    there.

7        Q.    And what do you remember

8    discussing at that interview?

9        A.    Our experience in litigation.  It

10   was basically an interview to see if we

11   would be the appropriate expert in this

12   upcoming rent determination.

13       Q.    And they asked specifically about

14   your litigation experience?

15       A.    Yes, sir.

16       Q.    Do you know or did they disclose

17   whether they were interviewing other

18   appraisers around this time?

19       A.    They didn't tell me who but it

20   was pretty evident that it was a beauty

21   pageant to see who they wanted.  They were

22   trying to -- who they thought would be the

23   appropriate expert.

24       Q.    And what kind of questions --

Page 95

```
1                        TENER
2    what kind of things did they ask you about
3    besides your litigation experience?
4         A.    I can't remember.  I think they
5    might have asked if I had -- they
6    definitely asked if I had experience
7    working in Brooklyn that met the
8    requirements of this, that what type of
9    ground leases I've worked on in terms of
10   rent resets, what attorneys I'd worked
11   with.  I don't recall details but I have
12   vague memories of that type of a
13   conversation.
14        Q.    And did they tell you a range of
15   valuations that they were looking for?
16        A.    No.
17        Q.    Now when you were discussing a
18   potential update of the report with them
19   in the weeks before this, you said they
20   sent you some updated comps?
21             MR. KOH:  Objection.
22             THE WITNESS:  I think so.  I
23        don't know if that was -- what period
24        of time that was.  There was a period
25        of time when they sent us updated
```

Page 96

1                    TENER

2        comps but I don't know if that had to

3        do with this interview.  I think that

4        preceded this interview.  I can't

5        recall how much.  That period of time

6        is not clear to me.

7    BY MR. WALSH:

8        Q.   Do you recall if they asked

9    whether you believed you would be in the

10   same range of values for ground rent that

11   you arrived at in August 2018?

12       A.   I don't recall any discussion of

13   value.

14       Q.   Did Morris Missry or anyone else

15   around this time tell KTR what appraisal

16   method would be used to determine the fair

17   market rent of value under the option rent

18   addendum to the lease?

19       A.   No, sir.

20            MR. WALSH:  If we could please

21       pull up what's been previously marked

22       as P28.

23   BY MR. WALSH:

24       Q.   This is the KTR engagement letter

25   dated March 8, 2019.

Page 97

1                    TENER

2        A.    I'm not seeing it yet.

3              VERITEXT CONCIERGE:  Just copying

4        it over.  Sorry, it appears to be a

5        little slow right now.  But it's in

6        there now.

7    BY MR. WALSH:

8        Q.    It's P28.

9        A.    It's up, sir.

10       Q.    Okay.  And so Morris Missry's law

11   firm ultimately retained KTR to serve as

12   McDonald's appraiser under the option rent

13   addendum to the McDonald's lease; right?

14       A.    Yes, sir.

15       Q.    Now, Vanderbilt had engaged KTR

16   directly for the August 2018 appraisal and

17   in January, KTR had sent Vanderbilt an

18   engagement letter addressed to Vanderbilt

19   for potential update but this engagement

20   letter is between KTR and Wachtel Missry.

21   Do you recall why there was a change?

22             MR. KOH:  Objection.

23             THE WITNESS:  I don't know if

24        they were related.  I don't know

25        whether that initial proposal, what

Page 98

```
 1                    TENER
 2        that was for.  This one certainly I
 3        was aware that it would be for the
 4        ground rent determination and in those
 5        cases, I almost invariably are engaged
 6        by counsel for one of the parties, not
 7        by the party.
 8   BY MR. WALSH:
 9        Q.   And why is that?
10             MR. KOH:  Objection.
11             THE WITNESS:  Generally it's to
12        preserve attorney/client privilege.
13        That I believe is the case but you
14        would have to ask counsel for that.
15        They are the ones who generally insist
16        upon it.
17   BY MR. WALSH:
18        Q.   Do you know if Wachtel Missry
19   retained any other appraisers around this
20   time?
21        A.   No, sir.
22        Q.   Okay.  Unlike the August 2018
23   appraisal and the January 2019 draft
24   engagement letter which gave sort of
25   generic reasons for the reason for the
```

Page 99

                              TENER

1

2      appraisal, this engagement letter

3      specifically talks about the fair market

4      rental valuation process described in the

5      option rent addendum; right?

6           A.    Yes, sir.

7           Q.    How would that change in use

8      affect the scope of your work or just

9      generally the work you would need to do

10     for this engagement?

11          A.    The option agreement specifies

12     the procedures under which this appraisal

13     proceeding would occur.  Among other

14     things it dictated a letter of value to be

15     exchanged between two parties.  It

16     anticipated the potential need for a third

17     appraiser.  So the reporting requirements,

18     the directions within the lease all impact

19     the scope of work.

20          Q.    Okay.  At the -- maybe two-thirds

21     of the way down that first page, it says,

22     "It is anticipated that the FMV will be

23     based on the standard market data approach

24     technique for valuing vacant land (the

25     sales comparison approach)."

1                     TENER

2            Who suggested that language?

3       A.    That language came out of the

4    lease.  The parenthetical was my

5    interpretation of that language.

6       Q.    Now, the option rent addendum

7    calls for a valuation of the fair market

8    rental value of the vacant land; is that

9    right?

10      A.    Can we turn to that?

11      Q.    Sure, that was P27.

12      A.    Yes, it says, "The rental value

13   shall be established based on the

14   definition of fair market rental value

15   which is a capitalized term as the price"

16   and it goes on, "which an average

17   well-informed tenant would pay and an

18   average well-informed landlord would

19   accept, exclusive of tenant's

20   improvements, knowing all uses to which

21   the property can be put, without duress on

22   either party."  And then it states that

23   "The standard market data approach

24   technique for valuing vacant land shall be

25   used by the appraisers."

1                    TENER

2       Q.   Okay.  And the next sentence

3   says, "All comparable leases shall be

4   appropriately adjusted, and the written

5   reports shall indicate the reasons for the

6   adjustments so made."  And then it goes on

7   to say that "If adequate comparable leases

8   are not available, then a land residual

9   technique shall be used."

10           Now, the fair market rental value

11  of vacant land is not the same thing as

12  the fair market value of vacant land;

13  isn't that right, are they different

14  concepts?

15      A.   One is a defined capitalized term

16  within the lease and the other is the

17  value of the land, so the value of the

18  land in my expert opinion is a component

19  of the defined fair market rental value

20  under the lease.  It is a component.  The

21  value of the land is one component, the

22  rent multiplier is the other.

23      Q.   Once again, at page 2 of this

24  engagement letter, you asked for copies of

25  any leases that encumber the properties;

```
                                        Page 102
 1                   TENER
 2   is that right?
 3        A.    I have the option rent up.
 4   Which --
 5        Q.    Oh, it's P28.
 6        A.    Yes, sir.
 7        Q.    Okay.  And even though you asked
 8   for it again, they didn't provide you with
 9   a copy of the Vanderbilt lease; right?
10        A.    I don't believe we ever got that.
11        Q.    At page 4 under basic assumptions
12   and limiting conditions, it says, "The
13   property is appraised free and clear of
14   any or all liens or encumbrances unless
15   otherwise stated."
16              Do you see that?
17        A.    Yes, sir.
18        Q.    So Vanderbilt had directed you to
19   appraise the property excluding the
20   encumbrance of the McDonald's lease;
21   right?
22              MR. KOH:  Objection.
23              THE WITNESS:  Are you talking
24        about in 2018?
25   ///
```

```
                                        Page 103

 1                  TENER
 2    BY MR. WALSH:
 3        Q.    In 2019.  In this letter.
 4        A.    In this assignment I was
 5    appraising the property based on the
 6    directions within the -- within the option
 7    agreement, not with any other -- at no
 8    direction from Vanderbilt.
 9        Q.    So I'm trying to understand what
10    the language that I just read to you on
11    page 4 means.
12        A.    That's a standard basic
13    assumption and limiting condition included
14    in all of our appraisals.  It states
15    that -- let's go back to it.  You will
16    find this in every KTR appraisal.  A
17    property is appraised free and clear of
18    all liens and encumbrances unless
19    otherwise stated.  Most often this is
20    relevant to appraising a property
21    encumbered with a mortgage.  We don't do
22    that.  It's always free and clear of
23    financing and unless encumbrances are
24    identified, it is assumed that they don't
25    exist for the value defined.  It is then
```

Page 104

1                              TENER
2      within the appraisal assignment you are
3      disclosing the encumbrances you are
4      considering and identify them and then if
5      necessary how they impact value.
6          Q.   So at the time that you entered
7      into this lease -- strike that.
8              At the time you entered into this
9      engagement letter with Morris Missry, did
10     you believe that your valuation would
11     consider the encumbrance of the McDonald's
12     lease?
13         A.   We were valuing it for the fair
14     market rent we set up in the McDonald's
15     lease.  That was what the assignment was,
16     to determine the fair market rent so we
17     were looking at the specifics as defined
18     within this lease so it was considering
19     the lease.
20         Q.   So you were considering the fact
21     that McDonald's had a lease to stay on the
22     property through 2039, you believed you
23     were going to consider that in your
24     analysis of valuation?
25         A.   I think you're mixing

1                    TENER

2    considerations.  We were valuing the

3    lease, the fair market rental value as

4    defined within the lease and as directed

5    within the lease that we are -- that we

6    were considering.  Then in determining the

7    fair market value of the land and the

8    rental value, at first there was

9    communication that we should not consider

10   the encumbrance of the ground lease in the

11   determination of the fair market rental

12   value.  And I at one point spoke with

13   counsel for clarifica -- counsel for

14   Vanderbilt for clarification of whether

15   the lease term would be considered and I

16   made him aware of a court ruling that I

17   believe that we should consider the term

18   of the lease in the valuation of the land,

19   provided that to Morris Missry, he read it

20   and said that I was incorrect by doing so,

21   that that would be tantamount to rewriting

22   the lease and that I should not consider

23   the term of the lease.  And in my initial

24   valuation when they engaged me, I did not

25   consider the term of the lease in the

```
                                          Page 106

1                        TENER

2    valuation.

3         Q.    You believed that it should have

4    been considered; correct?

5         A.    I believe that that court ruling

6    applied to this and gave it to counsel as

7    I would in any case that -- and sought

8    direction from counsel for legal issues.

9    I am not a legal expert.

10               MR. WALSH:  Okay.  If we could

11          pull up P29.  And also P30, please.

12               VERITEXT CONCIERGE:  P29 is in

13          there now and P30 is also in there

14          now.

15               MR. WALSH:  And P31, please.

16               VERITEXT CONCIERGE:  Okay, P31 is

17          also there.

18    BY MR. WALSH:

19         Q.    So if we could start with P29.

20    On April 1st, you e-mailed Morris Missry

21    with a copy to Sam Rottenberg and you

22    said, "Are you available to quickly

23    discuss a question that I have about the

24    language of the lease?"

25               Why did you copy Sam Rottenberg?
```

TENER

1
2     A.    Because he's the client
3     ultimately with his counsel.
4     Q.    Now, before you sent this e-mail,
5     had you spoken with Sam or Morris about
6     whether you should consider the
7     encumbrance of the McDonald's lease in
8     your valuation?
9     A.    I don't recall on the timeline.
10    I don't believe I had.
11    Q.    Okay.  And then if you could pull
12    up P30.
13    A.    Is there a way to rotate these?
14    I found it, thank you.
15    Q.    Okay.
16    A.    I have it, sir.
17    Q.    Okay.  And so it looks like you
18    spoke with Morris that day like you
19    testified earlier and then after that
20    conversation, you sent him a copy of the
21    936 Second Avenue case; right?
22    A.    Yes, sir.
23    Q.    When you spoke with Morris, did
24    he sound familiar with the 936 Second
25    Avenue case?

Page 108

1                    TENER

2              MR. KOH:  Objection.

3              THE WITNESS:  I don't recall.

4    BY MR. WALSH:

5         Q.    And so what do you remember about

6    that conversation before you sent the

7    case?

8         A.    I remember saying that I was

9    aware of this appellate decision that had

10   impacted other ground rent resets and

11   other leases for omitting specific, call

12   it assumed where they in drafting maybe

13   they assumed that they didn't have to

14   specify that which was not specifically

15   excluded would be included, and I remember

16   using that phrase to him and I said this

17   is the -- this is the ruling, can you take

18   a look at it and see if it applies to our

19   subject?  I think it does.  And sent it to

20   Morris for his opinion and he replied as

21   you'll see in the e-mails.

22        Q.    Now, before you sent him the

23   case, do you recall what his reaction to

24   what you're saying was?

25              MR. KOH:  Objection.

```
 1                    TENER
 2          THE WITNESS:  Yeah, I don't
 3      recall what his reaction was.
 4  BY MR. WALSH:
 5      Q.   Did anyone else participate in
 6  that conversation?
 7      A.   I don't remember.
 8      Q.   Okay.  And then at P31, this is
 9  the e-mail that you're referring to when
10  Morris told you that he disagreed with
11  your conclusion and told you -- and
12  instructed you not to consider the
13  encumbrance of the McDonald's lease in
14  your analysis; right?
15          MR. KOH:  Objection.  Go ahead.
16          THE WITNESS:  This was his legal
17      interpretation of it saying that that
18      would be tantamount to a modification
19      of the lease if we did this and that I
20      should not consider the term of the
21      lease.  This was his direction as
22      counsel interpreting this appellate
23      division relative to our lease and the
24      direction I received as the appraiser.
25  ///
```

```
                                            Page 110

 1                    TENER
 2    BY MR. WALSH:
 3        Q.   Did you agree with his
 4    conclusion?
 5             MR. KOH:  Objection.
 6             THE WITNESS:  Again I'm not a
 7        legal counsel.  I gave it to him
 8        because I thought it might be
 9        applicable but this is his response.
10    BY MR. WALSH:
11        Q.   Now, recognizing you're not an
12    attorney, did you agree with his
13    conclusion that it didn't apply?
14             MR. KOH:  Objection.
15             THE WITNESS:  Again, each case
16        has its own language and each document
17        has its own language.  It's tantamount
18        to going to a dentist when you need,
19        you know, medical advice.  You go to
20        the right person, you go to the
21        expert.  He was the expert that was
22        involved in this case.  I don't form
23        legal opinions.
24    BY MR. WALSH:
25        Q.   Did you tell Shaun or Sam or
```

Page 111

1                    TENER
2    Morris that you disagreed with his
3    conclusion on this point?
4        A.    I don't recall.  I recall asking
5    for the advice.  I believed when I
6    received it that it might be applicable
7    and that's why I asked them.  I don't
8    recall telling them I disagreed or not but
9    in the end, I believed it was an incorrect
10   determination as he changed his mind at a
11   later meeting.
12       Q.    Did you have any discussions with
13   Sam Rottenberg or Tom Li around this time
14   period about this 936 Second Avenue case?
15   I'm sorry, did you answer?
16       A.    I said I do not recall, sir.
17            MR. KOH:  We've been going about
18        90 minutes.  Just wondering if now
19        might be an appropriate break.
20            MR. WALSH:  Yeah, now would be a
21        fine time for a break and Mr. Tener,
22        it's up to you, we can take -- or you
23        and Cathi, I suppose, we can take a
24        lunch break now.  We can come back.
25        I'm open to whatever everyone is

```
 1                    TENER
 2       comfortable with.
 3            THE WITNESS:  I'm going to defer
 4       to Cathi but I would take a lunch
 5       break.
 6            MR. WALSH:  Should we try to come
 7       back around 1?
 8            MR. KOH:  That's good for me.
 9            THE WITNESS:  That works for me.
10            THE VIDEOGRAPHER:  Thanks,
11       everyone.  We're off the record at
12       12:26.
13            (Lunch recess taken at
14       12:26 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

```
                                            Page 113

 1                       TENER

 2          A F T E R N O O N      S E S S I O N

 3              (Time noted:  1:03 p.m.)

 4   T H O M A S    J.    T E N E R,   resumed

 5        and testified as follows:

 6              THE VIDEOGRAPHER:  The time is

 7        approximately 1:03.  We're back on the

 8        record.  This is the beginning of

 9        media 3.

10   CONTINUED EXAMINATION

11   BY MR. WALSH:

12        Q.   So before our break, Mr. Tener,

13   you said that you had sent the 936 Second

14   Avenue case to Mr. Missry because you

15   thought it applied and you were looking

16   for direction from counsel; is that right?

17              MR. KOH:  Objection.

18              THE WITNESS:  I thought that it

19        might apply and I was looking for

20        interpretation from -- legal

21        interpretation from counsel.

22   BY MR. WALSH:

23        Q.   And I guess -- why was it

24   important for you to know whether or not

25   this case applied?
```

Page 114

TENER

1

2      A.    To know whether the tenant, the

3   value was based on a 20-year term or an

4   unlimited term.

5      Q.    And so whether or not the case

6   applied would have impacted your analysis

7   in the first instance?

8      A.    Yes.

9      Q.    And how would it have impacted

10  your analysis in the first instance?

11     A.    The pool of comparables,

12  comparable ground leases that you might

13  consider would have to be looked at in

14  terms of how much control the -- how long

15  the tenant controls this, the subject

16  property, how long they have only 20 years

17  to get their return on their investment

18  rather than over a longer period of time,

19  it would impact the development potential

20  of the site.  As I noted in my report, or

21  in the evolution of my report, I didn't

22  consider residential development feasible

23  to get your return on and of that in a

24  20-year period, that I thought that retail

25  would.

                        TENER

1

2        Q.    And it would have impacted your

3    valuations; is that right?

4        A.    In the way I described.

5        Q.    And so would it have resulted in

6    a lower valuation if you had considered it

7    in your April 15, 2019 report?

8        A.    I don't know, sir.  In reality,

9    it did not because the retail component

10   ended up driving most of the value.  As

11   I -- as I reported in my appraisal, the

12   low cost of the retail and the relative

13   value or rent that you could achieve from

14   that once you amortized the cost of

15   constructing a single-story retail on the

16   site ended up at a value that closely

17   proximated the conclusion exclusive of the

18   period of control being unlimited.

19       Q.    So we'll get to those conclusions

20   in a bit but you said earlier that you

21   would have looked at different comps in

22   the first instance; right?

23       A.    Yeah, I would have -- so as I

24   said earlier, there are -- I didn't have

25   any -- I was not aware of any ground lease

1                    TENER

2    comparables that were for less than 49

3    years so or 20-year period ground lease

4    comparables, so that pretty much ruled out

5    an analysis of short-term ground leases,

6    and secondly what we could build would

7    change.

8        Q.   Would you have done a land

9    residual analysis in the first instance if

10   Morris had instructed you to follow the

11   rule announced in the 936 Second Avenue

12   case?

13           MR. KOH:  Objection.  Go ahead.

14           THE WITNESS:  Can you repeat

15       that?  I want to make sure I

16       understand.

17   BY MR. WALSH:

18       Q.   Sure.  Would you have done a land

19   residual analysis in the first instance,

20   meaning in your April 2019 report, if

21   Morris had instructed you to follow the

22   rule announced in the 936 Second Avenue

23   case?

24           MR. KOH:  Same objection.

25           THE WITNESS:  As I did once it

```
                                      Page 117

  1                    TENER

  2        was clarified, that that ruling did

  3        apply, I did include the residual and

  4        I would have done prior.

  5              MR. WALSH:  Okay.  So if we could

  6        pull up VA 000587.

  7              VERITEXT CONCIERGE:  This will be

  8        introduced as Exhibit P70.

  9              (Exhibit P70, document Bates

 10        labeled VA 000587, marked for

 11        identification.)

 12   BY MR. WALSH:

 13        Q.   So Mr. Tener, this is a March --

 14        A.   It's not there.

 15              Got it.  Hold on, let it come up.

 16   Yes, sir.

 17        Q.   This is a March 25, 2019 e-mail

 18   from you to Sam Rottenberg and Morris

 19   Missry.  Now this is a few days before you

 20   exchanged e-mails with Morris about the

 21   Second Avenue case.  You wrote, "We will

 22   be wrapping up the letter of value within

 23   the next few days.  Let's schedule a

 24   discussion for later this week.  What are

 25   your schedules for Thursday looking like?"
```

Page 118

                    TENER

1

2          What did you want to discuss with

3     him?

4     A.    I don't recall but I'm assuming

5     my preliminary results.

6     Q.    And do you recall if this

7     conversation occurred?

8     A.    I don't recall.

9     Q.    And does this refresh your

10    recollection about whether the issue of

11    the encumbrance of the lease and current

12    zoning came up in discussions before April

13    1, 2019?

14    A.    I'm sorry, sir?

15    Q.    Does this refresh your

16    recollection about whether the issue of

17    the encumbrance of the lease and current

18    zoning came up in discussions before April

19    1, 2019?

20    A.    No, it doesn't.

21          MR. WALSH:  If we could please

22      mark VA 000664.

23          (Exhibit P71, document Bates

24      labeled VA 000664, marked for

25      identification.)

1               TENER

2          VERITEXT CONCIERGE:  This will be

3     introduced as Exhibit P71.

4   BY MR. WALSH:

5        Q.    So on April 2, 2019 you sent an

6   e-mail to Morris only and you attached a

7   draft fair market value determination

8   letter for 840 Atlantic Avenue and you

9   gave it to him in Word format so in your

10  comments that he could make suggested

11  edits and track changes.

12          Do you typically send draft Word

13  versions of your reports to clients before

14  they are issued?

15       A.    Only to counsel.  Generally

16  counsel will review my reports relative to

17  the legal issues at hand and oftentimes

18  want to make suggested edits.  I don't

19  always accept them but I give counsel

20  opportunity to review my work product as

21  an expert.

22       Q.    Do you recall if you made any

23  changes to your report as a result of any

24  preliminary discussions you had with

25  Morris or Vanderbilt before you formally

```
                                        Page 120

 1                      TENER

 2   issued the report?

 3        A.   I don't recall.  There would be a

 4   comparison I assume between the two

 5   documents.

 6             MR. WALSH:  If we could pull up

 7        P33.

 8             VERITEXT CONCIERGE:  P33 has been

 9        copied over.

10   BY MR. WALSH:

11        Q.   This is a response from Sam

12   Rottenberg on April 11, 2019.

13             Do you see that?

14        A.   Yes, sir.

15        Q.   And so it looks like you actually

16   also sent your report to Sam; right?

17        A.   I don't know if I sent it or if

18   Morris forwarded it to him.

19        Q.   Okay.  Well, your e-mail below

20   asked him if he had any comments on the

21   draft.  I guess you were asking Morris

22   with a copy to Sam.  "Do you have any

23   comments on the draft report?"  And Sam

24   responded "The only comment (to the extent

25   I have one) is that perhaps there might be
```

Page 121

1                    TENER

2      a little room to be a bit more aggressive

3      on the residential valuation."

4             What was your reaction to Sam's

5      e-mail?

6         A.   Same as I have to any client, the

7      things that I'm not in agreement with them

8      in terms of their viewpoint on value, I'm

9      the professional, I don't -- if you want

10     to present facts to me I will consider

11     them but if you say things like that I

12     basically ignore them.

13        Q.   So you ignored this?

14        A.   Yes, sir.

15        Q.   Did you have a discussion with

16     Sam or anybody else about his comment?

17        A.    Not that I recall but if it

18     was -- if I did have one, I would have

19     told you exactly or similar, maybe more,

20     respectfully I would have said the same

21     thing.

22             MR. WALSH:  If we could please

23         pull up VA 001506.

24             (Exhibit P72, document Bates

25         labeled VA 001506, marked for

Page 122

1                    TENER
2         identification.)
3              VERITEXT CONCIERGE:  This will be
4         marked as Exhibit P72.
5              THE WITNESS:  It's up.
6    BY MR. WALSH:
7         Q.   Okay.  So on April 15th, you
8    e-mailed Morris again with a copy to Sam
9    and asked him if he had any comments;
10   right?
11        A.   Yes.
12        Q.   And again, is this consistent
13   with your standard practice?
14        A.   Yes, for legal proceedings.
15        Q.   And do you recall if he
16   responded?
17        A.   I don't recall.
18        Q.   Do you recall if you had a
19   discussion with him about it?
20        A.   I don't think there were any
21   changes.  I don't think -- I don't recall
22   honestly.
23              MR. WALSH:  Okay.  If we could
24         please pull up P32.  And Mr. Tener, it
25         may be easier, this is also in the

```
                                      Page 123
 1              TENER
 2       binder so it's up to you.  It's
 3       VA 001940.
 4              THE WITNESS:  Is that in binder
 5       2?
 6              MR. WALSH:  Probably.
 7              VERITEXT CONCIERGE:  P32 has been
 8       copied over.
 9   BY MR. WALSH:
10       Q.   So this is the original valuation
11   report that you prepared for Vanderbilt
12   for the fair market rental valuation
13   process described in the option rent
14   addendum to the McDonald's lease; right?
15       A.   I believe so.
16       Q.   And it's dated April 15, 2019?
17       A.   Yes, sir.
18       Q.   Okay.  And both you and Shaun
19   Kest signed this letter; right?
20       A.   Correct.
21       Q.   And even though you both signed
22   it, you take full responsibility for
23   everything that's in this report; right?
24       A.   Yes.
25       Q.   By the way, is Shaun still at
```

Page 124

1                    TENER

2    KTR?

3         A.    No.

4         Q.    Where is he now?

5         A.    He works for Addison Young.

6         Q.    When did he leave?

7         A.    Earlier this year.

8         Q.    Did he give any reason for his

9    departure, do you know why he left?

10        A.    He was offered a lot of money.

11        Q.    Did Shaun ever express concern to

12   you about decisions you were making on

13   appraisals you were working with him on?

14        A.    No, sir.

15        Q.    So he said it was purely about

16   money?

17        A.    Yes, sir.

18        Q.    Do you know if he agreed with

19   Vanderbilt's decision not to consider the

20   encumbrance to the lease?

21             MR. KOH:  Objection.

22             THE WITNESS:  Yes, I do know

23        he agreed.  Did not include the

24        encumbrance?

25   ///

```
                                            Page 125

 1                      TENER
 2    BY MR. WALSH:
 3        Q.   I want to know if he agreed with
 4    Vanderbilt's decision to tell you to not
 5    consider the encumbrance to the lease?
 6             MR. KOH:   Objection.
 7             THE WITNESS:   I misunderstood the
 8         question, I'm sorry.  He never raised
 9         the point.  I was the one who raised
10         the point.
11    BY MR. WALSH:
12        Q.   Did you ever discuss it with him?
13        A.   Only when the decision was made
14    which way we would go.  It wasn't
15    Vanderbilt's, it was Wachtel Missry's
16    decision so I don't recall him ever
17    expressing any opinion about it.  Again, I
18    don't think he was even aware of the
19    Second Avenue decision.
20        Q.   Now, you just said that it wasn't
21    Vanderbilt's decision, it was Wachtel
22    Missry's decision.  How do you know that?
23        A.   Because the communication came
24    from Morris Missry and it was his
25    interpretation of the lease.  It says in
```

Page 126

                        **TENER**

1

2    his e-mail to me I read it and he -- it

3    was his legal interpretation.  I would

4    assume that he wasn't lying to me.

5         Q.   Do you know if he had discussed

6    it with his client?

7         A.   I don't think he spent a lot of

8    time on the -- I think there wasn't much

9    of a lapse between when I sent it to him

10   and when he responded.  I do not know if

11   he spoke to him but it seemed like he read

12   the document and got back to me very

13   quickly.

14        Q.   Turning to page ending -- I guess

15   it's page 4 of that report.  It's the page

16   ending in 1944.  You concluded that the

17   fair market rental value of 840 Atlantic

18   Avenue as of April 8, 2019 was $1,348,000

19   per year; right?

20        A.   Yes.

21        Q.   And that was higher than the

22   estimated ground rent you included in your

23   August 30, 2018 report to Vanderbilt;

24   right?

25        A.   Yes, sir.

```
                                          Page 127
 1                       TENER
 2         Q.    And back then you had concluded
 3    that as of August 30, 2018, the property
 4    was -- the fair market rental value of the
 5    property was 1,098,000 dollars per year;
 6    right?
 7         A.    Yes, sir.
 8         Q.    So your estimated value increased
 9    more than 22 percent between August 2018
10    and April 2019; right?
11         A.    Do you want me to do the
12    calculation?
13         Q.    Sure.  1,348,000.
14         A.    What was the original one?
15         Q.    1,098,000.
16         A.    22.77 percent.
17         Q.    Okay.  So your conclusion was
18    that the fair market rental value of the
19    property increased 22.7 percent from
20    August 2018 to April 2019; is that right?
21         A.    Based on the -- all of the
22    changes within the two reports, I don't
23    believe the first one considered the lease
24    and uses and direction.  That was my
25    conclusion.
```

1                    TENER

2       Q.   Okay, but this report also didn't

3    consider the lease and the uses; right?

4       A.   This report considered the lease,

5    not the lease term.

6       Q.   I see.

7       A.   As directed within the lease.

8    The first one was not as directed within

9    this lease.

10       Q.   Okay.  Was this nearly 23 percent

11    change representative of changes in value

12    that were occurring all over the area

13    during this time?

14       A.   What do you mean by all over the

15    area?

16       Q.   I guess -- was this change

17    consistent with what you were seeing in

18    the market between August 2018 and April

19    2019?

20            MR. KOH:  Objection.

21            THE WITNESS:  Again, what market?

22    BY MR. WALSH:

23       Q.   The relevant market for this area

24    of Brooklyn.

25       A.   So there was significant -- there

1                    TENER

2     were significant increases but this is all

3     attributable to the most recent and

4     relevant comparables that we analyzed.

5     The use conclusions and ground rent rate

6     conclusion that we reached in the FMV

7     determination.

8          Q.   Okay.  And like you used in the

9     August 2018 report, you used the land

10    sales comparison in your April 15, 2019

11    report; right?

12         A.   Yes, sir.

13         Q.   And not by gathering, comparing

14    and adjusting comparable ground leases;

15    right?

16         A.   Correct, sir.

17         Q.   In the second full paragraph on

18    page 2 of your report, you write, "The FMV

19    of the demised premises is a function of

20    the market value of the subject land and

21    the ground rent percentage that," quote,

22    "an average well-informed tenant would pay

23    and an average well-informed landlord

24    would accept, exclusive of tenant's

25    improvements, knowing all of the uses to

```
 1                    TENER
 2    which the property can be put, without
 3    duress on either party."
 4            The second part of that sentence
 5    where I noted that I was quoting, that's a
 6    quote from the option rent addendum to the
 7    lease; right?
 8        A.   Yes, sir.
 9        Q.   But the first part of the
10    sentence, specifically the FMV of the
11    demised premises is a function that the
12    market value of the subject land and the
13    ground rent percentage.  That part is not
14    taken from the lease; right?
15        A.   No, sir.
16        Q.   So where did that come from?
17        A.   That comes from my understanding
18    of the components that make up the fair
19    market rent of a ground lease.  Land value
20    and a rent multiplier or a ground rent
21    percentage as used in this sentence.
22        Q.   Does the option rent addendum
23    talk about the market value of the subject
24    land?
25        A.   It does not.  It states value in
```

Page 131

1                          TENER
2    vacant land.
3         Q.    And then it talks about adjusting
4    comparable leases if they are available;
5    right?
6         A.    It does state that also, yes.
7         Q.    Okay.  Did Morris Missry or
8    Vanderbilt suggest that you should
9    value -- that you should estimate the
10   value using the market value of the
11   subject land and the ground rent
12   percentage?
13        A.    Neither gentlemen suggested
14   anything about how I appraise the property
15   in terms of what methods, what approach.
16   The input that Morris Missry gave me was
17   limited to the applicability of the Second
18   Avenue case, the input from Sam was
19   limited to what you saw, some critiques of
20   whether I was high enough in his opinion
21   of land value.  Nothing about methodology
22   or appraisal techniques.  That was left up
23   to me, the expert.
24        Q.    Okay, but you asked for Morris
25   about a legal opinion on the 936 Second

Page 132

1                    TENER

2    Avenue case, right, because he's a lawyer?

3         A.   Yes.

4         Q.   But you did not ask him for a

5    legal opinion on how he believed the

6    option rent addendum required you to value

7    the property?

8         A.   I didn't have any questions about

9    that -- or let me check that answer.

10             I don't know if I did ask him

11   about any of the -- I don't recall if I

12   asked him anything about some of these

13   provisions because there are some

14   sentences in here that aren't exactly

15   clear.  I may or may not have asked him

16   for clarification on that but I don't

17   recall.

18        Q.   Going back to page 2, the third

19   full paragraph towards the bottom, right

20   above that chart of the zoning area.

21        A.   I'm sorry.

22        Q.   Page 2, yeah.  This is the page

23   ending in 1942.  You wrote, "Based on the

24   subject's current zoning and considering

25   the uses exhibited by recent development

Page 133

1              **TENER**

2       in the immediate area, the highest and

3       best use of the subject, as if vacant,

4       would be commercial development in the

5       portion of the site zoned M1-1 and

6       residential development in the R6B zoned

7       portion of the site."

8                Do you see that?

9          A.    Yes, sir.

10         Q.    Now is this what appraisers

11      generally refer to as a highest and best

12      use conclusion or analysis?

13         A.    This is a conclusion, not the

14      analysis, because this is a restricted

15      report and is not explaining every detail.

16         Q.    Okay.   What is highest and --

17      what is the highest and best use analysis?

18         A.    It is an analysis of the legally

19      permissible, physically possible,

20      maximally productive uses that a site can

21      be put to that returns the highest value

22      to the site.

23         Q.    Now, you said legally

24      permissible, physically possible,

25      maximally --

```
 1                    TENER
 2       A.   Maximally productive.  There are
 3   four tests I would have to go exactly to.
 4       Q.   We can get to that.  Does the
 5   highest and best use also need to be
 6   financially feasible?
 7       A.   Yes, sir.
 8       Q.   And whenever a market value is
 9   developed, a highest and best use analysis
10   is necessary; right?
11       A.   Yes, sir.
12       Q.   And would you agree that if the
13   highest and best use is not adequately
14   addressed, an appraiser may
15   inappropriately analyze the property being
16   appraised?
17       A.   Yes, sir.
18       Q.   Okay.  So if a use is physically
19   possible, legally permissible and
20   financially feasible, you then test to see
21   what -- whether I guess that use is
22   economically productive; right?
23       A.   Maximally productive.
24       Q.   Maximally productive.  So where
25   did you do that analysis in order to reach
```

1                    **TENER**

2    this conclusion on page 2?

3        A.    My analysis was conducted at my

4    desk, analyzing the data that I had in

5    front of me, recognizing the typical uses

6    that were out there, the development

7    around the property, the conformity of

8    use, and based on my review of the

9    economics of the development that was

10   going on in this location and the zoning

11   that is legally permissible, that a mixed

12   use development of residential and

13   commercial would provide the -- would be

14   the highest and best use of the site.  So

15   I did that at my desk analyzing the data

16   in front of me.

17       Q.    What other uses did you try to

18   test to see if they would be maximally

19   productive?

20       A.    The only other use that I

21   considered was community facility and that

22   is more of a developer's option whether

23   they want to include that.  It doesn't

24   materially change the economics of the

25   development.

```
 1                    TENER
 2      Q.   Okay.  Now do you agree that a
 3   long-term ground lease could affect the
 4   highest and best use of the market value
 5   of the property?
 6      A.   Yes, sir.
 7      Q.   So if a property is subject to a
 8   ground lease that has 20 years left on it,
 9   it may not be economically feasible to
10   demolish the building that's on the
11   property and then construct a new building
12   within that lease term; right?
13      A.   Yes, sir.
14      Q.   And at the very least, you would
15   need to do an economic analysis before
16   arriving at a conclusion as to the highest
17   and best use if there was a ground lease
18   in place; right?
19      A.   I don't -- please repeat your
20   question.
21      Q.   So assume for a moment that a
22   ground lease was in place here, which
23   there was, although they told you to
24   ignore it, had they told you to consider
25   the ground lease, you would have needed to
```

```
 1                    TENER
 2    do an analysis to see what was possible
 3    within a 20-year period; right?
 4         A.    Yes, sir.
 5         Q.    But you didn't do that in April
 6    of 2019; right?
 7         A.    There was no restriction
 8    according to Morris Missry's determination
 9    of lease term.  I did consider it once the
10    20-year term was ruled or agreed to be
11    applicable and that's what is reflected in
12    my final report from July 30th.  As
13    detailed or discussed in that report, the
14    economics did not materially change
15    because the retail component building and
16    inexpensive single-story retail add
17    extremely low cost of what a D type
18    construction retail would cost provided
19    adequate return over a 20-year period.  So
20    in this case because retail drove so much
21    of the value that it ended up being
22    economically feasible in my opinion and my
23    analysis which is included in my July 30th
24    report.
25         Q.    Okay, we'll get there.  But you
```

```
 1                    TENER
 2   mentioned before that one of the reasons
 3   that it was important for you to
 4   understand whether the lease, the
 5   McDonald's lease needed to be considered,
 6   the 20-year term, was because it would
 7   impact the comparables; right?
 8        A.   It would impact potential
 9   comparables, yes.
10        Q.   And because you could only use
11   potential comparables that had the same
12   highest and best use, right, as the
13   McDonald's property was as encumbered;
14   right?
15        A.   The question about the
16   comparables was the term of the lease that
17   if you could only -- if the tenant only
18   controlled the property for 20 years and
19   you were looking for comparable ground
20   leases that were developed to their
21   highest and best use rather than an
22   interim use, which is not the highest and
23   best use, it's an interim use by
24   definition, you would be looking at
25   comparables that don't reflect the highest
```

```
                                              Page 139
1                          TENER
2      and best use, they reflect -- I'm
3      repeating myself, that reflect an interim
4      use.  So the inclusion or the recognition
5      that the tenant -- that the -- that this
6      particular appraisal assignment required
7      us to consider a 20-year hold period or
8      control period by the tenant limited the
9      comparable data, there were no comparables
10     identified by KTR of 20-year ground leases
11     developed to the highest and best use.  As
12     such, the residual was processed.
13              MR. WALSH:  If we could mark
14         VA 000117.  Now this is an Excel
15         spreadsheet so you're going to have to
16         pull it up in Exhibit Share.
17              (Exhibit P73, document Bates
18         labeled VA 000117, marked for
19         identification.)
20              VERITEXT CONCIERGE:  This will be
21         marked as P73 and it should be in
22         there now.
23     BY MR. WALSH:
24         Q.   Mr. Tener, this document was
25     contained in Vanderbilt's production.
```

```
                                      Page 140
 1                      TENER
 2     It's an Excel file with the name
 3     19-1-00075-840 Atlantic Ave FINAL.xls.
 4             Do you see that?
 5         A.   Yes, sir.
 6         Q.   What is this document?
 7         A.   This is the file, Excel work file
 8     or working product for my July -- I
 9     believe it's the July 30th report.  Let me
10     make sure.  I believe this is the -- I
11     believe it's for the July 30th report.
12         Q.   Well, would there have been any
13     differences in this spreadsheet from April
14     to July?
15         A.   The July -- I added a residual
16     but I believe it was under a separate
17     Excel.
18         Q.   I think that's in a different
19     file.  So this spreadsheet wouldn't have
20     changed from April 15 to July 30, 2019;
21     right?
22         A.   I don't know.  I don't know if
23     there were any changes.  I don't recall.
24         Q.   If you could look at the tab land
25     sale grid M1-1.
```

```
 1                     TENER
 2        A.   Yes, sir.
 3        Q.   On page 3 of your report you
 4   state that you identified and analyzed
 5   three sales of M1-1 zoned development
 6   sites and five sales of similarly zoned
 7   residential development sites.  Are these
 8   the three M1-1 sites referenced in your
 9   report?
10        A.   Yes, sir.
11        Q.   Were any of these three sites
12   encumbered by ground lease when they were
13   sold?
14        A.   I don't believe so, sir.
15        Q.   Would you have checked?
16        A.   Yes, sir.
17        Q.   And why would you have checked?
18        A.   I would have looked to see if
19   they were fee simple sales.
20        Q.   Would you have also looked to see
21   if there was a ground lease encumbering
22   the property like there was at
23   840 Atlantic?
24        A.   We would have been looking to see
25   if they were encumbered, whether it was a
```

Page 142

```
 1                      TENER
 2   fee simple or a lease fee.  If it turned
 3   out that they were lease fee, then we
 4   would investigate as best we can the
 5   economics of the encumbered lease and
 6   maybe or maybe not include them in this
 7   analysis.
 8       Q.   So if you had in April 2019 been
 9   valuing 840 Atlantic Avenue as encumbered
10   by the 20-year term of the McDonald's
11   lease, would you still have used these
12   three properties as comparables in your
13   analysis?
14           MR. KOH:  Objection.  Go ahead.
15           THE WITNESS:  I did in my final
16       so I would say yes.
17   BY MR. WALSH:
18       Q.   Would you have looked for
19   properties that had been sold that were
20   encumbered by a ground lease?
21           MR. KOH:  Objection.
22           THE WITNESS:  I need to think
23       about that.  Ask it again, would I
24       have?
25   ///
```

```
 1                    TENER
 2   BY MR. WALSH:
 3       Q.   Would you have looked for
 4   properties that had been sold that were
 5   encumbered by a ground lease when they
 6   were sold?
 7       A.   Based on --
 8            MR. KOH:  Same objection.  Go
 9       ahead.
10            THE WITNESS:  Based on which
11       analysis?
12   BY MR. WALSH:
13       Q.   If you had been asked to consider
14   the encumbrance of the 20-year term of the
15   McDonald's lease in April of 2019.
16            MR. KOH:  Same objection.
17            THE WITNESS:  I'm not sure.
18   BY MR. WALSH:
19       Q.   Isn't this an apples to oranges
20   comparison if you're valuing properties,
21   if you're valuing a property that is
22   encumbered by a 20-year lease compared to
23   properties that are not encumbered by a
24   ground lease, isn't that apples to
25   oranges?
```

Page 144

1                          TENER

2          A.    It's not apples to oranges but

3     it's certainly recognizing that the tenant

4     has control over the property for a

5     shorter duration, and if my residual had

6     not shown values that were bracketing the

7     number that came from this ground lease

8     analysis, I probably would have dismissed

9     it as not being economically feasible, but

10    because the residual illustrated that it

11    would be economically feasible, my

12    conclusion was that the general soundness

13    of the initial economics of the ground

14    lease were supported by the residual and

15    not overly impacted by the shortened term.

16         Q.    Well, by the time you had done

17    the land residual analysis, you had

18    already issued a report to Vanderbilt that

19    had your valuation; right?

20         A.    I did, sir.

21         Q.    And that valuation was as

22    unencumbered by the 20-year McDonald's

23    lease; right?

24         A.    Are you referring to the --

25         Q.    The April 2019 report.

```
                                      Page 145

 1                     TENER

 2        A.    Not the 2018 report.

 3        Q.    The April 2019 report.

 4        A.    Yes, sir.

 5        Q.    And so that valuation was not

 6    encumbered by the McDonald's lease?

 7        A.    Yes, sir.

 8        Q.    And so I guess -- I'm trying to

 9    take you back to April; right?  So before

10    you had completed this analysis, right, so

11    assume you had known that you were

12    supposed to consider the encumbrance to

13    the lease, wouldn't you had to have made

14    certain adjustments in this grid to

15    reflect sort of the difference in what's

16    being sold as far as properties that are

17    not encumbered and comparing a property

18    that is encumbered?

19            MR. KOH:  Objection.  Go ahead

20        and answer.

21            THE WITNESS:  I think what you

22        mean in terms of that question is -- I

23        want to clarify the question.  When

24        you say encumbered you mean by the

25        period of time?
```

1                    TENER

2              MR. WALSH:  By the period of the

3        lease, yes.

4              MR. KOH:  Same objection.

5              THE WITNESS:  One would think

6        that would be a factor and it

7        certainly was investigated by myself.

8        I'm losing my train of thought so I

9        don't want to -- I do have an answer

10        for it but I lost my train of thought.

11   BY MR. WALSH:

12        Q.   Right.  So what I'm trying to

13   understand is, had you been aware in April

14   2019 that the property needed to be valued

15   as encumbered by the 20-year term of the

16   lease and you're doing this land sales

17   comparison method and you're adjusting to

18   make them comparative, wouldn't an

19   adjustment have been required to reflect

20   the difference between these properties

21   that were not encumbered by the lease and

22   then trying to arrive at a value for a

23   property that is encumbered by a 20-year

24   term lease?

25        A.   Thank you for your patience.  You

1                        TENER

2    got me back on my train of thought.

3              MR. KOH:  Objection.

4              THE WITNESS:  The value of the

5         land that is in all these has nothing

6         to do with the term.  The land is

7         valued and it's fee simple.  The rent

8         is a factor of the multiplier of that

9         period of time.  Because when it

10        became a 20-year period the use

11        shifted to retail, the economics of

12        both developing it and the ground rent

13        percentage multiplier changed from the

14        initial one.  They just happened to

15        change in a way that did not alter the

16        conclusion based on a mixed use

17        development.  So the land value stays

18        the same.  You pay rent based on a

19        percentage of land value.  The use of

20        that land value was impacted by the

21        20-year term that shifted it to retail

22        which had different economics,

23        different development, different

24        return on the investment which would

25        have affected my rent multiplier

```
 1                    TENER
 2      determination.
 3  BY MR. WALSH:
 4      Q.    Well, I'm sorry if I'm not being
 5  clear.  Here's what I'm trying to
 6  understand.  I know that later on you did
 7  a land residual analysis; right?  What I'm
 8  trying to understand is had you known in
 9  April 2019, how would you have accounted
10  for the 20-year term of the McDonald's
11  lease in this analysis that we're looking
12  at in your spreadsheet here which we've
13  marked as P73?
14          MR. KOH:   Objection.
15          THE WITNESS:  I would have looked
16      at the uses that the site could have
17      been developed under under that period
18      of time which would have been
19      primarily retail uses, the M1 zone,
20      and concluded based on that use and
21      that's -- that would have driven the
22      resultant multiplier and the resultant
23      value.
24  BY MR. WALSH:
25      Q.    Okay.  So which was more
```

Page 149

1                    TENER

2    valuable, the M1-1 portion of the site or

3    the R6B site?

4         A.   Because of the size of the land

5    area, the M1-1 was.

6         Q.   What about just on a

7    per-square-foot basis, what's more

8    valuable, the M1-1 or the R6B?

9         A.   It's not per square foot because

10   each one has a different multiplier.  The

11   M1-1 had a higher price per square foot of

12   the ZFA but only had a 1 ZFA.  The

13   residential had a lower price per ZFA but

14   it had a 3.44 floor area ratio.

15        Q.   So what I'm trying to understand

16   is you said that you would have excluded

17   the R6B portion of your analysis had you

18   known the 20-year term needed to be

19   considered in April 2019; right?

20        A.   I would have given less weight to

21   that component of it in the election of

22   the -- of the rent multiplier.  You're not

23   going to give them the residential land

24   for free in a lease document because --

25   but you're not going to presume that it

Page 150

1                           **TENER**

2      gets developed.  In my residual analysis

3      which I would have done in the April '19

4      appraisal, I utilized the residential land

5      area as parking and as access to below

6      grade parking.  So it's used, it's just

7      not used for residential development

8      because in my conclusion, residential

9      development, you could not get your return

10     on and of the investment in a 20-year

11     period.

12         Q.   So what would have been the

13     impact to your valuation had you excluded

14     the R6B portion in April 2019 and

15     considered it as primarily M1-1 use?

16             MR. KOH:   Objection.

17             THE WITNESS:   The same conclusion

18         that I reached in the July 30th.

19     BY MR. WALSH:

20         Q.   How do you know that?

21         A.   Because I did the analysis.

22         Q.   Well no, but what I'm saying is

23     you only did that analysis after the fact.

24     What I'm trying to understand is in this

25     spreadsheet we're looking at here, P73,

1                    TENER

2    what would the impact have been?

3         A.   There wouldn't have been an

4    impact in this spreadsheet.  What I'm

5    saying is those land values would not have

6    changed.  They are fee simple land values.

7    The multiplier and the contributory

8    portion of the R6 versus M1 would shift

9    like it did in my July 30 report.  Exactly

10   what I wrote in the July 30th report would

11   have been the report that I had written on

12   April 15th.  There would have been no

13   changes.

14        Q.   There would have been absolutely

15   no changes?

16        A.   The July 30th report would have

17   been my report.

18        Q.   Okay.  So once you arrived at an

19   estimated land value in the manner that

20   you did considering both a residential and

21   manufacturing use, you needed to convert

22   that land value to an annual fair market

23   rental value for ground lease; right?

24        A.   Yes, sir.

25        Q.   And your report says on page 3

```
                                    Page 152

 1                    TENER

 2      under FMV determination, this is the page

 3      ending in 1943, "In order to estimate the

 4      FMV of the demised premises, KTR analyzed

 5      the economic terms of relevant ground

 6      leases in Brooklyn, Queens and Manhattan."

 7            Do you see that?

 8      A.    Yes, sir.

 9      Q.    Were these the same relevant

10      ground leases that you used for your

11      August 2018 appraisal?

12      A.    Yes, sir.  I'm sorry, August

13      2018?  I think so.

14      Q.    And your August 2018 appraisal

15      sought to estimate the annual ground rent

16      for a 99-year ground lease?

17      A.    Yes, sir.

18      Q.    And what term did you estimate

19      ground rent for in your April 15, 2019

20      report?

21      A.    I didn't specify.

22      Q.    Would those 99-year ground

23      leases, are those relevant when you're

24      considering a lease that only has 20 years

25      left?
```

1                    TENER

2        A.   They are not all 99 years.  Some

3    are 49 years.  Most of these are 20-year

4    rent reset periods so yes, they are

5    relevant.

6        Q.   Well, but earlier you testified

7    that you were trying to figure out rent

8    for 99 years in August 2018; right?

9        A.   No, I didn't say that.  I just

10   said it didn't have a -- I didn't say for

11   99 years.  I said it didn't have a -- it

12   was unencumbered.

13       Q.   Well, you assumed it was for a

14   99-year term in August 2018, that's what

15   your report says?

16       A.   I think that's what my report

17   says, yes.

18       Q.   Okay.  But now you're considering

19   for a up to 20-year term; right?

20            MR. KOH:  Objection.  Go ahead.

21            THE WITNESS:  Yes.

22   BY MR. WALSH:

23       Q.   And it's your testimony that the

24   same -- you can use the same leases for

25   both analyses?

Page 154

1           TENER

2           MR. KOH:  Objection.  Go ahead.

3           THE WITNESS:  My testimony is

4     that those leases have rent resets

5     from which these rates are extracted

6     that are similar to 20-year terms.

7     Then there is another fair market rent

8     determination that occurs typically or

9     the lease ends but these rent resets

10    are where these rent multipliers are

11    derived from.  So the term is not

12    inconsistent with the lease term of

13    the McDonald's lease.

14  BY MR. WALSH:

15    Q.   But it would have been

16  inconsistent with the 99-year term assumed

17  in your August 2018 report; right?

18    A.   Remember, I'm going state it

19  again, that in those 49- and 99-year

20  leases there are rent resets that occur.

21  That's where these numbers are coming from

22  so they are applicable.

23    Q.   So in August 2018, you stated

24  that the 840 Atlantic Avenue property

25  would likely command a ground rent of 4 to

1                    TENER

2    5 percent of the current land value, had

3    it not been for the strong likelihood that

4    the M-Crown zoning would be passed in the

5    first term of the ground lease; right?

6         A.   Yes, sir.

7         Q.   But in April -- in April 2019 --

8    and you ultimately used a 6 percent rate

9    in August 2018; right?

10        A.   In 2018, yes, sir.

11        Q.   But in 2019, April 2019, you

12   concluded that 8 percent of the fair

13   market value of the property would be

14   consistent with the market for ground

15   leases; right?

16        A.   Yes, sir.

17        Q.   And that was with the identical

18   pool of leases that you were using to make

19   that comparison; right?

20        A.   Yes, sir.

21        Q.   So what changed from August 2018

22   to April 2019 to change your conclusion of

23   the appropriate rent to be applied?

24        A.   So when we looked at the

25   initial -- I would have -- I want to go

1                    TENER

2     back to my initial report because I'm

3     losing what my rationale was.  I know I

4     had one.  I would like to pull up my

5     initial --

6          Q.    Sure.  So you can do it in two

7     ways.  It's either the very -- I guess the

8     second document in binder one.  It's 02,

9     or it's P22 electronically.  And that

10    ground rent analysis was at page 69 which

11    is VA 082 to 083.

12          A.    Can I have some time just to read

13    this?

14          Q.    Sure.

15          A.    (Witness perusing document.)

16                This is twofold.  First, the

17    initial assignment was not advised by the

18    definitions within the rent option and

19    secondly, the -- the focus on how much of

20    this site would be attributable to retail

21    development informed the decision closer

22    to the 10 percent ratio than was the

23    earlier one.  So basically in the analysis

24    of the rent reset, it was recognized the

25    majority of this or the driving factor in

1                    TENER

2    development of this site as stressed by

3    the ground lease or the McDonald's lease

4    would tend towards the retail which slid

5    up towards the higher end of the range.

6    My comparables for retail ground leases

7    were largely at 10 percent so at the end

8    of our conclusion we felt -- I felt that

9    an 8 percent ground rent multiplier was

10   appropriate to this type of development.

11       Q.   Well, I thought that the value

12   determination is driven largely by the

13   highest and best use, not the current use

14   as a McDonald's.

15       A.   I didn't state that it had

16   anything to do with McDonald's.  I'm

17   saying that this assignment was informed

18   by the directions within the lease.  The

19   other was not but recognizing the

20   development of the site I looked at, that

21   this was largely going to be a retail

22   component economically, the development of

23   the site would be driven by the retail

24   largely and concluded that the rent

25   multiplier for that under this premise

1                    TENER

2    should be closer to the pure retail

3    development towards the 10 percent.

4        Q.   I don't understand how the

5    language in the fair market value, the

6    language in the option rent addendum to

7    the lease changes that calculus.  Can you

8    walk me through that because you said that

9    the initial assignment was not advised by

10   the definitions within the option rent

11   addendum.  So let's talk about that.  How

12   did the definitions in the option rent

13   addendum to the lease cause you to move

14   from a 6 percent rent value in August 2018

15   to an 8 percent in April 2019?

16            MR. KOH:  Objection.  Go ahead.

17            THE WITNESS:  I'm not saying

18       that.  I said it was twofold.

19            MR. WALSH:  Let me just -- I'm

20       sorry.

21            MR. KOH:  Go ahead.

22            THE WITNESS:  Do you want to --

23   BY MR. WALSH:

24       Q.   I guess -- so I understood your

25   answer but you're saying it's twofold so

1                    TENER

2    what I'm trying to understand is first,

3    before we get to the second part, how does

4    that first part change or can you not

5    break it up like that?  Is it really two

6    parts that go together?

7              MR. KOH:  Objection.  Go ahead.

8              THE WITNESS:  I don't think I can

9         break it out cleanly for you but there

10        are impacts that are in the

11        terminology of the amendment, the

12        option agreement, that impact and

13        define what you should do.

14   BY MR. WALSH:

15        Q.   Can you give me an example?

16        A.   No.  The words are there.  It

17   tells you to use certain approaches.  It

18   tells you to value land, then use a -- it

19   tells you a definition of fair market

20   rental.  None of these specifics were I

21   believe informed in the earlier appraisal.

22        Q.   Well, but you use the sales

23   comparison approach in August 2018; right?

24        A.   Yes.

25        Q.   And you use the sales comparison

```
                                        Page 160
 1                    TENER
 2    approach in April 2019; right?
 3        A.    Yes, sir.
 4        Q.    So your approach didn't change
 5    based upon the language in the option rent
 6    addendum, you use the same exact approach;
 7    right?
 8        A.    Same approach to value.
 9        Q.    Okay.  And so that didn't change.
10    What else in the option rent addendum
11    caused you to move from a 6 percent to an
12    8 percent?
13        A.    I'm not saying that anything in
14    the option rent addendum told -- what I'm
15    saying is that within the second appraisal
16    you are informed by the directions within
17    the option rent.  What changes is the
18    first market conditions have changed,
19    movement towards an M-Crown rezoning has
20    changed, the comparables we analyzed
21    changed.  All of these inform what's
22    happening in the market.  Secondly, what's
23    changed is that I recognize that the
24    majority of this development would be
25    towards retail based on its current land
```

1              TENER

2    value, recognizing that, recognizing the

3    public's awareness of the pending zoning

4    changes, all of these things impact market

5    opinions, market value, and in my opinion,

6    based on the concluded land values as of

7    '19, at that point in time, a tenant would

8    have had to pay 8 percent of that land

9    value at that time.  At the prior one

10   under the subtle differences not defined

11   within the option rent agreement and where

12   they were relevant to M-Crown and the

13   sales and lease comparables going on in

14   the market at that point, my conclusion

15   was that it would have been 6 percent they

16   would have had to have paid.  The market

17   continued to evolve and change and have

18   appreciation, have value.

19       Q.   Okay.  You said the market

20   continued to evolve and change but you

21   didn't add any new ground rent resets to

22   your analysis, right, it was the same

23   exact rule that you used in August 2018?

24       A.   Yes, sir.

25       Q.   So actually if we could turn to

```
                                   Page 162
  1                    TENER
  2     that.  It's ground rent resets tab at P73.
  3     Do you see it?
  4          A.   Yes.
  5          Q.   So there are 39 ground leases
  6     identified in this spreadsheet.  Do you
  7     see them, numbered 1 through 39?
  8          A.   Yes, sir.
  9          Q.   For each of those ground leases,
 10     you list a borough, you have a date, a
 11     use, a percent land value and you also
 12     have some comments and for three of them,
 13     numbers 24 through 26, they don't have a
 14     borough listed.
 15               Do you see that?
 16          A.   Yes.
 17          Q.   And there is no other data in
 18     here in your spreadsheet other than about
 19     these ground rents -- about these ground
 20     leases other than what's in this tab of
 21     the spreadsheet; right?
 22          A.   Yes, sir.
 23               MR. KOH:  Sorry, are we on P73?
 24               MR. WALSH:  P73, ground rent
 25          resets tab.
```

Page 163

                                   TENER
1
2    BY MR. WALSH:
3         Q.    Have you reviewed --
4              MR. KOH:  Where?  I'm not seeing
5         that yet.  I'm seeing tabs that run
6         from site area, tax, land sale grid.
7              MR. WALSH:  You've got to keep
8         going to the right.
9              THE WITNESS:  It's after AMI to
10        MKT.
11             MR. KOH:  Yeah, I'm trying to get
12        to that.
13             THE WITNESS:  The slide on the
14        bottom.
15             MR. KOH:  I've done that.  Maybe
16        if I switch to a horizontal view, it
17        will give me enough room to see that.
18        There it is.  Thank you.  I just had
19        to switch the view.  Go ahead.
20   BY MR. WALSH:
21        Q.    So have you reviewed all of the
22   actual ground leases that are reflected in
23   this spreadsheet?
24        A.    No, I have not.  These were part
25   of the assignment, many of these were part

Page 164

1                    TENER

2    of the assignment that were performed by

3    Theresa Nygard reviewing -- some of them

4    were assignments that she worked on.  She

5    worked on an analysis of the economics of

6    ground rent resets.  I also had access to

7    the ground rent reset terms from a Cushman

8    & Wakefield report that we reviewed that

9    summarized the ground rent resets and what

10   the property's uses were.  So it was a

11   combination of the assignment by Theresa

12   Nygard and some of these other reports

13   that we reviewed.

14       Q.    So have you reviewed any of these

15   ground leases?

16       A.    Yes.

17       Q.    How many of them?

18       A.    I don't know offhand.

19       Q.    More than five?

20       A.    It's possible.

21       Q.    Which ones?

22       A.    I can't tell you from this table.

23       Q.    Okay.  If I asked you to produce

24   all these leases, could you do that?

25       A.    I don't know.  Some of them were

Page 165

```
 1                    TENER
 2    under confidentiality but I did not -- I'm
 3    telling you that the majority of this
 4    assignment was from assignments that
 5    Theresa worked on, the ground rent resets
 6    and so they are all in our files.  Whether
 7    I have read them all or not, I doubt that
 8    I've read them all but I am certain that I
 9    have read several of them.
10        Q.    Several of the 39?
11        A.    Yes, sir.
12        Q.    Okay.  But you are confident that
13    all of these 39 leases are somewhere in
14    your office?
15        A.    No, I'm not confident that all of
16    them.  I can tell you that the C&W reports
17    are just summary of the provisions of the
18    rent resets.
19        Q.    What, if anything, did you do to
20    verify the accuracy of the data contained
21    in this tab of the spreadsheet?
22        A.    I looked at the work performed by
23    a co-worker who I trust and am confident
24    in her ability.  I can't tell you I did
25    anything more than look at the summarized
```

```
 1                    TENER
 2    provisions of these rent resets.
 3        Q.   Okay.  So you didn't do anything
 4    to verify the accuracy of the data
 5    contained in this tab of the spreadsheet;
 6    right?
 7             MR. KOH:  Objection.
 8             THE WITNESS:  Some of them I have
 9         personal knowledge of, others I have
10         had access to reliable verification by
11         one of my employees.
12    BY MR. WALSH:
13        Q.   Okay.  You didn't personally do
14    anything though, right, to verify the
15    data?
16             MR. KOH:  Objection.
17             THE WITNESS:  I'm not saying --
18         that's not true.  Some of them I have.
19    BY MR. WALSH:
20        Q.   So what did you do?
21        A.   Please --
22        Q.   I'm just wondering, I'm asking
23    what did you do to verify the data in this
24    report personally, not aside from relying
25    on other people, what did you do to verify
```

1                    TENER

2    that the accuracy of the data in this tab

3    of the spreadsheet titled ground rent

4    resets?

5         A.   Several of them I have read.  The

6    ones that I have not read I relied on my

7    employees.  And the other, the C&W one, I

8    just took the reported data from a report

9    that we reviewed and assumed that it was

10   accurate.

11        Q.   Okay.  And you didn't actually

12   talk to Theresa to make sure that it was

13   all for the same purpose, did you?

14        A.   I spoke to Theresa about this

15   assignment, her original assignment.  I

16   knew that the purpose of her original

17   assignment was and am familiar with what

18   she did to complete the assignment.  I

19   have no reason to think that her data is

20   not accurate.

21        Q.   Did you talk with Theresa about

22   this assignment or this particular aspect

23   of your assignment and how you'd be using

24   her data?

25             MR. KOH:  Objection.

1               TENER

2          THE WITNESS:  It's not her data.

3      It's our company data and it belongs

4      to the client in terms of the end work

5      product.  I did speak to her about

6      this assignment and what I was hoping

7      to document in the market and have no

8      issues with its -- with the relevance

9      to what I put in there.

10  BY MR. WALSH:

11      Q.   So 10 of these 39 leases date

12  back to the 1950s, nine of the 39 leases

13  date back to the 1960s.  How did you

14  verify that leases that were that old

15  still had relevance to a market rent reset

16  being performed in 2019?

17      A.   These rent resets or these rent

18  multipliers are based on their current

19  rent resets.  They are for recent resets

20  so these are occurring in the last 10

21  years, the rent resets.  That is the best

22  information that we have.  It's negotiated

23  ratios of land value to future rent

24  determinations of generally 20 years is

25  most typical for the rent resets.  I found

```
                                        Page 169
 1                    TENER
 2     this to be the best available comparable
 3     data that I could find.
 4          Q.   So what is in KTR's files that
 5     would show -- for example, we're looking
 6     at -- I'm looking at number 1.  It says
 7     Manhattan, date 1955, use office.  Where
 8     would I look to confirm that that 5
 9     percent number was accurate and when it
10     was negotiated?
11          A.   The backup data for Theresa's
12     report.
13          Q.   But you didn't do that as part of
14     this analysis?
15          A.   As I said, I trust that
16     employee's ability who is also an expert
17     witness to do this work credibly and I
18     have no doubt that it accurately reflects
19     information that she reported.
20          Q.   On the bottom of this spreadsheet
21     of this tab in the spreadsheet, rows 46
22     through 49, you have some years.  I'm just
23     trying to understand.  It says 1950
24     minimum 4.5 percent, 2012 maximum 10
25     percent, 1969.5 median 6 percent, 1973
```

```
 1                    TENER
 2    average 6.5 percent.
 3             What do those years and numbers
 4    reflect?
 5        A.   Just the years that the leases
 6    were originally signed.
 7        Q.   Now, you just testified that the
 8    reason this data is all relevant is
 9    because these all reflect rent resets that
10    happened in the past 20 years.  So why did
11    you summarize the years in this other
12    portion of the spreadsheet?
13        A.   My own knowledge of when --
14             MR. KOH:  Objection.  Go ahead.
15             THE WITNESS:  Just for my own
16        knowledge of when these occurred.
17    BY MR. WALSH:
18        Q.   When what occurred?
19        A.   When the original lease was
20    signed.
21        Q.   What relevance does that have to
22    your analysis?
23        A.   I want to know whether I had
24    recent lease comparables from which to
25    derive current rents.  The most recent one
```

1                       TENER

2    that I had was 2012 which was a

3    residential development in Manhattan on

4    23rd Street.

5         Q.   But you just testified that all

6    of these, regardless of the year that's

7    listed in column C, were negotiated in the

8    past 20 years.  Is that not accurate?

9         A.   No --

10              MR. KOH:  Objection.  That's not

11       what he said.

12              THE WITNESS:  That's not what I

13       testified to.

14   BY MR. WALSH:

15        Q.   Okay, so can you clarify because

16   that was my impression of what you were

17   testifying to.

18        A.   It's an incorrect impression.

19   The -- what I said or if I misstated, I

20   will clarify now, is that these were all

21   leases that were signed as indicated in

22   that table.  They all have periodic rent

23   resets.  These rent resets have occurred

24   within the last 20 years.

25        Q.   I see.  But the percent of the

```
 1                        TENER
 2     reset would have been negotiated or could
 3     have been negotiated in the year listed in
 4     column C; is that correct?
 5          A.    Yes, sir.
 6          Q.    So for number 1, Manhattan date
 7     1955, that 5 percent that you used to
 8     determine a market rent reset in 2019 was
 9     negotiated in 1955?
10          A.    Well, it was part of the data
11     set.  It wasn't negotiated in 1955 but it
12     was part of the data set.
13          Q.    So when was it negotiated?
14          A.    I said 1955.
15          Q.    Okay.  And so you believe that a
16     rate negotiated 64 years before this rent
17     reset is relevant and reliable to
18     determine what the current market value of
19     this ground lease should be?
20          A.    I believe that the pool of ground
21     rent multipliers that I looked at
22     regardless -- I wouldn't say regardless,
23     but the pool that I looked at is reliable
24     to set a current and informs the rates
25     that would be accepted in the market.
```

```
                                    Page 173

 1                  TENER

 2       Q.   Now, do you agree that the

 3   percentage of land value for a particular

 4   ground lease reflects the percentage that

 5   an investor would expect to get from its

 6   purchase of the property?

 7            MR. KOH:  Objection.  Go ahead.

 8            THE WITNESS:  I think it has some

 9        bearing on the purchase but most of

10        the time, ground leases are negotiated

11        because the owner of the fee does not

12        want to sell the asset and wants to

13        control it in perpetuity.

14   BY MR. WALSH:

15       Q.   But the percentage of the value

16   that they negotiate, that is essentially

17   their return on investment; right?

18       A.   It is the --

19            MR. KOH:  Objection.

20            THE WITNESS:  It is a negotiated

21        return.

22   BY MR. WALSH:

23       Q.   Okay.  And that doesn't change

24   over time, what investors expect as a

25   return on their investments?
```

Page 174

1                    TENER

2       A.    It certainly can.

3       Q.    Okay.

4             MR. KOH:   Brendan, we've been

5       going about an hour and a half.

6             MR. WALSH:   We can take a break

7       now.

8             THE VIDEOGRAPHER:   Thank you.

9       The time is approximately 2:20.   We're

10      going off the record.   This is the end

11      of media 3.

12            (Recess taken from 2:20 p.m. to

13      2:32 p.m.)

14            THE VIDEOGRAPHER:   The time is

15      approximately 2:32.   We're back on the

16      record.   This is the beginning of

17      media 4.

18   BY MR. WALSH:

19      Q.    Mr. Tener, referring back to your

20   April 15, 2019 report, which is Exhibit

21   P32, looking at the bottom of page 3, it's

22   the page ending in Bates stamp 1943.   The

23   bottom paragraph, you wrote, "Additional

24   factors influencing this rate would

25   include the significant increase in land

1                    TENER

2    value that would likely occur should the

3    proposed M-Crown rezoning be approved in a

4    manner that is consistent with that

5    currently being considered.  Based on the

6    most recent presentation (as of the

7    February 7, 2019 meeting), the subject's

8    maximum developable area would increase to

9    approximately 170,500 square feet of ZFA

10   and would include an affordable housing

11   component.  Although the timing and

12   certainty of this rezoning is unknown, it

13   is a factor that a well-informed landlord

14   would consider in determining the fair

15   market rental value."

16           Do you see that?

17       A.    I do, sir.

18       Q.    Would this same assumption hold

19   true if you had considered the encumbrance

20   of the 20-year McDonald's lease in your

21   valuation in April 2019?

22       A.    What date, in April 2019?

23       Q.    Correct.

24       A.    This is not an assumption.  What

25   appraisers are required to do is to

                          TENER

1      consider pending zoning changes.  It's

2      actually in USPAP standard 1.3, and their

3      impact potential impact on value.  An

4      example, if a landlord is considering

5      encumbering a property with a 20-year

6      lease to give away control of a property

7      to a tenant for 20 years and there's a

8      chance that the zoning on that property

9      will change in the next two, three, four

10     or five years or during that 20-year

11     period, it's going to impact the return or

12     the rate that a landlord would accept to

13     give up control of an asset that could

14     materially change in value during the

15     lease term.

16         Q.   Okay.  But here Vanderbilt had

17     already given up control of the property;

18     right?  So McDonald's already had a lease

19     that ran through April 2039; right?

20         A.   There is a lease on the property,

21     yes.

22         Q.   So McDonald's already had control

23     of the property; right?  So the only

24     question is what price should McDonald's

                    TENER

1

2   pay for the first five-year term and for

3   the three option terms after that; right?

4        A.   I don't think it's McDonald's.  I

5   don't think the lease says what this

6   tenant would pay.

7        Q.   What the fair market value is for

8   the next five years and then up to 20

9   years, right, because of the 20-year term?

10       A.   The tenant would control this

11  property for 20 years for a fair market

12  rental value as the price an average

13  well-informed tenant would pay and an

14  average well-informed landlord would

15  accept, exclusive of tenant's improvements

16  knowing all uses to which the property can

17  be put without duress on either party.

18  That's the direction within the lease

19  documents.

20       Q.   And it's the uses to which the

21  property could be put for the next 20

22  years; right?

23       A.   We have now determined that based

24  on the Second Avenue, yes.

25       Q.   Right.  So if the question is the

1                    TENER

2    uses to which the property could be put

3    for the next 20 years, could the zoning

4    envisioned by the M-Crown rezoning, could

5    the property be developed in a manner

6    consistent with M-Crown for only a period

7    of 20 years?

8         A.   That would not be my conclusion

9    that you could do that.  What I'm saying

10   is that the landlord would be giving up

11   control for 20 years at which point in

12   time during that 20-year period the tenant

13   would have control over an asset that

14   would change materially in value, and

15   that's going to inform a well-informed

16   landlord decision about the rate that

17   would be appropriate to the fair market

18   rental value.

19        Q.   Okay.  So it's your professional

20   opinion that a landlord can consider --

21   I'm sorry, strike that.

22             It's your opinion that Vanderbilt

23   can consider a change in zoning in

24   determining the rent that McDonald's would

25   pay for the next 20 years?

1               TENER

2          MR. KOH:  Objection.  Go ahead.

3          THE WITNESS:  That Vanderbilt

4     will?

5     BY MR. WALSH:

6     Q.   Right.  That Vanderbilt is

7     entitled to consider the possibility of a

8     change in zoning in deciding what rent to

9     charge McDonald's for the next 20 years.

10    A.   That's not my testimony at all.

11    Q.   Okay.

12         But you're saying that they would

13    be allowed to consider that in deciding

14    what to charge McDonald's; right?  How are

15    the two different?

16    A.   What I'm saying is that a fair

17    market rental value as directed within

18    this lease says that what a well-informed

19    tenant would pay and a well-informed

20    landlord would accept, a well-informed

21    landlord in determining what they would

22    accept would be aware of changes to zoning

23    that would materially change the value of

24    their property that they are giving up for

25    20 years and it would inform the rate they

Page 180

```
 1                    TENER
 2   would require or the rent that they would
 3   require.  If you had a property on Park --
 4   or Central Park South and Fifth Avenue
 5   that was zoned 1 FAR and you could only
 6   put a car wash on it and it was going to
 7   be rezones to an 18 FAR or they were
 8   talking about it, do you think a landlord
 9   would be informed by that pending decision
10   in deciding what they would accept for
11   rent for the property?  The answer I will
12   give you is yes and it's a requirement of
13   appraisers to consider that under USPAP.
14        Q.   Doesn't the 936 Second Avenue
15   case say that zoning is an encumbrance?
16             MR. KOH:  Objection.  Go ahead.
17             THE WITNESS:  I don't know.
18   BY MR. WALSH:
19        Q.   So you're not aware if the
20   936 Second Avenue case requires appraisers
21   to consider only current zoning in a
22   situation like this?
23             MR. KOH:  Objection.  Go ahead.
24             THE WITNESS:  I've not been
25      informed that that is the ruling.  I
```

```
 1                     TENER
 2       know that I am appraising it under
 3       this zoning and I am appraising it
 4       under a requirement that the fair
 5       market rental value be determined by
 6       well-informed tenants and landlords
 7       and that while I do not -- I do not
 8       deem to appraise it based on a change
 9       in zoning, I am saying that the zoning
10       is in effect, I am not appraising it
11       under a different zoning.  I am saying
12       that the potential for a zoning change
13       would impact the return requirements
14       of the landlord in determining whether
15       they will give away the right to use a
16       property for a 20-year period.  That
17       is the requirement.  I do not think
18       that the decision you're talking about
19       speaks to that part of appraisal.
20            MR. WALSH:  If we could turn to
21       page 5 of your report, it's the page
22       ending in 1945, certificate of
23       appraisal.
24            MR. KOH:  What exhibit number is
25       this?  I'm sorry.
```

```
                                        Page 182
 1                    TENER
 2             MR. WALSH:  It's still P32.  It's
 3        the April 2019 report.
 4             MR. KOH:  I've got it.
 5    BY MR. WALSH:
 6        Q.   The very bottom certification,
 7    you wrote, "Other than preliminary
 8    investigation and analysis in conjunction
 9    with this appraisal assignment, we have
10    not appraised or provided any other
11    services with respect to the subject
12    property, as appraisers or in any other
13    capacity, in the last three years."
14             Now this is a disclosure required
15    by the ethical rules of USPAP; right?
16        A.   Yes.
17        Q.   And as a licensed appraiser in
18    New York, you're bound by USPAP; right?
19        A.   Yes, sir.
20        Q.   Is this an accurate statement?
21        A.   This is referring to the -- yes,
22    it is.  It's referring to the statements
23    -- to the appraisals that we did for Sam
24    Rottenberg relative to this, what evolved
25    into this assignment.
```

                        TENER

1
2      Q.   But that was under a different
3   engagement letter from a different firm;
4   right?
5      A.   Yes.
6           MR. KOH:  Objection.  Go ahead.
7           THE WITNESS:  It wasn't for
8       Wachtel Missry, it was for his client.
9   BY MR. WALSH:
10      Q.   And it had nothing to do with the
11   fair market rental valuation process in
12   the option rent addendum to the lease;
13   right?
14           MR. KOH:  Objection.  Go ahead.
15           THE WITNESS:  I don't know
16       whether it did or not.  Could it be
17       clearer?  Yes, but the intent was to
18       inform that we had done that work.
19   BY MR. WALSH:
20      Q.   So you consider the August 2018
21   appraisal preliminary and investigation
22   and analysis in connection with this
23   appraisal assignment?
24      A.   Sitting here at this point,
25   that's what it feels like to me, that I

Page 184

1                    TENER

2    was engaged by them, by Sam Rottenberg's

3    group and through all of his actions, it

4    appears like this was a audition for this

5    eventual rent decision, that's why we

6    phrased it this way, it felt like this was

7    all part of leading up to it even though I

8    was not fully aware of it at the time.

9         Q.   Is it common practice for

10   appraisers to ask associates or even

11   competitors for assistance in gathering

12   market data for a particular assignment?

13        A.   Yes, sir.

14        Q.   So, for example, you got

15   information from Theresa Nygard that you

16   used in this assignment; right?

17        A.   Yes, sir.

18        Q.   And you also relied on data from

19   Cushman & Wakefield; right?

20        A.   Yes, sir.

21        Q.   Can you show me any

22   correspondence anywhere with any other

23   appraisers asking for assistance in

24   finding potential ground lease comps for a

25   period of under 49 years?

1                    TENER

2         A.    I didn't reach out to anybody

3    looking for that.

4         Q.    Did you reach out to any

5    colleagues?

6         A.    I spoke to Theresa who is my

7    expert in ground leases.  Neither one of

8    us could think of anyone but no, I did not

9    go out and ask other appraisers if they

10   had 20-year ground leases that were

11   recently signed or any ground leases that

12   were signed.

13        Q.    And you also did not reach out to

14   any brokers?

15        A.    No, I did not.

16        Q.    No landlords or developers?

17        A.    No, sir.

18        Q.    Okay.  So after you issued your

19   report in April -- on April 15, 2019, do

20   you recall what was the next thing that

21   happened in the fair market rental

22   valuation process for this lease?

23        A.    I believe that we had a -- I'm

24   not sure if the next stop was naming the

25   other -- naming the third-party appraiser.

                            TENER

1    I forget the sequence.

2        Q.   So do you recall when you found

3    out that Sharon Locatell was serving as

4    McDonald's appraiser?

5        A.   What I was inarticulately saying

6    is that I don't really recall the

7    sequence.

8        Q.   You knew Sharon before this

9    assignment; right?

10       A.   Yes, sir.

11       Q.   What is Sharon's reputation in

12   the appraisal community?

13       A.   I would rather not speak to her

14   reputation.

15       Q.   Well, I'm asking you that

16   question and I would like an answer.

17       A.   She's an MAI that's active in

18   litigation, that's her reputation.

19       Q.   Why are you uncomfortable

20   answering that question?

21       A.   Because I don't think that I need

22   to speak about reputation.  I think I'd

23   rather be matter of fact.

24       Q.   Do you believe she's a competent

```
                                        Page 187

 1                      TENER

 2   appraiser?

 3        A.   I would prefer to not answer that

 4   question.

 5        Q.   My question is do you believe she

 6   is a competent appraiser, yes or no?

 7        A.   She's a designated appraiser.

 8   She has -- she has all of the licenses and

 9   she's an MAI and so I'll let her -- we'll

10   let her credentials speak for themselves.

11        Q.   Someone with those credentials

12   must be a competent appraiser though;

13   right?

14        A.   No, sir.

15        Q.   You have those credentials

16   though, don't you?

17        A.   I'm an MAI, sir.

18             MR. WALSH:  Okay.  If we could

19        look at P37, please.

20             VERITEXT CONCIERGE:  P37 is now

21        being copied over.

22   BY MR. WALSH:

23        Q.   If you could look at I guess it's

24   pages 3 and 4.

25        A.   I'm not seeing it yet.
```

Page 188

1                      **TENER**

2           Pages 3 and 4?

3      Q.    Actually let's look at page 1,

4   I'm sorry.  The page ending in 026 which I

5   guess is page 2.  There's an April 23,

6   2019 e-mail on the bottom of the page.

7   It's from you to Morris Missry.

8           Do you see that?

9      A.    At the bottom?

10     Q.    Yeah.

11     A.    Yes.

12     Q.    And you wrote, "I will be

13  speaking with Sharon Locatell tomorrow at

14  10 a.m. to go over the logistics of this

15  FMR determination and to begin the

16  discussion about the selection of the

17  third appraiser.  Please send me the list

18  of appraisers that Sam has spoken with

19  about this property.  Besides Amanda Aaron

20  are there any appraisers that you do not

21  want to be considered.  Thanks."

22          What appraisers did Morris tell

23  you should not be considered?  It looks

24  like he told you not to consider Amanda

25  Aaron?

1                    TENER

2         A.    I think so but based on this

3    communication.

4         Q.    Do you recall why?

5         A.    No, I don't.

6         Q.    Do you recall if he told you any

7    other appraisers that you shouldn't

8    consider?

9         A.    I don't recall.

10        Q.    And did he give you a list of

11   appraisers that Sam has spoken with about

12   the property?

13        A.    I don't recall.

14        Q.    Okay.  Looking at the first page,

15   there's some correspondence back and forth

16   with you and on April 25th, you wrote,

17   "Morris and Sam, I am also considering

18   Kevin Leprohon at Blake (he is

19   Christophe's partner).  Any conflict?"

20   Morris Missry responded that same day,

21   "No, you know what we're looking for."

22             What was Morris Missry looking

23   for in a third appraiser?

24        A.    I think he was looking for

25   someone that was knowledgeable of the

Page 190

                    **TENER**

1        Brooklyn market and would understand

2        ground leases.

3            Q.    Was there anything else he was

4        looking for?

5            A.    Not that I know of.

6            Q.    What else do you remember about

7        that process and what Morris told you?

8            A.    Not what Morris told me.  In

9        general you're looking for appraisers that

10       don't have any conflicts.  That's really

11       what I was trying to add.

12           Q.    Okay.  Were you feeling pressured

13       at this time to get a third appraiser in

14       place?

15           A.    Not pressured but there was a

16       timeline that I believe that we were

17       trying to move this forward on.  I'm not

18       sure if it was specified in this lease or

19       not.  Some of the leases specify a time

20       frame where you have to have the third by.

21               MR. WALSH:  If we can mark

22           VA 001592.

23               (Exhibit P74, document Bates

24           labeled VA 001592, marked for

Page 191

1                    TENER

2           identification.)

3                    VERITEXT CONCIERGE:  This we'll

4           mark as Exhibit P74.

5    BY MR. WALSH:

6           Q.   If you could look to the bottom

7    of the second page, it's the page ending

8    in 1593.

9           A.   1593, I'm there, sir.

10          Q.   So this is an e-mail from you to

11   Morris Missry and Sam Rottenberg on April

12   25, 2019.  And at the bottom of page 2 you

13   wrote, "She seems to think that we will

14   meet with the 3rd appraiser and try to

15   convince the 3rd that our MVS are correct,

16   prior to the 3rd appraiser authoring a

17   report."  On the next page you say, "What

18   is your take on the procedure outlined in

19   the option rent addendum?"

20               Do you see that?

21          A.   I do, sir.

22          Q.   So how did you respond when

23   Sharon brought that up to you during your

24   call with her?

25               MR. KOH:  Objection.  Go ahead.

Page 192

```
 1                    TENER
 2          THE WITNESS:  I don't recall what
 3      I said to her.  I actually don't
 4      remember what the conversation was.
 5      This is a summation of that -- of her
 6      opinion of it.  I don't recall what I
 7      said to her.
 8  BY MR. WALSH:
 9      Q.   And you asked Morris Missry for
10  advice; right?
11      A.   I was asking for an
12  interpretation of the appraisal proceeding
13  of how we were supposed to move forward
14  and how the appraisal proceeding was
15  supposed to occur.
16      Q.   And then Morris responded and
17  asked if you were available for a quick
18  call with him and Sam Rottenberg; right?
19      A.   Yes, sir.
20      Q.   And do you recall that call?
21      A.   No, sir.
22      Q.   Okay.  And what do you recall
23  about the instructions Morris Missry gave
24  you about Vanderbilt's position on the
25  role of the third appraiser?
```

1                    TENER

2       A.    I think there was a belief that

3    the rent option addendum directed us to

4    exchange letters of value that didn't make

5    a provision for what Sharon was asking for

6    which was basically a -- almost an

7    arbitration where we would be presenting

8    data to the -- or presenting our case to a

9    third appraiser prior to him ever -- that

10   third appraiser which happened to be Marc

11   Nakleh who we agreed upon, to before that

12   appraiser would write their own appraisal

13   letter of opinion which appeared to be in

14   conflict with the directions of the option

15   rent addendum.

16      Q.    So did you agree with Morris that

17   the parties' appraiser should not be

18   allowed to have discussions with the third

19   appraiser?

20            MR. KOH:  Objection.  You may

21       answer.

22            THE WITNESS:  I don't know

23       whether discussions as opposed to a

24       hearing.  Really what Sharon was

25       suggesting is that almost like before

Page 194

1              TENER
2       the third appraiser ever wrote their
3       letter of opinion that there would be
4       this exchange of almost our case, our
5       position on this valuation.  I was
6       under -- my reading of the rent option
7       addendum didn't jive with Sharon's
8       reading of it.  I thought that we were
9       supposed to exchange letters of value,
10      letter opinions of value, the three of
11      us and compare the results, and if
12      there was agreement between two, they
13      would prevail.  If there was not, it
14      would be an average of the three
15      reports.  I took on this assignment
16      believing that it was a simple
17      exchange of values and not a
18      full-fledged arbitration.
19   BY MR. WALSH:
20      Q.   Okay.  So that was your view.
21   What view did Morris and Sam tell you to
22   take?
23           MR. KOH:  Objection.
24           THE WITNESS:  Sam didn't tell me
25      anything that I recall.  I think

```
 1                    TENER
 2        Morris was of the opinion that it was
 3        supposed to be a simple exchange, that
 4        it was more in line with my
 5        understanding.
 6   BY MR. WALSH:
 7        Q.   Did Morris ever suggest that not
 8   having discussions with a third appraiser
 9   was more likely to result in the averaging
10   of the three appraisals?
11             MR. KOH:   Objection.   Go ahead.
12             THE WITNESS:   I don't recall that
13        being a discussion point.   It was a
14        discussion point of what does the rent
15        addendum tell us to do.
16   BY MR. WALSH:
17        Q.   But did he ever suggest that his
18   approach was more likely to result in an
19   averaging?
20        A.   I don't recall that.
21        Q.   Did Morris or Sam ever express a
22   desire to you that your valuation be
23   averaged with the other two valuations?
24        A.   A desire, no, I don't think so.
25        Q.   Well, how would you describe it?
```

```
 1                    TENER
 2       A.   That because there was a
 3   significant difference and this would have
 4   been -- so we're jumping ahead.  This is
 5   after our exchange that there was a
 6   significant difference between us that it
 7   wouldn't be likely that we would have
 8   agreement.  That's about it.
 9            MR. WALSH:  If we could pull up
10       P38, please.
11   BY MR. WALSH:
12       Q.   Okay, the bottom e-mail is an
13   e-mail from you to Sam Rottenberg and
14   Morris Missry on May 6th and you wrote,
15   "Guys, I haven't spoken with Sharon yet;
16   however, I am considering including Marc
17   Nakleh of C&W on my extended list."
18   Morris responded a few minutes later and
19   asked you why and then you responded a few
20   minutes later and said, "I reviewed one of
21   his appraisal reports that he did for
22   Brian Corcoran that detailed numerous
23   ground land percentages relative to land
24   value.  I will remind him of this data
25   that he has available in his files.  Some
```

1                    TENER

2    of this data is noted in my report and is

3    supportive of a high percentage in the

4    estimation of FMR."

5            Do you see that?

6        A.   Yes, sir.

7        Q.   So earlier you testified that

8    what you were looking for in an appraiser

9    was someone who knew Brooklyn and someone

10   who didn't have a conflict, but here

11   you're indicating a preference for

12   somebody who has data that is supportive

13   of a high percentage in the estimation of

14   FMR; right?

15       A.   I think that the intent was

16   because I had gone towards the high end of

17   the range that I would remind this

18   appraiser, if he was the one selected, of

19   the data that I had available that he was

20   knowledgeable of.

21       Q.   How would you remind him of that

22   data?  Because you were envisioning a

23   process where there was no discussions and

24   Morris was considering more of an

25   exchange.  So how would you have reminded

Page 198

```
 1                     TENER
 2    him of that data?
 3              MR. KOH:  Objection.  That's not
 4         what he testified to.  Go ahead.
 5              THE WITNESS:  I don't know
 6         exactly what level of communication
 7         there would be between the three
 8         appraisers.  What I had said was that
 9         I did not envision this being a
10         arbitration where we're presenting our
11         case to the third where he wrote an
12         appraisal, but I didn't think it would
13         be in a complete vacuum.  I just
14         didn't think it would be the way
15         Sharon described it, that she
16         envisioned this almost hearing and
17         presentation of our cases to Marc
18         Nakleh before he even wrote his letter
19         opinion of value.  I didn't think that
20         was consistent with the direction the
21         option rent addendum went.
22    BY MR. WALSH:
23         Q.   Did Morris think that it should
24    be done in a vacuum?
25              MR. KOH:  Objection.
```

```
 1                    TENER
 2           THE WITNESS:  I don't know
 3      whether he did or not but I think they
 4      did not agree with the premise taken
 5      by Ms. Locatell.
 6  BY MR. WALSH:
 7      Q.   And just to be clear, the data
 8  that you said in this e-mail is noted in
 9  your report, those were the C&W entries in
10  the ground rent reset tab of that
11  spreadsheet we looked at earlier; right?
12      A.   Yes, sir.
13           MR. WALSH:  Okay.  So if we could
14      mark MCD002701.
15           (Exhibit P75, document Bates
16      labeled MCD002701, marked for
17      identification.)
18           VERITEXT CONCIERGE:  This is
19      being introduced as P75.
20  BY MR. WALSH:
21      Q.   This is an e-mail from Sharon
22  Locatell to Carol Demarco.  I'm just
23  telling you it's an e-mail from Sharon
24  Locatell to Carol Demarco and Mike Meyer
25  on Thursday, May 9th.  If you could just
```

Page 200

                              TENER

1
2     read that e-mail and let me know when
3     you've read it.
4          A.    (Witness perusing document.)
5               I've read it.
6          Q.    Is Sharon's summary of what she
7     interpreted her position as, is that
8     consistent with the position that you took
9     during your meeting?
10         A.    I don't think it's a hundred
11    percent accurate and I recall her not
12    wanting to call Marc, not the other way
13    around.  So I think she has
14    miscommunicated that portion of it.
15    The -- I'm not sure why.  I'm not quite
16    sure what she's saying as I thought he
17    read the lease to say, which means that
18    she had a concern about how I read the
19    lease and maybe she read the lease in a
20    certain way, to say that we all have to
21    come to the initial meeting of the letter
22    opinion of value.  So that's consistent
23    that I thought that the three appraisers
24    would write their letter opinion of
25    values, we would exchange that, if we

1                    TENER

2    couldn't come to an agreement of value

3    that then the three would be averaged.

4    That is how I read this.  She words it a

5    little bit differently but yes, that was

6    closely consistent with my interpretation

7    and what we discussed.

8              MR. WALSH:  Okay.  If we could

9         mark VA 000408.

10             (Exhibit P76, document Bates

11        labeled VA 000408, marked for

12        identification.)

13             VERITEXT CONCIERGE:  This will be

14        introduced as P76.

15   BY MR. WALSH:

16        Q.   So the e-mail we just looked at

17   indicated that you and Sharon had a call

18   about the process on May 9th and this

19   document indicates that you scheduled or

20   someone scheduled a telephone conference

21   between you, Morris Missry, Sam Rottenberg

22   and Tom Li the next day on May 10, 2019.

23             Do you see that?

24        A.   It looks like I was the organizer

25   of it.

```
                                      Page 202

 1                    TENER

 2       Q.   And that meeting was to discuss

 3   the instructions to be given to the third

 4   appraiser; right?

 5       A.   I believe so.

 6       Q.   And Morris, Sam and Tom Li were

 7   all at that meeting, right, or on that

 8   call?

 9       A.   I don't recall if all attended.

10       Q.   Okay.  In your invoice for May

11   time, you wrote call with MM, SR, TL about

12   SL reading of instructions to appraisers.

13   If you put it in your time entries, it

14   would seem likely that they were all

15   there; right?

16       A.   Yes, sir.

17       Q.   Okay.  And what do you remember

18   about that phone call?

19       A.   I remember explaining her

20   position as best I could and pretty much

21   asking them how do we solve this because

22   Sharon didn't want to reach out to Marc

23   until we had this settled.

24       Q.   What instructions did they give

25   you?
```

Page 203

```
 1                        TENER
 2        A.   I don't recall but it's okay to
 3     go forward with the way that she thinks
 4     that it is read.
 5             MR. WALSH:  If we can mark
 6        VA 001248.
 7             (Exhibit P77, document Bates
 8        labeled VA 001248, marked for
 9        identification.)
10             VERITEXT CONCIERGE:  This will be
11        marked as Exhibit P77.
12             THE WITNESS:  It's up.
13     BY MR. WALSH:
14        Q.   So you were exchanging e-mails
15     with Sam and Morris about this
16     disagreement on the process with the third
17     appraiser and the second e-mail on the
18     first page on May 14, 2019, you wrote to
19     Morris, "If the hope is to avoid
20     litigation and delay in the rent reset, I
21     might suggest that we propose having the
22     three appraisers review the directions and
23     see if two of us can agree.  What do you
24     think?"
25             Do you see that?
```

```
                                              Page 204

 1                    TENER

 2       A.    Yes, sir.

 3       Q.    And Morris rejected that idea;

 4  right?

 5            MR. KOH:  Objection.

 6            THE WITNESS:  He states, "The

 7       lease provision is clear.  I am

 8       talking to them and will let you know

 9       what happens.  Thank you."  That's all

10       he said.  I don't know whether he

11       rejected that idea or not.

12  BY MR. WALSH:

13       Q.    Did he ever accept that idea?

14       A.    I don't know.

15       Q.    Okay.  Around this time you asked

16  Vanderbilt for a list of the owners and

17  ownership entities for the conflict check.

18  If we could mark P65.

19            VERITEXT CONCIERGE:  P65 has been

20       copied.

21            THE WITNESS:  I'm sorry, what is

22       the?

23  BY MR. WALSH:

24       Q.    P65.

25       A.    Oh, it's at the bottom.  They are
```

```
                                                    Page 205
 1                        TENER
 2      not going in order at this point.
 3           Q.   And so Tom Li on May 21st sent
 4      you a list of entities.
 5                Do you see that?
 6           A.   Yes, sir.
 7           Q.   If we could now pull up P64.
 8                VERITEXT CONCIERGE:   P64 has been
 9           copied.
10      BY MR. WALSH:
11           Q.   Now, if you could look at P64.
12           A.   Yes, sir.
13           Q.   This is an e-mail that Tom only
14      sent internally to Sam Rottenberg before
15      he sent you the list that we just looked
16      at at P65 and there's a bunch of
17      additional names in here.  Were you aware
18      that these other entities were involved in
19      some way in the ownership of this
20      property?
21                MR. KOH:   Objection.  Go ahead.
22                THE WITNESS:   I don't think so.
23      BY MR. WALSH:
24           Q.   Have you ever worked with Simon
25      Dushinsky before?
```

```
 1                    TENER
 2        A.    I don't know offhand.
 3        Q.    How about the Rabsky Group?
 4        A.    I don't know offhand.  I would
 5   have to check.
 6        Q.    Why was it important for you to
 7   have the full list of all the owners that
 8   had some sort of interest in this
 9   property?
10        A.    The conflict check is primarily
11   for me to inform the attorneys involved if
12   I have done work for other people so they
13   can decide whether I have potentially any
14   conflicts that would make them not want to
15   work with me.  That's my understanding of
16   a conflict check.  I'm looking to see have
17   I done work, do people think that I have
18   any relationship with any of these people,
19   do I have some business relationship with
20   them that would somehow preclude my
21   independence.
22        Q.    And so it would have been
23   important for Marc to know all of the
24   ownership entities involved, right, in
25   order to understand whether he had some
```

1                    TENER

2    sort of conflict?

3              MR. KOH:  Objection.

4              THE WITNESS:  This is from Marc.

5         So I misunderstood the nature of this

6         disclosure.  You would want Marc to

7         know who these entities were to see if

8         they have any relationship with him,

9         Marc has any relationship to see if

10        his independence would be impacted.

11   BY MR. WALSH:

12        Q.   So this is another instance where

13   you asked for information and Vanderbilt

14   either didn't give it to you or didn't

15   give you everything.  Is it concerning to

16   see -- for example, you asked for the

17   McDonald's lease in August 2018, they

18   didn't give it to you.  You asked for the

19   Vanderbilt lease in August 2018, they

20   didn't give it to you.  You asked for the

21   Vanderbilt lease again in March of 2019,

22   they didn't give it to you.  Now you're

23   asking for the names of the owners and

24   ownership entities and it appears at least

25   they only gave you partial information.

```
                                              Page 208

 1                      TENER
 2            MR. KOH:  Objection.
 3    BY MR. WALSH:
 4        Q.   Does this give you pause about
 5    what else they may have been holding back
 6    from you?
 7            MR. KOH:  Objection.  You may
 8        answer.
 9            THE WITNESS:  I don't know if it
10        gives me pause.  I would prefer to
11        have everything disclosed to me when I
12        ask for it.  It's the way I do
13        business.
14    BY MR. WALSH:
15        Q.   But you don't know what you don't
16    know unless they tell you; right?
17        A.   That's right.
18        Q.   So ultimately the parties and
19    appraisers scheduled a meeting for June
20    19, 2019 at Morris Missry's office; right?
21        A.   Yes, sir.
22            MR. WALSH:  If we could pull up
23        P34, please.
24            VERITEXT CONCIERGE:  P34 is now
25        copied over.
```

Page 209

1                         **TENER**

2       BY MR. WALSH:

3            Q.   It's handwritten notes.  First of

4       all, did you take notes during that June

5       19, 2019 meeting?

6            A.   Not that I saved.  Not that I

7       have in my files.

8            Q.   When would you have discarded

9       those notes?

10           A.   Probably at the meeting.  I

11      remember doing some calculations on my

12      HP12C of a basic residual.  I don't know

13      whether I did it on paper or whether it

14      was all in my HP12C but that would have

15      been the extent of the notes that I took.

16           Q.   So these are not your notes?

17           A.   It's not my handwriting.

18           Q.   Do you know whose handwriting it

19      is?

20           A.   No.

21           Q.   What did you understand the

22      purpose of the June 19, 2019 meeting to

23      be?

24           A.   I thought it was so that we could

25      move forward with trying to determine the

```
 1                    TENER
 2   procedures with a third appraiser.  That's
 3   what I thought the purpose was.  I was
 4   also asked to bring my initial appraisal
 5   letter.
 6       Q.   In preparation for that meeting,
 7   did you have conversations with Morris,
 8   Sam or Tom Li about the encumbrance of the
 9   lease, that issue, the 20-year term of the
10   lease not being considered in your initial
11   report?
12       A.   I don't think leading up to that
13   meeting, I don't think I did.
14       Q.   So after you had spoken with
15   Morris about that in early April 2019, you
16   don't recall any conversations about that
17   particular issue, meaning the 20-year term
18   of the lease, until after that June 19,
19   2019 meeting?
20       A.   Actually at the meeting, Morris
21   said that he agreed with them, with that
22   the -- that the decision applied.  That
23   was the first time I had heard that.  I
24   don't recall having a conversation with
25   him before that.  I remember being
```

Page 211

```
 1                        TENER
 2    surprised that he changed his opinion.
 3         Q.   And how did that come up, why did
 4    he say that?
 5              MR. KOH:  Objection.
 6              THE WITNESS:  There was a
 7         conversation between both sides
 8         dealing with the lease term and I
 9         think Sharon was saying it was a
10         five-year lease term and I think the
11         conversation went to 20 years and then
12         the conversation went to that
13         provision.
14    BY MR. WALSH:
15         Q.   And so did McDonald's --
16    McDonald's objected at that meeting to
17    your failure to consider the 20-year term
18    of the lease; isn't that right?
19              MR. KOH:  Objection.
20              THE WITNESS:  I believe they made
21         a point about it.
22    BY MR. WALSH:
23         Q.   And then you said that Morris
24    ultimately agreed with them at that
25    meeting?
```

1                    TENER

2        A.    I don't know if he agreed with

3    them but he stated that -- I don't want to

4    say stated but what I understood him to

5    communicate was that yes, the -- that part

6    of the provision of the Second Avenue

7    information would apply and that the lease

8    term needed to be considered.

9        Q.    Okay.  Was it a cordial meeting?

10       A.    Some parts were cordial, some

11   parts were not.

12       Q.    What parts were not?

13       A.    I don't recall all of them but

14   there were parts where it was definitely

15   heated.

16       Q.    Was Morris Missry the person who

17   was heated?

18            MR. KOH:  Objection.

19            THE WITNESS:  I think both sides

20       were heated.

21   BY MR. WALSH:

22       Q.    Who on McDonald's side would you

23   say was heated?

24            MR. KOH:  Same objection.

25            THE WITNESS:  I don't recall

1                    TENER

2          offhand but it definitely was not

3          the -- not overly -- I would say it

4          was not overly cordial.

5   BY MR. WALSH:

6          Q.    Did you know in advance of that

7   meeting that you and Sharon had used

8   different approaches or methodologies to

9   arrive at the fair market rental value of

10  the property?

11         A.    I don't think so.

12         Q.    And you told Sharon that you

13  didn't believe the ground lease comps she

14  used were appropriate because they did not

15  consider all the uses to which the

16  property could be put; right?

17         A.    I told her that they weren't

18  ground lease comps, that they were quick

19  service retail comps that did not consider

20  the highest and best use of the property.

21  They weren't ground lease comps.  They

22  were rentals of small fast food

23  restaurants like McDonald's.  It didn't

24  follow the directions of the lease.

25         Q.    Well, the McDonald's lease,

```
 1                    TENER
 2    that's a ground lease; right?
 3        A.    I believe it is a ground lease in
 4    that McDonald's constructed the building,
 5    yes.
 6        Q.    So what is the distinction you're
 7    drawing between -- because you're saying
 8    that these were only leases for quick
 9    service restaurants.  Why is that not a
10    ground lease?
11        A.    Because the tenant rented the
12    building, not the land.  They didn't
13    construct their building.  Her leases are
14    all I believe of existing fast food
15    restaurants, at least in that initial
16    report, and certainly did not consider the
17    highest and best use of the property, all
18    the uses that could be put to the site.
19        Q.    So would your view be different
20    if you learned that those tenants had
21    actually constructed the buildings that
22    were on those properties?
23            MR. KOH:  Objection.  Go ahead.
24            THE WITNESS:  It would --
25        terminology wise, I would think it
```

Page 215

1                    TENER

2          would be a pad rental if the tenant

3          constructed it but I certainly would

4          not change my opinion that she did not

5          consider the highest and best use of

6          the subject property.

7     BY MR. WALSH:

8          Q.    So they would be ground leases

9     but they would not be comparable in your

10    view because they didn't have the same

11    highest and best use; is that right?

12         A.    They may or may not be comparable

13    if you analyze them based on the highest

14    and best use.  She analyzed them based on

15    an annual rent per month or per year

16    regardless of what they could be developed

17    to or what the subject could be developed

18    to.  So following that logic, if I had a

19    similar site on the corner of Park Avenue

20    and Fifth and it was rented as a fast food

21    restaurant, that would be the rent I

22    should pay for this.  It was absurd.

23         Q.    I want to go back to your dispute

24    that these are ground leases because you

25    testified earlier that you could not find

                        TENER

1   any ground leases that were under 49

2   years; right?

3       A.   Developed at a highest and best

4   use, yes.

5       Q.   So that's how -- so your

6   testimony is that there were ground leases

7   under 49 years but none of those developed

8   the properties to their highest and best

9   use?

10              MR. KOH:   Objection.

11              THE WITNESS:   I don't know if

12          there were ground leases of 20 years

13          developed at a highest and best use,

14          nor do I know if any of her

15          comparables were developed at the

16          highest and best use.  That's not --

17          that was not explained within any of

18          her information and certainly when you

19          consider her analysis as a gross

20          dollar amount, it's impossible that

21          she considered it.

22   BY MR. WALSH:

23       Q.   I'm not talking about that

24   analysis.  I'm just talking about your

1                    TENER
2     dispute that she didn't look at ground
3     leases.
4          A.   It does not look like she looked
5     at ground leases.  She looked at quick
6     service restaurants leases.
7          Q.   But wouldn't those quick service
8     leases be ground leases if all they did
9     was rent the ground and then build a
10    restaurant on that ground?
11              MR. KOH:  Objection.  Go ahead.
12              THE WITNESS:  Could one or two of
13         them been ground leases?  She never
14         explained that, nor did she analyze
15         that.  These are appraisal differences
16         that we would have addressed if this
17         had gone to the appropriate
18         arbitration or appraisal proceeding,
19         but because McDonald's wouldn't agree
20         to hire, even reach out to sign up
21         Marc Nakleh, we never got to that.
22    BY MR. WALSH:
23         Q.   I thought -- didn't you testify
24    that you suggested that to Morris and he
25    didn't accept that?

1                    TENER

2            MR. KOH:  Objection.

3            THE WITNESS:  I said that I

4        suggested it in that letter.  I didn't

5        get a response.

6     BY MR. WALSH:

7        Q.    Okay, so how do you know it was

8     McDonald's?

9        A.    When I spoke with Sharon, she

10    refused to move forward.  She said the

11    client doesn't agree with this.  I asked

12    we should reach out, get our clients to

13    reach out to Marc and get an engagement

14    letter going so that we can proceed with

15    this.  When I followed up with Morris

16    Missry about that, he informed me that

17    they wouldn't go forward because of a

18    disagreement in the procedure and that's

19    why that meeting of July 19th was being

20    scheduled to try to hash through that so

21    that we could go forward.

22        Q.    So going back to Sharon's

23    analysis briefly, it's your position that

24    those were not ground leases that she was

25    looking at; is that right?

                          TENER

1

2        A.   Certainly not all of them, that's

3    for sure.

4        Q.   Okay.  What did you do to

5    determine whether they were actually

6    ground leases or not as she said they were

7    in her report?

8        A.   If I recall, I looked at when the

9    building was built, but I don't recall at

10   this point two and a half years later

11   everything I looked at.

12       Q.   Okay.  Now certainly some of the

13   ground leases that you looked at, those

14   buildings were built in the '50s and '60s;

15   right?

16            MR. KOH:  Objection.

17            THE WITNESS:  Yes, sir.

18   BY MR. WALSH:

19       Q.   So why does the fact when a

20   building was built determine whether

21   something was a ground lease or not?

22       A.   A ground lease by nature is a

23   lease to a user who will construct their

24   property or their building, their desired

25   building on the site.  If the property is

Page 220

1                    TENER

2    improved and the tenant is leasing the

3    improved asset, that is not a ground

4    lease.

5         Q.   But if the property is not

6    improved, then it is a ground lease;

7    right?

8         A.   If the property --

9              MR. KOH:  Objection.

10             THE WITNESS:  If the property is

11        vacant?

12   BY MR. WALSH:

13        Q.   Correct.

14        A.   It would be either a ground lease

15   or it could be a -- the economics could be

16   similar to a storage arrangement where

17   you're only using it to park cars, store

18   equipment, things like that.  Those again

19   are, if you want to have semantics, they

20   could be ground leases but they are not

21   ground leases in terms of the highest and

22   best use.  They would be in premises.

23        Q.   Okay.  But when you looked at

24   Sharon's report, you didn't attempt to

25   determine whether the properties that she

```
                                    Page 221
 1                   TENER
 2     had claimed were comparable were developed
 3     to their highest and best use; right?
 4          A.    They certainly weren't highest
 5     and best use consistent with our highest
 6     and best use.  The subject was highest and
 7     best use.  So even if they were consistent
 8     with the highest and best use of that
 9     particular site, the analysis had to
10     understand the differences between that
11     and the subject's highest and best use
12     which certainly was not communicated or
13     even suggested in Ms. Locatell's report.
14          Q.    And in your April 2019 report you
15     concluded that the highest and best use
16     was a mix of both commercial and
17     residential; right?
18          A.    Without the lease term, which?
19          Q.    April 2019.
20          A.    Yes.
21          Q.    Who suggested the idea of
22     supplementing your report with a land
23     residual analysis?
24          A.    I did, at that meeting.
25          Q.    To who?
```

Page 222

1              TENER

2      A.    To Morris Missry and Sam

3   Rottenberg when we were in the breakout.

4      Q.    And did you raise -- was that

5   issue raised with McDonald's during the

6   June 19, 2019 meeting?

7      A.    I actually believe it was

8   discussed because I remember running the

9   map on the HP12C and got a rough

10  indication that the rents would be -- not

11  be dissimilar depending on what the costs

12  were to build a small retail development

13  there and the rents of the finished

14  product that you would have to adjust for

15  those costs over the 20-year period.

16     Q.    So if -- with the information

17  that the 936 Second Avenue case should

18  have applied in this situation, and you

19  were required to consider the cumbrance of

20  the 20-year lease on the property, why

21  didn't you suggest completely redoing your

22  report as opposed to just supplementing it

23  with a new analysis?

24     A.    The answer is twofold.  One, as I

25  have testified already, I was not aware of

Page 223

1                    TENER

2    ground leases developed to their highest

3    and best use that would be applicable to

4    these recent ones, and that section would

5    not necessarily need to be revised pending

6    the findings of the land residual which in

7    the rent option agreement, the appraisers

8    are instructed to if adequate comparable

9    leases are not available, then a land

10   residual technique should be used.  That

11   was the -- for me, that was the defining

12   direction within the option agreement.  I

13   had been under the conclusion and am still

14   under the conclusion that adequate ground

15   leases are not available that reflect the

16   highest and best use of the site and as

17   such, I was directed to utilize the land

18   residual which I did.

19       Q.   Okay.  But in April 2019 you

20   concluded that there were not adequate

21   comparable leases because there were no

22   leases that had this use for both

23   residential and manufacturing; right?

24       A.   Well, no.  Prior to the lease

25   term, I hadn't found recent ground leases

Page 224

1                          TENER

2    of properties developed to the highest and

3    best use.  My research at the time had not

4    uncovered any recent ground leases

5    relative to that use in comparable

6    locations that would work.  Not work, just

7    didn't find any.

8              In following the direction of the

9    lease back then, where it told me to solve

10   for the land value of the vacant land

11   under the standard market value, that

12   direction was telling me to do that as a

13   step and then to use market research to

14   determine the appropriate rent multiplier.

15   We still felt like that was the -- I still

16   felt like that was the instructions of the

17   option agreement.

18             The direction is to find the land

19   value, solve for the rent multiplier.  If

20   there were recent ground leases from which

21   I could derive those rent multipliers

22   and/or rents, use them but I -- this is

23   the direction that I saw within the lease

24   and I followed it.

25        Q.   So my understanding of part of

1              TENER

2    your concerns with Sharon's analysis is

3    that she did not use comparable leases

4    that considered all of the uses to the

5    property to which the property could be

6    put; is that accurate?

7         A.   Can I look at the wording because

8    I'm not sure you got it straight?

9         Q.   I guess we'll get to it in a

10   little bit but I guess I have understood

11   your concern with Sharon's analysis to be

12   something different than what you're

13   explaining now.  My understanding was that

14   your disagreement with her was that she

15   did not consider comparable leases that

16   considered all of the uses to which this

17   property could be put.

18        A.   That's accurate, that she did not

19   consider all uses to which the property

20   could be put as specified within the

21   lease.  She is -- she treated it like this

22   property can only be a quick service

23   restaurant.  Did not consider what even

24   minimally what this could be developed to.

25        Q.   Okay.  But what you're saying now

1                    TENER

2    is that she didn't even use comparable

3    ground leases.  That seemed to be what you

4    were saying 10 minutes ago.

5              MR. KOH:  Objection.

6              THE WITNESS:  You misunderstood.

7         I'll repeat it.  She failed to

8         consider the highest and best use of

9         the site.  That obviously informed her

10        selection of comparables.  I think she

11        failed to analyze them.  I think she

12        failed to apply them to the highest

13        and best use of the property as

14        directed within the option agreement.

15        I think she failed on many levels so

16        it's -- and it's obvious in the

17        significant difference between her

18        conclusion and ours that I am looking

19        at a highest and best use, she is

20        looking at an interim use.

21    BY MR. WALSH:

22        Q.   When you say highest and best use

23    and interim use, in your first report, you

24    said that the highest and best use was

25    both residential and commercial; right?

```
 1                    TENER
 2        A.   Yes, sir.
 3        Q.   But that's not the highest and
 4   best use over a 20-year term; right?
 5        A.   I concluded that it was not
 6   financially feasible to get your
 7   residential return on and of in over the
 8   20-year period.  I concluded that you
 9   could get your return on and of on the
10   retail component through its maximum
11   development.
12        Q.   Let's stop there.  So you would
13   agree that over a 20-year term, which you
14   did not consider in the first instance but
15   Sharon did, you would agree that the
16   highest and best use is a purely
17   commercial use; correct?
18        A.   A retail development of the site
19   to its maximum, yes.
20        Q.   Okay, but initially your concern
21   was that she did not consider the highest
22   and best use as you determined it in April
23   which was both residential and commercial;
24   right?
25        A.   No, she just did not consider --
```

```
 1                    TENER
 2    we don't have to agree on the highest and
 3    best use.  Without consideration of the
 4    lease term, it's mixed use residential and
 5    commercial.  With consideration of the
 6    lease term, it's commercial.  In neither
 7    case did she consider the highest and best
 8    use.  Plain and simple.
 9        Q.   Okay.  Now did you believe the
10    purpose of your land residual analysis was
11    to develop an independent opinion of value
12    or were you trying to support the fair
13    market rental valuation included in your
14    April 15, 2019 report?
15              MR. KOH:  Objection.  Go ahead.
16              THE WITNESS:  A hundred percent
17         fair market.  I'm not trying to
18         suggest anything else.
19    BY MR. WALSH:
20        Q.   They just came to the same
21    number?
22        A.   No.  What happened is, as I
23    expressed in my report, that under the
24    market rent that I was able to research
25    for retail in that area, that there was a
```

Page 229

1                    TENER

2    range that it could achieve economically

3    and using the residual proved a value that

4    bracketed the original conclusion based on

5    a ground rent determination and I felt for

6    simplicity's sake that it was fair as this

7    was within the range.  I could have

8    concluded to the higher end of the range

9    if that was supported.  A residual should

10   prove the highest that you could pay but I

11   chose -- I said that it would be

12   reasonable to conclude within that range

13   for which the original value -- the

14   original conclusion fell and as such, I

15   did not change the conclusion I reached.

16        Q.   Okay.  But before Morris and Sam

17   instructed you to go forward with the land

18   residual analysis, you had already told

19   them that you believed it would arrive at

20   the same value; isn't that right?

21             MR. KOH:  Objection.

22             THE WITNESS:  No.  I said that I

23        believed it would be similar to that

24        because I ran some preliminary numbers

25        based on my knowledge of the area that

```
                                        Page 230

 1                    TENER

 2        I still needed to obviously research,

 3        but if it had come in lower, I would

 4        have concluded lower.

 5   BY MR. WALSH:

 6        Q.   And how long did it -- you did

 7   this preliminary calculations at the June

 8   19, 2019 meeting in a breakout room on a

 9   calculator?

10        A.   I did some of them but that was

11   the -- I didn't have my cost data.  I just

12   guessed at the cost data.  I didn't have

13   retail rent comps so I guessed at that.

14   There was a lot of guessing so it wasn't

15   the number that was presented in my

16   report, it was just some rough

17   guesstimates.

18             MR. WALSH:  Okay.  So now would

19        actually be a good time to stop.  I'm

20        at a good breaking point.  Maybe we

21        just take a five, 10-minute break.

22             MR. KOH:  Okay with me.

23             THE VIDEOGRAPHER:  Thank you, the

24        time is 3:41.  We're going off the

25        record.
```

```
1                    TENER

2              (Recess taken from 3:41 p.m. to

3        3:52 p.m.)

4              THE VIDEOGRAPHER:  The time is

5        3:52.  We're back on the record.  This

6        is the beginning of media 5.

7   BY MR. WALSH:

8        Q.   Mr. Tener, what is a land

9   residual analysis?

10       A.   A land residual analysis looks at

11  what a property can be constructed to,

12  looks at the finished product, analyzes

13  the property based on its completed and

14  occupied economics so the value upon

15  stabilization.  It then solves for the

16  cost to construct the property and reduces

17  that prospective value by the costs of

18  hard and soft to render an indication of

19  the land value.

20              In this case, because we're

21  solving for a rental value, you're looking

22  at the market rents of the improved

23  property based on its highest and best use

24  and then you are deducting the amortized

25  costs of the construction over the lease
```

1                    TENER

2    term to solve for the economic rent that

3    can be paid.

4         Q.   Okay.  So one of the first things

5    you said was that you analyze what a

6    property can be constructed to and look at

7    the finished product so let's start there.

8              So would you normally figure out

9    what the building -- what the property

10   looks like after construction is

11   completed, is that what I understand you

12   to be saying there?

13        A.   To some degree, you can do it

14   through a high level of degree on complex

15   properties designing them, with architects

16   and figuring out every detail of it or you

17   could do it in a generalized sense based

18   on the most likely development of the site

19   based on someone who had more general

20   considerations.

21        Q.   So first you have to figure out

22   what can be -- how the property can be

23   developed and then what that development

24   looks like and then would the next step be

25   once you know what that development looks

1                    **TENER**

2    like and what's been constructed on there,

3    what price you can rent out that property

4    as improved out for?

5        A.    Yes.

6        Q.    Okay.  And I think another thing

7    that you said is that a land residual

8    value renders an indication of the land

9    value; is that right?

10       A.    Well, it can be used to develop

11   an opinion of the land value or of the

12   rent for the land.

13       Q.    But wouldn't you agree that you

14   wouldn't normally develop a land residual

15   analysis in an appraisal to determine the

16   market value of a development site?

17       A.    Can you repeat that question?

18       Q.    Wouldn't you agree that you would

19   not normally develop a land residual

20   analysis in an appraisal to determine the

21   market value of a development site?

22            MR. KOH:  Objection.

23            THE WITNESS:  I wouldn't agree.

24            MR. WALSH:  Okay.  Can we please

25       mark VA 017997?

```
                                      Page 234

 1                   TENER

 2             (Exhibit P78, document Bates

 3        labeled VA 017997, marked for

 4        identification.)

 5             VERITEXT CONCIERGE:  This will be

 6        introduced as Exhibit P78.

 7   BY MR. WALSH:

 8        Q.   This is an e-mail that spans

 9   Bates stamp VA 017997 to 018000.  The top

10   e-mail is an e-mail from Tom Tener to Sam

11   Rottenberg, Shaun Kest and Theresa Nygard

12   dated June 13, 2018.

13             Mr. Tener, do you have it up?

14        A.   I do.

15        Q.   So it looks like what happened

16   was that Vanderbilt sent you a copy of a

17   report that TerraCRG had prepared for the

18   property earlier in 2018 and you wrote,

19   "The TerraCRG report investigates several

20   land residual analyses to develop

21   indications of value in addition to their

22   analysis of land sales."  And you wrote,

23   "Typically, we would not develop a land

24   residual analysis in an appraisal of the

25   market value of a development site as this
```

Page 235

1                        TENER

2       provides an indication of the most that an

3       investor can pay for the land, not

4       necessarily what the market value is."

5               So a moment ago I said wouldn't

6       you agree that you wouldn't normally

7       develop a land residual analysis in an

8       appraisal to determine the market value of

9       a development site and you did not agree.

10      Isn't that exactly what you're saying in

11      this e-mail?

12          A.   You know, out of context it's

13      similar to what I'm saying, not exactly.

14      The -- if I recall the TerraCRG report,

15      they put in a bunch of assumptions of what

16      they were speccing out as potential

17      development.  The reality is that the land

18      residual is a less reliable indicator of

19      land value than the sales comparison

20      approach.  However, when you are

21      instructed as this lease document

22      instructs us to use a land residual when

23      you don't have -- sorry, if adequate

24      comparable leases aren't available, then

25      you're being directed.  Most of the time

```
 1                    TENER
 2     that I use land residuals, they are
 3     involved in ground rent determinations.  I
 4     have used them for developers that are not
 5     for ground rent determinations but because
 6     you are generally the way they are -- the
 7     way they are most often used are
 8     developers are testing reasonableness of
 9     what they can pay for land based on what
10     they think they can build and the returns
11     they can get.  So long answer short, the
12     residual is not the best method for
13     determining fair market value of the land
14     but when you are directed to use it, you
15     should use it.
16         Q.   Okay.  And to be clear, the
17     option rent addendum only says that it can
18     be used if comparable ground leases are
19     not available; right?
20         A.   If adequate ground leases are not
21     available.
22         Q.   Okay.  A land residual technique
23     also requires a highest and best use
24     analysis; right?
25         A.   Not necessarily.  I've been in
```

1              TENER

2     one -- I've been involved where the use is

3     defined in ground leases that says -- one

4     we're in right now says the property has

5     to be a rental property even though the

6     highest and best might be a condominium.

7     It's not necessarily just the highest and

8     best use.  This one particularly tells you

9     to consider all uses that it can -- the

10    property can be put so that would be the

11    highest and best use.

12         Q.   When you say that would be the

13    highest and best use, what do you mean?

14         A.   That direction considering all

15    uses the property can be put would be a

16    direction to consider the highest and best

17    use of the property.

18         Q.   Okay.  And land residual models

19    are often used to test whether something

20    is, in fact, the highest and best use or

21    not; isn't that right?

22         A.   Yes, sir.

23         Q.   And the highest and best use

24    analysis as we talked about earlier

25    requires that the use be financially

Page 238

1                    TENER
2    feasible; right?
3         A.   Yes, sir.
4         Q.   Okay.  So when you're performing
5    a land residual analysis, you need to know
6    the building value; right?
7         A.   Well, in this case you need to
8    know the economic rents of the building.
9         Q.   But in order to figure out the
10   economic rents, wouldn't you need to know
11   what kind of building it is?
12        A.   Yes.
13        Q.   So, for example, if I put up a
14   circus tent on 840 Atlantic Avenue and
15   tried to rent out space, I wouldn't be
16   able to get the same rent that I would be
17   able to get if I put up a class A
18   building; right?
19        A.   Yes.
20        Q.   Okay.  So you need to know what's
21   going to be built and the value of that
22   building first; right?
23        A.   Again, in this case you need to
24   know the rental value of that building,
25   not particularly the value, the

1                    TENER

2    capitalized value of that.

3        Q.   Okay.  But to be perfectly clear,

4    the rental value of the building will

5    depend on the quality of the building;

6    right?

7        A.   Location, quality, design.

8        Q.   Amenities?

9        A.   For a retail, no, not amenities.

10        Q.   And then you need to be able to

11    estimate the net operating income for the

12    property; right?

13        A.   Yes, sir.

14        Q.   And then you need to be able to

15    extract, you know, building and land

16    capitalization rates somehow; right?

17        A.   No, sir.

18        Q.   You disagree with that?

19        A.   Not when you are starting with

20    the rental value and solving for the

21    rental value.  You do not need to have

22    capitalization rates for that.

23        Q.   Okay.  So let's talk about that

24    for a second.  You said you're starting

25    with the rental value.  How can you start

Page 240

```
 1              TENER
 2   with the rental value if you don't know
 3   what the building is going to look like
 4   and sort of, you know, and the quality of
 5   that building, how can you figure that out
 6   before you figure out what the end product
 7   is going to look like and what people are
 8   going to be willing to rent it for?
 9       A.   I do know what the proposed
10   building would be.  I specify it within my
11   cost analysis that it would be a D class
12   taxpayer with below grade parking.  I used
13   generalized cost based on Marshall
14   Valuation and utilize that as the
15   amortized cost over the lease term.
16   Specific drawings, renderings are not
17   necessary to perform this form of land
18   residual.
19       Q.   And you alluded to this before
20   but would you agree that a land residual
21   analysis isn't necessarily the most
22   accurate way to determine the market rent
23   of a property?
24       A.   No, I don't think it's the most
25   accurate but it certainly is the method
```

1                    TENER

2    that is directed when you don't have

3    adequate ground lease comparables.

4         Q.    And one of the reasons that it's

5    hard to get an accurate value is because

6    there's a lot of variables, right, in a

7    land residual analysis?

8         A.    There can be a lot of variables.

9    Mine is not.  Mine is rather simple in

10   terms of the variables that are there.

11        Q.    Okay.  But in a normal land

12   residual analysis, small variations in

13   those variables could end up dramatically

14   changing the results of a land residual

15   analysis; right?

16             MR. KOH:   Objection.

17             THE WITNESS:   I disagree with the

18        modifiers you used.

19   BY MR. WALSH:

20        Q.    What do you disagree with?

21        A.    Small and dramatic I believe.

22             MR. WALSH:   If we could pull up

23        what's been marked as ARE 3.  If we

24        could mark that, please.

25             (Exhibit P79, document entitled

```
1              TENER

2       The Appraisal of Real Estate, marked

3       for identification.)

4            VERITEXT CONCIERGE:  This will be

5       introduced as Exhibit P79.

6  BY MR. WALSH:

7       Q.    So P79 is another excerpt from

8  the Appraisal Institute's 14th edition of

9  The Appraisal of Real Estate.  It's pages

10 370 and 371.  You can tell me when you

11 have that up and I can direct you.

12      A.    I'm on page 370.

13      Q.    So if you look under the bullets,

14 1, 2, 3, it says, "The land residual

15 method requires the following conditions

16 be met:  1.  Building value is known or

17 could be accurately estimated.  2.  Net

18 operating income to the property is known

19 or can be estimated.  3.  Both building

20 and land capitalization rates can be

21 extracted from the market."  It goes on to

22 say, "Small variations in any of these

23 variables can result in a dramatic change

24 in the land value estimate.  For this

25 reason, courts have shown a clear disdain
```

1                    TENER

2     for the land residual method."

3              Do you disagree with The

4     Appraisal Institute there?

5         A.    In the generalization, I have

6     some concerns as it relates to the

7     direction within this lease.  I don't have

8     a problem in theory but we are -- the

9     residual that I performed and is described

10    within the option agreement does not

11    require us to value the building and solve

12    for the land and building capitalization

13    rates extracted from the market.  Those

14    are the biggest variables that will create

15    dramatic changes.  We are just solving for

16    an economic fair market rent as defined

17    within the option agreement.  What that

18    building would sell for is irrelevant to

19    this appraisal problem.  We are solving

20    rents-- excuse me.  We are solving rents.

21    I start with rent, I amortize the cost of

22    the building and solve for the final land

23    rent based on what a typical 21,500 square

24    foot single story taxpayer would

25    reasonably achieve in this location, and

1                    TENER

2    what it would cost to build anticipating

3    that you would want to recoup your

4    investment on and of that construction

5    over the 20-year period.  If the

6    appraisers have an issue with my approach

7    to this, that would be solved in the

8    appraisal proceeding between the three

9    appraisers.  That's a reasonable thing to

10   challenge and to talk about.  I feel like

11   I have done it as directed within the

12   lease and the complexity of what is in

13   this chapter of The Appraisal of Real

14   Estate goes beyond the particular

15   application in this case.

16        Q.   Why is that?

17        A.   This is speaking to solving for

18   land value, in other words buy and sell

19   land value.  It is solving for what

20   someone would pay for that building in the

21   future, not what someone would pay a rent

22   for it as of a specific date that we are

23   talking about.  This is about a

24   speculative improvement on land, the other

25   is about solving for a fair market rent.

1                    TENER

2    You are adding significantly more complex

3    elements that are not necessary to

4    understand this appraisal problem.  This

5    is geared towards let's understand what

6    this generic site could be built to and

7    sold for in the future and based on these

8    complex leasing and operating issues, what

9    would that building sell for in the future

10   and how long it would take to build it and

11   what would be the construction period, the

12   time frame and solving back what would be

13   the appropriate return on the land over

14   that.  That's not pertinent to this

15   appraisal problem.  We are just solving

16   for rent.

17        Q.   Well, doesn't the land sales

18   comparison approach also value land?

19        A.   It does as a component of the

20   fair market rental valuation.  The other

21   component is the rent multiplier.

22        Q.   And so in both scenarios, you

23   would need to -- strike that.

24             Do you consider yourself an

25   expert in land residual calculations?

1                    TENER

2        A.   I have testified as an expert in

3    land residual calculations and I have

4    prepared numerous reports of land

5    residuals so I am -- I consider myself

6    one, yes.

7        Q.   Do other members of your firm

8    typically ask you to assist with projects

9    that require a land residual technique?

10       A.   Yes, sir.

11       Q.   So you're sort of the go-to guy

12   at KTR for land residual techniques; is

13   that right?

14       A.   I don't know if that's true.  My

15   brother, Terry, certainly would be more

16   than capable and there are other people

17   that are trained that would be capable of

18   it but I have a very strong understanding

19   of the technique.

20            MR. WALSH:  If we can mark

21       VA 001083.

22            (Exhibit P80, document Bates

23       labeled VA 001083, marked for

24       identification.)

25            VERITEXT CONCIERGE:  This will be

```
 1                    TENER

 2       introduced as Exhibit P80.

 3  BY MR. WALSH:

 4       Q.    If you could open up P80, it's a

 5  July 9, 2019 e-mail from you to Sam

 6  Rottenberg and Morris Missry.

 7       A.    It's open.

 8       Q.    So this is July 9.  It's after

 9  the June 19, 2019 meeting and you write to

10  tell Sam that you have done some

11  preliminary analysis but have not begun

12  the land residual analysis; is that right?

13       A.    Yes, sir.

14       Q.    Okay.  And you tell him at the

15  bottom of the first paragraph, comparable

16  leases in the 90 to $100 per square foot

17  range, about 75 triple net, would support

18  our concluded FMR for a 20-year term.

19            Do you see that?

20       A.    I do, sir.

21       Q.    So what you were telling him here

22  is that if he could find rents in that

23  range, that those rents would support your

24  concluded fair market value; right?

25       A.    Out of context, it was -- these
```

1                    TENER

2    are the numbers that I -- based on my

3    knowledge and the other appraisals that we

4    had that I was aware of in this area that

5    we have worked on, that I expected this

6    range and that based on my preliminary

7    numbers, I thought that numbers in this

8    range would be -- would support the same

9    range that we concluded, that based on

10   what's out there in the market, that I

11   think a land residual would be consistent

12   with our 20-year conclusion that was

13   already reflected in the report.

14        Q.   Without the encumbrance to the

15   lease; right?

16        A.   No, this might be --

17        Q.   I'm saying you said that your

18   previously concluded value did not

19   consider the encumbrance of the lease,

20   that's all I'm asking if you can confirm.

21        A.   Yes.

22        Q.   Okay.  So continuing on you

23   wrote, "The most significant challenge to

24   developing the M1-1 portion of this site

25   to this bulk would be meeting the parking

1                    **TENER**

2    requirements of 1 space for 300 square

3    feet.  At 2.4 FAR on the M1-1 portion of

4    this site, we would need 176 parking

5    spaces for the most likely community

6    facility use with retail at grade.  We

7    would need an architect to determine if we

8    could construct the below grade parking

9    garage to accommodate this parking

10   requirement and a cost estimator for the

11   hard and soft cost budget.  It would

12   likely be a hard sell to get a third to

13   agree that the cost of project of this

14   size could be recovered in a 20 year

15   period."

16           Do you see that?

17      A.   I do, sir.

18      Q.   So you told him before you did

19   this analysis that it would likely be a

20   hard sell to get a third appraiser to

21   agree that the cost of a project of this

22   size could be recovered in a 20-year

23   period; isn't that right?

24      A.   That the project of developing a

25   community facility development use, not

```
                                    Page 250
 1                  TENER
 2     the retail that I -- the community
 3     facility use required significantly more
 4     for parking than retail and that that
 5     would not be a feasible residual,
 6     community facility, sir.
 7          Q.   How does the parking differ
 8     between --
 9          A.   It would be significantly higher.
10          Q.   So what are the numbers?  How
11     many parking spaces do you need per square
12     foot, per --
13          A.   I don't have that in front of me
14     but I investigated when I did it.
15          Q.   Okay.  And you also told them
16     that you would need an architect to
17     determine if you could construct the below
18     grade parking garage; right?
19          A.   To facilitate 176 parking spaces.
20     That's a massive development.
21          Q.   Did you retain an architect to
22     determine what could be built on the site?
23          A.   Yes.
24          Q.   Did Morris Missry?
25          A.   No, not that I know of, not that
```

Page 251

1                         TENER
2     I used.
3          Q.    Did Vanderbilt?
4          A.    Not that I know of.
5          Q.    Did you ever retain a cost
6     estimator for the hard and soft cost
7     budget?
8          A.    No, I used Marshall.
9          Q.    Did Vanderbilt?
10         A.    No, sir.
11         Q.    Did Morris Missry?
12         A.    Not that I know of, sir.
13         Q.    And why not?
14         A.    Because I didn't need one to
15    design and price out the simple taxpayer
16    that was utilized to determine the fair
17    market rent.  It didn't require that level
18    of assistance.  We're talking about
19    completely different design in this
20    e-mail.  They are not apples and oranges,
21    they are apples and pineapples.
22         Q.    Walk me through what you're
23    talking about in the e-mail that we just
24    read versus the building that you
25    ultimately priced out in your land

Page 252

1                    TENER

2    residual analysis.

3        A.   So I'm talking about designing a

4    multi-story mixed use community facility

5    and retail development with 176 parking

6    garage space on a site that I don't know

7    if you could accommodate that.  That would

8    require an expert to test and design.

9    What I priced -- what I utilized for a

10   land residual is a 12,000 -- I'm sorry, a

11   21,500 square foot grade level taxpayer

12   with a below grade parking garage accessed

13   from a two points on Pacific and

14   Vanderbilt that allowed access for surface

15   and ground below grade parking that is

16   significantly easier to build and not

17   difficult to envision for designer cost.

18       Q.   Did you sketch out these plans?

19       A.   I don't need to sketch them out.

20   I'm pricing a generic taxpayer.  You see

21   them on the one-story taxpayers throughout

22   New York City, you see them in suburbia.

23   They are not difficult to price out or to

24   envision.

25            MR. WALSH:  If we could pull up

```
                                              Page 253

 1                    TENER

 2        P62, please.

 3               VERITEXT CONCIERGE:   P62 has been

 4        copied over.

 5   BY MR. WALSH:

 6        Q.    This is an e-mail exchange in

 7   late July between you and Vanderbilt.   Do

 8   you have it up?

 9        A.    I do, sir.

10        Q.    On the bottom e-mail on the first

11   page, it's an e-mail, July 23, 2019.   It's

12   from you to Sam Rottenberg and Morris

13   Missry.   You said, "I have built the model

14   for a land residual and my staff is

15   researching rent comps in the area.   I

16   think that both you and Morris mentioned

17   at the McDonald's meeting that you have

18   knowledge of retail lease comps in the

19   $100 per square foot range in this area.

20   If you could send this information to me

21   for incorporation into our report, it

22   would be helpful as a supplement to our

23   research."

24               What McDonald's meeting were you

25   referring to?
```

Page 254

1                    TENER

2      A.   That was the July 19th.

3      Q.   The June 19, 2019 meeting?

4      A.   Yeah, June 19, 2019.

5      Q.   Okay.

6      A.   The one at Wachtel Missry.

7           MR. WALSH:  If we could mark

8      VA 001061.

9           (Exhibit P81, document Bates

10     labeled VA 001061, marked for

11     identification.)

12          VERITEXT CONCIERGE:  Can you

13     repeat that number, please?

14          MR. WALSH:  VA 001061.

15          VERITEXT CONCIERGE:  This will be

16     introduced as Exhibit P81.

17  BY MR. WALSH:

18     Q.   All right, this is a July 24

19  e-mail exchange between you --

20     A.   I don't have it yet.

21     Q.   Okay.  It's between you and

22  Morris Missry and Sam Rottenberg.

23     A.   I got it.

24     Q.   Okay.  So you were -- you reached

25  out to Sam and Morris on July 24th I guess

```
 1                    TENER
 2    to find out the status of an agreement
 3    with McDonald's.  Do you know what that
 4    was about?
 5         A.   I think it's the agreement of how
 6    the reports would be exchanged between
 7    Sharon and myself, the revised reports.
 8         Q.   And Morris responded no, need you
 9    to do your thing.
10              What did you understand that to
11    mean, need you to do your thing?
12         A.   I have no idea.
13              MR. WALSH:  Okay, if we could
14         pull up VA 001039.
15              (Exhibit P82, document Bates
16         labeled VA 001039, marked for
17         identification.)
18    BY MR. WALSH:
19         Q.   By the way, did you think that
20    Morris was asking you to prepare a land
21    residual analysis that would justify your
22    original valuation, is that what he meant
23    by do your thing?
24              MR. KOH:  Objection.
25              THE WITNESS:  I don't think
```

Page 256

1                    TENER
2         that's remotely what I would think he
3         was saying.
4    BY MR. WALSH:
5         Q.   So what do you think --
6         A.   I don't recall what he was saying
7    but certainly I have never had that
8    thought that you articulated in your
9    question in my head at all.
10             VERITEXT CONCIERGE:  This will be
11        marked as Exhibit P82.
12             THE WITNESS:  It's up.
13   BY MR. WALSH:
14        Q.   So this is a July 30 e-mail from
15   you to Morris Missry and Sam Rottenberg
16   transmitting your July 30, 2019 report and
17   invoice for June and July hours.
18             You wrote, "Attached is my
19   revised FMV letter incorporating the land
20   residual analysis, which is supportive of
21   my original determination of the FMV."
22   That's what you wrote; right?
23        A.   Yes, sir.
24        Q.   And if we can pull up -- and just
25   to be clear, was your assignment to

Page 257

```
 1                    TENER
 2   prepare an independent valuation using the
 3   land residual technique or was it to
 4   perform an estimate that would support
 5   your original determination of the fair
 6   market value?
 7        A.    The first.
 8        Q.    So this was an independent
 9   valuation?
10        A.    Yes, sir.
11        Q.    Okay.  Because those are two
12   different things; right?  An independent
13   valuation versus trying to match a
14   previous valuation, those are very
15   different things, you would agree; right?
16        A.    I would never take an assignment
17   to try to match something else.  That's
18   not how I appraise.
19        Q.    Okay.  So it's your testimony
20   that you would have done the land residual
21   technique in the first instance exactly
22   the same way if you had not already issued
23   your April 15, 2019 report?
24        A.    I would have done it very similar
25   but the results would be the same.
```

Page 258

1                    TENER

2              MR. WALSH:  All right, if we

3        could pull up P36, please.  This is

4        the July 30, 2019 report and

5        Mr. Tener, you'll also have a hard

6        copy of this.  It starts with

7        VA 001045.

8              VERITEXT CONCIERGE:  P36 has been

9        copied over.

10              THE WITNESS:  I have to find

11        which binder it's in.

12              Almost there.  I have it.

13    BY MR. WALSH:

14        Q.   Okay.  So this is your revised

15    July 30, 2019 report; right?

16        A.   Yes, sir.

17        Q.   And this is identical to your

18    original April 15 report except that you

19    added an additional section on page 4

20    entitled Land Residual; right?

21        A.   I would have to do a compare

22    document but it's very similar.

23        Q.   And your conclusion -- and even

24    though you performed a land residual

25    analysis to account for the 20-year term

Page 259

                              TENER

1   of the McDonald's lease, your conclusion

2   on the fair market rental value of the

3   property stayed exactly the same; right?

4        A.   My conclusion on the residual is

5   that the value is between 1,310,600 and

6   1,478,300 per year and I concluded that it

7   was directly supportive of the value

8   derived in the standard market data

9   approach of 1,348,000 and chose not to

10  revise that.

11       Q.   So your concluded fair market

12  rental value was exactly the same in this

13  report as it was in your previous report;

14  right?

15       A.   Yes.

16       Q.   Is it your professional opinion

17  that a sophisticated and knowledgeable

18  investor would pay exactly the same amount

19  for a piece of land that they can develop

20  and own in perpetuity, that they would pay

21  for a parcel that they could only benefit

22  for a defined 20-year period of time?

23       A.   Can you repeat the question,

24  please?

Page 260

```
 1                      TENER
 2        Q.   Is it your professional opinion
 3    that a sophisticated and knowledgeable
 4    investor would pay exactly the same amount
 5    for a piece of land that they can develop
 6    and own in perpetuity than they would for
 7    a parcel that they can only use and
 8    benefit from for a defined 20-year period
 9    of time?
10            MR. KOH:  Objection.  Go ahead.
11            THE WITNESS:  So the two would be
12        different.  One would be a purchase
13        and one would be a rental so they
14        would not be the same.
15    BY MR. WALSH:
16        Q.   Right.  So what someone would pay
17    to own a property outright would be
18    different than what they would pay to
19    basically own it for a 20-year period of
20    time; right?
21        A.   It would be a capitalization of
22    that rent in perpetuity as opposed to over
23    a shorter period of time.
24        Q.   And what an investor could do
25    with a property for a 99-year ground lease
```

1                    TENER

2      is very different than what an investor

3      could do for a 20-year ground lease;

4      right?

5          A.   In this case, I concluded that

6      you could only build a 21,500 square foot

7      taxpayer for the 20-year period and for

8      the longer period, that you would be able

9      to build a mixed use residential and

10     retail so it would be different.

11         Q.   But you came up with the

12     identical value even though one analysis

13     considered the encumbrance of the 20-year

14     term and the other did not.  So I'm just

15     trying to understand how is that possible?

16         A.   Well, when you read the report,

17     you see that the economics of building a

18     taxpayer allows for someone to pay via

19     land residual and up to $1,478,000 per

20     year and still make -- amortize their

21     costs and not pay above market rent for

22     the building they can construct.  They are

23     not committing to paying that for a

24     hundred years.  They are only paying that

25     for control over a 20-year period.  Based

TENER

1

2    on the economics of that less expensive

3    investment, they are able to pay a rent

4    that is even higher based on my residual

5    than the long-term commitment of 49 or 99

6    years.  In that 49- or 99-year lease you

7    would have additional resets in the

8    future, you would have other obligations

9    including longer development periods, a

10   more complex asset.  Based on the two

11   analyses, I did not go into it thinking

12   that they would be the same but it proved

13   the residual that on a short period of

14   time, 20 years, you could potentially pay

15   even more than my conclusion via the land

16   valuation and fair market determination

17   via the market -- standard market data

18   approach.

19       Q.   So you were surprised that the

20   numbers worked out exactly the same?

21       A.   Not -- they didn't work out

22   exactly the same.  There was a range.  The

23   range showed -- and remember a residual

24   shows what you can pay based on these

25   analyses, depending on what developer and

Page 263

1               TENER

2   residual technique would model, whether

3   it's 90 or a hundred dollars a foot, you

4   could pay as much as 1.3 million to almost

5   1.5 million under the land residual. You

6   might even be able to pay more because my

7   land residual didn't even include the

8   potential benefits of ICAP, that you would

9   get 15 years of tax savings or significant

10  tax abatement for the improvement. I

11  processed full taxes in my analysis which

12  really understates the return that the

13  tenant would achieve.

14      Q.   On page 2 of your report, even

15  though you're now in this report taking

16  into account the 20-year term of the

17  McDonald's lease, you kept your conclusion

18  on page 2 that "Based on the subject's

19  current zoning and considering the uses

20  exhibited by recent development in the

21  immediate area, the highest and best use

22  of the subject, as if vacant, would be

23  commercial development of the portion of

24  the site zoned M1-1 and residential

25  development in the R6B zone portion of the

```
                                    Page 264
 1                    TENER
 2    site."
 3              Is that still accurate with the
 4    20-year term of the lease?
 5        A.   No, it's residential -- retail
 6    only.  Residential I concluded would not
 7    be feasible.
 8        Q.   So why did you keep that highest
 9    and best use analysis or conclusion if
10    it's not accurate anymore?
11        A.   It probably could have been
12    clarified better in the letter.  I think
13    when I was writing it I was not
14    considering the term when I left that text
15    in there.  I probably should have added a
16    phrase that for the 20-year period that
17    the residential would not have -- would
18    not be economically feasible and only
19    retail would be.  It's probably a slight
20    of communication on my part.
21        Q.   Okay, but you skill kept in this
22    entire first analysis of the land sales
23    comparison approach, right, but this -- is
24    this valuation still valid considering
25    that you've now arrived at a different
```

Page 265

```
 1                      TENER
 2    highest and best use for 20 years?
 3         A.   What we are saying is that --
 4    what I am saying is that the land
 5    valuation does not change, that that's
 6    what land is worth in that area.  What
 7    does change potentially is the rent
 8    multiplier.  I may have been shy on my
 9    rent multiplier in the initial 8 percent.
10    It could have been higher than that, there
11    was potential for higher.  But the land
12    residual proves that it's generally
13    consistent with the conclusion that was
14    originally received.  As I stated earlier,
15    I easily could have concluded to a higher
16    number at a million 478.  That is
17    supported by the land residual as well.
18         Q.   So where in your work file do you
19    prove that the land value is the same
20    regardless of the highest and best use
21    conclusion, using a land sales comparison
22    approach?
23              MR. KOH:  Objection.  Go ahead.
24              THE WITNESS:  The highest and
25         best use of that land is still the
```

Page 266

```
1                      TENER
2          same.  The highest and best use
3          feasibly of what you can build in a
4          20-year period is different but the
5          highest and best use of the land
6          remains mixed use residential and
7          retail.  Under the 20-year period, I
8          conclude that you could not get your
9          residential back so I don't conclude
10         that it's the same.  I conclude that
11         under the 20 years, it would be --
12         would be retail only.
13     BY MR. WALSH:
14         Q.   Here's what I'm trying to
15     understand.  You are now considering the
16     encumbrance of the lease and you have an
17     entire section of your report that talks
18     about residential development sites and
19     how the highest and best use is both
20     commercial and residential, and what I'm
21     hearing you say now is that residential
22     isn't possible even though you say on page
23     2 that is the highest and best use and you
24     arrive at this land valuation with
25     assumptions about what residential could
```

Page 267

1                        TENER

2   be built and what you're telling me is

3   that residential can't be built.  So I'm

4   wondering why is all of this still in the

5   report if it's not relevant and accurate?

6       A.   It is still relevant outside the

7   term of the lease and it's a valid

8   critique that the appraisal proceeding

9   would address if -- but it certainly

10  addresses the highest and best use of the

11  property exclusive of the 20-year term.

12  So it is a valid critique that I would

13  have to sit down and think about and

14  explain why it's -- it hasn't been

15  changed.  At the end of the day, the land

16  residual is driving the value and

17  potentially could have been slightly

18  different but not lower than the one

19  million 310 and as high as one million

20  478.

21      Q.   And do you really not believe

22  that your land residual analysis and the

23  value you reached there was somehow driven

24  by a desire to match the value you arrived

25  at in April 2019?

```
1                    TENER
2          MR. KOH:  Objection.  Go ahead.
3          THE WITNESS:  It was definitely
4     not true.  It was driven by market
5     information.  Just because there's
6     communication that says that I believe
7     that the market will support a number
8     like that does not correlate to a
9     goal.
10         MR. WALSH:  If we could pull --
11    mark VA 00959, it's an Excel
12    spreadsheet called (Quick
13    Residual).xlsx.
14         VERITEXT CONCIERGE:  This will be
15    marked as P83.
16         (Exhibit P83, document Bates
17    labeled VA 000959, marked for
18    identification.)
19  BY MR. WALSH:
20    Q.   So this is your land residual
21  model for this property; right?
22    A.   This is my basic one.  The costs
23  are on sheet 2.  The pro forma is on sheet
24  1.
25    Q.   Why is this called quick
```

Page 269

1                          TENER

2    residual?

3        A.   Because it was the same file that

4    I used when I first made this.  I just

5    never renamed it.

6        Q.   Is this the same model that you

7    typically use when you are preparing a

8    land residual analysis?

9        A.   No, normally I'm not solving for

10   rent -- rental value, I'm solving for land

11   value on a residual.  This is a different

12   model to address this particular appraisal

13   problem.

14       Q.   Have you ever used this model

15   before?

16       A.   This particular one, no, but I've

17   used similar models to test highest and

18   best use on a residual basis.

19       Q.   And given that you had arrived at

20   the land value using the land sales

21   comparison approach and then used the cap

22   rate to arrive at a ground rent in your

23   original analysis, how come you couldn't

24   use your normal land residual model,

25   arrive at a land value rate and then apply

Page 270

```
 1                    TENER
 2   cap rate to that?
 3            MR. KOH:  Objection.
 4            THE WITNESS:  One, I didn't apply
 5        a cap rate.  It was a rent multiplier.
 6        Two, there's no reason to complicate
 7        the process by adding sales, and this
 8        is a 20-year hold so we're solving for
 9        a rent during the 20-year period.
10        There is no sale.  It's not necessary
11        and not appropriate to it.
12   BY MR. WALSH:
13        Q.   So let's start with sheet 1.  You
14   assumed a 21,500 square foot retail
15   building could be built at this site and
16   rented out between 90 and $100 per square
17   foot; right?
18        A.   Yes.
19        Q.   I think you used the phrase on a
20   modified gross basis.  What does that
21   mean?
22        A.   Real estate taxes over base, the
23   tenant would pay -- the tenant or tenants
24   would reimburse real estate taxes over a
25   base year amount.  All other operating
```

Page 271

```
 1                    TENER
 2   expenses are effectively met.
 3        Q.   And what data did you use to
 4   estimate real estate taxes in the range of
 5   $20 per square foot?
 6        A.   20 percent of EGI is what I used
 7   as the estimate of real estate taxes and
 8   that's roughly based on the New York City
 9   assessors guidelines published each year.
10   There's a range of taxes as a percentage
11   of EGI that the assessor targets and
12   that's what I used.
13        Q.   How did you determine that the
14   site could support a 21,500 square foot
15   retail building?
16        A.   Based on the floor print of the
17   site that is zoned retail, looked at the
18   site, physically looked at the structures
19   around it, drew a map and basically
20   assumed that the commercial or M1 portion
21   of the site could be built full.
22        Q.   So how much square footage of
23   M1-1 is on this site?
24        A.   I believe it's 21,500 square
25   feet.
```

Page 272

1                        TENER

2        Q.   So you estimated that every

3   single square foot of property that was

4   zoned as M1-1 could have a part of the

5   building on it?

6        A.   Yes, sir.

7        Q.   Okay.  And you drew it out on

8   like a -- you mocked it up on like a pad

9   or what did you -- how did you determine

10   that?

11        A.   I said I assumed that it could be

12   built full.  I did not draw it out.  It

13   would have been the site, the portion of

14   the site that is zoned M1-1 is assumed to

15   be built full.

16        Q.   Now, this is a U-shaped parcel;

17   right?

18        A.   Yes, sir.

19        Q.   So what parts of the property are

20   zoned as M1-1?

21        A.   I'll pull up my report to look at

22   the blueprint.  If I recall correctly, the

23   portions of the site that are front on

24   Vanderbilt and Atlantic, and I believe the

25   portion that is residential fronts on

1                    TENER

2     Pacific, east of the -- sorry, excuse me,

3     the residential building on Pacific, I

4     believe there's also a small sliver that

5     is under M1-1.

6          Q.   Under your hypothetical

7     development, what would happen to the R6B

8     portion, would it just be empty?

9          A.   It would be parking and access to

10    the underground parking.

11         Q.   So you would be allowed to put a

12    parking lot on the R6B portion?

13         A.   That's my understanding.  There

14    already is one there, sir.

15         Q.   Okay.  Well, that's an existing

16    use, right, so are you certain that

17    currently you can put a parking lot on

18    that R6B portion?

19         A.   An existing use would be

20    permitted to be retained, so yes, sir.

21         Q.   Even with a new tenant?

22         A.   Even with the new development, an

23    existing use on that would be permitted to

24    be retained.

25         Q.   How much parking would you need

```
                                        Page 274

 1                     TENER

 2     for a 21,500 square foot retail building?

 3          A.    Offhand, I know I calculated it.

 4          Q.    And if you could just tell me

 5     what you're looking up I'd appreciate it.

 6          A.    Right now I'm looking at the

 7     marginal costs.

 8          Q.    We'll get there.  We'll get

 9     there.  We'll talk about parking a little

10     bit.  Did you anticipate that this

11     building would have bathrooms in it?

12          A.    They would have bathrooms, yes.

13          Q.    How many?

14          A.    I don't know, sir.

15          Q.    Okay.  How many separate spaces

16     would this building be broken up into?

17          A.    I didn't specify to that level of

18     detail.  This is a building that could be

19     single tenant, it could be multi-tenant.

20     Whatever it ends up being demised, my

21     residual is based on an average rent.

22          Q.    And your 2.1 million dollar

23     estimate of hard construction costs is

24     contained on sheet 2; right?

25          A.    Yes, sir.
```

Page 275

1            TENER

2       Q.    I'd like to walk through that

3    calculation with you.

4            The $57 per square foot, that is

5    for what Marshall & Swift refers to as low

6    cost class D construction; right?

7       A.    Yes, sir.

8            MR. WALSH:  If we could mark the

9         document called Marshall Valuation

10        Service.

11            (Exhibit P84, document entitled

12        Marshall Valuation Service, marked for

13        identification.)

14            VERITEXT CONCIERGE:  This will be

15        introduced as Exhibit P84.

16    BY MR. WALSH:

17       Q.    And Mr. Tener, these are excerpts

18    from Marshall & Swift.

19            What is Marshall & Swift?

20       A.    It's the nationally published

21    cost estimator service that derives its

22    costs from recorded contributors of

23    construction.

24       Q.    And a lot of appraisers maintain

25    a comprehensive file of current cost data;

Page 276

                              TENER

1                           TENER

2    right?

3         A.    I don't know whether a lot of

4    appraisers do or not.

5         Q.    Does your firm do that?

6         A.    What did you say?

7         Q.    Like maintain a file of current

8    cost data so you understand what

9    construction costs.  Do you do that or no?

10        A.    We have some construction costs

11   but we don't have a file of construction

12   costs.  For construction costs we use

13   Marshall.

14        Q.    And you also sometimes use cost

15   estimators; right?

16        A.    Yes, sir.

17        Q.    Okay.  In your experience, which

18   provides a more accurate level of -- which

19   is more accurate, a professional cost

20   estimator or Marshall & Swift?

21             MR. KOH:  Objection.

22             THE WITNESS:  I would think that

23        a professional cost estimator would

24        provide a greater level of detail.

25   ///

```
 1                       TENER
 2    BY MR. WALSH:
 3         Q.    And you had told Vanderbilt a few
 4    weeks earlier that you would want to
 5    retain a professional cost estimator if
 6    you went down the path that Sam had
 7    suggested; right?
 8         A.    If we're designing a multi-level
 9    mixed use community facility and retail
10    project, yes, I asked for that level of
11    complexity and I thought it would be
12    appropriate to have one.
13         Q.    Did you suggest a professional
14    cost estimator for this project?
15         A.    No, sir.
16         Q.    Did you suggest that they hire an
17    architect for mixed use?
18         A.    No, sir.
19         Q.    So if you could turn to page 13
20    of the pdf that's just been marked as
21    Exhibit P84, it's titled Calculator Method
22    Retail Stores.
23              Do you see that?
24         A.    I do, sir.
25         Q.    Okay.  And this lists the
```

```
 1                    TENER
 2   different classes of construction for
 3   retail stores; right?
 4        A.    It does.
 5        Q.    A through D, Dpole and S; right?
 6        A.    Yes, sir.
 7        Q.    And you chose low-cost class D;
 8   right?
 9        A.    Yes, sir.
10        Q.    And that's where you came up with
11   the $57 per square foot amount; right?
12        A.    Yes, sir.
13        Q.    Now it says for exterior walls
14   next to low class cost D, low-cost stucco
15   siding, very plain exterior?
16        A.    Yes, sir.
17        Q.    And for the interior finish it
18   says drywall, cheap acoustic tile, asphalt
19   tile, few partitions; right?
20        A.    Yes, sir.
21        Q.    Under lighting, plumbing and
22   mechanical, it says minimum lighting and
23   outlets, minimum plumbing; right?
24        A.    Yes, sir.
25        Q.    And actually in the average cost
```

TENER

1
2    D, under lighting, plumbing and
3    mechanical, it lists restrooms.  Do you
4    see that?
5         A.    Where, sir?
6         Q.    Directly above an average cost D
7    lighting, plumbing mechanical.  Right
8    above where we were just looking it says
9    adequate store lighting, restrooms and
10   low-cost fixtures.  Do you see that?
11        A.    Yes, sir.
12        Q.    But low-cost D doesn't say
13   anything about restrooms, does it?
14        A.    No, it says minimum plumbing,
15   sir.
16        Q.    And it also says minimum
17   lighting; right?
18        A.    Yes, sir.
19        Q.    Whereas the category above says
20   adequate store lighting?
21        A.    Yes, sir.
22        Q.    So is it -- what low-cost class D
23   buildings are you aware of in Brooklyn
24   that have been built in the past 20 years?
25        A.    I don't know, sir.  I was pricing

Page 280

1                    TENER

2    out something that would be fully

3    depreciated within the 20-year period.

4    The minimum plumbing would be roughed out

5    for a tenant to install restrooms.  This

6    is what I considered someone who would

7    control the property for 20 years would

8    construct and I thought this was the most

9    appropriate costing level and construction

10   level construct for a 20-year period.

11        Q.   But if you had upgraded from

12   low-cost class D to average-cost class D

13   in order to get adequate store lighting

14   and restrooms, the price per square foot

15   would have jumped up to $80 per square

16   foot; right?

17        A.   Would you like me to test that

18   and see what that would do?

19        Q.   Well, it changes it by at least

20   600,000; is that right?

21        A.   I don't know.  Would you like me

22   to test that, sir?

23        Q.   I would love it.

24        A.   At that cost level the hard cost

25   would go to -- sorry.  681,000.  At the

1                    TENER

2    $90 foot rent the FMR would be 1,255,571.

3    At the hundred dollar FAR rent it would be

4    1,423,000, still bracketing my conclusion

5    and not materially change the residual.

6         Q.   Is there a demand for low-cost

7    class D construction for retail purpose in

8    this area of Brooklyn?

9         A.   I believe that there would be

10   demand for single-story retail of that

11   design in this location and I have

12   concluded to my opinion of the fair market

13   rent in my report.

14        Q.   So what is your conclusion that

15   there is demand for low-cost class D

16   retail space in Brooklyn based on?

17        A.   I think it's based on the strong

18   retail demand in that area, the exposure

19   of that site, the physical nature of the

20   retail in that location.  The box is not

21   the important part, it's the location and

22   the exposure.  A McDonald's development is

23   even less of a construction quality.  The

24   S type is even a lower cost construction

25   type than the D.  It's not always driven

Page 282

1                          TENER

2      by the box, the quality of the box.  It's

3      the location and exposure which this

4      property has an exceptional location and

5      exposure.

6          Q.    Looking back to sheet 2 of your

7      quick residual analysis, you assumed zero

8      dollars for heating, cooling and

9      ventilation; right?

10         A.    Additional, zero additional

11     dollars, yes.

12         Q.    And you assumed no elevator;

13     right?

14         A.    Yes, sir, no elevator.

15         Q.    Wouldn't you need an elevator

16     since you were building an underground

17     parking garage?

18         A.    Absolutely not.

19         Q.    No?  What is that assumption

20     based on?

21         A.    It's ramp entrances and it would

22     have staircases.

23         Q.    Now, where -- how did you come up

24     with the 1.042 height per story

25     multiplier?

1                    TENER

2        A.    I believe that's based on the 14

3    foot estimated height of the first story

4    based on D, it would be in the back -- in

5    that section, there would be a --

6        Q.    Is that section 13 page 42?

7        A.    I don't know but we can look.

8              Yes, it is.

9        Q.    And how about the 0.790 floor

10    area perimeter multiplier?

11        A.    That would probably be the table

12    directly above that.

13        Q.    How did you determine the

14    perimeter of the building, the floor area

15    perimeter.

16        A.    Based on the perimeter of the --

17    based on the perimeter of the M1.

18        Q.    So you must have sketched it out,

19    figured out dimensions and figured out the

20    perimeter that way?

21        A.    I don't know, sir.

22        Q.    So how did you arrive at a 9,342

23    square foot parking area?

24        A.    I don't recall.

25        Q.    Because that's a very specific

```
                                    Page 284

 1                    TENER

 2   number.

 3        A.    It is.

 4             MR. KOH:  Can you tell me where

 5        you're looking for that number?

 6             THE WITNESS:  It's in sheet 2,

 7        column F, row 35.

 8             MR. KOH:  Thank you, I see it.

 9   BY MR. WALSH:

10        Q.    How big -- or I guess what is the

11   minimum size parking spot that could have

12   been used here?

13        A.    I don't know.  I'd have to look

14   at my files to go through on how I

15   calculated that.  That potentially could

16   be one.  It seems small to me.

17        Q.    It seems small to me, too.

18        A.    But I have to -- I would have to

19   check.

20        Q.    And how did you figure out what

21   this parking area would look like?  Did

22   you figure out where the aisles would be,

23   where the ramp would be?  How did you

24   figure that out?

25             MR. KOH:  Objection.
```

1                    TENER

2           THE WITNESS:  I don't recall.  I

3      would like to find my calculations and

4      repeat it but I don't have an answer

5      right now.

6   BY MR. WALSH:

7      Q.   If you could turn to page 1 of

8   the Marshall pdf which has been marked as

9   Exhibit P84.  Look up at the top where it

10  says, "Class D buildings generally have

11  wood frame, floor, and roof structure.

12  They may have concrete floor on grade and

13  other substitute materials, but are

14  considered combustible construction.  This

15  class includes the pre-engineered pole- or

16  post-frame hoop and arch-rib-frame

17  buildings."

18           Is that your understanding of

19  what you were proposing for this site?

20      A.   That and the description in the

21  class of construction below.

22      Q.   Okay.  So wood or steel studs in

23  bearing wall and primarily combustible

24  construction?

25      A.   Yes, sir.

```
                                              Page 286

 1                    TENER

 2            MR. WALSH:  Why don't we take a

 3       break.

 4            THE VIDEOGRAPHER:  Is that okay

 5       with everyone?

 6            MR. KOH:  It's okay with me.

 7       When do you want to come back?

 8            THE VIDEOGRAPHER:  Well, let's go

 9       off the record.  The time is 5:06.

10       We're going off the record.

11            (Recess taken from 5:06 p.m. to

12       5:16 p.m.)

13            THE VIDEOGRAPHER:  The time is

14       approximately 5:16.  We're back on the

15       record.  It's the beginning of media

16       6.

17  BY MR. WALSH:

18       Q.   Mr. Tener, what information would

19  you need to review in order to determine

20  where you came up with the 9,342 square

21  feet of parking?

22       A.   I would have to find my -- the

23  parking spaces that I needed and the

24  square footage that I used for the average

25  parking spaces necessary to create -- to
```

Page 287

```
 1                    TENER
 2    come up with that size.
 3         Q.   And you believe that's somewhere
 4    in your work file?
 5         A.   I hope so.  Otherwise I will have
 6    to re-hand calculate and make sure that I
 7    have it correctly.
 8         Q.   Okay.  So let's go back to the
 9    quick residual spreadsheet, sheet 1.  So
10    you came up with the hard cost, estimated
11    hard costs of 2.1 million and you
12    estimated 20 percent soft costs.  What
13    exactly --
14         A.   I'm not there.
15         Q.   Oh, I'm sorry.  It's P83, the
16    quick residual spreadsheet.  So you
17    assumed a 20 percent soft cost figure
18    based off of the 2.1 million of hard
19    costs.  What exactly do you believe is
20    captured within that 20 percent soft cost
21    estimate?
22         A.   It's the traditional ones that
23    I've always used.  It's architectural
24    engineering fees, filing fees, some
25    carrying costs during construction,
```

Page 288

1                    TENER

2    including real estate taxes during that,

3    some other soft costs associated with

4    marketing and things like that.  It's your

5    traditional soft costs associated with

6    construction.

7         Q.    That's what I'm trying to nail

8    down.  So these are construction soft

9    costs?

10        A.    They are development hard and

11   soft costs.  They're -- I pretty much

12   answered the question.  They are

13   development soft costs.

14        Q.    You use the term traditional soft

15   costs.  I'm trying to understand

16   everything that's captured within that

17   because I'm not an appraiser, right, I'm

18   not a construction developer.

19        A.    We often use a range of hard and

20   soft costs, soft costs as a percentage of

21   hard costs.  And generally the low can be

22   as low as 15 percent.  For more complex

23   assignments it could be as high as 25

24   percent.  If you're including financing

25   within that, it can go higher.  This is

1                    TENER

2    not including financing costs other than

3    minimal ones that would be associated with

4    the development of this.  So it's

5    generally a rule of thumb allocation that

6    I thought was appropriate to this level.

7         Q.   How long would it take to get a

8    building like this with the parking garage

9    built and ready for tenants to move in and

10   open up their store?

11        A.   Six months to a year.

12        Q.   Okay.  But your model assumes

13   that the developer could generate income

14   for a full 20-year period; right?

15        A.   No, my model amortizes the costs

16   over a 20-year period.  It takes the

17   initial rent of a hundred dollars a foot,

18   takes six months free rent off of that,

19   amortizes that over the term.  So I don't

20   think that's an accurate statement.

21        Q.   Well so, but let's look at this.

22   I understand that you -- I'm not talking

23   about the building cost.  I'm talking

24   purely about the amount of rent that you

25   believe can be generated over a period of

Page 290

1               **TENER**

2    20 years.  I've done the math and maybe

3    just correct me if I'm wrong, the only

4    period of time where I see that you're not

5    accounting for rent is you're assuming

6    that over the course of 20 years, you have

7    to give a six-month rent concession and

8    then you deduct $43,000 a year for that.

9    But other than that, you're assuming

10   tenancy on day one of year one through the

11   last day of year 20 without any break;

12   isn't that right?

13       A.   I am assuming that the tenant who

14   would take this and build this would get

15   six months free rent, that the economics

16   that they would pay based on would be this

17   80 to hundred dollars a foot rent based on

18   its full development of the site.

19       Q.   Right.  But this isn't a ground

20   lease; right?  The developer is building

21   the store, building the building and then

22   renting out the building.  So the building

23   can't be rented out until it's complete;

24   right?

25       A.   Correct.  The tenant is building

1                    TENER

2     a store in this scenario.  The tenant is

3     the one paying the fair market rent.  That

4     is a residual.

5          Q.   So you're assuming that someone

6     will buy this property, pay the rent but

7     isn't that -- you're talking about a

8     ground lease rent though; isn't that

9     right?  What you're talking about is a

10    ground lease.  The residual you built is

11    based upon retail rents.

12         A.   The rents for a single-story

13    retail, correct.

14         Q.   Right.  So whoever is paying this

15    rent isn't assuming they are also going to

16    have to build the building; right?  They

17    are moving their business into a space in

18    your building; right?

19         A.   No, that's the amortization of

20    the building is being taken off.  The 1.7

21    million would be that cost the

22    construction of it is what comes off

23    solves for the rent that would be

24    attributable to the land.

25         Q.   Okay, so that's a big difference.

Page 292

1                      TENER

2    So just to be perfectly clear, you are

3    assuming that whoever is paying this

4    hundred dollars per square foot of rent is

5    responsible for also building the building

6    that's going to be put on this site?

7         A.   That's the residual analysis is

8    what is the economic rent, what is the

9    cost to construct this and taking that off

10   of the economic rent, that is the

11   residual.

12        Q.   So I guess we'll get to it when

13   we look at your rent comps.

14             Don't you -- where do you account

15   for lease up time or is it your view that

16   you don't have to consider either the time

17   for construction or the time to lease the

18   property because the person is also

19   responsible for building the building?

20        A.   The property is turned over with

21   20-year term.  The economics of the rent

22   for that is adjusted by the cost to build

23   the property.

24        Q.   Okay.

25        A.   And the concession here

```
                                        Page 293

 1                        TENER

 2      obviously.

 3           Q.    And so there's no lease up time

 4      that's considered in this analysis?

 5           A.    This is leased.  Yes, this is

 6      leased to -- in this scenario, this is to

 7      solve for the rental.

 8           Q.    When you say this is leased, what

 9      is leased, just the property?

10           A.    Yes.

11           Q.    So here's the disconnect.  What

12      you're describing sounds to me like a

13      ground lease, whereas my understanding is

14      that you compared what tenants of retail

15      buildings were paying for those spaces but

16      what you're describing is a ground lease.

17      Am I correct?

18           A.    Yes.  I'm solving for the ground

19      rent using the economics of retail in this

20      location, less the amortized cost to

21      build.

22           Q.    So is that why you also don't

23      have any contingency for vacancy and

24      collection costs?

25           A.    Yes, sir.
```

Page 294

1                    TENER
2        Q.   Where is -- what is
3    entrepreneurial incentive?
4        A.   Entrepreneurial incentive is the
5    reward for developing something.
6        Q.   And the concept is that if
7    someone is going to develop something,
8    they want to make sure that they make
9    money off of it; right?
10       A.   Yes.
11       Q.   Where does your model contemplate
12   or account for entrepreneurial incentive?
13       A.   It doesn't.  This is the end user
14   that the tenant in control of this.
15       Q.   So how do they make money off of
16   it?
17       A.   They are paying economic rent on
18   this.  That is the economic rent
19   calculation for controlling the dirt for
20   20 years.
21       Q.   Okay.  So as I understand it
22   then, they would have to pay the fee owner
23   of the property a hundred dollars a square
24   foot for 20 years.  Then they have to
25   build a building on it with a parking

Page 295

1                    TENER

2    garage and then they have to charge rent

3    to other tenants, that's what you're

4    assuming?

5         A.   They would pay the opposite of

6    that.  They would pay the landlord 1.348

7    million dollars per year.  The

8    amortization of the cost of building the

9    improvements would be roughly $200,000 per

10   year and then you work your way back up to

11   the economic rents to achieve that.

12        Q.   Right, but where do they make

13   money?

14        A.   This is the economic rent for

15   leasing this dirt.

16        Q.   But that's not my question.  How

17   does anybody that does what you're

18   proposing make money?  Can you

19   demonstrate, how do they make money?

20        A.   By operating their business

21   there.  This is not -- this is not -- this

22   is not a developer's return.  This is a

23   tenant paying for what could be built

24   there, residually.

25        Q.   Now why wouldn't they just rent a

Page 296

```
 1                   TENER
 2   building that's already built?
 3       A.    That's not the equation here.
 4       Q.    Okay.  So in your view, someone
 5   would build a low-cost class D building
 6   rather than renting -- for all -- all of
 7   this cost rather than renting a
 8   preexisting building somewhere in the same
 9   neighborhood?
10       A.    I'm not saying rather than.  I'm
11   saying this is a residual that proves what
12   you would pay via the residual of what the
13   market rent for that space is, what the
14   amortized cost to build that space would
15   be.
16       Q.    But there's got to be some
17   incentive for them to do that; right?
18   What I'm trying to understand is why would
19   they go this route if they could just move
20   into a fully built-out building with
21   bathrooms and pay the same hundred dollars
22   a square foot?
23       A.    What is the incentive of
24   McDonald's building their space on a site
25   to run their business there?  What is the
```

Page 297

1                    TENER

2    incentive is to run your business there.

3        Q.   And how did you determine

4    financial feasibility in this model?

5        A.   That the -- that the concluded

6    rent of $1,348,000 a year plus the

7    amortized costs associated with

8    constructing that property are less than

9    the market rent that could be achieved for

10   that property.

11       Q.   What do you mean the market rent

12   that could be achieved for that property?

13       A.   The 1.72 million dollars a year

14   versus the -- sorry, I can't edit this but

15   the roughly high-end 1.72 million dollars

16   a year.

17       Q.   Where does that number come from?

18       A.   That's $100 a foot less real

19   estate taxes times 21,500 square foot.

20       Q.   Okay.  Doesn't your model prove

21   that this actually is not a financially

22   feasible use?

23       A.   No, sir.

24       Q.   You disagree with that?

25       A.   Yes, sir.

Page 298

TENER

1

2          Q.   Okay.  Show me where the

3     incentive is, where is the incentive for

4     somebody to take on this risk?

5          A.   Again, what is the incentive for

6     a tenant to rent ground and build their

7     building there?  It is -- the incentive is

8     to run their business and make a profit.

9     This is a residual to prove the rent.

10          Q.   So who is -- what businesses are

11     you aware of that would take on this risk?

12          A.   I have not given that a thought.

13          Q.   So if you're not aware of any

14     businesses that would take on this risk,

15     how can you be so sure that this is a

16     financially feasible use?

17          A.   That's not what my answer was

18     that I'm not aware.  I said I have not

19     given that a thought.  But to be

20     financially feasible is proven by the fact

21     the ground rent payment plus those

22     amortized costs is less than the rent that

23     could be achieved there so it's

24     financially feasible.

25               MR. WALSH:  All right.  If we

Page 299

```
 1                    TENER
 2       could mark VA 002153.
 3            (Exhibit P85, document Bates
 4       labeled VA 002153, marked for
 5       identification.)
 6            VERITEXT CONCIERGE:  I don't have
 7       a -- never mind.
 8            MR. WALSH:  It's a spreadsheet
 9       named (Retail Rent Comps).xlsx.
10            VERITEXT CONCIERGE:  It's in
11       here.  This will be marked as Exhibit
12       P85 and introducing now.
13    BY MR. WALSH:
14       Q.   If you could please open up P85.
15       A.   It's open.
16       Q.   This spreadsheet contains the
17    data that you used to justify market rent
18    levels of 90 to $100 per square foot;
19    right?
20       A.   Yes, sir.
21       Q.   And the first half of this
22    spreadsheet called Retail Rent Comps
23    contains eight purported rent comps;
24    right?
25       A.   Yes, sir.
```

Page 300

1                    TENER

2        Q.    And the rentable square footage

3    of the comps ranges from 900 square feet

4    on the low end to 4,700 square feet on the

5    high end; right?

6        A.    Yes, sir.

7        Q.    And your spreadsheet notes that

8    the average square footage of the eight

9    spaces is 1,965 square feet; right?

10       A.    Yes, sir.

11       Q.    So if each tenant in your

12   proposed building took a space -- let me

13   ask it this way:  You are comparing a

14   21,500 square foot building to comps that

15   on average are 1,965 square feet; right?

16       A.    I am looking at the comparables

17   within that range, from 900 to 4,700

18   square feet, yes.

19       Q.    With an average of 1,965?

20       A.    Yes, sir.

21       Q.    On what basis do you contend that

22   the rent for a 21,500 square foot space

23   would be comparable to these smaller

24   spaces?

25       A.    This building could be configured

1                    TENER

2     to accommodate all of those spaces.

3     Therefore, regardless of the overall size,

4     the economics of the retail in that

5     location drive the economic rent.

6          Q.   I'm actually adding all of these

7     up now.  Bear with me.

8               Combined, the square footage of

9     these eight rent comps is 15,717; is that

10    right?  Or you can take my word for it,

11    it's 15,717.  So you would actually need

12    all of these tenants and several more in

13    order to fill up the building you're

14    proposing on this site; right?

15         A.   Yes, sir.

16         Q.   Okay.  And what is the term in

17    years of these proposed rent comps?

18         A.   Seven to 15 years.

19         Q.   But you're proposing for 20

20    years; right?

21         A.   That's the defined term for this.

22         Q.   But none of these comps are 20

23    years; right?

24         A.   Okay.

25         Q.   Is that right?

1                    TENER

2        A.    Yes, sir.

3        Q.    I guess going back to a question

4    that I was asking before, wouldn't you

5    have to account -- so it seems like you

6    would have to build this building and have

7    multiple tenants, at least according to

8    the data that you provided and used as

9    comps.  Wouldn't you need to get a number

10   of tenants and split up the space in order

11   to make it comparable to what you're

12   suggesting can be done here?

13       A.    You feasibly could tenant this

14   with anywhere from one to 10 tenants if

15   need be.  That's the basis of the economic

16   rents that this could -- this site, this

17   development could accommodate any number

18   of tenant installations.

19       Q.    And if you had multiple tenants,

20   then you would have lease up and lease

21   down time; right?

22       A.    Again we're solving for this to

23   be leased to a single tenant, not whether

24   they occupy it or not, a single tenant.

25       Q.    Okay.  But you're not -- what

```
                                         Page 303

 1                      TENER

 2    demand is there in this area for a 21,500

 3    square foot retail space?

 4         A.    There is demand for a variety of

 5    commercial sizes in this area.

 6         Q.    And what did you do to verify

 7    that?

 8         A.    I looked at comparable data.  I

 9    looked at listings in the area.  There are

10    obviously larger retail tenants west of

11    us, closer to Barclay Center that are

12    significantly larger.  There is evidence

13    of retail tenancy in a wide degree of

14    sizes.

15         Q.    Isn't there a spot -- isn't there

16    retail space of about this same size

17    directly across the street that's been

18    empty for years?

19         A.    Which building are you talking

20    about, sir?

21         Q.    Right across the street.  I don't

22    know the address.

23         A.    I'd have to look at it again.

24         Q.    Is that something you would have

25    looked at in your analysis?
```

```
1                    TENER
2        A.    I don't know if I looked at how
3    long the space was available.  I was
4    primarily looking for lease transactions,
5    not space that was on the market for any
6    particular period of time.
7        Q.    Now, let's look at the other tab
8    of that spreadsheet.  It's got nine more
9    rent comps ranging in size from 720 square
10   feet to 2,050 square feet.  Where did this
11   data come from?
12       A.    Looks like it says 137 Atlantic
13   Avenue.  May have come from another KTR
14   appraisal.
15       Q.    Okay.  Of all the properties --
16   so we're looking at 17 buildings, 17
17   properties.  Are any of these low-cost
18   class D construction?
19       A.    I don't think so.
20       Q.    Okay.  Wouldn't that impact what
21   someone would be willing to pay?
22       A.    Again, I don't think it really
23   matters.  I think the location, the
24   exposure is what drives it, not the box
25   that it's in.
```

Page 305

1                    TENER

2        Q.   So someone would pay the same for

3    class A retail space as they would pay for

4    class D in the same location, is that your

5    testimony?

6        A.   I see single story retail of very

7    low quality aged retail, not trading for

8    any different than newer.  It's largely

9    driven based on the exposure and location

10   of the property, not the quality of the

11   box as stated over and over.

12            MR. WALSH:  So if we could mark

13       VA 000848.

14            VERITEXT CONCIERGE:  This will be

15       introduced as Exhibit P86.

16            (Exhibit P86, document Bates

17       labeled VA 000848, marked for

18       identification.)

19   BY MR. WALSH:

20       Q.   Okay, if you could open up P86

21   when it's available and let me know when

22   it's available.

23       A.   It's open.

24       Q.   Okay.  So Vanderbilt forwarded

25   you retail rent comps because you had

Page 306

```
1                        TENER
2       asked them a day earlier to provide you
3       with the information that supported their
4       hundred dollars per square foot range they
5       shared with you at the June 19, 2019
6       meeting.  You then forwarded this
7       information to Shaun and you asked him or
8       Rebecca to confirm the comps.  If you
9       could turn to the page ending in 852 and
10      you're going to need to rotate it.
11           A.   Okay.
12           Q.   So this is a list of recent lease
13      transactions; right?
14           A.   It's a list of transactions from
15      comps, I think CompStak, I can't tell.
16      From January of 2019, mostly 2016 and all
17      the way through November of '17.
18           Q.   Okay.  Is this the type of data
19      that you would be looking at in trying to
20      arrive at retail rent comps?
21           A.   This would be potential things
22      that you would look at to see if they're
23      applicable to your property.  Some of
24      these look like they are certainly not
25      comparable.
```

                        TENER

1

2        Q.    So what about 485 Atlantic

3    Avenue, it's the first one on the list.

4    It's two blocks from the Barclay Center.

5    It's on the same street.  I know it's many

6    blocks away, it's on the other side of the

7    Barclay Center.  But that in December 2017

8    rented out for $46 per square foot.  Why

9    is that not a comp?

10       A.    It's an office/retail use for a

11   one and a half-year term.  It would not be

12   considered a comp at all.

13       Q.    How about 1010 Dean Street?  It's

14   a first floor.  In your sales comp

15   analysis you looked at -- only a handful

16   of land sales comps was a block away on

17   Dean Street.  1010 Dean Street, July 2016,

18   $30 per square foot.  Did you consider

19   that?

20       A.    I don't know whether we did or

21   not.  I would have to look at what -- it

22   says Brooklyn Warehouse LLC was the

23   tenant.  Certainly they -- a lease of that

24   economics is not consistent.  Most of the

25   data that I have -- I understand.  So

1                    TENER

2      looking at this, I can't tell what we knew

3      about it, what we looked at.  It certainly

4      doesn't appear to be consistent with the

5      comparable data that we were aware of,

6      that we confirmed.

7          Q.   But they sent this to you and you

8      asked your associate to look into it.

9          A.   This is what you would consider a

10     data dump.  I don't know if they sent a

11     bunch of things.  Not every transaction is

12     a comparable that's relevant.

13         Q.   I'm not suggesting that.  I'm

14     just trying to understand what you did.

15     The other thing is when you look at 1010

16     Dean Street, it says Brooklyn warehouse.

17     When you pull it up that's a warehouse.

18     Isn't that your sort of perfect low-cost

19     class D construction, a warehouse?

20         A.   A warehouse is a warehouse, not

21     retail.  Again, what I asked at the

22     beginning of this was can you or Rebecca

23     confirm these comps, at least the ones

24     that are applicable to 840 Atlantic?  It's

25     the job of the appraiser to determine

1                    TENER

2    what's applicable and what's not.  I can't

3    go through each of these without doing

4    research, pulling it up and answering your

5    questions, why we didn't include them or

6    why some work or wouldn't work.  The most

7    comparable were included, analyzed and

8    formed my conclusion.

9         Q.   Okay.  So you don't think it has

10   anything to do with the fact that these

11   weren't in the price range you were

12   looking for?

13        A.   I know that it doesn't have

14   anything to do with that.

15        Q.   How do you know that?

16        A.   Because that's not how I do

17   research and that's not how my staff does

18   research.  We weren't geared towards

19   trying to prove it, prove a number.  We

20   were analyzing comparables that we thought

21   were the most locationally similar, had

22   the same attributes, to try to inform our

23   opinion based on our knowledge of this

24   location of what the economics of retail

25   at that location would derive.  We choose

```
 1                    TENER
 2    and filter the most applicable, analyze
 3    the most applicable and conclude to our
 4    opinion of market rent.
 5        Q.    But you didn't ask Vanderbilt to
 6    send you their comps, you asked them to
 7    send you their comps in the hundred
 8    dollars per square foot range; right?
 9            MR. KOH:  Objection.
10            THE WITNESS:  That was relative
11        to their assertion or their
12        communication during the meeting of
13        June where they said we have knowledge
14        of comparables, and they used the word
15        comparables not always the same way
16        that an appraiser uses comparables.
17        People think a transaction is a
18        comparable.  Transactions are
19        transactions.  An appraiser determines
20        whether it is comparable to the
21        subject.  Lots of times clients will
22        just send you things and you have to
23        determine whether they are comparable.
24        That conversation was such that they
25        believed that they had knowledge of
```

```
 1                     TENER
 2        these transactions that were in excess
 3        of a hundred collars a foot.  My
 4        challenge to them was if that's what
 5        you have knowledge of, send it to us,
 6        we'll consider it if it's comparable.
 7   BY MR. WALSH:
 8        Q.   Okay, but I'm a lay person, I'm
 9   not an appraiser, but there is a lot of
10   information they sent you and that's in
11   your files that suggest that the 90 to
12   $100 per square foot range that you assume
13   is not a universal retail rent.  And I'm
14   just trying to understand why those lower
15   rents weren't considered and what, if
16   anything, you did to make sure those were
17   not applicable.
18        A.   What I had is I had my staff
19   confirm the comparables they could,
20   compare them, look at the properties
21   relative to us, filter out the ones that
22   we considered were relevant, that's the
23   process that you go through.  You don't
24   just take a number on the surface and say
25   that's comparable.  You have to look at
```

Page 312

1                    TENER

2     it.  Like you said, that other property

3     was a warehouse.  We would have thrown

4     that out immediately.  The one and a half

5     year lease that was office retail, we

6     would have thrown that out immediately.

7     Gone through two, and that process would

8     have continued through any ones that we

9     thought locationally had a bearing on the

10    subject.

11        Q.   But the 1010 Dean Street is a

12    block away from the land sales comp that

13    you used so how is it locationally

14    different?  It's a block away.

15        A.   On what type of zoning was that?

16        Q.   You're the appraiser, you tell

17    me.

18        A.   I don't have it in front of me.

19    Can I go back to it?

20        Q.   It's P73.

21        A.   What is P73?

22        Q.   It's the spreadsheet.

23        A.   I'm looking.

24        Q.   It was an M1-1 site.

25             MR. KOH:  I'm sorry, you're

Page 313

```
 1                    TENER
 2       looking at P73 now?
 3            MR. WALSH:  P73.  One of his
 4       comps for M1-1 sites was at 901 Dean
 5       Street.  I'm trying to understand why
 6       rent comp a block away --
 7            THE WITNESS:  Which is 901 Dean
 8       Street?
 9   BY MR. WALSH:
10       Q.   It's number 3.
11       A.   An M1.
12       Q.   Yes.
13       A.   Versus M1 Crown.
14            MR. KOH:  What tab are you on on
15       73?
16            MR. WALSH:  Land sale grid and
17       1-1.
18            THE WITNESS:  Do you mind if I
19       look at the location of 901 Dean
20       versus what was the other one?
21   BY MR. WALSH:
22       Q.   Well, look, you didn't take -- it
23   was a zero percent adjustment for
24   location.
25       A.   But I want to look at the comp
```

1                    TENER

2    that you're concerned about, the 10 -- or

3    the lease transaction that you're

4    concerned about, the 1010 Dean.

5         Q.    1010 Dean Street.

6         A.    I would like to see where that

7    is.  What matters is physically what that

8    property, how it sits on the street.  Is

9    it the same kind of frontage, what is it?

10        Q.    Let's move on.

11              When you sent the July 30, 2019

12   report that concluded the same value,

13   Vanderbilt already knew it was going to

14   have the same value, right, you had

15   already told them?

16        A.    What date?

17        Q.    July 30, 2019.

18        A.    I don't know if I reported ahead

19   of time.  It's possible that before I

20   finished writing the report I might have

21   told them but I don't recall.

22        Q.    You said you were surprised that

23   the numbers worked out.  Were they

24   surprised?

25              MR. KOH:  Objection.

Page 315

1                      TENER
2              THE WITNESS:  I don't know if
3        they were surprised or not.
4     BY MR. WALSH:
5        Q.    What was their reaction?
6        A.    I don't recall.
7              MR. WALSH:  If we can mark
8        VA 001773.
9              (Exhibit P87, document Bates
10       labeled VA 001773, marked for
11       identification.)
12             VERITEXT CONCIERGE:
13       VA 001773-75?
14             MR. WALSH:  Yes.
15             VERITEXT CONCIERGE:  Just wanted
16       to make sure.  This will be introduced
17       as Exhibit P87.
18    BY MR. WALSH:
19       Q.    So this is an e-mail that you
20    sent to Sam Rottenberg and Morris Missry
21    on September 4, 2019.  You attached a
22    redlined Word document which is why it
23    doesn't have a Bates number on it but it
24    was attached sequentially.  Sam Rottenberg
25    had sent you a letter a day earlier.  It

Page 316

                        TENER
1
2    was a draft agreement that McDonald's had
3    sent to Vanderbilt and you made some
4    suggested edits and sent them back to
5    McDonald's.
6            Do you see that?
7        A.   Yes, sir.
8        Q.   Do you recall that?
9        A.   I recall reviewing this and I do
10   recall making some markups and sending
11   them back.
12       Q.   So one of the edits you proposed
13   making is in bullet point 1 where you
14   recommended striking language that would
15   have the appraisers estimate the value of
16   the property as encumbered by the lease.
17           Do you see that?
18       A.   Yes, sir.
19       Q.   But you on July 30th had issued a
20   report that purportedly estimated the
21   value of the property as encumbered by the
22   lease; right?
23       A.   Yes, at least considering the
24   lease term, yes.
25       Q.   So why were you concerned and why

1                    TENER

2    did you suggest striking that requirement

3    that the parties be directed to have their

4    appraisers estimate the value as

5    encumbered by the lease?

6              MR. KOH:   Objection.

7              THE WITNESS:   Because this -- I

8         believe I had an e-mail associated

9         with this.   If I recall correctly, I

10        was concerned that this would be

11        tantamount to modifying the lease and

12        I think that the phrase encumbered as

13        encumbered by the lease may have had

14        more far-reaching effects than just

15        taking into consideration the lease

16        term.

17   BY MR. WALSH:

18        Q.   Well, but Morris Missry had told

19   you on April 1, 2019 to ignore the

20   encumbrance to the lease; right?

21        A.   You're using the word encumbrance

22   now.   It's taking into account the lease

23   term.

24        Q.   Okay.

25        A.   So that's really the concern is

```
 1              TENER
 2    that does this phrasing speak to more than
 3    just the ruling of the Second Avenue and
 4    that sort of just was my concern is that
 5    they should be careful in terms of going
 6    beyond what the Second Avenue ruling
 7    requires of them.
 8         Q.   But Morris had told you in April,
 9    he had given you the instructions on April
10    1st that we went through for that 936
11    Second Avenue, and isn't it true you were
12    just trying to protect his position here?
13         A.   I don't understand that question.
14         Q.   So in April, on April 1st, Morris
15    told you not to consider the rule
16    announced in 936 Second Avenue; right?
17         A.   Correct.
18         Q.   You had asked him about that and
19    wouldn't you agree that that is basically
20    what Mike Meyer was trying to capture in
21    his draft agreement that you struck the
22    language from?
23              MR. KOH:  Objection.
24              THE WITNESS:  My concern is that
25         McDonald's might have been trying to
```

```
 1                     TENER
 2       go beyond that.  I don't know whether
 3       they were trying to capture that or
 4       trying to amend the lease agreement.
 5       That was my concern was that they
 6       might be trying to go beyond that.
 7  BY MR. WALSH:
 8       Q.   But weren't you trying to protect
 9  Morris's position that he staked out in
10  April?
11       A.   No, I was trying to have them
12  avoid modifying their lease to go beyond
13  the ruling of Second Avenue.
14            MR. WALSH:  Okay.  If we could
15       pull up VA 001776.
16            (Exhibit P88, document Bates
17       labeled VA 001776, marked for
18       identification.)
19            VERITEXT CONCIERGE:  This will be
20       marked as Exhibit P88.
21  BY MR. WALSH:
22       Q.   This is a series of e-mails
23  including an e-mail that you sent on
24  September 4, 2019 to what appears to be
25  Morris Missry and Sam Rottenberg.
```

```
                                        Page 320
 1                      TENER
 2            Do you see that?  And Morris
 3    asked you why you deleted that language.
 4    And you responded, "I was trying to
 5    protect your position that the lease is
 6    not to be considered unless it is
 7    specifically stated in the lease.  If you
 8    want to argue this point, an agreement in
 9    this letter might eliminate your position.
10    That said, I do believe that they may
11    prevail in their interpretation of the
12    lease under the concept of that which is
13    not specifically excluded is included in
14    the court decision that I previously sent
15    you."
16            And that court decision that you
17    previously sent him was 936 Second Avenue;
18    right?
19         A.    Yes, sir.
20         Q.    And notwithstanding the fact that
21    you had now given them a report that
22    purportedly took into account the 20-year
23    lease term, you still wanted to protect
24    that position; isn't that right?
25              MR. KOH:  Objection.
```

1                    TENER

2          THE WITNESS:  That's what this

3     states.  My recollection was more

4     consistent with what you told you

5     before but I can't -- I can't disagree

6     with what I wrote here so my

7     recollection when I testified a few

8     seconds ago is what I thought that was

9     intended to do.  I still believe that

10     this only talks about pieces that I

11     was concerned that they would be

12     modifying the lease.  I still think

13     that was a concern but it's definitely

14     not communicated here, sir.

15   BY MR. WALSH:

16       Q.   Appraisers must be unbiased;

17   right?

18       A.   Yes, sir.

19       Q.   And appraisers are not advocates

20   for their client; right?

21       A.   Correct, sir.

22       Q.   Okay.  And appraisals are

23   supposed to be based upon market evidence

24   and not formulated to the advancement of

25   the client's objective; right?

```
                                        Page 322
 1                    TENER
 2        A.    Yes, sir.
 3        Q.    So why were you trying to protect
 4   Vanderbilt's position?
 5        A.    This has nothing to do with the
 6   appraisal.  This has to do with an
 7   agreement that they were going to have to
 8   exchange reports.  I believe that's what
 9   that letter was.
10        Q.    Well, then, why were they asking
11   you to edit it if it had nothing to do
12   with the appraisal?
13            MR. KOH:  Objection.
14            THE WITNESS:  Because it had to
15        do with the provisions under which the
16        reports would be exchanged.  They were
17        leaving the wording of the -- or
18        altering the wording of the option
19        agreement that directs appraisers so
20        that would be the reason I guess that
21        they asked.  I don't know why they
22        asked me, I just responded to them.
23   BY MR. WALSH:
24        Q.    And you responded and made edits
25   to try to protect their position; right?
```

```
                                              Page 323

 1                    TENER
 2        A.    That's what this states.
 3              MR. KOH:  Objection.  Go ahead.
 4              THE WITNESS:  That's what this
 5        states.
 6   BY MR. WALSH:
 7        Q.    And those are your words; right?
 8        A.    Yes, sir.
 9        Q.    And you had testified earlier
10   that you actually thought the case should
11   apply; right?
12        A.    I still think the case applies.
13        Q.    Right.  And even here you say
14   that you think McDonald's has the better
15   position; right?
16              MR. KOH:  Objection.
17              THE WITNESS:  I think that the
18        case applies.  I didn't know whether
19        they would argue this or not.
20   BY MR. WALSH:
21        Q.    So if you thought the case
22   applied and if you're not an advocate and
23   you're not supposed to be biased, why are
24   you striking language to protect a
25   position that you think is wrong?
```

```
 1               TENER
 2          MR. KOH:  Objection.
 3          THE WITNESS:  Sorry, sir, I
 4      didn't hear that, Howard.
 5          MR. KOH:  I just made an
 6      objection.
 7          THE WITNESS:  Can you repeat the
 8      question?
 9   BY MR. WALSH:
10      Q.   If you thought the case applied
11   and if you're not an advocate and you're
12   not supposed to be biased, why are you
13   striking language to protect the position
14   that you thought was wrong?
15          MR. KOH:  Same objection.
16          THE WITNESS:  I wasn't defending
17      a position I thought was wrong.  I was
18      giving them markups that I thought
19      might be altering the option
20      agreement, potentially.
21          MR. WALSH:  If we could mark
22      VA 001833.
23          (Exhibit P89, document Bates
24      labeled VA 001833, marked for
25      identification.)
```

```
                                               Page 325

 1                    TENER

 2              VERITEXT CONCIERGE:  This will be

 3         introduced as Exhibit P89.

 4    BY MR. WALSH:

 5         Q.   If you could look at the top of

 6    the third page, 1835, Mike Meyer wrote an

 7    e-mail to Morris Missry that was then

 8    forwarded to you.  Mike sent Morris that

 9    e-mail on October 8, 2019 and Mike wrote,

10    "Morris, sorry to have missed your call.

11    I'm in department meetings today -

12    Thursday.  I reviewed Tom Tener's

13    restricted appraisal that he exchanged

14    with Sharon.  We talked at the end of

15    August, and you agreed that the property

16    was to be valued as encumbered by the

17    lease and that you were instructing the

18    appraiser to redo his report to account

19    for the lease encumbrance."  And then he

20    goes on to say that "it does not appear

21    that the report was redone as Morris had

22    indicated on his call."

23              And Morris forwarded this e-mail

24    to you; right?

25         A.   Yes, sir.
```

                        TENER

1

2      Q.   And he asked you to ghostwrite a

3   response to him; right?

4      A.   Yes.

5      Q.   As an appraiser, do you feel it's

6   your place to ghostwrite a response for a

7   lawyer?

8      A.   I don't think that I should

9   ghostwrite legal responses.  He was asking

10  me to respond relative to the -- whether

11  KTR revised the appraisal.  What I

12  communicated was the facts that occurred

13  so that he could use them.

14     Q.   And did Morris -- by the way, did

15  you speak with Morris about Mike's e-mail?

16     A.   I don't recall.

17     Q.   Do you recall if he ever denied

18  making that statement to Mike Meyer?

19     A.   What statement?

20     Q.   That Mike said in his e-mail, and

21  this is a quote from Mike's e-mail saying

22  what Morris had told him, quote, "We

23  talked at the end of August, and you

24  agreed that the property was to be valued

25  as encumbered by the lease and that you

Page 327

```
 1                    TENER
 2   were instructing the appraiser to redo his
 3   report to account for the lease
 4   encumbrance."
 5           Did Morris ever deny to you that
 6   he made that statement?
 7       A.   I don't know.  I don't recall.
 8       Q.   Did he ever admit to making that
 9   statement?
10       A.   I don't recall.
11       Q.   Okay.  And then at the very top
12   after a little bit more back and forth,
13   Morris wrote to you on October 8th at
14   1:35 p.m., "I had many calls with him,"
15   referring to Mike, "but you did the
16   appraisal, bottom line, before we actually
17   signed that letter."
18           Do you agree with Morris that you
19   redid your appraisal in July?
20       A.   Yes, sir.  After we left that
21   June meeting, we agreed that I was
22   going -- it was going to be necessary for
23   me to redo the appraisal to incorporate
24   the residual approach.  I couldn't start
25   on it right away.  As you'll see in some
```

Page 328

```
 1                    TENER
 2   of the communications, I tell them when I
 3   could get around to do it.  My staff
 4   started doing research just a few weeks
 5   later and I finished it up in late July.
 6   At that point, I viewed it as done and
 7   ready to go forward and that my conclusion
 8   reflected the 20-year lease term
 9   encumbrance.
10       Q.   Do you know why Morris or did
11   Morris ever tell you why he waited until
12   the end of August to communicate to
13   McDonald's that he had asked you to redo
14   your appraisal?
15           MR. KOH:  Objection.
16           THE WITNESS:  I don't know why or
17       what his timing was relative to
18       communications.  I was -- I had
19       already received my direction to do it
20       and I had completed it by the end of
21       July.
22           MR. WALSH:  Just two more very
23       quick things.  If we could mark
24       VA 000420.
25           (Exhibit P90, document Bates
```

```
                                           Page 329

 1                       TENER

 2          labeled VA 000420, marked for

 3          identification.)

 4                VERITEXT CONCIERGE:  This will be

 5          introduced as Exhibit P90.

 6    BY MR. WALSH:

 7          Q.   Mr. Tener, this is a September 30

 8    e-mail that you sent to Morris Missry and

 9    Sam Rottenberg.  And you appear to be --

10    actually can you tell me what this e-mail

11    reflects?

12                MR. KOH:  I'm sorry, what number

13          is this?  What exhibit number is this?

14                VERITEXT CONCIERGE:  This is P90.

15                MR. KOH:  Thank you.

16                THE WITNESS:  It was a summation

17          of the meeting and exchange of our

18          revised reports.

19    BY MR. WALSH:

20          Q.   And one of the things you wrote

21    is, "She also continues to identify the

22    term as a 5 year renewal."

23                Can you explain what concern you

24    were trying to express there?

25                MR. KOH:  Objection.
```

```
                                        Page 330

 1                    TENER

 2              THE WITNESS:  She was stating

 3         five-year term rather than the 20-year

 4         term, the tenant renewal.

 5    BY MR. WALSH:

 6         Q.    And where did she state that?

 7         A.    She stated it during our meeting

 8    and I believe if I recall correctly in the

 9    report but she definitely was

10    communicating that during our meeting.

11         Q.    Now, earlier you explained that

12    you were -- for your August 2018 report

13    you assumed 99-year ground lease term and

14    you came up with a rent amount; right?

15         A.    Yes.

16         Q.    And then in July of the following

17    year, you were asked to come up with the

18    ground rent for a 20-year term and even

19    though -- and the rent was actually higher

20    for the 20-year term.  I guess I'm trying

21    to understand how does the length of the

22    renewal period or the length of the lease

23    that she was considering, how does that

24    impact value and make her valuation

25    unreliable?
```

1                    TENER

2        A.    She's not considering all uses of

3    the property could be put by limiting it

4    to a five-year term.  She is stuck with

5    the concept that this is a quick service

6    restaurant type of use similar to a

7    McDonald's and deriving comps from that

8    assumption, not that the site could be

9    used for anything more than a say 3,000

10   square foot retail with abundant parking

11   around it.  That is not consistent with

12   the highest and best use and I think her

13   five-year presumptive term is biassing her

14   conclusion and her opinion.

15           MR. WALSH:  Okay.  This is the

16       last document, I think VA 000593.

17           (Exhibit P91, document Bates

18       labeled VA 000593, marked for

19       identification.)

20           MR. WALSH:  It's some handwritten

21       notes.

22           VERITEXT CONCIERGE:  I actually

23       don't have a 593.  Oh, wait, I'm

24       sorry, there it is.  Introducing now.

25       It will be known as Exhibit P91.  It's

```
                                          Page 332

 1                    TENER

 2        in there now.

 3              MR. WALSH:  Thank you.

 4              THE WITNESS:  Okay.

 5    BY MR. WALSH:

 6        Q.   Do you recognize this

 7    handwriting?

 8        A.   It's not mine.

 9        Q.   It came from your work file.  I'm

10    just trying to understand what this

11    reflects.  Do you know what this document

12    is?

13        A.   I'm not sure.  I think this might

14    be the original notes from Theresa Nygard

15    when she got a call about this but I'm not

16    certain.

17        Q.   The notes seem to reference

18    somebody named Michael Greenbaum.  Do you

19    have any idea who that is?

20        A.    No.  I think this might have been

21    in a call to Theresa Nygard and her notes

22    when she originally passed this on to me

23    as something that I might do.  I think the

24    original call came in to her and because

25    she had a lot of experience in Brooklyn,
```

```
                                              Page 333

 1                        TENER
 2     that most of her expertise was Manhattan
 3     land, that she felt that she should turn
 4     it over to me.
 5          Q.   I see.  Okay, if I could just
 6     have two minutes, I think I'm done.  If we
 7     could just go off the record for two
 8     minutes.
 9               MR. KOH:  Okay.
10               THE VIDEOGRAPHER:  Okay, thank
11          you.  The time is 6:15.  We're going
12          off the record.
13               (Recess taken from 6:15 p.m. to
14          6:17 p.m.)
15               THE VIDEOGRAPHER:  The time is
16          approximately 6:18.  We're back on the
17          record.
18               MR. WALSH:  Thank you for your
19          time today, Mr. Tener.  I don't have
20          any further questions at this time but
21          I reserve the right to ask some
22          follow-up questions based upon any
23          questions that Mr. Koh may ask.
24               MR. KOH:  Thank you.  And
25          Brendan, if you could refresh my
```

Page 334

1                    TENER

2         recollection as to which exhibit

3         number -- I think it's P36.  So let's

4         bring up P36 and yes, I am right.

5    EXAMINATION

6    BY MR. KOH:

7         Q.   And Mr. Tener, I would like to

8    direct your attention to the second -- to

9    the third page of that document which is

10   the second page of the report.  It bears

11   Bates stamp number VA 001047.  And I'd

12   like to direct your attention to the third

13   full paragraph, first sentence.  I would

14   like you to read that to yourself and then

15   tell me when you're ready and I'll ask you

16   a question.

17        A.   (Witness perusing document.)

18             The third full --

19        Q.   Right.  Begins the subject site

20   is a U-shaped.

21        A.   I have the wrong page.

22        Q.   It's on the same page --

23        A.   I had the wrong page.  That's

24   what made it difficult.

25             Yes, sir.

1                     TENER

2      Q.   Okay.  So having read this

3   sentence, earlier you testified that you

4   believe that the M1-1 portion of the site

5   at 840 Atlantic Avenue was 22,500 square

6   feet.  Does this sentence change your

7   answer in any way?

8      A.   Yes, sir.  The M1 portion is

9   22,000 square feet.  There is a -- if I

10  recall there was a small sliver of about

11  5,000 square feet that I did not use for

12  the development footprint of the 21,500

13  square foot building.  I only used the

14  portion that fronts on Atlantic and

15  Vanderbilt and it's an L-shaped site, not

16  the tail that comes down that has frontage

17  on Pacific.

18          MR. KOH:  Thank you.  I have no

19      more questions, Mr. Tener.  Mr. Walsh,

20      do you have any follow-up based on --

21      that is within the scope of what I

22      just asked?

23          MR. WALSH:  I have no further

24      questions.

25          MR. KOH:  Okay.  All right, then

Page 336

```
 1                    TENER
 2        this deposition is concluded and thank
 3        you for your time, Mr. Tener, thank
 4        you, everybody.  Cathi are you going
 5        to send me a rough?
 6             THE VIDEOGRAPHER:  Can I just
 7        close out the deposition?
 8             MR. KOH:  Yes, please.
 9             THE VIDEOGRAPHER:  Okay, thanks
10        everyone.  We are off the record at
11        6:21 p.m. and this concludes today's
12        testimony given by Thomas J. Tener.
13        The total number of media units used
14        was 6 and will be retained by Veritext
15        New York.  Thanks, everyone.
16             (Time noted:  6:21 p.m.)
17
18    _____
19    THOMAS J. TENER
20
21    Subscribed and sworn to before me
22    this _____ day of _____, 20___.
23
24    _____
25    Notary Public
```

Page 337

1

2              C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                            : ss.

5    COUNTY OF NASSAU        )

6

7         I, CATHI IRISH, a Registered

8    Professional Reporter, Certified Realtime

9    Reporter, and Notary Public within and for

10   the State of New York, do hereby certify:

11        That THOMAS J. TENER, the witness

12   whose deposition is hereinbefore set

13   forth, was duly sworn by me and that such

14   deposition is a true record of the

15   testimony given by the witness.

16        I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, and that I am

19   in no way interested in the outcome of

20   this matter.

21        IN WITNESS WHEREOF, I have hereunto

22   set my hand this 22nd day of September,

23   2021.

24              <%5027,Signature%>

              _____

25              CATHI IRISH, RPR, CRR, CLVS

Page 338

1

2    ---------------- I N D E X ----------------

3    WITNESS                EXAMINATION BY        PAGE

4    THOMAS J. TENER    MR. WALSH              6

5                       MR. KOH                334

6

7

8    ---------------- EXHIBITS ----------------

9    EXHIBIT NUMBER      DESCRIPTION           PAGE

10   Exhibit P66, document Bates labeled   10

11   VA 001059

12   Exhibit P67, document Bates labeled   45

13   VA 023239

14   Exhibit P68, document entitled The    60

15   Appraisal of Real Estate

16   Exhibit P69, document Bates labeled   79

17   VA 000313

18   Exhibit P70, document Bates labeled   117

19   VA 000587

20   Exhibit P71, document Bates labeled   118

21   VA 000664

22   Exhibit P72, document Bates labeled   121

23   VA 001506

24   Exhibit P73, document Bates labeled   139

25   VA 000117

```
                                          Page 339

 1

 2    Exhibit P74, document Bates labeled    190

 3    VA 001592

 4    Exhibit P75, document Bates labeled    199

 5    MCD002701

 6    Exhibit P76, document Bates labeled    201

 7    VA 000408

 8    Exhibit P77, document Bates labeled    203

 9    VA 001248

10    Exhibit P78, document Bates labeled    234

11    VA 017997

12    Exhibit P79, document entitled The     241

13    Appraisal of Real Estate

14    Exhibit P80, document Bates labeled    246

15    VA 001083

16    Exhibit P81, document Bates labeled    254

17    VA 001061

18    Exhibit P82, document Bates labeled    255

19    VA 001039

20    Exhibit P83, document Bates labeled    268

21    VA 000959

22    Exhibit P84, document entitled         275

23    Marshall Valuation Service

24    Exhibit P85, document Bates labeled    299

25    VA 002153
```

Page 340

```
 1
 2    Exhibit P86, document Bates labeled    305
 3    VA 000848
 4    Exhibit P87, document Bates labeled    315
 5    VA 001773
 6    Exhibit P88, document Bates labeled    319
 7    VA 001776
 8    Exhibit P89, document Bates labeled    324
 9    VA 001833
10    Exhibit P90, document Bates labeled    328
11    VA 000420
12    Exhibit P91, document Bates labeled    331
13    VA 000593
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 341

1               ** ERRATA SHEET **

2    CASE: MCDONALD'S vs. VANDERBILT

     DEPOSITION DATE: 9/21/2021

3    DEPONENT: THOMAS J. TENER

4    PAGE LINE(S)   CHANGE              REASON

5    ____|_____|_____|_____

6    ____|_____|_____|_____

7    ____|_____|_____|_____

8    ____|_____|_____|_____

9    ____|_____|_____|_____

10   ____|_____|_____|_____

11   ____|_____|_____|_____

12   ____|_____|_____|_____

13   ____|_____|_____|_____

14   ____|_____|_____|_____

15   ____|_____|_____|_____

16   ____|_____|_____|_____

17   ____|_____|_____|_____

18   ____|_____|_____|_____

19   ____|_____|_____|_____

20

21                   _____

                     THOMAS J. TENER

22

     SUBSCRIBED AND SWORN TO BEFORE ME

23   THIS _____ DAY OF _____, 20___.

24

     _____    _____

25   (NOTARY PUBLIC)           MY COMMISSION EXPIRES:

**&**

**&**   3:11 5:18 164:8
184:19 275:5,18
275:19 276:20

**0**

**0.790**   283:9
**00**   11:13
**00001**   9:22
**000117**   139:14,18
338:25
**000313**   79:7,9
338:17
**000408**   201:9,11
339:7
**000420**   328:24
329:2 340:11
**000587**   117:6,10
338:19
**000593**   331:16,18
340:13
**000664**   118:22,24
338:21
**000848**   305:13,17
340:3
**000959**   268:17
339:21
**001039**   255:14,16
339:19
**001045**   258:7
**001047**   334:11
**001059**   10:22,24
11:14 338:11
**001061**   254:8,10
254:14 339:17
**001083**   246:21,23
339:15
**001248**   203:6,8
339:9
**001506**   121:23,25
338:23

**001592**   190:23,25
339:3
**001773**   315:8,10
340:5
**001773-75**   315:13
**001776**   319:15,17
340:7
**001833**   324:22,24
340:9
**001940**   123:3
**002153**   299:2,4
339:25
**002265**   9:22
**00959**   268:11
**017901**   31:21,23
**017997**   233:25
234:3,9 339:11
**018000**   234:9
**02**   156:8
**023239**   44:24 45:5
338:13
**026**   188:4
**06471**   1:7 4:13
**082**   55:22 56:2,13
56:25 74:24 75:3
156:11
**083**   156:11
**09**   52:3

**1**

**1**   4:6 37:11 46:5
47:7 52:3 60:15
112:7 118:13,19
149:12 162:7
169:6 172:6 180:5
188:3 242:14,16
249:2 268:24
270:13 285:7
287:9 316:13
317:19
**1,098,000**   58:6
127:5,15

**1,255,571**   281:2
**1,310,600**   259:6
**1,348,000**   126:18
127:13 259:10
297:6
**1,423,000**   281:4
**1,478,000**   261:19
**1,478,300**   259:7
**1,965**   300:9,15,19
**1-1**   313:17
**1.042**   282:24
**1.1**   71:9
**1.3**   176:3 263:4
**1.348**   295:6
**1.5**   263:5
**1.7**   291:20
**1.72**   297:13,15
**10**   16:9 69:7,18
156:22 157:7
158:3 168:11,20
169:24 188:14
201:22 226:4
230:21 302:14
314:2 338:10
**100**   247:16 253:19
270:16 297:18
299:18 311:12
**10017**   3:15
**10022**   8:10
**1010**   307:13,17
308:15 312:11
314:4,5
**10577**   3:8
**10:00**   2:9
**10:01**   4:4
**10:51**   44:16,17
**11**   44:7,8,20
120:12
**117**   338:18
**118**   338:20

**11:00**   44:18
**11:34**   41:18
**12,000**   252:10
**121**   338:22
**125**   3:13
**128**   67:3
**12:26**   112:12,14
**13**   234:12 277:19
283:6
**137**   304:12
**139**   338:24
**14**   89:18 203:18
283:2
**14th**   60:24 61:6
65:23 242:8
**15**   16:2 61:10
115:7 123:16
129:10 140:20
152:19 174:20
185:19 228:14
257:23 258:18
263:9 288:22
301:18
**15,717**   301:9,11
**1593**   191:8,9
**15th**   61:4 122:7
151:12
**16**   83:21
**17**   84:16 85:3
304:16,16 306:17
**170,500**   175:9
**176**   249:4 250:19
252:5
**18**   58:9 85:13
180:7
**18.3**   50:19
**1835**   325:6
**19**   150:3 161:7
208:20 209:5,22
210:18 222:6
230:8 247:9 254:3

254:4 306:5
**19-1-00075-840**
140:3
**190** 339:2
**1942** 132:23
**1943** 152:3 174:22
**1944** 126:16
**1945** 181:22
**1950** 169:23
**1950s** 168:12
**1955** 169:7 172:7,9
172:11,14
**1960s** 168:13
**1969.5** 169:25
**1973** 169:25
**1986** 12:9
**1989** 19:17
**199** 339:4
**19th** 218:19 254:2
**1:03** 113:3,7
**1:19** 1:7 4:13
**1:35** 327:14
**1st** 106:20 318:10
318:14

**2**

**2** 44:22 45:24 46:7
46:9,12 47:8,23,24
50:17 88:20
101:23 119:5
123:5 129:18
132:18,22 135:2
188:5 191:12
242:14,17 263:14
263:18 266:23
268:23 274:24
282:6 284:6
**2,050** 304:10
**2.0** 46:24
**2.1** 274:22 287:11
287:18

**2.4** 249:3
**20** 16:9 20:2 58:11
66:25 76:22,25
114:3,16,24 116:3
136:8 137:3,10,19
138:6,18 139:7,10
142:10 143:14,22
144:22 146:15,23
147:10,21 148:10
149:18 150:10
152:24 153:3,19
154:6 168:24
170:10 171:8,24
175:20 176:6,8,11
177:8,9,11,21
178:3,7,11,12,25
179:9,25 181:16
185:10 210:9,17
211:11,17 216:13
222:15,20 227:4,8
227:13 244:5
247:18 248:12
249:14,22 258:25
259:23 260:8,19
261:3,7,13,25
262:14 263:16
264:4,16 265:2
266:4,7,11 267:11
270:8,9 271:5,6
279:24 280:3,7,10
287:12,17,20
289:14,16 290:2,6
290:11 292:21
294:20,24 301:19
301:22 320:22
328:8 330:3,18,20
336:22 341:23
**200,000** 295:9
**2008** 17:12 23:16
**2009** 19:14

**201** 339:6
**2012** 169:24 171:2
**2016** 306:16
307:17
**2017** 27:21 28:11
28:22 34:16 40:10
54:12 66:10,24
307:7
**2018** 27:16 33:8
34:10 35:17 36:24
41:18 42:10 45:10
45:13,22 49:23
50:8 54:2 57:16
59:21 62:7,24
69:10,24 70:21
71:8 74:10 77:7
78:5,8,16,25 83:2
89:22 90:5,25
91:2 96:11 97:16
98:22 102:24
126:23 127:3,9,20
128:18 129:9
145:2 152:11,13
152:14 153:8,14
154:17,23 155:9
155:10,21 158:14
159:23 161:23
183:20 207:17,19
234:12,18 330:12
**2019** 11:6,25 79:18
79:22 80:8 81:5
83:16,21 84:16
85:3 86:13 87:13
89:13,19 92:4
93:20 96:25 98:23
103:3 115:7
116:20 117:17
118:13,19 119:5
120:12 123:16
126:18 127:10,20
128:19 129:10

137:6 140:20
142:8 143:15
144:25 145:3
146:14 148:9
149:19 150:14
152:19 155:7,11
155:11,22 158:15
160:2 168:16
172:8 174:20
175:7,21,22 182:3
185:19 188:6
191:12 201:22
203:18 207:21
208:20 209:5,22
210:15,19 221:14
221:19 222:6
223:19 228:14
230:8 247:5,9
253:11 254:3,4
256:16 257:23
258:4,15 267:25
306:5,16 314:11
314:17 315:21
317:19 319:24
325:9
**2021** 1:15 2:8 4:5
337:23
**203** 339:8
**2039** 67:23 104:22
176:20
**204** 3:7
**21** 1:15 2:8 4:5
**21,500** 243:23
252:11 261:6
270:14 271:14,24
274:2 297:19
300:14,22 303:2
335:12
**21st** 205:3
**22** 86:13 89:13
127:9

**22,000**   335:9
**22,500**   335:5
**22.7**   127:19
**22.77**   127:16
**22nd**   337:22
**23**   128:10 188:5
   253:11
**234**   339:10
**23rd**   171:4
**24**   162:13 254:18
**240**   45:12
**241**   339:12
**246**   339:14
**24th**   254:25
**25**   42:25 58:11
   92:4 117:17
   191:12 288:23
**254**   339:16
**255**   339:18
**25th**   93:19 189:16
**26**   162:13
**268**   339:20
**27**   33:8 34:10
   36:24
**275**   339:22
**28**   93:20
**2900**   3:6
**299**   339:24
**2:20**   174:9,12
**2:32**   174:13,15

**3**

**3**   67:2 113:9 141:3
   151:25 174:11,21
   187:24 188:2
   241:23 242:14,19
   313:10
**3,000**   331:9
**3.1**   67:20 68:9
**3.1.1**   68:25
**3.44**   38:10 149:14

**30**   11:6,25 27:21
   28:11,21 34:15
   40:10 49:23 50:8
   54:12 66:10,24
   69:10,23 70:21
   71:7 83:2 85:13
   89:21 126:23
   127:3 140:20
   151:9 256:14,16
   258:4,15 307:18
   314:11,17 329:7
**300**   249:2
**301**   8:11
**305**   340:2
**30th**   137:12,23
   140:9,11 150:18
   151:10,16 316:19
**310**   267:19
**313**   79:16
**315**   340:4
**319**   340:6
**324**   340:8
**328**   340:10
**331**   340:12
**334**   338:5
**35**   69:14 284:7
**357**   79:16
**36,000**   69:11,15
**360,000**   69:22
   71:13
**370**   242:10,12
**371**   242:10
**38.8**   50:25
**39**   162:5,7 165:10
   165:13 168:11,12
**3:41**   230:24 231:2
**3:52**   231:3,5
**3rd**   191:14,15,16

**4**

**4**   74:17 75:8
   102:11 103:11
   126:15 154:25
   174:17 187:24
   188:2 258:19
   315:21 319:24
**4,700**   300:4,17
**4.5**   169:24
**42**   283:6
**43,000**   290:8
**45**   338:12
**46**   169:21 307:8
**466**   61:23
**478**   265:16 267:20
**485**   307:2
**49**   43:14 77:2
   116:2 153:3
   154:19 169:22
   184:25 216:2,8
   262:5,6

**5**

**5**   74:18 75:9 155:2
   169:8 172:7
   181:21 231:6
   329:22
**5,000**   335:11
**50**   57:22 76:14,16
**5027**   337:24
**50s**   219:14
**551**   8:9
**57**   275:4 278:11
**593**   331:23
**5:06**   286:9,11
**5:16**   286:12,14

**6**

**6**   58:10 75:14
   155:8 158:14
   160:11 161:15
   169:25 286:16

   336:14 338:4
**6.5**   170:2
**60**   338:14
**600,000**   280:20
**60s**   219:14
**64**   172:16
**681,000**   280:25
**69**   55:22 56:2,18
   56:24 57:4 59:7
   74:12 156:10
**6:15**   333:11,13
**6:17**   333:14
**6:18**   333:16
**6:21**   336:11,16
**6th**   196:14

**7**

**7**   27:16 175:7
**70**   56:18,22 57:21
**720**   304:9
**73**   313:15
**75**   247:17
**79**   338:16
**7th**   3:14 32:11
   36:21

**8**

**8**   96:25 126:18
   155:12 157:9
   158:15 160:12
   161:8 265:9 325:9
**80**   280:15 290:17
**82**   55:24
**840**   22:7 90:5
   119:8 126:17
   141:23 142:9
   154:24 238:14
   308:24 335:5
**847**   85:4
**852**   306:9
**8th**   327:13

**9**

**9** 41:18 42:10 45:13,22 79:18 80:8 247:5,8
**9,342** 283:22 286:20
**9/21/2021** 341:2
**90** 111:18 247:16 263:3 270:16 281:2 299:18 311:11
**900** 300:3,17
**901** 313:4,7,19
**90s** 12:19 13:6 14:2
**936** 17:9 107:21,24 111:14 113:13 116:11,22 131:25 180:14,20 222:17 318:10,16 320:17
**99** 42:17,19,22 57:18,22,23 65:2 76:14,17 152:16 152:22 153:2,8,11 153:14 154:16,19 260:25 262:5,6 330:13
**9th** 199:25 201:18

**a**

**a.m.** 2:9 4:4 44:17 44:18,20 188:14
**aaron** 188:19,25
**abatement** 263:10
**ability** 165:24 169:16
**able** 65:14 228:24 238:16,17 239:10 239:14 261:8 262:3 263:6

**absolutely** 151:14 282:18
**absurd** 215:22
**abundant** 331:10
**academy** 12:6
**accept** 100:19 119:19 129:24 176:13 177:15 179:20,22 180:10 204:13 217:25
**accepted** 172:25
**access** 150:5 164:6 166:10 252:14 273:9
**accessed** 252:12
**accommodate** 249:9 252:7 301:2 302:17
**account** 258:25 263:16 292:14 294:12 302:5 317:22 320:22 325:18 327:3
**accounted** 148:9
**accounting** 290:5
**accuracy** 165:20 166:4 167:2
**accurate** 8:4 34:21 54:16,19,20 58:25 59:22 167:10,20 169:9 171:8 182:20 200:11 225:6,18 240:22 240:25 241:5 264:3,10 267:5 276:18,19 289:20
**accurately** 169:18 242:17
**achieve** 115:13 229:2 243:25 263:13 295:11

**achieved** 297:9,12 298:23
**acoustic** 278:18
**acquired** 48:2
**action** 4:13,25 337:18
**actions** 184:3
**active** 186:18
**actual** 163:22
**add** 137:16 161:21 190:12
**added** 85:20 140:15 258:19 264:15
**addendum** 92:6 92:16 93:6 96:18 97:13 99:5 100:6 123:14 130:6,22 132:6 158:6,11,13 160:6,10,14 183:12 191:19 193:3,15 194:7 195:15 198:21 236:17
**adding** 245:2 270:7 301:6
**addison** 124:5
**addition** 38:3,4 234:21
**additional** 25:22 78:13 84:10 174:23 205:17 258:19 262:7 282:10,10
**address** 267:9 269:12 303:22
**addressed** 50:11 97:18 134:14 217:16
**addressee** 80:15 82:20

**addresses** 267:10
**adequate** 101:7 137:19 223:8,14 223:20 235:23 236:20 241:3 279:9,20 280:13
**adequately** 134:13
**adjust** 62:8,25 63:12 64:8 222:14
**adjusted** 62:13 63:8 101:4 292:22
**adjusting** 129:14 131:3 146:17
**adjustment** 146:19 313:23
**adjustments** 101:6 145:14
**adjusts** 62:4
**administer** 4:23
**admit** 327:8
**advance** 213:6
**advancement** 321:24
**advice** 110:19 111:5 192:10
**advised** 87:10 156:17 158:9
**advising** 64:14
**advisors** 19:5,13 86:24
**advocate** 323:22 324:11
**advocates** 321:19
**affairs** 34:7
**affect** 99:8 136:3
**affiliations** 5:5
**affordable** 175:10
**aged** 305:7
**aggressive** 121:2
**ago** 15:10 22:22 226:4 235:5 321:8

**agree** 110:3,12
134:12 136:2
173:2 193:16
199:4 203:23
217:19 218:11
227:13,15 228:2
233:13,18,23
235:6,9 240:20
249:13,21 257:15
318:19 327:18
**agreed** 124:18,23
125:3 137:10
193:11 210:21
211:24 212:2
325:15 326:24
327:21
**agreement** 99:11
103:7 121:7
159:12 161:11
194:12 196:8
201:2 223:7,12
224:17 226:14
243:10,17 255:2,5
316:2 318:21
319:4 320:8 322:7
322:19 324:20
**agreements** 47:25
**ahead** 18:22 21:4
30:3 37:4 38:20
46:3 47:3 48:9,21
54:3 57:10 64:9
68:11 69:25 87:21
109:15 116:13
142:14 143:9
145:19 153:20
154:2 158:16,21
159:7 163:19
170:14 173:7
179:2 180:16,23
183:6,14 191:25
195:11 196:4

198:4 205:21
214:23 217:11
228:15 260:10
265:23 268:2
314:18 323:3
**aisles** 284:22
**allocation** 289:5
**allow** 24:3
**allowed** 51:19
179:13 193:18
252:14 273:11
**allows** 75:20
261:18
**alluded** 240:19
**alter** 147:15
**altering** 322:18
324:19
**amanda** 188:19,24
**amend** 319:4
**amendment**
159:11
**amenities** 239:8,9
**ami** 163:9
**amortization**
291:19 295:8
**amortize** 243:21
261:20
**amortized** 115:14
231:24 240:15
293:20 296:14
297:7 298:22
**amortizes** 289:15
289:19
**amount** 58:20
69:7,9 216:21
259:19 260:4
270:25 278:11
289:24 330:14
**analyses** 20:9
38:24 153:25
234:20 262:11,25

**analysis** 38:18
39:9 41:24 48:11
48:20 49:8 55:23
56:19 57:5,7 58:4
59:9 63:5,20 65:3
69:24 70:17 74:12
76:10,16 88:24
104:24 109:14
114:6,10 116:5,9
116:19 133:12,14
133:17,18 134:9
134:25 135:3
136:15 137:2,23
142:7,13 143:11
144:8,17 145:10
148:7,11 149:17
150:2,21,23
156:10,23 161:22
164:5 169:14
170:22 182:8
183:22 216:20,25
218:23 221:9,23
222:23 225:2,11
228:10 229:18
231:9,10 233:15
233:20 234:22,24
235:7 236:24
237:24 238:5
240:11,21 241:7
241:12,15 247:11
247:12 249:19
252:2 255:21
256:20 258:25
261:12 263:11
264:9,22 267:22
269:8,23 282:7
292:7 293:4
303:25 307:15
**analyze** 71:3 77:5
134:15 215:13
217:14 226:11

232:5 310:2
**analyzed** 46:16
62:14,17 63:5,8,17
70:3,13 72:2
129:4 141:4 152:4
160:20 215:14
309:7
**analyzes** 231:12
**analyzing** 135:4
135:15 309:20
**announced** 116:11
116:22 318:16
**annual** 71:9
151:22 152:15
215:15
**annually** 23:10
**answer** 6:18,20
7:15 17:17 18:12
30:4 68:11 73:23
73:25 90:23
111:15 132:9
145:20 146:9
158:25 180:11
186:17 187:3
193:21 208:8
222:24 236:11
285:4 298:17
335:7
**answered** 73:25
288:12
**answering** 7:14
186:21 309:4
**answers** 6:16 8:4
**anticipate** 274:10
**anticipated** 57:24
99:16,22
**anticipating** 244:2
**anybody** 121:16
185:2 295:17
**anymore** 264:10

appeals   17:11
appear   308:4
  325:20 329:9
appearance   5:8
appearances   5:4,9
appeared   193:13
appearing   2:13
  4:17 5:3
appears   86:11
  97:4 184:4 207:24
  319:24
appellate   108:9
  109:22
apples   143:19,24
  144:2 251:20,21
applicability
  131:17
applicable   110:9
  111:6 137:11
  154:22 223:3
  306:23 308:24
  309:2 310:2,3
  311:17
application   49:3
  244:15
applied   106:6
  113:15,25 114:6
  155:23 210:22
  222:18 323:22
  324:10
applies   108:18
  323:12,18
apply   110:13
  113:19 117:3
  212:7 226:12
  269:25 270:4
  323:11
applying   64:19
appointed   16:18
appraisal   12:13
  14:4,7,10,12,16,17

14:22,23,25 15:4
15:13 20:3 22:8
27:24 30:14,17,23
34:25 36:11 49:23
50:7 60:11,12,18
60:24 61:2,8,16
64:6,23 65:24
69:11,16 80:25
86:25 89:22 90:4
91:8 96:15 97:16
98:23 99:2,12
103:16 104:2
115:11 131:22
139:6 150:4
152:11,14 159:21
160:15 181:19,23
182:9 183:21,23
186:13 192:12,14
193:12 196:21
198:12 210:4
217:15,18 233:15
233:20 234:24
235:8 242:2,8,9
243:4,19 244:8,13
245:4,15 267:8
269:12 304:14
322:6,12 325:13
326:11 327:16,19
327:23 328:14
338:15 339:13
appraisals   33:24
  35:6 36:19,20
  90:12 103:14
  124:13 182:23
  195:10 248:3
  321:22
appraise   40:2
  70:23 81:12
  102:19 131:14
  181:8 257:18

appraised   21:20
  39:19 102:13
  103:17 134:16
  182:10
appraiser   12:15
  12:17 15:9 16:12
  16:18,24,24 17:2,7
  24:19 62:3 64:7
  97:12 99:17
  109:24 134:14
  182:17 185:25
  186:5 187:2,6,7,12
  188:17 189:23
  190:14 191:14,16
  192:25 193:9,10
  193:12,17,19
  194:2 195:8 197:8
  197:18 202:4
  203:17 210:2
  249:20 288:17
  308:25 310:16,19
  311:9 312:16
  325:18 326:5
  327:2
appraisers   15:2
  18:20 19:23 61:12
  64:21 94:19 98:19
  100:25 133:10
  175:25 180:13,20
  182:12 184:10,23
  185:9 188:18,20
  188:22 189:7,11
  190:10 198:8
  200:23 202:12
  203:22 208:19
  223:7 244:6,9
  275:24 276:4
  316:15 317:4
  321:16,19 322:19
appraising   40:16
  103:5,20 181:2,3

181:10
appreciate   274:5
appreciation
  74:14 75:5 161:18
approach   20:16
  54:22,25 55:2,3,17
  59:4 62:20 99:23
  99:25 100:23
  131:15 159:23
  160:2,4,6,8 195:18
  235:20 244:6
  245:18 259:10
  262:18 264:23
  265:22 269:21
  327:24
approaches   20:23
  159:17 213:8
appropriate   31:10
  55:4 62:18 76:21
  94:12,24 111:19
  155:23 157:10
  178:17 213:14
  217:17 224:14
  245:13 270:11
  277:12 280:9
  289:6
appropriately
  101:4
approved   24:6
  175:3
approximately   4:4
  15:11 16:6,14
  44:20 113:7 174:9
  174:15 175:9
  286:14 333:16
april   87:12 106:20
  115:7 116:20
  118:12,18 119:5
  120:12 122:7
  123:16 126:18
  127:10,20 128:18

129:10 137:5
140:13,20 142:8
143:15 144:25
145:3,9 146:13
148:9 149:19
150:3,14 151:12
152:19 155:7,7,11
155:22 158:15
160:2 174:20
175:21,22 176:20
182:3 185:19,19
188:5 189:16
191:11 210:15
221:14,19 223:19
227:22 228:14
257:23 258:18
267:25 317:19
318:8,9,14,14
319:10
**arbitration** 15:22
193:7 194:18
198:10 217:18
**arbitrator** 16:16
**arch** 285:16
**architect** 249:7
250:16,21 277:17
**architects** 232:15
**architectural**
287:23
**area** 46:6,13,14,16
46:17 51:21
128:12,15,23
132:20 133:2
149:5,14 150:5
163:6 175:8
228:25 229:25
248:4 253:15,19
263:21 265:6
281:8,18 283:10
283:14,23 284:21
303:2,5,9

**argue** 320:8
323:19
**arm's** 64:16 72:9
**arrangement**
220:16
**arrive** 58:4 146:22
213:9 229:19
266:24 269:22,25
283:22 306:20
**arrived** 96:11
151:18 264:25
267:24 269:19
**arriving** 136:16
**articulated** 256:8
**aside** 166:24
**asked** 20:9 21:7
55:16 72:20 73:17
74:3 76:20 88:13
94:14 95:5,6 96:8
101:24 102:7
111:7 120:20
122:9 131:24
132:12,15 143:13
164:23 192:9,17
196:19 204:15
207:13,16,18,20
210:4 218:11
277:10 306:2,7
308:8,21 310:6
318:18 320:3
322:21,22 326:2
328:13 330:17
335:22
**asking** 31:9 43:4
70:23 73:13,21
82:2,9 83:6 111:4
120:21 166:22
184:23 186:16
192:11 193:5
202:21 207:23
248:20 255:20

302:4 322:10
326:9
**aspect** 167:22
**asphalt** 278:18
**assertion** 310:11
**assessor** 271:11
**assessors** 271:9
**asset** 38:17 43:22
88:23 173:12
176:14 178:13
220:3 262:10
**assets** 62:15 64:13
**assigned** 25:6
**assignment** 21:10
22:20,22 25:7,19
25:25 26:2,7
30:13 31:15 32:14
40:11,12 41:23
53:23 103:4 104:2
104:15 139:6
156:17 157:17
158:9 163:25
164:2,11 165:4
167:15,15,17,18
167:22,23 168:6
182:9,25 183:23
184:12,16 186:10
194:15 256:25
257:16
**assignments** 21:24
22:11 164:4 165:4
288:23
**assist** 24:20 38:16
88:22 246:8
**assistance** 184:11
184:23 251:18
**assistant** 13:10,14
**associate** 308:8
**associated** 288:3,5
289:3 297:7 317:8

**associates** 21:25
67:25 68:5 69:6
69:21 184:10
**assume** 6:19 35:21
42:17,21 87:17
120:4 126:4
136:21 145:11
311:12
**assumed** 103:24
108:12,13 153:13
154:16 167:9
270:14 271:20
272:11,14 282:7
282:12 287:17
330:13
**assumes** 289:12
**assuming** 51:4
118:4 290:5,9,13
291:5,15 292:3
295:4
**assumption** 30:18
30:24 36:2 37:13
40:2,5 53:6 80:22
82:3,10 85:25
86:7 103:13
175:18,24 282:19
331:8
**assumptions** 36:18
36:20 39:16,17
52:4,7 81:8 82:15
82:18 85:22
102:11 235:15
266:25
**atlantic** 1:7 4:10
5:20 22:7 38:16
88:22 89:17 90:5
119:8 126:17
140:3 141:23
142:9 154:24
238:14 272:24
304:12 307:2

308:24 335:5,14
**attached** 11:6,24
  39:15 79:20 119:6
  256:18 315:21,24
**attempt** 220:24
**attempting** 57:6
**attended** 202:9
**attention** 84:24
  334:8,12
**attorney** 5:9 7:10
  98:12 110:12
**attorneys** 3:5,12
  95:10 206:11
**attributable** 129:3
  156:20 291:24
**attributes** 309:22
**audition** 184:4
**august** 41:18
  42:10 45:10,13,21
  49:23 50:8 62:7
  62:24 69:10,23
  70:21 71:7 74:10
  77:7 78:16 83:2
  85:13 89:21 96:11
  97:16 98:22
  126:23 127:3,9,20
  128:18 129:9
  152:11,12,14
  153:8,14 154:17
  154:23 155:9,21
  158:14 159:23
  161:23 183:20
  207:17,19 325:15
  326:23 328:12
  330:12
**authoring** 191:16
**authoritative**
  14:17 61:12,15
**authorize** 24:10
**authorized** 4:23

**available** 10:12,14
  40:20 80:19 101:8
  106:22 131:4
  169:2 192:17
  196:25 197:19
  223:9,15 235:24
  236:19,21 304:3
  305:21,22
**ave** 140:3
**avenue** 3:6,13 8:10
  17:9 22:7 90:5
  107:21,25 111:14
  113:14 116:11,22
  117:21 119:8
  125:19 126:18
  131:18 132:2
  142:9 154:24
  177:24 180:4,14
  180:20 212:6
  215:19 222:17
  238:14 304:13
  307:3 318:3,6,11
  318:16 319:13
  320:17 335:5
**average** 100:16,18
  129:22,23 170:2
  177:12,14 194:14
  274:21 278:25
  279:6 280:12
  286:24 300:8,15
  300:19
**averaged** 195:23
  201:3
**averaging** 195:9
  195:19
**avoid** 203:19
  319:12
**aware** 18:21,24
  19:2 22:25 48:6
  65:6 67:16 68:7
  68:17 76:23 78:7

84:11 98:3 105:16
  108:9 115:25
  125:18 146:13
  179:22 180:19
  184:8 205:17
  222:25 248:4
  279:23 298:11,13
  298:18 308:5
**awareness** 161:3
**awhile** 56:7

**b**

**b** 52:8
**back** 19:17 28:21
  32:5 44:7,20
  57:16 65:23 74:9
  74:11 90:25
  103:15 111:24
  112:7 113:7
  126:12 127:2
  132:18 145:9
  147:2 156:2
  168:12,13 174:15
  174:19 189:15
  208:5 215:23
  218:22 224:9
  231:5 245:12
  266:9 282:6 283:4
  286:7,14 287:8
  295:10 302:3
  312:19 316:4,11
  327:12 333:16
**backup** 169:11
**bank** 24:11
**barclay** 303:11
  307:4,7
**base** 68:14 270:22
  270:25
**based** 30:15 31:12
  37:14 55:19 57:14
  57:23 58:7,8,11
  59:25 66:12 76:9

77:3 80:14 83:24
  99:23 100:13
  103:5 114:3
  127:21 132:23
  135:8 143:7,10
  147:16,18 148:20
  160:5,25 161:6
  168:18 175:5
  177:23 181:8
  189:2 215:13,14
  229:4,25 231:13
  231:23 232:17,19
  236:9 240:13
  243:23 245:7
  248:2,6,9 261:25
  262:4,10,24
  263:18 271:8,16
  274:21 281:16,17
  282:20 283:2,4,16
  283:17 287:18
  290:16,17 291:11
  305:9 309:23
  321:23 333:22
  335:20
**basic** 39:15,17,25
  102:11 103:12
  209:12 268:22
**basically** 20:6
  94:11 121:12
  156:23 193:6
  260:19 271:19
  318:19
**basis** 149:7 269:18
  270:20 300:21
  302:15
**bates** 9:22 10:23
  44:24 45:4 55:25
  56:24 67:3 79:8
  85:4 117:9 118:23
  121:24 139:17
  174:22 190:24

199:15 201:10
203:7 234:2,9
246:22 254:9
255:15 268:16
299:3 305:16
315:9,23 319:16
324:23 328:25
331:17 334:11
338:10,12,16,18
338:20,22,24
339:2,4,6,8,10,14
339:16,18,20,24
340:2,4,6,8,10,12
**bathrooms** 274:11
274:12 296:21
**bbg** 90:4
**bear** 43:24 301:7
**bearing** 173:9
285:23 312:9
**bears** 44:24
334:10
**beauty** 94:21
**beginning** 5:8
44:21 85:15 87:12
113:8 174:16
231:6 286:15
308:22
**begins** 334:19
**begun** 247:11
**behalf** 5:15 24:11
**belief** 193:2
**believe** 10:16
12:19 15:14 21:5
22:23,24 25:9
35:23 38:3,9
46:12 48:4 52:23
53:2,17 54:15
55:10,18,19 56:13
58:19 59:5 60:7
61:6 71:12 76:18
77:2,4 79:3 81:14

82:16 83:4 86:8
88:17 90:9 94:5
98:13 102:10
104:10 105:17
106:5 107:10
123:15 127:23
140:9,10,11,16
141:14 159:21
172:15,20 185:23
186:25 187:5
190:17 202:5
211:20 213:13
214:3,14 222:7
228:9 241:21
267:21 268:6
271:24 272:24
273:4 281:9 283:2
287:3,19 289:25
317:8 320:10
321:9 322:8 330:8
335:4
**believed** 96:9
104:22 106:3
111:5,9 132:5
229:19,23 310:25
**believing** 194:16
**belongs** 168:3
**benefit** 259:22
260:8
**benefits** 263:8
**best** 20:8 80:20
85:11 133:3,11,17
134:5,9,13 135:14
136:4,17 138:12
138:21,23 139:2
139:11 142:4
157:13 168:21
169:2 202:20
213:20 214:17
215:5,11,14 216:4
216:9,14,17

220:22 221:3,5,6,7
221:8,11,15 223:3
223:16 224:3
226:8,13,19,22,24
227:4,16,22 228:3
228:7 231:23
236:12,23 237:6,8
237:11,13,16,20
237:23 263:21
264:9 265:2,20,25
266:2,5,19,23
267:10 269:18
331:12
**better** 264:12
323:14
**beyond** 12:11
47:24 244:14
318:6 319:2,6,12
**biased** 323:23
324:12
**biassing** 331:13
**big** 284:10 291:25
**biggest** 243:14
**binder** 10:6 56:11
56:12 123:2,4
156:8 258:11
**binders** 9:16,19
56:11
**bit** 44:11 115:20
121:2 201:5
225:10 274:10
327:12
**blake** 189:18
**block** 307:16
312:12,14 313:6
**blocks** 307:4,6
**blood** 337:18
**blueprint** 272:22
**board** 13:13
**book** 60:10,25

**borough** 162:10
162:14
**boroughs** 24:15
59:12
**bottom** 56:2 58:3
74:13 75:2 85:14
88:9 132:19
163:14 169:20
174:21,23 182:6
188:6,9 191:6,12
196:12 204:25
247:15 253:10
327:16
**bought** 48:16
**bound** 182:18
**box** 281:20 282:2
282:2 304:24
305:11
**bracketed** 229:4
**bracketing** 144:6
281:4
**break** 7:19,21 44:3
111:19,21,24
112:5 113:12
159:5,9 174:6
230:21 286:3
290:11
**breaking** 230:20
**breakout** 222:3
230:8
**brendan** 3:9 5:13
174:4 333:25
**brian** 196:22
**briefly** 75:18
218:23
**bring** 210:4 334:4
**broken** 274:16
**broker** 13:20,24
42:25
**brokers** 185:14

**brooklyn** 24:17
95:7 128:24 152:6
190:2 197:9
279:23 281:8,16
307:22 308:16
332:25
**brother** 19:10,21
246:15
**brought** 93:10
191:23
**bs** 12:6
**budget** 249:11
251:7
**budgets** 24:3
**buffering** 86:22
**build** 49:3 116:6
217:9 222:12
236:10 244:2
245:10 252:16
261:6,9 266:3
290:14 291:16
292:22 293:21
294:25 296:5,14
298:6 302:6
**buildable** 46:6
51:21 69:7,9
**building** 17:4
47:12 136:10,11
137:15 214:4,12
214:13 219:9,20
219:24,25 232:9
238:6,8,11,18,22
238:24 239:4,5,15
240:3,5,10 242:16
242:19 243:11,12
243:18,22 244:20
245:9 251:24
261:17,22 270:15
271:15 272:5
273:3 274:2,11,16
274:18 282:16

283:14 289:8,23
290:20,21,21,22
290:22,25 291:16
291:18,20 292:5,5
292:19,19 294:25
295:8 296:2,5,8,20
296:24 298:7
300:12,14,25
301:13 302:6
303:19 335:13
**buildings** 214:21
219:14 279:23
285:10,17 293:15
304:16
**built** 37:20 46:13
46:15 47:6,7
51:17 219:9,14,20
238:21 245:6
250:22 253:13
267:2,3 270:15
271:21 272:12,15
279:24 289:9
291:10 295:23
296:2,20
**bulk** 248:25
**bullet** 39:18 52:10
316:13
**bullets** 242:13
**bunch** 205:16
235:15 308:11
**business** 20:20
206:19 208:13
291:17 295:20
296:25 297:2
298:8
**businesses** 298:10
298:14
**buy** 244:18 291:6
**buying** 49:2

**c**

**c** 3:2 171:7 172:4
337:2,2
**c&w** 165:16 167:7
196:17 199:9
**calculate** 287:6
**calculated** 274:3
284:15
**calculation** 127:12
275:3 294:19
**calculations**
209:11 230:7
245:25 246:3
285:3
**calculator** 230:9
277:21
**calculus** 158:7
**calendar** 93:18
**call** 72:4 92:10,11
108:11 191:24
192:18,20 200:12
201:17 202:8,11
202:18 325:10,22
332:15,21,24
**called** 5:21 15:16
55:23 60:15
268:12,25 275:9
299:22
**calls** 100:7 327:14
**cap** 269:21 270:2,5
**capable** 246:16,17
**capacity** 16:15
182:13
**capital** 43:16
**capitalization**
239:16,22 242:20
243:12 260:21
**capitalized** 100:15
101:15 239:2
**capture** 318:20
319:3

**captured** 287:20
288:16
**car** 180:6
**careful** 318:5
**carol** 199:22,24
**carrying** 287:25
**cars** 220:17
**case** 9:19 17:9,15
18:19 98:13 106:7
107:21,25 108:7
108:23 110:15,22
111:14 113:14,25
114:5 116:12,23
117:21 131:18
132:2 137:20
180:15,20 193:8
194:4 198:11
222:17 228:7
231:20 238:7,23
244:15 261:5
323:10,12,18,21
324:10 341:2
**cases** 20:9 98:5
198:17
**category** 279:19
**cathi** 1:20 2:14
4:21 111:23 112:4
336:4 337:7,25
**cause** 158:13
**caused** 160:11
**center** 303:11
307:4,7
**central** 180:4
**certain** 18:4 38:17
88:23 145:14
159:17 165:8
200:20 273:16
332:16
**certainly** 43:20
59:4 61:13,20
64:25 88:3 90:16

98:2 144:3 146:7 174:2 214:16 215:3 216:19 219:2,12 221:4,12 240:25 246:15 256:7 267:9 306:24 307:23 308:3
**certainty** 175:12
**certificate** 181:22
**certification** 182:6
**certified** 2:15 12:14 337:8
**certify** 337:10,16
**chain** 45:9 80:6 83:15 92:3
**challenge** 244:10 248:23 311:4
**chance** 72:16 176:9
**change** 30:18,24 31:5 48:12 60:5 80:15 82:20 86:3 97:21 99:7 116:7 128:11,16 135:24 137:14 147:15 155:22 159:4 160:4,9 161:17,20 173:23 176:10,15 178:14,23 179:8 179:23 181:8,12 215:4 229:15 242:23 265:5,7 281:5 335:6 341:4
**changed** 111:10 140:20 147:13 151:6 155:21 160:18,20,21,23 211:2 267:15
**changes** 60:9 75:22 78:19

119:11,23 122:21 127:22 128:11 140:23 151:13,15 158:7 160:17 161:4 176:2 179:22 243:15 280:19
**changing** 78:22 241:14
**chapter** 244:13
**characteristics** 29:7
**charge** 13:15 179:9,14 295:2
**charges** 68:15
**chart** 132:20
**chats** 9:12
**cheap** 278:18
**check** 22:3 55:12 132:9 204:17 206:5,10,16 284:19
**checked** 141:15,17
**chief** 23:17
**choose** 309:25
**chose** 229:11 259:10 278:7
**christophe's** 189:19
**circus** 238:14
**city** 31:13 252:22 271:8
**civil** 4:12
**claimed** 221:2
**clarifica** 105:13
**clarification** 43:6 105:14 132:16
**clarified** 48:23 117:2 264:12
**clarify** 43:4 145:23 171:15,20

**class** 238:17 240:11 275:6 278:7,14 279:22 280:12,12 281:7 281:15 285:10,15 285:21 296:5 304:18 305:3,4 308:19
**classes** 278:2
**cleanly** 159:9
**clear** 38:24 39:19 51:5 53:4 78:14 84:6 85:6 92:18 93:7 96:6 102:13 103:17,22 132:15 148:5 199:7 204:7 236:16 239:3 242:25 256:25 292:2
**clearer** 183:17
**client** 38:21 53:3 54:13 98:12 107:2 121:6 126:6 168:4 183:8 218:11 321:20
**client's** 321:25
**clients** 119:13 218:12 310:21
**close** 336:7
**closely** 33:18 115:16 201:6
**closer** 156:21 158:2 303:11
**clvs** 1:20 337:25
**coast** 12:23
**collars** 311:3
**colleagues** 185:5
**collection** 293:24
**column** 171:7 172:4 284:7

**combination** 39:5 164:11
**combined** 22:8 301:8
**combustible** 285:14,23
**come** 17:8 32:5 44:6 48:15 111:24 112:6 117:15 130:16 200:21 201:2 211:3 230:3 269:23 282:23 286:7 287:2 297:17 304:11,13 330:17
**comes** 130:17 291:22 335:16
**comfortable** 112:2
**coming** 6:7 11:18 56:4,5 154:21
**command** 74:17 75:8 154:25
**comment** 120:24 121:16
**comments** 119:10 120:20,23 122:9 162:12
**commercial** 46:24 76:2,6 133:4 135:13 221:16 226:25 227:17,23 228:5,6 263:23 266:20 271:20 303:5
**commission** 341:25
**commitment** 262:5
**committing** 261:23

**common** 90:10,17
184:9
**communicate** 53:5
212:5 328:12
**communicated**
53:3 81:15 221:12
321:14 326:12
**communicating**
330:10
**communication**
48:5 53:12 79:5
105:9 125:23
189:3 198:6
264:20 268:6
310:12
**communications**
9:12 84:7 328:2
328:18
**community** 38:5
76:4 135:21
186:13 249:5,25
250:2,6 252:4
277:9
**comp** 49:7 83:24
307:9,12,14
312:12 313:6,25
**company** 20:18
91:8,13,16 168:3
**comparable** 58:15
58:24 62:4,9,25
63:12 64:8 65:2
65:10 76:9 101:3
101:7 114:12
129:14 131:4
138:19 139:9
169:2 215:9,12
221:2 223:8,21
224:5 225:3,15
226:2 235:24
236:18 247:15
300:23 302:11

303:8 306:25
308:5,12 309:7
310:18,20,23
311:6,25
**comparables**
64:16 76:24 77:5
78:13,15 79:4
114:11 116:2,4
129:4 138:7,9,11
138:16,25 139:9
142:12 157:6
160:20 161:13
170:24 216:16
226:10 241:3
300:16 309:20
310:14,15,16
311:19
**comparative**
146:18
**compare** 62:8,24
63:11 64:7 194:11
258:21 311:20
**compared** 143:22
293:14
**compares** 62:3
**comparing** 129:13
145:17 300:13
**comparison** 54:22
54:25 55:2 99:25
120:4 129:10
143:20 146:17
155:19 159:23,25
235:19 245:18
264:23 265:21
269:21
**competent** 186:25
187:6,12
**competitors**
184:11
**complete** 8:4 68:4
167:18 198:13

290:23
**completed** 145:10
231:13 232:11
328:20
**completely** 35:5
222:21 251:19
**complex** 25:18,24
25:25 26:6,11
232:14 245:2,8
262:10 288:22
**complexity** 244:12
277:11
**complicate** 270:6
**complicated** 7:4
**component** 62:12
63:3,4 101:18,20
101:21 115:9
137:15 149:21
157:22 175:11
227:10 245:19,21
**components** 63:9
63:17 130:18
**comprehensive**
275:25
**comps** 45:15,18,20
84:10 95:20 96:2
115:21 184:24
213:13,18,19,21
230:13 253:15,18
292:13 299:9,22
299:23 300:3,14
301:9,17,22 302:9
304:9 305:25
306:8,15,20
307:16 308:23
310:6,7 313:4
331:7
**compstak** 306:15
**computer** 10:16
**concept** 294:6
320:12 331:5

**concepts** 101:14
**concern** 124:11
200:18 225:11
227:20 317:25
318:4,24 319:5
321:13 329:23
**concerned** 11:21
314:2,4 316:25
317:10 321:11
**concerning** 207:15
**concerns** 225:2
243:6
**concession** 290:7
292:25
**concierge** 3:20
11:11,15 27:6
31:22,25 33:9
40:22 41:10 44:25
49:25 60:20 66:20
77:20 79:11 80:3
83:12 84:17 86:14
89:7 91:24 92:21
93:15 97:3 106:12
106:16 117:7
119:2 120:8 122:3
123:7 139:20
187:20 191:3
199:18 201:13
203:10 204:19
205:8 208:24
234:5 242:4
246:25 253:3
254:12,15 256:10
258:8 268:14
275:14 299:6,10
305:14 315:12,15
319:19 325:2
329:4,14 331:22
**conclude** 229:12
266:8,9,10 310:3

**concluded** 58:8,9
62:13,18 63:9
126:16 127:2
148:20 155:12
157:24 161:6
221:15 223:20
227:5,8 229:8
230:4 247:18,24
248:9,18 259:7,12
261:5 264:6
265:15 281:12
297:5 314:12
336:2
**concludes** 336:11
**conclusion** 70:4
109:11 110:4,13
111:3 115:17
127:17,25 129:6
133:12,13 135:2
136:16 144:12
147:16 150:8,17
155:22 157:8
161:14 178:8
223:13,14 226:18
229:4,14,15
248:12 258:23
259:2,5 262:15
263:17 264:9
265:13,21 281:4
281:14 309:8
328:7 331:14
**conclusions**
115:19 129:5
**concrete** 285:12
**condition** 50:23
103:13
**conditional** 72:5
**conditions** 39:16
39:18 102:12
160:18 242:15

**condominium**
237:6
**conducted** 135:3
**conducting** 70:17
**conference** 201:20
**confident** 165:12
165:15,23
**confidentiality**
165:2
**configured** 300:25
**confirm** 32:7
34:20 169:8
248:20 306:8
308:23 311:19
**confirmed** 308:6
**confirming** 54:19
**conflict** 189:19
193:14 197:10
204:17 206:10,16
207:2
**conflicting** 53:9,16
**conflicts** 190:11
206:14
**conformity** 135:7
**confusing** 7:3
**confusion** 43:3
**conjunction** 182:8
**connection** 11:8
41:3 183:22
**consider** 25:21
26:14 29:8,19
38:7 61:11 78:13
79:4 88:14 104:11
104:23 105:9,17
105:22,25 107:6
109:12,20 114:13
114:22 121:10
124:19 125:5
128:3 136:24
137:9 139:7
143:13 145:12

175:14 176:2
178:20,23 179:7
179:13 180:13,21
183:20 188:24
189:8 211:17
213:15,19 214:16
215:5 216:20
222:19 225:15,19
225:23 226:8
227:14,21,25
228:7 237:9,16
245:24 246:5
248:19 292:16
307:18 308:9
311:6 318:15
**consideration**
27:25 88:11,18
228:3,5 317:15
**considerations**
72:11 105:2
232:20
**considered** 18:9
18:17 29:16 30:20
36:12 43:21 49:11
62:17 80:25 81:18
105:15 106:4
115:6 127:23
128:4 135:21
138:5 149:19
150:15 175:5,19
188:21,23 210:10
212:8 216:22
225:4,16 261:13
280:6 285:14
293:4 307:12
311:15,22 320:6
**considering** 40:15
84:9 104:4,18,20
105:6 132:24
151:20 152:24
153:18 176:5

189:17 196:16
197:24 237:14
263:19 264:14,24
266:15 316:23
330:23 331:2
**consisted** 23:23
**consistent** 30:19
30:25 75:13,16
122:12 128:17
155:14 175:4
178:6 198:20
200:8,22 201:6
221:5,7 248:11
265:13 307:24
308:4 321:4
331:11
**constitutes** 25:25
**construct** 136:11
214:13 219:23
231:16 249:8
250:17 261:22
280:8,10 292:9
**constructed** 214:4
214:21 215:3
231:11 232:6
233:2
**constructing**
115:15 297:8
**construction**
20:15,19,24 23:8
23:14 24:2,4,5,6,8
24:12,21,24 25:4
25:16 26:3,17
137:18 231:25
232:10 244:4
245:11 274:23
275:6,23 276:9,10
276:11,12 278:2
280:9 281:7,23,24
285:14,21,24
287:25 288:6,8,18

291:22 292:17
304:18 308:19
**consultation** 23:9
23:15,22
**consulting** 20:19
**contact** 93:3
**contacted** 26:23
82:4
**contained** 139:25
165:20 166:5
274:24
**containing** 9:16
**contains** 299:16
299:25
**contemplate**
294:11
**contemplating**
64:6
**contend** 300:21
**contents** 35:5
**context** 28:24 29:2
48:5 235:12
247:25
**contingency**
293:23
**continued** 113:10
161:17,20 312:8
**continues** 329:21
**continuing** 248:22
**contracts** 25:6
**contributors**
275:22
**contributory**
151:7
**control** 43:21
114:14 115:18
139:8 144:4
173:13 176:7,14
176:18,23 177:10
178:11,13 261:25
280:7 294:14

**controlled** 138:18
**controlling** 294:19
**controls** 114:15
**conversation** 28:6
28:13 32:21 41:22
80:14 95:13
107:20 108:6
109:6 118:7 192:4
210:24 211:7,11
211:12 310:24
**conversations**
23:3 53:8 77:12
81:3 210:7,16
**convert** 59:21
151:21
**convince** 191:15
**cooling** 282:8
**copied** 33:10
66:21 77:21 80:4
83:13 86:15 120:9
123:8 187:21
204:20 205:9
208:25 253:4
258:9
**copies** 35:12
101:24
**copy** 10:4 27:14
52:14,15,18,21
56:11 57:2 66:9
74:21,23 79:15,18
80:9 84:22 91:2
102:9 106:21,25
107:20 120:22
122:8 234:16
258:6
**copying** 27:6 97:3
**corcoran** 196:22
**cordial** 212:9,10
213:4
**corner** 215:19

**corners** 18:6
**corp** 4:9
**corporate** 17:10
**corporation** 1:5
5:16
**correct** 9:14 32:8
52:9 55:7 106:4
123:20 129:16
172:4 175:23
191:15 220:13
227:17 290:3,25
291:13 293:17
318:17 321:21
**correctly** 272:22
287:7 317:9 330:8
**correlate** 268:8
**correspondence**
33:22 184:22
189:15
**cost** 20:15,16,17
20:20,23,24 21:9
23:25 24:24 25:4
25:16 26:17
115:12,14 137:17
137:18 230:11,12
231:16 240:11,13
240:15 243:21
244:2 249:10,11
249:13,21 251:5,6
252:17 275:6,21
275:25 276:8,14
276:19,23 277:5
277:14 278:7,14
278:14,25 279:6
279:10,12,22
280:12,12,24,24
281:6,15,24
287:10,17,20
289:23 291:21
292:9,22 293:20
295:8 296:5,7,14

304:17 308:18
**costar** 65:13
**costing** 280:9
**costs** 222:11,15
231:17,25 261:21
268:22 274:7,23
275:22 276:9,10
276:12,12 287:11
287:12,19,25
288:3,5,9,11,13,15
288:20,20,21
289:2,15 293:24
297:7 298:22
**counsel** 4:8 5:3
8:25 9:9 10:10
18:25 25:8,13
98:6,14 105:13,13
106:6,8 107:3
109:22 110:7
113:16,21 119:15
119:16,19
**county** 337:5
**couple** 68:22
**course** 57:10
290:6
**court** 1:2 4:11,20
5:10 6:8,9,13,21
7:5 15:12,14,15,16
15:18,20 17:11
105:16 106:5
320:14,16
**courts** 242:25
**cover** 84:24
**create** 243:14
286:25
**credentials** 187:10
187:11,15
**credibly** 169:17
**critique** 267:8,12
**critiques** 131:19

**crown** 30:20,25
31:4 37:15 50:25
51:15,18 56:22
74:16 75:7,14,22
83:24 155:4
160:19 161:12
175:3 178:4,6
313:13
**crr** 1:20 337:25
**cumbrance** 222:19
**current** 25:7 30:15
34:7 37:14 50:19
51:18 59:2,5,15,20
61:7 74:18 75:9
118:11,17 132:24
155:2 157:13
160:25 168:18
170:25 172:18,24
180:21 263:19
275:25 276:7
**currently** 19:23
175:5 273:17
**cushman** 164:7
184:19
**cv** 1:7 4:13
**cycle** 13:9

**d**

**d** 137:17 240:11
275:6 278:5,7,14
279:2,6,12,22
280:12,12 281:7
281:15,25 283:4
285:10 296:5
304:18 305:4
308:19 338:2
**data** 58:21 59:20
60:8 62:4,9,25
63:3,4 64:22
99:23 100:23
135:4,15 139:9
162:17 165:20

166:4,15,23 167:2
167:8,19,24 168:2
168:3 169:3,11
170:8 172:10,12
184:12,18 193:8
196:24 197:2,12
197:19,22 198:2
199:7 230:11,12
259:9 262:17
271:3 275:25
276:8 299:17
302:8 303:8
304:11 306:18
307:25 308:5,10
**date** 162:10
168:11,13 169:7
172:6 175:22
244:22 314:16
341:2
**dated** 27:21 34:15
54:11 66:9,24
80:8 84:15 85:3
86:13 89:18 93:18
96:25 123:16
234:12
**dave** 91:20
**day** 92:5,10,25
107:18 189:20
201:22 267:15
290:10,11 306:2
315:25 336:22
337:22 341:23
**days** 117:19,23
**deal** 10:20
**dealing** 64:13
211:8
**dean** 307:13,17,17
308:16 312:11
313:4,7,19 314:4,5
**deceased** 91:10

**december** 307:7
**decide** 206:13
**deciding** 179:8,13
180:10
**decision** 17:11
24:4 108:9 124:19
125:4,13,16,19,21
125:22 156:21
178:16 180:9
181:18 184:5
210:22 320:14,16
**decisions** 38:18
88:24 124:12
**deduct** 290:8
**deducting** 231:24
**deem** 17:21 181:8
**defendant** 1:8
3:12 5:19 9:7
**defending** 324:16
**defer** 112:3
**define** 28:23
159:13
**defined** 101:15,19
103:25 104:17
105:4 161:10
237:3 243:16
259:23 260:8
301:21
**defining** 223:11
**definitely** 53:11,12
95:6 212:14 213:2
268:3 321:13
330:9
**definition** 100:14
138:24 159:19
**definitions** 156:18
158:10,12
**degree** 232:13,14
303:13
**delay** 203:20

**deleted** 320:3
**demand** 281:6,10
281:15,18 303:2,4
**demarco** 199:22
199:24
**demised** 129:19
130:11 152:4
274:20
**demolish** 136:10
**demolition** 55:11
**demonstrate**
295:19
**denied** 326:17
**density** 37:18 38:8
47:18 49:4 51:14
51:20 75:20
**dentist** 110:18
**deny** 327:5
**department** 13:15
325:11
**departure** 124:9
**depend** 43:10
239:5
**depending** 62:16
222:11 262:25
**deponent** 341:3
**deposed** 15:18
**deposition** 1:12
2:11 4:7,15 6:24
8:8 336:2,7
337:12,14 341:2
**depreciated** 280:3
**derive** 20:17
170:25 224:21
309:25
**derived** 154:11
259:9
**derives** 275:21
**deriving** 331:7
**describe** 8:15
23:21 195:25

described 32:11
39:8 93:22 99:4
115:4 123:13
198:15 243:9
describing 293:12
293:16
description 285:20
338:9
design 26:6,10,14
26:19 239:7
251:15,19 252:8
281:11
designated 14:9
15:22 16:4 187:7
designation 12:12
13:12 15:6 61:18
designer 252:17
designing 232:15
252:3 277:8
desire 195:22,24
267:24
desired 219:24
desk 135:4,15
desktop 8:21
detail 82:16
133:15 232:16
274:18 276:24
detailed 51:12
137:13 196:22
details 26:4 95:11
determination
17:4 18:10 63:10
94:13 98:4 105:11
111:10 119:7
129:7 137:8 148:2
152:2 154:8
157:12 188:15
229:5 256:21
257:5 262:16
determinations
16:13,17,19 57:15

57:16 168:24
236:3,5
determine 38:23
49:13 62:21 64:15
71:5 76:21 96:16
104:16 172:8,18
209:25 219:5,20
220:25 224:14
233:15,20 235:8
240:22 249:7
250:17,22 251:16
271:13 272:9
283:13 286:19
297:3 308:25
310:23
determined 51:4
55:19 58:22 75:14
177:23 181:5
227:22
determines 310:19
determining 36:23
105:6 175:14
178:24 179:21
181:14 236:13
develop 228:11
233:10,14,19
234:20,23 235:7
259:20 260:5
294:7
developable 175:8
developed 46:24
47:17,23 62:17
134:9 138:20
139:11 148:17
150:2 178:5
215:16,17 216:4,8
216:14,16 221:2
223:2 224:2
225:24 232:23
developer 262:25
288:18 289:13

290:20
developer's
135:22 295:22
developers 185:16
236:4,8
developing 147:12
248:24 249:24
294:5
development
17:10 47:9,25
48:2,3 76:7 80:20
114:19,22 132:25
133:4,6 135:6,9,12
135:25 141:5,7
147:17,23 150:7,9
156:21 157:2,10
157:20,22 158:3
160:24 171:3
222:12 227:11,18
232:18,23,25
233:16,21 234:25
235:9,17 249:25
250:20 252:5
262:9 263:20,23
263:25 266:18
273:7,22 281:22
288:10,13 289:4
290:18 302:17
335:12
developments
26:8
devine 3:19 4:18
dictated 99:14
differ 250:7
difference 51:10
55:13 145:15
146:20 196:3,6
226:17 291:25
differences 140:13
161:10 217:15
221:10

different 26:5
39:10 51:14 59:17
60:4 62:15 76:19
101:13 115:21
140:18 147:22,23
147:23 149:10
179:15 181:11
183:2,3 213:8
214:19 225:12
251:19 257:12,15
260:12,18 261:2
261:10 264:25
266:4 267:18
269:11 278:2
305:8 312:14
differently 201:5
difficult 252:17,23
334:24
dimensions 283:19
direct 45:11 68:14
84:24 242:11
334:8,12
directed 102:18
105:4 128:7,8
179:17 193:3
223:17 226:14
235:25 236:14
241:2 244:11
317:3
direction 103:8
106:8 109:21,24
113:16 127:24
177:18 198:20
223:12 224:8,12
224:18,23 237:14
237:16 243:7
328:19
directions 99:18
103:6 157:18
160:16 193:14
203:22 213:24

**directly** 22:3
97:16 259:8 279:6
283:12 303:17
**directs** 322:19
**dirt** 294:19 295:15
**disagree** 239:18
241:17,20 243:3
297:24 321:5
**disagreed** 109:10
111:2,8
**disagreement**
203:16 218:18
225:14
**discarded** 209:8
**disclose** 81:16
94:17
**disclosed** 82:12
208:11
**disclosing** 104:3
**disclosure** 182:14
207:6
**disconnect** 293:11
**discounting** 43:2
**discovery** 9:18
84:21
**discuss** 65:21
106:23 118:2
125:12 202:2
**discussed** 32:24
75:19 78:11 126:5
137:13 201:7
222:8
**discussing** 23:11
94:9 95:17
**discussion** 45:15
57:23 96:12
117:24 121:15
122:19 188:16
195:13,14
**discussions** 81:22
111:12 118:12,18

119:24 193:18,23
195:8 197:23
**disdain** 242:25
**dismissed** 144:8
**dispute** 215:23
217:2
**dissimilar** 222:11
**distinction** 214:6
**district** 1:2,3 4:11
4:12 30:21 31:2
**division** 109:23
**dli** 1:7 4:14
**document** 10:23
13:19 23:5 45:4
57:11 60:17 67:6
79:8,16 84:23
110:16 117:9
118:23 121:24
126:12 139:17,24
140:6 149:24
156:8,15 168:7
190:24 199:15
200:4 201:10,19
203:7 234:2
235:21 241:25
246:22 254:9
255:15 258:22
268:16 275:9,11
299:3 305:16
315:9,22 319:16
324:23 328:25
331:16,17 332:11
334:9,17 338:10
338:12,14,16,18
338:20,22,24
339:2,4,6,8,10,12
339:14,16,18,20
339:22,24 340:2,4
340:6,8,10,12
**documents** 9:16
10:5,5,7 44:4,10

120:5 177:19
**doing** 31:15 33:19
105:20 146:16
209:11 309:3
328:4
**dollar** 216:21
274:22 281:3
**dollars** 127:5
263:3 282:8,11
289:17 290:17
292:4 294:23
295:7 296:21
297:13,15 306:4
310:8
**double** 56:14
**doubt** 165:7
169:18
**dpole** 278:5
**draft** 98:23 119:7
119:12 120:21,23
316:2 318:21
**drafting** 108:12
**dramatic** 241:21
242:23 243:15
**dramatically**
241:13
**draw** 272:12
**drawing** 214:7
**drawings** 240:16
**drew** 271:19 272:7
**drive** 301:5
**driven** 148:21
157:12,23 267:23
268:4 281:25
305:9
**drives** 304:24
**driving** 115:10
156:25 267:16
**drove** 137:20
**drywall** 278:18

**duly** 5:22 337:13
**dump** 308:10
**duration** 144:5
**duress** 100:21
130:3 177:17
**dushinsky** 205:25

---

**e**

**e** 3:2,2 5:21,21
27:2,13 28:14
32:12 33:21 36:21
41:18 42:9,16
45:9,12,13,22
53:14 78:3 79:17
80:6,7,8 81:16
83:15,17,17,19,19
84:25 92:3,24
106:20 107:4
108:21 109:9
113:2,2,4,4 117:17
117:20 119:6
120:19 121:5
122:8 126:2 188:6
191:10 196:12,13
199:8,21,23 200:2
201:16 203:14,17
205:13 234:8,10
234:10 235:11
247:5 251:20,23
253:6,10,11
254:19 256:14
315:19 317:8
319:22,23 325:7,9
325:23 326:15,20
326:21 329:8,10
337:2,2 338:2
**earlier** 23:6,11
26:21 36:19,22
75:20 78:16 81:21
82:11 107:19
115:20,24 124:7
153:6 156:23

159:21 197:7
199:11 215:25
234:18 237:24
265:14 277:4
306:2 315:25
323:9 330:11
335:3
**early** 13:25 34:5
210:15
**easier** 122:25
252:16
**easiest** 58:20
**easily** 265:15
**east** 273:2
**eastern** 1:3 4:12
**economic** 71:2
136:15 152:5
232:2 238:8,10
243:16 292:8,10
294:17,18 295:11
295:14 301:5
302:15
**economically**
134:22 136:9
137:22 144:9,11
157:22 229:2
264:18
**economics** 25:22
72:2 135:9,24
137:14 142:5
144:13 147:11,22
164:5 220:15
231:14 261:17
262:2 290:15
292:21 293:19
301:4 307:24
309:24
**edit** 297:14 322:11
**edition** 60:24 61:4
61:6 65:24 242:8

**edits** 119:11,18
316:4,12 322:24
**educated** 14:9
**education** 12:11
13:16
**effect** 181:10
**effectively** 271:2
**effects** 317:14
**egi** 271:6,11
**eight** 299:23 300:8
301:9
**either** 16:24 35:16
40:14 65:18
100:22 130:3
156:7 177:17
207:14 220:14
292:16
**election** 149:21
**electronic** 84:22
**electronically**
156:9
**elements** 245:3
**elevator** 282:12,14
282:15
**eliminate** 320:9
**emotion** 74:7
**employee's** 169:16
**employees** 166:11
167:7
**empty** 8:23 273:8
303:18
**enactment** 74:15
75:6
**encumber** 35:12
101:25
**encumbered** 27:20
34:14 81:13
103:21 138:13
141:12,25 142:5,9
142:20 143:5,22
143:23 145:6,17

145:18,24 146:15
146:21,23 316:16
316:21 317:5,12
317:13 325:16
326:25
**encumbering**
141:21 176:6
**encumbrance** 18:8
18:15,16 51:5
70:25 80:24 88:14
102:20 104:11
105:10 107:7
109:13 118:11,17
124:20,24 125:5
143:14 145:12
175:19 180:15
210:8 248:14,19
261:13 266:16
317:20,21 325:19
327:4 328:9
**encumbrances**
39:20 40:4 102:14
103:18,23 104:3
**ended** 115:10,16
137:21
**ends** 154:9 274:20
**engaged** 53:19,22
81:11 97:15 98:5
105:24 184:2
**engagement** 32:13
32:17 33:8 35:10
86:12 89:16 96:24
97:18,19 98:24
99:2,10 101:24
104:9 183:3
218:13
**engine** 13:15
**engineer** 12:23
13:11,14
**engineered** 285:15

**engineering** 12:6,7
20:18 23:8,14,21
24:21 287:24
**ensure** 63:25
**entered** 70:8 104:6
104:8
**entire** 10:11 37:12
37:13 50:23 70:6
72:12 264:22
266:17
**entities** 27:23 30:7
34:17 204:17
205:4,18 206:24
207:7,24
**entitled** 11:4 60:17
67:2 179:7 241:25
258:20 275:11
338:14 339:12,22
**entity** 29:19
**entrances** 282:21
**entrepreneurial**
294:3,4,12
**entries** 199:9
202:13
**environmental**
20:19
**envision** 198:9
252:17,24
**envisioned** 178:4
198:16
**envisioning**
197:22
**equal** 67:25
**equation** 296:3
**equipment** 220:18
**equivalent** 43:17
**errata** 341:1
**especially** 6:23
**esq** 3:9,16
**essentially** 85:12
173:16

established  100:13
estate  13:20,24
  19:5,13 20:4,12
  60:11,18,25 65:24
  86:24 91:8 242:2
  242:9 244:14
  270:22,24 271:4,7
  288:2 297:19
  338:15 339:13
estimate  19:24
  37:8 62:2 77:15
  131:9 152:3,15,18
  239:11 242:24
  257:4 271:4,7
  274:23 287:21
  316:15 317:4
estimated  126:22
  127:8 151:19
  242:17,19 272:2
  283:3 287:10,12
  316:20
estimates  20:15,17
  20:20
estimating  21:9
estimation  20:25
  197:4,13
estimator  249:10
  251:6 275:21
  276:20,23 277:5
  277:14
estimators  24:25
  25:4,16 26:17
  276:15
ethical  182:15
ethics  14:22
event  9:25 43:15
eventual  184:5
everybody  336:4
evidence  303:12
  321:23

evident  94:21
evolution  114:21
evolve  161:17,20
evolved  182:24
exact  160:6 161:23
exactly  23:2 67:25
  71:20 121:19
  132:14 134:3
  151:9 198:6
  235:10,13 257:21
  259:4,13,19 260:4
  262:20,22 287:13
  287:19
examination  6:2
  113:10 334:5
  338:3
examined  5:23
example  48:25
  159:15 169:5
  176:5 184:14
  207:16 238:13
excel  139:14 140:2
  140:7,17 268:11
exceptional  282:4
excerpt  60:23
  242:7
excerpts  275:17
excess  48:2 311:2
exchange  78:3
  193:4 194:4,9,17
  195:3 196:5
  197:25 200:25
  253:6 254:19
  322:8 329:17
exchanged  99:15
  117:20 255:6
  322:16 325:13
exchanging
  203:14
exclude  18:4

excluded  17:21
  18:15 108:15
  149:16 150:13
  320:13
excluding  102:19
exclusive  100:19
  115:17 129:24
  177:15 267:11
excuse  243:20
  273:2
exercise  54:7
exercised  52:25
  87:18
exercising  87:11
exhibit  10:3,23
  11:16 27:7 32:2
  33:10 40:22,25
  45:4 50:2 60:16
  60:17,21 79:8,12
  117:8,9 118:23
  119:3 121:24
  122:4 139:16,17
  174:20 181:24
  190:24 191:4
  199:15 201:10
  203:7,11 234:2,6
  241:25 242:5
  246:22 247:2
  254:9,16 255:15
  256:11 268:16
  275:11,15 277:21
  285:9 299:3,11
  305:15,16 315:9
  315:17 319:16,20
  324:23 325:3
  328:25 329:5,13
  331:17,25 334:2
  338:9,10,12,14,16
  338:18,20,22,24
  339:2,4,6,8,10,12
  339:14,16,18,20

339:22,24 340:2,4
  340:6,8,10,12
exhibited  132:25
  263:20
exhibits  10:2
  338:8
exist  103:25
existed  19:16
existence  82:12
existing  42:2
  214:14 273:15,19
  273:23
expect  173:5,24
expected  248:5
expenses  271:2
expensive  262:2
experience  94:10
  94:15 95:3,6
  276:17 332:25
expert  15:13,22
  25:20 93:11 94:12
  94:24 101:18
  106:7 110:21,21
  119:21 131:23
  169:16 185:7
  245:25 246:2
  252:8
expertise  25:23
  91:15 333:2
experts  25:8,13
expired  40:14
expires  341:25
expiring  28:17
  34:12 40:14 49:18
  87:5,16
explain  29:10 42:4
  71:20 75:18
  267:14 329:23
explained  39:6
  41:23 53:24,25
  54:5 63:2 216:18

217:14 330:11
**explaining** 133:15
202:19 225:13
**explanation** 53:15
**exposure** 281:18
281:22 282:3,5
304:24 305:9
**express** 124:11
195:21 329:24
**expressed** 228:23
**expressing** 125:17
**extended** 196:17
**extent** 28:7 120:24
209:15
**exterior** 278:13,15
**extract** 239:15
**extracted** 154:5
242:21 243:13
**extraordinary**
36:20 52:4,7 53:6
80:22 81:8 82:3
82:10,14,18 85:22
85:25 86:7
**extremely** 137:17

**f**

**f** 113:2 284:7
337:2
**facilitate** 250:19
**facility** 38:6 76:3,4
135:21 249:6,25
250:3,6 252:4
277:9
**fact** 68:7,17,18
104:20 150:23
186:24 219:19
237:20 298:20
309:10 320:20
**factor** 48:19 146:6
147:8 156:25
175:13

**factors** 24:3 43:20
49:14 62:11 64:18
174:24
**facts** 43:7 121:10
326:12
**faded** 11:8
**failed** 226:7,11,12
226:15
**failure** 211:17
**fair** 16:13 17:7
18:9 59:24 71:10
75:15 96:16 99:3
100:7,14 101:10
101:12,19 104:13
104:16 105:3,7,11
119:7 123:12
126:17 127:4,18
130:18 151:22
154:7 155:12
158:5 159:19
175:14 177:7,11
178:17 179:16
181:4 183:11
185:21 213:9
228:12,17 229:6
236:13 243:16
244:25 245:20
247:24 251:16
257:5 259:3,12
262:16 281:12
291:3
**faith** 14:13
**familiar** 17:13
60:10 61:3,5
107:24 167:17
**family** 91:14,17
**far** 21:17 45:24
46:5,7,9,12 47:7,8
145:16 180:5,7
249:3 281:3
317:14

**fars** 46:19
**fashion** 29:5
**fast** 213:22 214:14
215:20
**feasibility** 297:4
**feasible** 114:22
134:6,20 136:9
137:22 144:9,11
227:6 238:2 250:5
264:7,18 297:22
298:16,20,24
**feasibly** 266:3
302:13
**february** 89:18
92:4 93:19,20
175:7
**fee** 27:24 37:9
40:16 42:11 50:18
50:21 51:8 54:22
55:6,8 70:23
80:17 81:11,13,18
88:18 141:19
142:2,2,3 147:7
151:6 173:11
294:22
**feel** 244:10 326:5
**feeling** 190:13
**feels** 183:25
**fees** 287:24,24
**feet** 175:9 249:3
271:25 286:21
300:3,4,9,15,18
304:10,10 335:6,9
335:11
**fein** 3:11 5:18
**fell** 229:10
**felt** 157:8,8 184:6
224:15,16 229:5
333:3
**field** 14:12

**fields** 25:20
**fifth** 180:4 215:20
**figure** 153:7 232:8
232:21 238:9
240:5,6 284:20,22
284:24 287:17
**figured** 283:19,19
**figuring** 232:16
**file** 8:22 10:11
36:7,10,14 49:2
65:8,16 91:3
140:2,7,7,19
265:18 269:3
275:25 276:7,11
287:4 332:9
**filed** 4:10 47:12
86:6
**files** 35:19,21 67:8
67:9 165:6 169:4
196:25 209:7
284:14 311:11
**filing** 287:24
**fill** 301:13
**filter** 310:2 311:21
**final** 137:12
142:15 243:22
**final.xls.** 140:3
**financial** 297:4
**financially** 5:2
134:6,20 227:6
237:25 297:21
298:16,20,24
**financing** 40:3
103:23 288:24
289:2
**find** 65:15 103:16
169:3 215:25
224:7,18 247:22
255:2 258:10
285:3 286:22

**finding** 184:24
**findings** 223:6
**fine** 29:16 111:21
**finish** 6:25 278:17
**finished** 222:13
  231:12 232:7
  314:20 328:5
**firm** 4:19 5:13
  21:12,22 23:7
  26:22 27:16 97:11
  183:3 246:7 276:5
**firms** 19:15 24:20
**first** 12:18,20 13:8
  21:15 22:4 26:23
  30:14 31:15 32:22
  33:3 34:9 42:15
  52:9 56:12 61:24
  62:12 67:5 75:25
  80:7 84:21 85:2
  85:14,24 87:12
  88:10 89:24 90:7
  91:16 92:14 99:21
  105:8 114:7,10
  115:22 116:9,19
  127:23 128:8
  130:9 155:5
  156:16 159:2,4
  160:18 177:2
  189:14 203:18
  209:3 210:23
  226:23 227:14
  232:4,21 238:22
  247:15 253:10
  257:7,21 264:22
  269:4 283:3
  299:21 307:3,14
  334:13
**five** 16:2,20,22
  24:15 44:3 65:4
  141:6 164:19
  176:11 177:2,8

211:10 230:21
  330:3 331:4,13
**fixtures** 279:10
**flat** 58:11
**fledged** 194:18
**flip** 33:13 35:9
  52:2
**floor** 3:14 46:13
  46:14,17 149:14
  271:16 283:9,14
  285:11,12 307:14
**fmr** 188:15 197:4
  197:14 247:18
  281:2
**fmv** 99:22 129:6
  129:18 130:10
  152:2,4 256:19,21
**focus** 41:21 156:19
**folder** 8:22 27:7
  33:11 40:25 50:2
**follow** 116:10,21
  213:24 333:22
  335:20
**followed** 47:13
  218:15 224:24
**following** 215:18
  224:8 242:15
  330:16
**follows** 5:24 113:5
**food** 213:22
  214:14 215:20
**foot** 46:6,17,19
  69:8,18 149:7,9,11
  243:24 247:16
  250:12 252:11
  253:19 261:6
  263:3 270:14,17
  271:5,14 272:3
  274:2 275:4
  278:11 280:14,16
  281:2 283:3,23

289:17 290:17
  292:4 294:24
  296:22 297:18,19
  299:18 300:14,22
  303:3 306:4 307:8
  307:18 310:8
  311:3,12 331:10
  335:13
**footage** 69:9
  271:22 286:24
  300:2,8 301:8
**footprint** 335:12
**forget** 186:2
**form** 16:8 42:13
  110:22 240:17
**forma** 268:23
**formal** 12:10
  13:17
**formally** 119:25
**format** 119:9
**formed** 91:16
  309:8
**formerly** 91:9
**formulated** 321:24
**forth** 189:15
  327:12 337:13
**forward** 83:22
  190:18 192:13
  203:3 209:25
  218:10,17,21
  229:17 328:7
**forwarded** 120:18
  305:24 306:6
  325:8,23
**found** 19:12 45:19
  107:14 168:25
  186:3 223:25
**founded** 19:14
  91:12
**four** 18:6 81:22
  134:3 176:10

**fourth** 13:15
**frame** 190:21
  245:12 285:11,16
  285:16
**free** 39:19 51:5
  102:13 103:17,22
  149:24 289:18
  290:15
**front** 8:16,18 9:20
  135:5,16 250:13
  272:23 312:18
**frontage** 314:9
  335:16
**fronts** 272:25
  335:14
**full** 38:13 61:24
  65:25 83:23
  123:22 129:17
  132:19 194:18
  206:7 263:11
  271:21 272:12,15
  289:14 290:18
  334:13,18
**fully** 47:8 184:8
  280:2 296:20
**function** 129:19
  130:11
**funding** 24:7
**further** 333:20
  335:23 337:16
**furthermore**
  34:13
**future** 168:23
  244:21 245:7,9
  262:8

**g**

**gains** 43:16
**garage** 249:9
  250:18 252:6,12
  282:17 289:8
  295:2

gather 62:8,24
63:11 64:7
gathered 62:13
63:3,8
gathering 129:13
184:11
gathers 62:3
geared 245:5
309:18
general 12:14
48:14 144:12
190:10 232:19
generalization
243:5
generalized
232:17 240:13
generally 23:21
98:11,15 99:9
119:15 133:11
168:24 236:6
265:12 285:10
288:21 289:5
generate 289:13
generated 289:25
generic 39:11
64:11,18,22 98:25
245:6 252:20
gentlemen 131:13
geographic 24:14
geographically
24:13
getting 57:3
ghostwrite 326:2,6
326:9
gist 79:5
give 32:4 52:18,20
53:15 119:19
124:8 149:23
159:15 163:17
176:7,14 180:12
181:15 189:10

202:24 207:14,15
207:18,20,22
208:4 290:7
given 35:25 88:11
149:20 176:18
202:3 269:19
298:12,19 318:9
320:21 336:12
337:15
gives 208:10
giving 8:3 28:9
44:11 178:10
179:24 324:18
go 18:22 21:4 30:3
37:4,23 38:20
41:3,7 46:3 47:3
47:24 48:9,21
49:10 54:3 57:10
64:9 68:11 69:25
87:21 103:15
109:15 110:19,20
116:13 125:14
134:3 142:14
143:8 145:19
153:20 154:2
155:25 158:16,21
159:6,7 163:19
170:14 173:7
179:2 180:16,23
183:6,14 185:9
188:14 191:25
195:11 198:4
203:3 205:21
214:23 215:23
217:11 218:17,21
228:15 229:17
246:11 260:10
262:11 265:23
268:2 280:25
284:14 286:8
287:8 288:25

296:19 309:3
311:23 312:19
319:2,6,12 323:3
328:7 333:7
goal 14:11 48:17
268:9
goes 64:3 100:16
101:6 242:21
244:14 325:20
going 4:3 6:15
28:21 32:4 37:8
44:16 47:6,17
48:22 65:23 68:10
74:9 93:8 104:23
110:18 111:17
112:3 132:18
135:10 139:15
149:23,25 154:18
157:21 161:13
163:8 174:5,10
176:12 178:15
180:6 205:2
218:14,22 230:24
238:21 240:3,7,8
286:10 291:15
292:6 294:7 302:3
306:10 314:13
318:5 322:7
327:22,22 333:11
336:4
good 4:2 5:12,17
6:4 66:4 112:8
230:19,20
gowanus 46:23
48:8
grade 23:10 26:5
150:6 240:12
249:6,8 250:18
252:11,12,15
285:12

graduated 12:4
great 8:24
greater 276:24
greenbaum
332:18
grid 140:25
145:14 163:6
313:16
gross 216:20
270:20
ground 16:12,17
16:19 17:3 27:21
27:22 28:2,11,22
28:25 29:3 31:10
31:12 34:15,16
35:16,17 36:24
37:2 40:9,10
41:25 42:17,22
54:14 55:23 56:19
57:4,14 58:2,10,15
58:23,24 59:2,5,10
59:10,14,17,22
62:11,20 63:12
65:2,10,13,19 66:9
67:12,17 70:17
74:11,17 75:8
76:13,20,24 85:17
85:23 88:12 95:9
96:10 98:4 105:10
108:10 114:12
115:25 116:3,5
126:22 129:5,14
129:21 130:13,19
130:20 131:11
136:3,8,17,22,25
138:19 139:10
141:12,21 142:20
143:5,24 144:7,13
147:12 151:23
152:5,10,15,16,19
152:22 154:25

155:5,14 156:10
157:3,6,9 161:21
162:2,5,9,19,19,24
163:22 164:6,7,9
164:15 165:5
167:3 172:19,20
173:4,10 184:24
185:7,10,11 190:3
196:23 199:10
213:13,18,21
214:2,3,10 215:8
215:24 216:2,7,13
217:2,5,8,9,10,13
218:24 219:6,13
219:21,22 220:3,6
220:14,20,21
223:2,14,25 224:4
224:20 226:3
229:5 236:3,5,18
236:20 237:3
241:3 252:15
260:25 261:3
269:22 290:19
291:8,10 293:13
293:16,18 298:6
298:21 330:13,18
**group** 184:3 206:3
**guard** 12:24
**guess** 7:13 9:6
10:19 12:23 26:11
28:19 29:11 45:19
48:14 62:23 71:19
84:8 113:23
120:21 126:14
128:16 134:21
145:8 156:7
158:24 187:23
188:5 225:9,10
254:25 284:10
292:12 302:3
322:20 330:20

**guessed** 230:12,13
**guessing** 230:14
**guesstimates**
230:17
**guidelines** 271:9
**guy** 246:11
**guys** 196:15

**h**

**h** 5:21 113:4
**half** 174:5 219:10
299:21 307:11
312:4
**halfway** 54:12
66:2 74:12 75:3
87:3
**hand** 6:22 66:2
119:17 287:6
337:22
**handful** 307:15
**handled** 86:8
**handwriting**
209:17,18 332:7
**handwritten**
209:3 331:20
**happen** 90:16
273:7
**happened** 147:14
170:10 185:21
193:10 228:22
234:15
**happening** 48:7
160:22
**happens** 68:23
204:9
**hard** 10:4 57:2
74:21,23 79:15
231:18 241:5
249:11,12,20
251:6 258:5
274:23 280:24
287:10,11,18

288:10,19,21
**hash** 218:20
**hayden** 3:4 5:14
**head** 256:9
**headset** 41:13
**hear** 41:11,14
324:4
**heard** 23:3 210:23
**hearing** 15:23
193:24 198:16
266:21
**heated** 212:15,17
212:20,23
**heating** 282:8
**height** 282:24
283:3
**held** 4:15 63:25
**helped** 84:10
**helpful** 253:22
**hereinbefore**
337:12
**hereunto** 337:21
**high** 26:8 49:4
131:20 197:3,13
197:16 232:14
267:19 288:23
297:15 300:5
**higher** 45:23 46:5
46:18 47:18 48:17
51:13,20 75:20
76:6,8 126:21
149:11 157:5
229:8 250:9 262:4
265:10,11,15
288:25 330:19
**highest** 14:11
80:20 133:2,11,16
133:17,21 134:5,9
134:13 135:14
136:4,16 138:12
138:21,22,25

139:11 157:13
213:20 214:17
215:5,11,13 216:4
216:9,14,17
220:21 221:3,4,5,6
221:8,11,15 223:2
223:16 224:2
226:8,12,19,22,24
227:3,16,21 228:2
228:7 229:10
231:23 236:23
237:6,7,11,13,16
237:20,23 263:21
264:8 265:2,20,24
266:2,5,19,23
267:10 269:17
331:12
**highly** 14:9
**hire** 217:20 277:16
**historically** 20:17
91:11
**history** 70:3 71:4
**hold** 117:15 139:7
175:18 270:8
**holding** 208:5
**holdings** 1:8 4:10
5:20 38:16 88:23
89:17
**honestly** 85:10
122:22
**hoop** 285:16
**hope** 203:19 287:5
**hoping** 168:6
**horizontal** 163:16
**hour** 174:5
**hours** 80:12
256:17
**housing** 175:10
**howard** 3:16,22
5:17 9:4 10:19
324:4

**hp12c** 209:12,14
    222:9
**hundred** 29:24
    200:10 228:16
    261:24 263:3
    281:3 289:17
    290:17 292:4
    294:23 296:21
    306:4 310:7 311:3
**hypothetical**
    50:23 57:17 273:6

**i**

**icap** 263:8
**idea** 204:3,11,13
    221:21 255:12
    332:19
**identical** 85:12
    155:17 258:17
    261:12
**identification**
    10:25 45:6 60:19
    79:10 117:11
    118:25 122:2
    139:19 191:2
    199:17 201:12
    203:9 234:4 242:3
    246:24 254:11
    255:17 268:18
    275:13 299:5
    305:18 315:11
    319:18 324:25
    329:3 331:19
**identified** 40:7
    62:10 63:25
    103:24 139:10
    141:4 162:6
**identify** 40:4
    104:4 329:21
**ignore** 121:12
    136:24 317:19

**ignored** 121:13
**illustrated** 144:10
**imagine** 29:20
**immediate** 133:2
    263:21
**immediately** 312:4
    312:6
**impact** 18:7 29:23
    29:25 30:7 43:12
    43:19 88:11 99:18
    104:5 114:19
    138:7,8 150:13
    151:2,4 159:12
    161:4 176:4,4,12
    181:13 304:20
    330:24
**impacted** 64:17
    69:23 108:10
    114:6,9 115:2
    144:15 147:20
    207:10
**impacts** 51:23
    159:10
**imply** 87:24
**important** 113:24
    138:3 206:6,23
    281:21
**impossible** 216:21
**impression** 42:11
    47:5 87:16 171:16
    171:18
**improved** 52:11
    64:13 220:2,3,6
    231:22 233:4
**improvement**
    244:24 263:10
**improvements**
    100:20 129:25
    177:15 295:9
**inaccurate** 25:10

**inactive** 13:2,5,9
**inappropriately**
    134:15
**inarticulately**
    186:6
**incentive** 294:3,4
    294:12 296:17,23
    297:2 298:3,3,5,7
**include** 20:15
    24:17 30:13 36:18
    38:5 41:24 117:3
    124:23 135:23
    142:6 174:25
    175:10 263:7
    309:5
**included** 17:22
    42:6 53:6 103:13
    108:15 126:22
    137:23 228:13
    309:7 320:13
**includes** 85:16
    285:15
**including** 51:6
    196:16 262:9
    288:2,24 289:2
    319:23
**inclusion** 59:23
    139:4
**income** 239:11
    242:18 289:13
**inconsistent** 49:12
    53:2 88:3 154:12
    154:16
**incorporate**
    327:23
**incorporating**
    256:19
**incorporation**
    253:21
**incorrect** 54:2
    105:20 111:9

    171:18
**increase** 174:25
    175:8
**increased** 127:8
    127:19
**increases** 129:2
**independence**
    206:21 207:10
**independent**
    228:11 257:2,8,12
**indicate** 101:5
**indicated** 171:21
    201:17 325:22
**indicates** 201:19
**indicating** 47:16
    197:11
**indication** 60:2
    65:9 66:4 222:10
    231:18 233:8
    235:2
**indications** 234:21
**indicator** 235:18
**industrial** 37:18
    37:22
**industry** 14:10
**inexpensive**
    137:16
**influence** 49:14
**influences** 61:14
**influencing** 174:24
**inform** 160:21
    178:15 179:25
    183:18 206:11
    309:22
**information** 28:10
    36:4,8 48:15,19
    49:5,16,20 53:9,16
    54:2,6,17 69:23
    70:16 71:21 73:15
    93:3 168:22
    169:19 184:15

207:13,25 212:7
216:19 222:16
253:20 268:5
286:18 306:3,7
311:10
**informed**  18:25
27:22 40:13
100:17,18 129:22
129:23 156:21
157:17 159:21
160:16 175:13
177:13,14 178:15
179:18,19,20
180:9,25 181:6
218:16 226:9
**informs**  172:24
**initial**  13:8 27:2
40:11 58:10 97:25
105:23 144:13
147:14 155:25
156:2,5,17 158:9
200:21 210:4,10
214:15 265:9
289:17
**initially**  65:12,17
227:20
**input**  131:16,18
**insist**  98:15
**insisted**  85:7
**install**  280:5
**installations**
302:18
**instance**  114:7,10
115:22 116:9,19
207:12 227:14
257:21
**institute**  12:13
14:5,7,16,24 15:4
60:12 61:2,16
64:6 243:4

**institute's**  242:8
**institution**  24:7
**instructed**  40:8
109:12 116:10,21
223:8 229:17
235:21
**instructing**  325:17
327:2
**instructions**  7:23
192:23 202:3,12
202:24 224:16
318:9
**instructs**  235:22
**insurable**  21:8
**intended**  18:5
38:15 62:16 88:21
321:9
**intends**  49:2 86:24
**intent**  183:17
197:15
**interest**  19:15
27:25 29:5,12,18
29:22 37:9 40:17
50:18,22 54:23
55:8 70:24 80:18
206:8
**interested**  5:2
337:19
**interests**  20:11,11
55:7
**interface**  34:3
**interim**  138:22,23
139:3 226:20,23
**interior**  278:17
**internal**  38:23
89:2
**internally**  205:14
**internet**  11:8
**interpretation**
100:5 109:17
113:20,21 125:25

126:3 192:12
201:6 320:11
**interpreted**  200:7
**interpreting**
109:22
**interview**  93:10,21
93:24 94:9,11
96:3,4
**interviewed**  53:21
71:25
**interviewing**
94:18
**introduced**  11:16
45:2 79:12 117:8
119:3 199:19
201:14 234:6
242:5 247:2
254:16 275:15
305:15 315:16
325:3 329:5
**introducing**  79:13
299:12 331:24
**invariably**  98:5
**investigate**  30:9
142:4
**investigated**  31:6
146:7 250:14
**investigates**
234:19
**investigation**
182:8 183:21
**investment**  23:9
38:24 114:17
147:24 150:10
173:17 244:4
262:3
**investments**
173:25
**investor**  173:5
235:3 259:19
260:4,24 261:2

**investors**  173:24
**invite**  93:18
**invoice**  202:10
256:17
**involve**  26:7,18
**involved**  25:17,23
53:23 110:22
205:18 206:11,24
236:3 237:2
**involves**  7:12 16:7
**irish**  1:20 2:14
4:21 337:7,25
**irrelevant**  243:18
**issue**  61:17 118:10
118:16 210:9,17
222:5 244:6
**issued**  14:20 50:8
77:6,8 78:6,25
81:20 82:25
119:14 120:2
144:18 185:18
257:22 316:19
**issues**  15:5 106:8
119:17 168:8
245:8
**issuing**  85:8

## j

**j**  1:13 2:12 4:7
5:21 113:4 336:12
336:19 337:11
338:4 341:3,21
**january**  19:14
79:18,22 80:8
81:4 83:15,20
84:16 85:3 86:13
89:13 97:17 98:23
306:16
**jive**  194:7
**job**  308:25
**july**  11:6,25
137:12,23 140:8,9

140:11,14,15,20
150:18 151:9,10
151:16 218:19
247:5,8 253:7,11
254:2,18,25
256:14,16,17
258:4,15 307:17
314:11,17 316:19
327:19 328:5,21
330:16
**jumped** 280:15
**jumping** 196:4
**june** 27:16 32:11
33:7 34:10 36:21
36:24 208:19
209:4,22 210:18
222:6 230:7
234:12 247:9
254:3,4 256:17
306:5 310:13
327:21
**justify** 255:21
299:17

**k**

**keep** 68:6,19 163:7
264:8
**kept** 263:17
264:21
**kest** 27:15 33:23
34:23 35:24 45:14
50:14 78:4 79:17
80:9 83:20 92:6
92:25 93:25
123:19 234:11
**kevin** 189:18
**kind** 89:2 94:25
95:2 238:11 314:9
**knew** 31:3 78:23
167:16 186:9
197:9 308:2
314:13

**know** 6:18 7:20
10:8 18:23 21:22
21:24 22:2,17
31:3,7 33:17
35:18 36:19 53:13
58:17 61:9 65:16
65:19 66:15 70:16
74:4,6 78:10,19,21
81:21 82:4,6,15
86:18 87:22,25
88:7 89:19 90:3
90:17 91:6,20
94:17 95:23 96:2
97:23,24 98:18
110:19 113:24
114:2 115:8
120:17 124:9,18
124:22 125:3,22
126:5,10 132:10
140:22,22 148:6
150:20 156:3
164:18,25 170:23
180:17 181:2
183:15 189:21
190:6 193:22
198:5 199:2 200:2
204:8,10,14 206:2
206:4,23 207:7
208:9,15,16
209:12,18 212:2
213:6 216:12,15
218:7 232:25
235:12 238:5,8,10
238:20,24 239:15
240:2,4,9 246:14
250:25 251:4,12
252:6 255:3 274:3
274:14 276:3
279:25 280:21
283:7,21 284:13
303:22 304:2

305:21 307:5,20
308:10 309:13,15
314:18 315:2
319:2 322:21
323:18 327:7
328:10,16 332:11
**knowing** 100:20
129:25 177:16
**knowledge** 166:9
170:13,16 229:25
248:3 253:18
309:23 310:13,25
311:5
**knowledgeable**
189:25 197:20
259:18 260:3
**known** 31:7
145:11 148:8
149:18 242:16,18
331:25
**koh** 3:16 5:17,18
9:4,5 11:17 17:16
18:11,22 21:4
30:3 37:4 38:20
41:6,9 44:6,13
46:3 47:3 48:9,21
54:3 56:7 63:15
64:9 67:15 68:10
69:25 70:18 71:16
71:23 72:24 73:6
73:16,24 78:17
79:23 81:24 82:22
87:21 88:5 90:14
90:21 95:21 97:22
98:10 102:22
108:2,25 109:15
110:5,14 111:17
112:8 113:17
116:13,24 124:21
125:6 128:20
142:14,21 143:8

143:16 145:19
146:4 147:3
148:14 150:16
153:20 154:2
158:16,21 159:7
162:23 163:4,11
163:15 166:7,16
167:25 170:14
171:10 173:7,19
174:4 179:2
180:16,23 181:24
182:4 183:6,14
191:25 193:20
194:23 195:11
198:3,25 204:5
205:21 207:3
208:2,7 211:5,19
212:18,24 214:23
216:11 217:11
218:2 219:16
220:9 226:5
228:15 229:21
230:22 233:22
241:16 255:24
260:10 265:23
268:2 270:3
276:21 284:4,8,25
286:6 310:9
312:25 313:14
314:25 317:6
318:23 320:25
322:13 323:3,16
324:2,5,15 328:15
329:12,15,25
333:9,23,24 334:6
335:18,25 336:8
338:5
**ktr** 19:5,12,13,18
19:24 20:4,17,21
21:2,12,18 22:13
35:15 42:10 45:10

45:21 50:7 52:5
52:13 53:24 57:6
57:25 58:14 59:9
79:21 82:25 83:16
85:7 86:12,21,23
86:25 87:9 91:2
91:12 92:4 96:15
96:24 97:11,15,17
97:20 103:16
124:2 139:10
152:4 246:12
304:13 326:11
**ktr's** 89:21 169:4

**l**

**l** 335:15
**labeled** 10:24 45:5
79:9 117:10
118:24 121:25
139:18 190:25
199:16 201:11
203:8 234:3
246:23 254:10
255:16 268:17
299:4 305:17
315:10 319:17
324:24 329:2
331:18 338:10,12
338:16,18,20,22
338:24 339:2,4,6,8
339:10,14,16,18
339:20,24 340:2,4
340:6,8,10,12
**lack** 70:11
**land** 25:17 54:21
55:7,15,15 57:15
57:15 58:5,13,22
59:21 62:12,14
63:6 74:14,16,18
75:5,7,9 76:9
99:24 100:8,24
101:8,11,12,17,18

101:21 105:7,18
116:8,18 129:9,20
130:12,19,24
131:2,11,21
140:24 144:17
146:16 147:5,6,17
147:19,20 148:7
149:4,23 150:4
151:5,6,19,22
155:2 159:18
160:25 161:6,8
162:11 163:6
168:23 173:3
174:25 196:23,23
214:12 221:22
223:6,9,17 224:10
224:10,18 228:10
229:17 231:8,10
231:19 233:7,8,11
233:12,14,19
234:20,22,23
235:3,7,17,19,22
236:2,9,13,22
237:18 238:5
239:15 240:17,20
241:7,11,14
242:14,20,24
243:2,12,22
244:18,19,24
245:13,17,18,25
246:3,4,9,12
247:12 248:11
251:25 252:10
253:14 255:20
256:19 257:3,20
258:20,24 259:20
260:5 261:19
262:15 263:5,7
264:22 265:4,6,11
265:17,19,21,25
266:5,24 267:15

267:22 268:20
269:8,10,20,20,24
269:25 291:24
307:16 312:12
313:16 333:3
**landlord** 100:18
129:23 175:13
176:5,13 177:14
178:10,16,20
179:20,21 180:8
181:14 295:6
**landlords** 181:6
185:16
**language** 85:19
100:2,3,5 103:10
106:24 110:16,17
158:5,6 160:5
316:14 318:22
320:3 323:24
324:13
**lapse** 126:9
**laptop** 8:18
**large** 51:9
**largely** 64:12
75:25 157:7,12,21
157:24 305:8
**larger** 303:10,12
**late** 12:19 253:7
328:5
**law** 5:13 21:12
97:10
**lawyer** 132:2
326:7
**lay** 311:8
**leading** 184:7
210:12
**learned** 214:20
**learning** 89:25
90:8
**lease** 17:22 18:3,6
18:8,14,16 27:21

27:23 28:2,11,16
28:22,25 29:3
31:12 34:12,15,16
35:16,17 36:12,24
37:2 40:9,10,14,16
41:25 42:18,20,22
42:25 43:15 49:17
51:6,6 52:14,19,23
54:11,14 62:12
63:24 64:3 65:21
65:22 66:9,23,25
67:18,21 68:3,24
70:6,25 72:9,14,18
79:20,22 80:13
81:17 82:13 85:18
85:23 86:2 87:4
88:12,12,15,15
92:7,17 96:18
97:13 99:18 100:4
101:16,20 102:9
102:20 104:7,12
104:15,18,19,21
105:3,4,5,10,15,18
105:22,23,25
106:24 107:7
109:13,19,21,23
115:25 116:3
118:11,17 123:14
124:20 125:5,25
127:23 128:3,4,5,7
128:9 130:7,14,19
136:3,8,12,17,22
136:25 137:9
138:4,5,16 141:12
141:21 142:2,3,5
142:11,20 143:5
143:15,22,24
144:7,14,23 145:6
145:13 146:3,16
146:21,24 148:11
149:24 151:23

| | | | |
|---|---|---|---|
| 152:16,24 154:9 | 327:3 328:8 | **led** 23:7 | **levels** 226:15 |
| 154:12,13 155:5 | 330:13,22 | **left** 8:20 69:19 | 299:18 |
| 157:3,3,18 158:7 | **leased** 80:23 293:5 | 124:9 131:22 | **levine** 91:9 |
| 158:13 161:13 | 293:6,8,9 302:23 | 136:8 152:25 | **li** 21:19 33:14,15 |
| 170:19,24 172:19 | **leases** 35:12 40:18 | 264:14 327:20 | 34:2,5 45:14,22 |
| 173:4 175:20 | 58:15,23,24 59:2,6 | **legal** 106:8,9 | 47:5 77:11 78:4 |
| 176:7,16,19,21 | 59:10,14,19 63:12 | 109:16 110:7,23 | 79:17,19 80:10,13 |
| 177:5,18 179:18 | 64:4,8 65:2,10,13 | 113:20 119:17 | 80:16 82:21 92:5 |
| 183:12 184:24 | 65:20 66:3 67:13 | 122:14 126:3 | 92:15,25 94:6 |
| 185:22 190:19 | 67:17 76:13,15,20 | 131:25 132:5 | 111:13 201:22 |
| 200:17,19,19 | 76:25 81:14 88:19 | 326:9 | 202:6 205:3 210:8 |
| 204:7 207:17,19 | 95:9 101:3,7,25 | **legally** 133:18,23 | **li's** 21:22 |
| 207:21 210:9,10 | 108:11 114:12 | 134:19 135:11 | **license** 12:20 13:7 |
| 210:18 211:8,10 | 116:5 129:14 | **lender** 24:4 | **licensed** 12:17,22 |
| 211:18 212:7 | 131:4 138:20 | **lending** 24:7 | 13:20,23 182:17 |
| 213:13,18,21,24 | 139:10 152:6,10 | **length** 64:17 72:9 | **licenses** 187:8 |
| 213:25 214:2,3,10 | 152:23 153:24 | 330:21,22 | **licensing** 12:14 |
| 219:21,22,23 | 154:4,20 155:15 | **leprohon** 189:18 | 13:8 |
| 220:4,6,14 221:18 | 155:18 157:6 | **letter** 32:14,17 | **liens** 39:20 102:14 |
| 222:20 223:24 | 162:5,9,20 163:22 | 33:8 34:10 35:10 | 103:18 |
| 224:9,23 225:21 | 164:15,24 165:13 | 36:25 37:7 42:7 | **lighting** 278:21,22 |
| 228:4,6 231:25 | 168:11,12,14 | 85:15 86:12 87:20 | 279:2,7,9,17,20 |
| 235:21 240:15 | 170:5 171:21 | 89:13,16 96:24 | 280:13 |
| 241:3 243:7 | 173:10 185:7,10 | 97:18,20 98:24 | **liked** 70:15 73:14 |
| 244:12 248:15,19 | 185:11 190:3,20 | 99:2,14 101:24 | 73:22 |
| 253:18 259:2 | 214:8,13 215:8,24 | 103:3 104:9 | **likelihood** 75:13 |
| 260:25 261:3 | 216:2,7,13 217:3,5 | 117:22 119:8 | 155:3 |
| 262:6 263:17 | 217:6,8,8,13 | 123:19 183:3 | **limited** 131:17,19 |
| 264:4 266:16 | 218:24 219:6,13 | 193:13 194:3,10 | 139:8 |
| 267:7 290:20 | 220:20,21 223:2,9 | 198:18 200:21,24 | **limiting** 39:16,17 |
| 291:8,10 292:15 | 223:15,21,22,25 | 210:5 218:4,14 | 102:12 103:13 |
| 292:17 293:3,13 | 224:4,20 225:3,15 | 256:19 264:12 | 331:3 |
| 293:16 302:20,20 | 226:3 235:24 | 315:25 320:9 | **line** 195:4 327:16 |
| 304:4 306:12 | 236:18,20 237:3 | 322:9 327:17 | 341:4 |
| 307:23 312:5 | 247:16 | **letters** 193:4 194:9 | **lines** 26:12 |
| 314:3 316:16,22 | **leasing** 220:2 | **level** 198:6 232:14 | **list** 162:10 188:17 |
| 316:24 317:5,11 | 245:8 295:15 | 251:17 252:11 | 189:10 196:17 |
| 317:13,15,20,22 | **leave** 124:6 | 274:17 276:18,24 | 204:16 205:4,15 |
| 319:4,12 320:5,7 | **leaves** 68:25 69:3 | 277:8,10 280:9,10 | 206:7 306:12,14 |
| 320:12,23 321:12 | **leaving** 322:17 | 280:24 289:6 | 307:3 |
| 325:17,19 326:25 | | | |

**listed**   162:14
171:7 172:3
**listings**   303:9
**lists**   277:25 279:3
**litigation**   94:10,15
95:3 186:19
203:20
**little**   40:23 44:11
78:5 97:5 121:2
201:5 225:10
274:9 327:12
**llc**   1:8 4:10 5:20
19:13 38:16 86:24
88:23 307:22
**llp**   3:11
**load**   56:8
**loaded**   40:25 41:7
**loading**   40:24 67:4
74:20
**loan**   24:5,6
**locatell**   186:4
188:13 199:5,22
199:24
**locatell's**   221:13
**location**   135:10
239:7 243:25
281:11,20,21
282:3,4 293:20
301:5 304:23
305:4,9 309:24,25
313:19,24
**locationally**
309:21 312:9,13
**locations**   224:6
**log**   10:17
**logic**   215:18
**logistics**   188:14
**long**   7:22 12:16
13:4,7,17,23 34:15
67:14,21 76:13
114:14,16 136:3

230:6 236:11
245:10 262:5
289:7 304:3
**longer**   114:18
261:8 262:9
**look**   9:23 10:4
16:21 31:17 38:10
41:17 42:15 57:2
57:20 60:8 61:9
65:7 69:12 74:23
79:15 84:8 108:18
140:24 165:25
169:8 187:19,23
188:3 191:6
205:11 217:2,4
225:7 232:6 240:3
240:7 242:13
272:21 283:7
284:13,21 285:9
289:21 292:13
303:23 304:7
306:22,24 307:21
308:8,15 311:20
311:25 313:19,22
313:25 325:5
**looked**   32:12
36:22 47:12 65:8
72:6 76:12,15
82:11 114:13
115:21 141:18,20
142:18 143:3
148:15 155:24
157:20 165:22
172:21,23 199:11
201:16 205:15
217:4,5 219:8,11
219:13 220:23
271:17,18 303:8,9
303:25 304:2
307:15 308:3

**looking**   8:17,18
10:7,8 23:5 43:7
45:21 60:2 63:23
69:5 83:21 84:4
95:15 104:17
113:15,19 117:25
138:19,24 141:24
148:11 150:25
169:5,6 174:21
185:3 189:14,21
189:22,24 190:5
190:10 197:8
206:16 218:25
226:18,20 231:21
274:5,6 279:8
282:6 284:5
300:16 304:4,16
306:19 308:2
309:12 312:23
313:2
**looks**   11:5,23
30:12 33:14 42:16
42:23 45:13 56:19
57:12 59:13 85:23
92:9 107:17
120:15 188:23
201:24 231:10,12
232:10,24,25
234:15 304:12
**losing**   146:8 156:3
**lost**   41:2 146:10
**lot**   33:21,22 46:16
51:16 71:14
124:10 126:7
230:14 241:6,8
273:12,17 275:24
276:3 311:9
332:25
**lots**   310:21
**love**   280:23

**low**   37:18 38:8
115:12 137:17
275:5 278:7,14,14
279:10,12,22
280:12 281:6,15
288:21,22 296:5
300:4 304:17
305:7 308:18
**lower**   71:14,16,17
115:6 149:13
230:3,4 267:18
281:24 311:14
**lp**   17:9
**lunch**   111:24
112:4,13
**luxury**   26:8
**lying**   126:4
**lyons**   91:20

---

**m**

**m**   3:9 5:21 30:20
30:25 31:4 37:15
46:20 50:25 51:15
51:18 56:22 74:16
75:7,14,22 83:24
113:4 155:4
160:19 161:12
175:3 178:4,6
**m1**   38:4 46:14
76:2 148:19 151:8
271:20 283:17
313:11,13 335:8
**m1-1**   37:10,17
45:23 46:4 49:2,5
133:5 140:25
141:5,8 149:2,5,8
149:11 150:15
248:24 249:3
263:24 271:23
272:4,14,20 273:5
312:24 313:4
335:4

**[m1-2 - matter]**

**m1-2**  46:11,23
**m2-1**  46:11,23
**madison**  8:9
**mai**  15:5,8 18:20
  33:24 61:17
  186:18 187:9,17
**mail**  27:13 28:14
  32:12 36:21 41:18
  42:9,16 45:9,12,13
  45:22 53:14 78:3
  79:17 80:6,8
  81:16 83:15,17,17
  83:19,19 84:25
  92:3,24 107:4
  109:9 117:17
  119:6 120:19
  121:5 126:2 188:6
  191:10 196:12,13
  199:8,21,23 200:2
  201:16 203:17
  205:13 234:8,10
  234:10 235:11
  247:5 251:20,23
  253:6,10,11
  254:19 256:14
  315:19 317:8
  319:23 325:7,9,23
  326:15,20,21
  329:8,10
**mailed**  106:20
  122:8
**mails**  27:2 33:21
  80:7 108:21
  117:20 203:14
  319:22
**maintain**  13:7
  275:24 276:7
**mais**  18:24
**majority**  156:25
  160:24 165:3

**making**  124:12
  316:10,13 326:18
  327:8
**management**
  38:17 88:23
**managing**  19:4,6
**manhattan**  59:11
  152:6 169:7 171:3
  172:6 333:2
**manner**  151:19
  175:4 178:5
**manufacture**
  37:19
**manufacturing**
  151:21 223:23
**map**  222:9 271:19
**marc**  193:10
  196:16 198:17
  200:12 202:22
  206:23 207:4,6,9
  217:21 218:13
**march**  96:25
  117:13,17 207:21
**marginal**  274:7
**marine**  12:5,6
**mark**  10:22 31:20
  44:23 60:15 77:17
  77:18 79:7 118:22
  139:13 190:22
  191:4 199:14
  201:9 203:5
  204:18 233:25
  241:24 246:20
  254:7 268:11
  275:8 299:2
  305:12 315:7
  324:21 328:23
**marked**  10:24
  12:21 23:6 27:11
  33:10 40:25 45:5
  50:2 60:18,21

66:19 74:10 77:19
  79:9 80:2 83:11
  84:14 86:10 89:6
  91:23 92:20 96:21
  117:10 118:24
  121:25 122:4
  139:18,21 148:13
  190:25 199:16
  201:11 203:8,11
  234:3 241:23
  242:2 246:23
  254:10 255:16
  256:11 268:15,17
  275:12 277:20
  285:8 299:4,11
  305:17 315:10
  319:17,20 324:24
  329:2 331:18
**market**  16:13 17:8
  18:9 20:8 31:10
  37:8 58:4 59:24
  60:2 61:25 62:21
  64:12 66:5 71:6
  71:10 75:15,16
  80:17 85:16 96:17
  99:3,23 100:7,14
  100:23 101:10,12
  101:19 104:14,16
  105:3,7,11 119:7
  123:12 126:17
  127:4,18 128:18
  128:21,23 129:20
  130:12,19,23
  131:10 134:8
  136:4 151:22
  154:7 155:13,14
  158:5 159:19
  160:18,22 161:4,5
  161:14,16,19
  168:7,15 172:8,18
  172:25 175:15

177:7,11 178:17
  179:17 181:5
  183:11 184:12
  185:21 190:2
  213:9 224:11,13
  228:13,17,24
  231:22 233:16,21
  234:25 235:4,8
  236:13 240:22
  242:21 243:13,16
  244:25 245:20
  247:24 248:10
  251:17 257:6
  259:3,9,12 261:21
  262:16,17,17
  268:4,7 281:12
  291:3 296:13
  297:9,11 299:17
  304:5 310:4
  321:23
**marketing**  288:4
**markups**  316:10
  324:18
**marriage**  337:18
**marshall**  240:13
  251:8 275:5,9,12
  275:18,19 276:13
  276:20 285:8
  339:23
**marty**  91:9
**massive**  250:20
**match**  257:13,17
  267:24
**materially**  76:25
  135:24 137:14
  176:15 178:14
  179:23 281:5
**materials**  285:13
**math**  290:2
**matter**  4:9 10:12
  21:13,19,21 26:23

65:5 186:24 337:20

**mattered** 70:22

**matters** 16:7 17:6 26:18 29:3 304:23 314:7

**maximally** 133:20 133:25 134:2,23 134:24 135:18

**maximum** 47:23 169:24 175:8 227:10,19

**mcd002701** 199:14,19 339:5

**mcdonald's** 1:5 4:9 5:15 9:17 22:14,21,23,25 28:16 34:12 35:16 40:9 49:17 51:6 52:11,14,18 67:22 68:2,3,5,20,23,25 69:3,6,19 79:20,22 80:13,24 82:5,13 85:18,25 86:2 87:5,9,18 88:12,15 92:7 97:12,13 102:20 104:11,14 104:21 107:7 109:13 123:14 138:5,13 142:10 143:15 144:22 145:6 148:10 154:13 157:3,14 157:16 175:20 176:19,23,25 177:4 178:24 179:9,14 186:5 207:17 211:15,16 212:22 213:23,25 214:4 217:19 218:8 222:5

253:17,24 255:3 259:2 263:17 281:22 296:24 316:2,5 318:25 323:14 328:13 331:7 341:2

**mean** 17:24,25 38:19 39:24 46:2 46:9 47:2 69:19 128:14 145:22,24 237:13 255:11 270:21 297:11

**meaning** 22:6 116:20 210:17

**means** 18:2 47:4 67:10 103:11 200:17

**meant** 255:22

**mechanical** 12:7 278:22 279:3,7

**media** 4:6 44:22 113:9 174:11,17 231:6 286:15 336:13

**median** 169:25

**mediation** 15:17

**medical** 110:19

**medication** 8:2

**meet** 191:14

**meeting** 8:19 82:6 93:19 111:11 175:7 200:9,21 202:2,7 208:19 209:5,10,22 210:6 210:13,19,20 211:16,25 212:9 213:7 218:19 221:24 222:6 230:8 247:9 248:25 253:17,24 254:3 306:6

310:12 327:21 329:17 330:7,10

**meetings** 325:11

**meister** 3:11 5:18

**member** 12:13 14:4 19:4

**members** 14:23 19:6,18 246:7

**memorandum** 52:23,24 86:6

**memories** 95:12

**memory** 31:18 84:6

**mentioned** 14:3 26:21 38:5 138:2 253:16

**mentions** 23:7

**merchant** 12:5

**met** 95:7 242:16 271:2

**method** 63:19 96:16 146:17 236:12 240:25 242:15 243:2 277:21

**methodologies** 213:8

**methodology** 64:14 131:21

**methods** 131:15

**metropolitan** 89:17,20 91:7,18

**meyer** 3:21 199:24 318:20 325:6 326:18

**michael** 3:21 332:18

**mike** 199:24 318:20 325:6,8,9 326:18,20 327:15

**mike's** 326:15,21

**million** 50:19,25 58:9 71:9 263:4,5 265:16 267:19,19 274:22 287:11,18 291:21 295:7 297:13,15

**mind** 57:9 111:10 299:7 313:18

**mine** 241:9,9 332:8

**minimal** 289:3

**minimally** 225:24

**minimum** 29:6 169:24 278:22,23 279:14,16 280:4 284:11

**minute** 44:3 230:21

**minutes** 111:18 196:18,20 226:4 333:6,8

**miscommunicated** 200:14

**misleading** 53:5

**missed** 325:10

**missry** 21:13,16 53:20,21 82:7 93:10,20,21 94:3 96:14 97:20 98:18 104:9 105:19 106:20 113:14 117:19 125:24 131:7,16 183:8 188:7 189:20,22 191:11 192:9,23 196:14 201:21 212:16 218:16 222:2 247:6 250:24 251:11 253:13 254:6,22

| | | | n |
|---|---|---|---|

256:15 315:20 317:18 319:25 325:7 329:8
**missry's** 93:3 97:10 125:15,22 137:8 208:20
**misstated** 171:19
**misstatement** 9:6
**misunderstood** 125:7 207:5 226:6
**mix** 221:16
**mixed** 26:8 76:5 135:11 147:16 228:4 252:4 261:9 266:6 277:9,17
**mixing** 104:25
**mkt** 163:10
**mm** 202:11
**mmb** 67:24 68:5 69:6,21
**mocked** 272:8
**model** 253:13 263:2 268:21 269:6,12,14,24 289:12,15 294:11 297:4,20
**models** 237:18 269:17
**moderate** 38:9
**modification** 109:18
**modified** 270:20
**modifiers** 241:18
**modifying** 317:11 319:12 321:12
**moment** 136:21 235:5
**momentarily** 40:21
**money** 124:10,16 294:9,15 295:13

295:18,19
**month** 215:15 290:7
**months** 78:5,25 81:21,23 289:11 289:18 290:15
**morning** 4:2 5:12 5:17 6:4 80:15
**morris** 21:16 93:2 93:10,21 94:3 96:14 97:10 104:9 105:19 106:20 107:5,18,23 108:20 109:10 111:2 116:10,21 117:18,20 119:6 119:25 120:18,21 122:8 125:24 131:7,16,24 137:8 188:7,22 189:17 189:20,22 190:8,9 191:11 192:9,16 192:23 193:16 194:21 195:2,7,21 196:14,18 197:24 198:23 201:21 202:6 203:15,19 204:3 208:20 210:7,15,20 211:23 212:16 217:24 218:15 222:2 229:16 247:6 250:24 251:11 253:12,16 254:22,25 255:8 255:20 256:15 315:20 317:18 318:8,14 319:25 320:2 325:7,8,10 325:21,23 326:14 326:15,22 327:5

327:13,18 328:10 328:11 329:8
**morris's** 319:9
**mortgage** 20:10 40:3 103:21
**move** 32:3 158:13 160:11 190:18 192:13 209:25 218:10 289:9 296:19 314:10
**moved** 34:6 50:2 84:18 89:8 91:25 92:22 93:16
**movement** 160:19
**moving** 30:11 291:17
**multi** 26:4,14,18 91:14,17 252:4 274:19 277:8
**multiple** 26:4,14 46:16,19 72:11 90:11 302:7,19
**multiplier** 57:14 58:8 62:19 63:7 75:24 101:22 130:20 147:8,13 147:25 148:22 149:10,22 151:7 157:9,25 224:14 224:19 245:21 265:8,9 270:5 282:25 283:10
**multipliers** 59:25 60:3 62:15 154:10 168:18 172:21 224:21
**multipurpose** 26:15
**muted** 41:13
**mvs** 191:15

**n** 3:2 5:21 113:2,2 113:2,4 338:2
**nail** 288:7
**nakleh** 193:11 196:17 198:18 217:21
**name** 4:18 140:2
**named** 299:9 332:18
**names** 205:17 207:23
**naming** 185:24,25
**nassau** 337:5
**nationally** 275:20
**nature** 72:9 207:5 219:22 281:19
**near** 28:17 34:13 49:19 87:5,17
**nearly** 128:10
**necessarily** 223:5 235:4 236:25 237:7 240:21
**necessary** 9:23 38:12 90:20 104:5 134:10 240:17 245:3 270:10 286:25 327:22
**need** 7:19 9:25 11:20 18:21 19:25 29:7 30:8 43:5,20 44:5 48:22 80:21 81:7 99:9,16 110:18 134:5 136:15 142:22 186:22 223:5 238:5,7,10,20,23 239:10,14,21 245:23 249:4,7 250:11,16 251:14 252:19 255:8,11

273:25 282:15
286:19 301:11
302:9,15 306:10
**needed** 82:17
136:25 138:5
146:14 149:18
151:21 212:8
230:2 286:23
**needing** 39:8
**needs** 18:8
**negotiate** 173:16
**negotiated** 168:22
169:10 171:7
172:2,3,9,11,13,16
173:10,20
**neighborhood**
296:9
**neither** 131:13
185:7 228:6
**net** 239:11 242:17
247:17
**neutral** 16:12,16
16:25 17:3
**never** 25:11 29:16
53:25 54:5 72:16
72:17 125:8
217:13,21 256:7
257:16 269:5
299:7
**new** 1:3,14,14 2:17
3:8,15,15 4:12,19
4:22 8:10,10
13:21 17:11 18:21
31:13 136:11
161:21 182:18
222:23 252:22
271:8 273:21,22
336:15 337:3,10
**newer** 305:8
**nine** 168:12 304:8

**nods** 6:22
**non** 72:9
**normal** 241:11
269:24
**normally** 36:18
232:8 233:14,19
235:6 269:9
**notary** 2:16 5:23
336:25 337:9
341:25
**notation** 36:7
**noted** 5:10 113:3
114:20 130:5
197:2 199:8
336:16
**notes** 38:11 209:3
209:4,9,15,16
300:7 331:21
332:14,17,21
**noticing** 5:8
**notwithstanding**
7:16 320:20
**november** 27:21
28:11,21 34:15
40:10 54:12 66:10
66:24 306:17
**number** 4:13
11:12 45:12 55:25
144:7 169:6,9
172:6 181:24
228:21 230:15
254:13 265:16
268:7 284:2,5
297:17 302:9,17
309:19 311:24
313:10 315:23
329:12,13 334:3
334:11 336:13
338:9
**numbered** 52:9
162:7

**numbers** 9:22
154:21 162:13
170:3 229:24
248:2,7,7 250:10
262:20 314:23
**numerous** 196:22
246:4
**nygard** 22:2,19
26:22 27:15 164:3
164:12 184:15
234:11 332:14,21

---

**o**

**o** 5:21 113:2,2,2,4
**o'clock** 44:7,9
**oath** 4:24 6:10
**object** 7:11 68:10
**objected** 211:16
**objection** 7:16
17:16 18:11,22
21:4 30:3 37:4
38:20 46:3 47:3
48:9,21 54:3
63:15 64:9 67:15
69:25 70:18 71:16
71:23 72:24 73:6
73:16,24 78:17
79:23 81:24 82:22
87:21 88:5 90:14
90:21 95:21 97:22
98:10 102:22
108:2,25 109:15
110:5,14 113:17
116:13,24 124:21
125:6 128:20
142:14,21 143:8
143:16 145:19
146:4 147:3
148:14 150:16
153:20 154:2
158:16 159:7
166:7,16 167:25

170:14 171:10
173:7,19 179:2
180:16,23 183:6
183:14 191:25
193:20 194:23
195:11 198:3,25
204:5 205:21
207:3 208:2,7
211:5,19 212:18
212:24 214:23
216:11 217:11
218:2 219:16
220:9 226:5
228:15 229:21
233:22 241:16
255:24 260:10
265:23 268:2
270:3 276:21
284:25 310:9
314:25 317:6
318:23 320:25
322:13 323:3,16
324:2,6,15 328:15
329:25
**objections** 5:6
**objective** 321:25
**obligated** 6:11
**obligations** 262:8
**observation** 24:9
**obvious** 226:16
**obviously** 43:3
226:9 230:2 293:2
303:10
**occasionally** 24:20
**occupied** 231:14
**occupy** 302:24
**occur** 99:13
154:20 175:2
192:15
**occurred** 65:4,13
118:7 170:16,18

171:23 326:12
**occurring**  128:12
  168:20
**occurs**  154:8
**october**  78:4,8,24
  325:9 327:13
**offered**  124:10
**offhand**  164:18
  206:2,4 213:2
  274:3
**office**  8:9 9:15
  17:4 165:14 169:7
  208:20 307:10
  312:5
**officer**  23:18
**officers**  13:13
**oftentimes**  26:7
  119:17
**oh**  102:5 204:25
  287:15 331:23
**okay**  6:13 8:15
  9:10,15,21 10:14
  11:23 15:21 20:24
  24:17 31:8,16
  32:3,16,22 33:6
  35:20 36:13 39:3
  40:19,24 42:21
  43:23 44:6,13
  48:14 49:15 52:2
  54:10 55:21 56:16
  63:22 65:23 67:12
  70:15 77:25 79:6
  83:10 85:5 86:9
  86:19 88:9 90:10
  92:19 97:10 98:22
  99:20 101:2 102:7
  106:10,16 107:11
  107:15,17 109:8
  117:5 120:19
  122:7,23 123:18
  127:17 128:2,10

129:8 131:7,24
133:16 134:18
136:2 137:25
148:25 151:18
153:18 160:9
161:19 164:23
165:12 166:3,13
167:11 171:15
172:15 173:23
174:3 176:17
178:19 179:11
185:18 187:18
189:14 190:13
192:22 194:20
196:12 199:13
201:8 202:10,17
203:2 204:15
212:9 218:7 219:4
219:12 220:23
223:19 225:25
227:20 228:9
229:16 230:18,22
232:4 233:6,24
236:16,22 237:18
238:4,20 239:3,23
241:11 247:14
248:22 250:15
254:5,21,24
255:13 257:11,19
258:14 264:21
272:7 273:15
274:15 276:17
277:25 285:22
286:4,6 287:8
289:12 291:25
292:24 294:21
296:4 297:20
298:2 301:16,24
302:25 304:15,20
305:20,24 306:11
306:18 309:9

311:8 317:24
319:14 321:22
327:11 331:15
332:4 333:5,9,10
335:2,25 336:9
**old**  168:14
**omitting**  108:11
**once**  7:5 15:15,20
  24:5 34:10 68:23
  88:13 101:23
  115:14 116:25
  137:9 151:18
  232:25
**ones**  26:9 61:17
  98:15 164:21
  167:6 223:4
  287:22 289:3
  308:23 311:21
  312:8
**online**  4:16
**open**  8:19,21 50:6
  86:18 111:25
  247:4,7 289:10
  299:14,15 305:20
  305:23
**opened**  50:5
**operate**  15:3
**operating**  23:17
  239:11 242:18
  245:8 270:25
  295:20
**opine**  20:10
**opinion**  42:25
  85:16 101:18
  108:20 125:17
  131:20,25 132:5
  137:22 161:5
  178:20,22 192:6
  193:13 194:3
  195:2 198:19
  200:22,24 211:2

215:4 228:11
233:11 259:17
260:2 281:12
309:23 310:4
331:14
**opinions**  110:23
  161:5 194:10
**opportunity**
  119:20
**opposed**  193:23
  222:22 260:22
**opposite**  295:5
**option**  52:25 65:20
  87:11,12,19 92:6
  92:16 93:6 96:17
  97:12 99:5,11
  100:6 102:3 103:6
  123:13 130:6,22
  132:6 135:22
  156:18 158:6,10
  158:12 159:12
  160:5,10,14,17
  161:11 177:3
  183:12 191:19
  193:3,14 194:6
  198:21 223:7,12
  224:17 226:14
  236:17 243:10,17
  322:18 324:19
**oranges**  143:19,25
  144:2 251:20
**order**  29:8 53:4
  134:25 152:3
  205:2 206:25
  238:9 280:13
  286:19 301:13
  302:10
**organization**  14:8
  15:5
**organizer**  201:24

**original** 42:6 123:10 127:14 167:15,16 170:19 229:4,13,14 255:22 256:21 257:5 258:18 269:23 332:14,24

**originally** 91:15 170:6 265:14 332:22

**outcome** 5:2 337:19

**outer** 59:11

**outlets** 278:23

**outlined** 191:18

**outright** 260:17

**outset** 17:15

**outside** 267:6

**overall** 301:3

**overlap** 29:24

**overlapping** 29:11 29:22

**overly** 144:15 213:3,4

**owned** 91:9

**owner** 90:11 173:11 294:22

**owners** 204:16 206:7 207:23

**ownership** 29:4,12 29:15,18 30:6 204:17 205:19 206:24 207:24

**p**

**p** 3:2,2

**p.c.** 3:4 5:14

**p.m.** 112:14 113:3 174:12,13 231:2,3 286:11,12 327:14 333:13,14 336:11 336:16

**p19** 27:5,7,11 30:12

**p20** 33:7

**p21** 40:20,24

**p22** 49:22,25 74:11 156:9

**p24** 89:6,7,10,15

**p27** 91:23,24 100:11

**p28** 96:22 97:8 102:5

**p29** 106:11,12,19

**p30** 106:11,13 107:12

**p31** 106:15,16 109:8

**p32** 122:24 123:7 174:21 182:2

**p33** 120:7,8

**p34** 208:23,24

**p36** 258:3,8 334:3 334:4

**p37** 187:19,20

**p38** 196:10

**p4** 66:19,20

**p52** 77:19,20

**p55** 80:2,3

**p56** 83:11,12

**p57** 84:14,17,23

**p58** 86:11,14

**p59** 92:20,21

**p60** 93:14,15

**p62** 253:2,3

**p64** 205:7,8,11

**p65** 204:18,19,24 205:16

**p66** 10:23 11:16 12:21 23:6 338:10

**p67** 45:2,4,9 338:12

**p68** 60:17,21 338:14

**p69** 79:8,12 338:16

**p70** 117:8,9 338:18

**p71** 118:23 119:3 338:20

**p72** 121:24 122:4 338:22

**p73** 139:17,21 148:13 150:25 162:2,23,24 312:20,21 313:2,3 338:24

**p74** 190:24 191:4 339:2

**p75** 199:15,19 339:4

**p76** 201:10,14 339:6

**p77** 203:7,11 339:8

**p78** 234:2,6 339:10

**p79** 241:25 242:5 242:7 339:12

**p80** 246:22 247:2 247:4 339:14

**p81** 254:9,16 339:16

**p82** 255:15 256:11 339:18

**p83** 268:15,16 287:15 339:20

**p84** 275:11,15 277:21 285:9 339:22

**p85** 299:3,12,14 339:24

**p86** 305:15,16,20 340:2

**p87** 315:9,17 340:4

**p88** 319:16,20 340:6

**p89** 324:23 325:3 340:8

**p90** 328:25 329:5 329:14 340:10

**p91** 331:17,25 340:12

**pacific** 252:13 273:2,3 335:17

**pad** 215:2 272:8

**page** 33:14 35:9 37:11 38:13 41:5 41:20 42:15 45:11 50:17 52:3,7 55:22,22,24 56:2 56:17,18,18,19,22 56:24 57:20,21 58:3 59:7 61:23 61:24 63:23 65:25 66:25 67:3 69:13 69:14 74:12 75:2 76:11 80:7 85:2,3 88:10,20 99:21 101:23 102:11 103:11 126:14,15 126:15 129:18 132:18,22,22 135:2 141:3 151:25 152:2 156:10 174:21,22 181:21,21 188:3,4 188:5,6 189:14 191:7,7,12,17 203:18 242:12 253:11 258:19 263:14,18 266:22

[page - period]                                                                                          Page 36

277:19 283:6
285:7 306:9 325:6
334:9,10,21,22,23
338:3,9 341:4
**pageant** 94:22
**pages** 57:8 187:24
188:2 242:9
**paid** 49:14 161:16
232:3
**paper** 56:14
209:13
**paragraph** 27:19
30:12 34:9 38:14
39:13 52:3 54:10
61:25 64:12,19
65:25 74:13 75:4
82:11 85:14 87:3
129:17 132:19
174:23 247:15
334:13
**parcel** 259:22
260:7 272:16
**parenthetical**
100:4
**park** 3:13 180:3,4
215:19 220:17
**parking** 150:5,6
240:12 248:25
249:4,8,9 250:4,7
250:11,18,19
252:5,12,15 273:9
273:10,12,17,25
274:9 282:17
283:23 284:11,21
286:21,23,25
289:8 294:25
331:10
**part** 26:6 30:20
130:4,9,13 159:3,4
163:24,25 169:13
172:10,12 181:19

184:7 212:5
224:25 264:20
272:4 281:21
**partial** 20:11 30:6
207:25
**participants** 2:12
**participate** 109:5
**particular** 40:12
139:6 167:22
173:3 184:12
210:17 221:9
244:14 269:12,16
304:6
**particularly** 91:5
237:8 238:25
**parties** 4:17 21:2
28:23,24 29:4,9
54:14 63:24 67:13
67:18 70:7,10
71:25 98:6 99:15
193:17 208:18
317:3 337:17
**partitions** 278:19
**partner** 91:11
189:19
**parts** 30:14 72:13
159:6 212:10,11
212:12,14 272:19
**party** 4:25 16:12
16:18,23,24 17:2,7
63:25 64:3 98:7
100:22 130:3
177:17 185:25
**pashma** 3:4
**pashman** 5:14
**pass** 13:18 68:4,14
**passed** 155:4
332:22
**path** 277:6
**patience** 146:25

**pause** 208:4,10
**pay** 67:24 69:6,21
100:17 129:22
147:18 161:8
177:2,6,13 178:25
179:19 215:22
229:10 235:3
236:9 244:20,21
259:19,21 260:4
260:16,18 261:18
261:21 262:3,14
262:24 263:4,6
270:23 290:16
291:6 294:22
295:5,6 296:12,21
304:21 305:2,3
**paying** 261:23,24
291:3,14 292:3
293:15 294:17
295:23
**payment** 64:2
298:21
**payments** 24:10
**pays** 68:2,20
**pdf** 55:24 61:24
277:20 285:8
**pending** 7:22 9:13
30:20,25 31:5
161:3 176:2 180:9
223:5
**people** 166:25
206:12,17,18
240:7 246:16
310:17
**percent** 16:9 29:24
58:10 74:17,18
75:8,9,15 127:9,16
127:19 128:10
155:2,8,12 156:22
157:7,9 158:3,14
158:15 160:11,12

161:8,15 162:11
169:9,24,25,25
170:2 171:25
172:7 200:11
228:16 265:9
271:6 287:12,17
287:20 288:22,24
313:23
**percentage** 16:6
29:13,14 58:12
75:24 76:8 129:21
130:13,21 131:12
147:13,19 173:3,4
173:15 197:3,13
271:10 288:20
**percentages**
196:23
**perfect** 308:18
**perfectly** 239:3
292:2
**perform** 20:7
57:25 89:21 90:4
240:17 257:4
**performed** 21:6
22:9 164:2 165:22
168:16 243:9
258:24
**performing** 20:23
21:3,7 23:19
63:19 238:4
**perimeter** 283:10
283:14,15,16,17
283:20
**period** 65:14
76:22 84:7 87:12
90:13 93:9 95:23
95:24 96:5 111:14
114:18,24 115:18
116:3 137:3,19
139:7,8 145:25
146:2 147:9,10

148:17 150:11
176:12 178:6,12
181:16 184:25
222:15 227:8
244:5 245:11
249:15,23 259:23
260:8,19,23 261:7
261:8,25 262:13
264:16 266:4,7
270:9 280:3,10
289:14,16,25
290:4 304:6
330:22
**periodic**  171:22
**periods**  59:16
    153:4 262:9
**permissible**
    133:19,24 134:19
    135:11
**permitted**  70:24
    81:10,12 273:20
    273:23
**perpetuity**  173:13
    259:21 260:6,22
**person**  110:20
    212:16 292:18
    311:8
**personal**  166:9
**personally**  22:17
    23:19 166:13,24
**pertinent**  72:13
    245:14
**perusing**  57:11
    156:15 200:4
    334:17
**phase**  9:18 84:21
**phone**  33:3 92:10
    92:11 202:18
**phrase**  28:22,24
    39:3,4 108:16
    264:16 270:19

317:12
**phrased**  184:6
**phrasing**  318:2
**physical**  56:10
    281:19
**physically**  133:19
    133:24 134:18
    271:18 314:7
**piece**  259:20 260:5
**pieces**  321:10
**pineapples**  251:21
**place**  136:18,22
    190:15 326:6
**plain**  228:8 278:15
**plaintiff**  1:5 3:5
    4:8 5:15
**plan**  23:24
**plans**  24:2 47:12
    252:18
**platform**  10:3
**please**  5:4,7 6:18
    6:20,24 11:12
    27:4,10 33:7
    40:19 45:8 49:22
    79:19 93:14 96:20
    106:11,15 118:21
    121:22 122:24
    136:19 166:21
    187:19 188:17
    196:10 208:23
    233:24 241:24
    253:2 254:13
    258:3 259:25
    299:14 336:8
**plumbing**  278:21
    278:23 279:2,7,14
    280:4
**plus**  297:6 298:21
**point**  23:18 29:17
    31:4 58:18 73:11
    105:12 111:3

125:9,10 161:7,14
    178:11 183:24
    195:13,14 205:2
    211:21 219:10
    230:20 316:13
    320:8 328:6
**points**  36:16
    252:13
**pole**  285:15
**pool**  77:4 114:11
    155:18 172:20,23
**portion**  37:10,11
    133:5,7 149:2,17
    150:14 151:8
    170:12 200:14
    248:24 249:3
    263:23,25 271:20
    272:13,25 273:8
    273:12,18 335:4,8
    335:14
**portions**  272:23
**position**  33:17
    192:24 194:5
    200:7,8 202:20
    218:23 318:12
    319:9 320:5,9,24
    322:4,25 323:15
    323:25 324:13,17
**possibility**  179:7
**possible**  36:17
    133:19,24 134:19
    137:2 164:20
    261:15 266:22
    314:19
**post**  285:16
**potential**  36:24
    48:3 49:9 58:2
    74:14 75:5 95:18
    97:19 99:16
    114:19 138:8,11
    176:4 181:12

184:24 235:16
    263:8 265:11
    306:21
**potentially**  93:11
    206:13 262:14
    265:7 267:17
    284:15 324:20
**practically**  17:25
    18:2,13
**practice**  14:22,25
    122:13 184:9
**pre**  285:15
**preceded**  96:4
**precedent**  17:19
**preclude**  206:20
**predominant**  76:7
**predominantly**
    75:23 91:13
**preexisting**  296:8
**prefer**  187:3
    208:10
**preference**  197:11
**preliminary**  42:13
    118:5 119:24
    182:7 183:21
    229:24 230:7
    247:11 248:6
**premise**  157:25
    199:4
**premises**  129:19
    130:11 152:4
    220:22
**preparation**  210:6
**prepare**  86:24
    255:20 257:2
**prepared**  32:16
    34:25 39:15
    123:11 234:17
    246:4
**preparing**  269:7

**present** 3:18 29:7
  121:10
**presentation**
  175:6 198:17
**presented** 64:23
  230:15
**presenting** 193:7,8
  198:10
**presently** 25:12
**preserve** 98:12
**pressured** 190:13
  190:16
**presume** 149:25
**presumptive**
  331:13
**pretty** 94:21 116:4
  202:20 288:11
**prevail** 194:13
  320:11
**prevent** 7:14 8:2
**previous** 257:14
  259:14
**previously** 12:22
  27:11 77:19 80:2
  84:14 86:10 91:23
  96:21 248:18
  320:14,17
**price** 46:5,17
  49:14 100:15
  149:11,13 176:25
  177:12 233:3
  251:15 252:23
  280:14 309:11
**priced** 251:25
  252:9
**prices** 46:18
**pricing** 252:20
  279:25
**primarily** 20:12
  23:24 38:2 148:19
  150:15 206:10

**285**:23 304:4
**print** 271:16
**prior** 19:16 20:18
  21:21 22:9 23:7
  25:9 53:4 86:25
  117:4 161:9
  191:16 193:9
  223:24
**private** 9:11 49:3
**privilege** 7:13
  98:12
**pro** 268:23
**probably** 16:9
  25:10 123:6 144:8
  209:10 264:11,15
  264:19 283:11
**problem** 11:9
  44:12 64:23 243:8
  243:19 245:4,15
  269:13
**problems** 44:4
**procedure** 191:18
  218:18
**procedures** 99:12
  210:2
**proceed** 5:11
  83:23 89:11
  218:14
**proceeding** 5:6
  99:13 192:12,14
  217:18 244:8
  267:8
**proceedings** 15:18
  122:14
**process** 17:8 31:6
  49:10 99:4 123:13
  183:11 185:22
  190:8 197:23
  201:18 203:16
  270:7 311:23
  312:7

**processed** 139:12
  263:11
**produce** 164:23
**produced** 9:17
  84:20
**product** 119:20
  140:8 168:5
  222:14 231:12
  232:7 240:6
**production** 9:21
  139:25
**productive** 133:20
  134:2,22,23,24
  135:19
**professional** 2:14
  11:4 14:8,21,25
  121:9 178:19
  259:17 260:2
  276:19,23 277:5
  277:13 337:8
**professionals**
  14:10,14
**profit** 298:8
**progress** 24:9,10
**project** 249:13,21
  249:24 277:10,14
**projects** 246:8
**promote** 14:13
**promulgate** 14:11
**properties** 23:10
  35:13 87:2 101:25
  142:12,19 143:4
  143:20,23 145:16
  146:20 214:22
  216:9 220:25
  224:2 232:15
  304:15,17 311:20
**property** 21:21
  31:11 34:14 39:9
  39:19 40:3 42:12
  43:17 48:16,18

**49**:7 50:18,22
  51:4,17 52:10
  54:23 55:9,14
  58:15 60:4 62:2
  66:4 67:22 69:2,2
  69:4,20 70:8
  80:18,23 85:17
  90:11,12 100:21
  102:13,19 103:5
  103:17,20 104:22
  114:16 127:3,5,19
  130:2 131:14
  132:7 134:15
  135:7 136:5,7,11
  138:13,18 141:22
  143:21 144:4
  145:17 146:14,23
  154:24 155:13
  173:6 176:6,7,9,18
  176:21,24 177:11
  177:16,21 178:2,5
  179:24 180:3,11
  181:16 182:12
  188:19 189:12
  205:20 206:9
  213:10,16,20
  214:17 215:6
  219:24,25 220:5,8
  220:10 222:20
  225:5,5,17,19,22
  226:13 231:11,13
  231:16,23 232:6,9
  232:22 233:3
  234:18 237:4,5,10
  237:15,17 239:12
  240:23 242:18
  259:4 260:17,25
  267:11 268:21
  272:3,19 280:7
  282:4 291:6
  292:18,20,23

293:9 294:23
297:8,10,12
305:10 306:23
312:2 314:8
316:16,21 325:15
326:24 331:3
**property's** 164:10
**proposal** 48:7
51:18 97:25
**proposals** 25:11
37:14
**propose** 203:21
**proposed** 23:25
51:15 86:12 89:12
175:3 240:9
300:12 301:17
316:12
**proposing** 285:19
295:18 301:14,19
**prospective**
231:17
**protect** 318:12
319:8 320:5,23
322:3,25 323:24
324:13
**prove** 229:10
265:19 297:20
298:9 309:19,19
**proved** 229:3
262:12
**proven** 298:20
**proves** 265:12
296:11
**provide** 6:16
14:14 20:20 24:8
35:15 57:13 58:24
66:8 102:8 135:13
276:24 306:2
**provided** 23:8,14
35:22 36:4,8
45:20 52:15 59:17

72:23 73:4,18
91:2 105:19
137:18 182:10
302:8
**provides** 67:21
235:2 276:18
**providing** 93:2
**provision** 67:21
70:7 193:5 204:7
211:13 212:6
**provisions** 18:4
31:12 72:5 132:13
165:17 166:2
322:15
**proximated**
115:17
**public** 2:16 5:23
14:15 336:25
337:9 341:25
**public's** 161:3
**published** 60:25
271:9 275:20
**publishes** 60:12
**pull** 27:5,10 33:7
40:19 43:24 45:9
49:22 60:14 66:18
77:18 79:25 83:11
84:13 86:10,17
89:5 91:22 92:20
93:13 96:21
106:11 107:11
117:6 120:6
121:23 122:24
139:16 156:4
196:9 205:7
208:22 241:22
252:25 255:14
256:24 258:3
268:10 272:21
308:17 319:15

**pulling** 89:15
309:4
**punished** 70:11
**purchase** 3:8
173:6,9 260:12
**purchased** 47:9
**pure** 158:2
**purely** 124:15
227:16 289:24
**purported** 299:23
**purportedly**
316:20 320:22
**purpose** 21:10
39:7 53:22 86:3
167:13,16 209:22
210:3 228:10
281:7
**purposes** 59:9
76:15 89:3
**put** 100:21 130:2
133:21 168:9
177:17,21 178:2
180:6 202:13
213:16 214:18
225:6,17,20
235:15 237:10,15
238:13,17 273:11
273:17 292:6
331:3

**q**

**qualifications** 11:4
**qualified** 15:12
**quality** 14:12,14
239:5,7 240:4
281:23 282:2
305:7,10
**quarters** 35:11
**queens** 22:23
152:6
**question** 6:17,19
7:15,16,22 9:13

29:10 30:22 42:23
48:15 62:23 68:16
73:23 78:22 81:7
106:23 125:8
136:20 138:15
145:22,23 176:25
177:25 186:17,21
187:4,5 233:17
256:9 259:24
288:12 295:16
302:3 318:13
324:8 334:16
**questions** 6:15,20
7:11 8:3,5 82:17
94:25 132:8 309:5
333:20,22,23
335:19,24
**quick** 192:17
213:18 214:8
217:5,7 225:22
268:12,25 282:7
287:9,16 328:23
331:5
**quickly** 106:22
126:13
**quite** 55:10 200:15
**quote** 31:11
129:21 130:6
326:21,22
**quoting** 130:5

**r**

**r** 3:2 5:21 113:2,4
337:2
**r6** 151:8
**r6b** 37:11,25 38:4
38:7 133:6 149:3
149:8,17 150:14
263:25 273:7,12
273:18
**ra** 76:3

| | | | |
|---|---|---|---|
| **rabsky** 206:3 | **reaching** 317:14 | **reasonable** 36:2 | 210:16,24 212:13 |
| **raise** 222:4 | **reaction** 77:14 | 229:12 244:9 | 212:25 219:8,9 |
| **raised** 125:8,9 | 108:23 109:3 | **reasonableness** | 235:14 256:6 |
| 222:5 | 121:4 315:5 | 236:8 | 272:22 283:24 |
| **ramp** 282:21 | **read** 57:9 70:5 | **reasonably** 243:25 | 285:2 314:21 |
| 284:23 | 72:12 103:10 | **reasoning** 72:4 | 315:6 316:8,9,10 |
| **ran** 176:20 229:24 | 105:19 126:2,11 | **reasons** 72:22 | 317:9 326:16,17 |
| **range** 95:14 96:10 | 156:12 165:7,8,9 | 98:25 101:5 138:2 | 327:7,10 330:8 |
| 157:5 197:17 | 167:5,6 200:2,3,5 | 241:4 | 335:10 |
| 229:2,7,8,12 | 200:17,18,19 | **rebecca** 306:8 | **receive** 9:19 |
| 247:17,23 248:6,8 | 201:4 203:4 | 308:22 | **received** 109:24 |
| 248:9 253:19 | 251:24 261:16 | **recall** 12:18 16:20 | 111:6 265:14 |
| 262:22,23 271:4 | 334:14 335:2 | 21:17 22:18 26:20 | 328:19 |
| 271:10 288:19 | **reading** 58:7 68:8 | 28:9,12 31:14 | **recess** 44:17 |
| 300:17 306:4 | 194:6,8 202:12 | 32:13,17,19,20,23 | 112:13 174:12 |
| 309:11 310:8 | **ready** 289:9 328:7 | 33:5 34:22 36:3 | 231:2 286:11 |
| 311:12 | 334:15 | 37:2,5 42:8,14 | 333:13 |
| **ranges** 300:3 | **real** 13:20,24 19:5 | 49:20 53:7,10 | **recognition** 139:4 |
| **ranging** 76:14 | 19:13 20:4,11 | 55:16 57:19 66:11 | **recognize** 11:25 |
| 304:9 | 60:11,18,25 65:24 | 66:17 67:7 69:8 | 160:23 332:6 |
| **rate** 129:5 155:8 | 86:23 91:8 242:2 | 77:9,10,13,14 | **recognized** 156:24 |
| 172:16 174:24 | 242:9 244:13 | 78:23 79:21,24 | **recognizing** |
| 176:13 178:16 | 270:22,24 271:4,7 | 81:7,8,14,25 82:16 | 110:11 135:5 |
| 179:25 269:22,25 | 288:2 297:18 | 82:19,23 83:5,7,9 | 144:3 157:19 |
| 270:2,5 | 338:15 339:13 | 85:10,19 87:14 | 161:2,2 |
| **rates** 154:5 172:24 | **reality** 115:8 | 89:14 91:4 92:10 | **recollection** 26:25 |
| 239:16,22 242:20 | 235:17 | 92:12,14 94:2,6 | 52:17 78:20,21 |
| 243:13 | **really** 29:23 92:12 | 95:11 96:5,8,12 | 81:3 84:3 92:18 |
| **ratio** 46:14 149:14 | 159:5 186:7 | 97:21 107:9 108:3 | 93:4 118:10,16 |
| 156:22 | 190:11 193:24 | 108:23 109:3 | 321:3,7 334:2 |
| **rationale** 47:11 | 263:12 267:21 | 111:4,4,8,16 118:4 | **recollections** 93:7 |
| 72:3 156:3 | 304:22 317:25 | 118:6,8 119:22 | **recommended** |
| **ratios** 168:23 | **realm** 20:22 | 120:3 121:17 | 316:14 |
| **reach** 134:25 | **realtime** 2:15 | 122:15,17,18,21 | **reconcile** 71:5 |
| 185:2,4,13 202:22 | 337:8 | 125:16 132:11,17 | **record** 4:3 5:5 |
| 217:20 218:12,13 | **reason** 6:18 7:20 | 140:23 185:20 | 44:16,21 112:11 |
| **reached** 78:7,10 | 7:25 98:25 124:8 | 186:3,7 189:4,6,9 | 113:8 174:10,16 |
| 129:6 150:18 | 167:19 170:8 | 189:13 192:2,6,20 | 230:25 231:5 |
| 229:15 254:24 | 242:25 270:6 | 192:22 194:25 | 286:9,10,15 333:7 |
| 267:23 | 322:20 341:4 | 195:12,20 200:11 | 333:12,17 336:10 |
| | | 202:9 203:2 | 337:14 |

recorded  4:7
  275:22
recoup  244:3
recovered  249:14
  249:22
redevelopment
  48:17 70:9
redid  327:19
redlined  315:22
redo  325:18 327:2
  327:23 328:13
redoing  222:21
redone  325:21
reduces  231:16
refer  133:11
reference  28:13
  36:25 332:17
referenced  61:13
  87:2 141:8
referral  21:24
referred  27:2
referring  16:23
  48:12 109:9
  144:24 174:19
  182:21,22 253:25
  327:15
refers  275:5
reflect  80:17
  138:25 139:2,3
  145:15 146:19
  170:4,9 223:15
reflected  57:7 59:3
  87:20 137:11
  163:22 248:13
  328:8
reflects  169:18
  173:4 329:11
  332:11
refresh  11:20
  52:16 81:2 84:2
  93:4 118:9,15

333:25
refreshing  56:5
refused  218:10
regardless  171:6
  172:22,22 215:16
  265:20 301:3
registered  2:14
  337:7
regularly  25:3,15
reimburse  270:24
rejected  204:3,11
related  4:24 20:7
  20:13,14 27:23
  28:23,24 29:3,9,19
  30:6 34:17 38:17
  54:14 67:13,17
  88:24 97:24
  337:17
relates  243:6
relationship  29:25
  206:18,19 207:8,9
relationships
  29:21
relative  12:12
  109:23 115:12
  119:16 182:24
  196:23 224:5
  310:10 311:21
  326:10 328:17
relayed  41:21
relevance  168:8
  168:15 170:21
relevant  49:6 59:5
  103:20 128:23
  129:4 152:5,9,23
  153:5 161:12
  170:8 172:17
  267:5,6 308:12
  311:22
reliable  166:10
  172:17,23 235:18

relied  167:6
  184:18
relying  166:24
remains  67:22
  266:6
remember  31:18
  33:2 49:15 65:18
  77:12 94:8 95:4
  108:5,8,15 109:7
  154:18 190:7
  192:4 202:17,19
  209:11 210:25
  222:8 262:23
remind  196:24
  197:17,21
reminded  197:25
remote  1:12 2:11
remotely  4:17 5:3
  6:24 256:2
remove  86:7
renamed  91:18
  269:5
render  231:18
renderings  240:16
renders  233:8
renewal  54:7,8
  329:22 330:4,22
rent  16:13,13,17
  16:19 17:3,8 18:9
  31:11 55:23 56:20
  57:4,14 58:2,8,10
  58:11,12 59:10,17
  59:22,24,25 60:3
  61:25 62:4,9,11,14
  62:18,20,25 63:3,4
  63:7,10 64:12
  66:5 67:2,20,24,25
  68:4,14,19 69:7,22
  70:3,17 71:8,9
  72:5,7,7 74:11,17
  75:8,14,24 76:21

82:5 85:17 92:6
  92:16 93:6,12
  94:13 95:10 96:10
  96:17,17 97:12
  98:4 99:5 100:6
  101:22 102:3
  104:14,16 108:10
  115:13 123:13
  126:22 129:5,21
  130:6,13,19,20,20
  130:22 131:11
  132:6 147:7,12,18
  147:25 149:22
  152:15,19 153:4,7
  154:4,7,9,10,20,25
  155:23 156:10,18
  156:24 157:9,24
  158:6,10,12,14
  160:5,10,14,17
  161:11,21 162:2
  162:24 164:6,7,9
  165:5,18 166:2
  167:3 168:15,17
  168:17,19,21,23
  168:25 170:9
  171:22,23 172:8
  172:16,21 178:24
  179:8 180:2,11
  183:12 184:5
  191:19 193:3,15
  194:6 195:14
  198:21 199:10
  203:20 215:15,21
  217:9 223:7
  224:14,19,21
  228:24 229:5
  230:13 232:2
  233:3,12 236:3,5
  236:17 238:15,16
  240:8,22 243:16
  243:21,23 244:21

244:25 245:16,21
251:17 253:15
260:22 261:21
262:3 265:7,9
269:10,22 270:5,9
274:21 281:2,3,13
289:17,18,24
290:5,7,15,17
291:3,6,8,15,23
292:4,8,10,13,21
293:19 294:17,18
295:2,14,25
296:13 297:6,9,11
298:6,9,21,22
299:9,17,22,23
300:22 301:5,9,17
304:9 305:25
306:20 310:4
311:13 313:6
330:14,18,19
**rentable** 300:2
**rental** 58:5 99:4
  100:8,12,14
  101:10,19 105:3,8
  105:11 123:12
  126:17 127:4,18
  151:23 159:20
  175:15 177:12
  178:18 179:17
  181:5 183:11
  185:21 213:9
  215:2 228:13
  231:21 237:5
  238:24 239:4,20
  239:21,25 240:2
  245:20 259:3,13
  260:13 269:10
  293:7
**rentals** 213:22
**rented** 214:11
  215:20 270:16

290:23 307:8
**renting** 290:22
  296:6,7
**rents** 162:19
  170:25 222:10,13
  224:22 231:22
  238:8,10 243:20
  243:20 247:22,23
  291:11,12 295:11
  302:16 311:15
**repeat** 11:12 30:22
  116:14 136:19
  226:7 233:17
  254:13 259:24
  285:4 324:7
**repeating** 139:3
**replied** 108:20
**report** 11:25 38:15
  39:14 40:5,7
  49:24 50:7,15
  51:13 55:23 56:3
  70:21 74:10 77:6
  77:8 78:6 79:2
  80:16 81:20 83:3
  83:6 84:15 85:2
  85:12,13 88:22
  91:2 95:18 114:20
  114:21 115:7
  116:20 119:23
  120:2,16,23
  123:11,23 126:15
  126:23 128:2,4
  129:9,11,18
  133:15 137:12,13
  137:24 140:9,11
  141:3,9 144:18,25
  145:2,3 151:9,10
  151:11,16,17,25
  152:20 153:15,16
  154:17 156:2
  164:8 166:24

167:8 169:12
174:20 181:21
182:3 185:19
191:17 197:2
199:9 210:11
214:16 219:7
220:24 221:13,14
221:22 222:22
226:23 228:14,23
230:16 234:17,19
235:14 248:13
253:21 256:16
257:23 258:4,15
258:18 259:14,14
261:16 263:14,15
266:17 267:5
272:21 281:13
314:12,20 316:20
320:21 325:18,21
327:3 330:9,12
334:10
**reported** 1:19
  72:10 115:11
  167:8 169:19
  314:18
**reportedly** 34:16
**reporter** 2:15,15
  4:20 5:10 6:9,14
  6:21 7:5 337:8,9
**reporting** 99:17
**reports** 24:9,10
  34:25 101:5
  119:13,16 127:22
  164:12 165:16
  194:15 196:21
  246:4 255:6,7
  322:8,16 329:18
**representations**
  34:21 36:15
**representative**
  128:11

**represented** 8:25
  37:14
**representing** 5:19
**represents** 9:7
**reputation** 186:12
  186:15,19,23
**request** 10:10
**requested** 52:14
  85:9 86:21,23
**require** 16:7 21:8
  180:2,3 243:11
  246:9 251:17
  252:8
**required** 18:3 62:3
  63:5 132:6 139:6
  146:19 175:25
  182:14 222:19
  250:3
**requirement**
  180:12 181:4,17
  249:10 317:2
**requirements** 95:8
  99:17 181:13
  249:2
**requires** 13:16
  25:19 26:13
  180:20 236:23
  237:25 242:15
  318:7
**research** 77:3
  224:3,13 228:24
  230:2 253:23
  309:4,17,18 328:4
**researching**
  253:15
**reserve** 333:21
**reset** 82:5 93:12
  153:4 156:24
  164:7 168:15
  172:2,8,17 199:10
  203:20

**resets** 58:12 59:11
59:17,24 95:10
108:10 154:4,9,20
161:21 162:2,25
164:6,9 165:5,18
166:2 167:4
168:17,19,19,21
168:25 170:9
171:23,23 262:7
**residential** 26:9
38:2,8 49:4 75:23
76:4 114:22 121:3
133:6 135:12
141:7 149:13,23
150:4,7,8 151:20
171:3 221:17
223:23 226:25
227:7,23 228:4
261:9 263:24
264:5,6,17 266:6,9
266:18,20,21,25
267:3 272:25
273:3
**residual** 25:18
101:8 116:9,19
117:3 139:12
140:15 144:5,10
144:14,17 148:7
150:2 209:12
221:23 223:6,10
223:18 228:10
229:3,9,18 231:9
231:10 233:7,14
233:19 234:20,24
235:7,18,22
236:12,22 237:18
238:5 240:18,20
241:7,12,14
242:14 243:2,9
245:25 246:3,9,12
247:12 248:11

250:5 252:2,10
253:14 255:21
256:20 257:3,20
258:20,24 259:5
261:19 262:4,13
262:23 263:2,5,7
265:12,17 267:16
267:22 268:13,20
269:2,8,11,18,24
274:21 281:5
282:7 287:9,16
291:4,10 292:7,11
296:11,12 298:9
327:24
**residually** 295:24
**residuals** 236:2
246:5
**respect** 182:11
**respectfully**
121:20
**respond** 191:22
326:10
**responded** 120:24
122:16 126:10
189:20 192:16
196:18,19 255:8
320:4 322:22,24
**response** 110:9
120:11 218:5
326:3,6
**responses** 326:9
**responsibility**
123:22
**responsible** 35:4
64:2 292:5,19
**restaurant** 52:11
215:21 217:10
225:23 331:6
**restaurants**
213:23 214:9,15
217:6

**restricted** 133:14
325:13
**restriction** 137:7
**restrictions** 51:21
**restrooms** 279:3,9
279:13 280:5,14
**result** 53:5 65:15
74:15 75:6 119:23
195:9,18 242:23
**resultant** 148:22
148:22
**resulted** 115:5
**results** 118:5
194:11 241:14
257:25
**resumed** 113:4
**retail** 37:22 76:6
114:24 115:9,12
115:15 137:15,16
137:18,20 147:11
147:21 148:19
156:20 157:4,6,21
157:23 158:2
160:25 213:19
222:12 227:10,18
228:25 230:13
239:9 249:6 250:2
250:4 252:5
253:18 261:10
264:5,19 266:7,12
270:14 271:15,17
274:2 277:9,22
278:3 281:7,10,16
281:18,20 291:11
291:13 293:14,19
299:9,22 301:4
303:3,10,13,16
305:3,6,7,25
306:20 307:10
308:21 309:24
311:13 312:5

331:10
**retain** 9:5 24:20
25:3,8 250:21
251:5 277:5
**retained** 9:8 25:5
25:11,14 89:20
90:4 97:11 98:19
273:20,24 336:14
**retention** 42:6
**return** 114:17,23
137:19 147:24
150:9 173:17,21
173:25 176:12
181:13 227:7,9
245:13 263:12
295:22
**returns** 133:21
236:10
**review** 23:25 24:2
24:9 35:8 89:21
119:16,20 135:8
203:22 286:19
**reviewed** 36:12
59:9 67:18 163:3
163:21 164:8,13
164:14 167:9
196:20 325:12
**reviewing** 164:3
316:9
**revise** 259:11
**revised** 83:2 84:15
85:2 223:5 255:7
256:19 258:14
326:11 329:18
**revision** 85:7,8
**revisions** 83:22
**reward** 294:5
**rewarded** 70:9
**rewriting** 105:21
**rezone** 70:8

**rezoned** 37:13 49:10 50:24 69:3 69:4,20
**rezones** 180:7
**rezoning** 30:21 31:2 48:6 49:3 56:23 70:12 75:13 160:19 175:3,12 178:4
**rib** 285:16
**right** 6:11 7:8 8:16 8:24 9:24 10:19 12:24 19:5 26:24 28:18 30:15,21 31:2,13,18 35:2,6 44:12 49:17 50:9 50:15,19,25 51:7 51:24 54:24 57:18 59:14 61:8,18,21 63:13 65:3 66:2 66:10 67:6,10,23 71:11,14 72:18 75:16 83:3 86:20 86:22 87:20 88:4 88:16 97:5,13 99:5 100:9 101:13 102:2,9,21 107:21 109:14 110:20 113:16 115:3,22 120:16 122:10 123:14,19,23 126:19,24 127:6 127:10,20 128:3 129:11,15 130:7 130:14 131:5 132:2,19 134:10 134:22 136:12,18 137:3,6 138:7,12 138:14 140:21 144:19,23 145:9 145:10 146:12 148:7 149:19 151:23 153:8,19 154:17 155:5,9,15 155:19 159:23 160:2,7 161:22 162:21 163:8 166:6,14 173:17 176:19,20,24 177:3,9,22,25 179:6,14 181:15 182:15,18 183:4 183:13 184:16,19 186:10 187:13 192:10,18 197:14 199:11 202:4,7,15 204:4 206:24 208:16,17,20 211:18 213:16 214:2 215:11 216:3 218:25 219:15 220:7 221:3,17 223:23 226:25 227:4,24 229:20 233:9 236:19,24 237:4 237:21 238:2,6,18 238:22 239:6,12 239:16 241:6,15 246:13 247:12,24 248:15 249:23 250:18 254:18 256:22 257:12,15 258:2,15,20 259:4 259:15 260:16,20 261:4 264:23 268:21 270:17 272:17 273:16 274:6,24 275:6 276:2,15 277:7 278:3,5,8,11,19,23 279:7,17 280:16 280:20 282:9,13 285:5 288:17 289:14 290:12,19 290:20,24 291:9 291:14,16,18 294:9 295:12 296:17 298:25 299:19,24 300:5,9 300:15 301:10,14 301:20,23,25 302:21 303:21 306:13 310:8 314:14 316:22 317:20 318:16 320:18,24 321:17 321:20,25 322:25 323:7,11,13,15 325:24 326:3 327:25 330:14 333:21 334:4,19 335:25
**rights** 48:3
**rising** 16:10
**risk** 298:4,11,14
**role** 24:19 192:25
**roof** 285:11
**room** 8:12 10:10 121:2 163:17 230:8
**rotate** 107:13 306:10
**rottenberg** 21:19 27:3,14 32:7 33:16 34:3,8 41:19 42:24 50:12 77:11 79:18 80:9 82:21 83:20 94:5 106:21,25 111:13 117:18 120:12 182:24 191:11 192:18 196:13 201:21 205:14 222:3 234:11 247:6 253:12 254:22 256:15 315:20,24 319:25 329:9
**rottenberg's** 184:2
**rough** 222:9 230:16 336:5
**roughed** 280:4
**roughly** 43:16 271:8 295:9 297:15
**route** 296:19
**row** 284:7
**rows** 169:21
**rpr** 1:20 337:25
**rule** 17:15 18:7 116:11,22 161:23 289:5 318:15
**ruled** 116:4 137:10
**rules** 182:15
**ruling** 105:16 106:5 108:17 117:2 180:25 318:3,6 319:13
**run** 163:5 296:25 297:2 298:8
**running** 222:8
**résumé** 11:5,24 16:11

**s**

**s** 3:2,16 5:21 113:2 113:2,2,4 278:5 281:24 341:4
**sail** 13:6
**sake** 229:6
**sale** 43:17 65:22 140:25 163:6 270:10 313:16

**sales** 54:21,25 55:2
71:4 99:25 129:10
141:5,6,19 146:16
159:22,25 161:13
234:22 235:19
245:17 264:22
265:21 269:20
270:7 307:14,16
312:12
**sam** 21:18,22 22:5
27:14 32:7,18,23
33:3 34:2 41:19
41:20 42:3 50:11
77:11 79:18 80:9
82:20 83:20 94:5
106:21,25 107:5
110:25 111:13
117:18 120:11,16
120:22,23 121:16
122:8 131:18
182:23 184:2
188:18 189:11,17
191:11 192:18
194:21,24 195:21
196:13 201:21
202:6 203:15
205:14 210:8
222:2 229:16
234:10 247:5,10
253:12 254:22,25
256:15 277:6
315:20,24 319:25
329:9
**sam's** 121:4
**save** 56:14
**saved** 209:6
**savings** 263:9
**saw** 131:19 224:23
**saying** 108:8,24
109:17 150:22
151:5 157:17

158:17,25 160:13
160:15 166:17
178:9 179:12,16
181:9,11 186:6
200:16 211:9
214:7 225:25
226:4 232:12
235:10,13 248:17
256:3,6 265:3,4
296:10,11 326:21
**says** 12:4,22 13:19
16:11 31:14 37:7
39:14 42:19 50:17
52:10,13 56:22
59:8 61:25 63:24
66:3 68:9,13
69:14 75:4 83:21
86:20,23 87:3
88:10 99:21
100:12 101:3
102:12 125:25
151:25 153:15,17
169:6,23 177:5
179:18 236:17
237:3,4 242:14
268:6 278:13,18
278:22 279:8,14
279:16,19 285:10
304:12 307:22
308:16
**scenario** 58:17
291:2 293:6
**scenarios** 51:11
54:24 245:22
**schedule** 117:23
**scheduled** 201:19
201:20 208:19
218:20
**schedules** 117:25
**schleider** 91:10

**scope** 55:4,20
80:21 85:15 99:8
99:19 335:21
**screen** 8:20 11:18
**screens** 8:16
**searched** 65:10,12
65:19
**second** 11:7 17:9
17:10 27:19 30:17
30:23 32:4 35:9
38:13,13 41:5,20
43:25 45:11 52:4
57:21 58:3 59:8
65:25 107:21,24
111:14 113:13
116:11,22 117:21
125:19 129:17
130:4 131:17,25
156:8 159:3
160:15 177:24
180:14,20 191:7
203:17 212:6
222:17 239:24
318:3,6,11,16
319:13 320:17
334:8,10
**secondly** 116:6
156:19 160:22
**seconds** 321:8
**section** 67:2,20
68:24 223:4
258:19 266:17
283:5,6
**sections** 68:22
**see** 27:17 28:3
34:18 37:15 39:22
42:18 43:23 45:16
56:21 62:5 66:6
74:19 75:10 79:19
80:10 87:6 92:7
94:11,22 102:16

108:18,21 120:13
128:6 133:8
134:20 135:18
137:2 140:4
141:18,20,24
152:7 162:3,7,15
163:17 171:25
175:16 188:8
191:20 197:5
201:23 203:23,25
205:5 206:16
207:7,9,16 247:19
249:16 252:20,22
261:17 277:23
279:4,10 280:18
284:8 290:4 305:6
306:22 314:6
316:6,17 320:2
327:25 333:5
**seeing** 66:17 67:6
86:5 97:2 128:17
163:4,5 187:25
**seelig** 3:11 5:18
**seen** 65:9 66:15
90:16
**selected** 197:18
**selection** 188:16
226:10
**sell** 173:12 243:18
244:18 245:9
249:12,20
**semantics** 220:19
**send** 119:12
188:17 253:20
310:6,7,22 311:5
336:5
**sending** 316:10
**sense** 14:13 26:12
232:17
**sent** 9:15 27:14
42:24 45:18 56:12

78:16 79:21 80:13
92:5 93:6 95:20
95:25 97:17 107:4
107:20 108:6,19
108:22 113:13
119:5 120:16,17
126:9 205:3,14,15
234:16 308:7,10
311:10 314:11
315:20,25 316:3,4
319:23 320:14,17
325:8 329:8
**sentence** 39:14
46:22 52:5,5,13
59:8 63:22 101:2
130:4,10,21
334:13 335:3,6
**sentences** 132:14
**separate** 22:10
30:14 140:16
274:15
**september** 1:15
2:8 4:4 315:21
319:24 329:7
337:22
**sequence** 186:2,8
**sequentially**
315:24
**series** 319:22
**seriously** 61:21
**serve** 97:11
**served** 16:11,15,19
17:7
**service** 213:19
214:9 217:6,7
225:22 275:10,12
275:21 331:5
339:23
**services** 14:12,15
20:13,14 23:15,22
23:25 24:22 89:18

89:20 91:7,17,19
182:11
**serving** 186:4
**set** 17:19 62:11
76:20 83:24 84:10
104:14 172:11,12
172:24 337:12,22
**settled** 202:23
**seven** 15:10
301:18
**shaped** 272:16
334:20 335:15
**share** 8:22 10:3
40:23 139:16
**shared** 29:14
35:19 42:10 49:21
52:24 87:8 306:5
**shares** 29:4,12
**sharon** 186:4,9
188:13 191:23
193:5,24 196:15
198:15 199:21,23
201:17 202:22
211:9 213:7,12
218:9 227:15
255:7 325:14
**sharon's** 186:12
194:7 200:6
218:22 220:24
225:2,11
**shaun** 27:15 33:23
34:23 35:24 41:20
45:14,19 47:13
50:14 53:11 65:17
78:4,7,24 79:17,19
80:8,14 81:9
83:20,21 92:6,25
93:25 110:25
123:18,25 124:11
234:11 306:7

**sheet** 268:23,23
270:13 274:24
282:6 284:6 287:9
341:1
**shift** 151:8
**shifted** 147:11,21
**ship** 13:13
**short** 116:5 236:11
262:13
**shortened** 144:15
**shorter** 76:22
144:5 260:23
**show** 10:5 60:8
169:5 184:21
298:2
**showed** 262:23
**showing** 8:22 10:2
42:25
**shown** 144:6
242:25
**shows** 262:24
**shy** 265:8
**side** 66:2 212:22
307:6
**sided** 56:14
**sides** 211:7 212:19
**siding** 278:15
**sign** 217:20
**signals** 6:22
**signature** 33:13
337:24
**signed** 33:14 34:24
50:15 123:19,21
170:6,20 171:21
185:11,12 327:17
**significant** 58:20
60:9 128:25 129:2
174:25 196:3,6
226:17 248:23
263:9

**significantly** 51:13
245:2 250:3,9
252:16 303:12
**similar** 14:20 16:2
59:3 81:15 121:19
154:6 215:19
220:16 229:23
235:13 257:24
258:22 269:17
309:21 331:6
**similarly** 141:6
**simon** 205:24
**simple** 27:24 37:9
40:17 50:18,21
51:8 54:23 55:6,8
70:24 80:17 81:11
81:13,19 88:18
141:19 142:2
147:7 151:6
194:16 195:3
228:8 241:9
251:15
**simpler** 26:17 57:2
74:22
**simplicity's** 229:6
**single** 46:15
115:15 137:16
243:24 272:3
274:19 281:10
291:12 302:23,24
305:6
**sir** 6:6 8:6 11:7
12:3,25 13:22
15:7,10,24 17:13
19:22 21:14,17
22:9,12 23:12
24:16,18,23 25:2
27:12,18 28:4,8
32:9,25 33:5
34:19 35:7,14
36:5 37:16 39:23

41:8 43:11 45:17
47:19 50:6,10,16
50:20 51:2,8,25
52:6,12 57:5
61:19,22 66:7
67:11 68:16,21
71:15 72:19,21
73:2 74:25 75:11
75:17 77:16 78:9
80:11 87:7 89:4
89:23 90:2,6,24
91:5,21 92:8
93:23 94:16 96:19
97:9,14 98:21
99:6 102:6,17
107:16,22 111:16
115:8 117:16
118:14 120:14
121:14 123:17
124:14,17 126:25
127:7 129:12,16
130:8,15 133:9
134:7,11,17 136:6
136:13 137:4
140:5 141:2,10,14
141:16 144:20
145:4,7 151:24
152:8,12,17 155:6
155:10,16,20
160:3 161:24
162:8,22 165:11
172:5 175:17
182:19 184:13,17
184:20 185:17
186:11 187:14,17
191:9,21 192:19
192:21 197:6
199:12 202:16
204:2 205:6,12
208:21 219:17
227:2 237:22

238:3 239:13,17
246:10 247:13,20
249:17 250:6
251:10,12 253:9
256:23 257:10
258:16 272:6,18
273:14,20 274:14
274:25 275:7
276:16 277:15,18
277:24 278:6,9,12
278:16,20,24
279:5,11,15,18,21
279:25 280:22
282:14 283:21
285:25 293:25
297:23,25 299:20
299:25 300:6,10
300:20 301:15
302:2 303:20
316:7,18 320:19
321:14,18,21
322:2 323:8 324:3
325:25 327:20
334:25 335:8
**sit** 48:10 267:13
**site** 24:8 27:20,25
30:15 37:10,11,12
37:13 46:11,14
49:2 50:24 51:15
55:10 114:20
115:16 133:5,7,20
133:22 135:14
148:16 149:2,3
156:20 157:2,20
157:23 163:6
214:18 215:19
219:25 221:9
223:16 226:9
227:18 232:18
233:16,21 234:25
235:9 245:6

248:24 249:4
250:22 252:6
263:24 264:2
270:15 271:14,17
271:18,21,23
272:13,14,23
281:19 285:19
290:18 292:6
296:24 301:14
302:16 312:24
331:8 334:19
335:4,15
**sites** 45:23,24 46:4
46:7,10,12,14,20
46:23 48:2,3
141:6,7,8,11
266:18 313:4
**sits** 314:8
**sitting** 183:24
**situation** 180:22
222:18
**six** 16:20,22
289:11,18 290:7
290:15
**size** 149:4 249:14
249:22 284:11
287:2 301:3
303:16 304:9
**sizes** 303:5,14
**sketch** 252:18,19
**sketched** 283:18
**skill** 264:21
**sl** 202:12
**slid** 76:5 157:4
**slide** 163:13
**sliding** 75:24
**slight** 264:19
**slightly** 39:10
267:17
**sliver** 273:4
335:10

**slow** 40:23 97:5
**slt** 1:7 4:14
**small** 213:22
222:12 241:12,21
242:22 273:4
284:16,17 335:10
**smaller** 300:23
**soft** 231:18 249:11
251:6 287:12,17
287:20 288:3,5,8
288:11,13,14,20
288:20
**sold** 141:13 142:19
143:4,6 145:16
245:7
**solve** 202:21 224:9
224:19 232:2
243:11,22 293:7
**solved** 244:7
**solves** 231:15
291:23
**solving** 231:21
239:20 243:15,19
243:20 244:17,19
244:25 245:12,15
269:9,10 270:8
293:18 302:22
**somebody** 197:12
298:4 332:18
**somewhat** 47:10
**sophisticated**
259:18 260:3
**sorry** 41:2,12 44:2
56:5 83:8 90:23
97:4 111:15
118:14 125:8
132:21 148:4
152:12 158:20
162:23 178:21
181:25 188:4
204:21 235:23

252:10 273:2
280:25 287:15
297:14 312:25
324:3 325:10
329:12 331:24
**sort** 23:20 29:6,13
36:6 70:10 98:24
145:15 206:8
207:2 240:4
246:11 308:18
318:4
**sorts** 11:5
**sought** 106:7
152:15
**sound** 7:7 107:24
**soundness** 144:12
**sounds** 70:6
293:12
**source** 14:17
**south** 180:4
**space** 238:15
249:2 252:6
281:16 291:17
296:13,14,24
300:12,22 302:10
303:3,16 304:3,5
305:3
**spaces** 249:5
250:11,19 274:15
286:23,25 293:15
300:9,24 301:2
**spans** 9:21 79:16
234:8
**speak** 43:18 73:18
77:7 168:5 186:14
186:23 187:10
318:2 326:15
**speaking** 6:25 7:2
7:6 78:24 81:9
188:13 244:17

**speaks** 181:19
**speccing** 235:16
**specific** 18:3 38:22
49:7 64:20 89:3
108:11 240:16
244:22 283:25
**specifically** 17:21
28:5 32:23 55:17
94:14 99:3 108:14
130:10 320:7,13
**specifics** 43:18
104:17 159:20
**specified** 32:14
37:24 190:19
225:20
**specifies** 99:11
**specify** 108:14
152:21 190:20
240:10 274:17
**spectrum** 29:20
**speculate** 59:6
72:25
**speculative** 244:24
**spent** 126:7
**split** 302:10
**spoke** 32:18,22
33:4 77:10 92:15
105:12 107:18,23
126:11 167:14
185:6 218:9
**spoken** 107:5
188:18 189:11
196:15 210:14
**spot** 284:11
303:15
**spreadsheet**
139:15 140:13,19
148:12 150:25
151:4 162:6,18,21
163:23 165:21
166:5 167:3

169:20,21 170:12
199:11 268:12
287:9,16 299:8,16
299:22 300:7
304:8 312:22
**square** 22:20 46:6
46:17,18 69:8,9,18
149:7,9,11 175:9
243:23 247:16
249:2 250:11
252:11 253:19
261:6 270:14,16
271:5,14,22,24
272:3 274:2 275:4
278:11 280:14,15
283:23 286:20,24
292:4 294:23
296:22 297:19
299:18 300:2,3,4,8
300:9,14,15,18,22
301:8 303:3 304:9
304:10 306:4
307:8,18 310:8
311:12 331:10
335:5,9,11,13
**squared** 44:5,10
**sr** 202:11
**ss** 337:4
**stabilization**
231:15
**stacy** 3:22
**staff** 253:14
309:17 311:18
328:3
**staircases** 282:22
**staked** 319:9
**stamp** 44:24 56:25
67:3 85:4 174:22
234:9 334:11
**stand** 13:13

**standard** 39:25
99:23 100:23
103:12 122:13
176:3 224:11
259:9 262:17
**standards** 14:18
14:20,21,23,24
15:2
**start** 7:2 106:19
232:7 239:25
243:21 270:13
327:24
**started** 328:4
**starting** 239:19,24
**starts** 7:4 258:6
**state** 2:16 5:4,7
18:5,14 34:7
36:11 80:23 131:6
141:4 154:18
157:15 330:6
337:3,10
**stated** 28:19 39:21
102:15 103:19
154:23 212:3,4
265:14 305:11
320:7 330:7
**statement** 25:10
182:20 289:20
326:18,19 327:6,9
**statements** 182:22
**states** 1:2 12:5
15:3 84:5 100:22
103:14 130:25
204:6 321:3 323:2
323:5
**stating** 330:2
**status** 255:2
**stay** 104:21
**stayed** 259:4
**stays** 147:17

steel 285:22
stein 3:4 5:14
step 224:13 232:24
steps 58:11
steve 91:10
stop 11:7 185:24
　227:12 230:19
storage 220:16
store 220:17 279:9
　279:20 280:13
　289:10 290:21
　291:2
stores 277:22
　278:3
story 26:4,14,18
　115:15 137:16
　243:24 252:4,21
　281:10 282:24
　283:3 291:12
　305:6
straight 225:8
street 171:4
　303:17,21 307:5
　307:13,17,17
　308:16 312:11
　313:5,8 314:5,8
stressed 157:2
stretches 19:16
strike 104:7
　178:21 245:23
striking 316:14
　317:2 323:24
　324:13
strong 75:12 155:3
　246:18 281:17
struck 318:21
structure 285:11
structures 271:18
stucco 278:14
stuck 331:4

studies 20:8
studs 285:22
study 37:15 50:25
subject 21:20
　34:14 39:15 40:3
　51:15 52:10 55:10
　58:5 62:2 65:5
　66:3 73:8 74:16
　75:7 80:18 85:17
　108:19 114:15
　129:20 130:12,23
　131:11 133:3
　136:7 182:11
　215:6,17 221:6
　263:22 310:21
　312:10 334:19
subject's 132:24
　175:7 221:11
　263:18
subscribed 336:21
　341:22
subsequently
　45:20
substitute 285:13
subtle 161:10
suburbia 252:22
success 70:10,11
successor 19:15
suggest 131:8
　195:7,17 203:21
　222:21 228:18
　277:13,16 311:11
　317:2
suggested 100:2
　119:10,18 131:13
　217:24 218:4
　221:13,21 277:7
　316:4
suggesting 193:25
　302:12 308:13

suggests 42:24
suite 3:7 8:10
summarize 170:11
summarized 164:9
　165:25
summarizing 68:9
summary 165:17
　200:6
summation 192:5
　329:16
supplement
　253:22
supplementing
　221:22 222:22
support 228:12
　247:17,23 248:8
　257:4 268:7
　271:14
supported 144:14
　229:9 265:17
　306:3
supportive 197:3
　197:12 256:20
　259:8
suppose 111:23
supposed 145:12
　192:13,15 194:9
　195:3 321:23
　323:23 324:12
sure 6:25 9:24
　23:24 26:10 47:10
　48:11 52:6,20
　55:9,11 61:14
　69:16 70:22 81:6
　100:11 116:15,18
　127:13 140:10
　143:17 156:6,14
　167:12 185:24
　190:19 200:15,16
　219:3 225:8 287:6
　294:8 298:15

311:16 315:16
　332:13
surface 252:14
　311:24
surmised 17:20
surprised 211:2
　262:19 314:22,24
　315:3
swear 5:10
swift 275:5,18,19
　276:20
switch 163:16,19
sworn 5:22 6:8
　336:21 337:13
　341:22

| t |
|---|

t 5:21,21 113:2,4,4
　337:2,2
tab 140:24 162:2
　162:20,25 165:21
　166:5 167:2
　169:21 199:10
　304:7 313:14
table 164:22
　171:22 283:11
tabs 163:5
tail 335:16
take 6:21 7:6,21
　44:2 61:20 64:21
　108:17 111:22,23
　112:4 123:22
　145:9 174:6
　191:18 194:22
　209:4 230:21
　245:10 257:16
　286:2 289:7
　290:14 298:4,11
　298:14 301:10
　311:24 313:22
taken 4:8 36:14
　44:17 112:13

| | | | |
|---|---|---|---|
| 130:14 174:12 | 246:9,19 257:3,21 | 302:13,18,23,24 | 93:1 94:1 95:1 |
| 199:4 231:2 | 263:2 | 307:23 330:4 | 96:1 97:1 98:1 |
| 286:11 291:20 | **techniques** 25:18 | **tenant's** 100:19 | 99:1 100:1 101:1 |
| 333:13 | 131:22 246:12 | 129:24 177:15 | 102:1 103:1 104:1 |
| **takes** 289:16,18 | **telephone** 32:20 | **tenants** 181:6 | 105:1 106:1 107:1 |
| **talk** 64:4 68:23 | 53:13 201:20 | 214:20 270:23 | 108:1 109:1 110:1 |
| 84:25 93:5 130:23 | **tell** 6:11 23:2 28:6 | 289:9 293:14 | 111:1,21 112:1 |
| 158:11 167:12,21 | 50:4 56:23 69:13 | 295:3 301:12 | 113:1,12 114:1 |
| 239:23 244:10 | 70:4 74:5 85:11 | 302:7,10,14,19 | 115:1 116:1 117:1 |
| 274:9 | 87:23 94:20 95:14 | 303:10 | 117:13 118:1 |
| **talked** 36:22 | 96:15 110:25 | **tend** 46:18 157:4 | 119:1 120:1 121:1 |
| 237:24 325:14 | 125:4 164:22 | **tener** 1:13 2:12 4:7 | 122:1,24 123:1 |
| 326:23 | 165:16,24 188:22 | 6:4 7:1 8:1 9:1 | 124:1 125:1 126:1 |
| **talking** 7:5 102:23 | 194:21,24 195:15 | 10:1 11:1,3,17 | 127:1 128:1 129:1 |
| 180:8 181:18 | 208:16 242:10 | 12:1 13:1 14:1 | 130:1 131:1 132:1 |
| 204:8 216:24,25 | 247:10,14 274:4 | 15:1 16:1 17:1 | 133:1 134:1 135:1 |
| 244:23 251:18,23 | 284:4 306:15 | 18:1 19:1,9 20:1 | 136:1 137:1 138:1 |
| 252:3 289:22,23 | 308:2 312:16 | 21:1 22:1 23:1 | 139:1,24 140:1 |
| 291:7,9 303:19 | 328:2,11 329:10 | 24:1 25:1 26:1 | 141:1 142:1 143:1 |
| **talks** 54:11 68:25 | 334:15 | 27:1 28:1 29:1 | 144:1 145:1 146:1 |
| 85:18 99:3 131:3 | **telling** 81:14 111:8 | 30:1 31:1 32:1 | 147:1 148:1 149:1 |
| 266:17 321:10 | 165:3 199:23 | 33:1 34:1 35:1 | 150:1 151:1 152:1 |
| **tantamount** | 224:12 247:21 | 36:1 37:1 38:1 | 153:1 154:1 155:1 |
| 105:21 109:18 | 267:2 | 39:1 40:1 41:1,19 | 156:1 157:1 158:1 |
| 110:17 317:11 | **tells** 159:17,18,19 | 42:1 43:1 44:1 | 159:1 160:1 161:1 |
| **targets** 271:11 | 237:8 | 45:1,8 46:1 47:1 | 162:1 163:1 164:1 |
| **task** 64:20 | **tenancy** 290:10 | 48:1 49:1 50:1 | 165:1 166:1 167:1 |
| **tax** 163:6 263:9,10 | 303:13 | 51:1 52:1 53:1 | 168:1 169:1 170:1 |
| **taxable** 43:15 | **tenant** 100:17 | 54:1 55:1 56:1 | 171:1 172:1 173:1 |
| **taxes** 263:11 | 114:2,15 129:22 | 57:1 58:1 59:1 | 174:1,19 175:1 |
| 270:22,24 271:4,7 | 138:17 139:5,8 | 60:1,23 61:1 62:1 | 176:1 177:1 178:1 |
| 271:10 288:2 | 144:3 161:7 176:8 | 63:1 64:1 65:1 | 179:1 180:1 181:1 |
| 297:19 | 177:6,10,13 | 66:1 67:1 68:1 | 182:1 183:1 184:1 |
| **taxpayer** 240:12 | 178:12 179:19 | 69:1 70:1 71:1 | 185:1 186:1 187:1 |
| 243:24 251:15 | 214:11 215:2 | 72:1 73:1 74:1 | 188:1 189:1 190:1 |
| 252:11,20 261:7 | 220:2 263:13 | 75:1 76:1 77:1 | 191:1 192:1 193:1 |
| 261:18 | 270:23,23 273:21 | 78:1 79:1 80:1 | 194:1 195:1 196:1 |
| **taxpayers** 252:21 | 274:19,19 280:5 | 81:1 82:1 83:1 | 197:1 198:1 199:1 |
| **technique** 99:24 | 290:13,25 291:2 | 84:1 85:1 86:1 | 200:1 201:1 202:1 |
| 100:24 101:9 | 294:14 295:23 | 87:1 88:1 89:1 | 203:1 204:1 205:1 |
| 223:10 236:22 | 298:6 300:11 | 90:1 91:1 92:1 | 206:1 207:1 208:1 |

209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1,8
232:1 233:1 234:1
234:10,13 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1,5
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1,17
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1,18
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1

326:1 327:1 328:1
329:1,7 330:1
331:1 332:1 333:1
333:19 334:1,7
335:1,19 336:1,3
336:12,19 337:11
338:4 341:3,21
**tener's** 325:12
**tent** 238:14
**terence** 19:9
**term** 28:17 34:13
34:15 39:11 43:6
43:10,12 49:19
57:18,19,23 76:13
87:5,17,19 100:15
101:15 105:15,17
105:23,25 109:20
114:3,4 116:5
128:5 136:3,12
137:9,10 138:6,16
142:10 143:14
144:15 146:15,24
147:6,21 148:10
149:18 152:18
153:14,19 154:11
154:12,16 155:5
176:16 177:2,9
210:9,17 211:8,10
211:17 212:8
221:18 223:25
227:4,13 228:4,6
232:2 240:15
247:18 258:25
261:14 262:5
263:16 264:4,14
267:7,11 288:14
289:19 292:21
301:16,21 307:11
316:24 317:16,23
320:23 328:8
329:22 330:3,4,13

330:18,20 331:4
331:13
**terminates** 68:24
**terminology**
159:11 214:25
**terms** 36:23 37:2
41:25 43:16,21
71:2 81:10 95:9
114:14 121:8
131:15 145:22
152:5 154:6 164:7
168:4 177:3
220:21 241:10
318:5
**terracrg** 91:3
234:17,19 235:14
**terry** 22:18,19,22
246:15
**test** 134:20 135:18
237:19 252:8
269:17 280:17,22
**testified** 5:24
15:15 16:5 107:19
113:5 153:6 170:7
171:5,13 197:7
198:4 215:25
222:25 246:2
321:7 323:9 335:3
**testify** 15:12,19
217:23
**testifying** 171:17
**testimony** 15:17
16:4,8 25:19 64:5
64:11 153:23
154:3 179:10
216:7 257:19
305:5 336:12
337:15
**testing** 13:17,18
236:8

**tests** 134:3
**text** 61:12 264:14
**thank** 41:7 71:17
107:14 146:25
163:18 174:8
204:9 230:23
284:8 329:15
332:3 333:10,18
333:24 335:18
336:2,3
**thanks** 6:7 44:14
112:10 188:21
336:9,15
**theory** 243:8
**theresa** 21:25
22:19 26:22 27:15
27:22 28:5,15
164:3,11 165:5
167:12,14,21
184:15 185:6
234:11 332:14,21
**theresa's** 169:11
**thing** 7:21 65:17
101:11 121:21
185:20 233:6
244:9 255:9,11,23
308:15
**things** 37:9,20
95:2 99:14 121:7
121:11 161:4
220:18 232:4
257:12,15 288:4
306:21 308:11
310:22 328:23
329:20
**think** 18:20,24
28:7 29:2,17 30:5
34:5,6 35:24,25
38:9 40:13 47:21
66:11,12,12 72:22
78:12 82:2 85:21

86:4,4,5 90:6,19
93:25 95:4,22
96:3 104:25
108:19 122:20,21
125:18 126:7,8
140:18 142:22
145:21 146:5
152:13 153:16
159:8 167:19
173:8 177:4,5
180:8 181:17
185:8 186:22,23
189:2,24 191:13
193:2 194:25
195:24 197:15
198:12,14,19,23
199:3 200:10,13
203:24 205:22
206:17 210:12,13
211:9,10 212:19
213:11 214:25
226:10,11,15
233:6 236:10
240:24 248:11
253:16 255:5,19
255:25 256:2,5
264:12 267:13
270:19 276:22
281:17 289:20
304:19,22,23
306:15 309:9
310:17 317:12
321:12 323:12,14
323:17,25 326:8
331:12,16 332:13
332:20,23 333:6
334:3
**thinking** 262:11
**thinks** 203:3
**third** 13:10,14
20:25 30:11 31:8

39:18 52:5,13
61:24 99:16
132:18 185:25
188:17 189:23
190:14,21 192:25
193:9,10,18 194:2
195:8 198:11
202:3 203:16
210:2 249:12,20
325:6 334:9,12,18
**thirds** 99:20
**thomas** 1:13 2:12
3:19 4:7,18
336:12,19 337:11
338:4 341:3,21
**thought** 94:23
110:8 113:15,18
114:24 146:8,10
147:2 157:11
194:8 200:16,23
209:24 210:3
217:23 248:7
256:8 277:11
280:8 289:6
298:12,19 309:20
312:9 321:8
323:10,21 324:10
324:14,17,18
**thoughts** 73:7,10
**thousands** 23:9
**three** 30:13 35:11
37:9,12 58:9
141:5,8,11 142:12
162:12 176:10
177:3 182:13
194:10,14 195:10
198:7 200:23
201:3 203:22
244:8
**threshold** 29:13

**thrown** 312:3,6
**thumb** 289:5
**thursday** 117:25
199:25 325:12
**tile** 278:18,19
**time** 5:7 7:7 10:20
15:16 21:15 22:4
23:13,18 25:7
31:4,7 42:9 44:15
44:19 52:19 53:17
53:18 54:16 58:18
59:16 60:6 61:8
65:14 66:14 67:5
69:10 71:22 73:23
76:22 84:7 87:10
87:25 88:7 90:7
90:13 92:14 93:9
94:19 95:24,25
96:5,15 98:20
104:6,8 111:13,21
113:3,6 114:18
126:8 128:13
144:16 145:25
147:9 148:18
156:12 161:7,9
173:10,24 174:9
174:14 178:12
184:8 190:14,20
202:11,13 204:15
210:23 224:3
230:19,24 231:4
235:25 245:12
259:23 260:9,20
260:23 262:14
286:9,13 290:4
292:15,16,17
293:3 302:21
304:6 314:19
333:11,15,19,20
336:3,16

**timeline** 107:9
190:17
**times** 15:11,19,25
16:3,14,20,22
22:20 297:19
310:21
**timing** 81:6
175:11 328:17
**titled** 167:3 277:21
**tl** 202:11
**today** 6:5,7,16,24
7:20 8:5,8,13,25
10:2,6,12,15 68:7
68:18 325:11
333:19
**today's** 336:11
**told** 22:21 28:15
28:16,20 42:17,21
54:18 87:17 88:25
109:10,11 121:19
136:23,24 160:14
188:24 189:6
190:8,9 213:12,17
224:9 229:18
249:18 250:15
277:3 314:15,21
317:18 318:8,15
321:4 326:22
**tom** 21:19,22 22:5
33:14,15 34:2,5
41:18 45:14,22
47:4 77:11 78:4,7
78:24 79:17,19,21
80:10,12,16 82:21
92:5,15,25 93:4
111:13 201:22
202:6 205:3,13
210:8 234:10
325:12
**tomorrow** 83:22
188:13

[top - unknown]                                                                Page 53

| | | | |
|---|---|---|---|
| **top** 57:20 59:7 | 309:22 322:25 | 257:11 260:11 | 138:4 146:13 |
| 76:11 83:16,19 | **trying** 47:22 57:12 | 262:10 270:6 | 148:6,8 149:15 |
| 84:25 234:9 285:9 | 70:8 78:23 94:23 | 307:4 312:7 | 150:24 158:4 |
| 325:5 327:11 | 103:9 145:8 | 328:22 333:6,7 | 159:2 169:23 |
| **total** 336:13 | 146:12,22 148:5,8 | **twofold** 63:6 | 190:2 206:25 |
| **track** 119:11 | 149:15 150:24 | 156:16 158:18,25 | 209:21 221:10 |
| **trade** 46:5,18 | 153:7 159:2 | 222:24 | 232:11 245:4,5 |
| **trading** 305:7 | 163:11 169:23 | **type** 20:4 84:3 | 255:10 261:15 |
| **traditional** 287:22 | 190:12,18 209:25 | 95:8,12 137:17 | 266:15 276:8 |
| 288:5,14 | 228:12,17 257:13 | 157:10 281:24,25 | 288:15 289:22 |
| **traditionally** 39:6 | 261:15 266:14 | 306:18 312:15 | 294:21 296:18 |
| **train** 146:8,10 | 288:7,15 296:18 | 331:6 | 307:25 308:14 |
| 147:2 | 306:19 308:14 | **types** 25:13 26:4,5 | 311:14 313:5 |
| **trained** 246:17 | 309:19 311:14 | 37:20 60:4 62:15 | 318:13 330:21 |
| **tranched** 72:4 | 313:5 318:12,20 | **typical** 31:12 | 332:10 |
| **transaction** 65:22 | 318:25 319:3,4,6,8 | 135:5 168:25 | **understanding** 8:3 |
| 308:11 310:17 | 319:11 320:4 | 243:23 | 17:14,18 32:8,9,10 |
| 314:3 | 322:3 329:24 | **typically** 57:22 | 32:15 34:11 57:13 |
| **transactions** 65:21 | 330:20 332:10 | 76:13 119:12 | 87:4 130:17 195:5 |
| 76:24 304:4 | **tuesday** 1:15 | 154:8 234:23 | 206:15 224:25 |
| 306:13,14 310:18 | **tuning** 29:17 | 246:8 269:7 | 225:13 246:18 |
| 310:19 311:2 | **turn** 41:4 55:21 | | 273:13 285:18 |
| **transmitting** | 66:25 100:10 | **u** | 293:13 |
| 256:16 | 161:25 181:20 | **u** 272:16 334:20 | **understates** |
| **treat** 40:9 | 277:19 285:7 | **u.s.** 4:11 12:23 | 263:12 |
| **treated** 43:15 | 306:9 333:3 | **ultimately** 34:24 | **understood** 6:19 |
| 225:21 | **turned** 142:2 | 82:25 97:11 107:3 | 18:19 30:13 31:9 |
| **tried** 72:2,8 | 292:20 | 155:8 208:18 | 38:14 84:12 88:21 |
| 238:15 | **turning** 126:14 | 211:24 251:25 | 158:24 212:4 |
| **triple** 247:17 | **twice** 46:13 73:25 | **unbiased** 321:16 | 225:10 |
| **true** 36:16 166:18 | **two** 9:15 19:6,20 | **uncomfortable** | **unencumbered** |
| 175:19 246:14 | 23:2 45:22 51:10 | 186:20 | 40:18 80:19 |
| 268:4 318:11 | 56:19 57:7,15 | **uncovered** 52:22 | 144:22 153:12 |
| 337:14 | 62:11 63:6 70:7 | 224:4 | **uniform** 14:21,24 |
| **trust** 165:23 | 78:5,25 99:15,20 | **underground** | **unit** 4:6 |
| 169:15 | 120:4 127:22 | 273:10 282:16 | **united** 1:2 12:5 |
| **truth** 6:11 | 156:6 159:5 | **underlying** 55:15 | 15:3 |
| **try** 11:21 44:9 | 176:10 179:15 | **understand** 6:10 | **units** 336:13 |
| 62:8,24 112:6 | 194:12 195:23 | 6:17 7:12,17,23 | **universal** 311:13 |
| 135:17 191:14 | 203:23 217:12 | 9:10 45:25 46:25 | **unknown** 175:12 |
| 218:20 257:17 | 219:10 252:13 | 62:22 72:3,8 | |
| | | 103:9 116:16 | |

**unlimited** 114:4
115:18
**unreliable** 330:25
**unstable** 11:9
**upcoming** 93:12
94:13
**update** 80:16 83:6
83:23 84:3,9
86:25 89:12 95:18
97:19
**updated** 95:20,25
**updates** 83:25
**upgraded** 280:11
**use** 20:8 26:8,15
28:22 38:15,23
39:12 47:13 49:6
49:12,12 51:14
54:21 55:3,17
59:20 64:15,16
75:22 76:5,7
80:20 88:21 99:7
129:5 133:3,12,17
134:5,9,13,18,21
135:8,12,14,20
136:4,17 138:10
138:12,21,22,23
138:23 139:2,4,11
147:10,16,19
148:20 150:15
151:21 153:24
157:13,13 159:17
159:18,22,25
160:6 162:11
169:7 181:15
213:20 214:17
215:5,11,14 216:5
216:10,14,17
220:22 221:3,5,6,7
221:8,11,15 223:3
223:16,22 224:3,5
224:13,22 225:3

226:2,8,13,19,20
226:22,23,24
227:4,16,17,22
228:3,4,8 231:23
235:22 236:2,14
236:15,23 237:2,8
237:11,13,17,20
237:23,25 249:6
249:25 250:3
252:4 260:7 261:9
263:21 264:9
265:2,20,25 266:2
266:5,6,19,23
267:10 269:7,18
269:24 271:3
273:16,19,23
276:12,14 277:9
277:17 288:14,19
297:22 298:16
307:10 326:13
331:6,12 335:11
**user** 219:23
294:13
**uses** 26:5,15 37:23
38:5,6 51:22 59:3
100:20 127:24
128:3 129:25
132:25 133:20
135:5,17 148:16
148:19 164:10
177:16,20 178:2
213:15 214:18
225:4,16,19 237:9
237:15 263:19
310:16 331:2
**uspap** 176:3
180:13 182:15,18
**usually** 67:13
**utilize** 223:17
240:14

**utilized** 150:4
251:16 252:9

---

**v**

---

**v** 4:9
**va** 9:22,22 10:22
10:24 11:13 31:21
44:24 45:5 69:14
79:7,9 117:6,10
118:22,24 121:23
121:25 123:3
139:14,18 156:11
190:23,25 201:9
201:11 203:6,8
233:25 234:3,9
246:21,23 254:8
254:10,14 255:14
255:16 258:7
268:11,17 299:2,4
305:13,17 315:8
315:10,13 319:15
319:17 324:22,24
328:24 329:2
331:16,18 334:11
338:11,13,17,19
338:21,23,25
339:3,7,9,11,15,17
339:19,21,25
340:3,5,7,9,11,13
**vacancy** 293:23
**vacant** 80:19
99:24 100:8,24
101:11,12 131:2
133:3 220:11
224:10 263:22
**vacuum** 198:13,24
**vague** 26:11 95:12
**valid** 264:24 267:7
267:12
**valuable** 51:24
75:21 149:2,8

**valuation** 17:5
20:7,13,14 29:23
30:2 31:10 43:9
48:20 58:2,25
71:7,10 81:18
89:18,20 91:7,17
91:18 99:4 100:7
104:10,24 105:18
105:24 106:2
107:8 115:6 121:3
123:10,12 144:19
144:21 145:5
150:13 175:21
183:11 185:22
194:5 195:22
228:13 240:14
245:20 255:22
257:2,9,13,14
262:16 264:24
265:5 266:24
275:9,12 330:24
339:23
**valuations** 21:2,6
51:3,10 95:15
115:3 195:23
**value** 20:10 37:8
43:13,19 51:23
54:22 55:6,14,14
57:16 58:5,13,14
58:21 59:21,22
62:13,14,21 63:6
74:14,18 75:5,9,15
76:9 77:15 80:17
96:13,17 99:14
100:8,12,14
101:10,12,17,17
101:19,21 103:25
104:5 105:3,7,8,12
114:3 115:10,13
115:16 117:22
119:7 121:8

126:17 127:4,8,18
128:11 129:20
130:12,19,23,25
131:9,10,10,21
132:6 133:21
134:8 136:4
137:21 146:22
147:4,17,19,20
148:23 151:19,22
151:23 155:2,13
157:11 158:5,14
159:18 160:8
161:2,5,9,18
162:11 168:23
172:18 173:3,15
175:2,15 176:4,15
177:7,12 178:14
178:18 179:17,23
181:5 193:4 194:9
194:10 196:24
198:19 200:22
201:2 213:9
224:10,11,19
228:11 229:3,13
229:20 231:14,17
231:19,21 233:8,9
233:11,16,21
234:21,25 235:4,8
235:19 236:13
238:6,21,24,25
239:2,4,20,21,25
240:2 241:5
242:16,24 243:11
244:18,19 245:18
247:24 248:18
257:6 259:3,6,8,13
261:12 265:19
267:16,23,24
269:10,11,20,25
314:12,14 316:15
316:21 317:4

330:24
valued 50:17,21
146:14 147:7
325:16 326:24
values 21:8 42:11
84:9 96:10 144:6
151:5,6 161:6
194:17 200:25
valuing 43:8 48:19
99:24 100:24
104:13 105:2
142:9 143:20,21
vanderbilt 1:7
4:10 5:19 9:17
33:20 35:2,15,17
38:16 40:10 42:4
42:12,16 45:10
49:16 50:8,12
52:17,22 53:8
54:11 55:16 66:8
66:23 67:24 68:2
68:5,18 69:21
72:17 81:4 83:16
84:4 85:9,24 87:8
87:10 88:15,22
89:11,16,19 90:3
90:25 92:4,16
94:4 97:15,17,18
102:9,18 103:8
105:14 119:25
123:11 126:23
131:8 144:18
176:17 178:22
179:3,6 204:16
207:13,19,21
234:16 251:3,9
252:14 253:7
272:24 277:3
305:24 310:5
314:13 316:3
335:15 341:2

vanderbilt's 7:10
10:10 36:15
124:19 125:4,15
125:21 139:25
192:24 322:4
variables 241:6,8
241:10,13 242:23
243:14
variance 49:11
variations 241:12
242:22
variety 303:4
ventilation 282:9
verbally 6:20
verification
166:10
verify 165:20
166:4,14,23,25
168:14 303:6
veritext 3:20 4:19
4:21 8:21 11:11
11:15 27:6 31:22
31:25 33:9 40:22
41:10 44:25 49:25
60:20 66:20 77:20
79:11 80:3 83:12
84:17 86:14 89:7
91:24 92:21 93:15
97:3 106:12,16
117:7 119:2 120:8
122:3 123:7
139:20 187:20
191:3 199:18
201:13 203:10
204:19 205:8
208:24 234:5
242:4 246:25
253:3 254:12,15
256:10 258:8
268:14 275:14
299:6,10 305:14

315:12,15 319:19
325:2 329:4,14
331:22 336:14
veritext's 10:3
version 61:7 83:2
versions 119:13
versus 17:9 151:8
251:24 257:13
297:14 313:13,20
viable 59:4
video 4:6
videoconference
2:13 4:16
videographer 3:19
4:2,20 44:15,19
112:10 113:6
174:8,14 230:23
231:4 286:4,8,13
333:10,15 336:6,9
videotaped 1:12
2:11
view 22:10 163:16
163:19 194:20,21
214:19 215:10
292:15 296:4
viewed 328:6
viewpoint 121:8
vs 1:6 341:2

w

wachtel 21:13
53:20,21 82:7
93:19 97:20 98:18
125:15,21 183:8
254:6
wait 331:23
waited 328:11
wakefield 164:8
184:19
walder 3:4 5:14
walk 158:8 251:22
275:2

**wall** 285:23
**wallace** 3:20
**walls** 278:13
**walsh** 3:9 5:12,13
6:3 10:21 11:2,14
11:19 17:23 18:18
19:3 21:11 27:4,9
30:10 31:20,24
32:3,6 33:6,12
37:6 39:2 41:4,10
41:12,16 43:23
44:8,14,23 45:7
46:8 47:15 48:13
48:24 50:3 54:9
56:9 60:14,22
63:21 64:24 66:18
66:22 67:19 68:12
70:14,20 71:18
72:15 73:3,9,20
74:8 77:17,22
78:18 79:6,14,25
80:5 82:8,24
83:10,14 84:13,19
86:9,16 88:2,8
89:5,9 90:18,22
91:22 92:2,19,23
93:13,17 96:7,20
96:23 97:7 98:8
98:17 103:2
106:10,15,18
108:4 109:4 110:2
110:10,24 111:20
112:6 113:11,22
116:17 117:5,12
118:21 119:4
120:6,10 121:22
122:6,23 123:6,9
125:2,11 128:22
139:13,23 142:17
143:2,12,18 146:2
146:11 148:3,24

150:19 153:22
154:14 158:19,23
159:14 162:24
163:2,7,20 166:12
166:19 168:10
170:17 171:14
173:14,22 174:6
174:18 179:5
180:18 181:20
182:2,5 183:9,19
187:18,22 190:22
191:5 192:8
194:19 195:6,16
196:9,11 198:22
199:6,13,20 201:8
201:15 203:5,13
204:12,23 205:10
205:23 207:11
208:3,14,22 209:2
211:14,22 212:21
213:5 215:7
216:23 217:22
218:6 219:18
220:12 226:21
228:19 230:5,18
231:7 233:24
234:7 241:19,22
242:6 246:20
247:3 252:25
253:5 254:7,14,17
255:13,18 256:4
256:13 258:2,13
260:15 266:13
268:10,19 270:12
275:8,16 277:2
284:9 285:6 286:2
286:17 298:25
299:8,13 305:12
305:19 311:7
313:3,9,16,21
315:4,7,14,18

317:17 319:7,14
319:21 321:15
322:23 323:6,20
324:9,21 325:4
328:22 329:6,19
330:5 331:15,20
332:3,5 333:18
335:19,23 338:4
**want** 10:4,17 30:8
38:22 59:6 84:25
116:15 118:2
119:18 121:9
125:3 127:11
135:23 145:23
146:9 155:25
158:22 170:23
173:12 188:21
202:22 206:14
207:6 212:3
215:23 220:19
244:3 277:4 286:7
294:8 313:25
320:8
**wanted** 9:24 42:5
79:3 82:19 84:8
88:17 89:2 93:5
94:22 315:15
320:23
**wanting** 86:6
200:12
**wants** 173:12
**warehouse** 307:22
308:16,17,19,20
308:20 312:3
**wash** 180:6
**watch** 13:13
**way** 35:11 47:21
47:24 54:18 58:20
67:12 89:10 99:21
107:13 115:4
123:25 125:14

147:15 184:6
198:14 200:12,20
203:3 205:19
208:12 236:6,7
240:22 255:19
257:22 283:20
295:10 300:13
306:17 310:15
326:14 335:7
337:19
**ways** 156:7
**we've** 20:9 21:7
35:24 111:17
148:12 174:4
**week** 13:17 117:24
**weeks** 95:19 277:4
328:4
**weight** 149:20
**went** 72:7 198:21
211:11,12 277:6
318:10
**west** 303:10
**westchester** 3:6
**whereof** 337:21
**wide** 303:13
**willing** 240:8
304:21
**wise** 214:25
**wish** 73:4 74:5
**withheld** 54:5,8
**witness** 5:11,22
9:8 17:18 18:13
18:23 21:5 30:5
37:5 38:21 41:2,8
41:15 46:4 47:4
48:10,22 54:4
57:11 63:16 64:10
67:16 70:2,19
71:17,24 72:25
73:7,17 74:3
79:24 81:25 82:23

87:22 88:6 90:15
95:22 97:23 98:11
102:23 108:3
109:2,16 110:6,15
112:3,9 113:18
116:14,25 122:5
123:4 124:22
125:7 128:21
142:15,22 143:10
143:17 145:21
146:5 147:4
148:15 150:17
153:21 154:3
156:15 158:17,22
159:8 163:9,13
166:8,17 168:2
169:17 170:15
171:12 173:8,20
179:3 180:17,24
183:7,15 192:2
193:22 194:24
195:12 198:5
199:2 200:4
203:12 204:6,21
205:22 207:4
208:9 211:6,20
212:19,25 214:24
216:12 217:12
218:3 219:17
220:10 226:6
228:16 229:22
233:23 241:17
255:25 256:12
258:10 260:11
265:24 268:3
270:4 276:22
284:6 285:2
310:10 313:7,18
315:2 317:7
318:24 321:2
322:14 323:4,17

324:3,7,16 328:16
329:16 330:2
332:4 334:17
337:11,15,21
338:3
**wondering** 111:18
166:22 267:4
**wood** 285:11,22
**word** 119:9,12
301:10 310:14
315:22 317:21
**wording** 18:3
39:10 225:7
322:17,18
**words** 6:21 46:12
51:16 68:3 159:16
201:4 244:18
323:7
**work** 10:11 15:16
16:7 19:24 20:3,4
20:6,25 22:3,6,13
22:18,24 23:11
24:13 25:9,15
27:16 33:18,19
35:8 36:10,23,25
42:5 55:5,20
64:22 85:15 93:11
99:8,9,19 119:20
140:7 165:22
168:4 169:17
183:18 206:12,15
206:17 224:6,6
262:21 265:18
287:4 295:10
309:6,6 332:9
**worked** 21:12,16
21:18,23 22:5,19
22:19,22 23:4
25:12 26:9,16
33:24 91:12 95:9
95:10 164:4,5

165:5 205:24
248:5 262:20
314:23
**worker** 165:23
**working** 18:20
95:7 124:13 140:8
**works** 33:16 112:9
124:5
**worth** 25:21 265:6
**wrapping** 117:22
**write** 38:14 39:7
129:18 193:12
200:24 247:9
**writing** 264:13
314:20
**written** 87:24
101:4 151:11
**wrong** 57:4 290:3
323:25 324:14,17
334:21,23
**wrote** 27:20 45:22
46:22 54:13 79:19
80:14 88:20
117:21 132:23
151:10 174:23
182:7 188:12
189:16 191:13
194:2 196:14
198:11,18 202:11
203:18 234:18,22
248:23 256:18,22
321:6 325:6,9
327:13 329:20

| **x** |
| --- |

**x** 338:2
**xlsx** 268:13 299:9

| **y** |
| --- |

**yeah** 10:16 74:20
76:23 94:5 109:2
111:20 115:23

132:22 163:11
188:10 254:4
**year** 12:18 21:21
42:17,19,22,25
43:14 57:18,23
58:6 65:2 69:8,22
71:10,13 114:3,24
116:3 124:7
126:19 127:5
137:3,10,19 138:6
139:7,10 142:10
143:14,22 144:22
146:15,23 147:10
147:21 148:10
149:18 150:10
152:16,22 153:3
153:14,19 154:6
154:16,19 171:6
172:3 175:20
176:6,11 177:2,9
178:12 181:16
185:10 210:9,17
211:10,17 215:15
222:15,20 227:4,8
227:13 244:5
247:18 248:12
249:14,22 258:25
259:7,23 260:8,19
260:25 261:3,7,13
261:20,25 262:6
263:16 264:4,16
266:4,7 267:11
270:8,9,25 271:9
280:3,10 289:11
289:14,16 290:8
290:10,11 292:21
295:7,10 297:6,13
297:16 307:11
312:5 320:22
328:8 329:22
330:3,3,13,17,18

[year - zsf]                                                                    Page 58

330:20 331:4,13
**years**   15:10 22:22
58:12 65:5 76:14
76:17,22,25 77:2
114:16 116:3
136:8 138:18
152:24 153:2,3,8
153:11 168:21,24
169:22 170:3,5,10
170:11 171:8,24
172:16 176:8,11
177:8,9,11,22
178:3,7,11,25
179:9,25 182:13
184:25 211:11
216:3,8,13 219:10
261:24 262:6,14
263:9 265:2
266:11 279:24
280:7 290:2,6
294:20,24 301:17
301:18,20,23
303:18
**york**   1:3,14,14
2:17 3:8,15,15
4:12,19,22 8:10,10
13:21 17:11 18:21
31:13 182:18
252:22 271:8
336:15 337:3,10
**young**   124:5

**z**

**zaccagino**   3:20
**zero**   282:7,10
313:23
**zfa**   149:12,12,13
175:9
**zone**   46:20 148:19
263:25
**zoned**   37:10 133:5
133:6 141:5,6

180:5 263:24
271:17 272:4,14
272:20
**zoning**   30:15,19
30:25 31:5 37:17
37:19,23,25 38:8
42:2 46:17 47:25
48:11,12,17 50:19
51:11,18 69:5
74:16 75:7 118:12
118:18 132:20,24
135:10 155:4
161:3 176:2,9
178:3,23 179:8,22
180:15,21 181:3,9
181:9,11,12
263:19 312:15
**zoom**   4:16 6:24
8:19
**zsf**   45:23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.