# EXHIBIT FFF

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x
McDONALD'S CORPORATION,

                    Case 1:19-cv-06471

       Plaintiff,

    -against-

VANDERBILT ATLANTIC HOLDINGS LLC,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - x


       Zoom video conference deposition of
SHARON LOCATELL, taken pursuant to
notice, was held remotely, commencing
September 23, 2021, 10:07 a.m., before
Leslie Fagin, a Stenographic Court
Reporter and Notary Public in the State
of New York.


                 - - -


MAGNA LEGAL SERVICES
320 West 37th Street, 12th Floor
New York, New York 10018
(866) 624-6221



```
 1
 2    A P P E A R A N C E S:
      (All Parties Present Via Zoom.)
 3
 4
      PASHMAN STEIN WALDER HAYDEN P.C.
 5    Attorneys for Plaintiff
                 Court Plaza South
 6               21 Main Street, Suite 208
                 Hackensack, New Jersey 07601
 7    BY:       BRENDAN M. WALSH, ESQUIRE
 8
 9    MEISTER SEELIG & FEIN LLP
      Attorneys for Defendant
10               125 Park Avenue, 7th Floor
                 New York, New York 10017
11    BY:       HOWARD S. KOH, ESQUIRE
12
      ALSO PRESENT:
13
          STACY HOWARD
14        MICHAEL MEYER
15
16
17
18
19
20
21
22
23
24
25
```



1                  S. Locatell

2    S H A R O N   L O C A T E L L,  called as a

3        witness, having been duly sworn by a

4        Notary Public, was examined and testified

5        as follows:

6    EXAMINATION BY

7    MR. KOH:

8        Q.   Good morning, Ms. Locatell.  My

9    name is Howard Koh.  I'm counsel for the

10   defendant in this case pending in the United

11   States District Court for the Eastern

12   District of New York.

13            My client, as you know, is

14   Vanderbilt Atlantic Holdings LLC.  I will be

15   taking your deposition today and I believe

16   you've been deposed before, is that correct?

17       A.   Yes.

18       Q.   And I don't know if you have been

19   on video depositions before, but it's

20   important that we speak one at a time, is

21   that a fair instruction?

22       A.   Understood.

23       Q.   And do you understand that if, at

24   any time, you would like to take a break, you

25   may do that, just let us know and I would



```
 1              S. Locatell
 2    request that you answer the question pending
 3    on the record, is that understood?
 4         A.   Understood.
 5         Q.   You are the president of Appraisers
 6    and Planners, correct?
 7         A.   Yes.
 8         Q.   And it's Appraisers and Planners,
 9    Inc.
10              What is that organization?
11         A.   We are a midsize appraisal and
12    consulting firm that deals with real estate
13    in the metro New York area.
14         Q.   And you are a member of the
15    Appraisal Institute, MAI?
16         A.   That is correct.
17         Q.   I understand you are also a member
18    of the Counselors of Real Estate of CRE?
19         A.   That is also correct.
20         Q.   I understand you are a member of
21    the Royal Institution of Chartered Surveyors,
22    an MRICS?
23         A.   That's also correct, yes.
24         Q.   You are a licensed real estate
25    appraiser in what jurisdictions?
```



1                    S. Locatell

2         A.    New York and New Jersey and also

3    Connecticut.

4         Q.    You are not an attorney, though,

5    are you?

6         A.    I am not.

7         Q.    You are not an architect?

8         A.    I am not.

9         Q.    But you have participated in rent

10   reset proceedings before, am I correct?

11        A.    Many times, yes.

12        Q.    Are you able to estimate how many?

13        A.    Fifty to 60, that is an estimate.

14        Q.    And you've participated, both as a

15   party representative and a neutral, as I

16   understand it, is that correct?

17        A.    That is correct.

18        Q.    And can you give us your best

19   estimate as to the -- in those 50 or 60 rent

20   reset proceedings, how many times you

21   participated as a party and how many times --

22   not a party, but a party representative and

23   how many times you participated as a neutral?

24        A.    I would say roughly, I've been a

25   neutral roughly 15 to 20 times.  Again, this



Page 6

```
 1                S. Locatell
 2    is an estimate, so maybe one-third,
 3    two-thirds, one-third neutral, two-thirds
 4    party appointed.
 5         Q.   Also, as I understand it, you
 6    qualified as an expert in Federal Court?
 7         A.   That is correct.
 8         Q.   How about in any State Court, have
 9    you been qualified as an expert?
10         A.   Yes, New York, Connecticut and New
11    Jersey, I believe.
12         Q.   And have you testified in Federal
13    Court before?
14         A.   I have testified via a taped
15    deposition.  The case was settled prior to
16    going to full litigation.
17         Q.   And have you given testimony in any
18    State Court proceedings?
19         A.   Yes, I have.
20         Q.   Was that at a trial, a hearing or a
21    deposition or something else?
22         A.   Both trial and deposition.  I may
23    have misspoken, misunderstood.  I have
24    testified in Federal Court numerous times, I
25    apologize.
```



1              S. Locatell

2      Q.   Have you ever not been qualified as

3   an expert?

4      A.   No.

5      Q.   Now, you mentioned that you

6   participated in 50 or 60 rent reset

7   proceedings.

8           Were any of those -- let me ask the

9   question less generally.  Did any of those

10   involve ground rent as opposed to some other

11   kind of rent?

12      A.   Yes, many of them have involved

13   ground rent and many of them have involved

14   rents for space.  It runs the gamut.

15      Q.   So you've participated in ground

16   rent reset proceedings, office rent reset

17   proceedings?  You have to answer verbally.

18      A.   Yes, yes, and retail rent reset

19   proceedings, industrial space rent reset

20   proceedings, as well.

21      Q.   How long have you worked as an

22   appraiser for McDonald's?

23           MR. WALSH:  Objection to form.

24      Q.   Prior to this assignment, were you

25   or your firm ever retained by McDonald's?



```
 1                 S. Locatell
 2      A.   Yes.
 3      Q.   When was the first time that you
 4  were retained by McDonald's?
 5      A.   I believe it was 2013, 2012, 2013,
 6  to the best of my recollection.
 7      Q.   And who at McDonald's hired you,
 8  for lack of a better word?
 9           MR. WALSH:  Objection to form.
10      Q.   Who at McDonald's retained
11  Appraisers and Planners back in 2012, 2013?
12           MR. WALSH:  Same objection.
13      Q.   You can answer.
14      A.   I honestly don't recall who
15  retained me the first time I did work for
16  McDonald's.
17      Q.   I think you've brought up an
18  attorney distinction, so let me pursue that a
19  little bit further.
20           Who first asked you to work for
21  McDonald's back in 2012 or 2013?
22      A.   I don't recall.
23      Q.   And since that first assignment for
24  McDonald's in 2012 or 2013, how many
25  assignments have you done for McDonald's, not
```



1                S. Locatell

2    including the one related to or any

3    assignments related to 840 Atlantic Avenue?

4        A.   Again, this is an estimate, I would

5    say over the last almost 10 years, maybe 20

6    assignments.

7        Q.   Can you estimate for me, at any

8    given time, how many assignments from

9    McDonald's, Appraisers and Planners has in

10   its office?

11           MR. WALSH:  Objection to form.

12       Q.   You can answer.

13       A.   Sometimes none, on average, we do

14   one or two a year maybe.

15       Q.   So you average one or two

16   currently, you are averaging between one or

17   two assignments from McDonald's a year, is

18   that correct?

19       A.   That's about correct, yes.

20       Q.   How long have you known Carol

21   DeMarco?

22       A.   Probably -- I don't recall if

23   Carol -- if I was introduced to Carol during

24   the first assignment or so that I had for

25   McDonald's, but, if not, it was probably



Page 10

```
 1                   S. Locatell
 2   shortly thereafter, so maybe, if it wasn't
 3   2013, maybe 2014 or so.
 4        Q.   Over the period of time since 2013
 5   or maybe 2012 or 2014 that you have done
 6   assignments for McDonald's, approximately how
 7   many of those assignments has Carol DeMarco
 8   been involved in?
 9        A.   I would say she was involved in 80
10   percent of them.
11        Q.   When did you first get introduced
12   to Mike Meyer?
13        A.   Again, I don't specifically recall,
14   but I worked on an assignment for them, with
15   KTR, as well, a few years back and I think
16   Mike might have been involved with that, so
17   it's been a few years.
18        Q.   What assignment was that?
19        A.   That was the rent reset for space
20   in Times Square.
21        Q.   Were you representing McDonald's in
22   that proceeding?
23            MR. WALSH:  Objection to form.
24        A.   Yes.
25        Q.   Were you engaged by McDonald's for
```



1                 S. Locatell

2    that rent reset proceeding in Times Square?

3         A.    Yes, both KTR and myself were.

4         Q.    Have you ever worked for the

5    principal of Vanderbilt Atlantic, Sam

6    Rottenberg?

7         A.    No, not to my knowledge.  I have a

8    large staff of appraisers here, but, to my

9    knowledge, we have never done any work for

10   Mr. Rottenberg.

11        Q.    Have you ever done any work for the

12   firm of Wachtel Missry?

13        A.    Again, not to my knowledge,

14   however, my partner has been in business for

15   -- this firm has been in business 80 years

16   and he has been working, not quite that long,

17   but almost as long, so I'm hes -- I hesitate

18   to say that we have never done work for them,

19   but, to my knowledge, they are not a

20   recurring client of ours.

21        Q.    Let's talk about you, personally.

22   You, personally, have never worked with Sam

23   Rottenberg, right?

24        A.    No, not to my knowledge.

25        Q.    And have you, personally, ever



Page 12

```
 1              S. Locatell
 2  worked with anybody at the law firm of
 3  Wachtel Missry?
 4      A.   I don't recall.  I work for a lot
 5  of law firms, so I could have done a job for
 6  an attorney or I could have done a job for a
 7  client whose attorney was Wachtel and I was
 8  retained by them, but dealt with the client,
 9  so I'm hesitant to say no, never, to my
10  knowledge, not that I recall.
11      Q.   When was the first time you met
12  Morris Missry?
13      A.   I believe the first time I met him
14  was sometime in early 2019 at a meeting that
15  I attended with McDonald's and Mr. Missry and
16  his client.
17      Q.   When you say, Mr. Missry and his
18  client, you mean Sam Rottenberg, right?
19      A.   Yes, there was another gentleman
20  there, Tom Tener was there and there was
21  another gentleman.  It might have been Mr.
22  Li, who also attended.
23      Q.   We will talk about that meeting, I
24  suspect, a little bit later in the
25  deposition.
```



Page 13

```
 1                 S. Locatell
 2             You've also worked with my partner,
 3    Steven Meister, is that correct?
 4         A.   That is correct.
 5         Q.   How many times have you and Mr.
 6    Meister worked together on an assignment on
 7    behalf of a client?
 8         A.   I believe it's twice.
 9         Q.   This time, you are not working on
10    behalf of Mr. Meister?
11         A.   I am not.
12         Q.   So earlier I was asking you a
13    little bit about the various types of rent
14    reset proceedings you had been involved in.
15             You would agree that you've been
16    involved in all types of rent reset
17    proceedings, right?
18             MR. WALSH:  Objection to form.
19         A.   I have been.
20         Q.   Are there any specific
21    considerations that apply when you appraise
22    or you are involved in a -- specifically in a
23    ground rent reset proceeding?
24             MR. WALSH:  Objection to form.
25         A.   I'm not sure what you mean by
```



Page 14

1                S. Locatell

2    specific considerations.

3        Q.    How do ground rent reset

4    proceedings differ from other rent reset

5    proceedings?

6        A.    All reset, all rent reset

7    proceedings differ from each other, whether

8    ground rent reset proceedings or space rent

9    reset proceedings.  It always goes back to

10   the lease, what does the lease specifically

11   instruct you to do.

12       Q.    So you would agree then, the source

13   for what the appraiser is supposed to do in a

14   rent reset proceeding is defined by the

15   lease, is that fair to say?

16            MR. WALSH:  Objection to form and

17       to the extent it calls for a legal

18       conclusion.

19       Q.    You can answer.

20       A.    I agree that in any fair market

21   value reset, that the lease is a very

22   important document.

23       Q.    Have you ever heard the term, pad

24   site?

25       A.    Yes.



1           S. Locatell

2      Q.    What does that term mean to you?

3      A.    A pad site is typically a site that

4  is attached to a larger retail center, so,

5  for example, malls or strip centers will have

6  outposts of banks or fast food restaurants

7  located within their parking area.  That is

8  what a pad site is.

9      Q.    Have you ever heard the term,

10  development site?

11     A.    Yes, of course.

12     Q.    What does the term development site

13  mean to you?

14     A.    A development, broadly speaking,

15  development site means a piece of land or an

16  under improved parcel that can be developed

17  for some purpose.

18     Q.    When you say under improved, what

19  do you mean by under improved?

20     A.    Well, for example, you could have a

21  site that has a hundred year old industrial

22  building on it, but it is a development site

23  today because it would be redeveloped with an

24  office building if it were available for sale

25  and you could deliver it vacant of leases,



```
 1                    S. Locatell
 2   most importantly, and tenancies.
 3        Q.   Are you being represented by an
 4   attorney at this deposition?
 5        A.   No, I am not.
 6        Q.   What did you do to prepare to be
 7   deposed today?
 8        A.   Well, as you know, I've been
 9   involved in this property for many years and
10   it's been quite a while since I looked at the
11   file, my reports, Mr. Tener's reports, so I
12   reread all of that data, I met with counsel
13   yesterday to -- you delivered to my office
14   two giant boxes of documents, one of which I
15   almost tore my back this morning trying to
16   put it on a chair.
17        Q.   Sorry?
18        A.   I did not bend from my knees, is
19   the problem, but, in any case, I paged
20   through these documents and then realized it
21   appeared to be my entire file which I had
22   sent to you earlier at some point.  I don't
23   remember if it was last year or early this
24   year, so I generally relooked through all the
25   data so I could answer your questions to the
```



Page 17

```
 1                  S. Locatell
 2   best of my ability today.
 3          Q.    You mentioned that you met with
 4   counsel yesterday.  Who was that?
 5          A.    Mr. Walsh and Ms. Howard.
 6          Q.    Was that meeting in person or some
 7   other manner?
 8          A.    It was in the 2021 Zoom fashion.
 9          Q.    So what did you and Mr. Walsh and
10   Ms. Howard discuss at this meeting?
11          A.    Well, basically, we opened the
12   meeting, we met for a couple of hours, we
13   discussed the fact that this deposition was
14   likely going to be all day because they told
15   me how long that Mr. Tener's deposition took,
16   and then we discussed all of the documents
17   that you had delivered and I had been paging
18   through them and was wondering if I needed to
19   read all of them, we discussed that.
20              We discussed the reports that I had
21   prepared, the report that Mr. Tener had
22   prepared, just the same thing that I told you
23   earlier in terms of trying to prepare so I
24   could answer your questions to the best of my
25   ability, because it has been sometime since
```



Page 18

```
 1                S. Locatell
 2   all of these documents were researched and
 3   read, et cetera.
 4        Q.   During yesterday's Zoom meeting,
 5   did McDonald's counsel point to any or
 6   identify any specific documents that they
 7   wanted you to pay particular attention to?
 8        A.   They advised me to be familiar with
 9   my reports, which I knew to do, so those were
10   the documents that we talked about.
11        Q.   Did you talk about Mr. Tener's
12   reports?
13        A.   Not in any specificity, just as
14   they related to the rereading them and being
15   familiar with the information that they
16   contained.
17             MR. KOH:  Nat, will you please
18        bring up No. 1 in my stack, the November
19        20, 2018 email from Ms. Locatell to
20        Ellen Benjamin.  It's now been marked as
21        GG.
22             (Exhibit GG, November 20, 2018
23        email from Ms. Locatell to Ellen
24        Benjamin, marked for identification.)
25        Q.   I would like to focus your
```



```
 1                  S. Locatell
 2   attention on the second email from the top on
 3   Exhibit GG, that is an email from Michael
 4   Meyer dated August 16, 2018 to you with a
 5   copy to Ms. DeMarco.
 6            Is this the first time you recall
 7   having contact with Mr. Meyer?
 8            MR. WALSH:  Objection to form.
 9       A.   Regarding this assignment, this
10   appears -- it's roughly around the time I
11   remember I was contacted.
12       Q.   That is helpful and you answered my
13   next question.
14            My next question is simple.  Had
15   you communicated with Mr. Meyer about
16   anything before October 16, 2018?
17            MR. WALSH:  Objection to form.
18       A.   Again, as I said earlier, I don't
19   recall if Mr. Meyer was involved in the Times
20   Square matter, so I don't recall.  He was not
21   a primary contact person for that matter, but
22   there were a number of people from McDonald's
23   that were at the hearing and were involved
24   and I don't recall if Mr. Meyer was one of
25   them.  If he was, then I might have had a
```



Page 20

```
 1               S. Locatell
 2   conversation with him or been party to a
 3   conversation during that period.  However, as
 4   relates to this assignment, this is roughly
 5   the timeframe that I remember being contacted
 6   by Mr. Meyer.
 7        Q.   That's helpful, too.  My question
 8   is prior to this assignment, were there any
 9   other assignments that you worked on with Mr.
10   Meyer where you had substantial, let's call
11   it, contact with him?
12           MR. WALSH:  Objection to form.
13        A.   No.
14        Q.   Was the answer no?
15        A.   The answer is no.
16           MR. KOH:  Let's bring up what was
17           previously marked Plaintiff's Exhibit
18           39.  It's No. 2 in my stack.
19        Q.   What should be on your screen now
20   is Plaintiff's Exhibit No. 39.
21           Can you tell us what this document
22   is, Ms. Locatell?
23        A.   This appears to be an email that --
24   it's a chain of an email where we sent a
25   retainer to Mr. Meyer and then he responded
```



Page 21

1               S. Locatell

2  to see the signed letter attached.  I'm

3  assuming the signed letter was the retainer.

4  That's what it seems to be referring to.

5       Q.   For this property at 840 Atlantic

6  Avenue, which is the subject of this

7  litigation, was this the only retainer that

8  was entered into?

9       A.   To the best of my recollection.

10      Q.   So it would be accurate to say that

11 Appraisers and Planners, Inc.'s assignment

12 here would be to act as the tenant's

13 appraiser in regard to determining the fair

14 market rental value, FMRV, payable for the

15 five-year option period for the demised

16 ground lease premises as of approximately

17 March 2018 date to be provided, right?

18           MR. WALSH:  Objection to form.

19      A.   This is a form retainer we do send

20 out and it also includes all work associated

21 with this assignment and that's why we have

22 an hourly rate, as many times assignments are

23 broader than what one initially thinks

24 they're going to be, so this retainer covered

25 any work we were going to do for McDonald's



Page 22

```
 1              S. Locatell
 2   regarding 840 Atlantic Avenue.
 3       Q.   The only kind of work mentioned in
 4   the retainer is the acting as the tenant's
 5   appraiser in regards to determining the fair
 6   market rental value of the subject premises,
 7   right?
 8              MR. WALSH:  Objection to form.
 9       A.   No, that's incorrect.  I mean, the
10   retainer is for work related to this property
11   and we bill hourly for all work necessary, so
12   this would have been -- this is the retainer
13   that McDonald's -- any work that McDonald's
14   asked me to do in regard to 840 Atlantic
15   Avenue would be covered by this retainer and
16   it would be billed hourly beyond the flat
17   fee.
18       Q.   Is it true that once you were
19   retained, one of the early things that you
20   would do in order to fulfill your assignment
21   or assignments to McDonald's would be to
22   review the ground lease of the subject
23   premises, right?
24              MR. WALSH:  Objection to form.
25       A.   I'm sorry, you said once I was
```



Page 23

```
 1              S. Locatell
 2    retained?
 3         Q.   Let me ask you, did there come a
 4    time when you reviewed a ground lease related
 5    to the premises at 840 Atlantic Avenue?
 6         A.   Yes.
 7              MR. KOH:  Let's bring up exhibit --
 8              No. 3 in my stack, the March 18, 1998
 9              ground lease.  It was previously marked
10              as Exhibit C.
11         Q.   Is this the ground lease that you
12    reviewed?
13         A.   It appears to be.  Yes, this
14    appears to be the ground lease.
15         Q.   Included in that ground lease as
16    Exhibit F, I believe, is a document called an
17    option rent addendum.
18              Are you familiar with that?
19              MR. WALSH:  Objection to form.
20         A.   Can you direct me to the page,
21    please?
22         Q.   I'm going to make it simple and I
23    will bring up what was marked as Exhibit 4 --
24    is 4 in my stack, which is the option rent
25    addendum.
```



Page 24

```
 1                S. Locatell
 2           Take a look at that.  This was
 3  previously marked as Exhibit D.
 4           Do you know what Exhibit D is?
 5      A.   I do.  That is the option rent
 6  addendum that is part of the lease.
 7      Q.   And in connection with this
 8  assignment, did you read the option rent
 9  addendum?
10      A.   Yes, I did.
11      Q.   I would like to focus on the second
12  page of that and the second paragraph, which
13  begins, The rental value.  Read that
14  paragraph to yourself and tell me what that
15  paragraph means to you.
16           MR. WALSH:  Objection to form.
17      A.   It means we are determining a
18  rental value without the improvements in
19  place.
20      Q.   Under what use of the property is
21  the rental value to be determined?
22           MR. WALSH:  Objection to form.
23      A.   Well, it's very dangerous to just
24  select a sentence within the entirety of this
25  option agreement or option rent addendum.
```



Page 25

```
 1                    S. Locatell
 2    The entirety -- these two pages directs the
 3    appraiser as to how they are to determine the
 4    rental value and the most important piece of
 5    information is that it's subject to the lease
 6    itself and this term is for a five-year
 7    renewal term, so the use is relative to the
 8    term to which the property can be put.
 9        Q.   Taking your -- I'm sorry, did you
10    finish?
11        A.   I am finished, yes.
12        Q.   Taking your assumption, would it be
13    fair to say that the option rent addendum
14    directs that the property be appraised at its
15    highest and best use taking into account
16    whatever the term is?
17            MR. WALSH:  Objection to form.
18        A.   It directs us to determine the
19    rental value based on highest and best use
20    relative to the term, yes.
21        Q.   A little bit earlier you mentioned
22    that the engagement letter, which we looked
23    at at P 39, covered not only working as the
24    tenant's appraiser under the option rent
25    addendum, but also doing other work for
```



```
 1                    S. Locatell
 2   McDonald's relating to this property.
 3             Did there ever come a time when you
 4   were asked to do other work relating to this
 5   property that did not have to do with the
 6   setting the fair market rent under the option
 7   term addendum?
 8             MR. WALSH:  Objection to form.
 9        Q.   Do you understand the question?
10        A.   I believe I do.
11             Can I answer?
12        Q.   Yes, please.
13        A.   So I was asked to attend meetings,
14   obviously, and to review landlord's reports.
15   I was asked to do research regarding such
16   review and attending such a meeting, so we
17   were asked to prepare various analyses and
18   work relative to both the preparation of my
19   reports, as well as the reports prepared by
20   Mr. Tener at KTR.
21        Q.   When you say you were asked to
22   prepare various analyses and reports, were
23   those written?
24        A.   Some were, yes.
25        Q.   Can you describe those written
```



Page 27

1                  S. Locatell

2     reports for me?

3          A.    So the initial reports that we

4     prepared for the client in late 2018 dealt

5     with the value of the property as a

6     development site and those two -- that value

7     was prepared without consideration of the

8     language of the rent option addendum.

9               Additionally, once the rent renewal

10    period passed, which was April, April 1, 2019

11    I believe is the date that the rent, renewal

12    rent is to be redetermined, we did two

13    reports.  We did a letter of opinion report

14    and then a more fulsome report of the rental

15    value based on the terms of the rent reset

16    option agreement or addendum.  So there were,

17    I think, four reports prepared in total.

18               We also did the appraisal

19    requirements are unique in that if you --

20    even if you give a verbal value, you've

21    effectively or technically prepared a report,

22    so in speaking with the client in reviewing

23    Mr. Tener's report, although I don't believe

24    I ever prepared a full written rebuttal or

25    review of his report, I did have



Page 28

```
 1                    S. Locatell
 2   conversations with the client advising them
 3   of the numerous and extensive errors in Mr.
 4   Tener's report, both as relates to the
 5   specific data assumptions he used and also
 6   his complete misreading of the ground rent
 7   addendum option as to how the renewal rent
 8   was to be determined, so there were verbal
 9   reports prepared for the client, as well.
10        Q.   That's helpful.  Thank you.
11             You said that the initial reports
12   that you prepared for the client in late 2018
13   dealt with the value of the property as a
14   development site.
15             Who asked you to do that?
16        A.   Carol DeMarco asked for us to value
17   the land and Ellen Benjamin, who works very
18   closely with me who is an assistant
19   appraiser, put together the first sort of
20   tranches of data that we sent to them.
21             They were anxious to get an idea of
22   values and prior to the actual rent reset
23   coming up and so Ellen Benjamin of my office
24   put together the initial report and,
25   unfortunately, when she did that, she only
```



Page 29

```
 1                  S. Locatell
 2   included in her letter the first two bullet
 3   points or paragraphs of the rent addendum
 4   option that does not describe how you
 5   actually have to do it, what the procedure of
 6   setting the new rent is.
 7             So she had put together land sales,
 8   which was an incorrect method of analysis and
 9   also Carol, because she doesn't do this,
10   that's why she hires us, she didn't
11   understand or know what the -- I'm assuming,
12   I don't want to say she didn't understand,
13   but when she asked us to do this, she said
14   you could put together some land sales and
15   rents and then told us to prepare the value
16   based on the ground lease option.
17             So the initial reports that were
18   done in late 2018 were sort of data from both
19   perspectives and they actually were data that
20   was incorrect relative to the rent addendum
21   option, so the reports, when we actually did
22   them for the rent addendum option in early
23   2019, are the reports that meet the terms of
24   the actual rent provision reset language.
25             MR. KOH:  Please bring up what is
```



Page 30

```
 1               S. Locatell
 2       No. 5 in the stack, which is marked as
 3       exhibit -- it was previously marked as
 4       Exhibit I.
 5       Q.   Ms. Locatell, can you tell us what
 6   Exhibit I is?
 7       A.   Exhibit I is a document that was
 8   prepared early in this case, in December 12,
 9   2018 is the date, and it sets forth net lease
10   comps that we had uncovered as of that date
11   for comparison to determine the subject's
12   rental value for the five-year renewal term.
13       Q.   On the page No. 5, which bears
14   Bates stamp MCD 00347, is that your
15   signature?
16       A.   That is.
17       Q.   Did you read this Exhibit I before
18   it was -- before you signed it?
19       A.   Yes.
20       Q.   And, thereafter, did you or someone
21   in your office send it to Mr. Meyer and Ms.
22   DeMarco?
23       A.   I assume it was sent to them, yes.
24       Q.   Is it your practice to sign --
25   strike that.
```



Page 31

```
 1                    S. Locatell
 2              Is it your practice to sign
 3    correspondence before you are ready to send
 4    it out of your office?
 5              MR. WALSH:  Objection to form.
 6         A.   I didn't say I wasn't ready to send
 7    it out.
 8         Q.   I was just asking generally.  My
 9    question is, as a usual practice, do you wait
10    until you read the document and are ready to
11    send it out of your office until your
12    signature is affixed on the document?
13              MR. WALSH:  Objection to form.
14         A.   It's interesting you bring that up
15    because, you know, with the advent of
16    electronic signatures, it's something that
17    I'm constantly telling my appraisers.  I
18    review hundreds of reports a year and that
19    when we send things out in draft, you have to
20    make sure the signature is not on it.
21              Yes, I would have reviewed this
22    prior to it being signed.  What I was getting
23    at before is if you notice, page 2, page 2
24    only quotes from the lease A and B, which
25    does not direct you as to how you need to
```



Page 32

```
 1                    S. Locatell
 2   value this property.  That's what I was
 3   speaking to before, but this report had been
 4   read by myself, I signed it and that's why it
 5   went out.
 6        Q.   And since we are on page 2, if you
 7   drop down, there is a section called Sales
 8   (Rental) Comparison Approach.
 9             Do you see that?
10        A.   I do.
11        Q.   Why is the word, rental, in
12   parenthesis?
13        A.   That's what we are doing here, we
14   are doing a fair market rental value
15   determination and when you do that, you use
16   the sales comparison methodology.  That is
17   just a methodology for how you determine
18   value.  Most appraisals are done for sale
19   purposes, so the book, when they talk about
20   the steps that are required to come to a
21   conclusion of value, refer to them as sales.
22   The practice is you use the same methodology
23   when you are determining a rental value.
24             So for clarity, since we are doing
25   a fair market rental value, I'm showing here
```



Page 33

```
 1                  S. Locatell
 2   what the methodology we are using and that's
 3   why rental is in parenthesis.
 4       Q.   On that page and the page that
 5   carries over, there are five numbered
 6   paragraphs.  Paragraph 3 says one of the
 7   steps is to select relevant units of
 8   comparison, e.g., price per square foot and
 9   develop a comparative analysis for each unit.
10           Why is price per square foot an
11   important consideration?
12           MR. WALSH:  Objection to form.
13       Q.   Is price per foot an important
14   consideration?
15           MR. WALSH:  Same objection.
16       A.   Whenever you are doing a market
17   sales comparison approach, you look at the
18   data relative to how the market looks at it.
19   There is no prescribed method that says you
20   must look at something relative to price per
21   square foot or price per acre or price per
22   linear foot or total price.
23           What is important that you consider
24   is how does the market look at a property and
25   in our market, when you are looking at sites
```



Page 34

```
 1                    S. Locatell
 2    similar to the subject that can be leased for
 3    a period of five years and you are looking
 4    for rental value comps, typically, one will
 5    look at price per square foot of site, they
 6    will look at total price, but when you look
 7    at the unit of comparison per square foot,
 8    price per square foot is a metric that is
 9    considered, but also the total price is
10    considered and so in this -- the steps of
11    this methodology will typically will tell you
12    to lay out the price per unit that you are
13    comparing.
14              And you will see, this is just an
15    example, price per square foot, this is not
16    saying in my report, the only way you could
17    look at the sale rental comps is by price by
18    square foot, but this is an example of how
19    the methodology is applied.
20         Q.   In one of your earlier answers when
21    I asked you about the word, rental, in
22    parenthesis, you referred to a book, you said
23    most appraisals are done for sale purpose of
24    book.
25              When you talk about steps are
```



Page 35

```
 1                  S. Locatell
 2   required to come to a conclusion of value,
 3   what book are you referring to?
 4              MR. WALSH:  Objection to form.
 5       A.   Can you read that sentence you
 6   said?
 7       Q.   The way it said is as following:
 8   Most appraisals are done for sale purposes,
 9   so the book, when you talk about the steps
10   that are required to come to a conclusion of
11   value, referred to them as sales.
12              What book did you mean?
13              MR. WALSH:  Objection to form.
14       A.   The Appraisal of Real Estate.
15       Q.   Were you thinking of a particular
16   section of that book?
17       A.   No.
18       Q.   So for this report that we are
19   looking at, the comparable rental leases
20   chart on page 4 identifies three purportedly
21   comparable leases, correct?
22              MR. WALSH:  Objection to form.
23       A.   Correct.
24       Q.   Who found those comparable net
25   leases?
```



Page 36

```
 1                   S. Locatell
 2        A.   I believe Ellen Benjamin of my
 3   office found them.
 4        Q.   How long -- does Ellen Benjamin
 5   still work for you, by the way?
 6        A.   Yes, she does.
 7        Q.   How long has she worked for you?
 8        A.   Twenty years.
 9        Q.   So would it be fair to say she is
10   an experienced real estate appraiser?
11        A.   Yes.
12             MR. WALSH:  Objection to form.
13             Sharon, if could you just give me a
14        second or two just to get an objection
15        so we don't talk over each other.
16             THE WITNESS:  I apologize, I will.
17             MR. WALSH:  Thank you.
18        Q.   Ultimately, you concluded in this
19   letter, which we've marked as Exhibit I, that
20   the concluded market rent GBA was $80, and
21   that's on page 5, right?
22             MR. WALSH:  Objection to form.
23        Q.   Does it say -- do you have page 5
24   in front of you?
25        A.   I'm looking at it.  Please give me
```



Page 37

```
 1                S. Locatell
 2   a moment.
 3             Yes, we concluded $80 a total rent
 4   of 300,000.
 5        Q.   What is GBA?  Is that gross
 6   building area?
 7        A.   It is.
 8        Q.   And can you explain to me what is
 9   meant by gross building area?
10        A.   It's the area of an improved
11   property, not the rentable area, but it is
12   the gross building area, basically outside
13   wall to outside wall.
14        Q.   If there is a piece of land and it
15   has, for example, a parking lot and building,
16   the GBA would represent the footprint of the
17   building?
18        A.   That is correct.
19        Q.   And, here, you got to $300,800 by
20   multiplies $80 a square foot times 3,760,
21   correct?
22        A.   That is correct.
23        Q.   And the 3,760, where did that
24   number come from?
25        A.   That's the existing GBA on the site
```



Page 38

```
 1                  S. Locatell
 2    and this is just so -- it seems like you
 3    might be confused as to how the sites are
 4    analyzed and valued.
 5              Pad sites like this are looked at
 6    by three different ways; total rent, which is
 7    the metric that most tenants care about,
 8    right, what's the nut I'm going to pay
 9    annually.  They are looked at rent per square
10    foot of the land and then they are also
11    looked at rent per square foot of building
12    size and, typically, a site like this, would
13    be improved with something that ranged from,
14    you know, three to 4,000 square feet.
15              So one way of analyzing these is
16    looking at -- for the rental value of the
17    land, is looking at what -- if you look at
18    all my comps, they all range from roughly
19    3,300 square feet to 3,800 square foot.  This
20    is the size of these QSR-type buildings that
21    are built, but they -- so in analyzing what
22    they're paying for the land, it is
23    appropriate to look at what they paid for the
24    improvement, because when someone goes in and
25    rents one of these, quite often, you will see
```



MAGNA
LEGAL SERVICES

```
 1                    S. Locatell
 2   an existing freestanding restaurant there and
 3   the lease will expire, a new tenant will come
 4   in place, they will gut or take the building
 5   down and build their own thing, but they will
 6   build a building roughly the same size.
 7             So the rent they pay for the site
 8   itself can be looked at relative to per
 9   square foot of GBA price, per square foot of
10   land price and total price and by all of
11   these metrics, the conclusion reached here is
12   very reasonable because, as you can see, the
13   total prices paid for the comps ranged from
14   121,000 per annum to 300,000 and the prices
15   paid on a land basis ranged from a little
16   over $11 a foot to 15 a foot and if you take
17   my conclusion of 300,000, it makes sense on a
18   typical GBA building size, which I used the
19   existing building because it's a typical size
20   that would be built there, and it also makes
21   sense on a price per square foot per land and
22   makes sense on a total dollar basis.  In
23   fact, I chose the highest range possible to
24   conclude for the subject based on these
25   comps.
```



Page 40

1                S. Locatell

2       Q.   I've heard your answer.  My

3   question is, where did the 3,760 number come

4   from?  Am I correct that that was the square

5   footage of the existing McDonald's on the

6   site?

7       A.   And that's what I said in the first

8   few words of my answer.  That's what I told

9   you, and it's also the size of what a typical

10   QSR or retail building that would be put on

11   this site is, so they're one in the same, but

12   the value that's being estimated here is the

13   value for the site, the land value, based on

14   the highest and best use considering the term

15   and so, by all metrics, whether you look at

16   it on a price per square foot of typical

17   building area, which, in this case, is equal

18   to the size of what the existing McDonald's

19   was or if you look at it on a price per site

20   basis or a total basis, the numbers all made

21   sense, but the conclusion I'm giving you

22   here, the 300,000, is a land rental number.

23       Q.   You said that on this particular

24   site, what would typically be built if the

25   existing McDonald's was knocked down would be



Page 41

```
 1                    S. Locatell
 2     another building of similar size, is that
 3     your testimony?
 4          A.    That is my testimony, yes.
 5          Q.    And how do you know that?
 6          A.    Based on the market data research I
 7     did.  I think you have my later reports where
 8     I actually uncovered many more leases located
 9     within similar areas of New York City for
10     sites of similar size and the buildings that
11     are built on them are in this range.
12               So it's not me making this
13     declaration.  It's the data telling me that I
14     must make this declaration.
15          Q.    Is it possible that another
16     appraiser who would look at this site might
17     conclude that a larger structure could be
18     built on the site?
19               MR. WALSH:  Objection to form.
20          A.    How much larger, what size
21     differential?
22               If you are referring to Mr. Tener's
23     position that someone would build, for a
24     five-year term, even with options, a 20,000
25     square foot retail street front property with
```



Page 42

1                    S. Locatell

2    parking underneath of it, absolutely not, but

3    if you are saying that instead of 3,760,

4    someone might build 3,200 square feet or

5    4,200 square feet, yes, I would say that the

6    size of the building could differentiate off

7    of the 3,760, but it's going to be within the

8    range of what the 11 comparables that I had

9    included in my final report, plus one listing

10   show.  I found no -- and I searched this

11   market high and low for every type of

12   comparable asset, I did not limit myself to

13   buildings of this size, I looked for leases

14   of property that are similar in location and

15   if that had led me down the field of someone

16   building 10 to 20,000 square feet I would

17   have had those leases in my report, the

18   market had spoken and it spoke very loudly

19   that the size of what would be built at this

20   location is in the range of you know, what's

21   there now.

22        Q.   So if any appraiser saw the

23   methodology that you described Mr. Tener

24   using, that appraiser would immediately

25   conclude that Mr. Tener was just wrong and he



Page 43

```
 1                    S. Locatell
 2    just missed the mark on this one?
 3         A.    That is my opinion, he is wrong
 4    under many -- for many reasons, not just
 5    because of the size of the building that he
 6    is proposing to build here.
 7              I'm not sure if he is actually
 8    familiar or intimately familiar with this
 9    area of Brooklyn.  There is a very big
10    difference once you are east of Vanderbilt.
11    Even before that, once you are east of the
12    Barclays Center, the tenor and tone of
13    Atlantic Avenue changes dramatically for
14    retail space.
15              This is an automobile
16    traffic-driven location, you know, within a
17    few blocks of this property, most of what
18    exists there are auto repair service places,
19    there are CubeSmart Storage.  This is not a
20    walk to.  I live not far from here.  I drive
21    by this location to actually get my tires
22    changed and my car serviced and if I see a
23    person walking past this McDonald's, that's
24    unusual.  People do not walk to this
25    location, this is a drive-by location.
```



Page 44

```
 1                S. Locatell
 2            That is why the highest and best
 3   use of the property, given the term that's in
 4   place, right, which, at best, is 20 years,
 5   it's five years, by definition of the lease,
 6   that's what we are talking about.  So that's
 7   something that we should be -- all be
 8   concerned with.
 9            But even if you assume they have
10   control for 20 years, no one is building a
11   20,000 square foot retail, street front
12   retail property here.  You couldn't amortize
13   the cost of building it, tenanting it, trying
14   to find 20,000 -- a 20,000 square foot retail
15   user is nonexistent and the only retail uses
16   that can be shown to be in a demand in this
17   area are for small tenants and not at this
18   location.
19            Best case scenario, on the side
20   streets in either direction, there are some
21   activities for storefront to service some of
22   the residential tenants.  The spaces are 400
23   square feet, maybe as much as 2,500 square
24   feet.
25            So by Mr. Tener's projection, you
```



Page 45

```
 1                    S. Locatell
 2    are going to have to find 10 tenants, best
 3    case scenario.  How many years do you think
 4    it would take you to find 10 tenants?  There
 5    are building across the street that have been
 6    vacant for years, new construction.  The
 7    assumptions are -- they are very not
 8    credible, which is language that refers to
 9    how appraisals should be considered and
10    reviewed.
11              The assumptions he makes do not
12    hold up.  By his own admission in his report,
13    the comps he put in there range from, I
14    think, 400 to 2,200 square feet, so there is
15    no way that that property would be built and
16    tenanted.
17              You assume you have the keys April
18    1, 2019.  It's going to take you 18 months to
19    get approvals before you put a shovel in the
20    ground, then it takes at least a year to
21    build it, so you are already two, two and a
22    half years down the road of your five-year
23    lease.  Even it's a 20-year lease, he has 18
24    left.  How long would it take you to find 10
25    tenants at this location that is a
```


MAGNA
LEGAL SERVICES

Page 46

```
 1                    S. Locatell
 2    non-pedestrian-driven retail location, right?
 3    How many years?  It could easily take you
 4    three years.
 5               So then you are five years, six
 6    years into a 20-year lease term before you
 7    collect a dime.  He doesn't take leasing
 8    commissions off, he doesn't take free rent
 9    off or downtime, he doesn't take tenant
10    installation.  His construction costs are
11    absurdly low.
12               So I just -- I really feel that any
13    active impartial appraiser that looked at
14    this site and knew that you had control of it
15    for 20 years would not make the assumption
16    that Mr. Tener did.
17               That's putting aside the whole
18    issue of the lease directing us to consider
19    comparables.  That's what the lease directs
20    us to do.  It does not direct us to do the
21    land residual.  You only do the land residual
22    if there is no comparable data available.
23               I showed there were 11 pieces of
24    information, all of which I shared with Mr.
25    Tener.
```



Page 47

```
 1                 S. Locatell
 2       Q.   Have you completed your answer?
 3       A.   I have, yes.
 4       Q.   Excellent.
 5            MR. KOH:  Let's bring up the
 6       document in my stack No. 6, which was
 7       previously marked at Exhibit H.
 8       Q.   Can you tell us what Exhibit H is?
 9       A.   This is the -- there were two
10  documents prepared in December 2018 and this
11  is the second of them and this is what I was
12  referring to earlier.  These set forth land
13  sales of the subject site and this does not
14  meet the requirements of the lease, market
15  rent addendum option, although it does,
16  mistakenly, refers to it and it refers to
17  only A and B of the rent addendum option --
18  it only refers to A and B, which gives you
19  the percentage of fair market rental of the
20  demised premises and gives you the five-year
21  option rent that is currently being paid, but
22  it doesn't tell you the method by which you
23  are required to determine the rent under the
24  rent option agreement, so, unfortunately,
25  this report was -- is an error basically, but
```



Page 48

1              S. Locatell
2    that's what it includes.
3         Q.   Did you read this report when you
4    sent it out?
5         A.   I did.
6         Q.   You signed it?
7         A.   I did.
8         Q.   Including its addendum, it's 13
9    pages long, right?
10         A.   Right, but it does not include the
11    language, this is my point.  I read this
12    report.  This report was prepared by Ellen
13    Benjamin, was written by Ellen Benjamin, I
14    reviewed it and I read A and B without
15    reading the other part of the rent addendum
16    option.  She did not put it into the report.
17         Q.   So it's Ellen's report?
18         A.   I'm not ascribing fault.  What I'm
19    saying is what happened.  I'm giving you the
20    facts.  This report was put on my desk to
21    review and I did review it and what was
22    included as a description was that we would
23    determine 80 percent of the fair market
24    rental value of the demised premises -- that
25    we were to determine 80 percent of the fair



Page 49

                         S. Locatell

1

2    market rental value of the demised premises

3    exclusive of improvements.

4              She neglected to copy the following

5    paragraphs of the rent addendum option that

6    described what we actually were supposed to

7    do, which was give consideration to the

8    term -- excuse me, recognizing that the

9    analysis was as encumbered and then, also to

10   use rent comps.

11             So when I read this, it seemed

12   reasonable that she would have looked for

13   sales.

14             I also recall that Carol had asked

15   us to do a sales search.

16        Q.   Please continue.

17        A.   That's it.

18        Q.   Did Carol say why she wanted a

19   sales search done?

20        A.   No, but, typically, so you

21   understand the process that I have when I

22   work for McDonald's is they will, either by

23   phone call or email, ask me to do something

24   and, quite often, they will call me and say,

25   can you give me sales, can you give me rents?



1                    S. Locatell
2    I don't know, I am never involved in their
3    negotiations, so to speak, initially, unless
4    it goes to the point of, you know, involving
5    a third appraiser.
6               Typically, they just say, here is
7    the property, can you tell me what the fair
8    market rent is?  Can you tell me what the
9    sale price is?  And sometimes they're in
10   negotiations with the landlord to sell a
11   property, sometimes they're in the
12   negotiations to buy a property, so it's not
13   unusual for them to ask me to give them some
14   number that's not in direct relation to what
15   the language of the lease says and I just do
16   what they ask because that's what they hire
17   me for, is just to give them opinions of
18   value.
19              So that's my recollection, is that
20   Carol had asked me for land sales and when
21   Ellen put this report on my desk, I read it
22   and it makes perfect sense that she would
23   have uncovered land sales because it did not
24   include the entirety of the option language
25   in it.

Page 51

```
 1                S. Locatell
 2      Q.   You read and signed both Exhibit I,
 3  which we just looked at, and Exhibit H on the
 4  same day, correct?
 5           MR. WALSH:  Objection to form.
 6      Q.   They are both dated December 8,
 7  2018.
 8           Is it accurate to say that you read
 9  it and signed both Exhibit H and Exhibit I on
10  the same day?
11           MR. WALSH:  Same objection.
12      A.   The reports are dated the same day.
13      Q.   The second paragraph of Exhibit H,
14  you write, The rent renewal --
15      A.   The documents are -- when you say
16  I, they are numbered on my screen?
17      Q.   I will try to address that.
18           Did you read and sign the document
19  which, on your screen, is numbered Exhibit 5
20  and Exhibit 6, both on December 12, 2018?
21      A.   They are both dated December 12,
22  2018, yes.
23      Q.   And it's usually your practice to
24  make sure that the date you sign it is
25  accurately reflected on the letter, right?
```



Page 52

1                    S. Locatell

2        A.    That is my practice, yes.

3        Q.    On the second paragraph of what is

4   on your screen, No. 6, and was previously

5   marked as Exhibit H, it reads the following:

6   The rent renewal -- excuse me.  Let me say

7   that again.  The renewal rent is to be

8   determined in accordance with the ground

9   lease (lease) agreement dated March 18, 1998

10  between Anthony M. Musto, Landlord and

11  McDonald's Corporation, Tenant.

12             Does Exhibit H, document No. 6,

13  actually do that?

14       A.    It does not -- I'm sorry, hold on.

15  Let me look at No. 6 here and see.  It does

16  not do that.

17       Q.    So that's a mistake in the second

18  paragraph of the letter?

19       A.    Yes, that's what I was explaining

20  to you.

21       Q.    And, here, you do a zoning

22  analysis, but you didn't do the land sales or

23  rental analysis that you did in the other

24  December 12th letter, correct?

25             MR. WALSH:  Objection to form.



Page 53

1                    S. Locatell

2        A.   Correct.

3        Q.   Here, you conclude a land value of

4    9.9 million, that's what it shows on page 9?

5        A.    Correct, that is a land value,

6    assuming the site is vacant and unencumbered

7    of any leases, which is why I'm explaining

8    that this does not meet the terms of the rent

9    option addendum.

10       Q.   Even though it says it was done

11   according to the rent option addendum, you

12   say it doesn't meet the terms of the rent

13   option addendum, right?

14            MR. WALSH:  Objection to form.

15       A.   Yes, I had told you that several

16   times.  This did not include all of the

17   language of the rent option addendum, so this

18   has an error in it.  The report is in error

19   because it does not set forth the fair market

20   rental value of the subject premises per the

21   fair rent option addendum.  I hate that

22   phrase.

23       Q.   In any event, with -- putting aside

24   that error, you used a multiplier off the

25   land value to come up with a fair market



Page 54

```
 1                    S. Locatell
 2    rental value here, correct?
 3         A.    Correct.
 4         Q.    And you use a range of between 4
 5    and 6 percent, right?
 6         A.    That is correct, that is market
 7    range.
 8         Q.    What did you do to satisfy yourself
 9    that that was the appropriate market range?
10         A.    I am quite often hired by landlords
11    and/or tenants to help in structuring and
12    negotiating ground leases over the last
13    couple of years, so I'm quite familiar with
14    what current rents -- ratios are for rent
15    value relative to land value, so based on my
16    experience and my knowledge of the market,
17    that's the range that I've indicated.
18              I should point out that a 6
19    percent -- I have seen very few leases as
20    high as 6 percent.  Most of them are in the
21    range of 4 to 5 percent over the last couple
22    of years and that is, you know, these rates
23    are tied to the market, they are no different
24    than telling someone what the rental value or
25    the sale price value of their property is.
```



Page 55

1          S. Locatell

2          You can't -- if you are asking me

3     the value of something as of 2019, the

4     information that I need to consider is what

5     was the market like in 2019, what were prices

6     paid for rents or sales as of 2019.  I would

7     never go back and look at sale prices for

8     1962 to tell you what your property is worth

9     in 2019.

10         So the ratios that apply to rental,

11    land rental value are no different than any

12    other piece of market data.  They are tied to

13    a specific date of analysis and as of our

14    date of value, this range was very

15    reasonable.

16    Q.   Would an 8 percent range be

17    reasonable?

18    A.   Absolutely not.  It would be if you

19    had signed a lease in 1954, and those are the

20    leases that Mr. Tener refers to when he says,

21    I think he has got somewhere access or he's

22    read somewhere between 30 and 40 leases,

23    which I could only assume came from Tracy

24    Nigard because I know she keeps those leases.

25    Those leases were written, you know, 50 to 70



Page 56

1                    S. Locatell

2     years ago, and back then, the ratio of rental

3     value to land value was much higher, the

4     interest rate environment was higher back

5     then and those rates or that ratio that is

6     included in ground leases is no different

7     than any real estate pricing metric, it's

8     tied to the market, which is tied to the data

9     value.

10               So it's egregiously -- it is an

11    egregious error on Mr. Tener's part to look

12    back at historical ground leases from 50 to

13    70 years ago and to opine that those rates

14    are applicable in 2019.

15         Q.   So would it be fair to say that any

16    confident neutral appraiser who was --

17    noticed that Mr. Tener used an 8 percent

18    multiplier would immediately conclude that

19    that was an egregious error?

20         A.   Any neutral would determine it's an

21    egregious error to use comparables that are

22    50 to 70-years old.

23         Q.   Can you answer my question now?

24               Would it be fair to say any neutral

25    who noticed that Mr. Tener used an 8 percent



Page 57

1                    S. Locatell

2    multiplier would immediately conclude it was

3    an egregious error?

4                    MR. WALSH:  Objection to form.

5         A.    I think most neutrals would agree

6    with that, yes.

7         Q.    Now, we have two appraisals here

8    dated December 12th and one of them, December

9    12, 2018.  One of them comes up with a fair

10   market rental value of $300,800 and another

11   one comes up with a range of 396,000 to

12   $594,000.

13                You signed both of these on the

14   same day.  Which is correct?

15        A.    The 300,000.

16        Q.    Why did you sign the one that used

17   a multiplier off a land value which we are

18   looking at right now, which was marked as

19   Exhibit H, and is document 6 on your screen?

20        A.    The document 6 was done under the

21   assumption that the land would be controlled

22   by the tenant in perpetuity, so it makes

23   complete sense that you would have a

24   different value for the subject site if you

25   were given the keys on April 1, 2019 and told



```
 1                    S. Locatell
 2   you have it forever, you own it forever,
 3   versus what's the site worth if I give you
 4   the keys on 2019 and tell you that you have
 5   it for five to 20 years, so, obviously, there
 6   is going to be a differential in value.
 7              For some unexplainable reason, Mr.
 8   Tener seems to think that owning a site in
 9   perpetuity is equal to owning it for 20 years
10   and I mean --
11        Q.   Let's talk about --
12             MR. WALSH:  Objection.  Howard, she
13        wasn't finished talking.  If you could
14        let her finish her answer.
15             MR. KOH:  I'm happy to.
16        A.   I think that it's incredulous for
17   an active market participant, experienced
18   appraiser to say that the value of an
19   unimproved site that you control forever is
20   equal to the value of a site that you can
21   control for, at best, 20 years.
22        Q.   And would most competent neutral
23   appraisers do you believe would agree with
24   you?
25        A.   I do.  I think anybody involved in
```



Page 59

```
 1                   S. Locatell
 2    real estate would agree with me.
 3         Q.    So it's that obvious?
 4              MR. WALSH:  Objection to form.
 5              Are we talking about, Howard, this
 6         particular property or any property?
 7              MR. KOH:  Excuse me, when I need
 8         your help, Mr. Walsh, I will ask you for
 9         it.  Right now, I'm asking you just to
10         confine your objections to form.
11              MR. WALSH:  Thank you.  I will make
12         my objections as I see fit and I stand
13         by my objection.
14         Q.    The question was, you said, I think
15    it's incredulous for an active participant,
16    active market participant, experience
17    appraiser to say the value of an unimproved
18    site that you control forever is equal to the
19    value of a site you can control for 20 years.
20              Then I asked you, would most
21    competent neutral appraisers you believe
22    would agree with you?  You said, I do.  I
23    think anybody involved in real estate would
24    agree with me.
25              I said, so it's that obvious?
```



Page 60

1                    S. Locatell

2              Can you please answer my question?

3              MR. WALSH:  Same objection.

4         A.    It is to me and to active real

5    estate professionals, that if you control a

6    property in perpetuity versus being able to

7    control it for 20 years, meaning, you have no

8    reversion value, that there is greater value

9    to owning something forever than there is to

10   owning something for 20 years.

11             So if you compare them, you are

12   basically saying, if I own something forever,

13   I can build what I want, I will get that cash

14   flow for that 20-year period and at the end

15   of that 20-year period, I still own that

16   property, so there is value to the reversion.

17             In comparison to saying you own the

18   property for 20 years, so you get the cash

19   flow for 20 years, no reversion.  That's the

20   differential.

21             And I think that if you set those

22   metrics out to an active, knowledgeable real

23   estate investor or professional, they will

24   tell you that it is more valuable to own

25   something that has a reversion versus owning



Page 61

1              S. Locatell

2   something that does not have a reversion.

3      Q.   So is it fair to say the way you

4   square these two substantially different

5   values is that the one that has $300,800 as

6   an annual fair market rent accounts for the

7   limited term of the McDonald's lease and the

8   one that has the higher values does not

9   account for the limited term of the

10  McDonald's lease, right?

11          MR. WALSH:  Objection to form.

12     A.   In part.

13     Q.   Explain what else is -- what other

14  things you rely on to square them?

15     A.   Well, that is the difference.  The

16  difference is that in the first instance, we

17  looked -- and when I say first instance, I

18  mean in document 5, that analysis was

19  prepared in agreement with the rent addendum

20  option, rent option addendum.

21     Q.   Right.

22     A.   And in the instance as relates to

23  document 6, that does not meet the terms of

24  the rent option addendum.

25     Q.   Even though it mistakenly says it



Page 62

1                  S. Locatell

2    does?

3        A.    Yes, it mistakenly says it does,

4    but as I've told you, it doesn't include all

5    of the language.

6              And for context, just so you

7    understand, these analyses, these reports

8    were meant to be initial analyses.  We were

9    always understood to be determining this for

10   the rent reset once the date approached.  So

11   these initial analyses were, in part --

12   they're, in part, incorrect because they

13   don't include the totality of the rent option

14   agreement.

15             But, in addition, Ms. DeMarco did

16   ask for us to look for sales, so we would

17   have done that as a matter of course.  What

18   should not have been done is made the sales

19   analysis reference the rent option language,

20   so whether it's an error in that the entirety

21   of the language, rent option addendum

22   language is not included or that any of the

23   language should have been taken out of the

24   report, I'm telling you either of those

25   scenarios would have served to make this



Page 63

```
 1                  S. Locatell
 2   reasonable and it's just a hypothetical as to
 3   what is the value of the land without the
 4   lease in place, that is what this analysis
 5   is.
 6        Q.   Did you bill separately for these
 7   two letters on an hourly basis or was this
 8   included as part of the base appraisal fee
 9   that's described in P 39?
10        A.   I don't recall.  I would have to
11   look back at my billings.  Typically, we bill
12   for the report -- we would have billed for
13   the final report for the rent reset
14   provision.
15             The one that was done in June, that
16   would have been for the flat fee and anything
17   they asked us to do in terms of looking for
18   sales, you know, reviewing Mr. Tener's
19   records, attending meetings, would have been
20   billed hourly.
21        Q.   There is some handwriting on both
22   of these exhibits, 5 and 6.  On what is No.
23   6, it says, delivered vacant/redevelopment
24   site.
25             Whose handwriting is that?
```



Page 64

```
 1                    S. Locatell
 2       A.   That is Ellen Benjamin's
 3  handwriting.
 4       Q.   When did she write it on this, if
 5  you know?
 6       A.   I have no idea.
 7       Q.   On what we have marked as Exhibit 5
 8  or is on your screen as Exhibit 5, Exhibit I,
 9  there is handwriting.  It says, net lease
10  comps.
11            Is that also Ms. Benjamin's
12  handwriting?
13       A.   That is.
14            MR. KOH:  We've been going for
15       about 90 minutes.  I think now is
16       probably a good time to take a short
17       break to give Leslie a rest and
18       everybody else.
19            How long would you like, five, 10
20       minutes I think is appropriate?
21            THE WITNESS:  Fine with me.
22            (Recess.)
23            MR. KOH:  Let's please bring up,
24       Nat, No. 7 in the stack, which was
25       previously marked as Exhibit O.  It is
```



Page 65

```
 1                 S. Locatell
 2         an April 15, 2019 letter from Mr. Meyer
 3         to Tom Li.
 4         Q.   Ms. Locatell, have you seen this
 5    letter before?
 6         A.   Yes, I have.
 7         Q.   Did you see it at the time it went
 8    out or subsequent?
 9         A.   I believe I -- if I didn't see it
10    the day of April 15th, I saw it sometime
11    around then.
12         Q.   This is the letter that identifies
13    you as the appraiser for McDonald's with
14    respect to 840 Atlantic Avenue, right?
15         A.   That's correct.
16              MR. WALSH:  Objection to form.
17         Q.   Is the -- I would like to focus on
18    the last paragraph on the first page which
19    begins, The appraisers must meet.
20              Is it your understanding that that
21    was an accurate description of what was
22    required under the option rent addendum which
23    we previously looked at and is No. 4 in your
24    stack marked as Exhibit D?
25              MR. WALSH:  Objection to form.
```



Page 66

1                    S. Locatell

2        A.    Yes.

3        Q.    So Mr. Meyer writes, The appraisers

4    must meet and exchange letters of opinions of

5    value within 20 days of the date of this

6    letter.

7              Did that happen?

8              MR. WALSH:   Objection to form.

9        A.    I don't recall when Tom and I

10   exchanged our values or met and talked about

11   our values.  It was sometime in April, early

12   June of 2019.

13       Q.    Was it April or early June?  That's

14   a pretty big spread.  Do you recall?

15       A.    I said it was sometime in April or

16   early June.  It's not that big of a spread.

17   In these procedures, it is very common for

18   both sides to agree to an extension of some

19   amount of time, depending on what the

20   appraisers are specifically involved in and

21   what their workload is, so it happened timely

22   and it happened within, you know, let's call

23   it two or three weeks, but I don't recall the

24   exact date.

25       Q.    Why don't we go over exactly what



Page 67

```
 1                S. Locatell
 2    did happen shortly thereafter.
 3             MR. KOH:  Let's bring up what was
 4         previously marked as Exhibit P, I
 5         believe.
 6         Q.   Exhibit P is an April 25, 2014 --
 7    April 25, 2019 email that Ms. Locatell sent
 8    to Ms. DeMarco and Ellen Benjamin.
 9             Do you recognize this email, Ms.
10    Locatell?
11         A.   This looks like an email that I
12    sent to Carol and Ellen.
13         Q.   And you say, I spoke with Tom
14    Tener.  His side is pushing for us to select
15    the third appraiser.  I told him I'm not
16    ready, that I need to do work and circle back
17    with him the first full week of May.
18             What weren't you ready to do?
19         A.   I don't recall.  I may not have
20    been ready to select a third.  I know at this
21    time, I was extremely busy, I had at least
22    another one or two large projects going on,
23    so I don't recall.  I just wasn't ready to
24    meet with him and select a third.  We usually
25    do that live, as appraisers in these
```



Page 68

1           S. Locatell

2    proceedings, so...

3        Q.    Then you write, I will call you

4    next week to discuss the next -- led me read

5    that accurately.  I will call you next week

6    to discuss next steps.  In the meantime,

7    Ellen will continue to work on collecting new

8    data.

9           What were the next steps?

10       A.    The third appraiser that we were

11   going to select.  In these proceedings, you

12   typically confer with your client as to

13   recommendations for the selected neutral, you

14   have to come up with a list.  It's unusual

15   that both sides will agree on the -- on one

16   person, so you typically want to go through a

17   list of people that you think would be

18   experienced enough and understand the

19   property to serve as a neutral and you need

20   to discuss that with your client, so I'm

21   assuming that that's what I may have been

22   referring to, but, again, this was over two

23   years ago, so I don't know specifically.

24       Q.    Am I also right, one of the reasons

25   you need to discuss the potential neutral



```
 1                S. Locatell
 2   third appraiser is to make sure there are no
 3   conflicts?
 4        A.   Yes.
 5        Q.   That's not the only reason there
 6   are other reasons, too, right?
 7             MR. WALSH:  Objection to form.
 8        Q.   Are there other reasons besides
 9   just conflicts?
10        A.   I mentioned what the other things
11   that you would concern yourself with.  You
12   would want to make sure that the person is
13   experienced in the market in which your
14   property is located, you want to make sure
15   that the person has experience in doing the
16   type of analysis that we are talking about.
17   Not every appraiser has served as a neutral
18   before.  There may be appraisers who are very
19   well versed in this area of Brooklyn, but
20   they may not have served on a case before.
21             So you discuss all of these pros
22   and cons and try to come up with a list of
23   people that you feel would be responsible to
24   take on this role and you clear that list
25   with your client.  I'm sure Tom did the same
```



Page 70

```
 1                 S. Locatell
 2    thing with his client.
 3        Q.   So it wouldn't surprise you to
 4    learn that Tom did, in fact, did the same
 5    thing with Vanderbilt Atlantic?
 6             MR. WALSH:  Objection to form.
 7        A.   No.
 8        Q.   In the last sentence of this brief
 9    email that was sent by iPhone, you write, In
10    the meantime, Ellen will continue to work on
11    collecting new data.
12             Why did new data need to be
13    collected?
14        A.   Again, as you see in my report, my
15    June report, we set forth a very
16    comprehensive list of data, we didn't want to
17    miss anything, so we began collecting data
18    when we were retained in late 2018 and that
19    process continued through the preparation of
20    our report.
21             We collected data that confirmed,
22    generally, our original opinion of the rental
23    value of the site per the rent option
24    addendum, but it's not a static process.  We
25    had been doing our initial research prior to
```



1                    S. Locatell

2    the date of value, which is April 1, 2019, so

3    the valuation date had just passed here by 24

4    days and throughout -- from late 2018 until

5    this date, we had our feelers out for

6    comparable data that we could use to

7    determine the value, so that is not anything

8    that would be considered unusual.  In fact, I

9    think it would be considered necessary to

10   produce credible results.

11        Q.   Am I correct that the preparation

12   of these appraisals is an evolving process

13   where, as more data is collected, that is,

14   you know, ultimately informs what the final

15   appraisal numbers are?

16             MR. WALSH:  Objection to form.

17        A.   An evolving process, yes, I would

18   say from when you take on assignment to when

19   you complete it, you are looking for data.

20             If I take on assignment in late

21   December 2018 and I give them sort of a draft

22   opinion of value, but my valuation date

23   hasn't even occurred yet, I will continue to

24   be looking for comparable information that

25   could be used in my report.  Once the report



Page 72

1                    S. Locatell
2    is complete, then one would typically stop
3    looking for that information.
4         Q.   As you work through this process,
5    your initial value might change, right?
6         A.   Well, remember that the -- when I
7    did the initial value, I was doing it prior
8    to the valuation date, right, so, yes, my
9    valuation did change once the valuation date
10   came and passed.
11        Q.   So in that case, you initially
12   valued the fair market rent at $300,000, but
13   the ultimate appraisal you issued on this
14   came in at a higher number, right?
15        A.   That's right, 350,000, I believe.
16        Q.   Depending upon how the market went,
17   it could also come in lower, correct?
18             MR. WALSH:  Objection to form.
19        Q.   It was just, in this case, in your
20   professional opinion as an appraiser, given
21   the passage of time and the new data, you
22   wanted to raise the value from 300,000 to
23   350,000, is that fair to say?
24        A.   Correct, based on the data that I
25   uncovered in preparation of my final report,



Page 73

```
 1              S. Locatell
 2    my concluded value was 350,000.
 3              MR. KOH:  Let's mark the next
 4         document.  Bring it up, please.  This
 5         was previously marked, I'm sorry, as
 6         Exhibit Q, it is a May 6, 2019 email
 7         from Ms. Locatell to Ms. DeMarco.
 8         Q.   Do you know what this document is?
 9         A.   It is two emails, one sent from
10    Carol to myself and Ellen and one sent from
11    myself to Carol and cc'ing Ellen Benjamin.
12         Q.   I would like to focus on the top
13    email, May 6th, from you to Ms. DeMarco with
14    a copy to Ellen.
15              Again, Mr. Tener, you write, has
16    reached out and wants us to pick the third
17    appraiser.  He is getting pressure from his
18    client to do so.  I told him we could do it
19    later this week and reminded him that our
20    deadline is May 20th, so we, in fact, have
21    sometime, right?
22         A.   Correct.
23         Q.   As of the date of this email, May
24    6th, had you conferred with McDonald's about
25    the selection of the third appraiser?
```



Page 74

```
 1                  S. Locatell
 2       A.   I don't recall.
 3       Q.   In the next paragraph, you write,
 4  Ellen has been working on rezoning scenarios
 5  and has spoken with a land use attorney for
 6  some general guidance.  I think that we may
 7  need to hire them to write a letter in
 8  defense of our lower rezoning potential,
 9  cost, timing, et cetera.
10            Can you explain to me -- first of
11  all, was a land use attorney hired?
12       A.   Not to my knowledge.
13       Q.   Did you ever find out why a land
14  use attorney was not hired?
15            MR. WALSH:  Objection to form.
16       A.   No.
17       Q.   Did you ever discuss that with any
18  representative of McDonald's?
19       A.   Discuss why a land use attorney had
20  not been hired?
21       Q.   Correct.
22       A.   Not to my recollection.
23       Q.   Who was the landlord -- I'm sorry,
24  who was the land use attorney Ms. Benjamin
25  was speaking to?
```



Page 75

```
 1                  S. Locatell
 2      A.    I don't recall.  We did a lot of
 3  work with land use attorneys across all the
 4  major firms in the City, I don't remember who
 5  she spoke with.
 6      Q.    You write that you thought that you
 7  may need to hire them to write a letter in
 8  our defense of a lower rezoning potential.
 9            What is a lower rezoning potential?
10      A.    That refers to density.
11      Q.    Why was that something that was
12  important with respect to this assignment?
13      A.    So this goes back to Mr. Tener's
14  misunderstanding of the rent option addendum
15  and the fact that he valued the property as
16  unencumbered of the lease itself, meaning,
17  that if you were to rent it, you would have
18  it in perpetuity and that is, as I discussed
19  I think earlier today, the -- not correct, as
20  the lease states.
21            Tom and I had spoken about where we
22  were by this point in terms of value and he
23  explained to me how he was valuing the site
24  and so in -- assuming we were going to a
25  neutral, I was prepping McDonald's for sort
```



Page 76

```
 1                   S. Locatell
 2   of rebuttal review work we may need.
 3             This subject property, No. 1,
 4   should not have been valued as a development
 5   site, that is not what the lease allows for,
 6   that is not what the lease calls for and it
 7   does not meet the terms of the rent reset
 8   provisions.  However, Mr. Tener incorrectly
 9   had done it that way, so I wanted to have an
10   understanding of looking at the site as if
11   vacant and unencumbered of a subject lease,
12   even though it's in contravention of what the
13   actual lease says, what would the rezoning
14   potential of the site be?
15        Q.   Why did you need to understand what
16   the rezoning potential of the site would be
17   if that was in contravention of what the
18   lease said?
19             MR. WALSH:  Objection to form.
20        A.   To be frank, this is why clients
21   hire me, I'm very good at what I do and I do
22   the research for review and rebuttal.  I do
23   the research to see how the other side looks
24   at data.
25             Mr. Tener is fully incorrect, he is
```



1                   S. Locatell

2    completely incorrect in how he analyzed this

3    property.  He assumed that the rent should be

4    paid based on the idea that you will control

5    the land in perpetuity.  That is not, in

6    fact, the case, and when he did that, he

7    compounded the error by saying, I'm going

8    also to look at the site as it's vacant and

9    I'm going to look at the site, assuming it

10   has been rezoned, which it had not been

11   rezoned.

12           So I was understanding and wanted

13   to give McDonald's the information that even

14   if the site were to be looked at as a vacant

15   and unencumbered, how Mr. Tener was even

16   incorrect in making the assumptions that he

17   had made.

18           So this is just what I'm hired to

19   do when I get hired for these assignments to

20   act as a tenant or landlord appointed

21   appraiser.  It's to not only prepare the

22   accurate analysis based on the terms of the

23   lease, but it's also to review and rebut what

24   the other side says and part of my review and

25   my rebuttal of Mr. Tener's analysis was that



Page 78

```
 1                    S. Locatell
 2    not only was he completely incorrect in what
 3    he had done, but he also was incorrect in
 4    even the assumptions he had made within his
 5    own document.
 6         Q.   Well, why would there need to be a
 7    rebuttal if any qualified appraiser would be
 8    able to look at what Mr. Tener had done and
 9    conclude it was obviously an egregious error?
10              MR. WALSH:  Objection to form.
11         A.   Again, I'm very good at what I do
12    and what I do is I analyze everything.  I
13    don't leave things to be unreviewed, right,
14    so part of my assignment is to act as sort of
15    a research person for McDonald's.
16              So Mr. Tener is saying X and I'm
17    going to show you why he is incorrect, and I
18    would have been remiss had I not pointed out
19    all the errors in his report and his
20    analysis, so it's part and parcel of acting
21    as an appraiser in an assignment like this
22    and I don't know anybody who would not have
23    done some sort of rebuttal or review of the
24    oppositions report when you are acting as an
25    appraiser in an assignment to set a rent for
```



Page 79

1              S. Locatell

2    revalue purposes.

3              So although Mr. Tener is completely

4    incorrect at step 1, right, the gateway issue

5    here is, what the does the lease tell us to

6    do?  The lease tells us to value the rent for

7    the land for the subject to the lease itself.

8    That means, at best, you own the land for 20

9    years, you controlled the land for 20 years,

10   five years, really, but 20, at best.  Mr.

11   Tener did not do that.

12             But in addition, below the gateway

13   issue, he also has a series of errors in his

14   report, so my review and my work involved

15   pointing out those errors to McDonald's.

16   They can do with it what they want, but they

17   asked me to review his report, so that is

18   what I did.

19        Q.   So you recommended this to

20   strengthen the advocacy position that

21   McDonald's was taking in connection with this

22   fair market value reset?

23             MR. WALSH:  Objection to form.

24        A.   Again, this is not an advocacy

25   position.  This is -- we are hired as



Page 80

```
 1                    S. Locatell
 2    appraisers, we are subject and bound by
 3    ethics rules.  We are supposed to be
 4    competent in what we do, we are supposed to
 5    be credible and we are supposed to prepare
 6    reports that meet a basic level of standards
 7    at a minimum and I am not advocating for
 8    McDonald's when I tell you that the lease --
 9    the rent option states that you must consider
10    the lease itself, that it is not unencumbered
11    of the lease and that you are directed to use
12    as evidence for the rent to be determined for
13    this five-year period, lease comparables of
14    similar property.  That is what the lease
15    tells us to do.  I am not advocating for
16    McDonald's when I follow those directions.
17              Whether Mr. Tener was advocating
18    for his landlord, I will leave you to make
19    that opinion, but I was not advocating for
20    McDonald's position.  I was hired to tell
21    McDonald's what the fair market rent would be
22    for the renewal and I have done that for them
23    on other occasions.
24              They always just give me the lease
25    and ask me to do the analysis.  On occasion,
```



Page 81

```
 1                    S. Locatell
 2    they will say, can you provide me with sales,
 3    as well, can you provide me with rents?  I do
 4    that.  I do it based on what I think the
 5    market tells me to do, which is what I'm
 6    required to do as an appraiser.  I am not
 7    acting as an advocate.
 8        Q.   Why did you need a defense of a
 9    lower rezoning potential?
10             MR. WALSH:  Objection to form.
11        A.   I'm not sure.  You are picking out
12    a word I wrote in a sentence.  It's my
13    opinion that, putting aside the lease, if
14    there was no lease in place here and I was
15    looking at the site as a vacant site the way
16    Mr. Tener did, there appears to be a
17    potential for a rezoning.
18             Mr. Tener was assuming it was going
19    to be, I believe, spot rezoned, and I would
20    have to go back and check the reports and
21    analysis.  It's my understanding that the
22    community board in which this property lies
23    was very vocally against the rezoning that
24    was being put forth for this site and for the
25    larger end crown rezoning.
```



Page 82

1            S. Locatell

2            As you may be aware if you are

3    active in the real estate market in New York

4    City, community boards are sort of a gating

5    body that you have to get through for any

6    rezoning, whether it's a spot rezoning or

7    rezoning in its entirety and, you know, the

8    trend recently has been for extreme pushback

9    by residents and neighborhood for rezoning.

10   They are tired of having their neighborhoods

11   -- the community boards and the residents

12   have become very vocal in opposition to

13   rezonings.

14           So that was what I was researching

15   or advising McDonald's on, but it had no

16   relationship to my opinion as supported by

17   the market and as supported by the lease

18   itself, that Mr. Tener's analysis was

19   inapplicable and inappropriate and not

20   credible for the purposes of resetting the

21   rent for this rent option, period.

22   Q.   You also said, write a letter in

23   our defense of a, and we talked about lower

24   rezoning potential.  Then you say, cost and

25   timing, et cetera.



Page 83

```
 1              S. Locatell
 2              What is included in those concepts?
 3      A.    To get a property rezoned is no
 4    small matter.  You typically -- you have to
 5    go through what's called the ULURP, the
 6    Uniform Land Use Review Process, which is a
 7    public process which, at a minimum, takes 18
 8    months to two years, it can take much longer
 9    than that.  It cost hundreds of thousands, if
10    not more in legal fees and architectural fees
11    to effectuate such a rezoning.
12              And so I think that Mr. Tener, in
13    making this broad assumption that the subject
14    could just, you know, like this, become
15    rezoned to a higher density, was not
16    reflecting for all the actual costs and time
17    which is also a cost involved in getting a
18    property spot rezoned.
19      Q.    As of May 6, 2019, what you knew of
20    Mr. Tener's thinking was based on what he had
21    told you sometime between April 15th and May
22    6, 2019, right?
23              MR. WALSH:  Objection to form.
24      Q.    Had you seen anything in writing
25    from Mr. Tener relating to this property as
```



Page 84

```
 1                S. Locatell
 2   of the date of this email, May 6, 2019?
 3        A.   I don't recall if we had exchanged
 4   any data or reports by this time.  I don't
 5   think we had, but we had certainly talked
 6   about our valuations.
 7             MR. KOH:  Let's bring up Exhibit R,
 8        which is No. 10.  It's also a May 6,
 9        2019 email.
10        Q.   Do you recognize this document, Ms.
11   Locatell?
12        A.   Yes, it appears to be emails that
13   Carol -- that I sent, I guess, to Carol,
14   Carol responded to and then I then responded
15   to and Ellen Benjamin is cc'd.
16        Q.   I would like to start looking at
17   this on the second page of this document.  It
18   bears Bates No. 2953 and the bottom email at
19   2:57 is an email from you to -- from Ellen
20   Benjamin to you and she says that Sharon is
21   asking for recent net leases signed by
22   McDonald's.  I told her you were going to get
23   us information on the following, and then
24   there is a list of sites.
25             Why -- did you have an
```



Page 85

1                    S. Locatell

2    understanding of why Ellen Benjamin would be

3    going to Carol DeMarco for net lease data?

4        A.   Well, Carol acts -- I'm not exactly

5    sure what her title is, but she has a lot of

6    relationships with brokers in the region, in

7    the market and so it would not be unusual, in

8    doing an assignment like this, to ask for

9    comparable data that they may be aware of

10   that could be useful in the analysis.

11       Q.   Were these leases -- before I ask

12   that question.  Is it unusual for an

13   appraiser to ask their client to provide them

14   with data?

15       A.   Not at all.

16       Q.   There is nothing improper about

17   that, right?

18       A.   No.  In fact, if your client is

19   active in the market, I think it would be

20   improper to not ask them about data of which

21   they are aware of.

22       Q.   And the data specifically that you

23   were seeking were net leases signed by

24   McDonald's, right?

25            MR. WALSH:  Objection to form.



Page 86

S. Locatell

1

2      A.    In this email, yes, but just to be

3  clear, that was not the limitation.  This

4  email was in response to, I believe a

5  conversation that Ellen had with Carol or I

6  had with Carol where she mentioned -- I had

7  asked her whether any new leases in the

8  region had been done because they do lease

9  renewals quite often.  I'm looking

10  specifically in this timeframe.

11           Unlike Mr. Tener, I'm not looking

12  for deals done in the '50s and '60s, but I

13  was looking for lease deals that had been

14  done around this timeframe, and I think she

15  had mentioned these spaces or these locations

16  as being deals that had been, she thought,

17  done around this timeframe, so I believe that

18  I asked Ellen to ask Carol if they would be

19  willing to share this lease data.

20           They don't always share their lease

21  data because of whatever relationship they

22  have with the operators, et cetera.

23  Typically, we, you know, we do everything we

24  can to uncover lease data.  That is the

25  largest part of my job as a appraiser is



Page 87

```
 1                  S. Locatell
 2    detective to find data because that is what,
 3    you know, how I value things, is I have to
 4    value things by looking at what the market's
 5    telling me.
 6              So we had, prior to this, reached
 7    out to numerous appraisal shops, we
 8    researched all of our files, we called
 9    brokerage companies, we drove the area,
10    looked for signs, so this was in addition to
11    the data that we had uncovered, the
12    conversation I had with Carol, these were
13    potential new deals that had been done and I
14    wanted to see what that data was, as well.
15         Q.   And you mentioned in your answer
16    that sometimes McDonald's doesn't like to
17    release its data on its own leases and I
18    think if we look at the email right above
19    that, that comes through.
20              On May 16, 2019 at 3:06, Ms.
21    DeMarco writes to you and Ellen, I need to
22    discuss internally for approval.
23              Do you understand what -- what is
24    your understanding, I should say, of what Ms.
25    DeMarco meant by that?
```



Page 88

1                   S. Locatell

2           MR. WALSH:  Objection to form.

3      A.    I believe that, you know, because

4   McDonald's is not sharing their data, it's

5   confidential, it may be confidential by

6   virtue of their agreements with various

7   landlords, it may be confidential by virtue

8   of their agreements with their operators, but

9   they don't share their data.

10          I had asked specifically, so I

11  believe Carol had to go back, as her email

12  says, to discuss internally for approval.

13     Q.    In the second paragraph, I guess

14  the last sentence or maybe two, depending

15  upon the punctuation, Ms. DeMarco writes, If

16  there is no other good data, I will advise.

17          Was there no other good data?

18          MR. WALSH:  Objection to form.

19     A.    No, we had -- as you can see in my

20  report, I have 11 comps and a listing, I had

21  plenty of other good data, but, again, I

22  don't stop, I'm looking for the universe of

23  comps.

24          So any good appraiser will try and

25  unturn all stones to find information that



Page 89

1                     S. Locatell

2    would be useful in determining an appraised

3    value, so there was good data.  In fact,

4    these would have been -- these other

5    properties here, with the exception of

6    possibly the Bruckner Boulevard deal, these

7    others here, you know, they're densely

8    developed suburban areas and the only reason

9    they are listed here is because during a

10   conversation that I had with Carol, she had

11   mentioned that these might have been deals

12   that were done recently.

13            So I don't even recall if we

14   actually ended up getting this data.  If I

15   had, they would have been required to have

16   been adjusted for the subject's differences

17   or the differences between these comparable

18   properties and the subjects.

19   Q.   Ms. DeMarco writes, I thought it

20   would help for 20th Avenue.

21            What is 20th Avenue?

22   A.   That is another property that we

23   were appraising for them around this time in

24   Queens, further out in Queens, towards Long

25   Island, so I think that was her reference.



Page 90

1                   S. Locatell

2     She thought these comps would have been -- I

3     think it's her opinion these spaces would

4     have been similar to the property on 20th

5     avenue.

6          Q.   During this time, you had at least

7     two active assignments from McDonald's,

8     right?

9          A.   That's correct.  That's not

10    uncommon, doing a couple of assignments a

11    year for them.  They quite often overlap and

12    they take longer than a two to three-week

13    timeframe, as can you see from this

14    assignment.

15         Q.   Turning up to the next page, which

16    is No. 2952.  You wrote back to Ms. DeMarco,

17    I was thinking for use as backup for 840

18    Atlantic Avenue, language of lease references

19    market lease comps.  I want to put in data to

20    show that our land value is near the market

21    lease comps as site is currently zoned.

22              What is the reference to land value

23    in that email mean?

24              MR. WALSH:  Objection to form.

25         A.   All this means is I'm looking for



1               S. Locatell

2    more comps to come up with the value of the

3    site for the purpose of the rent reset.

4        Q.   Wouldn't it be rental value, not

5    land value?

6        A.   Yes, I mean, that's what we were

7    coming up with.  We were not doing land value

8    because we knew that the lease dictated us to

9    look at the property based on rents for

10   similar uses, given the use restriction in

11   terms of encumbrance of the lease.

12       Q.   So land value was an inaccuracy in

13   this email?

14       A.   Yes, it should have -- to be more

15   specific, I should have said rental value,

16   but, again, it was an email, we were emailing

17   back and forth over, can you give me these

18   comps.  I wouldn't read more into it than

19   that.

20       Q.   I appreciate that you wouldn't read

21   more into it.

22       A.   I'm telling you the intent under

23   which the email was written, so you should

24   not read more into it.  The email was written

25   looking for comparable data, lease data to



Page 92

                    S. Locatell
1
2    use in valuing the subject property for the
3    rent resale purpose, that's what this is
4    about, so the specific word I should have
5    used was rental value, but, again, I'm -- I
6    send hundreds of emails a day and I was
7    trying to get Carol to find out if she could
8    give me this comparable information to
9    include in my report, which I, numerous
10   times, told you what the purpose of the
11   report was for and the lease language itself
12   describes that were required to determine the
13   fair market value subject to the lease.
14          So it was a rental value.  Those
15   comps that we were looking for were rental
16   comps.
17       Q.   You then get an email back from Ms.
18   DeMarco, who I imagine understood what you
19   meant.  There is no indication in this
20   document that she didn't.  She writes,
21   Wouldn't you need Brooklyn deals then?  And
22   you wrote back, Yes, or similar high-density
23   demographic areas.  Then you write, I think
24   Ellen thought these deals were recent deals
25   that you had in the boroughs.



Page 93

1          S. Locatell

2          What is meant by high-density

3     demographic areas?

4          MR. WALSH:  Objection to form.

5     Q.   What did you mean when you wrote,

6     high-density demographic areas?

7     A.   Well, I wasn't looking for a

8     McDonald's lease that had been done in

9     Suffolk County, you know, where 2,000 cars a

10    day go by the site.

11         I was looking for deals that were

12    more similar in terms of population density

13    and car traffic density, because the subject

14    site has certain parameters, so I wouldn't

15    have said, give me deals out in, you know,

16    Bergen County, New Jersey or Connecticut.

17         I was looking for comparables that

18    were in urban locations similar to the

19    subject.

20    Q.   That's because when you select

21    comparables, they have to, in fact, be

22    similar to the subject, right?

23    A.   They -- when you select

24    comparables, you are selecting comparables

25    that are the best available data and then you



Page 94

```
 1                  S. Locatell
 2   are making adjustments for their differences
 3   relative to the subject property.
 4            So, yes, that's why all of my
 5   comparables are located within densely
 6   developed, high-traffic areas that are
 7   generally comparable to the subject property
 8   and when they are not comparable relative to
 9   those, specifics adjustments are made to them
10   to bring them in line with comparability of a
11   subject.
12            If I had only had comparables
13   located in less dense areas, you could adjust
14   them to the subject, but I was fortunate
15   enough to uncover a pretty wide variety of
16   comps that were located within New York City.
17       Q.   So some comps are better than
18   others, is what I think you are saying,
19   right?
20       A.   Correct.
21       Q.   What factors do you consider in
22   evaluating whether a comp is a good comp?
23       A.   Date of value is the first factor.
24   Again, I keep saying this, but I would not
25   use comps from 70 years ago.  I would use
```



Page 95

```
 1                  S. Locatell
 2   comps that were executed within a reasonable
 3   timeframe relative to changed market
 4   conditions.
 5           So all of the comparables that I
 6   included in my analysis, I believe were
 7   signed subsequent to sometime in 2014.
 8   That's a fairly wide range.
 9           I was -- the retail market
10   conditions were analyzed and understood by us
11   and so we were able to make adjustments for
12   those comparables that were signed earlier,
13   like in 2014, 2015, when the market for
14   retail was still increasing.  It then sort of
15   flattened out and has not been great.  I'm
16   talking about pre-Covid, I'm not talking
17   about the effects of Covid.  I'm talking
18   about the effects of the retail market duty,
19   cost commerce, et cetera, that we have been
20   seeing in the market since late 2015, early
21   2016, so date of value, No. 1.
22           No. 2 is use, property use, so we
23   look at the subject property and
24   understanding, again, going back to the
25   gateway issue here, which is you control the
```



1                  S. Locatell

2    site for five years to 20 years at best.

3    What could you do with it in that timeframe,

4    right, how can you profitably develop the

5    site and realize a return over that timeframe

6    for which you have control of the asset.

7                  So that led us to understand that

8    you are not going to develop a high-rise

9    residential building, not that you could even

10   do it based on the zoning that's in place

11   now, but you would develop something that the

12   market would recognize over a 20-year term.

13                 We then look at locational

14   differences, so we are on a very high traffic

15   corridor, commercial corridor.  It's not a

16   City-recognized retail corridor.  It is not a

17   corridor that is covered by any real estate

18   office or research firm that sets forth

19   retail rents for the various corridors.  They

20   do not cover this area of Atlantic Avenue or

21   Atlantic Avenue, I don't think, in general,

22   even the stronger areas that have pedestrian

23   retail traffic, more towards Brooklyn Heights

24   and Boerum Hill, on the other side of

25   Barclays Center.



Page 97

1               S. Locatell

2               So we look for comparables that

3    have the same sort of metrics of demographics

4    and traffic counts as the subject site.  We

5    look for size and then we look for lease

6    comparables and, you know, as you can see,

7    there is an active market for sites that

8    range in the area of 10 to 30,000 square feet

9    that are developed for retail uses, retails

10   or drivethrough uses when you are located on

11   a corner corridor that is highly influenced

12   by the traffic pattern such as the subject

13   property.

14               So those were the parameters under

15   which we looked.  We looked for all sorts of

16   retail lease comps.  We did not eliminate --

17   limit it to just looking at QSR, which stands

18   for quick service restaurants or banks or

19   drug stores.  We looked for everything and

20   the universe of comps that we uncovered is

21   presented in our report.

22        Q.   Zoning, is how the property zoned

23   something that you take into account when

24   figuring out is a comp is a good comp?

25        A.   Yes, zoning is considered.  For the



Page 98

1                    S. Locatell

2    type of use we are talking about, it can be

3    done under a M1-1 zoning classification or

4    other manufacturing classifications.  It

5    could be developed under that classification

6    of various C zones, commercial zones.  Also

7    residential zones would allow for this type

8    of development.

9            So for the subject property, in

10   particular, the zoning, while something of

11   note is not as important, because what is

12   most important here, you have to remember, is

13   the term for which you control the sites.

14   Q.   You said that's five years, right,

15   low as five, high as 20?

16           MR. WALSH:  Objection to form.

17   A.   It's a minimum.  We are doing a

18   five-year renewal option here, so you control

19   it for five years, you have a 20-year total

20   control period because there are increases

21   that are allowed for the next 15 years, so

22   it's a 20 year.

23           The way I analyzed it was assuming

24   you had control of the site for 20 years,

25   what I was pointing out was that the lease



Page 99

```
 1                  S. Locatell
 2    term itself was really just five years, but
 3    it's a 20-year controlled term, is the
 4    assumption that we made in our analysis.
 5             MR. KOH:  Let's bring up the next
 6          document, which is not Bates stamped,
 7          it's No. 11 on my list -- it's not
 8          marked as an exhibit yet.  Document
 9          bearing Bates stamped MCD 003543 to 44
10          and it is an email exchange between Ms.
11          Locatell and Mr. Tener.
12             (Exhibit HH, documents bearing
13          Bates stamp No. MCD 003543 and MCD
14          003544, marked for identification.)
15          Q.   Do you recognize what we have
16    marked as Exhibit HH?
17          A.   Yes, this looks like a continuation
18    of the emails that you showed me previously
19    on May 6th.
20          Q.   And you reminded, in the 11:45
21    email, that we have until May 20th, but I
22    have to leave for FL, I assume that's
23    Florida, on the 15th, so we should do it this
24    week or early next week.
25             This was an effort to schedule the
```



Page 100

```
 1                 S. Locatell
 2    telephonic meeting to select the third
 3    appraiser, right?
 4                 MR. WALSH:  Objection to form.
 5         A.    That's correct.
 6         Q.    Mr. Tener writes to you, I'm sorry
 7    to be a pain, but my side is not happy with
 8    the delay between us.
 9                 Did you ever discuss with Mr. Tener
10    why his side wasn't happy with the delay
11    between us?
12         A.    Not that I recall.  We had -- I
13    believe we had until the 20th to select the
14    neutral and as you can see in the email
15    below, I had -- this is what I'm remembering
16    now.  I had a mediation that was going on and
17    then I had another reset, so, and then I was
18    leaving for Florida, I was extremely busy
19    during this period.
20                 And also remember, this is not a
21    delay, there is no delay.  This was May 6th.
22    Tom and I had been talking, I believe, on --
23    it was the 25th of April or something, so
24    this would not be considered a delay.
25                 It may have been -- his clients,
```



1                    S. Locatell

2    the landlord, may have been anxious, but this

3    was not a delay by any stretch of the

4    imagination, that, typically, when you are

5    involved in these processes, to have this

6    done within a few weeks is not unusual.  It's

7    more typical than not.  It usually takes you

8    a few weeks to get to the neutral.

9                    Again, I needed to discuss the

10   neutral with the client and I was working on

11   a reset and mediation, so I was probably

12   effectively, like, in shutdown mode, where I

13   couldn't have phone calls during the day

14   because when I am in a mediation, I get there

15   at 8:00, I leave at 6:00, and then I'm back

16   working until that evening, so I don't get to

17   my emails until after business and I can't

18   schedule calls with clients because I'm

19   prepping for the mediation for the next day,

20   so...

21        Q.   I'm certainly sympathetic to those

22   difficulties.  I have heard some lawyers have

23   to deal with that, too.

24        A.   Really?

25        Q.   Is it fair to say the general



Page 102

1                  S. Locatell

2    expectation in the industry is that the

3    appraisers will cooperate with each other

4    over these scheduling issues?

5         A.   Yes, and that's what we were doing,

6    Tom and I never had a problem, we were

7    cooperating the entire time over this issue.

8              I mean, we obviously disagree

9    because of his incorrect analysis, but no one

10   was being cooperative as it related to

11   selecting a third appraiser.  I was just so

12   busy that I couldn't do it in a week.

13             MR. KOH:  Let's make sure -- I'm

14        going to go to No. 13.  I will skip No.

15        12 for the time being and go to No. 13,

16        which is a May 9, 2019 email from Ms.

17        Locatell to Ms. DeMarco to Mr. Meyer.

18        It's Bates stamped MCD 003349.

19             (Exhibit II, document bearing Bates

20        stamp No. MCD 003349, marked for

21        identification.)

22        Q.   Do you recognize Exhibit II, Ms.

23   Locatell?

24        A.   I do.

25        Q.   So it's correct that on May 11th,



Page 103

```
 1                  S. Locatell
 2    you and Mr. Tener agreed to select Marc
 3    Nakleh as the third appraiser?
 4             MR. WALSH:  Objection to form.
 5        Q.   Did you, on May 11th, agree to
 6    select Marc Nakleh as the third appraiser?
 7        A.   No, the email was sent on Thursday,
 8    May 9th.
 9        Q.   Excuse me, May 9th, I misspoke.
10        A.   Yes, a full three days later from
11    the last batch of emails, we selected our
12    neutral appraiser, Marc Nakleh.
13        Q.   That's nine days before the May
14    20th deadline, I'm sorry, 11 days?
15        A.   Yes, well in advance of the
16    deadline.
17        Q.   I apologize for my botching the
18    arithmetic.
19        A.   If you can wait, there is a fire
20    engine.
21        Q.   Maybe that's what scrambled my
22    neuron a little bit.
23             But you also write, We did not
24    reach out to Marc yet, as we have a
25    disagreement over the language in the lease
```



Page 104

```
 1                    S. Locatell
 2    as it relates to process.
 3                 What was that disagreement?
 4         A.   Well, it says here, he read the
 5    lease to say we all had to come to the
 6    initial meeting with a letter opinion of
 7    value, we will negotiate, but if we can't
 8    agree or get two of the three to agree, we
 9    will average the three values.  That was not
10    my understanding of the procedure we were to
11    follow per the term of the rent option.
12         Q.   What was your understanding of the
13    procedure?
14         A.   Well, if you go to the rent option
15    agreement, I think it's your document 4.
16         Q.   It is Exhibit D.
17         A.   Okay.  If you go to page 1 of that
18    Exhibit D, the last paragraph midway through
19    the paragraph, a sentence that starts, The
20    three appraisers so appointed shall then,
21    within 20 days of the date of the third
22    appraiser is appointed, the date the third
23    appraiser is appointed, estimate by means of
24    a letter opinion of value, the FMV.
25                 What this is directing us to do is
```



Page 105

```
 1                    S. Locatell
 2     for the three appraisers to meet and try to
 3     come to an agreement as to the FMV.
 4                    So Tom and I had a disagreement as
 5     to what this language was telling us to do
 6     and once we selected the neutral appraiser.
 7         Q.    The last sentence of the paragraph
 8     above that reads, Each appraiser's estimate
 9     is to be made by a letter opinion of value.
10                    What does that direct you to do?
11              MR. WALSH:  Objection to form.
12         A.    I'm sorry, can you point me to what
13     sentence you were reading?
14         Q.    Paragraph immediately above.  It's
15     the second paragraph from the bottom, the
16     last sentence.
17         A.    Right.  But that is telling you
18     that if you can't agree, the three of you,
19     then each of you do your letter opinion of
20     value, so each appraiser's estimate is made
21     by a letter of opinion of value, but then
22     when you read the next paragraph, it's
23     telling you that, it tells you how to appoint
24     the third appraiser and if the two appraisers
25     disagree by more than 15 percent and then
```



Page 106

```
 1                    S. Locatell
 2    once all three appraisers are appointed, you
 3    have 20 days in which to meet and determine
 4    the FMV, so if you can't, then each letter of
 5    opinion of value, so there is no -- to pick
 6    sentences here, you have to read this
 7    document in its totality and I think that's a
 8    problem that we are both falling into, is
 9    that in my initial December 18th report, I
10    only had A and B listed, Ellen had only wrote
11    A and B and not the entirety of the option
12    addendum.
13             Once you read the entirety of the
14    option addendum, it's telling you the process
15    to follow and, very clearly, here, it's
16    telling us that if the two appraisers cannot
17    agree within 15 percent, you will appoint a
18    third.  The three appraisers then meet and
19    try to agree to FMV and then if you don't,
20    it's the three letters of opinions that are
21    averaged that determine the rent.
22             So there was steps.  Tom was trying
23    to jump right to the final step.  Tom was
24    assuming that the three of us would not come
25    to some sort of an agreement, he was assuming
```



```
 1                    S. Locatell
 2    that -- he was eliminating that step of the
 3    process, so because of that, that is why I
 4    wrote that email, both of us, because we
 5    disagreed agreed that we should go back to
 6    counsel and have them, you know, deal with
 7    it, so...  but, to me, the clear language is
 8    that the three appraisers shall appoint and
 9    have 20 days to agree.
10              And let me add this one thing.  I
11    should also tell you that I do a lot of these
12    types of assignments and the lease always
13    controls, but in addition to the lease, it is
14    also standard practice for the three
15    appraisers to try and to agree.
16              So not only does it dictate here,
17    but that is also a standard methodology that
18    is followed by the appraisers when they are
19    undertaking these appraisal proceedings.
20         Q.   You used the word, meet, several
21    times.
22         A.   Uh-huh.
23         Q.   I don't see that.  Maybe I'm
24    missing it, but can you point out to me where
25    it appears in this?
```



Page 108

1          S. Locatell

2     A.   When I read this to you, I believe,

3  and it doesn't say the word, meet.  It

4  says -- I will read it again so you remember.

5  The three appraisers so appointed shall then,

6  within 20 days of the date the third

7  appraiser is appointed, estimate by means of;

8  A, of a letter opinion of value, the FMV.

9          So it is telling us that the three

10  of us should meet.  This is the reading here,

11  the three app -- I'm using the word meet

12  incorrectly.  You are assuming that means

13  physically meet or Zoom meet.

14          The three appraisers should try and

15  come to an agreement as to the performance,

16  whether it's meet or whatever, the three

17  appraisers should try to estimate the FMV, an

18  FMV, one letter of value.

19          He is skipping a step, Tom was

20  advocating to skip a step in the rent option

21  agreement document.

22     Q.   In any event, you describe this as

23  a disagreement between you and Tom, correct?

24     A.   Correct.

25     Q.   And, ultimately, you said that, and



Page 109

```
 1                S. Locatell
 2   I can find the exact words if you want to.
 3   This was something that you were going to let
 4   the lawyers deal with?
 5        A.   We were -- yes, we were going to
 6   let the lawyers give their opinion on the
 7   process, yes.
 8             MR. KOH:  Let's bring up what I
 9        have marked as No. 14, Nat, which is an
10        email which is actually dated May 20th
11        from Mr. Tener to Marc Nakleh, which is
12        copied to you.
13             Please mark this as Exhibit JJ.
14             (Exhibit JJ, email dated May 20th
15        from Mr. Tener to Marc Nakleh copied to
16        Sharon Locatell, marked for
17        identification.)
18        Q.   Do you recognize this email, Ms.
19   Locatell?
20        A.   I recognize this, yes.
21        Q.   Is this basically the first
22   communication that you and Mr. Tener had with
23   Marc Nakleh concerning this assignment?
24             MR. WALSH:  Objection to form.
25        A.   To my recollection, yes.
```



Page 110

1          S. Locatell

2     Q.   Do you recall having an initial

3 telephone call around 10:00 a.m. on May 21st

4 to go over the details and discuss conflicts?

5     A.   And I remember having a telephone

6 call, I can't tell if you it ended up

7 happening at 10:00 or some other time.

8     Q.   What do you remember happening

9 during the call?

10     A.   I remember, and I know what I

11 typically discuss, so whether it's exact

12 memory or a recollection based on how these

13 processes proceed, I'm sure we told Marc the

14 property address and asked him -- we told him

15 who the clients are, both on the tenant's

16 side and the landlord side, and I'm sure we

17 advised him as to counsel, what the timeframe

18 was and the first thing we would have asked

19 him would have been to clear conflicts, to

20 make sure he didn't do a lot of work for

21 McDonald's or he didn't do a lot of work for

22 the landlord, et cetera.

23          Obviously, Tom and I selected him

24 because we felt confident that he had the

25 experience to opine on rental values within



1                    S. Locatell

2    the subject market area, so our conversation

3    to him, the initial conversation would have

4    been primarily based on finding out if he had

5    a conflict and describing the asset and

6    rental value that we were looking for.

7         Q.   Do you remember how Marc responded

8    when you had this telephone call?

9         A.   I remembered he was thankful we had

10   confidence, that both Tom and I had

11   confidence in his abilities and I think he

12   thought that he was okay on conflicts, he

13   needed to check, obviously.  He is with

14   Cushman & Wakefield, which, as you know, is a

15   large national firm and they are quite active

16   in New York City, so I don't recall if he had

17   any hesitation as to having conflicts with

18   either the landlord or the tenant, but that's

19   my recollection of our first conversation.  I

20   don't recall it in any great detail, given it

21   was over two years ago.

22             MR. KOH:  Let's then bring up No.

23        15.  That is a document that bears Bates

24        No. MCD 002674 to 75 and mark that as

25        the next exhibit, which is KK.



Page 112

1          S. Locatell

2          (Exhibit KK, documents bearing

3      Bates stamp No. MCD 002674 and MCD

4      002675, marked for identification.)

5      Q.   Do you recognize Exhibit KK?

6      A.   I see it's an email that Mr. Meyer

7  sent to myself regarding Mr. Nakleh's

8  retention.

9      Q.   He was asking you for comments,

10 correct?

11     A.   That's correct.

12     Q.   Did you find anything unusual about

13 the fact that Mr. Meyer was asking you to

14 comment on this retention letter?

15     A.   No, that's quite common for the

16 attorneys to ask if he is describing what we

17 are asking of the neutral in specificity, if

18 the right language is included, this is quite

19 common for me to comment on retainers for the

20 neutral and it's common for both sides, the

21 retainer typically goes back and forth, and

22 the party-appointed, either arbitrators or

23 appraisers, will look at it and comment and

24 the attorneys will and the owner and tenants

25 will, so that is very common.



Page 113

1          S. Locatell

2      Q.   Do you recall if you, in fact, made

3  any comments?

4      A.   I do not recall.

5          MR. KOH:  Let's, Nat, bring up what

6          I had marked as Exhibit 35.  It was

7          previously marked as Exhibit V, as in

8          Victor.

9      Q.   Do you recognize Exhibit V, which

10  was previous 35 on your screen?

11      A.   Yes, it appears to be an email that

12  I -- in response to Mr. Meyer asking if I had

13  any comments on the Nakleh retainer letter.

14      Q.   In fact, you had two?

15      A.   I think I had three.

16      Q.   Right, okay.  So you had three.

17  The first comment was, Take out the reference

18  to the Prospect Heights neighborhood.

19          Why was that?

20      A.   I would have to look at the

21  retainer letter to be able to answer these

22  questions, so if you could pull that up, I'm

23  happy to look at it and try to answer them.

24      Q.   I think the draft was the second

25  page of what was marked as KK.



Page 114

1              S. Locatell

2     A.    Do you know the document number?

3     Q.    Fifteen.

4     A.    Fourteen?

5     Q.    Fifteen.

6           MR. WALSH:  I believe it was 14 --

7     Q.    Fourteen, I'm sorry, KK.

8     A.    Sorry, I missed the second page.

9     Q.    I described it badly.  It's clearly

10   my problem, not yours.

11    A.    Your question again?

12    Q.    My question is, why did you

13   recommend to Mr. Meyer to take out the

14   reference to the Prospect Heights area?

15    A.    The subject property is really

16   located on the border of Prospect Heights and

17   Crown Heights and it's unusual to put the

18   specific neighborhood within a retention

19   letter, so I was suggesting that it be

20   struck, it's not necessary.

21    Q.    Prospect Heights, how would you

22   describe that neighborhood as of the first

23   half of 2019?

24    A.    So Prospect Heights is -- as you

25   know, in New York City, neighborhood names



Page 115

```
 1                    S. Locatell
 2   get invented, changed, expanded by brokers
 3   and it's all in an effort to make
 4   neighborhoods seem very desirable and part of
 5   a more gentrified neighborhood as opposed to
 6   a neighborhood that might be more gritty.
 7             Calling the subject property
 8   Prospect Heights, it's now sort of accepted
 9   as being part of Prospect Heights, but it's
10   not the original part of Prospect Heights.
11   Prospect Heights initially was the area where
12   and even the part of where the Barclays
13   Center was not really Prospect Heights, that
14   was Flatbush.  Flatbush sort of divides it
15   between Part Slope and Prospect Heights.
16   Prospect Heights is a mixed residential area
17   that has retail sources on the ground floor.
18             It largely was improved prior to
19   the massive rezoning that Forest City Ratner
20   undertook 20 years ago or so was a brownstone
21   neighborhood and, you know, there was a very
22   contentious sort of major rezoning, part
23   state, part city, and they expanded -- that
24   rezoning has led to an expansion of sort of
25   the definition of Prospect Heights.
```



Page 116

```
 1                    S. Locatell
 2              Some people still refer to the area
 3    west of the subject up to Atlantic and
 4    Flatbush as Pacific Park and immediately to
 5    the east of the subject is Crown Heights, so
 6    the subject property is the rezoning that
 7    they're talking about for the subject
 8    properties area directly to the west is Crown
 9    Heights.
10              So I would define Prospect Heights
11    as a gentrifying sort of brownstone
12    neighborhood, the boundary of which was
13    really Atlantic Avenue, because Atlantic
14    Avenue was not a brownstone gentrifying
15    neighborhood.
16              So, anyway, the reason I suggested
17    the neighborhood be taken out, because the
18    subject is sort of located at this crossroads
19    and also not typical to include a
20    neighborhood identification in a retainer
21    letter.
22         Q.   So calling it -- saying it's within
23    the Prospect Heights area, is it fair to say
24    you feared that might give the property a
25    cache that it really wasn't worth having?
```



Page 117

```
 1                    S. Locatell
 2              MR. WALSH:  Objection to form.
 3        A.    I don't fear anything.
 4        Q.    There is a lot I'm afraid of.
 5        A.    Not me.  I used to be a base
 6   jumper.
 7              As I said, it is unusual to define
 8   a property's neighborhood in a retainer
 9   letter and the property is not firmly located
10   in one neighborhood or another, so I
11   suggested they take it out and that was my
12   reasoning, those two points were my
13   reasoning.
14        Q.    Then you write, Also, I thought you
15   were going to add language highlighting the
16   fact that the renewal option calls for
17   consideration of comparable leases to
18   determine the fair market rental value.
19              Why did you make that suggestion?
20        A.    Because that's what the ground
21   lease says.  It's very clear.  That
22   suggestion is so that -- again, apparently
23   Mr. Tener was confused with what the ground
24   lease said.
25              So I think it's very important to
```



Page 118

```
 1                    S. Locatell
 2   point the language to the lease, which is
 3   very specific and it tells the appraiser what
 4   to do.  If there are comparable leases for
 5   rental properties like the subject, that is
 6   the approach to be used.
 7            You use the residual only and when
 8   you can't find comparable leases so, there is
 9   nothing wrong with highlighting something
10   that's specific to the rent renewal option.
11   It actually helps the neutral appraiser and
12   most -- I've acted as a neutral many, many
13   times.  Typically, what I will do when I'm
14   trying to understand and put together a
15   retainer, I will talk to both parties and see
16   what does the language of the lease
17   specifically say.
18            So this was just in order to make
19   the assignment very clear and to reference
20   the actual rent option addendum, which is
21   what is directing, both myself, Tom and the
22   neutral, to do in determining the valuation
23   applicable to the subject property.
24        Q.   Did you tell us earlier any
25   competent appraiser would be able to read the
```



Page 119

```
 1                    S. Locatell
 2    lease of the rent option and figure out what
 3    -- didn't you tell us earlier, Ms. Locatell,
 4    that any competent neutral appraiser could
 5    simply read the lease and figure out what was
 6    required?
 7                    MR. WALSH:  Objection to form.
 8         A.    I believe what I told you is that
 9    any competent appraiser could --
10    understanding -- there are two things.  Yes,
11    any competent appraiser who does these
12    proceedings and understands how to read
13    ground lease rent reset provisions would know
14    that the lease does not explicitly say to
15    give consideration of determining value
16    without the lease in place, right.
17                    So there is a certain level of
18    competency you need to do this job and any
19    competent appraiser who was aware of how you
20    read these leases would know how to do that.
21                    What I think I was referring to was
22    would any competent appraiser understand, if
23    you only controlled this property for 20
24    years, that that value would not be the same
25    if you controlled it for a hundred years.
```



Page 120

```
 1                 S. Locatell
 2    That's what my reference to any competent
 3    appraiser was.
 4        Q.   You believe that Mr. Nakleh was
 5    competent to serve as the neutral here,
 6    right?
 7        A.   I did.  It is completely within the
 8    realm of typical practice for the retainer
 9    agreement to specifically reference.  This is
10    an unusual -- the two paragraphs here that
11    Mr. Meyer wrote is an unusual presentation of
12    a retainer for a neutral.  Typically, they
13    will include all of the language in the
14    option for the part of the lease that relates
15    to the rental determination that the neutral
16    is being hired for.
17             Most often, it will reference the
18    entirety of that section and Mr. Meyer
19    suggested couple of paragraphs did not do
20    that, so that's why I was saying to him that
21    you should put in and highlight what we were
22    actually supposed to be doing and this is
23    something that is done in all of these
24    proceedings.  It is very typical for, again,
25    both the party-appointed appraisers, as well
```



Page 121

1                       S. Locatell
2      as counsel and client to look at this
3      retainer agreement and also for the neutral
4      to have the parties explain to them exactly
5      what they'll be doing, what their role is,
6      show me the language, I want to know the
7      entirety of the option agreement so I know my
8      function is.
9           Q.   But it was your position that Mr.
10     Tener had not considered comparable leases to
11     determine the fair market value, right?
12               MR. WALSH:  Objection to form.
13          Q.   Wasn't that your contention?
14          A.   It's not a contention.  It's a
15     fact.
16          Q.   And you wanted to make sure that
17     the Mr. Nakleh understood that, in your view,
18     the lease required consideration of
19     comparables, right?
20               MR. WALSH:  Objection to form.
21          A.   Again, you are asking questions
22     that seem to me that you believe I was acting
23     as an advocate.  I was not acting as an
24     advocate here.  I was trying to make Mr.
25     Nakleh's job easier, which was to understand



1                    S. Locatell

2    what he was supposed to do as a neutral.

3              The full language of the rent

4    option addendum was not included in what Mr.

5    Meyer had sent me, so the -- what I was

6    trying to do was to make it clear what Mr.

7    Nakleh's job was in being hired as the third

8    appraiser.

9         Q.   Therefore, you also wanted to

10   highlight it was a five-year renewal term to

11   help make it clear to Mr. Nakleh?

12             MR. WALSH:  Objection to form.

13        A.   Of course.

14        Q.   Because you were concerned Mr.

15   Nakleh would not be able to read the lease

16   and understand it as you did?

17             MR. WALSH:  Objection to form.

18        A.   Mr. Koh, again, I selected Mr.

19   Nakleh or I agreed to Mr. Nakleh as a neutral

20   because I believe he is competent to do this

21   job.

22             So I'm not afraid of the lease.

23   The lease is the lease and when you do an

24   appropriate retainer, you should include the

25   full language of the lease.



Page 123

1          S. Locatell

2     Q.    Now, you also believe that Mr.

3 Tener had different views about the need to

4 reconsider the option -- to consider market

5 comps and the five-year renewal term, right?

6     A.    What I knew at that point was that

7 Mr. Tener had incorrectly prepared his

8 analysis.  He then changed his mind and

9 agreed that the determination of rental value

10 was subject to the term of the lease, but

11 when he and I first spoke about values, he

12 thought that we were valuing the land,

13 assuming that the tenant was going to own it

14 in perpetuity.  He was assuming that it was

15 free, vacant and unencumbered of the lease

16 itself and it does not say that.

17          So Mr. Tener was incorrect, to the

18 benefit of his client, and subsequent to our

19 meeting, he and his client did agree that the

20 language of the lease is such that the rental

21 redetermination should take into account the

22 fact that we are dealing with an encumbered

23 property, so Mr. Tener corrected his mistake

24 and all I'm doing here is saying, you have a

25 neutral appraiser, the typical process in



Page 124

```
 1                    S. Locatell
 2    writing one of these retainer agreements,
 3    because this is what Mr. Nakleh is going to
 4    ask, is, what is the lease language that is
 5    guiding my role here?
 6              And if you had all of that lease
 7    language in there, then I wouldn't have had
 8    to say, you know, put in, highlight the fact
 9    that you have to consider that the lease
10    tells you that you have to consider rent
11    comparables if they exist.
12         Q.   Why didn't you just recommend that
13    you put -- you quote the lease language, why
14    go through all of this discussion of what you
15    think it means?
16         A.   I don't think it's all this
17    discussion.  I think I wrote three sentences,
18    20 words, it's not a lot of discussion.
19    Maybe I should have said that, as well, but
20    that was the intent of the email.  I can tell
21    you that.  I can tell you by virtue of my
22    experience, that this is -- the retention
23    letter for the neutral is typically a parsed
24    document, both sides look at it and they want
25    to make sure the language of the lease is in
```



Page 125

1                    S. Locatell

2      there.

3              And what Mr. Meyer sent me did not

4      reflect for that, so that was why I sent this

5      email.  I could have said, just copy the

6      whole rent addendum and put it in the

7      retainer, it would have been the same thing.

8              MR. KOH:  Let's bring up the next

9          document, which is No. 16 in my list and

10         it's a May 31, 2019 email from Ms.

11         Locatell to Marc Nakleh and Tom Tener

12         bearing Bates stamp numbered MCD 003463

13         to 66.  Please mark this as LL.

14             (Exhibit LL, documents bearing

15         Bates stamp No. MCD 003463 through MCD

16         003466, marked for identification.)

17     Q.    Do you have that in front of you,

18     Ms. Locatell?

19     A.    I do.  I'm looking through it, if

20     you give me a moment.

21     Q.    Tell me when you are ready for

22     questions.

23             MR. WALSH:  Howard, I'm not

24         suggesting we take a break right at this

25         moment, but we've been going for about



Page 126

```
 1              S. Locatell
 2      an hour and 20 minutes, so I wouldn't
 3      mind taking a break after you get
 4      through some questions about this
 5      document.
 6          MR. KOH:  I was going to do this
 7      document and one other.  If you want to
 8      take a break before, then that's
 9      absolutely fine, but that was going to
10      close out an area, but any time either
11      you, Sharon or Leslie need to take a
12      break, just let me know.
13          MR. WALSH:  I have no objection to
14      doing this document.
15          MR. KOH:  I am cognizant that we
16      are approaching 90 minutes and that's a
17      long time for anybody.
18      Q.   Are you ready, Ms. Locatell?
19      A.   I am.
20      Q.   First, I would like to focus on the
21  last email here, March 22nd, and that's an
22  email that you sent to Marc Nakleh, right?
23      A.   March or May?
24      Q.   I'm sorry, May 22nd, excuse me.
25      A.   It is, yes.
```



Page 127

```
 1                   S. Locatell
 2        Q.   That was for purposes of disclosing
 3   conflicts?
 4        A.   It appears to be, yes.
 5        Q.   And you write just before the list
 6   at the bottom, As per Tom, his client
 7   (landlord) consist of the following persons
 8   and entities, right?
 9        A.   Correct.
10        Q.   And then there is a list?
11        A.   Uh-huh.
12        Q.   Did you get that list from Mr.
13   Tener?
14        A.   I believe so, yes.  I -- actually,
15   I don't remember where I got the list.
16        Q.   But that was the list that you sent
17   to Mr. Nakleh for sure, right?
18        A.   That's correct, cc'ing Tom.  I did
19   not have discussions or contact with Mr.
20   Nakleh.
21        Q.   I'm sure you didn't and I didn't
22   mean to imply that you did.
23             Then there is some discussion about
24   scheduling and things like that and at the
25   top email from May 31, 2019 at 10:09 a.m.,
```



Page 128

```
 1                    S. Locatell
 2    you write, Thanks, looks like it will be
 3    another beauty.
 4               What does that mean?
 5         A.    Well, at this point, there was
 6    already disagreements to even getting to what
 7    -- hiring the neutral.  It seemed as if the
 8    clients were not getting along from Tom and
 9    I, our perspective, so that's what it meant.
10               It wasn't going to be -- there are
11    some cases where tenants and landlords will
12    hire you and say, go at it.  There are no
13    attorneys involved, I should point out, and
14    they will let the appraisers do their job,
15    come to a conclusion and send final opinion
16    of value.
17               Usually once the attorneys are
18    involved, it turns into these very protracted
19    procedures, such as we have now, that may or
20    may not end up in litigation, so we --
21         Q.    It has.
22         A.    But that's what I think I was
23    referring to, was that the sides were not
24    agreeing, so sometimes, as a neutral, you
25    just, at the end, you show up to the meeting,
```



Page 129

```
 1                    S. Locatell
 2    you write your report, you do whatever you
 3    are directed to do and, other times, you have
 4    to be involved during the process to get to
 5    that point because the clients disagree over
 6    every little thing, so...
 7         Q.   So this was one of those, would it
 8    be fair to say, a hard fought appraisal?
 9              MR. WALSH:  Objection to form.
10         Q.   Would you characterize it as hard
11    fought?
12         A.   No, I mean not at that point.  All
13    Tom and I had done was -- and I don't even
14    remember if we met in person or had a phone
15    call talking about value.  We knew we were
16    not close and then we selected a neutral, so
17    I wouldn't say it was hard fought.
18              I was just saying it seemed like
19    the clients were not getting along and that
20    was an opinion that both Tom and I shared.
21         Q.   Would it be fair to say that both
22    of the clients, McDonald's and Vanderbilt,
23    were very entrenched in their positions?
24              MR. WALSH:  Objection to form.
25         Q.   Would that be fair to say?
```



Page 130

```
 1                   S. Locatell
 2      A.   I can't speak to the landlord's
 3 position.  All I can tell you is that
 4 McDonald's, they didn't have a position.  I
 5 had a position.  They asked me what the value
 6 was based on the terms of the lease and I
 7 told them, so I don't know if I would call it
 8 entrenched.  They hire me as an expert and
 9 they, I, think feel comfortable with my
10 analysis based on my experience, so I told
11 them what the value of the rent was for this
12 renewal term based on all the market data
13 that we had uncovered.  And the value was,
14 you know, in the range of $350,000 a year.
15           As to the landlord's position, you
16 would have to ask the landlord whether they
17 were entrenched.  McDonald's just knew what
18 their hired expert was telling them the value
19 of the property was.
20           MR. KOH:  Let's bring up the next
21           document, No. 17, in the list and mark
22           it as MM, Mary, Mary.  It's a one-page
23           email bearing Bates stamp MCD 005436.
24           (Exhibit MM, document bearing Bates
25           stamp No. MCD 005436, marked for
```



Page 131

1                    S. Locatell

2         identification.)

3         A.    I have it.

4         Q.    Can you tell me what this document

5    is?

6         A.    Again, this is an example of the

7    work we do to make sure we have the totality

8    of the lease comps.  This was sent to Dan

9    Sciannameo at Albert Valuation Group and we

10   are asking if he has any other -- any lease

11   comps for pad site retail rent.

12        Q.    You specifically said pad site,

13   right?

14        A.    That's what it says.  Looking for

15   any pad site rental retail comps.

16        Q.    Then you say, MCD, which I assume

17   is McDonald's; Dunkins, which is Dunkin

18   Donuts; Starbucks; banks.  You say all that?

19        A.    That's correct.

20        Q.    You say, I have a site on Atlantic

21   Avenue in Brooklyn, right?

22        A.    That's correct.

23        Q.    Why didn't you just give him the

24   address, say, do you have any comparable

25   sites for this address?



Page 132

1              S. Locatell

2       A.   I don't know.  No reason.

3  Sometimes -- I don't always include addresses

4  because appraisers, when you are asking for

5  data, they may just on their own limit the

6  market they are looking for.

7              I was looking for all of the data,

8  so if I just say Atlantic Avenue, I will get

9  the stuff to the east, the stuff to the west.

10 You know, to my recollection, I don't know if

11 David had anything.  I think I spoke to him

12 subsequent to this and, you know, told him I

13 had a 30,000 square foot site, was looking

14 for retail rent comps, but he's -- we are --

15 and I'm sure that Tommy talks to him a lot,

16 as well.  We share data with each other all

17 the time.

18      Q.   But you specifically said pad

19 sites.  Wouldn't that limit the data he would

20 give you?

21      A.    No.  He would have considered

22 retail sites on Atlantic Avenue or other

23 retail corridors.

24              I spoke to Dan, so, you know, there

25 is -- I don't specifically recall if I shared



                        S. Locatell
1
2    the address with him on the phone call.
3    Chances are, I had, because by this point, we
4    had already hired our neutral.  Dan
5    Sciannameo would have been one of the
6    appraisers probably on Tom Tener's and my
7    list for a potential neutral at one point, so
8    because he is very active in Brooklyn and
9    knew the area well, he was born and bread in
10   Park Slope, which is not far from here, so
11   Dan is smart and knowledgeable and knows what
12   comps, he would have sent me, had he had
13   them.
14        Q.   You told him to get pad sites,
15   right?
16        A.   Yes.
17        Q.   Not development sites?
18        A.   Well, I'm not sure of the
19   distinction you are making.
20        Q.   You were the one who made a
21   distinction before?
22        A.   You asked me.  You made the
23   distinction.  You asked me to describe
24   broadly the definitions of those two, but a
25   development site, a pad site is a development



Page 134

```
 1                   S. Locatell
 2    site, it's being developed for a retail use
 3    where you have control for a limited amount
 4    of time, so if I had said to him, Dan, I need
 5    comps of development sites near Atlantic
 6    Avenue, he would have sent me sales of land
 7    that were unencumbered, whereby the owner or
 8    tenant had control in effectively perpetuity
 9    and that's not what I needed.
10              Remember, here, the term is a
11    defining issue of what we are looking for in
12    terms of value here, so it would have been, I
13    would not have gotten anything relevant had I
14    said, development sites.
15        Q.   You didn't say five-year term, you
16    didn't say 20-year term, you said pad sites,
17    right?
18        A.   That's what I said.
19             MR. KOH:  Okay.  I think now is a
20        good time to take a lunch break.
21             (Luncheon recess taken.)
22
23
24
25
```



Page 135

```
 1                S. Locatell
 2            A F T E R N O O N   S E S S I O N
 3            (Time noted:  1:47 p.m.)
 4   S H A R O N   L O C A T E L L,   resumed and
 5      testified as follows:
 6            MR. KOH:  Can you please bring up
 7        No. 19, which is a June 27, 2019 -- June
 8        17, 2019 letter from Ms. Locatell, which
 9        was previously marked as Exhibit W.
10   EXAMINATION BY (Cont'd.)
11   MR. KOH:
12       Q.  Ms. Locatell, do you recognize
13   Exhibit W?  And feel free to look through all
14   nine pages.
15       A.  Thank you.  I do recognize it, yes.
16       Q.  Tell us what it is, please.
17       A.  It is the June 17, 2019 letter of
18   value that we prepared in regard to
19   determining the rent for the -- the renewal
20   rent for the renewal period per the terms of
21   the rent option agreement.
22       Q.  There is also --
23            MR. KOH:  Pull up Exhibit No. 18,
24        Nat, which is a letter dated the same
25        date, which is designated Exhibit X.
```



Page 136

1                    S. Locatell

2      Q.   And, Ms. Locatell, when that's up,

3  it's now document 19, can you tell me what

4  this is?

5      A.   This is the same -- excuse me while

6  I have a sip of water.

7      Q.   Take your time.

8      A.   This is the same report, but in a

9  longer format.  It is also setting forth the

10  rental value of the subject site per the term

11  of the rent option addendum.

12      Q.   Why did you prepare two separate

13  versions of this report?

14            MR. WALSH:  Objection to form.

15      Q.   Why are there two separate versions

16  of this report?

17            MR. WALSH:  Objection to form.

18      Q.   Can you answer that question?

19      A.   Yes, the first version is just a

20  short format report that we would have

21  supplied to the client and then the longer

22  version is the format that we would have

23  supplied, it has more detail of our analysis

24  of the adjustments that we made to the

25  comparables that would have been likely



Page 137

1                    S. Locatell
2    supplied as part of the appraisal proceeding
3    process.
4        Q.   Now, were these two appraisals the
5    only two appraisals that you prepared for --
6    or opinions of value, I should say, that you
7    prepared for 840 Atlantic Avenue from the
8    period December 12, 2018, which was the date
9    of the last two appraisals or opinions of
10   value we looked at and these?
11            MR. WALSH:  Objection to form.
12       A.   Yes, yes, to my recollection, these
13   are the only two.
14       Q.   Did you --
15       A.   I'm sorry, I just want to add on to
16   that answer.  Remember, I told you when I
17   give an opinion of value, even verbally, that
18   is an appraisal report, so I had been talking
19   to the client throughout this process, but as
20   to written reports that we exchanged, these
21   were the only other two.
22       Q.   Did you, after the preparation of
23   these two June 17th reports, attend a meeting
24   at the offices of Morris Missry?
25       A.   I don't recall when that meeting



Page 138

```
 1                 S. Locatell
 2    was.
 3         Q.   But you recall the meeting?
 4         A.   I do recall the meeting.  I just
 5    don't know if it occurred after this report
 6    or before this report.  I don't recall when
 7    it was.
 8         Q.   Who was at this meeting?
 9         A.   I believe -- I know Carol DeMarco
10    was there, Mr. -- Mike Meyer was there, I
11    believe, myself, obviously, Tom Tener was
12    there I know, Mr. Missry was there, I believe
13    Mr. Li was there and I believe Mr. Rottenberg
14    was there, but I'm not 100 percent certain.
15         Q.   What happened at this meeting?
16         A.   We discussed our differences in
17    value and Mr. Tener and Mr. Rottenberg's
18    incorrect reading of the lease.  Mr. Missry
19    was quite vocal and a little rude at the
20    meeting, but that's generally what we were
21    talking about.  It was a subject property and
22    the rent option agreement and how we came to
23    value.
24              I do remember exchange -- giving
25    Tom my comparables and he spent some time
```



Page 139

```
 1                  S. Locatell
 2    looking at them and discussing them and
 3    questioning me on them.  That's the extent of
 4    really what I remember.
 5         Q.   Did Mr. Tener or anybody on the
 6    Vanderbilt side give you any documents at
 7    that meeting?
 8         A.   I don't believe that either of us
 9    left with documents.  I think that we were --
10    and I don't actually recall if we exchanged
11    reports, other than I gave my list of
12    appraisal comps during the meeting.  I recall
13    giving those to Mr. Tener.
14              I don't remember if, at the
15    meeting, he gave me his actual report or we
16    were just talking about the assumptions he
17    made in his report.  I don't recall.
18              MR. KOH:  Nat, can you please bring
19         up No. 20, which was previously marked
20         as Exhibit 32.  It's a restricted
21         appraisal of Tom Tener.
22         Q.   And, Ms. Locatell, I would like you
23    to take a look at Plaintiff's Exhibit 32 and
24    tell me if you recognize it?
25         A.   Yes, I recognize this report.
```



Page 140

1                    S. Locatell

2        Q.   What is it?

3        A.   It's a restricted appraisal report

4   that Mr. Tener and Sean Kest (phonetic)

5   prepared.  It's dated April 15, 2019 and it

6   purports to set forth the fair market value

7   of the demised premises.

8        Q.   And do you remember when you first

9   saw this report?

10        A.   I think I just testified to that.

11   I'm not sure if I actually saw it at the

12   meeting with Mr. Missry and McDonald's

13   personnel or if it was given to me after that

14   meeting, I don't recall.

15        Q.   I want to focus on document 18 and

16   19, which are the two versions of the June

17   17th report that you prepared and I have some

18   questions about the difference between them.

19            In the short one, which is Exhibit

20   W, you did not include a sales (rental)

21   comparison approach, yet, you did in the long

22   version, Exhibit X.

23            Can you tell me why?

24            MR. WALSH:  Objection to form.

25        A.   So the letter, document 18, Exhibit



```
 1                    S. Locatell
 2   W, is setting forth our conclusion based on a
 3   rental value approach.  The only difference
 4   is that this letter is a short form and it is
 5   basically the conclusion without the extended
 6   analysis and individual pages of the
 7   comparables that are set forth in this
 8   report.
 9            So there is no different
10   methodology or work that was undertaken to
11   prepare this report versus the other report.
12   This is just presentation, this is showing a
13   short form presentation of the research and
14   data that was done via the rental comparison
15   approach with our conclusions.
16            The second document, document No.
17   19, which is exhibit -- I don't know what
18   exhibit that is.
19       Q.   X.
20       A.   -- X shows the detail, so instead
21   of having it in our file, now I've taken it
22   and we put it into the report itself, so
23   there is an adjustment grid and there are
24   individual pages that set forth the details
25   of each lease comparable, but this analysis
```



Page 142

1              S. Locatell

2   was done in preparation of the short form

3   report.  It's just presented in a short form

4   analysis, not too dissimilar to Mr. Tener's

5   restricted report, whereby he has no backup

6   for any of his assumptions or land sales, so

7   the same work and analysis went into both

8   reports.

9              The shorter report is nothing more

10  than that.  It's a shorter presentation of

11  the same valuation analysis.

12      Q.   Why make a shorter and longer

13  presentations?  That's my very basic

14  question.

15      A.   Well, the client didn't require a

16  longer presentation and the longer

17  presentation was if we needed to submit the

18  report at any point during the appraisal

19  proceeding, we wanted to have all the

20  documentation in there, so this is not

21  unusual.

22             The initial short form was for the

23  client to look at and see the comps we were

24  using.  The analysis was put into the longer

25  form report so that if the report was



Page 143

```
 1                    S. Locatell
 2  submitted to another party, they would have
 3  an understanding as to how we derived the
 4  number.
 5           I had been speaking to McDonald's
 6  over months at this point about what my
 7  valuation was, so they were not requiring the
 8  backup analysis for it.  That is the reason
 9  for the two different report formats.
10      Q.   Were either of these, the short
11  form or the long-term presentation, at any
12  point given to Vanderbilt?
13           MR. WALSH:  Objection to form.
14      Q.   Any representative of Vanderbilt?
15           MR. WALSH:  Same objection.
16      A.   I don't recall.  Typically, the
17  reports, if they're exchanged, would have
18  been exchanged through counsel in these
19  proceedings.  I don't recall.  Again, as I
20  said, I don't remember if I saw Tom's report
21  at the meeting with Morris or if we exchanged
22  reports after that meeting.
23           At some point, I came to have a
24  copy of Tom's report, obviously, because I
25  did analysis in looking at his assumptions,
```



Page 144

```
 1                 S. Locatell
 2   his data, et cetera, but I don't recall if I
 3   exchanged a report with him directly or if it
 4   was done through counsel.
 5       Q.   Let's focus a little bit on the
 6   long form since that contains more
 7   information.
 8            On pages 4 and 5, and we are
 9   looking at Exhibit X which is No. 18, I'm
10   sorry, No. 19, you've got what appear to be
11   eight different comps and something
12   identified as L-1, which -- you have eight
13   different comps and something identified as
14   L-1.
15            What is L-1?
16       A.   Listing.
17       Q.   So that was a deal that was being
18   negotiated, but not final, right?
19       A.   That's not exactly correct.  I'm
20   having -- hold on one second while I try to
21   enlarge this.  The print is quite small.
22            I don't think it was a deal being
23   negotiated.  I think it was a listing and we
24   had had a deal that had been in negotiation
25   at -- they were asking $312,000 in rent for
```



Page 145

```
 1                   S. Locatell
 2   the site, they had a deal that was close to
 3   being done at $280,000 per annum, but it fell
 4   through and so it was still being listed and
 5   the broker reported that after that deal fell
 6   through, the only offers they had received
 7   were between 180,000 and $220,000, so it was
 8   fully still a listing at this point.
 9              Yes, and I'm familiar with this
10   site because I've done work for this
11   landlord.  I was able to speak to the broker
12   specifically and this is well researched and
13   accurate data that's contained in the note.
14              MR. WALSH:  As a quick suggestion,
15        I'm curious, is this among the hardcopy
16        documents?
17              MR. KOH:  Yes.  If you would like
18        to go to the two large boxes, if you
19        want to pull them out, they are
20        organized by Bates number.  If you want
21        to pull them out to review them.
22              MR. WALSH:  She said she was having
23        a hard time reading them, that's why I
24        suggested that may be another option.
25              THE WITNESS:  Give me a moment.  I
```



Page 146

```
 1                  S. Locatell
 2       will see if I can find it in here.
 3       A.   I found it.
 4       Q.   I'm glad you have it in front of
 5   you because now, I'm going to turn your
 6   attention back to one of the December 12,
 7   2018 appraisals.  This one with the
 8   comparable net leases.  You can pull it up on
 9   your screen, it is No. 5.
10            And I want you to turn to the
11   fourth of eight pages where you have a table
12   of comparable net leases.
13       A.   I'm there.
14       Q.   Now, you've got on that table, you
15   have three net comparable net leases, two
16   Burger Kings and a Chipotle.
17            Am I correct that the two Burger
18   Kings appear on the table in what's been
19   marked as Exhibit X, which we are now looking
20   at in hardcopy, but the Chipotle, I don't see
21   there and I'm wondering if I'm missing
22   something or if there was a reason that
23   Chipotle fell off the list of appropriate
24   comps?
25       A.   2940 Cropsey Avenue is the address.
```



Page 147

```
 1                  S. Locatell
 2   It is not included on the list.
 3        Q.    How did that become an
 4   inappropriate comp, the one that wasn't
 5   included?
 6        A.    I don't believe it's an
 7   inappropriate comp.  I don't know why it fell
 8   off the list.
 9             I do know that they kept the
10   building there, so maybe -- Ellen put this
11   initial list together.  That may have been
12   why, but I have no explanation as to why it
13   is not on the list.  It should be on the
14   list.  I see it as a very good comparable.
15   It rented for 300,000 in a location that is
16   somewhat inferior to our location, so it
17   brackets our value very nicely.
18             I can't explain why it's not on the
19   list.  It's probably on oversight.
20        Q.    After the page -- and I want to
21   turn your attention back to Exhibit X which
22   is the long version of the June 17th opinion
23   of value.
24             After the table of comparable
25   ground rents retail, you have --
```



Page 148

```
 1                S. Locatell
 2      A.   Hold on one second.  That's not the
 3 one I found in hardcopy.  What document
 4 number is this?
 5      Q.   I'm looking at what is on your
 6 screen and maybe you can do this on the
 7 screen, would be No. 19.
 8      A.   I'm there.
 9      Q.   And let me get to that, as well,
10 and if you go to the sixth page, you start to
11 see a series of summaries of the subject and
12 then the various comps, right?
13      A.   Correct.  Those are what we call
14 comp pages.
15      Q.   That helps.  On these comp pages,
16 there is various information, right?
17      A.   There are.
18           I should point out, on these pages,
19 just so you know, if you look at the size of
20 the site, you will see that they say -- I
21 think for the majority of them, a couple of
22 them may be correct, you will see they list
23 the site size as 29,000 square feet, that's
24 the subject site size, not the individual
25 comp site size.  These pages are put together
```



```
 1                    S. Locatell
 2    with an Excel spreadsheet, so I think it's
 3    referencing the wrong cell, so I would like
 4    to point that out as a correction.
 5             As to our analysis, we used the
 6    correct site size.  You will see in the rent
 7    chart itself on pages 4 and 5 that the
 8    correct site size is being referenced and you
 9    can tell by our adjustments that the correct
10    site size was referenced, so that was a typo,
11    I would like you to note.
12       Q.   I think I understand that.  Let me
13    read your answer and make sure I do.
14             Is there any way to tell from
15    Exhibit X, what the zoning is for each of the
16    comparables that are listed here?
17       A.   I believe it's likely a hidden
18    column.  When you put these Excel worksheets
19    in a report, we start out a large number of
20    columns, but to make it legible, as you can
21    see, it's difficult to read with the number
22    of columns we have in place, we typically
23    will show the columns that are most
24    important.
25             And, again, as I mentioned earlier,
```



```
 1                  S. Locatell
 2   given that the control of this site is
 3   determined by the term of the lease,
 4   underlying zoning is less important here
 5   because for all of these subject spaces,
 6   whether it's manufacturing zoning, commercial
 7   zoning or residential zoning, they are
 8   allowed to do these commercial uses, which we
 9   determined to be the use -- the highest and
10   best use for the subject property, given its
11   term restriction.
12           So I don't see the zoning listed on
13   the chart and it is not included in the
14   individual pages.  It likely is in a column
15   that's been hidden in order to fit the data
16   on to the page so that it's legible.
17       Q.   After you exchanged -- after this
18   -- you met at Morris Missry's office in June,
19   did you have individual discussions with
20   people at McDonald's concerning what happened
21   at the meeting?
22       A.   I don't recall.  I'm sure Mr. Meyer
23   and I probably talked about the meeting
24   after.  It was quite a memorable meeting, so
25   I'm sure we had some conversations afterwards
```



```
 1                 S. Locatell
 2    regarding it, but in terms of other people at
 3    McDonald's, I don't remember.
 4         Q.   Well, since it was a memorable
 5    meeting, why don't you tell me everything you
 6    can remember about the meeting?
 7         A.   I think I told you.  I told you
 8    that we -- you asked me this initially and I
 9    said I recollected who was there, I told you
10    what I thought we did, we discussed the
11    valuations where both of us were coming from,
12    we discussed how Tom was incorrect in his
13    analysis, Mr. Missry got very angry and was
14    quite rude and we sat back down and discussed
15    further and Tom asked to see my comps, the
16    rental comps and I showed him my grid.
17              I don't recall if we -- I am
18    thinking that he didn't exchange reports
19    because I know I didn't give him my report in
20    its entirety, just the comps itself, so, you
21    know, we basically talked about why the value
22    is the value and that you need to consider
23    the term issue, which they ultimately agreed
24    to, so that's basically my recollection of
25    the meeting as I sit here now and can recall.
```



Page 152

```
 1              S. Locatell
 2         MR. KOH:  I would like you to bring
 3    up, Nat, document No. 21 on my list.
 4    It's a June 19th email from Ms. Locatell
 5    to Ms. DeMarco and Mr. Meyer.
 6    Q.    Can you tell me what this email is?
 7         MR. KOH:  Please mark this as
 8    Exhibit NN.  It bears Bates No. MCD
 9    004011.
10         (Exhibit NN, document bearing Bates
11    stamp No. MCD 004011, marked for
12    identification.)
13    A.    Yes, I recognize this.
14    Q.    What is this?
15    A.    It's an email that I sent to Carol
16  cc'ing Ms. Benjamin from my office asking for
17  answers on possible residual analysis
18  questions, given that landlord and landlord's
19  appraiser had incorrectly assumed there were
20  no rental comps to use for their analysis,
21  they did a residual analysis.
22              And, again, this goes back to me
23  trying to provide McDonald's with research
24  regarding a review of what KTR had done.  KTR
25  is saying there are no comps, I can't find a
```



Page 153

```
 1                    S. Locatell
 2  comp anywhere, even though Sharon gave me 11
 3  of them, I can't find any comps, so I have to
 4  do a residual analysis.  They did a residual
 5  analysis and I'm trying to help McDonald's
 6  understand that if you were going to do a
 7  residual analysis, it should be done
 8  correctly.
 9            So these were some of the issues I
10  thought that needed to be addressed in
11  potentially doing a residual to show Mr.
12  Tener that absent the fact that there were
13  numerous comparable leases to use, which is
14  what the rent option directs us to do, if you
15  did a residual analysis, you need to do it
16  correctly, so that's what this email was
17  regarding.
18       Q.   First of all, did you write this
19  email before or after the memorable meeting
20  at Morris Missry's office?
21       A.   I don't remember the day.  I think
22  I told you, I didn't remember the day of the
23  meeting.
24       Q.   I thought this might help, but
25  apparently it doesn't.
```



Page 154

1          S. Locatell

2          You used the term, residual

3    analysis.  Can you please explain to us what

4    a residual analysis is?

5          A.   Yes.  Well, as you may know, there

6    are three methods to valuation.  There is the

7    market data approach, commonly known as the

8    sales comparison approach, there is the cost

9    approach, whereby that's an additive

10   approach, you determine the value of a site

11   and then you add the cost to build those

12   improvements and that is your value, and the

13   third approach is the income capitalization

14   approach and you utilize that approach to

15   determine land value, it's called a land

16   residual or the model in our market that is

17   most utilized is called the land residual

18   model.

19         Q.   So the information you requested

20   here was for purposes of helping you develop

21   a better understanding of Mr. Tener's land

22   residual analysis, is that why you were

23   requesting this information?

24         A.   No, I understood Mr. Tener's

25   residual analysis.  I understood that it made



Page 155

1                    S. Locatell

2   sort of very wildly inaccurate assumptions.

3           What I was trying to do here was if

4   you could not find rent comparables and you

5   had to do a residual analysis per the rent

6   option agreement, how would you do it

7   appropriately, and so that's what this email

8   was in regard to.  It had nothing to do with

9   Mr. Tener's analysis.  I knew on the face of,

10  after talking to Mr. Tener and what his

11  assumptions were that his residual land

12  analysis was not credible, so this was --

13  these were the issues that I saw in what

14  would be necessary to understand in preparing

15  a more credible residual analysis.

16      Q.   Did you ever get the answers to the

17  questions you lay out in this email which

18  we've marked as NN?

19      A.   So as we discussed earlier, I don't

20  believe that a land use attorney was ever

21  retained.

22          That being said, I'm quite familiar

23  with the zoning regulations of New York City.

24  We review and analyze zoning for most

25  properties, so I know that we did some of our



Page 156

```
 1                 S. Locatell
 2    own research here, but as to getting
 3    information from McDonald's that specifically
 4    dealt with these questions, I don't believe
 5    that we did.
 6         Q.   Did you ever do a land residual
 7    analysis of the subject property at 840
 8    Atlantic Avenue?
 9         A.   Again, I actually don't recall.  I
10    don't think I ever did anything in a formal
11    report for them.  I might have done -- quite
12    often, I will have an Excel open and I do
13    back of the envelope analyses.  I don't even
14    save it sometimes.  I might have done
15    something along those lines, but I don't
16    think I did anything in an official report or
17    document that I remember.
18              It wasn't too long after this, I
19    believe, that we were sort of told to stop
20    working on the assignment.  I think that -- I
21    don't know if it was that you guys had
22    entered litigation at that point or what.  I
23    just stopped hearing from the client.
24              I'm so busy that if the client is
25    not contacting me, I'm not usually reaching
```



Page 157

1                    S. Locatell

2    out saying, how can I help you, I wait for

3    them to call me.

4            So I believe that, you know, it

5    wasn't too long after this that things sort

6    of came to a halt, so I don't recall

7    specifics much after this date.

8            MR. KOH:  Let's take a look at the

9        next document which I would like to

10       bring up, which, Nat, I marked as No.

11       22 in my stack.  It should be marked as

12       the next exhibit, which would be OO.  It

13       bears Bates stamp No. MCD 005733.

14           (Exhibit OO, document bearing Bates

15       stamp No. MCD 005733, marked for

16       identification.)

17   Q.    Do you recognize this email?

18   A.    I do.

19   Q.    What is this?

20   A.    It's an email I wrote to Carol and

21   Mr. Meyer and cc'd Ellen Benjamin from my

22   office asking, again, if they had any

23   information for 10 to 15,000 square foot

24   retail uses with parking.

25           This goes back to searching for



Page 158

1                     S. Locatell

2    data.  We had done this initially, as I told

3    you, we looked for the gamut of retail ground

4    leases for larger spaces, smaller spaces and

5    didn't find any, so this was going back to

6    that idea of because Tom was proposing this

7    over 20,000 square foot retail taxpayer

8    effectively, I was, again, reaching out to

9    see is there any data out there supportive of

10   this.

11        Q.   You used the term, taxpayer.

12             What does that mean?  In your

13   answer, you said 20,000 square foot taxpayer.

14   What does that mean in this context?

15        A.   It's basically what Tom proposed to

16   be developed on the site, even though you

17   only have it for 20 years.  A taxpayer is a

18   one-story retail building in New York City

19   parlance, it's a term of art.

20        Q.   I have heard it before, but I want

21   to make sure that anyone reading this

22   transcript understands it.  So that's

23   helpful.  Thank you.

24             Again, you specifically identify

25   Rite-Aid and CVS in Exhibit 00.  Why pick



Page 159

1                    S. Locatell

2     those?

3          A.    They're typical retailers that have

4     footprints in that range and I said, i.e.,

5     like, for example, that type of thing, I'm

6     just pointing out size.

7          Q.    Do you recall ever getting that

8     information after you sent this email to Ms.

9     DeMarco and Mr. Meyer?

10         A.    We did not.  Again, we looked, we

11    had been looking since the fall of 2018 for

12    these lease deals and we had not found them.

13              MR. KOH:  Let's bring up what had

14              been previously marked as Exhibit AA.

15              It's No. 23 in my stack, Nat.  It's a

16              September 16, 2019 letter from Mike

17              Meyer to Morris Missry and countersigned

18              by Tom Li, L-I.

19         Q.    Do you recognize Exhibit AA, Ms.

20    Locatell?

21         A.    Yes.

22         Q.    Tell us what it is, please.

23         A.    It looks like a letter that Mr.

24    Meyer from McDonald's sent to Mr. Missry as

25    landlord's attorney that sets forth some



Page 160

```
 1                   S. Locatell
 2   agreement that they had continuing the
 3   appraisal proceeding.
 4        Q.   In your earlier testimony a few
 5   moments ago, you said you were told to stop
 6   work on this assignment.
 7             Does Exhibit AA help refresh your
 8   recollection as to why you might have been
 9   told to stop work on the assignment?
10             MR. WALSH:  Objection to form.
11        Q.   You can answer.
12        A.   Well, what I was referring to in my
13   last answer was that we had selected the
14   neutral, we looked at each other's reports
15   and the clients were still disagreeing with
16   each other, so it was sort of a stop and go
17   procedure.
18             I believe that they were talking
19   about coming to an agreement as to how the
20   process would unfold with the neutral and
21   that's what this letter is detailing.
22             Remember, there was disagreement
23   between the way that Tom Tener and I read the
24   rent option addendum as to what Mr. Nakleh's
25   role would be and it appears to me that
```



Page 161

1                    S. Locatell
2    during the summer of 2019, the attorneys were
3    attempting to come to some agreement as to
4    how the process would unfold with the
5    neutral.
6         Q.    Paragraph numbered 1 of Exhibit AA
7    which we are looking at reads, Within three
8    weeks from the date of this letter, each
9    parties' appraiser will sent to the other
10   parties' appraiser his or her respective;
11   one, updated letter opinion of value
12   estimating each appraiser's fair market
13   rental value as defined in the option rent
14   addendum stating -- and stating the
15   methodology of valuation and conclusions and;
16   two, identifying the comparable transactions
17   on which the conclusions are based.
18            Did that ever happen?
19            MR. WALSH:  Objection to form.
20        A.    I believe I prepared a September --
21   I have a recollection there is a September
22   dated report.  As to whether or not they were
23   exchanged, I don't recall.
24            And, again, it's not uncommon for
25   if a report is complete, it's sent to counsel



Page 162

```
 1                  S. Locatell
 2   and then the counsel would exchange the
 3   reports as opposed to the appraiser
 4   exchanging them each other directly, I don't
 5   recall.
 6       Q.   Paragraph 3, the first sentence
 7   reads, The parties have selected Marc Nakleh
 8   as the third appraiser pursuant to the terms
 9   of this lease and agree to engage Mr. Nakleh
10   within 21 days of this agreement.
11            To your knowledge, was Mr. Nakleh
12   ever engaged?
13       A.   Again, I don't recall.  I know Mr.
14   Nakleh was continuing to contact Tom and I
15   about whether or not this appraisal
16   proceeding was moving forward.
17            As to whether or not the parties
18   had signed a retention document with him, I
19   don't recall.
20            MR. KOH:  Let's bring up what's
21        been marked as No. 24 in my stack and
22        mark it as the next exhibit, which would
23        be PP.  It's a document bearing Bates
24        No. MCD 003520 to 21.
25            (Exhibit PP, documents bearing
```



Page 163

```
 1                    S. Locatell
 2        Bates stamp No. MCD 003520 and MCD
 3        003521, marked for identification.)
 4        Q.   Do you recognize Exhibit PP?
 5        A.   Yes.
 6        Q.   What is it, please?
 7        A.   It is two emails, an email I sent
 8   on Friday, September 20, 2019 to Tom saying
 9   that I had heard that Carol and Sam, I'm
10   assuming that is Mr. Rottenberg, had spoke
11   about us all meeting, I believe that's Tom,
12   Marc and myself, and I was asking if --
13   actually, I should not say that.  I don't
14   know if it was Carol, Sam, Tom and I or Tom,
15   Marc and I, but I had some understanding that
16   we were to meet and I was asking if he could
17   confirm if he was available, and then he
18   responded that we should speak on Tuesday and
19   his understanding was that Tom and I were
20   going to meet and share our values and comps
21   and he didn't think there was going to be a
22   meeting, I guess of ownership.  That's my
23   understanding of the emails.
24             MR. KOH:  Let's bring up what's
25        been in the stack as No. 25.  It is a
```



Page 164

1          S. Locatell

2      multipage document bearing Bates stamp

3      number MCD 000707 to 733.

4      Q.   And if you want to get a hardcopy

5  of this document, it should be in the box we

6  sent over.

7      A.   It's okay.  It's not really any

8  better.  It's a faint print.

9      Q.   I have to work with what I have.

10 Maybe you can enlarge it.

11          (Exhibit QQ, documents bearing

12      Bates stamp No. MCD 000707 through MCD

13      000733, marked for identification.)

14     Q.   Tell me what this document, which

15 is marked as QQ, is.

16     A.   So this appears to be the document

17 that I gave to Tom Tener.  It says -- I can

18 see on Ellen's handwriting, she wrote, Gave

19 to Tom Tener 9/27/19.  This would have been

20 the -- this is our fair market rental value.

21 This was for the purposes, I believe, of Tom

22 and I discussing and still trying to

23 potentially come to some agreement and so

24 this is what that document is and this is --

25 yes, that's what this is.



Page 165

1              S. Locatell

2      Q.   That's Ellen's handwriting that

3  says, Gave copy to Tom Tener 9/27/19?

4      A.   Yes, that is her handwriting.

5      Q.   Did Mr. Tener come to your office

6  to pick up this document, do you know?  Did

7  you speak to Mr. Tener on or about September

8  27, 2019?

9      A.   I don't remember.

10     Q.   Looking through this, I would like

11 to draw your attention to the addendum that

12 has the top pages in it.

13     A.   Yes, I see that.

14     Q.   These seem to have the zoning

15 listed there.

16          Do you have any idea why this one

17 has the zoning listed and the one we looked

18 at previous does not?

19     A.   No.  Again, these are Excels and

20 when these are copied into reports as

21 pictures and sometimes rows will be hidden or

22 unhidden.

23          Again, as I said, the referencing

24 the zoning for this report, whether I

25 referenced it or didn't reference it would



Page 166

1                    S. Locatell

2    not have changed the analysis at all and so

3    the initial time that they weren't included

4    was probably just because the columns were

5    hidden.  It is in the individual pages and,

6    again, it has no effect on the rental value

7    determination.

8        Q.    It has no effect on the rental

9    value determinations.  Sometimes it appears

10   and sometimes it doesn't.  Is that your

11   testimony?

12       A.    Sometimes it's shown and when the

13   pictures are copied in from Excel, and

14   sometimes it does not.

15             We collect a lot of information.

16   When I'm collecting comp information, I

17   collect everything I possibly can.  It

18   doesn't mean that every piece of data I

19   collect has an effect on value.  We start

20   from scratch.  We don't want to eliminate

21   anything and that's just smart appraisal

22   practice.

23             In terms of what we end up putting

24   in a report, it's looked at relative to

25   what's needed.  The fact that zoning is shown



Page 167

```
 1                    S. Locatell
 2    here is nothing more than how the cells were
 3    captured and put into a report.  There is
 4    nothing to be read in the fact that the
 5    zoning was not in the initial report that I
 6    sent to the clients.
 7                    The clients were aware of what our
 8    value conclusions were, they had been reached
 9    prior to issuance basically of the written
10    documents and, as I said before, given the
11    use of the property and the restriction as to
12    the time that the tenant has use of the
13    property, zoning was not relevant to making
14    large value adjustments for this property, so
15    showing it or not showing it, again, the
16    report I'm showing to Tom is more
17    comprehensive because it has the zoning in
18    it.
19         Q.   So the subject property here was
20    split zone between M1-1 and RB-6, right?
21         A.   That's correct.
22         Q.   So were any of your comps also
23    zoned for M1-1?
24         A.   Comparable No. 11 is zoned M1-2
25    manufacturing, there are no other M1-1s other
```



Page 168

```
 1                    S. Locatell
 2   than the subject.  The subject has a
 3   commercial manufacturing and residential
 4   allowable uses, but the use that it can be
 5   put to, it is subjected to the amount of time
 6   that you can put that use to the property,
 7   right, so you have a 20-year term.
 8             I'm not sure if you are suggesting
 9   because it's split zoned, you would develop
10   residential on the residential piece of it
11   when you only have control of it for 20 years
12   because that, in fact, is an incorrect
13   assumption.  All of the comparables have a
14   residential with some sort of commercial
15   overlay.
16        Q.   I understand that.  I didn't mean
17   to suggest or assume anything.
18             My question was simply, were any of
19   the comparables that you included in your
20   September 20, 2019 report zoned in M1-1, and
21   I take it my answer is that none of them
22   were?
23        A.   They all have different zonings,
24   every single one of them, which is not
25   unusual for this property type.
```



Page 169

1              S. Locatell

2        Q.    And it's also correct that none of

3    the comps you picked had any RB-6 zonings, is

4    that right?

5        A.    With the exception of the M1-2, I

6    believe, they all have some sort of

7    residential zoning, they are all different.

8    I believe every comp has a specific

9    different -- we had an R6, so comparable No.

10   10 is R6 and R6 and R6B are not too

11   dissimilar, R6, R5 and R4 are not too

12   dissimilar, C1-2 and C1-3 are not that

13   dissimilar.

14              So, yes, all of the comparables

15   have slightly different zoning

16   classifications.  All of the comparables,

17   however, allow for one-story retail uses and

18   that's what's important to note.  The

19   important distinction is not what exactly is

20   the zoning classification.  The distinction

21   is what is the use that is allowed based on

22   the zoning classification and all of these

23   comparables have zoning classifications that

24   allow the same use as the subject property.

25              I should say, as the subject



Page 170

```
 1                    S. Locatell
 2    property's highest and best use per this rent
 3    option agreement, meaning, having controlled
 4    the property for just 20 years.
 5        Q.   I would like to turn to page 2 of
 6    the September 20, 2019 opinion of value, on
 7    page bearing Bates stamp 708 and focus your
 8    attention to the -- on the third paragraph of
 9    that page after the A and B section.
10             You wrote, We are specifically
11    tasked with determining the FMV of the
12    subject land as unimproved based on highest
13    and best use and in consideration of a
14    five-year renewal term and other provisions
15    of the lease.
16             You wrote that, right?
17             You said five-year renewal term,
18    not 20-year renewal term.  Why?
19        A.   That's the other provisions of the
20    lease.  I told you the analysis that we did
21    looked at the property assuming a 20-year
22    holding period.
23        Q.   That's because the tenant had
24    control over the use of the property for 20
25    years pursuant to the lease, right?
```


MAGNA
LEGAL SERVICES

Page 171

1                    S. Locatell
2        A.    That's correct.
3        Q.    The last sentence of this letter on
4    page 4 says or the second to last sentence
5    says, A complete appraisal will be supplied
6    at your request.
7              Has such complete appraisal been
8    prepared?
9        A.    I believe this is the last report
10   that was prepared, that we prepared for this
11   assignment.
12       Q.    Have you prepared any other written
13   reports concerning the property at 840
14   Atlantic Avenue since September 2019?
15       A.    Not to my recollection, but -- not
16   to my recollection.  Once the litigation
17   started, we did not prepare anything.  What
18   I'm saying is, I don't recall when that
19   began.
20       Q.    That's helpful.  Thank you.  I
21   would like to look at page 24, which is the
22   certification.  I would like to focus on item
23   11, and it reads, Sharon Locatell has
24   performed no services as an appraiser or in
25   any other capacity regarding the subject



Page 172

1              S. Locatell

2    property within the three-year period

3    immediately proceeding this assignment.  Is

4    that a true statement?

5         A.   Yes and no.  Technically, I should

6    have listed the June and the -- I forget the

7    dates, the June and the 2018 report.

8         Q.   The December 12, 2018 report?

9         A.   Yes, this was all part of the same

10   assignment and same valuation, so, yes, this

11   is a typo.  This is a form part of the

12   appraisal report that goes in there, so you

13   are correct, I should have said -- I should

14   have referenced the other work that was done

15   since December 2018, which the client knew

16   about, obviously.

17        Q.   Let's take a look at your

18   underlying assumptions and contingent

19   conditions.  I would like to focus on No. 3,

20   that there are no incumbrances or defects of

21   title.

22             Is that an accurate statement, to

23   your knowledge?

24        A.   You can't just read that because

25   this is -- unless it's stated, otherwise, in



Page 173

```
 1                    S. Locatell
 2     the appraisal report, we are assuming no
 3     encumbrances that we don't know about.
 4     Again, this is a form portion of every
 5     appraisal report that goes out, so there is
 6     -- certainly could be a typo in here, but
 7     that means something beyond the encumbrances
 8     that have been discussed within the appraisal
 9     report itself.
10          Q.   Do you know how Vanderbilt Atlantic
11     Holdings LLC holds its interest in this are
12     property at 840 Atlantic Avenue?
13          A.   Not specifically.
14          Q.   Do you know if it is a fee simple
15     honor?
16          A.   Not specifically.  I'm assuming
17     there is a landlord, I think it was a Mr.
18     Musto, was the original landowner, and it's
19     unclear to me whether he is a joint venture
20     with Vanderbilt now and he's contributed the
21     property or, I don't know, I don't know the
22     structure.  It's not relevant to the
23     assignment that I was given, which is to
24     determine fair market rental value, but
25     that's my -- that's the extent of my
```



Page 174

```
 1                   S. Locatell
 2   knowledge as to the landlord's position.
 3        Q.   Would it surprise you to learn that
 4   Vanderbilt Atlantic Holdings was a ground
 5   lessee of the subject property?
 6        A.   No, that wouldn't surprise me.
 7        Q.   And knowing that information, would
 8   it effect your conclusions in your reports in
 9   any way?
10        A.   No, not at all.
11        Q.   Did you ever look --
12             MR. WALSH:   I just -- my microphone
13        was muted.  I objected to attempted to
14        object to the form of the previous
15        question.  I just want that on the
16        record.
17        Q.   Did you ever make any attempt to
18   find out who owns the property at 840
19   Atlantic Avenue by say looking it upon ACRIS?
20        A.   I personally did not.  As a matter
21   of course, the appraiser working on this
22   would have done that.  I know we were given a
23   copy of the lease and given that this
24   assignment was to determine value subject to
25   the lease, that would have been our primary
```



Page 175

```
 1                S. Locatell
 2   understanding of who the landlord was and who
 3   tenant was.
 4          Ms. Benjamin, in her normal course
 5   of appraisal work, will typically look up a
 6   deed on ACRIS, but I can't tell you whether
 7   she did or not.
 8          MR. KOH:  Let's bring up what is
 9          No. 26 in the stack and mark it please
10          as RR, which is Mr. Tener's restricted
11          appraisal and it bears Bates stamp No.
12          1733 to 1749.  These are produced by
13          McDonald's.
14          (Exhibit RR, documents bearing
15          Bates stamp No. 1733 to 1749, marked for
16          identification.)
17     Q.   I believe these came from your file
18   Ms. Locatell, if you want to look at the
19   hardcopy.
20          Do you recognize what we designated
21   as Exhibit RR?
22     A.   Yes, I do recognize it.
23     Q.   What is this?
24     A.   This is a report prepared by Tom
25   Tener and Sean Kest from KTR purporting to
```



Page 176

```
 1                    S. Locatell
 2   set forth the fair market rental value of the
 3   demised premises for the renewal period,
 4   assuming that the land will be held for a
 5   20-year option term.
 6        Q.   There is handwriting on this
 7   document.
 8             Do you know whose handwriting it
 9   is?
10        A.   It looks like there is handwriting
11   from both myself and Ellen.
12             I recognize on page 4, Bates 583,
13   but sales, not retail, that's my handwriting
14   and then the handwriting on the following
15   page in blue, that is Ellen's handwriting.
16        Q.   What was the meaning of your
17   writing, but sales, not retail?
18        A.   Again, this goes back to the
19   gateway issue that he is using sales that
20   provide value for development sites that can
21   be controlled in perpetuity and that is not
22   what we are being tasked to do and it's also
23   not what he says he does in this report, so
24   he actually prepared two different analyses;
25   one where he assumes the value of the
```



Page 177

1            S. Locatell

2     property can be -- one where he sets forth

3     the value of the property, assuming that the

4     owner will have control in perpetuity, and

5     that's based on looking at sales of

6     unencumbered land and then he does a land

7     residual analysis where he says he is

8     considering all uses to which the property

9     can be put within the 20-year option term.

10            So this was his report that after

11    landlord -- my recollection is that after

12    landlord and Mr. Tener agreed that, yes, in

13    fact, we had been correct in that the

14    encumbrance of the lease itself had to be

15    taken into account in determining this

16    renewal rent, Mr. Tener agreed to go back and

17    redo his analysis and this was his attempt at

18    doing that, but instead of actually redoing

19    the analysis utilizing what the lease

20    dictates for us, which is to look at

21    comparable transactions of which I had

22    provided to Mr. Tener and he was aware he,

23    instead, included his incorrect unencumbered

24    land sales and came to a value and then does

25    a one-paragraph land residual analysis, that



Page 178

```
 1                    S. Locatell
 2    shockingly comes to the same value assuming
 3    you controlled the property for 20 years, so
 4    this report is -- it's a little scattered
 5    because it's setting forth two different
 6    values, but it's concluding to one value, so
 7    it's very confusing as to what this document
 8    actually is and I think there are some real
 9    issues with its credibility.
10         Q.   Do you believe that Mr. Nakleh
11    would have been able to address the issues
12    concerning this report's credibility?
13              MR. WALSH:  Objection to form.
14         A.   I believe Mr. Nakleh would have
15    instructed Mr. Tener to complete the report
16    appropriately.  The first half of his report
17    is setting forth a value conclusion that is
18    not called for in the lease and the second
19    half of his report is setting forth a value
20    conclusion that is called for in the lease,
21    but he is saying they're the same value
22    conclusion and I think Mr. Nakleh would have
23    said to Mr. Tener that your report doesn't
24    make sense because, No. 1, half of the report
25    which you are giving very strong reliance on
```


MAGNA
LEGAL SERVICES

```
 1                S. Locatell
 2   in deriving your conclusion is a
 3   misapplication of the valuation that you are
 4   required to do under the terms of the lease,
 5   so I don't believe that Mr. Nakleh would have
 6   accepted this report as being responsive to
 7   what landlord was supposed to produce in
 8   determining the value for resale purposes of
 9   the subject property.
10        Q.   Am I correct that you've never, in
11   fact, discussed Mr. Tener's July 30, 2019
12   report with Mr. Nakleh?
13        A.   Mr. Nakleh and Mr. Tener and myself
14   have never had a discussion about the
15   property, it never got to that point.  The
16   litigation interceded before we went any
17   further in the appraisal proceeding.
18        Q.   Isn't it true that where Mr.
19   Tener's report uses the land residual
20   technique, he concludes that the fair market
21   rental value would be bracketed between 1.3
22   million and $1.478 million?
23        A.   Yes, which is, he is -- take a look
24   at what that means.  He has previously said,
25   based on his unencumbered fee simple
```



Page 180

1                    S. Locatell

2    valuation of the subject property, that it is

3    worth 1.348 million and that assumes you have

4    control of the property in perpetuity with a

5    reversion value.

6              And then he goes on to do a land

7    residual analysis where he proposes that the

8    potential value of the site, when you control

9    it for only 20 years, could be as much as

10   1.478 million.  There is a very big

11   disconnect there, so, yes, he does provide a

12   range, but he provides a very troubling

13   range.

14      Q.   Is there any reason that you know

15   of that that couldn't have been addressed by

16   Mr. Nakleh in his role as the neutral

17   appraiser?

18             MR. WALSH:  Objection to form.

19      A.   Again, I think the entire KTR

20   report is not responsive to what was required

21   of the landlord and I believe that Mr. Nakleh

22   would have asked Mr. Tener to do a report

23   that was responsive to what the lease

24   required.

25             Remember, if the neutral appraiser,



Page 181

                    S. Locatell

1

2    the third appraiser and Mr. Tener and myself

3    can't agree, the value is averaged, and I

4    think that there is a very strong indication

5    here that Mr. Tener and landlord was sort of

6    trying to game the potential outcome by

7    putting in a document that is not responsive

8    to the value of the subject property, given

9    that there is only a 20-year term that's at

10   stake here.

11          So Mr. Tener has presented a report

12   that says, I'm valuing the property, assuming

13   that you have control of the property in

14   perpetuity, and that is just not the case, so

15   I don't think, given the direction in the

16   lease, which was a potential averaging of

17   values, I don't believe that Mr. Nakleh would

18   have accepted this report as being

19   appropriate.

20      Q.   You wrote, you said, and perhaps

21   you misspoke, if the neutral appraiser, the

22   third appraiser and Mr. Tener and myself

23   can't agree, the value is averaged.

24          Is that what the option rent

25   addendum provides or does it provide for a



Page 182

1              S. Locatell

2    majority of agreement?

3              MR. WALSH:  Objection to form.

4         A.   What document is the option

5    agreement, please?

6         Q.   It's document No. 4.

7         A.   What I said is correct.  If the

8    appraisers or a majority of them cannot agree

9    on the FMV, it should be determined by adding

10   all three estimates and dividing the total of

11   all three estimates by the No. 3, that is

12   simple average.

13        Q.   Let me ask a question.  What would

14   happen, as you understand things, if you and

15   Mr. Nakleh -- if Mr. Nakleh agreed with your

16   value, the $280,000 value, would that be the

17   fair market rent that was set or would it

18   still be averaged?

19        A.   No, that be would the value, but I

20   didn't say that there wasn't a potential to

21   have a majority agreement.  You are putting

22   words in my mouth.

23             What I said was that if they don't

24   agree, the three values get averaged.  That

25   is, in fact, what the lease says.



Page 183

1                    S. Locatell

2         Q.   It wasn't my intention to put words

3    in your mouth.  I was reading what admittedly

4    this realtime feed of the transcript said and

5    I wanted to be sure that we all had the same

6    understanding.  So thank you for that

7    clarification.

8              MR. KOH:  Let's bring up No. 27,

9         which is another version of Mr. Tener's

10        July 30, 2019 report and mark it SS, and

11        this bears Bates stamp Nos. MCD 00133 --

12        001733 through 49.

13             (Exhibit SS, documents bearing

14        Bates stamp No. MCD 001733 through MCD

15        001749, marked for identification.)

16        Q.   My question is, do you recognize

17   this document?

18        A.   I believe it's the same report,

19   just a different copy.

20        Q.   It has different handwriting on it,

21   though, does it not?

22        A.   It's the same KTR report, but the

23   handwriting notations are different, yes.

24        Q.   Whose handwriting is this?

25        A.   This, I believe, is my handwriting.



Page 184

```
 1                  S. Locatell
 2        Q.   I have some questions about the
 3   specific handwriting that you have.  On the
 4   second page of the report, there is a
 5   question mark and the words, have been
 6   research and analyzed are underlined.
 7             Do you remember why you made those
 8   marks on this report?
 9        A.   I -- no, I don't.  I believe that
10   before getting into the report, what were the
11   -- he is researching and analyzed land sales
12   and it's my first notation of, okay, he has
13   done this incorrectly, he is looking at sales
14   and property that can be owned for the full
15   bundle of rates in perpetuity.
16        Q.   And on the next page, which is the
17   third page of the report, next to the land
18   valuation column, you wrote, not applicable?
19        A.   Yes, for the same reason I just
20   mentioned.
21        Q.   And you circled a couple of numbers
22   there.  Can you tell me why?
23        A.   Yes, I circled the numbers he
24   applied to the land value.  He applied a $575
25   per square foot to the ZFA zone M1-1 and he
```



Page 185

```
 1                   S. Locatell
 2    applied a different value to the ZFA R6B, so
 3    I was just circling the number.
 4         Q.    In the FMV determination section,
 5    you circled and put a question mark at 10
 6    percent or based a ratio of 10 percent.
 7              Why did you do that?
 8         A.    For reasons we spoke about this
 9    morning.  Shockingly, where he got that
10    information.  I was going to be curious to
11    see how he was supporting ratios of that
12    amount for land as of 2019.
13              What I circled on this page are the
14    metrics that he uses to come to his rental
15    value.  It's the land price, plus the rent,
16    so I'm circling the information that's
17    relevant to -- that ties into the ultimate
18    conclusion that he has in this report.
19         Q.    Is that also true of the markings
20    that you've made on the next page, which is
21    page 4, you are identifying metrics?
22         A.    Exactly.
23              MR. KOH:  I think now be would be a
24         good time to take a break.  It's about
25         3:00.  Why don't we come back at 10
```



Page 186

1           S. Locatell

2      after 3:00 and see how much progress we

3      can make then.

4           (Recess.)

5           MR. KOH:  Nat, can you bring up

6      what I marked in the stack as No. 28,

7      and that is an email from Mr. Meyer to

8      Ms. Locatell bearing Bates stamp No.

9      MCD 005310 to 11 and mark it as Exhibit

10     TT.

11          (Exhibit TT, documents bearing

12     Bates stamp No. MCD 005310 and MCD

13     005311, marked for identification.)

14     Q.   Do you recognize Exhibit TT?

15     A.   Yes, I do.

16     Q.   Tell us what it is, please.

17     A.   It's an email that I wrote.  The

18  first part is an email that I wrote October

19  24, 2019 to Mr. Meyer and I cc'd Ms. DeMarco

20  and it is about, I had a call apparently with

21  Morris, Sam and Tom and I'm summarizing what

22  Tom's comments were regarding what he

23  undertook the land residual approach.

24     Q.   Was anybody else on this call

25  between Morris, Sam and Tom, if you recall?



Page 187

1              S. Locatell

2       A.   I don't recall.

3       Q.   Your first comment, is that the

4    first bullet point, He found no comparable

5    ground leases for 20 years which considered

6    all the uses to which the subject property

7    could be put?

8       A.   That's what he's stating, even

9    though I had shared with him at least 11

10   comparable leases.

11      Q.   But was it -- did you understand

12   Mr. Tener's position to be that he didn't

13   believe those leases were comparable?

14           MR. WALSH:  Objection to form.

15      A.   No, I mean, no, I don't.  He said

16   he considered -- he found no leases, this is

17   why I underlined it, which considered all the

18   uses to which the subject property could be

19   put.

20      Q.   You write, My comments regarding

21   the statement are that this is a

22   representation of the fact that for a 20-year

23   term at this location, a drivethrough pad

24   site is the highest and best use?

25           MR. WALSH:  Objection to form.



Page 188

```
 1                    S. Locatell
 2        Q.   Let me read it properly.  You
 3   wrote, your comment to Tom's comment, is that
 4   set forth in the paragraph underneath the
 5   first bullet point?
 6        A.   Yes.
 7        Q.   So you wrote, My comments regarding
 8   this statement are that this is
 9   representative of the fact that for a 20-year
10   term at this location, a drivethrough pad
11   site is the highest and best use, right?
12        A.   I wrote that.
13        Q.   And you then wrote, It is not, and
14   you capitalize all the letters in not, for a
15   one-story block front retail building, nor is
16   it for an industrial building, both of which
17   are allowed under current zoning, right?
18        A.   Correct.
19        Q.   So the two of you disagreed on the
20   highest and best use.  Would that be fair to
21   say?
22             MR. WALSH:  Objection to form.
23        A.   Tom -- that's not the only thing we
24   did not agree on.
25        Q.   You at least disagreed on what the
```





Page 189

```
 1                S. Locatell
 2    highest and best use for the property was, as
 3    encumbered by the 20-year lease term,
 4    correct?
 5         A.   That is correct.
 6         Q.   Is that something that Mr. Nakleh
 7    would be capable of determining, what the
 8    highest and best use of the property was as
 9    encumbered by a 20-year lease term?
10             MR. WALSH:  Objection to form.
11         A.   May I answer?
12         Q.   Yes.
13         A.   Yes.  Mr. Nakleh would.  That is
14    why I selected him, and felt comfortable with
15    him being a neutral here, because he does
16    have experience in reading these ground
17    leases and he would be capable of concluding
18    the highest and best use based upon
19    comparable lease transactions which were out
20    in the market.
21         Q.   You had done your best to summarize
22    those comparable lease transactions, right?
23         A.   Correct.
24         Q.   And the last two sentences, you
25    write, If the HBU, I assume that means
```



Page 190

```
 1                    S. Locatell
 2     highest and best use, was for construction of
 3     a block front one-story retail building,
 4     there would be comparable leases.  There are
 5     none.
 6            So is it your contention that the
 7     fact that Mr. Tener was unable to find
 8     comparable leases, evidence of the fact that
 9     Mr. Tener's proposed use of a one-story
10     retail block front building was not a
11     possible use?
12            MR. WALSH:  Objection to form.
13       A.   It's my opinion that that is one of
14     the pieces of evidence, it's not the sole
15     piece of evidence.
16            Mr. Tener neglected to look at
17     comparable leases, full stop.  He then did a
18     residual analysis that, as I go on to say, is
19     riddled with inappropriate assumptions, so
20     the combination of a lack of leases for
21     similar property types, in addition to the
22     fact that there are many leases for 20-year
23     terms for comparable property types that are
24     not included in Mr. Tener's analysis, as well
25     as the inappropriate assumptions he made on
```



Page 191

1                    S. Locatell

2    the land residual analysis are indications

3    that he has the wrong highest and best use.

4         Q.   Isn't it fairly common for

5    appraisers to have disagreements over whether

6    a comp is appropriate or not?

7              MR. WALSH:  Objection to form.

8         Q.   I think you can answer.

9         A.   I would agree that appraisers have

10   different opinions of the comparability or

11   the degree of comparability of comps, but I

12   would point to you and say, Mr. Tener has no

13   comparables, not one, not a single comparable

14   lease for this assignment and that is, I

15   believe, evidence that he didn't research the

16   market adequately, he doesn't understand the

17   highest and best use of the property and he

18   doesn't understand the directions in the

19   lease.

20             So this is not an issue of Tom and

21   I disagreeing as to comparability.  He has no

22   comparables.  He is choosing not to undertake

23   the approach that is dictated in the rent

24   option addendum.

25        Q.   But you've been involved in rent



Page 192

1                    S. Locatell

2      reset appraisals where there is a dispute

3      over the applicability of each sides'

4      proposed comparables, haven't you been?

5              MR. WALSH:  Objection to form.

6          A.   In typical rent reset processes,

7      each side has comparables that they submit.

8      There is usually overlay of at least some

9      portion of those comparables and then there

10     are a portion of the comparables that one

11     side or another may think is comparable or

12     not, but it is highly unusual for one side to

13     submit when there is an active market for

14     comparable properties, for only one side to

15     submit comparable rentals, so this is not a

16     scenario where we are disagreeing over the

17     comps.

18              Tom has not done a comparable

19     search.  He has not submitted any comps as it

20     relates to rental value.

21          Q.   He did submit comps as it relates

22     to sale value, correct?

23          A.   Yes, he submitted comparables as

24     relates to having control over the subject

25     property unencumbered.



Page 193

1          S. Locatell

2     Q.   You believe that those were

3   inappropriate comparables that Tom had

4   submitted?

5     A.   They were inappropriate comparables

6   and Tom agreed they were inappropriate and so

7   did Mr. Missry.  The landlord's position, my

8   understanding is they agreed to -- Tom redid

9   his report under the pretext that they were

10  agreeing that the lease was now subject to --

11  the rent redetermination was subject to the

12  term of the lease, it was encumbered, and

13  Tom's revised report was meant to reflect for

14  that, but instead of actually being a report

15  that sets forth the valuation under that

16  understanding, acknowledgment, he, instead,

17  did a mishmash of valuations where he took

18  his original valuation which looked at the

19  property as fully unencumbered, and then

20  added on a one-paragraph residual that comes

21  up with the same value or potentially even

22  higher for the property when it's encumbered

23  by a 20-year term.

24    Q.   So bottom line, you and -- you

25  disagreed with Mr. Tener's report?



Page 194

1          S. Locatell

2          MR. WALSH:  Objection to form.

3      A.   Mr. Tener's report is incorrect and

4  does not set forth an analysis of the

5  property as encumbered.

6      Q.   Is there any reason that Mr. Nakleh

7  could not have made that determination?

8          MR. WALSH:  Objection to form.

9      A.   I believe I told you multiple times

10 that I believe Mr. Nakleh would have made

11 that determination and I believe Mr. Nakleh

12 would have directed Tom to prepare an

13 appropriate report that dealt with the value

14 of the property per the terms of the rent

15 option addendum.

16     Q.   Let's look at the second bullet

17 point.  You say, the land -- excuse me, you

18 write that, Tom's comments why he utilized

19 the land residual approach were as follows,

20 and the second bullet point is, The land

21 residual technique that Tom does undertake is

22 riddled with inappropriate assumptions,

23 primarily regarding possible rental rates,

24 too high and the construction costs, too low,

25 right?



Page 195

1                    S. Locatell

2        A.    That's correct.

3        Q.    So you, in addition to believing

4    that Mr. Tener didn't correctly identify the

5    highest and best use, is it fair to say that

6    you also believed that his land residual

7    model had inappropriate assumptions?

8             MR. WALSH:  Objection to form.

9        Q.    Did you believe that Mr. Tener's

10   land residual model had inappropriate

11   assumptions?

12       A.    Yes, I did, I do.

13       Q.    What assumptions did you consider

14   to be inappropriate?

15       A.    Well, I list two of them here.  The

16   rental rate that he concluded to for the

17   retail space that he proposes to build is

18   much too high relative to the amount of

19   vacancies that existed along Atlantic Avenue

20   as of the date of value and in conjunction

21   with the actual leases that he uses as

22   comparables which involve very small space

23   that are located in noncomparable locations,

24   they are located in pedestrian-driven retail

25   corridors where the rents are much higher per



Page 196

```
 1                  S. Locatell
 2   square foot for very small spaces, so he uses
 3   incorrect rents to apply to his proposed
 4   21,000, thereabouts, square foot development.
 5            In addition, the second point I
 6   make in this email is that he uses
 7   construction costs that are far too low for
 8   how much it actually costs to build in New
 9   York City.  His construction costs, including
10   hard and soft costs, are just north of $100 a
11   foot.  That is ridiculously low by New York
12   City standards.
13            I know for certain that KTR has
14   access to numerous budgets, numerous reports
15   that are done by construction cost experts
16   and to put forth an estimate of $100, plus or
17   minus a square foot to build a building in
18   anywhere in New York City, let alone this
19   area, is, I think, very not credible.
20            There are a couple of other points
21   as relates to his land residual analysis that
22   I didn't specifically lay out in this email,
23   but he also does not deduct the cost
24   necessary to procure these tenants, these
25   potential -- based on his rent comps, it
```



Page 197

```
 1              S. Locatell
 2  would take a minimum of 10 tenants to fill
 3  this space that he is going to be building.
 4              He doesn't deal with the amount of
 5  time it would take to find these tenants.  He
 6  doesn't deal with the leasing commission that
 7  would be involved in executing these leases,
 8  the legal fees, the downtime, the potential
 9  TI, TI costs are now and as of our date of
10  value, very commonly paid to retail tenants.
11  None of those additional costs are reflected
12  in Mr. Tener's residual analysis and it has
13  the effect of inflating the value that he
14  comes up with.
15      Q.   Do you believe that had Mr. Nakleh
16  been given the opportunity to review Mr.
17  Tener's report, he would have been able to
18  make the same determinations that you just
19  listed for me?
20              MR. WALSH:  Objection to form.
21      A.   Do I believe that Mr. Nakleh would
22  have noted the same errors in Tom's report,
23  yes.
24      Q.   Yes.  So do you believe that Mr.
25  Nakleh would have noted the same issues in
```



Page 198

```
 1                  S. Locatell
 2   Mr. Tener's report?
 3              MR. WALSH:  Objection to form.
 4        A.   As it relates to the land residual
 5   approach, yes, but, again, I go back to the
 6   point that Tom Tener's report is not a report
 7   that meets the standards of what's asked for
 8   to determine the rental value of the subject
 9   property for the purposes of the rent
10   renewal, so whether Mr. Nakleh -- I certainly
11   think Mr. Nakleh is smart enough,
12   knowledgeable enough and experienced enough
13   to recognize the errors in the specific data
14   as relates to Mr. Tener's residual analysis,
15   but the overriding issue would be that Mr.
16   Nakleh would have the opinion that Mr.
17   Tener's report is not an accurate estimate of
18   the rental value per the terms of the rent
19   option addendum.
20              MR. KOH:  Let's bring up what is
21         marked as Exhibit U, please.  I'm sorry,
22         it's No. 29.  Let's mark it as Exhibit
23         UU.  It's a two-page document bearing
24         Bates stamp No. MCD 005443.
25              (Exhibit UU, document bearing Bates
```



Page 199

```
 1                S. Locatell
 2        stamp No. MCD 005443, marked for
 3        identification.)
 4        A.    Yes.
 5        Q.    Do you recognize UU?
 6        A.    I do.
 7        Q.    Tell me what it is, please.
 8        A.    I believe this is just a
 9   continuation of the email chain you just
10   asked me about previously.
11        Q.    On October 25th, Mr. Meyer writes
12   to you, Hi, Sharon, I'm having trouble
13   articulating how Tom incorporated the lease
14   into his analysis.  It seems that it played a
15   role in his land residual calculation.  Can
16   you explain that?
17              And, in fact, you responded and
18   attempted to explain it, am I correct?
19        A.    That is correct.
20        Q.    You write, Tom's land residual
21   analysis technically does incorporate the
22   encumbrance issue because he projects only a
23   20-year holding period, right?
24        A.    That is correct, that's what I
25   wrote.
```



Page 200

1           S. Locatell

2      Q.   But then you go on to say that Mr.

3  Tener is assuming that a building is

4  constructed and leased out for a period of 20

5  years, he deducts the cost to construct, as

6  amortized over a 20-year period, and the

7  resulting value is the land value as

8  encumbered.  Then you say, The problem is not

9  methodology, but his individual assumptions.

10  The rent is too high and the construction

11  costs are too low and he does not appear to

12  deduct any downtime for actually constructing

13  the building, right?

14      A.   Yes, all of which I just explained

15  to you previously.

16      Q.   The problem then is the assumptions

17  that Mr. Tener had made, right?

18           MR. WALSH:  Objection to form.

19      Q.   The problem with the land residual

20  analysis in Mr. Tener's report was the

21  assumption that he made?

22           MR. WALSH:  Objection to form.

23      Q.   Isn't that what you told Mr. Meyer?

24      A.   Yes, and that's what I told you

25  numerous times in the last half hour.  The



Page 201

```
 1                    S. Locatell
 2    problem with his residual analysis is that it
 3    is riddled with incorrect assumptions and
 4    analyses.
 5            MR. KOH:  Let's bring up -- let me
 6         make sure I get this one correct, No.
 7         31, please, in the stack, which is
 8         another October 25, 2019 email from you
 9         to Mr. Meyer.
10         Q.   Do you recognize that one?
11         A.   I do.
12            (Exhibit VV, October 25, 2019 email
13         from Ms. Locatell to Mr. Meyer, marked
14         for identification.)
15         Q.   Can you tell us what Exhibit VV is?
16         A.   Yes, this was, as I said a number
17    of times, Mr. Tener provided a very
18    abbreviated version of a residual analysis.
19    He has one paragraph of narrative and what I
20    was trying to do here was recreate his
21    conclusion, the range of his conclusion which
22    he reported to be, I believe, 1.31 million to
23    1.478 million, that's the net fallout value
24    to the land.
25            You remember he values the land,
```



```
 1                  S. Locatell
 2   assuming it's unencumbered and you have
 3   control of it in perpetuity, I think 1.348
 4   million and, here, he is showing you that if
 5   you have it for 20 years, it could
 6   potentially be worth more, 1.478 million, so
 7   this is a snapshot.  It's actually a picture
 8   of an Excel that I put together to try to
 9   recreate how he got to his numbers.
10        Q.   I'm correct that you put this Excel
11   together?
12        A.   Yes.  If you will see at the
13   bottom, I list some of the costs that he
14   neglects to reflect for at all in his
15   analysis.
16        Q.   So you understood what Mr. Tener
17   had done, but you didn't think he had done it
18   properly.  Would that be fair to say?
19             MR. WALSH:  Objection to form.
20        A.   He did not do it properly, that's
21   fair to say, yes.
22        Q.   You explained what Mr. Tener had
23   done and why it was improper in this series
24   of emails, right?
25             MR. WALSH:  Objection to form.
```



Page 203

```
 1                    S. Locatell

 2        A.   I'm sorry, I missed the question.

 3        Q.   The question is, isn't it true that

 4   you explained what Mr. Tener had done and why

 5   you believed it was improper in this series

 6   of emails that we've looked at since our last

 7   break?

 8             MR. WALSH:  Objection.

 9        A.   Yes, thus far, these emails are

10   indicating that the areas in which Mr.

11   Tener's analysis is wholly incorrect, yes.

12        Q.   And if you could explain to Mr.

13   Meyer, I presume you could have also

14   explained it to Mr. Nakleh, right?

15             MR. WALSH:  Objection to form.

16        A.   I could explain -- I'm a very

17   experienced appraiser, I could explain how to

18   correctly do appraisals to anybody who needs

19   explanation, yes.

20        Q.   As an experienced appraiser, do you

21   believe that Mr. Nakleh would have been able

22   to uncover the purported errors in Mr.

23   Tener's appraisal methodology?

24             MR. WALSH:  Objection.

25        A.   I believe that Marc would recognize
```



Page 204

```
 1                   S. Locatell
 2    that this is an inaccurate and not credible
 3    presentation of a land residual.
 4                   I also believe that the larger
 5    issue is that he would have found Mr. Tener's
 6    report incorrect from the get-go and he would
 7    have required him to do a report that was
 8    responsive to the lease which dictates you
 9    look for lease comparables when available and
10    takes into account term.  Mr. Tener's report
11    did not do that.
12        Q.    Couldn't Mr. Nakleh have also
13    simply agreed with your reports?
14                   MR. WALSH:  Objection to form.
15        A.    Yes, he could have, but if he did
16    not agree, as I said before, the final
17    determination is to average the three numbers
18    and it appears to me that Mr. Tener was
19    trying to submit a report that the proceeding
20    would be bound by that was higher than
21    substantiated by a correct and required
22    reading of the lease and the reason I say
23    that, I don't say that lightly, but the fact,
24    again, that Mr. Tener's conclusion of value
25    for the site when you are holding it for a
```



Page 205

```
 1                 S. Locatell
 2  20-year term, is equal to or potentially
 3  greater than the conclusion of value for the
 4  subject site when you hold it forever is
 5  incredulous.
 6      Q.   Do you believe Mr. Tener was being
 7  deliberately deceptive?
 8          MR. WALSH:  Objection to form.
 9      A.   I did not say that.  I said that I
10  believe Mr. Tener submitted a report that is
11  not responsive to the lease document that we
12  are required to by accepting the assignment
13  produce and I believe that Mr. Nakleh, acting
14  as the third appraiser and recognizing the
15  fact there was a potential to average these
16  numbers, would have gone back to Tom and
17  directed him to do a report that was
18  responsive to what the lease was directing us
19  to do.
20      Q.   Do you believe Mr. Tener was being
21  uncooperative?
22          MR. WALSH:  Objection to form.
23      A.   I didn't say that.  We never got to
24  the point of actually interacting with Marc
25  or submitting our reports to him as far as I
```



Page 206

```
 1                  S. Locatell
 2  remember.
 3           I believe that -- I think you asked
 4  me previously if Marc had even been
 5  officially retained, so I'm not saying that
 6  Tom was being uncooperative.  I'm saying that
 7  his report was not prepared correctly and I
 8  do believe that if we continued along the
 9  process, that Mr. Nakleh would have had
10  issues with the report that KTR put forth as
11  being responsive to what we were directed to
12  do per the terms of the option agreement or
13  option addendum.
14           MR. KOH:  Let's bring up the next
15      document, please, which is No. 33 on the
16      stack, Nat.  It's described as Locatell
17      Notes 2, which may not be an accurate
18      description.  Please mark it as WW.
19           (Exhibit WW, Locatell Notes 2,
20      marked for identification.)
21      Q.   This document was produced from
22  your files, Ms. Locatell.  I'm wondering if
23  you could tell us what it is.
24      A.   It's notes that look like the top
25  half of the -- this is my writing the top
```



Page 207

```
 1                    S. Locatell
 2   half of the notes relate to the subject
 3   property, and then there is a sticky that
 4   looks like it relates to another -- I don't
 5   know what Elder Care has.  I was doing a site
 6   on Lexington Avenue around this time, so I
 7   think this sticky is representative of a note
 8   for a job on Lexington Avenue in Manhattan
 9   and then also a job on Fulton Street that we
10   -- that Jeff Sutton --
11        Q.   When I saw this, I assumed that the
12   sticky was not part of this assignment.
13             Do you share that assumption?
14        A.   Yes.
15        Q.   Let's talk about the rest of the
16   document then.  It appears to be a sketch of
17   this site and you were sketching -- tell me
18   what you were sketching and why?
19             MR. WALSH:  Objection to form.
20        A.   I was -- the subject site has three
21   frontages and two zoning classifications, so
22   I was sketching here the layout and trying to
23   determine the square footage that lied within
24   the or lies within the M1-1 district versus
25   the R6B district, so that's what this is.
```



Page 208

```
 1              S. Locatell
 2      Q.   Is that is what is reflected in the
 3  column on the far right on the top part of
 4  this beginning with 2,500 M1-1?
 5      A.   I believe so.  I can't speak to
 6  it's accuracy.  These are working notes, so
 7  the numbers may be different, but it was --
 8  yes, it's looking at the site relative to its
 9  zoning and relative to its layout, what the
10  frontages on Atlantic, Pacific and
11  Vanderbilt.
12      Q.   Below that column, there is a
13  notation that says 2.4 FAR.
14           What does that mean?
15      A.   FAR stands for floor area ratio and
16  that is the zoning metric that allows you to
17  determine what the gross building area that
18  can be constructed on a site is relative to
19  its site size.
20      Q.   How did you determine that the FAR
21  for this property was 2.4?
22           MR. WALSH:  Objection to form.
23      Q.   Did you determine that the FAR for
24  this property was 2.4?
25      A.   I don't believe I did.  I believe
```



Page 209

```
 1                    S. Locatell
 2    M1-1 is a 1 FAR and R6B is a 2, but, again,
 3    these are working notes, they may have been
 4    doodles before we actually looked at what the
 5    zoning is.
 6              I, unfortunately, cannot remember
 7    every FAR allocation to every zoning
 8    classification I do.  I have to look them up
 9    on occasion.
10        Q.   Then there seems to be a line that
11    says dollar sign, 8.5 million.
12              What does that refer to?
13        A.   I don't know, but I believe -- one
14    second, please.
15              I believe these are notes that were
16    prepared in conjunction with us looking at
17    the value of the site unencumbered because if
18    you go back to document 6, which is exhibit
19    -- Exhibit H, this is the report we did
20    December 12, 2018, which looked at the
21    property as a vacant and unencumbered and you
22    will see that on page -- I think it's page 5,
23    you will see there is a little zoning chart
24    that ties to the notes on the exhibit you are
25    showing me, currently in terms of the site
```



Page 210

```
 1                    S. Locatell
 2   size that's located within each zoning
 3   district and what the FAR is.
 4            And then our final conclusion,
 5   assuming this site was fully unencumbered,
 6   not per the terms of the lease, mind you, was
 7   roughly 9 million, 9.9 million, so I believe
 8   this yellow pad were notes that were written
 9   when this was being prepared.
10       Q.   There is a notation that says M1-1
11   self storage, not IB maybe.
12            What does that mean?
13       A.   M1-1 means that -- M1-1 self
14   storage means could you develop self storage
15   in that district.
16            I don't know what IB means or I
17   don't recall what I was referring to there.
18       Q.   The line underneath that, is that
19   C8-2?
20       A.   Yes.
21       Q.   What does that mean?
22       A.   That is another zoning district.
23       Q.   Why is it on this page with the
24   information relevant to 840 Atlantic Avenue?
25            MR. WALSH:  Objection to form.
```



Page 211

```
 1                  S. Locatell
 2            If you know.
 3      A.    I don't know.  Again, these are
 4   notes --
 5      Q.    I understand.
 6      A.    I don't know why it's there.
 7            MR. KOH:  Let's bring up the next
 8            document, which is No. 32 in my stack,
 9            Nat, marked Locatell Notes 1 and, this,
10            you may need to rotate, there is a drop
11            down that says, rotate pages.  Keep
12            doing that until you get it so you could
13            see it.  These documents were also
14            produced to your files.
15      Q.    Do you recognize what this is?
16      A.    This looks like, this is -- I
17   should say where it says 840 Atlantic Avenue,
18   that's Ellen Benjamin's writing.  The rest of
19   it looks like my writing.  So they're my
20   notes from a call with McDonald's that
21   occurred on October 24, 2019 and there are
22   some phone numbers there.  It just turned on
23   its own.
24      Q.    That's not supposed to happen.  I
25   don't know why that did.
```


MAGNA
LEGAL SERVICES

Page 212

1                    S. Locatell

2         A.   So the remainder of the notes look

3    like that is my handwriting.

4         Q.   So this is notes that you were

5    taking during this call?

6         A.   Yes, they're notes.  I take notes

7    typically during phone calls and -- not

8    always, but, you know, I do if there is --

9    usually, if I had a pad in front of me, I'm a

10   doodler, but, in any case, I take notes as to

11   what I tell the client and I take notes as to

12   what the client tells me, so it's difficult

13   to -- I would assume that the first three are

14   notes that I told them because these were my

15   concerns about Tom's report.

16              (Exhibit XX, Locatell Notes 1,

17         marked for identification.)

18        A.   I believe what these are, it says

19   below, this was a call between Sam, Tom

20   Morris, Carol Mike and myself.

21        Q.   That call, did that happen on or

22   about October 24th, is that the call that we

23   are talking about here?

24        A.   I'm assuming it was around then.

25   There is a line that underlines.  I know when



1                    S. Locatell

2    I take notes, many times I will have notes

3    for different jobs on the same page and

4    sometimes I put a line underneath to separate

5    them, so I'm sure the call, if it wasn't at

6    1:30 at 10/24, it was around that date, I

7    don't recall specifically.

8         Q.   Let's take a look at the second

9    page.

10        A.   Yes.

11        Q.   At the top, there is a notation

12   that said, Conclusion supported 1.348 M.

13             What does that refer to?

14        A.   You have to start at the previous

15   page because I believe the last three lines,

16   I had asked Tom why he left in his land value

17   as unencumbered and he left it in because

18   appraiser compared the 1.31 million to 1.478

19   million per year [original GL conclusion] and

20   conclusion supported his 1.348 million, so

21   I'm quoting here or paraphrasing why Tom --

22   what Tom's explanation was for the reason

23   that he included an inappropriate valuation

24   in this revised appraisal that is supposed to

25   correct for the fact that he did not take



Page 214

```
 1                    S. Locatell
 2     into account the encumbrance of the lease.
 3          Q.    In the -- looking at that page 2
 4     that I drew your attention to right below
 5     where it says, Conclusions supported 1.348 M,
 6     there is an arrow and then it's underlined.
 7     It says, Mike.
 8               Can you tell me what it says after
 9     that?  I'm having a little trouble reading
10     some of that.
11          A.    My shorthand, I can suss out, I
12     think, generally what I was referring to
13     here.  I think Mike had asked -- we had a
14     discussion, likely prompted by Mike Meyer
15     about why the appraisal compared -- the
16     appraisal comps were compared.  There were no
17     ground leases that were only 20 years.
18               Remember, Tom, in coming up with
19     his rental value, his original rental value
20     for the property assumed -- reported that he
21     had looked at a number of leases in the range
22     of 35 or so and he had looked at the ratios
23     those leases had provided to set the ground
24     rent amount and Tom had said he had looked at
25     all -- all of the leases he had looked at
```



Page 215

1              S. Locatell

2    were 49-year leases and I think Mike had

3    said -- was asking why he hadn't looked at

4    any 20-year leases, given that was the term

5    that we were constrained by in evaluating the

6    subject property.

7         Q.   And how did Mr. Tener respond?

8         A.   I don't recall.  He was very, you

9    know -- he never really addressed the fact

10   that he was using market data that was, you

11   know, 50 years or greater old in coming up

12   with a current market value, so I don't know

13   that he had any real answer other than, well,

14   that's what I had available and that sort of

15   thing.

16        Q.   And below that line, there is -- I

17   see the words 20 YR, which I assume to be

18   year.

19              What is before that?

20        A.   LR, I'm assuming that stands for

21   land residual, land residual-20 year,

22   one-story retail onsite fully amortized over

23   lease term as any one.  This was what Tom

24   responded to as to how he did the land

25   residual analysis.



Page 216

1          S. Locatell

2     Q.   Then below that, a couple of lines

3  down, there is a line that begins with the

4  word, Morris.

5          Can you read that to me?

6     A.   It says, Morris interject.  Why did

7  analysis not same comps as Sharon.  Why not

8  helpful.

9     Q.   Were you trying to paraphrase or

10 quote Mr. Missry there?

11    A.   I guess, I would not want to

12 paraphrase Mr. Missry, I actually don't know

13 what that refers to.

14    Q.   In the column, there is a notation

15 that says, HBU, and then there is a word

16 underneath that.  Is that disingenuous?

17    A.   Yes, that was my comment.

18    Q.   That was your comment.  It's next

19 to the word Mike understand how appraisal

20 compliant with lease.

21          So what exactly were you saying was

22 disingenuous there?

23    A.   I was saying his highest and best

24 use was disingenuous.  I wasn't saying Mike

25 was disingenuous, I was saying Tom's highest



Page 217

```
 1                  S. Locatell
 2   and best use conclusion was disingenuous.  He
 3   neglected to consider the actual leases that
 4   were in place for comparable corridors.
 5   That's what I was saying was disingenuous.
 6   Mike was trying to understand how Tom's
 7   appraisal was compliant with the lease,
 8   that's what that comment meant.
 9        Q.   At the bottom of the page, there is
10   a darker rendition of the word, Morris, and
11   can you read to me what it says underneath
12   that?
13        A.   Yes.  That is an example of my
14   doodling.  Morris, this report complies, are
15   you --
16        Q.   Would that word be, drawing a line
17   in the sand?  That's what it looks like to
18   me?
19        A.   That seems like it.  Are you
20   drawing a line in the sand?
21        Q.   So what did you understand Mr.
22   Missry to mean by that?
23        A.   I guess he was arguing, my
24   recollection is that he was arguing that
25   Tom's report was compliant, even though it
```



1                    S. Locatell

2    had a valuation based on an unencumbered

3    methodology and then he was asking, Are you

4    drawing a line in the sand?  I don't recall

5    what that was in reference to.

6         Q.   Then there is some words after that

7    and I can't make out the next word.  Can you

8    tell me what that is?

9         A.   It says, I have not done HBU or

10   used ground leases.

11        Q.   Right.  Who was saying that?

12        A.   I don't know.

13        Q.   Then there is a word before those

14   parenthesis.  Do you know what that word is?

15        A.   Nuff fu [sic].  I have no idea what

16   that means, sorry.

17        Q.   You don't have to apologize.  If

18   anybody read my notes, they would probably be

19   horrified, too.  Sometimes it just happens

20   that way.

21             Let's turn to the next page,

22   please.

23        A.   I'm trying to turn it, it's not --

24   okay.  Now, it's going.  Got it.  I'm there.

25        Q.   At the top of the page, it says,



```
 1                    S. Locatell
 2   Mike, third appraiser.
 3            Do you know what that refers to?
 4       A.   No.  Maybe we were discussing the
 5   third appraiser or Mike brought up the third
 6   appraiser.
 7       Q.   And then there is a line that
 8   begins, Morris.  Can you explain -- can you
 9   tell me what that says?
10       A.   It looks like there was a
11   discussion being had about what the procedure
12   would be with the third appraiser.
13            Morris, last paragraph of first
14   page.  If two can't agree, appoint third.
15   Third does his job and issues letter opinion,
16   then you take the average.
17            Again, that's where I go back to
18   the average I was discussing earlier, so
19   that's what Morris was stating.
20       Q.   Then you write, You disagree.  What
21   does that mean?  Who was disagreeing with
22   what?
23       A.   Well, I disagreed.  I told you, I
24   disagree on the reading of that.
25       Q.   Okay.  Was --
```



Page 220

```
 1                  S. Locatell
 2        A.   It might have been Morris was
 3   saying I disagree because he wrote, you
 4   disagree.  I was writing what he said most
 5   likely.
 6        Q.   It then says, If continues to
 7   maintain position, then we will go to court.
 8             Who brought up the idea of going to
 9   court?
10        A.   It seems like it was Morris.  He
11   said the notes here are that he is explaining
12   what he thinks happens and then he is saying,
13   we disagree, meaning, myself and the landlord
14   and then he is saying, if continued to
15   maintain this position, and you can see I
16   tried to write like a little quote by the
17   then, I recognize my little quotation marks,
18   then we will go to court.
19        Q.   Aren't you quoting Mr. Meyer here?
20        A.   No, this is Morris, this is all
21   Morris notes.  Morris -- Mike doesn't start
22   speaking until after.  Morris tells us we are
23   going to be backing them into a corner and
24   they will go to court and then Mike responds
25   below, so everything above was Morris.
```



Page 221

1           S. Locatell

2      Q.   At the bottom of the page, there is

3   some small print.   It says in the column --

4   Can you tell me what that says?

5      A.   After Morris says, We are going to

6   court?

7      Q.   Yes.   The only writing in the left

8   column on this page begins with DIFF.

9      A.   Difference, I'm assuming,

10   difference in methodologies, differ in

11   results.

12      Q.   Was that a note to yourself?

13      A.   No, this is all Morris talking now.

14   Above, I do the dash, Morris, and Morris is

15   arguing, they don't want to argue that we are

16   going to court and they came up with their

17   own interpretation of the lease, so this is

18   me, I believe this is me paraphrasing what

19   Morris was saying at that point.

20      Q.   And you say -- can you read to me

21   the sentence that is next to the arrow at the

22   bottom of the page?

23      A.   Come up with own interpretation of

24   lease and I can't make out --

25      Q.   Does it say, do his own thing?



Page 222

1                  S. Locatell

2       A.   And do his own thing.  Happy to

3  take your view on that.  Again, this is

4  Morris speaking.

5       Q.   Let's take a look at the last page,

6  please.

7       A.   Okay.  There we go.

8       Q.   At the top, you wrote, For benefit

9  of everyone on call.  Give us thoughts how

10  process will continue.

11            Who was saying that, if you

12  remember?

13       A.   I believe Mike, because I have

14  noted over to the side what Morris said and

15  this sounds more like Mike than Morris.  He

16  says, For the benefit of everyone on the

17  call, give us thoughts on how the process

18  will continue.  The appraisal piece.  We need

19  to determine if Tom's analysis is compliant

20  with the lease.  Morris is obviously arguing

21  there is nothing to be determined, he

22  believes that Tom's analysis is compliant and

23  so I wrote over on the side, Morris, you

24  don't like it?

25       Q.   Then under that, you say, intent --



Page 223

```
 1                 S. Locatell
 2        A.   I was pointing out that Morris was
 3   saying you don't like it and then Mike said,
 4   Instruct the third appraiser to do an
 5   estimate without the analysis if no comp
 6   leases.  Morris recommended he'll --
 7        Q.   What does it say under that?
 8        A.   He'll and Fed.  He'll will take out
 9   sales approach because land residual is only
10   appropriate approach because no 20 year,
11   meaning, no control after 20 year.  Send
12   email on how they got to land residual.  Mike
13   sit tight until Tuesday.
14        Q.   Was send email and how they got to
15   land residual, was that a request that Mike
16   was making of you?
17        A.   I believe so, it was likely.  You
18   showed me an exhibit earlier that had my
19   Excel, a picture of my Excel where I
20   attempted to recreate Tom's residual based on
21   the data he had provided in his report.  I
22   believe that email was probably in response
23   to this.
24             It sounds like he was asking me how
25   to do that because if you will see, I have
```



Page 224

```
 1                  S. Locatell
 2    two hard lines after Morris speaks and,
 3    usually, I would put something like that if
 4    it was closed, what I was -- the conversation
 5    was closed and then I said, send email to
 6    Mike and wait, so I'm sure that sit tight was
 7    a direction from my client.
 8        Q.   Just so I'm clear, in the portion
 9    above, did, in fact, Morris say that or offer
10    to take out the sales approach and only do a
11    land residual analysis?
12        A.   Morris recommended he will take out
13    sales approach because the land residual is
14    the only applicable approach.
15        Q.   And I take it McDonald's never
16    agreed to that, as far as you know?
17             MR. WALSH:  Objection to form.
18        A.   I don't know, I have no knowledge
19    of that.
20             MR. KOH:  Let's bring up what is
21        No. 34 in this stack, please.
22        Q.   And these are more notes.  They may
23    not be yours.  I'm still trying to figure
24    this out, but it's lengthy and they seem
25    disjointed and I'm trying to figure out if
```


MAGNA
LEGAL SERVICES

1                    S. Locatell

2    any of these are your notes, so if you could

3    page through the document and let me know

4    which of these pages are your notes, I think

5    we should start there.  This has been

6    previously marked as Exhibit DD.

7         A.   Most all of these notes are Ellen

8    Benjamin's.

9         Q.   Some are yours, I think, right?

10        A.   That's correct.  Would you like me

11   to tell you which pages are mine?

12        Q.   That would probably be helpful, but

13   I think I can probably guess.  Let's get you

14   to confirm that.

15        A.   Page 2, the white paper.

16        Q.   Okay.

17        A.   No. 6, the one that's on its side.

18        Q.   That has your telltale doodles?

19        A.   That's right.

20        Q.   They say, I can't learn anything.

21             What else is yours?

22        A.   I'm not sure if there is anything

23   else.  There may be one more I saw.

24        Q.   I think there is.  Take your time.

25        A.   Yes, page 19 is mine and page 20.



Page 226

```
 1                    S. Locatell
 2    Actually, page 20 has some of Ellen's writing
 3    on there, too, but it's mostly mine.  I
 4    believe the rest is all Ellen's.
 5        Q.   Let's focus on just yours.  Let's
 6    skip page 2 because I think I understand what
 7    that's about.  Let's go to the one I think
 8    you said was page 9, which is the one on its
 9    side, which I'm happy to have you rotate.
10        A.   The rotation for me is -- I don't
11    know how I'm rotating, it rotates when I
12    hover.
13        Q.   You have to click and it appears to
14    me to only rotate in one direction, but there
15    it is.
16             Just bear with me while I review
17    this.  This seems to be -- it contains a
18    couple of dates.  9/9/19 and July 10th.
19             Can you explain what the two dates
20    are?
21        A.   No.  If you see below on the
22    right-hand side, I say, One week in August
23    for daughter's B day.  Three-year sabbatical.
24    Carol may have been telling me when she was
25    going to be away in on vacation in August.
```



Page 227

1                    S. Locatell

2        Q.    These notes were probably written

3    in July, not in September, you can't say for

4    certain?

5        A.    I can't say for certain.

6        Q.    Let's go to the other pages, which

7    I believe you identified as 19 and 20 --

8        A.    You are right, 19 and 20, I'm

9    there.

10       Q.    On page 19, it says, 80 Atlantic

11   Avenue on the top and above that, there is a

12   word that says, Liz, and then I can't read

13   what it says.

14            Does that have anything to do with

15   840 Atlantic Avenue?

16       A.    Liz Genovese was another MAI

17   appraiser, so she may have been someone we

18   were thinking about as a potential neutral.

19       Q.    Do these notes reflect, at least at

20   the top, an attempt to select a third neutral

21   appraiser?

22       A.    Yes.  I can't tell you whether

23   these notes are notes that I had in a

24   conversation with Tom or notes that I had a

25   conversation with client, but these were



Page 228

1                    S. Locatell

2    people who I would typically put on my list

3    as qualified appraisers to act as a neutral.

4         Q.    Then below that, there is a section

5    that says, Comps, and next to that, does that

6    say Bensonhurst?

7         A.    Yes.

8         Q.    And then there are two numbers, 250

9    K and 300 K.

10              What does this refer to?

11        A.    I don't know.  A comp in

12   Bensonhurst maybe somebody told me about.

13        Q.    Below that, there is a line that

14   says, 4.5 mill Ozone Park, and then I think

15   it says stone.

16        A.    Store.

17        Q.    Do you know what that refers to?

18        A.    I have no idea.

19        Q.    Is that another potential comp that

20   you were discussing with someone?

21        A.    I don't know.  I mean, it could be

22   the amount some store grosses because it says

23   it's a mall deal and it's 10 percent to

24   sales, so I don't know what this is.

25              Again, remember, around this time,



Page 229

```
 1                  S. Locatell
 2   I was also working on something in Whitestone
 3   which was located in more of like a strip
 4   mall, so this might be something having to do
 5   with that job and not the subject property.
 6        Q.   Then you say, ground lease, with an
 7   arrow, don't pay based on sales.
 8             Do you know what that means?
 9        A.   Yes, they don't pay rent, based on
10   the sales they do, at whatever site this is.
11        Q.   That's a discussion of what is
12   going on at that particular site?
13        A.   Yes.
14        Q.   I see.  And the 4.3 million.  Does
15   that reference that particular site, as well?
16        A.   Yes, it appears to, yes.
17        Q.   The next page, it says, BKLYN at
18   the top left corner, and then it says 840,
19   Madison is crossed out and it says Atlantic
20   Avenue, so that refers to this property,
21   right?
22        A.   It does.  That's Ellen's writing,
23   the shorthand for Brooklyn and Atlantic
24   Avenue.  The rest is my writing and I think I
25   was working on a mediation involving an 800
```



Page 230

```
 1                 S. Locatell
 2   block located Madison Avenue property during
 3   this timeframe, so she was correcting the
 4   note.
 5        Q.   It says, Hanging hat on language.
 6   Pure appraisal proceeding.
 7             Do you know what that refers to?
 8        A.   It means it's -- the lease calls
 9   for an appraisal proceeding and I think it's
10   referencing the language in the rent option
11   addendum, I'm assuming.
12        Q.   Do you remember who was hanging
13   their hat on language?
14        A.   No, both parties were, both parties
15   were reading the language as to how you
16   proceed in the appraisal proceeding
17   differently.
18        Q.   Below that, there is a line that
19   says -- a solid line and it says, Land use,
20   ask Jennifer.
21             Do you know what that refers to?
22        A.   That would be land use attorney,
23   Jennifer.
24        Q.   Do you know why that is written
25   here?
```



Page 231

1                    S. Locatell

2         A.   I don't remember her last name, but

3    it may have been a land use attorney that I

4    was going to recommend to the client to reach

5    out to, which, again, I believe they didn't

6    ever do.

7              Again, just so you are aware, Mr.

8    Koh, that line across, when I take notes,

9    again, I put a line across, so that notation

10   doesn't relate to -- likely, to the notes

11   that I was making above, just so you are

12   aware.  It could be a separate assignment, a

13   different job, a different day definitely,

14   but...

15        Q.   Thank you for that clarification.

16             MR. KOH:  It's about 4:25.  I would

17        like to take a break now and we will see

18        how much more, if any, I want to do at

19        this point.

20             (Recess.)

21             MR. KOH:  Thank you for coming in

22        today remotely, Ms. Locatell.  Unless

23        Mr. Walsh has questions, I think we are

24        done.

25             MR. WALSH:  I just have one place I



Page 232

```
 1                    S. Locatell

 2        want to follow-up on.

 3   EXAMINATION BY

 4   MR. WALSH:

 5        Q.   Ms. Locatell, if you could pull up

 6   Exhibit LL, it's document 16.

 7        A.   Yes.

 8        Q.   So on the bottom of the first page,

 9   there is an email from Tom to Marc and he

10   talks about forwarding conflicts disclosures.

11   On the next page, top of the next page, he

12   says, Thanks and have a great weekend.

13             Do you see that?

14        A.   Yes, I do.

15        Q.   Then Marc responds to that on May

16   31, 2019, 11:02 and writes, Thanks for the

17   update.  I will sit tight.  Have a good

18   weekend to all and then you respond, Thanks.

19   Looks like it will be another beauty.

20             You testified before about what

21   that may mean.  Do you think that could have

22   been referring to the weather that weekend?

23        A.   I think it was.  That's the problem

24   when you get asked questions referring to

25   information, things you might have said in an
```



Page 233

```
 1              S. Locatell
 2    email two years ago, but, yes, I think I was
 3    referring to the weekend.
 4         Q.   So you were saying, essentially, it
 5    looks like it will be another beautiful
 6    weekend.  Is that what you think you were
 7    trying to say?
 8         A.   Yes.
 9              MR. WALSH:  I have no further
10         questions.
11              MR. KOH:  I don't have any
12         follow-up.
13              (Time noted:  4:34 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 234

```
 1
 2                    - - -
 3               I N D E X
 4                    - - -
 5
 6   SHARON LOCATELL                    PAGE
 7        By Mr. Koh                    3
 8        By Mr. Walsh                  231
 9
10                    - - -
11               E X H I B I T
12                    - - -
13   EXHIBIT                            PAGE
14   Exhibit GG November 20, 2018 email    18
15        From Ms. Locatell to Ellen
16        Benjamin
17   Exhibit HH Documents bearing Bates    99
18        Stamp No. MCD 003543 and MCD
19        003544
20   Exhibit II Document bearing Bates     102
21        Stamp No. MCD 003349
22   Exhibit JJ Email dated May 20th from  109
23        Mr. Tener to Marc Nakleh copied
24        to Sharon Locatell
25
```



Page 235

1

2                   - - -

3              E X H I B I T

4                   - - -

5   EXHIBIT                              PAGE

6   Exhibit KK Documents bearing Bates    112

7        Stamp No. MCD 002674 and

8        MCD 002675

9   Exhibit LL Documents bearing Bates    125

10       Stamp No. MCD 003463 through

11       MCD 003466

12  Exhibit MM Document bearing Bates     130

13       Stamp No. MCD 005436

14  Exhibit NN Document bearing Bates     152

15       Stamp No. MCD 004011

16  Exhibit OO Document bearing Bates     157

17       Stamp No. MCD 005733

18  Exhibit PP Documents bearing Bates    162

19       Stamp No. MCD 003520 and

20       MCD 003521

21  Exhibit QQ Documents bearing Bates    164

22       Stamp No. MCD 000707 through

23       MCD 000733

24  Exhibit RR Documents bearing Bates    175

25       Stamp No. 1733 to 1749



Page 236

```
 1
 2                  - - -
 3            E X H I B I T
 4                  - - -
 5    EXHIBIT                        PAGE
 6    Exhibit SS Documents bearing Bates   183
 7        Stamp No. MCD 001733 through
 8        MCD 001749
 9    Exhibit TT Documents bearing Bates   186
10        Stamp No. MCD 005310 and MCD
11        005311
12    Exhibit UU Document bearing Bates    198
13        Stamp No. MCD 005443
14    Exhibit VV October 25, 2019 email    201
15        from Ms. Locatell to Mr. Meyer
16    Exhibit WW Locatell Notes 2          206
17    Exhibit XX Locatell Notes 1          212
18
19
20
21
22
23
24
25
```



Page 237

```
 1
 2                     - - -
 3            DEPOSITION SUPPORT INDEX
 4                     - - -
 5   Direction to Witness Not to Answer
     Page   Line        Page   Line   Page   Line
 6   None
                         - - -
 7

     Request for Production of Documents
 8   Page   Line        Page   Line   Page   Line
     None
 9
                         - - -
10

     Stipulations
11   Page   Line        Page   Line   Page   Line
     None
12                      - - -
13   Questions Marked
     Page   Line        Page   Line   Page   Line
14   None
                         - - -
15

     To Be Filled In
16   Page   Line        Page   Line   Page   Line
     None
17                      - - -
18
19
20
21
22
23
24
25
```



```
1                    CERTIFICATE

2

3

4          I HEREBY CERTIFY that the foregoing proceedings

5   were duly sworn by me and that the proceedings are a

6   true record.

7

8   _____

9   Leslie Fagin,
    Registered Professional Reporter
10  Dated:

11

12

13          (The foregoing certification of this transcript

14  does not apply to any reproduction of the same by any

15  means, unless under the direct control and/or

16  supervision of the certifying reporter.)

17

18

19

20

21

22

23

24

25
```

Page 239

```
 1
 2            ACKNOWLEDGMENT OF DEPONENT
 3            I,                      , do hereby
     certify that I have read the foregoing pages,
 4   and that the same is a correct transcription
     of the answers given by me to the questions
 5   therein propounded, except for the
     corrections or changes in form or substance,
 6   if any, noted in the attached Errata Sheet.
 7
 8
     SHARON LOCATELL              DATE
 9
10
     Subscribed and sworn
11   to before me this
            day of                 , 2021.
12
     My commission expires:
13
14   Notary Public
15
16
17
18
19
20
21
22
23
24
25
```



```
 1
 2              - - - - - -

              E R R A T A
 3              - - - - - -

     PAGE  LINE  CHANGE
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



## A

**a.m** 1:14 110:3 127:25
**AA** 159:14,19 160:7 161:6
**abbreviated** 201:18
**abilities** 111:11
**ability** 17:2,25
**able** 5:12 60:6 78:8 95:11 113:21 118:25 122:15 145:11 178:11 197:17 203:21
**absent** 153:12
**absolutely** 42:2 55:18 126:9
**absurdly** 46:11
**accepted** 115:8 179:6 181:18
**accepting** 205:12
**access** 55:21 196:14
**account** 25:15 61:9 97:23 123:21 177:15 204:10 214:2
**accounts** 61:6
**accuracy** 208:6
**accurate** 21:10 51:8 65:21 77:22 145:13 172:22 198:17 206:17
**accurately** 51:25 68:5
**acknowledgment** 193:16 239:2
**acre** 33:21
**ACRIS** 174:19 175:6
**act** 21:12 77:20 78:14 228:3
**acted** 118:12
**acting** 22:4 78:20 78:24 81:7 121:22 121:23 205:13
**active** 46:13 58:17

59:15,16 60:4,22 82:3 85:19 90:7 97:7 111:15 133:8 192:13
**activities** 44:21
**acts** 85:4
**actual** 28:22 29:24 76:13 83:16 118:20 139:15 195:21 217:3
**add** 107:10 117:15 137:15 154:11
**added** 193:20
**addendum** 23:17 23:25 24:6,9,25 25:13,25 26:7 27:8,16 28:7 29:3 29:20,22 47:15,17 48:8,15 49:5 53:9 53:11,13,17,21 61:19,20,24 62:21 65:22 70:24 75:14 106:12,14 118:20 122:4 125:6 136:11 160:24 161:14 165:11 181:25 191:24 194:15 198:19 206:13 230:11
**adding** 182:9
**addition** 62:15 79:12 87:10 107:13 190:21 195:3 196:5
**additional** 197:11
**Additionally** 27:9
**additive** 154:9
**address** 51:17 110:14 131:24,25 133:2 146:25 178:11
**addressed** 153:10 180:15 215:9
**addresses** 132:3
**adequately** 191:16
**adjust** 94:13

**adjusted** 89:16
**adjustment** 141:23
**adjustments** 94:2,9 95:11 136:24 149:9 167:14
**admission** 45:12
**admittedly** 183:3
**advance** 103:15
**advent** 31:15
**advise** 88:16
**advised** 18:8 110:17
**advising** 28:2 82:15
**advocacy** 79:20,24
**advocate** 81:7 121:23,24
**advocating** 80:7,15 80:17,19 108:20
**affixed** 31:12
**afraid** 117:4 122:22
**against-** 1:7
**ago** 56:2,13 68:23 94:25 111:21 115:20 160:5 233:2
**agree** 13:15 14:12 14:20 57:5 58:23 59:2,22,24 66:18 68:15 103:5 104:8 104:8 105:18 106:17,19 107:9 107:15 123:19 162:9 181:3,23 182:8,24 188:24 191:9 204:16 219:14
**agreed** 103:2 107:5 122:19 123:9 151:23 177:12,16 182:15 193:6,8 204:13 224:16
**agreeing** 128:24 193:10
**agreement** 24:25 27:16 47:24 52:9 61:19 62:14

104:15 105:3 106:25 108:15,21 120:9 121:3,7 135:21 138:22 155:6 160:2,19 161:3 162:10 164:23 170:3 182:2,5,21 206:12
**agreements** 88:6,8 124:2
**Albert** 131:9
**allocation** 209:7
**allow** 98:7 169:17 169:24
**allowable** 168:4
**allowed** 98:21 150:8 169:21 188:17
**allows** 76:5 208:16
**amortize** 44:12
**amortized** 200:6 215:22
**amount** 66:19 134:3 168:5 185:12 195:18 197:4 214:24 228:22
**analyses** 26:17,22 62:7,8,11 156:13 176:24 201:4
**analysis** 29:8 33:9 49:9 52:22,23 55:13 61:18 62:19 63:4 69:16 77:22 77:25 78:20 80:25 81:21 82:18 85:10 95:6 99:4 102:9 123:8 130:10 136:23 141:6,25 142:4,7,11,24 143:8,25 149:5 151:13 152:17,20 152:21 153:4,5,7 153:15 154:3,4,22 154:25 155:5,9,12 155:15 156:7

166:2 170:20 177:7,17,19,25 180:7 190:18,24 191:2 194:4 196:21 197:12 198:14 199:14,21 200:20 201:2,18 202:15 203:11 215:25 216:7 222:19,22 223:5 224:11
**analyze** 78:12 155:24
**analyzed** 38:4 77:2 95:10 98:23 184:6 184:11
**analyzing** 38:15,21 238:12
**and/or** 54:11 238:12
**angry** 151:13
**annual** 61:6
**annually** 38:9
**annum** 39:14 145:3
**answer** 4:2 7:17 8:13 9:12 14:19 16:25 17:24 20:14 20:15 26:11 40:2 40:8 47:2 56:23 58:14 60:2 87:15 113:21,23 136:18 137:16 149:13 158:13 160:11,13 168:21 189:11 191:8 215:13 237:5
**answered** 19:12
**answers** 34:20 152:17 155:16 239:4
**Anthony** 52:10
**anxious** 28:21 101:2
**anybody** 12:2 58:25 59:23 78:22 126:17 139:5 186:24 203:18



218:18
**anyway** 116:16
**apologize** 6:25
36:16 103:17
218:17
**app** 108:11
**apparently** 117:22
153:25 186:20
**appear** 144:10
146:18 200:11
**appeared** 16:21
**appears** 19:10
20:23 23:13,14
81:16 84:12
107:25 113:11
127:4 160:25
164:16 166:9
204:18 207:16
226:13 229:16
**applicability** 192:3
**applicable** 56:14
118:23 184:18
224:14
**applied** 34:19
184:24,24 185:2
**apply** 13:21 55:10
196:3 238:11
**appoint** 105:23
106:17 107:8
219:14
**appointed** 6:4
77:20 104:20,22
104:23 106:2
108:5,7
**appraisal** 4:11,15
27:18 35:14 63:8
71:15 72:13 87:7
107:19 129:8
137:2,18 139:12
139:21 140:3
142:18 160:3
162:15 166:21
171:5,7 172:12
173:2,5,8 175:5
175:11 179:17
203:23 213:24

214:15,16 216:19
217:7 222:18
230:6,9,16
**appraisals** 32:18
34:23 35:8 45:9
57:7 71:12 137:4
137:5,9 146:7
192:2 203:18
**appraise** 13:21
**appraised** 25:14
89:2
**appraiser** 4:25 7:22
14:13 21:13 22:5
25:3,24 28:19
36:10 41:16 42:22
42:24 46:13 50:5
56:16 58:18 59:17
65:13 67:15 68:10
69:2,17 72:20
73:17,25 77:21
78:7,21,25 81:6
85:13 86:25 88:24
100:3 102:11
103:3,6,12 104:22
104:23 105:6,24
108:7 118:3,11,25
119:4,9,11,19,22
120:3 122:8
123:25 152:19
161:9,10 162:3,8
171:24 174:21
180:17,25 181:2
181:21,22 203:17
203:20 205:14
213:18 219:2,5,6
219:12 223:4
227:17,21
**appraiser's** 105:8
105:20 161:12
**appraisers** 4:5,8
8:11 9:9 11:8
21:11 31:17 58:23
59:21 65:19 66:3
66:20 67:25 69:18
80:2 102:3 104:20
105:2,24 106:2,16

106:18 107:8,15
107:18 108:5,14
108:17 112:23
120:25 128:14
132:4 133:6 182:8
191:5,9 228:3
**appraising** 89:23
**appreciate** 91:20
**approach** 32:8
33:17 118:6
140:21 141:3,15
154:7,8,9,10,13
154:14,14 186:23
191:23 194:19
198:5 223:9,10
224:10,13,14
**approached** 62:10
**approaching**
126:16
**appropriate** 38:23
54:9 64:20 122:24
146:23 181:19
191:6 194:13
223:10
**appropriately**
155:7 178:16
**approval** 87:22
88:12
**approvals** 45:19
**approximately**
10:6 21:16
**April** 27:10,10
45:17 57:25 65:2
65:10 66:11,13,15
67:6,7 71:2 83:21
100:23 140:5
**arbitrators** 112:22
**architect** 5:7
**architectural** 83:10
**area** 4:13 15:7 37:6
37:9,10,11,12
40:17 43:9 44:17
69:19 87:9 96:20
97:8 111:2 114:14
115:11,16 116:2,8
116:23 126:10

133:9 196:19
208:15,17
**areas** 41:9 89:8
92:23 93:3,6 94:6
94:13 96:22
203:10
**argue** 221:15
**arguing** 217:23,24
221:15 222:20
**arithmetic** 103:18
**arrow** 214:6 221:21
229:7
**art** 158:19
**articulating** 199:13
**ascribing** 48:18
**aside** 46:17 53:23
81:13
**asked** 8:20 22:14
26:4,13,15,17,21
28:15,16 29:13
34:21 49:14 50:20
59:20 63:17 79:17
86:7,18 88:10
110:14,18 130:5
133:22,23 151:8
151:15 180:22
198:7 199:10
206:3 213:16
214:13 232:24
**asking** 13:12 31:8
55:2 59:9 84:21
112:9,13,17
113:12 121:21
131:10 132:4
144:25 152:16
157:22 163:12,16
215:3 218:3
223:24
**asset** 42:12 96:6
111:5
**assignment** 7:24
8:23 9:24 10:14
10:18 13:6 19:9
20:4,8 21:11,21
22:20 24:8 71:18
71:20 75:12 78:14

78:21,25 85:8
90:14 109:23
118:19 156:20
160:6,9 171:11
172:3,10 173:23
174:24 191:14
205:12 207:12
231:12
**assignments** 8:25
9:3,6,8,17 10:6,7
20:9 21:22 22:21
77:19 90:7,10
107:12
**assistant** 28:18
**associated** 21:20
**assume** 30:23 44:9
45:17 55:23 99:2
131:16 168:17
189:25 212:13
215:17
**assumed** 77:3
152:19 207:11
214:20
**assumes** 176:25
180:3
**assuming** 21:3
29:11 53:6 68:21
75:24 77:9 81:18
98:23 106:24,25
108:12 123:13,14
163:10 170:21
173:2,16 176:4
177:3 178:2
181:12 200:3
202:2 210:5
212:24 215:20
221:9 230:11
**assumption** 25:12
46:15 57:21 83:13
99:4 168:13
200:21 207:13
**assumptions** 28:5
45:7,11 77:16
78:4 139:16 142:6
143:25 155:2,11
172:18 190:19,25



194:22 195:7,11
195:13 200:9,16
201:3
**Atlantic** 1:8 3:14
9:3 11:5 21:5 22:2
22:14 23:5 43:13
65:14 70:5 90:18
96:20,21 116:3,13
116:13 131:20
132:8,22 134:5
137:7 156:8
171:14 173:10,12
174:4,19 195:19
208:10 210:24
211:17 227:10,15
229:19,23
**attached** 15:4 21:2
239:6
**attempt** 174:17
177:17 227:20
**attempted** 174:13
199:18 223:20
**attempting** 161:3
**attend** 26:13
137:23
**attended** 12:15,22
**attending** 26:16
63:19
**attention** 18:7 19:2
146:6 147:21
165:11 170:8
214:4
**attorney** 5:4 8:18
12:6,7 16:4 74:5
74:11,14,19,24
155:20 159:25
230:22 231:3
**attorneys** 2:5,9
75:3 112:16,24
128:13,17 161:2
**August** 19:4 226:22
226:25
**auto** 43:18
**automobile** 43:15
**available** 15:24
46:22 93:25

163:17 204:9
215:14
**avenue** 2:10 9:3
21:6 22:2,15 23:5
43:13 65:14 89:20
89:21 90:5,18
96:20,21 116:13
116:14 131:21
132:8,22 134:6
137:7 146:25
156:8 171:14
173:12 174:19
195:19 207:6,8
210:24 211:17
227:11,15 229:20
229:24 230:2
**average** 9:13,15
104:9 182:12
204:17 205:15
219:16,18
**averaged** 106:21
181:3,23 182:18
182:24
**averaging** 9:16
181:16
**aware** 82:2 85:9,21
119:19 167:7
177:22 231:7,12

---

**B**

**B** 31:24 47:17,18
48:14 106:10,11
170:9 226:23
234:11 235:3
236:3
**back** 8:11,21 10:15
14:9 16:15 55:7
56:2,4,12 63:11
67:16 75:13 81:20
88:11 90:16 91:17
92:17,22 95:24
101:15 107:5
112:21 146:6
147:21 151:14
152:22 156:13
157:25 158:5

176:18 177:16
185:25 198:5
205:16 209:18
219:17
**backing** 220:23
**backup** 90:17
142:5 143:8
**badly** 114:9
**banks** 15:6 97:18
131:18
**Barclays** 43:12
96:25 115:12
**base** 63:8 117:5
**based** 25:19 27:15
29:16 39:24 40:13
41:6 54:15 72:24
77:4,22 81:4
83:20 91:9 96:10
110:12 111:4
130:6,10,12 141:2
161:17 169:21
170:12 177:5
179:25 185:6
189:18 196:25
218:2 223:20
229:7,9
**basic** 80:6 142:13
**basically** 17:11
37:12 47:25 60:12
109:21 141:5
151:21,24 158:15
167:9
**basis** 39:15,22
40:20,20 63:7
**batch** 103:11
**Bates** 30:14 84:18
99:6,9,13 102:18
102:19 111:23
112:3 125:12,15
130:23,24 145:20
152:8,10 157:13
157:14 162:23
163:2 164:2,12
170:7 175:11,15
176:12 183:11,14
186:8,12 198:24

198:25 234:17,20
235:6,9,12,14,16
235:18,21,24
236:6,9,12
**bear** 226:16
**bearing** 99:9,12
102:19 112:2
125:12,14 130:23
130:24 152:10
157:14 162:23,25
164:2,11 170:7
175:14 183:13
186:8,11 198:23
198:25 234:17,20
235:6,9,12,14,16
235:18,21,24
236:6,9,12
**bears** 30:13 84:18
111:23 152:8
157:13 175:11
183:11
**beautiful** 233:5
**beauty** 128:3
232:19
**began** 70:17 171:19
**beginning** 208:4
**begins** 24:13 65:19
216:3 219:8 221:8
**behalf** 13:7,10
**believe** 3:15 6:11
8:5 12:13 13:8
23:16 26:10 27:11
27:23 36:2 58:23
59:21 65:9 67:5
72:15 81:19 86:4
86:17 88:3,11
95:6 100:13,22
108:2 114:6 119:8
120:4 121:22
122:20 123:2
127:14 138:9,11
138:12,13 139:8
147:6 149:17
155:20 156:4,19
157:4 160:18
161:20 163:11

164:21 169:6,8
171:9 175:17
178:10,14 179:5
180:21 181:17
183:18,25 184:9
187:13 191:15
193:2 194:9,10,11
195:9 197:15,21
197:24 199:8
201:22 203:21,25
204:4 205:6,10,13
205:20 206:3,8
208:5,25,25
209:13,15 210:7
212:18 213:15
221:18 222:13
223:17,22 226:4
227:7 231:5
**believed** 195:6
203:5
**believes** 222:22
**believing** 195:3
**bend** 16:18
**benefit** 123:18
222:8,16
**Benjamin** 18:20,24
28:17,23 36:2,4
48:13,13 67:8
73:11 74:24 84:15
84:20 85:2 152:16
157:21 175:4
234:16
**Benjamin's** 64:2,11
211:18 225:8
**Bensonhurst** 228:6
228:12
**Bergen** 93:16
**best** 5:18 8:6 17:2
17:24 21:9 25:15
25:19 40:14 44:2
44:4,19 45:2
58:21 79:8,10
93:25 96:2 150:10
170:2,13 187:24
188:11,20 189:2,8
189:18,21 190:2



191:3,17 195:5
216:23 217:2
**better** 8:8 94:17
154:21 164:8
**beyond** 22:16 173:7
**big** 43:9 66:14,16
180:10
**bill** 22:11 63:6,11
**billed** 22:16 63:12
63:20
**billings** 63:11
**bit** 8:19 12:24
13:13 25:21
103:22 144:5
**BKLYN** 229:17
**block** 188:15 190:3
190:10 230:2
**blocks** 43:17
**blue** 176:15
**board** 81:22
**boards** 82:4,11
**body** 82:5
**Boerum** 96:24
**book** 32:19 34:22
34:24 35:3,9,12
35:16
**border** 114:16
**born** 133:9
**boroughs** 92:25
**botching** 103:17
**bottom** 84:18
105:15 127:6
193:24 202:13
217:9 221:2,22
232:8
**Boulevard** 89:6
**bound** 80:2 204:20
**boundary** 116:12
**box** 164:5
**boxes** 16:14 145:18
**bracketed** 179:21
**brackets** 147:17
**bread** 133:9
**break** 3:24 64:17
125:24 126:3,8,12
134:20 185:24

203:7 231:17
**BRENDAN** 2:7
**brief** 70:8
**bring** 18:18 20:16
23:7,23 29:25
31:14 47:5 64:23
67:3 73:4 84:7
94:10 99:5 109:8
111:22 113:5
125:8 130:20
135:6 139:18
152:2 157:10
159:13 162:20
163:24 175:8
183:8 186:5
198:20 201:5
206:14 211:7
224:20
**broad** 83:13
**broader** 21:23
**broadly** 15:14
133:24
**broker** 145:5,11
**brokerage** 87:9
**brokers** 85:6 115:2
**Brooklyn** 43:9
69:19 92:21 96:23
131:21 133:8
229:23
**brought** 8:17 219:5
220:8
**brownstone** 115:20
116:11,14
**Bruckner** 89:6
**budgets** 196:14
**build** 39:5,6 41:23
42:4 43:6 45:21
60:13 154:11
195:17 196:8,17
**building** 15:22,24
37:6,9,12,15,17
38:11 39:4,6,18
39:19 40:10,17
41:2 42:6,16 43:5
44:10,13 45:5
96:9 147:10

158:18 188:15,16
190:3,10 196:17
197:3 200:3,13
208:17
**buildings** 38:20
41:10 42:13
**built** 38:21 39:20
40:24 41:11,18
42:19 45:15
**bullet** 29:2 187:4
188:5 194:16,20
**bundle** 184:15
**Burger** 146:16,17
**business** 11:14,15
101:17
**busy** 67:21 100:18
102:12 156:24
**buy** 50:12

---

## C

**C** 2:2 3:2 23:10
98:6 135:4
**C1-2** 169:12
**C1-3** 169:12
**C8-2** 210:19
**cache** 116:25
**calculation** 199:15
**call** 20:10 49:23,24
66:22 68:3,5
110:3,6,9 111:8
129:15 130:7
133:2 148:13
157:3 186:20,24
211:20 212:5,19
212:21,22 213:5
222:9,17
**called** 3:2 23:16
32:7 83:5 87:8
154:15,17 178:18
178:20
**calling** 115:7
116:22
**calls** 14:17 76:6
101:13,18 117:16
212:7 230:8
**capable** 189:7,17

**capacity** 171:25
**capitalization**
154:13
**capitalize** 188:14
**captured** 167:3
**car** 43:22 93:13
**care** 38:7 207:5
**Carol** 9:20,23,23
10:7 28:16 29:9
49:14,18 50:20
67:12 73:10,11
84:13,13,14 85:3
85:4 86:5,6,18
87:12 88:11 89:10
92:7 138:9 152:15
157:20 163:9,14
212:20 226:24
**carries** 33:5
**cars** 93:9
**case** 1:5 3:10 6:15
16:19 30:8 40:17
44:19 45:3 69:20
72:11,19 77:6
181:14 212:10
**cases** 128:11
**cash** 60:13,18
**cc'd** 84:15 157:21
186:19
**cc'ing** 73:11 127:18
152:16
**cell** 149:3
**cells** 167:2
**center** 15:4 43:12
96:25 115:13
**centers** 15:5
**certain** 93:14
119:17 138:14
196:13 227:4,5
**certainly** 84:5
101:21 173:6
198:10
**CERTIFICATE**
238:2
**certification** 171:22
238:10
**certify** 238:3 239:3

**certifying** 238:12
**cetera** 18:3 74:9
82:25 86:22 95:19
110:22 144:2
**chain** 20:24 199:9
**chair** 16:16
**Chances** 133:3
**change** 72:5,9
240:3
**changed** 43:22 95:3
115:2 123:8 166:2
**changes** 43:13
239:5
**characterize**
129:10
**chart** 35:20 149:7
150:13 209:23
**Chartered** 4:21
**check** 81:20 111:13
**Chipotle** 146:16,20
146:23
**choosing** 191:22
**chose** 39:23
**circle** 67:16
**circled** 184:21,23
185:5,13
**circling** 185:3,16
**city** 41:9 75:4 82:4
94:16 111:16
114:25 115:19,23
155:23 158:18
196:9,12,18
**City-recognized**
96:16
**clarification** 183:7
231:15
**clarity** 32:24
**classification** 98:3
98:5 169:20,22
209:8
**classifications** 98:4
169:16,23 207:21
**clear** 69:24 86:3
107:7 110:19
117:21 118:19
122:6,11 224:8



**clearly** 106:15 114:9
**click** 226:13
**client** 3:13 11:20 12:7,8,16,18 13:7 27:4,22 28:2,9,12 68:12,20 69:25 70:2 73:18 85:13 85:18 101:10 121:2 123:18,19 127:6 136:21 137:19 142:15,23 156:23,24 172:15 212:11,12 224:7 227:25 231:4
**clients** 76:20 100:25 101:18 110:15 128:8 129:5,19,22 160:15 167:6,7
**close** 126:10 129:16 145:2
**closed** 224:4,5
**closely** 28:18
**cognizant** 126:15
**collect** 46:7 166:15 166:17,19
**collected** 70:13,21 71:13
**collecting** 68:7 70:11,17 166:16
**column** 149:18 150:14 184:18 208:3,12 216:14 221:3,8
**columns** 149:20,22 149:23 166:4
**combination** 190:20
**come** 23:3 26:3 32:20 35:2,10 37:24 39:3 40:3 53:25 68:14 69:22 72:17 91:2 104:5 105:3 106:24 108:15 128:15

161:3 164:23 165:5 185:14,25 221:23
**comes** 57:9,11 87:19 178:2 193:20 197:14
**comfortable** 130:9 189:14
**coming** 28:23 91:7 151:11 160:19 214:18 215:11 231:21
**commencing** 1:13
**comment** 112:14 112:19,23 113:17 187:3 188:3,3 216:17,18 217:8
**comments** 112:9 113:3,13 186:22 187:20 188:7 194:18
**commerce** 95:19
**commercial** 96:15 98:6 150:6,8 168:3,14
**commission** 197:6 239:12
**commissions** 46:8
**common** 66:17 112:15,19,20,25 191:4
**commonly** 154:7 197:10
**communicated** 19:15
**communication** 109:22
**community** 81:22 82:4,11
**comp** 94:22,22 97:24,24 147:4,7 148:14,15,25 153:2 166:16 169:8 191:6 223:5 228:11,19
**companies** 87:9

**comparability** 94:10 191:10,11 191:21
**comparable** 35:19 35:21,24 42:12 46:22 71:6,24 85:9 89:17 91:25 92:8 94:7,8 117:17 118:4,8 121:10 131:24 141:25 146:8,12 146:15 147:14,24 153:13 161:16 167:24 169:9 177:21 187:4,10 187:13 189:19,22 190:4,8,17,23 191:13 192:11,14 192:15,18 217:4
**comparables** 42:8 46:19 56:21 80:13 93:17,21,24,24 94:5,12 95:5,12 97:2,6 121:19 124:11 136:25 138:25 141:7 149:16 155:4 168:13,19 169:14 169:16,23 191:13 191:22 192:4,7,9 192:10,23 193:3,5 195:22 204:9
**comparative** 33:9
**compare** 60:11
**compared** 213:18 214:15,16
**comparing** 34:13
**comparison** 30:11 32:8,16 33:8,17 34:7 60:17 140:21 141:14 154:8
**competency** 119:18
**competent** 58:22 59:21 80:4 118:25 119:4,9,11,19,22 120:2,5 122:20

**complete** 28:6 57:23 71:19 72:2 161:25 171:5,7 178:15
**completed** 47:2
**completely** 77:2 78:2 79:3 120:7
**compliant** 216:20 217:7,25 222:19 222:22
**complies** 217:14
**compounded** 77:7
**comprehensive** 70:16 167:17
**comps** 30:10 34:4 34:17 38:18 39:13 39:25 45:13 49:10 64:10 88:20,23 90:2,19,21 91:2 91:18 92:15,16 94:16,17,25 95:2 97:16,20 123:5 131:8,11,15 132:14 133:12 134:5 139:12 142:23 144:11,13 146:24 148:12 151:15,16,20 152:20,25 153:3 163:20 167:22 169:3 191:11 192:17,19,21 196:25 214:16 216:7 228:5
**concepts** 83:2
**concern** 69:11
**concerned** 44:8 122:14
**concerning** 109:23 150:20 171:13 178:12
**concerns** 212:15
**conclude** 39:24 41:17 42:25 53:3 56:18 57:2 78:9
**concluded** 36:18,20

37:3 73:2 195:16
**concludes** 179:20
**concluding** 178:6 189:17
**conclusion** 14:18 32:21 35:2,10 39:11,17 40:21 128:15 141:2,5 178:17,20,22 179:2 185:18 201:21,21 204:24 205:3 210:4 213:12,19,20 217:2
**conclusions** 141:15 161:15,17 167:8 174:8 214:5
**conditions** 95:4,10 172:19
**confer** 68:12
**conference** 1:12
**conferred** 73:24
**confidence** 111:10 111:11
**confident** 56:16 110:24
**confidential** 88:5,5 88:7
**confine** 59:10
**confirm** 163:17 225:14
**confirmed** 70:21
**conflict** 111:5
**conflicts** 69:3,9 110:4,19 111:12 111:17 127:3 232:10
**confused** 38:3 117:23
**confusing** 178:7
**conjunction** 195:20 209:16
**Connecticut** 5:3 6:10 93:16
**connection** 24:7 79:21



cons 69:22
consider 33:23
    46:18 55:4 80:9
    94:21 123:4 124:9
    124:10 151:22
    195:13 217:3
consideration 27:7
    33:11,14 49:7
    117:17 119:15
    121:18 170:13
considerations
    13:21 14:2
considered 34:9,10
    45:9 71:8,9 97:25
    100:24 121:10
    132:21 187:5,16
    187:17
considering 40:14
    177:8
consist 127:7
constantly 31:17
constrained 215:5
construct 200:5
constructed 200:4
    208:18
constructing
    200:12
construction 45:6
    46:10 190:2
    194:24 196:7,9,15
    200:10
consulting 4:12
Cont'd 135:10
contact 19:7,21
    20:11 127:19
    162:14
contacted 19:11
    20:5
contacting 156:25
contained 18:16
    145:13
contains 144:6
    226:17
contention 121:13
    121:14 190:6
contentious 115:22

context 62:6 158:14
contingent 172:18
continuation 99:17
    199:9
continue 49:16
    68:7 70:10 71:23
    222:10,18
continued 70:19
    206:8 220:14
continues 220:6
continuing 160:2
    162:14
contravention
    76:12,17
contributed 173:20
control 44:10 46:14
    58:19,21 59:18,19
    60:5,7 77:4 95:25
    96:6 98:13,18,20
    98:24 134:3,8
    150:2 168:11
    170:24 177:4
    180:4,8 181:13
    192:24 202:3
    223:11 238:12
controlled 57:21
    79:9 99:3 119:23
    119:25 170:3
    176:21 178:3
controls 107:13
conversation 20:2
    20:3 86:5 87:12
    89:10 111:2,3,19
    224:4 227:24,25
conversations 28:2
    150:25
cooperate 102:3
cooperating 102:7
cooperative 102:10
copied 109:12,15
    165:20 166:13
    234:23
copy 19:5 49:4
    73:14 125:5
    143:24 165:3
    174:23 183:19

corner 97:11
    220:23 229:18
Corporation 1:5
    52:11
correct 3:16 4:6,16
    4:19,23 5:10,16
    5:17 6:7 9:18,19
    13:3,4 35:21,23
    37:18,21,22 40:4
    51:4 52:24 53:2,5
    54:2,3,6 57:14
    65:15 71:11 72:17
    72:24 73:22 74:21
    75:19 90:9 94:20
    100:5 102:25
    108:23,24 112:10
    112:11 127:9,18
    131:19,22 144:19
    146:17 148:13,22
    149:6,8,9 167:21
    169:2 171:2
    172:13 177:13
    179:10 182:7
    188:18 189:4,5,23
    192:22 195:2
    199:18,19,24
    201:6 202:10
    204:21 213:25
    225:10 239:4
corrected 123:23
correcting 230:3
correction 149:4
corrections 239:5
correctly 153:8,16
    195:4 203:18
    206:7
correspondence
    31:3
corridor 96:15,15
    96:16,17 97:11
corridors 96:19
    132:23 195:25
    217:4
cost 44:13 74:9
    82:24 83:9,17
    95:19 154:8,11

196:15,23 200:5
costs 46:10 83:16
    194:24 196:7,8,9
    196:10 197:9,11
    200:11 202:13
counsel 3:9 16:12
    17:4 18:5 107:6
    110:17 121:2
    143:18 144:4
    161:25 162:2
Counselors 4:18
countersigned
    159:17
counts 97:4
County 93:9,16
couple 17:12 54:13
    54:21 90:10
    120:19 148:21
    184:21 196:20
    216:2 226:18
course 15:11 62:17
    122:13 174:21
    175:4
court 1:2,14 2:5
    3:11 6:6,8,13,18
    6:24 220:7,9,18
    220:24 221:6,16
cover 96:20
covered 21:24
    22:15 25:23 96:17
Covid 95:17
CRE 4:18
credibility 178:9,12
credible 45:8 71:10
    80:5 82:20 155:12
    155:15 196:19
    204:2
Cropsey 146:25
crossed 229:19
crossroads 116:18
crown 81:25
    114:17 116:5,8
CubeSmart 43:19
curious 145:15
    185:10
current 54:14

188:17 215:12
currently 9:16
    47:21 90:21
    209:25
Cushman 111:14
CVS 158:25

——————————

D

D 24:3,4 65:24
    104:16,18 234:3
Dan 131:8 132:24
    133:4,11 134:4
dangerous 24:23
darker 217:10
dash 221:14
data 16:12,25 28:5
    28:20 29:18,19
    33:18 41:6,13
    46:22 55:12 56:8
    68:8 70:11,12,16
    70:17,21 71:6,13
    71:19 72:21,24
    76:24 84:4 85:3,9
    85:14,20,22 86:19
    86:21,24 87:2,11
    87:14,17 88:4,9
    88:16,17,21 89:3
    89:14 90:19 91:25
    91:25 93:25
    130:12 132:5,7,16
    132:19 141:14
    144:2 145:13
    150:15 154:7
    158:2,9 166:18
    198:13 215:10
    223:21
date 21:17 27:11
    30:9,10 51:24
    55:13,14 62:10
    66:5,24 71:2,3,5
    71:22 72:8,9
    73:23 84:2 94:23
    95:21 104:21,22
    108:6 135:25
    137:8 157:7 161:8
    195:20 197:9



213:6 239:8
**dated** 19:4 51:6,12
  51:21 52:9 57:8
  109:10,14 135:24
  140:5 161:22
  234:22 238:7
**dates** 172:7 226:18
  226:19
**daughter's** 226:23
**David** 132:11
**day** 17:14 51:4,10
  51:12 57:14 65:10
  92:6 93:10 101:13
  101:19 153:21,22
  226:23 231:13
  239:11
**days** 66:5 71:4
  103:10,13,14
  104:21 106:3
  107:9 108:6
  162:10
**DD** 225:6
**deadline** 73:20
  103:14,16
**deal** 89:6 101:23
  107:6 109:4
  144:17,22,24
  145:2,5 197:4,6
  228:23
**dealing** 123:22
**deals** 4:12 86:12,13
  86:16 87:13 89:11
  92:21,24,24 93:11
  93:15 159:12
**dealt** 12:8 27:4
  28:13 156:4
  194:13
**December** 30:8
  47:10 51:6,20,21
  52:24 57:8,8
  71:21 106:9 137:8
  146:6 172:8,15
  209:20
**deceptive** 205:7
**declaration** 41:13
  41:14

**deduct** 196:23
  200:12
**deducts** 200:5
**deed** 175:6
**defects** 172:20
**defendant** 1:9 2:9
  3:10
**defense** 74:8 75:8
  81:8 82:23
**define** 116:10 117:7
**defined** 14:14
  161:13
**defining** 134:11
**definitely** 231:13
**definition** 44:5
  115:25
**definitions** 133:24
**degree** 191:11
**delay** 100:8,10,21
  100:21,24 101:3
**deliberately** 205:7
**deliver** 15:25
**delivered** 16:13
  17:17 63:23
**demand** 44:16
**DeMarco** 9:21 10:7
  19:5 28:16 30:22
  62:15 67:8 73:7
  73:13 85:3 87:21
  87:25 88:15 89:19
  90:16 92:18
  102:17 138:9
  152:5 159:9
  186:19
**demised** 21:15
  47:20 48:24 49:2
  140:7 176:3
**demographic** 92:23
  93:3,6
**demographics** 97:3
**dense** 94:13
**densely** 89:7 94:5
**density** 75:10 83:15
  93:12,13
**depending** 66:19
  72:16 88:14

**DEPONENT** 239:2
**deposed** 3:16 16:7
**deposition** 1:12
  3:15 6:15,21,22
  12:25 16:4 17:13
  17:15 237:3 238:4
**depositions** 3:19
**derived** 143:3
**deriving** 179:2
**describe** 26:25 29:4
  108:22 114:22
  133:23
**described** 42:23
  49:6 63:9 114:9
  206:16
**describes** 92:12
**describing** 111:5
  112:16
**description** 48:22
  65:21 206:18
**designated** 135:25
  175:20
**desirable** 115:4
**desk** 48:20 50:21
**detail** 111:20
  136:23 141:20
**detailing** 160:21
**details** 110:4
  141:24
**detective** 87:2
**determination**
  32:15 120:15
  123:9 166:7 185:4
  194:7,11 204:17
**determinations**
  166:9 197:18
**determine** 25:3,18
  30:11 32:17 47:23
  48:23,25 56:20
  71:7 92:12 106:3
  106:21 117:18
  121:11 154:10,15
  173:24 174:24
  198:8 207:23
  208:17,20,23
  222:19

**determined** 24:21
  28:8 52:8 80:12
  150:3,9 182:9
  222:21
**determining** 21:13
  22:5 24:17 32:23
  62:9 89:2 118:22
  119:15 135:19
  170:11 177:15
  179:8 189:7
**develop** 33:9 96:4,8
  96:11 154:20
  168:9 210:14
**developed** 15:16
  89:8 94:6 97:9
  98:5 134:2 158:16
**development** 15:10
  15:12,14,15,22
  27:6 28:14 76:4
  98:8 133:17,25,25
  134:5,14 176:20
  196:4
**dictate** 107:16
**dictated** 91:8
  191:23
**dictates** 177:20
  204:8
**DIFF** 221:8
**differ** 14:4,7 221:10
**difference** 43:10
  61:15,16 140:18
  141:3 221:9,10
**differences** 89:16
  89:17 94:2 96:14
  138:16
**different** 38:6
  54:23 55:11 56:6
  57:24 61:4 123:3
  141:9 143:9
  144:11,13 168:23
  169:7,9,15 176:24
  178:5 183:19,20
  183:23 185:2
  191:10 208:7
  213:3 231:13,13
**differential** 41:21

58:6 60:20
**differentiate** 42:6
**differently** 230:17
**difficult** 149:21
  212:12
**difficulties** 101:22
**dime** 46:7
**direct** 23:20 31:25
  46:20 50:14
  105:10 238:12
**directed** 80:11
  129:3 194:12
  205:17 206:11
**directing** 46:18
  104:25 118:21
  205:18
**direction** 44:20
  181:15 224:7
  226:14 237:5
**directions** 80:16
  191:18
**directly** 116:8
  144:3 162:4
**directs** 25:2,14,18
  46:19 153:14
**disagree** 102:8
  105:25 129:5
  219:20,24 220:3,4
  220:13
**disagreed** 107:5
  188:19,25 193:25
  219:23
**disagreeing** 160:15
  191:21 192:16
  219:21
**disagreement**
  103:25 104:3
  105:4 108:23
  160:22
**disagreements**
  128:6 191:5
**disclosing** 127:2
**disclosures** 232:10
**disconnect** 180:11
**discuss** 17:10 68:4
  68:6,20,25 69:21



74:17,19 87:22
88:12 100:9 101:9
110:4,11
**discussed** 17:13,16
17:19,20 75:18
138:16 151:10,12
151:14 155:19
173:8 179:11
**discussing** 139:2
164:22 219:4,18
228:20
**discussion** 124:14
124:17,18 127:23
179:14 214:14
219:11 229:11
**discussions** 127:19
150:19
**disingenuous**
216:16,22,24,25
217:2,5
**disjointed** 224:25
**dispute** 192:2
**dissimilar** 142:4
169:11,12,13
**distinction** 8:18
133:19,21,23
169:19,20
**district** 1:2,3 3:11
3:12 207:24,25
210:3,15,22
**divides** 115:14
**dividing** 182:10
**document** 14:22
20:21 23:16 30:7
31:10,12 47:6
51:18 52:12 57:19
57:20 61:18,23
73:4,8 78:5 84:10
84:17 92:20 99:6
99:8 102:19
104:15 106:7
108:21 111:23
114:2 124:24
125:9 126:5,7,14
130:21,24 131:4
136:3 140:15,25

141:16,16 148:3
152:3,10 156:17
157:9,14 162:18
162:23 164:2,5,14
164:16,24 165:6
176:7 178:7 181:7
182:4,6 183:17
198:23,25 205:11
206:15,21 207:16
209:18 211:8
225:3 232:6
234:20 235:12,14
235:16 236:12
**documentation**
142:20
**documents** 16:14
16:20 17:16 18:2
18:6,10 47:10
51:15 99:12 112:2
125:14 139:6,9
145:16 162:25
164:11 167:10
175:14 183:13
186:11 211:13
234:17 235:6,9,18
235:21,24 236:6,9
237:7
**doing** 25:25 32:13
32:14,24 33:16
69:15 70:25 72:7
85:8 90:10 91:7
98:17 102:5
120:22 121:5
123:24 126:14
153:11 177:18
207:5 211:12
**dollar** 39:22 209:11
**Donuts** 131:18
**doodler** 212:10
**doodles** 209:4
225:18
**doodling** 217:14
**downtime** 46:9
197:8 200:12
**draft** 31:19 71:21
113:24

**dramatically** 43:13
**draw** 165:11
**drawing** 217:16,20
218:4
**drew** 214:4
**drive** 43:20
**drive-by** 43:25
**drivethrough** 97:10
187:23 188:10
**drop** 32:7 211:10
**drove** 87:9
**drug** 97:19
**duly** 3:3 238:4
**Dunkin** 131:17
**Dunkins** 131:17
**duty** 95:18

### E

**E** 2:2,2 3:2 135:2,2
135:4 234:3,11
235:3 236:3 240:2
**e.g** 33:8
**earlier** 13:12 16:22
17:23 19:18 25:21
34:20 47:12 75:19
95:12 118:24
119:3 149:25
155:19 160:4
219:18 223:18
**early** 12:14 16:23
22:19 29:22 30:8
66:11,13,16 95:20
99:24
**easier** 121:25
**easily** 46:3
**east** 43:10,11 116:5
132:9
**Eastern** 1:3 3:11
**effect** 166:6,8,19
174:8 197:13
**effectively** 27:21
101:12 134:8
158:8
**effects** 95:17,18
**effectuate** 83:11
**effort** 99:25 115:3

**egregious** 56:11,19
56:21 57:3 78:9
**egregiously** 56:10
**eight** 144:11,12
146:11
**either** 44:20 49:22
62:24 111:18
112:22 126:10
139:8 143:10
**Elder** 207:5
**electronic** 31:16
**eliminate** 97:16
166:20
**eliminating** 107:2
**Ellen** 18:20,23
28:17,23 36:2,4
48:12,13 50:21
64:2 67:8,12 68:7
70:10 73:10,11,14
74:4 84:15,19
85:2 86:5,18
87:21 92:24
106:10 147:10
157:21 176:11
211:18 225:7
234:15
**Ellen's** 48:17
164:18 165:2
176:15 226:2,4
229:22
**email** 18:19,23 19:2
19:3 20:23,24
49:23 67:7,9,11
70:9 73:6,13,23
84:2,9,18,19 86:2
86:4 87:18 88:11
90:23 91:13,16,23
91:24 92:17 99:10
99:21 100:14
102:16 103:7
107:4 109:10,14
109:18 112:6
113:11 124:20
125:5,10 126:21
126:22 127:25
130:23 152:4,6,15

153:16,19 155:7
155:17 157:17,20
159:8 163:7 186:7
186:17,18 196:6
196:22 199:9
201:8,12 223:12
223:14,22 224:5
232:9 233:2
234:14,22 236:14
**emailing** 91:16
**emails** 73:9 84:12
92:6 99:18 101:17
103:11 163:7,23
202:24 203:6,9
**encumbered** 49:9
123:22 189:3,9
193:12,22 194:5
200:8
**encumbrance**
91:11 177:14
199:22 214:2
**encumbrances**
173:3,7
**ended** 89:14 110:6
**engage** 162:9
**engaged** 10:25
162:12
**engagement** 25:22
**engine** 103:20
**enlarge** 144:21
164:10
**entered** 21:8
156:22
**entire** 16:21 102:7
180:19
**entirety** 24:24 25:2
50:24 62:20 82:7
106:11,13 120:18
121:7 151:20
**entities** 127:8
**entrenched** 129:23
130:8,17
**envelope** 156:13
**environment** 56:4
**equal** 40:17 58:9,20
59:18 205:2



Errata 239:6
error 47:25 53:18
  53:18,24 56:11,19
  56:21 57:3 62:20
  77:7 78:9
errors 28:3 78:19
  79:13,15 197:22
  198:13 203:22
ESQUIRE 2:7,11
essentially 233:4
estate 4:12,18,24
  35:14 36:10 56:7
  59:2,23 60:5,23
  82:3 96:17
estimate 5:12,13,19
  6:2 9:4,7 104:23
  105:8,20 108:7,17
  196:16 198:17
  223:5
estimated 40:12
estimates 182:10
  182:11
estimating 161:12
et 18:3 74:9 82:25
  86:22 95:19
  110:22 144:2
ethics 80:3
evaluating 94:22
  215:5
evening 101:16
event 53:23 108:22
everybody 64:18
evidence 80:12
  190:8,14,15
  191:15
evolving 71:12,17
exact 66:24 109:2
  110:11
exactly 66:25 85:4
  121:4 144:19
  169:19 185:22
  216:21
EXAMINATION
  3:6 135:10 232:3
examined 3:4
example 15:5,20

34:15,18 37:15
  131:6 159:5
  217:13
Excel 149:2,18
  156:12 166:13
  202:8,10 223:19
  223:19
Excellent 47:4
Excels 165:19
exception 89:5
  169:5
exchange 66:4
  99:10 138:24
  151:18 162:2
exchanged 66:10
  84:3 137:20
  139:10 143:17,18
  143:21 144:3
  150:17 161:23
exchanging 162:4
exclusive 49:3
excuse 49:8 52:6
  59:7 103:9 126:24
  136:5 194:17
executed 95:2
executing 197:7
exhibit 18:22 19:3
  20:17,20 23:7,10
  23:16,23 24:3,4
  30:3,4,6,7,17
  36:19 47:7,8 51:2
  51:3,9,9,13,19,20
  52:5,12 57:19
  64:7,8,8,25 65:24
  67:4,6 73:6 84:7
  99:8,12,16 102:19
  102:22 104:16,18
  109:13,14 111:25
  112:2,5 113:6,7,9
  125:14 130:24
  135:9,13,23,25
  139:20,23 140:19
  140:22,25 141:17
  141:18 144:9
  146:19 147:21
  149:15 152:8,10

157:12,14 158:25
  159:14,19 160:7
  161:6 162:22,25
  163:4 164:11
  175:14,21 183:13
  186:9,11,14
  198:21,22,25
  201:12,15 206:19
  209:18,19,24
  212:16 223:18
  225:6 232:6
  234:13,14,17,20
  234:22 235:5,6,9
  235:12,14,16,18
  235:21,24 236:5,6
  236:9,12,14,16,17
exhibits 63:22
exist 124:11
existed 195:19
existing 37:25 39:2
  39:19 40:5,18,25
exists 43:18
expanded 115:2,23
expansion 115:24
expectation 102:2
experience 54:16
  59:16 69:15
  110:25 124:22
  130:10 189:16
experienced 36:10
  58:17 68:18 69:13
  198:12 203:17,20
expert 6:6,9 7:3
  130:8,18
experts 196:15
expire 39:3
expires 239:12
explain 37:8 61:13
  74:10 121:4
  147:18 154:3
  199:16,18 203:12
  203:16,17 219:8
  226:19
explained 75:23
  200:14 202:22
  203:4,14

explaining 52:19
  53:7 220:11
explanation 147:12
  203:19 213:22
explicitly 119:14
extended 141:5
extension 66:18
extensive 28:3
extent 14:17 139:3
  173:25
extreme 82:8
extremely 67:21
  100:18

## F

F 23:16 135:2
face 155:9
fact 17:13 39:23
  70:4 71:8 73:20
  75:15 77:6 85:18
  89:3 93:21 112:13
  113:2,14 117:16
  121:15 123:22
  124:8 153:12
  166:25 167:4
  168:12 177:13
  179:11 182:25
  187:22 188:9
  190:7,8,22 199:17
  204:23 205:15
  213:25 215:9
  224:9
factor 94:23
factors 94:21
facts 48:20
Fagin 1:14 238:6
faint 164:8
fair 3:21 14:15,20
  21:13 22:5 25:13
  26:6 32:14,25
  36:9 47:19 48:23
  48:25 50:7 53:19
  53:21,25 56:15,24
  57:9 61:3,6 72:12
  72:23 79:22 80:21
  92:13 101:25

116:23 117:18
  121:11 129:8,21
  129:25 140:6
  161:12 164:20
  173:24 176:2
  179:20 182:17
  188:20 195:5
  202:18,21
fairly 95:8 191:4
fall 159:11
falling 106:8
fallout 201:23
familiar 18:8,15
  23:18 43:8,8
  54:13 145:9
  155:22
far 43:20 133:10
  196:7 203:9
  205:25 208:3,13
  208:15,20,23
  209:2,7 210:3
  224:16
fashion 17:8
fast 15:6
fault 48:18
fear 117:3
feared 116:24
Fed 223:8
Federal 6:6,12,24
  173:14 179:25
feed 183:4
feel 46:12 69:23
  130:9 135:13
feelers 71:5
fees 83:10,10 197:8
feet 38:14,19 42:4,5
  42:16 44:23,24
  45:14 97:8 148:23
FEIN 2:9
fell 145:3,5 146:23
  147:7
felt 110:24 189:14
field 42:15
Fifteen 114:3,5
Fifty 5:13



**figure** 119:2,5
224:23,25
**figuring** 97:24
**file** 16:11,21 141:21
175:17
**files** 87:8 206:22
211:14
**fill** 197:2
**Filled** 237:15
**final** 42:9 63:13
71:14 72:25
106:23 128:15
144:18 204:16
210:4
**find** 44:14 45:2,4
45:24 74:13 87:2
88:25 92:7 109:2
112:12 118:8
146:2 152:25
153:3 155:4 158:5
174:18 190:7
197:5
**finding** 111:4
**fine** 64:21 126:9
**finish** 25:10 58:14
**finished** 25:11
58:13
**fire** 103:19
**firm** 4:12 7:25
11:12,15 12:2
96:18 111:15
**firmly** 117:9
**firms** 12:5 75:4
**first** 8:3,15,20,23
9:24 10:11 12:11
12:13 19:6 28:19
29:2 40:7 61:16
61:17 65:18 67:17
74:10 94:23
109:21 110:18
111:19 113:17
114:22 123:11
126:20 136:19
140:8 153:18
162:6 178:16
184:12 186:18

187:3,4 188:5
212:13 219:13
232:8
**fit** 59:12 150:15
**five** 33:5 34:3 44:5
46:5 58:5 64:19
79:10 96:2 98:14
98:15,19 99:2
**five-year** 21:15
25:6 30:12 41:24
45:22 47:20 80:13
98:18 122:10
123:5 134:15
170:14,17
**FL** 99:22
**flat** 22:16 63:16
**Flatbush** 115:14,14
116:4
**flattened** 95:15
**floor** 1:20 2:10
115:17 208:15
**Florida** 99:23
100:18
**flow** 60:14,19
**FMRV** 21:14
**FMV** 104:24 105:3
106:4,19 108:8,17
108:18 170:11
182:9 185:4
**focus** 18:25 24:11
65:17 73:12
126:20 140:15
144:5 170:7
171:22 172:19
226:5
**follow** 80:16 104:11
106:15
**follow-up** 232:2
233:12
**followed** 107:18
**following** 35:7 49:4
52:5 84:23 127:7
176:14
**follows** 3:5 135:5
194:19
**food** 15:6

**foot** 33:8,10,13,21
33:22 34:5,7,8,15
34:18 37:20 38:10
38:11,19 39:9,9
39:16,16,21 40:16
41:25 44:11,14
132:13 157:23
158:7,13 184:25
196:2,4,11,17
**footage** 40:5 207:23
**footprint** 37:16
**footprints** 159:4
**foregoing** 238:10
239:3
**Forest** 115:19
**forever** 58:2,2,19
59:18 60:9,12
205:4
**forget** 172:6
**form** 7:23 8:9 9:11
10:23 13:18,24
14:16 19:8,17
20:12 21:18,19
22:8,24 23:19
24:16,22 25:17
26:8 31:5,13
33:12 35:4,13,22
36:12,22 41:19
51:5 52:25 53:14
57:4 59:4,10
61:11 65:16,25
66:8 69:7 70:6
71:16 72:18 74:15
76:19 78:10 79:23
81:10 83:23 85:25
88:2,18 90:24
93:4 98:16 100:4
103:4 105:11
109:24 117:2
119:7 121:12,20
122:12,17 129:9
129:24 136:14,17
137:11 140:24
141:4,13 142:2,3
142:22,25 143:11
143:13 144:6

160:10 161:19
172:11 173:4
174:14 178:13
180:18 182:3
187:14,25 188:22
189:10 190:12
191:7 192:5 194:2
194:8 195:8
197:20 198:3
200:18,22 202:19
202:25 203:15
204:14 205:8,22
207:19 208:22
210:25 224:17
239:5
**formal** 156:10
**format** 136:9,20,22
**formats** 143:9
**forth** 30:9 47:12
53:19 70:15 81:24
91:17 96:18
112:21 136:9
140:6 141:2,7,24
159:25 176:2
177:2 178:5,17,19
188:4 193:15
194:4 196:16
206:10
**fortunate** 94:14
**forward** 162:16
**forwarding** 232:10
**fought** 129:8,11,17
**found** 35:24 36:3
42:10 146:3 148:3
159:12 187:4,16
204:5
**four** 27:17
**Fourteen** 114:4,7
**fourth** 146:11
**frank** 76:20
**free** 46:8 123:15
135:13
**freestanding** 39:2
**Friday** 163:8
**front** 36:24 41:25
44:11 125:17

146:4 188:15
190:3,10 212:9
**frontages** 207:21
208:10
**fu** 218:15
**fulfill** 22:20
**full** 6:16 27:24
67:17 103:10
122:3,25 184:14
190:17
**fully** 76:25 145:8
193:19 210:5
215:22
**fulsome** 27:14
**Fulton** 207:9
**function** 121:8
**further** 8:19 89:24
151:15 179:17
233:9

---
**G**

**game** 181:6
**gamut** 7:14 158:3
**gateway** 79:4,12
95:25 176:19
**gating** 82:4
**GBA** 36:20 37:5,16
37:25 39:9,18
**general** 74:6 96:21
101:25
**generally** 7:9 16:24
31:8 70:22 94:7
138:20 214:12
**Genovese** 227:16
**gentleman** 12:19
12:21
**gentrified** 115:5
**gentrifying** 116:11
116:14
**get-go** 204:6
**getting** 31:22 73:17
83:17 89:14 128:6
128:8 129:19
156:2 159:7
184:10
**GG** 18:21,22 19:3



234:14
**giant** 16:14
**give** 5:18 27:20
36:13,25 49:7,25
49:25 50:13,17
58:3 64:17 71:21
77:13 80:24 91:17
92:8 93:15 109:6
116:24 119:15
125:20 131:23
132:20 137:17
139:6 145:25
151:19 222:9,17
**given** 6:17 9:8 44:3
57:25 72:20 91:10
111:20 140:13
143:12 150:2,10
152:18 167:10
173:23 174:22,23
181:8,15 197:16
215:4 238:5 239:4
**gives** 47:18,20
**giving** 40:21 48:19
138:24 139:13
178:25
**GL** 213:19
**glad** 146:4
**go** 55:7 66:25 68:16
81:20 83:5 88:11
93:10 102:14,15
104:14,17 107:5
110:4 124:14
128:12 145:18
148:10 160:16
177:16 190:18
198:5 200:2
209:18 219:17
220:7,18,24 222:7
226:7 227:6
**goes** 14:9 38:24
50:4 75:13 112:21
152:22 157:25
172:12 173:5
176:18 180:6
**going** 6:16 17:14
21:24,25 23:22

38:8 42:7 45:2,18
58:6 64:14 67:22
68:11 75:24 77:7
77:9 78:17 81:18
84:22 85:3 95:24
96:8 100:16
102:14 109:3,5
117:15 123:13
124:3 125:25
126:6,9 128:10
146:5 153:6 158:5
163:20,21 185:10
197:3 218:24
220:8,23 221:5,16
226:25 229:12
231:4
**good** 3:8 64:16
76:21 78:11 88:16
88:17,21,24 89:3
94:22 97:24
134:20 147:14
185:24 232:17
**gotten** 134:13
**great** 95:15 111:20
232:12
**greater** 60:8 205:3
215:11
**grid** 141:23 151:16
**gritty** 115:6
**gross** 37:5,9,12
208:17
**grosses** 228:22
**ground** 7:10,13,15
13:23 14:3,8
21:16 22:22 23:4
23:9,11,14,15
28:6 29:16 45:20
52:8 54:12 56:6
56:12 115:17
117:20,23 119:13
147:25 158:3
174:4 187:5
189:16 214:17,23
218:10 229:6
**Group** 131:9
**guess** 84:13 88:13

163:22 216:11
217:23 225:13
**guidance** 74:6
**guiding** 124:5
**gut** 39:4
**guys** 156:21

---

**H**

**H** 3:2 47:7,8 51:3,9
51:13 52:5,12
57:19 135:4
209:19 234:11
235:3 236:3
**Hackensack** 2:6
**half** 45:22 114:23
178:16,19,24
200:25 206:25
207:2
**halt** 157:6
**handwriting** 63:21
63:25 64:3,9,12
164:18 165:2,4
176:6,8,10,13,14
176:15 183:20,23
183:24,25 184:3
212:3
**hanging** 230:5,12
**happen** 66:7 67:2
161:18 182:14
211:24 212:21
**happened** 48:19
66:21,22 138:15
150:20
**happening** 110:7,8
**happens** 218:19
220:12
**happy** 58:15 100:7
100:10 113:23
222:2 226:9
**hard** 129:8,10,17
145:23 196:10
224:2
**hardcopy** 145:15
146:20 148:3
164:4 175:19
**hat** 230:5,13

**hate** 53:21
**HAYDEN** 2:4
**HBU** 189:25
216:15 218:9
**he'll** 223:6,8,8
**heard** 14:23 15:9
40:2 101:22
158:20 163:9
**hearing** 6:20 19:23
156:23
**Heights** 96:23
113:18 114:14,16
114:17,21,24
115:8,9,10,11,13
115:15,16,25
116:5,9,10,23
**held** 1:13 176:4
**help** 54:11 59:8
89:20 122:11
153:5,24 157:2
160:7
**helpful** 19:12 20:7
28:10 158:23
171:20 216:8
225:12
**helping** 154:20
**helps** 118:11
148:15
**hes** 11:17
**hesitant** 12:9
**hesitate** 11:17
**hesitation** 111:17
**HH** 99:12,16
234:17
**Hi** 199:12
**hidden** 149:17
150:15 165:21
166:5
**high** 42:11 54:20
96:14 98:15
194:24 195:18
200:10
**high-density** 92:22
93:2,6
**high-rise** 96:8
**high-traffic** 94:6

**higher** 56:3,4 61:8
72:14 83:15
193:22 195:25
204:20
**highest** 25:15,19
39:23 40:14 44:2
150:9 170:2,12
187:24 188:11,20
189:2,8,18 190:2
191:3,17 195:5
216:23,25
**highlight** 120:21
122:10 124:8
**highlighting** 117:15
118:9
**highly** 97:11
192:12
**Hill** 96:24
**hire** 50:16 74:7
75:7 76:21 128:12
130:8
**hired** 8:7 54:10
74:11,14,20 77:18
77:19 79:25 80:20
120:16 122:7
130:18 133:4
**hires** 29:10
**hiring** 128:7
**historical** 56:12
**hold** 45:12 52:14
144:20 148:2
205:4
**holding** 170:22
199:23 204:25
**Holdings** 1:8 3:14
173:11 174:4
**holds** 173:11
**honestly** 8:14
**honor** 173:15
**horrified** 218:19
**hour** 126:2 200:25
**hourly** 21:22 22:11
22:16 63:7,20
**hours** 17:12
**hover** 226:12
**Howard** 2:11,13



3:9 17:5,10 58:12
59:5 125:23
**hundred** 15:21
119:25
**hundreds** 31:18
83:9 92:6
**hypothetical** 63:2

**I**

**i.e** 159:4
**IB** 210:11,16
**idea** 28:21 64:6
77:4 158:6 165:16
218:15 220:8
228:18
**identification** 18:24
99:14 102:21
109:17 112:4
116:20 125:16
131:2 152:12
157:16 163:3
164:13 175:16
183:15 186:13
199:3 201:14
206:20 212:17
**identified** 144:12
144:13 227:7
**identifies** 35:20
65:12
**identify** 18:6
158:24 195:4
**identifying** 161:16
185:21
**II** 102:19,22 234:20
**imagination** 101:4
**imagine** 92:18
**immediately** 42:24
56:18 57:2 105:14
116:4 172:3
**impartial** 46:13
**imply** 127:22
**important** 3:20
14:22 25:4 33:11
33:13,23 75:12
98:11,12 117:25
149:24 150:4

169:18,19
**importantly** 16:2
**improper** 85:16,20
202:23 203:5
**improved** 15:16,18
15:19 37:10 38:13
115:18
**improvement**
38:24
**improvements**
24:18 49:3 154:12
**inaccuracy** 91:12
**inaccurate** 155:2
204:2
**inapplicable** 82:19
**inappropriate**
82:19 147:4,7
190:19,25 193:3,5
193:6 194:22
195:7,10,14
213:23
**Inc.'s** 21:11
**include** 48:10 50:24
53:16 62:4,13
92:9 116:19
120:13 122:24
132:3 140:20
**included** 23:15
29:2 42:9 48:22
56:6 62:22 63:8
83:2 95:6 112:18
122:4 147:2,5
150:13 166:3
168:19 177:23
190:24 213:23
**includes** 21:20 48:2
**including** 9:2 48:8
196:9
**income** 154:13
**incorporate** 199:21
**incorporated**
199:13
**incorrect** 22:9 29:8
29:20 62:12 76:25
77:2,16 78:2,3,17
79:4 102:9 123:17

138:18 151:12
168:12 177:23
194:3 196:3 201:3
203:11 204:6
**incorrectly** 76:8
108:12 123:7
152:19 184:13
**increases** 98:20
**increasing** 95:14
**incredulous** 58:16
59:15 205:5
**incumbrances**
172:20
**INDEX** 237:3
**indicated** 54:17
**indicating** 203:10
**indication** 92:19
181:4
**indications** 191:2
**individual** 141:6,24
148:24 150:14,19
166:5 200:9
**industrial** 7:19
15:21 188:16
**industry** 102:2
**inferior** 147:16
**inflating** 197:13
**influenced** 97:11
**information** 18:15
25:5 46:24 55:4
71:24 72:3 77:13
84:23 88:25 92:8
144:7 148:16
154:19,23 156:3
157:23 159:8
166:15,16 174:7
185:10,16 210:24
232:25
**informs** 71:14
**initial** 27:3 28:11
28:24 29:17 62:8
62:11 70:25 72:5
72:7 104:6 106:9
110:2 111:3
142:22 147:11
166:3 167:5

**initially** 21:23 50:3
72:11 115:11
151:8 158:2
**installation** 46:10
**instance** 61:16,17
61:22
**Institute** 4:15
**Institution** 4:21
**instruct** 14:11
223:4
**instructed** 178:15
**instruction** 3:21
**intent** 91:22 124:20
222:25
**intention** 183:2
**interacting** 205:24
**interceded** 179:16
**interest** 56:4
173:11
**interesting** 31:14
**interject** 216:6
**internally** 87:22
88:12
**interpretation**
221:17,23
**intimately** 43:8
**introduced** 9:23
10:11
**invented** 115:2
**investor** 60:23
**involve** 7:10 195:22
**involved** 7:12,13
10:8,9,16 13:14
13:16,22 16:9
19:19,23 50:2
58:25 59:23 66:20
79:14 83:17 101:5
128:13,18 129:4
191:25 197:7
**involving** 50:4
229:25
**iPhone** 70:9
**Island** 89:25
**issuance** 167:9
**issue** 46:18 79:4,13
95:25 102:7

134:11 151:23
176:19 191:20
198:15 199:22
204:5
**issued** 72:13
**issues** 102:4 153:9
155:13 178:9,11
197:25 206:10
219:15
**item** 171:22

**J**

**Jeff** 207:10
**Jennifer** 230:20,23
**Jersey** 2:6 5:2 6:11
93:16
**JJ** 109:13,14
234:22
**job** 12:5,6 86:25
119:18 121:25
122:7,21 128:14
207:8,9 219:15
229:5 231:13
**jobs** 213:3
**joint** 173:19
**July** 179:11 183:10
226:18 227:3
**jump** 106:23
**jumper** 117:6
**June** 63:15 66:12
66:13,16 70:15
135:7,7,17 137:23
140:16 147:22
150:18 152:4
172:6,7
**jurisdictions** 4:25

**K**

**K** 228:9,9
**keep** 94:24 211:11
**keeps** 55:24
**kept** 147:9
**Kest** 140:4 175:25
**keys** 45:17 57:25
58:4
**kind** 7:11 22:3



**Kings** 146:16,18
**KK** 111:25 112:2,5
  113:25 114:7
  235:6
**knees** 16:18
**knew** 18:9 46:14
  83:19 91:8 123:6
  129:15 130:17
  133:9 155:9
  172:15
**knocked** 40:25
**know** 3:13,18,25
  16:8 24:4 29:11
  31:15 38:14 41:5
  42:20 43:16 50:2
  50:4 54:22 55:24
  55:25 63:18 64:5
  66:22 67:20 68:23
  71:14 73:8 78:22
  82:7 83:14 86:23
  87:3 88:3 89:7
  93:9,15 97:6
  107:6 110:10
  111:14 114:2,25
  115:21 119:13,20
  121:6,7 124:8
  126:12 130:7,14
  132:2,10,12,24
  138:5,9,12 141:17
  147:7,9 148:19
  151:19,21 154:5
  155:25 156:21
  157:4 162:13
  163:14 165:6
  173:3,10,14,21,21
  174:22 176:8
  180:14 196:13
  207:5 209:13
  210:16 211:2,3,6
  211:25 212:8,25
  215:9,11,12
  216:12 218:12,14
  219:3 224:16,18
  225:3 226:11
  228:11,17,21,24
  229:8 230:7,21,24

**knowing** 174:7
**knowledge** 11:7,9
  11:13,19,24 12:10
  54:16 74:12
  162:11 172:23
  174:2 224:18
**knowledgeable**
  60:22 133:11
  198:12
**known** 9:20 154:7
**knows** 133:11
**Koh** 2:11 3:7,9
  18:17 20:16 23:7
  29:25 47:5 58:15
  59:7 64:14,23
  67:3 73:3 84:7
  99:5 102:13 109:8
  111:22 113:5
  122:18 125:8
  126:6,15 130:20
  134:19 135:6,11
  135:23 139:18
  145:17 152:2,7
  157:8 159:13
  162:20 163:24
  175:8 183:8
  185:23 186:5
  198:20 201:5
  206:14 211:7
  224:20 231:8,16
  231:21 233:11
  234:7
**KTR** 10:15 11:3
  26:20 152:24,24
  175:25 180:19
  183:22 196:13
  206:10

---

**L**

**L** 3:2,2,2 135:4,4,4
**L-1** 144:12,14,15
**L-I** 159:18
**lack** 8:8 190:20
**land** 15:15 28:17
  29:7,14 37:14
  38:10,17,22 39:10

39:15,21 40:13,22
46:21,21 47:12
50:20,23 52:22
53:3,5,25 54:15
55:11 56:3 57:17
57:21 63:3 74:5
74:11,13,19,24
75:3 77:5 79:7,8,9
83:6 90:20,22
91:5,7,12 123:12
134:6 142:6
154:15,15,17,21
155:11,20 156:6
170:12 176:4
177:6,6,24,25
179:19 180:6
184:11,17,24
185:12,15 186:23
191:2 194:17,19
194:20 195:6,10
196:21 198:4
199:15,20 200:7
200:19 201:24,25
204:3 213:16
215:21,21,24
223:9,12,15
224:11,13 230:19
230:22 231:3
**landlord** 50:10
52:10 74:23 77:20
80:18 101:2
110:16,22 111:18
127:7 130:16
145:11 152:18
173:17 175:2
177:11,12 179:7
180:21 181:5
220:13
**landlord's** 26:14
130:2,15 152:18
159:25 174:2
193:7
**landlords** 54:10
88:7 128:11
**landowner** 173:18
**language** 27:8

29:24 45:8 48:11
50:15,24 53:17
62:5,19,21,22,23
90:18 92:11
103:25 105:5
107:7 112:18
117:15 118:2,16
120:13 121:6
122:3,25 123:20
124:4,7,13,25
230:5,10,13,15
**large** 11:8 67:22
111:15 145:18
149:19 167:14
**largely** 115:18
**larger** 15:4 41:17
41:20 81:25 158:4
204:4
**largest** 86:25
**late** 27:4 28:12
29:18 70:18 71:4
71:20 95:20
**law** 12:2,5
**lawyers** 101:22
109:4,6
**lay** 34:12 155:17
196:22
**layout** 207:22
208:9
**learn** 70:4 174:3
225:20
**lease** 14:10,10,15
14:21 21:16 22:22
23:4,9,11,14,15
24:6 25:5 29:16
30:9 31:24 39:3
44:5 45:23,23
46:6,18,19 47:14
50:15 52:9,9
55:19 61:7,10
63:4 64:9 75:16
75:20 76:5,6,11
76:13,18 77:23
79:5,6,7 80:8,10
80:11,13,14,24
81:13,14 82:17

85:3 86:8,13,19
86:20,24 90:18,19
90:21 91:8,11,25
92:11,13 93:8
97:5,16 98:25
103:25 104:5
107:12,13 117:21
117:24 118:2,16
119:2,5,13,14,16
120:14 121:18
122:15,22,23,23
122:25 123:10,15
123:20 124:4,6,9
124:13,25 130:6
131:8,10 138:18
141:25 150:3
159:12 162:9
170:15,20,25
174:23,25 177:14
177:19 178:18,20
179:4 180:23
181:16 182:25
189:3,9,19,22
191:14,19 193:10
193:12 199:13
204:8,9,22 205:11
205:18 210:6
214:2 215:23
216:20 217:7
221:17,24 222:20
229:6 230:8
**leased** 34:2 200:4
**leases** 15:25 35:19
35:21,25 41:8
42:13,17 53:7
54:12,19 55:20,22
55:24,25 56:6,12
84:21 85:11,23
86:7 87:17 117:17
118:4,8 119:20
121:10 146:8,12
146:15 153:13
158:4 187:5,10,13
187:16 189:17
190:4,8,17,20,22
195:21 197:7



214:17,21,23,25
215:2,4 217:3
218:10 223:6
**leasing** 46:7 197:6
**leave** 78:13 80:18
99:22 101:15
**leaving** 100:18
**led** 42:15 68:4 96:7
115:24
**left** 45:24 139:9
213:16,17 221:7
229:18
**legal** 1:20 14:17
83:10 197:8
**legible** 149:20
150:16
**lengthy** 224:24
**Leslie** 1:14 64:17
126:11 238:6
**lessee** 174:5
**let's** 11:21 20:10,16
23:7 47:5 58:11
64:23 66:22 67:3
73:3 84:7 99:5
102:13 109:8
111:22 113:5
125:8 130:20
144:5 157:8
159:13 162:20
163:24 172:17
175:8 183:8
194:16 198:20,22
201:5 206:14
207:15 211:7
213:8 218:21
222:5 224:20
225:13 226:5,5,7
227:6
**letter** 21:2,3 25:22
27:13 29:2 36:19
51:25 52:18,24
65:2,5,12 66:6
74:7 75:7 82:22
104:6,24 105:9,19
105:21 106:4
108:8,18 112:14

113:13,21 114:19
116:21 117:9
124:23 135:8,17
135:24 140:25
141:4 159:16,23
160:21 161:8,11
171:3 219:15
**letters** 63:7 66:4
106:20 188:14
**level** 80:6 119:17
**Lexington** 207:6,8
**Li** 12:22 65:3
138:13 159:18
**licensed** 4:24
**lied** 207:23
**lies** 81:22 207:24
**lightly** 204:23
**limit** 42:12 97:17
132:5,19
**limitation** 86:3
**limited** 61:7,9
134:3
**line** 94:10 193:24
209:10 210:18
212:25 213:4
215:16 216:3
217:16,20 218:4
219:7 228:13
230:18,19 231:8,9
237:5,5,5,8,8,8,11
237:11,11,13,13
237:13,16,16,16
240:3
**linear** 33:22
**lines** 156:15 213:15
216:2 224:2
**list** 68:14,17 69:22
69:24 70:16 84:24
99:7 125:9 127:5
127:10,12,15,16
130:21 133:7
139:11 146:23
147:2,8,11,13,14
147:19 148:22
152:3 195:15
202:13 228:2

**listed** 89:9 106:10
145:4 149:16
150:12 165:15,17
172:6 197:19
**listing** 42:9 88:20
144:16,23 145:8
**litigation** 6:16 21:7
128:20 156:22
171:16 179:16
**little** 8:19 12:24
13:13 25:21 39:15
103:22 129:6
138:19 144:5
178:4 209:23
214:9 220:16,17
**live** 43:20 67:25
**Liz** 227:12,16
**LLC** 1:8 3:14
173:11
**LLP** 2:9
**located** 15:7 41:8
69:14 94:5,13,16
97:10 114:16
116:18 117:9
195:23,24 210:2
229:3 230:2
**Locatell** 1:13 3:1,8
4:1 5:1 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1,19
18:23 19:1 20:1
20:22 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1,5 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1

62:1 63:1 64:1
65:1,4 66:1 67:1,7
67:10 68:1 69:1
70:1 71:1 72:1
73:1,7 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1,11
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1,11
100:1 101:1 102:1
102:17,23 103:1
104:1 105:1 106:1
107:1 108:1 109:1
109:16,19 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
119:3 120:1 121:1
122:1 123:1 124:1
125:1,11,18 126:1
126:18 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1,8,12
136:1,2 137:1
138:1 139:1,22
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1,4 153:1
154:1 155:1 156:1
157:1 158:1 159:1
159:20 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1,23
172:1 173:1 174:1
175:1,18 176:1
177:1 178:1 179:1
180:1 181:1 182:1

183:1 184:1 185:1
186:1,8 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1,13
202:1 203:1 204:1
205:1 206:1,16,19
206:22 207:1
208:1 209:1 210:1
211:1,9 212:1,16
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1,22 232:1,5
233:1 234:6,15,24
236:15,16,17
238:4 239:8
**location** 42:14,20
43:16,21,25,25
44:18 45:25 46:2
147:15,16 187:23
188:10
**locational** 96:13
**locations** 86:15
93:18 195:23
**long** 7:21 9:20
11:16,17 17:15
36:4,7 45:24 48:9
64:19 89:24
126:17 140:21
144:6 147:22
156:18 157:5
**long-term** 143:11
**longer** 83:8 90:12
136:9,21 142:12
142:16,16,24
**look** 24:2 33:17,20
33:24 34:5,6,6,17
38:17,23 40:15,19
41:16 52:15 55:7
56:11 62:16 63:11



77:8,9 78:8 87:18
91:9 95:23 96:13
97:2,5,5 112:23
113:20,23 121:2
124:24 135:13
139:23 142:23
148:19 157:8
171:21 172:17
174:11 175:5,18
177:20 179:23
190:16 194:16
204:9 206:24
209:8 212:2 213:8
222:5
**looked** 16:10 25:22
38:5,9,11 39:8
42:13 46:13 49:12
51:3 61:17 65:23
77:14 87:10 97:15
97:15,19 137:10
158:3 159:10
160:14 165:17
166:24 170:21
193:18 203:6
209:4,20 214:21
214:22,24,25
215:3
**looking** 33:25 34:3
35:19 36:25 38:16
38:17 57:18 63:17
71:19,24 72:3
76:10 81:15 84:16
86:9,11,13 87:4
88:22 90:25 91:25
92:15 93:7,11,17
97:17 111:6
125:19 131:14
132:6,7,13 134:11
139:2 143:25
144:9 146:19
148:5 159:11
161:7 165:10
174:19 177:5
184:13 208:8
209:16 214:3
**looks** 33:18 67:11

76:23 99:17 128:2
159:23 176:10
207:4 211:16,19
217:17 219:10
232:19 233:5
**lot** 12:4 37:15 75:2
85:5 107:11
110:20,21 117:4
124:18 132:15
166:15
**loudly** 42:18
**low** 42:11 46:11
98:15 194:24
196:7,11 200:11
**lower** 72:17 74:8
75:8,9 81:9 82:23
**LR** 215:20
**lunch** 134:20
**Luncheon** 134:21

———————

**M**

**M** 2:7 52:10 213:12
214:5
**M1-1** 98:3 167:20
167:23 168:20
184:25 207:24
208:4 209:2
210:10,13,13
**M1-1s** 167:25
**M1-2** 167:24 169:5
**Madison** 229:19
230:2
**MAGNA** 1:20
**MAI** 4:15 227:16
**Main** 2:6
**maintain** 220:7,15
**major** 75:4 115:22
**majority** 148:21
182:2,8,21
**making** 41:12
77:16 83:13 94:2
133:19 167:13
223:16 231:11
**mall** 228:23 229:4
**malls** 15:5
**Manhattan** 207:8

**manner** 17:7
**manufacturing**
98:4 150:6 167:25
168:3
**Marc** 103:2,6,12,24
109:11,15,23
110:13 111:7
125:11 126:22
162:7 163:12,15
203:25 205:24
206:4 232:9,15
234:23
**March** 21:17 23:8
52:9 126:21,23
**mark** 43:2 73:3
109:13 111:24
125:13 130:21
152:7 162:22
175:9 183:10
184:5 185:5 186:9
198:22 206:18
**marked** 18:20,24
20:17 23:9,23
24:3 30:2,3 36:19
47:7 52:5 57:18
64:7,25 65:24
67:4 73:5 99:8,14
99:16 102:20
109:9,16 112:4
113:6,7,25 125:16
130:25 135:9
139:19 146:19
152:11 155:18
157:10,11,15
159:14 162:21
163:3 164:13,15
175:15 183:15
186:6,13 198:21
199:2 201:13
206:20 211:9
212:17 225:6
237:13
**market** 14:20 21:14
22:6 26:6 32:14
32:25 33:16,18,24
33:25 36:20 41:6

42:11,18 47:14,19
48:23 49:2 50:8
53:19,25 54:6,9
54:16,23 55:5,12
56:8 57:10 58:17
59:16 61:6 69:13
72:12,16 79:22
80:21 81:5 82:3
82:17 85:7,19
90:19,20 92:13
95:3,9,13,18,20
96:12 97:7 111:2
117:18 121:11
123:4 130:12
132:6 140:6 154:7
154:16 161:12
164:20 173:24
176:2 179:20
182:17 189:20
191:16 192:13
215:10,12
**market's** 87:4
**markings** 185:19
**marks** 184:8
220:17
**Mary** 130:22,22
**massive** 115:19
**matter** 19:20,21
62:17 83:4 174:20
**MCD** 30:14 99:9,13
99:13 102:18,20
111:24 112:3,3
125:12,15,15
130:23,25 131:16
152:8,11 157:13
157:15 162:24
163:2,2 164:3,12
164:12 183:11,14
183:14 186:9,12
186:12 198:24
199:2 234:18,18
234:21 235:7,8,10
235:11,13,15,17
235:19,20,22,23
236:7,8,10,10,13
**McDONALD'S** 1:5

7:22,25 8:4,7,10
8:16,21,24,25 9:9
9:17,25 10:6,21
10:25 12:15 18:5
19:22 21:25 22:13
22:13,21 26:2
40:5,18,25 43:23
49:22 52:11 61:7
61:10 65:13 73:24
74:18 75:25 77:13
78:15 79:15,21
80:8,16,20,21
82:15 84:22 85:24
87:16 88:4 90:7
93:8 110:21
129:22 130:4,17
131:17 140:12
143:5 150:20
151:3 152:23
153:5 156:3
159:24 175:13
211:20 224:15
**mean** 12:18 13:25
15:2,13,19 22:9
35:12 58:10 61:18
90:23 91:6 93:5
102:8 127:22
128:4 129:12
158:12,14 166:18
168:16 187:15
208:14 210:12,21
217:22 219:21
228:21 232:21
**meaning** 60:7
75:16 170:3
176:16 220:13
223:11
**means** 15:15 24:15
24:17 79:8 90:25
104:23 108:7,12
124:15 173:7
179:24 189:25
210:13,14,16
218:16 229:8
230:8 238:11
**meant** 37:9 62:8



87:25 92:19 93:2
128:9 193:13
217:8
**mediation** 100:16
101:11,14,19
229:25
**meet** 29:23 47:14
53:8,12 61:23
65:19 66:4 67:24
76:7 80:6 105:2
106:3,18 107:20
108:3,10,11,13,13
108:16 163:16,20
**meeting** 12:14,23
17:6,10,12 18:4
26:16 100:2 104:6
123:19 128:25
137:23,25 138:3,4
138:8,15,20 139:7
139:12,15 140:12
140:14 143:21,22
150:21,23,24
151:5,6,25 153:19
153:23 163:11,22
**meetings** 26:13
63:19
**meets** 198:7
**Meister** 2:9 13:3,6
13:10
**member** 4:14,17,20
**memorable** 150:24
151:4 153:19
**memory** 110:12
**mentioned** 7:5 17:3
22:3 25:21 69:10
86:6,15 87:15
89:11 149:25
184:20
**met** 12:11,13 16:12
17:3,12 66:10
129:14 150:18
**method** 29:8 33:19
47:22
**methodologies**
221:10
**methodology** 32:16

32:17,22 33:2
34:11,19 42:23
107:17 141:10
161:15 200:9
203:23 218:3
**methods** 154:6
**metric** 34:8 38:7
56:7 208:16
**metrics** 39:11
40:15 60:22 97:3
185:14,21
**metro** 4:13
**Meyer** 2:14 10:12
19:4,7,15,19,24
20:6,10,25 30:21
65:2 66:3 102:17
112:6,13 113:12
114:13 120:11,18
122:5 125:3
138:10 150:22
152:5 157:21
159:9,17,24 186:7
186:19 199:11
200:23 201:9,13
203:13 214:14
220:19 236:15
**Michael** 2:14 19:3
**microphone** 174:12
**midsize** 4:11
**midway** 104:18
**Mike** 10:12,16
138:10 159:16
212:20 214:7,13
214:14 215:2
216:19,24 217:6
219:2,5 220:21,24
222:13,15 223:3
223:12,15 224:6
**mill** 228:14
**million** 53:4 179:22
179:22 180:3,10
201:22,23 202:4,6
209:11 210:7,7
213:18,19,20
229:14
**mind** 123:8 126:3

210:6
**mine** 225:11,25
226:3
**minimum** 80:7
83:7 98:17 197:2
**minus** 196:17
**minutes** 64:15,20
126:2,16
**misapplication**
179:3
**mishmash** 193:17
**misreading** 28:6
**missed** 43:2 114:8
203:2
**missing** 107:24
146:21
**misspoke** 103:9
181:21
**misspoken** 6:23
**Missry** 11:12 12:3
12:12,15,17
137:24 138:12,18
140:12 151:13
159:17,24 193:7
216:10,12 217:22
**Missry's** 150:18
153:20
**mistake** 52:17
123:23
**mistakenly** 47:16
61:25 62:3
**misunderstanding**
75:14
**misunderstood**
6:23
**mixed** 115:16
**MM** 130:22,24
235:12
**mode** 101:12
**model** 154:16,18
195:7,10
**moment** 37:2
125:20,25 145:25
**moments** 160:5
**months** 45:18 83:8
143:6

**morning** 3:8 16:15
185:9
**Morris** 12:12
137:24 143:21
150:18 153:20
159:17 186:21,25
212:20 216:4,6
217:10,14 219:8
219:13,19 220:2
220:10,20,21,21
220:22,25 221:5
221:13,14,14,19
222:4,14,15,20,23
223:2,6 224:2,9
224:12
**mouth** 182:22
183:3
**moving** 162:16
**MRICS** 4:22
**multipage** 164:2
**multiple** 194:9
**multiplier** 53:24
56:18 57:2,17
**multiplies** 37:20
**Musto** 52:10
173:18
**muted** 174:13

───────────
**N**
**N** 2:2 3:2 135:2,2,2
135:4 234:3
**Nakleh** 103:3,6,12
109:11,15,23
113:13 120:4
121:17 122:11,15
122:19,19 124:3
125:11 126:22
127:17,20 162:7,9
162:11,14 178:10
178:14,22 179:5
179:12,13 180:16
180:21 181:17
182:15,15 189:6
189:13 194:6,10
194:11 197:15,21
197:25 198:10,11

198:16 203:14,21
204:12 205:13
206:9 234:23
**Nakleh's** 112:7
121:25 122:7
160:24
**name** 3:9 231:2
**names** 114:25
**narrative** 201:19
**Nat** 18:17 64:24
109:9 113:5
135:24 139:18
152:3 157:10
159:15 186:5
206:16 211:9
**national** 111:15
**near** 90:20 134:5
**necessary** 22:11
71:9 114:20
155:14 196:24
**need** 31:25 55:4
59:7 67:16 68:19
68:25 70:12 74:7
75:7 76:2,15 78:6
81:8 87:21 92:21
119:18 123:3
126:11 134:4
151:22 153:15
211:10 222:18
**needed** 17:18 101:9
111:13 134:9
142:17 153:10
166:25
**needs** 203:18
**neglected** 49:4
190:16 217:3
**neglects** 202:14
**negotiate** 104:7
**negotiated** 144:18
144:23
**negotiating** 54:12
**negotiation** 144:24
**negotiations** 50:3
50:10,12
**neighborhood** 82:9
113:18 114:18,22



114:25 115:5,6,21
116:12,15,17,20
117:8,10
**neighborhoods**
82:10 115:4
**net** 30:9 35:24 64:9
84:21 85:3,23
146:8,12,15,15
201:23
**neuron** 103:22
**neutral** 5:15,23,25
6:3 56:16,20,24
58:22 59:21 68:13
68:19,25 69:17
75:25 100:14
101:8,10 103:12
105:6 112:17,20
118:11,12,22
119:4 120:5,12,15
121:3 122:2,19
123:25 124:23
128:7,24 129:16
133:4,7 160:14,20
161:5 180:16,25
181:21 189:15
227:18,20 228:3
**neutrals** 57:5
**never** 11:9,18,22
12:9 50:2 55:7
102:6 179:10,14
179:15 205:23
215:9 224:15
**new** 1:3,15,21,21
2:6,10,10 3:12
4:13 5:2,2 6:10,10
29:6 39:3 41:9
45:6 68:7 70:11
70:12 72:21 82:3
86:7 87:13 93:16
94:16 111:16
114:25 155:23
158:18 196:8,11
196:18
**nicely** 147:17
**Nigard** 55:24
**nine** 103:13 135:14

**NN** 152:8,10
155:18 235:14
**non-pedestrian-d...**
46:2
**noncomparable**
195:23
**nonexistent** 44:15
**normal** 175:4
**north** 196:10
**Nos** 183:11
**Notary** 1:15 3:4
239:14
**notation** 184:12
208:13 210:10
213:11 216:14
231:9
**notations** 183:23
**note** 98:11 145:13
149:11 169:18
207:7 221:12
230:4
**noted** 135:3 197:22
197:25 222:14
233:13 239:6
**notes** 206:17,19,24
207:2 208:6 209:3
209:15,24 210:8
211:4,9,20 212:2
212:4,6,6,10,11
212:14,16 213:2,2
218:18 220:11,21
224:22 225:2,4,7
227:2,19,23,23,24
231:8,10 236:16
236:17
**notice** 1:13 31:23
**noticed** 56:17,25
**November** 18:18
18:22 234:14
**Nuff** 218:15
**number** 19:22
37:24 40:3,22
50:14 72:14 114:2
143:4 145:20
148:4 149:19,21
164:3 185:3

201:16 214:21
**numbered** 33:5
51:16,19 125:12
161:6
**numbers** 40:20
71:15 184:21,23
202:9 204:17
205:16 208:7
211:22 228:8
**numerous** 6:24
28:3 87:7 92:9
153:13 196:14,14
200:25
**nut** 38:8

---

**O**

**O** 3:2,2 64:25 135:2
135:2,2,4,4
**object** 174:14
**objected** 174:13
**objection** 7:23 8:9
8:12 9:11 10:23
13:18,24 14:16
19:8,17 20:12
21:18 22:8,24
23:19 24:16,22
25:17 26:8 31:5
31:13 33:12,15
35:4,13,22 36:12
36:14,22 41:19
51:5,11 52:25
53:14 57:4 58:12
59:4,13 60:3
61:11 65:16,25
66:8 69:7 70:6
71:16 72:18 74:15
76:19 78:10 79:23
81:10 83:23 85:25
88:2,18 90:24
93:4 98:16 100:4
103:4 105:11
109:24 117:2
119:7 121:12,20
122:12,17 126:13
129:9,24 136:14
136:17 137:11

140:24 143:13,15
160:10 161:19
178:13 180:18
182:3 187:14,25
188:22 189:10
190:12 191:7
192:5 194:2,8
195:8 197:20
198:3 200:18,22
202:19,25 203:8
203:15,24 204:14
205:8,22 207:19
208:22 210:25
224:17
**objections** 59:10,12
**obvious** 59:3,25
**obviously** 26:14
58:5 78:9 102:8
110:23 111:13
138:11 143:24
172:16 222:20
**occasion** 80:25
209:9
**occasions** 80:23
**occurred** 71:23
138:5 211:21
**October** 19:16
186:18 199:11
201:8,12 211:21
212:22 236:14
**offer** 224:9
**offers** 145:6
**office** 7:16 9:10
15:24 16:13 28:23
30:21 31:4,11
36:3 96:18 150:18
152:16 153:20
157:22 165:5
**offices** 137:24
**official** 156:16
**officially** 206:5
**okay** 104:17 111:12
113:16 134:19
164:7 184:12
218:24 219:25
222:7 225:16

**old** 15:21 56:22
215:11
**once** 22:18,25 27:9
43:10,11 62:10
71:25 72:9 105:6
106:2,13 128:17
171:16
**one-page** 130:22
**one-paragraph**
177:25 193:20
**one-story** 158:18
169:17 188:15
190:3,9 215:22
**one-third** 6:2,3
**onsite** 215:22
**OO** 157:12,14
235:16
**open** 156:12
**opened** 17:11
**operators** 86:22
88:8
**opine** 56:13 110:25
**opinion** 27:13 43:3
70:22 71:22 72:20
80:19 81:13 82:16
90:3 104:6,24
105:9,19,21 106:5
108:8 109:6
128:15 129:20
137:17 147:22
161:11 170:6
190:13 198:16
219:15
**opinions** 50:17 66:4
106:20 137:6,9
191:10
**opportunity** 197:16
**opposed** 7:10 115:5
162:3
**opposition** 82:12
**oppositions** 78:24
**option** 21:15 23:17
23:24 24:5,8,25
24:25 25:13,24
26:6 27:8,16 28:7
29:4,16,21,22



47:15,17,21,24
48:16 49:5 50:24
53:9,11,13,17,21
61:20,20,24 62:13
62:19,21 65:22
70:23 75:14 80:9
82:21 98:18
104:11,14 106:11
106:14 108:20
117:16 118:10,20
119:2 120:14
121:7 122:4 123:4
135:21 136:11
138:22 145:24
153:14 155:6
160:24 161:13
170:3 176:5 177:9
181:24 182:4
191:24 194:15
198:19 206:12,13
230:10
**options** 41:24
**order** 22:20 118:18
150:15
**organization** 4:10
**organized** 145:20
**original** 70:22
115:10 173:18
193:18 213:19
214:19
**other's** 160:14
**outcome** 181:6
**outposts** 15:6
**outside** 37:12,13
**overlap** 90:11
**overlay** 168:15
192:8
**overriding** 198:15
**oversight** 147:19
**owned** 184:14
**owner** 112:24
134:7 177:4
**ownership** 163:22
**owning** 58:8,9 60:9
60:10,25
**owns** 174:18

**Ozone** 228:14

**P**

**P** 2:2,2 25:23 63:9
67:4,6
**P.C** 2:4
**p.m** 135:3 233:13
**Pacific** 116:4
208:10
**pad** 14:23 15:3,8
38:5 131:11,12,15
132:18 133:14,25
134:16 187:23
188:10 210:8
212:9
**page** 23:20 24:12
30:13 31:23,23
32:6 33:4,4 35:20
36:21,23 53:4
65:18 84:17 90:15
104:17 113:25
114:8 147:20
148:10 150:16
170:5,7,9 171:4
171:21 176:12,15
184:4,16,17
185:13,20,21
209:22,22 210:23
213:3,9,15 214:3
217:9 218:21,25
219:14 221:2,8,22
222:5 225:3,15,25
225:25 226:2,6,8
227:10 229:17
232:8,11,11 234:6
234:13 235:5
236:5 237:5,5,5,8
237:8,8,11,11,11
237:13,13,13,16
237:16,16 240:3
**paged** 16:19
**pages** 25:2 48:9
135:14 141:6,24
144:8 146:11
148:14,15,18,25
149:7 150:14

165:12 166:5
211:11 225:4,11
227:6 239:3
**paging** 17:17
**paid** 38:23 39:13,15
47:21 55:6 77:4
197:10
**pain** 100:7
**paper** 225:15
**paragraph** 24:12
24:14,15 33:6
51:13 52:3,18
65:18 74:3 88:13
104:18,19 105:7
105:14,15,22
161:6 162:6 170:8
188:4 201:19
219:13
**paragraphs** 29:3
33:6 49:5 120:10
120:19
**parameters** 93:14
97:14
**paraphrase** 216:9
216:12
**paraphrasing**
213:21 221:18
**parcel** 15:16 78:20
**parenthesis** 32:12
33:3 34:22 218:14
**Park** 2:10 116:4
133:10 228:14
**parking** 15:7 37:15
42:2 157:24
**parlance** 158:19
**parsed** 124:23
**part** 24:6 48:15
56:11 61:12 62:11
62:12 63:8 77:24
78:14,20 86:25
115:4,9,10,12,15
115:22,23 120:14
137:2 172:9,11
186:18 207:12
208:3
**participant** 58:17

59:15,16
**participated** 5:9,14
5:21,23 7:6,15
**particular** 18:7
35:15 40:23 59:6
98:10 229:12,15
**parties** 2:2 118:15
121:4 162:7,17
230:14,14
**parties'** 161:9,10
**partner** 11:14 13:2
**party** 5:15,21,22,22
6:4 20:2 143:2
**party-appointed**
112:22 120:25
**PASHMAN** 2:4
**passage** 72:21
**passed** 27:10 71:3
72:10
**pattern** 97:12
**pay** 18:7 38:8 39:7
229:7,9
**payable** 21:14
**paying** 38:22
**pedestrian** 96:22
**pedestrian-driven**
195:24
**pending** 3:10 4:2
**people** 19:22 43:24
68:17 69:23 116:2
150:20 151:2
228:2
**percent** 10:10
48:23,25 54:5,19
54:20,21 55:16
56:17,25 105:25
106:17 138:14
185:6,6 228:23
**percentage** 47:19
**perfect** 50:22
**performance**
108:15
**performed** 171:24
**period** 10:4 20:3
21:15 27:10 34:3
60:14,15 80:13

82:21 98:20
100:19 135:20
137:8 170:22
172:2 176:3
199:23 200:4,6
**perpetuity** 57:22
58:9 60:6 75:18
77:5 123:14 134:8
176:21 177:4
180:4 181:14
184:15 202:3
**person** 17:6 19:21
43:23 68:16 69:12
69:15 78:15
129:14
**personally** 11:21
11:22,25 174:20
**personnel** 140:13
**persons** 127:7
**perspective** 128:9
**perspectives** 29:19
**phone** 49:23 101:13
129:14 133:2
211:22 212:7
**phonetic** 140:4
**phrase** 53:22
**physically** 108:13
**pick** 73:16 106:5
158:25 165:6
**picked** 169:3
**picking** 81:11
**picture** 202:7
223:19
**pictures** 165:21
166:13
**piece** 15:15 25:4
37:14 55:12
166:18 168:10
190:15 222:18
**pieces** 46:23 190:14
**place** 24:19 39:4
44:4 63:4 81:14
96:10 119:16
149:22 217:4
231:25
**places** 43:18



**Plaintiff** 1:6 2:5
**Plaintiff's** 20:17,20
139:23
**Planners** 4:6,8 8:11
9:9 21:11
**played** 199:14
**Plaza** 2:5
**please** 18:17 23:21
26:12 29:25 36:25
49:16 60:2 64:23
73:4 109:13
125:13 135:6,16
139:18 152:7
154:3 159:22
163:6 175:9 182:5
186:16 198:21
199:7 201:7
206:15,18 209:14
218:22 222:6
224:21
**plenty** 88:21
**plus** 42:9 185:15
196:16
**point** 16:22 18:5
48:11 50:4 54:18
75:22 105:12
107:24 118:2
123:6 128:5,13
129:5,12 133:3,7
142:18 143:6,12
143:23 145:8
148:18 149:4
156:22 179:15
187:4 188:5
191:12 194:17,20
196:5 198:6
205:24 221:19
231:19
**pointed** 78:18
**pointing** 79:15
98:25 159:6 223:2
**points** 29:3 117:12
196:20
**population** 93:12
**portion** 173:4
192:9,10 224:8

**position** 41:23
79:20,25 80:20
121:9 130:3,4,5
130:15 174:2
187:12 193:7
220:7,15
**positions** 129:23
**possible** 39:23
41:15 152:17
190:11 194:23
**possibly** 89:6
166:17
**potential** 68:25
74:8 75:8,9 76:14
76:16 81:9,17
82:24 87:13 133:7
180:8 181:6,16
182:20 196:25
197:8 205:15
227:18 228:19
**potentially** 153:11
164:23 193:21
202:6 205:2
**PP** 162:23,25 163:4
235:18
**practice** 30:24 31:2
31:9 32:22 51:23
52:2 107:14 120:8
166:22
**pre-Covid** 95:16
**premises** 21:16
22:6,23 23:5
47:20 48:24 49:2
53:20 140:7 176:3
**preparation** 26:18
70:19 71:11 72:25
137:22 142:2
**prepare** 16:6 17:23
26:17,22 29:15
77:21 80:5 136:12
141:11 171:17
194:12
**prepared** 17:21,22
26:19 27:4,7,17
27:21,24 28:9,12
30:8 47:10 48:12

61:19 123:7
135:18 137:5,7
140:5,17 161:20
171:8,10,10,12
175:24 176:24
206:7 209:16
210:9
**preparing** 155:14
**prepping** 75:25
101:19
**prescribed** 33:19
**Present** 2:2,12
**presentation**
120:11 141:12,13
142:10,16,17
143:11 204:3
**presentations**
142:13
**presented** 97:21
142:3 181:11
**president** 4:5
**pressure** 73:17
**presume** 203:13
**pretext** 193:9
**pretty** 66:14 94:15
**previous** 113:10
165:18 174:14
213:14
**previously** 20:17
23:9 24:3 30:3
47:7 52:4 64:25
65:23 67:4 73:5
99:18 113:7 135:9
139:19 159:14
179:24 199:10
200:15 206:4
225:6
**price** 33:8,10,13,20
33:21,21,22 34:5
34:6,8,9,12,15,17
39:9,10,10,21
40:16,19 50:9
54:25 185:15
**prices** 39:13,14
55:5,7
**pricing** 56:7

**primarily** 111:4
194:23
**primary** 19:21
174:25
**principal** 11:5
**print** 144:21 164:8
221:3
**prior** 6:15 7:24
20:8 28:22 31:22
70:25 72:7 87:6
115:18 167:9
**probably** 9:22,25
64:16 101:11
133:6 147:19
150:23 166:4
218:18 223:22
225:12,13 227:2
**problem** 16:19
102:6 106:8
114:10 200:8,16
200:19 201:2
232:23
**procedure** 29:5
104:10,13 160:17
219:11
**procedures** 66:17
128:19
**proceed** 110:13
230:16
**proceeding** 10:22
11:2 13:23 14:14
137:2 142:19
160:3 162:16
172:3 179:17
204:19 230:6,9,16
**proceedings** 5:10
5:20 6:18 7:7,16
7:17,19,20 13:14
13:17 14:4,5,7,8,9
68:2,11 107:19
119:12 120:24
143:19
**process** 49:21
70:19,24 71:12,17
72:4 83:6,7 104:2
106:14 107:3

109:7 123:25
129:4 137:3,19
160:20 161:4
206:9 222:10,17
**processes** 101:5
110:13 192:6
**procure** 196:24
**produce** 71:10
179:7 205:13
**produced** 175:12
206:21 211:14
**Production** 237:7
**professional** 60:23
72:20 238:7
**professionals** 60:5
**profitably** 96:4
**progress** 186:2
**projection** 44:25
**projects** 67:22
199:22
**prompted** 214:14
**properly** 188:2
202:18,20
**properties** 89:5,18
116:8 118:5
155:25 192:14
**property** 16:9 21:5
22:10 24:20 25:8
25:14 26:2,5 27:5
28:13 32:2 33:24
37:11 41:25 42:14
43:17 44:3,12
45:15 50:7,11,12
54:25 55:8 59:6,6
60:6,16,18 68:19
69:14 75:15 76:3
77:3 80:14 81:22
83:3,18,25 89:22
90:4 91:9 92:2
94:3,7 95:22,23
97:13,22 98:9
110:14 114:15
115:7 116:6,24
117:9 118:23
119:23 123:23
130:19 138:21



150:10 156:7
167:11,13,14,19
168:6,25 169:24
170:4,21,24
171:13 172:2
173:12,21 174:5
174:18 177:2,3,8
178:3 179:9,15
180:2,4 181:8,12
181:13 184:14
187:6,18 189:2,8
190:21,23 191:17
192:25 193:19,22
194:5,14 198:9
207:3 208:21,24
209:21 214:20
215:6 229:5,20
230:2
**property's** 117:8
170:2
**proposed** 158:15
190:9 192:4 196:3
**proposes** 180:7
195:17
**proposing** 43:6
158:6
**propounded** 239:5
**pros** 69:21
**Prospect** 113:18
114:14,16,21,24
115:8,9,10,11,13
115:15,16,25
116:10,23
**protracted** 128:18
**provide** 81:2,3
85:13 152:23
176:20 180:11
181:25
**provided** 21:17
177:22 201:17
214:23 223:21
**provides** 180:12
181:25
**provision** 29:24
63:14
**provisions** 76:8

119:13 170:14,19
**public** 1:15 3:4
83:7 239:14
**pull** 113:22 135:23
145:19,21 146:8
232:5
**punctuation** 88:15
**Pure** 230:6
**purported** 203:22
**purportedly** 35:20
**purporting** 175:25
**purports** 140:6
**purpose** 15:17
34:23 91:3 92:3
92:10
**purposes** 32:19
35:8 79:2 82:20
127:2 154:20
164:21 179:8
198:9
**pursuant** 1:13
162:8 170:25
**pursue** 8:18
**pushback** 82:8
**pushing** 67:14
**put** 16:16 25:8
28:19,24 29:7,14
40:10 45:13,19
48:16,20 50:21
81:24 90:19
114:17 118:14
120:21 124:8,13
125:6 141:22
142:24 147:10
148:25 149:18
167:3 168:5,6
177:9 183:2 185:5
187:7,19 196:16
202:8,10 206:10
213:4 224:3 228:2
231:9
**putting** 46:17 53:23
81:13 166:23
181:7 182:21

**Q**

**QQ** 164:11,15
235:21
**QSR** 40:10 97:17
**QSR-type** 38:20
**qualified** 6:6,9 7:2
78:7 228:3
**Queens** 89:24,24
**question** 4:2 7:9
19:13,14 20:7
26:9 31:9 40:3
56:23 59:14 60:2
85:12 114:11,12
136:18 142:14
168:18 174:15
182:13 183:16
184:5 185:5 203:2
203:3
**questioning** 139:3
**questions** 16:25
17:24 113:22
121:21 125:22
126:4 140:18
152:18 155:17
156:4 184:2
231:23 232:24
233:10 237:13
239:4
**quick** 97:18 145:14
**quite** 11:16 16:10
38:25 49:24 54:10
54:13 86:9 90:11
111:15 112:15,18
138:19 144:21
150:24 151:14
155:22 156:11
**quotation** 220:17
**quote** 124:13
216:10 220:16
**quotes** 31:24
**quoting** 213:21
220:19

**R**

**R** 2:2 3:2 84:7
135:2,4 240:2,2
**R4** 169:11

**R5** 169:11
**R6** 169:9,10,10,11
**R6B** 169:10 185:2
207:25 209:2
**raise** 72:22
**range** 38:18 39:23
41:11 42:8,20
45:13 54:4,7,9,17
54:21 55:14,16
57:11 95:8 97:8
130:14 159:4
180:12,13 201:21
214:21
**ranged** 38:13 39:13
39:15
**rate** 21:22 56:4
195:16
**rates** 54:22 56:5,13
184:15 194:23
**ratio** 56:2,5 185:6
208:15
**ratios** 54:14 55:10
185:11 214:22
**Ratner** 115:19
**RB-6** 167:20 169:3
**reach** 103:24 231:4
**reached** 39:11
73:16 87:6 167:8
**reaching** 156:25
158:8
**read** 17:19 18:3
24:8,13 30:17
31:10 32:4 35:5
48:3,11,14 49:11
50:21 51:2,8,18
55:22 68:4 91:18
91:20,24 104:4
105:22 106:6,13
108:2,4 118:25
119:5,12,20
122:15 149:13,21
160:23 167:4
172:24 188:2
216:5 217:11
218:18 221:20
227:12 239:3

**reading** 48:15
105:13 108:10
138:18 145:23
158:21 183:3
189:16 204:22
214:9 219:24
230:15
**reads** 52:5 105:8
161:7 162:7
171:23
**ready** 31:3,6,10
67:16,18,20,23
125:21 126:18
**real** 4:12,18,24
35:14 36:10 56:7
59:2,23 60:4,22
82:3 96:17 178:8
215:13
**realize** 96:5
**realized** 16:20
**really** 46:12 79:10
99:2 101:24
114:15 115:13
116:13,25 139:4
164:7 215:9
**realm** 120:8
**realtime** 183:4
**reason** 58:7 69:5
89:8 116:16 132:2
143:8 146:22
180:14 184:19
194:6 204:22
213:22
**reasonable** 39:12
49:12 55:15,17
63:2 95:2
**reasoning** 117:12
117:13
**reasons** 43:4 68:24
69:6,8 185:8
**rebut** 77:23
**rebuttal** 27:24 76:2
76:22 77:25 78:7
78:23
**recall** 8:14,22 9:22
10:13 12:4,10



19:6,19,20,24
49:14 63:10 66:9
66:14,23 67:19,23
74:2 75:2 84:3
89:13 100:12
110:2 111:16,20
113:2,4 132:25
137:25 138:3,4,6
139:10,12,17
140:14 143:16,19
144:2 150:22
151:17,25 156:9
157:6 159:7
161:23 162:5,13
162:19 171:18
186:25 187:2
210:17 213:7
215:8 218:4
received 145:6
recess 64:22 134:21
186:4 231:20
recognize 67:9
84:10 96:12 99:15
102:22 109:18,20
112:5 113:9
135:12,15 139:24
139:25 152:13
157:17 159:19
163:4 175:20,22
176:12 183:16
186:14 198:13
199:5 201:10
203:25 211:15
220:17
recognizing 49:8
205:14
recollected 151:9
recollection 8:6
21:9 50:19 74:22
109:25 110:12
111:19 132:10
137:12 151:24
160:8 161:21
171:15,16 177:11
217:24
recommend 114:13

124:12 231:4
recommendations
68:13
recommended
79:19 223:6
224:12
reconsider 123:4
record 4:3 174:16
238:4
records 63:19
recreate 201:20
202:9 223:20
recurring 11:20
redetermination
123:21 193:11
redetermined
27:12
redeveloped 15:23
redid 193:8
redo 177:18
redoing 177:18
refer 32:21 116:2
209:12 213:13
228:10
reference 62:19
89:25 90:22
113:17 114:14
118:19 120:2,9,17
165:25 218:5
229:15
referenced 149:8
149:10 165:25
172:14
references 90:18
referencing 149:3
165:23 230:10
referred 34:22
35:11
referring 21:4 35:3
41:22 47:12 68:22
119:21 128:23
160:12 210:17
214:12 232:22,24
233:3
refers 45:8 47:16
47:16,18 55:20

75:10 216:13
219:3 228:17
229:20 230:7,21
reflect 125:4
193:13 202:14
227:19
reflected 51:25
197:11 208:2
reflecting 83:16
refresh 160:7
regard 21:13 22:14
135:18 155:8
regarding 19:9
22:2 26:15 112:7
151:2 152:24
153:17 171:25
186:22 187:20
188:7 194:23
regards 22:5
region 85:6 86:8
Registered 238:7
regulations 155:23
relate 207:2 231:10
related 9:2,3 18:14
22:10 23:4 102:10
relates 20:4 28:4
61:22 104:2
120:14 192:20,21
192:24 196:21
198:4,14 207:4
relating 26:2,4
83:25
relation 50:14
relationship 82:16
86:21
relationships 85:6
relative 25:7,20
26:18 29:20 33:18
33:20 39:8 54:15
94:3,8 95:3
166:24 195:18
208:8,9,18
release 87:17
relevant 33:7
134:13 167:13
173:22 185:17

210:24
reliance 178:25
relooked 16:24
rely 61:14
remainder 212:2
remember 16:23
19:11 20:5 72:6
75:4 98:12 100:20
108:4 110:5,8,10
111:7 127:15
129:14 134:10
137:16 138:24
139:4,14 140:8
143:20 151:3,6
153:21,22 156:17
160:22 165:9
180:25 184:7
201:25 206:2
209:6 214:18
222:12 228:25
230:12 231:2
remembered 111:9
remembering
100:15
reminded 73:19
99:20
remiss 78:18
remotely 1:13
231:22
rendition 217:10
renewal 25:7 27:9
27:11 28:7 30:12
51:14 52:6,7
80:22 98:18
117:16 118:10
122:10 123:5
130:12 135:19,20
170:14,17,18
176:3 177:16
198:10
renewals 86:9
rent 5:9,19 7:6,10
7:11,13,16,16,18
7:19 10:19 11:2
13:13,16,23 14:3
14:4,6,8,8,14

23:17,24 24:5,8
24:25 25:13,24
26:6 27:8,9,11,12
27:15 28:6,7,22
29:3,6,20,22,24
36:20 37:3 38:6,9
38:11 39:7 46:8
47:15,17,21,23,24
48:15 49:5,10
50:8 51:14 52:6,7
53:8,11,12,17,21
54:14 61:6,19,20
61:24 62:10,13,19
62:21 63:13 65:22
70:23 72:12 75:14
75:17 76:7 77:3
78:25 79:6 80:9
80:12,21 82:21,21
91:3 92:3 104:11
104:14 106:21
108:20 118:10,20
119:2,13 122:3
124:10 125:6
130:11 131:11
132:14 135:19,20
135:21 136:11
138:22 144:25
149:6 153:14
155:4,5 160:24
161:13 170:2
177:16 181:24
182:17 185:15
191:23,25 192:6
193:11 194:14
196:25 198:9,18
200:10 214:24
229:9 230:10
rentable 37:11
rental 21:14 22:6
24:13,18,21 25:4
25:19 27:14 30:12
32:8,11,14,23,25
33:3 34:4,17,21
35:19 38:16 40:22
47:19 48:24 49:2
52:23 53:20 54:2



54:24 55:10,11
56:2 57:10 70:22
91:4,15 92:5,14
92:15 110:25
111:6 117:18
118:5 120:15
123:9,20 131:15
136:10 140:20
141:3,14 151:16
152:20 161:13
164:20 166:6,8
173:24 176:2
179:21 185:14
192:20 194:23
195:16 198:8,18
214:19,19
**rentals** 192:15
**rented** 147:15
**rents** 7:14 29:15
38:25 49:25 54:14
55:6 81:3 91:9
96:19 147:25
195:25 196:3
**repair** 43:18
**report** 17:21 27:13
27:14,21,23,25
28:4,24 32:3
34:16 35:18 42:9
42:17 45:12 47:25
48:3,12,12,16,17
48:20 50:21 53:18
62:24 63:12,13
70:14,15,20 71:25
71:25 72:25 78:19
78:24 79:14,17
88:20 92:9,11
97:21 106:9 129:2
136:8,13,16,20
137:18 138:5,6
139:15,17,25
140:3,9,17 141:8
141:11,11,22
142:3,5,9,18,25
142:25 143:9,20
143:24 144:3
149:19 151:19

156:11,16 161:22
161:25 165:24
166:24 167:3,5,16
168:20 171:9
172:7,8,12 173:2
173:5,9 175:24
176:23 177:10
178:4,15,16,19,23
178:24 179:6,12
179:19 180:20,22
181:11,18 183:10
183:18,22 184:4,8
184:10,17 185:18
193:9,13,14,25
194:3,13 197:17
197:22 198:2,6,6
198:17 200:20
204:6,7,10,19
205:10,17 206:7
206:10 209:19
212:15 217:14,25
223:21
**report's** 178:12
**reported** 145:5
201:22 214:20
**reporter** 1:15 238:7
238:12
**reports** 16:11,11
17:20 18:9,12
26:14,19,19,22
27:2,3,13,17 28:9
28:11 29:17,21,23
31:18 41:7 51:12
62:7 80:6 81:20
84:4 137:20,23
139:11 142:8
143:17,22 151:18
160:14 162:3
165:20 171:13
174:8 196:14
204:13 205:25
**represent** 37:16
**representation**
187:22
**representative** 5:15
5:22 74:18 143:14

188:9 207:7
**represented** 16:3
**representing** 10:21
**reproduction**
238:11
**request** 4:2 171:6
223:15 237:7
**requested** 154:19
**requesting** 154:23
**require** 142:15
**required** 32:20
35:2,10 47:23
65:22 81:6 89:15
92:12 119:6
121:18 179:4
180:20,24 204:7
204:21 205:12
**requirements**
27:19 47:14
**requiring** 143:7
**reread** 16:12
**rereading** 18:14
**resale** 92:3 179:8
**research** 26:15
41:6 70:25 76:22
76:23 78:15 96:18
141:13 152:23
156:2 184:6
191:15
**researched** 18:2
87:8 145:12
**researching** 82:14
184:11
**reset** 5:10,20 7:6,16
7:16,18,19 10:19
11:2 13:14,16,23
14:3,4,6,6,8,9,14
14:21 27:15 28:22
29:24 62:10 63:13
76:7 79:22 91:3
100:17 101:11
119:13 192:2,6
**resetting** 82:20
**residential** 44:22
96:9 98:7 115:16
150:7 168:3,10,10

168:14 169:7
**residents** 82:9,11
**residual** 46:21,21
118:7 152:17,21
153:4,4,7,11,15
154:2,4,16,17,22
154:25 155:5,11
155:15 156:6
177:7,25 179:19
180:7 186:23
190:18 191:2
193:20 194:19,21
195:6,10 196:21
197:12 198:4,14
199:15,20 200:19
201:2,18 204:3
215:21,25 223:9
223:12,15,20
224:11,13
**residual-20** 215:21
**respect** 65:14 75:12
**respective** 161:10
**respond** 215:7
232:18
**responded** 20:25
84:14,14 111:7
163:18 199:17
215:24
**responds** 220:24
232:15
**response** 86:4
113:12 223:22
**responsible** 69:23
**responsive** 179:6
180:20,23 181:7
204:8 205:11,18
206:11
**rest** 64:17 207:15
211:18 226:4
229:24
**restaurant** 39:2
**restaurants** 15:6
97:18
**restricted** 139:20
140:3 142:5
175:10

**restriction** 91:10
150:11 167:11
**resulting** 200:7
**results** 71:10
221:11
**resumed** 135:4
**retail** 7:18 15:4
40:10 41:25 43:14
44:11,12,14,15
46:2 95:9,14,18
96:16,19,23 97:9
97:16 115:17
131:11,15 132:14
132:22,23 134:2
147:25 157:24
158:3,7,18 169:17
176:13,17 188:15
190:3,10 195:17
195:24 197:10
215:22
**retailers** 159:3
**retails** 97:9
**retained** 7:25 8:4
8:10,15 12:8
22:19 23:2 70:18
155:21 206:5
**retainer** 20:25 21:3
21:7,19,24 22:4
22:10,12,15
112:21 113:13,21
116:20 117:8
118:15 120:8,12
121:3 122:24
124:2 125:7
**retainers** 112:19
**retention** 112:8,14
114:18 124:22
162:18
**return** 96:5
**revalue** 79:2
**reversion** 60:8,16
60:19,25 61:2
180:5
**review** 22:22 26:14
26:16 27:25 31:18
48:21,21 76:2,22



77:23,24 78:23
79:14,17 83:6
145:21 152:24
155:24 197:16
226:16
**reviewed** 23:4,12
31:21 45:10 48:14
**reviewing** 27:22
63:18
**revised** 193:13
213:24
**rezoned** 77:10,11
81:19 83:3,15,18
**rezoning** 74:4,8
75:8,9 76:13,16
81:9,17,23,25
82:6,6,7,9,24
83:11 115:19,22
115:24 116:6
**rezonings** 82:13
**riddled** 190:19
194:22 201:3
**ridiculously** 196:11
**right** 11:23 12:18
13:17 21:17 22:7
22:23 36:21 38:8
44:4 46:2 48:9,10
51:25 53:13 54:5
57:18 59:9 61:10
61:21 65:14 68:24
69:6 72:5,8,14,15
73:21 78:13 79:4
83:22 85:17,24
87:18 90:8 93:22
94:19 96:4 98:14
100:3 105:17
106:23 112:18
113:16 119:16
120:6 121:11,19
123:5 125:24
126:22 127:8,17
131:13,21 133:15
134:17 144:18
148:12,16 167:20
168:7 169:4
170:16,25 188:11

188:17 189:22
194:25 199:23
200:13,17 202:24
203:14 208:3
214:4 218:11
225:9,19 227:8
229:21
**right-hand** 226:22
**Rite-Aid** 158:25
**road** 45:22
**role** 69:24 121:5
124:5 160:25
180:16 199:15
**rotate** 211:10,11
226:9,14
**rotates** 226:11
**rotating** 226:11
**rotation** 226:10
**Rottenberg** 11:6,10
11:23 12:18
138:13 163:10
**Rottenberg's**
138:17
**roughly** 5:24,25
19:10 20:4 38:18
39:6 210:7
**rows** 165:21
**Royal** 4:21
**RR** 175:10,14,21
235:24
**rude** 138:19 151:14
**rules** 80:3
**runs** 7:14

------

**S**

**S** 2:2,11 3:1,2 4:1
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1

37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
135:2,2,2,4 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1

173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1
**sabbatical** 226:23
**sale** 15:24 32:18
34:17,23 35:8
50:9 54:25 55:7
192:22
**sales** 29:7,14 32:7
32:16,21 33:17
35:11 47:13 49:13
49:15,19,25 50:20
50:23 52:22 55:6
62:16,18 63:18
81:2 134:6 140:20
142:6 154:8
176:13,17,19
177:5,24 184:11
184:13 223:9
224:10,13 228:24
229:7,10
**Sam** 11:5,22 12:18
163:9,14 186:21
186:25 212:19
**sand** 217:17,20
218:4
**sat** 151:14
**satisfy** 54:8

**save** 156:14
**saw** 42:22 65:10
140:9,11 143:20
155:13 207:11
225:23
**saying** 34:16 42:3
48:19 60:12,17
77:7 78:16 94:18
94:24 116:22
120:20 123:24
129:18 152:25
157:2 163:8
171:18 178:21
206:5,6 216:21,23
216:24,25 217:5
218:11 220:3,12
220:14 221:19
222:11 223:3
233:4
**says** 33:6,19 50:15
53:10 55:20 61:25
62:3 63:23 64:9
76:13 77:24 84:20
88:12 104:4 108:4
117:21 131:14
164:17 165:3
171:4,5 176:23
177:7 181:12
182:25 208:13
209:11 210:10
211:11,17 212:18
214:5,7,8 216:6
216:15 217:11
218:9,25 219:9
220:6 221:3,4,5
222:16 227:10,12
227:13 228:5,14
228:15,22 229:17
229:18,19 230:5
230:19,19 232:12
**scattered** 178:4
**scenario** 44:19 45:3
192:16
**scenarios** 62:25
74:4
**schedule** 99:25



101:18
scheduling 102:4
127:24
Sciannameo 131:9
133:5
scrambled 103:21
scratch 166:20
screen 20:19 51:16
51:19 52:4 57:19
64:8 113:10 146:9
148:6,7
Sean 140:4 175:25
search 49:15,19
192:19
searched 42:10
searching 157:25
second 19:2 24:11
24:12 36:14 47:11
51:13 52:3,17
84:17 88:13
105:15 113:24
114:8 141:16
144:20 148:2
171:4 178:18
184:4 194:16,20
196:5 209:14
213:8
section 32:7 35:16
120:18 170:9
185:4 228:4
see 21:2 32:9 34:14
38:25 39:12 43:22
52:15 59:12 65:7
65:9 70:14 76:23
87:14 88:19 90:13
97:6 100:14
107:23 112:6
118:15 142:23
146:2,20 147:14
148:11,20,22
149:6,21 150:12
151:15 158:9
164:18 165:13
185:11 186:2
202:12 209:22,23
211:13 215:17

220:15 223:25
226:21 229:14
231:17 232:13
seeing 95:20
seeking 85:23
SEELIG 2:9
seen 54:19 65:4
83:24
select 24:24 33:7
67:14,20,24 68:11
93:20,23 100:2,13
103:2,6 227:20
selected 68:13
103:11 105:6
110:23 122:18
129:16 160:13
162:7 189:14
selecting 93:24
102:11
selection 73:25
self 210:11,13,14
sell 50:10
send 21:19 30:21
31:3,6,11,19 92:6
128:15 223:11,14
224:5
sense 39:17,21,22
40:21 50:22 57:23
178:24
sent 16:22 20:24
28:20 30:23 48:4
67:7,12 70:9 73:9
73:10 84:13 103:7
112:7 122:5 125:3
125:4 126:22
127:16 131:8
133:12 134:6
152:15 159:8,24
161:9,25 163:7
164:6 167:6
sentence 24:24 35:5
70:8 81:12 88:14
104:19 105:7,13
105:16 162:6
171:3,4 221:21
sentences 106:6

124:17 189:24
separate 136:12,15
213:4 231:12
separately 63:6
September 1:14
159:16 161:20,21
163:8 165:7
168:20 170:6
171:14 227:3
238:7
series 79:13 148:11
202:23 203:5
serve 68:19 120:5
served 62:25 69:17
69:20
service 43:18 44:21
97:18
serviced 43:22
services 1:20
171:24
set 47:12 53:19
60:21 70:15 78:25
140:6 141:7,24
176:2 182:17
188:4 194:4
214:23
sets 30:9 96:18
159:25 177:2
193:15
setting 26:6 29:6
136:9 141:2 178:5
178:17,19
settled 6:15
share 86:19,20 88:9
132:16 163:20
207:13
shared 46:24
129:20 132:25
187:9
sharing 88:4
Sharon 1:13 36:13
84:20 109:16
126:11 153:2
171:23 199:12
216:7 234:6,24
238:4 239:8

Sheet 239:6
shockingly 178:2
185:9
shops 87:7
short 64:16 136:20
140:19 141:4,13
142:2,3,22 143:10
shorter 142:9,10,12
shorthand 214:11
229:23
shortly 10:2 67:2
shovel 45:19
show 42:10 78:17
90:20 121:6
128:25 149:23
153:11
showed 46:23
99:18 151:16
223:18
showing 32:25
141:12 167:15,15
167:16 202:4
209:25
shown 44:16
166:12,25
shows 53:4 141:20
shutdown 101:12
sic 218:15
side 44:19 67:14
76:23 77:24 96:24
100:7,10 110:16
110:16 139:6
192:7,11,12,14
222:14,23 225:17
226:9,22
sides 66:18 68:15
112:20 124:24
128:23
sides' 192:3
sign 30:24 31:2
51:18,24 57:16
209:11
signature 30:15
31:12,20
signatures 31:16
signed 21:2,3 30:18

31:22 32:4 48:6
51:2,9 55:19
57:13 84:21 85:23
95:7,12 162:18
signs 87:10
similar 34:2 41:2,9
41:10 42:14 80:14
90:4 91:10 92:22
93:12,18,22
190:21
simple 19:14 23:22
173:14 179:25
182:12
simply 119:5
168:18 204:13
single 168:24
191:13
sip 136:6
sit 151:25 223:13
224:6 232:17
site 14:24 15:3,3,8
15:10,12,15,21,22
27:6 28:14 34:5
37:25 38:12 39:7
40:6,11,13,19,24
41:16,18 46:14
47:13 53:6 57:24
58:3,8,19,20
59:18,19 63:24
70:23 75:23 76:5
76:10,14,16 77:8
77:9,14 81:15,15
81:24 90:21 91:3
93:10,14 96:2,5
97:4 98:24 131:11
131:12,15,20
132:13 133:25,25
134:2 136:10
145:2,10 148:20
148:23,24,25
149:6,8,10 150:2
154:10 158:16
180:8 187:24
188:11 204:25
205:4 207:5,17,20
208:8,18,19



209:17,25 210:5
229:10,12,15
**sites** 33:25 38:3,5
41:10 84:24 97:7
98:13 131:25
132:19,22 133:14
133:17 134:5,14
134:16 176:20
**six** 46:5
**sixth** 148:10
**size** 38:12,20 39:6
39:18,19 40:9,18
41:2,10,20 42:6
42:13,19 43:5
97:5 148:19,23,24
148:25 149:6,8,10
159:6 208:19
210:2
**sketch** 207:16
**sketching** 207:17
207:18,22
**skip** 102:14 108:20
226:6
**skipping** 108:19
**slightly** 169:15
**Slope** 115:15
133:10
**small** 44:17 83:4
144:21 195:22
196:2 221:3
**smaller** 158:4
**smart** 133:11
166:21 198:11
**snapshot** 202:7
**soft** 196:10
**sole** 190:14
**solid** 230:19
**somebody** 228:12
**somewhat** 147:16
**sorry** 16:17 22:25
25:9 52:14 73:5
74:23 100:6
103:14 105:12
114:7,8 126:24
137:15 144:10
198:21 203:2

218:16
**sort** 28:19 29:18
71:21 75:25 78:14
78:23 82:4 95:14
97:3 106:25 115:8
115:14,22,24
116:11,18 155:2
156:19 157:5
160:16 168:14
169:6 181:5
215:14
**sorts** 97:15
**sounds** 222:15
223:24
**source** 14:12
**sources** 115:17
**South** 2:5
**space** 7:14,19 10:19
14:8 43:14 195:17
195:22 197:3
**spaces** 44:22 86:15
90:3 150:5 158:4
158:4 196:2
**speak** 3:20 50:3
130:2 145:11
163:18 165:7
208:5
**speaking** 15:14
27:22 32:3 74:25
143:5 220:22
222:4
**speaks** 224:2
**specific** 13:20 14:2
18:6 28:5 55:13
91:15 92:4 114:18
118:3,10 169:8
184:3 198:13
**specifically** 10:13
13:22 14:10 66:20
68:23 85:22 86:10
88:10 118:17
120:9 131:12
132:18,25 145:12
156:3 158:24
170:10 173:13,16
196:22 213:7

**specificity** 18:13
112:17
**specifics** 94:9 157:7
**spent** 138:25
**split** 167:20 168:9
**spoke** 42:18 67:13
75:5 123:11
132:11,24 163:10
185:8
**spoken** 42:18 74:5
75:21
**spot** 81:19 82:6
83:18
**spread** 66:14,16
**spreadsheet** 149:2
**square** 10:20 11:2
19:20 33:8,10,21
34:5,7,8,15,18
37:20 38:9,11,14
38:19,19 39:9,9
39:21 40:4,16
41:25 42:4,5,16
44:11,14,23,23
45:14 61:4,14
97:8 132:13
148:23 157:23
158:7,13 184:25
196:2,4,17 207:23
**SS** 183:10,13 236:6
**stack** 18:18 20:18
23:8,24 30:2 47:6
64:24 65:24
157:11 159:15
162:21 163:25
175:9 186:6 201:7
206:16 211:8
224:21
**STACY** 2:13
**staff** 11:8
**stake** 181:10
**stamp** 30:14 99:13
102:20 112:3
125:12,15 130:23
130:25 152:11
157:13,15 163:2
164:2,12 170:7

175:11,15 183:11
183:14 186:8,12
198:24 199:2
234:18,21 235:7
235:10,13,15,17
235:19,22,25
236:7,10,13
**stamped** 99:6,9
102:18
**stand** 59:12
**standard** 107:14,17
**standards** 80:6
196:12 198:7
**stands** 97:17
208:15 215:20
**Starbucks** 131:18
**start** 84:16 148:10
149:19 166:19
213:14 220:21
225:5
**started** 171:17
**starts** 104:19
**state** 1:15 6:8,18
115:23
**stated** 172:25
**statement** 172:4,22
187:21 188:8
**states** 1:2 3:11
75:20 80:9
**static** 70:24
**stating** 161:14,14
187:8 219:19
**STEIN** 2:4
**Stenographic** 1:14
**step** 79:4 106:23
107:2 108:19,20
**steps** 32:20 33:7
34:10,25 35:9
68:6,9 106:22
**Steven** 13:3
**sticky** 207:3,7,12
**Stipulations** 237:10
**stone** 228:15
**stones** 88:25
**stop** 72:2 88:22
156:19 160:5,9,16

190:17
**stopped** 156:23
**storage** 43:19
210:11,14,14
**store** 228:16,22
**storefront** 44:21
**stores** 97:19
**street** 1:20 2:6
41:25 44:11 45:5
207:9
**streets** 44:20
**strengthen** 79:20
**stretch** 101:3
**strike** 30:25
**strip** 15:5 229:3
**strong** 178:25
181:4
**stronger** 96:22
**struck** 114:20
**structure** 41:17
173:22
**structuring** 54:11
**stuff** 132:9,9
**subject** 21:6 22:6
22:22 25:5 34:2
39:24 47:13 53:20
57:24 76:3,11
79:7 80:2 83:13
92:2,13 93:13,19
93:22 94:3,7,11
94:14 95:23 97:4
97:12 98:9 111:2
114:15 115:7
116:3,5,6,7,18
118:5,23 123:10
136:10 138:21
148:11,24 150:5
150:10 156:7
167:19 168:2,2
169:24,25 170:12
171:25 174:5,24
179:9 180:2 181:8
187:6,18 192:24
193:10,11 198:8
205:4 207:2,20
215:6 229:5



subject's 30:11
89:16
subjected 168:5
subjects 89:18
submit 142:17
192:7,13,15,21
204:19
submitted 143:2
192:19,23 193:4
205:10
submitting 205:25
Subscribed 239:10
subsequent 65:6
95:7 123:18
132:12
substance 239:5
substantial 20:10
substantially 61:4
substantiated
204:21
suburban 89:8
Suffolk 93:9
suggest 168:17
suggested 116:16
117:11 120:19
145:24
suggesting 114:19
125:24 168:8
suggestion 117:19
117:22 145:14
Suite 2:6
summaries 148:11
summarize 189:21
summarizing
186:21
summer 161:2
supervision 238:12
supplied 136:21,23
137:2 171:5
SUPPORT 237:3
supported 82:16,17
213:12,20 214:5
supporting 185:11
supportive 158:9
supposed 14:13
49:6 80:3,4,5

120:22 122:2
179:7 211:24
213:24
sure 13:25 31:20
43:7 51:24 69:2
69:12,14,25 81:11
85:5 102:13
110:13,16,20
121:16 124:25
127:17,21 131:7
132:15 133:18
140:11 149:13
150:22,25 158:21
168:8 183:5 201:6
213:5 224:6
225:22
surprise 70:3 174:3
174:6
Surveyors 4:21
suspect 12:24
suss 214:11
Sutton 207:10
sworn 3:3 238:4
239:10
sympathetic 101:21

——— T ———
T 3:2 135:2,4
234:11 235:3
236:3 240:2
table 146:11,14,18
147:24
take 3:24 24:2 39:4
39:16 45:4,18,24
46:3,7,8,9 64:16
69:24 71:18,20
83:8 90:12 97:23
113:17 114:13
117:11 123:21
125:24 126:8,11
134:20 136:7
139:23 157:8
168:21 172:17
179:23 185:24
197:2,5 212:6,10
212:11 213:2,8,25

219:16 222:3,5
223:8 224:10,12
224:15 225:24
231:8,17
taken 1:13 62:23
116:17 134:21
141:21 177:15
takes 45:20 83:7
101:7 204:10
talk 11:21 12:23
18:11 32:19 34:25
35:9 36:15 58:11
118:15 207:15
talked 18:10 66:10
82:23 84:5 150:23
151:21
talking 44:6 58:13
59:5 69:16 95:16
95:16,17 98:2
100:22 116:7
129:15 137:18
138:21 139:16
155:10 160:18
212:23 221:13
talks 132:15 232:10
taped 6:14
tasked 170:11
176:22
taxpayer 158:7,11
158:13,17
technically 27:21
172:5 199:21
technique 179:20
194:21
telephone 110:3,5
111:8
telephonic 100:2
tell 20:21 24:14
30:5 34:11 47:8
47:22 50:7,8 55:8
58:4 60:24 79:5
80:8,20 107:11
110:6 118:24
119:3 124:20,21
125:21 130:3
131:4 135:16

136:3 139:24
140:23 149:9,14
151:5 152:6
159:22 164:14
175:6 184:22
186:16 199:7
201:15 206:23
207:17 212:11
214:8 218:8 219:9
221:4 225:11
227:22
telling 31:17 41:13
54:24 62:24 87:5
91:22 105:5,17,23
106:14,16 108:9
130:18 226:24
tells 79:6 80:15
81:5 105:23 118:3
124:10 212:12
220:22
telltale 225:18
tenancies 16:2
tenant 39:3 46:9
52:11 57:22 77:20
111:18 123:13
134:8 167:12
170:23 175:3
tenant's 21:12 22:4
25:24 110:15
tenanted 45:16
tenanting 44:13
tenants 38:7 44:17
44:22 45:2,4,25
54:11 112:24
128:11 196:24
197:2,5,10
Tener 12:20 17:21
26:20 42:23,25
46:16,25 55:20
56:17,25 58:8
67:14 73:15 76:8
76:25 77:15 78:8
78:16 79:3,11
80:17 81:16,18
83:12,25 86:11
99:11 100:6,9

103:2 109:11,15
109:22 117:23
121:10 123:3,7,17
123:23 125:11
127:13 138:11,17
139:5,13,21 140:4
153:12 155:10
160:23 164:17,19
165:3,5,7 175:25
177:12,16,22
178:15,23 179:13
180:22 181:2,5,11
181:22 190:7,16
191:12 195:4
200:3,17 201:17
202:16,22 203:4
204:18 205:6,10
205:20 215:7
234:23
Tener's 16:11
17:15 18:11 27:23
28:4 41:22 44:25
56:11 63:18 75:13
77:25 82:18 83:20
133:6 142:4
154:21,24 155:9
175:10 179:11,19
183:9 187:12
190:9,24 193:25
194:3 195:9
197:12,17 198:2,6
198:14,17 200:20
203:11,23 204:5
204:10,24
tenor 43:12
term 14:23 15:2,9
15:12 25:6,7,8,16
25:20 26:7 30:12
40:14 41:24 44:3
46:6 49:8 61:7,9
96:12 98:13 99:2
99:3 104:11
122:10 123:5,10
130:12 134:10,15
134:16 136:10
150:3,11 151:23



154:2 158:11,19
168:7 170:14,17
170:18 176:5
177:9 181:9
187:23 188:10
189:3,9 193:12,23
204:10 205:2
215:4,23
**terms** 17:23 27:15
29:23 53:8,12
61:23 63:17 75:22
76:7 77:22 91:11
93:12 130:6
134:12 135:20
151:2 162:8
166:23 179:4
190:23 194:14
198:18 206:12
209:25 210:6
**testified** 3:4 6:12,14
6:24 135:5 140:10
232:20
**testimony** 6:17
41:3,4 160:4
166:11 238:5
**thank** 28:10 36:17
59:11 135:15
158:23 171:20
183:6 231:15,21
**thankful** 111:9
**Thanks** 128:2
232:12,16,18
**thereabouts** 196:4
**thing** 17:22 39:5
70:2,5 107:10
110:18 125:7
129:6 159:5
188:23 215:15
221:25 222:2
**things** 22:19 31:19
61:14 69:10 78:13
87:3,4 119:10
127:24 157:5
182:14 232:25
**think** 8:17 10:15
27:17 41:7 45:3

45:14 55:21 57:5
58:8,16,25 59:14
59:23 60:21 64:15
64:20 68:17 71:9
74:6 75:19 81:4
83:12 84:5 85:19
86:14 87:18 89:25
90:3 92:23 94:18
96:21 104:15
106:7 111:11
113:15,24 117:25
119:21 124:15,16
124:17 128:22
130:9 132:11
134:19 139:9
140:10 144:22,23
148:21 149:2,12
151:7 153:21
156:10,16,20
163:21 173:17
178:8,22 180:19
181:4,15 185:23
191:8 192:11
196:19 198:11
202:3,17 206:3
207:7 209:22
214:12,13 215:2
225:4,9,13,24
226:6,7 228:14
229:24 230:9
231:23 232:21,23
233:2,6
**thinking** 35:15
83:20 90:17
151:18 227:18
**thinks** 21:23
220:12
**third** 50:5 67:15,20
67:24 68:10 69:2
73:16,25 100:2
102:11 103:3,6
104:21,22 105:24
106:18 108:6
122:7 154:13
162:8 170:8 181:2
181:22 184:17

205:14 219:2,5,5
219:12,14,15
223:4 227:20
**thought** 75:6 86:16
89:19 90:2 92:24
111:12 117:14
123:12 151:10
153:10,24
**thoughts** 222:9,17
**thousands** 83:9
**three** 35:20 38:6,14
46:4 66:23 103:10
104:8,9,20 105:2
105:18 106:2,18
106:20,24 107:8
107:14 108:5,9,11
108:14,16 113:15
113:16 124:17
146:15 154:6
161:7 182:10,11
182:24 204:17
207:20 212:13
213:15
**three-week** 90:12
**three-year** 172:2
226:23
**Thursday** 103:7
**TI** 197:9,9
**tied** 54:23 55:12
56:8,8
**ties** 185:17 209:24
**tight** 223:13 224:6
232:17
**time** 3:20,24 8:3,15
9:8 10:4 12:11,13
13:9 19:6,10 23:4
26:3 64:16 65:7
66:19 67:21 72:21
83:16 84:4 89:23
90:6 102:7,15
110:7 126:10,17
132:17 134:4,20
135:3 136:7
138:25 145:23
166:3 167:12
168:5 185:24

197:5 207:6
225:24 228:25
233:13
**timeframe** 20:5
86:10,14,17 90:13
95:3 96:3,5
110:17 230:3
**timely** 66:21
**times** 5:11,20,21,23
5:25 6:24 10:20
11:2 13:5 19:19
21:22 37:20 53:16
92:10 107:21
118:13 129:3
194:9 200:25
201:17 213:2
**timing** 74:9 82:25
**tired** 82:10
**tires** 43:21
**title** 85:5 172:21
**today** 3:15 15:23
16:7 17:2 75:19
231:22
**told** 17:14,22 29:15
40:8 53:15 57:25
62:4 67:15 73:18
83:21 84:22 92:10
110:13,14 119:8
130:7,10 132:12
133:14 137:16
151:7,7,9 153:22
156:19 158:2
160:5,9 170:20
194:9 200:23,24
212:14 219:23
228:12
**Tom** 12:20 65:3
66:9 67:13 69:25
70:4 75:21 100:22
102:6 105:4
106:22,23 108:19
108:23 110:23
111:10 118:21
125:11 127:6,18
128:8 129:13,20
133:6 138:11,25

139:21 151:12,15
158:6,15 159:18
160:23 162:14
163:8,11,14,14,19
164:17,19,21
165:3 167:16
175:24 186:21,25
188:23 191:20
192:18 193:3,6,8
194:12,21 198:6
199:13 205:16
206:6 212:19
213:16,21 214:18
214:24 215:23
227:24 232:9
**Tom's** 143:20,24
186:22 188:3
193:13 194:18
197:22 199:20
212:15 213:22
216:25 217:6,25
222:19,22 223:20
**Tommy** 132:15
**tone** 43:12
**top** 19:2 73:12
127:25 165:12
206:24,25 208:3
213:11 218:25
222:8 227:11,20
229:18 232:11
**tore** 16:15
**total** 27:17 33:22
34:6,9 37:3 38:6
39:10,13,22 40:20
98:19 182:10
**totality** 62:13 106:7
131:7
**Tracy** 55:23
**traffic** 93:13 96:14
96:23 97:4,12
**traffic-driven**
43:16
**tranches** 28:20
**transactions**
161:16 177:21
189:19,22



transcript 158:22
  183:4 238:11
transcription 239:4
trend 82:8
trial 6:20,22
tried 220:16
trouble 199:12
  214:9
troubling 180:12
true 22:18 172:4
  179:18 185:19
  203:3 238:4
try 51:17 69:22
  88:24 105:2
  106:19 107:15
  108:14,17 113:23
  144:20 202:8
trying 16:15 17:23
  44:13 92:7 106:22
  118:14 121:24
  122:6 152:23
  153:5 155:3
  164:22 181:6
  201:20 204:19
  207:22 216:9
  217:6 218:23
  224:23,25 233:7
TT 186:10,11,14
  236:9
Tuesday 163:18
  223:13
turn 146:5,10
  147:21 170:5
  218:21,23
turned 211:22
Turning 90:15
turns 128:18
Twenty 36:8
twice 13:8
two 9:14,15,17
  16:14 25:2 27:6
  27:12 29:2 36:14
  45:21,21 47:9
  57:7 61:4 63:7
  66:23 67:22 68:22
  73:9 83:8 88:14

90:7,12 104:8
  105:24 106:16
  111:21 113:14
  117:12 119:10
  120:10 133:24
  136:12,15 137:4,5
  137:9,13,21,23
  140:16 143:9
  145:18 146:15,17
  161:16 163:7
  176:24 178:5
  188:19 189:24
  195:15 207:21
  219:14 224:2
  226:19 228:8
  233:2
two-page 198:23
two-thirds 6:3,3
type 42:11 69:16
  98:2,7 159:5
  168:25
types 13:13,16
  107:12 190:21,23
typical 39:18,19
  40:9,16 101:7
  116:19 120:8,24
  123:25 159:3
  192:6
typically 15:3 34:4
  34:11 38:12 40:24
  49:20 50:6 63:11
  68:12,16 72:2
  83:4 86:23 101:4
  110:11 112:21
  118:13 120:12
  124:23 143:16
  149:22 175:5
  212:7 228:2
typo 149:10 172:11
  173:6

**U**

U 198:21
Uh-huh 107:22
  127:11
ultimate 72:13

185:17
ultimately 36:18
  71:14 108:25
  151:23
ULURP 83:5
unable 190:7
unclear 173:19
uncommon 90:10
  161:24
uncooperative
  205:21 206:6
uncover 86:24
  94:15 203:22
uncovered 30:10
  41:8 50:23 72:25
  87:11 97:20
  130:13
underlined 184:6
  187:17 214:6
underlines 212:25
underlying 150:4
  172:18
underneath 42:2
  188:4 210:18
  213:4 216:16
  217:11
understand 3:23
  4:17,20 5:16 6:5
  26:9 29:11,12
  49:21 62:7 68:18
  76:15 87:23 96:7
  118:14 119:22
  121:25 122:16
  149:12 153:6
  155:14 168:16
  182:14 187:11
  191:16,18 211:5
  216:19 217:6,21
  226:6
understanding
  65:20 76:10 77:12
  81:21 85:2 87:24
  95:24 104:10,12
  119:10 143:3
  154:21 163:15,19
  163:23 175:2

183:6 193:8,16
understands
  119:12 158:22
understood 3:22
  4:3,4 62:9 92:18
  95:10 121:17
  154:24,25 202:16
undertake 191:22
  194:21
undertaken 141:10
undertaking
  107:19
undertook 115:20
  186:23
unencumbered
  53:6 75:16 76:11
  77:15 80:10
  123:15 134:7
  177:6,23 179:25
  192:25 193:19
  202:2 209:17,21
  210:5 213:17
  218:2
unexplainable 58:7
unfold 160:20
  161:4
unfortunately
  28:25 47:24 209:6
unhidden 165:22
Uniform 83:6
unimproved 58:19
  59:17 170:12
unique 27:19
unit 33:9 34:7,12
United 1:2 3:10
units 33:7
universe 88:22
  97:20
unreviewed 78:13
unturn 88:25
unusual 43:24
  50:13 68:14 71:8
  85:7,12 101:6
  112:12 114:17
  117:7 120:10,11
  142:21 168:25

192:12
update 232:17
updated 161:11
urban 93:18
use 24:20 25:7,15
  25:19 32:15,22
  40:14 44:3 49:10
  54:4 56:21 71:6
  74:5,11,14,19,24
  75:3 80:11 83:6
  90:17 91:10 92:2
  94:25,25 95:22,22
  98:2 118:7 134:2
  150:9,10 152:20
  153:13 155:20
  167:11,12 168:4,6
  169:21,24 170:2
  170:13,24 187:24
  188:11,20 189:2,8
  189:18 190:2,9,11
  191:3,17 195:5
  216:24 217:2
  230:19,22 231:3
useful 85:10 89:2
user 44:15
uses 44:15 91:10
  97:9,10 150:8
  157:24 168:4
  169:17 177:8
  179:19 185:14
  187:6,18 195:21
  196:2,6
usual 31:9
usually 51:23 67:24
  101:7 128:17
  156:25 192:8
  212:9 224:3
utilize 154:14
utilized 154:17
  194:18
utilizing 177:19
UU 198:23,25
  199:5 236:12

**V**

V 113:7,9



**vacancies** 195:19
**vacant** 15:25 45:6
53:6 76:11 77:8
77:14 81:15
123:15 209:21
**vacant/redevelop...**
63:23
**vacation** 226:25
**valuable** 60:24
**valuation** 71:3,22
72:8,9,9 118:22
131:9 142:11
143:7 154:6
161:15 172:10
179:3 180:2
184:18 193:15,18
213:23 218:2
**valuations** 84:6
151:11 193:17
**value** 14:21 21:14
22:6 24:13,18,21
25:4,19 27:5,6,15
27:20 28:13,16
29:15 30:12 32:2
32:14,18,21,23,25
34:4 35:2,11
38:16 40:12,13,13
48:24 49:2 50:18
53:3,5,20,25 54:2
54:15,15,24,25
55:3,11,14 56:3,3
56:9 57:10,17,24
58:6,18,20 59:17
59:19 60:8,8,16
63:3 66:5 70:23
71:2,7,22 72:5,7
72:22 73:2 75:22
79:6,22 87:3,4
89:3 90:20,22
91:2,4,5,7,12,15
92:5,13,14 94:23
95:21 104:7,24
105:9,20,21 106:5
108:8,18 111:6
117:18 119:15,24
121:11 123:9

128:16 129:15
130:5,11,13,18
134:12 135:18
136:10 137:6,10
137:17 138:17,23
140:6 141:3
147:17,23 151:21
151:22 154:10,12
154:15 161:11,13
164:20 166:6,9,19
167:8,14 170:6
173:24 174:24
176:2,20,25 177:3
177:24 178:2,6,17
178:19,21 179:8
179:21 180:5,8
181:3,8,23 182:16
182:16,19 184:24
185:2,15 192:20
192:22 193:21
194:13 195:20
197:10,13 198:8
198:18 200:7,7
201:23 204:24
205:3 209:17
213:16 214:19,19
215:12
**valued** 38:4 72:12
75:15 76:4
**values** 28:22 61:5,8
66:10,11 104:9
110:25 123:11
163:20 178:6
181:17 182:24
201:25
**valuing** 75:23 92:2
123:12 181:12
**Vanderbilt** 1:8
3:14 11:5 43:10
70:5 129:22 139:6
143:12,14 173:10
173:20 174:4
208:11
**variety** 94:15
**various** 13:13
26:17,22 88:6

96:19 98:6 148:12
148:16
**venture** 173:19
**verbal** 27:20 28:8
**verbally** 7:17
137:17
**versed** 69:19
**version** 136:19,22
140:22 147:22
183:9 201:18
**versions** 136:13,15
140:16
**versus** 58:3 60:6,25
141:11 207:24
**Victor** 113:8
**video** 1:12 3:19
**view** 121:17 222:3
**views** 123:3
**virtue** 88:6,7
124:21
**vocal** 82:12 138:19
**vocally** 81:23
**VV** 201:12,15
236:14

---

### W

**W** 135:9,13 140:20
141:2
**Wachtel** 11:12 12:3
12:7
**wait** 31:9 103:19
157:2 224:6
**Wakefield** 111:14
**WALDER** 2:4
**walk** 43:20,24
**walking** 43:23
**wall** 37:13,13
**Walsh** 2:7 7:23 8:9
8:12 9:11 10:23
13:18,24 14:16
17:5,9 19:8,17
20:12 21:18 22:8
22:24 23:19 24:16
24:22 25:17 26:8
31:5,13 33:12,15
35:4,13,22 36:12

36:17,22 41:19
51:5,11 52:25
53:14 57:4 58:12
59:4,8,11 60:3
61:11 65:16,25
66:8 69:7 70:6
71:16 72:18 74:15
76:19 78:10 79:23
81:10 83:23 85:25
88:2,18 90:24
93:4 98:16 100:4
103:4 105:11
109:24 114:6
117:2 119:7
121:12,20 122:12
122:17 125:23
126:13 129:9,24
136:14,17 137:11
140:24 143:13,15
145:14,22 160:10
161:19 174:12
178:13 180:18
182:3 187:14,25
188:22 189:10
190:12 191:7
192:5 194:2,8
195:8 197:20
198:3 200:18,22
202:19,25 203:8
203:15,24 204:14
205:8,22 207:19
208:22 210:25
224:17 231:23,25
232:4 233:9 234:8
**want** 29:12 60:13
68:16 69:12,14
70:16 79:16 90:19
109:2 121:6
124:24 126:7
137:15 140:15
145:19,20 146:10
147:20 158:20
164:4 166:20
174:15 175:18
216:11 221:15
231:18 232:2

**wanted** 18:7 49:18
72:22 76:9 77:12
87:14 121:16
122:9 142:19
183:5
**wants** 73:16
**wasn't** 10:2 31:6
58:13 67:23 93:7
100:10 116:25
121:13 128:10
147:4 156:18
157:5 182:20
183:2 213:5
216:24
**water** 136:6
**way** 34:16 35:7
36:5 38:15 45:15
61:3 76:9 81:15
98:23 149:14
160:23 174:9
218:20
**ways** 38:6
**we've** 36:19 64:14
125:25 155:18
203:6
**weather** 232:22
**week** 67:17 68:4,5
73:19 99:24,24
102:12 226:22
**weekend** 232:12,18
232:22 233:3,6
**weeks** 66:23 101:6
101:8 161:8
**went** 32:5 65:7
72:16 142:7
179:16
**weren't** 67:18
166:3
**west** 1:20 116:3,8
132:9
**white** 225:15
**Whitestone** 229:2
**wholly** 203:11
**wide** 94:15 95:8
**wildly** 155:2
**willing** 86:19



witness 3:3 36:16
64:21 145:25
237:5 238:3,5
wondering 17:18
146:21 206:22
word 8:8 32:11
34:21 81:12 92:4
107:20 108:3,11
216:4,15,19
217:10,16 218:7
218:13,14 227:12
words 40:8 109:2
124:18 182:22
183:2 184:5
215:17 218:6
work 8:15,20 11:9
11:11,18 12:4
21:20,25 22:3,10
22:11,13 25:25
26:4,18 36:5
49:22 67:16 68:7
70:10 72:4 75:3
76:2 79:14 110:20
110:21 131:7
141:10 142:7
145:10 160:6,9
164:9 172:14
175:5
worked 7:21 10:14
11:4,22 12:2 13:2
13:6 20:9 36:7
working 11:16 13:9
25:23 74:4 101:10
101:16 156:20
174:21 208:6
209:3 229:2,25
workload 66:21
works 28:17
worksheets 149:18
worth 55:8 58:3
116:25 180:3
202:6
wouldn't 70:3 91:4
91:18,20 92:21
93:14 124:7 126:2
129:17 132:19

174:6
write 51:14 64:4
68:3 70:9 73:15
74:3,7 75:6,7
82:22 92:23
103:23 117:14
127:5 128:2 129:2
153:18 187:20
189:25 194:18
199:20 219:20
220:16
writes 66:3 87:21
88:15 89:19 92:20
100:6 199:11
232:16
writing 83:24 124:2
176:17 206:25
211:18,19 220:4
221:7 226:2
229:22,24
written 26:23,25
27:24 48:13 55:25
91:23,24 137:20
167:9 171:12
210:8 227:2
230:24
wrong 42:25 43:3
118:9 149:3 191:3
wrote 81:12 90:16
92:22 93:5 106:10
107:4 120:11
124:17 157:20
164:18 170:10,16
181:20 184:18
186:17,18 188:3,7
188:12,13 199:25
220:3 222:8,23
WW 206:18,19
236:16

X

x 1:4,10 78:16
135:25 140:22
141:19,20 144:9
146:19 147:21
149:15 234:3,11

235:3 236:3
XX 212:16 236:17

Y

year 9:14,17 15:21
16:23,24 31:18
45:20 90:11 98:22
130:14 213:19
215:18,21 223:10
223:11
years 9:5 10:15,17
11:15 16:9 34:3
36:8 44:4,5,10
45:3,6,22 46:3,4,5
46:6,15 54:13,22
56:2,13 58:5,9,21
59:19 60:7,10,18
60:19 68:23 79:9
79:9,10 83:8
94:25 96:2,2
98:14,19,21,24
99:2 111:21
115:20 119:24,25
158:17 168:11
170:4,25 178:3
180:9 187:5 200:5
202:5 214:17
215:11 233:2
yellow 210:8
yesterday 16:13
17:4
yesterday's 18:4
York 1:3,15,21,21
2:10,10 3:12 4:13
5:2 6:10 41:9 82:3
94:16 111:16
114:25 155:23
158:18 196:9,11
196:18
YR 215:17

Z

ZFA 184:25 185:2
zone 167:20 184:25
zoned 90:21 97:22
167:23,24 168:9

168:20
zones 98:6,6,7
zoning 52:21 96:10
97:22,25 98:3,10
149:15 150:4,6,7
150:7,12 155:23
155:24 165:14,17
165:24 166:25
167:5,13,17 169:7
169:15,20,22,23
188:17 207:21
208:9,16 209:5,7
209:23 210:2,22
zonings 168:23
169:3
Zoom 1:12 2:2 17:8
18:4 108:13

0

00 158:25
000707 164:3,12
235:22
000733 164:13
235:23
00133 183:11
001733 183:12,14
236:7
001749 183:15
236:8
002674 111:24
112:3 235:7
002675 112:4 235:8
003349 102:18,20
234:21
003463 125:12,15
235:10
003466 125:16
235:11
00347 30:14
003520 162:24
163:2 235:19
003521 163:3
235:20
003543 99:9,13
234:18
003544 99:14

234:19
004011 152:9,11
235:15
005310 186:9,12
236:10
005311 186:13
236:11
005436 130:23,25
235:13
005443 198:24
199:2 236:13
005733 157:13,15
235:17
07601 2:6

1

1 18:18 27:10 45:18
57:25 71:2 76:3
79:4 95:21 104:17
161:6 178:24
209:2 211:9
212:16 236:17
1.3 179:21
1.31 201:22 213:18
1.348 180:3 202:3
213:12,20 214:5
1.478 179:22
180:10 201:23
202:6 213:18
1:19-cv-06471 1:5
1:30 213:6
1:47 135:3
10 9:5 42:16 45:2,4
45:24 64:19 84:8
97:8 157:23
169:10 185:5,6,25
197:2 228:23
10/24 213:6
10:00 110:3,7
10:07 1:14
10:09 127:25
100 138:14 196:10
196:16
10017 2:10
10018 1:21
102 234:20



**109** 234:22
**10th** 226:18
**11** 39:16 42:8 46:23
88:20 99:7 103:14
153:2 167:24
171:23 186:9
187:9
**11:02** 232:16
**11:45** 99:20
**112** 235:6
**11th** 102:25 103:5
**12** 30:8 51:20,21
57:9 102:15 137:8
146:6 172:8
209:20
**121,000** 39:14
**125** 2:10 235:9
**12th** 1:20 52:24
57:8
**13** 48:8 102:14,15
**130** 235:12
**14** 109:9 114:6
**15** 5:25 39:16 65:2
98:21 105:25
106:17 111:23
140:5
**15,000** 157:23
**152** 235:14
**157** 235:16
**15th** 65:10 83:21
99:23
**16** 19:4,16 87:20
125:9 159:16
232:6
**162** 235:18
**164** 235:21
**17** 130:21 135:8,17
**1733** 175:12,15
235:25
**1749** 175:12,15
235:25
**175** 235:24
**17th** 137:23 140:17
147:22
**18** 23:8 45:18,23
52:9 83:7 135:23

140:15,25 144:9
234:14
**180,000** 145:7
**183** 236:6
**186** 236:9
**18th** 106:9
**19** 135:7 136:3
140:16 141:17
144:10 148:7
225:25 227:7,8,10
**1954** 55:19
**1962** 55:8
**198** 236:12
**1998** 23:8 52:9
**19th** 152:4

_____

**2**

**2** 20:18 31:23,23
32:6 95:22 170:5
206:17,19 209:2
214:3 225:15
226:6 236:16
**2,000** 93:9
**2,200** 45:14
**2,500** 44:23 208:4
**2.4** 208:13,21,24
**2:57** 84:19
**20** 5:25 9:5 18:19
18:22 44:4,10
46:15 58:5,9,21
59:19 60:7,10,18
60:19 66:5 79:8,9
79:10 96:2 98:15
98:22,24 104:21
106:3 107:9 108:6
115:20 119:23
124:18 126:2
139:19 158:17
163:8 168:11,20
170:4,6,24 178:3
180:9 187:5 200:4
202:5 214:17
215:17 223:10,11
225:25 226:2
227:7,8 234:14
**20-year** 45:23 46:6

60:14,15 96:12
98:19 99:3 134:16
168:7 170:18,21
176:5 177:9 181:9
187:22 188:9
189:3,9 190:22
193:23 199:23
200:6 205:2 215:4
**20,000** 41:24 42:16
44:11,14,14 158:7
158:13
**201** 236:14
**2012** 8:5,11,21,24
10:5
**2013** 8:5,5,11,21,24
10:3,4
**2014** 10:3,5 67:6
95:7,13
**2015** 95:13,20
**2016** 95:21
**2018** 18:19,22 19:4
19:16 21:17 27:4
28:12 29:18 30:9
47:10 51:7,20,22
57:9 70:18 71:4
71:21 137:8 146:7
159:11 172:7,8,15
209:20 234:14
**2019** 12:14 27:10
29:23 45:18 55:3
55:5,6,9 56:14
57:25 58:4 65:2
66:12 67:7 71:2
73:6 83:19,22
84:2,9 87:20
102:16 114:23
125:10 127:25
135:7,8,17 140:5
159:16 161:2
163:8 165:8
168:20 170:6
171:14 179:11
183:10 185:12
186:19 201:8,12
211:21 232:16
236:14

**2021** 1:14 17:8
238:7 239:11
**206** 236:16
**208** 2:6
**20th** 73:20 89:20,21
90:4 99:21 100:13
103:14 109:10,14
234:22
**21** 2:6 152:3 162:10
162:24
**21,000** 196:4
**212** 236:17
**21st** 110:3
**22** 157:11
**220,000** 145:7
**22nd** 126:21,24
**23** 1:14 159:15
238:7
**231** 234:8
**24** 71:3 162:21
171:21 186:19
211:21
**24th** 212:22
**25** 67:6,7 163:25
201:8,12 236:14
**250** 228:8
**25th** 100:23 199:11
**26** 175:9
**27** 135:7 165:8
183:8
**28** 186:6
**280,000** 145:3
182:16
**29** 198:22
**29,000** 148:23
**2940** 146:25
**2952** 90:16
**2953** 84:18

_____

**3**

**3** 23:8 33:6 162:6
172:19 182:11
234:7
**3,200** 42:4
**3,300** 38:19
**3,760** 37:20,23 40:3

42:3,7
**3,800** 38:19
**3:00** 185:25 186:2
**3:06** 87:20
**30** 55:22 179:11
183:10
**30,000** 97:8 132:13
**300** 228:9
**300,000** 37:4 39:14
39:17 40:22 57:15
72:12,22 147:15
**300,800** 37:19
57:10 61:5
**31** 125:10 127:25
201:7 232:16
**312,000** 144:25
**32** 139:20,23 211:8
**320** 1:20
**33** 206:15
**34** 224:21
**35** 113:6,10 214:22
**350,000** 72:15,23
73:2 130:14
**37th** 1:20
**39** 20:18,20 25:23
63:9
**396,000** 57:11

_____

**4**

**4** 23:23,24 35:20
54:4,21 65:23
104:15 144:8
149:7 171:4
176:12 182:6
185:21
**4,000** 38:14
**4,200** 42:5
**4.3** 229:14
**4.5** 228:14
**4:25** 231:16
**4:34** 233:13
**40** 55:22
**400** 44:22 45:14
**44** 99:9
**49** 183:12
**49-year** 215:2



**5**

**5** 30:2,13 36:21,23
    51:19 54:21 61:18
    63:22 64:7,8
    144:8 146:9 149:7
    209:22
**50** 5:19 7:6 55:25
    56:12,22 215:11
**50s** 86:12
**575** 184:24
**583** 176:12
**594,000** 57:12

**6**

**6** 47:6 51:20 52:4
    52:12,15 54:5,18
    54:20 57:19,20
    61:23 63:22,23
    73:6 83:19,22
    84:2,8 209:18
    225:17
**6:00** 101:15
**60** 5:13,19 7:6
**60s** 86:12
**624-6221** 1:21
**66** 125:13
**6th** 73:13,24 99:19
    100:21

**7**

**7** 64:24
**70** 55:25 56:13
    94:25
**70-years** 56:22
**708** 170:7
**733** 164:3
**75** 111:24
**7th** 2:10

**8**

**8** 51:6 55:16 56:17
    56:25
**8.5** 209:11
**8:00** 101:15
**80** 10:9 11:15 36:20
    37:3,20 48:23,25

    227:10
**800** 229:25
**840** 9:3 21:5 22:2
    22:14 23:5 65:14
    90:17 137:7 156:7
    171:13 173:12
    174:18 210:24
    211:17 227:15
    229:18
**866** 1:21

**9**

**9** 53:4 102:16 210:7
    226:8
**9.9** 53:4 210:7
**9/27/19** 164:19
    165:3
**9/9/19** 226:18
**90** 64:15 126:16
**99** 234:17
**9th** 103:8,9

