# EXHIBIT GGG

Page 1

1

2          UNITED STATES DISTRICT COURT

3          EASTERN DISTRICT OF NEW YORK

4

5    MCDONALD'S CORPORATION,      )

              Plaintiff,      )

6                              )

         vs.                  )No.

7                              )1:19-cv-06471

     VANDERBILT ATLANTIC        )(DLI)(SLT)

8    HOLDINGS LLC,              )

              Defendant.       )

9    _____    )

10

11

12          REMOTE VIDEOTAPED DEPOSITION OF

13                MORRIS MISSRY

14              New York, New York

15          Thursday, September 30, 2021

16

17

18

19    Reported By:

20    CATHI IRISH, RPR, CRR, CLVS

21

22

23

24

25

Page 2

1

2

3

4

5

6

7

8                    September 30, 2021

9                    10:10 a.m.

10

11          Remote videotaped deposition of

12      MORRIS MISSRY, with all participants

13      appearing via videoconference, before

14      Cathi Irish, a Registered Professional

15      Reporter, Certified Realtime Reporter,

16      and Notary Public of the State of

17      New York.

18

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S:

3

4         PASHMA STEIN WALDER HAYDEN, P.C.

5         Attorneys for Plaintiff

6              21 Main Street

7              Suite 200

8              Hackensack, New Jersey 07601

9         BY:   BRENDAN M. WALSH, ESQ.

10             DENISE ALVAREZ, ESQ.

11

12

13        MEISTER SEELIG & FEIN LLP

14        Attorneys for Defendant

15             125 Park Avenue

16             7th Floor

17             New York, New York 10017

18        BY:   HOWARD S. KOH, ESQ.

19

20

21

22

23

24

25

Page 4

1

2    A P P E A R A N C E S:   (cont'd)

3

4         WACHTEL MISSRY LLP

5         Attorneys for the Witness

6              885 Second Avenue

7              New York, New York 10017

8         BY:  DANI SCHWARTZ, ESQ.

9

10

11   ALSO PRESENT:

12        JIM ROBERTS, videographer

13        GRACIE ARAUJO, Veritext concierge

14        MICHAEL MEYER

15        STACY HOWARD

16

17

18

19

20

21

22

23

24

25

1

2          THE VIDEOGRAPHER:  Good morning.

3     We're going on the record at

4     approximately 10:10 a.m. on September

5     30, 2021.

6          Please silence any cell phones,

7     computer tones or other electronic

8     devices.  Audio and video recording

9     will continue to take place unless all

10    parties agree to go off the record.

11         This is media unit 1 of the

12    recorded deposition of Morris Missry

13    taken by counsel for the plaintiff in

14    McDonald's Corporation versus

15    Vanderbilt Atlantic Holdings LLC filed

16    in the U.S.  District Court, Eastern

17    District of New York, case number

18    1:19-cv-06471(DLI)(SLT).

19         My name is Jim Roberts here in

20    association with Veritext New York.  I

21    am the videographer.  The court

22    reporter is Cathi Irish, also with

23    Veritext.

24         All counsel consent to this

25    remote video arrangement, waive

Page 6

1

2          objections to this manner of reporting

3          and to the remote swearing in of the

4          witness.

5               Counsel will please state their

6          appearances beginning with noticing

7          counsel.

8               MR. WALSH:  Brendan Walsh, Pashma

9          Stein Walder Hayden, on behalf of

10         plaintiff McDonald's Corporation.

11              MS. ALVAREZ:  Denise Alvarez,

12         Pashma Stein Walder Hayden, on behalf

13         of McDonald's Corporation.

14              MR. KOH:  Howard Koh, Meister

15         Seelig & Fein, on behalf of defendant

16         Vanderbilt Atlantic Holdings LLC.

17              MR. SCHWARTZ:  Dani Schwartz,

18         Wachtel Missry LLP, representing the

19         deponent.

20   M O R R I S   M I S S R Y,  called as a

21         witness, having been duly affirmed by

22         a Notary Public, was examined and

23         testified as follows:

24   ///

25   ///

Page 7

1

2    EXAMINATION

3    BY MR. WALSH:

4         Q.    Good morning, Mr. Missry.   How

5    are you today?

6         A.    Great.   How are you?

7         Q.    Good, thanks.   You're an attorney

8    and I imagine you've participated in many

9    depositions before so I won't necessarily

10   go through all of the instructions I

11   normally give to attorneys, but especially

12   because we're conducting the deposition

13   today over Zoom, I just ask that you

14   please make sure to let me finish asking

15   my question before you begin your

16   response.   It just gets very difficult for

17   the court reporter over this medium to get

18   all of us, even harder than normal.

19             And you're represented by your

20   partner today, Mr. Schwartz?

21        A.    Yes.

22        Q.    Is there any reason such as

23   medication that would prevent you from

24   understanding my questions or giving

25   complete and accurate answers today?

```
 1                    MISSRY
 2        A.    No.
 3        Q.    Where are you taking the
 4   deposition from today?
 5        A.    In my office at 885 Second
 6   Avenue, 47th floor, New York, New York.
 7        Q.    Are you in the room alone?
 8        A.    I am.
 9        Q.    Okay.  Can you describe the
10   screens that are in front of you right now
11   just so I understand what you're looking
12   at?
13        A.    I'm looking at a computer screen.
14        Q.    Just one screen?
15        A.    Yes.
16        Q.    Okay.  Do you have any programs
17   open other than Zoom and Exhibit Share?
18        A.    No.
19        Q.    Okay.  So you don't have your
20   e-mail program open?
21        A.    Let me check.  I don't think so.
22              Just Zoom and the Veritext
23   Exhibit Share.
24        Q.    Perfect.  Okay.  And do you
25   understand that you're not allowed to have
```

```
 1                      MISSRY
 2    any private communications or chats with
 3    anyone while a question is pending?
 4        A.    Yes.
 5        Q.    If you need a break for any
 6    reason, just let me know and I'm happy to
 7    take a break so long as there's not a
 8    question pending.
 9              MR. SCHWARTZ:  And as we
10         discussed yesterday, I'm going to make
11         a quick objection/statement.  I just
12         wanted to wait until you were finished
13         with your preliminaries to do that.
14              MR. WALSH:  Sure.
15              MR. SCHWARTZ:  I don't know
16         whether you are or not.  You tell me.
17              MR. WALSH:  I'm just about ready.
18              MR. SCHWARTZ:  Okay, great.
19              I want to make a quick statement
20         on the record with respect to an issue
21         that I discussed on the phone
22         yesterday with plaintiff's counsel.
23         Mr. Missry, the deponent today, is a
24         non-party to the action.  He's
25         represented the defendant in this case
```

```
                                           Page 10

 1                          MISSRY

 2          as its attorney on matters relating to

 3          the underlying dispute in this action.

 4          He's appearing voluntarily today.

 5          He's prepared to testify to the extent

 6          that the questions are appropriate and

 7          do not seek privileged information.

 8          By appearing and testifying, he does

 9          not in any way for himself or for the

10          law firm Wachtel Missry waive or

11          vitiate the attorney/client privilege,

12          work product privilege, common

13          interest privilege, the Kovel doctrine

14          or Kovel privilege or any other

15          applicable privileges.  Those

16          privileges can be asserted by both

17          clients and attorneys, and objections

18          can be made by both clients which in

19          this action would be the defendant and

20          attorneys.  Questions implicating a

21          privilege are improper and if such

22          questions are asked, we will object

23          and our objections should be deemed a

24          continuing objection to any such

25          questions.  But to be clear and
```

```
 1                    MISSRY
 2         regardless of an objection, a specific
 3         objection placed on the record in
 4         response to a specific question,
 5         Mr. Missry's testimony should not be
 6         deemed to constitute a waiver or
 7         vitiation of any privilege.
 8              I'm putting this on the record
 9         now even though it's in advance of
10         questioning or substantive questioning
11         simply to avoid cluttering the record,
12         and I understand that I am not
13         claiming that plaintiff's counsel
14         agrees with our position but I'm
15         placing it on the record.
16              MR. KOH:  And on behalf of
17         defendant Vanderbilt Atlantic Holdings
18         LLC, I join in Mr. Schwartz's
19         statement.
20              MR. WALSH:  Okay, to be clear,
21         McDonald's disagrees with much of what
22         was just said.  I understand that you
23         may make privileged objections today.
24         I do not agree that an answer to a
25         question does not constitute a waiver.
```

```
 1                    MISSRY
 2       We don't agree to any selective waiver
 3       of the privilege in this matter.  So I
 4       just want to make clear that we are
 5       not agreeing or stipulating to
 6       anything that you just said.
 7  BY MR. WALSH:
 8       Q.   Mr. Missry, have you ever been
 9  deposed before?
10       A.   I believe so.
11       Q.   When was that?
12       A.   I really don't recall how long
13  ago it was.
14       Q.   Do you remember what type of case
15  it was?
16       A.   There was one maybe 25 years ago
17  in a real estate matter and one maybe
18  three, four years ago in another real
19  estate matter.
20       Q.   Okay.  And how often do you take
21  depositions?
22       A.   I generally don't.  I'm a real
23  estate attorney.
24       Q.   Okay.  So have you ever taken a
25  deposition?
```

```
                                        Page 13

 1                    MISSRY

 2         A.    In my glorified past as a

 3    litigator I have.

 4         Q.    But it sounds like it's been a

 5    long time?

 6         A.    It's been a long time.

 7         Q.    Well, if you don't understand any

 8    of my questions for any reason just let me

 9    know and I'll be happy to try to rephrase

10    it.

11         A.    Sure.

12         Q.    Have you ever been retained by a

13    party in any litigation or arbitration to

14    serve as an expert?

15         A.    I don't believe so.

16         Q.    And have you ever been accepted

17    by a court or an arbitration panel to

18    serve as an expert?

19         A.    I don't believe so.

20         Q.    What, if anything, did you do to

21    prepare for today's deposition?

22         A.    I read through some old e-mails.

23    I read the fair market option rider and

24    some correspondence.

25         Q.    Did you meet with anyone?
```

```
                                    Page 14
 1                     MISSRY
 2        A.    Did I meet with anybody, no, I
 3   didn't have any meetings with anybody, no.
 4        Q.    Did Vanderbilt, anyone at
 5   Vanderbilt or Vanderbilt's counsel send
 6   you any documents to review?
 7        A.    Yes.
 8        Q.    Who sent you documents?
 9        A.    I think Howard sent us a couple
10   documents.
11        Q.    Do you remember what documents
12   those were?
13        A.    Some e-mails, the option rider,
14   maybe the letter agreement that was signed
15   between the parties when we were talking
16   about retaining the third arbitrator --
17   third appraiser, sorry.
18        Q.    Do you recall approximately how
19   many documents they sent you?
20        A.    I think there were five or six
21   attachments.
22        Q.    Were those documents, did they
23   contain exhibit tabs on them?
24        A.    I'm not sure.
25        Q.    Did you have any conversations
```

Page 15

```
 1                    MISSRY
 2   with anyone at Vanderbilt or Vanderbilt's
 3   counsel in advance of your deposition
 4   today?
 5        A.   Yes.
 6        Q.   When was the last time you spoke
 7   with them?
 8        A.   I think we had a conversation
 9   with Howard and his partner, Stephen,
10   what, today's Thursday, I think Monday.
11   Monday or last week, I'm not sure.
12        Q.   What did you discuss during that
13   meeting?
14             MR. SCHWARTZ:  I'm going to
15        object to that on the grounds of
16        common interest privilege.
17             MR. WALSH:  Can you explain what
18        the common interest is?
19             MR. SCHWARTZ:  I think it's
20        self-evident that the witness has
21        acted as an attorney for the
22        defendant.  I'm objecting but the
23        witness can answer if the witness
24        knows -- has a responsive answer.
25             THE WITNESS:  Should I answer?
```

1                    MISSRY

2            MR. SCHWARTZ:  You can answer if

3        you understood the question and have

4        an answer to give.

5            THE WITNESS:  Brendan, can you

6        ask the question again?

7    BY MR. WALSH:

8        Q.   You said that you had a

9    conversation with Howard Koh and his

10   partner at Meister on Monday you thought?

11       A.   Yeah, the conversation.

12       Q.   I was asking what you discussed

13   during that meeting or that conversation.

14       A.   Howard and Stephen mentioned that

15   you may be asking a question about the 936

16   case.  It was pretty much about that.

17   There may have been one other thing but I

18   just don't recall what it was.

19       Q.   How long did the conversation

20   last?

21       A.   10 minutes.

22       Q.   So all you recall about that

23   conversation is that they said I may ask

24   questions about the 936 Second Avenue

25   case?

```
1                   MISSRY
2        A.    There was probably another thing
3    that they mentioned but I don't -- just
4    off the top of my head I don't recall.
5        Q.    Did you have any conversations
6    with anyone at Vanderbilt, say within the
7    last month or so?
8        A.    Yes.
9        Q.    Who have you spoken with?
10       A.    Sam Rottenberg.
11       Q.    Are you currently representing
12   Vanderbilt Atlantic Holdings?
13       A.    Since McDonald's commenced the
14   litigation, we haven't done anything for
15   them.
16       Q.    Okay.  So you're not currently
17   representing Vanderbilt?
18       A.    I'm not currently doing any work.
19   I still have an open retainer.
20       Q.    So what did you discuss with
21   Mr. Rottenberg last time you spoke?
22       A.    The last time we spoke I called
23   him to see how he was doing.  He was very
24   ill and I immediately hung up the phone
25   and wished him a speedy recovery.
```

Page 18

```
 1                        MISSRY
 2       Q.   You didn't discuss anything
 3   substantive about this case?
 4       A.   No.
 5       Q.   When was the last time you spoke
 6   with Tom Li?
 7       A.   Tom Li from Sam's office?  Not --
 8   not since -- I would say probably when
 9   you -- when McDonald's commenced the
10   litigation, we may have spoken then but
11   before then, during the course of the
12   discussions we were having with McDonald's
13   in September of '19, I guess it was.
14       Q.   Have you reviewed the transcripts
15   of any of the depositions that have
16   previously been conducted in this matter?
17       A.   No.
18       Q.   Did anyone send you those
19   transcripts?
20       A.   I don't recall.
21       Q.   Okay.  Approximately how many
22   times in the past year have you spoken
23   with an attorney from Meister Seelig &
24   Fein about Vanderbilt or the dispute
25   between McDonald's and Vanderbilt?
```

1              MISSRY

2          A.    Not very often.  Very few times.

3          Q.    And who have you spoken with when

4      you've spoken to them?

5          A.    Howard or Stephen.

6          Q.    And do you recall what the

7      purpose of those discussions were?

8          A.    I really don't recall having

9      anything substantive to discuss with them

10     except, you know, in the outset or at the

11     outset of the litigation.

12         Q.    Okay.  Did Vanderbilt or its

13     attorneys ever tell you or your law firm

14     to retain all documents that are

15     potentially relevant to this dispute?

16         A.    Probably.

17         Q.    Do you recall when?

18         A.    I would assume it would have been

19     at the outset of the case but I don't

20     recall.

21         Q.    Okay.  Before you had that

22     discussion -- was it a discussion or was

23     it in writing, you just don't remember?

24         A.    I don't recall.

25         Q.    Before that communication, had

Page 20

1                    MISSRY
2    you destroyed or discarded any documents
3    relevant to this litigation?
4         A.   No, I don't make a habit of
5    discarding or shredding any documents.
6         Q.   So you graduated from Cardozo Law
7    School; right?
8         A.   I did.
9         Q.   What year?
10        A.   1990.
11        Q.   When were you admitted to the
12   New York Bar?
13        A.   1991.
14        Q.   Are you admitted anywhere else?
15        A.   No.
16        Q.   And before you graduated from
17   Cardozo you graduated from the University
18   of Maryland; is that right?
19        A.   Yes.
20        Q.   What year did you graduate from
21   Maryland?
22        A.   1986.
23        Q.   What was your degree in?
24        A.   Communications.
25        Q.   Any minors?

```
                                        Page 21
 1                   MISSRY
 2        A.    No.
 3        Q.    What did you do in the period
 4   between graduating from college and law
 5   school?
 6        A.    I graduated December 1986.  In
 7   January 1986, my father was diagnosed with
 8   lung cancer and had surgery in March of
 9   19 -- sorry, 1987, January '87, March '87
10   and I worked in his business while he was
11   recovering until law school started in
12   August.
13        Q.    What kind of business?
14        A.    My father manufactured blank
15   videotapes at the time.
16        Q.    Other than serving as a lawyer,
17   do you hold any other professional
18   licenses?
19        A.    I have a broker's license, a real
20   estate brokerage license.
21        Q.    Is that active?
22        A.    I believe so.
23        Q.    Do you recall when you became a
24   licensed real estate broker?
25        A.    No.
```

```
 1                        MISSRY
 2        Q.   And is that something that you
 3   actively use or is it something that you
 4   obtained years ago and just like to keep
 5   active?
 6        A.   The latter.
 7        Q.   Okay.  Are you a member of any
 8   entities other than Wachtel Missry?
 9        A.   Yes.
10        Q.   Okay.  What types of entities are
11   they?
12        A.   I have a lot of passive
13   investments, a lot of active real estate
14   investments, an active luxury products
15   company.
16        Q.   What is the luxury products
17   company?
18        A.   What do you mean what is it?
19        Q.   What is the name of it?
20        A.   Icon Trade Services LLC.
21        Q.   What does Icon Trade Services do?
22        A.   Icon Trade Services imports
23   luxury products and resells them in the
24   United States.
25        Q.   Do you know if any of the
```

```
1                        MISSRY
2    entities that you are a member of are a
3    party to a ground lease?
4         A.    A ground lease?  It's a very
5    specific question, no.
6         Q.    Have you ever been a principal or
7    member of an entity that's a party to a
8    ground lease?
9         A.    I've been a principal or a member
10   of an entity that has been parties to net
11   leases.  Ground leases -- ground leases
12   are typically leases that people sign to
13   develop property.
14        Q.    And net leases that you're
15   referring to, were those for property as
16   well?  I'm just trying to understand what
17   the distinction --
18        A.    Yes.
19        Q.    Were you a founding partner of
20   Wachtel Missry?
21        A.    No.
22        Q.    But you're currently the managing
23   partner of the firm; right?
24        A.    I am.
25        Q.    And you're the chair of the
```

Page 24

1                           MISSRY

2     firm's real estate department; right?

3          A.   I am.

4          Q.   Approximately how many lawyers

5     are in your firm's real estate department?

6          A.   We combine our real estate and

7     corporate departments because our

8     corporate departments service our real

9     estate departments so I would say without

10    counting, 25 or 26.

11         Q.   Is it the biggest department in

12    the firm?

13         A.   It is.

14         Q.   The firm bio states that you've

15    been representing clients in real estate

16    matters throughout the word for the past

17    three decades.  Did you begin practicing

18    real estate law right out of law school in

19    1990?

20         A.   Yes.

21         Q.   Where did you begin practicing?

22         A.   At a firm called Mishaan Dayon &

23    Zalta.

24         Q.   How long were you there?

25         A.   I was there until the end of '94.

```
 1                      MISSRY
 2      Q.    And you practiced real estate law
 3   while you were there?
 4      A.    Amongst other things, yes.
 5      Q.    When did you join what is now
 6   Wachtel Missry?
 7      A.    The end of '94, beginning of '95.
 8      Q.    Have you ever represented a
 9   client in a negotiation of a ground lease
10   that contains a fair market rental value
11   provision in it?
12      A.    Yes.
13      Q.    Approximately how many times?
14      A.    I've been doing this for a very
15   long time, Mr. Walsh.  I can't tell you.
16   I've done hundreds, if not more leases in
17   my career with a lot of fair market value
18   provisions.
19      Q.    Have you ever represented a
20   client in connection with a fair market
21   rent valuation process like occurred here
22   under a ground lease before you
23   represented Vanderbilt Atlantic Holdings?
24      A.    Can you repeat that?
25      Q.    Have you ever represented a
```

```
                                        Page 26
 1                      MISSRY
 2    client in connection with a fair market
 3    rent valuation process under a ground
 4    lease before you represented Vanderbilt
 5    Atlantic Holdings in this matter?
 6         A.   Probably but I can't recall which
 7    ones.
 8         Q.   Do you recall approximately how
 9    many times?
10         A.   I don't.
11         Q.   But this was not the first time;
12    correct?
13         A.   No.
14         Q.   Do you recall if the New York
15    Court of Appeals, its 2008 decision in
16    936 Second Avenue LLP versus Second
17    Corporate Development Company ever came up
18    in any of those prior representations?
19         A.   I don't believe so.
20         Q.   And how about the New York Court
21    of Appeals 1996 decision in New York
22    Overnight Partners v. Gordon?
23         A.   I don't know.
24         Q.   Are you familiar with those
25    cases?
```

```
                                                      Page 27
 1                          MISSRY
 2         A.    I'm familiar with the 936 case as
 3    a result of this particular process.
 4         Q.    Before this case, had you ever
 5    come across that case before?
 6         A.    As I just said, I don't recall.
 7         Q.    What is your understanding of
 8    what the 936 Second Avenue case stands for
 9    or the rule announced in that case?
10         A.    My understanding is that absent a
11    provision in the lease, in a net lease in
12    particular, that says you don't have to
13    take the net lease into account, you take
14    the net lease into account.
15         Q.    Do you recall when you became
16    aware of that rule, even if it wasn't from
17    that specific case?
18         A.    I believe Tom Tener brought it to
19    my attention sometime in 2019 after we had
20    retained him, as part of I guess his
21    retention, he brought it up to me.
22         Q.    Now earlier you said you've
23    negotiated a lot of ground leases and net
24    leases over the course of your career.
25    You were not aware of that rule before Tom
```

```
                                            Page 28

 1                        MISSRY
 2     Tener brought it to your attention?
 3         A.   Not really.
 4         Q.   Do you recall -- would you agree
 5     that the 936 Second Avenue case and the
 6     rule you just described would implicate
 7     the way a ground lease would be negotiated
 8     though; right?
 9              MR. KOH:  Objection.  You may
10         answer.
11              THE WITNESS:  Can you repeat
12         that?
13     BY MR. WALSH:
14         Q.   Yeah, would you agree that --
15     I'll rephrase it.
16              Would you agree that noting the
17     rule described in 936 Second Avenue would
18     be important in negotiating a ground lease
19     that contains a fair market rent valuation
20     provision?
21              MR. KOH:  Same objection.  The
22         witness may answer.
23              THE WITNESS:  When we negotiate
24         fair market value provisions, we
25         typically negotiate really clear
```

Page 29

```
 1                    MISSRY
 2        provisions that give the attorneys or
 3        whomever is looking at those
 4        provisions at the particular point in
 5        time clear guideposts, if you will,
 6        guide rails, and so in a typical
 7        provision, we would negotiate a lot of
 8        different things.  I don't necessarily
 9        think we need to put in -- we would
10        have needed to be aware of that
11        provision in any particular ground
12        lease or net lease or regular space
13        lease because of the guide rails we
14        typically negotiate.
15   BY MR. WALSH:
16        Q.   So what you're saying is that
17   typically you would make clear one way or
18   the other whether encumbrances should or
19   should not be included in the valuation?
20        A.   Yes.
21        Q.   Has that always been your
22   practice for your -- for as long as you've
23   been practicing real estate law?
24        A.   Whenever I've negotiated these
25   provisions, yes.
```

```
                                        Page 30
 1                    MISSRY
 2       Q.    When did you begin representing
 3   Vanderbilt Atlantic Holdings?
 4       A.    I think at the beginning of 2019.
 5       Q.    So Vanderbilt produced a
 6   privilege log in this matter and the first
 7   date your name appears in the log is on
 8   January 22, 2019, so that sounds about
 9   consistent with your recollection?
10       A.    Sounds right.
11       Q.    Okay.  How did you come to
12   represent Vanderbilt?
13       A.    Sam Rottenberg called me.
14       Q.    And have you worked with Sam
15   Rottenberg in the past?
16       A.    Sam was involved in a matter,
17   very, very -- a very long time ago with a
18   friend of mine and so I got to know him
19   during that matter.  I don't think I was
20   ever retained on that matter but we had
21   several conversations.
22       Q.    Was Sam Rottenberg your primary
23   point of contact while you were
24   representing Vanderbilt?
25       A.    Yes.
```

```
 1                    MISSRY
 2       Q.   Who else did you work with at
 3   Vanderbilt on this matter?
 4       A.   Well, Tom Li was involved in
 5   providing information and sort of helping
 6   Sam with information flow, et cetera, but
 7   I basically spoke to Sam.
 8       Q.   So did you report to Sam in
 9   connection with this matter?
10       A.   Yes.
11       Q.   Okay.  And was Sam responsible
12   for making decisions in this matter?
13       A.   He was the client so we would
14   discuss a matter and ultimately every --
15   you know, all clients make the final
16   decisions.
17       Q.   Did you work with any other
18   lawyers in connection with your
19   representation of Vanderbilt?
20       A.   In my firm?
21       Q.   Your firm or other firms.
22       A.   Michael Meyer from McDonald's was
23   my counterparty.
24       Q.   How about lawyers who were also
25   working on behalf of Vanderbilt?
```

```
                                        Page 32
 1                    MISSRY
 2       A.   I don't believe there were any
 3   other law firms involved.
 4       Q.   Do you know who represented
 5   Vanderbilt before they retained you?
 6       A.   No.
 7       Q.   You never interacted with prior
 8   counsel in this matter?
 9       A.   No.
10       Q.   Have you ever been represented
11   Sam Rottenberg personally?
12       A.   No.
13       Q.   Have you ever represented the
14   Rabsky Group?
15       A.   No.
16       Q.   Are you familiar with the Rabsky
17   Group?
18       A.   I've heard of them, I've read
19   articles about them.  I know Sam does work
20   with them.  I don't know what their
21   relationship is but just anecdotal.
22       Q.   Did you know that the Rabsky
23   Group is involved in this matter?
24            MR. KOH:  Objection.  Go ahead.
25            THE WITNESS:  No.
```

```
                                           Page 33
  1                    MISSRY
  2    BY MR. WALSH:
  3        Q.    Do you know who the members of
  4    840 Atlantic -- sorry, do you know who the
  5    members of Vanderbilt Atlantic Holdings
  6    were when you were representing them?
  7        A.    I don't recall.  I thought it was
  8    Sam.
  9        Q.    Did you ever deal with a man
 10    named Simon Dushinsky in connection with
 11    this matter?
 12        A.    No.
 13        Q.    Do you know who he is?
 14        A.    No.
 15        Q.    Are you familiar with an entity
 16    called 840 Atlantic LLC?
 17        A.    If that's the name of the
 18    property owner then I would be.
 19        Q.    But you don't know if that's the
 20    name of the property owner?
 21        A.    I would have to take a look at my
 22    notes.
 23        Q.    How about 840 Atlantic Holdings
 24    LLC?
 25        A.    Same answer.
```

Page 34

```
 1                        MISSRY
 2        Q.    MMB Associates LLC?
 3        A.    I'm not sure.
 4        Q.    How about Anthony Musto?
 5        A.    I don't know who he is.
 6        Q.    Did Vanderbilt Atlantic Holdings
 7   pay your firm's bills in this matter?
 8        A.    Did Vanderbilt pay?
 9        Q.    Correct.
10        A.    Yes.
11        Q.    So Vanderbilt Atlantic Holdings
12   was responsible for your bills and paid
13   your bills?
14        A.    I don't recall who actually made
15   the payments but we would bill the client,
16   then we would get paid.
17        Q.    And you testified earlier that
18   Sam Rottenberg was the person at
19   Vanderbilt who had final authority to make
20   decisions on behalf of Vanderbilt; is that
21   right?
22             MR. SCHWARTZ:  Objection.
23             MR. KOH:  Same objection.  Go
24        ahead.
25             THE WITNESS:  Sam was the person
```

Page 35

```
 1                         MISSRY
 2         that I was dealing with who I believed
 3         was the owner of Vanderbilt and whom I
 4         took direction from.
 5    BY MR. WALSH:
 6         Q.    Did you have authority to make
 7    decisions on behalf of Vanderbilt without
 8    getting approval from Mr. Rottenberg?
 9         A.    I'm an advisor, not a decider.
10         Q.    Do you expect to be paid by
11    Vanderbilt or anyone else for the time
12    spent preparing for this deposition or for
13    sitting for this deposition today?
14         A.    If we're legally allowed to be
15    paid, I would have no problem being paid.
16    I don't know what's appropriate but I'm
17    not -- I was not induced or promised
18    anything to appear today.
19         Q.    Do you intend to bill Vanderbilt
20    or anybody else for your time today?
21         A.    I haven't thought about it.
22              MR. WALSH:  If we could, Gracie,
23         please pull up P69.
24              THE WITNESS:  Should I go look at
25         the --
```

```
                                      Page 36

 1                    MISSRY

 2    BY MR. WALSH:

 3         Q.   It should be in the marked

 4    exhibits folder.  If you click on it, you

 5    should be able to pull it up.  It is the

 6    lease dated March 18, 1998 between Anthony

 7    Musto and McDonald's Corporation for the

 8    property located at 840 Atlantic Avenue in

 9    Brooklyn with its amendments and

10    supplements.  Do you have it pulled up?

11         A.   I do.

12         Q.   Okay.

13              Have you reviewed the full

14    McDonald's lease before?

15         A.   I did back when I was retained,

16    yes.

17         Q.   And was the first time you

18    reviewed it when you were retained in

19    January 2019?

20         A.   It would have been either then or

21    right after we were retained.

22         Q.   Okay.  So you were not familiar

23    with this lease before you were retained?

24         A.   No.

25         Q.   Were you familiar with the
```

```
 1                    MISSRY
 2    property at 840 Atlantic Avenue?
 3         A.   No.
 4         Q.   For what purpose were you
 5    retained by Vanderbilt Atlantic Holdings?
 6         A.   To deal with the option exercised
 7    by McDonald's in the determination of the
 8    fair market rent in connection with that
 9    exercise.
10         Q.   And what did you understand the
11    goal of that fair market rent valuation
12    exercise to be?
13         A.   The goal was to determine what
14    the fair market rent was in accordance
15    with the lease.
16         Q.   Are you aware that Vanderbilt has
17    been seeking a rezoning of the property
18    since shortly after it acquired its
19    99-year ground lease in November 2017?
20              MR. SCHWARTZ:  Objection.  The
21         witness can answer.
22              THE WITNESS:  I was made aware of
23         it after I was retained.
24    BY MR. WALSH:
25         Q.   Okay.  And what did you know
```

Page 38

1                          MISSRY

2    about Vanderbilt's plans for the property

3    when you were retained?

4         A.   I was focused on this particular

5    assignment.  I'm not a zoning attorney.

6    It may have been mentioned to me but I

7    really wasn't focused in on it.  I don't

8    know what their plans were but I believe

9    they had -- or they -- if the zoning

10   change went through, they would have an

11   ability to get more density on the

12   property but again, this is anecdotal.

13        Q.   So you were not representing

14   Vanderbilt in connection with its

15   redevelopment plans or its efforts to

16   obtain a rezoning of the property?

17        A.   No, only with respect to the

18   determination of the fair market rental

19   value of the property.

20        Q.   Have you ever had discussions

21   with anyone about how Vanderbilt could use

22   the fair market rent valuation process in

23   the lease to get McDonald's off of the

24   property?

25        A.   It's not possible.

```
                                                    Page 39
 1                        MISSRY
 2        Q.   Why do you say it's not possible?
 3        A.   Because there's no termination
 4   option in the lease in my understanding.
 5        Q.   So have you ever had discussions
 6   with anyone about trying to use that
 7   process to get a higher rent than
 8   McDonald's may be willing to pay in order
 9   to constructively remove them from the
10   property?
11            MR. KOH:   Objection.   Go ahead.
12            THE WITNESS:   Again, the focus of
13        my retention was to deal with a fair
14        market rental value determination.
15        How that would impact the party is not
16        my -- it's not in my particular domain
17        or interest.
18   BY MR. WALSH:
19        Q.   Did you ever have discussions
20   with anyone about how this process could
21   be used to get the highest possible
22   estimate of fair market rent?
23        A.   I don't think I'd be going out on
24   a limb by stating that landlords typically
25   want the highest rent possible and tenants
```

```
 1                    MISSRY
 2   want the lowest rent possible.  You hope
 3   that they meet somewhere and resolve it
 4   before it goes to an arbitration or some
 5   process.  This was a very interesting
 6   lease.  It didn't have a process other
 7   than for appraisers to submit their
 8   opinions and then to compare them and
 9   average them.
10       Q.   So was your goal in advising
11   Vanderbilt to arrive at the most accurate
12   estimate of the fair market rent valuation
13   or the highest possible estimate?
14            MR. KOH:  Objection.  The witness
15        may answer.
16            THE WITNESS:  My goal was to
17        advise my client on the process and
18        the interpretation of the particular
19        lease clause.  I don't have any skin
20        in the game in terms of the highest
21        rent, the lowest rent, the average
22        rent.  It's not relevant to me.
23   BY MR. WALSH:
24       Q.   Did you have conversations with
25   anyone about methods to obtain a higher
```

```
                                        Page 41
 1                      MISSRY
 2    fair market rent valuation from an
 3    appraiser?
 4        A.   The appraiser's job is to
 5    appraise and determine the value of the
 6    property and I believe that based upon
 7    that appraisal or appraised value, you
 8    then determine the rent but that's not --
 9    again, that's not in my domain.  That's
10    the appraiser's job.
11        Q.   But appraisers need to be given
12    instructions on how to appraise the
13    property; right?
14        A.   Not if the lease clause sets
15    forth the process and the criteria.
16        Q.   We'll get to that in a little
17    bit.
18            MR. WALSH:  If we could pull up
19        P15, please.  This is a May 10, 2018
20        letter from Vanderbilt Atlantic
21        Holdings to McDonald's Corporation.
22            THE WITNESS:  Will that pop up
23        also here?  So here I just see the
24        P69.
25            MR. WALSH:  You may just need to
```

```
 1                      MISSRY
 2        click on the marked exhibits folder
 3        again and it should pop up in there.
 4             MR. KOH:  Or just refresh your
 5        screen.
 6             THE WITNESS:  Got it.
 7   BY MR. WALSH:
 8        Q.   Have you seen this letter before?
 9        A.   I believe I did.
10        Q.   Do you recall when you first saw
11   this letter?
12        A.   No.
13        Q.   Okay.  And because it's dated May
14   2018, you were not involved in the
15   preparation of this letter; is that right?
16        A.   That's correct.
17        Q.   And the client did not consult
18   with you in advance of sending that
19   letter?
20        A.   He did not.
21        Q.   Do you have any knowledge of the
22   information that was used to prepare that
23   letter?
24        A.   I don't.
25        Q.   Do you have any involvement in
```

```
 1                   MISSRY
 2   Vanderbilt's retention of BBG in 2018?
 3       A.   No.
 4       Q.   Do you have an understanding of
 5   what BBG was retained to do in 2018?
 6            MR. KOH:  Objection.  Go ahead.
 7            THE WITNESS:  I don't know.
 8       Maybe do an appraisal.  I don't know.
 9       I wasn't involved until 2019 with
10       Vanderbilt.
11   BY MR. WALSH:
12       Q.   Okay, so then you were also not
13   involved in Vanderbilt's retention of Tom
14   Tener in 2018; is that right?
15       A.   In 2018, no.
16       Q.   And just to be clear, did you
17   have any involvement with Vanderbilt
18   Atlantic Holdings or 840 Atlantic Avenue
19   before January of 2019?
20       A.   No.
21       Q.   Vanderbilt Atlantic Holdings
22   retained Republic Valuations in January
23   2019.  Were you involved at all with the
24   work that Vanderbilt was doing with
25   Republic Valuations?
```

Page 44

```
 1                        MISSRY
 2        A.    The name doesn't sound familiar.
 3    I dealt with a few appraisers.  I don't
 4    recall Republic.  If you give me names of
 5    people, that would be helpful.
 6        Q.    How about Esty Cohen?
 7        A.    No.
 8        Q.    Are you familiar with
 9    Metropolitan Valuation Services?
10        A.    The name sounds familiar.
11        Q.    David Lyon?
12        A.    Yes.
13        Q.    Okay.  And what do you know about
14    David Lyon and Metropolitan Valuation
15    Services?
16        A.    I believe that we retained or Sam
17    retained David to look at an appraisal or
18    two that had been done previously because
19    David had come recommended from somebody.
20    I don't recall who.  I think he did some
21    type of review.
22        Q.    Okay, but he was or Metropolitan
23    was retained by Vanderbilt and not your
24    firm; correct?
25        A.    I don't recall.
```

```
                                          Page 45
 1                     MISSRY
 2           MR. WALSH:  Gracie, if you can
 3      please mark the document Bates stamped
 4      VA 012072.
 5           (Exhibit P92, document Bates
 6      labeled VA 012072, marked for
 7      identification.)
 8  BY MR. WALSH:
 9      Q.   This document runs through the
10  Bates stamp VA 012079.  It's an e-mail
11  chain beginning with what appears to be a
12  calendar invite for February 6, 2019 and
13  ending with an e-mail on February 15,
14  2019.
15      A.   I don't see it here.
16           MR. KOH:  Gracie, can you let us
17      know when it's uploaded?
18           VERITEXT CONCIERGE:  Yes, it's
19      taking a second.
20           THE WITNESS:  Where do you press
21      to refresh this file thing?
22           MR. KOH:  Just go up to the
23      browser bar with the Web address and
24      hit return on it and it should be --
25      it's available now.
```

```
 1                    MISSRY
 2              VERITEXT CONCIERGE:  Yes.
 3    BY MR. WALSH:
 4         Q.   Do you see --
 5         A.   It's loading.  I have it here,
 6    okay.
 7         Q.   Okay.  If you could just take a
 8    moment to review this document and let me
 9    know when you're ready to discuss it.
10    It's now been marked as Exhibit P92.
11         A.   (Witness perusing document.)
12              Okay.
13         Q.   Okay, if you could turn to the
14    page ending with Bates number 077.
15         A.   Okay.
16         Q.   It should be the sixth page.  It
17    looks like David Lyon sent you a calendar
18    invite on February 6, 2019 for a call that
19    same day.
20              Do you see that?
21         A.   I do.
22         Q.   Do you recall why you spoke with
23    David that day?
24         A.   I assume it was to discuss his
25    retention.
```

1                    MISSRY

2       Q.    And what specifically about his

3    retention, do you recall?

4       A.    Other than looking at these

5    e-mails, no.

6       Q.    So you don't remember anything

7    about a phone call that you had with David

8    Lyon in early February 2019?

9       A.    On that date, no.

10      Q.    Do you know if Sam Rottenberg or

11   anyone else from Vanderbilt would have

12   also participated in that call?

13      A.    Possibly.  Probably.

14      Q.    Why do you say probably?

15      A.    Because it looks based upon -- I

16   don't actually -- that was a meeting in my

17   office.  I don't know.

18      Q.    And in this e-mail chain, it

19   discusses a meeting, looks like probably

20   the following week, February 12th at

21   1:30 p.m. in your office.  Do you recall

22   that meeting?

23      A.    I see it referenced here.  I see

24   it referenced here.  I don't recall the

25   actual meeting from a couple years ago,

```
                                      Page 48

 1                    MISSRY

 2    no.

 3        Q.   And do you know who participated

 4    in that meeting?

 5        A.   I don't recall.

 6        Q.   I know we're talking about two

 7    and a half years ago.

 8        A.   Yeah, I'm sorry, I don't mean to

 9    be -- I just -- I want to give you

10    accurate answers.  I don't recall who was

11    there.

12        Q.   Is it your practice to take notes

13    during meetings like this with an

14    appraiser?

15        A.   Sometimes.

16             MR. KOH:  I'll object to that

17        question but he's answered.  Go ahead.

18    BY MR. WALSH:

19        Q.   Do you recall if you took notes

20    for this meeting?

21        A.   I don't have any recollection.

22        Q.   And do you recall what Vanderbilt

23    asked Metropolitan to do?

24        A.   Other than what's in this e-mail

25    and the proposal, no.
```

Page 49

```
 1                    MISSRY
 2          MR. WALSH:  Okay.  Now if we
 3      could pull up what's previously marked
 4      as P24.
 5              THE WITNESS:  If someone can just
 6      let me know when something is posted,
 7      it would be helpful.
 8  BY MR. WALSH:
 9      Q.   I see it on my screen now.   I
10  find if I just click that marked exhibits
11  folder, it seems to be a little faster for
12  me than refreshing the whole screen.
13      A.   Which one?
14      Q.   P24.
15      A.   Okay.  I have it up here.
16      Q.   This is a document Bates stamped
17  VA 011918 through 924.  It's a --
18      A.   I see it.
19      Q.   Okay.  What is this document?
20      A.   It looks like a proposal to do
21  some work for Vanderbilt Atlantic
22  Holdings.
23      Q.   Does this refresh your
24  recollection about what Metropolitan
25  Valuation Services was retained by
```

```
                                                Page 50
 1                        MISSRY
 2    Vanderbilt to do?
 3         A.    Yes.
 4         Q.    And what was Metropolitan
 5    Valuation Services retained by Vanderbilt
 6    to do?
 7         A.    They were going to review the
 8    reports, I guess the appraisals performed
 9    by KTR and BBG, and there's a list of
10    things that they were going to be doing on
11    19 of the Bates stamp.
12         Q.    Was this work being requested in
13    connection with the fair market rent
14    valuation process under the McDonald's
15    lease?
16              MR. KOH:   Objection.   The witness
17         may answer.
18              THE WITNESS:   I'm sure it was
19         done in preparation for a process.
20    BY MR. WALSH:
21         Q.    Would that process have been the
22    fair market valuation process under the
23    McDonald's lease?
24              MR. KOH:   Objection.   You may
25         answer.
```

```
                                              Page 51

 1                        MISSRY
 2              THE WITNESS:  It wasn't part of
 3        that process.  It was preparatory
 4        work.
 5     BY MR. WALSH:
 6        Q.   But preparatory work for that
 7     process; right?
 8        A.   Yes.
 9              MR. KOH:  Same objection but it's
10        fine, he answered.
11     BY MR. WALSH:
12        Q.   And the scope of your
13     representation was only related to that
14     fair market rent valuation process; is
15     that right?
16        A.   Correct.
17        Q.   Now, the third bullet point down
18     it says, "The reviewer will check for
19     mathematical accuracy and appropriate
20     methodology used in the reports."
21              Do you see that?
22        A.   Yes.
23        Q.   Do you know if Metropolitan was
24     given a copy of the McDonald's lease?
25        A.   I don't know.
```

Page 52

MISSRY

1

2     Q.    Would it have been important for

3     Metropolitan to have been given a copy of

4     the lease in order to understand the

5     appropriate methodology to be used in the

6     reports?

7               MR. KOH:  Objection.  The witness

8          may answer.

9               THE WITNESS:  I don't think

10         Metropolitan was doing an appraisal of

11         the property.  I think they were just

12         doing a desk review of the already

13         performed two appraisals that were

14         done apparently I guess in 2018, you

15         mentioned?

16    BY MR. WALSH:

17    Q.    Correct.

18    A.    So not necessarily.

19    Q.    Do you know if those two

20    appraisals, specifically the KTR appraisal

21    and the BBG appraisal that are referenced

22    in P24, were those prepared also in

23    preparation for the fair market rent

24    valuation process under the McDonald's

25    lease?

1                    MISSRY

2        A.    I have no idea.

3        Q.    Did you give any directions to

4   Metropolitan Valuation Services in

5   connection with the work they were doing

6   for Vanderbilt at this time?

7        A.    What does direction mean?  I'm

8   not understanding the question.

9        Q.    So did you -- let me ask it this

10  way.  Did you interact at all with

11  Metropolitan insofar as the specific work

12  it was being asked to do?

13       A.    We spoke with David, we met with

14  David.  I don't give direction to

15  appraisers or folks like this because it's

16  just not my expertise.  So direction,

17  other than telling him we want a desk

18  review or asking him what services he

19  could provide, no.

20       Q.    And you're not aware if he was

21  given a copy of the McDonald's lease?

22       A.    I don't recall.

23       Q.    Do you know who initially reached

24  out to Metropolitan from Vanderbilt?

25       A.    I don't recall.  It could have

```
 1                    MISSRY
 2   been me, I just don't remember.
 3           MR. WALSH:  Okay, if we could
 4       please pull up what's been previously
 5       marked as P25.
 6   BY MR. WALSH:
 7       Q.   It should be available.  This is
 8   an e-mail with a lengthy attachment that
 9   spans from VA 012456 to 012483.  If you
10   could just take a moment and look at the
11   document and let me know when you're ready
12   for some questions and I'll direct you to
13   specific parts I'd like to speak with you
14   about.
15       A.   Okay.
16       Q.   So the e-mails on the first two
17   pages reference a meeting that happened on
18   February 12th and on the second page of
19   this document, Sam Rottenberg says, it was
20   a pleasure to personally get to meet with
21   you yesterday.  And then on the bottom of
22   the first page, David Lyon responded on
23   February 13th saying likewise Sam, it was
24   a pleasure meeting you both.
25               So does that refresh your
```

Page 55

```
 1                      MISSRY
 2    recollection who would have been at that
 3    meeting with Metropolitan on February 12,
 4    2019?
 5         A.   It seems as though it was me, Sam
 6    and David.  I don't know if Tom was there
 7    but he could have been.  Tom usually
 8    accompanied Sam to meetings so he could
 9    have been there.  I just don't recall.
10         Q.   And on February 26, 2019, David
11    Lyon from Metropolitan Valuation Services
12    sent you, Sam Rottenberg and Tom Li
13    Metropolitan's review of the KTR appraisal
14    report.
15              Do you see that?
16         A.   I see the e-mail.  I'm looking at
17    the February 26th e-mail, yeah.
18         Q.   Okay.  And attached to this
19    e-mail is the report itself.  Do you see
20    that?  It starts beginning at 464.
21         A.   I see the report.
22         Q.   Okay.  Did you review this report
23    when David sent it to you?
24         A.   I'm sure I did.
25         Q.   Do you know if you reviewed a
```

1                    MISSRY

2    draft of the report before David Lyon

3    circulated it on February 26, 2019?

4         A.    I don't recall.

5         Q.    And when you said you are sure

6    you did, why are you so sure that you did

7    read this report when it came in?

8         A.    Because he sent it to me in an

9    e-mail and we retained him for the

10   purposes of reviewing the two appraisals

11   so I'm assuming that I reviewed the

12   report.

13        Q.    On the first page of that

14   document in David Lyon's cover e-mail, he

15   wrote, "If I remember correctly, the issue

16   of the ground rent re-set was

17   intentionally not part of the initial

18   engagement for either KTR or BBG."

19             Do you see that?

20        A.    I do.

21        Q.    Do you know if that was correct

22   or not, that it was intentionally not part

23   of their initial engagement?

24        A.    I wasn't involved with this

25   process or with this property in '18 so I

Page 57

```
 1                    MISSRY
 2    don't know.
 3         Q.   Did you ever come to learn
 4    whether that was true or not?
 5         A.   I don't know.
 6         Q.   Okay.  The next sentence he says,
 7    "In that regard, it would be my opinion
 8    that both of the appraisal reports (or one
 9    or the other depending on your decision to
10    use either, or both in your preliminary
11    negotiations with McDonald's, or if you
12    are prepared to exchange either or both as
13    per the ground lease re-set schedule)
14    would need to be updated to a current date
15    of value and additional market data would
16    need to be reviewed/included."
17              Do you see that?
18         A.   Yes.
19         Q.   So does this refresh your
20    recollection about whether you had
21    discussions with David Lyon about the
22    McDonald's lease?
23         A.   To give you some context here,
24    Brendan, we were reviewing and speaking to
25    different appraisers for the purpose of
```

Page 58

1                        MISSRY

2      engaging in the process.  So David was one

3      of the folks that we were interviewing and

4      we asked him to do this review to get his

5      thoughts and to try to ascertain his

6      expertise, his credibility, et cetera.

7           Q.    A couple lines down at the bottom

8      of that second full paragraph, he wrote,

9      "In general, appraisals prepared for

10     litigation (or something similarly

11     scrutinized) will include a higher degree

12     of support and/or facts and figures and

13     supportive data."

14             Did you discuss with David this

15     matter potentially going into litigation?

16          A.    There's no process for going into

17     litigation or arbitration as other fair

18     market value provisions contemplate so I

19     don't know why I would.

20          Q.    Okay.  And what do you mean by

21     that there's no process for going into

22     litigation or arbitration as other fair

23     market value provisions contemplate?

24          A.    So the provision in question

25     provides that two appraisers come up with

Page 59

1                          MISSRY
2       their valuations, if you will, and I think
3       if they are more than 15 percent
4       different, the two appraisers hire a
5       third, the third gives his or her opinion
6       of value and then they average the three
7       together.  So that process is devoid of
8       any judicial or extrajudicial type
9       procedure.  So that's what I mean by that.
10          Q.   Do you know what or how did you
11      understand when David said that appraisals
12      prepared for litigation or something
13      similarly scrutinized, what did you
14      understand that to be referring to?
15          A.   I can't tell you what he meant.
16          Q.   Well, how did you understand it?
17          A.   How do I understand it now or how
18      did I understand it then?
19          Q.   Either.
20          A.   Well, I can tell you how I
21      interpret it now but I don't think that's
22      appropriate.  Similarly scrutinize.  There
23      is no litigation so when we do appraisals,
24      I'm assuming he means that both sides are
25      going to scrutinize the other side's

```
                                            Page 60
 1                      MISSRY
 2    appraisals to the extent that they have
 3    that ability to.  I assume that's what he
 4    meant.
 5        Q.   But you don't remember having any
 6    conversations with him about that?
 7        A.   I don't recall, no.
 8        Q.   If we can now turn to his review
 9    of the KTR report.
10        A.   What page is that?
11        Q.   It's the page ending in 464.  It
12    starts with that letter dated February 26,
13    2019.
14        A.   Okay.
15        Q.   The evidence in this case shows
16    that KTR prepared and provided a report to
17    Vanderbilt in August of 2018 but then
18    issued a revised report to Vanderbilt in
19    January of 2019.  Do you know why KTR
20    produced a revised report in January 2019?
21            MR. KOH:  Objection.  You may
22        answer.
23            THE WITNESS:  Is that the same --
24        I know that we retained KTR to issue a
25        letter of opinion of value.  I didn't
```

Page 61

1                        MISSRY
2          think it was in January.
3      BY MR. WALSH:
4          Q.    Right.  So I believe you're
5      referring to there was a report that was
6      issued to you in April of 2019 and then
7      another one in July 2019.
8          A.    Right.
9          Q.    KTR produced a revised report in
10     January 2019.  Do you have any knowledge
11     about that?
12         A.    I don't.  I may have seen it
13     subsequent to my retention but I don't
14     recall.
15         Q.    Okay, if you can turn to the next
16     page at the bottom.
17         A.    Okay.
18         Q.    It talks about some hypothetical
19     conditions and extraordinary assumptions
20     that KTR made in the report that was being
21     reviewed and that included that the
22     property would be rezoned under the
23     M-Crown proposal.  That's at the bottom of
24     465 and spilling out to 466.
25              Do you see that?

Page 62

```
 1                    MISSRY
 2       A.    Yes.
 3       Q.    And the bottom of 466,
 4    Metropolitan wrote, "As the proposed
 5    re-zoning initiative has not yet been
 6    approved, it is our opinion this valuation
 7    scenario is highly speculative as of both
 8    the effective date of value, and the date
 9    of the report."
10            Do you recall what that -- what,
11    if anything, that meant to you when you
12    read it?
13       A.    Again, I can read it now and tell
14    you what I think it means but at the time,
15    I don't recall.
16       Q.    And do you recall if you shared
17    this conclusion with KTR?
18       A.    I don't know.
19       Q.    Who would have made the decision
20    about whether or not to share conclusions
21    from this report with KTR?
22            MR. KOH:  Objection.  You may
23        answer.
24            MR. SCHWARTZ:  Objection.  You
25        may answer.
```

```
                                              Page 63

 1                    MISSRY
 2           THE WITNESS:  I don't know if
 3       that's a conclusion.  I don't think
 4       that's a conclusion.  I think that's
 5       an opinion but who would have made the
 6       decision?  It would have been a
 7       discussion between Sam and I and then
 8       we would have decided or Sam would
 9       have said okay, send it to them or
10       don't send it to them.
11   BY MR. WALSH:
12       Q.   Okay.  So you don't remember if
13   this opinion was shared with KTR or not?
14       A.   I don't remember.
15       Q.   Did you provide any advice to
16   Vanderbilt regarding whether the potential
17   for an upzoning could be considered as
18   part of the fair market rent valuation
19   under the lease?
20       A.   As I testified to before,
21   absolutely not.  I don't get involved in
22   determining values or acting like an
23   appraiser when I'm not.
24       Q.   Well, but my question was whether
25   you provided advice to Vanderbilt as to
```

Page 64

1                    MISSRY
2    that issue.  Do you recall if you provided
3    advice?
4         A.    I would not provide that advice
5    but no, I don't recall.
6         Q.    Isn't that a legal question?
7         A.    Not at all.  That's an appraisal
8    question.  Whether or not an appraiser
9    under its standards and rules can take
10   into account a potential upzoning of a
11   property in determining its valuation,
12   it's not a legal question at all.
13        Q.    But couldn't that issue also be
14   governed by the lease?
15        A.    The issue could be governed by
16   the lease if there was language in the
17   lease that provided for highest and best
18   use and potential or current upzonings of
19   a property.
20        Q.    So isn't it at least partly a
21   legal question then as to what can and
22   cannot be considered by the appraisers?
23             MR. KOH:  Objection.  The witness
24        may answer.
25             THE WITNESS:  No.

Page 65

1                    MISSRY
2    BY MR. WALSH:
3        Q.    Even though it involves or could
4    involve interpreting a contract?
5        A.    If interpreting a contract, an
6    appraiser would take a look at the
7    particular provision in determining what
8    the scope of the appraisal would be.
9        Q.    If you could please look at the
10   page ending in 468, specifically bullet
11   four, it's on page 5 of the desk review
12   prepared by Metropolitan Valuation
13   Services.
14       A.    I see it.
15       Q.    So that paragraph says, "Should
16   the appraisal be utilized in conjunction
17   with the ground rent re-set, the highest
18   and best use analysis as improved should
19   consider the encumbrance in place with
20   respect to the ground lease which
21   precludes near-term demolition.
22   Similarly, the tenant retains additional
23   option periods which would limit any
24   redevelopment opportunity."
25                What do you understand that

```
                                          Page 66
 1                      MISSRY
 2   paragraph to be?
 3        A.    I understand that to be David's
 4   opinion.
 5        Q.    But what was -- if you could just
 6   summarize what his opinion was.
 7              MR. KOH:  Objection.
 8              THE WITNESS:  You just read it.
 9   BY MR. WALSH:
10        Q.    How would you interpret that?
11        A.    I wouldn't interpret it.  I read
12   it and it's pretty clear what he means.
13        Q.    And does he mean that the
14   encumbrance of the lease would need to be
15   considered in the highest and best use
16   analysis if these appraisals are being
17   used as part of the fair market rent
18   valuation process under the McDonald's
19   lease?
20              MR. KOH:  Objection.  The witness
21        may answer.
22              THE WITNESS:  That's what he
23        says.
24   BY MR. WALSH:
25        Q.    Do you recall having any
```

1                    MISSRY
2   discussions with Vanderbilt about that
3   portion of Metropolitan's report?
4        A.   I don't recall.
5        Q.   Do you recall reading this
6   portion of Metropolitan's report?
7        A.   Specifically, no.
8        Q.   So you don't remember this
9   specific conclusion from the report?
10       A.   No.
11       Q.   Do you recall any discussions or
12  communications with anyone either inside
13  or outside Vanderbilt before Metropolitan
14  issued this report about whether
15  Vanderbilt's appraisal for the fair market
16  rent valuation process should consider any
17  encumbrance on the property including the
18  McDonald's ground lease for current
19  zoning?
20       A.   No, I don't recall.  The first
21  time I do recall is when Tom Tener brought
22  it up to me.
23       Q.   And when did Tom Tener first
24  bring it up to you?
25       A.   I think after we retained him,

Page 68

1                    MISSRY

2    sometime in the first quarter of 2019 or

3    so.

4        Q.   Okay.  So just to be clear, you

5    don't remember any communications or

6    discussions with anyone about whether the

7    encumbrances on the property should be

8    included in the fair market rent

9    valuations before Tom Tener brought it up

10   to you?

11            MR. SCHWARTZ:  Objection.  You

12        can answer.

13            THE WITNESS:  No, because it

14        wouldn't be under the guise of my

15        representations.  That's for an

16        appraiser to ascertain and to take

17        into account, not me.

18            MR. SCHWARTZ:  Brendan, I would

19        appreciate a very short bathroom or

20        coffee break.

21            MR. WALSH:  Why don't we take a

22        break now.  We've been going for an

23        hour and 20 minutes.

24            THE VIDEOGRAPHER:  Going off the

25        record at 11:31 a.m.  This is the end

```
                                              Page 69

 1                         MISSRY

 2        of media unit 1.

 3               (Recess taken from 11:32 a.m. to

 4        11:39 a.m.)

 5               THE VIDEOGRAPHER:  We're going

 6        back on the record, 11:39 a.m.  This

 7        is the beginning of media unit 2.

 8        Okay, you may proceed.

 9   BY MR. WALSH:

10        Q.   Mr. Missry, did you provide legal

11   advice to Vanderbilt about any of the

12   information, conclusions or opinions in

13   the Metropolitan Valuation Services report

14   that we were just looking at?

15        A.   No.

16        Q.   So why did you review it?

17        A.   As I mentioned before, we were

18   interviewing different appraisers for the

19   purposes of determining who we wanted to

20   use for this process.

21        Q.   And do you recall having any

22   discussions with Vanderbilt about that

23   specific paragraph on page 5 that we were

24   just talking about that references the

25   encumbrance of the lease?
```

```
 1                      MISSRY
 2        A.    I don't have any recollection.
 3        Q.    Did you speak with David Lyon
 4   after he issued his report?
 5        A.    I don't recall.
 6        Q.    Did you ask any questions about
 7   anything in his report?
 8        A.    I don't recall.
 9        Q.    Before the break, you mentioned
10   that the first time you spoke with anyone
11   about whether the encumbrance of the lease
12   should be included was when Tom Tener
13   reached out to you.  Do you recall that?
14        A.    Yes.
15        Q.    When was the first time you
16   discussed that issue with Vanderbilt?
17             MR. KOH:  Objection.  You may
18        answer.
19             THE WITNESS:  I don't recall
20        exactly.  I don't recall.
21   BY MR. WALSH:
22        Q.    Did Vanderbilt ask for legal
23   advice about the impact of the rule
24   described in 936 Second Avenue on a fair
25   market rent valuation process?
```

```
                                            Page 71

 1                        MISSRY

 2        A.    I don't recall.

 3              MR. SCHWARTZ:  Objection.

 4    BY MR. WALSH:

 5        Q.    You don't recall?

 6        A.    I don't recall.

 7        Q.    And do you recall, whether they

 8    asked for it or not, if you gave

 9    Vanderbilt legal advice on that issue?

10        A.    I responded to Tom Tener's e-mail

11    to me but I don't recall whether I spoke

12    to or when I spoke to Sam about it.

13        Q.    I mentioned another case at the

14    beginning of the deposition called

15    New York Overnight Partners.  Do you know

16    if you ever discussed that case with

17    Vanderbilt?

18        A.    I doubt it.

19        Q.    Are you familiar with that case?

20        A.    I'm not.

21              MR. WALSH:  If we could mark

22        VA 043064 as Exhibit P93.

23              (Exhibit P93, document Bates

24        labeled VA 043064, marked for

25        identification.)
```

```
                                           Page 72
 1                       MISSRY
 2    BY MR. WALSH:
 3        Q.    This is a document that spans
 4    through Bates number VA 043073.  It's a
 5    continuation of the e-mail string with
 6    David Lyon that we were just looking at.
 7             It's now available on my screen.
 8        A.    What is it marked as?
 9        Q.    Exhibit P93.
10        A.    Okay.
11        Q.    On the bottom of the first page,
12    there's an e-mail from you to David Lyon,
13    Sam Rottenberg with a copy to Tom Li dated
14    February 26, 2019.
15             Do you see that?
16        A.    I do.
17        Q.    And you're responding to the
18    e-mail we were just looking at where David
19    Lyon sent you a copy of his report on the
20    KTR report.
21             Do you see that?
22        A.    I do.
23        Q.    You wrote, "Thanks Dave.  What
24    additional information and/or support do
25    you think is necessary for each
```

```
                                        Page 73
 1                    MISSRY

 2    appraisal?"

 3           What specifically were you asking

 4    for?

 5           MR. KOH:  Objection.  You may

 6        answer.

 7           THE WITNESS:  I think he

 8        mentioned in his previous e-mail that

 9        additional support updated facts would

10        be suggested so I assume I was

11        responding to that -- to that comment

12        that he made.

13    BY MR. WALSH:

14        Q.   Okay.  Then David responded that

15    same day.  Do you recall if you had any

16    follow-up conversations with David about

17    your question or anything else relating to

18    his reports?

19        A.   I see the e-mails that you

20    presented me with but I don't recall.

21        Q.   And you don't recall whether you

22    discussed the lease encumbrance issue with

23    David; is that right?

24        A.   No, I have no recollection of

25    that.
```

```
 1                    MISSRY
 2      Q.   Now, at the bottom of that e-mail
 3   on the first page from David Lyon to you,
 4   it says, "KTR should include a land
 5   residual as additional support, and
 6   provide actual support for the 6.0 percent
 7   reset number."
 8           Did you discuss that issue with
 9   David?
10      A.   I have zero recollection.
11      Q.   Do you recall whether you
12   discussed this issue with Vanderbilt?
13      A.   No idea.
14      Q.   Do you recall if you discussed
15   this issue with Tom Tener or Shaun Kest of
16   KTR?
17      A.   No idea.
18      Q.   After KTR was retained, who was
19   dealing primarily with KTR, was it you or
20   Sam Rottenberg, some combination?
21      A.   I think it was a combination of
22   both of us but I think Tom had to do his
23   work so we were sort of just waiting for
24   him to do his work.
25      Q.   I'm not trying to suggest that
```

```
 1                        MISSRY
 2    this comment or any other comment or
 3    opinion from Metropolitan's report was
 4    shared.  Had it been shared, would it have
 5    been shared by you or by Sam Rottenberg
 6    with Tom Tener?
 7             MR. KOH:  Objection.
 8             MR. SCHWARTZ:  Objection.
 9             MR. KOH:  Objection.  The witness
10        may answer.
11             THE WITNESS:  Either of us.
12    BY MR. WALSH:
13        Q.  Do you recall when you first
14    communicated with Tom Tener or Shaun Kest
15    at KTR?
16        A.  It must have been after Sam
17    retained us.  I don't know exactly when.
18             MR. WALSH:  Okay, if we could
19        pull up P59, please.
20    BY MR. WALSH:
21        Q.  It's now available on my screen.
22    P59.  It's an e-mail chain.
23        A.  Yes.
24        Q.  027513 to 514.  The top e-mail is
25    an e-mail from looks like Tom Li to Shaun
```

Page 76

```
 1                    MISSRY
 2   Kest and Tom Tener dated February 25,
 3   2019, sending along your contact
 4   information.
 5        A.   Got it.
 6        Q.   Does it seem like late February
 7   2019 would have been around the time that
 8   you first spoke with KTR?
 9             MR. SCHWARTZ:  Objection.  You
10        may answer.
11             THE WITNESS:  Late February,
12        early March, sure.
13             MR. WALSH:  If we could pull up
14        P60, please.
15             VERITEXT CONCIERGE:  It's now
16        available.
17             THE WITNESS:  P60, 6-0?
18   BY MR. WALSH:
19        Q.   Yes.
20        A.   It's loading.  Got it.
21        Q.   Okay.  So on February 25, 2019,
22   Tom Tener sent an appointment, looks like
23   a calendar invite to Tom Li and Shaun Kest
24   for a meeting at your office at 885 Second
25   Avenue on February 28, 2019.
```

```
                                            Page 77
 1                    MISSRY
 2           Do you see that?
 3      A.    I see that.
 4           MR. SCHWARTZ:   Objection.
 5  BY MR. WALSH:
 6      Q.    Do you recall whether you had
 7  spoken with Tom Tener or Shaun Kest about
 8  setting up a meeting around this time?
 9      A.    I believe I did.
10      Q.    And what was discussed the first
11  time you spoke with them?
12      A.    I'm not sure if I spoke to Tom
13  before this meeting so I don't recall
14  that.
15      Q.    Okay.  But you do recall a
16  meeting at your office in looks like late
17  February, 2019 with KTR?
18      A.    I recall meeting him.  I don't
19  recall the date other than what I see on
20  this screen.
21      Q.    Okay.  So what was the purpose of
22  that meeting?
23      A.    The purpose of the meeting like
24  other meetings we had with others and
25  phone calls we had with others was to
```

1                    MISSRY

2    interview potential appraisers for this

3    assignment.

4        Q.    Who else attended the meeting?

5        A.    That day?

6        Q.    Yeah.

7        A.    It would have been Sam, myself,

8    probably Tom Li and Tom Tener.

9        Q.    And you described this as an

10   interview.  What types of questions were

11   the appraisers being asked at this

12   meeting?

13       A.    I don't recall the exact

14   questions.

15       Q.    Were you the only person asking

16   questions or were Tom Li and Sam

17   Rottenberg also asking questions?

18       A.    I'm sure we were all -- Tom Li is

19   relatively quiet so it's probably just me

20   and Sam.

21       Q.    Okay.  Do you recall discussing

22   KTR's experience in litigation?

23       A.    Possibly, but I don't recall.

24       Q.    And why would that have been

25   relevant?

```
 1                         MISSRY
 2         A.   I don't recall.
 3         Q.   Did you discuss KTR's experience
 4    in fair market rent valuation proceedings?
 5         A.   Possibly.  Probably, but I don't
 6    know.
 7         Q.   Do you recall anything about what
 8    was discussed at this meeting?
 9         A.   Specifically, no.  I can make
10    assumptions but if you're asking for
11    specific recollections, I just don't
12    remember.
13         Q.   How about a discussion of the
14    appraisal method to be used by the
15    appraisers?
16         A.   That's not -- it's just not my
17    bailiwick so I would never have that
18    discussion regarding the methodology of
19    someone doing the appraisal.
20         Q.   And is that because it's not a
21    legal issue?
22         A.   It's because, A, I don't know
23    what the methodologies necessarily are for
24    this particular type of appraisal; B, I
25    don't think it would be appropriate for me
```

```
                                              Page 80
 1                    MISSRY
 2    to tell an appraiser what to do just like
 3    it wouldn't be appropriate for an
 4    appraiser to tell me what to do.
 5         Q.   The potential engagement that you
 6    were interviewing KTR for, was that
 7    intended to be an entirely new engagement
 8    or an add-on to the work that KTR did in
 9    2018 before you got involved?
10              MR. KOH:  Objection.  The witness
11         may answer.
12              MR. SCHWARTZ:  Objection.
13              THE WITNESS:  Entirely, no.
14    BY MR. WALSH:
15         Q.   And do you recall discussing with
16    them how the work they might be retained
17    to do in 2019 would differ from the work
18    they did in 2018?
19         A.   No, because I wasn't familiar
20    with the 2018 work.  I wasn't representing
21    the client at the time.
22         Q.   But you had read Metropolitan's
23    review of KTR's prior work; right?
24         A.   Yes.
25         Q.   And had you reviewed KTR's 2018
```

Page 81

1                    MISSRY

2    report before you met with them?

3         A.   Before I met with Tom Tener?

4         Q.   Yeah.

5         A.   Speculation.  I mean I could

6    have.  I probably did.  I may have.  I

7    don't recall.

8         Q.   Okay.  And that report was not

9    prepared in connection with the fair

10   market value process in the McDonald's

11   lease; right?

12        A.   I have no idea.  I wasn't

13   representing Vanderbilt at the time.

14        Q.   Do you recall any discussions

15   during that meeting or before KTR was

16   retained about the prior report or reports

17   that KTR prepared for Vanderbilt?

18        A.   No.

19        Q.   Now you also met with Michelle

20   Zell of BBG around that time; right?

21        A.   Sounds familiar.

22             MR. WALSH:  If we could please

23        mark as Exhibit P94 VA 012525.  It is

24        a two-page e-mail chain.

25             (Exhibit P94, document Bates

```
                                          Page 82

 1                     MISSRY

 2         labeled VA 012525, marked for

 3         identification.)

 4    BY MR. WALSH:

 5         Q.    Before we get to that document,

 6    what was the purpose of meeting with BBG?

 7         A.    Same purpose as meeting and

 8    talking to the other appraisers.

 9         Q.    Because you and/or Vanderbilt

10    were considering retaining BBG to serve as

11    Vanderbilt's appraiser for the fair market

12    rent valuation process on the McDonald's

13    lease?

14         A.    Yes.

15         Q.    Do you recall who else attended

16    that meeting with BBG?

17         A.    I don't.

18         Q.    Safe to assume Tom Li and Sam

19    Rottenberg would have attended as well?

20         A.    Always safe to assume that it was

21    Sam.  I don't recall.  I don't recall the

22    meeting with Michelle frankly.

23         Q.    Is it safe to assume that Sam was

24    there because he was very involved in this

25    process?
```

1                    MISSRY

2          MR. KOH:  Objection.  You may

3      answer.

4          THE WITNESS:  Yeah.

5    BY MR. WALSH:

6      Q.    How would you describe Sam's

7    involvement in this process?

8      A.    I would describe Sam's

9    involvement as any other concerned

10   property owner that is trying to negotiate

11   and/or ascertain the rent for the

12   extension term.  It's a 20-year extension

13   term so it was a pretty important process.

14     Q.    So he was actively involved in

15   the process?

16     A.    Yes.

17     Q.    Okay, if you could pull up what's

18   now been marked as Exhibit P94.

19     A.    Okay.

20     Q.    There's two e-mails or I guess

21   really maybe three if you count the

22   appointment on the second page.

23          The bottom e-mail on the first

24   page is an e-mail from Michelle Zell at

25   BBG dated February 28, 2019.  It's to you,

Page 84

```
 1                    MISSRY
 2    Tom Li, Abel Santamaria and Sam
 3    Rottenberg.  And she says, "Hi.  It was a
 4    pleasure meeting you today."  And then she
 5    provides contact information for three
 6    other appraisers.
 7            Do you recall why she sent you
 8    the contact information for these three
 9    appraisers, specifically Brian Corcoran at
10    Cushman, Dan Sciannameo at Albert
11    Valuation Group, and Theresa Nygard at
12    KTR?
13        A.   I asked all the appraisers that I
14    spoke to or met with for their
15    recommendations for great appraisers so
16    she was probably responding to that
17    request.
18        Q.   And why were you looking for
19    great appraisers?
20        A.   We wanted to interview several
21    appraisers and I was getting
22    recommendations.
23        Q.   Were these additional appraisers
24    that you were inquiring about, were you
25    considering them to potentially hire on
```

Page 85

1                        MISSRY
2    behalf of Vanderbilt or as a neutral in
3    this process?
4         A.   No, on behalf of Vanderbilt.  We
5    didn't get to -- we wouldn't even be
6    discussing the third appraiser until both
7    letters of opinion of value were submitted
8    and done.  We were just trying to get the
9    proper and most well-suited appraiser that
10   was familiar with Brooklyn, was familiar
11   with downtown Brooklyn in these types of
12   matters.
13        Q.   So besides Michelle Zell of BBG
14   and Tom Tener of KTR, who else did you
15   interview to potentially serve as an
16   appraiser?
17        A.   I think we interviewed Dave Lyon
18   as I mentioned before.  I think I called
19   Amanda Aaron because she's the first
20   person in my contact list and I knew from
21   previous engagements she was someone who
22   did a lot of appraisals.  I'm not sure who
23   else I may have spoken to.
24        Q.   Do you recall in any of these
25   meetings discussing whether the

```
 1                    MISSRY
 2   encumbrance of the lease or current zoning
 3   would need to be factored into the
 4   appraisal to be prepared for Vanderbilt?
 5       A.   I have no recollection.
 6       Q.   Did BBG express interest in
 7   serving as Vanderbilt's appraiser?
 8       A.   I'm not sure.
 9       Q.   Did any of the people you spoke
10   with not express interest in serving as
11   Vanderbilt's appraiser?
12       A.   Yes.
13       Q.   And did they give reasons why?
14       A.   I believe so.
15       Q.   Who do you recall?
16       A.   I think Amanda said it wasn't in
17   her field of expertise, she wasn't
18   familiar with this type of assignment.
19   That's what I recall with respect to her.
20   Michelle, I'm not sure.  You can read into
21   her e-mail giving me three different
22   appraisers.  Maybe it wasn't within her
23   bailiwick but I don't know.  I don't
24   recall that.
25       Q.   So do you recall whether BBG
```

```
 1                        MISSRY
 2    opted out serving as Vanderbilt's
 3    appraiser?
 4        A.    I don't recall that.
 5             MR. WALSH:  Okay, if we can pull
 6        up what's been previously marked as
 7        P28.
 8             THE WITNESS:  Okay.
 9    BY MR. WALSH:
10        Q.    So this is a cover e-mail with
11    the Bates stamp VA 015989.  It spans
12    through 996.  It's an e-mail from Abel
13    Santamaria in your office to Tom Tener
14    attaching a signed copy of a retainer
15    letter dated March 8, 2019, as well as a
16    copy of a check from Vanderbilt Atlantic
17    Holdings to KTR in the amount of $15,000.
18             Do you see that?
19        A.    I do.
20        Q.    Is Abel Santamaria your
21    assistant?
22        A.    He is.
23        Q.    Who drafted this letter, this
24    engagement letter?
25             MR. SCHWARTZ:  Objection.  You
```

```
 1                    MISSRY
 2        can answer if you know.
 3               MR. KOH:  Same objection.  Go
 4        ahead.
 5               THE WITNESS:  I don't know who
 6        drafted it.
 7     BY MR. WALSH:
 8        Q.    Do you recall if you drafted it?
 9        A.    I did not draft this.
10        Q.    Do you recall going back and
11     forth with KTR about the contents of this
12     letter?
13        A.    I don't think I can go back and
14     forth with KTR.  This is their retainer
15     letter.
16        Q.    But it explains the type of work
17     and the purpose?
18        A.    Um-hum.
19        Q.    And would you have read this
20     letter before signing it?
21        A.    Sure.
22        Q.    And if you had disagreed with
23     anything in here, would you have put that
24     disagreement somewhere?
25        A.    Hypothetically, yes.
```

1                       MISSRY

2          Q.    Now, why did your firm retain KTR

3     to serve as Vanderbilt's appraiser for the

4     fair market rent valuation process?

5          A.    I don't know.   It's just

6     appropriate to do that.

7          Q.    Why do you believe it's

8     appropriate to do that?

9          A.    Because we were retained to

10    represent the client in connection with

11    this process so we generally retain the

12    professionals.

13         Q.    Did you retain any other

14    appraisers in connection with your

15    retention by Vanderbilt?

16         A.    I don't know who retained David

17    Lyon but no, we didn't retain any other

18    professionals.

19         Q.    And this retention agreement was

20    to retain KTR specifically to serve as

21    Vanderbilt's appraiser for purposes of the

22    fair market rent valuation process in the

23    McDonald's lease; right?

24         A.    Yes.

25         Q.    If we could, looking at the first

```
                                            Page 90

 1                    MISSRY

 2    page of the agreement, second paragraph,

 3    about halfway down on the right-hand side,

 4    it begins with "It is anticipated that the

 5    FMV."

 6         A.   I'm sorry, where are you?

 7         Q.   It's the second full paragraph.

 8         A.   I got it, I got it.

 9         Q.   It says, "It is anticipated that

10    the FMV will be based on the standard

11    market data approach technique for valuing

12    vacant land," and in parentheses it says,

13    "the sales comparison approach."

14              Do you see that?

15         A.   I do.

16         Q.   Do you recall why that language

17    was included in this agreement?

18         A.   It seems like Tom took the lease

19    provision and incorporated a bunch of

20    things from the lease provision into his

21    retainer letter.

22         Q.   And do you recall that the option

23    rent addendum refers to something called

24    the standard market data approach?

25         A.   If you put it in front of me I'll
```

Page 91

```
 1                    MISSRY
 2   recall it but, you know, I'm assuming he
 3   copied this from that addendum.  It
 4   references the addendum so I assume it's
 5   in there.
 6        Q.   So did you recommend that he use
 7   or that KTR use the sales comparison
 8   approach for his valuation?
 9        A.   Absolutely not.
10        Q.   Did you provide KTR with any
11   directions about the approach or
12   methodologies or assumptions to be used
13   for purposes of their valuation?
14        A.   The only thing that I gave Tom
15   Tener my opinion on was the 936 case.
16        Q.   But that was after this
17   engagement letter was drafted; right?
18        A.   I don't know that they -- I would
19   assume it would be afterwards because they
20   didn't begin the process until after this
21   was signed.
22        Q.   Now, do you recall whether you
23   compared the language in this engagement
24   letter to the language in the option rent
25   addendum to the lease?
```

```
                                              Page 92

1                        MISSRY

2          A.    I assume I did.

3          Q.    Okay.  And you would have done

4     that to make sure that he was appraising

5     the property in compliance with the option

6     rent addendum; is that right?

7          A.    He was sent the lease and he was

8     sent the option rent addendum and his role

9     was to appraise the property and determine

10    the fair market rental value in accordance

11    with that addendum.

12         Q.    I'm going to jump ahead but I

13    know that eventually in June of 2019 you

14    had a meeting with McDonald's and

15    McDonald's appraiser.  Before that

16    meeting, so anywhere from the time you

17    were retained until that meeting, do you

18    recall having any discussions with

19    Vanderbilt about the specific appraisal

20    method to be used by KTR in its valuation?

21         A.    No, I don't recall.

22         Q.    So on the second page, second

23    paragraph, last sentence.

24         A.    Second page, second paragraph,

25    last sentence, okay.
```

Page 93

1                        MISSRY
2        Q.   It says, "The report will be
3    prepared subject to the attached Basic
4    Assumptions and Limiting Conditions."  And
5    then those basic assumptions and limiting
6    conditions are listed at pages 4, 5 and 6.
7    The third point on page 4 under Basic
8    Assumptions and Limiting Conditions says,
9    "The property is appraised free and clear
10   of any or all liens or encumbrances unless
11   otherwise stated."
12            Do you see that?
13       A.   I do.
14       Q.   So what did you do before you
15   signed this letter to confirm that that
16   was correct and appropriate?
17       A.   I don't recall.
18            MR. SCHWARTZ:  Objection.
19            MR. KOH:  Same objection.
20   BY MR. WALSH:
21       Q.   And you don't recall any specific
22   conversations about that basic assumption
23   and limiting condition?
24       A.   I don't recall.
25       Q.   Do you recall providing any legal

Page 94

```
 1                    MISSRY
 2   advice to Vanderbilt about that assumption
 3   and limiting condition?
 4       A.   No, I don't recall.
 5       Q.   A little further down in the
 6   second page, it says, "In order to
 7   initiate the assignment, the following
 8   information, if available, should be
 9   provided as soon as possible."  And the
10   first bullet point is "Copies of any
11   leases that encumber the properties."
12            Do you see that?
13       A.   I do.
14       Q.   What did you do to comply with
15   KTR's request to provide copies of any
16   leases that encumber the properties?
17            MR. SCHWARTZ:  Objection.
18            MR. KOH:  Same objection.
19            THE WITNESS:  Either myself or
20        Vanderbilt would have provided any
21        information that was requested by Tom.
22   BY MR. WALSH:
23       Q.   Here he specifically requested
24   copies of any leases that encumber the
25   properties; right?
```

```
                                            Page 95

 1                    MISSRY

 2       A.    Yes.

 3       Q.    So did you take any steps to

 4   provide KTR with copies of the leases that

 5   encumber the properties including the

 6   McDonald's lease and Vanderbilt's ground

 7   lease dated November 30, 2017?

 8       A.    Sam, Vanderbilt or myself or

 9   someone from my office would have provided

10   them with the information that they

11   requested.

12       Q.    Okay.  Tom Tener has testified

13   that he was never provided a copy of

14   Vanderbilt's ground lease dated November

15   30, 2017.  Do you recall ever providing

16   that document to him?

17          MR. SCHWARTZ:  Objection.  You

18       can answer.

19          THE WITNESS:  I don't necessarily

20       recall that ground lease.  No, I don't

21       recall.

22   BY MR. WALSH:

23       Q.    Had you ever reviewed that ground

24   lease?

25       A.    I don't know.
```

1                    MISSRY

2       Q.    So you're not sure if you've seen

3   it?

4       A.    I don't know if I've seen it.   I

5   don't.

6       Q.    Were you aware of it at the time?

7       A.    I don't recall.

8       Q.    And so do you believe that if

9   anyone should have provided it that should

10  have been Sam Rottenberg?

11            MR. KOH:   Objection.  You may

12        answer.

13            MR. SCHWARTZ:   Objection.

14            THE WITNESS:   Either myself or

15        Sam and his team -- sorry, either

16        Wachtel Missry or Vanderbilt would

17        have provided any appraiser with the

18        information that they requested.

19  BY MR. WALSH:

20      Q.    Can you think of any reason why

21  any information that was requested would

22  not have been provided?

23      A.    No.

24      Q.    If we could please pull up what's

25  been previously marked as P4.   And by the

```
 1                        MISSRY
 2    way, this portion of the engagement letter
 3    that we were just looking at also asks for
 4    additional information such as zoning
 5    analysis, development plans, details of
 6    the most recent transfers, contracts of
 7    sale, current listings.  It also asks for
 8    the most recent minutes or releases
 9    relating to the M-Crown proposed rezoning.
10    Who would have been responsible for
11    sending that information to KTR?
12         A.   In all likelihood, Vanderbilt.
13         Q.   And why do you say that?
14         A.   Because they were the repository
15    of all information.  They had all the
16    information, it was their property.
17         Q.   If you could pull up P4, this is
18    the November 30, 2017 ground lease between
19    MMB Associates LLC as landlord and
20    Vanderbilt Atlantic Holdings LLC as tenant
21    for the property located at 840 Atlantic
22    Avenue, Brooklyn.
23         A.   I see it.
24         Q.   Does this refresh your
25    recollection at all as to whether or not
```

1                    MISSRY

2    you've ever seen this ground lease?

3        A.    No.

4        Q.    Now discovery in this case has

5    revealed that Vanderbilt has described

6    this November 30, 2017 ground lease as a

7    ground lease between related parties.  As

8    an experienced real estate attorney, what

9    does that phrase mean to you?

10            MR. KOH:  Objection.  You may

11        answer.

12            THE WITNESS:  It means that there

13        is some legal relation between the

14        landlord and the tenant.

15    BY MR. WALSH:

16        Q.    And when you say some sort of

17    legal relation, what do you mean by that?

18    Is there any sort of minimum relationship

19    that would be required to make something a

20    related party lease?

21        A.    Not necessarily.

22        Q.    Are related party leases

23    generally negotiated at arm's length?

24            MR. KOH:  Objection.  You may

25        answer.

```
                                            Page 99

 1                    MISSRY
 2            MR. SCHWARTZ:  Objection.
 3            THE WITNESS:  I don't know who
 4       MMB is.  I don't know how this was
 5       negotiated.  I'm not sure I ever saw
 6       it before so I just can't answer that
 7       question.
 8   BY MR. WALSH:
 9       Q.   Well, my question is in your
10   experience, are leases between related
11   parties generally negotiated at arm's
12   length?
13            MR. KOH:  Objection.  The witness
14       may answer.
15            MR. SCHWARTZ:  Objection.
16            THE WITNESS:  They absolutely
17       could be.  It depends on the
18       relationship between the two parties.
19   BY MR. WALSH:
20       Q.   Okay.  Are you aware that this
21   lease provides that if McDonald's leaves
22   the property before November 2027 and the
23   property has not been rezoned by that
24   time, Vanderbilt would pay annual rent to
25   MMB in the amount of $360,000 per year?
```

```
                                         Page 100

 1                     MISSRY
 2              MR. SCHWARTZ:  Objection.
 3              THE WITNESS:  No.
 4    BY MR. WALSH:
 5         Q.   Are you aware that so long as
 6    McDonald's remains on the property,
 7    Vanderbilt must pay over every dollar of
 8    rent it receives from McDonald's to MMB
 9    Associates?
10         A.   No.
11         Q.   So you were not aware of either
12    of those facts before right now?
13         A.   I was not.
14              MR. SCHWARTZ:  Objection.
15    BY MR. WALSH:
16         Q.   Do you believe that information
17    in this lease would have been relevant to
18    KTR's engagement?
19              MR. KOH:  Objection.  The witness
20         may answer.
21              THE WITNESS:  No.
22    BY MR. WALSH:
23         Q.   Why do you say that?
24         A.   KTR was retained to determine
25    what the fair market rental value of the
```

Case 1:19-cv-06471-DLI-ST   Document 62-31   Filed 06/24/22   Page 102 of 260 PageID #: 3472

1                    MISSRY

2    premises was and having a 99-year ground

3    lease is irrelevant.  It's tantamount to

4    ownership of the property.  So no, I don't

5    think it has anything to do with KTR's

6    ability to appraise the fair market rental

7    value of the property.

8         Q.    Okay, but KTR had asked for

9    leases that encumber the properties;

10   right?

11        A.    Yeah, but that wasn't your

12   question.  Your question was should they

13   have been provided with this and what

14   effect would it have.  I don't see --

15        Q.    But -- I'm sorry.

16              Cathi, I'm sorry.  Did you get

17   that?  I interrupted and I should not

18   have.

19              And I guess you have never seen

20   it before but it contains rent provisions

21   and you know it was only negotiated in

22   November -- it was signed in November of

23   2017 and it contains provisions dictating

24   the rent that Vanderbilt will pay to MMB

25   for its ground lease.  You don't think

```
                                              Page 102
 1                         MISSRY
 2     that information would have any relevance
 3     to the rent that McDonald's might owe
 4     under its ground lease?
 5              MR. KOH:  Objection.  The witness
 6          may answer.
 7              MR. SCHWARTZ:  Objection.
 8              THE WITNESS:  I take it as
 9          zero -- zero effect or correlation to
10          the rent that McDonald's is required
11          to pay under their lease.
12     BY MR. WALSH:
13          Q.   Okay.  Whose decision was it to
14     not provide the Vanderbilt lease to KTR?
15              MR. KOH:  Objection.  You may
16          answer.
17              MR. SCHWARTZ:  Objection.
18              THE WITNESS:  I have no idea.  I
19          don't know if it was provided or not
20          provided.  I don't recall seeing this.
21     BY MR. WALSH:
22          Q.   Do you recall any discussions
23     with Vanderbilt about complying with KTR's
24     request to provide copies of leases that
25     encumber the properties?
```

```
                                      Page 103

 1                    MISSRY

 2       A.   Vanderbilt or Wachtel Missry

 3   would have provided information requested

 4   by KTR.  If something wasn't provided, I

 5   don't know.

 6       Q.   So if something was not provided,

 7   that would have been somebody else's

 8   decision, not yours?

 9            MR. KOH:  Objection.  Go ahead

10       and answer.

11            MR. SCHWARTZ:  Objection.

12            THE WITNESS:  Yes.

13   BY MR. WALSH:

14       Q.   And that would have been Sam

15   Rottenberg's decision?

16            MR. KOH:  Objection.  The witness

17       may answer.

18            THE WITNESS:  I don't know.

19   BY MR. WALSH:

20       Q.   Who else could have made that

21   decision?

22       A.   No idea.

23            MR. KOH:  Same objection.

24            THE WITNESS:  You mentioned

25       before that Sam may not have been the
```

1                    MISSRY

2        owner of Vanderbilt so I don't know.

3        You're confusing me.

4             MR. SCHWARTZ:  I was going to say

5        why don't we take the break now.

6             MR. WALSH:  Yes, why don't we

7        stop for lunch now and how long does

8        everybody need?  Why don't we go off

9        the record first.

10            THE VIDEOGRAPHER:  Off the record

11       at 12:25 p.m.  This is the end of

12       media unit 2.

13            (Lunch recess taken at

14       12:25 p.m.)

15

16

17

18

19

20

21

22

23

24

25

                       MISSRY

1              A F T E R N O O N    S E S S I O N

2                  (Time noted:  1:04 p.m.)

3        M O R R I S    M I S S R Y,    resumed and

4              testified as follows:

5                      THE VIDEOGRAPHER:  Going back on

6              the record at 1:04 p.m.  This is the

7              beginning of media unit 3.  You may

8              proceed.

9        CONTINUED EXAMINATION

10       BY MR. WALSH:

11            Q.    Mr. Missry, can you just please

12       confirm that you still have all screens

13       other than -- all programs other than Zoom

14       and Exhibit Share closed and that you

15       don't have a phone on or not looking at

16       your phone right now?

17            A.    I do have to close my Outlook so

18       just give me a second.

19            Q.    Okay.

20            A.    Let's see, Veritext and Zoom,

21       yeah, I can confirm that.

22            Q.    And is your phone away?

23            A.    Yes.

24            Q.    Okay, great.

```
 1                      MISSRY
 2            So I think we touched on this
 3     before but do you know if Vanderbilt ever
 4     discussed with Tom Tener before April 2019
 5     whether encumbrances on the property
 6     should be considered in his fair market
 7     rent valuation?
 8                 MR. SCHWARTZ:  Objection.
 9                 THE WITNESS:  I have no idea.
10     BY MR. WALSH:
11        Q.    And you did not have any such
12     discussions with him before April 2019; is
13     that right?
14        A.    No, we had an e-mail exchange I
15     think before April 2019 or whenever that
16     e-mail exchange was.
17        Q.    Let's pull that up.  That's
18     Exhibit P29, please.  It should be
19     available.
20        A.    Okay.
21        Q.    On Monday, April 1, 2019 at
22     9:46 a.m., Tom Tener sent you an e-mail
23     with a copy to Sam Rottenberg with the
24     subject, Question, and he wrote, "Morris,
25     are you available to quickly discuss a
```

1                   MISSRY

2     question that I have about the language of

3     the lease?"

4               Do you see that?

5          A.    Yes.

6          Q.    And is this one of the e-mails

7     that you were just talking about when Tom

8     Tener raised this issue about the

9     936 Second Avenue case for the first time?

10         A.    I would have to see the other

11    e-mail to see the context.

12         Q.    If we could pull up P30.  P30 is

13    another e-mail from Tom Tener and it's to

14    you, subject, Confidential.

15         A.    I see it.

16         Q.    "Morris, This is the Appellate

17    Court decision I mentioned in our

18    conversation."  936 Second Avenue case is

19    attached.

20              Do you see that?

21         A.    Yes.

22         Q.    Okay, so going back to P29 which

23    is the e-mail that Tom sent you earlier in

24    the day, do these e-mails refresh your

25    recollection about what Tom wanted to

```
 1                    MISSRY
 2    discuss with you on the morning of April
 3    1, 2019?
 4         A.   Give me a second.
 5              It looks like they are related.
 6         Q.   Okay, do you recall him having
 7    any other questions about the language of
 8    the lease around this time?
 9         A.   No.
10         Q.   Okay.  Do you recall at what
11    point in the day you spoke with Tom Tener?
12         A.   It said 4:28 p.m. I think was the
13    e-mail but no, I don't recall.
14              MR. WALSH:  If we could please
15         mark VA 001963 as Exhibit P95.
16              (Exhibit P95, document Bates
17         labeled VA 001963, marked for
18         identification.)
19    BY MR. WALSH:
20         Q.   This is a continuation of P29.
21    It's VA 001963 to 64.  It's a response
22    from you to Tom Tener and Sam Rottenberg
23    stating now, question mark.
24         A.   Okay.
25         Q.   So it looks like about two hours
```

Page 109

```
 1                    MISSRY
 2     later you responded and suggested that you
 3     speak now; right?
 4          A.    Okay.
 5          Q.    Is that right?
 6          A.    That's what the e-mail says,
 7     sure.
 8          Q.    And at some point that day you
 9     spoke with Tom Tener; correct?
10          A.    I don't recall.
11          Q.    Well, P30 which we've already
12     looked at, he wrote at 4:28 p.m., "Morris,
13     This is the Appellate Court decision that
14     I mentioned in our conversation."
15          A.    Okay.
16          Q.    So do you believe you spoke with
17     Tom that day?
18          A.    If the e-mails reflect it, I'm
19     sure I did.
20          Q.    And do you recall if -- so Sam
21     Rottenberg was copied on P29 and P95 which
22     were the e-mails earlier in the day.  Did
23     he participate in the conversation you
24     ultimately had with Tom Tener that day?
25          A.    I don't know.
```

Page 110

```
 1                      MISSRY
 2      Q.   Just based upon your recollection
 3   of Sam's involvement in the process, do
 4   you believe this wa a conversation that
 5   he would have been involved in?
 6           MR. SCHWARTZ:  Objection.
 7           MR. KOH:  Go ahead.
 8           THE WITNESS:  I would be
 9       speculating because I don't recall if
10       he was on the call or not.
11   BY MR. WALSH:
12      Q.   Do you remember anything about
13   the call that you had with Tom Tener on
14   April 1, 2019?
15           MR. SCHWARTZ:  Objection.  You
16       can answer.
17           THE WITNESS:  No.
18   BY MR. WALSH:
19      Q.   So we've already looked at P30
20   which is Tom sending you a copy of the
21   936 Second Avenue case.  Do you recall
22   your reaction when you first reviewed this
23   case -- actually strike that.
24           Do you recall your reaction to
25   Tom's question about whether encumbrances
```

1                     MISSRY

2    on the lease needed to be included in his

3    valuation?

4         A.    I don't recall.  I know I

5    responded to an e-mail which I reviewed

6    over the past week or so but sitting here

7    right now, I would have to take a look at

8    it.

9         Q.    Was this the first time you

10   became aware of the Second Avenue case

11   when Tom sent it to you?

12        A.    I believe so.  I think you asked

13   me that before.

14        Q.    What was your reaction when you

15   read it?

16        A.    I can only tell you what my

17   reaction was after me reviewing e-mails

18   and recalling what happened so if you'd

19   like that answer, I can tell you.

20        Q.    Okay, we'll talk about those

21   e-mails in a moment, but you don't as you

22   sit here today recall what your reaction

23   was to reading the case?

24        A.    I didn't think it was applicable.

25        Q.    Okay.  But you read it when he

```
                                         Page 112

 1                    MISSRY

 2     sent it to you; right?

 3          A.    I read it at some point in time

 4     when he sent it to me and I responded via

 5     e-mail to his transmission to me.  Again,

 6     I just don't recall what date that was.

 7          Q.    And you can't recall whether or

 8     not Sam Rottenberg was on that phone call;

 9     right?

10          A.    I don't.

11          Q.    Do you recall consulting with Sam

12     or anyone else at Vanderbilt about this

13     case before you responded to Tom's

14     question?

15          A.    I don't recall.

16          Q.    Do you recall if you consulted

17     with anyone about this case before you

18     responded to Tom Tener?

19          A.    I could have consulted with any

20     one of my partners here but I don't

21     recall.

22          Q.    Do you recall having any

23     discussions at any point with Sam

24     Rottenberg or anyone else at Vanderbilt

25     about the applicability of this case?
```

                              MISSRY

1

2        A.    Yes.

3        Q.    When do you recall those

4    discussions?

5        A.    What I recall is discussing it.

6    Sam and I used to speak every couple,

7    three days so we discussed a lot of

8    things.  But what I do recall sitting here

9    today is when we discussed it, when Mike

10   Meyer from McDonald's was trying to hold

11   us up and reinvent the wheel, when we were

12   trying to jointly retain the third

13   appraiser and was misinterpreting the

14   lease language in the option term rider

15   and insisting that we had to take the

16   lease into account -- or the appraisers

17   had to take the lease into account in

18   doing their appraisals, so I do remember

19   having that discussion but I believe it

20   was sometime after the initial time.

21       Q.    If we could please -- let's see,

22   hold on.  If you could just refer to P30

23   which is the e-mail from Tom Tener to you

24   attaching the case.  And just look at the

25   second page of the 936 opinion.  You may

Page 114

1                        MISSRY

2     need to rotate your screen in order to see

3     it.

4          A.    Okay.

5          Q.    So about halfway down the page

6     under Analysis it mentions the court's

7     previous decision in New York Overnight

8     Partners.  A little bit later it says, the

9     lease expressly excluded the definition of

10    land -- expressly excluded from the

11    definition of land the buildings and

12    improvements thereon erected.  And it

13    says, "When the parties deadlocked on the

14    meaning of the phrase appraised value of

15    the land, they sought judicial

16    interpretation to settle the dispute.  We

17    affirmed the Appellate Division order

18    directing the appraiser to determine the

19    value of the land as if vacant and

20    unimproved, subject to current zoning

21    restrictions and contractual limitations,

22    and to consider the effect of the lease on

23    the value of the land."

24              The court is there describing its

25    previous decision in the New York

```
 1                    MISSRY
 2   Overnight Partners.  And then it says, "In
 3   reaching that conclusion, we observed that
 4   when the language of the lease so
 5   dictates, appraisals must take into
 6   consideration all restrictions - including
 7   current zoning regulations and
 8   encumbrances on the land as well as the
 9   lease term."
10        A.    Um-hum.
11        Q.    Further down on the page when
12   it's talking about the lease at issue at
13   936 Second Avenue, this is the second to
14   last paragraph on that same page, it says,
15   "The lease is silent as to whether the
16   lease itself should be taken into account
17   in determining the value of the demised
18   premises."  And then the court went on to
19   hold that absent -- and this is on the
20   third page, "absent an agreement to the
21   contrary, the effect of a net lease must
22   be considered in valuing property for the
23   purpose of setting rent for a renewal
24   lease term.  Such a rule comports with
25   precedent, appraisal practices and common
```

```
 1                    MISSRY
 2    sense.  If the parties to a lease desire
 3    to exclude that encumbrance in valuing the
 4    property, they need only include language
 5    to that effect in their agreement."
 6            Do you see that?
 7        A.   I do.
 8        Q.   Okay.  But when you read this
 9    case, you concluded that this did not
10    require Tom Tener to consider the
11    encumbrance of the lease in his valuation;
12    right?
13            MR. SCHWARTZ:  Objection.
14            THE WITNESS:  Yes.
15    BY MR. WALSH:
16        Q.   How did you reach that
17    conclusion?
18        A.   When you read the provision of
19    the option to rider, I believe it says you
20    have to assume that it's vacant land and
21    that the premises are not encumbered by
22    the improvements.  And there was some
23    other language in there and based upon my
24    reading of that particular provision and
25    this case, it was my opinion at the time
```

Page 117

1                      MISSRY
2      that it had the necessary language to
3      exclude taking the lease into account.
4          Q.   Was that your interpretation of
5      the case or somebody else's interpretation
6      of the case?
7          A.   Well, you have my e-mail to Tom
8      so you know it was my interpretation.
9          Q.   Well, I don't know if it was your
10     interpretation or somebody else's.  Was
11     that your interpretation of the case or --
12         A.   It was my interpretation of the
13     option term rider as this case -- and this
14     case frankly.
15         Q.   Now, if we could pull up P31.
16     This is a two-page e-mail chain, VA 001753
17     to 1754.  This is an e-mail from you to
18     Tom Tener, April 1, 2019 at 4:41 p.m. and
19     then a response from Tom Tener at
20     5:30 p.m.
21         A.   Um-hum.
22         Q.   Is this the communication you
23     were just talking about where you told Tom
24     that you did not believe the case was
25     applicable to the McDonald's lease?

Page 118

1                    MISSRY

2        A.    Yes.

3        Q.    And you said, "I just reviewed

4    the case and I don't agree with the

5    analysis you mentioned to me and I don't

6    see it in there."

7              What analysis did Tom mention to

8    you?

9        A.    Tom sent me the case and

10   mentioned that some people hold that you

11   have to take the lease into effect.  I

12   told him I disagreed with that

13   interpretation.

14       Q.    Did Tom explain why he was asking

15   that question?

16       A.    No, he was aware of the case so

17   he just wanted to get my thoughts on it.

18       Q.    Did he say what impact the case

19   could have on his valuation?

20       A.    No.

21       Q.    Did he say he believed that the

22   936 Second Avenue case required him to

23   consider the encumbrance of the lease in

24   his analysis?

25       A.    No.

1                    MISSRY

2        Q.   So he just said that -- he was

3   just wondering whether it applied, he

4   didn't give you his view one way or the

5   other?

6        A.   He made me aware of the case, he

7   asked me for my interpretation, I gave him

8   my interpretation.

9        Q.   Now is the interpretation that

10   you gave him based upon solely your

11   opinion or the opinion of others?

12       A.   I can't tell you sitting here

13   today that I didn't discuss it with any of

14   my partners, but it was my opinion based

15   upon my review of the case and of the

16   poorly drafted option term rider

17   provision.

18       Q.   If we could pull up P16 which is

19   the option rent agreement.

20       A.   P16?

21       Q.   Yes.  It will need to be put up

22   there.

23       A.   Let me know when it's up.

24       Q.   Okay, it should be up.

25       A.   P16, okay, I'm in it.

```
1                       MISSRY
2        Q.    This is the option rent addendum
3    to the McDonald's lease; right?
4        A.    Yes.
5        Q.    And this is the rent addendum you
6    were just referring to?
7        A.    Yes.
8        Q.    Where in the option rent addendum
9    do you believe it states that the lease
10   should not be considered in the valuation?
11             MR. SCHWARTZ:   Objection.
12             MR. KOH:  Same objection.  Go
13        ahead and answer.
14             THE WITNESS:  First of all, this
15        is not a net lease which the case
16        described.  Second page, it says the
17        rental value shall be established
18        based upon a definition of fair market
19        rental value as the price which an
20        average well-informed tenant would
21        pay, an average well-informed --
22        exclusive of tenant's improvements
23        knowing all the uses to which the
24        property can be put without duress on
25        either party.  So to me my
```

1                    MISSRY

2        interpretation was exclusive of

3        tenant's improvements being there's

4        nothing there.  All the uses to the

5        property can be put means that you're

6        assuming it's vacant and unencumbered

7        because assuming the uses to which the

8        property can be put without it being

9        vacant and encumbered is sort of

10       irrelevant.  So that was my

11       interpretation.

12   BY MR. WALSH:

13       Q.   The language we just read from

14   the 936 case --

15       A.   Yes.

16       Q.   -- talked about how the party --

17   I guess the landlord in that case tried to

18   distinguish New York Overnight Partners,

19   quote, because the property in that case

20   was to be valued as a vacant while the

21   valuation of the property here must

22   include both the land and the buildings.

23   So the court in 936 expressly rejected the

24   same matter on which you're trying to

25   distinguish and I guess I'm just trying to

Page 122

1                     MISSRY
2    understand why --
3         A.    It seems --
4              MR. KOH:  Hold on.  He hasn't
5         finished the question and I object to
6         it if he had finished it.
7              MR. SCHWARTZ:  I'm objecting as
8         well.
9    BY MR. WALSH:
10        Q.    I just want to understand how you
11   could have reached that conclusion when
12   the court expressly rejected that same
13   reasoning in its opinion.
14             MR. SCHWARTZ:  Same objection.
15             MR. KOH:  Same objection.  Go
16        ahead and answer.
17             THE WITNESS:  I guess my opinion
18        was similar to the two lower courts.
19        My opinion was based upon the language
20        of the provision itself as opposed to
21        a case that was decided by the Court
22        of Appeals.  This isn't a net lease,
23        this is a space lease.  Is there a
24        distinction?  I thought there was a
25        distinction and I thought that at the

```
                                    Page 123

 1                    MISSRY
 2        time the language in the lease was
 3        fairly clear and again, my
 4        interpretation was that if there was
 5        no specific provision that said that
 6        the lease had to be taken into
 7        account, it wouldn't be taken into
 8        account.  That was my interpretation
 9        of that provision in case at the time
10        when I gave my opinion in April of
11        2019.  April of 2019, as you know, we
12        agreed I think in July or whenever
13        we -- September, whenever we signed
14        the letter agreement with McDonald's,
15        we did agree at that point in time
16        that the lease can be taken into
17        account and we directed Tom Tener to
18        take it into account.
19   BY MR. WALSH:
20        Q.   So I just want to back up to
21   something you said earlier in your
22   response when you said this isn't a net
23   lease, this is a space lease.  Is there a
24   distinction?  I thought there was a
25   distinction.
```

```
                                          Page 124

 1                      MISSRY

 2         A.    There's a huge distinction.

 3         Q.    So what distinction in your

 4    opinion can be made from that?

 5              MR. KOH:   Objection.   Go ahead

 6         and answer.

 7              THE WITNESS:   A net lease is

 8         typically triple net lease, that's the

 9         common parlance where the tenant is

10         responsible for all the costs and

11         expenses of maintaining the property,

12         paying all the real estate taxes,

13         paying all the rent on a net basis so

14         that the landlord is netting whatever

15         the tenant is paying in base rent.   A

16         space lease is a traditional lease

17         where you may have a tax stop where

18         the landlord may be responsible for

19         certain repair and maintenance

20         obligations and things of that nature.

21    BY MR. WALSH:

22         Q.    How could that difference impact

23    the analysis that the court explained in

24    936 Second Avenue?

25              MR. SCHWARTZ:   Objection.
```

```
                                        Page 125

 1                    MISSRY
 2           THE WITNESS:  You're asking me --
 3           MR. SCHWARTZ:  You can answer.
 4           THE WITNESS:  It impacted my
 5       analysis.
 6    BY MR. WALSH:
 7       Q.  I'm trying to understand why did
 8    it impact your analysis.
 9       A.  Because it did, that's my
10    opinion.
11       Q.  Can you explain any more than you
12    already have?
13       A.  No, I've given you all the
14    explanation --
15       Q.  I'm not finished with my
16    question.  Can you explain any more than
17    you already have why that distinction
18    impacted your interpretation of the case?
19       A.  No.
20       Q.  When you reviewed the case on
21    April 1, 2019, did you think that it was a
22    close call or did you think it was black
23    and white, it definitely did not apply?
24           MR. KOH:  Objection.  You can
25       answer.
```

Page 126

1                   MISSRY

2          THE WITNESS:  I gave my opinion

3      at the time and that was my opinion.

4    BY MR. WALSH:

5      Q.    That wasn't my question.   My

6    question is whether you thought it was a

7    close call.

8          MR. KOH:  Same objection.

9          THE WITNESS:  I gave my opinion

10     at that point in time and that was my

11     opinion at that point in time.

12   BY MR. WALSH:

13     Q.    I'll ask the question again.   Did

14   you think it was a close call?

15     A.    I gave my opinion at the time and

16   that was my opinion.

17     Q.    Are you refusing to answer my

18   question?

19          MR. KOH:  Objection.  He's

20     answered it three times.

21          THE WITNESS:  I'm answering.

22     You're being belligerent and I'm not

23     going to play your games.

24   BY MR. WALSH:

25     Q.    I'm not being belligerent.   I'm

                            MISSRY

1   trying to understand --

2       A.   It's irrelevant whether I thought

3   it was close or not.

4       Q.   Morris, Morris, let me finish my

5   question.  I'm asking you, did you believe

6   it was a close call or did you think the

7   answer was obvious based upon your reading

8   of the case what the answer was?

9           MR. KOH:  Same objection.

10          THE WITNESS:  I gave you my

11      answer already, Brendan, and I'm not

12      going to play the game.  I gave my

13      opinion.  I thought that was the

14      proper interpretation and the

15      application of the provision to the

16      case.

17  BY MR. WALSH:

18      Q.   Okay, so --

19      A.   That's my opinion.

20          MR. WALSH:  If we can mark down

21      that area of that question, that's

22      something that we'll call the judge

23      about in a little bit unless you want

24      to answer that question.

```
 1                    MISSRY
 2          THE WITNESS:  I answered the
 3      question three times already.
 4   BY MR. WALSH:
 5      Q.   You think it's --
 6      A.   You're just not satisfied with
 7   the answer.
 8      Q.   You're not answering my question.
 9   My question is --
10          MR. KOH:  Gentlemen, may I
11      suggest that --
12          MR. WALSH:  Howard, I'm in the
13      middle of a question.
14          MR. KOH:  No, you're not.  You're
15      making a statement.  You're arguing
16      with the witness.  I'd like you to ask
17      a question and stop arguing with the
18      witness, please.
19          MR. WALSH:  I would like the
20      witness to answer my questions.
21          THE WITNESS:  I've been answering
22      your questions for several hours now,
23      Brendan.  I answered the question
24      whether I thought it was a close call
25      or not a close call.  I don't recall
```

```
 1                    MISSRY
 2       at the time when I made the analysis
 3       but I gave an answer.
 4   BY MR. WALSH:
 5       Q.   So now you're saying you don't
 6   recall?  Is that your testimony?
 7       A.   That's my testimony.
 8       Q.   Okay.  That was easy; right?
 9       A.   Fantastically so.
10       Q.   Do you recall if Tom Tener sent
11   you a draft of his report before he
12   formally issued it?
13       A.   I don't recall.
14            MR. WALSH:  If we could mark
15       VA 018965.  It will come up as Exhibit
16       P96.
17            (Exhibit P96, document Bates
18       labeled VA 018965, marked for
19       identification.)
20   BY MR. WALSH:
21       Q.   It's a two-page e-mail chain
22   VA 018965 to 966.
23       A.   Okay.
24       Q.   So this e-mail reflects on April
25   10th, Tom Tener -- April 10, 2019, Tom
```

```
 1                    MISSRY
 2    Tener sent you with a copy to Sam
 3    Rottenberg an e-mail saying that he
 4    inspected the property on Monday and ready
 5    to finalize our report.  Do you have any
 6    comments on the draft report?  If not I
 7    will issue a signed copy for exchange.
 8    And you forwarded that e-mail and asked
 9    for Sam's input; is that right?
10         A.    It appears so.
11         Q.    Why did you ask for Sam's input?
12         A.    Because when anybody does an
13    appraisal you have to review it for
14    factual consistency.  You want to make
15    sure everything is correct in there so
16    that's why you send reports to people to
17    read them to make sure they are factually
18    correct.
19         Q.    If we could pull up what's been
20    previously marked as P32, this is the
21    April 15, 2019 KTR report.  This is the
22    letter opinion of value that Tom Tener
23    prepared for the fair market rent
24    valuation under the option rent addendum
25    to the lease; right?
```

```
                                              Page 131

 1                    MISSRY

 2            MR. SCHWARTZ:  Brendan, what

 3        exhibit are you directing us to?

 4            MR. WALSH:  P32.

 5            MR. SCHWARTZ:  Thank you.

 6            THE WITNESS:  I'm looking at it.

 7            Okay.

 8    BY MR. WALSH:

 9        Q.   So my question is:  This is the

10    first letter opinion of value that KTR

11    prepared for the fair market rent

12    valuation process on the option rent

13    addendum to the lease; correct?

14        A.   Yes.

15        Q.   And you reviewed this report when

16    he provided it to you?

17        A.   Yes.

18        Q.   What, if anything, did you do to

19    confirm that what KTR did in this report

20    complied with the terms of the option rent

21    addendum to the lease?

22        A.   Tom was given direction as to

23    what he was supposed to do.  He read the

24    terms of the lease, he's a lot more

25    experienced in that than I am.  I don't do
```

```
                                        Page 132
 1                    MISSRY
 2   appraisals and so I'm sure I read this.  I
 3   don't know if I even gave him any
 4   comments.  I'm not really sure.
 5        Q.   So the first part of your answer
 6   was Tom was given direction.
 7        A.   Yes.
 8        Q.   Who gave him that direction?
 9        A.   I'm sure I did.  I sent him a
10   copy or Sam or I sent him a copy of the
11   lease and the addendum and told him that
12   we needed an appraisal in accordance with
13   the terms of this lease.
14        Q.   And did you or Sam share your
15   views on the manner in which the option
16   rent addendum required him to prepare his
17   appraisal?
18             MR. SCHWARTZ:  Objection.  You
19        can answer.
20             THE WITNESS:  I think I've
21        already testified to that.  Other than
22        giving him my opinion as to taking the
23        lease into account, no.
24   BY MR. WALSH:
25        Q.   Okay.  So you deferred to Tom
```

```
                                   Page 133

 1                    MISSRY

 2    with the one exception we just discussed,

 3    you deferred to Tom's interpretation of

 4    the lease as to how he should prepare this

 5    valuation?

 6        A.   Very much so.

 7        Q.   Same with Vanderbilt?

 8        A.   Sorry?

 9        Q.   Same with Vanderbilt?

10             MR. SCHWARTZ:  Objection.

11             THE WITNESS:  I don't understand

12        the question.

13    BY MR. WALSH:

14        Q.   Vanderbilt also deferred to Tom,

15    is that what you're saying?

16        A.   I believe we had conversations

17    with Tom about what the lease says.  Tom

18    interpreted what the lease says.  It was

19    consistent with our reading and then he

20    did his appraisal based upon that.

21        Q.   So KTR in this April 15, 2019

22    report used land sales to arrive at a fair

23    market rent valuation.  Where in the

24    option rent addendum to the lease does it

25    say land sales can be used to determine
```

1                    MISSRY

2    the fair market rent value?  And if you

3    need to look at it, it's P16 is the option

4    rent addendum.

5            MR. KOH:  Objection to the

6        question.  The witness can answer.

7            MR. SCHWARTZ:  Objection.

8            THE WITNESS:  Can you repeat the

9        question?

10   BY MR. WALSH:

11       Q.   Where in the option rent addendum

12   does it say that land sales can be used to

13   determine the fair market rent value?

14           MR. KOH:  Same objection.  Go

15       ahead and answer, please.

16           MR. SCHWARTZ:  Objection.

17           THE WITNESS:  I don't know.

18       You'd have to take a look at the

19       lease.

20   BY MR. WALSH:

21       Q.   Well, I'm asking you to.  Where

22   in the option rent addendum does it

23   authorize KTR to use comparable land

24   sales?

25           MR. KOH:  Objection.

```
                                        Page 135
 1                    MISSRY
 2          MR. SCHWARTZ:  Objection.
 3          THE WITNESS:  I don't know what
 4      the standard market data approach
 5      technique is.  I'm not sure.  That
 6      could be it.  I'm not an appraiser, I
 7      don't know.
 8  BY MR. WALSH:
 9      Q.   So did you do anything to
10  determine what the standard market data
11  approach technique for valuing vacant land
12  would be?
13      A.   Yes.
14      Q.   What did you do?
15      A.   I hired Tom Tener.
16      Q.   Now, the next sentence states,
17  "All comparable leases shall be
18  appropriately adjusted and a written
19  report shall indicate the reasons for the
20  adjustment so made."
21          Is it your professional opinion
22  that those -- that those sentences
23  authorize KTR to value the property using
24  comparable land sales?
25          MR. KOH:  Objection.  The witness
```

```
 1                    MISSRY
 2      may answer.
 3             MR. SCHWARTZ:  Objection.
 4             THE WITNESS:  I don't know.
 5   BY MR. WALSH:
 6      Q.   But it doesn't mention comparable
 7   land sales but does mention comparable
 8   leases; isn't that right?
 9      A.   It says the standard market data
10   approach technique for valuing vacant land
11   shall be used by the appraisers.
12      Q.   How about the next sentence?
13      A.   That just refers to leases.
14   There's a lot of disjointed language in
15   this provision so I don't know.
16      Q.   Are you aware of any language
17   that specifically authorizes KTR to use a
18   land sales comparison approach?
19             MR. KOH:  Objection.  The witness
20        may answer.
21             THE WITNESS:  I would assume that
22        that's one of the ways that appraisers
23        value land is they compare sales.
24   BY MR. WALSH:
25      Q.   Do you believe that KTR complied
```

1                   MISSRY

2    with the terms of the option rent addendum

3    by using the method he used in the April

4    15, 2019 report?

5         A.   I have full faith in Tom Tener.

6    We were asked to change the appraisal by

7    McDonald's to include the lease as

8    encumbrance which he subsequently did.

9         Q.   So my question was do you believe

10   KTR complied with the terms of the option

11   rent addendum by using the method used in

12   the April 15, 2019 report?

13        A.   You'd have to ask Tom Tener that

14   question.

15        Q.   Well, I'm asking what you

16   believe.

17             MR. KOH:   Objection.  Go ahead

18        and answer.

19             THE WITNESS:  Again, we hired Tom

20        to do this work so we assumed that he

21        did it properly.

22   BY MR. WALSH:

23        Q.   That's not my question.  Do you

24   believe he did it in accordance with the

25   terms of the option rent addendum to the

```
                                        Page 138
 1                  MISSRY

 2    lease?

 3            MR. KOH:  Objection.  You're

 4        assuming a fact that's not necessarily

 5        in evidence, mainly did he have a

 6        belief.  Go on.

 7            THE WITNESS:  I don't really know

 8        how to answer that question.

 9    BY MR. WALSH:

10        Q.   You don't believe you can answer

11    whether you believe that Tom Tener

12    complied with the terms of the option rent

13    addendum?

14        A.   I believe that Tom did what he

15    believed was the correct analysis.

16        Q.   What do you believe was the

17    correct analysis?

18            MR. KOH:  Objection.  Go ahead

19        and answer if you can.

20            THE WITNESS:  I believe what Tom

21        Tener did was correct.

22    BY MR. WALSH:

23        Q.   And do you believe that what Tom

24    Tener did complied with the terms of the

25    option rent addendum to the lease?
```

```
 1                    MISSRY
 2           MR. KOH:  Objection.
 3           MR. SCHWARTZ:  Objection.
 4           MR. KOH:  You can answer.
 5           THE WITNESS:  I don't know but I
 6       do believe so.
 7   BY MR. WALSH:
 8       Q.   Did you have any discussions with
 9   KTR about what comparable leases they used
10   in their April 15, 2019 analysis?
11           MR. KOH:  Objection.  Go ahead
12       and answer.
13           THE WITNESS:  I think we had -- I
14       think the answer is yes.  I believe we
15       had a meeting with McDonald's and
16       their appraiser and I believe that
17       McDonald's appraiser and Tom reviewed
18       the leases that they were using for
19       comparison purposes.
20   BY MR. WALSH:
21       Q.   Well, my question is a little bit
22   different.  The option rent addendum says
23   all comparable leases shall be
24   appropriately adjusted.  What I'm
25   wondering is whether you had any
```

1                    MISSRY

2     discussions with KTR about what comparable

3     leases it used in its analysis?

4              MR. KOH:  Objection.  Go ahead

5          and answer.

6              MR. SCHWARTZ:  Objection.

7              THE WITNESS:  I don't recall.

8     BY MR. WALSH:

9          Q.   Do you know if KTR used

10    comparable leases in its analysis April

11    15, 2019?

12         A.   Let me go back to their report.

13    Do you know which number it was?

14              MR. KOH:  32, I believe.

15    BY MR. WALSH:

16         Q.   P32.

17         A.   FMV determination on page, let's

18    see, page 3 of their appraisal, they say

19    they analyzed the economic terms of

20    relevant ground leases in Brooklyn, Queens

21    and Manhattan.

22         Q.   Did you speak with Tom around

23    this time about those what he calls

24    relevant ground leases?

25         A.   I was talking to Tom and Sam

```
 1                    MISSRY
 2   throughout a process so I don't remember
 3   what we discussed specifically.
 4        Q.    Do you recall if Tom Tener or
 5   anyone else at KTR told you that those
 6   were comparable ground leases?
 7        A.    I don't recall.  He was the one
 8   who was doing the research so I don't know
 9   what value I could have added.
10        Q.    So in the second full paragraph
11   on page 2 of KTR's report, it states that
12   "The FMV of the demised premises is a
13   function of the market value of the
14   subject land and the ground rent
15   percentage that an average well-informed
16   tenant would pay and an average
17   well-informed landlord would accept,
18   exclusive of tenant's improvements,
19   knowing all the uses to which the property
20   can be put, without duress on either
21   party."
22             Do you see that?
23        A.    I do.
24        Q.    So the second part of that
25   sentence beginning with an average
```

```
 1                    MISSRY
 2   well-informed tenant is a quote from the
 3   option rent addendum to the lease, but the
 4   first part of that sentence is not taken
 5   from the lease.  Did you ever discuss with
 6   Tom where he got that language that he
 7   used in that portion of his report?
 8        A.   I don't recall.
 9        Q.   Does the option rent addendum say
10   anywhere that the fair market rental value
11   is a function of the market value of the
12   subject land and the ground rent
13   percentage?
14             MR. KOH:  Objection.  Go ahead
15        and answer.
16             THE WITNESS:  What exhibit is it?
17   BY MR. WALSH:
18        Q.   P16.
19        A.   Fair market rental value
20   exclusive -- let's see.  The rental value
21   shall be established based upon definition
22   of fair market rental value as the price
23   which a well-informed tenant would pay.  I
24   don't see his language in here if that's
25   the question.
```

1                    MISSRY

2        Q.    Did you ever ask KTR where that

3    came from?

4        A.    I don't recall.  We'd have to

5    look up the definition of fair market

6    rental value.  I don't know where it is.

7        Q.    Well --

8        A.    Probably somewhere in the lease

9    though.  What copy, where's the lease?

10       Q.    I believe it's P69.  But I think

11   if you look at the option rent addendum,

12   the second page says upon a definition of

13   fair market rental value as and goes on to

14   state what the definition of fair market

15   rental value is.  So I'm not sure where

16   that -- we need to look at the rest of the

17   lease.

18            MR. WALSH:  If we can mark

19        VA 024565.

20            (Exhibit P97, document Bates

21        labeled VA 024565, marked for

22        identification.)

23   BY MR. WALSH:

24       Q.    This is a multi-page e-mail chain

25   ending in VA 024568.

Page 144

1                        MISSRY

2        A.    Okay.

3        Q.    So this is an e-mail exchange

4    between you and Tom Tener at least on the

5    first page from April 15, 2019 which is

6    the date of the report we were just

7    looking at.  And on the bottom, it says,

8    "We are actually in contact with McDonalds

9    about setting up a meeting the week of the

10   29th.  Will you be available?"

11            Do you recall what you were

12   trying to set up a meeting with McDonald's

13   about?

14       A.    Yeah, we were trying to contact

15   McDonald's to negotiate a rent re-set and

16   it was extremely frustrating trying to get

17   in contact with them so we were trying to

18   set up a meeting in my office to start a

19   process of negotiating a new rent for the

20   renewal term.

21       Q.    In the top e-mail it says, "We

22   are notifying McDonalds that we designated

23   you," referring to Tom Tener, "as our

24   appraiser so if Sharon happens to reach

25   out to you please do not discuss

```
                                    Page 145
 1                   MISSRY
 2   valuations at all."
 3           Why did you not want Tom speaking
 4   with Sharon about valuations?
 5           MR. KOH:  Objection.
 6           THE WITNESS:  Because the option
 7       term addendum doesn't permit the
 8       parties to exchange valuation.  They
 9       are required to issue letters of
10       opinion of value and I didn't want Tom
11       to do anything that would violate that
12       provision.
13   BY MR. WALSH:
14       Q.   Do you recall why your firm
15   ultimately retained KTR instead of BBG or
16   one of the other appraisers that you
17   interviewed?
18       A.   Not specifically.
19       Q.   And who made the decision to
20   retain KTR, was that you or Sam
21   Rottenberg?
22           MR. KOH:  Objection.  You can
23       answer.
24           THE WITNESS:  We discussed it and
25       we thought Tom was the best choice.
```

```
 1                    MISSRY

 2       It's Sam's ultimate decision.

 3   BY MR. WALSH:

 4       Q.   I want to fast forward to a

 5   meeting that took place on June 19, 2019

 6   between the parties and their appraisers.

 7   Do you recall that meeting?

 8       A.   I recall a meeting that we had

 9   with Sharon, Tom, Sam, I'm not sure if

10   Mike was there or on a phone call.  Carol

11   Demarco I think was there but I do recall

12   the meeting.

13       Q.   And what was the purpose of that

14   meeting?

15       A.   The purpose of the meeting was to

16   discuss each party's findings to see if we

17   can find common ground so that we would

18   obviate the need to hire a third appraiser

19   and come to some type of value

20   proposition.

21       Q.   Now, in advance of that meeting,

22   did you have any communications with KTR

23   about the encumbrance of the lease issue,

24   other than the communications that you had

25   with KTR on April 1st that we reviewed
```

Page 147

```
 1                   MISSRY
 2   earlier?
 3        A.   I don't recall.
 4        Q.   And how about with Vanderbilt?
 5        A.   I don't recall.
 6        Q.   What happened first at that
 7   meeting, do you remember which party went
 8   first and what was said?
 9        A.   I think Sharon went first.  She
10   was super aggressive, if I recall
11   correctly, and then I believe Tom gave his
12   opinion and it seemed like the parties
13   were so way off.  That's what I remember
14   about the meeting.
15        Q.   And do you recall any objections
16   to the KTR report that McDonald's raised?
17        A.   I'm not sure.  There could have
18   been.  I think both parties objected to
19   the other's findings and basis for
20   computing their fair market rent
21   determination or value determinations.  I
22   think Sharon was using pad leases for fast
23   food restaurants in Queens and banks and
24   Tom didn't think that was appropriate.  I
25   thought Sharon admitted to Tom that he was
```

```
 1                    MISSRY
 2    probably right but again, it was -- I
 3    don't think the meeting went well.
 4        Q.   Do you recall screaming at anyone
 5    at that meeting?
 6        A.   I may have.  Sharon Locatell was
 7    extremely aggressive, disrespectful and
 8    obnoxious so if someone acts like that, I
 9    definitely could have screamed at her.
10        Q.   Do you believe that you were
11    extremely aggressive, disrespectful,
12    obnoxious or something else?
13             MR. SCHWARTZ:  I'm going to
14        object but he can answer.  Go ahead.
15             THE WITNESS:  Absolutely not.
16    BY MR. WALSH:
17        Q.   So in your opinion only Sharon
18    was?
19        A.   Oh, I know Sharon was.
20        Q.   Did you take notes at the
21    meeting?
22        A.   I believe I did and I think I
23    turned them over to Warren.
24        Q.   You turned them over to who?
25        A.   To Howard, sorry, Warren.
```

```
 1                    MISSRY
 2        Q.    If we could pull up P34.
 3              Do you have the document pulled
 4   up?
 5        A.    I do.
 6        Q.    Are these your notes from the
 7   June 19, 2019 meeting with McDonald's and
 8   the appraisers?
 9        A.    Yes.
10        Q.    And this is all your handwriting
11   here?
12        A.    It is.
13        Q.    So I would just like to go
14   through these notes with you.  Up at the
15   top it says TT and then there are some
16   numbers.  Are you able to read what that
17   says?
18        A.    First, I want to object because I
19   think it's totally inappropriate that my
20   internal notes would make it into this
21   proceeding.  So I know Dani objected
22   before but to me this is attorney/client
23   privilege and I just want to go on the
24   record as saying that.
25              Yes, TT is Tom Tener and I think
```

```
                                          Page 150

 1                    MISSRY
 2    I wrote 1,348,000 as his fair market value
 3    determination.
 4        Q.    And that's written first so it
 5    looks like maybe Tom spoke first?
 6            MR. KOH:   Objection.
 7            THE WITNESS:   I may have just
 8        made a notation because I knew what
 9        Tom's findings were before Sharon
10        started in.
11    BY MR. WALSH:
12        Q.    Okay.  And then it says -- does
13    that say Sharon Locatell underneath?
14        A.    It does.
15            MR. KOH:   Somebody needs to go on
16        mute.
17            MR. WALSH:   Do you know who's
18        talking in the background?
19            MR. KOH:   I think it's been
20        fixed.
21    BY MR. WALSH:
22        Q.    And what does it say directly
23    below Sharon Locatell?
24        A.    It looks like I wrote extreme
25    difference.
```

```
 1                    MISSRY
 2       Q.   And how about right below that?
 3       A.   FMV rent determination for a
 4    five-year lease.
 5       Q.   How about below that?
 6       A.   As opposed to a 20-year lease.
 7    12 leases, banks, coffee shops.
 8       Q.   And then does it say 350,000 per
 9    year times 20 percent?
10       A.   275.
11       Q.   And then it says, Mike believes
12    lease has to be considered in the
13    appraisal?
14       A.   Yes.
15       Q.   What do you recall about that
16    part of the conversation?
17            MR. SCHWARTZ:  Objection.
18            THE WITNESS:  Nothing.
19    BY MR. WALSH:
20       Q.   So what does it mean Mike
21    believes lease has to be considered in the
22    appraisal?
23       A.   It means Mike believes that the
24    lease has to be considered in the
25    appraisal.
```

```
 1                          MISSRY

 2        Q.    What else was Mike saying, do you

 3   recall what his position was?

 4        A.    I don't recall.

 5        Q.    Do you recall if he brought up

 6   the 936 Second Avenue case?

 7        A.    I don't recall.

 8        Q.    And you don't recall anything

 9   about why he was taking that position?

10        A.    I am not sure if Mike and I --

11   I'm sure Mike and I spoke beforehand and

12   he probably conveyed that sentiment to me.

13   Actually, this could have been the first

14   time he mentioned it.  I'm not really

15   sure.  If there's e-mails between us, then

16   maybe you can tell us.

17        Q.    What was your response to Tom's

18   comment that the lease has to be

19   considered in the appraisal?

20             MR. KOH:  Objection.  Go ahead.

21             THE WITNESS:  I don't think Tom

22        made a comment.

23   BY MR. WALSH:

24        Q.    What was your response?

25        A.    To who?
```

```
                                        Page 153

 1                      MISSRY

 2           MR. SCHWARTZ:  Objection.

 3    BY MR. WALSH:

 4       Q.   To Mike's comment that he

 5    believed the lease has to be considered in

 6    the appraisal.

 7       A.   I don't recall.

 8       Q.   Now this was the same issue that

 9    Tom Tener had raised with you on April 1,

10    2019; right?

11       A.   Apparently.

12       Q.   Was it or wasn't it?

13       A.   I'm reading off notes, you know.

14    There's no specifics here.  I'm assuming

15    it's the same issue.

16       Q.   It seems to be the same issue;

17    right?

18       A.   It seems to be.

19       Q.   Okay.  And so given that Mike

20    Meyer from McDonald's was saying this and

21    Tom Tener had brought this up to you a

22    couple months earlier, you didn't have any

23    reaction to his statement?

24           MR. KOH:  Objection.  Go ahead

25        and answer.
```

```
 1                        MISSRY
 2            THE WITNESS:  Tom had already
 3        done his appraisal, this was a
 4        settlement discussion.  Another reason
 5        why I'm shocked that this got out so
 6        it's wholly inappropriate to discuss
 7        what we discussed at that settlement
 8        negotiation.  But I don't recall how I
 9        reacted to what Mike said.  I know I
10        took down the note.
11   BY MR. WALSH:
12        Q.    There's something in parentheses
13   or I guess what does it say underneath
14   Mike believes lease has to be considered
15   in the appraisal?
16        A.    Sharon only considered comparable
17   leases.  $12 per square foot land value.
18        Q.    And how about underneath that?
19        A.    11 outer borough comps, five to
20   six in Brooklyn and Queens, 15-year to
21   20-year renewals, one five-year, bank,
22   Starbucks, McDonald's, 20K to 30K square
23   feet, totally different methodology.
24        Q.    How about the next line?
25        A.    Lease comps versus property
```

```
 1                    MISSRY
 2   comps.  I don't even know what all that
 3   means.
 4       Q.   And how about in the top of the
 5   next page, it seems to say rental
 6   determination based upon a five-year
 7   renewal term.  Do you see that?
 8       A.   Rental determination based
 9   upon -- yeah.  Yes, I do know what that
10   means.
11       Q.   Who said that?
12       A.   Sharon's analysis for all of
13   these comparable leases was based upon a
14   five-year term as opposed to a 20-year
15   term which McDonald's exercised.
16       Q.   So you believe McDonald's
17   exercised a 20-year term?
18            MR. KOH:  Objection.
19            THE WITNESS:  They did exercise a
20       20-year term.
21   BY MR. WALSH:
22       Q.   What is that opinion based upon?
23       A.   The lease.  There are automatic
24   renewals and the only thing that's
25   determined is the rent during the 20-year
```

```
 1                    MISSRY
 2   extension terms.
 3       Q.   So you believe that they had
 4   exercised a 20-year term?
 5       A.   Absolutely.
 6       Q.   How about on the next line down,
 7   (inaudible) ground lease.
 8       A.   I can't read the penultimate word
 9   there.  I don't know.  I don't know what
10   that says right now.
11       Q.   Okay.  How about further down, it
12   looks like it says exchange comps.
13       A.   Yeah.
14       Q.   What does it say underneath that?
15       A.   Tom Tener said the fundamental
16   flaws that their appraisal focuses on pad
17   sites and Sharon agreed with that
18   analysis.  Our site can build 22,000
19   square feet of retail, can build multiple
20   stories and basements.
21       Q.   So did Tom Tener who said that
22   the site can build 22,000 square foot of
23   retail?
24       A.   Yeah.
25       Q.   Do you recall if anyone from the
```

1                         MISSRY

2     McDonald's side got up and said they were

3     leaving before the meeting ended?

4          A.   I don't recall.

5          Q.   How did the meeting end?

6          A.   I don't recall.

7          Q.   Did you tell McDonald's during

8     that meeting that you agreed with their

9     position that the encumbrance to the lease

10    should be included and that you would have

11    Tom Tener consider it?

12         A.   I don't recall that.

13         Q.   So did you have a meeting with

14    KTR after this meeting to discuss next

15    steps?

16         A.   I don't know if I had a meeting.

17    We've had discussions.  I don't recall a

18    meeting.

19         Q.   So what discussions do you recall

20    with KTR after that meeting with

21    McDonald's?

22         A.   I recall pressing Mike Meyer and

23    trying to come up with a solution.  It was

24    very difficult to get his attention.

25    Again, we wanted a negotiated solution.

1                    MISSRY
2    The specifics I'd have to go through
3    e-mails and notes to -- or e-mails to
4    recreate what happened next.  I think in
5    July we started having more discussions.
6    I asked Tom to consider preparing an
7    updated appraisal.  Mike was insistent
8    that we take the lease into account.  So
9    again, we were trying to work together
10   cooperatively with McDonald's so one of
11   the ideas I floated by Tom was to redo the
12   appraisal and to take the lease into
13   account to accommodate their concern.
14        Q.   I want to talk a little bit about
15   that because I think you misunderstood my
16   question.  My question was what
17   discussions do you recall with KTR after
18   the meeting with McDonald's?
19        A.   I don't recall.
20        Q.   Do you recall Tom Tener
21   performing calculations on his calculator
22   that day?
23        A.   I don't recall.
24        Q.   Do you recall Tom telling you
25   around that time that he believed the land

```
 1                    MISSRY
 2    residual analysis would result in
 3    approximately the same value?
 4         A.    During what time?
 5         Q.    Right around the time of that
 6    meeting, June 19, 2019.
 7         A.    No.
 8         Q.    Did you tell Tom Tener that day
 9    that you agreed with McDonald's about the
10    applicability of the 936 Second Avenue
11    case?
12         A.    Sorry, can you repeat that?
13         Q.    Did you tell Tom Tener that day
14    that you agreed with McDonald's about the
15    applicability of the 936 Second Avenue
16    case?
17         A.    I don't recall.
18         Q.    Do you recall ever telling Tom
19    Tener that you agreed with McDonald's
20    about the applicability of the 936 Second
21    Avenue case?
22         A.    I could have told him down the
23    road but I don't recall a specific
24    discussion.
25         Q.    So do you now agree with
```

```
                                       Page 160

 1                    MISSRY

 2     McDonald's that the 936 Second Avenue case

 3     and the lease requires the encumbrances

 4     including the lease to be factored into

 5     the fair market rent valuation

 6     calculation?

 7               MR. KOH:  Objection.  The witness

 8          can answer.

 9               MR. SCHWARTZ:  Objection.

10               THE WITNESS:  Vanderbilt agreed

11          with McDonald's that their appraiser,

12          Tom Tener, would redo the -- his

13          appraisal taking the lease into

14          account.

15     BY MR. WALSH:

16          Q.   My question was actually

17     different.  Do you now agree that the case

18     and the lease requires the encumbrance of

19     the lease to be considered in the

20     valuation?

21               MR. KOH:  Objection.  The witness

22          may answer.

23               MR. SCHWARTZ:  Objection.

24               THE WITNESS:  It's a great

25          question.  I still have my doubts as
```

```
                                    Page 161

 1                    MISSRY

 2        to what a court would hold because of

 3        the language, because I do believe

 4        that the option term addendum is not

 5        clear.  I do see McDonald's

 6        perspective on why the lease should be

 7        included and I do see the other side

 8        of the coin as well.  So -- but for

 9        the purposes of again trying to work

10        things out, we took the approach that

11        the lease would be taken into account

12        in Tom having to do a revised, if you

13        will, appraisal.

14   BY MR. WALSH:

15        Q.    And who made that decision?

16        A.    We conferred and again, the

17   ultimate decision is the client's as you

18   know.

19        Q.    So Sam Rottenberg made that

20   decision?

21             MR. KOH:  Objection.  Go ahead.

22             THE WITNESS:  Sam Rottenberg in

23        consultation with myself and probably

24        Tom Tener made that decision.

25   ///
```

1                    MISSRY

2    BY MR. WALSH:

3        Q.    And do you recall when that

4    decision was made?

5        A.    I believe the decision to redo

6    the appraisal was made sometime in July of

7    '19 but it took the better part of a month

8    and a half, two months to get McDonald's

9    to agree to a non-prejudicial letter that

10   would allow the appraisers to hire the

11   third appraiser and proceed down the path

12   of getting that person's opinion of value.

13       Q.    Now in the course of deciding

14   whether to take the encumbrance of the

15   lease into account in KTR's analysis, did

16   you consult with anyone other than

17   Vanderbilt or Tom Tener?

18       A.    Other than possibly a partner or

19   two, no.

20       Q.    Do you recall if you did

21   additional research?

22       A.    I don't recall, no.

23       Q.    Now, when you made the decision

24   -- or when Vanderbilt made the decision to

25   have Tom revise his analysis, had your

1                    MISSRY

2    view on the applicability of the case

3    changed; in other words, did you feel

4    differently about the case at that point

5    in time than you did when you read it in

6    April of 2019?

7        A.    I saw -- as I mentioned before, I

8    saw McDonald's perspective and for the

9    purposes of trying to move the ball

10   forward, we agreed with their

11   interpretation.

12       Q.    So the only reason you agreed

13   with the interpretation was to try to move

14   the ball forward and not because

15   Vanderbilt believed it was correct?

16           MR. SCHWARTZ:  Objection.  You

17       can answer.

18           MR. KOH:  Objection.  Go ahead

19       and answer.

20           THE WITNESS:  I think the case

21       speaks for itself.  The case stands

22       for the theory that absent an express

23       statement in the lease, excluding

24       taking that particular lease into

25       account, that you shouldn't.  It was

```
                                    Page 164

 1                  MISSRY

 2         our belief beforehand that there was

 3         language that was tantamount to doing

 4         that but again, we always look at

 5         different perspectives.  If we're

 6         wrong, we're happy to say we're wrong.

 7         I don't know how the case, how our

 8         particular case would turn out but

 9         again, we agreed with their

10         interpretation as a concession to

11         moving forward because they wouldn't

12         move forward with appointing another

13         appraiser unless we did.

14    BY MR. WALSH:

15         Q.   Do you recall what specific

16    instructions you or Vanderbilt made to Tom

17    Tener to revise his original analysis?

18         A.   The only instructions we would

19    have given Tom is to take the lease into

20    account.

21         Q.   Did you or Vanderbilt suggest

22    that he look for comparable ground leases?

23         A.   I don't recall.  I would leave

24    Tom to doing his thing.  He's the

25    professional.
```

1                    MISSRY

2        Q.    When Vanderbilt instructed Tom

3    Tener to proceed to revise his analysis,

4    had KTR shared with you that it believed

5    its valuation conclusion would be

6    approximately the same even if he

7    considered the encumbrance to the lease?

8        A.    Can you repeat that?

9        Q.    Sure.

10            When Vanderbilt instructed KTR to

11   proceed to revise its analysis, had anyone

12   at KTR shared with you that it believed

13   its valuation conclusion would be

14   approximately the same as its original

15   valuation conclusion even if it considered

16   the encumbrance to the lease?

17            MR. SCHWARTZ:  Objection.

18            THE WITNESS:  I don't know that I

19        said that Vanderbilt directed.  I

20        think we collectively did.  And I

21        don't think we knew what his analysis

22        was before he did the work so I don't

23        think so.

24            MR. WALSH:  If we could just take

25        a five-minute break.  I think now

```
                                      Page 166
 1                    MISSRY
 2        would be a good time to take a quick
 3        break and we can come right back if
 4        that's okay with everyone.
 5              MR. KOH:  It's okay with me.
 6              THE VIDEOGRAPHER:  Going off the
 7        record at 2:17 p.m.  This is the end
 8        of media unit 3.
 9              (Recess taken from 2:18 p.m. to
10        2:29 p.m.)
11              THE VIDEOGRAPHER:  Going back on
12        the record, 2:29 p.m.  This is
13        beginning of media unit 4.  Okay, you
14        may proceed.
15   BY MR. WALSH:
16        Q.   Okay, if we can please pull up
17   P62.  So this is an e-mail from Tom Li --
18   or an e-mail chain between Tom Li, Tom
19   Tener, Sam Rottenberg and Morris Missry
20   from July 2019.  You tell me when you have
21   it up.
22        A.   I'm looking at it.
23        Q.   So if you could flip to the
24   second page, the bottom e-mail from July
25   9, 2019, 9:49 a.m. from Tom Tener to you
```

```
 1                    MISSRY
 2   and Sam Rottenberg, he says, other than
 3   some preliminary analysis, I have not
 4   begun the land residual.  I will not be
 5   able to start with the land residual until
 6   sometime during the week of July 22nd.  If
 7   you have confirmed details of any retail
 8   lease comparables in this area, please
 9   send them to me.  Comparable leases in the
10   90 to $100 per square foot range, about
11   $75 NNN, that's triple net, would support
12   our concluded FMR for a 20-year term.  Do
13   you see this?
14        A.   I see it.
15        Q.   What discussions did you have
16   with Tom around this time about what he
17   should be doing and how he should be
18   revising his analysis at all?
19        A.   The only thing I recall is
20   telling him that we're negotiating a
21   letter agreement with McDonald's and that
22   he should start -- he should start on
23   revising his appraisal based upon the
24   assumption that the lease is an
25   encumbrance.
```

```
                                        Page 168

  1                    MISSRY

  2        Q.   So this e-mail that we just read

  3   was July 9, 2019.  So you agree you had

  4   given him those instructions sometime

  5   before July 9, 2019?

  6        A.   In all likelihood, yeah.

  7        Q.   Now, the first page, bottom

  8   e-mail, it's a July 23, 2019 e-mail from

  9   Tom Tener to you and Sam Rottenberg.  It

 10   says, I have built the model for a land

 11   residual that my staff is researching rent

 12   comps in the area.  I think that both you

 13   and Morris mentioned at the McDonald's

 14   meeting that you have knowledge of retail

 15   lease comps in the $100 per square foot

 16   range in this area.

 17             Does this refresh your

 18   recollection about what you discussed with

 19   Tom Tener on the day of the McDonald's

 20   meeting?

 21        A.   No.

 22        Q.   Okay.  So he talks about that you

 23   may have mentioned retail lease comps,

 24   $100 per square foot range.  What, if

 25   anything, do you recall about that?
```

```
                                        Page 169
 1                    MISSRY
 2        A.    I don't recall anything specific.
 3        Q.    Do you think you would have been
 4    knowledgeable of retail lease comps in the
 5    $100 per square foot range in that area?
 6            MR. KOH:   Objection.
 7            THE WITNESS:   I think I would
 8        have knowledge of retail comps way
 9        above $100 per square foot.
10    BY MR. WALSH:
11        Q.    In that area?
12        A.    On Fulton Street, yeah.
13        Q.    If we could please pull up P36,
14    this is the July 30, 2019.
15        A.    P36?
16        Q.    Yes.
17        A.    Here it is.  Okay.
18        Q.    So this is his revised analysis
19    dated July 30, 2019.  And he came to the
20    same value conclusion.  Were you surprised
21    to learn that he had arrived at the same
22    exact fair market rent valuation as he did
23    in his prior report?
24        A.    Just give me a second.  I'm
25    looking at it.
```

```
 1                    MISSRY
 2            (Witness perusing document.)
 3            What was the question?  I'm
 4    sorry.
 5       Q.    Were you surprised to learn that
 6    KTR had arrived at the same exact fair
 7    market rent valuation as they did in its
 8    original report?
 9       A.    No.
10       Q.    Why?
11       A.    I thought that the analysis that
12    he did on the land residual was very
13    sound.  I think it was conservative to
14    assume market rent of 90 to $100 when, you
15    know, I've been involved in leases that
16    are way higher than that, although down
17    the block.  So I thought his analysis was
18    conservative but again, it was his
19    analysis.
20       Q.    Okay.  So a very experienced real
21    estate professional, I think you said
22    before that you're even a real estate
23    investor.  Is it your opinion that a
24    sophisticated and knowledgeable investor
25    would pay the exact same amount for a
```

```
1                    MISSRY
2    property that it could own in perpetuity
3    and then sell, that it would pay for a
4    parcel where it can only benefit for a
5    defined 20-year period of time with no
6    reversion interest?
7            MR. KOH:  Objection.  You may
8        answer the question.
9            MR. SCHWARTZ:  Objection.
10           THE WITNESS:  I think that there
11       is a flaw in that analysis; right?
12       You said before that that Sam owned a
13       99-year lease.  So a 99-year lease --
14       and you also said that he was going
15       to -- he had to pay his landlord what
16       he collected from McDonald's or some
17       differential if he didn't hit a
18       certain amount by a certain date.  I
19       think that's what you said.  So no, I
20       wouldn't be surprised that somebody
21       would pay an amount of money for 79
22       years or whatever the amount of the
23       term, the residual term was on the
24       lease, when it didn't have to pay a
25       purchase price.  So no, I wasn't
```

```
                                      Page 172
 1                  MISSRY
 2       shocked by this at all.
 3    BY MR. WALSH:
 4       Q.   I think you're talking about
 5    something different.  Tom in his revised
 6    analysis was assuming that the property
 7    could only be used for 20 years; right?
 8             MR. SCHWARTZ:  Objection.
 9             MR. KOH:  Objection.  Go ahead
10       and answer.
11             THE WITNESS:  He was doing a
12       valuation based upon a 20-year option
13       period.
14    BY MR. WALSH:
15       Q.   Right.  And his original analysis
16    was essentially with no time restriction;
17    right?  What would the property be worth
18    if it could be used with no time
19    restriction; right?
20       A.   Yeah, but when you're doing an
21    analysis, it's really, you don't -- the
22    analysis is based upon generally a 10-year
23    period.  He ran it out to 20 years.  If
24    I'm buying a property, I do my analysis
25    based upon what I'm going to be collecting
```

1                     MISSRY

2     in 10 years and I cap it out.  So he used

3     20 years because that was the term of the

4     lease.

5          Q.    Right.  But when you say you

6     would look at it in 10 years, you would

7     also factor in a reversion, the value of

8     the reversion interest back to after 10

9     years; right?

10               MR. KOH:  Objection.  You may

11          answer.

12               THE WITNESS:  I don't really know

13          where you're going with this.  This is

14          his analysis.  I'm not here to quibble

15          with his analysis.  He's the expert,

16          I'm not.

17     BY MR. WALSH:

18          Q.    Well, I'm asking for your

19     opinion.  Do you believe that a property

20     that can be owned or developed in

21     perpetuity would be worth the same amount

22     that a property could only be used for a

23     period of 20 years?

24               MR. KOH:  Objection.  You may

25          answer.

1                     MISSRY

2           THE WITNESS:  I think the

3       property that can be operating in

4       perpetuity would have a greater value

5       but I don't know that that was the

6       analysis here.

7    BY MR. WALSH:

8       Q.   Okay, so --

9       A.   He's analyzing -- I think he's

10   analyzing the rent and what the rent

11   should be on a 20-year lease.

12      Q.   So KTR's revised report is dated

13   July 30, 2019.  When did you tell

14   McDonald's that you would have KTR prepare

15   a new report?

16      A.   I don't know when Michael and I

17   started discussing the concept of doing

18   new reports and meeting again and trying

19   to figure it out again.  I'm not sure.

20           MR. WALSH:  If we could mark

21       MCD007663 as Exhibit P98.

22           MR. SCHWARTZ:  P98 did you say?

23           MR. WALSH:  Yes.

24           (Exhibit P98, document Bates

25       labeled MCD007663, marked for

```
                                            Page 175

 1                    MISSRY
 2        identification.)
 3    BY MR. WALSH:
 4        Q.    So this is an e-mail chain
 5    between you and Mike Meyer from McDonald's
 6    on August 28, 2019.  It spans through
 7    Bates stamp MCD007665.
 8        A.    Yeah.
 9        Q.    So does this refresh your
10    recollection about when you would have
11    told Mike Meyer that you would have KTR
12    prepare a new report?
13        A.    No.
14        Q.    Do you recall what you wanted to
15    speak with Mike about at this time?
16        A.    No idea.
17        Q.    Had you received KTR's report by
18    the time -- revised report by the time you
19    told McDonald's that you would have KTR
20    prepare a new report?
21            MR. KOH:  Objection.
22            THE WITNESS:  I don't know.
23        Possibly.  It took us a couple months
24        I think to negotiate the terms of the
25        letter agreement so it's possible.
```

```
 1                    MISSRY
 2   BY MR. WALSH:
 3       Q.   Okay.  Now, if a report had
 4   already been prepared in a revised manner,
 5   why wouldn't you have told McDonald's
 6   that?
 7            MR. KOH:  Objection.  Go ahead
 8        and answer.
 9            THE WITNESS:  Why wouldn't I have
10        told McDonald's that?  There could be
11        a whole host of reasons.  I don't
12        know.
13   BY MR. WALSH:
14       Q.   But you told McDonald's at some
15   point after the June 19, 2019 meeting that
16   you would instruct KTR to redo its
17   analysis by taking into account the
18   encumbrance of the lease; is that right?
19       A.   Yes, and I wanted to have a
20   letter agreement with McDonald's signed
21   that laid out a procedure.  In return for
22   us agreeing to redo the appraisal, we
23   wanted McDonald's to agree to a process
24   because they were forestalling that
25   process with the third appraiser, they
```

1                    MISSRY

2    wouldn't retain him.  So we wanted a

3    letter agreement with them that provided

4    for the retention of the third appraiser,

5    for everyone to redo their appraisal

6    without prejudice, et cetera, et cetera.

7    So we wouldn't have given McDonald's any

8    revised appraisals until we had a letter

9    agreement setting forth the procedure

10   going forward and it took them two or

11   three months to get that done.

12       Q.    If we could please pull up P87.

13       A.    Okay.

14       Q.    So this is an e-mail exchange

15   between you, Tom Tener and Sam Rottenberg

16   from early September 2019.  And Tom Tener

17   attached a redlined Word document that is

18   attached.  Now is this the draft agreement

19   that you were discussing with McDonald's

20   at the time?

21       A.    One of them.

22       Q.    Okay.  And by the way, is this

23   one of the documents that Vanderbilt's

24   counsel sent to you in advance of today's

25   deposition?

1                    MISSRY

2       A.    Yeah, the signed copy.

3       Q.    But not this draft?

4       A.    I don't think so.

5       Q.    So one of the edits that -- if

6    you could turn to the first page of the

7    redline.

8       A.    Sure.

9       Q.    The first numbered paragraph, one

10   of the edits Tom Tener proposed making in

11   bullet one was he was recommending to

12   strike the language in the agreement that

13   would have the appraisers estimate the

14   value of the property as encumbered by the

15   lease.

16            Do you see that?

17       A.    I do.

18       Q.    And do you recall why he made

19   that suggestion?

20            MR. KOH:  Objection.

21            MR. SCHWARTZ:  Same objection.

22            THE WITNESS:  I don't.

23   BY MR. WALSH:

24       Q.    Do you recall if you asked him?

25       A.    If I asked him to make that

```
 1                    MISSRY
 2   change?
 3        Q.   Or no, do you recall if you asked
 4   him why?
 5        A.   No, I don't recall.
 6            MR. WALSH:  If we could mark
 7        VA 034179, this is the signed copy of
 8        the agreement in 2019.
 9            (Exhibit P99, document Bates
10        labeled VA 034179, marked for
11        identification.)
12            THE WITNESS:  Okay, what exhibit?
13            MR. WALSH:  It should be P --
14            MR. KOH:  99.
15   BY MR. WALSH:
16        Q.   -- 99.
17        A.   Okay.
18        Q.   So this is the final copy of the
19   letter and the change that Tom suggested
20   was made so that language that would have
21   required the appraisers to estimate the
22   value of the property as encumbered by the
23   lease was ultimately removed as Tom had
24   suggested.  Do you recall why that
25   language was removed?
```

Page 180

1                       MISSRY

2       A.   Yes.

3       Q.   And why?

4       A.   It was removed because both

5    parties did not want to waive any of their

6    rights, any of the positions that they

7    previously took so we try to craft a

8    letter that was as non-prejudicial as

9    possible.  And if you take a look at

10   paragraph 2, you'll see that the second

11   sentence does that.

12      Q.   But at this point, if you had

13   already agreed to have Tom revise his

14   analysis to consider the encumbrance of

15   the lease, why would you have included it

16   in this agreement?

17           MR. KOH:  Objection.

18           MR. SCHWARTZ:  Objection.  Go

19      ahead.

20           THE WITNESS:  Because I already

21      told him to and there was no reason to

22      put it in what is best the settlement

23      negotiation letter with McDonald's.

24      It was academic at that point in time.

25   ///

```
 1                    MISSRY
 2   BY MR. WALSH:
 3       Q.   By the time you executed that
 4   letter in September of 2019, had you
 5   agreed or had Vanderbilt agreed that if a
 6   third appraiser was retained, that
 7   appraiser would also be instructed to
 8   value the rent as encumbered by the lease?
 9       A.   I don't -- I don't recall.
10       Q.   I know back in probably the
11   April/May 2019 time frame Sharon and Tom
12   Tener had some discussions about a search
13   for a third appraiser.  What role, if any,
14   did you play in the search for a third
15   appraiser?
16       A.   I think we asked Tom his opinion
17   on different appraisers and he gave us his
18   opinion and I think he brought up probably
19   three or four different people.  I think
20   Marc was the last person he brought up and
21   I guess he discussed all of these with
22   Sharon, that's what he told me, and they
23   agreed to Marc who I don't know from a
24   hole in the wall.
25       Q.   What was Vanderbilt looking for
```

```
 1                      MISSRY
 2    in a third appraiser?
 3         A.    Vanderbilt was looking for a
 4    third appraiser to do a letter of opinion
 5    of value.  Period, end of story.  They
 6    didn't really care who it was, they just
 7    wanted to get their rent paid and
 8    McDonald's was delaying the process since
 9    January.  So at that point in time, they
10    were happy with anybody that Sharon
11    reached out to.
12         Q.    If we could pull up P37.  It's an
13    e-mail chain between you and Sam
14    Rottenberg and Tom Tener from April 2019.
15         A.    P what, 37?
16         Q.    P37.  If you could look at the
17    bottom of the second page, it's ending in
18    VA 019026.  It's an e-mail from Tom Tener
19    to you dated April 23, 2019.
20         A.    Okay.
21         Q.    And Tom says that he's going to
22    be speaking with Sharon Locatell tomorrow
23    to go over the logistics of this FMR
24    determination and begin a discussion about
25    the selection of a third appraiser.
```

```
                                    Page 183

 1                    MISSRY

 2            Other than the appraisers that

 3     you listed before, do you recall if you

 4     spoke with any other appraisers or if you

 5     had any other appraisers that you did not

 6     want to be considered?

 7          A.   As the third appraiser?

 8          Q.   Yes.

 9          A.   I see here that I said not Amanda

10     because I didn't think Amanda was

11     qualified for this particular job but no,

12     we were -- we were, Vanderbilt and me,

13     were really relying on Tom to pick someone

14     that he liked and to get that person

15     approved by Sharon.  We were sort of

16     agnostic as to who it was.

17          Q.   So if you could just scroll up

18     through those e-mails and you mentioned

19     that Tom was going to give you a list of

20     his top three or four guys and asked him

21     to send a list and then he tells you who

22     he's contemplating, he puts out some

23     additional names.  And then on April 25,

24     2019 at 1:18 p.m. you wrote to him with a

25     copy to Sam Rottenberg, "You know what
```

```
 1                    MISSRY
 2   we're looking for."
 3        A.    Um-hum.
 4        Q.    What was Vanderbilt looking for?
 5             MR. KOH:  Objection.
 6             THE WITNESS:  Someone that Tom
 7        would choose to do the best possible
 8        job for both parties.
 9   BY MR. WALSH:
10        Q.    And nothing more?
11        A.    No.  Based upon the process, it
12   didn't matter to Vanderbilt.  Sam had his
13   appraisal.  We didn't think that -- I
14   don't know that we had anyone else's
15   appraisal at that point in time.  It was
16   very early in the process.  We had a sense
17   of what our valuation was so we just
18   wanted to move the process along.  It was
19   a very strong sense of frustration
20   because, you know, the folks at
21   McDonald's, I'm sure they have a million
22   things to do, were not really that focused
23   on this particular issue.
24        Q.    So do you recall having any
25   discussions with Tom or being a part of
```

```
                                    Page 185
 1                    MISSRY
 2   any discussions with Tom where he was told
 3   it would be helpful to have an appraiser
 4   appointed who would agree with a high
 5   valuation?
 6        A.   I have no recollection of that.
 7        Q.   If we could mark P38 or pull P38,
 8   I'm sorry.  And it's an e-mail chain from
 9   May 6, 2019 between you, Tom Tener and
10   Morris Missry and it starts with an e-mail
11   from Tom Tener saying that he had not
12   spoken with Sharon yet but he was
13   considering including Marc Nakleh of
14   Cushman & Wakefield on his list.  And you
15   ask, "Why him?"  And he responded, "I
16   reviewed one of his appraisal reports that
17   he did for Brian Corcoran that detailed
18   numerous ground rent percentages relative
19   to land value.  I will remind him of this
20   data that he has available in his files.
21   Some of this data is noted in my report
22   and is supportive of a high percentage in
23   the estimation of FMR."
24             So is this what Vanderbilt was
25   looking for in an appraiser?
```

```
 1                    MISSRY
 2       A.   I think that any appraiser would
 3   want somebody that would support its
 4   conclusions.  So I don't view that e-mail
 5   as anything but a good appraiser doing his
 6   job trying to find folks that would
 7   support the conclusions that he reached.
 8   Obviously Sharon had respect for Marc as
 9   well because she chose him out of four or
10   five different people and I would assume
11   that whatever Tom reviewed, Sharon could
12   also have reviewed.
13       Q.   If we could please pull up P74.
14       A.   Okay.
15       Q.   If you could go down to the
16   second page on the bottom e-mail, it's an
17   e-mail from Tom Tener to you, April 25,
18   2019.  It's to you and Sam Rottenberg
19   actually.
20       A.   Okay.
21       Q.   And Tom shares with you that --
22   this is the last line, last two lines on
23   that page, she, Sharon, seems to think
24   that we will meet with a third appraiser
25   and try to convince her that our FMVS are
```

1                     MISSRY

2     correct prior to the third appraiser

3     authoring our report.

4               What was your view on how the

5     three appraisers should work together?

6               MR. SCHWARTZ:  Objection.

7               THE WITNESS:  My view was and is

8          that the first two appraisers -- my

9          view is to interpret the lease

10         correctly so the first two appraisers

11         are supposed to -- the first two

12         appraisers are supposed to do their

13         work, issue their letter of opinion of

14         value or letters of opinion of

15         values -- value.  Once they do their

16         work and issue their letters, if

17         there's that disparity of 15 percent

18         or more, the parties are supposed to

19         appoint a third appraiser and that

20         third appraiser is supposed to issue

21         his or her letter of opinion of value

22         and then I guess they can discuss it

23         if they'd like to and then you take

24         the average of the three.

25     ///

1                    MISSRY
2   BY MR. WALSH:
3       Q.   And if you look back at that
4   e-mail that we just read, the very next
5   line on the next page, Tom says, "What is
6   your take on the procedure outlined in the
7   option rent addendum?"
8       A.   Um-hum.
9       Q.   Do you recall Tom asking for your
10  view?
11      A.   I'm sorry?
12      Q.   Do you recall Tom asking for your
13  view on the process?
14      A.   Yeah, I think he did.
15      Q.   Okay.  And then it looks like you
16  suggested call with you and Sam
17  Rottenberg; right?
18      A.   Okay.
19      Q.   And it looks like if you scroll
20  through the e-mails, that you had that
21  call with him on April 30th.
22           Do you see that?
23      A.   I do.
24      Q.   So the three of you spoke on
25  April 30th and did you communicate to Tom

```
 1                    MISSRY
 2    Tener on that call what you just shared
 3    with me?
 4        A.    I'm sure I did at some point.  I
 5    don't know what happened on that
 6    particular call.
 7        Q.    Now, your view on what the lease
 8    requires, did you consult with anyone else
 9    in arriving at that conclusion or was that
10    your conclusion alone?
11        A.    That was my conclusion.  I think
12    it was Tom's conclusion and probably Sam's
13    conclusion as well.
14        Q.    Was this the first time you had a
15    discussion with Tom Tener about how the
16    three appraisers would work together?
17        A.    I have no idea.
18        Q.    And you believe that this was
19    also Tom Tener's view of what the lease
20    language required?
21        A.    Yes.
22        Q.    If we could please pull up P77.
23    This is an e-mail chain from May of 2019
24    between Morris Missry, Tom Tener, Sam
25    Rottenberg and Tom Li.
```

Page 190

1                    MISSRY

2        A.    Yes.

3        Q.    So on May 14, 2019, Tom Tener

4    e-mailed you and said, "Morris:  If the

5    hope is to avoid litigation and delay in

6    the rent reset, I might suggest that you

7    propose having the three appraisers review

8    the directions and see if two of us can

9    agree.  What do you think?"  And you

10   responded about 15 minutes later, "The

11   lease provision is clear.  I am talking to

12   them and will let you know what happens.

13   Thank you."

14           So you rejected Tom Tener's

15   suggestion to have the three appraisers

16   try to figure this issue out; right?

17           MR. KOH:  Objection.

18           MR. SCHWARTZ:  Objection.

19           THE WITNESS:  I was interpreting

20      the lease provision.  To me it was and

21      is crystal clear as to the procedure.

22      I guess Tom was reacting to my comment

23      about trying to avoid litigation and

24      getting things done quickly so he was

25      trying to be conciliatory, but that

```
 1                      MISSRY
 2        unfortunately wasn't proper procedure
 3        and we wanted to stick with the proper
 4        procedure.
 5   BY MR. WALSH:
 6        Q.   So why don't we pull up the
 7   option rent addendum.  It's P16.  It is
 8   already in your list.
 9        A.   Okay.
10        Q.   So in your view, where does it
11   clearly state that the three appraisers
12   cannot have any discussions with each
13   other?
14             MR. SCHWARTZ:  Objection.  You
15        can answer.
16             MR. KOH:  Same objection.  Go
17        ahead.
18             THE WITNESS:  I don't think I
19        said that, did I?
20   BY MR. WALSH:
21        Q.   So what is your view?  What is
22   your view of what the lease requires?
23        A.   I just testified to it.
24        Q.   If you could explain it again
25   because my understanding is you were
```

Page 192

1                      MISSRY

2    saying that the three appraisers could not

3    have any communications with each other.

4        A.    I never said that.

5        Q.    So can you please explain what

6    your view of it is?

7        A.    If you take a look at the option

8    rent addendum, the last paragraph, let's

9    read it together.  We'll start with the

10   second sentence.  If the two appraisals

11   differ by more than 15 percent, which they

12   did, then the two appraisers shall appoint

13   a third appraiser chosen from a list of

14   three appraisers designated by the

15   national headquarters of American

16   Institute of Real Estate Appraisers, which

17   wasn't done, or if no longer in existence

18   a similar success organization.  They

19   chose Marc Nakleh because they both I

20   guess agreed that he was the proper guy.

21   The three appraisers so appointed shall

22   then within 20 days of the date of the

23   third appraiser estimate by means of a

24   letter of opinion about the fair market

25   value.  The decisions of the appraisers or

MISSRY

1
2    majority of them shall be binding upon the
3    parties.  If the appraisers cannot agree
4    to a fair market value, it shall be
5    determined by adding all three estimates
6    and dividing the total by three estimates,
7    by number three.  So by means of a letter
8    opinion of value, that's the procedure and
9    once each party -- and we can continue to
10   read other provisions that bolster that
11   process.  Once that appraiser, the third
12   appraiser issues its opinion of value,
13   then you compare the three.  If two of
14   them match, that's the rent, if they
15   don't, you divide by three.
16       Q.   So is it your view that it's a
17   purely sort of mechanical process of just
18   looking at the three valuations and if
19   they don't match to the penny, you need an
20   averaging?
21       A.   Yes, that's what it says.
22       Q.   So it's your view that the
23   appraisers cannot have any discussions to
24   see if they can agree on a valuation?
25            MR. KOH:  Objection.  Go ahead

```
 1                    MISSRY
 2      and answer.
 3           MR. SCHWARTZ:  Objection.
 4           THE WITNESS:  Again, you're
 5      putting words in my mouth.  I didn't
 6      say they can't speak.  What I said was
 7      they have to issue their letters of
 8      opinion of value first.
 9  BY MR. WALSH:
10      Q.   And unless they match to the
11  penny, they have to be averaged, is that
12  your view?
13      A.   Well, let's --
14           MR. SCHWARTZ:  Objection.  You
15      can answer.
16           MR. KOH:  Same objection.
17           THE WITNESS:  If the appraisers
18      or a majority of them cannot agree on
19      fair market value, so to me that means
20      they can't agree on what the precise
21      number is.
22  BY MR. WALSH:
23      Q.   I'm asking you in determining
24  whether they can agree --
25      A.   Yeah.
```

```
 1                    MISSRY
 2      Q.   -- are they allowed to have
 3   discussions to see if they can agree or is
 4   it just that process of looking at the
 5   valuations that they came up with and if
 6   they don't match, then averaging them?
 7           MR. SCHWARTZ:  Objection.  You
 8       can answer.
 9           THE WITNESS:  I answered it but
10       I'll repeat myself.  The third
11       appraiser has to estimate by means of
12       a letter of opinion of value the fair
13       market value.
14   BY MR. WALSH:
15      Q.   That wasn't my question.  What
16   I'm trying to understand is --
17      A.   I don't see anything in here --
18      Q.   Let me ask my question.  Is it
19   your opinion that the appraisers just work
20   independently and unless their valuations
21   match to the penny, they are averaged?
22      A.   Yeah.
23           MR. KOH:  Objection.  Go ahead
24       and answer.
25           THE WITNESS:  The answer is yes,
```

1                    MISSRY

2           I think the process tries to or the

3           provision of the lease tries to

4           eliminate any funny business by making

5           the three appraisers do their work

6           independently of each other, not

7           having one appraiser try to influence

8           the other and sort of skew that

9           process.  So I think that the process

10          set forth in the option term addendum

11          is inherently fair and impartial so

12          the answer is yes.

13     BY MR. WALSH:

14          Q.   If you could please turn back to

15     P38 which was an e-mail between -- e-mail

16     exchange between you and Tom Tener and Sam

17     Rottenberg about Marc Nakleh.

18          A.   Okay.

19          Q.   Tom wrote to you, "I will remind

20     him of this data that he has available in

21     his files.  Some of this data is noted in

22     my report and is supportive of a high

23     percentage in the estimation of FMR."

24               Did you ever tell Tom that it

25     would be inappropriate for him to speak

1                    MISSRY

2    with Marc and remind him of this data?

3        A.    I'm not sure that Tom spoke to

4    Marc about his data.

5        Q.    That wasn't my question.  Did you

6    ever tell Tom it would be inappropriate

7    for him to do that?

8        A.    What I would have told Tom as I

9    told Mike Meyer is that nobody, whether

10   the party or any appraiser, can skew or

11   try to talk to a third appraiser to tell

12   him what his estimate of value is and

13   cannot do anything improperly.

14       Q.    Did you tell him that?

15       A.    I told everybody that.

16       Q.    When did you tell him that?

17       A.    I don't recall.

18       Q.    Okay, so how are you so certain

19   that you told him that?

20       A.    Because I do things ethically and

21   you remember Mike Meyer making -- if you

22   take a look at his drafts, he wanted the

23   folks to talk.  He wanted them I believe

24   to share -- at least in conversations he

25   told me that he wanted the appraisers to

Page 198

1                    MISSRY

2     share their thoughts.  I thought it was

3     inappropriate given the language of the

4     lease.

5         Q.   Would you have told Tom that in

6     writing in response to his e-mail?

7         A.   I don't know if it was in writing

8     or if it was verbally.  I'm not sure.  The

9     process was very, very important to me

10     because I thought that the provision

11     wasn't so great and I wanted to abide by

12     the strict terms of it.

13             MR. WALSH:  If we could please

14         mark VA 000778.

15             (Exhibit P100, document Bates

16         labeled VA 000778, marked for

17         identification.)

18     BY MR. WALSH:

19         Q.   That will be P100.

20         A.   Let me know when it shows up,

21     please.

22         Q.   It's there.

23         A.   Thank you.  P100, here it is.

24         Q.   So on September 24, 2019, Tom

25     Tener sent you and Sam Rottenberg an

```
 1                    MISSRY
 2   e-mail saying that Sharon had reached out
 3   to him to set up a meeting to discuss
 4   Tom's value conclusions and he suggested
 5   that you and Mike Meyer of McDonald's
 6   reach out to Marc Nakleh and get his
 7   proposal for his role as the third
 8   appraiser in this proceeding.  Continuing
 9   down it says we will also likely want to
10   have a preliminary meeting with Marc and
11   to provide him with each appraiser's
12   understanding of the appraisal assignment
13   as well as our comparables in support of
14   our conclusion.
15                    What was your reaction to Tom's
16   suggestion?
17        A.   I don't know.  I would have to
18   see the e-mail.
19        Q.   I'm just asking you, do you
20   recall what your reaction was?
21        A.   If you show me the e-mail, maybe
22   I would recall.  I don't recall.
23        Q.   I'm not suggesting there's an
24   e-mail.  I'm asking what your reaction is.
25        A.   If I can see an e-mail I might
```

```
 1                   MISSRY
 2   recall.  I don't recall what my reaction
 3   was.
 4       Q.   Okay.  But what Tom was proposing
 5   was inconsistent with what you believe the
 6   process required; right?
 7       A.   Yes.
 8            MR. SCHWARTZ:  Objection.
 9            MR. KOH:  Same objection.
10   BY MR. WALSH:
11       Q.   Now do you know what position
12   Vanderbilt is currently taking about how
13   the three appraisers should work together?
14       A.   I have no idea.
15       Q.   Have you been involved in any
16   discussions with Vanderbilt about a change
17   in its position after this litigation was
18   filed?
19            MR. SCHWARTZ:  Objection.
20            THE WITNESS:  I haven't been in
21       touch with Vanderbilt to discuss this
22       process since McDonald's sued them.
23            MR. WALSH:  If you could please
24       mark 2021.05.27 and you can see the
25       rest, that will be Exhibit P101.
```

```
 1                    MISSRY
 2       These is Vanderbilt's amended answers
 3       and objections to plaintiff's first
 4       set of interrogatories.
 5              (Exhibit P101, amended answers
 6       and objections, marked for
 7       identification.)
 8              THE WITNESS:  Okay.
 9   BY MR. WALSH:
10       Q.   Okay, if you could -- so these --
11   if you could flip to the second to last
12   page, it's interrogatory number 20.  And
13   these are Vanderbilt's responses to our
14   interrogatories -- McDonald's
15   interrogatory.
16              The procedure that Vanderbilt is
17   suggesting in this response is different
18   than the procedure that you believed
19   should be followed and that we discussed
20   earlier; right?
21       A.   I think if you read this response
22   carefully, it says the three appraisers
23   would have no obligation to hear testimony
24   or take any other evidence beyond each
25   party's already prepared exchange
```

```
 1                    MISSRY
 2    appraisals.  I was reading from response
 3    to interrogatory number 20, the second
 4    sentence.
 5         Q.   Where it says the three
 6    appraisers would confer, you did not
 7    believe the appraisers should have any
 8    discussions; right?
 9              MR. SCHWARTZ:  Objection.
10              MR. KOH:  Objection.
11              THE WITNESS:  No, I didn't say
12         that.  You keep mischaracterizing what
13         I said.  What I said was there is no
14         obligation to have any discussions and
15         at the very least the obligation is
16         for each of the appraisers to complete
17         and issue their letter of opinion of
18         value.  They can confer all they want
19         afterwards but that's the obligation
20         under the lease.  Maybe there's a
21         Court of Appeals case that says that
22         they can talk even though it doesn't
23         say it in the lease.
24    BY MR. WALSH:
25         Q.   Are you aware of any such
```

Page 203

1                        MISSRY

2      decision?

3           A.    I'm not.

4           Q.    So on November 1, 2019, I sent

5      you a letter explaining the reasons why

6      McDonald's was concerned by Vanderbilt's

7      failure to cooperate in the fair market

8      rent valuation process.  Do you recall

9      that letter?

10               MR. SCHWARTZ:  Objection.

11               THE WITNESS:  I do.  I found it

12          comical.

13     BY MR. WALSH:

14          Q.    And your reaction to that letter

15     was to tell Vanderbilt that it should sue

16     McDonald's; right?

17          A.    I don't recall my reaction other

18     than laughing at the notion that

19     Vanderbilt was not cooperative when they

20     waited nine months, 10 months for

21     McDonald's to do anything.

22               MR. WALSH:  If we could mark

23          VA 034315.

24               (Exhibit P102, document Bates

25          labeled VA 034315, marked for

```
 1                    MISSRY
 2        identification.)
 3   BY MR. WALSH:
 4        Q.    And that will be Exhibit P102.
 5   Mr. Missry, what are you looking at right
 6   now?
 7        A.    I was looking at my text.
 8        Q.    But we're in the middle of a
 9   deposition.
10        A.    I'm waiting for you to tell
11   me that the exhibit --
12        Q.    I asked you before, please, you
13   should not be --
14        A.    Not a problem.
15        Q.    -- during this deposition?
16        A.    Not a problem.
17        Q.    Did that text relate to this
18   deposition?
19        A.    No, it relates to my gardener, if
20   you want to see it.  What exhibit do you
21   want me to look at?
22        Q.    Exhibit P102.
23             MR. KOH:  There's no 102 but
24        there's two 101s.
25             MR. WALSH:  I see an Exhibit P102
```

```
                                              Page 205
 1                    MISSRY
 2       on my screen.
 3              MR. KOH:  Now I have it.
 4              THE WITNESS:  Okay.
 5    BY MR. WALSH:
 6       Q.   So this is an e-mail that you
 7    sent to Sam Rottenberg and Tom Tener and
 8    Dani Schwartz on November 1, 2019 in
 9    response -- actually forwarding the letter
10    that I had sent to you and you wrote, they
11    fired the first shot.  We should -- we
12    need to sue them.
13       A.   Yeah.
14       Q.   What type of lawsuit did you
15    envision?
16       A.   I don't know.
17              MR. KOH:  Objection.
18    BY MR. WALSH:
19       Q.   What did you believe your claim
20    would be?
21              MR. KOH:  Objection.
22              THE WITNESS:  I don't know.
23    BY MR. WALSH:
24       Q.   Now, you testified earlier that
25    there was nothing in this option rent
```

Page 206

1                    MISSRY
2    addendum that provided for any litigation,
3    yet you're saying to Vanderbilt and to Tom
4    Tener we need to sue them.  I'm just
5    trying to understand what you believed
6    that lawsuit would look like.
7         A.   I believe McDonald's acted in bad
8    faith throughout the process.  I believe
9    they delayed Vanderbilt in determining the
10   fair market value rent.  I believe that
11   they wouldn't agree to retain Marc Nakleh
12   to be the third appraiser because they
13   were intimidated, afraid, didn't want to
14   accept Tom Tener's conclusions and no
15   matter what Marc Nakleh said, it would be
16   a disaster for McDonald's.  So they acted
17   in total bad faith.  That's what I meant.
18        Q.   And you believed that a court
19   should decide those issues; right?
20        A.   I believe that a court should
21   probably require the retention of Marc
22   Nakleh so that he could do the comps.
23        Q.   So that was the nature of your
24   proposed lawsuit?
25             MR. KOH:  Objection.

1                    MISSRY

2              MR. SCHWARTZ:  Objection.

3              THE WITNESS:  I don't recall the

4         nature of my proposed lawsuit other

5         than I was thinking along those lines

6         at the time.

7    BY MR. WALSH:

8         Q.   Do you remember how Tom Tener or

9    Vanderbilt reacted to your suggestion?

10             MR. KOH:  Objection.  Go ahead.

11             THE WITNESS:  No.

12   BY MR. WALSH:

13        Q.   Did you have any discussions with

14   Tom Tener about your proposed lawsuit?

15             MR. SCHWARTZ:  Objection.

16             THE WITNESS:  I didn't have a

17        proposed lawsuit.

18   BY MR. WALSH:

19        Q.   You're saying --

20        A.   I told my client -- let me finish

21   the answer.  I told my client that he

22   should sue McDonald's because McDonald's

23   was acting in bad faith in delaying the

24   determination of what the rent should be.

25        Q.   So my question is did you have

```
 1                    MISSRY
 2   any discussions with Tom Tener about that?
 3        A.   I don't recall having discussion
 4   with Tom Tener about litigation.
 5        Q.   Did you or your firm -- let me
 6   say, when did you begin collecting
 7   documents for document production purposes
 8   in this litigation?
 9        A.   Whenever Howard asked us to.
10        Q.   Do you recall when that was?
11        A.   No.
12        Q.   Whose documents were collected?
13        A.   Sorry?
14        Q.   Whose documents were collected?
15        A.   What does that mean?
16        Q.   Who did you collect documents
17   from?
18        A.   From my e-mails, from, you know,
19   my files.
20        Q.   Anyone else?
21        A.   I don't think anybody else worked
22   on this other than me.
23        Q.   Well, Dani Schwartz was just
24   copied on the e-mail that we looked at a
25   moment ago.  Was he working on this
```

1                    MISSRY

2    matter?

3         A.   Dani may have given me some

4    guidance on a couple things.  I'm not

5    sure.

6         Q.   Were those documents produced?

7              MR. SCHWARTZ:  Objection.  I just

8         want to note on the record that

9         there's been a pattern throughout the

10         day of stating as a premise of the

11         question things that the witness never

12         said or that are not in evidence and

13         not in the record, and in fact, belied

14         by the record.  So I would just ask

15         that you to take more care in

16         fashioning the questions instead of

17         putting words in the witness's mouth.

18              MR. WALSH:  I'll continue to ask

19         my questions and you can continue to

20         object if you disagree.

21    BY MR. WALSH:

22         Q.   So my question before was:  Was

23    Dani Schwartz working on this matter?

24         A.   He may have given me some

25    guidance on a few questions I had.

```
                                          Page 210

 1                      MISSRY
 2      Q.    So were those documents produced
 3   to Vanderbilt?
 4          MR. KOH:   Objection.   You're
 5       assuming such documents exist when
 6       there's no evidence that they do.
 7          MR. SCHWARTZ:   Same objection as
 8       to the prior objection that I made.
 9   BY MR. WALSH:
10      Q.    What did you do to determine if
11   Dani Schwartz or anybody else in your firm
12   had responsive documents?
13      A.    I don't recall.
14      Q.    Did you do anything?
15      A.    I'm assuming we asked around if
16   anybody had any documents on this matter.
17   That's what we typically do in a
18   litigation.
19      Q.    Would that have been done in
20   writing?
21      A.    I don't recall.
22      Q.    How did you determine which
23   documents would be provided to Vanderbilt?
24      A.    To Vanderbilt or to Vanderbilt's
25   attorney?
```

Page 211

1                        MISSRY

2          Q.   Either/or.

3          A.   I think we basically provided

4     everything we had.

5          Q.   How did you determine what

6     everything you had was?

7          A.   We looked.

8          Q.   How did you look?

9          A.   With a fine toothed comb and a

10    feather.  We looked on our system.

11         Q.   So did you --

12         A.   In our file.

13         Q.   What I'm trying to understand is

14    how did you look, what did you do, did you

15    run search terms?  I'm trying to just

16    figure out, it's not a hard question, what

17    did you do to determine what potentially

18    responsive documents you had?

19         A.   We looked at various search

20    terms, e-mails by and between parties.

21         Q.   What search terms did you use?

22         A.   I don't know.

23         Q.   Were those search terms retained?

24         A.   I don't recall.

25         Q.   And who did that process?

Page 212

1                          MISSRY
2         A.    I don't recall.
3         Q.    What instructions did you get
4    from Vanderbilt or Vanderbilt's counsel
5    about how to determine potentially
6    responsive documents?
7         A.    I don't recall.
8         Q.    Did Vanderbilt's counsel or
9    Vanderbilt send you copies of McDonald's
10   discovery demands?
11        A.    I don't recall.
12        Q.    How did you -- what file did you
13   locate your handwritten notes from the
14   June 19, 2019 meeting?
15        A.    I don't recall.
16        Q.    Are those the only handwritten
17   notes that you have from your
18   representation of Vanderbilt in this
19   matter?
20        A.    I assume so.
21        Q.    What did you do to check?
22        A.    We checked our files as I said
23   three times.
24        Q.    Are you certain that all
25   handwritten notes from your files have

```
 1                    MISSRY
 2    been produced?
 3         A.   I think so but I don't recall
 4    what else was produced.  It was awhile
 5    ago.
 6         Q.   Would you be surprised if those
 7    were the only notes that were provided in
 8    response to McDonald's document demands?
 9         A.   I really don't know.  We try to
10    be as thorough as possible and we provided
11    everything that we were requested to
12    provide.
13         Q.   I'm trying to understand, where
14    did you find those notes, were they in a
15    hard file?
16         A.   Probably but I don't know.
17         Q.   What else was in that file?
18         A.   Found it a long time ago, I don't
19    recall.
20         Q.   If we needed you to, would you be
21    able to locate that same file and
22    determine whether there's anything else
23    that's responsive?
24         A.   Would we be able to do what?
25         Q.   Would you be able to find that
```

1                    MISSRY

2    file and determine if there's any other

3    responsive documents?

4         A.   I think we've provided everything

5    to Meister Seelig.

6         Q.   Okay.  Did you withhold anything

7    as privileged or nonresponsive?

8         A.   You'd have to ask Mr. Koh and

9    Mr. Schwartz.  I don't know.

10        Q.   Well, I'm asking you.

11        A.   I don't know.  I have no idea.  I

12   provided everything that was asked of us.

13        Q.   Okay.  And what was asked of you?

14        A.   To provide all e-mails,

15   documents, et cetera, on this matter.

16        Q.   And you believe you did that?

17        A.   I believe we did.

18             MR. WALSH:  Okay, I think I'm

19        just about done.  If we could just

20        take a short two-minute break and come

21        back and hopefully wrap up.

22             THE VIDEOGRAPHER:  Off the record

23        at 3:26 p.m.

24             (Recess taken from 3:26 p.m. to

25        3:29 p.m.)

```
 1                    MISSRY
 2          THE VIDEOGRAPHER:  Back on the
 3       record 3:29 p.m.  You may proceed.
 4          MR. WALSH:  Mr. Missry, thank you
 5       for your time today.  I don't have any
 6       further questions.
 7          THE WITNESS:  Thank you very
 8       much.
 9          MR. KOH:  Mr. Missry, if you
10       could just indulge me for a very short
11       question or two, I'd like you to pull
12       up what was marked as I believe P59.
13       It should be the underlying lease
14       here.
15          MR. WALSH:  69?
16          MR. KOH:  69.  I'm sorry, 69.
17       Excuse me.
18          THE WITNESS:  Okay.
19    EXAMINATION
20    BY MR. KOH:
21       Q.  I'd like you to turn to paragraph
22    number 13 on that lease and when you have
23    it, just read it to yourself.  Let me know
24    when you're ready and then I will ask you
25    a question or two about that.
```

```
 1                        MISSRY
 2       A.    Paragraph 13?
 3       Q.    It's article 13.  It's on the
 4   page ending 334.  It begins option to
 5   extend.
 6       A.    Sure, just give me a second here.
 7             (Witness perusing document.)
 8             Yes.
 9       Q.    Earlier in the deposition you
10   testified that there was one 20-year
11   option term.  Does having seen paragraph
12   or article 13 affect your answer in any
13   way?
14       A.    No, it's an automatic extension
15   for four successive periods of five years
16   each which means it's a 20-year extension.
17             MR. KOH:  No further questions.
18             MR. SCHWARTZ:  None here.
19             MR. WALSH:  None here.
20             MR. KOH:  Thank you very much,
21       Mr. Missry.
22             THE VIDEOGRAPHER:  We're going
23       off the record at 3:31 p.m.  This
24       concludes today's testimony given by
25       Morris Missry.  There are four media
```

**Page 217**

1                          MISSRY

2          units.  They will be retained by

3          Veritext.

4              (Time noted:  3:31 p.m.)

5

6      _____

7    MORRIS MISSRY

8

9    Subscribed and sworn to before me

10   this ___ day of _____, 20___.

11

12

13   _____

14   Notary Public

15

16

17

18

19

20

21

22

23

24

25

Page 218

1

2                C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                           : ss.

5    COUNTY OF NASSAU       )

6

7         I, CATHI IRISH, a Registered

8    Professional Reporter, Certified Realtime

9    Reporter, and Notary Public within and for

10   the State of New York, do hereby certify:

11        That MORRIS MISSRY, the witness whose

12   deposition is hereinbefore set forth, was

13   duly sworn by me and that such deposition

14   is a true record of the testimony given by

15   the witness.

16        I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, and that I am

19   in no way interested in the outcome of

20   this matter.

21        IN WITNESS WHEREOF, I have hereunto

22   set my hand this 1st day of October, 2021.

23

24

        _____

25            CATHI IRISH, RPR, CRR, CLVS

Page 219

1

2      ---------------- I N D E X ----------------

3      WITNESS                 EXAMINATION BY        PAGE

4      MORRIS MISSRY       MR. WALSH            7

5                          MR. KOH             215

6

7

8      ---------------- EXHIBITS ----------------

9      EXHIBIT NUMBER      DESCRIPTION          PAGE

10     Exhibit P92, document Bates labeled   45

11     VA 012072

12     Exhibit P93, document Bates labeled   71

13     VA 043064

14     Exhibit P94, document Bates labeled   81

15     VA 012525

16     Exhibit P95, document Bates labeled   108

17     VA 001963

18     Exhibit P96, document Bates labeled   129

19     VA 018965

20     Exhibit P97, document Bates labeled   143

21     VA 024565

22     Exhibit P98, document Bates labeled   174

23     MCD007663

24     Exhibit P99, document Bates labeled   179

25     VA 034179

Page 220

1

2     Exhibit P100, document Bates          198

3       labeled VA 000778

4     Exhibit P101, amended answers and     201

5       objections

6     Exhibit P102, document Bates          203

7       labeled VA 034315

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 221

1              ** ERRATA SHEET **

2    CASE: MCDONALD'S vs. VANDERBILT

     DEPOSITION DATE: 9/30/2021

3    DEPONENT: MORRIS MISSRY

4    PAGE LINE(S)   CHANGE              REASON

5    ____|_____|_____|_____

6    ____|_____|_____|_____

7    ____|_____|_____|_____

8    ____|_____|_____|_____

9    ____|_____|_____|_____

10   ____|_____|_____|_____

11   ____|_____|_____|_____

12   ____|_____|_____|_____

13   ____|_____|_____|_____

14   ____|_____|_____|_____

15   ____|_____|_____|_____

16   ____|_____|_____|_____

17   ____|_____|_____|_____

18   ____|_____|_____|_____

19   ____|_____|_____|_____

20

21                   _____

                         MORRIS MISSRY

22

     SUBSCRIBED AND SWORN TO BEFORE ME

23   THIS _____ DAY OF _____, 20___.

24

     _____      _____

25   (NOTARY PUBLIC)           MY COMMISSION EXPIRES:

**[& - 26]**                                                      Page 1

| | |
|---|---|

**&**

**&**   3:13 6:15 18:23
24:22 185:14

**0**

**000778**   198:14,16
220:3
**001753**   117:16
**001963**   108:15,17
108:21 219:17
**011918**   49:17
**012072**   45:4,6
219:11
**012079**   45:10
**012456**   54:9
**012483**   54:9
**012525**   81:23 82:2
219:15
**015989**   87:11
**018965**   129:15,18
129:22 219:19
**019026**   182:18
**024565**   143:19,21
219:21
**024568**   143:25
**027513**   75:24
**034179**   179:7,10
219:25
**034315**   203:23,25
220:7
**043064**   71:22,24
219:13
**043073**   72:4
**06471**   1:7 5:18
**07601**   3:8
**077**   46:14

**1**

**1**   5:11 69:2 106:21
108:3 110:14
117:18 125:21
153:9 203:4 205:8

**1,348,000**   150:2
**10**   16:21 41:19
129:25 172:22
173:2,6,8 203:20
**100**   167:10 168:15
168:24 169:5,9
170:14
**10017**   3:17 4:7
**101s**   204:24
**102**   204:23
**108**   219:16
**10:10**   2:9 5:4
**10th**   129:25
**11**   154:19
**11:31**   68:25
**11:32**   69:3
**11:39**   69:4,6
**12**   55:3 151:7
154:17
**125**   3:15
**129**   219:18
**12:25**   104:11,14
**12th**   47:20 54:18
**13**   215:22 216:2,3
216:12
**13th**   54:23
**14**   190:3
**143**   219:20
**15**   45:13 59:3
130:21 133:21
137:4,12 139:10
140:11 144:5
154:20 187:17
190:10 192:11
**15,000**   87:17
**174**   219:22
**1754**   117:17
**179**   219:24
**18**   36:6 56:25
**19**   18:13 21:9
50:11 146:5 149:7

**159**:6 162:7
176:15 212:14
**198**   220:2
**1986**   20:22 21:6,7
**1987**   21:9
**1990**   20:10 24:19
**1991**   20:13
**1996**   26:21
**1998**   36:6
**1:04**   105:3,7
**1:18**   183:24
**1:19**   1:7 5:18
**1:30**   47:21
**1st**   146:25 218:22

**2**

**2**   69:7 104:12
141:11 180:10
**20**   68:23 83:12
151:6,9 154:21
155:14,17,20,25
156:4 167:12
171:5 172:7,12,23
173:3,23 174:11
192:22 201:12
202:3 216:10,16
217:10 221:23
**200**   3:7
**2008**   26:15
**201**   220:4
**2017**   37:19 95:7,15
97:18 98:6 101:23
**2018**   41:19 42:14
43:2,5,14,15 52:14
60:17 80:9,18,20
80:25
**2019**   27:19 30:4,8
36:19 43:9,19,23
45:12,14 46:18
47:8 55:4,10 56:3
60:13,19,20 61:6,7
61:10 68:2 72:14

**76**:3,7,21,25 77:17
80:17 83:25 87:15
92:13 106:4,12,15
106:21 108:3
110:14 117:18
123:11,11 125:21
129:25 130:21
133:21 137:4,12
139:10 140:11
144:5 146:5 149:7
153:10 159:6
163:6 166:20,25
168:3,5,8 169:14
169:19 174:13
175:6 176:15
177:16 179:8
181:4,11 182:14
182:19 183:24
185:9 186:18
189:23 190:3
198:24 203:4
205:8 212:14
**2021**   1:15 2:8 5:5
218:22
**2021.05.27**   200:24
**2027**   99:22
**203**   220:6
**20k**   154:22
**21**   3:6
**215**   219:5
**22**   30:8
**22,000**   156:18,22
**22nd**   167:6
**23**   168:8 182:19
**24**   198:24
**25**   12:16 24:10
76:2,21 183:23
186:17
**26**   24:10 55:10
56:3 60:12 72:14

[26th - adjustment]

Page 2

| | | | |
|---|---|---|---|
| **26th** 55:17 | **514** 75:24 | **95** 25:7 | **accuracy** 51:19 |
| **275** 151:10 | **5:30** 117:20 | **966** 129:22 | **accurate** 7:25 |
| **28** 76:25 83:25 | **6** | **99** 37:19 101:2 | 40:11 48:10 |
| 175:6 | **6** 45:12 46:18 93:6 | 171:13,13 179:14 | **acquired** 37:18 |
| **29th** 144:10 | 185:9 | 179:16 | **acted** 15:21 206:7 |
| **2:17** 166:7 | **6-0** 76:17 | **996** 87:12 | 206:16 |
| **2:18** 166:9 | **6.0** 74:6 | **9:46** 106:22 | **acting** 63:22 |
| **2:29** 166:10,12 | **64** 108:21 | **9:49** 166:25 | 207:23 |
| **3** | **69** 215:15,16,16 | **a** | **action** 9:24 10:3 |
| **3** 105:8 140:18 | **7** | **a.m.** 2:9 5:4 68:25 | 10:19 218:18 |
| 166:8 | **7** 219:4 | 69:3,4,6 106:22 | **active** 21:21 22:5 |
| **30** 1:15 2:8 5:5 | **71** 219:12 | 166:25 | 22:13,14 |
| 95:7,15 97:18 | **75** 167:11 | **aaron** 85:19 | **actively** 22:3 |
| 98:6 169:14,19 | **79** 171:21 | **abel** 84:2 87:12,20 | 83:14 |
| 174:13 | **7th** 3:16 | **abide** 198:11 | **acts** 148:8 |
| **30k** 154:22 | **8** | **ability** 38:11 60:3 | **actual** 47:25 74:6 |
| **30th** 188:21,25 | **8** 87:15 | 101:6 | **add** 80:8 |
| **32** 140:14 | **81** 219:14 | **able** 36:5 149:16 | **added** 141:9 |
| **334** 216:4 | **840** 33:4,16,23 | 167:5 213:21,24 | **addendum** 90:23 |
| **350,000** 151:8 | 36:8 37:2 43:18 | 213:25 | 91:3,4,25 92:6,8 |
| **360,000** 99:25 | 97:21 | **absent** 27:10 | 92:11 120:2,5,8 |
| **37** 182:15 | **87** 21:9,9 | 115:19,20 163:22 | 130:24 131:13,21 |
| **3:26** 214:23,24 | **885** 4:6 8:5 76:24 | **absolutely** 63:21 | 132:11,16 133:24 |
| **3:29** 214:25 215:3 | **9** | 91:9 99:16 148:15 | 134:4,11,22 137:2 |
| **3:31** 216:23 217:4 | **9** 166:25 168:3,5 | 156:5 | 137:11,25 138:13 |
| **4** | **9/30/2021** 221:2 | **academic** 180:24 | 138:25 139:22 |
| **4** 93:6,7 166:13 | **90** 167:10 170:14 | **accept** 141:17 | 142:3,9 143:11 |
| **45** 219:10 | **924** 49:17 | 206:14 | 145:7 161:4 188:7 |
| **464** 55:20 60:11 | **936** 16:15,24 26:16 | **accepted** 13:16 | 191:7 192:8 |
| **465** 61:24 | 27:2,8 28:5,17 | **accommodate** | 196:10 206:2 |
| **466** 61:24 62:3 | 70:24 91:15 107:9 | 158:13 | **adding** 193:5 |
| **468** 65:10 | 107:18 110:21 | **accompanied** 55:8 | **additional** 57:15 |
| **47th** 8:6 | 113:25 115:13 | **account** 27:13,14 | 65:22 72:24 73:9 |
| **4:28** 108:12 | 118:22 121:14,23 | 64:10 68:17 | 74:5 84:23 97:4 |
| 109:12 | 124:24 152:6 | 113:16,17 115:16 | 162:21 183:23 |
| **4:41** 117:18 | 159:10,15,20 | 117:3 123:7,8,17 | **address** 45:23 |
| **5** | 160:2 | 123:18 132:23 | **adjusted** 135:18 |
| **5** 65:11 69:23 93:6 | **94** 24:25 25:7 | 158:8,13 160:14 | 139:24 |
| **5027** 218:24 | | 161:11 162:15 | **adjustment** |
| | | 163:25 164:20 | 135:20 |
| | | 176:17 | |

**admitted** 20:11,14
  147:25
**advance** 11:9 15:3
  42:18 146:21
  177:24
**advice** 63:15,25
  64:3,4 69:11
  70:23 71:9 94:2
**advise** 40:17
**advising** 40:10
**advisor** 35:9
**affect** 216:12
**affirmed** 6:21
  114:17
**afraid** 206:13
**aggressive** 147:10
  148:7,11
**agnostic** 183:16
**ago** 12:13,16,18
  22:4 30:17 47:25
  48:7 208:25 213:5
  213:18
**agree** 5:10 11:24
  12:2 28:4,14,16
  118:4 123:15
  159:25 160:17
  162:9 168:3
  176:23 185:4
  190:9 193:3,24
  195:3 206:11
**agreed** 123:12
  156:17 157:8
  159:9,14,19
  160:10 163:10,12
  164:9 180:13
  181:5,5,23 192:20
**agreeing** 12:5
  176:22
**agreement** 14:14
  89:19 90:2,17

115:20 116:5
119:19 123:14
167:21 175:25
176:20 177:3,9,18
178:12 179:8
180:16
**agrees** 11:14
**ahead** 32:24 34:24
  39:11 43:6 48:17
  88:4 92:12 103:9
  110:7 120:13
  122:16 124:5
  134:15 137:17
  138:18 139:11
  140:4 142:14
  148:14 152:20
  153:24 161:21
  163:18 172:9
  176:7 180:19
  191:17 193:25
  195:23 207:10
**albert** 84:10
**allow** 162:10
**allowed** 8:25
  35:14 195:2
**alvarez** 3:10 6:11
  6:11
**amanda** 85:19
  86:16 183:9,10
**amended** 201:2,5
  220:4
**amendments** 36:9
**american** 192:15
**amount** 87:17
  99:25 170:25
  171:18,21,22
  173:21
**analysis** 65:18
  66:16 97:5 114:6
  118:5,7,24 124:23
  125:5,8 129:2

138:15,17 139:10
140:3,10 155:12
156:18 159:2
162:15,25 164:17
165:3,11,21 167:3
167:18 169:18
170:11,17,19
171:11 172:6,15
172:21,22,24
173:14,15 174:6
176:17 180:14
**analyzed** 140:19
**analyzing** 174:9
  174:10
**anecdotal** 32:21
  38:12
**announced** 27:9
**annual** 99:24
**answer** 11:24
  15:23,24,25 16:2,4
  28:10,22 33:25
  37:21 40:15 50:17
  50:25 52:8 60:22
  62:23,25 64:24
  66:21 68:12 70:18
  73:6 75:10 76:10
  80:11 83:3 88:2
  95:18 96:12 98:11
  98:25 99:6,14
  100:20 102:6,16
  103:10,17 110:16
  111:19 120:13
  122:16 124:6
  125:3,25 126:17
  127:8,9,12,25
  128:7,20 129:3
  132:5,19 134:6,15
  136:2,20 137:18
  138:8,10,19 139:4
  139:12,14 140:5
  142:15 145:23

148:14 153:25
160:8,22 163:17
163:19 171:8
172:10 173:11,25
176:8 191:15
194:2,15 195:8,24
195:25 196:12
207:21 216:12
**answered** 48:17
  51:10 126:20
  128:2,23 195:9
**answering** 126:21
  128:8,21
**answers** 7:25
  48:10 201:2,5
  220:4
**anthony** 34:4 36:6
**anticipated** 90:4,9
**anybody** 14:2,3
  35:20 130:12
  182:10 208:21
  210:11,16
**apparently** 52:14
  153:11
**appeals** 26:15,21
  122:22 202:21
**appear** 35:18
**appearances** 6:6
**appearing** 2:13
  10:4,8
**appears** 30:7
  45:11 130:10
**appellate** 107:16
  109:13 114:17
**applicability**
  112:25 159:10,15
  159:20 163:2
**applicable** 10:15
  111:24 117:25
**application** 127:16

**[applied - assume]**                                                                  Page 4

**applied**   119:3
**apply**   125:23
**appoint**   187:19
   192:12
**appointed**   185:4
   192:21
**appointing**   164:12
**appointment**
   76:22 83:22
**appraisal**   41:7
   43:8 44:17 52:10
   52:20,21 55:13
   57:8 64:7 65:8,16
   67:15 73:2 79:14
   79:19,24 86:4
   92:19 115:25
   130:13 132:12,17
   133:20 137:6
   140:18 151:13,22
   151:25 152:19
   153:6 154:3,15
   156:16 158:7,12
   160:13 161:13
   162:6 167:23
   176:22 177:5
   184:13,15 185:16
   199:12
**appraisals**   50:8
   52:13,20 56:10
   58:9 59:11,23
   60:2 66:16 85:22
   113:18 115:5
   132:2 177:8
   192:10 202:2
**appraise**   41:5,12
   92:9 101:6
**appraised**   41:7
   93:9 114:14
**appraiser**   14:17
   41:3 48:14 63:23
   64:8 65:6 68:16

80:2,4 82:11 85:6
85:9,16 86:7,11
87:3 89:3,21
92:15 96:17
113:13 114:18
135:6 139:16,17
144:24 146:18
160:11 162:11
164:13 176:25
177:4 181:6,7,13
181:15 182:2,4,25
183:7 185:3,25
186:2,5,24 187:2
187:19,20 192:13
192:23 193:11,12
195:11 196:7
197:10,11 199:8
206:12
**appraiser's**   41:4
   41:10 199:11
**appraisers**   40:7
   41:11 44:3 53:15
   57:25 58:25 59:4
   64:22 69:18 78:2
   78:11 79:15 82:8
   84:6,9,13,15,19,21
   84:23 86:22 89:14
   113:16 136:11,22
   145:16 146:6
   149:8 162:10
   178:13 179:21
   181:17 183:2,4,5
   187:5,8,10,12
   189:16 190:7,15
   191:11 192:2,12
   192:14,16,21,25
   193:3,23 194:17
   195:19 196:5
   197:25 200:13
   201:22 202:6,7,16

**appraising**   92:4
**appreciate**   68:19
**approach**   90:11
   90:13,24 91:8,11
   135:4,11 136:10
   136:18 161:10
**appropriate**   10:6
   35:16 51:19 52:5
   59:22 79:25 80:3
   89:6,8 93:16
   147:24
**appropriately**
   135:18 139:24
**approval**   35:8
**approved**   62:6
   183:15
**approximately**   5:4
   14:18 18:21 24:4
   25:13 26:8 159:3
   165:6,14
**april**   61:6 106:4
   106:12,15,21
   108:2 110:14
   117:18 123:10,11
   125:21 129:24,25
   130:21 133:21
   137:3,12 139:10
   140:10 144:5
   146:25 153:9
   163:6 181:11
   182:14,19 183:23
   186:17 188:21,25
**araujo**   4:13
**arbitration**   13:13
   13:17 40:4 58:17
   58:22
**arbitrator**   14:16
**area**   127:22 167:8
   168:12,16 169:5
   169:11

**arguing**   128:15,17
**arm's**   98:23 99:11
**arrangement**   5:25
**arrive**   40:11
   133:22
**arrived**   169:21
   170:6
**arriving**   189:9
**article**   216:3,12
**articles**   32:19
**ascertain**   58:5
   68:16 83:11
**asked**   10:22 48:23
   53:12 58:4 71:8
   78:11 84:13 101:8
   111:12 119:7
   130:8 137:6 158:6
   178:24,25 179:3
   181:16 183:20
   204:12 208:9
   210:15 214:12,13
**asking**   7:14 16:12
   16:15 53:18 73:3
   78:15,17 79:10
   118:14 125:2
   127:6 134:21
   137:15 173:18
   188:9,12 194:23
   199:19,24 214:10
**asks**   97:3,7
**asserted**   10:16
**assignment**   38:5
   78:3 86:18 94:7
   199:12
**assistant**   87:21
**associates**   34:2
   97:19 100:9
**association**   5:20
**assume**   19:18
   46:24 60:3 73:10
   82:18,20,23 91:4

[assume - believe]

91:19 92:2 116:20
136:21 170:14
186:10 212:20
**assumed** 137:20
**assuming** 56:11
59:24 91:2 121:6
121:7 138:4
153:14 172:6
210:5,15
**assumption** 93:22
94:2 167:24
**assumptions** 61:19
79:10 91:12 93:4
93:5,8
**atlantic** 1:7 5:15
6:16 11:17 17:12
25:23 26:5 30:3
33:4,5,16,23 34:6
34:11 36:8 37:2,5
41:20 43:18,18,21
49:21 87:16 97:20
97:21
**attached** 55:18
93:3 107:19
177:17,18
**attaching** 87:14
113:24
**attachment** 54:8
**attachments** 14:21
**attended** 78:4
82:15,19
**attention** 27:19
28:2 157:24
**attorney** 7:7 10:2
10:11 12:23 15:21
18:23 38:5 98:8
149:22 210:25
**attorneys** 3:5,14
4:5 7:11 10:17,20
19:13 29:2

**audio** 5:8
**august** 21:12
60:17 175:6
**authoring** 187:3
**authority** 34:19
35:6
**authorize** 134:23
135:23
**authorizes** 136:17
**automatic** 155:23
216:14
**available** 45:25
54:7 72:7 75:21
76:16 94:8 106:19
106:25 144:10
185:20 196:20
**avenue** 3:15 4:6
8:6 16:24 26:16
27:8 28:5,17 36:8
37:2 43:18 70:24
76:25 97:22 107:9
107:18 110:21
111:10 115:13
118:22 124:24
152:6 159:10,15
159:21 160:2
**average** 40:9,21
59:6 120:20,21
141:15,16,25
187:24
**averaged** 194:11
195:21
**averaging** 193:20
195:6
**avoid** 11:11 190:5
190:23
**aware** 27:16,25
29:10 37:16,22
53:20 96:6 99:20
100:5,11 111:10
118:16 119:6

136:16 202:25
**awhile** 213:4

**b**

**b** 79:24
**back** 36:15 69:6
88:10,13 105:6
107:22 123:20
140:12 166:3,11
173:8 181:10
188:3 196:14
214:21 215:2
**background**
150:18
**bad** 206:7,17
207:23
**bailiwick** 79:17
86:23
**ball** 163:9,14
**bank** 154:21
**banks** 147:23
151:7
**bar** 20:12 45:23
**base** 124:15
**based** 41:6 47:15
90:10 110:2
116:23 119:10,14
120:18 122:19
127:8 133:20
142:21 155:6,8,13
155:22 167:23
172:12,22,25
184:11
**basements** 156:20
**basic** 93:3,5,7,22
**basically** 31:7
211:3
**basis** 124:13
147:19
**bates** 45:3,5,10
46:14 49:16 50:11
71:23 72:4 81:25

87:11 108:16
129:17 143:20
174:24 175:7
179:9 198:15
203:24 219:10,12
219:14,16,18,20
219:22,24 220:2,6
**bathroom** 68:19
**bbg** 43:2,5 50:9
52:21 56:18 81:20
82:6,10,16 83:25
85:13 86:6,25
145:15
**beginning** 6:6 25:7
30:4 45:11 55:20
69:7 71:14 105:8
141:25 166:13
**begins** 90:4 216:4
**begun** 167:4
**behalf** 6:9,12,15
11:16 31:25 34:20
35:7 85:2,4
**belied** 209:13
**belief** 138:6 164:2
**believe** 12:10
13:15,19 21:22
26:19 27:18 32:2
38:8 41:6 42:9
44:16 61:4 77:9
86:14 89:7 96:8
100:16 109:16
110:4 111:12
113:19 116:19
117:24 120:9
127:6 133:16
136:25 137:9,16
137:24 138:10,11
138:14,16,20,23
139:6,14,16
140:14 143:10
147:11 148:10,22

155:16 156:3
161:3 162:5
173:19 189:18
197:23 200:5
202:7 205:19
206:7,8,10,20
214:16,17 215:12
**believed** 35:2
118:21 138:15
153:5 158:25
163:15 165:4,12
201:18 206:5,18
**believes** 151:11,21
151:23 154:14
**belligerent** 126:22
126:25
**benefit** 171:4
**best** 64:17 65:18
66:15 145:25
180:22 184:7
**better** 162:7
**beyond** 201:24
**biggest** 24:11
**bill** 34:15 35:19
**bills** 34:7,12,13
**binding** 193:2
**bio** 24:14
**bit** 41:17 114:8
127:24 139:21
158:14
**black** 125:22
**blank** 21:14
**block** 170:17
**blood** 218:18
**bolster** 193:10
**borough** 154:19
**bottom** 54:21 58:7
61:16,23 62:3
72:11 74:2 83:23
144:7 166:24
168:7 182:17

186:16
**break** 9:5,7 68:20
68:22 70:9 104:5
165:25 166:3
214:20
**brendan** 3:9 6:8
16:5 57:24 68:18
127:12 128:23
131:2
**brian** 84:9 185:17
**bring** 67:24
**broker** 21:24
**broker's** 21:19
**brokerage** 21:20
**brooklyn** 36:9
85:10,11 97:22
140:20 154:20
**brought** 27:18,21
28:2 67:21 68:9
152:5 153:21
181:18,20
**browser** 45:23
**build** 156:18,19,22
**buildings** 114:11
121:22
**built** 168:10
**bullet** 51:17 65:10
94:10 178:11
**bunch** 90:19
**business** 21:10,13
196:4
**buying** 172:24

---

**c**

**c** 3:2 4:2 218:2,2
**calculation** 160:6
**calculations**
158:21
**calculator** 158:21
**calendar** 45:12
46:17 76:23

**call** 46:18 47:7,12
110:10,13 112:8
125:22 126:7,14
127:7,23 128:24
128:25 146:10
188:16,21 189:2,6
**called** 6:20 17:22
24:22 30:13 33:16
71:14 85:18 90:23
**calls** 77:25 140:23
**cancer** 21:8
**cap** 173:2
**cardozo** 20:6,17
**care** 182:6 209:15
**career** 25:17 27:24
**carefully** 201:22
**carol** 146:10
**case** 5:17 9:25
12:14 16:16,25
18:3 19:19 27:2,4
27:5,8,9,17 28:5
60:15 71:13,16,19
91:15 98:4 107:9
107:18 110:21,23
111:10,23 112:13
112:17,25 113:24
116:9,25 117:5,6
117:11,13,14,24
118:4,9,16,18,22
119:6,15 120:15
121:14,17,19
122:21 123:9
125:18,20 127:9
127:17 152:6
159:11,16,21
160:2,17 163:2,4
163:20,21 164:7,8
202:21 221:2
**cases** 26:25
**cathi** 1:20 2:14
5:22 101:16 218:7

218:25
**cell** 5:6
**certain** 124:19
171:18,18 197:18
212:24
**certified** 2:15
218:8
**certify** 218:10,16
**cetera** 31:6 58:6
177:6,6 214:15
**chain** 45:11 47:18
75:22 81:24
117:16 129:21
143:24 166:18
175:4 182:13
185:8 189:23
**chair** 23:25
**change** 38:10
137:6 179:2,19
200:16 221:4
**changed** 163:3
**chats** 9:2
**check** 8:21 51:18
87:16 212:21
**checked** 212:22
**choice** 145:25
**choose** 184:7
**chose** 186:9
192:19
**chosen** 192:13
**circulated** 56:3
**claim** 205:19
**claiming** 11:13
**clause** 40:19 41:14
**clear** 10:25 11:20
12:4 28:25 29:5
29:17 43:16 66:12
68:4 93:9 123:3
161:5 190:11,21
**clearly** 191:11

click 36:4 42:2
49:10
client 10:11 25:9
25:20 26:2 31:13
34:15 40:17 42:17
80:21 89:10
149:22 207:20,21
client's 161:17
clients 10:17,18
24:15 31:15
close 105:18
125:22 126:7,14
127:4,7 128:24,25
closed 105:15
cluttering 11:11
clvs 1:20 218:25
coffee 68:20 151:7
cohen 44:6
coin 161:8
collect 208:16
collected 171:16
208:12,14
collecting 172:25
208:6
collectively 165:20
college 21:4
comb 211:9
combination
74:20,21
combine 24:6
come 27:5 30:11
44:19 57:3 58:25
129:15 146:19
157:23 166:3
214:20
comical 203:12
commenced 17:13
18:9
comment 73:11
75:2,2 152:18,22
153:4 190:22

comments 130:6
132:4
commission
221:25
common 10:12
15:16,18 115:25
124:9 146:17
communicate
188:25
communicated
75:14
communication
19:25 117:22
communications
9:2 20:24 67:2
68:5 146:22,24
192:3
company 22:15,17
26:17
comparable
134:23 135:17,24
136:6,7 139:9,23
140:2,10 141:6
154:16 155:13
164:22 167:9
comparables
167:8 199:13
compare 40:8
136:23 193:13
compared 91:23
comparison 90:13
91:7 136:18
139:19
complete 7:25
202:16
compliance 92:5
complied 131:20
136:25 137:10
138:12,24
comply 94:14

complying 102:23
comports 115:24
comps 154:19,25
155:2 156:12
168:12,15,23
169:4,8 206:22
computer 5:7 8:13
computing 147:20
concept 174:17
concern 158:13
concerned 83:9
203:6
concession 164:10
concierge 4:13
45:18 46:2 76:15
conciliatory
190:25
concluded 116:9
167:12
concludes 216:24
conclusion 62:17
63:3,4 67:9 115:3
116:17 122:11
165:5,13,15
169:20 189:9,10
189:11,12,13
199:14
conclusions 62:20
69:12 186:4,7
199:4 206:14
condition 93:23
94:3
conditions 61:19
93:4,6,8
conducted 18:16
conducting 7:12
confer 202:6,18
conferred 161:16
confidential
107:14

confirm 93:15
105:13,22 131:19
confirmed 167:7
confusing 104:3
conjunction 65:16
connection 25:20
26:2 31:9,18
33:10 37:8 38:14
50:13 53:5 81:9
89:10,14
consent 5:24
conservative
170:13,18
consider 65:19
67:16 114:22
116:10 118:23
157:11 158:6
180:14
consideration
115:6
considered 63:17
64:22 66:15 106:6
115:22 120:10
151:12,21,24
152:19 153:5
154:14,16 160:19
165:7,15 183:6
considering 82:10
84:25 185:13
consistency
130:14
consistent 30:9
133:19
constitute 11:6,25
constructively
39:9
consult 42:17
162:16 189:8
consultation
161:23

**consulted** 112:16
112:19
**consulting** 112:11
**cont'd** 4:2
**contact** 30:23 76:3
84:5,8 85:20
144:8,14,17
**contain** 14:23
**contains** 25:10
28:19 101:20,23
**contemplate** 58:18
58:23
**contemplating**
183:22
**contents** 88:11
**context** 57:23
107:11
**continuation** 72:5
108:20
**continue** 5:9 193:9
209:18,19
**continued** 105:10
**continuing** 10:24
199:8
**contract** 65:4,5
**contracts** 97:6
**contractual**
114:21
**contrary** 115:21
**conversation** 15:8
16:9,11,13,19,23
107:18 109:14,23
110:4 151:16
**conversations**
14:25 17:5 30:21
40:24 60:6 73:16
93:22 133:16
197:24
**conveyed** 152:12
**convince** 186:25

**cooperate** 203:7
**cooperative**
203:19
**cooperatively**
158:10
**copied** 91:3
109:21 208:24
**copies** 94:10,15,24
95:4 102:24 212:9
**copy** 51:24 52:3
53:21 72:13,19
87:14,16 95:13
106:23 110:20
130:2,7 132:10,10
143:9 178:2 179:7
179:18 183:25
**corcoran** 84:9
185:17
**corporate** 24:7,8
26:17
**corporation** 1:5
5:14 6:10,13 36:7
41:21
**correct** 26:12 34:9
42:16 44:24 51:16
52:17 56:21 93:16
109:9 130:15,18
131:13 138:15,17
138:21 163:15
187:2
**correctly** 56:15
147:11 187:10
**correlation** 102:9
**correspondence**
13:24
**costs** 124:10
**counsel** 5:13,24
6:5,7 9:22 11:13
14:5 15:3 32:8
177:24 212:4,8

**count** 83:21
**counterparty**
31:23
**counting** 24:10
**county** 218:5
**couple** 14:9 47:25
58:7 113:6 153:22
175:23 209:4
**course** 18:11
27:24 162:13
**court** 1:2 5:16,21
7:17 13:17 26:15
26:20 107:17
109:13 114:24
115:18 121:23
122:12,21 124:23
161:2 202:21
206:18,20
**court's** 114:6
**courts** 122:18
**cover** 56:14 87:10
**craft** 180:7
**credibility** 58:6
**criteria** 41:15
**crown** 61:23 97:9
**crr** 1:20 218:25
**crystal** 190:21
**current** 57:14
64:18 67:18 86:2
97:7 114:20 115:7
**currently** 17:11,16
17:18 23:22
200:12
**cushman** 84:10
185:14
**cv** 1:7 5:18

**d**

**d** 219:2
**dan** 84:10
**dani** 4:8 6:17
149:21 205:8

208:23 209:3,23
210:11
**data** 57:15 58:13
90:11,24 135:4,10
136:9 185:20,21
196:20,21 197:2,4
**date** 30:7 47:9
57:14 62:8,8
77:19 112:6 144:6
171:18 192:22
221:2
**dated** 36:6 42:13
60:12 72:13 76:2
83:25 87:15 95:7
95:14 169:19
174:12 182:19
**dave** 72:23 85:17
**david** 44:11,14,17
44:19 46:17,23
47:7 53:13,14
54:22 55:6,10,23
56:2,14 57:21
58:2,14 59:11
70:3 72:6,12,18
73:14,16,23 74:3,9
89:16
**david's** 66:3
**day** 46:19,23
73:15 78:5 107:24
108:11 109:8,17
109:22,24 158:22
159:8,13 168:19
209:10 217:10
218:22 221:23
**dayon** 24:22
**days** 113:7 192:22
**deadlocked**
114:13
**deal** 33:9 37:6
39:13

**dealing**  35:2 74:19
**dealt**  44:3
**decades**  24:17
**december**  21:6
**decide**  206:19
**decided**  63:8
  122:21
**decider**  35:9
**deciding**  162:13
**decision**  26:15,21
  57:9 62:19 63:6
  102:13 103:8,15
  103:21 107:17
  109:13 114:7,25
  145:19 146:2
  161:15,17,20,24
  162:4,5,23,24
  203:2
**decisions**  31:12,16
  34:20 35:7 192:25
**deemed**  10:23
  11:6
**defendant**  1:8
  3:14 6:15 9:25
  10:19 11:17 15:22
**deferred**  132:25
  133:3,14
**defined**  171:5
**definitely**  125:23
  148:9
**definition**  114:9
  114:11 120:18
  142:21 143:5,12
  143:14
**degree**  20:23
  58:11
**delay**  190:5
**delayed**  206:9
**delaying**  182:8
  207:23

**demands**  212:10
  213:8
**demarco**  146:11
**demised**  115:17
  141:12
**demolition**  65:21
**denise**  3:10 6:11
**density**  38:11
**department**  24:2,5
  24:11
**departments**  24:7
  24:8,9
**depending**  57:9
**depends**  99:17
**deponent**  6:19
  9:23 221:3
**deposed**  12:9
**deposition**  1:12
  2:11 5:12 7:12 8:4
  12:25 13:21 15:3
  35:12,13 71:14
  177:25 204:9,15
  204:18 216:9
  218:12,13 221:2
**depositions**  7:9
  12:21 18:15
**describe**  8:9 83:6
  83:8
**described**  28:6,17
  70:24 78:9 98:5
  120:16
**describing**  114:24
**description**  219:9
**designated**  144:22
  192:14
**desire**  116:2
**desk**  52:12 53:17
  65:11
**destroyed**  20:2
**detailed**  185:17

**details**  97:5 167:7
**determination**
  37:7 38:18 39:14
  140:17 147:21
  150:3 151:3 155:6
  155:8 182:24
  207:24
**determinations**
  147:21
**determine**  37:13
  41:5,8 92:9
  100:24 114:18
  133:25 134:13
  135:10 210:10,22
  211:5,17 212:5
  213:22 214:2
**determined**
  155:25 193:5
**determining**  63:22
  64:11 65:7 69:19
  115:17 194:23
  206:9
**develop**  23:13
**developed**  173:20
**development**
  26:17 97:5
**devices**  5:8
**devoid**  59:7
**diagnosed**  21:7
**dictates**  115:5
**dictating**  101:23
**differ**  80:17
  192:11
**difference**  124:22
  150:25
**different**  29:8
  57:25 59:4 69:18
  86:21 139:22
  154:23 160:17
  164:5 172:5
  181:17,19 186:10

  201:17
**differential**  171:17
**differently**  163:4
**difficult**  7:16
  157:24
**direct**  54:12
**directed**  123:17
  165:19
**directing**  114:18
  131:3
**direction**  35:4
  53:7,14,16 131:22
  132:6,8
**directions**  53:3
  91:11 190:8
**directly**  150:22
**disagree**  209:20
**disagreed**  88:22
  118:12
**disagreement**
  88:24
**disagrees**  11:21
**disaster**  206:16
**discarded**  20:2
**discarding**  20:5
**discovery**  98:4
  212:10
**discuss**  15:12
  17:20 18:2 19:9
  31:14 46:9,24
  58:14 74:8 79:3
  106:25 108:2
  119:13 142:5
  144:25 146:16
  154:6 157:14
  187:22 199:3
  200:21
**discussed**  9:10,21
  16:12 70:16 71:16
  73:22 74:12,14
  77:10 79:8 106:4

[discussed - encumbered]                                             Page 10

113:7,9 133:2
141:3 145:24
154:7 168:18
181:21 201:19
**discusses** 47:19
**discussing** 78:21
80:15 85:6,25
113:5 174:17
177:19
**discussion** 19:22
19:22 63:7 79:13
79:18 113:19
154:4 159:24
182:24 189:15
208:3
**discussions** 18:12
19:7 38:20 39:5
39:19 57:21 67:2
67:11 68:6 69:22
81:14 92:18
102:22 106:12
112:23 113:4
139:8 140:2
157:17,19 158:5
158:17 167:15
181:12 184:25
185:2 191:12
193:23 195:3
200:16 202:8,14
207:13 208:2
**disjointed** 136:14
**disparity** 187:17
**dispute** 10:3 18:24
19:15 114:16
**disrespectful**
148:7,11
**distinction** 23:17
122:24,25 123:24
123:25 124:2,3
125:17

**distinguish** 121:18
121:25
**district** 1:2,3 5:16
5:17
**divide** 193:15
**dividing** 193:6
**division** 114:17
**dli** 1:7 5:18
**doctrine** 10:13
**document** 45:3,5,9
46:8,11 49:16,19
54:11,19 56:14
71:23 72:3 81:25
82:5 95:16 108:16
129:17 143:20
149:3 170:2
174:24 177:17
179:9 198:15
203:24 208:7
213:8 216:7
219:10,12,14,16
219:18,20,22,24
220:2,6
**documents** 14:6,8
14:10,11,19,22
19:14 20:2,5
177:23 208:7,12
208:14,16 209:6
210:2,5,12,16,23
211:18 212:6
214:3,15
**doing** 17:18,23
25:14 43:24 50:10
52:10,12 53:5
79:19 113:18
141:8 164:3,24
167:17 172:11,20
174:17 186:5
**dollar** 100:7
**domain** 39:16 41:9

**doubt** 71:18
**doubts** 160:25
**downtown** 85:11
**draft** 56:2 88:9
129:11 130:6
177:18 178:3
**drafted** 87:23 88:6
88:8 91:17 119:16
**drafts** 197:22
**duly** 6:21 218:13
**duress** 120:24
141:20
**dushinsky** 33:10

**e**

**e** 3:2,2 4:2,2 8:20
13:22 14:13 45:10
45:13 47:5,18
48:24 54:8,16
55:16,17,19 56:9
56:14 71:10 72:5
72:12,18 73:8,19
74:2 75:22,24,25
81:24 83:20,23,24
86:21 87:10,12
105:2,2 106:14,16
106:22 107:6,11
107:13,23,24
108:13 109:6,18
109:22 111:5,17
111:21 112:5
113:23 117:7,16
117:17 129:21,24
130:3,8 143:24
144:3,21 152:15
158:3,3 166:17,18
166:24 168:2,8,8
175:4 177:14
182:13,18 183:18
185:8,10 186:4,16
186:17 188:4,20
189:23 190:4

196:15,15 198:6
199:2,18,21,24,25
205:6 208:18,24
211:20 214:14
218:2,2 219:2
**earlier** 27:22
34:17 107:23
109:22 123:21
147:2 153:22
201:20 205:24
216:9
**early** 47:8 76:12
177:16 184:16
**eastern** 1:3 5:16
**easy** 129:8
**economic** 140:19
**edits** 178:5,10
**effect** 101:14
102:9 114:22
115:21 116:5
118:11
**effective** 62:8
**efforts** 38:15
**either** 36:20 56:18
57:10,12 59:19
67:12 75:11 94:19
96:14,15 100:11
120:25 141:20
211:2
**electronic** 5:7
**eliminate** 196:4
**else's** 103:7 117:5
117:10 184:14
**encumber** 94:11
94:16,24 95:5
101:9 102:25
**encumbered**
116:21 121:9
178:14 179:22
181:8

**encumbrance**
65:19 66:14 67:17
69:25 70:11 73:22
86:2 116:3,11
118:23 137:8
146:23 157:9
160:18 162:14
165:7,16 167:25
176:18 180:14
**encumbrances**
29:18 68:7 93:10
106:5 110:25
115:8 160:3
**ended** 157:3
**engagement** 56:18
56:23 80:5,7
87:24 91:17,23
97:2 100:18
**engagements**
85:21
**engaging** 58:2
**entirely** 80:7,13
**entities** 22:8,10
23:2
**entity** 23:7,10
33:15
**envision** 205:15
**erected** 114:12
**errata** 221:1
**especially** 7:11
**esq** 3:9,10,18 4:8
**essentially** 172:16
**established** 120:17
142:21
**estate** 12:17,19,23
21:20,24 22:13
24:2,5,6,9,15,18
25:2 29:23 98:8
124:12 170:21,22
192:16

**estimate** 39:22
40:12,13 178:13
179:21 192:23
195:11 197:12
**estimates** 193:5,6
**estimation** 185:23
196:23
**esty** 44:6
**et** 31:6 58:6 177:6
177:6 214:15
**ethically** 197:20
**eventually** 92:13
**everybody** 104:8
197:15
**evidence** 60:15
138:5 201:24
209:12 210:6
**evident** 15:20
**exact** 78:13 169:22
170:6,25
**exactly** 70:20
75:17
**examination** 7:2
105:10 215:19
219:3
**examined** 6:22
**exception** 133:2
**exchange** 57:12
106:14,16 130:7
144:3 145:8
156:12 177:14
196:16 201:25
**exclude** 116:3
117:3
**excluded** 114:9,10
**excluding** 163:23
**exclusive** 120:22
121:2 141:18
142:20
**excuse** 215:17

**executed** 181:3
**exercise** 37:9,12
155:19
**exercised** 37:6
155:15,17 156:4
**exhibit** 8:17,23
14:23 45:5 46:10
71:22,23 72:9
81:23,25 83:18
105:15 106:18
108:15,16 129:15
129:17 131:3
142:16 143:20
174:21,24 179:9
179:12 198:15
200:25 201:5
203:24 204:4,11
204:20,22,25
219:9,10,12,14,16
219:18,20,22,24
220:2,4,6
**exhibits** 36:4 42:2
49:10 219:8
**exist** 210:5
**existence** 192:17
**expect** 35:10
**expenses** 124:11
**experience** 78:22
79:3 99:10
**experienced** 98:8
131:25 170:20
**expert** 13:14,18
173:15
**expertise** 53:16
58:6 86:17
**expires** 221:25
**explain** 15:17
118:14 125:11,16
191:24 192:5
**explained** 124:23

**explaining** 203:5
**explains** 88:16
**explanation**
125:14
**express** 86:6,10
163:22
**expressly** 114:9,10
121:23 122:12
**extend** 216:5
**extension** 83:12,12
156:2 216:14,16
**extent** 10:5 60:2
**extrajudicial** 59:8
**extraordinary**
61:19
**extreme** 150:24
**extremely** 144:16
148:7,11

**f**

**f** 105:2 218:2
**fact** 138:4 209:13
**factor** 173:7
**factored** 86:3
160:4
**facts** 58:12 73:9
100:12
**factual** 130:14
**factually** 130:17
**failure** 203:7
**fair** 13:23 25:10
25:17,20 26:2
28:19,24 37:8,11
37:14 38:18,22
39:13,22 40:12
41:2 50:13,22
51:14 52:23 58:17
58:22 63:18 66:17
67:15 68:8 70:24
79:4 81:9 82:11
89:4,22 92:10
100:25 101:6

106:6 120:18
130:23 131:11
133:22 134:2,13
142:10,19,22
143:5,13,14
147:20 150:2
160:5 169:22
170:6 192:24
193:4 194:19
195:12 196:11
203:7 206:10
**fairly** 123:3
**faith** 137:5 206:8
206:17 207:23
**familiar** 26:24
27:2 32:16 33:15
36:22,25 44:2,8,10
71:19 80:19 81:21
85:10,10 86:18
**fantastically** 129:9
**fashioning** 209:16
**fast** 146:4 147:22
**faster** 49:11
**father** 21:7,14
**feather** 211:10
**february** 45:12,13
46:18 47:8,20
54:18,23 55:3,10
55:17 56:3 60:12
72:14 76:2,6,11,21
76:25 77:17 83:25
**feel** 163:3
**feet** 154:23 156:19
**fein** 3:13 6:15
18:24
**field** 86:17
**figure** 174:19
190:16 211:16
**figures** 58:12
**file** 45:21 211:12
212:12 213:15,17

213:21 214:2
**filed** 5:15 200:18
**files** 185:20 196:21
208:19 212:22,25
**final** 31:15 34:19
179:18
**finalize** 130:5
**find** 49:10 146:17
186:6 213:14,25
**findings** 146:16
147:19 150:9
**fine** 51:10 211:9
**finish** 7:14 127:5
207:20
**finished** 9:12
122:5,6 125:15
**fired** 205:11
**firm** 10:10 19:13
23:23 24:12,14,22
31:20,21 44:24
89:2 145:14 208:5
210:11
**firm's** 24:2,5 34:7
**firms** 31:21 32:3
**first** 26:11 30:6
36:17 42:10 54:16
54:22 56:13 67:20
67:23 68:2 70:10
70:15 72:11 74:3
75:13 76:8 77:10
83:23 85:19 89:25
94:10 104:9 107:9
110:22 111:9
120:14 131:10
132:5 142:4 144:5
147:6,8,9 149:18
150:4,5 152:13
168:7 178:6,9
187:8,10,11
189:14 194:8
201:3 205:11

**five** 14:20 151:4
154:19,21 155:6
155:14 165:25
186:10 216:15
**fixed** 150:20
**flaw** 171:11
**flaws** 156:16
**flip** 166:23 201:11
**floated** 158:11
**floor** 3:16 8:6
**flow** 31:6
**fmr** 167:12 182:23
185:23 196:23
**fmv** 90:5,10
140:17 141:12
151:3
**fmvs** 186:25
**focus** 39:12
**focused** 38:4,7
184:22
**focuses** 156:16
**folder** 36:4 42:2
49:11
**folks** 53:15 58:3
184:20 186:6
197:23
**follow** 73:16
**followed** 201:19
**following** 47:20
94:7
**follows** 6:23 105:5
**food** 147:23
**foot** 154:17 156:22
167:10 168:15,24
169:5,9
**forestalling**
176:24
**formally** 129:12
**forth** 41:15 88:11
88:14 177:9
196:10 218:12

**forward** 146:4
163:10,14 164:11
164:12 177:10
**forwarded** 130:8
**forwarding** 205:9
**found** 203:11
213:18
**founding** 23:19
**four** 12:18 65:11
181:19 183:20
186:9 216:15,25
**frame** 181:11
**frankly** 82:22
117:14
**free** 93:9
**friend** 30:18
**front** 8:10 90:25
**frustrating** 144:16
**frustration** 184:19
**full** 36:13 58:8
90:7 137:5 141:10
**fulton** 169:12
**function** 141:13
142:11
**fundamental**
156:15
**funny** 196:4
**further** 94:5
115:11 156:11
215:6 216:17
218:16

**g**

**game** 40:20
127:13
**games** 126:23
**gardener** 204:19
**general** 58:9
**generally** 12:22
89:11 98:23 99:11
172:22

**gentlemen** 128:10
**getting** 35:8 84:21
  162:12 190:24
**give** 7:11 16:4 29:2
  44:4 48:9 53:3,14
  57:23 86:13
  105:19 108:4
  119:4 169:24
  183:19 216:6
**given** 41:11 51:24
  52:3 53:21 125:13
  131:22 132:6
  153:19 164:19
  168:4 177:7 198:3
  209:3,24 216:24
  218:14
**gives** 59:5
**giving** 7:24 86:21
  132:22
**glorified** 13:2
**go** 5:10 7:10 32:24
  34:23 35:24 39:11
  43:6 45:22 48:17
  88:3,13 103:9
  104:8 110:7
  120:12 122:15
  124:5 134:14
  137:17 138:6,18
  139:11 140:4,12
  142:14 148:14
  149:13,23 150:15
  152:20 153:24
  158:2 161:21
  163:18 172:9
  176:7 180:18
  182:23 186:15
  191:16 193:25
  195:23 207:10
**goal** 37:11,13
  40:10,16

**goes** 40:4 143:13
**going** 5:3 9:10
  15:14 39:23 50:7
  50:10 58:15,16,21
  59:25 68:22,24
  69:5 88:10 92:12
  104:4 105:6
  107:22 126:23
  127:13 148:13
  166:6,11 171:14
  172:25 173:13
  177:10 182:21
  183:19 216:22
**good** 5:2 7:4,7
  166:2 186:5
**gordon** 26:22
**governed** 64:14,15
**gracie** 4:13 35:22
  45:2,16
**graduate** 20:20
**graduated** 20:6,16
  20:17 21:6
**graduating** 21:4
**great** 7:6 9:18
  84:15,19 105:25
  160:24 198:11
**greater** 174:4
**ground** 23:3,4,8
  23:11,11 25:9,22
  26:3 27:23 28:7
  28:18 29:11 37:19
  56:16 57:13 65:17
  65:20 67:18 95:6
  95:14,20,23 97:18
  98:2,6,7 101:2,25
  102:4 140:20,24
  141:6,14 142:12
  146:17 156:7
  164:22 185:18
**grounds** 15:15

**group** 32:14,17,23
  84:11
**guess** 18:13 27:20
  50:8 52:14 83:20
  101:19 121:17,25
  122:17 154:13
  181:21 187:22
  190:22 192:20
**guidance** 209:4,25
**guide** 29:6,13
**guideposts** 29:5
**guise** 68:14
**guy** 192:20
**guys** 183:20

**h**

**habit** 20:4
**hackensack** 3:8
**half** 48:7 162:8
**halfway** 90:3
  114:5
**hand** 90:3 218:22
**handwriting**
  149:10
**handwritten**
  212:13,16,25
**happened** 54:17
  111:18 147:6
  158:4 189:5
**happens** 144:24
  190:12
**happy** 9:6 13:9
  164:6 182:10
**hard** 211:16
  213:15
**harder** 7:18
**hayden** 3:4 6:9,12
**head** 17:4
**headquarters**
  192:15
**hear** 201:23

**heard** 32:18
**helpful** 44:5 49:7
  185:3
**helping** 31:5
**hereinbefore**
  218:12
**hereunto** 218:21
**hi** 84:3
**high** 185:4,22
  196:22
**higher** 39:7 40:25
  58:11 170:16
**highest** 39:21,25
  40:13,20 64:17
  65:17 66:15
**highly** 62:7
**hire** 59:4 84:25
  146:18 162:10
**hired** 135:15
  137:19
**hit** 45:24 171:17
**hold** 21:17 113:10
  113:22 115:19
  118:10 122:4
  161:2
**holdings** 1:8 5:15
  6:16 11:17 17:12
  25:23 26:5 30:3
  33:5,23 34:6,11
  37:5 41:21 43:18
  43:21 49:22 87:17
  97:20
**hole** 181:24
**hope** 40:2 190:5
**hopefully** 214:21
**host** 176:11
**hour** 68:23
**hours** 108:25
  128:22
**howard** 3:18 4:15
  6:14 14:9 15:9

16:9,14 19:5
128:12 148:25
208:9
**huge** 124:2
**hum** 88:18 115:10
117:21 184:3
188:8
**hundreds** 25:16
**hung** 17:24
**hypothetical**
61:18
**hypothetically**
88:25

**i**

**icon** 22:20,21,22
**idea** 53:2 74:13,17
81:12 102:18
103:22 106:9
175:16 189:17
200:14 214:11
**ideas** 158:11
**identification** 45:7
71:25 82:3 108:18
129:19 143:22
175:2 179:11
198:17 201:7
204:2
**imagine** 7:8
**immediately** 17:24
**impact** 39:15
70:23 118:18
124:22 125:8
**impacted** 125:4,18
**impartial** 196:11
**implicate** 28:6
**implicating** 10:20
**important** 28:18
52:2 83:13 198:9
**imports** 22:22
**improper** 10:21

**improperly**
197:13
**improved** 65:18
**improvements**
114:12 116:22
120:22 121:3
141:18
**inappropriate**
149:19 154:6
196:25 197:6
198:3
**inaudible** 156:7
**include** 58:11 74:4
116:4 121:22
137:7
**included** 29:19
57:16 61:21 68:8
70:12 90:17 111:2
157:10 161:7
180:15
**including** 67:17
95:5 115:6 160:4
185:13
**inconsistent** 200:5
**incorporated**
90:19
**independently**
195:20 196:6
**indicate** 135:19
**induced** 35:17
**indulge** 215:10
**influence** 196:7
**information** 10:7
31:5,6 42:22
69:12 72:24 76:4
84:5,8 94:8,21
95:10 96:18,21
97:4,11,15,16
100:16 102:2
103:3

**informed** 120:20
120:21 141:15,17
142:2,23
**inherently** 196:11
**initial** 56:17,23
113:20
**initially** 53:23
**initiate** 94:7
**initiative** 62:5
**input** 130:9,11
**inquiring** 84:24
**inside** 67:12
**insistent** 158:7
**insisting** 113:15
**insofar** 53:11
**inspected** 130:4
**institute** 192:16
**instruct** 176:16
**instructed** 165:2
165:10 181:7
**instructions** 7:10
41:12 164:16,18
168:4 212:3
**intend** 35:19
**intended** 80:7
**intentionally**
56:17,22
**interact** 53:10
**interacted** 32:7
**interest** 10:13
15:16,18 39:17
86:6,10 171:6
173:8
**interested** 218:19
**interesting** 40:5
**internal** 149:20
**interpret** 59:21
66:10,11 187:9
**interpretation**
40:18 114:16
117:4,5,8,10,11,12

118:13 119:7,8,9
121:2,11 123:4,8
125:18 127:15
133:3 163:11,13
164:10
**interpreted**
133:18
**interpreting** 65:4
65:5 190:19
**interrogatories**
201:4,14
**interrogatory**
201:12,15 202:3
**interrupted**
101:17
**interview** 78:2,10
84:20 85:15
**interviewed** 85:17
145:17
**interviewing** 58:3
69:18 80:6
**intimidated**
206:13
**investments** 22:13
22:14
**investor** 170:23,24
**invite** 45:12 46:18
76:23
**involve** 65:4
**involved** 30:16
31:4 32:3,23
42:14 43:9,13,23
56:24 63:21 80:9
82:24 83:14 110:5
170:15 200:15
**involvement** 42:25
43:17 83:7,9
110:3
**involves** 65:3
**irish** 1:20 2:14
5:22 218:7,25

**irrelevant** 101:3
121:10 127:3
**issue** 9:20 56:15
60:24 64:2,13,15
70:16 71:9 73:22
74:8,12,15 79:21
107:8 115:12
130:7 145:9
146:23 153:8,15
153:16 184:23
187:13,16,20
190:16 194:7
202:17
**issued** 60:18 61:6
67:14 70:4 129:12
**issues** 193:12
206:19

**j**

**january** 21:7,9
30:8 36:19 43:19
43:22 60:19,20
61:2,10 182:9
**jersey** 3:8
**jim** 4:12 5:19
**job** 41:4,10 183:11
184:8 186:6
**join** 11:18 25:5
**jointly** 113:12
**judge** 127:23
**judicial** 59:8
114:15
**july** 61:7 123:12
158:5 162:6
166:20,24 167:6
168:3,5,8 169:14
169:19 174:13
**jump** 92:12
**june** 92:13 146:5
149:7 159:6
176:15 212:14

**k**

**keep** 22:4 202:12
**kest** 74:15 75:14
76:2,23 77:7
**kind** 21:13
**knew** 85:20 150:8
165:21
**know** 9:6,15 13:9
19:10 22:25 26:23
30:18 31:15 32:4
32:19,20,22 33:3,4
33:13,19 34:5
35:16 37:25 38:8
43:7,8 44:13
45:17 46:9 47:10
47:17 48:3,6 49:6
51:23,25 52:19
53:23 54:11 55:6
55:25 56:21 57:2
57:5 58:19 59:10
60:19,24 62:18
63:2 71:15 75:17
79:6,22 86:23
88:2,5 89:5,16
91:2,18 92:13
95:25 96:4 99:3,4
101:21 102:19
103:5,18 104:2
106:3 109:25
111:4 117:8,9
119:23 123:11
132:3 134:17
135:3,7 136:4,15
138:7 139:5 140:9
140:13 141:8
143:6 148:19
149:21 150:17
153:13 154:9
155:2,9 156:9,9
157:16 161:18
164:7 165:18

170:15 173:12
174:5,16 175:22
176:12 181:10,23
183:25 184:14,20
189:5 190:12
198:7,20 199:17
200:11 205:16,22
208:18 211:22
213:9,16 214:9,11
215:23
**knowing** 120:23
141:19
**knowledge** 42:21
61:10 168:14
169:8
**knowledgeable**
169:4 170:24
**knows** 15:24
**koh** 3:18 6:14,14
11:16 16:9 28:9
28:21 32:24 34:23
39:11 40:14 42:4
43:6 45:16,22
48:16 50:16,24
51:9 52:7 60:21
62:22 64:23 66:7
66:20 70:17 73:5
75:7,9 80:10 83:2
88:3 93:19 94:18
96:11 98:10,24
99:13 100:19
102:5,15 103:9,16
103:23 110:7
120:12 122:4,15
124:5 125:24
126:8,19 127:10
128:10,14 134:5
134:14,25 135:25
136:19 137:17
138:3,18 139:2,4
139:11 140:4,14

142:14 145:5,22
150:6,15,19
152:20 153:24
155:18 160:7,21
161:21 163:18
166:5 169:6 171:7
172:9 173:10,24
175:21 176:7
178:20 179:14
180:17 184:5
190:17 191:16
193:25 194:16
195:23 200:9
202:10 204:23
205:3,17,21
206:25 207:10
210:4 214:8 215:9
215:16,20 216:17
216:20 219:5
**kovel** 10:13,14
**ktr** 50:9 52:20
55:13 56:18 60:9
60:16,19,24 61:9
61:20 62:17,21
63:13 72:20 74:4
74:16,18,19 75:15
76:8 77:17 80:6,8
81:15,17 84:12
85:14 87:17 88:11
88:14 89:2,20
91:7,10 92:20
95:4 97:11 100:24
101:8 102:14
103:4 130:21
131:10,19 133:21
134:23 135:23
136:17,25 137:10
139:9 140:2,9
141:5 143:2
145:15,20 146:22
146:25 147:16

157:14,20 158:17
165:4,10,12 170:6
174:14 175:11,19
176:16
**ktr's** 78:22 79:3
80:23,25 94:15
100:18 101:5
102:23 141:11
162:15 174:12
175:17

**l**

**labeled** 45:6 71:24
82:2 108:17
129:18 143:21
174:25 179:10
198:16 203:25
219:10,12,14,16
219:18,20,22,24
220:3,7
**laid** 176:21
**land** 74:4 90:12
114:10,11,15,19
114:23 115:8
116:20 121:22
133:22,25 134:12
134:23 135:11,24
136:7,10,18,23
141:14 142:12
154:17 158:25
167:4,5 168:10
170:12 185:19
**landlord** 97:19
98:14 121:17
124:14,18 141:17
171:15
**landlords** 39:24
**language** 64:16
90:16 91:23,24
107:2 108:7
113:14 115:4
116:4,23 117:2

121:13 122:19
123:2 136:14,16
142:6,24 161:3
164:3 178:12
179:20,25 189:20
198:3
**late** 76:6,11 77:16
**laughing** 203:18
**law** 10:10 19:13
20:6 21:4,11
24:18,18 25:2
29:23 32:3
**lawsuit** 205:14
206:6,24 207:4,14
207:17
**lawyer** 21:16
**lawyers** 24:4
31:18,24
**learn** 57:3 169:21
170:5
**lease** 23:3,4,8 25:9
25:22 26:4 27:11
27:11,13,14 28:7
28:18 29:12,12,13
36:6,14,23 37:15
37:19 38:23 39:4
40:6,19 41:14
50:15,23 51:24
52:4,25 53:21
57:13,22 63:19
64:14,16,17 65:20
66:14,19 67:18
69:25 70:11 73:22
81:11 82:13 86:2
89:23 90:18,20
91:25 92:7 95:6,7
95:14,20,24 97:18
98:2,6,7,20 99:21
100:17 101:3,25
102:4,11,14 107:3
108:8 111:2

113:14,16,17
114:9,22 115:4,9
115:12,15,16,21
115:24 116:2,11
117:3,25 118:11
118:23 120:3,9,15
122:22,23 123:2,6
123:16,23,23
124:7,8,16,16
130:25 131:13,21
131:24 132:11,13
132:23 133:4,17
133:18,24 134:19
137:7 138:2,25
142:3,5 143:8,9,17
146:23 151:4,6,12
151:21,24 152:18
153:5 154:14,25
155:23 156:7
157:9 158:8,12
160:3,4,13,18,19
161:6,11 162:15
163:23,24 164:19
165:7,16 167:8,24
168:15,23 169:4
171:13,13,24
173:4 174:11
176:18 178:15
179:23 180:15
181:8 187:9 189:7
189:19 190:11,20
191:22 196:3
198:4 202:20,23
215:13,22
**leases** 23:11,11,11
23:12,14 25:16
27:23,24 94:11,16
94:24 95:4 98:22
99:10 101:9
102:24 135:17
136:8,13 139:9,18

139:23 140:3,10
140:20,24 141:6
147:22 151:7
154:17 155:13
164:22 167:9
170:15
**leave** 164:23
**leaves** 99:21
**leaving** 157:3
**legal** 64:6,12,21
69:10 70:22 71:9
79:21 93:25 98:13
98:17
**legally** 35:14
**length** 98:23 99:12
**lengthy** 54:8
**letter** 14:14 41:20
42:8,11,15,19,23
60:12,25 87:15,23
87:24 88:12,15,20
90:21 91:17,24
93:15 97:2 123:14
130:22 131:10
162:9 167:21
175:25 176:20
177:3,8 179:19
180:8,23 181:4
182:4 187:13,21
192:24 193:7
195:12 202:17
203:5,9,14 205:9
**letters** 85:7 145:9
187:14,16 194:7
**li** 18:6,7 31:4
55:12 72:13 75:25
76:23 78:8,16,18
82:18 84:2 166:17
166:18 189:25
**license** 21:19,20
**licensed** 21:24

**licenses** 21:18
**liens** 93:10
**liked** 183:14
**likelihood** 97:12
  168:6
**likewise** 54:23
**limb** 39:24
**limit** 65:23
**limitations** 114:21
**limiting** 93:4,5,8
  93:23 94:3
**line** 154:24 156:6
  186:22 188:5
  221:4
**lines** 58:7 186:22
  207:5
**list** 50:9 85:20
  183:19,21 185:14
  191:8 192:13
**listed** 93:6 183:3
**listings** 97:7
**litigation** 13:13
  17:14 18:10 19:11
  20:3 58:10,15,17
  58:22 59:12,23
  78:22 190:5,23
  200:17 206:2
  208:4,8 210:18
**litigator** 13:3
**little** 41:16 49:11
  94:5 114:8 127:24
  139:21 158:14
**llc** 1:8 5:15 6:16
  11:18 22:20 33:16
  33:24 34:2 97:19
  97:20
**llp** 3:13 4:4 6:18
  26:16
**loading** 46:5 76:20
**locate** 212:13
  213:21

**located** 36:8 97:21
**locatell** 148:6
  150:13,23 182:22
**log** 30:6,7
**logistics** 182:23
**long** 9:7 12:12
  13:5,6 16:19
  24:24 25:15 29:22
  30:17 100:5 104:7
  213:18
**longer** 192:17
**look** 33:21 35:24
  44:17 54:10 65:6
  65:9 111:7 113:24
  134:3,18 143:5,11
  143:16 164:4,22
  173:6 180:9
  182:16 188:3
  192:7 197:22
  204:21 206:6
  211:8,14
**looked** 109:12
  110:19 208:24
  211:7,10,19
**looking** 8:11,13
  29:3 47:4 55:16
  69:14 72:6,18
  84:18 89:25 97:3
  105:16 131:6
  144:7 166:22
  169:25 181:25
  182:3 184:2,4
  185:25 193:18
  195:4 204:5,7
**looks** 46:17 47:15
  47:19 49:20 75:25
  76:22 77:16 108:5
  108:25 150:5,24
  156:12 188:15,19
**lot** 22:12,13 25:17
  27:23 29:7 85:22

113:7 131:24
  136:14
**lower** 122:18
**lowest** 40:2,21
**lunch** 104:7,13
**lung** 21:8
**luxury** 22:14,16
  22:23
**lyon** 44:11,14
  46:17 47:8 54:22
  55:11 56:2 57:21
  70:3 72:6,12,19
  74:3 85:17 89:17
**lyon's** 56:14

---
**m**
---

**m** 3:9 6:20,20
  61:23 97:9 105:4
  105:4
**mail** 8:20 45:10,13
  47:18 48:24 54:8
  55:16,17,19 56:9
  56:14 71:10 72:5
  72:12,18 73:8
  74:2 75:22,24,25
  81:24 83:23,24
  86:21 87:10,12
  106:14,16,22
  107:11,13,23
  108:13 109:6
  111:5 112:5
  113:23 117:7,16
  117:17 129:21,24
  130:3,8 143:24
  144:3,21 166:17
  166:18,24 168:2,8
  168:8 175:4
  177:14 182:13,18
  185:8,10 186:4,16
  186:17 188:4
  189:23 196:15,15
  198:6 199:2,18,21

199:24,25 205:6
  208:24
**mailed** 190:4
**mails** 13:22 14:13
  47:5 54:16 73:19
  83:20 107:6,24
  109:18,22 111:17
  111:21 152:15
  158:3,3 183:18
  188:20 208:18
  211:20 214:14
**main** 3:6
**maintaining**
  124:11
**maintenance**
  124:19
**majority** 193:2
  194:18
**making** 31:12
  128:15 178:10
  196:4 197:21
**man** 33:9
**managing** 23:22
**manhattan** 140:21
**manner** 6:2
  132:15 176:4
**manufactured**
  21:14
**marc** 181:20,23
  185:13 186:8
  192:19 196:17
  197:2,4 199:6,10
  206:11,15,21
**march** 21:8,9 36:6
  76:12 87:15
**mark** 45:3 71:21
  81:23 108:15,23
  127:21 129:14
  143:18 174:20
  179:6 185:7
  198:14 200:24

203:22
**marked** 36:3 42:2
45:6 46:10 49:3
49:10 54:5 71:24
72:8 82:2 83:18
87:6 96:25 108:17
129:18 130:20
143:21 174:25
179:10 198:16
201:6 203:25
215:12
**market** 13:23
25:10,17,20 26:2
28:19,24 37:8,11
37:14 38:18,22
39:14,22 40:12
41:2 50:13,22
51:14 52:23 57:15
58:18,23 63:18
66:17 67:15 68:8
70:25 79:4 81:10
82:11 89:4,22
90:11,24 92:10
100:25 101:6
106:6 120:18
130:23 131:11
133:23 134:2,13
135:4,10 136:9
141:13 142:10,11
142:19,22 143:5
143:13,14 147:20
150:2 160:5
169:22 170:7,14
192:24 193:4
194:19 195:13
203:7 206:10
**marriage** 218:18
**maryland** 20:18
20:21
**match** 193:14,19
194:10 195:6,21

**mathematical**
51:19
**matter** 12:3,17,19
18:16 26:5 30:6
30:16,19,20 31:3,9
31:12,14 32:8,23
33:11 34:7 58:15
121:24 184:12
206:15 209:2,23
210:16 212:19
214:15 218:20
**matters** 10:2
24:16 85:12
**mcd007663**
174:21,25 219:23
**mcd007665** 175:7
**mcdonald's** 1:5
5:14 6:10,13
11:21 17:13 18:9
18:12,25 31:22
36:7,14 37:7
38:23 39:8 41:21
50:14,23 51:24
52:24 53:21 57:11
57:22 66:18 67:18
81:10 82:12 89:23
92:14,15 95:6
99:21 100:6,8
102:3,10 113:10
117:25 120:3
123:14 137:7
139:15,17 144:12
144:15 147:16
149:7 153:20
154:22 155:15,16
157:2,7,21 158:10
158:18 159:9,14
159:19 160:2,11
161:5 162:8 163:8
167:21 168:13,19
171:16 174:14

175:5,19 176:5,10
176:14,20,23
177:7,19 180:23
182:8 184:21
199:5 200:22
201:14 203:6,16
203:21 206:7,16
207:22,22 212:9
213:8 221:2
**mcdonalds** 144:8
144:22
**mean** 22:18 48:8
53:7 58:20 59:9
66:13 81:5 98:9
98:17 151:20
208:15
**meaning** 114:14
**means** 59:24 62:14
66:12 98:12 121:5
151:23 155:3,10
192:23 193:7
194:19 195:11
216:16
**meant** 59:15 60:4
62:11 206:17
**mechanical**
193:17
**media** 5:11 69:2,7
104:12 105:8
166:8,13 216:25
**medication** 7:23
**medium** 7:17
**meet** 13:25 14:2
40:3 54:20 186:24
**meeting** 15:13
16:13 47:16,19,22
47:25 48:4,20
54:17,24 55:3
76:24 77:8,13,16
77:18,22,23 78:4
78:12 79:8 81:15

82:6,7,16,22 84:4
92:14,16,17
139:15 144:9,12
144:18 146:5,7,8
146:12,14,15,21
147:7,14 148:3,5
148:21 149:7
157:3,5,8,13,14,16
157:18,20 158:18
159:6 168:14,20
174:18 176:15
199:3,10 212:14
**meetings** 14:3
48:13 55:8 77:24
85:25
**meister** 3:13 6:14
16:10 18:23 214:5
**member** 22:7 23:2
23:7,9
**members** 33:3,5
**mention** 118:7
136:6,7
**mentioned** 16:14
17:3 38:6 52:15
69:17 70:9 71:13
73:8 85:18 103:24
107:17 109:14
118:5,10 152:14
163:7 168:13,23
183:18
**mentions** 114:6
**met** 53:13 81:2,3
81:19 84:14
**method** 79:14
92:20 137:3,11
**methodologies**
79:23 91:12
**methodology**
51:20 52:5 79:18
154:23

| | | | |
|---|---|---|---|
| **methods** 40:25 | **misinterpreting** | 116:1 117:1 118:1 | **misunderstood** |
| **metropolitan** 44:9 | 113:13 | 119:1 120:1 121:1 | 158:15 |
| 44:14,22 48:23 | **missry** 1:13 2:12 | 122:1 123:1 124:1 | **mmb** 34:2 97:19 |
| 49:24 50:4 51:23 | 4:4 5:12 6:18 7:4 | 125:1 126:1 127:1 | 99:4,25 100:8 |
| 52:3,10 53:4,11,24 | 8:1 9:1,23 10:1,10 | 128:1 129:1 130:1 | 101:24 |
| 55:3,11 62:4 | 11:1 12:1,8 13:1 | 131:1 132:1 133:1 | **model** 168:10 |
| 65:12 67:13 69:13 | 14:1 15:1 16:1 | 134:1 135:1 136:1 | **moment** 46:8 |
| **metropolitan's** | 17:1 18:1 19:1 | 137:1 138:1 139:1 | 54:10 111:21 |
| 55:13 67:3,6 75:3 | 20:1 21:1 22:1,8 | 140:1 141:1 142:1 | 208:25 |
| 80:22 | 23:1,20 24:1 25:1 | 143:1 144:1 145:1 | **monday** 15:10,11 |
| **meyer** 4:14 31:22 | 25:6 26:1 27:1 | 146:1 147:1 148:1 | 16:10 106:21 |
| 113:10 153:20 | 28:1 29:1 30:1 | 149:1 150:1 151:1 | 130:4 |
| 157:22 175:5,11 | 31:1 32:1 33:1 | 152:1 153:1 154:1 | **money** 171:21 |
| 197:9,21 199:5 | 34:1 35:1 36:1 | 155:1 156:1 157:1 | **month** 17:7 162:7 |
| **michael** 4:14 | 37:1 38:1 39:1 | 158:1 159:1 160:1 | **months** 153:22 |
| 31:22 174:16 | 40:1 41:1 42:1 | 161:1 162:1 163:1 | 162:8 175:23 |
| **michelle** 81:19 | 43:1 44:1 45:1 | 164:1 165:1 166:1 | 177:11 203:20,20 |
| 82:22 83:24 85:13 | 46:1 47:1 48:1 | 166:19 167:1 | **morning** 5:2 7:4 |
| 86:20 | 49:1 50:1 51:1 | 168:1 169:1 170:1 | 108:2 |
| **middle** 128:13 | 52:1 53:1 54:1 | 171:1 172:1 173:1 | **morris** 1:13 2:12 |
| 204:8 | 55:1 56:1 57:1 | 174:1 175:1 176:1 | 5:12 106:24 |
| **mike** 113:9 146:10 | 58:1 59:1 60:1 | 177:1 178:1 179:1 | 107:16 109:12 |
| 151:11,20,23 | 61:1 62:1 63:1 | 180:1 181:1 182:1 | 127:5,5 166:19 |
| 152:2,10,11 | 64:1 65:1 66:1 | 183:1 184:1 185:1 | 168:13 185:10 |
| 153:19 154:9,14 | 67:1 68:1 69:1,10 | 185:10 186:1 | 189:24 190:4 |
| 157:22 158:7 | 70:1 71:1 72:1 | 187:1 188:1 189:1 | 216:25 217:7 |
| 175:5,11,15 197:9 | 73:1 74:1 75:1 | 189:24 190:1 | 218:11 219:4 |
| 197:21 199:5 | 76:1 77:1 78:1 | 191:1 192:1 193:1 | 221:3,21 |
| **mike's** 153:4 | 79:1 80:1 81:1 | 194:1 195:1 196:1 | **mouth** 194:5 |
| **million** 184:21 | 82:1 83:1 84:1 | 197:1 198:1 199:1 | 209:17 |
| **mine** 30:18 | 85:1 86:1 87:1 | 200:1 201:1 202:1 | **move** 163:9,13 |
| **minimum** 98:18 | 88:1 89:1 90:1 | 203:1 204:1,5 | 164:12 184:18 |
| **minors** 20:25 | 91:1 92:1 93:1 | 205:1 206:1 207:1 | **moving** 164:11 |
| **minute** 165:25 | 94:1 95:1 96:1,16 | 208:1 209:1 210:1 | **multi** 143:24 |
| 214:20 | 97:1 98:1 99:1 | 211:1 212:1 213:1 | **multiple** 156:19 |
| **minutes** 16:21 | 100:1 101:1 102:1 | 214:1 215:1,4,9 | **musto** 34:4 36:7 |
| 68:23 97:8 190:10 | 103:1,2 104:1 | 216:1,21,25 217:1 | **mute** 150:16 |
| **mischaracterizing** | 105:1,12 106:1 | 217:7 218:11 | **n** |
| 202:12 | 107:1 108:1 109:1 | 219:4 221:3,21 | **n** 3:2 4:2 105:2,2,2 |
| **mishaan** 24:22 | 110:1 111:1 112:1 | **missry's** 11:5 | 219:2 |
| | 113:1 114:1 115:1 | | |

**nakleh** 185:13
192:19 196:17
199:6 206:11,15
206:22
**name** 5:19 22:19
30:7 33:17,20
44:2,10
**named** 33:10
**names** 44:4 183:23
**nassau** 218:5
**national** 192:15
**nature** 124:20
206:23 207:4
**near** 65:21
**necessarily** 7:9
29:8 52:18 79:23
95:19 98:21 138:4
**necessary** 72:25
117:2
**need** 9:5 29:9
41:11,25 57:14,16
66:14 86:3 104:8
114:2 116:4
119:21 134:3
143:16 146:18
193:19 205:12
206:4
**needed** 29:10
111:2 132:12
213:20
**needs** 150:15
**negotiate** 28:23,25
29:7,14 83:10
144:15 175:24
**negotiated** 27:23
28:7 29:24 98:23
99:5,11 101:21
157:25
**negotiating** 28:18
144:19 167:20

**negotiation** 25:9
154:8 180:23
**negotiations** 57:11
**net** 23:10,14 27:11
27:13,14,23 29:12
115:21 120:15
122:22 123:22
124:7,8,13 167:11
**netting** 124:14
**neutral** 85:2
**never** 32:7 79:17
95:13 101:19
192:4 209:11
**new** 1:3,14,14 2:17
3:8,17,17 4:7,7
5:17,20 8:6,6
20:12 26:14,20,21
71:15 80:7 114:7
114:25 121:18
144:19 174:15,18
175:12,20 218:3
218:10
**nine** 203:20
**nnn** 167:11
**non** 9:24 162:9
180:8
**nonresponsive**
214:7
**normal** 7:18
**normally** 7:11
**notary** 2:16 6:22
217:14 218:9
221:25
**notation** 150:8
**note** 154:10 209:8
**noted** 105:3
185:21 196:21
217:4
**notes** 33:22 48:12
48:19 148:20
149:6,14,20

153:13 158:3
212:13,17,25
213:7,14
**noticing** 6:6
**notifying** 144:22
**noting** 28:16
**notion** 203:18
**november** 37:19
95:7,14 97:18
98:6 99:22 101:22
101:22 203:4
205:8
**number** 5:17
46:14 72:4 74:7
140:13 193:7
194:21 201:12
202:3 215:22
219:9
**numbered** 178:9
**numbers** 149:16
**numerous** 185:18
**nygard** 84:11

**o**

**o** 6:20 105:2,2,4
**object** 10:22 15:15
48:16 122:5
148:14 149:18
209:20
**objected** 147:18
149:21
**objecting** 15:22
122:7
**objection** 9:11
10:24 11:2,3 28:9
28:21 32:24 34:22
34:23 37:20 39:11
40:14 43:6 50:16
50:24 51:9 52:7
60:21 62:22,24
64:23 66:7,20
68:11 70:17 71:3

73:5 75:7,8,9 76:9
77:4 80:10,12
83:2 87:25 88:3
93:18,19 94:17,18
95:17 96:11,13
98:10,24 99:2,13
99:15 100:2,14,19
102:5,7,15,17
103:9,11,16,23
106:8 110:6,15
116:13 120:11,12
122:14,15 124:5
124:25 125:24
126:8,19 127:10
132:18 133:10
134:5,7,14,16,25
135:2,25 136:3,19
137:17 138:3,18
139:2,3,11 140:4,6
142:14 145:5,22
150:6 151:17
152:20 153:2,24
155:18 160:7,9,21
160:23 161:21
163:16,18 165:17
169:6 171:7,9
172:8,9 173:10,24
175:21 176:7
178:20,21 180:17
180:18 184:5
187:6 190:17,18
191:14,16 193:25
194:3,14,16 195:7
195:23 200:8,9,19
202:9,10 203:10
205:17,21 206:25
207:2,10,15 209:7
210:4,7,8
**objections** 6:2
10:17,23 11:23
147:15 201:3,6

[objections - p32]

220:5
**obligation**   201:23
202:14,15,19
**obligations**   124:20
**obnoxious**   148:8
148:12
**observed**   115:3
**obtain**   38:16 40:25
**obtained**   22:4
**obviate**   146:18
**obvious**   127:8
**obviously**   186:8
**occurred**   25:21
**october**   218:22
**office**   8:5 18:7
47:17,21 76:24
77:16 87:13 95:9
144:18
**oh**   148:19
**okay**   8:9,16,19,24
9:18 11:20 12:20
12:24 17:16 18:21
19:12,21 22:7,10
30:11 31:11 36:12
36:22 37:25 42:13
43:12 44:13,22
46:6,7,12,13,15
49:2,15,19 54:3,15
55:18,22 57:6
58:20 60:14 61:15
61:17 63:9,12
68:4 69:8 72:10
73:14 75:18 76:21
77:15,21 78:21
81:8 83:17,19
87:5,8 92:3,25
95:12 99:20 101:8
102:13 105:20,25
106:20 107:22
108:6,10,24 109:4
109:15 111:20,25

114:4 116:8
119:24,25 127:19
129:8,23 131:7
132:25 144:2
150:12 153:19
156:11 166:4,5,13
166:16 168:22
169:17 170:20
174:8 176:3
177:13,22 179:12
179:17 182:20
186:14,20 188:15
188:18 191:9
196:18 197:18
200:4 201:8,10
205:4 214:6,13,18
215:18
**old**   13:22
**once**   187:15 193:9
193:11
**ones**   26:7
**open**   8:17,20
17:19
**operating**   174:3
**opinion**   57:7 59:5
60:25 62:6 63:5
63:13 66:4,6 75:3
85:7 91:15 113:25
116:25 119:11,11
119:14 122:13,17
122:19 123:10
124:4 125:10
126:2,3,9,11,15,16
127:14,20 130:22
131:10 132:22
135:21 145:10
147:12 148:17
155:22 162:12
170:23 173:19
181:16,18 182:4
187:13,14,21

192:24 193:8,12
194:8 195:12,19
202:17
**opinions**   40:8
69:12
**opportunity**   65:24
**opposed**   122:20
151:6 155:14
**opted**   87:2
**option**   13:23 14:13
37:6 39:4 65:23
90:22 91:24 92:5
92:8 113:14
116:19 117:13
119:16,19 120:2,8
130:24 131:12,20
132:15 133:24
134:3,11,22 137:2
137:10,25 138:12
138:25 139:22
142:3,9 143:11
145:6 161:4
172:12 188:7
191:7 192:7
196:10 205:25
216:4,11
**order**   39:8 52:4
94:6 114:2,17
**organization**
192:18
**original**   164:17
165:14 170:8
172:15
**outcome**   218:19
**outer**   154:19
**outlined**   188:6
**outlook**   105:18
**outset**   19:10,11,19
**outside**   67:13
**overnight**   26:22
71:15 114:7 115:2

121:18
**owe**   102:3
**owned**   171:12
173:20
**owner**   33:18,20
35:3 83:10 104:2
**ownership**   101:4

## p

**p**   3:2,2 4:2,2
179:13 182:15
**p.c.**   3:4
**p.m.**   47:21 104:11
104:14 105:3,7
108:12 109:12
117:18,20 166:7,9
166:10,12 183:24
214:23,24,25
215:3 216:23
217:4
**p100**   198:15,19,23
220:2
**p101**   200:25 201:5
220:4
**p102**   203:24 204:4
204:22,25 220:6
**p15**   41:19
**p16**   119:18,20,25
134:3 142:18
191:7
**p24**   49:4,14 52:22
**p25**   54:5
**p28**   87:7
**p29**   106:18 107:22
108:20 109:21
**p30**   107:12,12
109:11 110:19
113:22
**p31**   117:15
**p32**   130:20 131:4
140:16

**[p34 - phone]**

**p34** 149:2
**p36** 169:13,15
**p37** 182:12,16
**p38** 185:7,7
  196:15
**p4** 96:25 97:17
**p59** 75:19,22
  215:12
**p60** 76:14,17
**p62** 166:17
**p69** 35:23 41:24
  143:10
**p74** 186:13
**p77** 189:22
**p87** 177:12
**p92** 45:5 46:10
  219:10
**p93** 71:22,23 72:9
  219:12
**p94** 81:23,25
  83:18 219:14
**p95** 108:15,16
  109:21 219:16
**p96** 129:16,17
  219:18
**p97** 143:20 219:20
**p98** 174:21,22,24
  219:22
**p99** 179:9 219:24
**pad** 147:22 156:16
**page** 46:14,16
  54:18,22 56:13
  60:10,11 61:16
  65:10,11 69:23
  72:11 74:3 81:24
  83:22,24 90:2
  92:22,24 93:7
  94:6 113:25 114:5
  115:11,14,20
  117:16 120:16
  129:21 140:17,18

141:11 143:12,24
  144:5 155:5
  166:24 168:7
  178:6 182:17
  186:16,23 188:5
  201:12 216:4
  219:3,9 221:4
**pages** 54:17 93:6
**paid** 34:12,16
  35:10,15,15 182:7
**panel** 13:17
**paragraph** 58:8
  65:15 66:2 69:23
  90:2,7 92:23,24
  115:14 141:10
  178:9 180:10
  192:8 215:21
  216:2,11
**parcel** 171:4
**parentheses** 90:12
  154:12
**park** 3:15
**parlance** 124:9
**part** 27:20 51:2
  56:17,22 63:18
  66:17 132:5
  141:24 142:4
  151:16 162:7
  184:25
**participants** 2:12
**participate** 109:23
**participated** 7:8
  47:12 48:3
**particular** 27:3,12
  29:4,11 38:4
  39:16 40:18 65:7
  79:24 116:24
  163:24 164:8
  183:11 184:23
  189:6

**parties** 5:10 14:15
  23:10 98:7 99:11
  99:18 114:13
  116:2 145:8 146:6
  147:12,18 180:5
  184:8 187:18
  193:3 211:20
  218:17
**partly** 64:20
**partner** 7:20 15:9
  16:10 23:19,23
  162:18
**partners** 26:22
  71:15 112:20
  114:8 115:2
  119:14 121:18
**parts** 54:13
**party** 9:24 13:13
  23:3,7 39:15
  98:20,22 120:25
  121:16 141:21
  147:7 193:9
  197:10
**party's** 146:16
  201:25
**pashma** 3:4 6:8,12
**passive** 22:12
**path** 162:11
**pattern** 209:9
**pay** 34:7,8 39:8
  99:24 100:7
  101:24 102:11
  120:21 141:16
  142:23 170:25
  171:3,15,21,24
**paying** 124:12,13
  124:15
**payments** 34:15
**pending** 9:3,8
**penny** 193:19
  194:11 195:21

**penultimate** 156:8
**people** 23:12 44:5
  86:9 118:10
  130:16 181:19
  186:10
**percent** 59:3 74:6
  151:9 187:17
  192:11
**percentage** 141:15
  142:13 185:22
  196:23
**percentages**
  185:18
**perfect** 8:24
**performed** 50:8
  52:13
**performing**
  158:21
**period** 21:3 171:5
  172:13,23 173:23
  182:5
**periods** 65:23
  216:15
**permit** 145:7
**perpetuity** 171:2
  173:21 174:4
**person** 34:18,25
  78:15 85:20
  181:20 183:14
**person's** 162:12
**personally** 32:11
  54:20
**perspective** 161:6
  163:8
**perspectives** 164:5
**perusing** 46:11
  170:2 216:7
**phone** 9:21 17:24
  47:7 77:25 105:16
  105:17,23 112:8
  146:10

**phones** 5:6
**phrase** 98:9
  114:14
**pick** 183:13
**place** 5:9 65:19
  146:5
**placed** 11:3
**placing** 11:15
**plaintiff** 1:5 3:5
  5:13 6:10
**plaintiff's** 9:22
  11:13 201:3
**plans** 38:2,8,15
  97:5
**play** 126:23
  127:13 181:14
**please** 5:6 6:5 7:14
  35:23 41:19 45:3
  54:4 65:9 75:19
  76:14 81:22 96:24
  105:12 106:18
  108:14 113:21
  128:18 134:15
  144:25 166:16
  167:8 169:13
  177:12 186:13
  189:22 192:5
  196:14 198:13,21
  200:23 204:12
**pleasure** 54:20,24
  84:4
**point** 29:4 30:23
  51:17 93:7 94:10
  108:11 109:8
  112:3,23 123:15
  126:10,11 163:4
  176:15 180:12,24
  182:9 184:15
  189:4
**poorly** 119:16

**pop** 41:22 42:3
**portion** 67:3,6
  97:2 142:7
**position** 11:14
  152:3,9 157:9
  200:11,17
**positions** 180:6
**possible** 38:25
  39:2,21,25 40:2,13
  94:9 175:25 180:9
  184:7 213:10
**possibly** 47:13
  78:23 79:5 162:18
  175:23
**posted** 49:6
**potential** 63:16
  64:10,18 78:2
  80:5
**potentially** 19:15
  58:15 84:25 85:15
  211:17 212:5
**practice** 29:22
  48:12
**practiced** 25:2
**practices** 115:25
**practicing** 24:17
  24:21 29:23
**precedent** 115:25
**precise** 194:20
**precludes** 65:21
**prejudice** 177:6
**prejudicial** 162:9
  180:8
**preliminaries** 9:13
**preliminary** 57:10
  167:3 199:10
**premise** 209:10
**premises** 101:2
  115:18 116:21
  141:12

**preparation** 42:15
  50:19 52:23
**preparatory** 51:3
  51:6
**prepare** 13:21
  42:22 132:16
  133:4 174:14
  175:12,20
**prepared** 10:5
  52:22 57:12 58:9
  59:12 60:16 65:12
  81:9,17 86:4 93:3
  130:23 131:11
  176:4 201:25
**preparing** 35:12
  158:6
**present** 4:11
**presented** 73:20
**press** 45:20
**pressing** 157:22
**pretty** 16:16 66:12
  83:13
**prevent** 7:23
**previous** 73:8
  85:21 114:7,25
**previously** 18:16
  44:18 49:3 54:4
  87:6 96:25 130:20
  180:7
**price** 120:19
  142:22 171:25
**primarily** 74:19
**primary** 30:22
**principal** 23:6,9
**prior** 26:18 32:7
  80:23 81:16
  169:23 187:2
  210:8
**private** 9:2
**privilege** 10:11,12
  10:13,14,21 11:7

12:3 15:16 30:6
  149:23
**privileged** 10:7
  11:23 214:7
**privileges** 10:15
  10:16
**probably** 17:2
  18:8 19:16 26:6
  47:13,14,19 78:8
  78:19 79:5 81:6
  84:16 143:8 148:2
  152:12 161:23
  181:10,18 189:12
  206:21 213:16
**problem** 35:15
  204:14,16
**procedure** 59:9
  176:21 177:9
  188:6 190:21
  191:2,4 193:8
  201:16,18
**proceed** 69:8
  105:9 162:11
  165:3,11 166:14
  215:3
**proceeding** 149:21
  199:8
**proceedings** 79:4
**process** 25:21 26:3
  27:3 38:22 39:7
  39:20 40:5,6,17
  41:15 50:14,19,21
  50:22 51:3,7,14
  52:24 56:25 58:2
  58:16,21 59:7
  66:18 67:16 69:20
  70:25 81:10 82:12
  82:25 83:7,13,15
  85:3 89:4,11,22
  91:20 110:3
  131:12 141:2

144:19 176:23,25
182:8 184:11,16
184:18 188:13
193:11,17 195:4
196:2,9,9 198:9
200:6,22 203:8
206:8 211:25
**produced**  30:5
60:20 61:9 209:6
210:2 213:2,4
**product**  10:12
**production**  208:7
**products**  22:14,16
22:23
**professional**  2:14
21:17 135:21
164:25 170:21
218:8
**professionals**
89:12,18
**program**  8:20
**programs**  8:16
105:14
**promised**  35:17
**proper**  85:9
127:15 191:2,3
192:20
**properly**  137:21
**properties**  94:11
94:16,25 95:5
101:9 102:25
**property**  23:13,15
33:18,20 36:8
37:2,17 38:2,12,16
38:19,24 39:10
41:6,13 52:11
56:25 61:22 64:11
64:19 67:17 68:7
83:10 92:5,9 93:9
97:16,21 99:22,23
100:6 101:4,7

106:5 115:22
116:4 120:24
121:5,8,19,21
124:11 130:4
135:23 141:19
154:25 171:2
172:6,17,24
173:19,22 174:3
178:14 179:22
**proposal**  48:25
49:20 61:23 199:7
**propose**  190:7
**proposed**  62:4
97:9 178:10
206:24 207:4,14
207:17
**proposing**  200:4
**proposition**
146:20
**provide**  53:19
63:15 64:4 69:10
74:6 91:10 94:15
95:4 102:14,24
199:11 213:12
214:14
**provided**  60:16
63:25 64:2,17
94:9,20 95:9,13
96:9,17,22 101:13
102:19,20 103:3,4
103:6 131:16
177:3 206:2
210:23 211:3
213:7,10 214:4,12
**provides**  58:25
84:5 99:21
**providing**  31:5
93:25 95:15
**provision**  25:11
27:11 28:20 29:7
29:11 58:24 65:7

90:19,20 116:18
116:24 119:17
122:20 123:5,9
127:16 136:15
145:12 190:11,20
196:3 198:10
**provisions**  25:18
28:24 29:2,4,25
58:18,23 101:20
101:23 193:10
**public**  2:16 6:22
217:14 218:9
221:25
**pull**  35:23 36:5
41:18 49:3 54:4
75:19 76:13 83:17
87:5 96:24 97:17
106:17 107:12
117:15 119:18
130:19 149:2
166:16 169:13
177:12 182:12
185:7 186:13
189:22 191:6
215:11
**pulled**  36:10 149:3
**purchase**  171:25
**purely**  193:17
**purpose**  19:7 37:4
57:25 77:21,23
82:6,7 88:17
115:23 146:13,15
**purposes**  56:10
69:19 89:21 91:13
139:19 161:9
163:9 208:7
**put**  29:9 88:23
90:25 119:21
120:24 121:5,8
141:20 180:22

**puts**  183:22
**putting**  11:8 194:5
209:17

**q**

**qualified**  183:11
**quarter**  68:2
**queens**  140:20
147:23 154:20
**question**  7:15 9:3
9:8 11:4,25 16:3,6
16:15 23:5 48:17
53:8 58:24 63:24
64:6,8,12,21 73:17
99:7,9 101:12,12
106:24 107:2
108:23 110:25
112:14 118:15
122:5 125:16
126:5,6,13,18
127:6,22,25 128:3
128:8,9,13,17,23
131:9 133:12
134:6,9 137:9,14
137:23 138:8
139:21 142:25
158:16,16 160:16
160:25 170:3
171:8 195:15,18
197:5 207:25
209:11,22 211:16
215:11,25
**questioning**  11:10
11:10
**questions**  7:24
10:6,20,22,25 13:8
16:24 54:12 70:6
78:10,14,16,17
108:7 128:20,22
209:16,19,25
215:6 216:17

**quibble** 173:14
**quick** 9:11,19
  166:2
**quickly** 106:25
  190:24
**quiet** 78:19
**quote** 121:19
  142:2

**r**

**r** 3:2 4:2 6:20,20
  6:20 105:2,4,4,4
  218:2
**rabsky** 32:14,16
  32:22
**rails** 29:6,13
**raised** 107:8
  147:16 153:9
**ran** 172:23
**range** 167:10
  168:16,24 169:5
**reach** 116:16
  144:24 199:6
**reached** 53:23
  70:13 122:11
  182:11 186:7
  199:2
**reaching** 115:3
**reacted** 154:9
  207:9
**reacting** 190:22
**reaction** 110:22,24
  111:14,17,22
  153:23 199:15,20
  199:24 200:2
  203:14,17
**read** 13:22,23
  32:18 56:7 62:12
  62:13 66:8,11
  80:22 86:20 88:19
  111:15,25 112:3
  116:8,18 121:13

130:17 131:23
132:2 149:16
156:8 163:5 168:2
188:4 192:9
193:10 201:21
215:23
**reading** 67:5
  111:23 116:24
  127:8 133:19
  153:13 202:2
**ready** 9:17 46:9
  54:11 130:4
  215:24
**real** 12:17,18,22
  21:19,24 22:13
  24:2,5,6,8,15,18
  25:2 29:23 98:8
  124:12 170:20,22
  192:16
**really** 12:12 19:8
  28:3,25 38:7
  83:21 132:4 138:7
  152:14 172:21
  173:12 182:6
  183:13 184:22
  213:9
**realtime** 2:15
  218:8
**reason** 7:22 9:6
  13:8 96:20 154:4
  163:12 180:21
  221:4
**reasoning** 122:13
**reasons** 86:13
  135:19 176:11
  203:5
**recall** 12:12 14:18
  16:18,22 17:4
  18:20 19:6,8,17,20
  19:24 21:23 26:6
  26:8,14 27:6,15

28:4 33:7 34:14
42:10 44:4,20,25
46:22 47:3,21,24
48:5,10,19,22
53:22,25 55:9
56:4 60:7 61:14
62:10,15,16 64:2,5
66:25 67:4,5,11,20
67:21 69:21 70:5
70:8,13,19,20 71:2
71:5,6,7,11 73:15
73:20,21 74:11,14
75:13 77:6,13,15
77:18,19 78:13,21
78:23 79:2,7
80:15 81:7,14
82:15,21,21 84:7
85:24 86:15,19,24
86:25 87:4 88:8
88:10 90:16,22
91:2,22 92:18,21
93:17,21,24,25
94:4 95:15,20,21
96:7 102:20,22
108:6,10,13
109:10,20 110:9
110:21,24 111:4
111:22 112:6,7,11
112:15,16,21,22
113:3,5,8 128:25
129:6,10,13 140:7
141:4,7 142:8
143:4 144:11
145:14 146:7,8,11
147:3,5,10,15
148:4 151:15
152:3,4,5,7,8
153:7 154:8
156:25 157:4,6,12
157:17,19,22
158:17,19,20,23

158:24 159:17,18
159:23 162:3,20
162:22 164:15,23
167:19 168:25
169:2 175:14
178:18,24 179:3,5
179:24 181:9
183:3 184:24
188:9,12 197:17
199:20,22,22
200:2,2 203:8,17
207:3 208:3,10
210:13,21 211:24
212:2,7,11,15
213:3,19
**recalling** 111:18
**received** 175:17
**receives** 100:8
**recess** 69:3 104:13
  166:9 214:24
**recollection** 30:9
  48:21 49:24 55:2
  57:20 70:2 73:24
  74:10 86:5 97:25
  107:25 110:2
  168:18 175:10
  185:6
**recollections**
  79:11
**recommend** 91:6
**recommendations**
  84:15,22
**recommended**
  44:19
**recommending**
  178:11
**record** 5:3,10 9:20
  11:3,8,11,15 68:25
  69:6 104:9,10
  105:7 149:24
  166:7,12 209:8,13

**[record - representation]**

209:14 214:22
215:3 216:23
218:14
**recorded** 5:12
**recording** 5:8
**recovering** 21:11
**recovery** 17:25
**recreate** 158:4
**redevelopment**
38:15 65:24
**redline** 178:7
**redlined** 177:17
**redo** 158:11
160:12 162:5
176:16,22 177:5
**refer** 113:22
**reference** 54:17
**referenced** 47:23
47:24 52:21
**references** 69:24
91:4
**referring** 23:15
59:14 61:5 120:6
144:23
**refers** 90:23
136:13
**reflect** 109:18
**reflects** 129:24
**refresh** 42:4 45:21
49:23 54:25 57:19
97:24 107:24
168:17 175:9
**refreshing** 49:12
**refusing** 126:17
**regard** 57:7
**regarding** 63:16
79:18
**regardless** 11:2
**registered** 2:14
218:7

**regular** 29:12
**regulations** 115:7
**reinvent** 113:11
**rejected** 121:23
122:12 190:14
**relate** 204:17
**related** 51:13 98:7
98:20,22 99:10
108:5 218:17
**relates** 204:19
**relating** 10:2
73:17 97:9
**relation** 98:13,17
**relationship** 32:21
98:18 99:18
**relative** 185:18
**relatively** 78:19
**releases** 97:8
**relevance** 102:2
**relevant** 19:15
20:3 40:22 78:25
100:17 140:20,24
**relying** 183:13
**remains** 100:6
**remember** 12:14
14:11 19:23 47:6
54:2 56:15 60:5
63:12,14 67:8
68:5 79:12 110:12
113:18 141:2
147:7,13 197:21
207:8
**remind** 185:19
196:19 197:2
**remote** 1:12 2:11
5:25 6:3
**remove** 39:9
**removed** 179:23
179:25 180:4
**renewal** 115:23
144:20 155:7

**renewals** 154:21
155:24
**rent** 25:21 26:3
28:19 37:8,11,14
38:22 39:7,22,25
40:2,12,21,21,22
41:2,8 50:13
51:14 52:23 56:16
63:18 65:17 66:17
67:16 68:8 70:25
79:4 82:12 83:11
89:4,22 90:23
91:24 92:6,8
99:24 100:8
101:20,24 102:3
102:10 106:7
115:23 119:19
120:2,5,8 124:13
124:15 130:23,24
131:11,12,20
132:16 133:23,24
134:2,4,11,13,22
137:2,11,25
138:12,25 139:22
141:14 142:3,9,12
143:11 144:15,19
147:20 151:3
155:25 160:5
168:11 169:22
170:7,14 174:10
174:10 181:8
182:7 185:18
188:7 190:6 191:7
192:8 193:14
203:8 205:25
206:10 207:24
**rental** 25:10 38:18
39:14 92:10
100:25 101:6
120:17,19 142:10
142:19,20,22

143:6,13,15 155:5
155:8
**repair** 124:19
**repeat** 25:24 28:11
134:8 159:12
165:8 195:10
**rephrase** 13:9
28:15
**report** 31:8 55:14
55:19,21,22 56:2,7
56:12 60:9,16,18
60:20 61:5,9,20
62:9,21 67:3,6,9
67:14 69:13 70:4
70:7 72:19,20
75:3 81:2,8,16
93:2 129:11 130:5
130:6,21 131:15
131:19 133:22
135:19 137:4,12
140:12 141:11
142:7 144:6
147:16 169:23
170:8 174:12,15
175:12,17,18,20
176:3 185:21
187:3 196:22
**reported** 1:19
**reporter** 2:15,15
5:22 7:17 218:8,9
**reporting** 6:2
**reports** 50:8 51:20
52:6 57:8 73:18
81:16 130:16
174:18 185:16
**repository** 97:14
**represent** 30:12
89:10
**representation**
31:19 51:13
212:18

**representations**
26:18 68:15
**represented** 7:19
9:25 25:8,19,23,25
26:4 32:4,10,13
**representing** 6:18
17:11,17 24:15
30:2,24 33:6
38:13 80:20 81:13
**republic** 43:22,25
44:4
**request** 84:17
94:15 102:24
**requested** 50:12
94:21,23 95:11
96:18,21 103:3
213:11
**require** 116:10
206:21
**required** 98:19
102:10 118:22
132:16 145:9
179:21 189:20
200:6
**requires** 160:3,18
189:8 191:22
**research** 141:8
162:21
**researching**
168:11
**resells** 22:23
**reset** 74:7 190:6
**residual** 74:5
159:2 167:4,5
168:11 170:12
171:23
**resolve** 40:3
**respect** 9:20 38:17
65:20 86:19 186:8
**responded** 54:22
71:10 73:14 109:2

111:5 112:4,13,18
185:15 190:10
**responding** 72:17
73:11 84:16
**response** 7:16 11:4
108:21 117:19
123:22 152:17,24
198:6 201:17,21
202:2 205:9 213:8
**responses** 201:13
**responsible** 31:11
34:12 97:10
124:10,18
**responsive** 15:24
210:12 211:18
212:6 213:23
214:3
**rest** 143:16 200:25
**restaurants**
147:23
**restriction** 172:16
172:19
**restrictions**
114:21 115:6
**result** 27:3 159:2
**resumed** 105:4
**retail** 156:19,23
167:7 168:14,23
169:4,8
**retain** 19:14 89:2
89:11,13,17,20
113:12 145:20
177:2 206:11
**retained** 13:12
27:20 30:20 32:5
36:15,18,21,23
37:5,23 38:3 43:5
43:22 44:16,17,23
49:25 50:5 56:9
60:24 67:25 74:18
75:17 80:16 81:16

89:9,16 92:17
100:24 145:15
181:6 211:23
217:2
**retainer** 17:19
87:14 88:14 90:21
**retaining** 14:16
82:10
**retains** 65:22
**retention** 27:21
39:13 43:2,13
46:25 47:3 61:13
89:15,19 177:4
206:21
**return** 45:24
176:21
**revealed** 98:5
**reversion** 171:6
173:7,8
**review** 14:6 44:21
46:8 50:7 52:12
53:18 55:13,22
58:4 60:8 65:11
69:16 80:23
119:15 130:13
190:7
**reviewed** 18:14
36:13,18 55:25
56:11 57:16 61:21
80:25 95:23
110:22 111:5
118:3 125:20
131:15 139:17
146:25 185:16
186:11,12
**reviewer** 51:18
**reviewing** 56:10
57:24 111:17
**revise** 162:25
164:17 165:3,11
180:13

**revised** 60:18,20
61:9 161:12
169:18 172:5
174:12 175:18
176:4 177:8
**revising** 167:18,23
**rezoned** 61:22
99:23
**rezoning** 37:17
38:16 97:9
**rider** 13:23 14:13
113:14 116:19
117:13 119:16
**right** 8:10 20:7,18
23:23 24:2,18
28:8 30:10 34:21
36:21 41:13 42:15
43:14 51:7,15
61:4,8 73:23
80:23 81:11,20
89:23 90:3 91:17
92:6 94:25 100:12
101:10 105:17
106:13 109:3,5
111:7 112:2,9
116:12 120:3
129:8 130:9,25
136:8 148:2 151:2
153:10,17 156:10
159:5 166:3
171:11 172:7,15
172:17,19 173:5,9
176:18 188:17
190:16 200:6
201:20 202:8
203:16 204:5
206:19
**rights** 180:6
**road** 159:23
**roberts** 4:12 5:19

**role** 92:8 181:13
199:7
**room** 8:7
**rotate** 114:2
**rottenberg** 17:10
17:21 30:13,15,22
32:11 34:18 35:8
47:10 54:19 55:12
72:13 74:20 75:5
78:17 82:19 84:3
96:10 106:23
108:22 109:21
112:8,24 130:3
145:21 161:19,22
166:19 167:2
168:9 177:15
182:14 183:25
186:18 188:17
189:25 196:17
198:25 205:7
**rottenberg's**
103:15
**rpr** 1:20 218:25
**rule** 27:9,16,25
28:6,17 70:23
115:24
**rules** 64:9
**run** 211:15
**runs** 45:9

**s**

**s** 3:2,18 4:2 6:20
6:20,20 105:2,2,2
105:4,4,4 221:4
**safe** 82:18,20,23
**sale** 97:7
**sales** 90:13 91:7
133:22,25 134:12
134:24 135:24
136:7,18,23
**sam** 17:10 30:13
30:14,16,22 31:6,7

31:8,11 32:11,19
33:8 34:18,25
44:16 47:10 54:19
54:23 55:5,8,12
63:7,8 71:12
72:13 74:20 75:5
75:16 78:7,16,20
82:18,21,23 84:2
95:8 96:10,15
103:14,25 106:23
108:22 109:20
112:8,11,23 113:6
130:2 132:10,14
140:25 145:20
146:9 161:19,22
166:19 167:2
168:9 171:12
177:15 182:13
183:25 184:12
186:18 188:16
189:24 196:16
198:25 205:7
**sam's** 18:7 83:6,8
110:3 130:9,11
146:2 189:12
**santamaria** 84:2
87:13,20
**satisfied** 128:6
**saw** 42:10 99:5
163:7,8
**saying** 29:16 54:23
129:5 130:3
133:15 149:24
152:2 153:20
185:11 192:2
199:2 206:3
207:19
**says** 27:12 51:18
54:19 57:6 65:15
66:23 74:4 84:3
90:9,12 93:2,8

94:6 109:6 114:8
114:13 115:2,14
116:19 120:16
133:17,18 136:9
139:22 143:12
144:7,21 149:15
149:17 150:12
151:11 156:10,12
167:2 168:10
182:21 188:5
193:21 199:9
201:22 202:5,21
**scenario** 62:7
**schedule** 57:13
**school** 20:7 21:5
21:11 24:18
**schwartz** 4:8 6:17
6:17 7:20 9:9,15
9:18 15:14,19
16:2 34:22 37:20
62:24 68:11,18
71:3 75:8 76:9
77:4 80:12 87:25
93:18 94:17 95:17
96:13 99:2,15
100:2,14 102:7,17
103:11 104:4
106:8 110:6,15
116:13 120:11
122:7,14 124:25
125:3 131:2,5
132:18 133:10
134:7,16 135:2
136:3 139:3 140:6
148:13 151:17
153:2 160:9,23
163:16 165:17
171:9 172:8
174:22 178:21
180:18 187:6
190:18 191:14

194:3,14 195:7
200:8,19 202:9
203:10 205:8
207:2,15 208:23
209:7,23 210:7,11
214:9 216:18
**schwartz's** 11:18
**sciannameo** 84:10
**scope** 51:12 65:8
**screamed** 148:9
**screaming** 148:4
**screen** 8:13,14
42:5 49:9,12 72:7
75:21 77:20 114:2
205:2
**screens** 8:10
105:13
**scroll** 183:17
188:19
**scrutinize** 59:22
59:25
**scrutinized** 58:11
59:13
**search** 181:12,14
211:15,19,21,23
**second** 4:6 8:5
16:24 26:16,16
27:8 28:5,17
45:19 54:18 58:8
70:24 76:24 83:22
90:2,7 92:22,22,24
92:24 94:6 105:19
107:9,18 108:4
110:21 111:10
113:25 115:13,13
118:22 120:16
124:24 141:10,24
143:12 152:6
159:10,15,20
160:2 166:24
169:24 180:10

| | | | |
|---|---|---|---|
| 182:17 186:16 | 212:9 | 218:12,22 | **side** 90:3 157:2 |
| 192:10 201:11 | **sending** 42:18 | **sets** 41:14 | 161:7 |
| 202:3 216:6 | 76:3 97:11 110:20 | **setting** 77:8 | **side's** 59:25 |
| **see** 17:23 41:23 | **sense** 116:2 184:16 | 115:23 144:9 | **sides** 59:24 |
| 45:15 46:4,20 | 184:19 | 177:9 | **sign** 23:12 |
| 47:23,23 49:9,18 | **sent** 14:8,9,19 | **settle** 114:16 | **signature** 218:24 |
| 51:21 55:15,16,19 | 46:17 55:12,23 | **settlement** 154:4,7 | **signed** 14:14 87:14 |
| 55:21 56:19 57:17 | 56:8 72:19 76:22 | 180:22 | 91:21 93:15 |
| 61:25 65:14 72:15 | 84:7 92:7,8 | **share** 8:17,23 | 101:22 123:13 |
| 72:21 73:19 77:2 | 106:22 107:23 | 62:20 105:15 | 130:7 176:20 |
| 77:3,19 87:18 | 111:11 112:2,4 | 132:14 197:24 | 178:2 179:7 |
| 90:14 93:12 94:12 | 118:9 129:10 | 198:2 | **signing** 88:20 |
| 97:23 101:14 | 130:2 132:9,10 | **shared** 62:16 | **silence** 5:6 |
| 105:21 107:4,10 | 177:24 198:25 | 63:13 75:4,4,5 | **silent** 115:15 |
| 107:11,15,20 | 203:4 205:7,10 | 165:4,12 189:2 | **similar** 122:18 |
| 113:21 114:2 | **sentence** 57:6 | **shares** 186:21 | 192:18 |
| 116:6 118:6 | 92:23,25 135:16 | **sharon** 144:24 | **similarly** 58:10 |
| 140:18 141:22 | 136:12 141:25 | 145:4 146:9 147:9 | 59:13,22 65:22 |
| 142:20,24 146:16 | 142:4 180:11 | 147:22,25 148:6 | **simon** 33:10 |
| 155:7 161:5,7 | 192:10 202:4 | 148:17,19 150:9 | **simply** 11:11 |
| 167:13,14 178:16 | **sentences** 135:22 | 150:13,23 154:16 | **sit** 111:22 |
| 180:10 183:9 | **sentiment** 152:12 | 156:17 181:11,22 | **site** 156:18,22 |
| 188:22 190:8 | **september** 1:15 | 182:10,22 183:15 | **sites** 156:17 |
| 193:24 195:3,17 | 2:8 5:4 18:13 | 185:12 186:8,11 | **sitting** 35:13 111:6 |
| 199:18,25 200:24 | 123:13 177:16 | 186:23 199:2 | 113:8 119:12 |
| 204:20,25 | 181:4 198:24 | **sharon's** 155:12 | **six** 14:20 154:20 |
| **seeing** 102:20 | **serve** 13:14,18 | **shaun** 74:15 75:14 | **sixth** 46:16 |
| **seek** 10:7 | 82:10 85:15 89:3 | 75:25 76:23 77:7 | **skew** 196:8 197:10 |
| **seeking** 37:17 | 89:20 | **sheet** 221:1 | **skin** 40:19 |
| **seelig** 3:13 6:15 | **service** 24:8 | **shocked** 154:5 | **slt** 1:7 5:18 |
| 18:23 214:5 | **services** 22:20,21 | 172:2 | **solely** 119:10 |
| **seen** 42:8 61:12 | 22:22 44:9,15 | **shops** 151:7 | **solution** 157:23,25 |
| 96:2,4 98:2 | 49:25 50:5 53:4 | **short** 68:19 214:20 | **somebody** 44:19 |
| 101:19 216:11 | 53:18 55:11 65:13 | 215:10 | 103:7 117:5,10 |
| **selection** 182:25 | 69:13 | **shortly** 37:18 | 150:15 171:20 |
| **selective** 12:2 | **serving** 21:16 86:7 | **shot** 205:11 | 186:3 |
| **self** 15:20 | 86:10 87:2 | **show** 199:21 | **soon** 94:9 |
| **sell** 171:3 | **set** 56:16 57:13 | **shows** 60:15 | **sophisticated** |
| **send** 14:5 18:18 | 65:17 144:12,15 | 198:20 | 170:24 |
| 63:9,10 130:16 | 144:18 196:10 | **shredding** 20:5 | **sorry** 14:17 21:9 |
| 167:9 183:21 | 199:3 201:4 | | 33:4 48:8 90:6 |

96:15 101:15,16
133:8 148:25
159:12 170:4
185:8 188:11
208:13 215:16
**sort** 31:5 74:23
98:16,18 121:9
183:15 193:17
196:8
**sought** 114:15
**sound** 44:2 170:13
**sounds** 13:4 30:8
30:10 44:10 81:21
**space** 29:12
122:23 123:23
124:16
**spans** 54:9 72:3
87:11 175:6
**speak** 54:13 70:3
109:3 113:6
140:22 175:15
194:6 196:25
**speaking** 57:24
145:3 182:22
**speaks** 163:21
**specific** 11:2,4
23:5 27:17 53:11
54:13 67:9 69:23
79:11 92:19 93:21
123:5 159:23
164:15 169:2
**specifically** 47:2
52:20 65:10 67:7
73:3 79:9 84:9
89:20 94:23
136:17 141:3
145:18
**specifics** 153:14
158:2
**speculating** 110:9

**speculation** 81:5
**speculative** 62:7
**speedy** 17:25
**spent** 35:12
**spilling** 61:24
**spoke** 15:6 17:21
17:22 18:5 31:7
46:22 53:13 70:10
71:11,12 76:8
77:11,12 84:14
86:9 108:11 109:9
109:16 150:5
152:11 183:4
188:24 197:3
**spoken** 17:9 18:10
18:22 19:3,4 77:7
85:23 185:12
**square** 154:17,22
156:19,22 167:10
168:15,24 169:5,9
**ss** 218:4
**stacy** 4:15
**staff** 168:11
**stamp** 45:10 50:11
87:11 175:7
**stamped** 45:3
49:16
**standard** 90:10,24
135:4,10 136:9
**standards** 64:9
**stands** 27:8 163:21
**starbucks** 154:22
**start** 144:18 167:5
167:22,22 192:9
**started** 21:11
150:10 158:5
174:17
**starts** 55:20 60:12
185:10
**state** 2:16 6:5
143:14 191:11

218:3,10
**stated** 93:11
**statement** 9:11,19
11:19 128:15
153:23 163:23
**states** 1:2 22:24
24:14 120:9
135:16 141:11
**stating** 39:24
108:23 209:10
**stein** 3:4 6:9,12
**stephen** 15:9
16:14 19:5
**steps** 95:3 157:15
**stick** 191:3
**stipulating** 12:5
**stop** 104:7 124:17
128:17
**stories** 156:20
**story** 182:5
**street** 3:6 169:12
**strict** 198:12
**strike** 110:23
178:12
**string** 72:5
**strong** 184:19
**subject** 93:3
106:24 107:14
114:20 141:14
142:12
**submit** 40:7
**submitted** 85:7
**subscribed** 217:9
221:22
**subsequent** 61:13
**subsequently**
137:8
**substantive** 11:10
18:3 19:9
**success** 192:18

**successive** 216:15
**sue** 203:15 205:12
206:4 207:22
**sued** 200:22
**suggest** 74:25
128:11 164:21
190:6
**suggested** 73:10
109:2 179:19,24
188:16 199:4
**suggesting** 199:23
201:17
**suggestion** 178:19
190:15 199:16
207:9
**suite** 3:7
**suited** 85:9
**summarize** 66:6
**super** 147:10
**supplements**
36:10
**support** 58:12
72:24 73:9 74:5,6
167:11 186:3,7
199:13
**supportive** 58:13
185:22 196:22
**supposed** 131:23
187:11,12,18,20
**sure** 7:14 9:14
13:11 14:24 15:11
34:3 50:18 55:24
56:5,6 76:12
77:12 78:18 85:22
86:8,20 88:21
92:4 96:2 99:5
109:7,19 130:15
130:17 132:2,4,9
135:5 143:15
146:9 147:17
152:10,11,15

165:9 174:19
178:8 184:21
189:4 197:3 198:8
209:5 216:6
**surgery**  21:8
**surprised**  169:20
170:5 171:20
213:6
**swearing**  6:3
**sworn**  217:9
218:13 221:22
**system**  211:10

**t**

**t**  105:2 218:2,2
**tabs**  14:23
**take**  5:9 9:7 12:20
27:13,13 33:21
46:7 48:12 54:10
64:9 65:6 68:16
68:21 95:3 102:8
104:5 111:7
113:15,17 115:5
118:11 123:18
134:18 148:20
158:8,12 162:14
164:19 165:24
166:2 180:9
187:23 188:6
192:7 197:22
201:24 209:15
214:20
**taken**  5:13 12:24
69:3 104:13
115:16 123:6,7,16
142:4 161:11
166:9 214:24
**talk**  111:20 158:14
197:11,23 202:22
**talked**  121:16
**talking**  14:15 48:6
69:24 82:8 107:7

115:12 117:23
140:25 150:18
172:4 190:11
**talks**  61:18 168:22
**tantamount**  101:3
164:3
**tax**  124:17
**taxes**  124:12
**team**  96:15
**technique**  90:11
135:5,11 136:10
**tell**  9:16 19:13
25:15 59:15,20
62:13 80:2,4
111:16,19 119:12
152:16 157:7
159:8,13 166:20
174:13 196:24
197:6,11,14,16
203:15 204:10
**telling**  53:17
158:24 159:18
167:20
**tells**  183:21
**tenant**  65:22 97:20
98:14 120:20
124:9,15 141:16
142:2,23
**tenant's**  120:22
121:3 141:18
**tenants**  39:25
**tener**  27:18 28:2
43:14 67:21,23
68:9 70:12 74:15
75:6,14 76:2,22
77:7 78:8 81:3
85:14 87:13 91:15
95:12 106:4,22
107:8,13 108:11
108:22 109:9,24
110:13 112:18

113:23 116:10
117:18,19 123:17
129:10,25 130:2
130:22 135:15
137:5,13 138:11
138:21,24 141:4
144:4,23 149:25
153:9,21 156:15
156:21 157:11
158:20 159:8,13
159:19 160:12
161:24 162:17
164:17 165:3
166:19,25 168:9
168:19 177:15,16
178:10 181:12
182:14,18 185:9
185:11 186:17
189:2,15,24 190:3
196:16 198:25
205:7 206:4 207:8
207:14 208:2,4
**tener's**  71:10
189:19 190:14
206:14
**term**  65:21 83:12
83:13 113:14
115:9,24 117:13
119:16 144:20
145:7 155:7,14,15
155:17,20 156:4
161:4 167:12
171:23,23 173:3
196:10 216:11
**termination**  39:3
**terms**  40:20
131:20,24 132:13
137:2,10,25
138:12,24 140:19
156:2 175:24
198:12 211:15,20

211:21,23
**testified**  6:23
34:17 63:20 95:12
105:5 132:21
191:23 205:24
216:10
**testify**  10:5
**testifying**  10:8
**testimony**  11:5
129:6,7 201:23
216:24 218:14
**text**  204:7,17
**thank**  131:5
190:13 198:23
215:4,7 216:20
**thanks**  7:7 72:23
**theory**  163:22
**thereon**  114:12
**theresa**  84:11
**thing**  16:17 17:2
45:21 91:14
155:24 164:24
167:19
**things**  25:4 29:8
50:10 90:20 113:8
124:20 161:10
184:22 190:24
197:20 209:4,11
**think**  8:21 14:9,20
15:8,10,19 29:9
30:4,19 39:23
44:20 52:9,11
59:2,21 61:2
62:14 63:3,4
67:25 72:25 73:7
74:21,22 79:25
85:17,18 86:16
88:13 96:20 101:5
101:25 106:2,15
108:12 111:12,24
123:12 125:21,22

126:14 127:7
128:5 132:20
139:13,14 143:10
146:11 147:9,18
147:22,24 148:3
148:22 149:19,25
150:19 152:21
158:4,15 163:20
165:20,21,23,25
168:12 169:3,7
170:13,21 171:10
171:19 172:4
174:2,9 175:24
178:4 181:16,18
181:19 183:10
184:13 186:2,23
188:14 189:11
190:9 191:18
196:2,9 201:21
208:21 211:3
213:3 214:4,18
**thinking** 207:5
**third** 14:16,17
51:17 59:5,5 85:6
93:7 113:12
115:20 146:18
162:11 176:25
177:4 181:6,13,14
182:2,4,25 183:7
186:24 187:2,19
187:20 192:13,23
193:11 195:10
197:11 199:7
206:12
**thorough** 213:10
**thought** 16:10
33:7 35:21 122:24
122:25 123:24
126:6 127:3,14
128:24 145:25
147:25 170:11,17

198:2,10
**thoughts** 58:5
118:17 198:2
**three** 12:18 24:17
59:6 83:21 84:5,8
86:21 113:7
126:20 128:3
177:11 181:19
183:20 187:5,24
188:24 189:16
190:7,15 191:11
192:2,14,21 193:5
193:6,7,13,15,18
196:5 200:13
201:22 202:5
212:23
**thursday** 1:15
15:10
**time** 13:5,6 15:6
17:21,22 18:5
21:15 25:15 26:11
29:5 30:17 35:11
35:20 36:17 53:6
62:14 67:21 70:10
70:15 76:7 77:8
77:11 80:21 81:13
81:20 92:16 96:6
99:24 105:3 107:9
108:8 111:9 112:3
113:20 116:25
123:2,9,15 126:3
126:10,11,15
129:2 140:23
152:14 158:25
159:4,5 163:5
166:2 167:16
171:5 172:16,18
175:15,18,18
177:20 180:24
181:3,11 182:9
184:15 189:14

207:6 213:18
215:5 217:4
**times** 18:22 19:2
25:13 26:9 126:20
128:3 151:9
212:23
**today** 7:5,13,20,25
8:4 9:23 10:4
11:23 15:4 35:13
35:18,20 84:4
111:22 113:9
119:13 215:5
**today's** 13:21
15:10 177:24
216:24
**told** 117:23 118:12
132:11 141:5
159:22 175:11,19
176:5,10,14
180:21 181:22
185:2 197:8,9,15
197:19,25 198:5
207:20,21
**tom** 18:6,7 27:18
27:25 31:4 43:13
55:6,7,12 67:21,23
68:9 70:12 71:10
72:13 74:15,22
75:6,14,25 76:2,22
76:23 77:7,12
78:8,8,16,18 81:3
82:18 84:2 85:14
87:13 90:18 91:14
94:21 95:12 106:4
106:22 107:7,13
107:23,25 108:11
108:22 109:9,17
109:24 110:13,20
111:11 112:18
113:23 116:10
117:7,18,19,23

118:7,9,14 123:17
129:10,25,25
130:22 131:22
132:6,25 133:14
133:17,17 135:15
137:5,13,19
138:11,14,20,23
139:17 140:22,25
141:4 142:6 144:4
144:23 145:3,10
145:25 146:9
147:11,24,25
149:25 150:5
152:21 153:9,21
154:2 156:15,21
157:11 158:6,11
158:20,24 159:8
159:13,18 160:12
161:12,24 162:17
162:25 164:16,19
164:24 165:2
166:17,18,18,25
167:16 168:9,19
172:5 177:15,16
178:10 179:19,23
180:13 181:11,16
182:14,18,21
183:13,19 184:6
184:25 185:2,9,11
186:11,17,21
188:5,9,12,25
189:15,19,24,25
190:3,14,22
196:16,19,24
197:3,6,8 198:5,24
200:4 205:7 206:3
206:14 207:8,14
208:2,4
**tom's** 110:25
112:13 133:3
150:9 152:17

189:12 199:4,15
**tomorrow** 182:22
**tones** 5:7
**toothed** 211:9
**top** 17:4 75:24
144:21 149:15
155:4 183:20
**total** 193:6 206:17
**totally** 149:19
154:23
**touch** 200:21
**touched** 106:2
**trade** 22:20,21,22
**traditional** 124:16
**transcripts** 18:14
18:19
**transfers** 97:6
**transmission**
112:5
**tried** 121:17
**tries** 196:2,3
**triple** 124:8
167:11
**true** 57:4 218:14
**try** 13:9 58:5
163:13 180:7
186:25 190:16
196:7 197:11
213:9
**trying** 23:16 39:6
74:25 83:10 85:8
113:10,12 121:24
121:25 125:7
127:2 144:12,14
144:16,17 157:23
158:9 161:9 163:9
174:18 186:6
190:23,25 195:16
206:5 211:13,15
213:13

**tt** 149:15,25
**turn** 46:13 60:8
61:15 164:8 178:6
196:14 215:21
**turned** 148:23,24
**two** 44:18 48:6
52:13,19 54:16
56:10 58:25 59:4
81:24 83:20 99:18
108:25 117:16
122:18 129:21
162:8,19 177:10
186:22 187:8,10
187:11 190:8
192:10,12 193:13
204:24 214:20
215:11,25
**type** 12:14 44:21
59:8 79:24 86:18
88:16 146:19
205:14
**types** 22:10 78:10
85:11
**typical** 29:6
**typically** 23:12
28:25 29:14,17
39:24 124:8
210:17

**u**

**u.s.** 5:16
**ultimate** 146:2
161:17
**ultimately** 31:14
109:24 145:15
179:23
**um** 88:18 115:10
117:21 184:3
188:8
**underlying** 10:3
215:13

**underneath**
150:13 154:13,18
156:14
**understand** 8:11
8:25 11:12,22
13:7 23:16 37:10
52:4 59:11,14,16
59:17,18 65:25
66:3 122:2,10
125:7 127:2
133:11 195:16
206:5 211:13
213:13
**understanding**
7:24 27:7,10 39:4
43:4 53:8 191:25
199:12
**understood** 16:3
**unencumbered**
121:6
**unfortunately**
191:2
**unimproved**
114:20
**unit** 5:11 69:2,7
104:12 105:8
166:8,13
**united** 1:2 22:24
**units** 217:2
**university** 20:17
**updated** 57:14
73:9 158:7
**uploaded** 45:17
**upzoning** 63:17
64:10
**upzonings** 64:18
**use** 22:3 38:21
39:6 57:10 64:18
65:18 66:15 69:20
91:6,7 134:23
136:17 211:21

**uses** 120:23 121:4
121:7 141:19
**usually** 55:7
**utilized** 65:16

**v**

**v** 26:22
**va** 45:4,6,10 49:17
54:9 71:22,24
72:4 81:23 82:2
87:11 108:15,17
108:21 117:16
129:15,18,22
143:19,21,25
179:7,10 182:18
198:14,16 203:23
203:25 219:11,13
219:15,17,19,21
219:25 220:3,7
**vacant** 90:12
114:19 116:20
121:6,9,20 135:11
136:10
**valuation** 25:21
26:3 28:19 29:19
37:11 38:22 40:12
41:2 44:9,14
49:25 50:5,14,22
51:14 52:24 53:4
55:11 62:6 63:18
64:11 65:12 66:18
67:16 69:13 70:25
79:4 82:12 84:11
89:4,22 91:8,13
92:20 106:7 111:3
116:11 118:19
120:10 121:21
130:24 131:12
133:5,23 145:8
160:5,20 165:5,13
165:15 169:22
170:7 172:12

184:17 185:5
193:24 203:8
**valuations** 43:22
43:25 59:2 68:9
145:2,4 193:18
195:5,20
**value** 25:10,17
28:24 38:19 39:14
41:5,7 57:15
58:18,23 59:6
60:25 62:8 81:10
85:7 92:10 100:25
101:7 114:14,19
114:23 115:17
120:17,19 130:22
131:10 134:2,13
135:23 136:23
141:9,13 142:10
142:11,19,20,22
143:6,13,15
145:10 146:19
147:21 150:2
154:17 159:3
162:12 169:20
173:7 174:4
178:14 179:22
181:8 182:5
185:19 187:14,15
187:21 192:25
193:4,8,12 194:8
194:19 195:12,13
197:12 199:4
202:18 206:10
**valued** 121:20
**values** 63:22
187:15
**valuing** 90:11
115:22 116:3
135:11 136:10
**vanderbilt** 1:7
5:15 6:16 11:17

14:4,5 15:2 17:6
17:12,17 18:24,25
19:12 25:23 26:4
30:3,5,12,24 31:3
31:19,25 32:5
33:5 34:6,8,11,19
34:20 35:3,7,11,19
37:5,16 38:14,21
40:11 41:20 43:10
43:17,21,24 44:23
47:11 48:22 49:21
50:2,5 53:6,24
60:17,18 63:16,25
67:2,13 69:11,22
70:16,22 71:9,17
74:12 81:13,17
82:9 85:2,4 86:4
87:16 89:15 92:19
94:2,20 95:8
96:16 97:12,20
98:5 99:24 100:7
101:24 102:14,23
103:2 104:2 106:3
112:12,24 133:7,9
133:14 147:4
160:10 162:17,24
163:15 164:16,21
165:2,10,19 181:5
181:25 182:3
183:12 184:4,12
185:24 200:12,16
200:21 201:16
203:15,19 206:3,9
207:9 210:3,23,24
212:4,9,18 221:2
**vanderbilt's** 14:5
15:2 38:2 43:2,13
67:15 82:11 86:7
86:11 87:2 89:3
89:21 95:6,14
177:23 201:2,13

203:6 210:24
212:4,8
**various** 211:19
**verbally** 198:8
**veritext** 4:13 5:20
5:23 8:22 45:18
46:2 76:15 105:21
217:3
**versus** 5:14 26:16
154:25
**video** 5:8,25
**videoconference**
2:13
**videographer** 4:12
5:2,21 68:24 69:5
104:10 105:6
166:6,11 214:22
215:2 216:22
**videotaped** 1:12
2:11
**videotapes** 21:15
**view** 119:4 163:2
186:4 187:4,7,9
188:10,13 189:7
189:19 191:10,21
191:22 192:6
193:16,22 194:12
**views** 132:15
**violate** 145:11
**vitiate** 10:11
**vitiation** 11:7
**voluntarily** 10:4
**vs** 1:6 221:2

**w**

**wachtel** 4:4 6:18
10:10 22:8 23:20
25:6 96:16 103:2
**wait** 9:12
**waited** 203:20
**waiting** 74:23
204:10

**waive** 5:25 10:10
180:5
**waiver** 11:6,25
12:2
**wakefield** 185:14
**walder** 3:4 6:9,12
**wall** 181:24
**walsh** 3:9 6:8,8 7:3
9:14,17 11:20
12:7 15:17 16:7
25:15 28:13 29:15
33:2 35:5,22 36:2
37:24 39:18 40:23
41:18,25 42:7
43:11 45:2,8 46:3
48:18 49:2,8
50:20 51:5,11
52:16 54:3,6 61:3
63:11 65:2 66:9
66:24 68:21 69:9
70:21 71:4,21
72:2 73:13 75:12
75:18,20 76:13,18
77:5 80:14 81:22
82:4 83:5 87:5,9
88:7 93:20 94:22
95:22 96:19 98:15
99:8,19 100:4,15
100:22 102:12,21
103:13,19 104:6
105:11 106:10
108:14,19 110:11
110:18 116:15
121:12 122:9
123:19 124:21
125:6 126:4,12,24
127:18,21 128:4
128:12,19 129:4
129:14,20 131:4,8
132:24 133:13
134:10,20 135:8

136:5,24 137:22
138:9,22 139:7,20
140:8,15 142:17
143:18,23 145:13
146:3 148:16
150:11,17,21
151:19 152:23
153:3 154:11
155:21 160:15
161:14 162:2
164:14 165:24
166:15 169:10
172:3,14 173:17
174:7,20,23 175:3
176:2,13 178:23
179:6,13,15 181:2
184:9 188:2 191:5
191:20 194:9,22
195:14 196:13
198:13,18 200:10
200:23 201:9
202:24 203:13,22
204:3,25 205:5,18
205:23 207:7,12
207:18 209:18,21
210:9 214:18
215:4,15 216:19
219:4
**want** 9:19 12:4
39:25 40:2 48:9
53:17 122:10
123:20 127:24
130:14 145:3,10
146:4 149:18,23
158:14 180:5
183:6 186:3 199:9
202:18 204:20,21
206:13 209:8
**wanted** 9:12 69:19
84:20 107:25
118:17 157:25

175:14 176:19,23
177:2 182:7
184:18 191:3
197:22,23,25
198:11
**warren** 148:23,25
**way** 10:9 28:7
29:17 53:10 97:2
119:4 147:13
169:8 170:16
177:22 216:13
218:19
**ways** 136:22
**we've** 68:22
109:11 110:19
157:17 214:4
**web** 45:23
**week** 15:11 47:20
111:6 144:9 167:6
**went** 38:10 115:18
147:7,9 148:3
**wheel** 113:11
**whereof** 218:21
**white** 125:23
**wholly** 154:6
**willing** 39:8
**wished** 17:25
**withhold** 214:6
**witness** 4:5 6:4,21
15:20,23,23,25
16:5 28:11,22,23
32:25 34:25 35:24
37:21,22 39:12
40:14,16 41:22
42:6 43:7 45:20
46:11 49:5 50:16
50:18 51:2 52:7,9
60:23 63:2 64:23
64:25 66:8,20,22
68:13 70:19 73:7
75:9,11 76:11,17

80:10,13 83:4
87:8 88:5 94:19
95:19 96:14 98:12
99:3,13,16 100:3
100:19,21 102:5,8
102:18 103:12,16
103:18,24 106:9
110:8,17 116:14
120:14 122:17
124:7 125:2,4
126:2,9,21 127:11
128:2,16,18,20,21
131:6 132:20
133:11 134:6,8,17
135:3,25 136:4,19
136:21 137:19
138:7,20 139:5,13
140:7 142:16
145:6,24 148:15
150:7 151:18
152:21 154:2
155:19 160:7,10
160:21,24 161:22
163:20 165:18
169:7 170:2
171:10 172:11
173:12 174:2
175:22 176:9
178:22 179:12
180:20 184:6
187:7 190:19
191:18 194:4,17
195:9,25 200:20
201:8 202:11
203:11 205:4,22
207:3,11,16
209:11 215:7,18
216:7 218:11,15
218:21 219:3
**witness's** 209:17

**wondering** 119:3
139:25
**word** 24:16 156:8
177:17
**words** 163:3 194:5
209:17
**work** 10:12 17:18
31:2,17 32:19
43:24 49:21 50:12
51:4,6 53:5,11
74:23,24 80:8,16
80:17,20,23 88:16
137:20 158:9
161:9 165:22
187:5,13,16
189:16 195:19
196:5 200:13
**worked** 21:10
30:14 208:21
**working** 31:25
208:25 209:23
**worth** 172:17
173:21
**wrap** 214:21
**writing** 19:23
198:6,7 210:20
**written** 135:18
150:4
**wrong** 164:6,6
**wrote** 56:15 58:8
62:4 72:23 106:24
109:12 150:2,24
183:24 196:19
205:10

|  **x**  |
| --- |
| **x** 219:2 |

|  **y**  |
| --- |
| **y** 6:20 105:4 |

**yeah** 16:11 28:14
48:8 55:17 78:6

81:4 83:4 101:11
105:22 144:14
155:9 156:13,24
168:6 169:12
172:20 175:8
178:2 188:14
194:25 195:22
205:13
**year**   18:22 20:9,20
37:19 83:12 99:25
101:2 151:4,6,9
154:20,21,21
155:6,14,14,17,20
155:25 156:4
167:12 171:5,13
171:13 172:12,22
174:11 216:10,16
**years**   12:16,18
22:4 47:25 48:7
171:22 172:7,23
173:2,3,6,9,23
216:15
**yesterday**   9:10,22
54:21
**york**   1:3,14,14
2:17 3:17,17 4:7,7
5:17,20 8:6,6
20:12 26:14,20,21
71:15 114:7,25
121:18 218:3,10

**z**

**zalta**   24:23
**zell**   81:20 83:24
85:13
**zero**   74:10 102:9,9
**zoning**   38:5,9 62:5
67:19 86:2 97:4
114:20 115:7
**zoom**   7:13 8:17,22
105:14,21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.