# EXHIBIT HHH

Page 1

1

2            UNITED STATES DISTRICT COURT

3            EASTERN DISTRICT OF NEW YORK

4

5    MCDONALD'S CORPORATION,      )

                 Plaintiff,        )

6                                  )

            vs.                    )No.

7                                  )1:19-cv-06471

     VANDERBILT ATLANTIC          )(DLI)(SLT)

8    HOLDINGS LLC,                 )

                 Defendant.        )

9    _____      )

10

11

12         REMOTE VIDEOTAPED DEPOSITION OF

13              MICHAEL P. HEDDEN

14          Lawrenceville, New Jersey

15          Thursday, January 20, 2022

16

17

18

19   Reported By:

20   CATHI IRISH, RPR, CRR, CLVS

21

22

23

24

25

Page 2

1

2

3

4

5

6

7

8                    January 20, 2022

9                    11:08 a.m.

10

11          Remote videotaped deposition of

12     MICHAEL P. HEDDEN, with all

13     participants appearing via

14     videoconference, before Cathi Irish, a

15     Registered Professional Reporter,

16     Certified Realtime Reporter, and

17     Notary Public of the State of

18     New York.

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S:

3

4         PASHMA STEIN WALDER HAYDEN, P.C.

5         Attorneys for Plaintiff

6              21 Main Street

7              Suite 200

8              Hackensack, New Jersey 07601

9         BY:   BRENDAN M. WALSH, ESQ.

10             DENISE ALVAREZ, ESQ.

11

12        MEISTER SEELIG & FEIN LLP

13        Attorneys for Defendant

14             125 Park Avenue

15             7th Floor

16             New York, New York 10017

17        BY:   HOWARD S. KOH, ESQ.

18

19    ALSO PRESENT:

20        MARCELO RIVERA, videographer

21        CHELSEA GILCHRIST, Veritext concierge

22        MICHAEL MEYER

23        STACY HOWARD

24        AMANDA AARON

25        SHARYL AMOVITZ

Page 4

1

2           THE VIDEOGRAPHER:  Good morning.

3      We're going on the record at

4      11:08 a.m. on January 20, 2022.

5           This deposition is being taken

6      remotely of Mr. Michael Hedden in the

7      matter of McDonald's Corporation

8      versus Vanderbilt Atlantic Holdings

9      LLC.

10           My name is Marcelo Rivera and I

11      am the videographer.  The court

12      reporter is Cathi Irish in association

13      with Veritext Legal Solutions.

14           I am not related to any party in

15      this action, nor am I financially

16      interested in the outcome.

17           Counsel and all present remotely

18      will now state their appearances and

19      affiliations for the record.  If there

20      are any objections to proceeding,

21      please state them at the time of your

22      appearance beginning with the noticing

23      attorney.

24           MR. WALSH:  Good morning.  My

25      name is Brendan Walsh.  I'm an

1

2      attorney at the law firm of Pashma

3      Stein Walder Hayden and I represent

4      the plaintiff, McDonald's Corporation

5      in this matter.

6           MR. KOH:  Howard Koh, Meister

7      Seelig & Fein.  I represent the

8      defendant, Vanderbilt Atlantic

9      Holdings LLC.

10 M I C H A E L    H E D D E N,  called as

11      a witness, having been duly sworn by a

12      Notary Public, was examined and

13      testified as follows:

14 EXAMINATION

15 BY MR. WALSH:

16      Q.   Good morning again, Mr. Hedden.

17 How are you today?

18      A.   Well, Mr. Walsh.  How are you?

19      Q.   Good, thanks.  So you've just

20 been sworn in and you understand that

21 although we're not in court, you are under

22 oath and obligated to tell the truth.  Do

23 you understand that?

24      A.   Yes.

25      Q.   Okay.  And you've been deposed

1                   HEDDEN

2    before; right?

3        A.    Yes.

4        Q.    About how many times do you

5    think?

6        A.    I would say conservatively 25

7    times.

8        Q.    Okay, so you're comfortable with

9    the process then; right?

10       A.    Yes.

11       Q.    Okay.  So as you know, there's a

12   court reporter here who is taking

13   everything down.  I will ask the questions

14   and you will answer.  If you don't

15   understand a question for any reason, just

16   let me know.  If you answer the question,

17   I'm going to assume you understood it.

18   Please answer your questions verbally with

19   words.  The court reporter can't take down

20   any nods or hand signals and especially

21   because we're doing this remotely through

22   Zoom, it's important that you let me

23   finish speaking before you start speaking

24   and I'll do the same for you.  The court

25   reporter can't take it all down if we're

1                    HEDDEN

2    speaking at the same time.  Do you

3    understand that?

4        A.   I do.

5        Q.   Okay.  So Vanderbilt's attorney,

6    Mr. Koh, may object to some of my

7    questions but you'll still be required to

8    answer my questions unless he directs you

9    not to answer for some reason.

10             If you need a break, just let me

11   know and I'm happy to take one.  The only

12   thing I ask is that you answer any pending

13   questions before we take a break but

14   you're in charge today as far as breaks so

15   just let me know and I'm happy to

16   accommodate you.

17             Do you understand all these

18   instructions?

19       A.   I do.

20       Q.   Okay.  Is there any reason that

21   you are not able to give your best and

22   most accurate testimony today?

23       A.   No, there's no reason.

24       Q.   Okay.  And I heard you say

25   earlier that you're taking the deposition

```
 1                    HEDDEN
 2   from Lawrenceville, New Jersey today; is
 3   that right?
 4        A.   Yes.
 5        Q.   Are you in the room alone?
 6        A.   Yes, I am.
 7        Q.   Can you just describe what you
 8   see in front of you as far as the screens
 9   that you have in front of you?
10        A.   I have the monitor in front of me
11   which I'm watching you, I can see myself
12   in the background.  I see a box with those
13   in the gallery format for those that are
14   in attendance here, yourself, Mr. Koh and
15   any others.  I see on my other monitor
16   over here the Veritext Exhibit Share
17   screen which I will then use to view the
18   exhibits as they are posted, and that is
19   what I see in front of me.
20        Q.   Okay.  So it sounds like you have
21   the Zoom program open, you've got Veritext
22   Exhibit Share and you don't have any other
23   programs open; is that right?
24        A.   That is correct.
25        Q.   Okay.  And do you understand that
```

```
 1                    HEDDEN
 2   you're not permitted to have any private
 3   conversations or chats with anyone while a
 4   question is pending?
 5        A.   Oh, yes, I do.
 6        Q.   Okay.  All right.  So what, if
 7   anything, did you do to prepare for your
 8   deposition today?
 9        A.   I read my expert report.  I read
10   the expert report that was prepared by
11   Mr. Tom Tener of KTR in this matter.  I
12   looked at the footnotes and the references
13   that I made in my expert report, and
14   that's about it.
15        Q.   Did you meet with counsel in
16   preparation for your deposition today?
17        A.   I had a conversation with counsel
18   last week.
19        Q.   Okay.  Was that -- that was just
20   a phone call?
21        A.   Yes.
22        Q.   And who participated in that
23   phone call?
24        A.   Mr. Koh and myself.
25        Q.   Nobody else?
```

Page 10

1                    HEDDEN
2        A.   No.
3        Q.   And about how long did that
4    telephone call last?
5        A.   I think it was about 30 to 45
6    minutes.
7        Q.   Okay.  Now, did you meet or speak
8    with anyone else in preparation for your
9    deposition today?
10       A.   No.
11       Q.   Okay.  And other than the
12   documents that you just referenced, did
13   you review any other documents in
14   preparation for your deposition today?
15       A.   I did look at the addendum to the
16   lease to refresh my recollection but other
17   than what I've just testified to, no, I
18   have not looked at anything else.
19       Q.   Okay.  And other than the
20   November 12, 2021 expert report, have you
21   authored any other documents in connection
22   with the case?
23       A.   No.
24       Q.   Okay.  Have you ever spoken with
25   Tom Tener?

1                    HEDDEN

2        A.    Yes.

3        Q.    Okay, and when was the last

4   time --

5        A.    But not in this matter.

6        Q.    Okay.  So when was the last time

7   you spoke with Mr. Tener?

8        A.    It had to have been after COVID

9   so it was after March of 2020 so I'm going

10  to have to say it was probably in late

11  2020.

12       Q.    Okay.  And were you working with

13  him on another matter?

14       A.    Yes.

15       Q.    What type of matter was that?

16       A.    It was a matter that while I was

17  employed at Houlihan Lokey, it was a

18  matter we called the -- hang on -- Miami

19  Freedom Park, Miami Freedom Park, MFP, it

20  was Miami Freedom Park.

21       Q.    So what was your role in that

22  project and what was Mr. Tener's role?

23       A.    I was an appraiser working on

24  behalf of the City of Miami to estimate

25  the value of a ground lease that was under

```
                                        Page 12
 1                    HEDDEN
 2    negotiation between the developer and the
 3    City and Mr. Tener's role was as a
 4    reviewing appraiser.
 5         Q.   Okay.  And so you said it was the
 6    value of a ground lease.  Was it -- what
 7    do you mean by the value of a ground
 8    lease, were you trying to determine fair
 9    market rental value?
10         A.   Yes.
11         Q.   Okay.  And were you both working
12    on behalf of the City of Miami?
13         A.   No.
14         Q.   Who was he working for?
15         A.   I believe he was hired as an
16    independent third-party review appraiser
17    engaged by I think jointly between the law
18    firm and the developer, the law firm on
19    behalf of the City and the developer.
20         Q.   Okay.  And did you -- do you know
21    if Mr. Tener agreed with the conclusions
22    you reached in that matter?
23         A.   I am unaware.
24         Q.   So you never saw his review so
25    you're not sure whether he found it
```

Page 13

1                          HEDDEN
2    credible or reasonable?
3         A.    That's correct.
4         Q.    Okay.   And how many other times
5    have you worked with Mr. Tener?
6         A.    Not before that matter ever.
7         Q.    Okay.   Mr. Hedden, have you ever
8    gone by any other names?
9         A.    No.
10        Q.    Okay.   Where did you attend
11   college?
12        A.    That's an interesting question.
13   I've never been asked that one before.
14   Sorry.   Aliases are not my thing.
15               I went to the University of
16   Bridgeport in Bridgeport, Connecticut and
17   I attended the university -- Rutgers
18   University.
19        Q.    Okay.   And what was your degree
20   in from the University of Bridgeport?
21        A.    It was a degree of business
22   administration with a focus on marketing.
23        Q.    Okay.   And when did you graduate?
24        A.    1976.
25        Q.    And how about from Rutgers, what

Page 14

```
 1                    HEDDEN
 2   was your degree?
 3        A.   It was a master's in city and
 4   regional planning, also references an MCRP
 5   degree.
 6        Q.   When was that?
 7        A.   1998.
 8        Q.   Where do you currently reside?
 9        A.   I currently reside at 2700
10   Princeton Pike, Lawrenceville, New Jersey.
11        Q.   How long have you lived in
12   Lawrenceville?
13        A.   Since 1988.
14        Q.   Have you ever lived in any of the
15   boroughs of New York City?
16        A.   No.
17        Q.   Have you ever worked in any of
18   the boroughs of New York City and when I
19   say worked, I mean your office was located
20   there?
21        A.   Yes.
22        Q.   When was that?
23        A.   My office was located in
24   New York City in Manhattan when I worked
25   at Landauer Associates and then when I
```

Page 15

1                              HEDDEN

2       worked at American Appraisal, when I

3       worked at FTI Consulting and when I worked

4       at Houlihan.  Those were located in

5       Manhattan.

6            Q.   Have you ever worked full-time at

7       an office in Brooklyn?

8            A.   No.

9            Q.   Okay.  How long have you been a

10      licensed appraiser?

11           A.   I have been a licensed appraiser

12      since 1992 to my best recollection when

13      they enacted the licensing law.

14           Q.   Was that first license in

15      New Jersey?

16           A.   Yes.

17           Q.   And when did you become certified

18      or licensed to appraise properties in

19      New York?

20           A.   I do not recall exactly.

21           Q.   Was it before or after you became

22      licensed in New Jersey?

23           A.   After.

24           Q.   Okay.  And why were you

25      certified -- or why did you become

1                   HEDDEN

2    licensed in New Jersey first?

3         A.   Because at the time licensure was

4    enacted, that was my home office or home

5    base of operation.

6         Q.   And then why did you become

7    licensed in New York?

8         A.   When I joined CBIZ Valuation in

9    again I think it was 2002, my practice

10   expanded on a national or much more

11   regional basis and I believe that's the

12   reason why I became licensed in New York.

13        Q.   Are you licensed or certified in

14   any other states?

15        A.   Yes.

16        Q.   Where?

17        A.   I'm currently certified in

18   New Jersey, New York, Pennsylvania and

19   Florida.

20        Q.   Okay.  And you've been a licensed

21   real estate broker in New Jersey for the

22   past 43 years; right?

23        A.   Yes.

24        Q.   Have you ever been a licensed

25   real estate broker in New York?

Page 17

1                           HEDDEN

2          A.    No.

3          Q.    And why do you hold that license

4    in New Jersey but not in New York?

5          A.    Because the practice of being a

6    real estate broker has never required me

7    to get a license in New York.

8          Q.    What is the Appraisal Institute?

9          A.    The Appraisal Institute is a

10   professional organization that promotes

11   real estate appraisal through its

12   education and certification of real estate

13   appraisers.

14         Q.    When did you become a member of

15   the Appraisal Institute?

16         A.    By member, I received my MAI

17   member -- well, the MAI designation, I

18   believe in 1985.  That's my best

19   recollection.  Prior to that, I had joined

20   the chapter of the Appraisal Institute as

21   a associate member, if you will, prior to

22   receiving my designation as far back as

23   1978.

24         Q.    Now, when you become an MAI

25   appraiser, is that associated with a

Page 18

1                         HEDDEN

2     specific state or is it just you're a

3     member of the Appraisal Institute, period?

4          A.    Member of the Appraisal

5     Institute, period.

6          Q.    Have you ever held any positions

7     with the Appraisal Institute?

8          A.    Yes.

9          Q.    What positions have you held?

10         A.    I was the chapter president in

11    New Jersey.  I was again a board member in

12    the New Jersey chapter.  On a national

13    level, I have been on project teams

14    relative to valuation of -- or valuation

15    for financial reporting, and I am a

16    licensed instructor for the Appraisal

17    Institute or certified appraiser for the

18    Appraisal Institute, and I'm trying to

19    think if there's other -- most of it is in

20    my CV that is attached to my report so

21    that basically from a summary is the roles

22    that I've played within the Appraisal

23    Institute.

24         Q.    You mentioned that you're a

25    licensed instructor for the Appraisal

1    HEDDEN

2    Institute.  What courses have you taught

3    for the Appraisal Institute?

4         A.    Again I'm certified.  There's no

5    licensing.  I'm certified to teach for the

6    Appraisal Institute.  I currently teach

7    appraisal -- excuse me, highest and best

8    use in market analysis both on a general

9    and advanced basis.  Those are two

10   different courses.  I am certified to

11   teach statistics and -- a statistics

12   course, an entry level statistics course.

13   I have taught international income

14   capitalization approach and I have taught

15   in my past all the capitalization courses

16   that the Appraisal Institute had offered

17   in their early stages, plus I've taught a

18   couple of seminars but I can't recall all

19   of them.  It's been a long process of my

20   tenure in the teaching for the Appraisal

21   Institute.

22        Q.    Understood.  So when was the last

23   time you taught a market analysis and

24   highest and best use class?

25        A.    I think it was just before COVID

```
                                           Page 20
 1                    HEDDEN
 2    I taught in New York City, the New York
 3    chapter, so it would have to have been I
 4    think 2019.
 5         Q.   Was that the advanced class or
 6    the basic class?
 7         A.   That was the basic class.  They
 8    called it general.  It's called a general
 9    highest and best use.
10         Q.   When was the last time you taught
11    the advanced class?
12         A.   It had to have been maybe 2017 or
13    '18.  That's my best recollection.
14         Q.   Okay.  So you mentioned that
15    your -- you're affiliated with the
16    New Jersey chapter of the Appraisal
17    Institute.  What are the rough geographic
18    boundaries of that chapter?
19         A.   I would say the New York -- it's
20    in New Jersey but it's the northern
21    portion of New Jersey.  They have chapter
22    members all over the state but I would say
23    as far south as say Mercer County and
24    Middlesex County to the northern boundary
25    with New York and Pennsylvania.
```

1                    HEDDEN

2       Q.    Does it include any of the

3   boroughs of New York City?

4       A.    No, it does not.

5       Q.    Okay.  And why did you affiliate

6   with the New Jersey chapter of the

7   Appraisal Institute?

8       A.    Well, my early career, and again

9   when I started as a real estate broker,

10   that was the chapter.  I was known as

11   chapter number 1 and that is when I became

12   affiliated with that chapter and I then

13   increased my chapter membership to include

14   the metropolitan New York chapter as well

15   because of my involvement in the city so I

16   was a dual member in both New York and

17   New Jersey.

18       Q.    And when did you do that?

19       A.    It's been many years as I began

20   to work in New York and teach in New York,

21   but I don't exactly know when I became a

22   dual member.

23       Q.    About how many times have you

24   been qualified by a court to testify as an

25   expert in appraisals?

Page 22

1                    HEDDEN

2       A.   I'm going to say 20, 25 times at

3    least.

4       Q.   Ever in the state or federal

5    courts in New York?

6       A.   Yes.  I have been qualified in

7    the Southern District, in federal court.

8    And if you can repeat the question again,

9    I got a little distracted so please

10   repeat.

11      Q.   I was just curious if you'd ever

12   been qualified as an expert in the state

13   or federal courts in New York?

14      A.   Early on in my career, I was

15   Supreme Court of New York up in I think it

16   was Westchester County.  We just talked

17   about the Southern District, and then I

18   have appeared at the bankruptcy court in

19   Brooklyn, but again it's been many years

20   but those are my best recollections but in

21   my CV we identify the Southern District

22   testimony.

23      Q.   I'm hearing some feedback here.

24           Were any of those -- did any of

25   those assignments involve fair market rent

```
                                           Page 23
 1                   HEDDEN
 2   valuations?
 3        A.   No.
 4        Q.   Have you ever served as an expert
 5   in a case involving a fair market rent
 6   valuation?
 7        A.   Yes.
 8        Q.   Okay.  Can you describe -- I
 9   guess how many times?
10        A.   In terms of my appearance as an
11   expert in the determination or opinion as
12   to a ground lease opinion of rental, just
13   one time.
14        Q.   Okay.  And where was that, was
15   that the Miami case we talked about
16   earlier?
17        A.   No, that was in Trenton federal
18   court.
19        Q.   Do you recall the name of that
20   case?
21        A.   I believe the name of the case
22   was Textron, T-E-X-T-R-O-N, Textron.
23        Q.   How about in arbitrations, have
24   you ever served as an expert in
25   arbitration?
```

Page 24

1                      HEDDEN
2        A.    No.
3        Q.    Do you know if a court has ever
4    excluded or rejected any proposed expert
5    testimony by you?
6        A.    Can we go back to the prior
7    question when you said arbitration?  Yes,
8    I have appeared in arbitration in divorce
9    matters in the City of Philadelphia so to
10   make the record clear, arbitration or
11   mediation, between in matrimonial matters.
12   In your second question then with regards
13   to, no, my testimony has never been
14   barred, I've never been disqualified.
15       Q.    Over the past 10 years or so,
16   approximately how much of your work
17   involves matters that require testimony in
18   some form?
19       A.    Over the last 10 years, was that
20   the question?
21       Q.    Yeah, just roughly.  I'm not
22   looking for an exact number.
23       A.    I would have to say 60 to 70
24   percent of my work has been involved in
25   that capacity.

Page 25

1                    HEDDEN

2        Q.    And what did the other 30 to 40

3    percent of your work involve?

4        A.    Would have been valuation.

5        Q.    So just you serving as an

6    appraiser?

7        A.    Yes.

8        Q.    And we may have briefly touched

9    on this earlier but have you ever served

10   as a neutral or party appraiser for a fair

11   market rent determination before?

12       A.    No.

13       Q.    Are you familiar with the

14   New York Court of Appeals decisions in

15   936 Second Avenue LP versus Second

16   Corporate Development, it's a 2008

17   decision and the 1996 decision in New York

18   Overnight Partners LP v. Gordon?

19       A.    I have become familiar with those

20   cases.

21       Q.    What is your understanding of

22   those cases and the rules announced to

23   them?

24            MR. KOH:  Objection.  You may

25       answer.

```
 1                    HEDDEN
 2           THE WITNESS:  Well, I think again
 3       my -- that's a legal interpretation of
 4       what the cases mean.  As an appraiser
 5       I read them and I generally take away
 6       the themes, if you will, of those
 7       cases and as instructive to an
 8       appraisal guideline in the valuation
 9       of ground leases.
10   BY MR. WALSH:
11       Q.   So just generally, what is your
12   understanding of what those cases require
13   of an appraiser?
14           MR. KOH:  Same objection.  Go
15       ahead and answer.
16           THE WITNESS:  Well, I think the
17       key takeaways would be to the extent
18       the language in the lease does not
19       specifically address the issue of
20       encumbrance of the lease in the reset,
21       so to speak, that a lease should be
22       considered in the valuation going
23       forward as encumbered, if it's not
24       mentioned as specifically one way or
25       the other, then it is to be considered
```

1                    HEDDEN

2       in the analysis.

3    BY MR. WALSH:

4       Q.    Have you ever needed to apply

5    that rule in one of the appraisals that

6    you've been involved in?

7       A.    No.

8       Q.    Okay.  So you've never been

9    involved in an appraisal or appraisal

10   assignment that involved that rule?

11      A.    That's correct.

12      Q.    Do you recall when you first

13   learned of this rule?

14      A.    I think just generally reading

15   appraisal literature as in the cases that

16   were cited in my expert report that were

17   in the appraisal journal, and having read

18   the materials that are involved in this

19   case.

20      Q.    Okay.  And you're now currently

21   employed by Integra Realty Resources in

22   Philadelphia; correct?

23      A.    Yes.

24      Q.    And you started there in June of

25   2021; right?

Page 28

1                              HEDDEN

2          A.     Yes.

3          Q.     And you're based in their

4     Philadelphia office; right?

5          A.     Correct.

6          Q.     What types of projects have you

7     worked on at IRR since you joined them in

8     June of 2021?

9          A.     Valuation of properties

10    throughout southern New Jersey and

11    Philadelphia, general Philadelphia region,

12    and have been retained, but currently not

13    working on some projects in New York, and

14    the bulk of it, 90 percent of it, has been

15    in valuation for bank mortgages, and some

16    general litigation involved in the general

17    Philadelphia region.

18         Q.     Okay.  You mentioned --

19         A.     The work, bear with me, has been

20    significant in the valuation of

21    quick-serve restaurants and ground leases

22    for various mortgage or estate tax

23    purposes.

24         Q.     Let's talk about that last part

25    about your work for valuation of

1                    HEDDEN

2    quick-service restaurants.  Can you just

3    describe in a little bit more detail what

4    that work involves, what type of

5    quick-service restaurants, what you were

6    engaged to do?

7         A.   Yes, it's been for mortgage

8    purposes to value the triple net ground

9    leases attendant to I can think of a

10   Wendy's, McDonald's, I have to think of

11   some of the other restaurants that were

12   underlying some of these leases.  And

13   that's generally been the valuation, scope

14   of work that's been involved again for

15   financing purposes and then a large

16   portfolio that just came through with

17   ground leases for an estate tax

18   assignment.  And so that's in general what

19   my involvement has been with Integra in

20   the last, say, six, seven months.

21        Q.   For the matters in New York that

22   you referenced you're working on, where

23   are those properties located?

24        A.   It's kind of confidential.  I'll

25   generally speak because they are currently

```
                                              Page 30

 1                      HEDDEN
 2    being litigated.  One is in Astoria and I
 3    have another case that's currently still
 4    pending in Manhattan.
 5         Q.    Astoria in Queens?
 6         A.    Yes.
 7         Q.    And before you joined the IRR,
 8    you worked at Houlihan Lokey; right?
 9         A.    Yes.
10         Q.    And you were in their dispute
11    resolution and consulting practice; right?
12         A.    That's correct.
13         Q.    You joined there in October 2017?
14         A.    Yes.
15         Q.    Where was your office when you
16    worked at Houlihan?
17         A.    Park Avenue between 46th and
18    47th.
19         Q.    And approximately what percentage
20    of your work was for litigation support or
21    expert testimony services when you were at
22    Houlihan?
23         A.    About a hundred percent.
24         Q.    Of that work at Houlihan, what
25    percentage related to properties located
```

```
                                            Page 31

  1                         HEDDEN

  2    in New York?

  3         A.    Could be 50 percent.

  4         Q.    Okay.  And of that -- of those

  5    New York cases, what percentage were in

  6    the outer boroughs of New York City,

  7    meaning the four boroughs other than

  8    Manhattan?

  9         A.    A very small portion, 10 percent,

 10    15 percent maybe.

 11         Q.    So it sounds like the vast

 12    majority of your New York work was for

 13    properties in Manhattan?

 14         A.    For the ones -- for the

 15    assignments that I had in New York, yes,

 16    Manhattan was the primary focus.

 17         Q.    Okay.  And for the properties

 18    that were in the outer boroughs, what type

 19    of work did you do for those properties?

 20         A.    Type of work was a partnership --

 21    yeah, partnership dispute or dispute

 22    amongst various parties so that was the

 23    nature of the assignment.

 24         Q.    And so what specifically were you

 25    tasked with doing?
```

```
                                         Page 32

 1                       H E D D E N

 2        A.    There was a claim by one of the

 3   participants in this property at the 100

 4   Water Street in Brooklyn relative to their

 5   entitlement to certain cash flows flowing

 6   from that development, and that was my

 7   involvement, to counsel the owner of the

 8   property as to what this other third-party

 9   was entitled to.

10        Q.    Okay.  Did any of the matters in

11   the outer boroughs when you were at

12   Houlihan involve valuation of vacant

13   properties or properties assumed to be

14   vacant?

15        A.    Not that I recall, no.

16        Q.    Okay.  And before you joined

17   Houlihan, you worked at FTI Consulting in

18   FTI's real estate solutions practice

19   group; right?

20        A.    Yes.

21        Q.    And you joined them in around

22   November of 2010?

23        A.    Might have been 2012.  I think it

24   was only a five year, from 2012 to 2017.

25        Q.    Okay.  And you were in --
```

```
 1                      HEDDEN
 2    headquartered in their New York office?
 3         A.    Yes.
 4         Q.    What type of work did you do at
 5    FTI?
 6         A.    Primarily litigation support with
 7    some other valuation and consulting
 8    assignments.
 9         Q.    Approximately what percentage of
10    your work was for litigation support or
11    expert testimony at FTI?
12         A.    Probably 50 percent, 50, 60
13    percent.
14         Q.    And how about the remaining 40 to
15    50 percent?
16         A.    Well, it could have involved
17    valuation for -- again, I have to think
18    for a second.  Public offerings, companies
19    that were going to go public.  It could
20    have involved valuation for like I say
21    financial reporting.  It could have
22    involved -- I'm just trying to think,
23    non-litigation case, right.  And then
24    there would be restructuring or bankruptcy
25    work.  So those are -- again because they
```

```
 1                      HEDDEN
 2    range on valuation in the litigation
 3    context, it's kind of fuzzy between the
 4    work that I did, whether it was litigation
 5    or whether it was just straight valuation.
 6        Q.    Understood.  So of the -- of your
 7    work at FTI, roughly what percent involved
 8    properties in New York?
 9        A.    Much more significant than it was
10    at Houlihan.  Percentage wise it probably
11    was of the work, 30 to 40 percent of the
12    work was in New York, you know, Manhattan
13    or the boroughs.
14        Q.    Okay.  And of that 30 to 40
15    percent that was in New York, what
16    percentage of that New York involved
17    properties in Manhattan?
18        A.    Probably 20 percent, 25 percent.
19        Q.    And where was the other 75 to 80
20    percent?
21        A.    It could have been in -- again
22    there was some work in Brooklyn, some work
23    in Staten Island.  I'm trying to think.
24    And again, we're going over numbers and
25    percentages so it's all starting to run
```

Page 35

1                    HEDDEN
2    together here.  So there was a signifi --
3    and the rest of it probably was in
4    Manhattan, some out in Queens and out on
5    the island, Long Island.  So that's the
6    best of my recollection as we stand here
7    today.
8        Q.    So at FTI were you ever involved
9    in any matters that involved valuing
10   vacant land or property assumed to be
11   vacant in one of the outer boroughs?
12       A.    Yes, I believe there was a case,
13   yeah.
14       Q.    And what did that matter involve?
15       A.    When you say boroughs, something
16   was out in Rockaway where I was
17   representing a neighboring property owner
18   that had their property contaminated and
19   the neighboring property was -- had a
20   vacant track that they were trying to
21   develop so it involved environmentally
22   contaminated property that was vacant
23   hoping to be developed out in Rockaway is
24   the one case that comes to mind right away
25   but I'm sure there might be others but I

```
 1                        HEDDEN
 2    don't recall at this time.
 3         Q.    Okay.  And how about any fair
 4    market rent valuations when you were at
 5    FTI in the outer boroughs?
 6         A.    None that I recall.
 7         Q.    Okay, so we've gone back about a
 8    dozen years or so.  I know you mentioned
 9    before I think that you were at American
10    Appraisal and CBIZ, that's C-B-I-Z,
11    Valuation Group.  So over the course of
12    the past 20 years or so, so going back to
13    2002 which is when I believe you joined
14    CBIZ, can you recall any other projects
15    that we haven't already talked about that
16    involve fair market rent evaluations for
17    property located in the outer boroughs?
18         A.    No, specifically to the outer
19    boroughs, no.
20         Q.    And again over the course of the
21    past 20 years or so, approximately what
22    percentage of your appraisal work related
23    to properties located in the outer
24    boroughs of New York?
25         A.    10 percent, and I'm coming up on
```

```
 1                    HEDDEN
 2    my best estimate.  You said over my career
 3    of almost 20 years in outer boroughs and
 4    all of the work that I have done, given
 5    the magnitude of the amount of work I've
 6    done, you know, I'm saying 10 percent.
 7         Q.   Okay, and how about in Brooklyn
 8    specifically?
 9         A.   To the extent we've just
10    referenced the project at 100 Water, I did
11    some advisory work for people in Brooklyn
12    Heights on the recent zoning issues there,
13    and then I'm trying to think of some other
14    work that we've done in the outer boroughs
15    as you've requested.  And then in Long
16    Island City, some work there.  I would
17    have to say that probably is the extent of
18    the valuation assignments I've done in the
19    outer boroughs in the last I'll say three
20    to eight, say 10 years.
21         Q.   I was asking you to go back even
22    further.  I'm wondering in the past, say,
23    20 years what matters do you recall in
24    Brooklyn that we haven't discussed?
25         A.   So if we go back into the CBIZ
```

```
 1                    HEDDEN
 2    years, there was a project I worked on on
 3    behalf of the LeFrak family on behalf of
 4    the co-op and apartment conversion they
 5    were doing in Brooklyn.  That's one that
 6    comes to me when I was at CBIZ.  So that
 7    goes back again to that extra 10-year
 8    increment.  And again there might be an
 9    odd property here or there but those are
10    the ones that I can recall at this moment.
11        Q.   Okay.  When was the first time
12    you were contacted for performing work for
13    the property located at 840 Atlantic
14    Avenue in Brooklyn?
15        A.   I believe it was in October, late
16    September, October.  Again I did not
17    review my engagement letter before we
18    talked today, I didn't look at it but I
19    think that that was in 2021 so it was
20    maybe a month or two before I rendered
21    that report, my expert report.
22        Q.   Okay.  And who contacted you?
23        A.   I was contacted by Howard Koh.
24        Q.   Have you ever worked with Mr. Koh
25    before?
```

Page 39

1                            HEDDEN

2            A.    No.

3            Q.    What facts or information about

4     the matter did Mr. Koh share with you

5     during your initial conversations before

6     you were engaged?

7            A.    That there was an issue regarding

8     a ground lease reset beneath a McDonald's

9     at the property in question, 840 Atlantic

10    Avenue, and that there was an appraisal

11    that was prepared by Mr. Tener from KTR

12    regarding a ground rent reset and asked if

13    I would be willing to participate as

14    reviewing appraiser to look at the

15    document, look at again all the other

16    production in this case and prepare an

17    expert report as you see here that I have

18    submitted in this matter.

19           Q.    Were you familiar with this

20    specific property at 840 Atlantic Avenue

21    in Brooklyn before you became involved in

22    this matter?

23           A.    No.

24           Q.    Have you ever spoken with Sam

25    Rottenberg about this matter?

```
                                          Page 40

 1                      HEDDEN

 2        A.    No.

 3        Q.    Have you ever spoken with Sam

 4   Rottenberg about any matter?

 5        A.    No.

 6        Q.    How about Tom Li?

 7        A.    No.

 8        Q.    Have you ever worked with the

 9   attorneys at the law firm of Meister

10   Seelig & Fein before this matter?

11        A.    Yes.

12        Q.    Who have you worked with?

13        A.    Mr. Missry.

14        Q.    Oh, so you mean Morris Missry?

15        A.    Yes.

16        Q.    Okay.  I was actually asking you

17   about attorneys at Mr. Koh's firm, Meister

18   Seelig & Fein?

19        A.    Then I should pay attention to

20   the question.  No, no other attorneys at

21   the Meister firm.

22        Q.    So how often or how many times

23   have you worked with Morris Missry then?

24        A.    Oh, I just -- one other time.

25        Q.    What did that matter involve?
```

```
 1              HEDDEN
 2        A.    When I worked at FTI, I was --
 3    did an appraisal assignment on behalf of a
 4    property owner for properties in the
 5    garment district, and there was a dispute
 6    as to a partnership agreement and so my
 7    role was to value the property under that
 8    scenario.
 9        Q.    What type of dispute was it?
10        A.    I think it had to do with a
11    fractional interest.  There was a partial
12    ownership interest and there was a dispute
13    as to what the partner's share was worth
14    and whether it was proportionate or
15    whether it was subject to a marketability
16    discount or lack of -- you know, a DLOM,
17    right, discount for lack of marketability.
18        Q.    I see.  Have you ever spoken with
19    Simon Dushinsky before?
20        A.    No.
21        Q.    Have you ever worked with anyone
22    at the Rabsky Group before?
23        A.    No.
24        Q.    Did Meister Seelig tell you to
25    make any assumptions that you relied on in
```

Page 42

```
 1              HEDDEN
 2   forming your opinions in this matter?
 3        A.   No.
 4              MR. WALSH:  Okay.  Chelsea, if we
 5        could please mark as P103 the expert
 6        report of Michael P. Hedden.
 7              VERITEXT CONCIERGE:  Yes, one
 8        moment, please.
 9              (Exhibit P103, expert report of
10        Michael P. Hedden, marked for
11        identification.)
12              THE WITNESS:  While she's putting
13        that up, I'm pretty regimented about
14        my lunch hour, so 12:30 if we can go,
15        I'm just giving you the heads up,
16        we'll go to another half an hour and
17        then I'll ask for a break.
18              MR. WALSH:  That's totally fine.
19              MR. KOH:  Exhibit P 103 has been
20        introduced.  Please refresh in Exhibit
21        Share.
22   BY MR. WALSH:
23        Q.   Okay, Mr. Hedden, if you can tell
24   me when you've had a chance to pull that
25   up.
```

1                    HEDDEN

2        A.   Okay, I see the pdf and I'll

3   click on it, and it is opening.  Okay, it

4   is in front of me.

5        Q.   And this is the expert report

6   dated November 12, 2021 that you issued in

7   this matter; right?

8        A.   Yes.

9        Q.   If you could turn to the back,

10  it's the page after your signature page so

11  I guess it's about page 20.  It's section

12  VII and it's captioned Information

13  Considered In Forming The Opinions.

14       A.   I see that in front of me.

15       Q.   Okay.  There are 18 documents or

16  categories of documents listed in there.

17  Is this the full universe of information

18  that you considered in forming your

19  opinions in this matter?

