# EXHIBIT III

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------X

MCDONALD'S CORPORATION,

                    Plaintiff,

         -against-         Index No.:

                           1:19-cv-06471


VANDERBILT ATLANTIC HOLDINGS LLC,


                    Defendant.

----------------------------------------X


                REMOTE DEPOSITION

                        OF

                  AMANDA AARON




Reported by:  Robin LaFemina, RPR, CLR

Job No.: 787400




                MAGNA LEGAL SERVICES

                   (866)624-6221

                  Www.MagnaLS.com



Page 2

```
 1
 2
 3
 4
 5
 6
 7                    January 21, 2022
 8                    10:13 a.m. Eastern Time
 9
10
11
12          Remote Deposition of AMANDA AARON,
13   taken before Robin LaFemina, a Registered
14   Professional Reporter, Certified LiveNote
15   Reporter and Notary Public.
16
17
18
19
20
21
22
23
24
25
```



Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4   PASHMAN STEIN WALDER HAYDEN, PC
 5   Attorneys for the Plaintiff
 6        2900 Westchester Avenue, Suite 204
 7        Purchase, New York 10577
 8   BY:  BRENDAN M. WALSH, ESQ.
 9        bwalsh@pashmanstein.com
10
11   MEISTER SEELIG & FEIN, LLP
12   Attorneys for the Defendant
13        125 Park Avenue, 7th Floor
14        New York, New York 10017
15   BY:  HOWARD S. KOH, ESQ.
16        hsk@msf-law.com
17
18   ALSO PRESENT:
19        STACY HOWARD, In-House Counsel,
20        McDonald's Corporation
21        SHARYL AMOVITZ, PARALEGAL, McDonald's
22        Corporation
23        MICHAEL HEDDEN, Expert Witness for
24        Vanderbilt
25        JOSHUA PINKUS, Magna Tech
```



Page 4

1

2              THE COURT REPORTER:  Counsel,

3        do you agree that I can swear in the

4        witness remotely?

5              Mr. Koh?

6              MR. KOH:  Yes.

7              THE COURT REPORTER:  Mr. Walsh?

8              MR. WALSH:  Yes, I agree.

9   AMANDA AARON,

10        called as  a Witness, having been first

11        duly sworn by Robin LaFemina, a Notary

12        Public within and for the State of New

13        York, was examined and testified as

14        follows:

15              THE COURT REPORTER:  Okay.  You

16        may begin.

17              MR. KOH:  Okay.

18   EXAMINATION BY

19   MR. KOH:

20        Q.    Good morning, Ms. Aaron.  My

21   name is Howard Koh.  I'll be taking your

22   deposition in this matter, McDonald's

23   Corporation against Vanderbilt Atlantic

24   Holdings LLC.

25              Am I correct that you've been



Page 5

```
 1                    Aaron
 2   retained as an expert witness on behalf
 3   of -- and to prepare a report on behalf of
 4   McDonald's Corporation?
 5        A.    Yes.
 6        Q.    And who retained you?
 7        A.    I was retained by Pashman &
 8   Stein by Brendan Walsh.
 9        Q.    Have you ever been deposed
10   before?
11        A.    Just once.
12        Q.    Okay.
13              Have you ever been deposed by
14   videoconference before?
15        A.    Yes.
16        Q.    Oh, okay.  So you're somewhat
17   familiar.  I'll be asking you a series of
18   questions.  If you at any point are confused
19   by the question or do not hear it, please
20   speak up and I will attempt to repeat or
21   rephrase.
22              Is that fair?
23        A.    Yes.
24        Q.    We will also be showing you a
25   series of exhibits throughout this
```



Page 6

1                       Aaron

2     deposition.  You will be able to access them

3     on the Agile Law platform which we logged

4     into before we got online.  If you have any

5     issues with that, please speak up, we want

6     to be sure that you can see and manipulate

7     the documents without difficulty.

8                 Last thing, it's important that

9     we speak one at a time, particularly on

10    video depositions, court reporters can't

11    take down two people speaking at once.

12                Is that fair?

13    A.    Yes.

14    Q.    And if you need a break at any

15    time, please speak up, and once there is no

16    pending question on the record, we'll be

17    able to arrange the break.

18                Does that sound fair?

19    A.    Absolutely.

20    Q.    Okay.

21                Are you alone in the room where

22    you're being deposed?

23    A.    I am.

24    Q.    And other than the Agile Law

25    platform and the Zoom platform for this



```
 1                    Aaron
 2    deposition, do you have anything open on any
 3    computer screen?
 4         A.     Just the Zoom link.
 5         Q.     Okay.
 6                And do you have your cell phone
 7    with you?
 8         A.     It's next to me and it's on
 9    airplane mode.
10         Q.     Okay.  Very good.  I was going
11    to suggest that.
12                Tell me, what did you do to
13    prepare for today's deposition?
14         A.     I reread my expert report, I
15    reread the depositions of Tom Tener and
16    Sharon Locatell, I had a meeting -- two
17    meetings with Pashman Stein and McDonald's,
18    and I think -- I can't think of anything
19    else.
20         Q.     These two meetings with Pashman
21    Stein and McDonald's, let's talk about the
22    first meeting.  When was that?
23         A.     I believe it was last week, on
24    Friday.
25         Q.     And was it in person or by
```



1                     Aaron

2    videoconference or telephone conference?

3         A.      Videoconference.

4         Q.      And how long did it last?

5         A.      I believe it was just shy of

6    three hours.

7         Q.      And who was present at that

8    meeting?

9         A.      Myself, Brendan Walsh, Stacy

10   Howard and Mike Meyer.

11        Q.      Anyone else present at that

12   meeting?

13        A.      Not that I recall.

14        Q.      Did anyone at that meeting show

15   you any documents to review?

16        A.      No.

17        Q.      The second meeting, when was

18   that?

19        A.      That was Tuesday of this week.

20        Q.      And was that also by

21   videoconference?

22        A.      Yes.

23        Q.      And who was present -- how long

24   did that meeting last?

25        A.      I believe that meeting lasted


MAGNA
LEGAL SERVICES

1                    Aaron

2    around two hours.

3         Q.     Who was present for the meeting?

4         A.     The same people were present.

5         Q.     Did you meet with any employees

6    or representatives of McDonald's who you

7    have not already named in order to prepare

8    for this deposition?

9         A.     No.

10        Q.     Did you review any other

11   materials to prepare for this deposition

12   other than what you've told us, which would

13   be your report and the transcripts of Tom

14   Tener and Sharon Locatell's deposition?

15        A.     Not that I recall.

16        Q.     Have you ever spoken to Carol

17   DeMarco?

18        A.     No.

19        Q.     Describe your educational

20   background for us, please.

21        A.     I have an undergraduate degree

22   from Columbia University, a graduate degree

23   from New York University and I have

24   postgraduate work, coursework toward the MAI

25   designation from the Appraisal Institute.



Page 10

1                        Aaron

2          Q.      When did you get your

3    undergraduate degree?

4          A.      1993.

5          Q.      When did you get your graduate

6    degree?

7          A.      1995.

8          Q.      And when did you achieve the MAI

9    designation?

10         A.      2011.

11         Q.      What does an MAI designation

12   signify?

13         A.      An MAI designation is a

14   professional designation from the Appraisal

15   Institute, that's our national professional

16   organization that promotes the appraisal

17   profession.  The MAI designation is the

18   highest designation that signifies expertise

19   in a wide range of commercial and

20   residential property types.

21         Q.      And you also I think are a

22   member of an organization called the

23   Counselors of Real Estate?

24         A.      I am.

25         Q.      And what is that?



1                    Aaron

2        A.      That is also a professional

3    organization for not just appraisers, but a

4    wide range of real estate professionals.

5    That organization admits members at the

6    recommendation of other professionals who

7    are already members and it signifies that

8    you play a significant role in counseling

9    clients about high level real estate issues.

10       Q.      When did you earn your CRE,

11   Counselors of Real Estate, designation?

12       A.      In 2020.

13       Q.      And when did you earn your MAI

14   designation?

15       A.      In 2011.

16       Q.      What professional licenses do

17   you hold?

18       A.      I hold the state certified

19   general real estate appraiser license for

20   New York.

21       Q.      Are you licensed in any other

22   jurisdictions?

23       A.      I am not.

24       Q.      Have you ever testified as an

25   expert before?



Page 12

```
  1                     Aaron
  2       A.      I have.
  3       Q.      How many times?
  4       A.      Four times including the
  5  deposition, the video deposition.
  6       Q.      Okay.
  7               And in what matters were those?
  8       A.      Well, one -- are you asking
  9  specifically the addresses of the
 10  properties?
 11       Q.      Let me break it down a little
 12  bit more succinctly for you if I can.
 13               All right.  I understand you've
 14  testified before the Kings County Civil
 15  Court in a case called Agudus Chasidei
 16  Chabad of the United States against
 17  Congregation Lubavitch, Inc.
 18               Was that testimony deposition
 19  testimony or trial testimony or some other
 20  testimony?
 21       A.      That was trial testimony.
 22       Q.      Okay.
 23               Did you qualify as an expert in
 24  that case?
 25       A.      I did.
```



1                    Aaron

2       Q.      Okay.

3               And, generally speaking, what

4    was the subject matter of that case?

5       A.      The subject matter of that case

6    was the World Headquarters of the Chabad

7    Lubavitch Organization in Brooklyn, New York.

8       Q.      What was the issue about which

9    you were testifying as an expert?

10      A.      The issue was the fair market

11   rental value of this property or of a

12   portion of the property.

13      Q.      You've also testified in a case

14   called Mercos L'Inyonei v. Lubavitch, Inc.,

15   also in Kings County, Supreme Court.

16      A.      That's the same.  That's the

17   same.

18      Q.      That's the same matter?

19      A.      Yes.

20      Q.      Okay.

21              Well, tell me the other -- you

22   testified earlier that you testified in a

23   deposition once before.  Was that as an

24   expert?

25      A.      Yes, it was.



Page 14

```
1                    Aaron
2         Q.     Okay.
3                And what was the property at
4    issue in that matter?
5         A.     I don't know the address
6    offhand.  It was quite some time ago,
7    between 2013 and 2015.  I believe it was
8    2014.  It was an apartment, multi-family
9    apartment property in Woodside, Queens.
10        Q.     And what was the issue on which
11   you were retained to testify as an expert?
12        A.     The fair market value of the
13   property.  There was a family dispute as to
14   the value in association with an estate.
15        Q.     Did that -- did you also testify
16   at a trial in that matter?
17        A.     I did not.
18        Q.     So you said you had testified at
19   trial at deposition four times.  I've
20   identified two times.  What were the other
21   two times?
22        A.     In 2015, I testified in U.S.
23   Bankruptcy Court about the value of two
24   multi-family properties in Brooklyn, New
25   York, and in 2013 I testified for Brooklyn
```



```
 1                    Aaron
 2    Supreme Court about the rental value of a
 3    piece of land for a short-term period while
 4    the land was used by a developer of an
 5    adjacent building.
 6         Q.     Okay.
 7                And what was the subject of the
 8    2014 testimony in bankruptcy?  What was your
 9    expertise?
10         A.     The subject was the value of two
11    multi-family properties in Brooklyn.
12         Q.     Okay.
13                So that would have been the sale
14    value?
15         A.     That was the sale value; yes.
16         Q.     Okay.
17                And in the 2013 testimony before
18    the Supreme Court of the State of New York
19    in Brooklyn, what was the subject of that
20    testimony?
21         A.     That was land, fair market
22    rental value.
23         Q.     Fair market rental value of raw
24    land?
25         A.     Yes.
```



1                       Aaron

2        Q.     You currently work for your own

3    firm, Aaron Valuation?

4        A.     I do.

5        Q.     And how long have you done that?

6        A.     Since late 2010, early 2011.

7        Q.     Prior to that, where did you

8    work and what did you do?

9        A.     I worked at a firm called

10   Leitner Group and I was a commercial real

11   estate appraiser.

12       Q.     And how long did that job last?

13       A.     12 years.

14       Q.     So that would have taken us back

15   to approximately 1998?

16       A.     That's correct.

17       Q.     And before that, where did you

18   work?

19       A.     Before that, I did not work in

20   real estate.  I worked at Cahner's

21   Publishing.

22       Q.     Okay.

23              In the past, have you ever been

24   retained in your capacity as an appraiser to

25   work for McDonald's?



```
 1                    Aaron

 2        A.      No.

 3        Q.      So this is the first assignment

 4   you've ever taken for McDonald's?

 5        A.      Yes.

 6        Q.      In the past, have you ever been

 7   retained to work for Pashman Stein?

 8        A.      No.

 9        Q.      So you've said that you've

10   participated testifying as an expert in fair

11   market rental proceedings; is that correct?

12        A.      Yes.

13        Q.      Have you ever also participated,

14   not as a testifying expert, but as an

15   appraiser in a fair market rent reset

16   process?

17        A.      I have.

18        Q.      Approximately how many times?

19        A.      Approximately ten times.

20        Q.      And that is ten times in

21   addition to the times that you were retained

22   as an expert to testify?

23        A.      Yes.

24        Q.      And these ten times where you

25   participated in a fair market rental value
```



Page 18

```
 1                    Aaron
 2   reset, what was your role?
 3        A.    I've been attending -- I've been
 4   a party appointed appraiser and I've been a
 5   neutral appraiser.
 6        Q.    How many times have you served
 7   as a neutral?
 8        A.    I have been engaged as a neutral
 9   seven times, I have fully served through the
10   process two times, two are ongoing.
11        Q.    The two times that you are a
12   neutral are still ongoing?
13        A.    I've been engaged recently as a
14   neutral for two matters.
15        Q.    Okay.
16              So am I correct that as of
17   today, while you've been engaged as a
18   neutral before, none of those matters have
19   gone to completion?
20        A.    Two of them have.
21        Q.    Two of them have gone to
22   completion?
23        A.    Yes.
24        Q.    Okay.
25        A.    Actually three, three of them
```



1                    Aaron

2    have now that -- to correct the record.

3         Q.     Okay.   Three of them have gone

4    to completion.

5                And approximately how many times

6    have you been a party appraiser?

7         A.     Six or seven times.

8         Q.     Okay.

9                And in that context, have you

10   represented both landlords and tenants?

11        A.     I have.

12        Q.     How many times have you

13   represented landlords?

14        A.     It's about even.   Three or four

15   of each.

16        Q.     Have you ever performed an

17   appraisal review before this project?

18        A.     Yes.

19        Q.     How many times?

20        A.     Many.   Difficult to count the

21   amount of appraisal review assignments I've

22   completed.

23        Q.     Okay.

24                And did these appraisal reviews

25   include reviews of appraisals on ground rent



Page 20

```
 1                    Aaron
 2  resets?
 3       A.     Yes.
 4       Q.     And when you -- and when you
 5  were engaged -- excuse me a second.
 6              And when you were engaged as a
 7  party appraiser, did those situations
 8  involve ground rent resets?
 9       A.     Some.
10       Q.     How many?
11       A.     Two properties, although it was
12  more than two engagements.
13       Q.     How many engagements?
14       A.     Many.  It was a years long
15  multi-engagement, multi-phase ground
16  resetting process.
17       Q.     But only two properties?
18       A.     Yes.
19       Q.     And where were these two
20  properties located?
21       A.     These two properties were in
22  Roosevelt Island.
23       Q.     And with respect to the other
24  ground rent reset proceedings where you
25  appeared as a party appraiser, where were
```


MAGNA
LEGAL SERVICES

1                    Aaron

2    those properties?

3        A.      Those are the two -- I -- for a

4    ground rent reset proceeding, I had the two

5    on Roosevelt Island and I believe there's

6    only one where I was a party -- one other

7    where I was a party appointed appraiser, and

8    it was specifically a land ground rent

9    reset, and that was in Brooklyn, New York.

10       Q.      And what was the address of that

11   property?

12       A.      I don't recall the address.  It

13   was on 4th Avenue.

14       Q.      And when you served as a

15   neutral, have you been a neutral in a ground

16   rent reset proceeding?

17       A.      Not specifically a ground rent

18   reset; no.

19       Q.      Have you ever met Tom Tener?

20       A.      Yes.

21       Q.      And how do you know Tom Tener?

22       A.      I know Tom through our joint

23   service on the Metropolitan New York

24   Appraisal Institute Chapter Board and I know

25   him from before that time informally from



Page 22

```
 1                    Aaron
 2   chapter events and courses.
 3        Q.     Have you ever been involved in
 4   an appraisal proceeding where Tom Tener was
 5   also involved?
 6        A.     No.
 7        Q.     Before this assignment, have you
 8   ever had any occasion to review Tom Tener's
 9   work?
10        A.     Yes.
11        Q.     And when was that?
12        A.     I -- in my -- when I was in
13   Leitner Group, I performed third party
14   review appraisal for lenders and I reviewed
15   his work and Shaun Kest's work as a third
16   party appraisal reviewer then.  I don't
17   recall any other specific instances.
18        Q.     And when you reviewed Mr. Tener
19   and Mr. Kest's work, how did you evaluate it?
20        A.     I don't remember specifically.
21   There's always some back and forth in
22   reviews.
23        Q.     Did you ever when you were at
24   Leitner in reviewing Tom Tener and Sean
25   Kest's work find the work to be not
```



```
 1                    Aaron
 2   reasonable or not credible?
 3       A.    I don't specifically recall.
 4       Q.    So you can't recall ever until
 5   this assignment finding Mr. Tener's work not
 6   reasonable and credible; is that correct?
 7             MR. WALSH:  Objection to the
 8       form.
 9       Q.    You can answer.
10       A.    I specifically recall having
11   conversations with them about issues with
12   their appraisal, but I don't recall
13   specifically declaring their work not
14   credible or reasonable.
15       Q.    So what do you recall about the
16   conversations you had with them about their
17   appraisal?
18             MR. WALSH:  Objection to form.
19       A.    Simply that those conversations
20   occurred.
21       Q.    Okay.
22             Can't remember anything else
23   about those conversations?
24       A.    Not specifically.
25       Q.    Okay.
```



Page 24

1                    Aaron

2            Do you know Sharon Locatell?

3       A.      I do.

4       Q.      How do you know Ms. Locatell?

5       A.      Similarly, Sharon Locatell and I

6  served on the Metropolitan New York

7  Appraisal Institute Chapter Board together.

8  I have known her through most of my

9  appraisal career.  It is a very small

10 community of appraisers in New York City and

11 we trade -- have traded comparable data.  I

12 also know her because we both live in

13 Brooklyn, New York.

14      Q.      Have you ever participated in

15 any appraisal proceedings with Ms. Locatell?

16      A.      I have.

17      Q.      And what proceeding was that?

18      A.      There were at least three

19 proceedings.

20      Q.      Describe each time you've

21 participated in an appraisal proceeding with

22 Ms. Locatell and what roles each of you had.

23      A.      There were four proceedings

24 actually.  There was a matter, a ground rent

25 reset for a KFC, the one on 4th Avenue in



Page 25

1                          Aaron

2    Brooklyn, I was the party appointed

3    appraiser.  Ms. Locatell was the third or

4    neutral appraiser.  There was a matter

5    relating to the land value of a development

6    site on the upper east side of Manhattan.

7    We were both party appointed appraisers.

8    There was no proceeding in that matter.  I

9    was the neutral on a land valuation -- this

10   was a mediation, in lower Manhattan, near

11   the World Trade Center, the value of the

12   site, it was a litigation, a family dispute

13   about the value of the property.  I was the

14   neutral.  Sharon was a party appointed

15   appraiser.  And there was a fair market rent

16   reset proceeding regarding a retail store in

17   Manhattan.  I was the neutral and Sharon was

18   a party appointed appraiser.

19       Q.      Earlier in your testimony, you

20   mentioned something called the Metropolitan

21   New York Chapter Board.  What is that?

22       A.      The Metropolitan New York

23   Chapter of the Appraisal Institute is one of

24   many chapters across the country.  It has a

25   national organization, there's regional



Page 26

1                          Aaron

2     organizations and then there's chapters.

3     This chapter covers the metropolitan New

4     York area, but specifically the five

5     boroughs of New York City, and the Board of

6     Directors, each member serves I believe a

7     three-year term, and Sharon, Tom and I have

8     all been in leadership positions within the

9     local chapter.

10         Q.     How do you get to be a member of

11    this Board?

12         A.     Every year the Board goes

13    through a nomination process.  The

14    nominating committee puts forth names of

15    appraisers who -- to put forth into

16    membership roles.

17         Q.     So is it fair to say that in

18    order to become a member of this Board, you

19    are essentially selected by your colleagues,

20    your professional colleagues?

21         A.     That's fair to say.

22         Q.     Did you have any role in

23    selecting Sharon Locatell for this Board?

24         A.     I did not.

25         Q.     Did Sharon Locatell have any



Page 27

```
 1                    Aaron
 2   role in selecting you for this Board?
 3        A.      Not that --
 4                MR. WALSH:  Objection to form.
 5        A.      Not that I know of.
 6        Q.      Did you have any role in
 7   selecting Tom Tener as a member of this
 8   Board?
 9        A.      No.
10        Q.      Did Tom Tener have any role in
11   selecting you as a member of this Board?
12        A.      I don't believe so.
13        Q.      Have you now told us all of the
14   projects you've worked on with Sharon
15   Locatell?
16        A.      That I can recall.
17        Q.      Okay.
18                You prepared the expert report
19   in this matter; correct?
20        A.      Yes.
21        Q.      Okay.  I am going to bring up on
22   the exhibit platform the expert report.
23                (Exhibit YY, Expert Report of
24        Amanda Aaron, marked for
25        identification, as of this date.)
```



1                      Aaron

2      Q.     And let me know if you have it

3   now.  You should be able to see it.

4      A.     Yes.

5      Q.     Okay.

6            Is this the expert report that

7   you prepared?

8      A.     Yes.

9      Q.     What standards did you apply

10  when preparing this report?

11           MR. WALSH:  Objection to the

12      form.

13      Q.     You can answer.

14      A.     This form is in conformance with

15  USPAP, specifically Standards 3 and 4.

16      Q.     And what do USPAP Standards 3

17  and 4 provide?

18           MR. WALSH:  Objection to the

19      form.

20      A.     These are the guidelines related

21  to preparing appraisal review reports.

22      Q.     Did you consider any other

23  standards when preparing these appraisal

24  review reports?

25           MR. WALSH:  Objection to the



1                    Aaron

2       form.

3       Q.      You may answer.

4       A.      Not that I specifically recall.

5       Q.      Okay.

6               Did you consider the Code of

7  Professional Ethics of the Appraiser

8  Institute?

9       A.      I did.  Thank you for reminding

10  me.  Both Standards of Professional Practice

11  and the Code of Professional Ethics of the

12  Appraiser Institute.

13      Q.      Did you consider any other

14  standards?

15      A.      Not that I recall.

16      Q.      What documents did you review in

17  order to prepare this expert report?

18              MR. WALSH:  Objection to the

19      form.

20              MR. KOH:  Let me step back.

21      Q.      Did you review any documents in

22  connection with the preparation of this

23  expert report?

24      A.      I did.

25      Q.      Can you tell me what they are?



Page 30

                              Aaron

1

2       A.      Those documents are listed in

3    the expert report, and it would be helpful

4    to look at those as we --

5       Q.      I believe it's page 39, which

6    you can manipulate.

7       A.      Yes.  I also have a printout of

8    the --

9       Q.      Well, that makes -- that might

10   make it easier.

11      A.      Yeah.  So specifically I

12   reviewed the Complaint in this case and the

13   Answer and Counterclaim.  I reviewed the

14   list of documents here that were produced in

15   this case and the deposition transcripts of

16   Tom Tener and Sharon Locatell.

17      Q.      Did you review any other

18   deposition transcripts?

19      A.      No.

20      Q.      Why not?

21      A.      I -- well, I wasn't asked to.

22      Q.      Okay.

23              And by the person who asked you

24   to review these documents, was that the

25   Pashman Stein law firm?



Page 31

```
 1                    Aaron
 2        A.     Yes.
 3        Q.     Did you review Sharon Locatell's
 4   work file?
 5        A.     I did.
 6        Q.     Okay.
 7               The complete file?
 8        A.     I had access to the complete
 9   file and I reviewed many documents in the
10   work file.  I can't say that I reviewed the
11   complete file.  That would have been quite
12   an undertaking.
13        Q.     Did you review Tom Tener's work
14   file?
15        A.     I did.
16        Q.     Did you review all of the
17   documents in Tom Tener's work file?
18        A.     I can't say whether it was all
19   of the documents.  I reviewed many documents.
20        Q.     How did you decide which
21   documents to review and which documents
22   maybe not to review when you reviewed Tom
23   Tener's file?
24               MR. WALSH:  Objection to the
25        form.
```



Page 32

```
 1                    Aaron

 2      A.    I had access to a database

 3  called DISCO, which I believe included all

 4  of the documents that had been produced in

 5  relation to this case, and DISCO allows for

 6  searching and sorting based on certain

 7  filters, such as the author of a document,

 8  whether a document was a PDF or an e-mail or

 9  an Excel file or a Word file, and as I was

10  reviewing the reports of Tom Tener and

11  Sharon Locatell, I was also searching the

12  database for specific types of work file

13  documents such as e-mail exchanges that may

14  have had a certain text string or Excel

15  files, and I also -- when I couldn't find a

16  specific document that I was looking for, I

17  did occasionally ask for Pashman Stein's

18  assistance in finding documents.

19      Q.    When preparing an appraisal

20  report, does an appraiser have any

21  discretion in the preparation of that

22  report?

