UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MCDONALD'S CORPORATION, | : |
| | : |
| Plaintiff, | : No. 1:19-cv-06471-DLI-ST |
| | : |
| v. | : |
| | : Oral Argument Requested |
| VANDERBILT ATLANTIC HOLDINGS LLC, | : |
| | : |
| | : Date of Service: June 10, 2022 |
| Defendant. | : |
| | : |

---

## PLAINTIFF MCDONALD'S CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**PASHMAN STEIN WALDER HAYDEN, P.C.**
Brendan M. Walsh, Esq.
Denise Alvarez, Esq.
The Woolworth Building
233 Broadway, Suite 820
New York, NY 10279

*Attorneys for Plaintiff McDonald's Corporation*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

DISPUTED FACTS ............................................................................................................ 4

LEGAL STANDARD ......................................................................................................... 5

ARGUMENT ...................................................................................................................... 5

   I.     THE ROTTENBERG DECLARATION ALONE SHOWS THAT THERE ARE
        GENUINE DISPUTES OF MATERIAL FACT ........................................................ 5

   II.    THE EVIDENCE SHOWS THAT VANDERBILT FAILED TO COOPERATE
        IN THE FMV PROCESS ........................................................................................... 7

     A.    Vanderbilt Had No Intention to, and Did Not, Cooperate in the FMV Process .......... 8

     B.    Vanderbilt Repeatedly Refused to Provide Its Appraiser with a Copy of Its
         Ground Lease with M.M.B. ......................................................................................... 9

     C.    Vanderbilt Refused to Appraise the Property Consistent with New York State
         Law ............................................................................................................................ 13

     D.    Expert Opinion Testimony Confirms that Vanderbilt Did Not Cooperate .............. 16

     E.    Vanderbilt Halted the Appraisal Process by Refusing to Allow the Party
         Appraisers to Collaborate with the Neutral Appraiser ............................................. 20

   III.   THE EVIDENCE SHOWS THAT MCDONALD'S COOPERATED IN THE
        FMV PROCESS ...................................................................................................... 23

CONCLUSION ................................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

<u>Cases</u>

*936 Second Ave. L.P. v. Second Corp. Dev. Co.*,
  10 N.Y.3d 628 (2008) ................................................................ 6, 13, 14, 15

*ADC Orange, Inc. v. Coyote Acres, Inc.*,
  7 N.Y.3d 484 (2006) .................................................................................. 24

*Bolt Elec., Inc. v. City of New York*,
  223 F.3d 146 (2d Cir. 2000) ...................................................................... 22

*CityPlace Retail, L.L.C. v. Wells Fargo Bank, N.A.*,
  457 F. Supp. 3d 1318 (S.D. Fla. 2020) ................................... 10, 11, 19, 24

*Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*,
  887 F. Supp. 2d 459 (E.D.N.Y. 2012) ......................................................... 6

*Fed. Deposit Ins. Corp. v. Murex LLC*,
  500 F. Supp. 3d 76 (S.D.N.Y. 2020) ........................................................... 7

*Gadomski v. Gadomski*,
  245 A.D.2d 579 (3d Dept. 1997) ............................................................... 10

*Janetos v. Home Depot U.S.A., Inc.*,
  No. 09-cv-1025, 2012 WL 4049839 (E.D.N.Y. Sept. 13, 2012) .................. 6

*Kolbe v. Tibbetts*,
  22 N.Y.3d 344 (2013) .................................................................................. 8

*Kooleraire Serv. & Installation Corp. v. Board of Educ.*,
  28 N.Y.2d 101 (1971) ................................................................................ 24

*Kruger v. Virgin Atl. Airways Ltd.*,
  976 F. Supp. 2d 290 (E.D.N.Y. 2013) ......................................................... 7

*Leser v. U.S. Bank Nat'l Ass'n*,
  No. 09-cv-2362, 2012 WL 4472025 (E.D.N.Y. Sept. 25, 2012) .............. 5, 7

*New York Overnight Partners, L.P. v. Gordon*,
  88 N.Y.2d 716 (1996) ................................................................................ 14

*Ohio Cas. Ins. Co. v. Twin City Fire Ins. Co.*,
  No. 14-cv-858, 2018 WL 10466847 (E.D.N.Y. June 29, 2018) .................. 5

*Rogoz v. City of Hartford,*
796 F.3d 236 (2d Cir. 2015) .................................................................................. 5

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,*
487 F.3d 89 (2d Cir. 2007) .................................................................................... 9

*Travellers Int'l, A.G., v. Trans World Airlines, Inc.,*
41 F.3d 1570 (2d Cir. 1994) .................................................................................. 9

*Y.L. v. L.L.,*
68 Misc.3d 1209(A) (N.Y. S. Ct., Richmond County 2020) ................................ 10

## **Rules**

Fed. R. Civ. P. 56.1(a) ............................................................................................... 5

Fed. R. Civ. P. 56.l(b) ............................................................................................... 5

Local Rule 7.1(a) ....................................................................................................... 6

## INTRODUCTION

Defendant Vanderbilt Atlantic Holdings, LLC acquired a 99-year ground lease for the Property at 840 Atlantic Avenue in Brooklyn in November 2017 ("Vanderbilt Lease") with the goal of "maximiz[ing] the value" of the Property. (McD 56.1(b) ¶ 1(r).)[1] Vanderbilt hired a team of attorneys, lobbyists, consultants, and architects to work on its proposal for a high-rise mixed-use building and met with City and community officials to pitch its plan for the Property; a plan that did not include a McDonald's on the Property. (*Id.* ¶¶ 1(w)-(oo).) An internal Vanderbilt document shows that in late 2018, it hoped to start construction of an 18-story building on the Property in 2020 or 2021 "with completion and expected occupancy to occur in 2022." (Walsh Dec. Ex. 44 at VA 018778.) There was just one problem: McDonald's has a ground lease for the Property that allows it to stay on the Property until April 2039 ("McDonald's Lease").

The evidence shows that Vanderbilt sought to solve this problem by attempting to corrupt the fair market rent valuation ("FMV") process required by the McDonald's Lease to try to cause McDonald's rent to skyrocket in April 2019. Vanderbilt hoped that this would prompt McDonald's to leave on its own or agree to a cheaper buyout than Vanderbilt could obtain with a proper valuation. Vanderbilt ultimately claimed that McDonald's rent should increase from $167,292/year to $1,078,400/year (80% of its FMV estimate of $1,348,000); McDonald's appraiser determined it should increase to $280,000/year (80% of her FMV estimate of $350,000).