20       A.   This is the information that I

21  considered in addition to the publications

22  and treatise which are contained in

23  section 8 so I would say that this coupled

24  with that section and then again, my

25  experience over 40 years were used in the

Page 44

```
 1                        HEDDEN
 2     formation of my opinion.
 3          Q.    Right, but I guess section VII
 4     contains all of the documents that are
 5     relevant to this specific matter that you
 6     reviewed?
 7          A.    Yes.
 8          Q.    And since you issued your report
 9     on November 12, have you reviewed or
10     considered any additional documents
11     relating to this matter that are not
12     listed on here?
13          A.    Not that were used in the basis
14     of my opinion that is shown in this expert
15     report, no.
16          Q.    Have you reviewed any other
17     documents relevant to this property that
18     are not listed on this section VII?
19          A.    Yes.
20          Q.    What documents?
21          A.    I believe I was provided the
22     expert report that was prepared on behalf
23     of McDonald's and the review of
24     Mr. Tener's report.
25          Q.    So that was the expert report of
```

```
                                          Page 45

 1                       HEDDEN
 2    Amanda Aaron?
 3         A.   Yes.
 4         Q.   Now, your list includes seven
 5    deposition transcripts.  Did you review
 6    all seven deposition transcripts in their
 7    entirety?
 8         A.   Yes, I opened each one of them
 9    and reviewed them, yes.
10         Q.   So let's start with the first one
11    on the list, Mr. Tener's deposition.
12              When did you review that?
13         A.   Prior to my rendering -- prior to
14    issuing the report.
15         Q.   And how long do you recall
16    roughly spending reading that transcript?
17         A.   Given the size of it, I think it
18    probably took me, I'm going to do my best
19    recollection, probably took me four hours,
20    five hours.
21         Q.   And when you were reviewing that
22    transcript, were you also reviewing the
23    exhibits that were shown to Mr. Tener
24    during his deposition?
25         A.   Yes.
```

```
 1                       HEDDEN
 2        Q.    And how about for Sam Rottenberg,
 3    did you -- you reviewed his transcript in
 4    its entirety?
 5        A.    Yes.
 6        Q.    What testimony stood out to you
 7    as relevant in Mr. Rottenberg's
 8    transcript?  And when I say relevant,
 9    relevant to your analysis.
10        A.    I think the things that stood out
11    from his deposition transcript really had
12    very little to do with my expert report
13    given the scope of what I was asked to do.
14    So other than we could discuss what it
15    said and what you could glean from that
16    document, very little, if anything, had to
17    do with the expert report that I've
18    rendered in this case or my opinions in
19    this case.
20        Q.    Okay.  Do you remember any
21    relevant information that you learned for
22    purposes of rendering your opinion from
23    Mr. Rottenberg's deposition transcript?
24        A.    As this deposition progresses if
25    there are certain questions you ask me
```

Page 47

```
 1                    HEDDEN
 2   relative to information that may have been
 3   discussed by Mr. Rottenberg, I am aware of
 4   those but there's nothing relevant in
 5   Rottenberg's testimony that went into my
 6   formulating my opinion regarding the
 7   credibility of Mr. Tener's report.
 8        Q.   Okay.  Same question for the
 9   transcript of the deposition of Michael
10   Meyer.
11        A.   I don't remember anything in
12   Mr. Meyer's testimony that was relevant in
13   my opinion and that's contained in my
14   expert report.
15        Q.   Okay.  How about for the
16   deposition transcript of Tom Li, do you
17   remember any relevant information you
18   learned for purposes of rendering your
19   opinion in this matter?
20        A.   No, I don't really recall
21   Mr. Li's deposition.
22        Q.   How about Carol Demarco?
23        A.   Again, not as it relates to my
24   opinions in this matter, no, there's
25   nothing relevant in her testimony that I
```

Page 48

1                       HEDDEN

2       can say influenced my opinion.

3            Q.    How about Sharon Locatell's

4       deposition?

5            A.    No, I can say other than

6       understanding Ms. Locatell's position in

7       this case, again my opinion deals with the

8       credibility of Mr. Tener's report and

9       there's nothing in what I did and the

10      opinions that I've reached that are

11      overshadowed by any of the deposition

12      testimony from Mrs. Locatell.

13           Q.    Okay.  And so to be clear, you're

14      not rendering any opinions on Sharon

15      Locatell's reports; is that right?

16           A.    No, I have not been asked to

17      render any of those opinions in this

18      report.  It's basically those that are

19      contained in my expert report that we have

20      on the screen here.

21           Q.    By the way, have you ever

22      reviewed any of Sharon Locatell's reports

23      issued for 840 Atlantic Avenue?

24           A.    If her report was in the

25      exhibits, then I would have seen it but I

```
1              HEDDEN
2    think your question when did I read it and
3    the answer would be no, I don't recall
4    reading other than scanning through a few
5    pages maybe.
6         Q.   Do you recall the fair market
7    rental value conclusion that Sharon
8    Locatell reached in her analysis?
9         A.   Vaguely.
10        Q.   What do you recall about that?
11        A.   I believe it was -- it had
12   300,000 as the first digit and it wasn't
13   400,000.  My best recollection it was more
14   than 300,000 and less than 400,000 is the
15   best I recall without seeing it.
16        Q.   And do you recall what value
17   Mr. Tener reached when he valued the same
18   property?
19        A.   Can you please show me the report
20   so I don't misspeak?
21             MR. WALSH:  Sure, Chelsea, it's
22        been previously marked as P36.
23             VERITEXT CONCIERGE:  And you
24        would like to keep that marking as
25        P36?
```

```
                                        Page 50

 1                    HEDDEN
 2            MR. WALSH:  Yes, please.
 3            VERITEXT CONCIERGE:  One moment.
 4            MR. WALSH:  And I'm just -- never
 5        mind.
 6            VERITEXT CONCIERGE:  Exhibit P36
 7        has been introduced.  Please refresh.
 8     BY MR. WALSH:
 9        Q.    Mr. Hedden, P36 is KTR's July 30,
10     2019 report regarding 840 Atlantic Avenue
11     in Brooklyn and it's signed by both Tom
12     Tener and Shaun Kest.
13        A.    Yeah, I've got it.  It's coming
14     up on the screen now.  The conclusion
15     reached by Mr. Tener as shown by page 4 of
16     his report indicates a fair market rental
17     value of $1,078,400 per year.
18        Q.    Okay.
19              And that's roughly a million
20     dollars more per year than Sharon
21     Locatell's value; right?
22        A.    Again, I have not authoritatively
23     spoken to what Sharon Locatell's value is
24     but if that's your representation to me,
25     then it is what it is.
```

1                         HEDDEN
2        Q.    Well, you said you recall it
3    having a -- somewhere between 3- and
4    400,000; right?
5        A.    Let's pull up Sharon Locatell's
6    report on the screen and I'll be able to
7    give an exact difference.
8        Q.    So I don't think that's necessary
9    but I'm just -- your recollection was that
10   it was between 3- and 400,000, right, for
11   Sharon Locatell?
12       A.    Yes, that's my recollection
13   without looking at the report and my
14   memory.
15       Q.    And your understanding was that
16   she was valuing exactly the same thing
17   that Mr. Tener had been asked to value;
18   correct?
19       A.    No.
20       Q.    You think they were doing
21   different -- they were tasked with
22   different assignments?
23       A.    Your question was vague, you said
24   the same thing, so no, they had the same
25   assignment generally speaking, yes.

```
                                        Page 52
 1                       HEDDEN
 2       Q.   And you didn't think it was -- it
 3   would be helpful or relevant to read her
 4   report even though she arrived at a
 5   valuation of roughly a million dollars
 6   lower per year than Mr. Tener?
 7             MR. KOH:  Objection.  You may
 8       answer.
 9             THE WITNESS:  No.
10   BY MR. WALSH:
11       Q.   Why not?
12       A.   My assignment and the scope of my
13   work went to determining or again reaching
14   an opinion as to the credibility or
15   whether Mr. Tener's report was worthy of
16   belief based on the report that he has
17   prepared and the work papers that were
18   provided and his testimony in deposition
19   and whether or not there was a compliance
20   with USPAP and whether or not his work was
21   consistent with the addendum to the lease
22   relative to the process of the rent reset
23   for this property.  It did not include
24   comparing or looking at Ms. Locatell's
25   report.
```

```
 1              HEDDEN
 2      Q.    Well, wouldn't the report of
 3   another MAI appraiser who was given the
 4   same assignment as Mr. Tener, wouldn't
 5   that be relevant in evaluating credibility
 6   and reasonableness and reliability of
 7   Mr. Tener's report?
 8      A.    No.
 9      Q.    Why is that?
10      A.    Appraisers will differ.
11   Appraisals are opinions.  Mr. Tener has
12   his opinion, Ms. Locatell has hers.  I'm
13   not interested in Mrs. Locatell's opinion.
14   I'm interested in Mr. Tener's opinion and
15   whether within the four corners of his
16   report, coupled with his testimony and his
17   work papers produced a credible opinion
18   that was worthy of belief and not to think
19   about or not to be involved with
20   Ms. Locatell's opinion because appraisers
21   are free to have their own opinion and
22   based on the review that I've conducted,
23   the process was -- that was laid out in
24   the addendum was followed, USPAP was
25   followed and therefore I didn't need to
```

```
 1                    HEDDEN
 2   consider any other information.
 3        Q.   And you can't imagine any
 4   information that may have been included in
 5   Ms. Locatell's report that would have
 6   impacted your opinion on the reliability,
 7   credibility and reasonableness of
 8   Mr. Tener's opinion?
 9            MR. KOH:  Objection.  Go ahead
10        and answer.
11            THE WITNESS:  Given the magnitude
12        of the differential between the two
13        appraisers, when this occurs,
14        oftentimes it is as a result of a
15        highest and best use conclusion that
16        causes the information to go as vastly
17        wide as it has, and that's why when
18        the lease called for a differential of
19        more than 15 percent, that a
20        third-party appraiser would be called
21        in to reconcile the two opinions.
22   BY MR. WALSH:
23        Q.   Especially given the magnitude of
24   the differential between the two
25   appraisers, wouldn't it have been helpful
```

```
                                          Page 55

 1                    HEDDEN
 2    in your valuation of Mr. Tener's report
 3    and opinions to understand what
 4    information Ms. Locatell considered in
 5    reaching a very different conclusion as to
 6    value than Mr. Tener?
 7            MR. KOH:  Objection.  You may
 8        answer.
 9            THE WITNESS:  When I said I
10        briefly looked at Ms. Locatell's
11        report, I specifically looked at her
12        conclusion of highest and best use and
13        as I just testified, oftentimes when
14        there's such a varity or wide spread
15        between the two opinions, it rests in
16        highest and best use.  So therefore,
17        once I understood where Ms. Locatell
18        was coming from in terms of highest
19        and best use, I understood why the
20        difference.
21    BY MR. WALSH:
22        Q.   And that's where you stopped?
23        A.   Yes.
24        Q.   Okay.  How about the deposition
25    of Morris Missry, what, if any, relevant
```

Page 56

HEDDEN

1
2    information did you learn from your review
3    of that deposition transcript?
4        A.    My best recollection, and I don't
5    recall exactly but I think that whether it
6    was an e-mail or in the testimony, my best
7    recollection of Mr. Missry's position on
8    this was that the cases -- the case law
9    that you previously cited, he did not
10   necessarily agree with as applicable in
11   the subject case.  So that's the key
12   takeaway from Mr. Missry's position or his
13   deposition, had he elaborated on that
14   position in the deposition, I can't recall
15   specifically, but the key aspect of what
16   he may have said there would have been his
17   interpretation of the subject lease and as
18   it related to the case law of those cases
19   that you previously cited in earlier
20   testimony.
21       Q.    Okay.  So your recollection --
22   I'm sorry, I'm hearing a lot of feedback
23   on my end.
24            Your recollection is that there
25   was I guess a disagreement about the

1                     HEDDEN

2    applicability of, say, the 936 Second

3    Avenue case; is that right?

4         A.    I'm not sure that you've

5    characterized, you said in your question

6    he just took a legal position and from he

7    said, he didn't think it was applicable.

8    There was no conflict, per se, other than

9    the fact that as he's a legal guy, he's a

10   lawyer, he knows and he's very

11   knowledgeable about real estate matters,

12   so that's his opinion.

13        Q.    And so that's an opinion as to

14   whether the 20-year encumbrance of the

15   McDonald's lease needed to be considered

16   in the valuation; is that right?

17        A.    In a nutshell, yes, that's the

18   key concept that he objected to.

19        Q.    And would that be an important

20   fact for an appraiser to understand when

21   performing a valuation?

22        A.    Yes.

23        Q.    Why is that?

24        A.    In these types of situations,

25   that is an area of interpretation and so

Page 58

1                           HEDDEN

2      to the extent that it's his position that

3      it is not applicable or does not apply, is

4      relevant to the extent that that's his

5      position and he's advising his client.  So

6      in that regard, I think that's -- you take

7      it for what it's worth and as the

8      appraiser, you follow the guidelines that

9      have been set forth by precedent and you

10     move forward.  But he's entitled to his

11     legal interpretation.

12          Q.   So why would it have been

13     important for Mr. Tener to know whether or

14     not the 20-year encumbrance of the lease

15     needed to be considered in his valuation?

16          A.   I think it would have been

17     important going forward because given his

18     role as the -- one of the appraisers on

19     behalf of the landlord, and knowing that

20     it was very possible that there was going

21     to be a third-party review, had him and

22     Ms. Locatell not reached a consensus as to

23     the value, that he would know that another

24     MAI so qualified as himself or a peer

25     would also factor that in.  So he would

Page 59

1                    HEDDEN
2    have been remiss had he not walked through
3    the exercise.
4        Q.   So would the existence of the
5    20-year encumbrance of the lease impact
6    the valuation of the property?
7        A.   I believe that the consideration
8    of the 20-year encumbrance does impact the
9    value of the property.
10       Q.   So understanding whether or not
11   the encumbrance of the lease needed to be
12   considered was necessary for Mr. Tener to
13   determine how to value the property;
14   right?
15       A.   No, it was one of various tools
16   that he could use following the
17   instructions of the lease in arriving at
18   his opinion but it was one of the things
19   he should have -- and he did consider.
20       Q.   Okay.  So we'll address that a
21   little bit further later on.
22            Moving back to section VII of
23   your report, P103, bullet 3 says
24   McDonald's exhibit production, Exhibits P1
25   through P102.  You've already testified

Page 60

1                          HEDDEN
2     that you did not fully read Ms. Locatell's
3     reports.  What documents did you review in
4     their entirety that were within this P1
5     through P102 range?
6          A.   I scrolled through them.  I mean
7     there's a lot of them and so I sat with
8     the computer and scrolled through each one
9     of them just to, one, say that I looked at
10    them and anything that was relevant I read
11    and looked at.
12         Q.   Which of the documents do you
13    recall being especially relevant aside
14    from Mr. Tener's reports?
15         A.   The list is pretty long so I
16    don't want to go and say that these are
17    only the ones.  I think in the -- those
18    things that might have been brought up in
19    my report, expert report were then
20    considered relevant in my analysis but
21    generally speaking, I would have to say
22    that other than I familiarized myself with
23    the issues in this case, very few of them
24    had anything really relevant impact on my
25    position here and the opinions that I've

```
                                        Page 61

 1                    HEDDEN

 2    reached in my expert report.  So I can't

 3    as I stand here now and testify think

 4    about the 102 exhibits that were in that

 5    download.

 6         Q.    But if it was relevant, you would

 7    have referenced it somewhere else in your

 8    report; is that what your testimony is?

 9         A.    Yes.

10         Q.    How about Vanderbilt's document

11    production or exhibit production, A

12    through Z and then AA through XX, do you

13    recall which documents were especially

14    relevant?

15         A.    The only thing that I considered

16    relevant in either one, and I don't know

17    what bucket they were in, was the lease --

18    or the information because it came up, it

19    would have been the subsequent lease with

20    Vanderbilt and the existing landlord, I'm

21    going to mispronounce, Musto, and the

22    structure of the organization that was put

23    together as a result of the transfer of

24    the asset so again without seeing them in

25    front of me but those pieces of
```

Page 62

1                        HEDDEN
2     information I thought were relevant in
3     hindsight to the understanding of that
4     transfer of this property, and I'm sure
5     that questions will come up about it later
6     so I don't want to dismiss them here as we
7     are in this area of questioning so those I
8     think we will explore, and I'm assuming
9     you're going to explore with me later, so
10    therefore I want to point them out at this
11    time.  But other than those points of --
12    or those pieces of information, I don't
13    think anything of significant relevance is
14    contained therein.
15        Q.   You said you thought they were
16    relevant in hindsight.  What do you mean
17    by relevant in hindsight?
18        A.   Well, I say relevant in hindsight
19    because when I read the reports -- in
20    rendering my opinion, that had nothing to
21    do with my opinion of the credibility of
22    Mr. Tener's report or his compliance with
23    the addendum or his compliance with USPAP
24    had nothing to do with that, other than
25    the compliance with USPAP.  And in USPAP

1            HEDDEN
2    there's a provision that talks about
3    having knowledge about transactions that
4    occurred three years prior and again, I
5    don't have all the specifics in front of
6    me at the moment but to the extent that
7    Mr. Tener inquired but did not have
8    available to him that transfer of
9    information may or may not have reconciled
10   it with the information that he had when
11   he prepared his report, I looked at it and
12   I found it somewhat relevant in defense of
13   Mr. Tener not considering it or not
14   including it and why it's not relevant in
15   this case and therefore I highlight it at
16   this time.  But again, it doesn't go to
17   Mr. Tener's credibility of his opinion but
18   it does go to a possible issue on a USPAP
19   like matter that goes to considering
20   transactions involving the subject
21   property.  In that context that's my
22   explanation.
23            MR. WALSH:  So I think we will
24       need to explore that a little bit
25       later.  It's 12:30 right now so you

```
                                        Page 64
 1                    HEDDEN
 2      requested a break.  Happy to take one.
 3      How much time would you like?
 4           THE WITNESS:  I'm going to
 5      suggest 45 minutes.
 6           MR. WALSH:  That's fine by me.
 7      Cathi, does that work for you?
 8           THE REPORTER:  Yes, it's fine.
 9           MR. KOH:  We'll see everybody at
10      1:15 then.
11           THE VIDEOGRAPHER:  The time is
12      12:31.
13           (Lunch recess taken at
14      12:31 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

1                    HEDDEN

2       A F T E R N O O N    S E S S I O N

3            (Time noted:  1:19 p.m.)

4    M I C H A E L    H E D D E N,  resumed

5        and testified as follows:

6            THE VIDEOGRAPHER:  The time is

7        1:19 p.m.  We're back on the record.

8    CONTINUED EXAMINATION

9    BY MR. WALSH:

10       Q.   Mr. Hedden, before we broke, we

11   were talking about some of the documents

12   that you reviewed and I want to just

13   continue that discussion.

14            How much time did you spend

15   reviewing the documents that are

16   identified in section VII of your report?

17   Approximately how much time total?

18       A.   I'm going to have to say 25 hours

19   maybe, 20, something like that.

20       Q.   And then how much time did you

21   spend preparing your report?

22       A.   About the same.  It was split

23   50/50 so it was about 20 some hours in

24   production of the document and 20 some

25   hours reviewing information in number VII.

Page 66

1                         HEDDEN

2        Q.    If we could refer to paragraph 23

3    of your report which is P103.

4        A.    Okay.

5        Q.    You wrote, "As part of my

6    analysis, I have conducted, one, a

7    thorough review of the report and the

8    exhibits produced in the appraiser's

9    deposition and confirmed the

10   calculations."

11              What do you mean "produced in the

12   appraiser's deposition"?

13       A.    We've identified Mr. Tener as the

14   appraiser so there should be an apostrophe

15   after that possessive and so it's the

16   appraiser's deposition meaning Mr. Tener's

17   deposition.  So his report, the exhibits

18   that were used in his deposition and the

19   deposition testimony itself.

20       Q.    Okay, now this paragraph does not

21   discuss any review of any other exhibits

22   other than Mr. Tener's -- the exhibits

23   used in Mr. Tener's deposition and you

24   said earlier that you sort of just you

25   skimmed sort of the rest of them?

Page 67

1                    HEDDEN

2        A.    Correct.

3        Q.    Okay.  Now paragraph 23 does not

4    refer to KTR's work file and section VII

5    of your report also does not reference

6    KTR's work file.  Did Vanderbilt provide

7    you with KTR's complete work file for the

8    July 30, 2019 report?

9        A.    I do not know what would have

10   been in the possession of Meister law firm

11   relative to the complete work file.  When

12   I identified the report in this exhibit --

13   excuse me, in my expert report, it was

14   those work papers in the Excel

15   spreadsheets that we've identified, and

16   again I scrolled to this section so I

17   can't identify specifically, but those

18   Excel spreadsheets that were produced as

19   exhibits showing his calculations and so

20   any of that was considered as part of,

21   quote, the Tener report because the report

22   was only issued in a letter or restricted

23   format and therefore my use of the word

24   report here incorporates the written

25   document itself that he produced plus the

Page 68

1                        HEDDEN

2    supporting information that was contained

3    in what I call his work file.

4         Q.   Okay.  If you could pull up what

5    has already been marked as P36, it's the

6    July 2019 KTR report.

7         A.   Is it in the Exhibit Share?

8         Q.   Yeah, we looked at it earlier.

9         A.   Okay.

10        Q.   It's --

11        A.   I'll go there.  Let me just

12   refresh.  Hang on.  Let's just see.  And

13   I'll get to the root file.  My report was

14   still here, hang on.

15             Still spooling.  Hang on, let me

16   try something else.  P36, I'm there.

17        Q.   The bottom of the first full

18   page?

19        A.   Yes.

20        Q.   It ends with the Bates stamp

21   1046.

22        A.   I'm there.

23        Q.   The very last sentence, it spills

24   over on to the next page, it says, "The

25   client is cautioned that the opinions and

```
 1                    HEDDEN
 2   conclusions set forth in this restricted
 3   appraisal report may not be understood
 4   properly without additional information in
 5   the appraiser's work file."
 6          Do you see that?
 7      A.   Yes.
 8      Q.   And Meister Seelig did not give
 9   you access to KTR's complete work file;
10   right?
11      A.   I don't know that to be true.
12      Q.   Okay.  But you only received the
13   select documents that were used in
14   Mr. Tener's deposition; right?
15      A.   Yeah, they were produced in the
16   deposition, the exhibits, that's correct.
17      Q.   So what type of information is
18   typically contained in an appraiser's work
19   file?
20      A.   Well, there could be notes --
21   let's go back.  It would be the engagement
22   letter or retention letter, notes
23   regarding the inspection of the property,
24   other public information, again tax bills,
25   so general information used in the
```

1                    HEDDEN

2   compilation of the report, both in terms

3   of the description of the property and

4   then the comparables used, the analysis

5   and the ultimate conclusion.  All of that

6   usually is shown somewhere in the work

7   papers, if it's not in the expert report,

8   or the report in here, so it's those types

9   of things that one finds in an appraiser's

10  work file.

11      Q.   Would there typically be some

12  sort of note or information about the work

13  that an appraiser did to search for comps?

14      A.   No, not necessarily.

15      Q.   Could it?

16      A.   Well, again, you're saying

17  description of the behavior used in the

18  collection of the comparables.  It would

19  contain the comparables that were used in

20  the analysis but it wouldn't necessarily

21  describe our notes on what the activities

22  were in collection of same.

23      Q.   Do appraiser's work files

24  sometimes contain information about steps

25  the appraiser took to look for comps?

Page 71

1                        HEDDEN

2        A.    Well, yeah, if there's different

3    identities of comparables.  In other

4    words, the different sources one may have

5    used, there would be threads of

6    information relative maybe to what sources

7    were used to locate comparables.

8        Q.    Did you see any such information

9    in the information that was provided to

10   you?

11       A.    I believe in the information that

12   was provided to me were prior reports

13   showing prior work relative to complete

14   appraisal reports and then in the

15   spreadsheets that were provided had

16   details of other comparables that were

17   considered in this analysis but weren't

18   necessarily used.

19       Q.    So Mr. Tener testified that he

20   was not able to find any comparable leases

21   to use in his analysis.  Did you see

22   anything in his work file demonstrating

23   what Mr. Tener did to search for such

24   comps?

25       A.    No.

1                          HEDDEN

2          Q.    Do you know what he did to search

3      for comparable leases?

4          A.    Only that would have been

5      described in his deposition testimony

6      because I would have read it but I can't

7      right now respond to your question because

8      I can't recall exactly what he did in that

9      endeavor.

10         Q.    Okay.  So you can't recall what

11     he did to search for comparable leases?

12         A.    I can't recall what he did to

13     find comparable leases, that's correct.

14         Q.    So if you were not sure if you

15     received Mr. Tener's complete work file,

16     how can you be certain that you fully

17     understand the opinions and conclusions

18     contained in his report?

19         A.    Because I found the spreadsheets

20     that were then supported by his deposition

21     testimony as comprehensive enough so as to

22     understand that Mr. Tener fulfilled the

23     requirements under USPAP and the

24     instructions in the addenda of the lease

25     and found them convincing and credible

Page 73

1                           HEDDEN

2      enough to render the opinion that I did in

3      my expert report.

4          Q.   But if you did not review his

5      complete work file, how can you be certain

6      that analysis was complete?

7              MR. KOH:  Objection.  Go ahead

8          and answer.

9              THE WITNESS:  His analysis was

10         complete enough for me to render the

11         opinion that I did and therefore

12         whether or not there might have been

13         some other superfluous information

14         that I was not privy to did not impair

15         my ability to render the report that I

16         did and reach the conclusion that

17         Mr. Tener's report was credible.

18     BY MR. WALSH:

19         Q.   How do you know that information

20     that was not provided to you would have

21     been superfluous?

22         A.   Because I felt that based on my

23     review of the information before me that

24     was provided to me allowed me to have a

25     level of professional certainty that

                         HEDDEN

1   is -- bear with me, I just got a

2   connection issue.

3            To continue, so I had a level of

4   certainty, professional certainty that the

5   conclusion I reached and the information

6   that was given to me was sufficient enough

7   for me to render.  Whether or not there

8   was other information that was contained

9   in the file, again, I described as

10  superfluous because it wasn't germane to

11  what I needed to opine the way I did in my

12  expert report.

13       Q.   Okay, so before we took a break

14  earlier, you indicated that you learned

15  perhaps some additional information about

16  the Vanderbilt lease that you did not

17  consider originally in preparing your

18  expert report; isn't that right?

19       A.   No, it's not correct.

20       Q.   Okay.  So is there any

21  information that you've learned since you

22  issued your expert report in November of

23  2021 that you have found to be relevant

24  that you did not consider to be relevant

25

1                        HEDDEN

2    when you first issued your report?

3         A.   Can you repeat the question?   It

4    was a little compound, it was a little

5    confusing.

6         Q.   Is there any information that you

7    learned since you issued your report in

8    November of 2021 that you have since found

9    to be relevant that you did not consider

10   to be relevant when you issued your

11   report?

12        A.   No.

13        Q.   Did you ask for KTR's complete

14   work file?

15        A.   No.

16        Q.   Why not?

17        A.   I didn't think it was necessary

18   based on the information that I had

19   already in my possession.

20        Q.   Notwithstanding the statement in

21   KTR's report that the opinions and

22   conclusions set forth in the restricted

23   appraisal report may not be understood

24   properly without additional information in

25   the appraiser's work file?

Page 76

1                        HEDDEN
2        A.   The information that I understood
3    to mean in that writing was the Excel
4    spreadsheets in addition to some of the
5    other exhibits I did look at and therefore
6    I considered that to be his work file.
7        Q.   Did you confirm that
8    understanding with anyone?
9        A.   No.
10       Q.   Did you author your report in its
11   entirety?
12       A.   Yes.
13       Q.   Did you receive assistance from
14   anyone?
15       A.   No.
16       Q.   Did you consult with anyone else
17   in conducting your review and preparing
18   your expert report?
19       A.   No.
20       Q.   Okay, if we could refer back to
21   paragraph 23 of your expert report.
22   Actually by the way, before we move on,
23   you mentioned earlier that some other
24   material that may be contained in an
25   appraiser's work file might be notes on

1                    HEDDEN

2    the appraiser's inspection.  Did you

3    review that information in Mr. Tener's

4    report -- I'm sorry, in Mr. Tener's work

5    file?

6        A.    No.

7        Q.    You also said it may contain some

8    public information that the appraiser

9    considered.  Did you review any such

10   information in connection with your review

11   of Mr. Tener's report?

12       A.    To the extent that any of those

13   legal documents relative to deed and

14   recorded leases or memorandums and that

15   that was contained in the exhibits, yes.

16   However, relative to anything that's not

17   already been produced in terms of public

18   documents, no, I did not.  Like tax bills,

19   for instance.

20       Q.    So do you know if any of that

21   information was, in fact, in Mr. Tener's

22   work file?

23       A.    I am unaware.

24       Q.    Okay.  In point 2 of paragraph 23

25   of your report, you say you conducted a

Page 78

1                         HEDDEN
2      site inspection of the subject property.
3           A.   Yes.
4           Q.   When did you perform that site
5      inspection?
6           A.   Oh, early part of September, I
7      think.
8           Q.   And do you recall what day of the
9      week you visited the property?
10          A.   I believe it was a Saturday.
11          Q.   What time of day?
12          A.   4:30-ish, 4 or 4:30.
13          Q.   And what did your site visit
14     consist of?
15          A.   Drove down Atlantic, drove across
16     Vanderbilt, drove through the parking lot,
17     came out the back of the site, looped
18     around back onto Vanderbilt and then
19     headed down Atlantic towards the Barclay
20     Center.
21          Q.   How long did the site visit last?
22          A.   10 minutes.
23          Q.   Was that the first time you had
24     ever been to this property?
25          A.   Yes.

```
                                    Page 79

 1                   HEDDEN
 2        Q.    Had you ever been in this
 3    neighborhood before?
 4        A.    Yes.
 5             MR. KOH:   Objection.   Go ahead.
 6    BY MR. WALSH:
 7        Q.    When had you been in this
 8    neighborhood?
 9        A.    My son lives in Brooklyn so when
10    I go and visit him, you know, I'm up and
11    down Brooklyn and a radius from Fort Green
12    to Park Slope to Boerum Hill to all over,
13    so yeah, and when we go to dinner and
14    stuff so I'm all around Brooklyn with my
15    son.
16        Q.    Where in Brooklyn does he live?
17        A.    He lives in Boerum Hill.
18        Q.    Had you ever been to Prospect
19    Heights before?
20        A.    Sure.
21        Q.    When?
22        A.    I don't recall.   Numerous times.
23    I'm all around.
24        Q.    Had you ever been there for work
25    before?
```

```
                                            Page 80

 1                      HEDDEN
 2        A.    I can't recall.  I don't think
 3    so.
 4        Q.    Did you take pictures or notes
 5    during your site visit?
 6        A.    I took a couple of photographs of
 7    the building, yes, of the McDonald's site,
 8    yes, I did.
 9        Q.    So what did you observe about
10    840 Atlantic Avenue and the surrounding
11    area during your site inspection?
12        A.    At the time of day that I was
13    there significant traffic volume.  I had
14    people on bikes pull up alongside of me.
15    It was difficult to make a left-hand turn
16    without hitting a pedestrian in the
17    crosswalk.  It was crazy.  People were
18    coming in for early burgers so the parking
19    lot was very congested and very busy.  And
20    then at the time I can't recall, there was
21    a street closure and there was I want to
22    say a food festival or an activity down
23    the street there is my best recollection
24    so those are my observations.
25        Q.    Okay.
```

```
                                            Page 81

 1                      HEDDEN
 2              How many lanes of traffic are on
 3      each side of this portion of Atlantic
 4      Avenue?
 5          A.   I can't recall.  Specifically, I
 6      don't know.  I would be guessing.
 7          Q.   Do you remember if there's more
 8      than one lane on each side?
 9          A.   Yes.
10          Q.   And what do you remember?
11          A.   There's more than one.
12          Q.   Okay.  And you said you also
13      drove down Vanderbilt Avenue?
14          A.   I drove around Vanderbilt Avenue.
15      Down, up, around, I was in the
16      neighborhood and I drove around.  I don't
17      recall.
18          Q.   Okay.  What did you observe about
19      this portion of Vanderbilt Avenue during
20      your site visit?
21          A.   Across Atlantic on Vanderbilt
22      there's a very large building so -- and
23      then there was the -- as you looked down
24      towards the Barclay Center you see that
25      the infill of the high-rises over the
```

Page 82

1                         HEDDEN
2      tracks as it relates going close to the
3      subject property and then -- I mean that's
4      the best I'm recalling in my mind what I
5      saw at the time and that's the best of my
6      recollection as we stand here.
7           Q.   Do you recall how many lanes of
8      traffic are on each side of this portion
9      of Vanderbilt Avenue next to the
10     restaurant?
11          A.   There might have been one in each
12     direction and then a turning lane so --
13     but that's the best I can recall.  It's
14     really, there was something keeping up on
15     my right-hand side, whether it was
16     reconstruction of the sidewalk or
17     something because the bikes were right up
18     alongside my car so again, that's the best
19     I can recall.
20          Q.   How much pedestrian foot traffic
21     did you observe during your site visit?
22          A.   How much is a relative term.  I
23     saw people.
24          Q.   You saw a few people?
25          A.   They were in the crosswalk and it

Page 83

1               HEDDEN
2     kept interfering with my ability to get
3     across the street.
4          Q.   If you could just quantify, was
5     it dozens of people walking down the
6     street, was it a handful?
7          A.   It was not Manhattan and 42nd
8     Street.  There was a steady stream of
9     folks walking across on a 4:30 on a
10    Saturday afternoon, the baby carriages and
11    the like.  20, 15, 10, somewhere in there.
12         Q.   As you were standing at the
13    McDonald's and looking across Vanderbilt
14    Avenue, what do you see across Vanderbilt
15    Avenue from the McDonald's?
16         A.   An office building.
17         Q.   Okay.  Anything else?
18         A.   There was an office building.
19         Q.   Okay.  And do you recall seeing
20    any rail yards or rail lines?
21         A.   So can you direct me please,
22    again which way am I looking?
23         Q.   You're looking across Vanderbilt
24    Avenue from the McDonald's.
25         A.   From the McDonald's, Vanderbilt

Page 84

1                    HEDDEN
2    down towards -- in a southerly direction?
3         Q.   Looking right across Vanderbilt.
4    I guess looking right across Vanderbilt.
5    I guess it's looking west.
6         A.   Okay, good.  So if I'm looking
7    down Atlantic, you're telling me I'm
8    looking down towards the Barclay Center,
9    I'm standing at the McDonald's and I'm
10   looking towards the Barclay Center; right?
11        Q.   Right, directly across
12   Vanderbilt.
13        A.   Maybe I'll pull up a Google map
14   and I'll be able to describe it.
15        Q.   That's not necessary.
16        A.   My best recollection I've already
17   described this as best I can recall.
18        Q.   Okay.  Do you remember seeing a
19   rail line or rail yards during your site
20   inspection?
21        A.   I just spoke of that earlier in
22   the prior paragraph, yes, I do.
23        Q.   So what do you recall about them?
24        A.   Not much.
25        Q.   Okay.  How far do they stretch?