23            MR. KOH:  Objection to the form.

24      A.    Of course.  Of course an

25  appraiser has discretion in preparing the
```



Page 33

```
 1                   Aaron
 2  report.
 3      Q.     Are there certain aspects of the
 4  analysis where discretion is permitted and
 5  others where discretion is not permitted?
 6              MR. KOH:  Objection to form.
 7      A.     That's a very general question,
 8  I'm not sure -- I'm not sure how to answer
 9  that.  There's no specific set of rules that
10  appraisers will have discretion in this
11  area, but not that area.
12      Q.     Okay.
13              Is it possible for two
14  appraisers to appraise a single piece of
15  property and come up with differing values?
16      A.     Yes, there -- yes, appraisers
17  often come up with differing values.
18  There's something that we refer to as the
19  range of reasonableness.
20      Q.     And what is the range --
21      A.     And --
22      Q.     I'm sorry.  I didn't mean to cut
23  you off.
24      A.     A range of reasonableness is,
25  you know, there's often a spread of values
```



1                          Aaron

2    that reasonable appraisers could come to the

3    same conclusions within, having undertaken

4    the same scope of work, and so there are

5    often differing opinions of value within

6    this range.

7         Q.    How does an appraiser know what

8    the range of reasonableness is for a

9    particular assignment?

10        A.    Well, this goes to -- this goes

11   to scope of work and it goes to all the

12   training that we have as appraisers about

13   what constitutes a credible and reasonable

14   appraisal report, the kind of data and

15   research and analysis that needs to go into

16   an appraisal report, so if an appraiser

17   hasn't undertaken that -- the appropriate

18   scope of work or the appropriate amount of

19   research, it can often lead to -- or if the

20   appraiser doesn't have competency in

21   appraising this property type or within a

22   geographic area, a value can fall outside

23   this range.

24        Q.    You said if the appraiser hasn't

25   undertaken the appropriate scope of work or



                              Aaron

1
2    the appropriate amount of research.  How do
3    you know when the appraiser has taken the
4    appropriate scope of work?
5         A.     Well, each assignment -- each
6    assignment is -- involves a process of
7    determining the appropriate scope of work,
8    the appraiser is the one that determines the
9    scope of work, and then negotiates or
10   renegotiates scope of work with the client
11   because scope of work can evolve as new
12   facts and data come to light in an
13   assignment, and then the appraiser, as the
14   scope of work changes or depending on the
15   particular scope of work, based on the
16   appraiser's training and judgment, the scope
17   of work needs to be appropriate to the
18   appraisal problem.
19        Q.     And how do you determine whether
20   the scope of work is appropriate to the
21   appraisal problem?
22        A.     Well, this is -- this is the
23   foundation of our years of training and
24   education.  I mean, the courses that we take
25   and that I teach train an appraiser to



Page 36

```
 1                    Aaron
 2   determine which methodologies are
 3   appropriate to which appraisal problem.
 4        Q.     So is it something that's
 5   generally left to the appraiser's judgment?
 6             MR. WALSH:  Objection to the
 7        form.
 8        A.     Each appraiser -- yes, each
 9   appraiser is responsible for determining the
10   appropriate scope of work and that matches
11   the appraisal problem.
12        Q.     And what about the amount of
13   research?  Is that something that is also
14   generally left to the appraiser's judgment?
15             MR. WALSH:  Objection to the
16        form.
17        A.     Well, I'm not sure what you mean
18   by appraiser's judgment in this specific
19   context.
20        Q.     I'll try to make it more simple.
21             How does an appraiser know when
22   an appropriate amount of research has been
23   performed?
24        A.     The appraiser knows that an
25   appropriate amount of research has been
```



1                          Aaron

2    performed when each assumption and data

3    point in the appraisal is well supported and

4    when there is little doubt as to the

5    credibility of the value conclusions.

6         Q.    In an earlier answer, you

7    mentioned you do some teaching concerning

8    appraisals.

9               What have you taught?

10        A.    I have taught the business

11   practices and ethics course through the

12   Appraisal Institute, I have taught the

13   general sales comparison approach course

14   many times, and I have taught the

15   introduction to the HP 12C calculator course

16   which is really an income approach review

17   course on financial functions that can be

18   performed both by Excel and a calculator.

19        Q.    Any other courses that you've

20   taught?

21        A.    No.  I'm authorized to teach the

22   Fair Housing/Fair Lending course.  This is a

23   new course.  But I have not taught it yet.

24        Q.    And how many times have you

25   taught these courses?



Page 38

```
 1                    Aaron

 2       A.      Dozens.

 3       Q.      I'm sorry?

 4       A.      Dozens of times.

 5       Q.      Dozens?  Okay.

 6               Let's take a look at your

 7   report, please, and if you look on page 4 of

 8   the report, in the section titled Summary of

 9   Conclusions, you write:  All of my opinions

10   expressed herein were reached to a

11   reasonable degree of certainty based upon my

12   experience and training in the field of

13   commercial real estate appraisers and my

14   expertise as an MAI designated appraiser.

15               Do you see that?

16       A.      I do.

17       Q.      What do you mean by reasonable

18   degree of certainty?

19       A.      It means that I'm confident in

20   the conclusions within my expert report.

21       Q.      Is it possible that somebody

22   could look at the same situation, come to a

23   different conclusion and still have a

24   reasonable degree of certainty?

25               MR. WALSH:  Objection to the
```



1                    Aaron

2        form.

3        A.      That's always possible.

4        Q.      Are there any standards by which

5    you evaluate what a reasonable degree of

6    certainty is?

7                MR. WALSH:  Objection to the

8        form.

9        A.      I'm not sure I understand that

10   question.

11       Q.      Well, I'm trying to decide or

12   I'm trying to understand how you determine

13   whether your belief is to a reasonable

14   degree of certainty and whether it's not to

15   a reasonable degree of certainty.

16       A.      When I have competency in the

17   property type I'm appraising, and that means

18   both in experience appraising similar

19   properties a certain number of times and

20   also geographic competency, I reach a

21   reasonable degree of certainty.  There

22   certainly are assignments that I've been

23   involved with that it has taken me quite a

24   bit longer and more work to reach that

25   reasonable degree of certainty.  So it



Page 40

```
 1                      Aaron
 2    really does depend on the appraiser's past
 3    experience and, like I said, competency with
 4    a geography and a property type.  And with,
 5    I might add, with, you know, with other
 6    instances of similar appraisal problems.
 7         Q.    What was the appraisal problem
 8    that Mr. Tener was asked to approach in his
 9    report?
10                MR. WALSH:  Objection to the
11         form.
12         A.    I actually --
13         Q.    Do you know?
14         A.    I need to be clear that an
15    appraisal problem, you may be asked to do
16    one thing and discover that the
17    circumstances require you to solve a
18    different appraisal problem, so I can't say
19    specifically what he was asked to do,
20    although it seems from my review of his
21    documents and his work file that his scope
22    of work began with one appraisal problem and
23    evolved to include an entirely different
24    appraisal problem.
25         Q.    And why do you say that?
```



Page 41

```
 1                      Aaron
 2      A.      Well, one version of his report
 3  showed a fee simple value of land and the
 4  second version or the final version showed
 5  both a fee simple valuation of land which
 6  was unchanged from the first and something
 7  that purported to be the value of the land
 8  as encumbered.  The appraisal problem in
 9  this report was extremely muddled and it was
10  really not appropriate to confuse these two
11  scenarios.  The scope of work required to
12  appraise the land as encumbered and per the
13  instructions of the lease is an entirely
14  different scope of work than the scope of
15  work to appraise vacant land unencumbered in
16  perpetuity -- owned in perpetuity.  I'm not
17  sure that the proper scope of work -- I am
18  sure that the proper scope of work for the
19  second appraisal problem, the value of the
20  land as encumbered by the lease, was not
21  appropriately undertaken in this case.
22      Q.      Well, am I correct that,
23  generally speaking, when an appraiser gets
24  an assignment, the first thing they need to
25  do is look at the terms of the lease?  Or,
```



Page 42

```
 1                    Aaron
 2   I'm sorry, the terms of the document that
 3   creates the assignment.
 4           MR. WALSH:  Objection to the
 5       form.
 6           MR. KOH:  Let me rephrase that
 7       and let's do it this way.  I'll
 8       withdraw the question.
 9       Q.    Okay.  I've just brought up a
10   document which was previously marked as
11   Plaintiff's Exhibit 16.  My first question
12   is:  Are you familiar with this document?
13       A.    Yes.
14       Q.    And what do you recognize it to
15   be?
16       A.    This looks to be the Option Rent
17   Addendum in the subject property lease.
18       Q.    This is the document that
19   defines what the appraisers involved in this
20   project were supposed to do; correct?
21       A.    Yes.
22       Q.    And it contemplates the
23   appointment of two party appraisers; is that
24   right?
25           MR. WALSH:  Objection to the
```



Page 43

```
 1                    Aaron
 2      form.
 3      A.      I believe so; yes.
 4      Q.      Okay.
 5              And on the first page of the
 6  document, it says if the two appraisals
 7  differ by more than 15%, then the two
 8  appraisers shall appoint a third appraiser
 9  chosen from a list of three appraisers
10  designated by the National Headquarters of
11  the American Institute of Real Estate Board
12  Appraisers, or if that is no longer in
13  existence, a similar or successor
14  organization.
15              Do you see that?
16      A.      I'm actually looking for that
17  specific -- which paragraph are you looking
18  at?
19      Q.      That's in the final paragraph on
20  the page and it begins the second sentence.
21      A.      I do see that.
22      Q.      So is it fair to say, Ms. Aaron,
23  that what the option rent term contemplates
24  for setting the fair market value is that if
25  the two appraisers differ by more than 15%,
```



Page 44

```
 1                    Aaron
 2  they appoint a third neutral appraiser?
 3       A.     It does say this; yes.
 4       Q.     Okay.
 5              And, in fact, you've served
 6  in -- as the neutral appraiser in similar
 7  situations; is that right?
 8       A.     I have.
 9       Q.     Let's move to the second page
10  then.  I'd like to move to the second
11  paragraph.  The second paragraph under that
12  page says the rental value shall be
13  established based upon the definition of
14  fair market rental value as the price which
15  an average well-informed tenant would pay
16  and an average well-informed landlord would
17  accept exclusive of tenant's improvements
18  knowing all of the uses to which the
19  property can be put without duress on either
20  party.
21              Do you understand that?
22       A.     Yes.
23       Q.     What does that language mean to
24  you in terms of how the property should be
25  valued?
```



Page 45

1                         Aaron

2          A.      The lease is asking for a fair

3    market rental value, simply the rent that a

4    tenant would pay for the property, an

5    average tenant, not a specific tenant, and

6    that an average or typical landlord would

7    accept.

8          Q.      Have you ever heard the term

9    highest and best use?

10         A.      Yes, I have.

11         Q.      Does this language essentially

12   mean that you should set the rent at the

13   highest and best use?

14         A.      The rent at the highest and best

15   use given other limitations of the appraisal

16   problem and the language in the lease,

17   absolutely.   The highest and best use

18   determination is constrained by other

19   language in the lease and the encumbrance of

20   the lease itself in this case.

21         Q.      If two appraisers had differing

22   views as the highest and best use, what

23   would be the likely impact on their two

24   valuations?

25         A.      It could result in very



Page 46

```
 1                    Aaron
 2   different value conclusions.
 3        Q.    So is it fair to say that the
 4   determination of the highest and best use is
 5   an important factor in leading to how an
 6   appraiser would value the property?
 7        A.    Absolutely.
 8        Q.    Have you ever been involved in
 9   any appraisal process or litigation where
10   different appraisers determined a single
11   piece of property had a different highest
12   and best use?
13        A.    I have been involved in
14   appraisal processes where some of the
15   appraisers have not analyzed highest and
16   best use properly or consistently, so yes.
17        Q.    So there have been times in
18   appraisal processes where the appraisers
19   have disagreed on the highest and best use;
20   is that fair to say?
21             MR. WALSH:  Objection to the
22        form.
23        A.    Appraisers have disagreed or
24   applied highest and best use in incorrect
25   ways.
```



Page 47

```
 1                    Aaron
 2      Q.    Well, you said incorrect.  Is it
 3 possible that two appraisers could have a
 4 differing view of highest and best use?
 5 Well, you said that; right?
 6      A.    Sure.
 7            MR. WALSH:  Objection to the
 8      form.
 9            MR. KOH:  Let me withdraw the
10      question.
11      Q.    If two appraisers disagree as to
12 a property's highest and best use, how is
13 that difference resolved?
14            MR. WALSH:  Objection to the
15      form and to the extent it calls for a
16      legal conclusion.
17      Q.    Have you -- let me withdraw the
18 question and rephrase.
19            Have you -- you say you have
20 been involved in appraisal processes where
21 the two appraisers disagreed on the highest
22 and best use; is that right?
23      A.    I can't say that the appraisers
24 have come up with an entirely different
25 conclusion about the highest and best use,
```



Page 48

```
 1                      Aaron
 2    but the application of highest and best use
 3    and the choice of comparables has been
 4    inconsistent in some of the appraisals that
 5    I've seen.
 6         Q.    Okay.
 7               And where there were these
 8    inconsistencies, what happened in those
 9    cases to determine which appraiser's
10    appraisal would be followed?
11               MR. WALSH:  Objection to the
12         form.
13         Q.    What happened in -- let me
14    rephrase the question.
15               In the cases where the two
16    appraisers had come up with inconsistent
17    applications of the highest and best use,
18    what happened after that?
19         A.    After that, the appraisers
20    involved have written review appraisals of
21    the -- of their peers' analyses and pointed
22    out the flaws, and the -- either the judge
23    or the neutral appraiser has made a
24    determination of which one is correct.
25         Q.    And how is it determined whether
```



Page 49

```
 1                     Aaron
 2    that person who made the determination as to
 3    which one was correct was the judge or the
 4    neutral?
 5              MR. WALSH:  Objection to the
 6         form.
 7         A.    Depending on the context of the
 8    type of proceeding.
 9         Q.    So is it fair to say where you
10    have two appraisers who differ on the
11    highest and best use and there's a neutral
12    involved, is it the neutral's job to
13    determine which appraiser had the correct
14    highest and best use?
15              MR. WALSH:  Objection to the
16         form.
17         A.    Yes.
18         Q.    Is there any reason in this case
19    why the neutral could not determine whether
20    Ms. Locatell's appraisal or Mr. Tener's
21    appraisal was more correct?
22              MR. WALSH:  Objection to the
23         form.
24         A.    If this case were to proceed to
25    the point where a neutral was involved, it
```



Page 50

                          Aaron

1

2    would be the neutral's responsibility to

3    make that determination.

4         Q.    Let's look at the next paragraph

5    on the Options Rent Addendum which we've

6    marked as Plaintiff's 16.  That first

7    sentence reads:  The standard market data

8    approach technique for valuing vacant land

9    shall be used by the appraisers.

10             What is the standard market data

11   approach technique for valuing vacant land?

12             MR. WALSH:  Objection to the

13        form.

14        A.    That's not a common appraisal

15   term, standard market data approach

16   technique.  I understand that to simply mean

17   that market research of data needs to be

18   performed involving vacant land, you know,

19   yeah, involving vacant land, transactions

20   involving vacant land.

21        Q.    If that's not a standard term --

22   hold on.  I want to make sure I understand

23   what you said.

24             If that's not a standard or a

25   common term, would it be the job of the



Page 51

```
  1                    Aaron
  2   appraiser to interpret what that language
  3   means?
  4            MR. WALSH:  Objection to the
  5        form, to the extent it calls for a
  6        legal conclusion.
  7        A.    It's the job of the appraiser to
  8   interpret it within the rest of the language
  9   in this paragraph and in the lease.
 10        Q.    We'll come to the rest of the
 11   language in this paragraph and the lease,
 12   but is it possible that two different
 13   appraisers looking at this language could
 14   decide it means two different things?
 15            MR. WALSH:  Objection to the
 16        form.
 17        A.    I can't answer that question.
 18   I'm not -- I'm not sure.
 19        Q.    Okay.  Well, let's look at the
 20   next sentence, which says:  All comparable
 21   leases shall be appropriately adjusted and
 22   the written report shall indicate the
 23   reasons for the adjustment so made.
 24            What is a comparable lease?
 25        A.    It seems to be a lease for the
```



Page 52

1                    Aaron

2    land in this process.

3            MR. WALSH:  Howard, if we could

4        take a break at 11:15, that would be

5        appreciated?  We're five minutes away.

6            MR. KOH:  Okay.  We can do that.

7        Q.    But the first sentence refers to

8    the standard market data approach for

9    valuing vacant land.

10       A.    Yeah.

11       Q.    And the second sentence says all

12   comparable leases.

13           So how do you reconcile the

14   first sentence discussing land and the

15   second discussing leases?

16           MR. WALSH:  Objection to the

17       form.

18       A.    That the lease -- that this

19   lease is instructing the appraiser to

20   analyze leases of land.

21       Q.    Isn't this lease instructing the

22   appraiser to value the vacant land and then

23   address for comparable leases?

24       A.    That's not my reading of this

25   language.



Page 53

```
 1                        Aaron
 2      Q.     But it's possible that somebody
 3   else reading this language could read it the
 4   way I said; isn't that true?
 5             MR. WALSH:  Objection to the
 6        form.
 7      A.     I can't say.  That's not how I'm
 8   reading this language.
 9      Q.     Do you believe that if Mr. Tener
10   read this language and first valued the
11   land, that would have been an inappropriate
12   appraisal step?
13             MR. WALSH:  Objection to the
14        form.
15      A.     I really don't understand the
16   question.
17      Q.     All right.  Let's take the break
18   that Mr. Walsh asked and we'll come back and
19   pick this up shortly.
20             MR. KOH:  How long do you want,
21        Mr. Walsh?
22             MR. WALSH:  You know, maybe --
23        why don't we come back at 11:20.
24             MR. KOH:  Okay.  Very good.
25             MR. WALSH:  Thank you.  And if
```



Page 54

```
 1                    Aaron
 2      Magna could put me in a breakout room
 3      with I guess everybody except the court
 4      reporter and Mr. Koh.
 5           MR. KOH:  And Mr. Hedden.
 6           MR. WALSH:  Yes.  And Mr.
 7      Hedden.  Good point.
 8           MAGNA TECH:  So one moment.  I
 9      will create a breakout room.  I am
10      creating it now, and then in the room
11      it will be -- can you just read off
12      that list for me?  I'm sorry.
13           MR. KOH:  Why don't we go off
14      the record.
15           MR. WALSH:  Sure.
16           (Whereupon, a brief recess was
17      taken.)
18  CONTINUED BY MR. KOH:
19      Q.    All right, so, Ms. Aaron, I'd
20  like you to turn to page 5 of your report,
21  take a look at the first full paragraph.
22      A.    I am here.
23      Q.    You conclude that the Locatell
24  appraisal follows the lease instructions
25  with regard to methodology and reporting and
```



Page 55

1                          Aaron

2     it complies with USPAP with regard to the

3     completeness, adequacy, relevance and

4     appropriateness of the data presented and

5     the valuation techniques applied and the

6     reasonableness of the value conclusions

7     drawn.

8                     That's what you write about

9     Ms. Locatell?

10         A.     Yes.

11         Q.     And you do not make the same

12    conclusion with respect to Mr. Tener; right?

13         A.     I do not.

14         Q.     In fact, on page 7, you write,

15    and I'm going to pick up in the middle of

16    the sentence in the second to last paragraph,

17    the Tener appraisal complies with neither

18    the lease nor USPAP and cannot be relied

19    upon as an indication of the -- I'm sorry --

20    of fair market rental value pursuant to the

21    terms of the lease; right?

22         A.     Yes.

23         Q.     Okay.  So I'd like to spend some

24    time exploring what your issues are with the

25    Tener appraisal, and I think one of the



```
 1                    Aaron
 2   first things you pick up and discuss is the --
 3   some of the background concerning the case
 4   law; right?
 5        A.    Yes.
 6        Q.    And you discuss that on page 4.
 7              Do you see that?
 8        A.    Yes.
 9        Q.    And on page 4, you write:  In
10   lease rent proceedings performed in New York
11   State, appraisers are bound by legal
12   precedent as outlined in cases such as New
13   York Overnight Partners v. Gordon, and
14   that's defined as Overnight, and 936 Second
15   Avenue, LP v. Second Corporate Development
16   Inc. Second Avenue; right?  And then you go
17   on.
18        A.    That's correct.
19        Q.    And you're not an attorney, are
20   you?
21        A.    No.
22        Q.    How did you come to understand
23   what the cases New York Overnight Partners
24   and 936 Second Avenue require of appraisers?
25        A.    There's a textbook for
```



Page 57

1                    Aaron

2    appraisers who participate in arbitrations

3    by Paula Konikoff.

4         Q.    That's captioned or -- I'm

5    sorry -- titled Appraisers in Arbitration,

6    it's written by Paula Konikoff with Peter

7    Christensen and, in fact, in your report,

8    you refer to the text on pages 39 to 41;

9    right?

10        A.    I do refer to that textbook; yes.

11        Q.    Okay.

12              Is your understanding of what

13   those cases provided -- provide solely from

14   that textbook?

15        A.    Also reading -- reading the

16   language from the cases themselves, the

17   direct language.

18        Q.    Have you discussed these cases

19   with any attorneys?

20        A.    This is -- these cases are in

21   issue in this litigation.

22        Q.    Specifically the New York

23   Overnight Partners and 936 Second Avenue,

24   have you ever discussed those two cases with

25   any attorneys?



Page 58

```
 1                      Aaron
 2      A.      With the attorneys with respect
 3   to this case I'm saying.
 4      Q.      So Mr. Walsh?
 5      A.      Yes.
 6      Q.      Okay.
 7              And did what you discussed with
 8   Mr. Walsh go into or influence in any way
 9   the preparation of your report?
10      A.      Absolutely not.
11      Q.      Okay.
12              Is it possible that a differing
13   attorney could come up with a differing
14   interpretation of what these cases require
15   than Ms. Konikoff?
16              MR. WALSH:  Objection to the
17         form.
18      A.      I can't speak to attorneys
19   and their interpretation of anything.
20   Ms. Konikoff is also an appraiser.
21      Q.      So would it have been important
22   for an appraiser preparing a report for this
23   project, 840 Atlantic Avenue, to discuss
24   936 Second Avenue and New York Overnight
25   Partners with an attorney before preparing
```



Page 59

```
 1                    Aaron
 2   the report?
 3             MR. WALSH:  Objection to the
 4       form.
 5       A.     It's absolutely important for an
 6   appraiser to know that case law precedent
 7   before preparing a report because it
 8   directly dictates the methodology and
 9   appraisal problem undertaken.  So I don't
10   know whether an appraiser would necessarily
11   need legal advice if an appraiser is already
12   familiar with their opinions and their
13   impact on the valuation process.
14       Q.     So to continue with what you
15   wrote in paragraph -- on page 4, you write,
16   after you identified the cases, which
17   clearly state that unless the lease says
18   otherwise, appraisers, and then you quote,
19   must take into consideration all
20   restrictions including current zoning
21   regulations and encumbrances on the land as
22   well as the lease term.
23             Do you see that?
24       A.     I do.
25       Q.     What happens if the lease says
```



Page 60

                      Aaron

1  otherwise?

3      A.      If the lease says otherwise,

4  then you follow the instructions in the

5  lease.

6      Q.      So isn't having a good

7  understanding of exactly what the lease

8  provides important to determine whether

9  Overnight Partners and 936 Second Avenue

10  apply?

11              MR. WALSH:  Objection to the

12         form.

13      A.      Can you reask the question,

14  restate the question?

15      Q.      Sure.

16              We've established that you only

17  apply the holdings in Overnight Partners and

18  936 Second Avenue unless the lease states

19  otherwise; correct?

20      A.      Correct.

21      Q.      So isn't a review of the lease

22  important to determine whether the lease in

23  fact states otherwise?

24      A.      Absolutely.

25      Q.      And as between an appraiser and



Page 61

```
 1                    Aaron
 2   a lawyer, who is in the best position to
 3   determine what the lease states?
 4              MR. WALSH:  Objection to the
 5        form.
 6        A.    I can't answer that question.
 7        Q.    Okay.  Let's go to page 14 of
 8   your report, which is captioned Tener
 9   Appraisal.
10        A.    I'm there.
11        Q.    It says right under there, the
12   Tener appraisal disregards the instructions
13   in the lease's Option Rent Addendum to
14   adjust comparable leases of vacant land as
15   the valuation method without discussion or
16   reason for the exclusion of such leases and
17   when such leases are available in the market
18   area as demonstrated by both the Locatell
19   report and the independent research
20   typically performed by appraisers in
21   assignments of this type.
22              Is that what you wrote?
23        A.    It is.
24        Q.    Okay.
25              So you believe that there were
```



Page 62

1                         Aaron

2      comparable leases that should have been

3      adjusted for in preparing this report;

4      correct?

5           A.     Correct.

6           Q.     Okay.

7                  Is it possible that Mr. Tener

8      did not believe there were any comparable

9      leases?

10                 MR. WALSH:  Objection to the

11           form.

12           A.     He testified he did not believe

13      there were comparable leases.

14           Q.     Do you believe that Mr. Tener

15      really did think there were comparable

16      leases, but testified that he didn't?

17                 MR. WALSH:  Objection to the

18           form.

19           A.     I can't say what Mr. Tener

20      thought other than what he stated.

21           Q.     If the appraiser believed there

22      were not comparable leases, what should the

23      appraiser have done?

24           A.     The appraiser's belief that

25      there were not comparable leases needs to be



Page 63

1                        Aaron

2     backed up by a thorough search for

3     comparable leases, so that's part of the

4     process, is the research -- you know,

5     adequate research, a thorough survey of the

6     market of all data available, whether it be

7     on public databases, calling other

8     appraisers, really scouring the market for

9     data.  I don't know whether Tom Tener did

10    this, I saw no evidence of it in his work

11    file.  So, you know, that's step number 1.

12    You have to do the appropriate scope of work

13    to make that determination.  Then if there

14    truly were no comparable leases, and I'm not

15    saying that's the case there because Sharon

16    Locatell's report has 11 or 12 comparable

17    leases that could have been analyzed, then a

18    land residual technique is permitted to be

19    undertaken.

20         Q.     You say there are comparable

21    leases and that's demonstrated by the fact

22    to begin with that the Locatell report found

23    11 or 12 comparable leases; correct?

24         A.     Yes.  The Locatell report

25    includes comparable leases which were



Page 64

1                    Aaron

2    adjusted.

3        Q.     And you in fact believe that at

4    least nine of them were comparable?

5        A.     I -- yes, I confirmed that nine

6    of them appear to be comparable leases; yes.

7        Q.     And you say another way to

8    determine whether there is comparable

9    research check check is independent research

10   typically performed by appraisers.  Describe

11   that research for me.

12       A.     Appraisers -- appraisers can

13   search subscription databases for comparable

14   data, appraisers can certainly look in their

15   own work files and the work files of other

16   appraisers in their firm, appraisers

17   typically e-mail and phone many other

18   appraisers, when data is hard to come by,

19   they can ask clients that they've had in the

20   past or currently for market data,

21   especially if you have appraised a certain

22   property type and you know brokers and

23   owners of these property types, sometimes

24   that's the best way to get comparable data.

25       Q.     Did you conduct any of this



Page 65

```
 1                    Aaron
 2  independent research?
 3       A.     I searched CoStar database.
 4       Q.     What's the CoStar database?
 5       A.     CoStar is a national
 6  subscription database with general real
 7  estate data and comparable lease and sale
 8  data.
 9       Q.     And what did you find when you
10  searched the CoStar database?
11       A.     I wasn't specifically searching
12  for comparable land leases in this matter.
13       Q.     Well, what did you search the
14  CoStar database for?
15       A.     I was searching in relation to
16  my examination of the comparables used in
17  Tener's land residual analysis, so I was
18  searching for leases of already improved
19  retail, which is one of the inputs in the
20  land residual analysis.
21       Q.     So you didn't do the search to
22  determine if there were other comparable
23  sites like Ms. Locatell did; right?
24       A.     I didn't do an independent
25  search of additional comparable land sales.
```



Page 66

```
 1                    Aaron
 2        Q.    Okay.
 3              And when Ms. Locatell did her
 4   search of --
 5        A.    Land rentals, if I might correct
 6   myself.
 7        Q.    That's what I thought.  Of land
 8   rentals.  Did she make an assumption of what
 9   the property's highest and best use was?
10              MR. WALSH:  Objection to the
11        form.
12        A.    I don't -- I don't know about
13   your use of the word assumption.  Her
14   appraisal report analyzes quick service
15   retail as the leases of land developed for
16   quick service retail, so that's the implicit
17   highest and best use conclusion of her
18   report.
19        Q.    So just so that I'm sure that I
20   understand, you believe that Ms. Locatell
21   implicitly concluded that quick service
22   retail was the highest and best use for the
23   site at 840 Atlantic Avenue?
24        A.    Subject to the encumbrance of
25   the lease, yes.
```



```
 1                    Aaron
 2       Q.     Did Mr. Tener share that
 3   conclusion from what you can tell in
 4   reviewing his report?
 5       A.     No.  I see no evidence that
 6   Mr. Tener concluded that quick service
 7   retail was highest and best use.
 8       Q.     In fact, he thought that the
 9   highest and best use was a development site;
10   correct?
11       A.     A development --
12            MR. WALSH:  Objection to the
13       form.
14       A.     Yeah, development site's a very
15   general term.
16       Q.     Well, to the extent that
17   Ms. Locatell and Mr. Tener had a difference
18   of opinion as to the property's highest and
19   best use, is there any reason a neutral
20   appraiser couldn't resolve that difference?
21            MR. WALSH:  Objection to the
22       form.
23       A.     If this matter were permitted to
24   be put forward with a neutral -- to move
25   forward with a neutral process, a neutral
```



Page 68

```
 1                    Aaron
 2    would be required to determine who's right
 3    and who's wrong.
 4         Q.    Okay.
 5              So as you sit here today, it's
 6    your testimony that if this matter moves
 7    forward and a neutral reviews the appraisals
 8    of both Mr. Tener and Ms. Locatell, a
 9    competent neutral would be able to determine
10    which of those two had the correct highest
11    and best use?
12              MR. WALSH:  Objection to the
13         form and to the extent it calls for a
14         legal conclusion.
15              MR. KOH:  I'll rephrase.
16         Q.    Can any neutral determine what
17    the highest and best use is for the property
18    subject to the restrictions of the lease and
19    the law for the property at 840 Atlantic
20    Avenue?
21         A.    Can you repeat the question?
22         Q.    Yes.
23              Would a competent neutral be
24    able to determine the highest and best use
25    for the property at 840 Atlantic Avenue
```



Page 69

```
 1                    Aaron
 2   subject to the lease and the law?
 3        A.    A competent neutral appraiser
 4   would absolutely conclude that the Locatell
 5   report complies with the language of the
 6   lease and determines highest and best use
 7   under the language of the lease, and the
 8   Tener report does not.
 9        Q.    Okay.
10             So in plain English, if a
11   neutral were involved here, that neutral
12   would see that Ms. Locatell should win;
13   right?
14             MR. WALSH:  Objection to the
15        form.
16        A.    Yeah, I'm --
17        Q.    Okay.  Let me rephrase.
18             You believe that if the process
19   described in the lease were to go forward, a
20   neutral would determine that Ms. Locatell's
21   report more properly captures the fair
22   market rental value of the property at
23   840 Atlantic Avenue?
24             MR. WALSH:  Objection to the
25        form.
```



Page 70

```
 1                      Aaron

 2        Q.      You can answer that.

 3        A.      Absolutely.

 4        Q.      Okay.

 5                And is that primarily because

 6   you believe that Mr. Tener implicitly used

 7   the incorrect highest and best use?