Discovery uncovered substantial and compelling evidence that Vanderbilt failed to

---

[1] "McD 56.1(a)" refers to Plaintiff McDonald's Corporation's Response to Defendant's Rule 56.1(a) Statement and "McD. 56.1(b)" refers to McDonald's Statement of Additional Material Facts in Dispute Pursuant to Rule 56.1(b). "Walsh Dec." refers to the Declaration of Brendan M. Walsh, Esq. submitted herewith. "Locatell Dec." refers to the Declaration of Sharon Locatell submitted herewith. "Rottenberg Dec." refers to the Declaration of Pinchus "Sam" Rottenberg filed with Vanderbilt's moving papers. All references to deposition transcripts are to the transcripts attached to the Declaration of Howard S. Koh ("Koh Dec.") filed with Vanderbilt's moving papers.

cooperate in the contractually required FMV process. First, Vanderbilt's appraiser, Tom Tener, did not consider the financial terms of the Vanderbilt Lease signed less than a year-and-a-half earlier because Vanderbilt rejected multiple requests from Tener for a copy of that lease and misled him to believe it was a "related party" transaction. (McD 56.1(b) ¶ 3.) That misinformation caused Tener to ignore the $7 million value Vanderbilt ascribed to the lease for tax purposes. Vanderbilt's contention that Tener never asked for the lease is contradicted by Tener's own testimony, and two separate letters in which Tener specifically requested Vanderbilt provide "Copies of any leases that encumber the properties." (Walsh Dec. Ex. 20 at 2; Ex. 28 at 2; Tener Dep. Tr. 66:8-72:21.) And despite Vanderbilt's argument to the contrary, the evidence shows that the lease terms were negotiated at arm's length and driven by market value, nothing else. (McD 56.1(b) ¶ 4.)

Had Tener been given access to that lease, he would have seen that Vanderbilt and M.M.B. Associates, LLC had agreed in November 2017 that the fair market rental value of the Property under existing zoning was $360,000 per year. (McD 56.1(b) ¶ 1(j)-(l).) That amount is very close to the $350,000 FMV that McDonald's appraiser, Sharon Locatell, determined in her report (Walsh Dec. Ex. QQ) and nearly $1 million per year less than the estimate Tener arrived at in his improper, and incredible, FMV analysis (Rottenberg Dec. Ex. SS). Had Tener been given access to this information—as he should have been—he would have had to address this wildly inconsistent valuation in his analysis. (Walsh Dec. Ex YY at 30-32; Tener Dep. Tr. 70:21-71:6.)

Second, the evidence shows that Vanderbilt failed to have its appraiser prepare a FMV estimate in the manner required by the McDonald's Lease and New York law. For example, Vanderbilt initially told Tener to ignore binding New York law that requires the Property to be valued as encumbered by the remaining 20-year term of the McDonald's Lease. (McD 56.1(b) ¶ 6.) Vanderbilt gave Tener this instruction despite being told by both Tener and a consulting

appraiser from a different firm that the encumbrance of the Lease should be considered in the FMV estimate. (*Id.*) And even after Vanderbilt conceded months later that the encumbrance of the McDonald's Lease needed to be considered—a concession it is now trying to walk back—and agreed to have Tener "redo" his FMV estimate (McD 56.1(b) ¶ 23), Vanderbilt still failed to have Tener perform a compliant appraisal. Instead, Vanderbilt had Tener add a one-paragraph, non-compliant "land residual" analysis that purported to account for the 20-year remaining term of the McDonald's Lease. (Walsh Cert. Ex. YY at 5-7.) Incredibly, Tener's "revised" analysis resulted in an even *higher* FMV estimate, but Tener stuck to his original estimate of $1,348,000 because he concluded that his original, flawed estimate was "supportive" of the valuation. (Rottenberg Dec. Ex. SS at 4.) There is evidence in the record establishing that Tener likely did this because he viewed himself as an advocate for Vanderbilt, not an independent appraiser. (McD 56.1(b) ¶ 22.)

McDonald's obtained expert testimony from Amanda Aaron, an MAI-designated, Brooklyn-based appraiser. In her 32-page report, she concluded that Tener's FMV estimate is "non-compliant with the Lease and non-compliant with [the Uniform Standards of Professional Appraisal Practice ("USPAP")], and neither reasonable nor credible." (Walsh Cert. Ex. YY at 32.) She also found that "Vanderbilt's withholding of the [Vanderbilt Lease] likely led to a significant 'error of omission' in the Tener report resulting in a 'significant effect on the credibility of the assignment results.'" (*Id.* at 31-32 (quoting USPAP Standards Rules 1-1b).)

Finally, the record shows that Vanderbilt again failed to cooperate by refusing to allow the three appraisers to work collaboratively to determine the FMV and then reversing its position and conceding this issue after McDonald's filed this suit.[2] (McD 56.1(b) ¶¶ 8-10.) This concession is

---

[2] Count II of McDonald's complaint seeks a declaration that the third appraiser may collaborate with the two party appraisers in determining the FMV. Vanderbilt's motion seeks dismissal of McDonald's entire complaint, but Vanderbilt has not argued why Count II should be dismissed.

also fatal to Vanderbilt's counterclaim that McDonald's failed to cooperate in the FMV process by filing this litigation.

Vanderbilt's claim that the difference in FMV estimates is simply due to "a difference of opinion" between the parties' appraisers, and that McDonald's failed to cooperate in the FMV process, is not credible or supported by the evidence. Indeed, all the data points, including some of Vanderbilt's own values, are remarkably consistent except for Tener's non-compliant estimate.

| Sharon Locatell FMV Estimate | Vanderbilt Lease with Existing Zoning | Vanderbilt Lease for Tax Purposes | Tom Tener FMV Estimate |
|---|---|---|---|
| $350,000/yr (Walsh Dec. Ex. QQ at 3.) | $360,000/yr (McD 56.1(b) ¶¶ 1(j)-(l).) | $350,000/yr based on $7 million value (Locatell Dec. ¶ 8.) | $1,348,000/yr (Rottenberg Dec. Ex. SS at 4.) |

Vanderbilt's sole basis for its claim is that McDonald's allegedly failed to abide with a September 2019 agreement, which Vanderbilt argues required the parties to engage a third appraiser, Marc Nakleh, by October 7, 2019. But that agreement makes clear that the parties had no intention of retaining Nakleh until they agreed on how the three appraisers would work together, if at all. (Rottenberg Dec. Ex. AA at § 3; McD 56.1(a) ¶¶ 30-32.) Because the parties could not reach agreement and Vanderbilt refused to permit collaboration until long after this lawsuit was filed, the parties could not retain Nakleh. (*Id.*; McD 56.1(b) ¶¶ 8-10.)

For all these reasons and those set forth below, the Court should deny Vanderbilt's motion for summary judgment and schedule a bench trial to resolve the disputed issues of fact and scrutinize the credibility of Vanderbilt's representatives and appraiser.

**DISPUTED FACTS**

A complete recitation of the disputed material facts is found in McDonald's response to Vanderbilt's Rule 56.1(a) statement and statement of additional material facts in dispute pursuant to Rule 56.1(b), filed herewith.