```
                                    Page 85
 1                  HEDDEN
 2        A.    Again, I don't recall the number
 3    of blocks but a few blocks.
 4        Q.    So you don't know?
 5        A.    I don't recall without looking at
 6    a map.
 7        Q.    What is located at street level
 8    directly along the stretch of Atlantic
 9    across the rail lines?
10        A.    I don't recall.
11        Q.    What about on street level on
12    Atlantic Avenue across from the rail
13    lines?
14        A.    Again, I was driving.  I don't
15    recall.  I looked at it from satellite
16    Google Earth and I did the street scene as
17    part of some reconnaissance I did on this
18    project but I don't recall.
19        Q.    Did you notice what types of
20    businesses are located on the same block,
21    Atlantic Avenue, as the McDonald's?
22        A.    No, I don't.
23        Q.    Did you notice any retail in the
24    blocks surrounding 840 Atlantic Avenue?
25        A.    My general recollection is a
```

Page 86

1                      HEDDEN
2    street, retail along the first floor but I
3    don't recall exactly the kind of retail or
4    anything.  Again, like I said, I was
5    driving and watching traffic.  I don't
6    recall.
7         Q.   So you're not sure what, if any,
8    retail is in the area immediately
9    surrounding the McDonald's at 840 Atlantic
10   Avenue?
11        A.   That's correct.
12        Q.   Okay.  What neighborhood of
13   Brooklyn is 840 Atlantic Avenue in?
14             MR. KOH:  Objection.  Go ahead.
15             THE WITNESS:  I don't recall.
16   BY MR. WALSH:
17        Q.   Okay.  Do you know what
18   neighborhoods surround the property?
19        A.   No, I can't mention them at this
20   time without looking at a map.
21        Q.   Okay.  What specific parts of
22   Brooklyn do you consider to be comparable
23   to the area immediately surrounding
24   840 Atlantic Avenue?
25             A.   I don't have any opinion.  I

Page 87

1          HEDDEN

2   wasn't asked to do that research so I

3   can't authoritatively speak at this time.

4        Q.   If we could turn to paragraph 13

5   of your report.  It says, "I have been

6   retained as an expert by Meister Seelig &

7   Fein," and then I'm going to skip a little

8   bit down to the fourth line, "to examine

9   the restrictive appraisal report and

10  workpapers prepared by Thomas J. Tener."

11          Do you see that?

12       A.   Yes.

13       Q.   But you didn't actually review

14  all of Mr. Tener's work papers; right?

15       A.   I don't know that to be the case.

16  The work papers in this paragraph as

17  defined from my prior testimony were those

18  exhibits that were produced in this matter

19  and I assume them to be the work papers.

20       Q.   But you didn't confirm with

21  anyone?

22       A.   No.

23       Q.   So paragraph 13 of your report

24  does not reference KTR's earlier

25  restricted report dated April 15, 2019.

Page 88

1              HEDDEN

2    Have you reviewed that report?

3         A.   I remember seeing it but reviewed

4    is a term of art that I did not conduct a

5    USPAP standard three-appraisal review of

6    that report but I generally looked at it.

7         Q.   And what do you recall about the

8    differences between the April 15, 2019 and

9    July 30, 2019 KTR reports?

10        A.   I believe one of the differences

11   was the inclusion of the residual

12   analysis.

13        Q.   And what is your understanding as

14   to why a second report was issued on July

15   30, 2019?

16        A.   My understanding was based on

17   meetings between the parties to this

18   matter, there was an agreement that that

19   analysis would be undertaken by Mr. Tener.

20        Q.   So your understanding is there

21   was an agreement that Mr. Tener would

22   undertake a land residual analysis?

23        A.   Yeah, I believe that's my

24   understanding.

25        Q.   Okay.  If we could look at

Page 89

1           HEDDEN

2    paragraph 15 of your report.  Second

3    sentence, "The scope of work relative to

4    this ARR is to determine, one, whether:

5    1.) the report contains adequate and

6    relevant data; 2.) the appraisal methods

7    and techniques used in the report are

8    appropriate given the language in the

9    lease; and 3.) the analyses and opinions

10   and conclusions in the report are

11   appropriate, credible and reasonable for

12   the intended use of the intended user

13   within the context of the lease."

14          Let's start with the first of

15   those points, to determine whether the

16   report contains adequate and relevant

17   data.  What specific steps did you take to

18   determine whether the report contains

19   adequate and relevant data?

20       A.   I looked at the report, the

21   written report, the restrictive report and

22   I looked at the spreadsheets that were

23   produced as part of his work papers.

24       Q.   Did you conduct any independent

25   research?

Page 90

1                          HEDDEN

2          A.    No.  It was not necessary.

3          Q.    Why do you believe it was not

4     necessary?

5          A.    Because the information that I

6     found inside the report identified a

7     significant number of comparables that

8     Mr. Tener believed were, in fact,

9     comparable and therefore, there was

10    sufficient number of data points for him

11    to render his opinion.

12         Q.    Now, how did you determine that

13    they were comparable?

14              MR. KOH:   Objection.  Go ahead.

15              THE WITNESS:  My scope was not to

16         determine, quote, if they were

17         comparable, close quote.  It was that

18         his representation in the document and

19         his testimony is that they were

20         comparable and that's his opinion.

21    BY MR. WALSH:

22         Q.    So are you rendering any opinion

23    as to whether you agree with Mr. Tener's

24    conclusions that certain -- that the comps

25    identified in his work papers are, in

Page 91

1                   HEDDEN
2    fact, comparables?
3        A.   No, I'm not rendering that
4    opinion.  My opinion is Mr. Tener believes
5    that they are comparable and that's his
6    opinion and that was sufficient and
7    relevant enough and sufficient enough for
8    me to come to my conclusion.
9        Q.   And you did not believe you
10   needed to test Mr. Tener's conclusion in
11   that regard?
12       A.   No, because based upon the way
13   the lease is structured, that would be
14   determined by the third appraiser that
15   would be selected as part of the process
16   and they would challenge his conclusion as
17   to comparability if it was deemed so.
18       Q.   Moving on to the second point,
19   what specific steps did you take to
20   determine if the appraisal methods and
21   techniques used in the report are
22   appropriate given the language in the
23   lease?
24       A.   Well, Mr. Tener used a standard
25   appraisal technique in valuing vacant land

Page 92

1          HEDDEN
2    which is sales comparison report of
3    comparables that he deemed to think were
4    similar and highest best use.  So those
5    comparables were included, appropriately
6    adjusted and I say appropriately, they
7    were adjusted based on his opinion as to
8    the appropriate adjustments and came to a
9    conclusion and that was bracketed by the
10   data set that was provided.  And then he
11   continued to move on to do the residual
12   approach and he followed methodologies
13   that are part of the highest and best use
14   analysis in looking at residual techniques
15   and therefore, based upon that, methods
16   and techniques used were appropriate given
17   the language in the lease that he
18   followed.
19          MR. WALSH:  Okay.  So let's pull
20      up what's been previously marked as
21      P69.  It's the McDonald's lease.
22          VERITEXT CONCIERGE:  One moment,
23      please.
24          P69 has been introduced.  Please
25      refresh.

Page 93

```
 1                    HEDDEN
 2    BY MR. WALSH:
 3        Q.   Mr. Hedden, this is the
 4    McDonald's lease.  I'd like you to scroll
 5    down to the bottom, towards the bottom,
 6    it's the option rent addendum.  I believe
 7    it's Exhibit G.
 8        A.   Okay, so I'm seeing -- bear with
 9    me a second.  All right.  So 3 of 45 so
10    I'm going to scroll down to what page
11    number?  40 or 45.
12        Q.   It's probably right around there.
13    I'm scrolling myself.  It's a little slow
14    right now.
15        A.   Same with mine.  We'll see.  Come
16    on baby, let's go.
17            VERITEXT CONCIERGE:  If it's at
18        all helpful for loading purposes,
19        there is a download button in the top
20        right of the Exhibit Share screen.
21        You can download it locally.
22            MR. WALSH:  Yeah, that's probably
23        a good idea.  Thank you for that.
24            THE WITNESS:  Thank you.  All
25        right.  I've got it open.  I'll scroll
```

Page 94

1                    HEDDEN
2       in a minute.  I've got the download
3       going on.
4   BY MR. WALSH:
5       Q.   So it's page 41 of that pdf.
6   It's the first page of the option rent
7   addendum.
8       A.   Okay, I'm there.  Wait, okay
9   we're there, option rent agreement or
10  addendum.
11      Q.   You just talked about how
12  Mr. Tener used the sales comparison
13  approach in his analysis; right?
14      A.   Yes.
15      Q.   And the first way that he valued
16  the property was to analyze fee simple
17  land sales of what he determined to be
18  comparable properties; right?
19      A.   Yes.
20      Q.   Where in the option rent addendum
21  does it say that the appraisers can value
22  the fair market rental value of the
23  property using sales, fee simple sales of
24  land?
25      A.   The second page of this addendum,

Page 95

1                    HEDDEN
2    the second to last paragraph, it says,
3    "The standard market data approach
4    technique in valuing vacant land shall be
5    used by the appraisers."
6         Q.   What does the next sentence say?
7         A.   All comparable leases shall be
8    appropriately adjusted, and the written
9    report shall indicate the reasons for the
10   adjustments so made."
11        Q.   And then what about the next
12   sentence?
13        A.   "If adequate comparable leases
14   are not available, then a land residual
15   technique, as defined by the American
16   Institute of Real Estate Appraisers, shall
17   be used."
18        Q.   Okay.  So the second and third
19   sentences of that paragraph talk about
20   comparable leases; right?
21        A.   Yes.
22        Q.   They don't reference comparable
23   land sales; right?
24        A.   They do not.
25        Q.   Okay.  But it's -- do you believe

Page 96

```
 1                      HEDDEN
 2    that that language means that the
 3    appraisers were authorized to value the
 4    fair market rental value of the property
 5    using fee simple land sales as opposed to
 6    comparing and adjusting comparable ground
 7    leases?
 8              MR. KOH:  Objection.  Go ahead
 9         and answer.
10              THE WITNESS:  Yes.
11    BY MR. WALSH:
12         Q.   Why do you believe that?
13         A.   The keywords in those sentences
14    are standard market data approach, which
15    the Appraisal Institute recognizes as the
16    sales comparison approach in the valuation
17    of vacant land.  The second sentence says
18    all comparable leases.  We focus on the
19    word comparable and comparable would mean
20    consistent with the highest and best use
21    as deemed by the appraiser, and the
22    ability to find leases that are deemed
23    comparable and whether or not they could
24    be adjusted.  So the point being
25    comparability and comparable -- in order
```

Page 97

1                    HEDDEN

2     to select a comparable it has to have a

3     consistent highest and best use, and

4     therefore the two sentences are somewhat

5     conflicting in that it instructs the

6     appraiser to use a sales comparison

7     approach at the same time defined

8     comparables that are consistent with the

9     highest and best use as defined earlier on

10    in this lease about the definition of

11    market value between knowledgeable parties

12    and neither duress and knowing what this

13    property could be put to in terms of uses.

14    And the reason why we're here is the

15    conflicting language of the lease addendum

16    guiding the appraiser to use a sales

17    comparison approach but then also try to

18    find leases that are deemed comparable

19    given the fact pattern.

20         Q.   Wouldn't adjusting comparable

21    ground leases, reviewing and adjusting

22    comparable ground leases, couldn't that

23    also be considered a sales comparison

24    approach of sorts?

25              MR. KOH:   Objection.   Go ahead.

```
                                        Page 98

 1                   HEDDEN

 2            THE  WITNESS:   No,  because  I  think

 3       that  the  terminology  you  just  used  a

 4       sales  comparison  is  not  dealing  with

 5       leases.   So  you  can  do  a  lease

 6       adjustment  analysis  or  a  lease

 7       analysis  and  comparative  like  but  it

 8       doesn't  --  it's  not  part  of  the  sales

 9       comparison.

10  BY  MR.  WALSH:

11       Q.    Okay.

12       A.    Which  is  the  standard  market

13  approach  that  Mr.  Tener  used.

14       Q.    So  does  the  lease  authorize  the

15  appraisers  to  calculate  fair  market  rental

16  value  using  more  than  one  method?

17       A.    Yes,  I  think  that  the  sentence

18  does  that  or  the  third  sentence  says  that.

19       Q.    Well,  it  says  if  adequate

20  comparative  leases  are  not  available,  then

21  a  land  residual  technique  shall  be  used;

22  right?   So  wouldn't  you  agree  that  that

23  only  applies  if  adequate  comparable  leases

24  are  not  available?

25       A.    Correct.
```

```
                                        Page 99

 1                      HEDDEN
 2       Q.    Okay.  But Mr. Tener valued the
 3   property using two different methods;
 4   right?
 5       A.    Yes, as he was instructed to do.
 6       Q.    But the lease does not authorize
 7   him to use two separate methods, right, at
 8   the same time?
 9       A.    It uses the word shall so does
10   that constitute authorization and then
11   given legal instruction?  I think it does.
12       Q.    Did you take any other steps to
13   determine if the appraisal methods and
14   techniques used in the report are
15   appropriate given the language in the
16   lease?
17       A.    Any other steps?
18            MR. KOH:  Objection.  Go ahead.
19            THE WITNESS:  I'm confused by
20       your question.
21   BY MR. WALSH:
22       Q.    I'm just trying to understand
23   what else, if anything, did you do to
24   determine if the appraisal methods and
25   techniques used in the report are
```

Page 100

1                       HEDDEN

2    appropriate given the language in the

3    lease.

4        A.    What I did was I looked at his

5    land residual technique and method and he

6    followed the steps in arriving at a land

7    residual income consistent with the

8    teachings in the highest and best use

9    class as well as the textbook.

10       Q.    What specific steps did you take

11   to determine if the analyses, opinions and

12   conclusions in the report are appropriate,

13   credible and reasonable for the intended

14   use?

15       A.    So that question goes back to my

16   expert report, right, the paragraph in

17   question?

18       Q.    Yes, this is paragraph 15.

19       A.    All right, let me pull that up on

20   the screen then.  I'm waiting for it to

21   refresh.  I'll download it so we don't

22   have this delay again.  It's coming back.

23   Hedden's expert report.  It is coming up.

24   Bear with me.  I'm just going to do a

25   quick download.

1              HEDDEN

2          Okay, good, it's up.  So we're in

3    paragraph what, sir?

4      Q.   15.

5      A.   Thank you.

6      Q.   Third point.

7      A.   All right, there we are.  So

8    third point, "The analysis, opinions and

9    conclusions in the report are appropriate,

10   credible and reasonable for the intended

11   use of the intended user within the

12   context of the lease."

13          So your question is, just to

14   repeat quickly?

15     Q.   What specific steps did you take

16   to determine if the analyses, opinions and

17   conclusions in the report are appropriate,

18   credible and reasonable for the intended

19   use?

20     A.   Okay, so we start with the

21   intended use and the intended user which

22   is the basis for which the report was

23   prepared and the user being the

24   knowledgeable, sophisticated, whatever

25   clients I have here, the clients that

Page 102

1                    HEDDEN
2     Mr. Tener had in the landlord's position
3     as well as the attorney, the use of the
4     document then would be for this process in
5     establishing a ground lease reset with the
6     idea that you'd have two appraisers and
7     then if they were outside of 15 percent
8     each, then a third appraiser would be
9     named and then the three appraisers would
10    collaborate to opine and if that could so
11    be reached that you have a majority.  So
12    this process for the intended use was
13    deemed reasonable for the context of the
14    lease which I just alluded to, the
15    language in the lease, and that everything
16    that was contained in the report, and
17    again the report incorporating his work
18    papers, in my opinion was appropriate and
19    his conclusion was credible based on all
20    the information before me.  So that was
21    the steps I used in coming to my
22    conclusion that I did reach in my expert
23    report and that's basically the process
24    that I used in arriving at that opinion.
25         Q.   Okay.  All three of these

1                    HEDDEN

2    determinations that you reference in

3    paragraph 15, did you undertake any

4    independent research in reaching the

5    conclusions that you reached in your

6    report?

7         A.    The independent research that I

8    may have done which I did do, was all

9    subsequent to the date of value and the

10   date of this report relative to what's

11   currently involved in the subject

12   property, right, which is not usable.

13   Appraisers are not allowed to think about

14   what was in the appraiser's ability to

15   know as of the date that that appraiser

16   rendered their opinion.  So that might

17   have been additional research that I knew

18   of regarding the M-Crown zoning and the

19   ultimate approval for this property.  But

20   again, that wasn't in my mindset when I

21   considered this appraisal review.  That

22   answers your question as to additional

23   research but it was not part of my

24   ultimate conclusion.

25        Q.    So what specific independent

Page 104

1               HEDDEN
2    research did you do in your analysis?
3        A.    In my analysis, I did no
4    independent research because it wasn't
5    called for, one, in my scope of work, or
6    two, for me to render the opinion that I
7    did given the language in the lease and
8    given the use and user of this report,
9    realizing that in similar situations it's
10   the third-party appraiser who then
11   reconciles between the two appraisers and
12   given Mr. Tener's knowledge and competency
13   and his use of all of the ethical
14   standards relative to signing a
15   certification and doing techniques and
16   methods and the amount of information that
17   was contained within the four corners of
18   the report and the work papers, did not
19   require me to do any independent research
20   in order for me to come to my opinion
21   relative to his fulfillment of the
22   language contained in the lease to move
23   this process forward.
24       Q.    If we can move to paragraph 35 of
25   your report.

1                        HEDDEN

2        A.    Okay.

3        Q.    You state that "Highest and best

4    use is defined as the reasonably probable

5    use of property that results in the

6    highest value.  The four criteria that the

7    highest and best use must meet are legal

8    permissibility, physical possibility,

9    financial feasibility, and maximum

10   productivity"; is that right?

11       A.    Yes.

12       Q.    Okay.  And is that the standard

13   definition of highest and best use?

14       A.    Yes.

15       Q.    Okay.  So just because a use is

16   physically possible and legally

17   permissible does not mean that the use is

18   necessarily the highest and best use;

19   right?

20       A.    Correct.

21       Q.    Okay.  The use must also be

22   adequately supported, financially feasible

23   and result in the highest value; right?

24       A.    Yes.

25       Q.    And an appraiser's highest and

Page 106

1                      HEDDEN
2    best use conclusion is an incredibly
3    important part of the analysis; right?
4         A.    Yes.
5         Q.    Why is that?
6         A.    Because it's the basis for value,
7    for market value, the basis of market
8    value is the highest and best use.
9         Q.    Okay.  So what happens if the
10   highest and best use analysis is not
11   performed properly?
12        A.    Then the appraiser would be
13   directed to find comparables that aren't,
14   in fact, consistent with the highest and
15   best use and could lead to a value
16   conclusion that would not be a market
17   value.
18        Q.    Can a --
19        A.    Based on the incorrect selection
20   of comparables driven by an incorrect
21   highest and best use analysis.
22        Q.    Can a property have more than one
23   highest and best use?
24        A.    I don't believe so.  If you make
25   a calculation and get to the highest

Page 107

HEDDEN

1          HEDDEN
2     value, you can have competing values and
3     so how those competing -- excuse me,
4     competing uses, how those competing uses
5     are analyzed could alter one's opinion as
6     to the highest and best use through their
7     calculations but ultimately in its purest
8     sense there can only be one highest and
9     best use.
10          MR. WALSH:  I'm sorry, there's
11       some construction going on nearby.
12       Can anyone hear that?  Okay, good.
13     By MR. WALSH:
14       Q.   Is it unusual for an appraisal
15     report to have two -- to list two highest
16     and best uses?
17       A.   By definition as I just spoke,
18     there could be competing uses but
19     ultimately there is by definition I
20     believe the highest value is the highest
21     and best use and therefore I don't believe
22     that there can be two highest and best
23     uses.
24       Q.   Okay.  What is a market analysis?
25       A.   Bear with me.  There could be an

1                    HEDDEN

2    interim highest and best use so not to

3    misspeak, that's got an adjective to

4    highest and best use, one ultimate highest

5    and best use but then there could be an

6    interim use that leads you to a highest

7    and best use as I've defined in my report.

8    So I want to make sure the record is clear

9    as to my position on that.

10        Q.    What is a market analysis?

11        A.    A market analysis is as we speak

12   in the treatises and in the course

13   literature an analysis of the subject

14   property and its productivity and its

15   ability to compete in the marketplace.

16   Then compared to the demand for such

17   product, the supply of a product similar

18   to the subject property and then looking

19   at whether there's surplus demand or

20   excess supply and from that come to a

21   conclusion as to how the property will

22   participate in the market and leading to

23   an ultimate conclusion of performance of

24   this property in the marketplace.  And

25   again this property meaning your property

1           HEDDEN

2    in question.

3        Q.   So it sounds like you're talking

4    about a marketability analysis; is that

5    right?  Is that the same as a market

6    analysis or is marketability analysis

7    something different?

8        A.   Marketability analysis in my best

9    recollection, not looking specifically at

10   the material, but marketability is how

11   that subject property is a site in search

12   of a user versus a market analysis which

13   is much more overarching or regarding a

14   specific type of property in the market

15   area so it's usually ground up versus top

16   down.

17       Q.   Would you agree that all

18   appraisal assignments to develop an

19   opinion of market value must include a

20   marketability analysis?

21       A.   No.

22       Q.   You disagree with that?

23       A.   Yes.

24           MR. WALSH:  Okay.  If we could

25       mark as the next exhibit, I think it's

1                    HEDDEN

2         P104.

3              VERITEXT CONCIERGE:  One moment.

4              MR. WALSH:  It's called advanced

5         Market Analysis and HBU course

6         handbook.

7              VERITEXT CONCIERGE:  I see that.

8         One moment, please.  It's taking an

9         extra second.  Apologies.

10             MR. WALSH:  It's a bit of a large

11        file.

12             THE WITNESS:  Yes, it is.

13             VERITEXT CONCIERGE:  That might

14        explain it.

15             MR. WALSH:  And Mr. Hedden, I

16        would recommend downloading this file

17        once it is marked.

18             THE WITNESS:  Yes, sir.

19             VERITEXT CONCIERGE:  It's really

20        taking its time.  Okay, Exhibit P104

21        has been introduced.  Please refresh.

22             (Exhibit P104, Advanced Market

23        Analysis and Highest & Best Use

24        course handbook, marked for

25        identification.)

Page 111

1              H E D D E N

2   BY MR. WALSH:

3       Q.    Mr. Hedden, if you can let me

4   know once you're able to download that

5   document.

6       A.    Will do.  I see the document just

7   came up.  Now I am clicking on it and

8   downloading it.  Wow, it came up pretty

9   quick though but I will download the

10  exhibit.  Hang on a second.  Almost there.

11  I just opened the file and we are good.

12  Go ahead, sir.

13      Q.    If you could refer in part to --

14  it's page 34 of the document.  It's page

15  67 of the pdf.

16      A.    Yes, sir.

17      Q.    It's in part 2 of this book.  By

18  the way, do you recognize this document?

19      A.    Yes, sir.

20      Q.    And what is it?

21      A.    It is the handbook that I use

22  when I teach the course An Advanced Market

23  Analysis and Highest & Best Use.  And so

24  part 2, page what, sir?

25      Q.    Page 34.

Page 112

1                     HEDDEN
2          A.    Okay.
3          Q.    And it's the second page of part
4     2 after the preview.
5          A.    Page 34.  36, 34, okay, yes, sir.
6          Q.    So the first two pages of this
7     part, define market analysis, market
8     study, marketability analysis and about
9     halfway on page 34 it says, "Note, all
10    appraisal assignments to develop an
11    opinion of market value include
12    marketability analyses."
13              Do you see that?
14         A.    Yes, I do.
15         Q.    Now a moment ago you disagreed
16    with my statement that all appraisal
17    assignments to develop an opinion of
18    market include a marketability analysis;
19    right?
20         A.    Correct.  I stand corrected.  The
21    material is correct and I testified
22    incorrectly.  It's clearly market value
23    includes marketability analysis.
24         Q.    Okay.  Now, what does -- what
25    does that entail?  What is involved in

Page 113

1              HEDDEN

2    performing a marketability analysis for a

3    property?  I know you now have the course

4    materials in front of you.  I'm not asking

5    you to review the course materials and

6    summarize them.  I'd actually prefer it if

7    you could close that down and just tell me

8    what your understanding of a marketability

9    analysis is and what that entails.

10        A.    Where I got confused on my

11   earlier testimony is market study, market

12   analysis, market area, but the

13   marketability analysis basically compares

14   the subject property to your market

15   analysis.  So to the extent that you have

16   now done your supply and demand and your

17   other market analysis, you then compare

18   your subject property to that analysis to

19   understand how your property competes in

20   the marketplace.

21        Q.    Okay.  And so there's six steps

22   in the process; right?  You've got to

23   analyze property productivity first;

24   right?

25        A.    Yes.

1                         HEDDEN

2        Q.    You've got to delineate the

3    market area and the competitive market

4    area; right?

5        A.    Um-hmm, yes.

6        Q.    You've got to project or forecast

7    demand for that property; right?

8        A.    Yes.

9        Q.    You've got to measure and project

10   competitive supply; right?

11       A.    Correct.

12       Q.    You've got to calculate residual

13   demand; right?

14       A.    Yes.

15       Q.    And then you've got to project

16   subject capture; right?

17       A.    Correct.

18       Q.    And so the market analysis helps

19   determine the financial feasibility of a

20   specific use; right?

21       A.    Yes.

22       Q.    So in order to understand the

23   financial feasibility of a specific use,

24   you have to conduct a marketability

25   analysis; right?

1                    HEDDEN

2        A.    Yes.

3        Q.    And that involves understanding

4   the supply and demand for this particular

5   use in this particular location; right?

6        A.    That's correct.

7        Q.    Okay.  And a use cannot be

8   financially feasible if it's not

9   appropriately supported by the market;

10  right?

11       A.    Correct.

12       Q.    So how does an appraiser

13  determine if the market exhibits

14  appropriate support for a specific use of

15  a property?

16       A.    Well, there are two methods one

17  could use, there's an inferred method for

18  less complex and simple assignments and

19  there's a fundamental method which is used

20  for more complicated or problematic

21  properties.  And those are the two

22  so-called methods that one can use in

23  determining the market analysis.

24       Q.    So which method did Tom Tener

25  use?

1                    HEDDEN

2        A.   I am not knowledgeable as to

3    which method he used.

4        Q.   Why not?

5        A.   It was not alluded to in his

6    testimony, nor was it in his work papers

7    and it was not in his appraisal report.

8        Q.   But you determined that his

9    conclusions were credible and reliable;

10   right?

11       A.   Yes.

12       Q.   So how did you do that if you

13   don't understand how he conducted a

14   marketability analysis to determine if the

15   use was financially feasible?

16       A.   Mr. Tener's expertise in the

17   market, coupled with the fact that he is

18   knowledgeable of this market area and

19   given the complexity of the problem to

20   arrive at a ground rent using the

21   methodologies prescribed in the lease

22   would not necessitate the more complex

23   marketability study that you've alluded

24   to.  What is inferred, meaning relying

25   upon his knowledge of the market coupled

1                    HEDDEN

2    with historical information and the

3    information that he has available to him

4    led him to the conclusion that it was

5    financially feasible based upon his expert

6    opinion.  So it was -- I am allowed to

7    then render my conclusion as to his

8    credibility, relying upon his knowledge of

9    the marketplace and his expertise and his

10   conclusion that in his residual analysis

11   that is, his hypothetical analysis was

12   feasible.

13       Q.   You've only worked with Tom Tener

14   once before; isn't that right?

15       A.   Correct.

16       Q.   So what is your understanding --

17   what is the basis for your belief that he

18   has a special expertise in this

19   marketplace?

20       A.   Having been practicing in the

21   New York market and been in this business

22   for 40 years, knowing the Tener name is

23   associated with KTR, knowing his

24   colleagues, Theresa Nygard and others in

25   the firm, they have a very highly regarded

1                    HEDDEN

2    reputation.  And it's my opinion that

3    based upon looking at his résumé and

4    having met him briefly in the assignment

5    that we spoke of a couple years ago, that

6    it would be his learned opinion that it's

7    financially feasible under this

8    hypothetical construct to prepare the

9    residual analysis that he did, and that's

10   the basis for my conclusion.

11       Q.   So you believe that he's an

12   expert and he concluded it was financially

13   feasible so therefore you concluded he

14   must be right?

15            MR. KOH:  Objection.  Go ahead.

16            THE WITNESS:  I concluded that

17       based on the intended use and the

18       intended user and for the purposes

19       this appraisal was being prepared that

20       the analysis that he did under a

21       hypothetical construct being

22       hypothetical nature and a land

23       residual analysis that was conducted

24       did not lead me to a conclusion that

25       his conclusion of the appropriate

```
 1                    HEDDEN
 2        ground rent was not credible.  In
 3        other words, it was credible,
 4        notwithstanding the lack of, quote,
 5        marketability analysis, that may not
 6        have been included in his work papers
 7        in his calculation of the residual
 8        analysis.  So my belief is that he
 9        believes that it was credible or
10        possible and feasible and therefore I
11        accepted his conclusion.
12   BY MR. WALSH:
13        Q.    Do you agree that current sales
14   and leasing activity can indicate the
15   strength of a market?
16        A.    Yes.
17        Q.    And do you agree that if an
18   appraiser is considering the financial
19   feasibility of a vacant site for retail
20   use, the market should be investigated for
21   recent sales of unimproved properties to
22   end users for that purpose?
23        A.    Yes, it would be helpful, yes.
24        Q.    And what does it suggest to you
25   if there are no such sales for that
```

```
                                          Page 120
 1                      HEDDEN
 2    purpose?
 3         A.    That the demand for such purpose
 4    is lacking.
 5         Q.    Okay.  Are you aware of any sales
 6    of vacant sites for a retail use in this
 7    specific market or comparable markets?
 8         A.    Yes.
 9         Q.    Where?
10         A.    There are two transactions that I
11    can think of that came to light while I
12    was doing work on another matter that
13    involved the development in Staten Island
14    of a Lydell grocery store that is going to
15    be positioned in a location that's
16    confidential.  But in light of that, I
17    came upon two transactions, one in
18    Brooklyn, one in Queens, of a knockdown of
19    a funeral home and an adjoining property
20    and the development of a Flanigan, Raymour
21    & Flanigan furniture store with parking
22    beneath.  And then I came across another
23    knockdown of a facility and the
24    development of a health club fitness
25    center.  I believe it's in Queens.  So
```

1                    HEDDEN

2     these types of transactions do occur and

3     so to be specific to your question, yes, I

4     am knowledgeable in two situations where

5     for specific type of destination users

6     like a furniture store and a fitness

7     center, these types of redevelopment occur

8     -- these redevelopment types of properties

9     do occur.

10         Q.    Okay.  Were any of those

11    identified in any of the work papers that

12    you reviewed of Tom Tener's?

13         A.    No.

14         Q.    Do you know if he identified any

15    sales of properties for an intended retail

16    use?

17         A.    I am not aware.

18         Q.    So if Tom Tener had not

19    identified any such sales, wouldn't he

20    have concluded that there was not

21    sufficient demand for this specific use?

22              MR. KOH:  Objection.  Go ahead

23         and answer.

24              THE WITNESS:  The analysis that

25         you allude to in Mr. Tener's work is a

1                    HEDDEN

2          hypothetical.  It's clearly prepared

3          to accommodate this request to produce

4          an additional method where it said

5          shall in the work papers -- excuse me,

6          in the lease addendum shall prepare a

7          residual analysis under these

8          hypothetical constructs and given the

9          existing zoning, he's limited in his

10         ability to ultimately opine to the

11         highest and best use of this site.

12         This construct that he prepares in

13         terms of its retail use and

14         feasibility is an interim use and not

15         the highest and best use.  So

16         therefore, the detailed market

17         analysis or demand analysis or

18         whatever is really secondary because

19         he doesn't give it a lot of weight

20         ultimately in his conclusion.  It's a

21         supported check against the standard

22         appraisal approach which is the sales

23         comparison and -- or sales of other

24         properties, and therefore, it was of

25         no matter to me relative to the

Page 123

1                        HEDDEN
2           complexity of his analysis but the
3           fact that it wasn't necessary to come
4           to my conclusion that Mr. Tener's
5           ultimate conclusion is credible and
6           for the intended use and consistent
7           with the lease language, so it's of no
8           mind to me.
9     BY MR. WALSH:
10          Q.   What specific work are you aware
11    of that Mr. Tener did to determine if
12    there was a demand at this specific
13    property for a 21,500 square foot retail
14    building?
15          A.   I am not aware of any analysis he
16    may have done specific to your fact
17    pattern in your question.
18               MR. WALSH:  Okay.  So we've been
19          going for about an hour and 25.  If we
20          could just take maybe a five,
21          10-minute break.
22               THE WITNESS:  I'm fine with that.
23               THE VIDEOGRAPHER:  The time is
24          2:39 p.m. and we're going off the
25          record.

Page 124

1                    HEDDEN
2           (Recess taken from 2:39 p.m. to
3      2:50 p.m.)
4           THE VIDEOGRAPHER:  The time is
5      2:50 p.m.  We're back on the record.
6  BY MR. WALSH:
7      Q.   Mr. Hedden, before we broke, you
8  testified that you came across some other
9  transactions in other boroughs, I believe,
10  where properties were purchased and then
11  developed for a retail use.  Do you recall
12  that?
13      A.   Yes.
14      Q.   I think you said there was one in
15  Staten Island that was for a grocery store
16  and then you said one in Brooklyn, one in
17  Queens, a knockdown of a funeral home and
18  the development of a Raymour & Flanigan
19  furniture store.  Do you recall that?
20      A.   Yes.
21      Q.   So which of those was in
22  Brooklyn?
23      A.   Raymour.
24      Q.   Where was that property?
25      A.   I don't recall.  I don't have the

Page 125

```
 1                    HEDDEN
 2   paperwork in front of me.
 3       Q.   Were the sales prices for those
 4   properties consistent with the conclusions
 5   of value that Mr. Tener determined in his
 6   July 30 report?
 7            MR. KOH:  Objection.  Go ahead.
 8            THE WITNESS:  The sales
 9       transaction prices would be irrelevant
10       to me.
11   BY MR. WALSH:
12       Q.   And why is that?
13       A.   It goes to your point earlier
14   that you were inquiring, relative to the
15   demand for these types of uses and does it
16   occur, and so whether or not the
17   transaction prices and everything else is
18   all irrelevant because the behavior of
19   buyers that are trying to get into a
20   marketplace to establish a retail use is
21   what we were discussing.  And so yes,
22   those types of events do occur and that's
23   the only reason why I mentioned those
24   transactions.
25       Q.   Okay.
```

HEDDEN

1

2     A.    It has nothing to do with the
3  price.

4     Q.    I understand you believe that the
5  price is irrelevant.  My question is were
6  those prices on a square foot basis
7  consistent with the conclusion that
8  Mr. Tener reached in his report?

9          MR. KOH:  Same objection.  Go
10      ahead.

11          THE WITNESS:  I never analyzed
12      that so I don't know.

13  BY MR. WALSH:

14     Q.    If we could go to Mr. Tener's
15  July 2019 report, that's P36.  And I'm
16  looking at page 2 of his report.  Right
17  above, there's a table that says Zoning
18  Floor Area Of The Demised Premises.  It's
19  on the page ending in 1047 Bates stamp.

20     A.    Bear with me a second.  I've got
21  to go pull that report up again.  I didn't
22  have it saved down so I have to go back to
23  the exhibit store and pull it down again,
24  I apologize.  I'll get it in a second.

25          Okay, it's up.  Hang on a second.