 8                MR. WALSH:  Objection to the

 9        form.

10        A.      Yes.  Mr. Tener didn't do the

11   work -- didn't appear to do the work to

12   get to the proper highest and best use.

13   Mr. Tener, his appraisal report started out

14   with the wrong appraisal problem, the fee

15   simple value of the property in perpetuity,

16   so the highest and best use in that case is

17   entirely different from what -- what the

18   highest and best use would be as encumbered

19   up to a 20-year lease term because of

20   financial feasibility.  Development sites in

21   perpetuity have a totally different highest

22   and best use than development sites for a

23   20-year term.  Then the Tener report

24   purportedly added an analysis of the land

25   residual that accounts for the encumbrance
```



MAGNA
LEGAL SERVICES

Page 71

1                          Aaron

2    of the lease.  However, that analysis was so

3    unsupported and every input was unsupported.

4    I don't know where his conclusion of the

5    highest and best use of some kind of 20,000

6    square foot retail development came from

7    because it wasn't supported by any market

8    data, and I didn't see any evidence of any

9    research of market data in his report in

10   support of the hypothetical improvement for

11   this highest and best use conclusion.  So

12   yes, I think highest and best use is a real

13   problem in the Tener report.

14        Q.    And you believe that any

15   competent neutral would come to the same

16   conclusion?

17        A.    Absolutely.

18        Q.    Bear with me one moment, please.

19        A.    I could add on to my answer if

20   appropriate.

21        Q.    Go ahead.

22        A.    Highest and best use in the

23   Tener report is a glaring problem because

24   Tener somehow tries to say that the land

25   residual which was done based on this



```
1                    Aaron
2    hypothetical highest and best use as a
3    20,000 square foot retail development is
4    somehow supportive of the value of the site
5    in perpetuity, and in fact comes to a higher
6    residual value under this highest and best
7    use of the site as encumbered for 20 years
8    than in perpetuity.  So this is a huge red
9    flag in the appraisal because a site as
10   encumbered for 20 years would never be --
11   the land would never be worth more than the
12   site in perpetuity, and if in fact an
13   interim highest and best use for 20 years
14   were worth more than the highest and best
15   use in perpetuity, that would be, by
16   definition, the highest and best use, and
17   the comparable sites in the market would not
18   be purchased for mixed use development, they
19   would be being purchased for development of
20   20,000 low Class D retail developments.
21        Q.    And is that something that any
22   competent neutral reviewing Mr. Tener's
23   report would be able to see?
24        A.    Absolutely.
25              MR. WALSH:  It looks like I had
```



Page 73

1                          Aaron

2          myself on mute.  I attempted to object

3          to the form of that question.

4                    MR. KOH:  Why am I not

5          surprised?

6          Q.    So one of the faults you have

7     with the Tener appraisal is that he doesn't

8     identify any comparables and adjust for

9     them; correct?

10         A.    Correct.

11         Q.    And Ms. Locatell does that;

12    correct?

13         A.    Yes.  To be specific, comparable

14    leases.

15         Q.    Right.

16               And Ms. Locatell as comparable

17    leases used quick service restaurant leases?

18         A.    That's correct.

19         Q.    Is that what some of those were?

20         A.    That's correct.  For the most

21    part, restaurants, I believe.

22         Q.    And others were banks, for

23    example?

24         A.    Yes.

25         Q.    Have you heard the term pad



```
 1                    Aaron
 2   site?
 3        A.     I've heard that term; yes.
 4        Q.     What does it mean to you?
 5        A.     It means land that is
 6   developed -- to be developed typically --
 7   typically for quick service retail or bank
 8   uses with -- they typically have high land
 9   to building ratios, so larger sites, smaller
10   buildings, and often they are -- often
11   they're adjacent to shopping centers, but
12   not -- certainly not in urban areas like
13   Brooklyn.
14        Q.     So is it fair to say that
15   implicit in Ms. Locatell's report is that
16   the highest and best use for the property at
17   840 Atlantic Avenue was a pad site?
18        A.     As encumbered by the lease for
19   up to a 20-year term, that is the implicit
20   conclusion; yes.
21        Q.     And Mr. Tener did not share that
22   conclusion; correct?
23        A.     No.
24        Q.     Is there also a comparable --
25   I'm sorry.
```



Page 75

```
 1                      Aaron
 2            Is there any reason a comparable
 3    neutral could not make the determination as
 4    to whether Ms. Locatell or Mr. Tener was
 5    correct about the highest and best use?
 6            MR. WALSH:  Objection to the
 7        form.
 8        A.     Part of the neutral's job is to
 9    determine who is correct and who is not
10    correct, if it were permitted to, you know,
11    if it were permitted to go there.
12        Q.     So once Mr. Tener came to the
13    conclusion that the highest and best use
14    were not as a pad site, but as a development
15    site, did he have a duty to search for
16    comparables?
17        A.     Well, searching for comparables
18    needs to be part of the -- of forming that
19    conclusion.  Prior to forming that
20    conclusion of highest and best use, there
21    has to be market evidence of leases or sales
22    for that use.  So the comparable search
23    isn't after you determine -- necessarily in
24    the order that you're saying, the appraiser
25    comes up with the highest and best use and
```



Page 76

Aaron

1
2  then searches for support.  It's the other
3  way around.  The appraiser performs a market
4  analysis, sees what the market is doing,
5  sees what the active -- the leasing activity
6  is active for and sales activity over, you
7  know, certainly for development over a
8  20-year term, and then comes to the
9  highest -- sees all the different uses that
10  the market is exhibiting demand for and then
11  draws a conclusion.  So I'm not sure that
12  Mr. Tener did things in that order, but
13  that's the order that appraisers need to
14  perform their work.
15      Q.    Are you relying on any specific
16  USPAP or other professional standard for
17  your conclusion that the determination of
18  highest and best use must follow a market
19  survey?
20      A.    Yes.  Absolutely.  The basic
21  appraisal textbook, the Appraisal of Real
22  Estate, describes a six-step process, and --
23  and market analysis comes before highest and
24  best use conclusions, and then -- then at
25  that point, the appraisal methodology is



Page 77

1                         Aaron

2      determined.  It's called, you know, they

3      have a -- literally in the textbook there's

4      a chart of the order of the steps that we

5      perform the appraisal process.  So only

6      after you do your market analysis and

7      conclude to the highest and best use can you

8      then determine the appropriate approaches to

9      apply in your appraisal.

10          Q.     What market analysis did

11     Ms. Locatell perform in order to determine

12     that a pad site was the highest and best use?

13          A.     Well, I certainly can't say

14     comprehensively what Ms. Locatell did or

15     didn't do.  However, I am aware that in her

16     work file there were CoStar search results,

17     there were e-mails to other appraisers

18     asking for data.

19          Q.     Isn't it true that Ms. Locatell

20     first determined that this was to be

21     evaluated as a pad site and then went out

22     and looked for the comps?

23               MR. WALSH:  Objection to the

24          form.

25          A.     Well, I can't say what order



Page 78

Aaron

 1

 2  Ms. Locatell did things in because that was

 3  not obvious to anybody from the outside.  I

 4  can say that a competent appraiser in a

 5  given market area can certainly have enough

 6  experience with other properties to know

 7  what the market activity is and what things

 8  are being sold for and rented for and can

 9  certainly rule out certain uses based on

10  lack of demand or lack of any evidence of

11  market activity in their appraisal practice.

12  So there is a certain amount of experience

13  that competent appraisers in a geography

14  bring to the analysis.  So I'm not trying to

15  say that every appraiser's work file needs

16  to have like evidence of every step

17  performed in the proper order.  We all have

18  different levels of experience with

19  different property types and geographies in

20  our appraisal practice that we bring to an

21  assignment coming in.

22       Q.     Have you made a determination

23  as to the highest and best use of the

24  property at 840 Atlantic Avenue as

25  restricted by the lease and the law?



1                    Aaron

2       A.    I have not made an independent

3   determination.  I have concluded that the

4   conclusions in the Locatell report are well

5   supported and reasonable and comply with the

6   lease and that the conclusions of highest

7   and best use in the Tener report are

8   unsupported and not reasonable and don't

9   conform to the language of the lease.

10      Q.    And what is your basis for

11  concluding that Mr. Tener's -- I'm sorry.

12  Let me rephrase that a second.

13            Why do you believe that

14  Mr. Tener's conclusions on highest and best

15  use are unsupported and not reasonable and

16  don't conform to the language of the lease?

17      A.    Well, Mr. Tener has conflicting

18  conclusions about highest and best use in

19  his report, first.  The whole bulk of the

20  report is based on fee simple land analysis,

21  and so his stated highest and best use

22  conclusion in the report is mixed use

23  development, which is only appropriate to

24  sites owned in perpetuity.  So that

25  conclusion is noncompliant with the lease --



Page 80

1                    Aaron

2    the encumbrance of the lease.  And then he

3    has this tacked on land residual approach

4    which is not based on development -- the

5    stated highest and best use of development

6    of a mixed use property in perpetuity where

7    there is no stated highest and best use, but

8    the hypothetical improvements that Tener

9    includes are a 20,000 square foot retail

10   property, and I have concluded that that use

11   is absolutely not financially feasible.

12   I've concluded this by testing every input

13   in his land residual approach against market

14   data and finding each assumption to be

15   unsupported and to have the compound effect

16   of inflating value, and I've also performed

17   independent research showing that there's no

18   market demand for these hypothetical

19   improvements.  So that's -- that's the basis

20   for my conclusion that his highest and best

21   use is --

22        Q.    Well, what independent research

23   have you performed to reach the conclusion

24   that there was no market demand for these

25   hypothetical improvements?



Page 81

```
 1                    Aaron
 2      A.     I have seen -- I -- let me
 3  rephrase that.  In my -- in my experience as
 4  a Brooklyn appraiser and someone who does
 5  more than 45% of the appraisals in my office
 6  are based in Brooklyn, New York, we do land
 7  and development appraisals all the time, and
 8  I have never seen land in this kind of area
 9  of Brooklyn sold -- in recent -- in around
10  this time, 2018, I see no evidence of sales
11  for this kind of development, or leases.
12  And then the independent market research
13  that I did was to test, you know, the
14  assumptions about rent for these hypothetical
15  improvements which I found the likely rent
16  for improvements of this size and in this
17  location, there's market evidence that the
18  achievable rent would be much, much lower,
19  perhaps half, and I did market research
20  about the costs, about the construction
21  costs, and I have experience with proposed
22  construction in New York City and have never
23  seen costs anywhere near as low as though
24  and I have never seen Class D construction
25  of retail in Brooklyn, New York.  You know,
```


MAGNA
LEGAL SERVICES

Page 82

1              Aaron

2    it's all here in my report the things that I

3    tested and the things that I didn't test in

4    terms of the research that I did.

5        Q.     Didn't Mr. Tener's residual land

6    analysis contemplate an owner user purchasing

7    the site to develop a commercial use from

8    which its own product could be sold?

9              MR. WALSH:  Objection to the

10        form.

11       A.     I do know that Tener testified

12    as to this.  There's certainly no -- nothing

13    in the report to indicate that this

14    hypothetical improvement would be for an

15    owner user, but once again, I have seen no

16    owner users developing property -- retail

17    property of this size anywhere in New York

18    in my career.  Ever.  I mean, it's just not

19    something that owner users are doing in the

20    market, and that -- that's really a key

21    point here, is that highest and best use

22    conclusions, you know, they can be

23    quantitative or they can be qualitative, but

24    either way, they need to be supported by

25    market activity which demonstrates demand.



Page 83

```
 1                    Aaron
 2    There is an owner user market for retail
 3    land, and that is the quick service retail
 4    market.  So for sites of this size, the only
 5    owner users that are actively leasing and
 6    developing land that I am aware of are
 7    restaurants and banks.
 8        Q.     What about retail stores?  Are
 9    you aware of any of those?
10        A.     Owners developing retail land --
11        Q.     Yes.
12        A.     -- with their own buildings?
13        Q.     Yes.
14        A.     Not specifically.  Maybe there's
15    a few here and there.  I'm not aware of them
16    as being an active retail developer purchase
17    point.
18        Q.     Are you aware that Raymour &
19    Flanigan, the furniture retailer, purchased
20    a site in Brooklyn to develop its own retail
21    store, construct and develop its own retail
22    store?
23             MR. WALSH:  Objection to the
24        form.
25        A.     I am not aware of the specific
```



Page 84

```
 1                    Aaron
 2   property.
 3        Q.     If you became aware of that,
 4   would that change your view in any way?
 5        A.     Well, not necessarily.  I mean,
 6   it really depends on the economics of that
 7   site acquisition and at what cost, you
 8   know -- in terms of would it change my
 9   opinion that you could buy land -- that an
10   owner user would buy land for, you know, 700
11   something dollars a square foot and then
12   invest in the cost to develop a 20,000
13   square foot building, I'd love to see if
14   Raymour & Flanigan was spending that kind of
15   money on land.
16        Q.     Let's continue to talk a little
17   bit about your concerns with Mr. Tener's
18   analysis.  On page 15, you write:  The rate
19   chosen -- and this is at the bottom of the
20   first paragraph -- the rate chosen is also
21   above the normal range of 4 to 6% that has
22   been fairly consistent in recent years and
23   supported by my own survey of recent land
24   leases signed between 2016 and 2018.
25                What land survey are you
```



Page 85

```
 1                    Aaron
 2   referring to?
 3        A.     My work in appraisals that my
 4   company has performed.  I reviewed land
 5   leases in our file.
 6        Q.     Okay.
 7               And you say the rate chosen.
 8   What is -- I know it's 8%, but that was the
 9   interest or -- I'm sorry.  What did you mean
10   by the rate chosen other than the amount?
11        A.     Well, I'll first say that this
12   rate is in association with the fee simple
13   sales comparison approach, so it's wholly
14   irrelevant anyway to the appraisal problem.
15        Q.     I understand that, but one of
16   your -- I know you believe that the sales
17   comparison approach was the wrong approach,
18   but you also criticized the sales comparison
19   approach for choosing the wrong rate or rate
20   of return, 8%.
21        A.     Right.
22        Q.     And I want to explore that a
23   little bit.  Do you think 4 to 6% is more
24   typical?
25        A.     I would say that 4 to 6% is all
```



Page 86

```
 1                      Aaron
 2   that I've ever seen in my practice in terms
 3   of land rates, and we do appraise quite a few.
 4        Q.     And are these land rates located
 5   in a specific geography?
 6        A.     Within the five boroughs of New
 7   York.
 8        Q.     Does that include Brooklyn?
 9        A.     It does.
10        Q.     Would a competent neutral be
11   able to determine that an 8% rate would be
12   less appropriate than a 4 to 6% return rate?
13               MR. WALSH:  Objection to the
14          form.
15        A.     If it were appropriate for
16   this -- to proceed to include a neutral,
17   and, again, I can't comment on the
18   litigation beyond these appraisal reports, a
19   neutral would make a -- would -- and if this
20   were determined by the neutral to have any
21   relevance to the appraisal problem, then the
22   neutral would need to decide whether that
23   rate is appropriate.
24        Q.     You also criticize the data set
25   that Mr. Tener uses to come up with his 8%
```



Page 87

1                          Aaron

2    rent.  You determined that some of the

3    leases were too old.  Is that correct?

4         A.      Absolutely.

5         Q.      Okay.

6                 How do you know what the -- when

7    a lease is too old and when it isn't too old?

8         A.      Again, it's the same thing I

9    keep coming back to in my testimony here.

10   An appraiser must do the appropriate

11   research to get the full landscape of data.

12   And so if it were appropriate to apply a

13   rate to sales of vacant land, part of the

14   scope of work is researching recent rates,

15   recent deals.  There are deals being done in

16   New York that are long-term ground leases of

17   vacant land.  What are those rates.  You

18   need to get the data.  I don't know why

19   anyone would look at data that is 50 to 70

20   years old -- 20 to 70 years old when there

21   are deals being done, there are brokers that

22   specialize in these deals, and it takes

23   work, it takes phone calls, e-mails, it

24   might take a lot of time, but in order to

25   support -- to support your rate; yeah.


MAGNA
LEGAL SERVICES

Page 88

1                          Aaron

2          Q.       So any analysis that used an 8%

3     rate of return would be inappropriate in

4     your view?

5          A.       That's not --

6                   MR. WALSH:   Objection to the

7          form.

8          A.       That's not what I said.

9          Q.       Okay.  Well, I'm trying to

10    figure it out.

11         A.       If the Tener work file had

12    recent comparables of ground leases in the

13    outer boroughs of New York City for retail

14    use demonstrating that deals are being done

15    at an 8% rate, then that's appropriate

16    support.  I just didn't see any appropriate

17    support.  And on top of that, the rate used

18    was way outside anything I have seen in my

19    practice.

20         Q.       And you also criticize Mr. Tener's

21    report for factoring potential rezoning of

22    the land into the rate selection; correct?

23    That's on page 15.

24         A.       And where -- if you would remind

25    me where that is.



Page 89

```
 1                    Aaron
 2      Q.      Page 15, bottom paragraph, by
 3  factoring in a potential rezoning of the
 4  land into the rate selection, Tener has
 5  violated the requirements established by
 6  legal precedent, the Overnight and Second
 7  Avenue, to determine the value of the land
 8  as if vacant and unimproved subject to
 9  current zoning restrictions and contractual
10  limitations.
11      A.      Right.  So this gets back to the
12  fundamental appraisal problem here, which is
13  to value the property subject to the
14  encumbrance of the lease, so yes, Overnight
15  and Second Avenue do -- the language very
16  clearly says current zoning restrictions,
17  and so that would be the current zoning
18  district, but I would also say that if
19  you're looking at the encumbrance of the
20  lease, which is up to a 20-year term, a
21  potential rezoning is completely irrelevant
22  because no one could -- within a 20-year
23  period, you know, these rezonings take a
24  very long time, this M-Crown still isn't in
25  effect and it's been, you know, years since
```



Page 90

```
 1                    Aaron
 2   2014 or something like that that they've
 3   been talking about it and, you know, on day 1
 4   of the lease to wait for a rezoning and then
 5   to file plans and get in the ground, too
 6   much of that 20-year period would pass to be
 7   able to recoup any kind of investment in
 8   land, so it's not appropriate to factor any
 9   rezoning into the appraisal encumbered -- of
10   land encumbered by a 20-year term for
11   multiple reasons.
12        Q.    Okay.
13              So just to be sure I understand
14   that, you essentially have two reasons why
15   in fact Mr. Tener -- it was inappropriate
16   for Mr. Tener to factor in the potential
17   rezoning, the first being that it doesn't
18   comply with the lease and the law; right?
19        A.    Correct.
20        Q.    Okay.
21              So is it your belief that a
22   well-informed landlord would not consider
23   the possibility of rezoning the property in
24   connection with setting the leasing rates
25   for this property?
```



Page 91

1                         Aaron

2              MR. WALSH:  Objection to the

3       form.

4       A.     It's not just the landlord that

5  determines a deal.

6       Q.     Sure.

7       A.     It could be a meeting of the

8  minds between a landlord and a tenant.  The

9  landlord may be very much aware of the

10  potential rezoning of the site, but a tenant

11  leasing land for 20 years couldn't care less

12  about the potential rezoning of the site,

13  so, you know, the tenant -- there's no

14  reason that a well-informed tenant would pay

15  a rate that's any different from any other

16  site that's not subject to a rezoning --

17       Q.     So --

18       A.     -- a potential rezoning.

19       Q.     -- do I understand you correctly

20  that even if the potential tenant knew of

21  the possibility of the rezoning, they

22  wouldn't pay attention to that because they

23  couldn't in your view recoup any build-out

24  on the basis of that rezoning within the

25  20-year period?



Page 92

1                          Aaron

2        A.        Absolutely.

3                  MR. WALSH:  Objection to the

4        form.

5        Q.        So the real problem is the 20

6    years, not so much the fact that Mr. Tener

7    considered that in his report?

8                  MR. WALSH:  Objection to the

9        form.

10       A.        The language in the Second

11   Avenue case is very clear that the valuation

12   needs to be done with consideration of

13   current zoning restrictions.  They are both

14   reasons not to consider the potential -- the

15   very -- you know, potential hypothetical

16   M-Crown rezoning.  By the way, this is not

17   an official rezoning even on the City's

18   website yet.  I mean, this is very

19   speculative.  At the time of value, M-Crown

20   itself and any rezoning of the site was

21   highly speculative, the timing being very

22   uncertain.

23       Q.        Is it possible that the owner of

24   this property could have applied for a

25   zoning variance irrespective of whether



Page 93

1                    Aaron

2    M-Crown passes or not?

3        A.      Absolutely.  Any property owner

4    can apply for a zoning variance, or a

5    zoning -- actually a zoning variance; yes.

6    Or a rezoning is I think what actually

7    happened in this case.

8        Q.      I'm sorry.  You said a rezoning?

9        A.      For a rezoning, for a rezoning.

10        Q.      Right.  You said that actually

11    happened in this case.  What did you mean by

12    that?

13        A.      Recently the site as we, most of

14    us are aware, rezoning of this site has been

15    approved or has passed the preliminary

16    approval towards a rezoning, which is

17    irrelevant, because this is all several

18    years past the date of value.

19        Q.      I'd like to look at page 17.  In

20    the second full paragraph, you write if the

21    Tener appraisal is correct that a site

22    developed for retail use over a 20-year

23    period produces the same or a higher value

24    than a site developed for mixed residential

25    and retail use in perpetuity, then by



Page 94

1                          Aaron

2    definition the property's highest and best

3    use would be retail development for fee

4    simple ownership as well as for 20-year

5    leasehold property rights and not a mixed

6    use development as stated earlier in the

7    Tener report.

8                    What did you mean by definition?

9         A.       The definition of highest and

10   best use is the use that produces the

11   highest residual land value, the highest

12   return to the land, so I think I tried to

13   explain this earlier.  If the assumptions of

14   the land residual in Tener's report bore

15   out, which they don't, and land were worth

16   more -- equal to or more for this 20,000

17   square foot retail development than land for

18   mixed use residential development, that

19   would be the highest and best use for land

20   with similar zoning.  It couldn't be -- if

21   the residual land value were more -- worth

22   more for this use, that would be the highest

23   and best use, and the -- and it would be

24   evidenced by market activity.  The fee

25   simple land sales that you -- that Tener



1                          Aaron

2    used are sales that they -- if retail were

3    the highest and best use, those similar

4    sales would be sold to retail instead of

5    what they have been sold for, which is mixed

6    use development, wait for a rezoning, try to

7    get their own site rezoned, what this

8    market, you know, what the fee simple market

9    is doing in this location.  You wouldn't see

10   that.  You would see a bunch of retail

11   buildings being constructed quickly at low

12   cost, and by owner users.  I see it nowhere.

13        Q.     Have you ever heard the term

14   interim use?

15        A.     Of course.

16        Q.     And what does that term mean to

17   you?

18        A.     An interim use is when a market

19   is changing, when there is a future highest

20   and best use, if you see the supply and

21   demand factors changing and you see a path

22   toward the fundamental economics changing

23   and you forecast based on data that, you

24   know, in three or five years there will be a

25   future highest and best use, but as of today



Page 96

```
 1                    Aaron
 2   it's not there yet, and as of today a
 3   certain use has a higher value, that would
 4   be an interim use.  So yes, that's the
 5   definition of interim use.
 6        Q.     Didn't Mr. Tener conclude that
 7   while the highest and best use long-term for
 8   this property was mixed use residential/retail
 9   development, the best use for the 20-year
10   period and interim use was a commercial
11   development?
12               MR. WALSH:  Objection to the
13        form.
14        A.     Well, once again, conclusions of
15   interim use need to be just as supported as
16   conclusions of highest and best use, of any
17   kind of highest and best use, so he may have
18   concluded that this was an interim use, it
19   certainly wasn't stated in his report,
20   but -- but, again, none of that is supported
21   by any market demand for this use type, in
22   fact there's evidence for lack of demand for
23   retail as of the date of value, for large
24   retail, so, you know, he can call it what he
25   wants, it just -- you know, everything needs
```



Page 97

```
 1                     Aaron
 2    to be backed by proper support, and it's not.
 3         Q.     Is there any reason that a
 4    competent neutral reviewing Mr. Tener's
 5    report would not be able to conclude that
 6    Mr. Tener did not have appropriate proper
 7    support for his conclusion that commercial
 8    was the best interim use?
 9              MR. WALSH:  Objection to the
10         form and to this whole line of
11         questioning as to what a competent
12         neutral appraiser would do.
13              MR. KOH:  Your objection is
14         noted.  I don't know what else to tell
15         you.
16         A.     I'll just keep saying the same
17    answer, which is if this process were
18    permitted to, you know, proceed, and, again,
19    there might be reasons why it should or
20    should not go to a neutral, yes, I mean, a
21    neutral would have to make all these
22    determinations.
23         Q.     Your report discusses the
24    property at 470 Atlantic -- Vanderbilt
25    Avenue; correct?
```



Page 98