## **LEGAL STANDARD**

The court may only grant a motion for summary judgment "where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Rogoz v. City of Hartford,* 796 F.3d 236, 245 (2d Cir. 2015). A fact is material if it "might affect the outcome of the suit under the governing law." *Leser v. U.S. Bank Nat'l Ass'n,* No. 09-cv-2362, 2012 WL 4472025, *4 (E.D.N.Y. Sept. 25, 2012) (quotation omitted). An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Vanderbilt bears the initial burden of showing the lack of any genuine issue of material fact. *Ohio Cas. Ins. Co. v. Twin City Fire Ins. Co.,* No. 14-cv-858, 2018 WL 10466847, *4 (E.D.N.Y. June 29, 2018). In assessing whether a genuine dispute exists, "the Court must construe all facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all inferences against the movant." *Id.* The function of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz,* 796 F.3d at 245 (quotation omitted). Credibility determinations, if necessary, must be resolved in favor of the non-moving party or result in the denial of the motion. *Id.* at 245-46.

## **ARGUMENT**

### I.   THE ROTTENBERG DECLARATION ALONE SHOWS THAT THERE ARE GENUINE DISPUTES OF MATERIAL FACT

Vanderbilt submitted a 42-page, 151-paragraph declaration from its principal, Pinchus "Sam" Rottenberg, in support of its motion. The Rottenberg Declaration, alone, proves that there are multiple factual disputes that cannot be resolved on summary judgment.

To begin with, the Rottenberg Declaration is filled with legal argument that the Court should disregard. (*See, e.g.*, Rottenberg Decl. ¶¶ 2, 21, 33, 37, 38.) Local Rule 7.1(a) requires legal

argument to be contained in briefs. *Janetos v. Home Depot U.S.A., Inc., No*. 09-cv-1025, 2012 WL 4049839, *7 (E.D.N.Y. Sept. 13, 2012). Affidavits or declarations may only contain facts. *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.,* 887 F. Supp. 2d 459, 465 n.3 (E.D.N.Y. 2012). And by including arguments that are not in Vanderbilt's brief, Vanderbilt seeks to do an end-run around the page limitation for briefs set by the Court with the Rottenberg Declaration.

Furthermore, the Rottenberg Declaration contains several statements that conflict with his prior sworn testimony and discusses certain matters in detail that he disclaimed any knowledge of at his deposition.[3] For example, Rottenberg repeatedly testified at his deposition that he did not know whether an LLC of which he is the 100% owner acquired an interest in M.M.B. before or after Vanderbilt signed the Vanderbilt Lease. (Walsh Dec. ¶ 9.) But he now asserts in his declaration that "when Vanderbilt entered into the ground lease with M.M.B., [he] owned an interest in M.M.B." (Rottenberg Dec. ¶ 119.) He also testified at his deposition that he is "not familiar" with the New York Court of Appeals' decision in *936 Second Ave. L.P. v. Second Corp. Dev. Co.*, 10 N.Y.3d 628 (2008), and "ha[s] no idea what it is." (Walsh Dec. ¶ 12.) But the Rottenberg Declaration contains multiple paragraphs discussing the decision and explaining why it "cannot be applied as McDonald's contends it should be." (Rottenberg Dec. ¶¶ 21-28.) Rottenberg also makes claims in his declaration inconsistent with his deposition testimony and other evidence. For example, he contends in his declaration that McDonald's is "lying" by claiming that Tener asked Vanderbilt for a copy of the Vanderbilt Lease (Rottenberg Dec. ¶ 106) even though he acknowledged at his deposition that Tener asked multiple times for "Copies of any leases that are on the properties." (Walsh Dec. ¶ 16.)

---

[3] Rottenberg responded with some version of "I don't know" or "I can't remember" more than 270 times during his deposition. (Walsh Dec. ¶¶ 4-5.)

His inconsistent statements are identified in the accompanying Walsh Declaration and must all be rejected under the sham affidavit doctrine. "It is well settled in [the Second Circuit] that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Kruger v. Virgin Atl. Airways Ltd.*, 976 F. Supp. 2d 290, 309 (E.D.N.Y. 2013) (citation omitted); *see also Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 95 (S.D.N.Y. 2020) (stating that the sham affidavit doctrine "applies to sham affidavits offered to procure judgment for the offering party").

At the very least, the Rottenberg Declaration shows there are disputed issues of material fact and casts doubt on his credibility. It is shocking how many things Rottenberg now knows that he claimed not to know anything about during his deposition, and how many statements in the Rottenberg Declaration conflict with his prior testimony and other evidence. Credibility questions such as these cannot be resolved on a motion for summary judgment and must be tested on cross-examination at trial. *Leser*, 2012 WL 4472025, *14 (denying summary judgment where deposition testimony contained "several internal contradictions . . . and also seemed to contradict written evidence at times" thereby requiring determinations of "the credibility of that testimony and how much weight the testimony and emails should be afforded").

## II. THE EVIDENCE SHOWS THAT VANDERBILT FAILED TO COOPERATE IN THE FMV PROCESS

Vanderbilt seeks the dismissal of Count I of McDonald's Complaint, in which McDonald's seeks a declaration that Vanderbilt failed to cooperate in the FMV process in violation of the Option Rent Addendum ("ORA") to the Lease. The ORA states:

> If one of the parties fails to chose [sic] an appraiser within the specified time period or fails to cooperate *in any way* so that the [FMV appraisal] process described above cannot be completed prior to 120 days of the expiration of the primary term of the lease, the FMV of the one appraiser chosen by the cooperating party shall be used to determine the rent during the extension periods.

(Rottenberg Dec. Ex. D at 2 (emphasis added).) This provision is clear on its face and there can be no genuine dispute over its meaning. The phrase "fails to cooperate in any way" should be given its plain meaning. *Kolbe v. Tibbetts*, 22 N.Y.3d 344, 353 (2013). The primary term of the Lease expired on April 8, 2019. (McD 56.1(a) ¶ 6.) One hundred and twenty days later was August 6, 2019. Therefore, the Court must determine whether there is a genuine dispute about whether Vanderbilt failed *in any way* to cooperate in the FMV process required by the McDonald's Lease such that it could not be completed by August 6, 2019. The record is full of such failures.