```
 1                    HEDDEN
 2    P36; right?
 3         Q.   Yes.  Page 2.
 4         A.   I'll download it so we don't have
 5    that delay again.  It's opening.  We're on
 6    page -- okay, Bates -- 1047.  Go ahead.
 7         Q.   Third full paragraph towards the
 8    bottom where he talks about highest and
 9    best use, he said, "Based on the subject's
10    current zoning and considering the uses
11    exhibited by recent development in the
12    immediate area, the highest and best use
13    of the subject, as if vacant, would be
14    commercial development in the portion of
15    the site zoned M1-1 and residential
16    development in the R6B zoned portion of
17    the site."
18              Do you see that?
19         A.   Yes.
20         Q.   And do you understand that
21    Mr. Tener reached that conclusion assuming
22    that the property was not encumbered by
23    the remaining 20-year term of the
24    McDonald's lease?
25         A.   Yes, I would assume, yes, that's
```

Page 128

1                    HEDDEN

2    correct.

3        Q.    Okay.  And using land sales for

4    these different -- I guess for those uses,

5    he arrived -- he then used an 8 percent

6    ground lease rate to determine the fair

7    market rental value of the property; is

8    that right?

9        A.    Yes.

10       Q.    And do you believe that that

11   portion of his analysis, meaning the 8

12   percent ground lease rate is supported by

13   adequate and relevant data?

14       A.    Yes.

15       Q.    And what is that belief based

16   upon?

17       A.    I think from the number of

18   transactions, the historical perspective

19   and the amount of information contained

20   therein was the basis of my conclusion.

21       Q.    Did you do any independent

22   research to determine if that 8 percent

23   amount was appropriate?

24       A.    No.

25       Q.    Okay.  Are you aware that 10 of

Page 129

1                          HEDDEN

2     the 39 leases that Mr. Tener used in that

3     analysis date back to the 1950s?

4          A.   Yes.

5          Q.   Okay.  And are you aware that

6     Mr. Tener did not know when those rate

7     increases were negotiated?

8          A.   I recall that was his testimony.

9          Q.   Okay.  So do you believe that

10    rates negotiated in the 1950s could be

11    relevant to determining the fair market

12    value of a property in 2019?

13         A.   Well, I think the perspective

14    that I took on that analysis or the length

15    of historic information that Mr. Tener

16    relied upon was relevant in his conclusion

17    based on the fact that it would smooth out

18    economic cycles over time and to the

19    extent that we are at historically low

20    interest rate environment and considering

21    that the conclusion would be based on the

22    future 20 years, that it was useful to

23    consider the time span and the type of use

24    in his conclusion, and that is the context

25    in which I took the longevity of the

```
                                          Page 130
 1                    HEDDEN
 2    information as relevant.
 3         Q.   Do you know when those rates were
 4    negotiated?
 5         A.   No.
 6         Q.   Is 8 percent typical or
 7    consistent with what you see in the
 8    market?
 9             MR. KOH:  Objection.  Go ahead.
10             THE WITNESS:  Given what time
11         frame?
12    BY MR. WALSH:
13         Q.   April of 2019.
14         A.   And what type of property?
15         Q.   This property.
16         A.   Okay.  So yes, I believe that the
17    fact that the data that he was using
18    coupled with my knowledge generally of
19    from reading all the different pieces of
20    information that I've read on the articles
21    and everything else, that 8 percent was
22    reasonable and that it would be subject to
23    debate between the two appraisers and the
24    third appraiser that would be selected as
25    a part of this process and so that's how
```

1                      HEDDEN

2     that conclusion Mr. Tener reached would be

3     reconciled.

4          Q.   So what specific data are you

5     aware of in the Brooklyn market that is

6     supportive of an 8 percent rate?

7          A.   When you talk about the Brooklyn

8     market, we're talking about land beneath a

9     development on a larger scale.  These

10    types of properties when they do lease and

11    when they do trade are not just relative

12    to a Brooklyn market but the larger

13    New York and even sometimes national

14    market.  So I don't think you're going to

15    tie it specifically to Brooklyn so that's

16    my position on that.

17         Q.   Are you aware of any specific

18    data that is supportive of that rate in

19    Brooklyn?

20         A.   No, not anything that was not

21    contained in the Tener report.

22         Q.   Okay.  If you had been doing this

23    analysis, what data would you have used?

24              MR. KOH:  Objection.  Go ahead.

25              THE WITNESS:  Well, I haven't

Page 132

1              HEDDEN
2        been doing this analysis and I really
3        hadn't thought about that in this
4        context so I would have to reserve on
5        that opinion.  I'm not offering that
6        opinion and, you know, so I haven't
7        thought of that so I can't answer your
8        question.
9    BY MR. WALSH:
10       Q.   But Tom used it and so you
11   believe it was appropriate because Tom
12   used it?
13       A.   Well, and given the source,
14   right, and Tom used it but it came from
15   his appraisal files and what I do know is
16   that the fact that TN alongside the
17   notations and that came from Theresa
18   Nygard and she's one of the leading
19   experts in this area of practice.  So to
20   the extent that it was in their office
21   files and that was the source, I deemed it
22   to be reliable and credible.
23       Q.   Is your conclusion that this was
24   reliable and credible based on anything
25   other than the fact that it was contained

```
1                    HEDDEN
2    in Tom and Theresa's work files?
3         A.   I would say coupled with my 40
4    years of experience in having looked at
5    ground leases and having understood what
6    parameters are used in establishing ground
7    rents in this general market area over
8    this time frame.  So again, added to their
9    work and this file comes from my years of
10   experience and knowledge as to what's a
11   reasonable parameter which ground rent
12   capitalization rates can be established.
13        Q.   Okay, but I just asked you
14   earlier what specific data you are aware
15   of that is supportive of that and you
16   couldn't identify any, can you?
17        A.   That's correct.
18        Q.   Okay.  Do you agree with
19   Mr. Tener's conclusion that there were no
20   comparable leases for him to adjust in
21   arriving at his valuation?
22        A.   I believe it's credible and
23   believable.
24        Q.   But do you agree with that
25   conclusion?
```

Page 134

1                    HEDDEN
2           MR. KOH:  Objection.  Go ahead
3       and answer.
4           THE WITNESS:  You know my role as
5       to whether or not I agree in my scope
6       of work here and what I was asked to
7       do doesn't reach me to a conclusion
8       whether I agree.  I find his
9       conclusion credible based on what I
10      have experienced or knowledgeable
11      about trying to find comparables for
12      20-year leases of this kind of
13      property in a market area.  They don't
14      exist that I'm aware of so I believe
15      him to -- I believe his conclusion is
16      credible in that regard.
17  BY MR. WALSH:
18      Q.   Do you know what Mr. Tener did to
19  determine if there were comparable leases?
20      A.   No, other than I believe he just
21  did a general investigative but I have no
22  specifics as to exactly what he did.
23      Q.   Okay.  If we could turn to page 4
24  of Mr. Tener's July 30, 2019 report.
25  Notwithstanding his statement at page 2

Page 135

1              HEDDEN

2    that the highest and best use of the

3    subject as if vacant would be commercial

4    development in the portion of the site

5    zoned M1-1 in the residential development

6    in the R6B zoned portion of the site,

7    Mr. Tener states on page 4 that the most

8    probable hypothetical improvement,

9    assuming full return on investment over a

10   20-year term, would be retail.

11            Do you see that?

12       A.   Yes.

13       Q.   And this is the interim highest

14   and best use that you were referring to

15   earlier?

16       A.   Yes.

17       Q.   By definition isn't an interim

18   highest and best use going to be less

19   valuable than the highest and best use?

20       A.   That's a difficult question to

21   answer because the interim highest and

22   best use could give you a higher present

23   value in the short term than having to

24   wait for the property to mature and to

25   achieve its final highest and best use in

1                    HEDDEN

2    the future.  The construct in this

3    assignment has made for very complicated

4    economic principles that are not easily

5    explained.  So my response is

6    traditionally you would expect the interim

7    to be a highest and best use for a short

8    period of time before the property

9    matures.  It's complicated.

10        Q.   Okay, but for a period of 20

11   years, if the highest and best use over a

12   period of 20 years is retail, wouldn't you

13   expect to see people developing properties

14   in that area for retail?

15        A.   This hypothetical construct is

16   only as a result of instruction and

17   precedent law and the situation in which

18   we find ourselves in in this confusing

19   language in a addendum ground lease.  So

20   if you stepped back, the ultimate highest

21   and best use just got approved by city

22   council last year for 170 -- Tom's

23   calculation says it could have been

24   170,000 square foot of high-rise apartment

25   and we know it got approved for 18-floor

1                    HEDDEN
2    apartment building, right, so 18-story
3    apartment building.  So the idea that
4    we're discussing this is only in this
5    hypothetical situation, otherwise
6    knowledgeable participants in this deal
7    would not think about highest and best use
8    as commercial at all.  The highest and
9    best use would be wait for it to become
10   approved under the M zoning and then
11   redevelop the site so you would be in a
12   period of abeyance for a period of years.
13   Let's just step back.  The way this was
14   crafted and the way these appraisals are
15   prepared by both sides has to be
16   reconciled by a third-party appraisal.
17   There's no easy way out of this so I'm
18   sorry I got off topic.
19            The point here is that you would
20   expect that this retail and this
21   hypothetical would -- the way it's
22   constructed would be the only way that you
23   could possibly get the return of and on at
24   a reasonable return rate would be a retail
25   property like he has hypothetically

1                        HEDDEN

2    opposed on this site.  So that is why this

3    21,500 square foot retail building appears

4    when, in fact, the calculation should have

5    been 36,000 square feet of potential FAR.

6    So it's just a hypothetical construct that

7    Mr. Tener uses in this context to satisfy

8    the requirement of valuing the property as

9    encumbered.  And I apologize for going off

10   on that long-winded answer but that's the

11   problem that you're faced here with and

12   why it's got to be solved by a third party

13   appraiser to try to pull everybody

14   together and figure out exactly which way

15   this goes.  It's not easily done.

16       Q.   Mr. Tener's report concludes that

17   the fair market rental value of the

18   property is potentially higher as

19   encumbered by the remaining 20-year term

20   of the lease than it was as not encumbered

21   by the lease; right?

22       A.   Correct.

23       Q.   And you believe that to be a

24   credible conclusion?

25       A.   It's credible in the context of

```
 1                      HEDDEN
 2    how this report is crafted and the fact
 3    pattern in which he had to follow.  He
 4    doesn't give it the greatest weight, he
 5    only calls it as a supportive check and
 6    the opinion that he reaches, which is
 7    credible, is the rent that it was given
 8    under a standard approach using sales and
 9    using a capitalization rate that is
10    credible.  So the methodology that you
11    have here is how is it higher?  Well, it's
12    higher because of the construct that he
13    uses.  He doesn't opine here, he actually
14    steps it down and was using the lower end
15    of the range and oftentimes many of his
16    conclusions in that residual analysis so
17    ultimately conservative.
18             But if you were really doing a
19    land residual you'd build it out as
20    potential zoning at 170,000 square feet
21    and then wait a couple years and then
22    develop it accordingly as willing buyer,
23    willing seller, full knowledgeable, blah,
24    blah, blah, would develop this site so
25    this is purely hypothetical and not really
```

1                    HEDDEN

2    credible in a true sense other than the

3    fact that the credible opinion, it results

4    in his final conclusion.

5         Q.    But the lease and the case law

6    required the property to be valued as

7    encumbered by the lease; right?

8         A.    Yes.

9         Q.    So what the property is worth or

10   what the fair market rental value is as

11   unencumbered by the lease is entirely

12   irrelevant to this appraisal problem,

13   isn't it?

14             MR. KOH:   Objection.  Go ahead.

15             THE WITNESS:   No.

16   BY MR. WALSH:

17        Q.    How can that be if the lease and

18   the law require the property to be valued

19   as encumbered by the 20-year term of the

20   lease?

21        A.    That's an absolute answer and

22   that would be determined either by the

23   third party or by judicial determination

24   as to exactly what is applicable here.  We

25   have Mr. Missry saying that it's not

1          HEDDEN

2    applicable here and that's to be

3    determined by others.  My point would be

4    then that the methodology that is

5    prescribed in the addenda of the lease

6    relative to this process has been followed

7    by Mr. Tener to the ability that he could

8    under the precedents that were set and he

9    put together a hypothetical to consider

10   that.  And he did.  But he opines to a

11   lower rent based on another methodology as

12   prescribed under the standard method of

13   appraising these properties.  So again

14   it's betwixt and between but it's not

15   absolute that this is the only methodology

16   to prescribe.

17        Q.    Turning back to Mr. Tener's

18   hypothetical retail improvement, you would

19   agree that for a use to be financially

20   feasible the market must exhibit

21   appropriate support for the use; right?

22        A.    Yes.

23        Q.    And a use cannot be financially

24   feasible if it is not appropriately

25   supported by the market; right?

Page 142

1                          HEDDEN

2          A.    At that moment in time but it

3     could become financially feasible in the

4     future.  It's just under current.  That

5     use now, again what we teach in the

6     course, it may not be financially feasible

7     now but if supply and demand changes over

8     time, it is in market analysis ability to

9     project it in the future, it does become

10    financially feasible.

11         Q.    If you could pull up the advanced

12    market analysis handbook again and turn to

13    page 50 in part 2.

14         A.    Page 50, part 2.  I'm glad we

15    downloaded these.  Hang on.  Page 48 part

16    2.  Measuring financial feasibility.

17         Q.    Second bullet under financial

18    feasibility.  It says, "In short, for a

19    use to be financially feasible, the market

20    must exhibit appropriate support for the

21    use.  A use cannot be financially feasible

22    if it is not appropriately supported by

23    the market."

24              So do you disagree with that

25    statement?

1                    HEDDEN

2        A.    No, I agree with it.

3        Q.    Okay.  And you would also -- and

4    you're not aware of any specific steps

5    that Mr. Tener took to determine if there

6    was demand for this specific retail use at

7    this specific property; right?

8        A.    Correct.

9        Q.    Okay.  Are you familiar with the

10   property located at 470 Vanderbilt Avenue?

11       A.    Can you be more specific?

12       Q.    So if you're standing at the

13   McDonald's restaurant and looking diagonal

14   across Vanderbilt and Atlantic so the

15   property directly diagonal to the

16   McDonald's, the opposite corner of

17   Vanderbilt and Atlantic, that is

18   470 Vanderbilt Avenue.  Are you familiar

19   with that building?

20       A.    Is it the one owned by RXR and

21   got NYSHA as a primary tenant?

22       Q.    I believe that's the one.

23       A.    I apologize the number is

24   escaping me but yes, I am familiar with

25   that office building across the street.

Page 144

1          HEDDEN
2      Q.    Are you aware that as of April
3  15, 2019, 14,895 square foot of retail
4  space located on the ground floor of that
5  building directly across the street from
6  the McDonald's had sat vacant for over six
7  years since 2015?
8      A.    I became aware of it after I
9  completed my report.
10      Q.    Okay.  What, if anything, does
11  that fact tell you about the demand for
12  large retail spaces in this specific
13  market in Brooklyn?
14      A.    Well, what it tells me is that it
15  may attract a different user than that
16  envisioned by Mr. Tener.
17      Q.    They are both for retail uses;
18  right?
19      A.    Yes.  However, retail can be
20  convenience retail, destination retail,
21  specialty retail.  Retail can be broken
22  down into many categories.
23      Q.    Well, look, I understand you're
24  doing your best to try to defend
25  Mr. Tener's work here, but doesn't the

1                    HEDDEN
2    fact that that large retail space directly
3    across the street had sat vacant for over
4    six years indicate that there may not be
5    demand for large retail spaces in this
6    specific market in Brooklyn?
7            MR. KOH:  Objection.  Brendan, we
8        can do without those kind of
9        predicates.  Go ahead and answer.
10           MR. WALSH:  I stand by my
11       question.
12           THE WITNESS:  Yes, and there
13       might be problem with that space.  It
14       may not be the right configuration.
15       It might be not suitable for say a
16       destination retailer who wants their
17       own standalone location.  There might
18       be transactionals issues, frontage
19       issues.  Again like I said,
20       configuration of the space.  There
21       might be a lot of reasons why that
22       space hasn't leased.  It could be the
23       neighboring tenant.  It could be the
24       fact that a retail doesn't want to be
25       in a building with the office

```
 1               HEDDEN
 2      occupancy as it's set up.  Just
 3      because a space sat vacant doesn't
 4      mean that you can't have a competing
 5      retail space in the market area that
 6      would attract a different user.
 7  BY MR. WALSH:
 8      Q.   Okay.  I understand that there
 9  may be hypothetical reasons.  Are you
10  aware of any specific reasons or specific
11  problems with that retail space across the
12  street?
13      A.   No, other than looking at a
14  schematic I got from CoStar to see how the
15  layout is and look at where the access
16  points are on Atlantic Avenue, other than
17  that information that was gotten from
18  public sources I have no other knowledge.
19      Q.   And so you're not aware of any
20  defects or problems with that specific
21  space, are you?
22          MR. KOH:  Objection.  Go ahead.
23          THE WITNESS:  Other than looking
24      at it as a retail expert like I am, I
25      mean I have no other knowledge other
```

1                    HEDDEN

2        than my general real estate acumen.

3    BY MR. WALSH:

4        Q.    If Mr. Tener had performed a

5    proper marketability analysis, shouldn't

6    he have identified this 15,000 square foot

7    retail space directly across the street

8    that had been vacant for six years and at

9    least investigated why that space was

10   vacant?

11       A.    Again I have no knowledge as to

12   what he investigated and what he didn't.

13   If he said so in his testimony then please

14   refresh my memory.  Whether he knew or did

15   not know, I don't know.  But to the extent

16   that bit of information would have altered

17   his opinion or my opinion, I don't believe

18   it does.

19       Q.    Okay.  You didn't answer my

20   question.  My question is:  If Mr. Tener

21   had performed a proper marketability

22   analysis, shouldn't he have identified

23   this data?

24       A.    Yes, if Mr. Tener had done a

25   detailed marketability analysis, that

1                    HEDDEN

2    property would or should have been

3    considered.

4        Q.    And are you aware --

5        A.    And accepted or rejected as

6    appropriate.

7        Q.    Are you aware of him even

8    considering it?

9        A.    I am not aware.

10       Q.    You didn't see anything in his

11   work papers about this; right?

12       A.    Correct, there was nothing in his

13   work papers.  Again, was it mentioned in

14   his deposition?  I don't recall.  If it

15   is, then it's in his deposition but I

16   don't recall.

17       Q.    Okay.  Now if this data wasn't

18   identified and you're not aware of any

19   specific reasons why it should have been

20   accepted or rejected, how can you be

21   certain that Mr. Tener's conclusion that

22   there is demand for a 21,500 square foot

23   retail space in this specific market of

24   Brooklyn at a price of a hundred dollars

25   per square foot is credible and

Page 149

1                    HEDDEN

2    reasonable?

3        A.    I think Mr. Tener identifies this

4    as a taxpayer type of location, right, so

5    when he describes his definition of the

6    retail at this location, he calls it I

7    think a taxpayer which is again a small

8    retail development.  In my eye, when he

9    talked about taxpayer, it was from my

10   perspective that he was talking about an

11   owner-occupied destination.  So obviously

12   that doesn't fit with the type of retail

13   that we've alluded to across the street.

14   So his definition of what this retail

15   building would be is not consistent with

16   the same kind of retail that you've

17   described for that other vacancy across

18   the street.  So in a marketability

19   analysis, one would have included it in

20   his calculation of supply or would have

21   excluded it for that very reason.

22       Q.    But he didn't do either; right?

23       A.    Again, I am not aware of what he

24   did or did not do in that regard.

25       Q.    Okay.  Do you know what the

```
                                      Page 150

 1                    HEDDEN
 2     asking price as of April 15, 2019 was for
 3     that 14,895 square foot retail space
 4     across the street?
 5          A.   No.
 6          Q.   Are you aware that it was -- had
 7     an asking price of $60 per square foot
 8     with modified gross lease terms?
 9          A.   No.
10          Q.   Okay.  What, if anything, did
11     that tell you about Mr. Tener's conclusion
12     that a 21,500 square foot building across
13     the street could command a rent of $100
14     per square foot?
15          A.   I have no opinion.
16          Q.   You don't have any opinion?
17          A.   No.
18          Q.   Why not?
19          A.   Because that would involve an
20     analysis that was not undertaken so it
21     would be remiss of me to offer an opinion
22     of such magnitude without having done any
23     appropriate background or research.  I
24     have no knowledge about the asking price
25     or the conditions of the lease offering.
```

                        HEDDEN

1

2      Q.    If you have not done that

3  research, how can you at the same time

4  opine that Mr. Tener's conclusion is

5  credible and reasonable?

6      A.    Mr. Tener's analysis of the

7  retail had a good number of leases in

8  there and it showed certain price points

9  for space that were used for retail and

10  Mr. Tener's opinion based upon that

11  analysis was as he's opined in his report

12  and his work papers.  So based on his

13  adequacy of the data or the amount of the

14  data that was there in his professional

15  opinion, that's his opinion.  And again,

16  based on my review of that and given the

17  context of this process and the

18  third-party appraiser as described in the

19  lease addenda would ferret out whether or

20  not it was appropriate use or appropriate

21  conclusion with their -- under their scope

22  of work.

23      Q.    What is feasibility rent?

24      A.    It's that rent necessary to

25  satisfy all the factors of production in

```
 1                        HEDDEN
 2     the development of a site.
 3          Q.    So the rent necessary to justify
 4     new construction; right?
 5          A.    Yes.
 6          Q.    And in order to calculate
 7     feasibility rent, you need to understand a
 8     lot of -- you have to have a lot of data
 9     points; right?
10          A.    Yes.
11          Q.    You need to know the site
12     preparation costs; right?
13          A.    One of the things that are
14     considered.  You need to know your
15     construction cost.
16          Q.    Entrepreneurial incentive; right?
17          A.    Depending.
18          Q.    What do you mean depending?
19          A.    Certain buildings are built with
20     entrepreneurial incentive and some
21     buildings aren't, so it depends on what
22     you assume is being constructed on the
23     site.
24          Q.    What buildings are built without
25     entrepreneurial incentive?
```

Page 153

1                        HEDDEN

2          A.    End user.

3          Q.    Okay, but whether you call it

4    entrepreneurial incentive or otherwise,

5    there needs to be some incentive for that

6    end user to build the property; right?

7          A.    Yes.

8          Q.    And so --

9          A.    Sometimes in the selling of

10   goods.  Again a special purpose like a

11   McDonald's.  You build a McDonald's and

12   then you sell hamburgers.  There's your

13   incentive is to sell product out of an

14   establishment and that's your incentive.

15         Q.    And it can't be -- in order to

16   justify the construction of a site for an

17   end user, it can't be a risky endeavor.

18   They want it to be a relatively safe

19   investment; right?

20         A.    Yes, some level of risk is there

21   but you would hope that you've analyzed

22   your risk profile enough that it's not

23   risky enough to entice equity and debt to

24   your deal.

25         Q.    And a rational developer or end

Page 154

HEDDEN

1
2     user would not pay more to build its own
3     building than it could to rent the same
4     building from somebody else that's already
5     built; right?
6         A.   It would depend upon the -- it
7     would depend upon the end user or the
8     developer, their incentive; right?  So
9     they would either rent but if they didn't
10    want to rent from somebody else but wanted
11    to own, then they would again own rather
12    than rent so it depends upon their
13    perspective.
14        Q.   Right, but let's talk about this
15    specific situation.  If we're talking
16    about a 20-year term, they would only
17    control the property for 20 years; right?
18        A.   Correct.
19        Q.   With no reversion value; right?
20        A.   Correct, unless they would
21    negotiate extensions.
22        Q.   Right.  So if we're talking about
23    a 20-year period, even though you're
24    saying how they would own the building,
25    they are renting the space for 20 years;

Page 155

1                    HEDDEN

2    right?

3         A.    Correct.

4         Q.    Okay.  And over that same 20-year

5    period, if they could rent a preexisting

6    building for a lower price, wouldn't that

7    be the rational decision for that business

8    owner?

9         A.    All other things being equal but

10   this has a unique location on a unique

11   block.  So to the extent that this affords

12   that tenant, if you will, on the ground

13   lease a competitive advantage to be

14   located at 840 Atlantic Avenue, then they

15   would opt to rent here rather than rent

16   somewhere else.

17        Q.    I'm glad you brought that up.

18   What is unique and special about this

19   particular location for a retail use?

20        A.    It's unique as part of the M1

21   zoning.  That's what makes it unique.

22   It's part of a redevelopment initiative in

23   Brooklyn under the M-Crown zoning.

24        Q.    But you just testified that this

25   property would give somebody a competitive

```
  1                    H E D D E N
  2    advantage.  Why?
  3         A.   Because of the traffic flow,
  4    because of the fact that it's on Atlantic
  5    Avenue and it's got pretty good exposure.
  6    It's a corner location, it's got dual
  7    access, it's got, you know, a couple of
  8    other benefits that would go to an
  9    occupant of this site like McDonald's is
 10    enjoying right now.
 11         Q.   So in order to be comparable,
 12    other locations that you're using to
 13    arrive at an estimated rent for the
 14    property would have to share those same
 15    characteristics; right?  Good traffic
 16    flow, good corner location; right?  Same
 17    size?
 18         A.   So repeat the question.  I
 19    understand the criteria that you've just
 20    laid out but can you explain the question
 21    or repeat it?
 22         Q.   You said that this specific site
 23    would give somebody a competitive
 24    advantage because of the traffic flow, the
 25    fact that it's on Atlantic Avenue, a
```

```
 1              HEDDEN
 2   corner location, so those are all the
 3   criteria that you would need to look at if
 4   you're looking for comps; right?
 5        A.   For a hypothetical retail use;
 6   correct.
 7        Q.   Okay.  And the comps that
 8   Mr. Tener used in his analysis to arrive
 9   at the hundred dollars rent per square
10   foot, do they share those characteristics?
11        A.   I'm not aware.
12        Q.   Did you do any research to
13   determine whether they do?
14        A.   No.
15        Q.   And if they don't share those
16   characteristics, are they appropriate
17   comps?
18            MR. KOH:  Objection.  Go ahead.
19            THE WITNESS:  They are
20        appropriate to the extent they have
21        led Mr. Tener to the conclusion of the
22        rent that he opines to for the subject
23        property.  So in that context, they
24        are appropriate because they took
25        Mr. Tener to his ultimate conclusion
```

1                    HEDDEN

2       which I found to be credible.

3    BY MR. WALSH:

4       Q.    Okay.  So if Mr. Tener had come

5    across a property in Juneau, Alaska that

6    he believed was comparable, would you be

7    satisfied that that is, in fact, an

8    appropriate comp for Mr. Tener to use in

9    his analysis of fair market rent for this

10   property?

11           MR. KOH:  Objection.  Go ahead.

12           THE WITNESS:  If I was hired as

13       the third-party appraisal and looked

14       at this with the scope of work that it

15       would have included, scrubbing the

16       data like you're inferring, then I

17       probably would have under that

18       hypothetical you've just laid out, no,

19       I would definitely say it's not

20       appropriate and get it out of your

21       report.

22   BY MR. WALSH:

23       Q.    Okay.  So did you do that here?

24       A.    No.

25       Q.    Why not?

1          HEDDEN

2      A.   I wasn't asked to do that.  My

3   role here is to opine as to the inside the

4   four corners of his report, inside his

5   work papers, to determine whether or not

6   he fulfilled the requirements under USPAP

7   in terms of checking the boxes for typical

8   USPAP compliance and to interpret the

9   lease agreement to see if Mr. Tener's

10  appraisal report complied with those

11  issues and then to opine as to whether or

12  not the ultimate conclusion was credible

13  based on the document, the information

14  contained therein and to permit the

15  appraisal process to go forward in the

16  selection of a third appraiser, and then

17  that's basically the extent of my

18  involvement and the root of my expert

19  report.

20      Q.   So are you saying that you

21  approached this differently than you would

22  have approached it if you had been hired

23  as the third independent appraiser?

24      A.   Yes, I think that's clear in the

25  way my report is written and it's totally

1                    HEDDEN

2    transparent as to my role and scope of

3    work in this matter.

4        Q.   Are you aware of any business

5    that would build the hypothetical

6    improvement at the cost estimated by

7    Mr. Tener and at the rent that they would

8    be required to pay in order to build that

9    building?

10       A.   No, I do not know of any

11   developer because again, the way you

12   phrase that question would have assumed

13   that there was a third-party developer or

14   investor building a building for someone

15   else.  So I don't know anybody that would

16   be in that market.

17       Q.   My question did not ask for that

18   assumption.  My question is:  Are you

19   aware of any business that would construct

20   a building on that property for its own

21   use, paying the rent Mr. Tener assumes

22   they would have to pay, and paying the

23   construction costs they would have to pay,

24   are you aware of any business that would

25   do that?

```
                                        Page 161
 1                    HEDDEN
 2        A.    So when you -- I'm sorry, just
 3     for clarification, when you said rent,
 4     you're talking about a ground rent, not
 5     rent to rent the building, that's where
 6     the confusion lies.
 7        Q.    You're not aware of any business
 8     that would take that risk?
 9        A.    That is correct.  I have not done
10     that investigation to determine if there
11     was an actual user that would take that
12     risk.
13        Q.    Okay.  And you're also not aware
14     if Mr. Tener did that analysis; right?
15        A.    Correct.
16        Q.    Now in estimating construction
17     costs, Mr. Tener relied entirely on cost
18     data contained in Marshall & Swift;
19     correct?
20        A.    Yes.
21        Q.    Do you recall what class of
22     construction Mr. Tener assumed for his
23     hypothetical improvement?
24        A.    I believe it was a wood frame
25     with a masonry basement, a class C, what
```

Page 162

1                    HEDDEN

2    they call class C or masonry, with a

3    framed construction, upper level.  I

4    believe that's my best recollection

5    without looking at the work papers.

6         Q.   So Mr. Tener testified that he

7    assumed a low cost class D construction.

8    Do you recall that?

9         A.   Yes, that is my recollection.

10        Q.   Are you aware of any low cost

11   class D buildings that had been built in

12   Brooklyn within the past 20 years?

13        A.   No.

14        Q.   Okay.  Does that -- does the

15   absence of any construction of low cost

16   class D buildings lead you to any

17   conclusions about the reasonableness of

18   assuming cost of construction using low

19   cost class D buildings by Mr. Tener?

20        A.   I mean that was his assumption.

21   That was his hypothetical construct that

22   he uses in this analysis and it took him

23   to the conclusion for the residual

24   analysis that he so opined.

25        Q.   What data are you aware of that

1              HEDDEN

2    leads you to believe that it was credible

3    and reasonable for Mr. Tener to use low

4    cost class D construction costs in his

5    analysis?

6         A.   Well, to the extent that it's a

7    hypothetical and it was clearly a

8    construct made for this scope of work that

9    he was fulfilling in terms of going

10   through a land residual process under a

11   certain hypothetical situation, I felt

12   that it was -- comes to a conclusion which

13   exceeds the other approach and the

14   standard approach that he uses.  And so

15   therefore he says that he gives it as a

16   supportive check so therefore I paid it no

17   mind and left it to the third-party

18   appraisal to figure out.

19        Q.   Well, but you concluded that his

20   analysis was credible and reasonable;

21   right?

22        A.   Correct.

23        Q.   And so in order for you to reach

24   that conclusion, wouldn't the assumptions

25   that he made have to be credible and

```
 1                    HEDDEN
 2    reasonable?
 3         A.    Yes.
 4         Q.    Okay.  So what data did you rely
 5    on in order to conclude that it was
 6    credible and reasonable to assume low cost
 7    class D construction costs?
 8         A.    Well, to the extent that you can
 9    do it in Marshall's valuation service and
10    he uses and he recites the book and page
11    and the multipliers and the like and that
12    was his assumption in his hypothetical
13    that that could be done.  So I don't have
14    any independent knowledge of that but to
15    the extent that he pulled it from a
16    credible source and referenced it
17    accordingly and the fact that he applied
18    the appropriate multipliers for location
19    and for time led me to the conclusion that
20    overall his technique and his method was
21    credible.
22         Q.    Okay.  What --
23         A.    I don't have an opinion as to the
24    result.  I mean I wasn't asked to have any
25    independent valuation opinions here so I
```

```
 1                      HEDDEN
 2    don't have an opinion as to other than the
 3    fact that the material was credible.
 4         Q.   Okay.  So you're not aware of any
 5    data supporting a demand for a 21,500
 6    square foot retail building at this
 7    property; right?
 8         A.   It could have been smaller, it
 9    could have been higher.  I have no idea
10    because again his analysis is only to use
11    that commercial zoning area that was
12    permitted under the commercial zone.  It's
13    clearly a hypothetical construct on his
14    part.  I'm not aware of anything else.
15         Q.   Okay.  I'd like you to listen to
16    my question and answer my question.
17              You're not aware of any data
18    supporting demand for a 21,500 square foot
19    retail building at this property; right?
20         A.   I personally am not aware, no.
21         Q.   And you're not aware of any data
22    supporting demand for a low cost class D
23    building at this property; right?
24         A.   That's correct, I am not.
25         Q.   Okay, are you aware of any data
```

1                    HEDDEN

2    supporting Mr. Tener's conclusion that an

3    end user would pay a hundred dollars per

4    square foot for low cost class D

5    construction at this site?

6         A.   I don't believe Mr. Tener

7    concluded to a hundred dollars a square

8    foot.  My recollection is that he used a

9    rent at the lower end of the scale after

10   an allowance for expenses closer to the

11   70- or $80 a foot.  I don't believe it was

12   a hundred.

13        Q.   Whatever number he used, are you

14   aware of any data supporting his

15   conclusion that an end user would pay

16   whatever price he estimated for low cost

17   class D construction at this site?

18             MR. KOH:  Objection.  Go ahead.

19             THE WITNESS:  Other than the

20        market data that was contained within

21        his lease analysis, which he opines

22        and concludes, no, the information I

23        relied on was contained in his

24        workbooks.

25   ///

Page 167

1               HEDDEN

2    BY MR. WALSH:

3         Q.    Okay.   Mr. Tener estimated

4    construction costs to be $117 per square

5    foot of above grade retail area.   Are you

6    aware of any other construction in

7    New York City within the past 10 years

8    that has been this low?

9         A.    No, I am not.

10        Q.    So what have you been seeing over

11   the past 10 years for retail buildings?

12        A.    I have no opinion as I haven't

13   done the research, I don't recall.   I have

14   no opinion as to what I've been seeing

15   because I haven't seen anything like this

16   in recent years.

17        Q.    So you have no basis to determine

18   whether that amount is reasonable or

19   unreasonable; right?

20        A.    I have a basis to believe that

21   Marshall valuation said it could be

22   constructed based on using cost manuals.

23   That's what I have a belief in.

24        Q.    But you're not aware of any low

25   cost class D construction in New York in

```
                                      Page 168
 1                   HEDDEN
 2    the past 10 or 20 years, are you?
 3            MR. KOH:  Objection.  Go ahead.
 4            THE WITNESS:  I personally do
 5        not, no.  I'm sure that if you scoured
 6        the market you'd find something
 7        somewhere but I don't have any
 8        personal knowledge of that.
 9    BY MR. WALSH:
10        Q.   Why are you sure that if you
11    scoured the market somewhere you'd find
12    it?
13        A.   Because there's always a
14    possibility.  It's like you find it
15    somewhere.  To the extent that you have a
16    frame infill construction somewhere in
17    some neighborhood within the boroughs of
18    New York, it's very possible that there's
19    an infill retail project somewhere where
20    somebody built a frame building and was
21    able to achieve a cost commensurate with
22    Marshall valuation.  They use Marshall
23    valuation based on actual case studies so
24    if it can be done and it can be shown in
25    the manuals then it can be accomplished.
```

Page 169

1                    HEDDEN

2     Where, I haven't the slightest idea.

3          Q.    Now, Mr. Tener conceded at his

4     deposition that the construction estimate

5     does not account for either the cost of

6     the interior build-out or an HVAC system.

7     Shouldn't he have considered these

8     additional costs since a tenant would need

9     to pay those costs?

10         A.    Not necessarily, no.

11         Q.    Why?

12         A.    That comes from the negotiation

13    between the landlord and the tenant.  The

14    tenant would obviously factor that in

15    their occupancy costs but as a return for

16    the building and the land and with a

17    retail work letter sometimes are called

18    tenant improvements, the tenant only gets

19    a box, what they call in the industry a

20    vanilla box.  So therefore, any interior

21    improvement and/or oftentimes HVAC, which

22    is to be debated, is left to a tenant to

23    make their own improvements.  The landlord

24    doesn't provide that.

25         Q.    But remember we're talking about

1              HEDDEN

2    an end user.  Remember?  We're not talking

3    about a tenant.  We're talking about a

4    business building its own building; right?

5         A.    Correct.

6         Q.    So in that case shouldn't that

7    cost have been considered since whoever is

8    building this building would need to pay

9    those costs in order to make the building

10   usable?

11            MR. KOH:  Objection.

12            THE WITNESS:  You're right and

13        then they would build it into the

14        amortized cost over the 20-year period

15        in which they occupy the building.

16        And like any other retail user,

17        oftentimes costs are amortized over

18        that time of period based on their own

19        tenant improvements and taken on their

20        taxes accordingly.

21   BY MR. WALSH:

22        Q.    But Mr. Tener did not consider

23   those costs in his analysis; right?

24        A.    Correct.

25        Q.    But he should have; right?

1                    HEDDEN

2       A.    No, I don't agree.

3       Q.    How is it credible for him to

4    have ignored these costs?  Can you explain

5    that to me?

6       A.    Mr. Tener's model was based on

7    just a return on and return of a cost

8    incurred to develop the frame building and

9    the basement as he has alluded to in his

10   model and that's how his analysis was

11   conducted.  Costs over and above that,

12   which under your hypothetical would be

13   borne by the tenant, are outside of his

14   work -- his model.

15      Q.    Wouldn't those costs be necessary

16   to understand if the project is

17   financially feasible for someone over a

18   period of 20 years?

19      A.    Well, based on our hypothetical

20   conversation, now we're talking about an

21   owner/user and they would make a

22   determination as to whether it was

23   feasible based on the number of widgets

24   they could sell from that site.  They have

25   their own occupancy costs and they would

Page 172

1           HEDDEN
2    make their own determination as to
3    feasibility and whether or not their total
4    occupancy costs would be supported by
5    their retail operation.
6        Q.    Right.  But they would need to
7    know what those costs are to make the
8    determination whether it's financially
9    feasible; right?
10            MR. KOH:  Objection.
11            THE WITNESS:  They would need
12        that calculation.
13   BY MR. WALSH:
14       Q.    So how is it credible to ignore
15   those if they have to be considered?
16       A.    You're on the other side of the
17   equation.  This side of the equation is
18   from a landlord's perspective or again a
19   typical frame building that gets you to a
20   certain point in time.  Your hypothetical
21   then adds to additional costs that the
22   tenant would reconcile but that's not
23   necessary to be considered by Mr. Tener.
24   It's not part of his calculation.
25       Q.    Okay.  If we can flip to