```
 1                    Aaron
 2       A.      Yes.
 3       Q.      Can you describe that property
 4  for me?
 5       A.      That property is located
 6  diagonally across Atlantic and Vanderbilt
 7  northwest from the subject property and it's
 8  an office and retail property multi-story.
 9       Q.      Are there often tenants?
10       A.      Yes.
11       Q.      Do you know who they are?
12       A.      Well, I don't know all of them.
13  I know there are a variety of tenants on the
14  upper floor.  I know it is -- the New York
15  City Housing Authority is one of the major
16  tenants of that building as well.
17       Q.      What's a major -- you said the
18  term major tenant.  What do you mean by
19  major tenant?
20       A.      Taking a significant amount of
21  space in the building.
22       Q.      Is the retail portion of
23  470 Atlantic Avenue occupied currently?
24       A.      I don't know --
25       Q.      Let me rephrase that question.
```



Page 99

1                     Aaron

2              At the time you rendered your

3    report, was the retail portion of 470

4    Atlantic Avenue occupied?

5         A.    I don't know if the space that I

6    refer to in my report is a hundred percent

7    of the retail space.  There may be one --

8    there may be more.  However, large retail

9    space was not occupied then and I don't

10   believe it's occupied now.

11        Q.    How much frontage on Atlantic

12   Avenue does that large retail space have?

13        A.    None.  And that was a very

14   interesting data point to me.  I believe

15   none in that, you know, when this building

16   was converted, this location of Atlantic

17   Avenue was not considered the more desirable

18   retail frontage.  They actually put the

19   Housing Authority space on Atlantic Avenue

20   and chose to put their retail on Vanderbilt,

21   which I think was considered perhaps a more

22   desirable retail location than Atlantic.

23        Q.    And you said the building was

24   converted.  When did the conversion occur?

25        A.    I don't know exactly, but at



Page 100

```
 1                    Aaron
 2    least ten years ago, perhaps longer.
 3         Q.     Bear with me for a moment.
 4                All right.  I was about to turn
 5    to another area, but I think now might be a
 6    good time to take lunch.  Would anybody
 7    object to that?  Should we come back at
 8    1:00?
 9                MR. WALSH:  Fine with me.
10         Amanda?
11                THE WITNESS:  Yes.  Absolutely.
12         Sounds good.
13                MR. WALSH:  Okay.
14                MR. KOH:  Okay.  If you could
15         put everybody in the same breakout
16         rooms, Josh, that would be great, and
17         we'll return at 1, everybody.
18                MR. WALSH:  1:00.  Thanks.
19                MAGNA TECH:  They should be
20         open.
21                (Time noted:  12:24 p.m.)
22                (Lunch recess taken.)
23                (Time resumed:  1:02 p.m.)
24    CONTINUED BY MR. KOH:
25         Q.     Okay.  I would like to pick up
```



Page 101

```
 1                        Aaron
 2   on an area that I didn't get to this
 3   morning, but would like to get to now.
 4             I understand that you made an
 5   inspection of the property at issue here?
 6        A.   I did.
 7        Q.   And you did that in October of
 8   2018 -- I'm sorry -- 2021, October 28, 2021;
 9   correct?
10        A.   If that's what it says in my
11   report, that's when I did it.
12        Q.   Okay.
13             Well, describe what you did in
14   order to inspect the property.
15        A.   Sure.  I walked to the property
16   from my home, which is about a mile south,
17   mile and a half south, so I walked down
18   north on Vanderbilt, I walked the property,
19   and then I walked to my office from the
20   property along Atlantic Avenue, and my
21   office is about three quarters of a mile to
22   the west at the intersection of Atlantic and
23   Flatbush, right off of there, and I took
24   photos and made special note of the
25   surrounding.  That's what I did.
```



Page 102

1                    Aaron

2        Q.     About how long did this process

3   take?

4        A.     Well, in all the walking, it

5   took quite some time.

6        Q.     The actual inspection process.

7        A.     Maybe 15, 20 minutes on site.

8        Q.     Okay.  I commend you for your

9   walking.  It's very healthy.

10        A.     Thank you.

11        Q.     I've run in -- I run in Brooklyn

12   occasionally when I run along Atlantic

13   Avenue and 4th Avenue for the New York

14   Marathon.

15        A.     Ah, yeah.  Yes.

16        Q.     I just had to get that out so

17   everyone understands that I did that.

18               MR. WALSH:  I've done it, too.

19               MR. KOH:  I'm impressed.

20        A.     Well, I can't say I've had that

21   particular Brooklyn experience.

22        Q.     Granted.

23               MR. KOH:  Well, let's compare

24        times because we're in a competitive

25        business.



Page 103

1                    Aaron

2            Okay.  Back to work.

3            MR. WALSH:  I'm sure it was

4       better than mine.

5            MR. KOH:  No.  I'm pretty slow.

6       Q.    Okay.  Let's go back to your

7    report for just a moment then.  I want to

8    direct your attention to page 21.  And under

9    Hypothetical Improvements, your second

10   paragraph reads:  As discussed above, proper

11   highest and best use analysis begins with

12   market data showing significant demand for

13   given hypothetical use, but I'm aware of no

14   market evidence of demand for sites to

15   develop 21,500 square feet of retail around

16   the date of value, and Tener's report and

17   work file provide no support for the

18   conclusion.

19            What about smaller sizes?  Are

20   you aware of market data showing sufficient

21   demand for that?

22            MR. WALSH:  Objection to the

23       form.

24       A.    Can you be more specific?

25       Q.    Well, is there market demand, in



Page 104

```
 1                    Aaron
 2   your opinion, for a 10,000 square foot
 3   hypothetical use at this property?
 4        A.      I haven't --
 5                MR. WALSH:  Objection to the
 6        form.
 7        A.      I haven't tested that.  However,
 8   I haven't seen much retail development at
 9   all.  As of the date of value, retail wasn't
10   doing so great.  It had come down quite a
11   bit from its high in 2015, 2016, and retail
12   rents were falling, and retail construction
13   was generally challenged.  So I don't -- I
14   don't see a lot of that happening in this
15   market area.
16        Q.      On page 23, you write:  The size
17   differential alone rules out these as
18   reasonable comparables from which to derive
19   a single market rent for a 21,500 square
20   foot property.  As such, the gross market
21   rent conclusion for the hypothetical
22   improvements is not reasonably supported and
23   the comparables do not demonstrate any
24   market demand for hypothetical improvements
25   in the market area greater than 5,000 square
```


MAGNA
LEGAL SERVICES

Page 105

```
 1                    Aaron
 2   feet.  So 5,000 square feet would be okay,
 3   but 10,000 square feet, there isn't
 4   sufficient market demand?  Is that your
 5   conclusion?
 6        A.    No, it's not.  I didn't conclude
 7   that 5,000 square foot stand-alone retail
 8   development was financially feasible.
 9        Q.    Okay.
10            So even a 5,000 square foot
11   retail development might not be financially
12   feasible in your view?  Is that the
13   conclusion?
14        A.    I did not test the financial
15   feasibility of small -- small retail other
16   than what the market is showing us in terms
17   of quick service retail sites being
18   purchased for 3 to 4,000 square foot
19   improvements.
20        Q.    So you do believe that there's
21   market demand for a 3 to 4,000 square foot
22   quick service restaurant use at the property
23   at 840 Vanderbilt Avenue -- Atlantic Avenue?
24   I'm sorry.
25        A.    Sure.  There's market demand
```



Page 106

```
 1                        Aaron
 2    given an appropriate land cost.  And I guess
 3    I could qualify that to say given an
 4    appropriate land cost, there is market
 5    demand perhaps for a variety of uses.
 6         Q.     I understand.
 7                On page 30, you criticize
 8    Mr. Tener for not considering the value of
 9    Vanderbilt's lease with its landlord, and
10    you write under Subject Property Ground
11    Lease, likewise, although neither Tener nor
12    Locatell was provided with the subject
13    property ground lease that was executed on
14    November 30, 2017 between Vanderbilt
15    Atlantic Holdings LLC and MMB Associates,
16    the land owner, this lease which runs for
17    99 years with a net present value of
18    $7 million, provides an important data point
19    and test of reasonableness of the Tener and
20    Locatell conclusions.
21                Do you see that?
22         A.     I do.
23         Q.     How did you determine that the
24    net present value of that lease was $7 million?
25         A.     There was a memorandum of lease
```



Page 107

```
 1                      Aaron

 2   recorded on public record.

 3        Q.     Have you ever reviewed the

 4   actual lease?

 5        A.     I have not.

 6        Q.     Do you know who signed on behalf

 7   of the parties?

 8        A.     I believe I've seen the lease.

 9   I can't -- I can't recall.

10        Q.     Do you know if -- well, have you

11   heard the term arm's length transaction?

12        A.     Absolutely.

13        Q.     And what does it mean to you?

14        A.     It means that when there's a

15   relationship between -- when there's no

16   relationship between the parties, it's fully

17   arm's length.

18        Q.     Do you know if the lease between

19   Vanderbilt Atlantic Holdings LLC and MMB

20   Associates LLC was an arm's length

21   transaction?

22        A.     I don't know -- I don't know

23   that, but that is definitely something that

24   the appraiser should have been permitted to

25   fully investigate.
```



Page 108

```
 1                    Aaron
 2      Q.      Did you take any steps to fully
 3 investigate whether the lease between
 4 Vanderbilt Atlantic Holdings, LLC and
 5 MMB Holdings, LLC was an arm's length
 6 transaction?
 7      A.      My report makes no conclusion
 8 about whether that lease was an arm's length
 9 transaction and I simply have an opinion
10 that the lease is a piece -- important piece
11 of market data, that the appraiser doing a
12 full market value appraisal or market rent
13 appraisal should have had access to and
14 should have had the ability to ask the
15 appropriate questions.  It's a really
16 important part of the appraisal process and
17 it's important specifically in USPAP that
18 the appraisers be allow -- allowed to
19 specifically analyze any recent transactions
20 and agreements relating to a subject
21 property which occurred within a few years
22 of the valuation end date.
23      Q.      Okay.
24              If it turns out that the lease
25 between Vanderbilt Atlantic Holdings LLC and
```



Page 109

```
 1                      Aaron
 2   MMB Associates LLC was not an arm's length
 3   transaction, is it fair to say that that
 4   lease should not have been considered in the
 5   appraisal reports that Mr. Tener and
 6   Ms. Locatell prepared?
 7        A.     I can't make a blanket statement
 8   like that.  I think that even, you know, if
 9   it were not arm's length, it would be up to
10   the appraiser to really investigate and find
11   out what the relationship between the
12   parties was and how those numbers in the
13   lease were determined, what consideration
14   the various entities had.  I think that the
15   fact that there is a lease agreement of the
16   subject property site as encumbered with the
17   current zoning is very interesting, and if I
18   were appraising the site, I would want to
19   know everything I could possibly know about
20   how the rent of that lease was negotiated
21   between the parties, what the parties'
22   relationships were, what they were at the
23   signing of the lease, and how they -- how
24   the parties were thinking about value of
25   their site specifically with a potential for
```



Page 110

1                    Aaron

2    McDonald's to renew the lease.

3         Q.    Does Ms. Locatell address the

4    lease between Vanderbilt Atlantic Holdings LLC

5    and MMB Associates LLC in her report?

6         A.    I don't recall.  I don't recall.

7         Q.    If she had failed to address

8    that lease between Vanderbilt and Atlantic

9    Holdings LLC and MMB Associates in her

10   report, would that be a criticism you would

11   have of Ms. Locatell's report?

12        A.    Certainly both reports would

13   benefit from an analysis of this lease, but

14   considering that Tener's clients were

15   parties to the lease, it is more likely that

16   he would be able to get answers to these

17   questions than Sharon Locatell.  But yes,

18   absolutely, this should have been reported,

19   the memorandum of the lease or the existence

20   of the lease should have been reported in

21   both appraisals.

22        Q.    All right.

23              Now, in your report you rely on

24   and cite to Paula Konikoff's book,

25   Appraisers in Arbitration; correct?



Page 111

```
 1                    Aaron
 2      A.      Yes.
 3      Q.      And you regard that as an
 4  authoritative source on how appraisals
 5  should be done?
 6              MR. WALSH:  Objection to the
 7         form.
 8      Q.      Do you regard that as an
 9  authoritative source on how -- on appraisal
10  methodology?
11              MR. WALSH:  Objection to the
12         form.
13      Q.      You can answer.
14      A.      I wouldn't say appraisal
15  methodology; no.  I don't think it's an
16  authoritative source on appraisal
17  methodology.
18      Q.      What do you think it's an
19  authoritative source for?
20              MR. WALSH:  Objection to the
21         form.
22      A.      I think it's --
23      Q.      Let me rephrase.
24              Do you think that Appraisals in
25  Arbitration by Paula Konikoff is an
```



Page 112

1                       Aaron

2    authoritative source for anything?

3                MR. WALSH:  Objection to the

4        form.

5        Q.     Do you?

6        A.     I think that Paula Konikoff is

7    an authority in -- or an expert in the

8    considerations that appraisers need to have

9    in mind when working in an arbitration

10   context versus a typical -- arbitration and

11   expert witness.  It's a very helpful guide

12   for appraisers who are interested in doing a

13   specific kind of appraisal work in the

14   arbitration and litigation context.

15       Q.     So if Ms. Konikoff were to say

16   something, you would consider it --

17   concerning appraisal and arbitration, you

18   would consider it coming from an authority;

19   is that fair to say?

20       A.     Yes, she --

21               MR. WALSH:  Objection to the

22       form.

23       Q.     All right.  Well, let's take a

24   look at some of the things Ms. Konikoff has

25   to say.



Page 113

```
 1                    Aaron

 2            MR. WALSH:  And hold on.  I

 3       believe you cut Ms. Konikoff on.

 4            MR. KOH:  Oh.

 5            MR. WALSH:  I don't know.  Were

 6       you done answering?

 7            THE WITNESS:  I -- I don't

 8       recall the question at this point.

 9            MR. WALSH:  Yes, because I'm

10       just looking at the transcript, you

11       said yes, she, I objected and I think

12       we were talking over each other and

13       that's the only reason I raise it.

14            MR. KOH:  Let's take a moment to

15       try to correct that.  Thank you.

16       Q.    My question was:  So if

17   Ms. Konikoff were to say something, you

18   would consider it -- and then I corrected

19   myself, concerning appraisal and

20   arbitration, you would consider it coming

21   from an authority; is that fair to say?  You

22   began answering yes, she.  Then Mr. Walsh

23   objected.  Would you like to continue your

24   answer?

25       A.    I think that most appraisers
```



Page 114

```
 1                      Aaron
 2   would consider Paula Konikoff to be an
 3   authority.
 4       Q.    Okay.  So I've marked and would
 5   now like to bring up, and I think I have,
 6   maybe I haven't.  You should see what's been
 7   marked as, and I gave it the wrong Exhibit
 8   Number, so I gotta try to change that.  Hold
 9   on a second.
10       A.    I see it.  I see the document.
11       Q.    I'm going to republish it with a
12   correct exhibit number because I didn't do
13   that.
14             (Exhibit ZZ, DESCRIPTION, marked
15        for identification, as of this date.)
16       Q.    I will now publish it as
17   Exhibit ZZ, which do you see that on your
18   screen?
19       A.    Okay.  Yeah.
20       Q.    Okay.
21             So I'd like to draw your
22   attention to -- I'm having a little
23   difficulty seeing it here -- the middle of
24   that page where the second paragraph begins:
25   The serious appraisal problem caused by the
```



```
 1                    Aaron
 2   Overnight decision is that nothing in
 3   appraisal standards of practice textbooks or
 4   other appraisal reference material helps
 5   valuation professionals understand how to
 6   value land, quote, subject to the remaining
 7   term, close quote, of a ground lease.
 8             The basis of a land valuation is
 9   the comparison of property being appraised
10   to similarly located parcels of land that
11   have been sold recently and that have been
12   the same or similar -- I'm sorry -- and that
13   have the same or similar highest and best
14   use as the subject land.
15             Do you see that?
16   A.      I do.
17   Q.      Okay.
18             So is it fair to say that
19   Ms. Konikoff is pointing out a difficulty in
20   evaluating the value of land that is subject
21   to the remaining term of a ground lease?
22   A.      Yes; but the following two
23   sentences, it's out of context because she
24   continues on to say whereas the appraiser
25   defined a transaction involving the purchase
```



Page 116

```
 1                        Aaron
 2   of land by someone knowing that the land can
 3   be developed and used only for a limited
 4   period of years and then must be returned to
 5   the seller.  Such sales transactions simply
 6   do not exist because that type of
 7   arrangement is a lease rather than a sale.
 8        Q.     So is it -- is it your belief
 9   that on the basis of this, that means that
10   Mr. Tener should have evaluated this by
11   looking at comparable leases and not used
12   the standard market -- the standard market
13   data approach technique for valuing vacant
14   land?
15             MR. WALSH:  Objection to the
16        form.
17        Q.     You can answer.
18        A.     I disagree with your framing of
19   the question because I don't interpret
20   standard market data approach technique
21   to -- that could very well include the
22   analysis of leases of land.  I think that
23   both this paragraph and the lease are
24   aligned in instructing appraisers to analyze
25   leases of land based on market data.
```



Page 117

```
 1                      Aaron
 2      Q.     What in this paragraph leads you
 3  to conclude that in the face of this
 4  particular option rent term addendum, it
 5  would have been appropriate for Mr. Tener to
 6  begin his analysis with comparable leases as
 7  opposed to land sales?
 8             MR. WALSH:   Objection to the
 9       form.
10      A.     The final sentence of this
11  paragraph says such sales transactions
12  simply do not exist because that type of
13  arrangement is a lease rather than a sale,
14  and I think that Konikoff might be pointing
15  that perhaps the error that Tener made of
16  analyzing land sales with the sales comparison
17  approach, perhaps it's a common error,
18  perhaps it's a common misunderstanding of
19  appraisers that that's the only way you can
20  value land.  I don't know.  I think that's
21  one of the reasons that she wrote this book,
22  was to help appraisers who aren't
23  experienced in these kinds of arbitration
24  matters involving the value of land as
25  encumbered by the lease.  She's offering
```



Page 118

```
 1                      Aaron

 2   guidance to appraisers that in fact know

 3   sales transactions in perpetuity do not

 4   satisfy land valuation subject to Overnight.

 5   You have to analyze transactions of leases

 6   over similar terms.

 7        Q.     Isn't it fair to say that what

 8   this paragraph does is identify a serious

 9   appraisal problem caused by the Overnight

10   decision?

11             MR. WALSH:  Objection to the

12        form.

13        A.     I would agree that the Overnight

14   decision perhaps made appraisers' jobs more

15   challenging.  Absolutely.  Absolutely.  The

16   job got harder once appraisers had to

17   account for the encumbrance of the leases.

18   It's much more difficult to appraise

19   property subject to -- vacant land subject

20   to a 20-year term than it is to appraise fee

21   simple vacant land.

22        Q.     And because Overnight in your

23   words made the job of the appraiser much

24   more difficult, isn't there room for an

25   appraiser to decide in or her discretion
```



Page 119

```
 1                    Aaron
 2   what methodology to use?
 3              MR. WALSH:  Objection to the
 4        form.
 5        A.    I don't -- I don't understand
 6   how one is flowing here from the other in
 7   your question.
 8        Q.     In light of this paragraph that
 9   we've just read from Ms. Konikoff, isn't it
10   fair to say that the appraiser is charged
11   with using his best description to figure
12   out how to appraise a piece of property that
13   is subject to a remaining lease term?
14        A.     I think that the appraiser's
15   discretion becomes less and less of an issue
16   when your appraisal problem is so constrained.
17   If it were simply fee simple vacant land,
18   the appraiser obviously would have many data
19   points and options, do I do the sales
20   comparison approach, do I look at leases of
21   99-year ground leases, do I do a residual,
22   do I do all three and they can support each
23   other.  Once you're encumbered by a lease as
24   you are in this case by the remaining term
25   of a lease and the lease language itself
```



Page 120

```
 1                      Aaron

 2    speaks to adjusting comparable leases and

 3    this paragraph here speaks to comparable

 4    leases being evidence of a remaining term,

 5    the appraiser has very little discretion in

 6    terms of the methods that are appropriate to

 7    use.  Comparable leases need to be

 8    researched and adjusted if they exist.

 9        Q.    Is it true that the comparable

10    leases must be consistent with the -- that

11    are -- let me rephrase that.

12               When an appraiser chooses a

13    comparable, isn't it true that that

14    comparable has to be consistent with what

15    the appraiser has established as the highest

16    and best use for the property?

17        A.    Generally, yes.  Or that the

18    market has established is the highest and

19    best use, the appraiser has concluded based

20    upon market evidence.

21        Q.    One of the things you've

22    criticized Mr. Tener for was that he didn't

23    have any comparables for the highest and

24    best use that he had determined for the

25    property; is that correct?
```



```
 1                   Aaron
 2      A.     Yes.
 3      Q.     And doesn't Ms. Konikoff support
 4  that conclusion by saying such sales
 5  transactions simply do not exist?
 6      A.     Well, she's saying the sales
 7  approach is no longer appropriate often in
 8  these cases.
 9      Q.     So --
10      A.     So I'm not saying that he would
11  have found comparable sales; no.
12      Q.     You're saying that given the
13  language of the lease, Mr. Tener should have
14  simply looked for lease comparables for the
15  highest and best use and not done an
16  evaluation of the standard market data
17  approach for valuing vacant land?  That's
18  what you're saying?
19      A.     I'm --
20             MR. WALSH:  Object to the form
21      of the question.
22      A.     I'm absolutely not accepting
23  your reading, your implied reading of
24  standard market value data -- value --
25  whatever the phrase is -- standard market
```



Page 122

                              Aaron

1

2   value data technique.  That to me does not

3   indicate the sales comparison approach of

4   sales.  That is not what that means to me,

5   I've never heard that phrase, but it has the

6   words market data technique, approach and

7   technique, so leases are market data, too,

8   and right after that, in the lease, in the

9   Option Rent Addendum, it specifically

10  instructs the appraiser to analyze and

11  adjust leases.  So I don't see -- I don't

12  see any contradiction with excluding the

13  sales comparison approach in this and the

14  language of the lease.

15       Q.    So is it your interpretation

16  that the way that Mr. Tener apparently read

17  this lease was unreasonable?

18            MR. WALSH:  Objection to the

19       form.

20       A.    I have no idea how Mr. Tener

21  read -- read this language.  I am making my

22  own reading of the language.  And based upon

23  my reading, I see no instruction to do the

24  sales comparison approach of vacant land.

25       Q.    And anybody who read the same



Page 123

```
 1                    Aaron
 2    language and went ahead and did a sales
 3    comparison approach, would they be behaving
 4    unreasonably?
 5             MR. WALSH:  Objection to the
 6        form.
 7        A.    I can't speak for anybody --
 8    anybody in general.  I don't -- there's no
 9    such thing as a sale of a property for a
10    20-year term that I'm aware of other than a
11    lease, you know, so yeah, it's not
12    appropriate to this -- this appraisal
13    problem to do a sales comparison approach of
14    a fee simple sales transaction.
15        Q.    I'm bringing up a document
16    previously marked as Exhibit H.
17             Have you ever seen this document
18    before?
19        A.    This is the report by appraisers
20    and planners, and this one is the prior
21    version -- prior appraisal by appraisers and
22    planners, not the final version that I
23    reviewed in detail, but I have seen this
24    document before.
25        Q.    Okay.
```



Page 124

```
 1                     Aaron
 2            And this is an evaluation of
 3   840 Atlantic Avenue that uses the sales
 4   comparison approach; correct?
 5        A.    It does; yes.
 6        Q.    And how many comps did
 7   Ms. Locatell identify?
 8            MR. WALSH:  Objection to the
 9        form.
10        Q.    In the report, how many comps of
11   comparison land sales does it show?
12        A.    Four.
13        Q.    In your view, is that a
14   sufficient number of comparables?
15        A.    I did not perform an appraisal
16   review of this appraisal report.
17        Q.    Do you have any view of whether
18   the four land sales comparables that
19   Ms. Locatell used in this appraisal were
20   appropriate?
21            MR. WALSH:  Objection to the
22        form.
23        A.    I don't.  I don't have any
24   opinion about this appraisal report.
25        Q.    And what were the square
```


MAGNA
LEGAL SERVICES

Page 125

```
 1                    Aaron
 2    footages of each of the properties that
 3    Ms. Locatell chose in this review?
 4         A.     The site size is 21,993, 27,000,
 5    22,883 and 5,000.
 6         Q.     Okay.
 7                And you haven't formed an
 8    opinion as to whether those were appropriate
 9    comparables?
10         A.     Well, as I said, for valuation
11    subject to the lease, the land sale
12    comparison approach is not appropriate.
13         Q.     What did Ms. Locatell concern
14    about the land sale -- conclude about the
15    land sale value of 840 Atlantic Avenue when
16    she rendered this particular report which
17    we've marked as Exhibit H?
18                MR. WALSH:  Objection to the
19           form.
20         A.     Are you asking me to read her
21    value conclusion on page 9 of the PDF?
22         Q.     I am.  I'm asking you, isn't it
23    true that Ms. Locatell concluded the land
24    was worth $9.9 million?
25                MR. WALSH:  Objection to the
```



Page 126

```
 1                    Aaron
 2      form.
 3      A.     That appears to be the
 4  conclusion of this appraisal report.
 5      Q.     And she then in order to compute
 6  the fair market rent used multiple -- rent
 7  multipliers ranging from 4% to 6%; isn't
 8  that right?
 9             MR. WALSH:  Objection to the
10      form.
11      A.     That appears to be correct.
12      Q.     And she concluded that the rent
13  range would run from $396,000 to $594,000;
14  right?
15             MR. WALSH:  Objection to the
16      form.
17      A.     That is the conclusion of
18  what -- of this report; yes.
19      Q.     Okay.
20             How, if at all, did this report
21  that you reviewed prior to rendering your
22  report affect your conclusion in your reports?
23             MR. WALSH:  Objection to the
24      form.
25      A.     Not at all.
```



1                    Aaron

2        Q.     And why didn't it affect your

3   conclusion?

4        A.     Because this was not the report

5   that was part of my scope of work to review.

6        Q.     What did Ms. Locatell conclude

7   that the fair market rental value was for

8   this property?

9        A.     In this report?

10       Q.     In her -- in the report that you

11  did review.

12       A.     I would have to look

13  specifically, but it was somewhere between

14  3 and -- I think 350,000 -- $350,000, in

15  that range.

16       Q.     Okay.

17              And in this report, even the

18  lowest range she reports is almost $400,000;

19  right?

20              MR. WALSH:  Objection to the

21       form.

22       A.     That's the range in this report.

23  This appears to be a completely different

24  scope of work.

25       Q.     So the scope of work can affect



Page 128

```
 1                    Aaron
 2    what the fair market rent is?
 3        A.      Of course.   The scope of work
 4    determines -- is determined by the appraisal
 5    problem, and this one doesn't seem to be
 6    compliant with the language of the lease and
 7    the encumbrance of the lease either.
 8        Q.      So appraisals can come up with
 9    different valuations for fair market rent
10    depending upon how the appraiser or the
11    lease defines the scope of work; is that
12    correct?
13        A.      Yeah.   Well, okay, the -- the
14    appraiser defines -- the appraiser
15    determines the scope of work based upon,
16    quote, unquote, the appraisal problem, which
17    is constrained by the language of the lease.
18    So yes, different leases have different
19    language and that would result in different
20    appraisal problems which would then result
21    in different scope of work which would then
22    result in different values.
23        Q.      And whose job is it to determine
24    what the scope of work should be?
25                MR. WALSH:  Objection to the
```



Page 129

1                    Aaron

2      form.

3      A.      It's absolutely the appraiser's

4  job to determine the appropriate scope of

5  work given the appraisal problem.

6      Q.      I'd like to bring up a document

7  previously marked in this proceeding as

8  Exhibit M as in Mike.  And my question to

9  you is:  Have you seen Exhibit M before?

10     A.      I'm waiting for it to appear.

11     Q.      Let me know when you have it.

12     A.      I don't have it.

13     Q.      You may want to refresh your

14  screen.

15     A.      It's not on mine.  Are other

16  people seeing this?

17              MR. WALSH:  I have not seen it

18      yet.

19              MR. KOH:  Josh, what do I do?

20              MAGNA TECH:  You might have to

21      just reveal it.  If it was previously

22      marked --

23              MR. KOH:  I have hit reveal.

24      Oh, wait.  Let me see.  Now it should

25      be going.



Page 130

```
 1                    Aaron

 2        A.      Yes, I see it now.

 3                MR. WALSH:  I can see it now.

 4                MAGNA TECH:  There it is.

 5        Q.      I thought I revealed it, but

 6   apparently that didn't happen.  There you

 7   go.  Now that you can see what I'm talking

 8   about, have you seen Exhibit M before, M as

 9   in Mike?