A.   **Vanderbilt Had No Intention to, and Did Not, Cooperate in the FMV Process**

The evidence shows that Vanderbilt wanted McDonald's off the Property so that it could redevelop it with a high-rise mixed-use building. (McD 56.1(b) ¶ 1.) Since before Vanderbilt signed the Vanderbilt Lease, it has been trying to make that happen, including attempting to raise McDonald's rent to the point where McDonald's would want to leave the Property. (McD 56.1(b) ¶¶ 1-7, 11-29.) Vanderbilt's efforts to push McDonald's off the Property led Vanderbilt to ignore Tener's requests for information, violate the terms of the Lease, disregard New York law, and have Tener produce an appraisal inconsistent with USPAP appraisal standards. (*Id.*)

The Vanderbilt Lease itself provided Vanderbilt with additional motivation to force McDonald's off the Property and shows that Vanderbilt has no interest in the rent McDonald's pays; only an interest in how quickly it can terminate the McDonald's Lease. The Vanderbilt Lease provides that (i) so long as the McDonald's Lease remains in effect, Vanderbilt must pay all rent that McDonald's pays under the Lease to M.M.B.; (ii) Vanderbilt cannot generate revenue from the Property until McDonald's leaves; (iii) the 99-year term of the lease began to run on November 30, 2017 and is in no way dependent on when McDonald's vacates the Property; and (iv) Vanderbilt can lock in a lower rent for the rest of the 99-year term of its lease if McDonald's

8

terminates its Lease before November 30, 2027. (McD 56.1(b) ¶¶ 1(f)-(q).)

Vanderbilt's argument that there is nothing improper about Vanderbilt having the motive "to get undeservedly high rent" or "'wanting' McDonald's out" misses the point. (Rottenberg Dec. ¶¶ 67, 71.) The evidence shows that "wanting McDonald's out" motivated Vanderbilt to do what it could to ensure that the FMV process would yield a rent amount that would persuade McDonald's to terminate the Lease and vacate the Property. This motive and the evidence showing Vanderbilt's failure to cooperate in the FMV process create triable issues of fact. *Travellers Int'l, A.G., v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1576-77 (2d Cir. 1994) (considering motive evidence at trial in determining that defendant's reduced promotional efforts did not result from good faith business judgments but from the improper motive of eliminating plaintiff-operator from their joint venture); *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 100 n.8 (2d Cir. 2007) (whether a party acted in good faith "is an issue entirely tied to motive").

### B. Vanderbilt Repeatedly Refused to Provide Its Appraiser with a Copy of Its Ground Lease with M.M.B.

The evidence shows that Vanderbilt rejected Tener's multiple requests for a copy of the Vanderbilt Lease. Astonishingly, Vanderbilt claims that "Vanderbilt was never asked for the 2017 ground lease" and that "McDonald's is lying" about this. (Rottenberg Dec. ¶ 106.)  But in both his June 2018 and April 2019 engagement letters, Tener specifically asked for "Copies of any leases that encumber the properties," which includes the Vanderbilt Lease. (Walsh Dec. Ex. 20 at 2; Ex. 28 at 2.) And Tener confirmed at his deposition that he had no chance to review the Vanderbilt Lease *even though he asked Vanderbilt for it*. (Tener Dep. Tr. at 66:8-72:21.)

Vanderbilt's contention that the Vanderbilt Lease "has no bearing on the value of the land," is both questionable and immaterial to the analysis of whether Vanderbilt cooperated in the FMV process. Tener testified that he repeatedly requested all leases that encumber the Property and that

he would have undertaken additional analyses had he been provided with a copy of the Vanderbilt Lease. (Tener Dep. at 66:23-67:11, 69:18-72:21.) Vanderbilt's refusal to provide its appraiser with relevant information requested by the appraiser constitutes a failure to cooperate in the FMV process. *CityPlace Retail, L.L.C. v. Wells Fargo Bank, N.A.,* 457 F. Supp. 3d 1318, 1345-46 (S.D. Fla. 2020) (holding plaintiff breached its duty to cooperate by failing to provide appraiser with the financial information he requested); *Gadomski v. Gadomski*, 245 A.D.2d 579, 580-81 (3d Dept. 1997) (holding defendant in a divorce proceeding failed to cooperate in the appraisal of the couple's mobile home park by denying the appraiser access to the mobile home park and refusing to provide the number of sites there); *Y.L. v. L.L.,* 68 Misc.3d 1209(A), *4 and *19 (N.Y. S. Ct., Richmond County 2020) (holding defendant in divorce proceeding failed to cooperate in the valuation of her businesses by failing to provide financial information requested by the appraiser).

The district court's decision in *CityPlace Retail, L.L.C. v. Wells Fargo Bank, N.A.,* 457 F. Supp. 3d 1318 (S.D. Fla. 2020) (applying New York law), is instructive. There, a borrower sought to refinance its debt by repaying its existing loan with the defendant-bank and borrowing money from a different lender. However, the borrower's existing loan agreement required that the subject property be appraised to determine the payoff amount of its debt. The bank retained an appraiser to conduct the appraisal as required by the agreement, which also required the borrower to cooperate in the appraisal process by promptly providing the appraiser with any requested information. When the appraisal was being conducted, the borrower had a pending zoning application, seeking a zoning change allowing for the development of a higher-density residual tower complex. *Id.* at 1324-28. To try to keep the appraised value of the property—and therefore the loan payoff amount—artificially low, the borrower failed to disclose its zoning application to the bank or the appraiser and failed to provide the appraiser with other information the appraiser

had requested. The borrower and the bank filed competing claims for declaratory relief about the validity of the appraisal. Applying New York law, the court held that the borrower breached its duty to cooperate in the appraisal of property by failing to provide the appraiser with the requested information. *Id.* at 1345-46. The court ruled that the appraisal was "void and should not be used to determine the Property's Appraisal Value" because (1) the appraisal did not comply with either the terms of the governing agreement or USPAP appraisal standards, and (2) the borrower "breached its implied duty of good faith and fair dealing by intentionally manipulating the appraisal . . . and concealing material information" from the appraiser. *Id.* at 1346.

Just as the plaintiff did in *CityPlace Retail,* Vanderbilt withheld material information about the Vanderbilt Lease from Tener despite his repeated requests. And as explained in further detail below, Vanderbilt also disregarded the requirements of the McDonald's Lease and appraisal standards, rendering the appraisal non-compliant, invalid, and void. Vanderbilt's actions in refusing to turn over material information and follow the procedures required by the Lease, the law, and appraisal standards, constitutes a blatant failure to cooperate in the FMV process.

To distract the Court from its own failings, Vanderbilt argues that the Vanderbilt Lease must not be as important as McDonald's claims because McDonald's appraiser, Sharon Locatell, did not ask Vanderbilt for a copy. But McDonald's has never contended that Vanderbilt denied a request by Locatell for the Vanderbilt Lease. Locatell was aware of the Vanderbilt Lease and Vanderbilt's $7 million valuation of its lease when she performed her valuation. (Locatell Dec. ¶¶ 4-6.) And the $7 million valuation fit her FMV estimate, which reasonably led Locatell to conclude that Vanderbilt Lease did not merit discussion in her analysis. (*Id.* ¶¶ 8-9.)