```
 1                      HEDDEN
 2    paragraph 46 of your report.
 3        A.   Okay.
 4        Q.   And you write, "Appraisers enjoy
 5    broad discretion in deciding which factors
 6    are relevant to a particular valuation
 7    problem and how such factors impact the
 8    valuation, absent an agreement expressly
 9    requiring or precluding consideration of
10    such factors."
11             What do you mean by this
12    statement?
13        A.   Well, this statement was taken
14    from the Sevelka article that is footnoted
15    below so the -- what I mean by it is
16    exactly as it states is that they have
17    broad discretion is to -- and it goes
18    right to our previous conversation, that
19    is, Mr. Tener enjoyed broad discretion in
20    figuring out what factors were relevant in
21    the particular valuation problem and how
22    they impact the valuation.  So absent an
23    agreement expressly requiring or
24    precluding consideration of such factors.
25    So the lease was silent in terms of
```

HEDDEN

1
2    instruction to the appraiser, then
3    therefore he's got broad discretion on how
4    he calculated or what factors he uses in
5    his residual analysis or more reaching, in
6    a sales comparison analysis to the extent
7    there were no comparable leases.  So that
8    is what this statement goes to and
9    that's -- that which was in the article
10   that was in the appraisal journal by
11   Mr. Sevelka.
12        Q.    Appraisers do not enjoy
13   unfettered discretion; right?
14        A.    No, they do not.
15        Q.    Their conclusions must still be
16   reasonable and credible; right?
17        A.    They must be worthy of belief or
18   credible under the definition set forth in
19   USPAP.
20        Q.    Have you ever determined that
21   another appraiser's conclusions were not
22   reasonable or credible?
23        A.    Yes.
24        Q.    Okay.  So what were the
25   circumstances of those?  Just explain to

HEDDEN

me what it takes for an appraiser to abuse their discretion.

A. Well, based upon using methodologies that are bastardized or incorrectly applied in the valuation of properties. It could be appraisal adjustments that are double counted, it could be income approaches that are not reflective again in use of the expense ratios, leaving information out, leaving information in so more of an active -- we're going to say -- it's not coming to me -- a covert act of bad behavior which I have rendered those kinds of opinions in the past during some of my other appraisal reviews for bank loans in other litigation cases.

Q. But sometimes an appraiser's conclusions can be so unreasonable that their valuation is unreliable, right, and not credible?

A. Yes.

Q. In paragraph 59 of your report, you say, "USPAP makes clear that the goal

```
 1                      HEDDEN
 2   of its standards is not perfection but
 3   rather to ensure a level of competence and
 4   quality in the appraisal and appraisal
 5   review process to promote credible
 6   results."
 7             Your own report is governed by
 8   USPAP; right?
 9       A.   Yes.
10       Q.   And so your own results must be
11   credible and reasonable; right?
12       A.   Yes.
13       Q.   Okay.  How can your results be
14   credible or reasonable if you did not
15   conduct your own research to test the data
16   used by Mr. Tener in the conclusions he
17   reached from that data?
18       A.   Because again another article
19   that we go on in the next section, you're
20   under appraisal reviews.  I don't inject
21   my own biases or my own opinions as to
22   what I believe to be the value in this
23   scope of work or in the intended use for
24   users or the appraisal processes outlined
25   in that addendum to this ground lease.  So
```

1              HEDDEN

2     it's very focused and very transparent as

3     to exactly what my role was here and as

4     defined under USPAP.  So therefore, my

5     conclusion is consistent with USPAP and is

6     credible based upon the situation and the

7     scope that I was asked to opine on.  If I

8     were in the third-party appraiser, or if I

9     had a different role or was asked to

10    accomplish a different task, then I would

11    have a different expert report but I'm

12    not, and therefore, my conclusion is such

13    that I find in this context that it was

14    prepared, it's credible and believable and

15    therefore the third-party appraiser could

16    be then so selected and the process can

17    move forward.  I mean it's that simple.

18         Q.   So I want you to assume for a

19    moment that you were appointed as the

20    third independent appraiser for this

21    assignment.  What critiques or criticisms

22    would you have about Tom Tener's report if

23    you had been appointed as the third

24    appraiser?

25              MR. KOH:  Objection.  Answer if

Page 178

1                           HEDDEN

2         you can.

3               THE WITNESS:  I have no opinion

4         in that regard because I've never done

5         that type of analysis where I've been

6         asked to render that kind of opinion.

7         So that opinion won't be evidenced in

8         this matter and hypothetically I think

9         that I would probably pull both

10        appraisers together and have

11        criticisms on both sides and try to

12        reconcile between the two as to what

13        was a reasonable middle ground, if you

14        will, that both parties could agree

15        to.

16    BY MR. WALSH:

17        Q.   Now, how do you --

18        A.   That's how I would be as a

19    third-party appraiser, as a reconciler of

20    the various opinions if it so could be

21    reached.  The language here is very

22    confusing.  The lease itself is the one

23    that's caused this inconsistency between

24    the two appraisers and the ability to

25    ascertain a highest and best use based on

Page 179

```
 1                      HEDDEN
 2     the definitions set up in the lease
 3     agreement.
 4         Q.   So you believe that the language
 5     of the lease is what has caused the
 6     appraisers to arrive at different
 7     conclusions of value?
 8             MR. KOH:  Objection.  Go ahead.
 9             THE WITNESS:  I think it's vague.
10         I think it's caused the -- again as I
11         see in other situations, it's the
12         language in the lease agreement that
13         allows the appraisers to -- allows,
14         but which is not clear enough for them
15         to dictate exactly how this -- and so
16         that's where that prior reference to
17         discretion, there's broad discretion
18         on how appraisers approach these
19         problems and so that's reason why I
20         believe that the situation you find
21         yourself in has caused a vast
22         discrepancies in the values.
23     BY MR. WALSH:
24         Q.   What language in the lease caused
25     these problems?
```

1                     HEDDEN

2        A.    It could have been more

3    prescriptive.   It said use a standard

4    approach.   It said comparable leases when

5    there are no comparable leases for 20-year

6    terms.

7        Q.    Let's stop there.   How do you

8    know that there are no comparable leases

9    for 20-year terms?

10       A.    Well, if you read the articles by

11   Sevelka or others, trying to find leases

12   for a 20-year term that trade in the

13   marketplace is very complicated.

14       Q.    Are you aware that Sharon

15   Locatell identified more than a dozen

16   comparable leases for a period of around

17   20 years?

18       A.    Well, were they for highest and

19   best use as can be constructed here on the

20   subject property?   That's where we're

21   going, right, the highest and best use

22   conclusion.   So to the extent that she

23   found leases, were they, in fact,

24   comparable.

25       Q.    Let's talk about that, right,

```
                                    Page 181
 1                  H E D D E N
 2   because you're saying that you testified a
 3   moment ago that the difference in
 4   valuation was caused by vague language in
 5   the lease.  Are you now saying that the
 6   difference in value was caused by
 7   different highest and best use
 8   conclusions?
 9            MR. KOH:  Objection.  Go ahead.
10            THE WITNESS:  Yes.
11   BY MR. WALSH:
12       Q.   So which is it, is it vague
13   language in the lease or different highest
14   and best use conclusions?
15            MR. KOH:  Objection.
16            THE WITNESS:  It's a combination.
17   BY MR. WALSH:
18       Q.   Okay.  So when you reviewed
19   Sharon's report, you said you didn't read
20   the whole thing, you read it quickly;
21   right?
22       A.   Yeah, I only focused on the
23   highest and best use.
24       Q.   And what highest and best use did
25   she conclude was appropriate?
```

```
                                        Page 182
 1                   HEDDEN
 2        A.   Well, my recollection was that it
 3   was for a pad site.
 4        Q.   And did you -- and that's a big
 5   deal, right, because a different highest
 6   and best use could dramatically change the
 7   value of the property; right?
 8        A.   I think I testified to that
 9   earlier, yes.
10        Q.   Okay.  So what did you do to
11   conclude that Sharon's highest and best
12   use of a pad site was not credible or
13   reasonable?
14             MR. KOH:  Objection.
15             THE WITNESS:  I don't have that
16        opinion.
17   BY MR. WALSH:
18        Q.   So you testified before that a
19   property can't have two highest and best
20   uses; right?  Understanding at least -- I
21   understand that sometimes there could be
22   an interim highest and best use but let's
23   put that aside for a second.  There's got
24   to be one highest and best use; right?
25             MR. KOH:  Objection.
```

```
                                          Page 183

 1                    HEDDEN
 2           THE WITNESS:  Yes, I think we've
 3      talked about that the highest and best
 4      use there is one.
 5   BY MR. WALSH:
 6      Q.   So one of them is wrong; right?
 7      A.   It's possible that both are
 8   wrong.
 9      Q.   Did you consider the fact that
10   Sharon may be right in her analysis or did
11   you not even consider that possibility?
12      A.   Based on the fact pattern that I
13   have before me of the zoning, of the
14   M-Crown potentials for the future and
15   given the location of this property, I did
16   not believe that the highest and best use
17   was anything different than that concluded
18   by Mr. Tener.
19      Q.   So it's your opinion that
20   Sharon's -- Sharon Locatell's highest and
21   best use conclusion is incorrect?
22      A.   Again, I don't have that opinion.
23   I just believe that Mr. Tener's conclusion
24   is correct.
25      Q.   Okay.  But you didn't review
```

```
 1                    HEDDEN
 2   Ms. Locatell's report in any detail or her
 3   work papers; right?
 4        A.    That is correct.
 5             MR. WALSH:  We're getting close
 6        to wrapping up.  May we take a
 7        five-minute break?
 8             MR. KOH:  Yeah, that's fine.  You
 9        say you're close to wrapping up?
10             MR. WALSH:  Yeah, probably within
11        a half hour I'd say.
12             MR. KOH:  Okay, that's useful for
13        me to know, thank you.
14             MR. WALSH:  No promises but
15        that's what I think.
16             THE WITNESS:  What time do you
17        want me back?
18             MR. WALSH:  Why don't we come
19        back at 4:10.  We'll make it eight
20        minutes.
21             THE VIDEOGRAPHER:  The time is
22        4:02 p.m.  We're going off the record.
23             (Recess taken from 4:03 p.m. to
24        4:13 p.m.)
25             THE VIDEOGRAPHER:  The time is
```

```
 1                      HEDDEN
 2        4:13 p.m.  We're back on the record.
 3   BY MR. WALSH:
 4        Q.    Okay.  Mr. Hedden, do you recall
 5   Mr. Tener confirming at his deposition
 6   that he made multiple requests for a copy
 7   of the November 30, 2017 ground lease
 8   between Vanderbilt Atlantic Holdings and
 9   MMB Associates but that it was never
10   provided to him?
11        A.    Yes.
12        Q.    Okay.  And have you had an
13   opportunity to review that lease?
14        A.    Yes.
15        Q.    And you were given an opportunity
16   to review that lease before you issued
17   your expert opinion; right?
18        A.    Yes.
19        Q.    Did you review that lease before
20   you issued your expert opinion?
21        A.    I did.
22        Q.    So are you aware the lease
23   provides that if McDonald's were to leave
24   the property and the zoning remained the
25   same as it was in April 2019, Vanderbilt's
```

1                    HEDDEN

2    annual rent to MMB Associates would be

3    $360,000 per year?

4         A.   Yes, I believe without the zoning

5    change.

6         Q.   Correct.  So under current

7    zoning, if McDonald's were to leave the

8    property, Vanderbilt's annual rent to MMB

9    Associates would be $360,000 per year;

10   right?

11        A.   Yes, that's my recollection based

12   on your representation.  That seems to be

13   right.

14        Q.   Okay.  Are you aware that the

15   936 Second Avenue case requires in this

16   case existing zoning to be considered in

17   the analysis?

18             MR. KOH:  Objection.  Go ahead

19        and answer.

20             THE WITNESS:  I believe that to

21        be the case.

22   BY MR. WALSH:

23        Q.   Okay.  Wasn't this a highly

24   relevant data point for Mr. Tener to be

25   aware of?

Page 187

1                        HEDDEN
2          A.    Only if it was deemed to be
3     between unrelated parties.  So I would
4     believe that it is relevant information
5     unless it's not deemed to be arm's length.
6          Q.    So let me -- I think -- I just
7     want to make sure the record is clear that
8     you believe it would be relevant
9     information unless it's deemed to be not
10    arm's length?
11         A.    To rephrase, if it is not an
12    arm's length transaction, then it is not
13    relevant.
14         Q.    Right.  But if it was an arm's
15    length transaction, it would be relevant?
16              MR. KOH:  Objection.  Go ahead.
17              THE WITNESS:  Yes.  Yes, that is
18         true.
19    BY MR. WALSH:
20         Q.    Do you know whether this was an
21    arm's length transaction?
22         A.    Based upon the -- I'm going to
23    call it an organizational chart, based on
24    the participants in the underlying
25    landlord relationship of the ownership of

```
 1                    HEDDEN
 2    that site, I did not in my looking at it
 3    consider this to be an arm's length
 4    relationship between the parties.
 5         Q.   Okay.  Do you know if those
 6    organizational relationships that you're
 7    referring to existed at the time that
 8    lease was negotiated?
 9              MR. KOH:  Objection.  Go ahead.
10              THE WITNESS:  I do not know the
11         timing of those relationships and when
12         they were initiated.
13    BY MR. WALSH:
14         Q.   Okay.  Now if you were told that
15    it was two parties negotiating with each
16    other, right, with both parties clearly on
17    opposite sides of the table, right, no --
18    nobody is straddling both sides.  If there
19    were two parties on either side of the
20    table negotiating that, would that be an
21    arm's length transaction?
22         A.   So to focus on the word "arm's
23    length" we mean unrelated parties.  There
24    are no financial or relationship
25    interconnections between the parties,
```

1                    HEDDEN
2    right, they are totally separate from each
3    other and there is no relationships,
4    financial or otherwise?  Is that what
5    we're saying is arm's length?
6        Q.   You're the one that introduced
7    that term so I'm just trying to understand
8    what we're talking about here.
9        A.   I believe based on my review of
10   the information that was given to me, both
11   in terms of the exhibits and from the
12   depositions, there is an interrelationship
13   between the parties on that lease
14   agreement, right, so between the landlord
15   and the tenant in that lease that you're
16   alluding to, they are somewhat financially
17   related.
18       Q.   And so does that automatically
19   disqualify this lease from having any
20   relevance in the analysis, that one fact?
21       A.   Well, I think also the relevant
22   fact in that lease is that the parties
23   recognize the likelihood that -- or the
24   possibility that the property could
25   achieve a rezoning and there would be a

Page 190

1                    HEDDEN
2    significant amount of rent increase in the
3    event they were successful in pursuing a
4    rent -- a zoning change that would permit
5    a higher and better use.  So that
6    consideration I felt relevant in the
7    conclusion of the highest and best use of
8    this property.
9        Q.   Well, shouldn't Vanderbilt have
10   provided this lease to Mr. Tener and let
11   him dig into it and sort of understand
12   those relationships and give him an
13   opportunity to explore it?
14           MR. KOH:   Objection.  Go ahead.
15           THE WITNESS:   Notwithstanding
16       their providing that document or not,
17       Mr. Tener was performing under the
18       USPAP requirement to request it and he
19       is within his rights to move forward
20       with his report if it's not provided.
21       He did what he could have done to
22       request the lease and if it was not
23       provided, then it does not prohibit
24       Mr. Tener from reaching his opinion as
25       to the market value or the market rent

```
 1                       HEDDEN
 2        value of this property.
 3   BY MR. WALSH:
 4        Q.    Okay.  So any faults for not
 5   providing it would land at the feet of
 6   Vanderbilt, right, and not Mr. Tener?
 7             MR. KOH:  Objection.  Go ahead.
 8             THE WITNESS:  That's correct.
 9             MR. WALSH:  Okay, I think I'm
10        just about done.  If I could just have
11        five minutes just to make sure that
12        I'm done and hopefully when I come
13        back I'll have nothing more than a
14        couple minutes, if anything.
15             THE VIDEOGRAPHER:  Okay.  The
16        time is 4:22 p.m.  We're going off the
17        record.
18             (Recess taken from 4:22 p.m. to
19        4:24 p.m.)
20             THE VIDEOGRAPHER:  The time is
21        4:24 p.m.  We're back on the record.
22             MR. WALSH:  Mr. Hedden, thank you
23        very much for coming today and
24        cooperating.  I don't have any further
25        questions for you at this time.
```

Page 192

1                    **HEDDEN**

2            THE WITNESS:  Thank you.

3            MR. KOH:  Thank you, Michael.

4            THE VIDEOGRAPHER:  The time is

5       4:25 p.m.  We're going off the record.

6            (Time noted:  4:25 p.m.)

7

8

9

10    _____

11    MICHAEL P. HEDDEN

12

13    Subscribed and sworn to before me

14    this ___ day of _____, 2022.

15

16    _____

17    Notary Public

18

19

20

21

22

23

24

25

Page 193

1

2                C E R T I F I C A T E

3     STATE OF NEW YORK      )

4                            : ss.

5     COUNTY OF NASSAU       )

6

7          I, CATHI IRISH, a Registered

8     Professional Reporter, Certified Realtime

9     Reporter, and Notary Public within and for

10    the State of New York, do hereby certify:

11         That MICHAEL P. HEDDEN, the witness

12    whose deposition is hereinbefore set

13    forth, was duly sworn by me and that such

14    deposition is a true record of the

15    testimony given by the witness.

16         I further certify that I am not

17    related to any of the parties to this

18    action by blood or marriage, and that I am

19    in no way interested in the outcome of

20    this matter.

21         IN WITNESS WHEREOF, I have hereunto

22    set my hand this 22nd day of January,

23    2022.

24

      _____

25              CATHI IRISH, RPR, CRR, CLVS

Page 194

1

2     --------------- I N D E X ---------------

3     WITNESS                 EXAMINATION BY      PAGE

4     MICHAEL P. HEDDEN   MR. WALSH            5

5

6

7     --------------- EXHIBITS ---------------

8     EXHIBIT NUMBER      DESCRIPTION        PAGE

9     Exhibit P103, expert report of          42

10    Michael P. Hedden

11    Exhibit P104, Advanced Market          110

12    Analysis and Highest & Best Use

13    course handbook

14

15

16

17

18

19

20

21

22

23

24

25

Page 195