10                (Witness reviewing document.)

11        A.      I've never seen this document as

12   far as I'm aware.

13        Q.      Do you know what it is?

14        A.      I don't.

15        Q.      Looking at this document, would

16   you have liked to have seen it before you

17   completed your opinion of Mr. Tener's and

18   Ms. Locatell's work?

19                MR. WALSH:  Objection to the

20        form.

21        A.      I don't know what this

22   document is.

23        Q.      Can you answer that question?

24        A.      I don't know what this document

25   is, so I can't say whether I would have
```



Page 131

1                    Aaron

2    wanted to see it.

3         Q.    This is a document whereby

4    McDonald's approved the exercise of the

5    option rent term for its restaurant at

6    840 Atlantic Avenue.

7         A.    Okay.

8         Q.    And in doing so, it does some

9    analysis of the perspective fair market

10   rent.  Would you have liked to have seen

11   that document before you rendered your

12   report?

13            MR. WALSH:  Objection to the

14        form and your characterization of the

15        document.

16        A.    I'm not sure I -- this -- this

17   is not typical for an appraiser to see when

18   they do an appraisal review, so no, I don't

19   need this, to have seen this document.

20        Q.    If McDonald's had made an

21   analysis of what the fair market rent of the

22   property at 840 Atlantic Avenue should be,

23   would you have liked to have seen that

24   document before completing your report?

25            MR. WALSH:  Objection to the



Page 132

```
 1                      Aaron

 2        form.

 3        A.      It wouldn't have hurt to see it,

 4   but I don't see it changing anything in my

 5   report.

 6        Q.      One of the things your report

 7   relies upon is the Appraisal of Real Estate

 8   14th Edition; correct?

 9        A.      Correct.

10               MR. KOH:  Josh, can you bring

11          that up for me and mark it as Exhibit

12          AAA, alpha alpha alpha?

13               MAGNA TECH:  Bringing --

14               MR. KOH:  I'm sorry.  The

15          document that's labeled 14th Edition

16          Table 17.1.

17               MAGNA TECH:  So if you look at

18          the top of your screen --

19               MR. KOH:  Yes?

20               MAGNA TECH:  -- do you have the

21          ability to give me controls?

22               MR. KOH:  Somewhere I do.

23               MAGNA TECH:  Because at this

24          very second, I don't want to waste

25          everyone's time, but at the moment I
```



```
 1                    Aaron
 2      don't have the ability to mark.
 3             MR. KOH:  Hot seat controls?
 4      No.  Pass control.  Yes.  I'm passing
 5      to you.
 6             MAGNA TECH:  Great.  Okay.  And
 7      you wanted this marked as?
 8             MR. KOH:  AAA.
 9             (Exhibit AAA, Appraisal of Real
10      Estate 14th Edition Table 17.1, marked
11      for identification, as of this date.)
12             MAGNA TECH:  There you go.  It
13      should be available now.
14             MR. KOH:  Okay.
15      Q.     Do we see that?
16      A.     Mm-hmm.
17      Q.     Okay.
18      A.     I'm trying to --
19             MAGNA TECH:  Just confirming, it
20      was 14th Edition, Table 17.1; correct?
21             MR. KOH:  Right.
22             MAGNA TECH:  Okay.
23      Q.     This is a copy of Table 17.1
24   from the 14th Edition of the Appraisal of
25   Real Estate.
```



Page 134

1                    Aaron

2              Have you seen this table before?

3      A.      Yes.

4      Q.      And this table is a table of

5  various valuation methods?

6      A.      Yes.

7      Q.      And it says sales comp --

8  comparison is the most common technique for

9  valuing sites and is the preferred method

10  when comparable sales are available?

11      A.      Absolutely.  That is true.

12      Q.      Yet you criticize Mr. Tener for

13  using the most common and preferred method

14  in his report.

15              MR. WALSH:  Objection to the

16      form.

17      A.      Well, that's because the

18  comparable sales were for an entirely

19  different property rights than the appraisal

20  problem required subject to the lease.

21      Q.      And is that something that a

22  competent appraiser would have been able to

23  determine -- a competent neutral would have

24  been able to determine?

25              MR. WALSH:  Objection to the



Page 135

```
 1                    Aaron
 2       form.
 3       A.     Competent -- yes.  A hundred
 4  percent.
 5       Q.     One of the things you testified
 6  about earlier is that an appraiser is
 7  charged with surveying the market, and I
 8  want to make sure I got this right,
 9  surveying the market before determining what
10  the highest and best use is; is that correct?
11       A.     Yes.
12            MR. KOH:  Josh, can you bring up
13       page 44 from the 14th Edition?
14            MAGNA TECH:  Yes.  And what
15       would you like this marked as?
16            MR. KOH:  BBB.
17            (Exhibit BBB, Appraisal of Real
18       Estate 14th Edition page 44, marked for
19       identification, as of this date.)
20       Q.     Do you have that in front of you?
21       A.     I do.
22       Q.     Doesn't this table indicate that
23  you first have to identify the client and
24  intended uses as well as the purpose of the
25  assignment and the effective date and the
```



Page 136

```
 1                    Aaron
 2   relevant characteristics and the conditions
 3   and then collect the data?
 4             MR. WALSH:  Objection to the
 5        form.
 6        A.    Well, yes, yes.  Absolutely.
 7   You collect the data after the intended user
 8   and intended use and the purpose of the
 9   assignment and all those things, they help
10   you identify the appraisal problem.
11   Absolutely.
12        Q.    Okay.
13             So the first step then is to
14   identify the intended -- the intended use;
15   right?
16        A.    Yes.
17             MR. WALSH:  Objection to the
18        form.
19        Q.    And in this case, there was a
20   dispute over what the intended highest and
21   best use should be; is that correct?
22             MR. WALSH:  Objection to the
23        form.
24        A.    I think you may be getting
25   confused between two appraisal terms.  One
```



                        Aaron

1

2    of them is intended use of the appraisal

3    report and one of them is highest and best

4    use.  So for this, the intended use is, you

5    know, a ground rent determination pursuant

6    to a lease whereas the highest and best use

7    is whatever use is most financially feasible

8    subject to the language in the lease and the

9    constraints of property rights and encumbrance

10   of the lease.  But yes, you must -- the

11   appraisal problem is defined by what's the

12   context of this appraisal report, what's the

13   intended use of this appraisal report, and

14   so I see that one of the things that

15   happened here and I can see in the Tener

16   deposition and the work file and the

17   e-mails, that part of the problem with the

18   Tener report is that the appraisal problem

19   was defined improperly at the beginning of

20   the assignment, and so then the scope of

21   work and the data collection all flowed from

22   the wrong appraisal problem, which was fee

23   simple valuation of the land using the sales

24   comparison, you know, what's the fee simple

25   value of the land, what's the rent of the



```
 1                    Aaron
 2    land in perpetuity.  I see that he did quite
 3    a bit of work collecting sales comps, doing
 4    adjustments, doing analysis of the wrong
 5    appraisal problem.  I mean, it was not
 6    permitted based on Overnight and Second
 7    Avenue and the lease's instruction to
 8    analyze leases and not sales.  And then at a
 9    certain point, kind of late in the game as
10    it goes for arbitrations, it was determined
11    that -- it was included or agreed by all the
12    parties that in fact the appraisal problem
13    was not fee simple valuation of the land, it
14    was valuation subject to the encumbrance of
15    the lease, and I really sympathize with the
16    appraiser's challenge at that point because
17    once the appraisal problem changed
18    completely, it kind of forces the appraiser
19    to start over and get entirely different
20    types of comparables, do an entirely
21    different type of research and have a
22    different scope of work, and so I understand
23    the inclination to try to just tack
24    something on to the original analysis
25    that's, quote, unquote, supportive and kind
```



Page 139

```
 1                        Aaron
 2    of get it done or make it work, but
 3    that's -- that can't happen, I mean, it's
 4    just -- it's a different appraisal problem,
 5    it's a different property rights, it's
 6    different sales or it's not sale, it's
 7    different leases and comps and it's a whole
 8    bunch of different work.  So this -- this
 9    chart that you're showing really outlines
10    the challenges of this assignment, it's not
11    easy to do this work, it's not easy to
12    figure out the highest and best use subject
13    to a lease, and, you know, also scope of
14    work is negotiated between appraisers and
15    clients, and so when your clients are giving
16    you certain instructions, it's a very -- it
17    can be a lot -- there can be a lot of
18    tension to make sure that you're producing a
19    credible appraisal report and you're doing
20    the appropriate scope of work to solve the
21    problem -- the appropriate -- the appraisal
22    problem.  But it's on the appraiser to make
23    sure that that all happens the way it's, you
24    know, the way it's outlined in this chart.
25         Q.    Given the difficulty of this
```



Page 140

1                    Aaron

2    problem, isn't it possible that two

3    appraisers both proceeding in good faith

4    could have come up with a different approach

5    to the appraisal problem?

6              MR. WALSH:  Objection to the

7         form.

8         A.      Well, unfortunately there's very

9    few approaches that could -- there's only

10   one that I'm aware of that complies with the

11   lease and the encumbrance of the lease and

12   that's adjusting comparable rentals of land.

13   So very hard.  I'm not saying it's easy,

14   it's very difficult.  These rentals are few

15   and far between.  They are not easy to find.

16   They're not something that you can find by

17   searching CoStar usually.  Sometimes they're

18   there.  They're not -- sometimes you have

19   to -- it's a hard assignment, so I actually

20   don't think different appraisers would come

21   up with different approaches to solve this

22   particular appraisal problem, but I think

23   that the appraisal problem was misunderstood

24   perhaps by parties in this matter for a

25   good -- a good part of the timeline that



1                    Aaron

2    they were working on the assignment.

3         Q.    What do you believe to be the

4    source of that misunderstanding?

5              MR. WALSH:  Objection to the

6         form.

7         A.    I couldn't possibly say.  I

8    wasn't party to those discussions.

9         Q.    All right.  I would like to take

10   a break now and let's come back at 1:00,

11   please.

12             MR. WALSH:  2:00 you mean?

13             MR. KOH:  2:00; right.

14             MR. WALSH:  All right.

15             (Whereupon, a brief recess was

16        taken.)

17             MR. KOH:  At this point, I've

18        asked the questions I'd like to ask of

19        Ms. Aaron.

20             Mr. Walsh, do you have any

21        questions?

22             MR. WALSH:  I do not have any

23        questions.

24             MR. KOH:  Then thank you for

25        coming in, Ms. Aaron.  Apology for the



Page 142

1                        Aaron

2         technical difficulties at times and

3         this deposition is concluded.

4                   Thank you, Josh, for jumping in.

5                   MAGNA TECH:  No problem at all.

6         It was my pleasure.

7                   MR. KOH:  Okay.

8                   MR. WALSH:  Thank you, Josh.

9         Thank you, Robin.  Thank you, Howard.

10                  (Time noted:  2:02 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 143

```
 1
 2              A C K N O W L E D G E M E N T
 3
 4          I, AMANDA AARON, hereby
 5      certify that I have read the transcript
 6      of my testimony taken under oath in my
 7      deposition of January 21, 2022; that
 8      the transcript is a true, complete and
 9      correct record of what was asked,
10      answered and said during this
11      deposition, and that the answers on the
12      record as given by me are true and
13      correct.
14
15
16      _____
        AMANDA AARON
17
18
        Subscribed and sworn to
19
        before me this _____ day
20
        of_____, 2006.
21
22      _____
        NOTARY PUBLIC
23
24
25
```



Page 144

```
 1
 2                    I N D E X
 3
 4    WITNESS            EXAMINATION BY       PAGE
 5    Amanda Aaron       Mr. Koh               4
 6
 7     EXHIBITS          DESCRIPTION          PAGE
 8    Exhibit YY    Expert Report of      27
                    Amanda Aaron
 9
      Exhibit ZZ    DESCRIPTION           114
10
      Exhibit AAA   Appraisal of Real     133
11                  Estate 14th Edition
                    Table 17.1
12
      Exhibit BBB   Appraisal of Real     135
13                  Estate 14th Edition
                    page 44
14
15
16    PREVIOUSLY MARKED EXHIBITS:
17    Plaintiff's Exhibit 16
      Exhibit H
18    Exhibit M
19
20
21
22
23
24
25
```



Page 145

```
 1

 2              C E R T I F I C A T E

 3    STATE OF NEW YORK        )

 4                             ) ss.:

 5    COUNTY OF NASSAU         )

 6              I, ROBIN LaFEMINA, a Registered

 7    Professional Reporter, Certified LiveNote

 8    Reporter and Notary Public, do hereby

 9    certify:

10              That AMANDA AARON, the witness

11    whose deposition is hereinbefore set forth,

12    was duly sworn by me and that such deposition

13    is a true record of the testimony given by

14    such witness.

15              I further certify that I am not

16    related to any of the parties to this action

17    by blood or marriage; and that I am in no

18    way interested in the outcome of this matter.

19              IN WITNESS WHEREOF, I have

20    hereunto set my hand this   day of        ,

21    2022.

22

23

24                    Robin LaFemina
                      ROBIN LaFEMINA

25
```



Page 146

```
 1
 2                      ERRATA SHEET
 3    CASE NAME:  McDONALD'S v. ATLANTIC
      DATE OF DEPOSITION:  1/21/22
 4    WITNESS' NAME:  AMANDA AARON
 5    PAGE/LINE(S)/    CHANGE            REASON
           /        /_____/_____
 6    ____/_____/_____/_____
           /        /_____/_____
 7    ____/_____/_____/_____
           /        /_____/_____
 8    ____/_____/_____/_____
           /        /_____/_____
 9    ____/_____/_____/_____
      ____/_____/_____/_____
10    ____/_____/_____/_____
      ____/_____/_____/_____
11    ____/_____/_____/_____
      ____/_____/_____/_____
12    ____/_____/_____/_____
      ____/_____/_____/_____
13    ____/_____/_____/_____
      ____/_____/_____/_____
14    ____/_____/_____/_____
      ____/_____/_____/_____
15    ____/_____/_____/_____
           /        /_____/_____
16    ____/_____/_____/_____
      ____/_____/_____/_____
17    ____/_____/_____/_____
           /        /_____/_____
18    ____/_____/_____/_____
           /        /_____/_____
19    ____/_____/_____/_____