In any event, Locatell had no access to Vanderbilt; only McDonald's did. (*Id.* ¶ 7.) And when McDonald's asked Vanderbilt for a copy of the Vanderbilt Lease, Vanderbilt refused to

provide it. When McDonald's pressed Vanderbilt for it, Vanderbilt eventually sent over what it called a "highly redacted" version of the document with all of the financial terms blacked out. (McD. 56.1(a) ¶ 33; Walsh Dec. Exs. 107-109.) For these reasons, it is almost comical that Vanderbilt tries to turn the fact that it refused Tener's repeated requests for a copy of the Vanderbilt Lease against McDonald's.

Despite Vanderbilt not sharing the Vanderbilt Lease with its own appraiser, Tener was aware of its existence and the $7 million value ascribed to it by Vanderbilt in public records. (McD 56.1(b) ¶ 2(m); Walsh Dec. Ex. 22 at VA 000016.) But unlike Locatell, Tener could not conclude that the $7 million was consistent with his FMV estimate. Vanderbilt dealt with this inconvenient truth by wrongly telling Tener that the Vanderbilt Lease was made between "related entities," implying that it was not an arm's-length transaction (Tener Dep. 27:13-28:4, 28:21-29:19), even though there is no evidence indicating that the Vanderbilt Lease was anything but an arm's-length, market value transaction. (McD 56.1(a) ¶ 10.) Tener actually noted the significant difference in value in one of his reports, but explained that he had ignored it at Vanderbilt's request and wrote: "The difference between the appraised value and the reported ground lease consideration is attributable to unknown conditions in the ground lease *which was not provided for review*." (Walsh Dec. Ex 22 at VA 000016.) This all points to a failure to cooperate by Vanderbilt.

Vanderbilt's contention that "it did not corrupt" Tener's appraisal simply because it did not tell him the "range of valuations it was looking for" or "what appraisal method" misses the point. (Moving Br. at 7-8.) A "failure to cooperate" is not limited to these specific actions but includes any attempt to disrupt the process. The bottom line is that Vanderbilt failed to cooperate in the appraisal process by failing to provide Tener the information he requested, and further deceiving Tener by wrongly telling him that the Vanderbilt Lease was between related entities.

12

The record reveals that Vanderbilt's omissions and misstatements to Tener about the Vanderbilt Lease materially impacted his FMV estimate. The $360,000 rent agreed to between Vanderbilt and M.M.B., as the rent Vanderbilt would pay under existing zoning when the McDonald's Lease terminates (McD 56.1(b) ¶¶ 1(j)-(m)), is remarkably close to Locatell's $350,000 FMV estimate. Vanderbilt therefore "held back an important piece of market information and denied [its appraiser] the opportunity to raise questions about the nature of the lease and its terms, which if answered, could provide the 'valuable (or important) insights into market trends, property and buyer characteristics' that USPAP describes." (Walsh Cert., Ex. YY at 31.)[4]

## C. Vanderbilt Refused to Appraise the Property Consistent with New York State Law

Vanderbilt further failed to cooperate in the FMV process by directing its appraiser not to follow the New York Court of Appeals' decision in *936 Second Ave. L.P. v. Second Corp. Dev. Co.,* 10 N.Y.3d 628, 629-30 (2008), in its appraisal of the Property. In *936 Second Avenue,* the New York Court of Appeals directly addressed whether a lease should be considered in the appraisal of commercial property when determining the renewal rent for the property: "[T]he issue is whether the net lease itself must be considered by appraisers in valuing the demised premises for purposes of establishing the net rent for the renewal term of the lease." *Id.* at 630. The Court of Appeals ruled:

> [A]bsent an agreement to the contrary, the effect of a net lease must be considered in valuing property for the purpose of setting rent for a renewal term. Such a rule comports with precedent, appraisal practices and common sense. If the parties to a lease desire to exclude that encumbrance in valuing property, they need only

[4] Vanderbilt's argument that the $7 million reported by Vanderbilt constitutes the value of that lease and not the value of the Property is a red herring. (Moving Br. at 9-10; Rottenberg Decl. ¶¶ 90-103.) Given that it is a 99-year lease, the value given to it by Vanderbilt is plainly inconsistent with its claim that the fair market rental value of the Property is $1,348,000/year. Moreover, that Vanderbilt may have underreported the value to "minimize not maximize transfer taxes" (Rottenberg Decl. ¶ 103) is not something that Locatell could have foreseen, and further shows that the Rottenberg Declaration brings Rottenberg's credibility into question.

include language to that effect in their agreement.

*Id.* at 633. In reaching its conclusion, the Court of Appeals relied on its prior decision in *New York Overnight Partners, L.P. v. Gordon*, 88 N.Y.2d 716 (1996), in which the Court held that "'[w]hen the language of the lease so dictates, appraisals must take into consideration all restrictions—including current zoning regulations—and encumbrances on the land, as well as the lease term.'" *936 Second Ave.,* 10 N.Y.3d at 631 (quoting *New York Overnight Partners*, 88 N.Y.2d at 721). The Court elaborated that "in determining the highest and best use of the property, appraisers necessarily must examine any restrictions or limitations, including long-term leases, that may impact the highest and best use for which the property may be utilized." *Id.* at 632.

The Court of Appeals' decisions require appraisers to consider the encumbrance of a lease in FMV estimates, absent an agreement to the contrary. The decisions also require that current zoning regulations be considered. Nothing in the McDonald's Lease states that the encumbrance of the Lease or current zoning regulations should not be considered in the appraisal. Indeed, at least two appraisers retained by Vanderbilt, including Tener, told Vanderbilt and its counsel that *936 Second Avenue* required the encumbrance of the McDonald's Lease to be considered. (McD 56.1(b) ¶¶ 6(a)-(e).) But based on instructions from Vanderbilt's counsel, Tener did not consider the encumbrance of the Lease in his initial appraisal of the Property even though he believed the rule from *936 Second Avenue* applied. (Tener Dep. Tr. 110:3-111:11, 145:3-7; Rottenberg Dec. Ex. 32 at VA 001946.) The Court can reasonably conclude that Vanderbilt's patently incorrect instruction to Tener, despite being told otherwise by two different appraisers, constituted a failure to cooperate in the FMV process.

In its motion, Vanderbilt argues for the first time that *936 Second Avenue* does not apply here because the ORA states that the "rental value shall be established based" in part on "all of the

uses to which the property can be put . . . ." Vanderbilt contends that this is "an agreement to the contrary" excluding the Lease from the court's holding because the drafter of the ORA "would never have expressly directed the appraisers to consider 'all the uses to which the property can be put' if he intended certain uses not to be considered based on the twenty years remaining on the Lease." (Moving Br. at 17.) But absent language in a lease to the contrary, *936 Second Avenue* itself requires appraisers to consider the term of the Lease be considered in determining highest and best use. Accordingly, the absence of such language required the appraisers to consider the term of the McDonald's Lease in determining highest and best use in the FMV process. *936 Second Ave.*, 10 N.Y.3d at 632.