```
1              ** ERRATA SHEET **
2    CASE: MCDONALD'S vs. VANDERBILT
     DEPOSITION DATE: 1/20/2022
3    DEPONENT: MICHAEL P. HEDDEN
4    PAGE LINE(S)   CHANGE              REASON
5    ____|_____|_____|_____
6    ____|_____|_____|_____
7    ____|_____|_____|_____
8    ____|_____|_____|_____
9    ____|_____|_____|_____
10   ____|_____|_____|_____
11   ____|_____|_____|_____
12   ____|_____|_____|_____
13   ____|_____|_____|_____
14   ____|_____|_____|_____
15   ____|_____|_____|_____
16   ____|_____|_____|_____
17   ____|_____|_____|_____
18   ____|_____|_____|_____
19   ____|_____|_____|_____
20
21                    _____
                       MICHAEL P. HEDDEN
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS _____ DAY OF _____, 20___.
24
     _____    _____
25   (NOTARY PUBLIC)         MY COMMISSION EXPIRES:
```

**[& - 59]**                                                                 Page 1

## &

**&**   3:12 5:7 40:10
40:18 87:6 110:23
111:23 120:21
124:18 161:18
194:12

## 0

**06471**   1:7
**07601**   3:8

## 1

**1**   21:11 89:5
**1,078,400**   50:17
**1/20/2022**   195:2
**10**   24:15,19 31:9
36:25 37:6,20
38:7 78:22 83:11
123:21 128:25
167:7,11 168:2
**100**   32:3 37:10
150:13
**10017**   3:16
**102**   61:4
**103**   42:19
**1046**   68:21
**1047**   126:19 127:6
**110**   194:11
**117**   167:4
**11:08**   2:9 4:4
**12**   10:20 43:6 44:9
**125**   3:14
**12:30**   42:14 63:25
**12:31**   64:12,14
**13**   87:4,23
**14,895**   144:3 150:3
**15**   31:10 54:19
83:11 87:25 88:8
89:2 100:18 101:4
102:7 103:3 144:3
150:2

**15,000**   147:6
**170**   136:22
**170,000**   136:24
139:20
**18**   20:13 43:15
136:25 137:2
**1950s**   129:3,10
**1976**   13:24
**1978**   17:23
**1985**   17:18
**1988**   14:13
**1992**   15:12
**1996**   25:17
**1998**   14:7
**1:15**   64:10
**1:19**   1:7 65:3,7

## 2

**2**   77:24 89:6
111:17,24 112:4
126:16 127:3
134:25 142:13,14
142:16
**20**   1:15 2:8 4:4
22:2 34:18 36:12
36:21 37:3,23
43:11 57:14 58:14
59:5,8 65:19,23,24
83:11 127:23
129:22 134:12
135:10 136:10,12
138:19 140:19
154:16,17,23,25
155:4 162:12
168:2 170:14
171:18 180:5,9,12
180:17 195:23
**200**   3:7
**2002**   16:9 36:13
**2008**   25:16
**2010**   32:22

**2012**   32:23,24
**2015**   144:7
**2017**   20:12 30:13
32:24 185:7
**2019**   20:4 50:10
67:8 68:6 87:25
88:8,9,15 126:15
129:12 130:13
134:24 144:3
150:2 185:25
**2020**   11:9,11
**2021**   10:20 27:25
28:8 38:19 43:6
74:24 75:8
**2022**   1:15 2:8 4:4
192:14 193:23
**21**   3:6
**21,500**   123:13
138:3 148:22
150:12 165:5,18
**22nd**   193:22
**23**   66:2 67:3 76:21
77:24
**25**   6:6 22:2 34:18
65:18 123:19
**2700**   14:9
**2:39**   123:24 124:2
**2:50**   124:3,5

## 3

**3**   51:3,10 59:23
89:9 93:9
**30**   10:5 25:2 34:11
34:14 50:9 67:8
88:9,15 125:6
134:24 185:7
**300,000**   49:12,14
**34**   111:14,25 112:5
112:5,9
**35**   104:24
**36**   112:5

**36,000**   138:5
**360,000**   186:3,9
**39**   129:2

## 4

**4**   50:15 78:12
134:23 135:7
**40**   25:2 33:14
34:11,14 43:25
93:11 117:22
133:3
**400,000**   49:13,14
51:4,10
**41**   94:5
**42**   194:9
**42nd**   83:7
**43**   16:22
**45**   10:5 64:5 93:9
93:11
**46**   173:2
**46th**   30:17
**470**   143:10,18
**47th**   30:18
**48**   142:15
**4:02**   184:22
**4:03**   184:23
**4:10**   184:19
**4:13**   184:24 185:2
**4:22**   191:16,18
**4:24**   191:19,21
**4:25**   192:5,6
**4:30**   78:12,12 83:9

## 5

**5**   194:4
**50**   31:3 33:12,12
33:15 142:13,14
**50/50**   65:23
**5027**   193:24
**59**   175:24

Case 1:19-cv-06471-DLI-ST   Document 62-32   Filed 06/24/22   Page 198 of 232 PageID #: 3828

**6**

**60** 24:23 33:12 150:7
**67** 111:15

**7**

**70** 24:23 166:11
**75** 34:19
**7th** 3:15

**8**

**8** 43:23 128:5,11 128:22 130:6,21 131:6
**80** 34:19 166:11
**840** 38:13 39:9,20 48:23 50:10 80:10 85:24 86:9,13,24 155:14

**9**

**90** 28:14
**936** 25:15 57:2 186:15

**a**

**a.m.** 2:9 4:4
**aa** 61:12
**aaron** 3:24 45:2
**abeyance** 137:12
**ability** 73:15 83:2 96:22 103:14 108:15 122:10 141:7 142:8 178:24
**able** 7:21 51:6 71:20 84:14 111:4 168:21
**absence** 162:15
**absent** 173:8,22
**absolute** 140:21 141:15

**abuse** 175:2
**accepted** 119:11 148:5,20
**access** 69:9 146:15 156:7
**accommodate** 7:16 122:3
**accomplish** 177:10
**accomplished** 168:25
**account** 169:5
**accurate** 7:22
**achieve** 135:25 168:21 189:25
**act** 175:14
**action** 4:15 193:18
**active** 175:12
**activities** 70:21
**activity** 80:22 119:14
**actual** 161:11 168:23
**acumen** 147:2
**added** 133:8
**addenda** 72:24 141:5 151:19
**addendum** 10:15 52:21 53:24 62:23 93:6 94:7,10,20,25 97:15 122:6 136:19 176:25
**addition** 43:21 76:4
**additional** 44:10 69:4 74:16 75:24 103:17,22 122:4 169:8 172:21
**address** 26:19 59:20
**adds** 172:21

**adequacy** 151:13
**adequate** 89:5,16 89:19 95:13 98:19 98:23 128:13
**adequately** 105:22
**adjective** 108:3
**adjoining** 120:19
**adjust** 133:20
**adjusted** 92:6,7 95:8 96:24
**adjusting** 96:6 97:20,21
**adjustment** 98:6
**adjustments** 92:8 95:10 175:8
**administration** 13:22
**advanced** 19:9 20:5,11 110:4,22 111:22 142:11 194:11
**advantage** 155:13 156:2,24
**advising** 58:5
**advisory** 37:11
**affiliate** 21:5
**affiliated** 20:15 21:12
**affiliations** 4:19
**affords** 155:11
**afternoon** 83:10
**ago** 112:15 118:5 181:3
**agree** 56:10 90:23 98:22 109:17 119:13,17 133:18 133:24 134:5,8 141:19 143:2 171:2 178:14
**agreed** 12:21

**agreement** 41:6 88:18,21 94:9 159:9 173:8,23 179:3,12 189:14
**ahead** 26:15 54:9 73:7 79:5 86:14 90:14 96:8 97:25 99:18 111:12 118:15 121:22 125:7 126:10 127:6 130:9 131:24 134:2 140:14 145:9 146:22 157:18 158:11 166:18 168:3 179:8 181:9 186:18 187:16 188:9 190:14 191:7
**alaska** 158:5
**aliases** 13:14
**allowance** 166:10
**allowed** 73:24 103:13 117:6
**allows** 179:13,13
**allude** 121:25
**alluded** 102:14 116:5,23 149:13 171:9
**alluding** 189:16
**alongside** 80:14 82:18 132:16
**alter** 107:5
**altered** 147:16
**alvarez** 3:10
**amanda** 3:24 45:2
**american** 15:2 36:9 95:15
**amortized** 170:14 170:17

[amount - appropriately]

**amount** 37:5
104:16 128:19,23
151:13 167:18
190:2
**amovitz** 3:25
**analyses** 89:9
100:11 101:16
112:12
**analysis** 19:8,23
27:2 46:9 49:8
60:20 66:6 70:4
70:20 71:17,21
73:6,9 88:12,19,22
92:14 94:13 98:6
98:7 101:8 104:2
104:3 106:3,10,21
107:24 108:10,11
108:13 109:4,6,6,8
109:12,20 110:5
110:23 111:23
112:7,8,18,23
113:2,9,12,13,15
113:17,18 114:18
114:25 115:23
116:14 117:10,11
118:9,20,23 119:5
119:8 121:24
122:7,17,17 123:2
123:15 128:11
129:3,14 131:23
132:2 139:16
142:8,12 147:5,22
147:25 149:19
150:20 151:6,11
157:8 158:9
161:14 162:22,24
163:5,20 165:10
166:21 170:23
171:10 174:5,6
178:5 183:10
186:17 189:20

194:12
**analyze** 94:16
113:23
**analyzed** 107:5
126:11 153:21
**announced** 25:22
**annual** 186:2,8
**answer** 6:14,16,18
7:8,9,12 25:25
26:15 49:3 52:8
54:10 55:8 73:8
96:9 121:23 132:7
134:3 135:21
138:10 140:21
145:9 147:19
165:16 177:25
186:19
**answers** 103:22
**anybody** 160:15
**apartment** 38:4
136:24 137:2,3
**apologies** 110:9
**apologize** 126:24
138:9 143:23
**apostrophe** 66:14
**appeals** 25:14
**appearance** 4:22
23:10
**appearances** 4:18
**appeared** 22:18
24:8
**appearing** 2:13
**appears** 138:3
**applicability** 57:2
**applicable** 56:10
57:7 58:3 140:24
141:2
**applied** 164:17
175:6
**applies** 98:23

**apply** 27:4 58:3
**appointed** 177:19
177:23
**appraisal** 15:2
17:8,9,11,15,20
18:3,4,7,16,18,22
18:25 19:3,6,7,16
19:20 20:16 21:7
26:8 27:9,9,15,17
36:10,22 39:10
41:3 69:3 71:14
75:23 87:9 88:5
89:6 91:20,25
96:15 99:13,24
103:21 107:14
109:18 112:10,16
116:7 118:19
122:22 132:15
137:16 140:12
158:13 159:10,15
163:18 174:10
175:7,16 176:4,4
176:20,24
**appraisals** 21:25
27:5 53:11 137:14
**appraise** 15:18
**appraiser** 11:23
12:4,16 15:10,11
17:25 18:17 25:6
25:10 26:4,13
39:14 53:3 54:20
57:20 58:8 66:14
70:13,25 77:8
91:14 96:21 97:6
97:16 102:8
103:15 104:10
106:12 115:12
119:18 130:24
138:13 151:18
159:16,23 174:2
175:2 177:8,15,20

177:24 178:19
**appraiser's** 66:8
66:12,16 69:5,18
70:9,23 75:25
76:25 77:2 103:14
105:25 174:21
175:19
**appraisers** 17:13
53:10,20 54:13,25
58:18 94:21 95:5
95:16 96:3 98:15
102:6,9 103:13
104:11 130:23
173:4 174:12
178:10,24 179:6
179:13,18
**appraising** 141:13
**approach** 19:14
92:12 94:13 95:3
96:14,16 97:7,17
97:24 98:13
122:22 139:8
163:13,14 179:18
180:4
**approached**
159:21,22
**approaches** 175:9
**appropriate** 89:8
89:11 91:22 92:8
92:16 99:15 100:2
100:12 101:9,17
102:18 115:14
118:25 128:23
132:11 141:21
142:20 148:6
150:23 151:20,20
157:16,20,24
158:8,20 164:18
181:25
**appropriately**
92:5,6 95:8 115:9

141:24 142:22
**approval** 103:19
**approved** 136:21
  136:25 137:10
**approximately**
  24:16 30:19 33:9
  36:21 65:17
**april** 87:25 88:8
  130:13 144:2
  150:2 185:25
**arbitration** 23:25
  24:7,8,10
**arbitrations** 23:23
**area** 57:25 62:7
  80:11 86:8,23
  109:15 113:12
  114:3,4 116:18
  126:18 127:12
  132:19 133:7
  134:13 136:14
  146:5 165:11
  167:5
**arm's** 187:5,10,12
  187:14,21 188:3
  188:21,22 189:5
**arr** 89:4
**arrive** 116:20
  156:13 157:8
  179:6
**arrived** 52:4 128:5
**arriving** 59:17
  100:6 102:24
  133:21
**art** 88:4
**article** 173:14
  174:9 176:18
**articles** 130:20
  180:10
**ascertain** 178:25
**aside** 60:13 182:23

**asked** 13:13 39:12
  46:13 48:16 51:17
  87:2 133:13 134:6
  159:2 164:24
  177:7,9 178:6
**asking** 37:21
  40:16 113:4 150:2
  150:7,24
**aspect** 56:15
**asset** 61:24
**assignment** 27:10
  29:18 31:23 41:3
  51:25 52:12 53:4
  118:4 136:3
  177:21
**assignments** 22:25
  31:15 33:8 37:18
  51:22 109:18
  112:10,17 115:18
**assistance** 76:13
**associate** 17:21
**associated** 17:25
  117:23
**associates** 14:25
  185:9 186:2,9
**association** 4:12
**assume** 6:17 87:19
  127:25 152:22
  164:6 177:18
**assumed** 32:13
  35:10 160:12
  161:22 162:7
**assumes** 160:21
**assuming** 62:8
  127:21 135:9
  162:18
**assumption**
  160:18 162:20
  164:12
**assumptions** 41:25
  163:24

**astoria** 30:2,5
**atlantic** 1:7 4:8 5:8
  38:13 39:9,20
  48:23 50:10 78:15
  78:19 80:10 81:3
  81:21 84:7 85:8
  85:12,21,24 86:9
  86:13,24 143:14
  143:17 146:16
  155:14 156:4,25
  185:8
**attached** 18:20
**attend** 13:10
**attendance** 8:14
**attendant** 29:9
**attended** 13:17
**attention** 40:19
**attorney** 4:23 5:2
  7:5 102:3
**attorneys** 3:5,13
  40:9,17,20
**attract** 144:15
  146:6
**author** 76:10
**authored** 10:21
**authoritatively**
  50:22 87:3
**authorization**
  99:10
**authorize** 98:14
  99:6
**authorized** 96:3
**automatically**
  189:18
**available** 63:8
  95:14 98:20,24
  117:3
**avenue** 3:14 25:15
  30:17 38:14 39:10
  39:20 48:23 50:10
  57:3 80:10 81:4

81:13,14,19 82:9
83:14,15,24 85:12
85:21,24 86:10,13
86:24 143:10,18
146:16 155:14
156:5,25 186:15
**aware** 47:3 120:5
  121:17 123:10,15
  128:25 129:5
  131:5,17 133:14
  134:14 143:4
  144:2,8 146:10,19
  148:4,7,9,18
  149:23 150:6
  157:11 160:4,19
  160:24 161:7,13
  162:10,25 165:4
  165:14,17,20,21
  165:25 166:14
  167:6,24 180:14
  185:22 186:14,25

| b |
|---|

**b** 36:10
**baby** 83:10 93:16
**back** 17:22 24:6
  36:7,12 37:21,25
  38:7 43:9 59:22
  65:7 69:21 76:20
  78:17,18 100:15
  100:22 124:5
  126:22 129:3
  136:20 137:13
  141:17 184:17,19
  185:2 191:13,21
**background** 8:12
  150:23
**bad** 175:14
**bank** 28:15 175:17
**bankruptcy** 22:18
  33:24

**barclay** 78:19
81:24 84:8,10
**barred** 24:14
**base** 16:5
**based** 28:3 52:16
53:22 73:22 75:18
88:16 91:12 92:7
92:15 102:19
106:19 117:5
118:3,17 127:9
128:15 129:17,21
132:24 134:9
141:11 151:10,12
151:16 159:13
167:22 168:23
170:18 171:6,19
171:23 175:4
177:6 178:25
183:12 186:11
187:22,23 189:9
**basement** 161:25
171:9
**basic** 20:6,7
**basically** 18:21
48:18 102:23
113:13 159:17
**basis** 16:11 19:9
44:13 101:22
106:6,7 117:17
118:10 126:6
128:20 167:17,20
**bastardized** 175:5
**bates** 68:20 126:19
127:6
**bear** 28:19 74:2
93:8 100:24
107:25 126:20
**began** 21:19
**beginning** 4:22
**behalf** 11:24 12:12
12:19 38:3,3 41:3

44:22 58:19
**behavior** 70:17
125:18 175:14
**belief** 52:16 53:18
117:17 119:8
128:15 167:23
174:17
**believable** 133:23
177:14
**believe** 12:15
16:11 17:18 23:21
35:12 36:13 38:15
44:21 49:11 59:7
71:11 78:10 88:10
88:23 90:3 91:9
93:6 95:25 96:12
106:24 107:20,21
118:11 120:25
124:9 126:4
128:10 129:9
130:16 132:11
133:22 134:14,15
134:20 138:23
143:22 147:17
161:24 162:4
163:2 166:6,11
167:20 176:22
179:4,20 183:16
183:23 186:4,20
187:4,8 189:9
**believed** 90:8
158:6
**believes** 91:4
119:9
**beneath** 39:8
120:22 131:8
**benefits** 156:8
**best** 7:21 15:12
17:18 19:7,24
20:9,13 22:20
35:6 37:2 45:18

49:13,15 54:15
55:12,16,19 56:4,6
80:23 82:4,5,13,18
84:16,17 92:4,13
96:20 97:3,9
100:8 105:3,7,13
105:18 106:2,8,10
106:15,21,23
107:6,9,16,21,22
108:2,4,5,7 109:8
110:23 111:23
122:11,15 127:9
127:12 135:2,14
135:18,19,22,25
136:7,11,21 137:7
137:9 144:24
162:4 178:25
180:19,21 181:7
181:14,23,24
182:6,11,19,22,24
183:3,16,21 190:7
194:12
**better** 190:5
**betwixt** 141:14
**biases** 176:21
**big** 182:4
**bikes** 80:14 82:17
**bills** 69:24 77:18
**bit** 29:3 59:21
63:24 87:8 110:10
147:16
**blah** 139:23,24,24
**block** 85:20
155:11
**blocks** 85:3,3,24
**blood** 193:18
**board** 18:11
**boerum** 79:12,17
**book** 111:17
164:10

**borne** 171:13
**boroughs** 14:15,18
21:3 31:6,7,18
32:11 34:13 35:11
35:15 36:5,17,19
36:24 37:3,14,19
124:9 168:17
**bottom** 68:17 93:5
93:5 127:8
**boundaries** 20:18
**boundary** 20:24
**box** 8:12 169:19
169:20
**boxes** 159:7
**bracketed** 92:9
**break** 7:10,13
42:17 64:2 74:14
123:21 184:7
**breaks** 7:14
**brendan** 3:9 4:25
145:7
**bridgeport** 13:16
13:16,20
**briefly** 25:8 55:10
118:4
**broad** 173:5,17,19
174:3 179:17
**broke** 65:10 124:7
**broken** 144:21
**broker** 16:21,25
17:6 21:9
**brooklyn** 15:7
22:19 32:4 34:22
37:7,11,24 38:5,14
39:21 50:11 79:9
79:11,14,16 86:13
86:22 120:18
124:16,22 131:5,7
131:12,15,19
144:13 145:6
148:24 155:23

162:12
**brought** 60:18
 155:17
**bucket** 61:17
**build** 139:19 153:6
 153:11 154:2
 160:5,8 169:6
 170:13
**building** 80:7
 81:22 83:16,18
 123:14 137:2,3
 138:3 143:19,25
 144:5 145:25
 149:15 150:12
 154:3,4,24 155:6
 160:9,14,14,20
 161:5 165:6,19,23
 168:20 169:16
 170:4,4,8,8,9,15
 171:8 172:19
**buildings** 152:19
 152:21,24 162:11
 162:16,19 167:11
**built** 152:19,24
 154:5 162:11
 168:20
**bulk** 28:14
**bullet** 59:23
 142:17
**burgers** 80:18
**business** 13:21
 117:21 155:7
 160:4,19,24 161:7
 170:4
**businesses** 85:20
**busy** 80:19
**button** 93:19
**buyer** 139:22
**buyers** 125:19

**c**

**c** 3:2 5:10 36:10
 65:4 161:25 162:2
 193:2,2
**calculate** 98:15
 114:12 152:6
**calculated** 174:4
**calculation** 106:25
 119:7 136:23
 138:4 149:20
 172:12,24
**calculations** 66:10
 67:19 107:7
**call** 9:20,23 10:4
 68:3 153:3 162:2
 169:19 187:23
**called** 5:10 11:18
 20:8,8 54:18,20
 104:5 110:4
 115:22 169:17
**calls** 139:5 149:6
**capacity** 24:25
**capitalization**
 19:14,15 133:12
 139:9
**captioned** 43:12
**capture** 114:16
**car** 82:18
**career** 21:8 22:14
 37:2
**carol** 47:22
**carriages** 83:10
**case** 10:22 23:5,15
 23:20,21 27:19
 30:3 33:23 35:12
 35:24 39:16 46:18
 46:19 48:7 56:8
 56:11,18 57:3
 60:23 63:15 87:15
 140:5 168:23
 170:6 186:15,16

186:21 195:2
**cases** 25:20,22
 26:4,7,12 27:15
 31:5 56:8,18
 175:18
**cash** 32:5
**categories** 43:16
 144:22
**cathi** 1:20 2:14
 4:12 64:7 193:7
 193:25
**caused** 178:23
 179:5,10,21,24
 181:4,6
**causes** 54:16
**cautioned** 68:25
**cbiz** 16:8 36:10,14
 37:25 38:6
**center** 78:20 81:24
 84:8,10 120:25
 121:7
**certain** 32:5 46:25
 72:16 73:5 90:24
 148:21 151:8
 152:19 163:11
 172:20
**certainty** 73:25
 74:5,5
**certification** 17:12
 104:15
**certified** 2:16
 15:17,25 16:13,17
 18:17 19:4,5,10
 193:8
**certify** 193:10,16
**challenge** 91:16
**chance** 42:24
**change** 182:6
 186:5 190:4 195:4
**changes** 142:7

**chapter** 17:20
 18:10,12 20:3,16
 20:18,21 21:6,10
 21:11,12,13,14
**characteristics**
 156:15 157:10,16
**characterized**
 57:5
**charge** 7:14
**chart** 187:23
**chats** 9:3
**check** 122:21
 139:5 163:16
**checking** 159:7
**chelsea** 3:21 42:4
 49:21
**circumstances**
 174:25
**cited** 27:16 56:9
 56:19
**city** 11:24 12:3,12
 12:19 14:3,15,18
 14:24 20:2 21:3
 21:15 24:9 31:6
 37:16 136:21
 167:7
**claim** 32:2
**clarification** 161:3
**class** 19:24 20:5,6
 20:7,11 100:9
 161:21,25 162:2,7
 162:11,16,19
 163:4 164:7
 165:22 166:4,17
 167:25
**clear** 24:10 48:13
 108:8 159:24
 175:25 179:14
 187:7
**clearly** 112:22
 122:2 163:7

**[clearly - confirm]**

165:13 188:16
click 43:3
clicking 111:7
client 58:5 68:25
clients 101:25,25
close 82:2 90:17
  113:7 184:5,9
closer 166:10
closure 80:21
club 120:24
clvs 1:20 193:25
collaborate 102:10
colleagues 117:24
collection 70:18
  70:22
college 13:11
combination
  181:16
come 62:5 91:8
  93:15 104:20
  108:20 123:3
  158:4 184:18
  191:12
comes 35:24 38:6
  133:9 163:12
  169:12
comfortable 6:8
coming 36:25
  50:13 55:18 80:18
  100:22,23 102:21
  175:13 191:23
command 150:13
commensurate
  168:21
commercial
  127:14 135:3
  137:8 165:11,12
commission
  195:25
comp 158:8

companies 33:18
comparability
  91:17 96:25
comparable 71:20
  72:3,11,13 86:22
  90:9,13,17,20 91:5
  94:18 95:7,13,20
  95:22 96:6,18,19
  96:19,23,25 97:2
  97:18,20,22 98:23
  120:7 133:20
  134:19 156:11
  158:6 174:7 180:4
  180:5,8,16,24
comparables 70:4
  70:18,19 71:3,7,16
  90:7 91:2 92:3,5
  97:8 106:13,20
  134:11
comparative 98:7
  98:20
compare 113:17
compared 108:16
compares 113:13
comparing 52:24
  96:6
comparison 92:2
  94:12 96:16 97:6
  97:17,23 98:4,9
  122:23 174:6
compete 108:15
competence 176:3
competency
  104:12
competes 113:19
competing 107:2,3
  107:4,4,18 146:4
competitive 114:3
  114:10 155:13,25
  156:23

compilation 70:2
complete 67:7,11
  69:9 71:13 72:15
  73:5,6,10 75:13
completed 144:9
complex 115:18
  116:22
complexity 116:19
  123:2
compliance 52:19
  62:22,23,25 159:8
complicated
  115:20 136:3,9
  180:13
complied 159:10
compound 75:4
comprehensive
  72:21
comps 70:13,25
  71:24 90:24 157:4
  157:7,17
computer 60:8
conceded 169:3
concept 57:18
concierge 3:21
  42:7 49:23 50:3,6
  92:22 93:17 110:3
  110:7,13,19
conclude 164:5
  181:25 182:11
concluded 118:12
  118:13,16 121:20
  163:19 166:7
  183:17
concludes 138:16
  166:22
conclusion 49:7
  50:14 54:15 55:5
  55:12 70:5 73:16
  74:6 91:8,10,16
  92:9 102:19,22

103:24 106:2,16
108:21,23 117:4,7
117:10 118:10,24
118:25 119:11
122:20 123:4,5
126:7 127:21
128:20 129:16,21
129:24 131:2
132:23 133:19,25
134:7,9,15 138:24
140:4 148:21
150:11 151:4,21
157:21,25 159:12
162:23 163:12,24
164:19 166:2,15
177:5,12 180:22
183:21,23 190:7
conclusions 12:21
  69:2 72:17 75:22
  89:10 90:24
  100:12 101:9,17
  103:5 116:9 125:4
  139:16 162:17
  174:15,21 175:20
  176:16 179:7
  181:8,14
conditions 150:25
conduct 88:4
  89:24 114:24
  176:15
conducted 53:22
  66:6 77:25 116:13
  118:23 171:11
conducting 76:17
confidential 29:24
  120:16
configuration
  145:14,20
confirm 76:7
  87:20

[confirmed - court]                                      Page 8

confirmed   66:9
confirming   185:5
conflict   57:8
conflicting   97:5,15
confused   99:19
  113:10
confusing   75:5
  136:18 178:22
confusion   161:6
congested   80:19
connecticut   13:16
connection   10:21
  74:3 77:10
consensus   58:22
conservative
  139:17
conservatively   6:6
consider   54:2
  59:19 74:18,25
  75:9 86:22 129:23
  141:9 170:22
  183:9,11 188:3
consideration   59:7
  173:9,24 190:6
considered   26:22
  26:25 43:13,18,21
  44:10 55:4 57:15
  58:15 59:12 60:20
  61:15 67:20 71:17
  76:6 77:9 97:23
  103:21 148:3
  152:14 169:7
  170:7 172:15,23
  186:16
considering   63:13
  63:19 119:18
  127:10 129:20
  148:8
consist   78:14
consistent   52:21
  96:20 97:3,8

100:7 106:14
  123:6 125:4 126:7
  130:7 149:15
  177:5
constitute   99:10
construct   118:8,21
  122:12 136:2,15
  138:6 139:12
  160:19 162:21
  163:8 165:13
constructed
  137:22 152:22
  167:22 180:19
construction
  107:11 152:4,15
  153:16 160:23
  161:16,22 162:3,7
  162:15,18 163:4
  164:7 166:5,17
  167:4,6,25 168:16
  169:4
constructs   122:8
consult   76:16
consulting   15:3
  30:11 32:17 33:7
contacted   38:12
  38:22,23
contain   70:19,24
  77:7
contained   43:22
  47:13 48:19 62:14
  68:2 69:18 72:18
  74:9 76:24 77:15
  102:16 104:17,22
  128:19 131:21
  132:25 159:14
  161:18 166:20,23
contains   44:4 89:5
  89:16,18
contaminated
  35:18,22

context   34:3 63:21
  89:13 101:12
  102:13 129:24
  132:4 138:7,25
  151:17 157:23
  177:13
continue   65:13
  74:4
continued   65:8
  92:11
control   154:17
convenience
  144:20
conversation   9:17
  171:20 173:18
conversations   9:3
  39:5
conversion   38:4
convincing   72:25
cooperating
  191:24
copy   185:6
corner   143:16
  156:6,16 157:2
corners   53:15
  104:17 159:4
corporate   25:16
corporation   1:5
  4:7 5:4
correct   8:24 13:3
  27:11,22 28:5
  30:12 51:18 67:2
  69:16 72:13 74:20
  86:11 98:25
  105:20 112:20,21
  114:11,17 115:6
  115:11 117:15
  128:2 133:17
  138:22 143:8
  148:12 154:18,20
  155:3 157:6 161:9

161:15,19 163:22
  165:24 170:5,24
  183:24 184:4
  186:6 191:8
corrected   112:20
cost   152:15 160:6
  161:17 162:7,10
  162:15,18,19
  163:4 164:6
  165:22 166:4,16
  167:22,25 168:21
  169:5 170:7,14
  171:7
costar   146:14
costs   152:12
  160:23 161:17
  163:4 164:7 167:4
  169:8,9,15 170:9
  170:17,23 171:4
  171:11,15,25
  172:4,7,21
council   136:22
counsel   4:17 9:15
  9:17 32:7
counted   175:8
county   20:23,24
  22:16 193:5
couple   19:18 80:6
  118:5 139:21
  156:7 191:14
coupled   43:23
  53:16 116:17,25
  130:18 133:3
course   19:12,12
  36:11,20 108:12
  110:5,24 111:22
  113:3,5 142:6
  194:13
courses   19:2,10,15
court   1:2 4:11
  5:21 6:12,19,24

21:24 22:7,15,18
23:18 24:3 25:14
**courts** 22:5,13
**covert** 175:14
**covid** 11:8 19:25
**crafted** 137:14
139:2
**crazy** 80:17
**credibility** 47:7
48:8 52:14 53:5
54:7 62:21 63:17
117:8
**credible** 13:2
53:17 72:25 73:17
89:11 100:13
101:10,18 102:19
116:9 119:2,3,9
123:5 132:22,24
133:22 134:9,16
138:24,25 139:7
139:10 140:2,3
148:25 151:5
158:2 159:12
163:2,20,25 164:6
164:16,21 165:3
171:3 172:14
174:16,18,22
175:22 176:5,11
176:14 177:6,14
182:12
**criteria** 105:6
156:19 157:3
**criticisms** 177:21
178:11
**critiques** 177:21
**crosswalk** 80:17
82:25
**crown** 103:18
155:23 183:14
**crr** 1:20 193:25

**curious** 22:11
**current** 119:13
127:10 142:4
186:6
**currently** 14:8,9
16:17 19:6 27:20
28:12 29:25 30:3
103:11
**cv** 1:7 18:20 22:21
**cycles** 129:18

**d**

**d** 5:10,10 65:4,4
162:7,11,16,19
163:4 164:7
165:22 166:4,17
167:25 194:2
**data** 89:6,17,19
90:10 92:10 95:3
96:14 128:13
130:17 131:4,18
131:23 133:14
147:23 148:17
151:13,14 152:8
158:16 161:18
162:25 164:4
165:5,17,21,25
166:14,20 176:15
176:17 186:24
**date** 103:9,10,15
129:3 195:2
**dated** 43:6 87:25
**day** 78:8,11 80:12
192:14 193:22
195:23
**deal** 137:6 153:24
182:5
**dealing** 98:4
**deals** 48:7
**debate** 130:23
**debated** 169:22

**debt** 153:23
**deciding** 173:5
**decision** 25:17,17
155:7
**decisions** 25:14
**deed** 77:13
**deemed** 91:17
92:3 96:21,22
97:18 102:13
132:21 187:2,5,9
**defects** 146:20
**defend** 144:24
**defendant** 1:8
3:13 5:8
**defense** 63:12
**define** 112:7
**defined** 87:17
95:15 97:7,9
105:4 108:7 177:4
**definitely** 158:19
**definition** 97:10
105:13 107:17,19
135:17 149:5,14
174:18
**definitions** 179:2
**degree** 13:19,21
14:2,5
**delay** 100:22
127:5
**delineate** 114:2
**demand** 108:16,19
113:16 114:7,13
115:4 120:3
121:21 122:17
123:12 125:15
142:7 143:6
144:11 145:5
148:22 165:5,18
165:22
**demarco** 47:22

**demised** 126:18
**demonstrating** 71:22
**denise** 3:10
**depend** 154:6,7
**depending** 152:17
152:18
**depends** 152:21
154:12
**deponent** 195:3
**deposed** 5:25
**deposition** 1:12
2:11 4:5 7:25 9:8
9:16 10:9,14 45:5
45:6,11,24 46:11
46:23,24 47:9,16
47:21 48:4,11
52:18 55:24 56:3
56:13,14 66:9,12
66:16,17,18,19,23
69:14,16 72:5,20
148:14,15 169:4
185:5 193:12,14
195:2
**depositions** 189:12
**describe** 8:7 23:8
29:3 70:21 84:14
**described** 72:5
74:10 84:17
149:17 151:18
**describes** 149:5
**description** 70:3
70:17 194:8
**designation** 17:17
17:22
**destination** 121:5
144:20 145:16
149:11
**detail** 29:3 184:2
**detailed** 122:16
147:25

**details** 71:16
**determination**
23:11 25:11
140:23 171:22
172:2,8
**determinations**
103:2
**determine** 12:8
59:13 89:4,15,18
90:12,16 91:20
99:13,24 100:11
101:16 114:19
115:13 116:14
123:11 128:6,22
134:19 143:5
157:13 159:5
161:10 167:17
**determined** 91:14
94:17 116:8 125:5
140:22 141:3
174:20
**determining** 52:13
115:23 129:11
**develop** 35:21
109:18 112:10,17
139:22,24 171:8
**developed** 35:23
124:11
**developer** 12:2,18
12:19 153:25
154:8 160:11,13
**developing** 136:13
**development**
25:16 32:6 120:13
120:20,24 124:18
127:11,14,16
131:9 135:4,5
149:8 152:2
**diagonal** 143:13
143:15

**dictate** 179:15
**differ** 53:10
**difference** 51:7
55:20 181:3,6
**differences** 88:8
88:10
**different** 19:10
51:21,22 55:5
71:2,4 99:3 109:7
128:4 130:19
144:15 146:6
177:9,10,11 179:6
181:7,13 182:5
183:17
**differential** 54:12
54:18,24
**differently** 159:21
**difficult** 80:15
135:20
**dig** 190:11
**digit** 49:12
**dinner** 79:13
**direct** 83:21
**directed** 106:13
**direction** 82:12
84:2
**directly** 84:11
85:8 143:15 144:5
145:2 147:7
**directs** 7:8
**disagree** 109:22
142:24
**disagreed** 112:15
**disagreement**
56:25
**discount** 41:16,17
**discrepancies**
179:22
**discretion** 173:5
173:17,19 174:3
174:13 175:3

179:17,17
**discuss** 46:14
66:21
**discussed** 37:24
47:3
**discussing** 125:21
137:4
**discussion** 65:13
**dismiss** 62:6
**dispute** 30:10
31:21,21 41:5,9,12
**disqualified** 24:14
**disqualify** 189:19
**distracted** 22:9
**district** 1:2,3 22:7
22:17,21 41:5
**divorce** 24:8
**dli** 1:7
**dlom** 41:16
**document** 39:15
46:16 61:10 65:24
67:25 90:18 102:4
111:5,6,14,18
159:13 190:16
**documents** 10:12
10:13,21 43:15,16
44:4,10,17,20 60:3
60:12 61:13 65:11
65:15 69:13 77:13
77:18
**doing** 6:21 31:25
38:5 51:20 104:15
120:12 131:22
132:2 139:18
144:24
**dollars** 50:20 52:5
148:24 157:9
166:3,7
**double** 175:8
**download** 61:5
93:19,21 94:2

100:21,25 111:4,9
127:4
**downloaded**
142:15
**downloading**
110:16 111:8
**dozen** 36:8 180:15
**dozens** 83:5
**dramatically**
182:6
**driven** 106:20
**driving** 85:14 86:5
**drove** 78:15,15,16
81:13,14,16
**dual** 21:16,22
156:6
**duly** 5:11 193:13
**duress** 97:12
**dushinsky** 41:19

**e**

**e** 3:2,2 5:10,10,10
23:22 56:6 65:2,2
65:4,4,4 193:2,2
194:2
**earlier** 7:25 23:16
25:9 56:19 66:24
68:8 74:15 76:23
84:21 87:24 97:9
113:11 125:13
133:14 135:15
182:9
**early** 19:17 21:8
22:14 78:6 80:18
**earth** 85:16
**easily** 136:4
138:15
**eastern** 1:3
**easy** 137:17
**economic** 129:18
136:4

education 17:12
eight 37:20 184:19
either 61:16
  140:22 149:22
  154:9 169:5
  188:19
elaborated 56:13
employed 11:17
  27:21
enacted 15:13
  16:4
encumbered 26:23
  127:22 138:9,19
  138:20 140:7,19
encumbrance
  26:20 57:14 58:14
  59:5,8,11
endeavor 72:9
  153:17
ends 68:20
engaged 12:17
  29:6 39:6
engagement 38:17
  69:21
enjoy 173:4
  174:12
enjoyed 173:19
enjoying 156:10
ensure 176:3
entail 112:25
entails 113:9
entice 153:23
entirely 140:11
  161:17
entirety 45:7 46:4
  60:4 76:11
entitled 32:9 58:10
entitlement 32:5
entrepreneurial
  152:16,20,25
  153:4

entry 19:12
environment
  129:20
environmentally
  35:21
envisioned 144:16
equal 155:9
equation 172:17
  172:17
equity 153:23
errata 195:1
escaping 143:24
especially 6:20
  54:23 60:13 61:13
esq 3:9,10,17
establish 125:20
established 133:12
establishing 102:5
  133:6
establishment
  153:14
estate 16:21,25
  17:6,11,12 21:9
  28:22 29:17 32:18
  57:11 95:16 147:2
estimate 11:24
  37:2 169:4
estimated 156:13
  160:6 166:16
  167:3
estimating 161:16
ethical 104:13
evaluating 53:5
evaluations 36:16
event 190:3
events 125:22
everybody 64:9
  138:13
evidenced 178:7
exact 24:22 51:7

exactly 15:20
  21:21 51:16 56:5
  72:8 86:3 134:22
  138:14 140:24
  173:16 177:3
  179:15
examination 5:14
  65:8 194:3
examine 87:8
examined 5:12
exceeds 163:13
excel 67:14,18
  76:3
excess 108:20
excluded 24:4
  149:21
excuse 19:7 67:13
  107:3 122:5
exercise 59:3
exhibit 8:16,22
  42:9,19,20 50:6
  59:24 61:11 67:12
  68:7 93:7,20
  109:25 110:20,22
  111:10 126:23
  141:20 142:20
  194:8,9,11
exhibited 127:11
exhibits 8:18
  45:23 48:25 59:24
  61:4 66:8,17,21,22
  67:19 69:16 76:5
  77:15 87:18
  115:13 189:11
  194:7
exist 134:14
existed 188:7
existence 59:4
existing 61:20
  122:9 186:16

expanded 16:10
expect 136:6,13
  137:20
expense 175:10
expenses 166:10
experience 43:25
  133:4,10
experienced
  134:10
expert 9:9,10,13
  10:20 21:25 22:12
  23:4,11,24 24:4
  27:16 30:21 33:11
  38:21 39:17 42:5
  42:9 43:5 44:14
  44:22,25 46:12,17
  47:14 48:19 60:19
  61:2 67:13 70:7
  73:3 74:13,19,23
  76:18,21 87:6
  100:16,23 102:22
  117:5 118:12
  146:24 159:18
  177:11 185:17,20
  194:9
expertise 116:16
  117:9,18
experts 132:19
expires 195:25
explain 110:14
  156:20 171:4
  174:25
explained 136:5
explanation 63:22
explore 62:8,9
  63:24 190:13
exposure 156:5
expressly 173:8,23