20                    _____
                      AMANDA AARON
21
      SUBSCRIBED AND SWORN TO
22    BEFORE ME THIS_____DAY
      OF_____, 20___
23    _____
24         NOTARY PUBLIC
25    MY COMMISSION EXPIRES_____
```



**A**

**AAA** 132:12 133:8
133:9 144:10
**Aaron** 1:14 2:12
4:9,20 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1,3 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1,24 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1,22 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1,19 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1

129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1,19,25 142:1
143:4,16 144:5,8
145:10 146:4,20
**ability** 108:14
132:21 133:2
**able** 6:2,17 28:3
68:9,24 72:23
86:11 90:7 97:5
110:16 134:22,24
**absolutely** 6:19
45:17 46:7 58:10
59:5 60:24 69:4
70:3 71:17 72:24
76:20 80:11 87:4
92:2 93:3 100:11
107:12 110:18
118:15,15 121:22
129:3 134:11
136:6,11
**accept** 44:17 45:7
**accepting** 121:22
**access** 6:2 31:8 32:2
108:13
**account** 118:17
**accounts** 70:25
**achievable** 81:18
**achieve** 10:8
**acquisition** 84:7
**action** 145:16
**active** 76:5,6 83:16
**actively** 83:5
**activity** 76:5,6 78:7
78:11 82:25 94:24
**actual** 102:6 107:4
**add** 40:5 71:19
**added** 70:24
**addendum** 42:17
50:5 61:13 117:4
122:9
**addition** 17:21
**additional** 65:25
**address** 14:5 21:10

21:12 52:23 110:3
110:7
**addresses** 12:9
**adequacy** 55:3
**adequate** 63:5
**adjacent** 15:5
74:11
**adjust** 61:14 73:8
122:11
**adjusted** 51:21
62:3 64:2 120:8
**adjusting** 120:2
140:12
**adjustment** 51:23
**adjustments** 138:4
**admits** 11:5
**advice** 59:11
**affect** 126:22 127:2
127:25
**Agile** 6:3,24
**ago** 14:6 100:2
**agree** 4:3,8 118:13
**agreed** 138:11
**agreement** 109:15
**agreements** 108:20
**Agudus** 12:15
**Ah** 102:15
**ahead** 71:21 123:2
**airplane** 7:9
**aligned** 116:24
**allow** 108:18
**allowed** 108:18
**allows** 32:5
**alpha** 132:12,12,12
**Amanda** 1:14 2:12
4:9 27:24 100:10
143:4,16 144:5,8
145:10 146:4,20
**American** 43:11
**amount** 19:21
34:18 35:2 36:12
36:22,25 78:12
85:10 98:20
**AMOVITZ** 3:21
**analyses** 48:21
**analysis** 33:4 34:15

65:17,20 70:24
71:2 76:4,23 77:6
77:10 78:14 79:20
82:6 84:18 88:2
103:11 110:13
116:22 117:6
131:9,21 138:4,24
**analyze** 52:20
108:19 116:24
118:5 122:10
138:8
**analyzed** 46:15
63:17
**analyzes** 66:14
**analyzing** 117:16
**answer** 23:9 28:13
29:3 30:13 33:8
37:6 51:17 61:6
70:2 71:19 97:17
111:13 113:24
116:17 130:23
**answered** 143:10
**answering** 113:6,22
**answers** 110:16
143:11
**anybody** 78:3
100:6 122:25
123:7,8
**anyway** 85:14
**apartment** 14:8,9
**Apology** 141:25
**apparently** 122:16
130:6
**appear** 64:6 70:11
129:10
**appeared** 20:25
**appears** 126:3,11
127:23
**application** 48:2
**applications** 48:17
**applied** 46:24 55:5
92:24
**apply** 28:9 60:10,17
77:9 87:12 93:4
**appoint** 43:8 44:2
**appointed** 18:4

21:7 25:2,7,14,18
**appointment** 42:23
**appraisal** 9:25
10:14,16 19:17,21
19:24 21:24 22:4
22:14,16 23:12,17
24:7,9,15,21
25:23 28:21,23
32:19 34:14,16
35:18,21 36:3,11
37:3,12 40:6,7,15
40:18,22,24 41:8
41:19 45:15 46:9
46:14,18 47:20
48:10 49:20,21
50:14 53:12 54:24
55:17,25 59:9
61:9,12 66:14
70:13,14 72:9
73:7 76:21,21,25
77:5,9 78:11,20
85:14 86:18,21
89:12 90:9 93:21
108:12,13,16
109:5 111:9,14,16
112:13,17 113:19
114:25 115:3,4
118:9 119:16
123:12,21 124:15
124:16,19,24
126:4 128:4,16,20
129:5 131:18
132:7 133:9,24
134:19 135:17
136:10,25 137:2
137:11,12,13,18
137:22 138:5,12
138:17 139:4,19
139:21 140:5,22
140:23 144:10,12
**appraisals** 19:25
37:8 43:6 48:4,20
68:7 81:5,7 85:3
110:21 111:4,23
128:8
**appraise** 33:14



41:12,15 86:3
118:18,20 119:12
**appraised** 64:21
115:9
**appraiser** 11:19
16:11,24 17:15
18:4,5 19:6 20:7
20:25 21:7 25:3,4
25:15,18 29:7,12
32:20,25 34:7,16
34:20,24 35:3,8
35:13,25 36:8,9
36:21,24 38:14
41:23 43:8 44:2,6
46:6 48:23 49:13
51:2,7 52:19,22
58:20,22 59:6,10
59:11 60:25 62:21
62:23 67:20 69:3
75:24 76:3 78:4
81:4 87:10 97:12
107:24 108:11
109:10 115:24
118:23,25 119:10
119:18 120:5,12
120:15,19 122:10
128:10,14,14
131:17 134:22
135:6 138:18
139:22
**appraisers** 11:3
24:10 25:7 26:15
33:10,14,16 34:2
34:12 38:13 42:19
42:23 43:8,9,12
43:25 45:21 46:10
46:15,18,23 47:3
47:11,21,23 48:16
48:19 49:10 50:9
51:13 56:11,24
57:2,5 59:18
61:20 63:8 64:10
64:12,12,14,16,16
64:18 76:13 77:17
78:13 108:18
110:25 112:8,12

113:25 116:24
117:19,22 118:2
118:14,16 123:19
123:21 139:14
140:3,20
**appraiser's** 35:16
36:5,14,18 40:2
48:9 62:24 78:15
119:14 129:3
138:16
**appraising** 34:21
39:17,18 109:18
**appreciated** 52:5
**approach** 37:13,16
40:8 50:8,11,15
52:8 80:3,13
85:13,17,17,19
116:13,20 117:17
119:20 121:7,17
122:3,6,13,24
123:3,13 124:4
125:12 140:4
**approaches** 77:8
140:9,21
**appropriate** 34:17
34:18,25 35:2,4,7
35:17,20 36:3,10
36:22,25 41:10
63:12 71:20 77:8
79:23 86:12,15,23
87:10,12 88:15,16
90:8 97:6 106:2,4
108:15 117:5
120:6 121:7
123:12 124:20
125:8,12 129:4
139:20,21
**appropriately**
41:21 51:21
**appropriateness**
55:4
**approval** 93:16
**approved** 93:15
131:4
**approximately**
16:15 17:18,19

19:5
**arbitration** 57:5
110:25 111:25
112:9,10,14,17
113:20 117:23
**arbitrations** 57:2
138:10
**area** 26:4 33:11,11
34:22 61:18 78:5
81:8 100:5 101:2
104:15,25
**areas** 74:12
**arm's** 107:11,17,20
108:5,8 109:2,9
**arrange** 6:17
**arrangement** 116:7
117:13
**asked** 30:21,23
40:8,15,19 53:18
141:18 143:9
**asking** 5:17 12:8
45:2 77:18 125:20
125:22
**aspects** 33:3
**assignment** 17:3
22:7 23:5 34:9
35:5,6,13 41:24
42:3 78:21 135:25
136:9 137:20
139:10 140:19
141:2
**assignments** 19:21
39:22 61:21
**assistance** 32:18
**Associates** 106:15
107:20 109:2
110:5,9
**association** 14:14
85:12
**assumption** 37:2
66:8,13 80:14
**assumptions** 81:14
94:13
**Atlantic** 1:8 4:23
58:23 66:23 68:19
68:25 69:23 74:17

78:24 97:24 98:6
98:23 99:4,11,16
99:19,22 101:20
101:22 102:12
105:23 106:15
107:19 108:4,25
110:4,8 124:3
125:15 131:6,22
146:3
**attempt** 5:20
**attempted** 73:2
**attending** 18:3
**attention** 91:22
103:8 114:22
**attorney** 56:19
58:13,25
**attorneys** 3:5,12
57:19,25 58:2,18
**author** 32:7
**authoritative** 111:4
111:9,16,19 112:2
**authority** 98:15
99:19 112:7,18
113:21 114:3
**authorized** 37:21
**available** 61:17
63:6 133:13
134:10
**Avenue** 3:6,13
21:13 24:25 56:15
56:16,24 57:23
58:23,24 60:9,18
66:23 68:20,25
69:23 74:17 78:24
89:7,15 92:11
97:25 98:23 99:4
99:12,17,19
101:20 102:13,13
105:23,23 124:3
125:15 131:6,22
138:7
**average** 44:15,16
45:5,6
**aware** 77:15 83:6,9
83:15,18,25 84:3
91:9 93:14 103:13

103:20 123:10
130:12 140:10
**a.m** 2:8

## B

**back** 16:14 22:21
29:20 53:18,23
87:9 89:11 100:7
103:2,6 141:10
**backed** 63:2 97:2
**background** 9:20
56:3
**bank** 74:7
**bankruptcy** 14:23
15:8
**banks** 73:22 83:7
**based** 32:6 35:15
38:11 44:13 71:25
78:9 79:20 80:4
81:6 95:23 116:25
120:19 122:22
128:15 138:6
**basic** 76:20
**basis** 79:10 80:19
91:24 115:8 116:9
**BBB** 135:16,17
144:12
**Bear** 71:18 100:3
**began** 40:22 113:22
**beginning** 137:19
**begins** 43:20
103:11 114:24
**behalf** 5:2,3 107:6
**behaving** 123:3
**belief** 39:13 62:24
90:21 116:8
**believe** 7:23 8:5,25
14:7 21:5 26:6
27:12 30:5 32:3
43:3 53:9 61:25
62:8,12,14 64:3
66:20 69:18 70:6
71:14 73:21 79:13
85:16 99:10,14
105:20 107:8
113:3 141:3



believed 62:21
benefit 110:13
best 45:9,13,14,17
  45:22 46:4,12,16
  46:19,24 47:4,12
  47:22,25 48:2,17
  49:11,14 61:2
  64:24 66:9,17,22
  67:7,9,19 68:11
  68:17,24 69:6
  70:7,12,16,18,22
  71:5,11,12,22
  72:2,6,13,14,16
  74:16 75:5,13,20
  75:25 76:18,24
  77:7,12 78:23
  79:7,14,18,21
  80:5,7,20 82:21
  94:2,10,19,23
  95:3,20,25 96:7,9
  96:16,17 97:8
  103:11 115:13
  119:11 120:16,19
  120:24 121:15
  135:10 136:21
  137:3,6 139:12
better 103:4
beyond 86:18
bit 12:12 39:24
  84:17 85:23
  104:11 138:3
blanket 109:7
blood 145:17
Board 21:24 24:7
  25:21 26:5,11,12
  26:18,23 27:2,8
  27:11 43:11
book 110:24 117:21
bore 94:14
boroughs 26:5 86:6
  88:13
bottom 84:19 89:2
bound 56:11
break 6:14,17
  12:11 52:4 53:17
  141:10

breakout 54:2,9
  100:15
Brendan 3:8 5:8
  8:9
brief 54:16 141:15
bring 27:21 78:14
  78:20 114:5 129:6
  132:10 135:12
bringing 123:15
  132:13
brokers 64:22
  87:21
Brooklyn 13:7
  14:24,25 15:11,19
  21:9 24:13 25:2
  74:13 81:4,6,9,25
  83:20 86:8 102:11
  102:21
brought 42:9
building 15:5 74:9
  84:13 98:16,21
  99:15,23
buildings 74:10
  83:12 95:11
build-out 91:23
bulk 79:19
bunch 95:10 139:8
business 37:10
  102:25
buy 84:9,10
bwalsh@pashma...
  3:9

——— C ———
C 3:2 143:2 145:2,2
Cahner's 16:20
calculator 37:15,18
call 96:24
called 4:10 10:22
  12:15 13:14 16:9
  25:20 32:3 77:2
calling 63:7
calls 47:15 51:5
  68:13 87:23
capacity 16:24
captioned 57:4

61:8
captures 69:21
care 91:11
career 24:9 82:18
Carol 9:16
case 12:15,24 13:4
  13:5,13 30:12,15
  32:5 41:21 45:20
  49:18,24 56:3
  58:3 59:6 63:15
  70:16 92:11 93:7
  93:11 119:24
  136:19 146:3
cases 48:9,15 56:12
  56:23 57:13,16,18
  57:20,24 58:14
  59:16 121:8
caused 114:25
  118:9
cell 7:6
Center 25:11
centers 74:11
certain 32:6,14
  33:3 39:19 64:21
  78:9,12 96:3
  138:9 139:16
certainly 39:22
  64:14 74:12 76:7
  77:13 78:5,9
  82:12 96:19
  110:12
certainty 38:11,18
  38:24 39:6,14,15
  39:21,25
certified 2:14 11:18
  145:7
certify 143:5 145:9
  145:15
Chabad 12:16 13:6
challenge 138:16
challenged 104:13
challenges 139:10
challenging 118:15
change 84:4,8
  114:8 146:5
changed 138:17

changes 35:14
changing 95:19,21
  95:22 132:4
chapter 21:24 22:2
  24:7 25:21,23
  26:3,9
chapters 25:24
  26:2
characteristics
  136:2
characterization
  131:14
charged 119:10
  135:7
chart 77:4 139:9,24
Chasidei 12:15
check 64:9,9
choice 48:3
chooses 120:12
choosing 85:19
chose 99:20 125:3
chosen 43:9 84:19
  84:20 85:7,10
Christensen 57:7
circumstances
  40:17
cite 110:24
City 24:10 26:5
  81:22 88:13 98:15
City's 92:17
Civil 12:14
Class 72:20 81:24
clear 40:14 92:11
clearly 59:17 89:16
client 35:10 135:23
clients 11:9 64:19
  110:14 139:15,15
close 115:7
CLR 1:18
Code 29:6,11
colleagues 26:19,20
collect 136:3,7
collecting 138:3
collection 137:21
Columbia 9:22
come 33:15,17 34:2

35:12 38:22 47:24
  48:16 51:10 53:18
  53:23 56:22 58:13
  64:18 71:15 86:25
  100:7 104:10
  128:8 140:4,20
  141:10
comes 72:5 75:25
  76:8,23
coming 78:21 87:9
  112:18 113:20
  141:25
commend 102:8
comment 86:17
commercial 10:19
  16:10 38:13 82:7
  96:10 97:7
COMMISSION
  146:25
committee 26:14
common 50:14,25
  117:17,18 134:8
  134:13
community 24:10
comp 134:7
company 85:4
comparable 24:11
  51:20,24 52:12,23
  61:14 62:2,8,13
  62:15,22,25 63:3
  63:14,16,20,23,25
  64:4,6,8,13,24
  65:7,12,22,25
  72:17 73:13,16
  74:24 75:2,22
  116:11 117:6
  120:2,3,7,9,13,14
  121:11 134:10,18
  140:12
comparables 48:3
  65:16 73:8 75:16
  75:17 88:12
  104:18,23 120:23
  121:14 124:14,18
  125:9 138:20
compare 102:23



comparison 37:13
85:13,17,18 115:9
117:16 119:20
122:3,13,24 123:3
123:13 124:4,11
125:12 134:8
137:24
competency 34:20
39:16,20 40:3
competent 68:9,23
69:3 71:15 72:22
78:4,13 86:10
97:4,11 134:22,23
135:3
competitive 102:24
Complaint 30:12
complete 31:7,8,11
143:8
completed 19:22
130:17
completely 89:21
127:23 138:18
completeness 55:3
completing 131:24
completion 18:19
18:22 19:4
compliant 128:6
complies 55:2,17
69:5 140:10
comply 79:5 90:18
compound 80:15
comprehensively
77:14
comps 77:22 124:6
124:10 138:3
139:7
compute 126:5
computer 7:3
concern 125:13
concerning 37:7
56:3 112:17
113:19
concerns 84:17
conclude 54:23
69:4 77:7 96:6
97:5 105:6 117:3

125:14 127:6
concluded 66:21
67:6 79:3 80:10
80:12 96:18
120:19 125:23
126:12 142:3
concluding 79:11
conclusion 38:23
47:16,25 51:6
55:12 66:17 67:3
68:14 71:4,11,16
74:20,22 75:13,19
75:20 76:11,17
79:22,25 80:20,23
97:7 103:18
104:21 105:5,13
108:7 121:4
125:21 126:4,17
126:22 127:3
conclusions 34:3
37:5 38:9,20 46:2
55:6 76:24 79:4,6
79:14,18 82:22
96:14,16 106:20
conditions 136:2
conduct 64:25
conference 8:2
confident 38:19
confirmed 64:5
confirming 133:19
conflicting 79:17
conform 79:9,16
conformance 28:14
confuse 41:10
confused 5:18
136:25
Congregation
12:17
connection 29:22
90:24
consider 28:22 29:6
29:13 90:22 92:14
112:16,18 113:18
113:20 114:2
consideration
59:19 92:12

109:13
considerations
112:8
considered 92:7
99:17,21 109:4
considering 106:8
110:14
consistent 84:22
120:10,14
consistently 46:16
constitutes 34:13
constrained 45:18
119:16 128:17
constraints 137:9
construct 83:21
constructed 95:11
construction 81:20
81:22,24 104:12
contemplate 82:6
contemplates 42:22
43:23
context 19:9 36:19
49:7 112:10,14
115:23 137:12
continue 59:14
84:16 113:23
CONTINUED
54:18 100:24
continues 115:24
contractual 89:9
contradiction
122:12
control 133:4
controls 132:21
133:3
conversations
23:11,16,19,23
conversion 99:24
converted 99:16,24
copy 133:23
Corporate 56:15
Corporation 1:5
3:20,22 4:23 5:4
correct 4:25 16:16
17:11 18:16 19:2
23:6 27:19 41:22

42:20 48:24 49:3
49:13,21 56:18
60:19,20 62:4,5
63:23 66:5 67:10
68:10 73:9,10,12
73:18,20 74:22
75:5,9,10 87:3
88:22 90:19 93:21
97:25 101:9
110:25 113:15
114:12 120:25
124:4 126:11
128:12 132:8,9
133:20 135:10
136:21 143:9,13
corrected 113:18
correctly 91:19
cost 84:7,12 95:12
106:2,4
CoStar 65:3,4,5,10
65:14 77:16
140:17
costs 81:20,21,23
Counsel 3:19 4:2
counseling 11:8
Counselors 10:23
11:11
count 19:20
Counterclaim
30:13
country 25:24
County 12:14
13:15 145:5
course 32:24,24
37:11,13,15,17,22
37:23 95:15 128:3
courses 22:2 35:24
37:19,25
coursework 9:24
court 1:2 4:2,7,15
6:10 12:15 13:15
14:23 15:2,18
54:3
covers 26:3
CRE 11:10
create 54:9

creates 42:3
creating 54:10
credibility 37:5
credible 23:2,6,14
34:13 139:19
criticism 110:10
criticize 86:24
88:20 106:7
134:12
criticized 85:18
120:22
current 59:20 89:9
89:16,17 92:13
109:17
currently 16:2
64:20 98:23
cut 33:22 113:3

---

### D

D 72:20 81:24
143:2 144:2
data 24:11 34:14
35:12 37:2 50:7
50:10,15,17 52:8
55:4 63:6,9 64:14
64:18,20,24 65:7
65:8 71:8,9 77:18
80:14 86:24 87:11
87:18,19 95:23
99:14 103:12,20
106:18 108:11
116:13,20,25
119:18 121:16,24
122:2,6,7 136:3,7
137:21
database 32:2,12
65:3,4,6,10,14
databases 63:7
64:13
date 27:25 93:18
96:23 103:16
104:9 108:22
114:15 133:11
135:19,25 146:3
day 90:3 143:19
145:20 146:22



**deal** 91:5
**deals** 87:15,15,21
   87:22 88:14
**decide** 31:20 39:11
   51:14 86:22
   118:25
**decision** 115:2
   118:10,14
**declaring** 23:13
**Defendant** 1:9 3:12
**defined** 56:14
   115:25 137:11,19
**defines** 42:19
   128:11,14
**definitely** 107:23
**definition** 44:13
   72:16 94:2,8,9
   96:5
**degree** 9:21,22 10:3
   10:6 38:11,18,24
   39:5,14,15,21,25
**demand** 76:10
   78:10 80:18,24
   82:25 95:21 96:21
   96:22 103:12,14
   103:21,25 104:24
   105:4,21,25 106:5
**DeMarco** 9:17
**demonstrate**
   104:23
**demonstrated**
   61:18 63:21
**demonstrates**
   82:25
**demonstrating**
   88:14
**depend** 40:2
**depending** 35:14
   49:7 128:10
**depends** 84:6
**deposed** 5:9,13
   6:22
**deposition** 1:12
   2:12 4:22 6:2 7:2
   7:13 9:8,11,14
   12:5,5,18 13:23

14:19 30:15,18
   137:16 142:3
   143:7,11 145:11
   145:12 146:3
**depositions** 6:10
   7:15
**derive** 104:18
**describe** 9:19 24:20
   64:10 98:3 101:13
**described** 69:19
**describes** 76:22
**description** 114:14
   119:11 144:7,9
**designated** 38:14
   43:10
**designation** 9:25
   10:9,11,13,14,17
   10:18 11:11,14
**desirable** 99:17,22
**detail** 123:23
**determination**
   45:18 46:4 48:24
   49:2 50:3 63:13
   75:3 76:17 78:22
   79:3 137:5
**determinations**
   97:22
**determine** 35:19
   36:2 39:12 48:9
   49:13,19 60:8,22
   61:3 64:8 65:22
   68:2,9,16,24
   69:20 75:9,23
   77:8,11 86:11
   89:7 106:23
   128:23 129:4
   134:23,24
**determined** 46:10
   48:25 77:2,20
   86:20 87:2 109:13
   120:24 128:4
   138:10
**determines** 35:8
   69:6 91:5 128:4
   128:15
**determining** 35:7

36:9 135:9
**develop** 82:7 83:20
   83:21 84:12
   103:15
**developed** 66:15
   74:6,6 93:22,24
   116:3
**developer** 15:4
   83:16
**developing** 82:16
   83:6,10
**development** 25:5
   56:15 67:9,11,14
   70:20,22 71:6
   72:3,18,19 75:14
   76:7 79:23 80:4,5
   81:7,11 94:3,6,17
   94:18 95:6 96:9
   96:11 104:8 105:8
   105:11
**developments**
   72:20
**diagonally** 98:6
**dictates** 59:8
**differ** 43:7,25 49:10
**difference** 47:13
   67:17,20
**different** 38:23
   40:18,23 41:14
   46:2,10,11 47:24
   51:12,14 70:17,21
   76:9 78:18,19
   91:15 127:23
   128:9,18,18,19,21
   128:22 134:19
   138:19,21,22
   139:4,5,6,7,8
   140:4,20,21
**differential** 104:17
**differing** 33:15,17
   34:5 45:21 47:4
   58:12,13
**difficult** 19:20
   118:18,24 140:14
**difficulties** 142:2
**difficulty** 6:7

114:23 115:19
   139:25
**direct** 57:17 103:8
**directly** 59:8
**Directors** 26:6
**disagree** 47:11
   116:18
**disagreed** 46:19,23
   47:21
**DISCO** 32:3,5
**discover** 40:16
**discretion** 32:21,25
   33:4,5,10 118:25
   119:15 120:5
**discuss** 56:2,6
   58:23
**discussed** 57:18,24
   58:7 103:10
**discusses** 97:23
**discussing** 52:14,15
**discussion** 61:15
**discussions** 141:8
**dispute** 14:13 25:12
   136:20
**disregards** 61:12
**district** 1:2,3 89:18
**document** 32:7,8
   32:16 42:2,10,12
   42:18 43:6 114:10
   123:15,17,24
   129:6 130:10,11
   130:15,22,24
   131:3,11,15,19,24
   132:15
**documents** 6:7 8:15
   29:16,21 30:2,14
   30:24 31:9,17,19
   31:19,21,21 32:4
   32:13,18 40:21
**doing** 76:4 82:19
   95:9 104:10
   108:11 112:12
   131:8 138:3,4
   139:19
**dollars** 84:11
**doubt** 37:4

**Dozens** 38:2,4,5
**draw** 114:21
**drawn** 55:7
**draws** 76:11
**duly** 4:11 145:12
**duress** 44:19
**duty** 75:15

**E**

**E** 3:2,2 143:2,2,2
   144:2 145:2,2,2
**earlier** 13:22 25:19
   37:6 94:6,13
   135:6
**early** 16:6
**earn** 11:10,13
**easier** 30:10
**east** 25:6
**Eastern** 1:3 2:8
**easy** 139:11,11
   140:13,15
**economics** 84:6
   95:22
**Edition** 132:8,15
   133:10,20,24
   135:13,18 144:11
   144:13
**education** 35:24
**educational** 9:19
**effect** 80:15 89:25
**effective** 135:25
**either** 44:19 48:22
   82:24 128:7
**employees** 9:5
**encumbered** 41:8
   41:12,20 70:18
   72:7,10 74:18
   90:9,10 109:16
   117:25 119:23
**encumbrance**
   45:19 66:24 70:25
   80:2 89:14,19
   118:17 128:7
   137:9 138:14
   140:11
**encumbrances**



59:21
engaged 18:8,13,17
  20:5,6
engagements 20:12
  20:13
English 69:10
entirely 40:23
  41:13 47:24 70:17
  134:18 138:19,20
entities 109:14
equal 94:16
ERRATA 146:2
error 117:15,17
especially 64:21
ESQ 3:8,15
essentially 26:19
  45:11 90:14
established 44:13
  60:16 89:5 120:15
  120:18
estate 10:23 11:4,9
  11:11,19 14:14
  16:11,20 38:13
  43:11 65:7 76:22
  132:7 133:10,25
  135:18 144:11,13
ethics 29:7,11
  37:11
evaluate 22:19 39:5
evaluated 77:21
  116:10
evaluating 115:20
evaluation 121:16
  124:2
events 22:2
everybody 54:3
  100:15,17
everyone's 132:25
evidence 63:10
  67:5 71:8 75:21
  78:10,16 81:10,17
  96:22 103:14
  120:4,20
evidenced 94:24
evolve 35:11
evolved 40:23

exactly 60:7 99:25
examination 4:18
  65:16 144:4
examined 4:13
example 73:23
Excel 32:9,14 37:18
exchanges 32:13
excluding 122:12
exclusion 61:16
exclusive 44:17
excuse 20:5
executed 106:13
exercise 131:4
exhibit 27:22,23
  42:11 114:7,12,14
  114:17 123:16
  125:17 129:8,9
  130:8 132:11
  133:9 135:17
  144:8,9,10,12,17
  144:17,18
exhibiting 76:10
exhibits 5:25 144:7
  144:16
exist 116:6 117:12
  120:8 121:5
existence 43:13
  110:19
experience 38:12
  39:18 40:3 78:6
  78:12,18 81:3,21
  102:21
experienced 117:23
expert 3:23 5:2
  7:14 11:25 12:23
  13:9,24 14:11
  17:10,14,22 27:18
  27:22,23 28:6
  29:17,23 30:3
  38:20 112:7,11
  144:8
expertise 10:18
  15:9 38:14
EXPIRES 146:25
explain 94:13
explore 85:22

exploring 55:24
expressed 38:10
extent 47:15 51:5
  67:16 68:13
extremely 41:9
e-mail 32:8,13
  64:17
e-mails 77:17 87:23
  137:17

___

**F**

F 145:2
face 117:3
fact 44:5 55:14 57:7
  60:23 63:21 64:3
  67:8 72:5,12
  90:15 92:6 96:22
  109:15 118:2
  138:12
factor 46:5 90:8,16
factoring 88:21
  89:3
factors 95:21
facts 35:12
failed 110:7
fair 5:22 6:12,18
  13:10 14:12 15:21
  15:23 17:10,15,25
  25:15 26:17,21
  37:22 43:22,24
  44:14 45:2 46:3
  46:20 49:9 55:20
  69:21 74:14 109:3
  112:19 113:21
  115:18 118:7
  119:10 126:6
  127:7 128:2,9
  131:9,21
fairly 84:22
faith 140:3
fall 34:22
falling 104:12
familiar 5:17 42:12
  59:12
family 14:13 25:12
far 130:12 140:15

faults 73:6
feasibility 70:20
  105:15
feasible 80:11
  105:8,12 137:7
fee 41:3,5 70:14
  79:20 85:12 94:3
  94:24 95:8 118:20
  119:17 123:14
  137:22,24 138:13
feet 103:15 105:2,2
  105:3
FEIN 3:11
field 38:12
figure 88:10 119:11
  139:12
file 31:4,7,9,10,11
  31:14,17,23 32:9
  32:9,12 40:21
  63:11 77:16 78:15
  85:5 88:11 90:5
  103:17 137:16
files 32:15 64:15,15
filters 32:7
final 41:4 43:19
  117:10 123:22
financial 37:17
  70:20 105:14
financially 80:11
  105:8,11 137:7
find 22:25 32:15
  65:9 109:10
  140:15,16
finding 23:5 32:18
  80:14
Fine 100:9
firm 16:3,9 30:25
  64:16
first 4:10 7:22 17:3
  41:6,24 42:11