Regardless, Vanderbilt conceded to McDonald's in late August 2019 that the rule in *936 Second Avenue* applied to the FMV appraisal. (McD 56.1(b) ¶ 23.) Though McDonald's later learned that Vanderbilt made this concession nearly a month after Tener performed his revised "land residual" analysis that, incredibly, arrived at the identical FMV estimate as his original FMV estimate (Rottenberg Dec. Ex. SS), it should not be permitted to change course once again. Vanderbilt's contention that it never agreed that *936 Second Avenue* applied, and only agreed to consider the encumbrance of the Lease "out of a spirit of cooperation" is not supported by the evidence. Indeed, Tener testified that Vanderbilt agreed that he should have considered the encumbrance of the McDonald's Lease in his analysis:

> Actually at the [June 19, 2019] meeting, [Vanderbilt's attorney] Morris [Missry] said that he agreed with them, with that – that the decision applied. That was the first time I had heard that. I don't recall having a conversation with him before that. I remember being surprised that he changed his opinion.
>
> . . .
>
> I don't know if he agreed with them but he stated that – I don't want to say stated but what I understood him to communicate was that yes, the – that part of the provision of the Second Avenue information would apply and that the lease term needed to be considered.

(Tener Dep. Tr. 210:14-212:8.) Accordingly, the evidence shows that Vanderbilt knew that *936 Second Avenue* and the Lease required that the encumbrance of the Lease be considered in the appraisal of the Property, and yet, instructed its appraiser not to consider it in determining McDonald's rent for the renewal term. Vanderbilt's refusal to abide by binding New York law constitutes a failure to cooperate in the FMV process, especially when coupled with the non-compliant "revised" FMV estimate it shared with McDonald's months later.

### D.  Expert Opinion Testimony Confirms that Vanderbilt Did Not Cooperate

The expert opinion of Amanda Aaron, a Brooklyn-based, MAI-designated appraiser with over 25 years of experience, further supports McDonald's claim that Vanderbilt failed to cooperate in the FMV process. The Court should review her report in its entirety; it is a compelling read. (Walsh Cert., Ex. YY.) In short, she concluded that Tener's letter opinion of value disregarded the terms of the Lease, New York law, and the appraisal standards set forth by the Appraisal Institute of Real Estate Appraisers and USPAP. She concluded that Tener's appraisal suffers from at least four flaws that render it non-compliant and non-credible.

> *First,* Aaron concluded that
>
> The Tener appraisal disregards the instructions in the Lease's Option Rent Addendum to adjust comparable leases of vacant land as the valuation method without discussion or reasoning for the exclusion of such leases and when such leases are available in the market area as demonstrated by both the Locatell report and independent research typically performed by appraisers in assignments of this type.

(Walsh Cert. Ex. YY at 14.) Aaron explained that "Tener's use of comparable <u>sales</u> owned outright and in perpetuity"—rather than comparable *leases* as required by the Lease—"is inappropriate and conflating fee simple and leasehold value this way is counter to USPAP's clear instructions not to present analyses or conclusions that are in any way misleading." (*Id.*) Aaron added that Tener's sales comparison analysis was flawed because it is "based on upon the highest and best use

16

conclusion that the subject property could be developed for a mixed-use residential building" that "would not be financially feasible over a 20-year term." (*Id.* at 16.)

*Second,* Aaron concluded that Tener's land residual analysis—performed months after the sales comparison analysis and with which he impossibly arrived at exactly the same value as the sales comparison analysis—is "non-compliant with the Lease instructions to adjust comparable leases, non-compliant with the Lease language to use the technique as defined by the [American Institute], and non-compliant with basic appraisal rules and procedures for land residuals." (*Id.* at 6.) Aaron explained that the technique used by Tener in his supposed land residual analysis is not one recognized by the Appraisal Institute because it does not use procedures consistent with the Appraisal Institute's standards and used a methodology not appropriate for determining land rent. (*Id.*) She pointed out that Tener's highest and best use conclusion "names mixed-use development but the residual analysis is based upon hypothetical retail improvements which fail the basic tests of market analysis" given that the "market shows no recently constructed or proposed improvements similar to what Tener's land residual analysis describes . . . ." (*Id.*) Aaron also explained that Tener relies on retail leases that are not comparable to arrive at his conclusions and the construction cost data he relies on are "inappropriate" and "unsupported by activity in the property's market area." (*Id.*) And importantly, Aaron explained that it is simply not possible that a site encumbered for 20 years—which is what Tener supposedly assumed in his "revised" land residual analysis—would have the same rental value as the unencumbered site used in his sales comparison analysis: "The report's internal incoherence in claiming that these two analyses could produce a similar valuation conclusion is counter to any definition of reasonableness or credibility as required by USPAP and is fully unsupported by actual investor activity and data in the market area . . . ." (*Id.* at 7.) For these reasons, Aaron concluded that "the Tener appraisal complies with

neither the Lease nor USPAP and cannot be relied upon as an indication of fair market rental value pursuant to the terms of the Lease." (*Id.* at 7.)

*Third*, Aaron found that Tener failed to abide by binding "case law precedent" that "appraisers are bound by" and "which defines basic ground rules for interpretation of leases in lease rent re-set proceedings." (*Id.* at 9.) She quoted the New York Court of Appeals' decisions in *Overnight Partners* and *936 Second Avenue,* which, she explained, require appraisers to

> "take into consideration all restrictions—including current zoning regulations—and encumbrances on the land, as well as the lease term" in the valuation and that "in determining the highest and best use of a property, appraisers necessarily must examine any restrictions or limitations, including long-term leases, that may impact the highest and best use for which the property may be utilized."

(*Id.* at 9.) Aaron found that because the Lease "is silent regarding lease encumbrances . . . based upon the terms of the Lease and this case law precedent, appraisers must take into consideration current zoning regulations and the lease term in both highest and best use and FMV conclusions with an appraisal methodology appropriate to the lease encumbrance." (*Id.*) All of this strongly supports McDonald's contention that Tener's failure to consider this binding law—at Vanderbilt's instruction, despite knowledge that it should be considered—violated the Lease and New York law, and constitutes a failure to cooperate in the FMV process.