extensions 154:21
extent 26:17 37:9
  37:17 58:2,4 63:6

77:12 113:15
129:19 132:20
147:15 155:11
157:20 159:17
163:6 164:8,15
168:15 174:6
180:22
**extra** 38:7 110:9
**eye** 149:8

**f**

**f** 65:2 193:2
**faced** 138:11
**facility** 120:23
**fact** 57:9,20 77:21
90:8 91:2 97:19
106:14 116:17
123:3,16 129:17
130:17 132:16,25
138:4 139:2 140:3
144:11 145:2,24
156:4,25 158:7
164:17 165:3
180:23 183:9,12
189:20,22
**factor** 58:25
169:14
**factors** 151:25
173:5,7,10,20,24
174:4
**facts** 39:3
**fair** 12:8 22:25
23:5 25:10 36:3
36:16 49:6 50:16
94:22 96:4 98:15
128:6 129:11
138:17 140:10
158:9
**familiar** 25:13,19
39:19 143:9,18,24
**familiarized** 60:22

**family** 38:3
**far** 7:14 8:8 17:22
20:23 84:25 138:5
**faults** 191:4
**feasibility** 105:9
114:19,23 119:19
122:14 142:16,18
151:23 152:7
172:3
**feasible** 105:22
115:8 116:15
117:5,12 118:7,13
119:10 141:20,24
142:3,6,10,19,21
171:17,23 172:9
**federal** 22:4,7,13
23:17
**fee** 94:16,23 96:5
**feedback** 22:23
56:22
**feet** 138:5 139:20
191:5
**fein** 3:12 5:7 40:10
40:18 87:7
**felt** 73:22 163:11
190:6
**ferret** 151:19
**festival** 80:22
**figure** 138:14
163:18
**figuring** 173:20
**file** 67:4,6,7,11
68:3,13 69:5,9,19
70:10 71:22 72:15
73:5 74:10 75:14
75:25 76:6,25
77:5,22 110:11,16
111:11 133:9
**files** 70:23 132:15
132:21 133:2

**final** 135:25 140:4
**financial** 18:15
33:21 105:9
114:19,23 119:18
142:16,17 188:24
189:4
**financially** 4:15
105:22 115:8
116:15 117:5
118:7,12 141:19
141:23 142:3,6,10
142:19,21 171:17
172:8 189:16
**financing** 29:15
**find** 71:20 72:13
96:22 97:18
106:13 134:8,11
136:18 168:6,11
168:14 177:13
179:20 180:11
**finds** 70:9
**fine** 42:18 64:6,8
123:22 184:8
**finish** 6:23
**firm** 5:2 12:18,18
40:9,17,21 67:10
117:25
**first** 15:14 16:2
27:12 38:11 45:10
49:12 68:17 75:2
78:23 86:2 89:14
94:6,15 112:6
113:23
**fit** 149:12
**fitness** 120:24
121:6
**five** 32:24 45:20
123:20 184:7
191:11
**flanigan** 120:20,21
124:18

**flip** 172:25
**floor** 3:15 86:2
126:18 136:25
144:4
**florida** 16:19
**flow** 156:3,16,24
**flowing** 32:5
**flows** 32:5
**focus** 13:22 31:16
96:18 188:22
**focused** 177:2
181:22
**folks** 83:9
**follow** 58:8 139:3
**followed** 53:24,25
92:12,18 100:6
141:6
**following** 59:16
**follows** 5:13 65:5
**food** 80:22
**foot** 82:20 123:13
126:6 136:24
138:3 144:3 147:6
148:22,25 150:3,7
150:12,14 157:10
165:6,18 166:4,8
166:11 167:5
**footnoted** 173:14
**footnotes** 9:12
**forecast** 114:6
**form** 24:18
**format** 8:13 67:23
**formation** 44:2
**forming** 42:2
43:13,18
**formulating** 47:6
**fort** 79:11
**forth** 58:9 69:2
75:22 174:18
193:13

**forward**  26:23
58:10,17 104:23
159:15 177:17
190:19
**found**  12:25 63:12
72:19,25 74:24
75:8 90:6 158:2
180:23
**four**  31:7 45:19
53:15 104:17
105:6 159:4
**fourth**  87:8
**fractional**  41:11
**frame**  130:11
133:8 161:24
168:16,20 171:8
172:19
**framed**  162:3
**free**  53:21
**freedom**  11:19,19
11:20
**front**  8:8,9,10,19
43:4,14 61:25
63:5 113:4 125:2
**frontage**  145:18
**fti**  15:3 32:17 33:5
33:11 34:7 35:8
36:5 41:2
**fti's**  32:18
**fulfilled**  72:22
159:6
**fulfilling**  163:9
**fulfillment**  104:21
**full**  15:6 43:17
68:17 127:7 135:9
139:23
**fully**  60:2 72:16
**fundamental**
115:19
**funeral**  120:19
124:17

**furniture**  120:21
121:6 124:19
**further**  37:22
59:21 191:24
193:16
**future**  129:22
136:2 142:4,9
183:14
**fuzzy**  34:3

**g**

**g**  93:7
**gallery**  8:13
**garment**  41:5
**general**  19:8 20:8
20:8 28:11,16,16
29:18 69:25 85:25
133:7 134:21
147:2
**generally**  26:5,11
27:14 29:13,25
51:25 60:21 88:6
130:18
**geographic**  20:17
**germane**  74:11
**getting**  184:5
**gilchrist**  3:21
**give**  7:21 51:7 69:8
122:19 135:22
139:4 155:25
156:23 190:12
**given**  37:4 45:17
46:13 53:3 54:11
54:23 58:17 74:7
89:8 91:22 92:16
97:19 99:11,15
100:2 104:7,8,12
116:19 122:8
130:10 132:13
139:7 151:16
183:15 185:15
189:10 193:15

**gives**  163:15
**giving**  42:15
**glad**  142:14
155:17
**glean**  46:15
**go**  24:6 26:14
33:19 37:21,25
42:14,16 54:9,16
60:16 63:16,18
68:11 69:21 73:7
79:5,10,13 86:14
90:14 93:16 96:8
97:25 99:18
111:12 118:15
121:22 125:7
126:9,14,21,22
127:6 130:9
131:24 134:2
140:14 145:9
146:22 156:8
157:18 158:11
159:15 166:18
168:3 176:19
179:8 181:9
186:18 187:16
188:9 190:14
191:7
**goal**  175:25
**goes**  38:7 63:19
100:15 125:13
138:15 173:17
174:8
**going**  4:3 6:17
11:9 22:2 26:22
33:19 34:24 36:12
45:18 58:17,20
61:21 62:9 64:4
65:18 82:2 87:7
93:10 94:3 100:24
107:11 120:14
123:19,24 131:14

135:18 138:9
163:9 175:13
180:21 184:22
187:22 191:16
192:5
**good**  4:2,24 5:16
5:19 84:6 93:23
101:2 107:12
111:11 151:7
156:5,15,16
**goods**  153:10
**google**  84:13 85:16
**gordon**  25:18
**gotten**  146:17
**governed**  176:7
**grade**  167:5
**graduate**  13:23
**greatest**  139:4
**green**  79:11
**grocery**  120:14
124:15
**gross**  150:8
**ground**  11:25 12:6
12:7 23:12 26:9
28:21 29:8,17
39:8,12 96:6
97:21,22 102:5
109:15 116:20
119:2 128:6,12
133:5,6,11 136:19
144:4 155:12
161:4 176:25
178:13 185:7
**group**  32:19 36:11
41:22
**guess**  23:9 43:11
44:3 56:25 84:4,5
128:4
**guessing**  81:6
**guideline**  26:8

guidelines  58:8
guiding  97:16
guy  57:9

**h**

h  5:10,10 65:4,4
hackensack  3:8
half  42:16 184:11
halfway  112:9
hamburgers
  153:12
hand  6:20 80:15
  82:15 193:22
handbook  110:6
  110:24 111:21
  142:12 194:13
handful  83:6
hang  11:18 68:12
  68:14,15 111:10
  126:25 142:15
happens  106:9
happy  7:11,15
  64:2
hayden  3:4 5:3
hbu  110:5
headed  78:19
headquartered
  33:2
heads  42:15
health  120:24
hear  107:12
heard  7:24
hearing  22:23
  56:22
hedden  1:13 2:12
  4:6 5:16 6:1 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1,7 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1

27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1,6,10,23 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1,9 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1,10 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1,3 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1,15 111:1,3
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1,7 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1

147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
185:4 186:1 187:1
188:1 189:1 190:1
191:1,22 192:1,11
193:11 194:4,10
195:3,21
hedden's  100:23
heights  37:12
  79:19
held  18:6,9
helpful  52:3 54:25
  93:18 119:23
helps  114:18
hereinbefore
  193:12
hereunto  193:21
high  81:25 136:24
higher  135:22
  138:18 139:11,12
  165:9 190:5
highest  19:7,24
  20:9 54:15 55:12
  55:16,18 92:4,13
  96:20 97:3,9
  100:8 105:3,6,7,13
  105:18,23,25
  106:8,10,14,21,23
  106:25 107:6,8,15
  107:20,20,22

108:2,4,4,6 110:23
111:23 122:11,15
127:8,12 135:2,13
135:18,19,21,25
136:7,11,20 137:7
137:8 178:25
180:18,21 181:7
181:13,23,24
182:5,11,19,22,24
183:3,16,20 190:7
194:12
highlight  63:15
highly  117:25
  186:23
hill  79:12,17
hindsight  62:3,16
  62:17,18
hired  12:15
  158:12 159:22
historic  129:15
historical  117:2
  128:18
historically
  129:19
hitting  80:16
hmm  114:5
hold  17:3
holdings  1:8 4:8
  5:9 185:8
home  16:4,4
  120:19 124:17
hope  153:21
hopefully  191:12
hoping  35:23
houlihan  11:17
  15:4 30:8,16,22,24
  32:12,17 34:10
hour  42:14,16
  123:19 184:11
hours  45:19,20
  65:18,23,25

**howard** 3:17,23
5:6 38:23
**hundred** 30:23
148:24 157:9
166:3,7,12
**hvac** 169:6,21
**hypothetical**
117:11 118:8,21
118:22 122:2,8
135:8 136:15
137:5,21 138:6
139:25 141:9,18
146:9 157:5
158:18 160:5
161:23 162:21
163:7,11 164:12
165:13 171:12,19
172:20
**hypothetically**
137:25 178:8

**i**

**idea** 93:23 102:6
137:3 165:9 169:2
**identification**
42:11 110:25
**identified** 65:16
66:13 67:12,15
90:6,25 121:11,14
121:19 147:6,22
148:18 180:15
**identifies** 149:3
**identify** 22:21
67:17 133:16
**identities** 71:3
**ignore** 172:14
**ignored** 171:4
**imagine** 54:3
**immediate** 127:12
**immediately** 86:8
86:23

**impact** 59:5,8
60:24 173:7,22
**impacted** 54:6
**impair** 73:14
**important** 6:22
57:19 58:13,17
106:3
**improvement**
135:8 141:18
160:6 161:23
169:21
**improvements**
169:18,23 170:19
**incentive** 152:16
152:20,25 153:4,5
153:13,14 154:8
**include** 21:2,13
52:23 109:19
112:11,18
**included** 54:4 92:5
119:6 149:19
158:15
**includes** 45:4
112:23
**including** 63:14
**inclusion** 88:11
**income** 19:13
100:7 175:9
**inconsistency**
178:23
**incorporates**
67:24
**incorporating**
102:17
**incorrect** 106:19
106:20 183:21
**incorrectly** 112:22
175:6
**increase** 190:2
**increased** 21:13

**increases** 129:7
**incredibly** 106:2
**increment** 38:8
**incurred** 171:8
**independent** 12:16
89:24 103:4,7,25
104:4,19 128:21
159:23 164:14,25
177:20
**indicate** 95:9
119:14 145:4
**indicated** 74:15
**indicates** 50:16
**industry** 169:19
**inferred** 115:17
116:24
**inferring** 158:16
**infill** 81:25 168:16
168:19
**influenced** 48:2
**information** 39:3
43:12,17,20 46:21
47:2,17 54:2,4,16
55:4 56:2 61:18
62:2,12 63:9,10
65:25 68:2 69:4
69:17,24,25 70:12
70:24 71:6,8,9,11
73:13,19,23 74:6,9
74:16,22 75:6,18
75:24 76:2 77:3,8
77:10,21 90:5
102:20 104:16
117:2,3 128:19
129:15 130:2,20
146:17 147:16
159:13 166:22
175:11,12 187:4,9
189:10
**initial** 39:5

**initiated** 188:12
**initiative** 155:22
**inject** 176:20
**inquired** 63:7
**inquiring** 125:14
**inside** 90:6 159:3,4
**inspection** 69:23
77:2 78:2,5 80:11
84:20
**instance** 77:19
**institute** 17:8,9,15
17:20 18:3,5,7,17
18:18,23 19:2,3,6
19:16,21 20:17
21:7 95:16 96:15
**instructed** 99:5
**instruction** 99:11
136:16 174:2
**instructions** 7:18
59:17 72:24
**instructive** 26:7
**instructor** 18:16
18:25
**instructs** 97:5
**integra** 27:21
29:19
**intended** 89:12,12
100:13 101:10,11
101:18,21,21
102:12 118:17,18
121:15 123:6
176:23
**interconnections**
188:25
**interest** 41:11,12
129:20
**interested** 4:16
53:13,14 193:19
**interesting** 13:12
**interfering** 83:2

**interim**  108:2,6
  122:14 135:13,17
  135:21 136:6
  182:22
**interior**  169:6,20
**international**
  19:13
**interpret**  159:8
**interpretation**
  26:3 56:17 57:25
  58:11
**interrelationship**
  189:12
**introduced**  42:20
  50:7 92:24 110:21
  189:6
**investigated**
  119:20 147:9,12
**investigation**
  161:10
**investigative**
  134:21
**investment**  135:9
  153:19
**investor**  160:14
**involve**  22:25 25:3
  32:12 35:14 36:16
  40:25 150:19
**involved**  24:24
  27:6,9,10,18 28:16
  29:14 33:16,20,22
  34:7,16 35:8,9,21
  39:21 53:19
  103:11 112:25
  120:13
**involvement**  21:15
  29:19 32:7 159:18
**involves**  24:17
  29:4 115:3
**involving**  23:5
  63:20

**irish**  1:20 2:14
  4:12 193:7,25
**irr**  28:7 30:7
**irrelevant**  125:9
  125:18 126:5
  140:12
**ish**  78:12
**island**  34:23 35:5
  35:5 37:16 120:13
  124:15
**issue**  26:19 39:7
  63:18 74:3
**issued**  43:6 44:8
  48:23 67:22 74:23
  75:2,7,10 88:14
  185:16,20
**issues**  37:12 60:23
  145:18,19 159:11
**issuing**  45:14

**j**

**j**  87:10
**january**  1:15 2:8
  4:4 193:22
**jersey**  1:14 3:8 8:2
  14:10 15:15,22
  16:2,18,21 17:4
  18:11,12 20:16,20
  20:21 21:6,17
  28:10
**joined**  16:8 17:19
  28:7 30:7,13
  32:16,21 36:13
**jointly**  12:17
**journal**  27:17
  174:10
**judicial**  140:23
**july**  50:9 67:8 68:6
  88:9,14 125:6
  126:15 134:24
**june**  27:24 28:8

**juneau**  158:5
**justify**  152:3
  153:16

**k**

**keep**  49:24
**keeping**  82:14
**kept**  83:2
**kest**  50:12
**key**  26:17 56:11
  56:15 57:18
**keywords**  96:13
**kind**  29:24 34:3
  86:3 134:12 145:8
  149:16 178:6
**kinds**  175:15
**knew**  103:17
  147:14
**knockdown**
  120:18,23 124:17
**know**  6:11,16 7:11
  7:15 12:20 21:21
  24:3 34:12 36:8
  37:6 41:16 58:13
  58:23 61:16 67:9
  69:11 72:2 73:19
  77:20 79:10 81:6
  85:4 86:17 87:15
  103:15 111:4
  113:3 121:14
  126:12 129:6
  130:3 132:6,15
  134:4,18 136:25
  147:15,15 149:25
  152:11,14 156:7
  160:10,15 172:7
  180:8 184:13
  187:20 188:5,10
**knowing**  58:19
  97:12 117:22,23
**knowledge**  63:3
  104:12 116:25

117:8 130:18
  133:10 146:18,25
  147:11 150:24
  164:14 168:8
**knowledgeable**
  57:11 97:11
  101:24 116:2,18
  121:4 134:10
  137:6 139:23
**known**  21:10
**knows**  57:10
**koh**  3:17 5:6,6 7:6
  8:14 9:24 25:24
  26:14 38:23,24
  39:4 42:19 52:7
  54:9 55:7 64:9
  73:7 79:5 86:14
  90:14 96:8 97:25
  99:18 118:15
  121:22 125:7
  126:9 130:9
  131:24 134:2
  140:14 145:7
  146:22 157:18
  158:11 166:18
  168:3 170:11
  172:10 177:25
  179:8 181:9,15
  182:14,25 184:8
  184:12 186:18
  187:16 188:9
  190:14 191:7
  192:3
**koh's**  40:17
**ktr**  9:11 39:11
  68:6 88:9 117:23
**ktr's**  50:9 67:4,6,7
  69:9 75:13,21
  87:24

| **l** | | | |
|---|---|---|---|

**l** 5:10 65:4
**lack** 41:16,17 119:4
**lacking** 120:4
**laid** 53:23 156:20 158:18
**land** 35:10 88:22 91:25 94:17,24 95:4,14,23 96:5,17 98:21 100:5,6 118:22 128:3 131:8 139:19 163:10 169:16 191:5
**landauer** 14:25
**landlord** 58:19 61:20 169:13,23 187:25 189:14
**landlord's** 102:2 172:18
**lane** 81:8 82:12
**lanes** 81:2 82:7
**language** 26:18 89:8 91:22 92:17 96:2 97:15 99:15 100:2 102:15 104:7,22 123:7 136:19 178:21 179:4,12,24 181:4 181:13
**large** 29:15 81:22 110:10 144:12 145:2,5
**larger** 131:9,12
**late** 11:10 38:15
**law** 5:2 12:17,18 15:13 40:9 56:8 56:18 67:10 136:17 140:5,18

**lawrenceville** 1:14 8:2 14:10,12
**lawyer** 57:10
**layout** 146:15
**lead** 106:15 118:24 162:16
**leading** 108:22 132:18
**leads** 108:6 163:2
**learn** 56:2
**learned** 27:13 46:21 47:18 74:15 74:22 75:7 118:6
**lease** 10:16 11:25 12:6,8 23:12 26:18,20,21 39:8 52:21 54:18 56:17 57:15 58:14 59:5 59:11,17 61:17,19 72:24 74:17 89:9 89:13 91:13,23 92:17,21 93:4 97:10,15 98:5,6,14 99:6,16 100:3 101:12 102:5,14 102:15 104:7,22 116:21 122:6 123:7 127:24 128:6,12 131:10 136:19 138:20,21 140:5,7,11,17,20 141:5 150:8,25 151:19 155:13 159:9 166:21 173:25 176:25 178:22 179:2,5,12 179:24 181:5,13 185:7,13,16,19,22 188:8 189:13,15 189:19,22 190:10 190:22

**leased** 145:22
**leases** 26:9 28:21 29:9,12,17 71:20 72:3,11,13 77:14 95:7,13,20 96:7,18 96:22 97:18,21,22 98:5,20,23 129:2 133:5,20 134:12 134:19 151:7 174:7 180:4,5,8,11 180:16,23
**leasing** 119:14
**leave** 185:23 186:7
**leaving** 175:11,11
**led** 117:4 157:21 164:19
**lefrak** 38:3
**left** 80:15 163:17 169:22
**legal** 4:13 26:3 57:6,9 58:11 77:13 99:11 105:7
**legally** 105:16
**length** 129:14 187:5,10,12,15,21 188:3,21,23 189:5
**letter** 38:17 67:22 69:22,22 169:17
**level** 18:13 19:12 73:25 74:4 85:7 85:11 153:20 162:3 176:3
**li** 40:6 47:16
**li's** 47:21
**license** 15:14 17:3 17:7
**licensed** 15:10,11 15:18,22 16:2,7,12 16:13,20,24 18:16 18:25

**licensing** 15:13 19:5
**licensure** 16:3
**lies** 161:6
**light** 120:11,16
**likelihood** 189:23
**limited** 122:9
**line** 84:19 87:8 195:4
**lines** 83:20 85:9,13
**list** 45:4,11 60:15 107:15
**listed** 43:16 44:12 44:18
**listen** 165:15
**literature** 27:15 108:13
**litigated** 30:2
**litigation** 28:16 30:20 33:6,10,23 34:2,4 175:17
**little** 22:9 29:3 46:12,16 59:21 63:24 75:4,4 87:7 93:13
**live** 79:16
**lived** 14:11,14
**lives** 79:9,17
**llc** 1:8 4:9 5:9
**llp** 3:12
**loading** 93:18
**loans** 175:17
**locally** 93:21
**locate** 71:7
**located** 14:19,23 15:4 29:23 30:25 36:17,23 38:13 85:7,20 143:10 144:4 155:14
**locatell** 48:12 49:8 51:11 53:12 55:4

55:17 58:22
180:15
**locatell's** 48:3,6,15
48:22 50:21,23
51:5 52:24 53:13
53:20 54:5 55:10
60:2 183:20 184:2
**location** 115:5
120:15 145:17
149:4,6 155:10,19
156:6,16 157:2
164:18 183:15
**locations** 156:12
**lokey** 11:17 30:8
**long** 10:3 14:11
15:9 19:19 35:5
37:15 45:15 60:15
78:21 138:10
**longevity** 129:25
**look** 10:15 38:18
39:14,15 70:25
76:5 88:25 144:23
146:15 157:3
**looked** 9:12 10:18
55:10,11 60:9,11
63:11 68:8 81:23
85:15 88:6 89:20
89:22 100:4 133:4
158:13
**looking** 24:22
51:13 52:24 83:13
83:22,23 84:3,4,5
84:6,8,10 85:5
86:20 92:14
108:18 109:9
118:3 126:16
143:13 146:13,23
157:4 162:5 188:2
**looped** 78:17
**lot** 56:22 60:7
78:16 80:19

122:19 145:21
152:8,8
**low** 129:19 162:7
162:10,15,18
163:3 164:6
165:22 166:4,16
167:8,24
**lower** 52:6 139:14
141:11 155:6
166:9
**lp** 25:15,18
**lunch** 42:14 64:13
**lydell** 120:14

**m**

**m** 3:9 5:10 65:4
103:18 137:10
155:23 183:14
**m1** 155:20
**m1-1** 127:15 135:5
**magnitude** 37:5
54:11,23 150:22
**mai** 17:16,17,24
53:3 58:24
**mail** 56:6
**main** 3:6
**majority** 31:12
102:11
**manhattan** 14:24
15:5 30:4 31:8,13
31:16 34:12,17
35:4 83:7
**manuals** 167:22
168:25
**map** 84:13 85:6
86:20
**marcelo** 3:20 4:10
**march** 11:9
**mark** 42:5 109:25
**marked** 42:10
49:22 68:5 92:20
110:17,24

**market** 12:9 19:8
19:23 22:25 23:5
25:11 36:4,16
49:6 50:16 94:22
95:3 96:4,14
97:11 98:12,15
106:7,7,16 107:24
108:10,11,22
109:5,12,14,19
110:5,22 111:22
112:7,7,11,18,22
113:11,11,12,14
113:17 114:3,3,18
115:9,13,23
116:17,18,25
117:21 119:15,20
120:7 122:16
128:7 129:11
130:8 131:5,8,12
131:14 133:7
134:13 138:17
140:10 141:20,25
142:8,12,19,23
144:13 145:6
146:5 148:23
158:9 160:16
166:20 168:6,11
190:25,25 194:11
**marketability**
41:15,17 109:4,6,8
109:10,20 112:8
112:12,18,23
113:2,8,13 114:24
116:14,23 119:5
147:5,21,25
149:18
**marketing** 13:22
**marketplace**
108:15,24 113:20
117:9,19 125:20
180:13

**markets** 120:7
**marking** 49:24
**marriage** 193:18
**marshall** 161:18
167:21 168:22,22
**marshall's** 164:9
**masonry** 161:25
162:2
**master's** 14:3
**material** 76:24
109:10 112:21
165:3
**materials** 27:18
113:4,5
**matrimonial**
24:11
**matter** 4:7 5:5
9:11 11:5,13,15,16
11:18 12:22 13:6
35:14 39:4,18,22
39:25 40:4,10,25
42:2 43:7,19 44:5
44:11 47:19,24
63:19 87:18 88:18
120:12 122:25
160:3 178:8
193:20
**matters** 24:9,11,17
29:21 32:10 35:9
37:23 57:11
**mature** 135:24
**matures** 136:9
**maximum** 105:9
**mcdonald's** 1:5
4:7 5:4 29:10 39:8
44:23 57:15 59:24
80:7 83:13,15,24
83:25 84:9 85:21
86:9 92:21 93:4
127:24 143:13,16
144:6 153:11,11

156:9 185:23
186:7 195:2
**mcrp**  14:4
**mean**  12:7 14:19
26:4 40:14 60:6
62:16 66:11 76:3
82:3 96:19 105:17
146:4,25 152:18
162:20 164:24
173:11,15 177:17
188:23
**meaning**  31:7
66:16 108:25
116:24 128:11
**means**  96:2
**measure**  114:9
**measuring**  142:16
**mediation**  24:11
**meet**  9:15 10:7
105:7
**meetings**  88:17
**meister**  3:12 5:6
40:9,17,21 41:24
67:10 69:8 87:6
**member**  17:14,16
17:17,21 18:3,4,11
21:16,22
**members**  20:22
**membership**
21:13
**memorandums**
77:14
**memory**  51:14
147:14
**mention**  86:19
**mentioned**  18:24
20:14 26:24 28:18
36:8 76:23 125:23
148:13
**mercer**  20:23

**met**  118:4
**method**  98:16
100:5 115:17,19
115:24 116:3
122:4 141:12
164:20
**methodologies**
92:12 116:21
175:5
**methodology**
139:10 141:4,11
141:15
**methods**  89:6
91:20 92:15 99:3
99:7,13,24 104:16
115:16,22
**metropolitan**
21:14
**meyer**  3:22 47:10
**meyer's**  47:12
**mfp**  11:19
**miami**  11:18,19,20
11:24 12:12 23:15
**michael**  1:13 2:12
3:22 4:6 42:6,10
47:9 192:3,11
193:11 194:4,10
195:3,21
**middle**  178:13
**middlesex**  20:24
**million**  50:19 52:5
**mind**  35:24 50:5
82:4 123:8 163:17
**mindset**  103:20
**mine**  93:15
**minute**  94:2
123:21 184:7
**minutes**  10:6 64:5
78:22 184:20
191:11,14

**mispronounce**
61:21
**misspeak**  49:20
108:3
**missry**  40:13,14
40:23 55:25
140:25
**missry's**  56:7,12
**mmb**  185:9 186:2
186:8
**model**  171:6,10,14
**modified**  150:8
**moment**  38:10
42:8 50:3 63:6
92:22 110:3,8
112:15 142:2
177:19 181:3
**monitor**  8:10,15
**month**  38:20
**months**  29:20
**morning**  4:2,24
5:16
**morris**  40:14,23
55:25
**mortgage**  28:22
29:7
**mortgages**  28:15
**move**  58:10 76:22
92:11 104:22,24
177:17 190:19
**moving**  59:22
91:18
**multiple**  185:6
**multipliers**  164:11
164:18
**musto**  61:21

**n**

**n**  3:2 5:10 23:22
65:2,2,2,4 194:2
**name**  4:10,25
23:19,21 117:22

**named**  102:9
**names**  13:8
**nassau**  193:5
**national**  16:10
18:12 131:13
**nature**  31:23
118:22
**nearby**  107:11
**necessarily**  56:10
70:14,20 71:18
105:18 169:10
**necessary**  51:8
59:12 75:17 84:15
90:2,4 123:3
151:24 152:3
171:15 172:23
**necessitate**  116:22
**need**  7:10 53:25
63:24 152:7,11,14
157:3 169:8 170:8
172:6,11
**needed**  27:4 57:15
58:15 59:11 74:12
91:10
**needs**  153:5
**negotiate**  154:21
**negotiated**  129:7
129:10 130:4
188:8
**negotiating**  188:15
188:20
**negotiation**  12:2
169:12
**neighborhood**
79:3,8 81:16
86:12 168:17
**neighborhoods**
86:18
**neighboring**  35:17
35:19 145:23

neither 97:12
net 29:8
neutral 25:10
never 12:24 13:13
  17:6 24:13,14
  27:8 50:4 126:11
  178:4 185:9
new 1:3,14 2:18
  3:8,16,16 8:2
  14:10,15,18,24
  15:15,19,22 16:2,7
  16:12,18,18,21,25
  17:4,4,7 18:11,12
  20:2,2,16,19,20,21
  20:25 21:3,6,14,16
  21:17,20,20 22:5
  22:13,15 25:14,17
  28:10,13 29:21
  31:2,5,6,12,15
  33:2 34:8,12,15,16
  36:24 117:21
  131:13 152:4
  167:7,25 168:18
  193:3,10
nods 6:20
non 33:23
northern 20:20,24
notary 2:17 5:12
  192:17 193:9
  195:25
notations 132:17
note 70:12 112:9
noted 65:3 192:6
notes 69:20,22
  70:21 76:25 80:4
notice 85:19,23
noticing 4:22
notwithstanding
  75:20 119:4
  134:25 190:15

november 10:20
  32:22 43:6 44:9
  74:23 75:8 185:7
number 21:11
  24:22 65:25 85:2
  90:7,10 93:11
  128:17 143:23
  151:7 166:13
  171:23 194:8
numbers 34:24
numerous 79:22
nutshell 57:17
nygard 117:24
  132:18
nysha 143:21

o

o 23:22 65:2,2,2
oath 5:22
object 7:6
objected 57:18
objection 25:24
  26:14 52:7 54:9
  55:7 73:7 79:5
  86:14 90:14 96:8
  97:25 99:18
  118:15 121:22
  125:7 126:9 130:9
  131:24 134:2
  140:14 145:7
  146:22 157:18
  158:11 166:18
  168:3 170:11
  172:10 177:25
  179:8 181:9,15
  182:14,25 186:18
  187:16 188:9
  190:14 191:7
objections 4:20
obligated 5:22
observations
  80:24

observe 80:9
  81:18 82:21
obviously 149:11
  169:14
occupancy 146:2
  169:15 171:25
  172:4
occupant 156:9
occupied 149:11
occupy 170:15
occur 121:2,7,9
  125:16,22
occurred 63:4
occurs 54:13
october 30:13
  38:15,16
odd 38:9
offer 150:21
offered 19:16
offering 132:5
  150:25
offerings 33:18
office 14:19,23
  15:7 16:4 28:4
  30:15 33:2 83:16
  83:18 132:20
  143:25 145:25
oftentimes 54:14
  55:13 139:15
  169:21 170:17
oh 9:5 40:14,24
  78:6
okay 5:25 6:8,11
  7:5,20,24 8:20,25
  9:6,19 10:7,11,19
  10:24 11:3,6,12
  12:5,11,20 13:4,7
  13:10,19,23 15:9
  15:24 16:20 20:14
  21:5 23:8,14 27:8
  27:20 28:18 31:4

31:17 32:10,16,25
  34:14 36:3,7 37:7
  38:11,22 40:16
  42:4,23 43:2,3,15
  46:20 47:8,15
  48:13 50:18 55:24
  56:21 59:20 66:4
  66:20 67:3 68:4,9
  69:12 72:10 74:14
  74:21 76:20 77:24
  80:25 81:12,18
  83:17,19 84:6,18
  84:25 86:12,17,21
  88:25 92:19 93:8
  94:8,8 95:18,25
  98:11 99:2 101:2
  101:20 102:25
  105:2,12,15,21
  106:9 107:12,24
  109:24 110:20
  112:2,5,24 113:21
  115:7 120:5
  121:10 123:18
  125:25 126:25
  127:6 128:3,25
  129:5,9 130:16
  131:22 133:13,18
  134:23 136:10
  143:3,9 144:10
  146:8 147:19
  148:17 149:25
  150:10 153:3
  155:4 157:7 158:4
  158:23 161:13
  162:14 164:4,22
  165:4,15,25 167:3
  172:25 173:3
  174:24 176:13
  181:18 182:10
  183:25 184:12
  185:4,12 186:14

Case 1:19-cv-06471-DLI-ST   Document 62-32   Filed 06/24/22   Page 216 of 232 PageID #: 3846

186:23 188:5,14
191:4,9,15
**once** 55:17 110:17
111:4 117:14
**one's** 107:5
**ones** 31:14 38:10
60:17
**op** 38:4
**open** 8:21,23
93:25
**opened** 45:8
111:11
**opening** 43:3
127:5
**operation** 16:5
172:5
**opine** 74:12
102:10 122:10
139:13 151:4
159:3,11 177:7
**opined** 151:11
162:24
**opines** 141:10
157:22 166:21
**opinion** 23:11,12
44:2,14 46:22
47:6,13,19 48:2,7
52:14 53:12,13,14
53:17,20,21 54:6,8
57:12,13 59:18
62:20,21 63:17
73:2,11 86:25
90:11,20,22 91:4,4
91:6 92:7 102:18
102:24 103:16
104:6,20 107:5
109:19 112:11,17
117:6 118:2,6
132:5,6 139:6
140:3 147:17,17
150:15,16,21

151:10,15,15
164:23 165:2
167:12,14 178:3,6
178:7 182:16
183:19,22 185:17
185:20 190:24
**opinions** 42:2
43:13,19 46:18
47:24 48:10,14,17
53:11 54:21 55:3
55:15 60:25 68:25
72:17 75:21 89:9
100:11 101:8,16
164:25 175:15
176:21 178:20
**opportunity**
185:13,15 190:13
**opposed** 96:5
138:2
**opposite** 143:16
188:17
**opt** 155:15
**option** 93:6 94:6,9
94:20
**order** 96:25
104:20 114:22
152:6 153:15
156:11 160:8
163:23 164:5
170:9
**organization**
17:10 61:22
**organizational**
187:23 188:6
**originally** 74:18
**outcome** 4:16
193:19
**outer** 31:6,18
32:11 35:11 36:5
36:17,18,23 37:3
37:14,19

**outlined** 176:24
**outside** 102:7
171:13
**overall** 164:20
**overarching**
109:13
**overnight** 25:18
**overshadowed**
48:11
**owned** 143:20
**owner** 32:7 35:17
41:4 149:11 155:8
171:21
**ownership** 41:12
187:25

**p**

**p** 1:13 2:12 3:2,2
42:6,10,19 192:11
193:11 194:4,10
195:3,21
**p.c.** 3:4
**p.m.** 64:14 65:3,7
123:24 124:2,3,5
184:22,23,24
185:2 191:16,18
191:19,21 192:5,6
**p1** 59:24 60:4
**p102** 59:25 60:5
**p103** 42:5,9 59:23
66:3 194:9
**p104** 110:2,20,22
194:11
**p36** 49:22,25 50:6
50:9 68:5,16
126:15 127:2
**p69** 92:21,24
**pad** 182:3,12
**page** 43:10,10,11
50:15 68:18,24
93:10 94:5,6,25
111:14,14,24,25

112:3,5,9 126:16
126:19 127:3,6
134:23,25 135:7
142:13,14,15
164:10 194:3,8
195:4
**pages** 49:5 112:6
**paid** 163:16
**papers** 52:17
53:17 67:14 70:7
87:14,16,19 89:23
90:25 102:18
104:18 116:6
119:6 121:11
122:5 148:11,13
151:12 159:5
162:5 184:3
**paperwork** 125:2
**paragraph** 66:2
66:20 67:3 76:21
77:24 84:22 87:4
87:16,23 89:2
95:2,19 100:16,18
101:3 103:3
104:24 127:7
173:2 175:24
**parameter** 133:11
**parameters** 133:6
**park** 3:14 11:19
11:19,20 30:17
79:12
**parking** 78:16
80:18 120:21
**part** 28:24 66:5
67:20 78:6 85:17
89:23 91:15 92:13
98:8 103:23 106:3
111:13,17,24
112:3,7 130:25
142:13,14,15
155:20,22 165:14

172:24
**partial** 41:11
**participants** 2:13
  32:3 137:6 187:24
**participate** 39:13
  108:22
**participated** 9:22
**particular** 115:4,5
  155:19 173:6,21
**parties** 31:22
  88:17 97:11
  178:14 187:3
  188:4,15,16,19,23
  188:25 189:13,22
  193:17
**partner's** 41:13
**partners** 25:18
**partnership** 31:20
  31:21 41:6
**parts** 86:21
**party** 4:14 12:16
  25:10 32:8 54:20
  58:21 104:10
  137:16 138:12
  140:23 151:18
  158:13 160:13
  163:17 177:8,15
  178:19
**pashma** 3:4 5:2
**pattern** 97:19
  123:17 139:3
  183:12
**pay** 40:19 154:2
  160:8,22,23 166:3
  166:15 169:9
  170:8
**paying** 160:21,22
**pdf** 43:2 94:5
  111:15
**pedestrian** 80:16
  82:20

**peer** 58:24
**pending** 7:12 9:4
  30:4
**pennsylvania**
  16:18 20:25
**people** 37:11
  80:14,17 82:23,24
  83:5 136:13
**percent** 24:24 25:3
  28:14 30:23 31:3
  31:9,10 33:12,13
  33:15 34:7,11,15
  34:18,18,20 36:25
  37:6 54:19 102:7
  128:5,12,22 130:6
  130:21 131:6
**percentage** 30:19
  30:25 31:5 33:9
  34:10,16 36:22
**percentages** 34:25
**perfection** 176:2
**perform** 78:4
**performance**
  108:23
**performed** 106:11
  147:4,21
**performing** 38:12
  57:21 113:2
  190:17
**period** 18:3,5
  136:8,10,12
  137:12,12 154:23
  155:5 170:14,18
  171:18 180:16
**permissibility**
  105:8
**permissible**
  105:17
**permit** 159:14
  190:4

**permitted** 9:2
  165:12
**personal** 168:8
**personally** 165:20
  168:4
**perspective**
  128:18 129:13
  149:10 154:13
  172:18
**philadelphia** 24:9
  27:22 28:4,11,11
  28:17
**phone** 9:20,23
**photographs** 80:6
**phrase** 160:12
**physical** 105:8
**physically** 105:16
**pictures** 80:4
**pieces** 61:25 62:12
  130:19
**pike** 14:10
**plaintiff** 1:5 3:5
  5:4
**planning** 14:4
**played** 18:22
**please** 4:21 6:18
  22:9 42:5,8,20
  49:19 50:2,7
  83:21 92:23,24
  110:8,21 147:13
**plus** 19:17 67:25
**point** 62:10 77:24
  91:18 96:24 101:6
  101:8 125:13
  137:19 141:3
  172:20 186:24
**points** 62:11 89:15
  90:10 146:16
  151:8 152:9
**portfolio** 29:16

**portion** 20:21 31:9
  81:3,19 82:8
  127:14,16 128:11
  135:4,6
**position** 48:6 56:7
  56:12,14 57:6
  58:2,5 60:25
  102:2 108:9
  131:16
**positioned** 120:15
**positions** 18:6,9
**possession** 67:10
  75:19
**possessive** 66:15
**possibility** 105:8
  168:14 183:11
  189:24
**possible** 58:20
  63:18 105:16
  119:10 168:18
  183:7
**possibly** 137:23
**posted** 8:18
**potential** 138:5
  139:20
**potentially** 138:18
**potentials** 183:14
**practice** 16:9 17:5
  30:11 32:18
  132:19
**practicing** 117:20
**precedent** 58:9
  136:17
**precedents** 141:8
**precluding** 173:9
  173:24