  43:5 50:6 52:7,14
  53:10 54:21 56:2
  77:20 79:19 84:20
  85:11 90:17
  135:23 136:13
five 26:4 52:5 86:6

95:24
flag 72:9
Flanigan 83:19
  84:14
Flatbush 101:23
flaws 48:22
floor 3:13 98:14
flowed 137:21
flowing 119:6
follow 60:4 76:18
followed 48:10
following 115:22
follows 4:14 54:24
foot 71:6 72:3 80:9
  84:11,13 94:17
  104:2,20 105:7,10
  105:18,21
footages 125:2
forces 138:18
forecast 95:23
form 23:8,18 27:4
  28:12,14,19 29:2
  29:19 31:25 32:23
  33:6 36:7,16 39:2
  39:8 40:11 42:5
  43:2 46:22 47:8
  47:15 48:12 49:6
  49:16,23 50:13
  51:5,16 52:17
  53:6,14 58:17
  59:4 60:12 61:5
  62:11,18 66:11
  67:13,22 68:13
  69:15,25 70:9
  73:3 75:7 77:24
  82:10 83:24 86:14
  88:7 91:3 92:4,9
  96:13 97:10
  103:23 104:6
  111:7,12,21 112:4
  112:22 116:16
  117:9 118:12
  119:4 121:20
  122:19 123:6
  124:9,22 125:19
  126:2,10,16,24



130:20 131:14
132:2 134:16
135:2 136:5,18,23
140:7 141:6
**formed** 125:7
**forming** 75:18,19
**forth** 22:21 26:14
26:15 145:11
**forward** 67:24,25
68:7 69:19
**found** 63:22 81:15
121:11
**foundation** 35:23
**four** 12:4 14:19
19:14 24:23
124:12,18
**framing** 116:18
**Friday** 7:24
**front** 135:20
**frontage** 99:11,18
**full** 54:21 87:11
93:20 108:12
**fully** 18:9 107:16
107:25 108:2
**functions** 37:17
**fundamental** 89:12
95:22
**furniture** 83:19
**further** 145:15
**future** 95:19,25

**G**

**G** 143:2
**game** 138:9
**general** 11:19 33:7
37:13 65:6 67:15
123:8
**generally** 13:3 36:5
36:14 41:23
104:13 120:17
**geographic** 34:22
39:20
**geographies** 78:19
**geography** 40:4
78:13 86:5
**getting** 136:24

**give** 132:21
**given** 45:15 78:5
103:13 106:2,3
121:12 129:5
139:25 143:12
145:13
**giving** 139:15
**glaring** 71:23
**go** 34:15 54:13
56:16 58:8 61:7
69:19 71:21 75:11
97:20 103:6 130:7
133:12
**goes** 26:12 34:10,10
34:11 138:10
**going** 7:10 27:21
55:15 114:11
129:25
**good** 4:20 7:10
53:24 54:7 60:6
100:6,12 140:3,25
140:25
**Gordon** 56:13
**gotta** 114:8
**graduate** 9:22 10:5
**Granted** 102:22
**great** 100:16
104:10 133:6
**greater** 104:25
**gross** 104:20
**ground** 19:25 20:8
20:15,24 21:4,8
21:15,17 24:24
87:16 88:12 90:5
106:10,13 115:7
115:21 119:21
137:5
**Group** 16:10 22:13
**guess** 54:3 106:2
**guidance** 118:2
**guide** 112:11
**guidelines** 28:20

**H**

**H** 123:16 125:17
144:17

**half** 81:19 101:17
**hand** 145:20
**happen** 130:6
139:3
**happened** 48:8,13
48:18 93:7,11
137:15
**happening** 104:14
**happens** 59:25
139:23
**hard** 64:18 140:13
140:19
**harder** 118:16
**HAYDEN** 3:4
**Headquarters** 13:6
43:10
**healthy** 102:9
**hear** 5:19
**heard** 45:8 73:25
74:3 95:13 107:11
122:5
**Hedden** 3:23 54:5,7
**help** 117:22 136:9
**helpful** 30:3 112:11
**helps** 115:4
**hereinbefore**
145:11
**hereunto** 145:20
**high** 11:9 74:8
104:11
**higher** 72:5 93:23
96:3
**highest** 10:18 45:9
45:13,14,17,22
46:4,11,15,19,24
47:4,12,21,25
48:2,17 49:11,14
66:9,17,22 67:7,9
67:18 68:10,17,24
69:6 70:7,12,16
70:18,21 71:5,11
71:12,22 72:2,6
72:13,14,16 74:16
75:5,13,20,25
76:9,18,23 77:7
77:12 78:23 79:6

**half** 79:14,18,21 80:5
80:7,20 82:21
94:2,9,11,11,19
94:22 95:3,19,25
96:7,16,17 103:11
115:13 120:15,18
120:23 121:15
135:10 136:20
137:3,6 139:12
**highly** 92:21
**hit** 129:23
**hold** 11:17,18 50:22
113:2 114:8
**holdings** 1:8 4:24
60:17 106:15
107:19 108:4,5,25
110:4,9
**home** 101:16
**Hot** 133:3
**hours** 8:6 9:2
**Housing** 98:15
99:19
**Housing/Fair** 37:22
**Howard** 3:15
4:21 8:10 52:3
142:9
**HP** 37:15
**hsk@msf-law.com**
3:16
**huge** 72:8
**hundred** 99:6
135:3
**hurt** 132:3
**hypothetical** 71:10
72:2 80:8,18,25
81:14 82:14 92:15
103:9,13 104:3,21
104:24

**I**

**idea** 122:20
**identification** 27:25
114:15 133:11
135:19
**identified** 14:20
59:16

**identify** 73:8 118:8
124:7 135:23
136:10,14
**impact** 45:23 59:13
**implicit** 66:16
74:15,19
**implicitly** 66:21
70:6
**implied** 121:23
**important** 6:8 46:5
58:21 59:5 60:8
60:22 106:18
108:10,16,17
**impressed** 102:19
**improperly** 137:19
**improved** 65:18
**improvement**
71:10 82:14
**improvements**
44:17 80:8,19,25
81:15,16 103:9
104:22,24 105:19
**inappropriate**
53:11 88:3 90:15
**inclination** 138:23
**include** 19:25 40:23
86:8,16 116:21
**included** 32:3
138:11
**includes** 63:25 80:9
**including** 12:4
59:20
**income** 37:16
**inconsistencies**
48:8
**inconsistent** 48:4
48:16
**incorrect** 46:24
47:2 70:7
**independent** 61:19
64:9 65:2,24 79:2
80:17,22 81:12
**Index** 1:7
**indicate** 51:22
82:13 122:3
135:22



indication 55:19
inflating 80:16
influence 58:8
informally 21:25
input 71:3 80:12
inputs 65:19
inspect 101:14
inspection 101:5
102:6
instances 22:17
40:6
Institute 9:25 10:15
21:24 24:7 25:23
29:8,12 37:12
43:11
instructing 52:19
52:21 116:24
instruction 122:23
138:7
instructions 41:13
54:24 60:4 61:12
139:16
instructs 122:10
intended 135:24
136:7,8,14,14,20
137:2,4,13
interest 85:9
interested 112:12
145:18
interesting 99:14
109:17
interim 72:13
95:14,18 96:4,5
96:10,15,18 97:8
interpret 51:2,8
116:19
interpretation
58:14,19 122:15
intersection 101:22
introduction 37:15
invest 84:12
investigate 107:25
108:3 109:10
investment 90:7
involve 20:8
involved 22:3,5

39:23 42:19 46:8
46:13 47:20 48:20
49:12,25 69:11
involves 35:6
involving 50:18,19
50:20 115:25
117:24
In-House 3:19
irrelevant 85:14
89:21 93:17
irrespective 92:25
Island 20:22 21:5
issue 13:8,10 14:4
14:10 57:21 101:5
119:15
issues 6:5 11:9
23:11 55:24

J
January 2:7 143:7
job 1:19 16:12
49:12 50:25 51:7
75:8 118:16,23
128:23 129:4
jobs 118:14
joint 21:22
Josh 100:16 129:19
132:10 135:12
142:4,8
JOSHUA 3:25
judge 48:22 49:3
judgment 35:16
36:5,14,18
jumping 142:4
jurisdictions 11:22

K
K 143:2
keep 87:9 97:16
Kest's 22:15,19,25
key 82:20
KFC 24:25
kind 34:14 71:5
81:8,11 84:14
90:7 96:17 112:13
138:9,18,25

kinds 117:23
Kings 12:14 13:15
knew 91:20
know 14:5 21:21,22
21:24 24:2,4,12
27:5 28:2 33:25
34:7 35:3 36:21
40:5,13 50:18
53:22 59:6,10
63:4,9,11 64:22
66:12 71:4 75:10
76:7 77:2 78:6
81:13,25 82:11,22
84:8,10 85:8,16
87:6,18 89:23,25
90:3 91:13 92:15
95:8,24 96:24,25
97:14,18 98:11,12
98:13,14,24 99:5
99:15,25 107:6,10
107:18,22,22
109:8,19,19 113:5
117:20 118:2
123:11 129:11
130:13,21,24
137:5,24 139:13
139:24
knowing 44:18
116:2
known 24:8
knows 36:24
Koh 3:15 4:5,6,17
4:19,21 29:20
32:23 33:6 42:6
47:9 52:6 53:20
53:24 54:4,5,13
54:18 68:15 73:4
97:13 100:14,24
102:19,23 103:5
113:4,14 129:19
129:23 132:10,14
132:19,22 133:3,8
133:14,21 135:12
135:16 141:13,17
141:24 142:7
144:5

Konikoff 57:3,6
58:15,20 111:25
112:6,15,24 113:3
113:17 114:2
115:19 117:14
119:9 121:3
Konikoff's 110:24

L
L 143:2
labeled 132:15
lack 78:10,10 96:22
LaFemina 1:18
2:13 4:11 145:6
145:24
land 15:3,4,21,24
21:8 25:5,9 41:3,5
41:7,12,15,20
50:8,11,18,19,20
52:2,9,14,20,22
53:11 59:21 61:14
63:18 65:12,17,20
65:25 66:5,7,15
70:24 71:24 72:11
74:5,8 79:20 80:3
80:13 81:6,8 82:5
83:3,6,10 84:9,10
84:15,23,25 85:4
86:3,4 87:13,17
88:22 89:4,7 90:8
90:10 91:11 94:11
94:12,14,15,17,19
94:21,25 106:2,4
106:16 115:6,8,10
115:14,20 116:2,2
116:14,22,25
117:7,16,20,24
118:4,19,21
119:17 121:17
122:24 124:11,18
125:11,14,15,23
137:23,25 138:2
138:13 140:12
landlord 44:16
45:6 90:22 91:4,8
91:9 106:9

landlords 19:10,13
landscape 87:11
language 44:23
45:11,16,19 51:2
51:8,11,13 52:25
53:3,8,10 57:16
57:17 69:5,7 79:9
79:16 89:15 92:10
119:25 121:13
122:14,21,22
123:2 128:6,17,19
137:8
large 96:23 99:8,12
larger 74:9
lasted 8:25
late 16:6 138:9
law 6:3,24 30:25
56:4 59:6 68:19
69:2 78:25 90:18
lawyer 81:2
lead 34:19
leadership 26:8
leading 46:5
leads 117:2
lease 41:13,20,25
42:17 45:2,16,19
45:20 51:9,11,24
51:25 52:18,19,21
54:24 55:18,21
56:10 59:17,22,25
60:3,5,7,18,21,22
61:3 65:7 66:25
68:18 69:2,6,7,19
70:19 71:2 74:18
78:25 79:6,9,16
79:25 80:2 87:7
89:14,20 90:4,18
106:9,11,13,16,24
106:25 107:4,8,18
108:3,8,10,24
109:4,13,15,20,23
110:2,4,8,13,15
110:19,20 115:7
115:21 116:7,23
117:13,25 119:13
119:23,25,25



121:13,14 122:8
122:14,17 123:11
125:11 128:6,7,11
128:17 134:20
137:6,8,10 138:15
139:13 140:11,11
**leasehold** 94:5
**leases** 51:21 52:12
52:15,20,23 61:14
61:16,17 62:2,9
62:13,16,22,25
63:3,14,17,21,23
63:25 64:6 65:12
65:18 66:15 73:14
73:17,17 75:21
81:11 84:24 85:5
87:3,16 88:12
116:11,22,25
117:6 118:5,17
119:20,21 120:2,4
120:7,10 122:7,11
128:18 138:8
139:7
**lease's** 61:13 138:7
**leasing** 76:5 83:5
90:24 91:11
**left** 36:5,14
**legal** 1:22 47:16
51:6 56:11 59:11
68:14 89:6
**Leitner** 16:10
22:13,24
**lenders** 22:14
**Lending** 37:22
**length** 107:11,17,20
108:5,8 109:2,9
**let's** 7:21 38:6 42:7
44:9 50:4 51:19
53:17 61:7 84:16
102:23 103:6
112:23 113:14
141:10
**level** 11:9
**levels** 78:18
**license** 11:19
**licensed** 11:21

**licenses** 11:16
**light** 35:12 119:8
**liked** 130:16 131:10
131:23
**likewise** 106:11
**limitations** 45:15
89:10
**limited** 116:3
**line** 97:10
**link** 7:4
**list** 30:14 43:9
54:12
**listed** 30:2
**literally** 77:3
**litigation** 25:12
46:9 57:21 86:18
112:14
**little** 12:11 37:4
84:16 85:23
114:22 120:5
**live** 24:12
**LiveNote** 2:14
145:7
**LLC** 1:8 4:24
106:15 107:19,20
108:4,5,25 109:2
110:4,5,9
**LLP** 3:11
**local** 26:9
**located** 20:20 86:4
98:5 115:10
**Locatell** 7:16 24:2
24:4,5,15,22 25:3
26:23,25 27:15
30:16 32:11 54:23
55:9 61:18 63:22
63:24 65:23 66:3
66:20 67:17 68:8
69:4,12 73:11,16
75:4 77:11,14,19
78:2 79:4 106:12
106:20 109:6
110:3,17 124:7,19
125:3,13,23 127:6
**Locatell's** 9:14 31:3
49:20 63:16 69:20

74:15 110:11
130:18
**location** 81:17 95:9
99:16,22
**logged** 6:3
**long** 8:4,23 16:5,12
20:14 53:20 89:24
102:2
**longer** 39:24 43:12
100:2 121:7
**long-term** 87:16
96:7
**look** 30:4 38:6,7,22
41:25 50:4 51:19
54:21 64:14 87:19
93:19 112:24
119:20 127:12
132:17
**looked** 77:22
121:14
**looking** 32:16
43:16,17 51:13
89:19 113:10
116:11 130:15
**looks** 42:16 72:25
**lot** 87:24 104:14
139:17,17
**love** 84:13
**low** 72:20 81:23
95:11
**lower** 25:10 81:18
**lowest** 127:18
**LP** 56:15
**Lubavitch** 12:17
13:7,14
**lunch** 100:6,22
**L'Inyonei** 13:14

---

### M

**M** 3:8 129:8,9
130:8,8 143:2
144:18
**Magna** 1:22 3:25
54:2,8 100:19
129:20 130:4
132:13,17,20,23

133:6,12,19,22
135:14 142:5
**MAI** 9:24 10:8,11
10:13,17 11:13
38:14
**major** 98:15,17,18
98:19
**making** 122:21
**Manhattan** 25:6,10
25:17
**manipulate** 6:6
30:6
**Marathon** 102:14
**mark** 132:11 133:2
**marked** 27:24
42:10 50:6 114:4
114:7,14 123:16
125:17 129:7,22
133:7,10 135:15
135:18 144:16
**market** 13:10 14:12
15:21,23 17:11,15
17:25 25:15 43:24
44:14 45:3 50:7
50:10,15,17 52:8
55:20 61:17 63:6
63:8 64:20 69:22
71:7,9 72:17
75:21 76:3,4,10
76:18,23 77:6,10
78:5,7,11 80:13
80:18,24 81:12,17
81:19 82:20,25
83:2,4 94:24 95:8
95:8,18 96:21
103:12,14,20,25
104:15,19,20,24
104:25 105:4,16
105:21,25 106:4
108:11,12,12
116:12,12,20,25
120:18,20 121:16
121:24,25 122:6,7
126:6 127:7 128:2
128:9 131:9,21
135:7,9

**marriage** 145:17
**matches** 36:10
**material** 115:4
**materials** 9:11
**matter** 4:22 13:4,5
13:18 14:4,16
24:24 25:4,8
27:19 65:12 67:23
68:6 140:24
145:18
**matters** 12:7 18:14
18:18 117:24
**McDonald's** 1:5
3:20,21 4:22 5:4
7:17,21 9:6 16:25
17:4 110:2 131:4
131:20 146:3
**mean** 33:22 35:24
36:17 38:17 44:23
45:12 50:16 74:4
82:18 84:5 85:9
92:18 93:11 94:8
95:16 97:20 98:18
107:13 138:5
139:3 141:12
**means** 38:19 39:17
51:3,14 74:5
107:14 116:9
122:4
**mediation** 25:10
**meet** 9:5
**meeting** 7:16,22 8:8
8:12,14,17,24,25
9:3 91:7
**meetings** 7:17,20
**MEISTER** 3:11
**member** 10:22 26:6
26:10,18 27:7,11
**members** 11:5,7
**membership** 26:16
**memorandum**
106:25 110:19
**mentioned** 25:20
37:7
**Mercos** 13:14
**met** 21:19



method 61:15
134:9,13
methodologies 36:2
methodology 54:25
59:8 76:25 111:10
111:15,17 119:2
methods 120:6
134:5
metropolitan 21:23
24:6 25:20,22
26:3
Meyer 8:10
MICHAEL 3:23
middle 55:15
114:23
Mike 8:10 129:8
130:9
mile 101:16,17,21
million 106:18,24
125:24
mind 112:9
minds 91:8
mine 103:4 129:15
minutes 52:5 102:7
misunderstanding
117:18 141:4
misunderstood
140:23
mixed 72:18 79:22
80:6 93:24 94:5
94:18 95:5 96:8
MMB 106:15
107:19 108:5
109:2 110:5,9
Mm-hmm 133:16
mode 7:9
moment 54:8 71:18
100:3 103:7
113:14 132:25
money 84:15
morning 4:20
101:3
move 44:9,10 67:24
moves 68:6
muddled 41:9
multiple 90:11

126:6
multipliers 126:7
multi-engagement
20:15
multi-family 14:8
14:24 15:11
multi-phase 20:15
multi-story 98:8
mute 73:2
M-Crown 89:24
92:16,19 93:2

——————
N
——————
N 3:2 143:2,2 144:2
name 4:21 146:3,4
named 9:7
names 26:14
NASSAU 145:5
national 10:15
25:25 43:10 65:5
near 25:10 81:23
necessarily 59:10
75:23 84:5
need 6:14 40:14
41:24 59:11 76:13
82:24 86:22 87:18
96:15 112:8 120:7
131:19
needs 34:15 35:17
50:17 62:25 75:18
78:15 92:12 96:25
negotiated 109:20
139:14
negotiates 35:9
neither 55:17
106:11
net 106:17,24
neutral 18:5,7,8,12
18:14,18 21:15,15
25:4,9,14,17 44:2
44:6 48:23 49:4
49:11,19,25 67:19
67:24,25,25 68:7
68:9,16,23 69:3
69:11,11,20 71:15
72:22 75:3 86:10

86:16,19,20,22
97:4,12,20,21
134:23
neutral's 49:12
50:2 75:8
never 72:10,11 81:8
81:22,24 122:5
130:11
new 1:3 3:7,14,14
4:12 9:23 11:20
13:7 14:24 15:18
21:9,23 24:6,10
24:13 25:21,22
26:3,5 35:11
37:23 56:10,12,23
57:22 58:24 81:6
81:22,25 82:17
86:6 87:16 88:13
98:14 102:13
145:3
nine 64:4,5
nominating 26:14
nomination 26:13
noncompliant
79:25
normal 84:21
north 101:18
northwest 98:7
Notary 2:15 4:11
143:22 145:8
146:24
note 101:24
noted 97:14 100:21
142:10
November 106:14
number 39:19
63:11 114:8,12
124:14
numbers 109:12

——————
O
——————
O 143:2
oath 143:6
object 73:2 100:7
121:20
objected 113:11,23

objection 23:7,18
27:4 28:11,18,25
29:18 31:24 32:23
33:6 36:6,15
38:25 39:7 40:10
42:4,25 46:21
47:7,14 48:11
49:5,15,22 50:12
51:4,15 52:16
53:5,13 58:16
59:3 60:11 61:4
62:10,17 66:10
67:12,21 68:12
69:14,24 70:8
75:6 77:23 82:9
83:23 86:13 88:6
91:2 92:3,8 96:12
97:9,13 103:22
104:5 111:6,11,20
112:3,21 116:15
117:8 118:11
119:3 122:18
123:5 124:8,21
125:18,25 126:9
126:15,23 127:20
128:25 130:19
131:13,25 134:15
134:25 136:4,17
136:22 140:6
141:5
obvious 78:3
obviously 119:18
occasion 22:8
occasionally 32:17
102:12
occupied 98:23
99:4,9,10
occur 99:24
occurred 23:20
108:21
October 101:7,8
offering 117:25
offhand 14:6
office 81:5 98:8
101:19,21
official 92:17

Oh 5:16 113:4
129:24
okay 4:15,17 5:12
5:16 6:20 7:5,10
12:6,22 13:2,20
14:2 15:6,12,16
16:22 18:15,24
19:3,8,23 23:21
23:25 27:17,21
28:5 29:5 30:22
31:6 33:12 38:5
42:9 43:4 44:4
48:6 51:19 52:6
53:24 55:23 57:11
58:6,11 61:7,24
62:6 66:2 68:4
69:9,17 70:4 85:6
87:5 88:9 90:12
90:20 100:13,14
100:25 101:12
102:8 103:2,6
105:2,9 108:23
114:4,19,20
115:17 123:25
125:6 126:19
127:16 128:13
131:7 133:6,14,17
133:22 136:12
142:7
old 87:3,7,7,20,20
once 5:11 6:11,15
13:23 75:12 82:15
96:14 118:16
119:23 138:17
ongoing 18:10,12
online 6:4
open 7:2 100:20
opinion 67:18 84:9
104:2 108:9
124:24 125:8
130:17
opinions 34:5 38:9
59:12
opposed 117:7
option 42:16 43:23
61:13 117:4 122:9



131:5
**options** 50:5 119:19
**order** 9:7 26:18
  29:17 75:24 76:12
  76:13 77:4,11,25
  78:17 87:24
  101:14 126:5
**organization** 10:16
  10:22 11:3,5 13:7
  25:25 43:14
**organizations** 26:2
**original** 138:24
**outcome** 145:18
**outer** 88:13
**outlined** 56:12
  139:24
**outlines** 139:9
**outside** 34:22 78:3
  88:18
**Overnight** 56:13,14
  56:23 57:23 58:24
  60:9,17 89:6,14
  115:2 118:4,9,13
  118:22 138:6
**owned** 41:16 79:24
**owner** 82:6,15,16
  82:19 83:2,5
  84:10 92:23 93:3
  95:12 106:16
**owners** 64:23 83:10
**ownership** 94:4

**P**
**P** 3:2,2
**pad** 73:25 74:17
  75:14 77:12,21
**page** 30:5 38:7 43:5
  43:20 44:9,12
  54:20 55:14 56:6
  56:9 59:15 61:7
  84:18 88:23 89:2
  93:19 103:8
  104:16 106:7
  114:24 125:21
  135:13,18 144:4,7
  144:13

**pages** 57:8
**PAGE/LINE(S)**
  146:5
**paragraph** 43:17
  43:19 44:11,11
  50:4 51:9,11
  54:21 55:16 59:15
  84:20 89:2 93:20
  103:10 114:24
  116:23 117:2,11
  118:8 119:8 120:3
**PARALEGAL**
  3:21
**parcels** 115:10
**Park** 3:13
**part** 63:3 73:21
  75:8,18 87:13
  108:16 127:5
  137:17 140:25
**participate** 57:2
**participated** 17:10
  17:13,25 24:14,21
**particular** 34:9
  35:15 102:21
  117:4 125:16
  140:22
**particularly** 6:9
**parties** 107:7,16
  109:12,21,21,24
  110:15 138:12
  140:24 145:16
**Partners** 56:13,23
  57:23 58:25 60:9
  60:17
**party** 18:4 19:6
  20:7,25 21:6,7
  22:13,16 25:2,7
  25:14,18 42:23
  44:20 141:8
**Pashman** 3:4 5:7
  7:17,20 17:7
  30:25 32:17
**pass** 90:6 133:4
**passed** 93:15
**passes** 93:2
**passing** 133:4

**path** 95:21
**Paula** 57:3,6
  110:24 111:25
  112:6 114:2
**pay** 44:15 45:4
  91:14,22
**PC** 3:4
**PDF** 32:8 125:21
**peers** 48:21
**pending** 6:16
**people** 6:11 9:4
  129:16
**percent** 99:6 135:4
**perform** 76:14 77:5
  77:11 124:15
**performed** 19:16
  22:13 36:23 37:2
  37:18 50:18 56:10
  61:20 64:10 78:17
  80:16,23 85:4
**performs** 76:3
**period** 15:3 89:23
  90:6 91:25 93:23
  96:10 116:4
**permitted** 33:4,5
  63:18 67:23 75:10
  75:11 97:18
  107:24 138:6
**perpetuity** 41:16
  41:16 70:15,21
  72:5,8,12,15
  79:24 80:6 93:25
  118:3 138:2
**person** 7:25 30:23
  49:2
**perspective** 131:9
**Peter** 57:6
**phone** 7:6 64:17
  87:23
**photos** 101:24
**phrase** 121:25
  122:5
**pick** 53:19 55:15
  56:2 100:25
**piece** 15:3 33:14
  46:11 108:10,10

119:12
**PINKUS** 3:25
**plain** 69:10
**Plaintiff** 1:6 3:5
**Plaintiff's** 42:11
  50:6 144:17
**planners** 123:20,22
**plans** 90:5
**platform** 6:3,25,25
  27:22
**play** 11:8
**please** 5:19 6:5,15
  9:20 38:7 71:18
  141:11
**pleasure** 142:6
**point** 5:18 37:3
  49:25 54:7 76:25
  82:21 83:17 99:14
  106:18 113:8
  138:9,16 141:17
**pointed** 48:21
**pointing** 115:19
  117:14
**points** 119:19
**portion** 13:12
  98:22 99:3
**position** 61:2
**positions** 26:8
**possibility** 90:23
  91:21
**possible** 33:13
  38:21 39:3 47:3
  51:12 53:2 58:12
  62:7 92:23 140:2
**possibly** 109:19
  141:7
**postgraduate** 9:24
**potential** 88:21
  89:3,21 90:16
  91:10,12,18,20
  92:14,15 109:25
**practice** 29:10
  78:11,20 86:2
  88:19 115:3
**practices** 37:11
**precedent** 56:12

59:6 89:6
**preferred** 134:9,13
**preliminary** 93:15
**preparation** 29:22
  32:21 58:9
**prepare** 5:3 7:13
  9:7,11 29:17
**prepared** 27:18
  28:7 109:6
**preparing** 28:10,21
  28:23 32:19,25
  58:22,25 59:7
  62:3
**present** 3:18 8:7,11
  8:23 9:3,4 106:17
  106:24
**presented** 55:4
**pretty** 103:5
**previously** 42:10
  123:16 129:7,21
  144:16
**price** 44:14
**primarily** 70:5
**printout** 30:7
**prior** 16:7 75:19
  123:20,21 126:21
**problem** 35:18,21
  36:3,11 40:7,15
  40:18,22,24 41:8
  41:19 45:16 59:9
  70:14 71:13,23
  85:14 86:21 89:12
  92:5 114:25 118:9
  119:16 123:13
  128:5,16 129:5
  134:20 136:10
  137:11,17,18,22
  138:5,12,17 139:4
  139:21,22 140:2,5
  140:22,23 142:5
**problems** 40:6
  128:20
**proceed** 49:24
  86:16 97:18
**proceeding** 21:4,16
  22:4 24:17,21



MAGNA
LEGAL SERVICES

25:8,16 49:8
129:7 140:3
**proceedings** 17:11
20:24 24:15,19,23
56:10
**process** 17:16
18:10 20:16 26:13
35:6 46:9 52:2
59:13 63:4 67:25
69:18 76:22 77:5
97:17 102:2,6
108:16
**processes** 46:14,18
47:20
**produced** 30:14
32:4
**produces** 93:23
94:10
**producing** 139:18
**product** 82:8
**profession** 10:17
**professional** 2:14
10:14,15 11:2,16
26:20 29:7,10,11
76:16 145:7
**professionals** 11:4
11:6 115:5
**project** 19:17 42:20
58:23
**projects** 27:14
**promotes** 10:16
**proper** 41:17,18
70:12 78:17 97:2
97:6 103:10
**properly** 46:16
69:21
**properties** 12:10
14:24 15:11 20:11
20:17,20,21 21:2
39:19 78:6 125:2
**property** 10:20
13:11,12 14:3,9
14:13 21:11 25:13
33:15 34:21 39:17
40:4 42:17 44:19
44:24 45:4 46:6

46:11 64:22,23
68:17,19,25 69:22
70:15 74:16 78:19
78:24 80:6,10
82:16,17 84:2
89:13 90:23,25
92:24 93:3 94:5
96:8 97:24 98:3,5
98:7,8 101:5,14
101:15,18,20
104:3,20 105:22
106:10,13 108:21
109:16 115:9
118:19 119:12
120:16,25 123:9
127:8 131:22
134:19 137:9
139:5
**property's** 47:12
66:9 67:18 94:2
**proposed** 81:21
**provide** 28:17
57:13 103:17
**provided** 57:13
106:12
**provides** 60:8
106:18
**public** 2:15 4:12
63:7 107:2 143:22
145:8 146:24
**publish** 114:16
**Publishing** 16:21
**purchase** 3:7 83:16
115:25
**purchased** 72:18
72:19 83:19
105:18
**purchasing** 82:6
**purported** 41:7
**purportedly** 70:24
**purpose** 135:24
136:8
**pursuant** 55:20
137:5
**put** 26:15 44:19
54:2 67:24 99:18

99:20 100:15
**puts** 26:14
**p.m** 100:21,23
142:10

**Q**

**qualify** 12:23 106:3
**qualitative** 82:23
**quantitative** 82:23
**quarters** 101:21
**Queens** 14:9
**question** 5:19 6:16
33:7 39:10 42:8
42:11 47:10,18
48:14 51:17 53:16
60:13,14 61:6
68:21 73:3 98:25
113:8,16 116:19
119:7 121:21
129:8 130:23
**questioning** 97:11
**questions** 5:18
108:15 110:17
141:18,21,23
**quick** 66:14,16,21
67:6 73:17 74:7
83:3 105:17,22
**quickly** 95:11
**quite** 14:6 31:11
39:23 86:3 102:5
104:10 138:2
**quote** 59:18 115:6,7
128:16 138:25

**R**

**R** 3:2 145:2
**raise** 113:13
**range** 10:19 11:4
33:19,20,24 34:6
34:8,23 84:21
126:13 127:15,18
127:22
**ranging** 126:7
**rate** 84:18,20 85:7
85:10,12,19,19