*Fourth,* Aaron concluded that the Vanderbilt Lease "represents the value of the property as encumbered by the McDonald's sublease" and should have been evaluated by Tener as required by USPAP since it was both available to him and inconsistent with his valuation. (Walsh Cert. Ex. YY at 30-31.) She stated that "USPAP requires appraisers to 'analyze and report pending and recent agreements, options, listings, and sales involving the subject property being appraised,'" and that by failing to provide Tener with a copy of the Vanderbilt Lease, "Vanderbilt held back an important piece of market information and denied him the opportunity to raise important questions

about the nature of the lease and its terms, which if answered, could provide the 'valuable (or important) insights into market trends, property and buyer characteristics' that USPAP describes above." (*Id.* at 31.) In other words, Aaron confirmed that the Vanderbilt Lease—a document Vanderbilt intentionally withheld from Tener and incorrectly described to him as a "related party" transaction—is a helpful indicator of market value. Indeed, that lease flatly contradicts Tener's conclusions—and in fact supports Locatell's conclusions—by showing that the market rent for the Property was approximately $360,000/year. Vanderbilt's decision to withhold this information from Tener, even after he repeatedly requested it, constitutes a failure to cooperate in the FMV process. *See CityPlace Retail*, 457 F. Supp. 3d at 1345-51.

Vanderbilt's attempt to reframe the issue as one of "differing opinions" is plain wrong.[5] Vanderbilt argues that the valuation differences are driven by the appraiser's differing views on the Property's highest and best use. (Moving Br. at 12-13; Rottenberg ¶ 62.) But Tener determined the "highest and best use" without considering the limitations imposed by current zoning and the twenty-year encumbrance of the Lease. Indeed, Aaron testified that Tener did not properly determine the highest and best use, resulting in a significant problem with his appraisal:

> Tener didn't do the work – didn't appear to do the work to get to the proper highest and best use. Mr. Tener, his appraisal report started with the wrong appraisal problem, the fee simple value of the property in perpetuity, so the highest and best use in that case is entirely different from what – what the highest and best use would be as encumbered up to a 20-year lease term because of financial feasibility. Development sites in perpetuity have a totally different highest and best use than development sites for a 20-year term. Then the Tener report purportedly added an analysis of the land residual that accounts for the encumbrance of the lease. However, that analysis was so unsupported and every input was unsupported. I don't know where his conclusion of the highest and best use of some kind of 20,000

---

[5] Vanderbilt repeatedly argues that this matter involves a difference of opinion that should be determined by a third appraiser in arbitration. (Moving Br. at 15-16; Rottenberg Decl. ¶¶ 66, 141-146.) This issue has already been decided by the Court and the decision was affirmed by the Second Circuit. Thus, the Court should disregard Vanderbilt's arguments that this case should be resolved by submitting it to a third appraiser.

square foot retail development came from because it wasn't supported by any market data, and I didn't see any evidence of any research of market data in his report in support of the hypothetical improvement for this highest and best use conclusion. So yes, I think the highest and best use is a real problem in the Tener report.

(Aaron Dep. Tr. 70:10-71:13.) Thus, the evidence shows that the valuation differences did not result from a difference in opinions, but from Tener's failure to undertake the proper steps and analyses to determine the highest and best use of Property. Tener's failure to take the proper steps constitutes more evidence that Vanderbilt failed to cooperate in the FMV process.

### E. Vanderbilt Halted the Appraisal Process by Refusing to Allow the Party Appraisers to Collaborate with the Neutral Appraiser

Before filing suit, McDonald's was prepared to move forward with a third appraiser to resolve the parties' valuation differences. Vanderbilt, however, thwarted the process by taking the unreasonable position—unsupported by the Lease—that the third appraiser could not collaborate with the party-appraisers in arriving at a FMV. (McD 56.1(b) ¶ 8.) Vanderbilt's refusal to allow collaboration is yet another example of how Vanderbilt failed to cooperate in the FMV process.

The ORA describes the procedure to be followed if the party appraisers arrive at fair market values that differ by more than 15%. The ORA states:

> If the two appraisals differ by more than 15%, then the two appraisers shall appoint a third appraiser chosen from a list of three appraisers designated by the National Headquarters of the American Institute of Real Estate Appraisers or, if it is no longer in existence, a similar or successor organization. ***The three appraisers so appointed shall then, within 20 days of the date the third appraiser is appointed, estimate, by means of a letter opinion of value, the FMV***. The decisions of the appraisers, or a majority of them, shall be binding on the parties. ***If the appraisers, or a majority of them, cannot agree on the FMV***, it shall be determined by adding all three estimates and dividing the total of all three estimates by the number three.

(Rottenberg Dec. Ex. D at 1 (emphases added).) The language makes clear that the three appraisers must work together to try to "agree on the FMV" in "***a*** letter opinion of value." That cannot happen without collaboration.

Vanderbilt, however, argued that the three appraisers must work completely independently and if the third appraiser's valuation matched the valuations of the other two appraisers, then that valuation would govern. But, according to Vanderbilt, if the third appraiser did not independently arrive at ***exactly the same valuation*** as one of the other two appraisers, then the three FMV estimates would be averaged. (McD 56.1(b) ¶ 8.) Vanderbilt knew that it was almost impossible for the third appraiser's FMV estimate to match Locatell's FMV estimate to the penny. It also knew that, with Tener's artificially inflated FMV estimate of $1,348,000, averaging the three valuations would result in a much higher valuation than it could obtain if the three appraisers were allowed to try to agree on an estimate in "a" single letter opinion of value as required by the McDonald's Lease. Rottenberg continues to take this position, arguing that "once a third appraiser is appointed," "each of [the] three appraisers (including the two party appraisers) issue their respective *written* FMV opinions." (Rottenberg Dec. ¶ 76.) Nowhere does the ORA state that the third appraiser will issue his/her own written opinion. Rather, the ORA states that the three appraisers shall "estimate, by means of *a* letter opinion of value, the FMV."

Rottenberg's new argument that there is both a "collaborative" and "non-collaborative" process in the ORA for the third appraiser to follow finds no support in language of the ORA, and conflicts with Vanderbilt's pre-litigation position. The reference to what occurs if the three appraisers "cannot agree on the FMV" in the last sentence refers to process described in the prior sentence where the appraisers are supposed to attempt to "estimate, by means of a letter opinion of value, the FMV." (Rottenberg Dec. Ex. D at 1.) Vanderbilt's strained attempt to read two processes into the ORA is another indicator that its position on this issue is wrong. Had the parties intended to include two separate processes for the third appraiser to follow, they would have said so with clear and concise language. *Bolt Elec., Inc. v. City of New York*, 223 F.3d 146, 150 (2d Cir.

2000) ("In reviewing a written contract, the Court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use.").

Rather than follow the process set forth in the ORA, Vanderbilt insisted that the appraisers could not collaborate, halting the entire process. But just as it has done with many other issues in this case, Vanderbilt changed its position after McDonald's filed this lawsuit. In its Answer and Amended Counterclaim filed on December 3, 2020—nearly thirteen months after McDonald's filed this action—Vanderbilt requested a judgment from this Court "directing that the three appraisers, i.e. Mr. Tener, Ms. Locatell, and Mr. Nakleh, or a majority of them, collaborate and estimate the FMV of the Demised Premises within twenty days of the entry of a final judgment in this action . . . ." (Dkt. 28 at p. 16.) This about-face in its position on the role of the third appraiser is yet more evidence of Vanderbilt's failure to cooperate in the FMV process.