**predicates** 145:9
**preexisting** 155:5
**prefer** 113:6
**premises** 126:18

**preparation** 9:16 10:8,14 152:12
**prepare** 9:7 39:16 118:8 122:6
**prepared** 9:10 39:11 44:22 52:17 63:11 87:10 101:23 118:19 122:2 137:15 177:14
**prepares** 122:12
**preparing** 65:21 74:18 76:17
**prescribe** 141:16
**prescribed** 116:21 141:5,12
**prescriptive** 180:3
**present** 3:19 4:17 135:22
**president** 18:10
**pretty** 42:13 60:15 111:8 156:5
**preview** 112:4
**previous** 173:18
**previously** 49:22 56:9,19 92:20
**price** 126:3,5 148:24 150:2,7,24 151:8 155:6 166:16
**prices** 125:3,9,17 126:6
**primarily** 33:6
**primary** 31:16 143:21
**princeton** 14:10
**principles** 136:4
**prior** 17:19,21 24:6 45:13,13 63:4 71:12,13 84:22 87:17

**private** 9:2
**privy** 73:14
**probable** 105:4 135:8
**probably** 11:10 33:12 34:10,18 35:3 37:17 45:18 45:19 93:12,22 158:17 178:9 184:10
**problem** 116:19 138:11 140:12 145:13 173:7,21
**problematic** 115:20
**problems** 146:11 146:20 179:19,25
**proceeding** 4:20
**process** 6:9 19:19 52:22 53:23 91:15 102:4,12,23 104:23 113:22 130:25 141:6 151:17 159:15 163:10 176:5 177:16
**processes** 176:24
**produce** 122:3
**produced** 53:17 66:8,11 67:18,25 69:15 77:17 87:18 89:23
**product** 108:17,17 153:13
**production** 39:16 59:24 61:11,11 65:24 151:25
**productivity** 105:10 108:14 113:23

**professional** 2:15 17:10 73:25 74:5 151:14 193:8
**profile** 153:22
**program** 8:21
**programs** 8:23
**progresses** 46:24
**prohibit** 190:23
**project** 11:22 18:13 37:10 38:2 85:18 114:6,9,15 142:9 168:19 171:16
**projects** 28:6,13 36:14
**promises** 184:14
**promote** 176:5
**promotes** 17:10
**proper** 147:5,21
**properly** 69:4 75:24 106:11
**properties** 15:18 28:9 29:23 30:25 31:13,17,19 32:13 32:13 34:8,17 36:23 41:4 94:18 115:21 119:21 121:8,15 122:24 124:10 125:4 131:10 136:13 141:13 175:7
**property** 32:3,8 35:10,17,18,19,22 36:17 38:9,13 39:9,20 41:4,7 44:17 49:18 52:23 59:6,9,13 62:4 63:21 69:23 70:3 78:2,9,24 82:3 86:18 94:16,23 96:4 97:13 99:3

103:12,19 105:5 106:22 108:14,18 108:21,24,25,25 109:11,14 113:3 113:14,18,19,23 114:7 115:15 120:19 123:13 124:24 127:22 128:7 129:12 130:14,15 134:13 135:24 136:8 137:25 138:8,18 140:6,9,18 143:7 143:10,15 148:2 153:6 154:17 155:25 156:14 157:23 158:5,10 160:20 165:7,19 165:23 180:20 182:7,19 183:15 185:24 186:8 189:24 190:8 191:2
**proportionate** 41:14
**proposed** 24:4
**prospect** 79:18
**provide** 67:6 169:24
**provided** 44:21 52:18 71:9,12,15 73:20,24 92:10 185:10 190:10,20 190:23
**provides** 185:23
**providing** 190:16 191:5
**provision** 63:2
**public** 2:17 5:12 33:18,19 69:24 77:8,17 146:18

192:17 193:9
195:25
**publications** 43:21
**pull** 42:24 51:5
68:4 80:14 84:13
92:19 100:19
126:21,23 138:13
142:11 178:9
**pulled** 164:15
**purchased** 124:10
**purely** 139:25
**purest** 107:7
**purpose** 119:22
120:2,3 153:10
**purposes** 28:23
29:8,15 46:22
47:18 93:18
118:18
**pursuing** 190:3
**put** 61:22 97:13
141:9 182:23
**putting** 42:12

**q**

**qualified** 21:24
22:6,12 58:24
**quality** 176:4
**quantify** 83:4
**queens** 30:5 35:4
120:18,25 124:17
**question** 6:15,16
9:4 13:12 22:8
24:7,12,20 39:9
40:20 47:8 49:2
51:23 57:5 72:7
75:3 99:20 100:15
100:17 101:13
103:22 109:2
121:3 123:17
126:5 132:8
135:20 145:11
147:20,20 156:18

156:20 160:12,17
160:18 165:16,16
**questioning** 62:7
**questions** 6:13,18
7:7,8,13 46:25
62:5 191:25
**quick** 28:21 29:2,5
100:25 111:9
**quickly** 101:14
181:20
**quote** 67:21 90:16
90:17 119:4

**r**

**r** 3:2 23:22 65:2
193:2
**r6b** 127:16 135:6
**rabsky** 41:22
**radius** 79:11
**rail** 83:20,20 84:19
84:19 85:9,12
**range** 34:2 60:5
139:15
**rate** 128:6,12
129:6,20 131:6,18
137:24 139:9
**rates** 129:10 130:3
133:12
**rational** 153:25
155:7
**ratios** 175:11
**raymour** 120:20
124:18,23
**reach** 73:16
102:22 134:7
163:23
**reached** 12:22
48:10 49:8,17
50:15 58:22 61:2
74:6 102:11 103:5
126:8 127:21
131:2 176:17

178:21
**reaches** 139:6
**reaching** 52:13
55:5 103:4 174:5
190:24
**read** 9:9,9 26:5
27:17 49:2 52:3
60:2,10 62:19
72:6 130:20
180:10 181:19,20
**reading** 27:14
45:16 49:4 130:19
**real** 16:21,25 17:6
17:11,12 21:9
32:18 57:11 95:16
147:2
**realizing** 104:9
**really** 46:11 47:20
60:24 82:14
110:19 122:18
132:2 139:18,25
**realtime** 2:16
193:8
**realty** 27:21
**reason** 6:15 7:9,20
7:23 16:12 97:14
125:23 149:21
179:19 195:4
**reasonable** 13:2
89:11 100:13
101:10,18 102:13
130:22 133:11
137:24 149:2
151:5 163:3,20
164:2,6 167:18
174:16,22 176:11
176:14 178:13
182:13
**reasonableness**
53:6 54:7 162:17

**reasonably** 105:4
**reasons** 95:9
145:21 146:9,10
148:19
**recall** 15:20 19:18
23:19 27:12 32:15
36:2,6,14 37:23
38:10 45:15 47:20
49:3,6,10,15,16
51:2 56:5,14
60:13 61:13 72:8
72:10,12 78:8
79:22 80:2,20
81:5,17 82:7,13,19
83:19 84:17,23
85:2,5,10,15,18
86:3,6,15 88:7
124:11,19,25
129:8 148:14,16
161:21 162:8
167:13 185:4
**recalling** 82:4
**receive** 76:13
**received** 17:16
69:12 72:15
**receiving** 17:22
**recess** 64:13 124:2
184:23 191:18
**recites** 164:10
**recognize** 111:18
189:23
**recognizes** 96:15
**recollection** 10:16
15:12 17:19 20:13
35:6 45:19 49:13
51:9,12 56:4,7,21
56:24 80:23 82:6
84:16 85:25 109:9
162:4,9 166:8
182:2 186:11

| | | | |
|---|---|---|---|
| **recollections** 22:20 | **regard** 58:6 91:11 134:16 149:24 178:4 | 61:6,14,16 62:2,16 62:17,18 63:12,14 74:24,25 75:9,10 | **rent** 22:25 23:5 25:11 36:4,16 39:12 52:22 93:6 |
| **recommend** 110:16 | **regarded** 117:25 | 89:6,16,19 91:7 | 94:6,9,20 116:20 |
| **reconcile** 54:21 172:22 178:12 | **regarding** 39:7,12 47:6 50:10 69:23 | 128:13 129:11,16 130:2 173:6,20 | 119:2 133:11 139:7 141:11 |
| **reconciled** 63:9 131:3 137:16 | 103:18 109:13 | 186:24 187:4,8,13 187:15 189:21 | 150:13 151:23,24 152:3,7 154:3,9,10 |
| **reconciler** 178:19 | **regards** 24:12 | 190:6 | 154:12 155:5,15 |
| **reconciles** 104:11 | **regimented** 42:13 | **reliability** 53:6 54:6 | 155:15 156:13 157:9,22 158:9 |
| **reconnaissance** 85:17 | **region** 28:11,17 | **reliable** 116:9 | 160:7,21 161:3,4,5 |
| **reconstruction** 82:16 | **regional** 14:4 16:11 | 132:22,24 | 161:5 166:9 186:2 186:8 190:2,4,25 |
| **record** 4:3,19 24:10 65:7 108:8 | **registered** 2:15 193:7 | **relied** 41:25 129:16 161:17 166:23 | **rental** 12:9 23:12 49:7 50:16 94:22 |
| 123:25 124:5 184:22 185:2 | **rejected** 24:4 148:5,20 | **rely** 164:4 | 96:4 98:15 128:7 138:17 140:10 |
| 187:7 191:17,21 192:5 193:14 | **related** 4:14 30:25 36:22 56:18 | **relying** 116:24 117:8 | **renting** 154:25 |
| **recorded** 77:14 | 189:17 193:17 | **remained** 185:24 | **rents** 133:7 |
| **redevelop** 137:11 | **relates** 47:23 82:2 | **remaining** 33:14 127:23 138:19 | **repeat** 22:8,10 75:3 101:14 |
| **redevelopment** 121:7,8 155:22 | **relating** 44:11 | **remember** 46:20 | 156:18,21 |
| **refer** 66:2 67:4 76:20 111:13 | **relationship** 187:25 188:4,24 | 47:11,17 81:7,10 84:18 88:3 169:25 | **rephrase** 187:11 |
| **reference** 67:5 | **relationships** 188:6,11 189:3 | 170:2 | **report** 9:9,10,13 10:20 18:20 27:16 |
| 87:24 95:22 103:2 179:16 | 190:12 | **remiss** 59:2 150:21 | 38:21,21 39:17 42:6,9 43:5 44:8 |
| **referenced** 10:12 | **relative** 18:14 32:4 47:2 52:22 67:11 | **remote** 1:12 2:11 | 44:15,22,24,25 |
| 29:22 37:10 61:7 164:16 | 71:6,13 77:13,16 | **remotely** 4:6,17 6:21 | 45:14 46:12,17 47:7,14 48:8,18,19 |
| **references** 9:12 | 82:22 89:3 103:10 104:14,21 122:25 | **render** 48:17 73:2 | 48:24 49:19 50:10 50:16 51:6,13 |
| 14:4 | 125:14 131:11 | 73:10,15 74:8 90:11 104:6 117:7 | 52:4,15,16,25 53:2 |
| **referring** 135:14 188:7 | 141:6 | 178:6 | 53:7,16 54:5 55:2 55:11 59:23 60:19 |
| **reflective** 175:10 | **relatively** 153:18 | **rendered** 38:20 | 60:19 61:2,8 |
| **refresh** 10:16 | **relevance** 62:13 189:20 | 46:18 103:16 175:15 | 62:22 63:11 65:16 |
| 42:20 50:7 68:12 92:25 100:21 | **relevant** 44:5,17 | **rendering** 45:13 | 65:21 66:3,7,17 67:5,8,12,13,21,21 |
| 110:21 147:14 | 46:7,8,9,21 47:4 47:12,17,25 52:3 | 46:22 47:18 48:14 62:20 90:22 91:3 | 67:24 68:6,13 |
| | 53:5 55:25 58:4 | | |
| | 60:10,13,20,24 | | |

69:3 70:2,7,8
72:18 73:3,15,17
74:13,19,23 75:2,7
75:11,21,23 76:10
76:18,21 77:4,11
77:25 87:5,9,23,25
88:2,6,14 89:2,5,7
89:10,16,18,20,21
89:21 90:6 91:21
92:2 95:9 99:14
99:25 100:12,16
100:23 101:9,17
101:22 102:16,17
102:23 103:6,10
104:8,18,25
107:15 108:7
116:7 125:6 126:8
126:15,16,21
131:21 134:24
138:16 139:2
144:9 151:11
158:21 159:4,10
159:19,25 173:2
175:24 176:7
177:11,22 181:19
184:2 190:20
194:9
**reported** 1:19
**reporter** 2:15,16
4:12 6:12,19,25
64:8 193:8,9
**reporting** 18:15
33:21
**reports** 48:15,22
60:3,14 62:19
71:12,14 88:9
**represent** 5:3,7
**representation**
50:24 90:18
186:12

**representing**
35:17
**reputation** 118:2
**request** 122:3
190:18,22
**requested** 37:15
64:2
**requests** 185:6
**require** 24:17
26:12 104:19
140:18
**required** 7:7 17:6
140:6 160:8
**requirement**
138:8 190:18
**requirements**
72:23 159:6
**requires** 186:15
**requiring** 173:9
173:23
**research** 87:2
89:25 103:4,7,17
103:23 104:2,4,19
128:22 150:23
151:3 157:12
167:13 176:15
**reserve** 132:4
**reset** 26:20 39:8
39:12 52:22 102:5
**reside** 14:8,9
**residential** 127:15
135:5
**residual** 88:11,22
92:11,14 95:14
98:21 100:5,7
114:12 117:10
118:9,23 119:7
122:7 139:16,19
162:23 163:10
174:5

**resolution** 30:11
**resources** 27:21
**respond** 72:7
**response** 136:5
**rest** 35:3 66:25
**restaurant** 82:10
143:13
**restaurants** 28:21
29:2,5,11
**restricted** 67:22
69:2 75:22 87:25
**restrictive** 87:9
89:21
**restructuring**
33:24
**rests** 55:15
**result** 54:14 61:23
105:23 136:16
164:24
**results** 105:5
103:3 176:6,10,13
**resumed** 65:4
**retail** 85:23 86:2,3
86:8 119:19 120:6
121:15 122:13
123:13 124:11
125:20 135:10
136:12,14 137:20
137:24 138:3
141:18 143:6
144:3,12,17,19,20
144:20,21,21
145:2,5,24 146:5
146:11,24 147:7
148:23 149:6,8,12
149:14,16 150:3
151:7,9 155:19
157:5 165:6,19
167:5,11 168:19
169:17 170:16
172:5

**retailer** 145:16
**retained** 28:12
87:6
**retention** 69:22
**return** 135:9
137:23,24 169:15
171:7,7
**reversion** 154:19
**review** 10:13
12:16,24 38:17
44:23 45:5,12
53:22 56:2 58:21
60:3 66:7,21 73:4
73:23 76:17 77:3
77:9,10 87:13
88:5 103:21 113:5
151:16 176:5
183:25 185:13,16
185:19 189:9
**reviewed** 44:6,9
44:16 45:9 46:3
48:22 65:12 88:2
88:3 121:12
181:18
**reviewing** 12:4
39:14 45:21,22
65:15,25 97:21
**reviews** 175:17
176:20
**rezoning** 189:25
**right** 6:2,9 8:3,23
9:6 16:22 27:25
28:4 30:8,11
32:19 33:23 35:24
41:17 43:7 44:3
48:15 50:21 51:4
51:10 57:3,16
59:14 63:25 69:10
69:14 72:7 74:19
82:15,17 84:3,4,10
84:11 87:14 93:9

93:12,14,20,25
94:13,18 95:20,23
98:22 99:4,7
100:16,19 101:7
103:12 105:10,19
105:23 106:3
109:5 112:19
113:22,24 114:4,7
114:10,13,16,20
114:25 115:5,10
116:10 117:14
118:14 126:16
127:2 128:8
132:14 137:2
138:21 140:7
141:21,25 143:7
144:18 145:14
148:11 149:4,22
152:4,9,12,16
153:6,19 154:5,8
154:14,17,19,22
155:2 156:10,15
156:16 157:4
161:14 163:21
165:7,19,23
167:19 170:4,12
170:23,25 172:6,9
173:18 174:13,16
175:21 176:8,11
180:21,25 181:21
182:5,7,20,24
183:6,10 184:3
185:17 186:10,13
187:14 188:16,17
189:2,14 191:6
**rights** 190:19
**rise** 136:24
**rises** 81:25
**risk** 153:20,22
161:8,12

**risky** 153:17,23
**rivera** 3:20 4:10
**rockaway** 35:16
35:23
**role** 11:21,22 12:3
41:7 58:18 134:4
159:3 160:2 177:3
177:9
**roles** 18:21
**room** 8:5
**root** 68:13 159:18
**rottenberg** 39:25
40:4 46:2 47:3
**rottenberg's** 46:7
46:23 47:5
**rough** 20:17
**roughly** 24:21
34:7 45:16 50:19
52:5
**rpr** 1:20 193:25
**rule** 27:5,10,13
**rules** 25:22
**run** 34:25
**rutgers** 13:17,25
**rxr** 143:20
**résumé** 118:3

**s**

**s** 3:2,17 65:2,2,2
195:4
**safe** 153:18
**sales** 92:2 94:12,17
94:23,23 95:23
96:5,16 97:6,16,23
98:4,8 119:13,21
119:25 120:5
121:15,19 122:22
122:23 125:3,8
128:3 139:8 174:6
**sam** 39:24 40:3
46:2

**sat** 60:7 144:6
145:3 146:3
**satellite** 85:15
**satisfied** 158:7
**satisfy** 138:7
151:25
**saturday** 78:10
83:10
**saved** 126:22
**saw** 12:24 82:5,23
82:24
**saying** 37:6 70:16
140:25 154:24
159:20 181:2,5
189:5
**says** 59:23 68:24
87:5 95:2 96:17
98:18,19 112:9
126:17 136:23
142:18 163:15
**scale** 131:9 166:9
**scanning** 49:4
**scenario** 41:8
**scene** 85:16
**schematic** 146:14
**scope** 29:13 46:13
52:12 89:3 90:15
104:5 134:5
151:21 158:14
160:2 163:8
176:23 177:7
**scoured** 168:5,11
**screen** 8:17 48:20
50:14 51:6 93:20
100:20
**screens** 8:8
**scroll** 93:4,10,25
**scrolled** 60:6,8
67:16
**scrolling** 93:13

**scrubbing** 158:15
**se** 57:8
**search** 70:13
71:23 72:2,11
109:11
**second** 24:12
25:15,15 33:18
57:2 88:14 89:2
91:18 93:9 94:25
95:2,18 96:17
110:9 111:10
112:3 126:20,24
126:25 142:17
182:23 186:15
**secondary** 122:18
**section** 43:11,23
43:24 44:3,18
59:22 65:16 67:4
67:16 176:19
**see** 8:8,11,12,15,19
39:17 41:18 43:2
43:14 64:9 68:12
69:6 71:8,21
81:24 83:14 87:11
93:15 110:7 111:6
112:13 127:18
130:7 135:11
136:13 146:14
148:10 159:9
179:11
**seeing** 49:15 61:24
83:19 84:18 88:3
93:8 167:10,14
**seelig** 3:12 5:7
40:10,18 41:24
69:8 87:6
**seen** 48:25 167:15
**select** 69:13 97:2
**selected** 91:15
130:24 177:16

selection  106:19
159:16
sell  153:12,13
171:24
seller  139:23
selling  153:9
seminars  19:18
sense  107:8 140:2
sentence  68:23
89:3 95:6,12
96:17 98:17,18
sentences  95:19
96:13 97:4
separate  99:7
189:2
september  38:16
78:6
serve  28:21
served  23:4,24
25:9
service  29:2,5
164:9
services  30:21
serving  25:5
set  58:9 69:2 75:22
92:10 141:8 146:2
174:18 179:2
193:12,22
sevelka  173:14
174:11 180:11
seven  29:20 45:4,6
share  8:16,22 39:4
41:13 42:21 68:7
93:20 156:14
157:10,15
sharon  48:3,14,22
49:7 50:20,23
51:5,11 180:14
183:10,20
sharon's  181:19
182:11 183:20

sharyl  3:25
shaun  50:12
sheet  195:1
short  135:23 136:7
142:18
show  49:19
showed  151:8
showing  67:19
71:13
shown  44:14 45:23
50:15 70:6 168:24
side  81:3,8 82:8,15
172:16,17 188:19
sides  137:15
178:11 188:17,18
sidewalk  82:16
signals  6:20
signature  43:10
193:24
signed  50:11
signifi  35:2
significant  28:20
34:9 62:13 80:13
90:7 190:2
signing  104:14
silent  173:25
similar  92:4 104:9
108:17
simon  41:19
simple  94:16,23
96:5 115:18
177:17
sir  101:3 110:18
111:12,16,19,24
112:5
site  78:2,4,13,17
78:21 80:5,7,11
81:20 82:21 84:19
109:11 119:19
122:11 127:15,17
135:4,6 137:11

138:2 139:24
152:2,11,23
153:16 156:9,22
166:5,17 171:24
182:3,12 188:2
sites  120:6
situation  136:17
137:5 154:15
163:11 177:6
179:20
situations  57:24
104:9 121:4
179:11
six  29:20 113:21
144:6 145:4 147:8
size  45:17 156:17
skimmed  66:25
skip  87:7
slightest  169:2
slope  79:12
slow  93:13
slt  1:7
small  31:9 149:7
smaller  165:8
smooth  129:17
solutions  4:13
32:18
solved  138:12
somebody  154:4
154:10 155:25
156:23 168:20
somewhat  63:12
97:4 189:16
son  79:9,15
sophisticated
101:24
sorry  13:14 56:22
77:4 107:10
137:18 161:2
sort  66:24,25
70:12 190:11

sorts  97:24
sounds  8:20 31:11
109:3
source  132:13,21
164:16
sources  71:4,6
146:18
south  20:23
southerly  84:2
southern  22:7,17
22:21 28:10
space  144:4 145:2
145:13,20,22
146:3,5,11,21
147:7,9 148:23
150:3 151:9
154:25
spaces  144:12
145:5
span  129:23
speak  10:7 26:21
29:25 87:3 108:11
speaking  6:23,23
7:2 51:25 60:21
special  117:18
153:10 155:18
specialty  144:21
specific  18:2 39:20
44:5 86:21 89:17
91:19 100:10
101:15 103:25
109:14 114:20,23
115:14 120:7
121:3,5,21 123:10
123:12,16 131:4
131:17 133:14
143:4,6,7,11
144:12 145:6
146:10,10,20
148:19,23 154:15
156:22

**specifically** 26:19 26:24 31:24 36:18 37:8 55:11 56:15 67:17 81:5 109:9 131:15
**specifics** 63:5 134:22
**spend** 65:14,21
**spending** 45:16
**spills** 68:23
**split** 65:22
**spoke** 11:7 84:21 107:17 118:5
**spoken** 10:24 39:24 40:3 41:18 50:23
**spooling** 68:15
**spread** 55:14
**spreadsheets** 67:15,18 71:15 72:19 76:4 89:22
**square** 123:13 126:6 136:24 138:3,5 139:20 144:3 147:6 148:22,25 150:3,7 150:12,14 157:9 165:6,18 166:4,7 167:4
**ss** 193:4
**stacy** 3:23
**stages** 19:17
**stamp** 68:20 126:19
**stand** 35:6 61:3 82:6 112:20 145:10
**standalone** 145:17
**standard** 88:5 91:24 95:3 96:14 98:12 105:12

**standards** 104:14 176:2
**standing** 83:12 84:9 143:12
**start** 6:23 45:10 89:14 101:20
**started** 21:9 27:24
**starting** 34:25
**state** 2:17 4:18,21 18:2 20:22 22:4 22:12 105:3 193:3 193:10
**statement** 75:20 112:16 134:25 142:25 173:12,13 174:8
**staten** 34:23 120:13 124:15
**states** 1:2 16:14 135:7 173:16
**statistics** 19:11,11 19:12
**steady** 83:8
**stein** 3:4 5:3
**step** 137:13
**stepped** 136:20
**steps** 70:24 89:17 91:19 99:12,17 100:6,10 101:15 102:21 113:21 139:14 143:4
**stood** 46:6,10
**stop** 180:7
**stopped** 55:22
**store** 120:14,21 121:6 124:15,19 126:23

**story** 137:2
**straddling** 188:18
**straight** 34:5
**stream** 83:8
**street** 3:6 32:4 80:21,23 83:3,6,8 85:7,11,16 86:2 143:25 144:5 145:3 146:12 147:7 149:13,18 150:4,13
**strength** 119:15
**stretch** 84:25 85:8
**structure** 61:22
**structured** 91:13
**studies** 168:23
**study** 112:8 113:11 116:23
**stuff** 79:14
**subject** 41:15 56:11,17 63:20 78:2 82:3 103:11 108:13,18 109:11 113:14,18 114:16 127:13 130:22 135:3 157:22 180:20
**subject's** 127:9
**submitted** 39:18
**subscribed** 192:13 195:22
**subsequent** 61:19 103:9
**successful** 190:3
**sufficient** 74:7 90:10 91:6,7 121:21
**suggest** 64:5 119:24
**suitable** 145:15

**suite** 3:7
**summarize** 113:6
**summary** 18:21
**superfluous** 73:13 73:21 74:11
**supply** 108:17,20 113:16 114:10 115:4 142:7 149:20
**support** 30:20 33:6,10 115:14 141:21 142:20
**supported** 72:20 105:22 115:9 122:21 128:12 141:25 142:22 172:4
**supporting** 68:2 165:5,18,22 166:2 166:14
**supportive** 131:6 131:18 133:15 139:5 163:16
**supreme** 22:15
**sure** 12:25 35:25 49:21 57:4 62:4 72:14 79:20 86:7 108:8 168:5,10 187:7 191:11
**surplus** 108:19
**surround** 86:18
**surrounding** 80:10 85:24 86:9 86:23
**swift** 161:18
**sworn** 5:11,20 192:13 193:13 195:22
**system** 169:6

| t | | | |
|---|---|---|---|
| **t**  23:22,22 65:2 193:2,2 | **taxpayer**  149:4,7 149:9 | 129:2,6,15 131:2 131:21 134:18 | **terms**  23:10 55:18 70:2 77:17 97:13 |
| **table**  126:17 188:17,20 | **teach**  19:5,6,11 21:20 111:22 142:5 | 135:7 138:7 141:7 143:5 144:16 147:4,20,24 149:3 | 122:13 150:8 159:7 163:9 173:25 180:6,9 |
| **take**  6:19,25 7:11 7:13 26:5 58:6 64:2 80:4 89:17 91:19 99:12 100:10 101:15 123:20 161:8,11 184:6 | **teaching**  19:20 **teachings**  100:8 **teams**  18:13 **technique**  91:25 95:4,15 98:21 100:5 164:20 | 157:8,21,25 158:4 158:8 160:7,21 161:14,17,22 162:6,19 163:3 166:6 167:3 169:3 170:22 172:23 173:19 176:16 | 189:11 **test**  91:10 176:15 **testified**  5:13 10:17 55:13 59:25 65:5 71:19 112:21 124:8 155:24 162:6 181:2 182:8 |
| **takeaway**  56:12 **takeaways**  26:17 **taken**  4:5 64:13 124:2 170:19 173:13 184:23 191:18 | **techniques**  89:7 91:21 92:14,16 99:14,25 104:15 **telephone**  10:4 **tell**  5:22 41:24 42:23 113:7 144:11 150:11 | 183:18 185:5 186:24 190:10,17 190:24 191:6 **tener's**  11:22 12:3 44:24 45:11 47:7 48:8 52:15 53:7 | 182:18 **testify**  21:24 61:3 **testimony**  7:22 22:22 24:5,13,17 30:21 33:11 46:6 47:5,12,25 48:12 |
| **takes**  175:2 **talk**  28:24 95:19 131:7 154:14 180:25 | **telling**  84:7 **tells**  144:14 **tenant**  143:21 145:23 155:12 | 53:14 54:8 55:2 60:14 62:22 63:17 66:16,22,23 69:14 72:15 73:17 77:3 | 52:18 53:16 56:6 56:20 61:8 66:19 72:5,21 87:17 90:19 113:11 |
| **talked**  22:16 23:15 36:15 38:18 94:11 149:9 183:3 | 169:8,13,14,18,18 169:22 170:3,19 171:13 172:22 189:15 | 77:4,11,21 87:14 90:23 91:10 104:12 116:16 121:12,25 123:4 | 116:6 129:8 147:13 193:15 **textbook**  100:9 **textron**  23:22,22 |
| **talking**  65:11 109:3 131:8 149:10 154:15,22 161:4 169:25 170:2,3 171:20 189:8 | **tener**  9:11 10:25 11:7 12:21 13:5 39:11 45:23 49:17 50:12,15 51:17 52:6 53:4,11 55:6 58:13 59:12 63:7 | 126:14 133:19 134:24 138:16 141:17 144:25 148:21 150:11 151:4,6,10 159:9 166:2 171:6 | **thank**  93:23,24 101:5 184:13 191:22 192:2,3 **thanks**  5:19 **themes**  26:6 **theresa**  117:24 |
| **talks**  63:2 127:8 **task**  177:10 **tasked**  31:25 51:21 | 63:13 66:13 67:21 71:19,23 72:22 87:10 88:19,21 90:8 91:4,24 94:12 98:13 99:2 | 177:22 183:23 **tenure**  19:20 **term**  82:22 88:4 127:23 135:10,23 138:19 140:19 | 132:17 **theresa's**  133:2 **thing**  7:12 13:14 51:16,24 61:15 181:20 |
| **taught**  19:2,13,14 19:17,23 20:2,10 **tax**  28:22 29:17 69:24 77:18 **taxes**  170:20 | 102:2 115:24 117:13,22 121:18 123:11 125:5 126:8 127:21 | 154:16 180:12 189:7 **terminology**  98:3 | **things**  46:10 59:18 60:18 70:9 152:13 155:9 |

**think** 6:5 10:5
12:17 16:9 18:19
19:25 20:4 22:15
26:2,16 27:14
29:9,10 32:23
33:17,22 34:23
36:9 37:13 38:19
41:10 45:17 46:10
49:2 51:8,20 52:2
53:18 56:5 57:7
58:6,16 60:17
61:3 62:8,13
63:23 75:17 78:7
80:2 92:3 98:2,17
99:11 103:13
109:25 120:11
124:14 128:17
129:13 131:14
137:7 149:3,7
159:24 178:8
179:9,10 182:8
183:2 184:15
187:6 189:21
191:9
**third** 12:16 32:8
54:20 58:21 91:14
95:18 98:18 101:6
101:8 102:8
104:10 127:7
130:24 137:16
138:12 140:23
151:18 158:13
159:16,23 160:13
163:17 177:8,15
177:20,23 178:19
**thomas** 87:10
**thorough** 66:7
**thought** 62:2,15
132:3,7
**threads** 71:5

**three** 37:19 63:4
88:5 102:9,25
**thursday** 1:15
**tie** 131:15
**time** 4:21 7:2 11:4
11:6 15:6 16:3
19:23 20:10 23:13
36:2 38:11 40:24
62:11 63:16 64:3
64:11 65:3,6,14,17
65:20 78:11,23
80:12,20 82:5
86:20 87:3 97:7
99:8 110:20
123:23 124:4
129:18,23 130:10
133:8 136:8 142:2
142:8 151:3
164:19 170:18
172:20 184:16,21
184:25 188:7
191:16,20,25
192:4,6
**times** 6:4,7 13:4
21:23 22:2 23:9
40:22 79:22
**timing** 188:11
**tn** 132:16
**today** 5:17 7:14,22
8:2 9:8,16 10:9,14
35:7 38:18 191:23
**told** 188:14
**tom** 9:11 10:25
40:6 47:16 50:11
115:24 117:13
121:12,18 132:10
132:11,14 133:2
177:22
**tom's** 136:22
**tools** 59:15

**top** 93:19 109:15
**topic** 137:18
**total** 65:17 172:3
**totally** 42:18
159:25 189:2
**touched** 25:8
**track** 35:20
**tracks** 82:2
**trade** 131:11
180:12
**traditionally**
136:6
**traffic** 80:13 81:2
82:8,20 86:5
156:3,15,24
**transaction** 125:9
125:17 187:12,15
187:21 188:21
**transactionals**
145:18
**transactions** 63:3
63:20 120:10,17
121:2 124:9
125:24 128:18
**transcript** 45:16
45:22 46:3,8,11,23
47:9,16 56:3
**transcripts** 45:5,6
**transfer** 61:23
62:4 63:8
**transparent** 160:2
177:2
**treatise** 43:22
**treatises** 108:12
**trenton** 23:17
**triple** 29:8
**true** 69:11 140:2
187:18 193:14
**truth** 5:22
**try** 68:16 97:17
138:13 144:24

178:11
**trying** 12:8 18:18
33:22 34:23 35:20
37:13 99:22
125:19 134:11
180:11 189:7
**turn** 43:9 80:15
87:4 134:23
142:12
**turning** 82:12
141:17
**two** 19:9 38:20
54:12,21,24 55:15
97:4 99:3,7 102:6
104:6,11 107:15
107:15,22 112:6
115:16,21 120:10
120:17 121:4
130:23 178:12,24
182:19 188:15,19
**type** 11:15 29:4
31:18,20 33:4
41:9 69:17 109:14
121:5 129:23
130:14 149:4,12
178:5
**types** 28:6 57:24
70:8 85:19 121:2
121:7,8 125:15,22
131:10
**typical** 130:6
159:7 172:19
**typically** 69:18
70:11

**u**

**ultimate** 70:5
103:19,24 108:4
108:23 123:5
136:20 157:25
159:12

| | | | v |
|---|---|---|---|
| **ultimately** 107:7 107:19 122:10,20 139:17 | **united** 1:2 **universe** 43:17 **university** 13:15 13:17,18,20 | 142:21,21 143:6 151:20 155:19 157:5 158:8 160:21 163:3 | **v** 25:18 **vacancy** 149:17 **vacant** 32:12,14 35:10,11,20,22 |

**ultimately** 107:7
107:19 122:10,20
139:17
**um** 114:5
**unaware** 12:23
77:23
**underlying** 29:12
187:24
**understand** 5:20
5:23 6:15 7:3,17
8:25 55:3 57:20
72:17,22 99:22
113:19 114:22
116:13 126:4
127:20 144:23
146:8 152:7
156:19 171:16
182:21 189:7
190:11
**understanding**
25:21 26:12 48:6
51:15 59:10 62:3
76:8 88:13,16,20
88:24 113:8 115:3
117:16 182:20
**understood** 6:17
19:22 34:6 55:17
55:19 69:3 75:23
76:2 133:5
**undertake** 88:22
103:3
**undertaken** 88:19
150:20
**unencumbered**
140:11
**unfettered** 174:13
**unimproved**
119:21
**unique** 155:10,10
155:18,20,21

**united** 1:2
**universe** 43:17
**university** 13:15
13:17,18,20
**unreasonable**
167:19 175:20
**unrelated** 187:3
188:23
**unreliable** 175:21
**unusual** 107:14
**upper** 162:3
**usable** 103:12
170:10
**use** 8:17 19:8,24
20:9 54:15 55:12
55:16,19 59:16
67:23 71:21 89:12
92:4,13 96:20
97:3,6,9,16 99:7
100:8,14 101:11
101:19,21 102:3
102:12 104:8,13
105:4,5,7,13,15,17
105:18,21 106:2,8
106:10,15,21,23
107:6,9,21 108:2,4
108:5,6,7 110:23
111:21,23 114:20
114:23 115:5,7,14
115:17,22,25
116:15 118:17
119:20 120:6
121:16,21 122:11
122:13,14,15
123:6 124:11
125:20 127:9,12
129:23 135:2,14
135:18,19,22,25
136:7,11,21 137:7
137:9 141:19,21
141:23 142:5,19

142:21,21 143:6
151:20 155:19
157:5 158:8
160:21 163:3
165:10 168:22
175:10 176:23
178:25 180:3,19
180:21 181:7,14
181:23,24 182:6
182:12,22,24
183:4,16,21 190:5
190:7 194:12
**useful** 129:22
184:12
**user** 89:12 101:11
101:21,23 104:8
109:12 118:18
144:15 146:6
153:2,6,17 154:2,7
161:11 166:3,15
170:2,16 171:21
**users** 119:22 121:5
176:24
**uses** 97:13 99:9
107:4,4,16,18,23
125:15 127:10
128:4 138:7
139:13 144:17
162:22 163:14
164:10 174:4
182:20
**uspap** 52:20 53:24
62:23,25,25 63:18
72:23 88:5 159:6
159:8 174:19
175:25 176:8
177:4,5 190:18
**usually** 70:6
109:15

**v** 25:18
**vacancy** 149:17
**vacant** 32:12,14
35:10,11,20,22
91:25 95:4 96:17
119:19 120:6
127:13 135:3
144:6 145:3 146:3
147:8,10
**vague** 51:23 179:9
181:4,12
**vaguely** 49:9
**valuable** 135:19
**valuation** 16:8
18:14,14 23:6
25:4 26:8,22 28:9
28:15,20,25 29:13
32:12 33:7,17,20
34:2,5 36:11
37:18 52:5 55:2
57:16,21 58:15
59:6 96:16 133:21
164:9,25 167:21
168:22,23 173:6,8
173:21,22 175:6
175:21 181:4
**valuations** 23:2
36:4
**value** 11:25 12:6,7
12:9 29:8 41:7
49:7,16 50:17,21
50:23 51:17 55:6
58:23 59:9,13
94:21,22 96:3,4
97:11 98:16 103:9
105:6,23 106:6,7,8
106:15,17 107:2
107:20 109:19
112:11,22 125:5
128:7 129:12

135:23 138:17
140:10 154:19
176:22 179:7
181:6 182:7
190:25 191:2
**valued** 49:17
94:15 99:2 140:6
140:18
**values** 107:2
179:22
**valuing** 35:9 51:16
91:25 95:4 138:8
**vanderbilt** 1:7 4:8
5:8 61:20 67:6
74:17 78:16,18
81:13,14,19,21
82:9 83:13,14,23
83:25 84:3,4,12
143:10,14,17,18
185:8 190:9 191:6
195:2
**vanderbilt's** 7:5
61:10 185:25
186:8
**vanilla** 169:20
**various** 28:22
31:22 59:15
178:20
**varity** 55:14
**vast** 31:11 179:21
**vastly** 54:16
**verbally** 6:18
**veritext** 3:21 4:13
8:16,21 42:7
49:23 50:3,6
92:22 93:17 110:3
110:7,13,19
**versus** 4:8 25:15
109:12,15
**videoconference**
2:14

**videographer** 3:20
4:2,11 64:11 65:6
123:23 124:4
184:21,25 191:15
191:20 192:4
**videotaped** 1:12
2:11
**view** 8:17
**vii** 43:12 44:3,18
59:22 65:16,25
67:4
**visit** 78:13,21
79:10 80:5 81:20
82:21
**visited** 78:9
**volume** 80:13
**vs** 1:6 195:2

**w**

**wait** 94:8 135:24
137:9 139:21
**waiting** 100:20
**walder** 3:4 5:3
**walked** 59:2
**walking** 83:5,9
**walsh** 3:9 4:24,25
5:15,18 26:10
27:3 42:4,18,22
49:21 50:2,4,8
52:10 54:22 55:21
63:23 64:6 65:9
73:18 79:6 86:16
90:21 92:19 93:2
93:22 94:4 96:11
98:10 99:21
107:10,13 109:24
110:4,10,15 111:2
119:12 123:9,18
124:6 125:11
126:13 130:12
132:9 134:17
140:16 145:10

146:7 147:3 158:3
158:22 167:2
168:9 170:21
172:13 178:16
179:23 181:11,17
182:17 183:5
184:5,10,14,18
185:3 186:22
187:19 188:13
191:3,9,22 194:4
**want** 60:16 62:6
62:10 65:12 80:21
108:8 145:24
153:18 154:10
177:18 184:17
187:7
**wanted** 154:10
**wants** 145:16
**watching** 8:11
86:5
**water** 32:4 37:10
**way** 26:24 48:21
74:12 76:22 83:22
91:12 94:15
111:18 137:13,14
137:17,21,22
138:14 159:25
160:11 193:19
**we've** 36:7 37:9,14
66:13 67:15
123:18 149:13
183:2
**week** 9:18 78:9
**weight** 122:19
139:4
**wendy's** 29:10
**went** 13:15 47:5
52:13
**west** 84:5
**westchester** 22:16

**whereof** 193:21
**wide** 54:17 55:14
**widgets** 171:23
**willing** 39:13
139:22,23
**winded** 138:10
**wise** 34:10
**witness** 5:11 26:2
26:16 42:12 52:9
54:11 55:9 64:4
73:9 86:15 90:15
93:24 96:10 98:2
99:19 110:12,18
118:16 121:24
123:22 125:8
126:11 130:10
131:25 134:4
140:15 145:12
146:23 157:19
158:12 166:19
168:4 170:12
172:11 178:3
179:9 181:10,16
182:15 183:2
184:16 186:20
187:17 188:10
190:15 191:8
192:2 193:11,15
193:21 194:3
**wondering** 37:22
**wood** 161:24
**word** 67:23 96:19
99:9 188:22
**words** 6:19 71:4
119:3
**work** 21:20 24:16
24:24 25:3 28:19
28:25 29:4,14
30:20,24 31:12,19
31:20 33:4,10,25
34:4,7,11,12,22,22

36:22 37:4,5,11,14
37:16 38:12 52:13
52:17,20 53:17
64:7 67:4,6,7,11
67:14 68:3 69:5,9
69:18 70:6,10,12
70:23 71:13,22
72:15 73:5 75:14
75:25 76:6,25
77:4,22 79:24
87:14,16,19 89:3
89:23 90:25
102:17 104:5,18
116:1 119:6
120:12 121:11,25
122:5 123:10
133:2,9 134:6
144:25 148:11,13
151:12,22 158:14
159:5 160:3 162:5
163:8 169:17
171:14 176:23
184:3
**workbooks**   166:24
**worked**   13:5 14:17
14:19,24 15:2,3,3
15:6 28:7 30:8,16
32:17 38:2,24
40:8,12,23 41:2,21
117:13
**working**   11:12,23
12:11,14 28:13
29:22
**workpapers**   87:10
**worth**   41:13 58:7
140:9
**worthy**   52:15
53:18 174:17
**wow**   111:8
**wrapping**   184:6,9

**write**   173:4
**writing**   76:3
**written**   67:24
89:21 95:8 159:25
**wrong**   183:6,8
**wrote**   66:5

|   x   |
| --- |

**x**   23:22 194:2
**xx**   61:12

|   y   |
| --- |

**yards**   83:20 84:19
**yeah**   24:21 31:21
35:13 50:13 68:8
69:15 71:2 79:13
88:23 93:22
181:22 184:8,10
**year**   32:24 38:7
50:17,20 52:6
57:14 58:14 59:5
59:8 127:23
134:12 135:10
136:22 138:19
140:19 154:16,23
155:4 170:14
180:5,9,12 186:3,9
**years**   16:22 21:19
22:19 24:15,19
36:8,12,21 37:3,20
37:23 38:2 43:25
63:4 117:22 118:5
129:22 133:4,9
136:11,12 137:12
139:21 144:7
145:4 147:8
154:17,25 162:12
167:7,11,16 168:2
171:18 180:17
**york**   1:3 2:18 3:16
3:16 14:15,18,24
15:19 16:7,12,18

16:25 17:4,7 20:2
20:2,19,25 21:3,14
21:16,20,20 22:5
22:13,15 25:14,17
28:13 29:21 31:2
31:5,6,12,15 33:2
34:8,12,15,16
36:24 117:21
131:13 167:7,25
168:18 193:3,10

|   z   |
| --- |

**z**   36:10 61:12
**zone**   165:12
**zoned**   127:15,16
135:5,6
**zoning**   37:12
103:18 122:9
126:17 127:10
137:10 139:20
155:21,23 165:11
183:13 185:24
186:4,7,16 190:4
**zoom**   6:22 8:21

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.