86:11,12,23 87:13

87:25 88:3,15,17
88:22 89:4 91:15
**rates** 86:3,4 87:14
87:17 90:24
**ratios** 74:9
**raw** 15:23
**Raymour** 83:18
84:14
**reach** 39:20,24
80:23
**reached** 38:10
**read** 53:3,10 54:11
119:9 122:16,21
122:21,25 125:20
143:5
**reading** 52:24 53:3
53:8 57:15,15
121:23,23 122:22
122:23
**reads** 50:7 103:10
**real** 10:23 11:4,9
11:11,19 16:10,20
38:13 43:11 65:6
71:12 76:21 92:5
132:7 133:9,25
135:17 144:10,12
**really** 37:16 40:2
41:10 53:15 62:15
63:8 82:20 84:6
108:15 109:10
138:15 139:9
**reask** 60:13
**reason** 49:18 61:16
67:19 75:2 91:14
97:3 113:13 146:5
**reasonable** 23:2,6
23:14 34:2,13
38:11,17,24 39:5
39:13,15,21,25
79:5,8,15 104:18
**reasonableness**
33:19,24 34:8
55:6 106:19
**reasonably** 104:22
**reasons** 51:23
90:11,14 92:14

97:19 117:21
**recall** 8:13 9:15
21:12 22:17 23:3
23:4,10,12,15
27:16 29:4,15
107:9 110:6,6
113:8
**recess** 54:16 100:22
141:15
**recognize** 42:14
**recommendation**
11:6
**reconcile** 52:13
**record** 6:16 19:2
54:14 107:2 143:9
143:12 145:13
**recorded** 107:2
**recoup** 90:7 91:23
**red** 72:8
**refer** 33:18 57:8,10
99:6
**reference** 115:4
**referring** 85:2
**refers** 52:7
**refresh** 129:13
**regard** 54:25 55:2
111:3,8
**regarding** 25:16
**regional** 25:25
**Registered** 2:13
145:6
**regulations** 59:21
**related** 28:20
145:16
**relating** 25:5
108:20
**relation** 32:5 65:15
**relationship** 107:15
107:16 109:11
**relationships**
109:22
**relevance** 55:3
86:21
**relevant** 136:2
**relied** 55:18
**relies** 132:7



**rely** 110:23
**relying** 76:15
**remaining** 115:6,21
  119:13,24 120:4
**remember** 22:20
  23:22
**remind** 88:24
**reminding** 29:9
**Remote** 1:12 2:12
**remotely** 4:4
**rendered** 99:2
  125:16 131:11
**rendering** 126:21
**renegotiates** 35:10
**renew** 110:2
**rent** 17:15 19:25
  20:8,24 21:4,8,16
  21:17 24:24 25:15
  42:16 43:23 45:3
  45:12,14 50:5
  56:10 61:13 81:14
  81:15,18 87:2
  104:19,21 108:12
  109:20 117:4
  122:9 126:6,6,12
  128:2,9 131:5,10
  131:21 137:5,25
**rental** 13:11 15:2
  15:22,23 17:11,25
  44:12,14 45:3
  55:20 69:22 127:7
**rentals** 66:5,8
  140:12,14
**rented** 78:8
**rents** 104:12
**repeat** 5:20 68:21
**rephrase** 5:21 42:6
  47:18 48:14 68:15
  69:17 79:12 81:3
  98:25 111:23
  120:11
**report** 5:3 7:14
  9:13 27:18,22,23
  28:6,10 29:17,23
  30:3 32:20,22
  33:2 34:14,16

38:7,8,20 40:9
  41:2,9 51:22
  54:20 57:7 58:9
  58:22 59:2,7 61:8
  61:19 62:3 63:16
  63:22,24 66:14,18
  67:4 69:5,8,21
  70:13,23 71:9,13
  71:23 72:23 74:15
  79:4,7,19,20,22
  82:2,13 88:21
  92:7 94:7,14
  96:19 97:5,23
  99:3,6 101:11
  103:7,16 108:7
  110:5,10,11,23
  123:19 124:10,16
  124:24 125:16
  126:4,18,20,22
  127:4,9,10,17,22
  131:12,24 132:5,6
  134:14 137:3,12
  137:13,18 139:19
  144:8
**reported** 1:18
  110:18,20
**reporter** 2:14,15
  4:2,7,15 54:4
  145:7,8
**reporters** 6:10
**reporting** 54:25
**reports** 28:21,24
  32:10 86:18 109:5
  110:12 126:22
  127:18
**representatives** 9:6
**represented** 19:10
  19:13
**republish** 114:11
**require** 40:17
  56:24 58:14
**required** 41:11
  68:2 134:20
**requirements** 89:5
**reread** 7:14,15
**research** 34:15,19

35:2 36:13,22,25
  50:17 61:19 63:4
  63:5 64:9,9,11
  65:2 71:9 80:17
  80:22 81:12,19
  82:4 87:11 138:21
**researched** 120:8
**researching** 87:14
**reset** 17:15 18:2
  20:24 21:4,9,16
  21:18 24:25 25:16
**resets** 20:2,8
**resetting** 20:16
**residential** 10:20
  93:24 94:18
**residential/retail**
  96:8
**residual** 63:18
  65:17,20 70:25
  71:25 72:6 80:3
  80:13 82:5 94:11
  94:14,21 119:21
**resolve** 67:20
**resolved** 47:13
**respect** 20:23 55:12
  58:2
**responsibility** 50:2
**responsible** 36:9
**rest** 51:8,10
**restate** 60:14
**restaurant** 73:17
  105:22 131:5
**restaurants** 73:21
  83:7
**restricted** 78:25
**restrictions** 59:20
  68:18 89:9,16
  92:13
**result** 45:25 128:19
  128:20,22
**results** 77:16
**resumed** 100:23
**retail** 25:16 65:19
  66:15,16,22 67:7
  71:6 72:3,20 74:7
  80:9 81:25 82:16

83:2,3,8,10,16,20
  83:21 88:13 93:22
  93:25 94:3,17
  95:2,4,10 96:23
  96:24 98:8,22
  99:3,7,8,12,18,20
  99:22 103:15
  104:8,9,11,12
  105:7,11,15,17
**retailer** 83:19
**retained** 5:2,6,7
  14:11 16:24 17:7
  17:21
**return** 85:20 86:12
  88:3 94:12 100:17
**returned** 116:4
**reveal** 129:21,23
**revealed** 130:5
**review** 8:15 9:10
  19:17,21 22:8,14
  28:21,24 29:16,21
  30:17,24 31:3,13
  31:16,21,22 37:16
  40:20 48:20 60:21
  124:16 125:3
  127:5,11 131:18
**reviewed** 22:14,18
  30:12,13 31:9,10
  31:19,22 85:4
  107:3 123:23
  126:21
**reviewer** 22:16
**reviewing** 22:24
  32:10 67:4 72:22
  97:4 130:10
**reviews** 19:24,25
  22:22 68:7
**rezoned** 95:7
**rezoning** 88:21
  89:3,21 90:4,9,17
  90:23 91:10,12,16
  91:18,21,24 92:16
  92:17,20 93:6,8,9
  93:9,14,16 95:6
**rezonings** 89:23
**right** 12:13 42:24

44:7 47:5,22
  53:17 54:19 55:12
  55:21 56:4,16
  57:9 61:11 65:23
  68:2 69:13 73:15
  85:21 89:11 90:18
  93:10 100:4
  101:23 110:22
  112:23 122:8
  126:8,14 127:19
  133:21 135:8
  136:15 141:9,13
  141:14
**rights** 94:5 134:19
  137:9 139:5
**Robin** 1:18 2:13
  4:11 142:9 145:6
  145:24
**role** 11:8 18:2
  26:22 27:2,6,10
**roles** 24:22 26:16
**room** 6:21 54:2,9
  54:10 118:24
**rooms** 100:16
**Roosevelt** 20:22
  21:5
**RPR** 1:18
**rule** 78:9
**rules** 33:9 104:17
**run** 102:11,11,12
  126:13
**runs** 106:16

---
**S**
---

**S** 3:2,15
**sale** 15:13,15 65:7
  116:7 117:13
  123:9 125:11,14
  125:15 139:6
**sales** 37:13 65:25
  75:21 76:6 81:10
  85:13,16,18 87:13
  94:25 95:2,4
  116:5 117:7,11,16
  117:16 118:3
  119:19 121:4,6,11



122:3,4,13,24
123:2,13,14 124:3
124:11,18 134:7
134:10,18 137:23
138:3,8 139:6
satisfy 118:4
saw 63:10
saying 58:3 63:15
75:24 97:16 121:4
121:6,10,12,18
140:13
says 43:6 44:12
51:20 52:11 59:17
59:25 60:3 61:11
89:16 101:10
117:11 134:7
scenarios 41:11
scope 34:4,11,18,25
35:4,7,9,10,11,14
35:15,16,20 36:10
40:21 41:11,14,14
41:17,18 63:12
87:14 127:5,24,25
128:3,11,15,21,24
129:4 137:20
138:22 139:13,20
scouring 63:8
screen 7:3 114:18
129:14 132:18
Sean 22:24
search 63:2 64:13
65:13,21,25 66:4
75:15,22 77:16
searched 65:3,10
searches 76:2
searching 32:6,11
65:11,15,18 75:17
140:17
seat 133:3
second 8:17 20:5
41:4,19 43:20
44:9,10,11 52:11
52:15 55:16 56:14
56:15,16,24 57:23
58:24 60:9,18
79:12 89:6,15

92:10 93:20 103:9
114:9,24 132:24
138:6
section 38:8
see 6:6 28:3 38:15
43:15,21 56:7
59:23 67:5 69:12
71:8 72:23 81:10
84:13 88:16 95:9
95:10,12,20,21
104:14 106:21
114:6,10,10,17
115:15 122:11,12
122:23 129:24
130:2,3,7 131:2
131:17 132:3,4
133:15 137:14,15
138:2
seeing 114:23
129:16
SEELIG 3:11
seen 48:5 81:2,8,23
81:24 82:15 86:2
88:18 104:8 107:8
123:17,23 129:9
129:17 130:8,11
130:16 131:10,19
131:23 134:2
sees 76:4,5,9
selected 26:19
selecting 26:23
27:2,7,11
selection 88:22
89:4
seller 116:5
sentence 43:20 50:7
51:20 52:7,11,14
55:16 117:10
sentences 115:23
series 5:17,25
serious 114:25
118:8
served 18:6,9 21:14
24:6 44:5
serves 26:6
service 21:23 66:14

66:16,21 67:6
73:17 74:7 83:3
105:17,22
SERVICES 1:22
set 33:9 45:12
86:24 145:11,20
setting 43:24 90:24
seven 18:9 19:7
share 67:2 74:21
Sharon 7:16 9:14
24:2,5 25:14,17
26:7,23,25 27:14
30:16 31:3 32:11
63:15 110:17
SHARYL 3:21
Shaun 22:15
SHEET 146:2
shopping 74:11
shortly 53:19
short-term 15:3
show 8:14 124:11
showed 41:3,4
showing 5:24 80:17
103:12,20 105:16
139:9
shy 8:5
side 25:6
signed 84:24 107:6
significant 11:8
98:20 103:12
signifies 10:18 11:7
signify 10:12
signing 109:23
similar 39:18 40:6
43:13 44:6 94:20
95:3 115:12,13
118:6
similarly 24:5
115:10
simple 36:20 41:3,5
70:15 79:20 85:12
94:4,25 95:8
118:21 119:17
123:14 137:23,24
138:13
simply 23:19 45:3

50:16 108:9 116:5
117:12 119:17
121:5,14
single 33:14 46:10
104:19
sit 68:5
site 25:6,12 66:23
67:9 72:4,7,9,12
74:2,17 75:14,15
77:12,21 82:7
83:20 84:7 91:10
91:12,16 92:20
93:13,14,21,24
95:7 102:7 109:16
109:18,25 125:4
sites 65:23 70:20,22
72:17 74:9 79:24
83:4 103:14
105:17 134:9
site's 67:14
situation 38:22
situations 20:7 44:7
Six 19:7
six-step 76:22
size 81:16 82:17
83:4 104:16 125:4
sizes 103:19
slow 103:5
small 24:9 105:15
105:15
smaller 74:9
103:19
sold 78:8 81:9 82:8
95:4,5 115:11
solely 57:13
solve 40:17 139:20
140:21
somebody 38:21
53:2
somewhat 5:16
sorry 33:22 38:3
42:2 54:12 55:19
57:5 74:25 79:11
85:9 93:8 101:8
105:24 115:12
132:14

sorting 32:6
sound 6:18
Sounds 100:12
source 111:4,9,16
111:19 112:2
141:4
south 101:16,17
space 98:21 99:5,7
99:9,12,19
speak 5:20 6:5,9,15
58:18 123:7
speaking 6:11 13:3
41:23
speaks 120:2,3
special 101:24
specialize 87:22
specific 22:17
32:12,16 33:9
36:18 43:17 45:5
73:13 76:15 83:25
86:5 103:24
112:13
specifically 12:9
21:8,17 22:20
23:3,10,13,24
26:4 28:15 29:4
30:11 40:19 57:22
65:11 83:14
108:17,19 109:25
122:9 127:13
speculative 92:19
92:21
spend 55:23
spending 84:14
spoken 9:16
spread 33:25
square 71:6 72:3
80:9 84:11,13
94:17 103:15
104:2,19,25 105:2
105:3,7,10,18,21
124:25
ss 145:4
Stacy 3:19 8:9
standard 50:7,10
50:15,21,24 52:8



76:16 116:12,12
116:20 121:16,24
121:25
**standards** 28:9,15
28:16,23 29:10,14
39:4 115:3
**stand-alone** 105:7
**start** 138:19
**started** 70:13
**state** 4:12 11:18
15:18 56:11 59:17
145:3
**stated** 62:20 79:21
80:5,7 94:6 96:19
**statement** 109:7
**states** 1:2 12:16
60:18,23 61:3
**Stein** 3:4 5:8 7:17
7:21 17:7 30:25
**Stein's** 32:17
**step** 29:20 53:12
63:11 78:16
136:13
**steps** 77:4 108:2
**store** 25:16 83:21
83:22
**stores** 83:8
**string** 32:14
**subject** 13:4,5 15:7
15:10,19 42:17
66:24 68:18 69:2
89:8,13 91:16
98:7 106:10,12
108:20 109:16
115:6,14,20 118:4
118:19,19 119:13
125:11 134:20
137:8 138:14
139:12
**Subscribed** 143:18
146:21
**subscription** 64:13
65:6
**successor** 43:13
**succinctly** 12:12
**sufficient** 103:20

105:4 124:14
**suggest** 7:11
**Suite** 3:6
**Summary** 38:8
**supply** 95:20
**support** 71:10 76:2
87:25,25 88:16,17
97:2,7 103:17
119:22 121:3
**supported** 37:3
71:7 79:5 82:24
84:23 96:15,20
104:22
**supportive** 72:4
138:25
**supposed** 42:20
**Supreme** 13:15
15:2,18
**sure** 6:6 33:8,8
36:17 39:9 41:17
41:18 47:6 50:22
51:18 54:15 60:15
66:19 76:11 90:13
91:6 101:15 103:3
105:25 131:16
135:8 139:18,23
**surprised** 73:5
**surrounding**
101:25
**survey** 63:5 76:19
84:23,25
**surveying** 135:7,9
**swear** 4:3
**sworn** 4:11 143:18
145:12 146:21
**sympathize** 138:15

---
**T**
---
**T** 143:2 145:2,2
**table** 132:16 133:10
133:20,23 134:2,4
134:4 135:22
144:11
**tack** 138:23
**tacked** 80:3
**take** 6:11 35:24

38:6 52:4 53:17
54:21 59:19 87:24
89:23 100:6 102:3
108:2 112:23
113:14 141:9
**taken** 2:13 16:14
17:4 35:3 39:23
54:17 100:22
141:16 143:6
**takes** 87:22,23
**talk** 7:21 84:16
**talking** 90:3 113:12
130:7
**taught** 37:9,10,12
37:14,20,23,25
**teach** 35:25 37:21
**teaching** 37:7
**Tech** 3:25 54:8
100:19 129:20
130:4 132:13,17
132:20,23 133:6
133:12,19,22
135:14 142:5
**technical** 142:2
**technique** 50:8,11
50:16 63:18
116:13,20 122:2,6
122:7 134:8
**techniques** 55:5
**telephone** 8:2
**tell** 7:12 13:21
29:25 67:3 97:14
**ten** 17:19,20,24
100:2
**tenant** 44:15 45:4,5
45:5 91:8,10,13
91:14,20 98:18,19
**tenants** 19:10 98:9
98:13,16
**tenant's** 44:17
**Tener** 7:15 9:14
21:19,21 22:4,18
22:24 27:7,10
30:16 32:10 40:8
53:9 55:12,17,25
61:8,12 62:7,14

62:19 63:9 67:2,6
67:17 68:8 69:8
70:6,10,13,23
71:13,23,24 73:7
74:21 75:4,12
76:12 79:7,17
80:8 82:11 86:25
88:11 89:4 90:15
90:16 92:6 93:21
94:7,25 96:6 97:6
106:8,11,19 109:5
116:10 117:5,15
120:22 121:13
122:16,20 134:12
137:15,18
**Tener's** 22:8 23:5
31:13,17,23 49:20
65:17 72:22 79:11
79:14 82:5 84:17
88:20 94:14 97:4
103:16 110:14
130:17
**tension** 139:18
**term** 26:7 43:23
45:8 50:15,21,25
59:22 67:15 70:19
70:23 73:25 74:3
74:19 76:8 89:20
90:10 95:13,16
98:18 107:11
115:7,21 117:4
118:20 119:13,24
120:4 123:10
131:5
**terms** 41:25 42:2
44:24 55:21 82:4
84:8 86:2 105:16
118:6 120:6
136:25
**test** 81:13 82:3
105:14 106:19
**tested** 82:3 104:7
**testified** 4:13 11:24
12:14 13:13,22,22
14:18,22,25 62:12
62:16 82:11 135:5

**testify** 14:11,15
17:22
**testifying** 13:9
17:10,14
**testimony** 12:18,19
12:19,20,21 15:8
15:17,20 25:19
68:6 87:9 143:6
145:13
**testing** 80:12
**text** 32:14 57:8
**textbook** 56:25
57:10,14 76:21
77:3
**textbooks** 115:3
**thank** 29:9 53:25
102:10 113:15
141:24 142:4,8,9
142:9
**Thanks** 100:18
**thing** 6:8 40:16
41:24 87:8 123:9
**things** 51:14 56:2
76:12 78:2,7 82:2
82:3 112:24
120:21 132:6
135:5 136:9
137:14
**think** 7:18,18 10:21
55:25 62:15 71:12
85:23 93:6 94:12
99:21 100:5 109:8
109:14 111:15,18
111:22,24 112:6
113:11,25 114:5
116:22 117:14,20
119:14 127:14
136:24 140:20,22
**thinking** 109:24
**third** 22:13,15 25:3
43:8 44:2
**thorough** 63:2,5
**thought** 62:20 66:7
67:8 130:5
**three** 8:6 18:25,25
19:3,14 24:18



43:9 95:24 101:21
119:22
**three-year** 26:7
**time** 2:8 6:9,15
14:6 21:25 24:20
55:24 81:7,10
87:24 89:24 92:19
99:2 100:6,21,23
102:5 132:25
142:10
**timeline** 140:25
**times** 12:3,4 14:19
14:20,21 17:18,19
17:20,21,24 18:6
18:9,10,11 19:5,7
19:12,19 37:14,24
38:4 39:19 46:17
102:24 142:2
**timing** 92:21
**titled** 38:8 57:5
**today** 18:17 68:5
95:25 96:2
**today's** 7:13
**told** 9:12 27:13
**Tom** 7:15 9:13
21:19,21,22 22:4
22:8,24 26:7 27:7
27:10 30:16 31:13
31:17,22 32:10
63:9
**top** 88:17 132:18
**totally** 70:21
**trade** 24:11 25:11
**traded** 24:11
**train** 35:25
**training** 34:12
35:16,23 38:12
**transaction** 107:11
107:21 108:6,9
109:3 115:25
123:14
**transactions** 50:19
108:19 116:5
117:11 118:3,5
121:5
**transcript** 113:10

143:5,8
**transcripts** 9:13
30:15,18
**trial** 12:19,21 14:16
14:19
**tried** 94:12
**tries** 71:24
**true** 53:4 77:19
120:9,13 125:23
134:11 143:8,12
145:13
**truly** 63:14
**try** 36:20 95:6
113:15 114:8
138:23
**trying** 39:11,12
78:14 88:9 133:18
**Tuesday** 8:19
**turn** 54:20 100:4
**turns** 108:24
**two** 6:11 7:16,20
9:2 14:20,21,23
15:10 18:10,10,11
18:14,20,21 20:11
20:12,17,19,21
21:3,4 33:13
41:10 42:23 43:6
43:7,25 45:21,23
47:3,11,21 48:15
49:10 51:12,14
57:24 68:10 90:14
115:22 136:25
140:2
**type** 34:21 39:17
40:4 49:8 61:21
64:22 96:21 116:6
117:12 138:21
**types** 10:20 32:12
64:23 78:19
138:20
**typical** 45:6 85:24
112:10 131:17
**typically** 61:20
64:10,17 74:6,7,8

───── U ─────

**uncertain** 92:22
**unchanged** 41:6
**undergraduate**
9:21 10:3
**understand** 12:13
39:9,12 44:21
50:16,22 53:15
56:22 66:20 85:15
90:13 91:19 101:4
106:6 115:5 119:5
138:22
**understanding**
57:12 60:7
**understands**
102:17
**undertaken** 34:3
34:17,25 41:21
59:9 63:19
**undertaking** 31:12
**unencumbered**
41:15
**unfortunately**
140:8
**unimproved** 89:8
**United** 1:2 12:16
**University** 9:22,23
**unquote** 128:16
138:25
**unreasonable**
122:17
**unreasonably**
123:4
**unsupported** 71:3
71:3 79:8,15
80:15
**upper** 25:6 98:14
**urban** 74:12
**use** 45:9,13,15,17
45:22 46:4,12,16
46:19,24 47:4,12
47:22,25 48:2,17
49:11,14 66:9,13
66:17,22 67:7,9
67:19 68:11,17,24
69:6 70:7,12,16
70:18,22 71:5,11

71:12,22 72:2,7
72:13,15,16,18
74:16 75:5,13,20
75:22,25 76:18,24
77:7,12 78:23
79:7,15,18,21,22
80:5,6,7,10,21
82:7,21 88:14
93:22,25 94:3,6
94:10,10,18,19,22
94:23 95:3,6,14
95:18,20,25 96:3
96:4,5,7,8,9,10,15
96:16,17,18,21
97:8 103:11,13
104:3 105:22
115:14 119:2
120:7,16,19,24
121:15 135:10
136:8,14,21 137:2
137:4,4,6,7,13
139:12
**user** 82:6,15 83:2
84:10 136:7
**users** 82:16,19 83:5
95:12
**uses** 44:18 74:8
76:9 78:9 86:25
106:5 124:3
135:24
**USPAP** 28:15,16
55:2,18 76:16
108:17
**usually** 140:17
**U.S** 14:22

───── V ─────

**v** 13:14 56:13,15
146:3
**vacant** 41:15 50:8
50:11,18,19,20
52:9,22 61:14
87:13,17 89:8
116:13 118:19,21
119:17 121:17
122:24

**valuation** 16:3 25:9
41:5 55:5 59:13
61:15 92:11
108:22 115:5,8
118:4 125:10
134:5 137:23
138:13,14
**valuations** 45:24
128:9
**value** 13:11 14:12
14:14,23 15:2,10
15:14,15,22,23
17:25 25:5,11,13
34:5,22 37:5 41:3
41:7,19 43:24
44:12,14 45:3
46:2,6 52:22 55:6
55:20 69:22 70:15
72:4,6 80:16 89:7
89:13 92:19 93:18
93:23 94:11,21
96:3,23 103:16
104:9 106:8,17,24
108:12 109:24
115:6,20 117:20
117:24 121:24,24
122:2 125:15,21
127:7 137:25
**valued** 44:25 53:10
**values** 33:15,17,25
128:22
**valuing** 50:8,11
52:9 116:13
121:17 134:9
**Vanderbilt** 1:8
3:24 4:23 97:24
98:6 99:20 101:18
105:23 106:14
107:19 108:4,25
110:4,8
**Vanderbilt's** 106:9
**variance** 92:25
93:4,5
**variety** 98:13 106:5
**various** 109:14
134:5



version 41:2,4,4
123:21,22
versus 112:10
video 6:10 12:5
videoconference
5:14 8:2,3,21
view 47:4 84:4 88:4
91:23 105:12
124:13,17
views 45:22
violated 89:5

**W**

W 143:2
wait 90:4 95:6
129:24
waiting 129:10
WALDER 3:4
walked 101:15,17
101:18,19
walking 102:4,9
Walsh 3:8 4:7,8 5:8
8:9 23:7,18 27:4
28:11,18,25 29:18
31:24 36:6,15
38:25 39:7 40:10
42:4,25 46:21
47:7,14 48:11
49:5,15,22 50:12
51:4,15 52:3,16
53:5,13,18,21,22
53:25 54:6,15
58:4,8,16 59:3
60:11 61:4 62:10
62:17 66:10 67:12
67:21 68:12 69:14
69:24 70:8 72:25
75:6 77:23 82:9
83:23 86:13 88:6
91:2 92:3,8 96:12
97:9 100:9,13,18
102:18 103:3,22
104:5 111:6,11,20
112:3,21 113:2,5
113:9,22 116:15
117:8 118:11

119:3 121:20
122:18 123:5
124:8,21 125:18
125:25 126:9,15
126:23 127:20
128:25 129:17
130:3,19 131:13
131:25 134:15,25
136:4,17,22 140:6
141:5,12,14,20,22
142:8
want 6:5 50:22
53:20 85:22 103:7
109:18 129:13
132:24 135:8
wanted 131:2 133:7
wants 96:25
wasn't 30:21 65:11
71:7 96:19 104:9
141:8
waste 132:24
way 42:7 53:4 58:8
64:7,24 76:3
82:24 84:4 88:18
92:16 117:19
122:16 139:23,24
145:18
ways 46:25
website 92:18
week 7:23 8:19
well-informed
44:15,16 90:22
91:14
went 77:21 123:2
west 101:22
Westchester 3:6
we'll 6:16 51:10
53:18 100:17
we're 52:5 102:24
we've 50:5 60:16
119:9 125:17
WHEREOF
145:19
wholly 85:13
wide 10:19 11:4
win 69:12

withdraw 42:8 47:9
47:17
witness 3:23 4:4,10
5:2 100:11 112:11
113:7 130:10
144:4 145:10,14
145:19 146:4
Woodside 14:9
word 32:9 66:13
words 118:23 122:6
work 9:24 16:2,8
16:18,19,25 17:7
22:9,15,15,19,25
22:25 23:5,13
31:4,10,13,17
32:12 34:4,11,18
34:25 35:4,7,9,10
35:11,14,15,17,20
36:10 39:24 40:21
40:22 41:11,14,15
41:17,18 63:10,12
64:15,15 70:11,11
76:14 77:16 78:15
85:3 87:14,23
88:11 103:2,17
112:13 127:5,24
127:25 128:3,11
128:15,21,24
129:5 130:18
137:16,21 138:3
138:22 139:2,8,11
139:14,20
worked 16:9,20
27:14
working 112:9
141:2
World 13:6 25:11
worth 72:11,14
94:15,21 125:24
wouldn't 91:22
95:9 111:14 132:3
write 38:9 55:8,14
56:9 59:15 84:18
93:20 104:16
106:10
written 48:20 51:22

57:6
wrong 68:3 70:14
85:17,19 114:7
137:22 138:4
wrote 59:15 61:22
117:21
Www.MagnaLS....
1:23

**X**

X 1:4,10 144:2

**Y**

yeah 30:11 50:19
52:10 67:14 69:16
87:25 102:15
114:19 123:11
128:13
year 26:12
years 16:13 20:14
35:23 72:7,10,13
84:22 87:20,20
89:25 91:11 92:6
93:18 95:24 100:2
106:17 108:21
116:4
York 1:3 3:7,14,14
4:13 9:23 11:20
13:7 14:25 15:18
21:9,23 24:6,10
24:13 25:21,22
26:4,5 56:10,13
56:23 57:22 58:24
81:6,22,25 82:17
86:7 87:16 88:13
98:14 102:13
145:3
YY 27:23 144:8

**Z**

zoning 59:20 89:9
89:16,17 92:13,25
93:4,5,5 94:20
109:17
Zoom 6:25 7:4
ZZ 114:14,17 144:9

**$**

$350,000 127:14
$396,000 126:13
$400,000 127:18
$594,000 126:13
$7 106:18,24
$9.9 125:24

**1**

1 63:11 90:3 100:17
1/21/22 146:3
1:00 100:8,18
141:10
1:02 100:23
1:19-cv-06471 1:7
10,000 104:2 105:3
10:13 2:8
10017 3:14
10577 3:7
11 63:16,23
11:15 52:4
11:20 53:23
114 144:9
12 16:13 63:16,23
12C 37:15
12:24 100:21
125 3:13
133 144:10
135 144:12
14 61:7
14th 132:8,15
133:10,20,24
135:13,18 144:11
144:13
15 84:18 88:23 89:2
102:7
15% 43:7,25
16 42:11 50:6
144:17
17 93:19
17.1 132:16 133:10
133:20,23 144:11
1993 10:4
1995 10:7
1998 16:15



**2**

**2:00** 141:12,13
**2:02** 142:10
**20** 72:7,10,13 87:20
   91:11 92:5 102:7
   146:22
**20,000** 71:5 72:3,20
   80:9 84:12 94:16
**20-year** 70:19,23
   74:19 76:8 89:20
   89:22 90:6,10
   91:25 93:22 94:4
   96:9 118:20
   123:10
**2006** 143:20
**2010** 16:6
**2011** 10:10 11:15
   16:6
**2013** 14:7,25 15:17
**2014** 14:8 15:8 90:2
**2015** 14:7,22
   104:11
**2016** 84:24 104:11
**2017** 106:14
**2018** 81:10 84:24
   101:8
**2020** 11:12
**2021** 101:8,8
**2022** 2:7 143:7
   145:21
**204** 3:6
**21** 2:7 103:8 143:7
**21,500** 103:15
   104:19
**21,993** 125:4
**22,883** 125:5
**23** 104:16
**27** 144:8
**27,000** 125:4
**28** 101:8
**2900** 3:6

**3**

**3** 28:15,16 105:18
   105:21 127:14
**30** 106:7,14

**350,000** 127:14
**39** 30:5 57:8

**4**

**4** 28:15,17 38:7
   56:6,9 59:15
   84:21 85:23,25
   86:12 144:5
**4th** 21:13 24:25
   102:13
**4%** 126:7
**4,000** 105:18,21
**41** 57:8
**44** 135:13,18
   144:13
**45%** 81:5
**470** 97:24 98:23
   99:3

**5**

**5** 54:20
**5,000** 104:25 105:2
   105:7,10 125:5
**50** 87:19

**6**

**6%** 84:21 85:23,25
   86:12 126:7

**7**

**7** 55:14
**7th** 3:13
**70** 87:19,20
**700** 84:10
**787400** 1:19

**8**

**8%** 85:8,20 86:11
   86:25 88:2,15
**840** 58:23 66:23
   68:19,25 69:23
   74:17 78:24
   105:23 124:3
   125:15 131:6,22
**866)624-6221** 1:23

**9**

**9** 125:21
**936** 56:14,24 57:23
   58:24 60:9,18
**99** 106:17
**99-year** 119:21