Rather than address its reversal of positions, Vanderbilt argues that an agreement executed between the parties dated September 16, 2019 altered the terms of the ORA and unconditionally required the parties to retain Marc Nakleh by October 7, 2019. Vanderbilt is mistaken. For the reasons explained in Section III below, the agreement did not unconditionally require the parties to retain Nakleh by a date certain. Further, and more to the point, the agreement says nothing about what process should be followed by the third appraiser in arriving at the FMV. Instead, it recognizes that the parties disagreed on whether the appraisers could collaborate. Paragraph 3 of the letter states: "The Parties further agree that their appraisers shall jointly communicate with Mr. Nakleh that the Parties intend to retain him *upon agreement regarding the process set forth in the Lease*." (Rottenberg Dec. Ex. AA at ¶ 3 (emphasis added).) It is unclear how the process could have moved forward with a third appraiser absent an agreement on the appraisal's role.

Vanderbilt's refusal to agree to a collaborative process (and subsequent change in position)

constitutes a failure to cooperate in the FMV process. But in the event the Court disagrees, Count

Two of McDonald's requests a declaration from this Court about the role of the third appraiser.

## III.   THE EVIDENCE SHOWS THAT MCDONALD'S COOPERATED IN THE FMV PROCESS

Discovery shows that McDonald's fully cooperated in the FMV process. But perhaps

unsurprisingly, Vanderbilt argues that it is "irrefutable" that McDonald's did not cooperate.

Vanderbilt's sole basis for this position is that McDonald's declined to move forward with a third

appraiser absent an agreement on process. (Moving Br. at 23-24; Rottenberg Dec. ¶¶ 129-32.)

Vanderbilt relies on the September 2019 Agreement, claiming that it "unconditionally" obligated

both parties to engage Nakleh by October 7, 2019. (Moving Br. at 2, 6-7.) The plain language of

that agreement refutes that argument.

McDonald's negotiated the September 2019 Agreement to try to resolve the parties'

differences over the FMV process and avoid litigation. (Rottenberg Dec. AA ¶ 5.) During the June

2019 meeting, McDonald's learned that Vanderbilt had violated the terms of the McDonald's

Lease by using the sales comparison approach to determine the FMV, and violated New York law

by ignoring the encumbrance of the McDonald's Lease in its determination. (Walsh Dec. Ex. 120.)

The parties also disagreed about whether the third appraiser could collaborate with the party-

appraiser under the McDonald's Lease. (*Id.*) Later, in August 2019, Vanderbilt finally agreed to

re-do its appraisal to take the encumbrance of the Lease into account. (McD. 56.1(b) ¶ 23.)

The parties later executed the September 2019 Agreement to paper their agreement. In the

September 2019 Agreement, Vanderbilt agreed to update its "letter opinion of value," with the

understanding that it would consider the encumbrance of the McDonald's Lease in the

determination of the FMV. The parties also agreed to the selection of Marc Nakleh as the third

appraiser. The September 16 Agreement states:

> The Parties have selected March Nakleh as the third appraiser pursuant to the terms of the Lease and agree to engage Mr. Nakleh within 21 days of the agreement. The Parties further agree that their appraisers shall jointly communicate with Mr. Nakleh *that the Parties intend to retain him upon agreement regarding the process set forth in the Lease*.

(Rottenberg Dec. Ex. AA at ¶ 3 (emphasis added).) Vanderbilt now argues that McDonald's failed to cooperate in the FMV process by failing to retain Nakleh within 21 days. Indeed, Rottenberg argues that McDonald's "easily could have written the obligation to engage Mr. Nakleh would have to await the resolution of the dispute over the procedures." (Rottenberg Dec. ¶ 34.) But that's exactly what the parties did. The second sentence of paragraph expressly states that the parties intend to agree on the process prior to retaining Nakleh. Given that Vanderbilt insisted that the party appraisers could not collaborate with Nakleh, the parties never reached agreement on process and thus could not retain Nakleh. Even if, for sake of argument, Nakleh had been retained by October 7, 2019, the parties would not have been able to direct him on how to proceed, and therefore his engagement would have been futile.

In any event, Vanderbilt violated the September 2019 Agreement before October 7, 2019 by providing McDonald's with a non-compliant FMV estimate from Tener. As the *CityPlace Retail* court explained, "New York law provides that a party cannot claim a breach of a contractual condition when it has taken acts to frustrate or prevent the other party from satisfying that condition." 457 F. Supp. 3d at 1345 n.13 (citing *ADC Orange, Inc. v. Coyote Acres, Inc.*, 7 N.Y.3d 484, 490 (2006)); *Kooleraire Serv. & Installation Corp. v. Board of Educ.*, 28 N.Y.2d 101, 106 (1971)). At the very least, there are disputed issues of fact as to whether the parties intended to obligate themselves to retain a third appraiser absent an agreement on process and despite Vanderbilt's failure to produce a compliant appraisal.

Furthermore, the McDonald's Lease provides that if a party fails to cooperate such that the

24

FMV process cannot be completed within 120 days from the expiration of the primary term of the lease, then the other party's appraisal will govern. (Rottenberg Dec. Ex. D at 2.) The September 2019 agreement was executed over one month after 120 days had passed since the expiration of the primary term (i.e., August 6, 2019). Thus, even if McDonald's had failed to cooperate by not retaining Nakleh—which it did not—it has no impact on which FMV will govern.

In the end, Vanderbilt cannot establish—with undisputed evidence—that McDonald's failed to cooperate in the FMV process. There is substantial evidence that McDonald's moved forward with the process in good faith every step of the way, and that Vanderbilt intentionally took unreasonable positions inconsistent with the terms of the Lease and New York law in an attempt to have the FMV process yield an unreasonably high FMV. Indeed, the evidence shows that it was Vanderbilt's decisions and actions—its failure to cooperate—that prevented the parties from completing the process within 120 days. At the very minimum, there are disputed issues of fact as to why the process could not be completed consistent with the Lease, and the Court should have a chance to address those issues, and judge the credibility of those involved, at trial.

## CONCLUSION

For all these reasons, McDonald's requests that the Court deny Vanderbilt's motion for summary judgment and schedule a bench trial.

Dated: June 10, 2022                    Respectfully submitted,
                                        PASHMAN STEIN WALDER HAYDEN, P.C.

                                        /s/ Brendan M. Walsh
                                        Brendan M. Walsh, Esq.
                                        Denise Alvarez, Esq.
                                        *Attorneys for Plaintiff McDonald's Corporation*