UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MCDONALD'S CORPORATION, | : |
| | : |
| Plaintiff, | : No. 1:19-cv-06471-DLI-ST |
| | : |
| v. | : |
| | : |
| VANDERBILT ATLANTIC HOLDINGS LLC, | : |
| | : |
| Defendant. | : |

**PLAINTIFF MCDONALD'S CORPORATION'S RESPONSE TO DEFENDANT'S RULE 56.1(a) STATEMENT AND STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE PURSUANT TO RULE 56.1(b)**

**PASHMAN STEIN WALDER HAYDEN, P.C.**
Brendan M. Walsh, Esq.
Denise Alvarez, Esq.
The Woolworth Building
233 Broadway, Suite 820
New York, NY 10279

*Attorneys for Plaintiff McDonald's Corporation*

Pursuant to Local Rule 56.1(b), Plaintiff McDonald's Corporation provides the following Response to Defendant Vanderbilt Atlantic Holdings, LLC's Local Rule 56.1 Statement of Undisputed Material Facts in support of Vanderbilt's motion for summary judgment, without admitting that any of Vanderbilt's statements are material:

1.      McDonald's is a Delaware corporation with its principal place of business in Illinois. Complaint (CM/ECF Doc. No. 1]) ¶ 7, Answer (CM/ECF Doc. No. 28) ¶ 7

**RESPONSE**: Not disputed.

2.      Vanderbilt is a New York limited liability company with its principal place of business in New York and whose members are citizens of the State of New York. Complaint (CM/ECF Doc. No. 1]) ¶ 8, Answer (CM/ECF Doc. No. 28) ¶ 8.

**RESPONSE**: Not disputed.

3.      The property at issue, 840 Atlantic Avenue, is located at the southeast corner of Vanderbilt Avenue and Atlantic Avenue, Brooklyn, NY (Block 1122, Lot 1, hereinafter the "Premises"), and is owned in fee simple by M.M.B. Associates LLC ("M.M.B.") as successor in interest to Anthony Musto. Declaration of Pinchus "Sam" Rottenberg, executed April 29, 2022 ("Rottenberg Decl.") ¶ 9.

**RESPONSE: Not disputed, except as to the Block and Lot description. It is identified on the New York City tax maps as Block 1122, Lots 1, 68, and 71. (Declaration of Brendan M. Walsh dated June 10, 2022 ("Walsh Dec.") Ex. QQ at 2.) McDonald's will refer to this as the "Property" throughout its opposition papers.**

4.      On March 18, 1998 Musto as landlord and McDonald's as tenant signed a lease for the Premises (the "Lease"). Rottenberg Decl. ¶ 10.

**RESPONSE**: **Not disputed. McDonald's will refer to this as the "McDonald's Lease" throughout its opposition papers.**

5.      A true copy of the Lease appears at Exhibit C to the Rottenberg Decl. Rottenberg Decl. ¶ 10.

**RESPONSE**: **Not disputed.**

6.      The original term of the Lease came to an end on April 8, 2019. The Lease contains four five-year renewal terms, exercisable by McDonald's. If all four renewal terms are exercised by McDonald's, the term of the Lease is extended until April 8, 2039. Rottenberg Decl. ¶¶ 10, 12.

**RESPONSE**: **Not disputed.**

7.      On November 30, 2017, M.M.B. as ground lessor and Vanderbilt as ground lessee entered into a separate, intervening lease transaction as a result of which Vanderbilt became the primary ground lessee of the Premises. By virtue of the intervening 2017 M.M.B.-Vanderbilt ground lease, Vanderbilt became McDonald's landlord and McDonald's became Vanderbilt's sublessee under the Lease. Rottenberg Decl. ¶ 11.

**RESPONSE**: **Not disputed that Vanderbilt entered into a 99-year ground lease with M.M.B. on November 30, 2017 (the "Vanderbilt Lease") and that, by virtue of the terms of the Vanderbilt Lease and an accompanying Assignment and Assumption of Lease, Vanderbilt became McDonald's landlord under the Lease.**

**Disputed as to Vanderbilt's use of the term "intervening" in its description of the Vanderbilt Lease as it is unclear what Vanderbilt means by that term. The Vanderbilt Lease did not alter McDonald's existing legal status as the "Tenant" on the Property under**

the Lease. (Rottenberg Dec. Ex. C (Lease); Rottenberg Dec. Ex. 4(Vanderbilt Lease);

Walsh Dec. Ex. 105 (Assignment and Assumption of Lease).)

8.      The real estate records for Kings County reveal that M.M.B. has not conveyed the

Premises. Rottenberg Decl. ¶ 112.

**RESPONSE: Not disputed.**

9.      A Memorandum of Lease dated November 30, 2017 disclosing the M.M.B.-

Vanderbilt ground lease appears in the real estate records for Kings County with a

recorded/filing date of December 26, 2017. A true copy of the Memorandum of Lease is attached

as Exhibit 6 to the Rottenberg Decl. Rottenberg Decl. ¶¶ 112, 120.

**RESPONSE: Not disputed. However, the Memorandum of Lease does not disclose**

**any of the financial terms of the Vanderbilt Lease. (Walsh Dec. Ex. 105.)**

10.     At the time Vanderbilt became M.M.B.'s ground lessee of the Premises—and in

consequence the sublessor of the Premises to McDonald's—Rottenberg owned an interest in

M.M.B. Rottenberg Decl. ¶ 119.

**RESPONSE: Disputed. Rottenberg, individually, does not own an interest in**

**M.M.B. At his deposition, Rottenberg testified that 840 Atlantic Holdings, LLC is a 20%**

**owner of M.M.B. and that he is the 100% owner of 840 Atlantic Holdings, LLC.**

**(Declaration of Howard S. Koh ("Koh Dec.") Ex. AAA ("Rottenberg Dep. Tr.") 37:9-15,**

**39:8-10.) Further, the record is unclear as to when 840 Atlantic Holdings, LLC acquired an**

**interest in M.M.B. When asked when 840 Atlantic Holdings, LLC became a member of**

**M.M.B., Rottenberg repeatedly testified that he could not remember when that occurred,**

**or whether it was before or after Vanderbilt entered into the Vanderbilt Lease.**

**(Rottenberg Dep. Tr. 39:14-17 ("Q. Okay. When did 840 Atlantic Holdings, LLC become a**

member of M.M.B. Associates? A. I can't remember times."). Even after he reviewed the Vanderbilt Lease, Rottenberg testified that he could not recall when his LLC acquired a 20% interest in M.M.B. (Rottenberg Dep. Tr. 64:11-15 ("Q. . . . [D]id you become a member of M.M.B. Associates before or after [Vanderbilt entered into the Vanderbilt Lease]? A. You asked me that question before and I said I don't remember.").)

Regardless of when the LLC controlled by Vanderbilt acquired a minority interest in M.M.B., further disputed to the extent that Vanderbilt implies or contends that the Vanderbilt Lease was not an arm's-length transaction. When asked repeatedly whether he was involved in both sides of the negotiations for the Vanderbilt Lease, Rottenberg refused to give a definitive response, claiming, incredibly, that he could not recall whether he had any involvement on behalf of M.M.B. (Rottenberg Dep. Tr. 92:6-93:4 ("Q. So at the time – I guess what I'm trying to understand is, at the time of this transaction, were you on both sides of the transaction or on only the Vanderbilt side of the transaction. A. I was on the Vanderbilt side of the transaction. Q. Only? A. I don't know what means 'only.' I was on Vanderbilt. Q. So you can't answer that question? A. What is the question? I was on the Vanderbilt side of the transaction. That is my answer. Q. Were you also on the M.M.B. side of the transaction? A. Yeah, I might have been an interest in the M.M.B. side. But for this transaction I was on the Vanderbilt side. Q. Only; is that correct? A. I don't know. I can't remember [if] it was only or not only.").)

Importantly, Vanderbilt itself is not a member of, and holds no interest—directly or indirectly—in M.M.B. (Rottenberg Dep. Tr. 55:15-19.) Moreover, Vanderbilt is not Rottenberg's alter ego; Rottenberg is a 50% owner of Vanderbilt, with Simon Dushinsky owning the other 50%. (Rottenberg Dep. Tr. 29:11-23; Dkt. 20 at ¶ 2 (Declaration of

Pinchus Rottenberg dated Sept. 9, 2020) ("The members of Defendant are Simon Dushinsky and me, both of whom are citizens of the State of New York, residing in Kings County.").) No evidence has been presented showing that Dushinsky owns any interest in M.M.B., directly or indirectly. (Walsh Dec. ¶ 21.) For these reasons, any claim by Vanderbilt that its 99-year lease with M.M.B. was something other than an arm's-length transaction because one of Vanderbilt's two owners—Rottenberg—might have indirectly owned a minority interest in M.M.B. at the time of the transaction is misleading and unsupported by the record evidence.

11.     The Lease contains an "Option Rent Addendum" governing the resetting of rent during the option terms, which appears as Exhibit G to the Lease. Rottenberg Decl. ¶ 12.

**RESPONSE: Not disputed.**

12.     A true copy of the Option Rent Addendum is attached as Exhibit D to the Rottenberg Decl. Rottenberg Decl. ¶ 4.

**RESPONSE: Not disputed.**

13.     The Option Rent Addendum provides: "The rental value shall be established based upon a definition of Fair Market Rental Value as the price which an average well-informed tenant would pay and an average well-informed landlord would accept, exclusive of Tenant's improvements, knowing all of the uses to which the property can be put, without duress on either party." Rottenberg Decl., Ex. D at page 2.

**RESPONSE: Not disputed that the quoted language appears in the Option Rent Addendum. Disputed to the extent that Vanderbilt implies the quoted language can be interpreted and analyzed in isolation, separate and apart from the rest of the Option Rent Addendum. The entire Option Rent Addendum must be considered in determining how the**

appraisers are required to determine the Fair Market Rental Value of the Property. (Rottenberg Dec. Ex. D.)

14.     On or about May 10, 2018 Vanderbilt sent a letter to McDonald's proposing a rent during the first option term of $975,000 per year, a true copy of which is attached as Exhibit G to the Rottenberg Decl. Rottenberg Decl. ¶ 39.

**RESPONSE: Not disputed that Vanderbilt's May 10, 2018 letter is attached as Exhibit G to the Rottenberg Declaration.**

**Disputed that Vanderbilt initially proposed that the rent during the first option term should be $975,000 per year. In its May 10, 2018 letter to McDonald's, Vanderbilt stated that it had "determined that the Fair Market Value of the Demised Premises ('FMV') is $975,000.00. Therefore, the annual rent payable during the first extension period shall be $780,000.00 (80% of the FMV)." (Rottenberg Dec. Ex. G.)**

15.     On or about April 15, 2019, McDonald's sent a letter to Vanderbilt noting the parties could not agree on the FMV, and commenced an appraisal process provided for in the Option Rent Addendum, a true copy of which is attached as Exhibit O to the Rottenberg Decl. Rottenberg Decl. ¶ 39.

**RESPONSE: Not disputed that McDonald's sent a letter to Vanderbilt dated April 15, 2019, that a true copy of that letter is attached as Exhibit O to the Rottenberg Declaration, and that McDonald's advised Vanderbilt in that letter that "the parties have been unable to reach agreement as to the FMV."**

**Disputed to the extent that Vanderbilt implies or contends that McDonald's alone "commenced" the fair market rental valuation process described in the Option Rent Addendum; the process commenced when the parties were collectively unable to reach an**

6

agreement in writing as to the FMV within the time period set forth in the Option Rent Addendum. (Rottenberg Dec. Ex. O; Rottenberg Dec. Ex. D).

16.     Pursuant to the Option Rent Addendum McDonald's appointed Sharon Locatell as its appraiser. Rottenberg Decl. ¶ 39.

**RESPONSE: Not disputed.**

17.     Pursuant to the Option Rent Addendum Vanderbilt appointed Tom Tener as its appraiser. Rottenberg Decl. ¶ 39.

**RESPONSE: Not disputed.**

18.     Mr. Tener prepared an appraisal of the Property dated April 15, 2019, a true copy of which is attached as Exhibit 32 to the Rottenberg Decl. Rottenberg Decl. ¶ 42.

**RESPONSE: Not disputed that Tener provided Vanderbilt with a document dated April 15, 2019 that purports to be a "Restricted Appraisal" of the Property pursuant to the Option Rent Addendum to the McDonald's Lease or that a true copy of that document is attached as Exhibit 32 to the Rottenberg Declaration.**

**Disputed to the extent that Vanderbilt implies or contends that Tener's April 15, 2019 "Restricted Appraisal" satisfied Vanderbilt's obligations under the Option Rent Addendum given that: (a) it presents a fee simple land sales analysis which does not comply with the McDonald's Lease instructions; (b) it does not account for the encumbrance of the McDonald's Lease, as required by the McDonald's Lease and New York law; (c) Vanderbilt failed to give Tener relevant and material information he requested to perform his valuation; and (d) Vanderbilt incorrectly or misleadingly told Tener that the Vanderbilt Lease was a "related party" transaction. (Walsh Dec. Ex. YY (Expert Report of Amanda Aaron, MAI, CRE) at 14, 30-32.) *See also* Response to ¶ 10 above.**

19.     Mr. Tener's appraisal of the Property, dated April 15, 2019, estimated the Fair Market Rental Value of the Premises (the "FMV") at $1,348,000 per annum. Rottenberg Decl. ¶ 42.

**RESPONSE: Not disputed that Tener's April 15, 2019 "Restricted Appraisal" purported to estimate the FMV of the Property to be $1,348,000 per year.**

**Disputed to the extent that Vanderbilt implies or contends that Tener's April 15, 2019 "Restricted Appraisal" satisfied Vanderbilt's obligations under the Option Rent Addendum given that: (a) it presents a fee simple land sales analysis which does not comply with the McDonald's Lease instructions; (b) it does not account for the encumbrance of the McDonald's Lease, as required by the McDonald's Lease and New York law; (c) Vanderbilt failed to give Tener relevant and material information he requested to perform his valuation; and (d) Vanderbilt incorrectly or misleadingly told Tener that the Vanderbilt Lease was a "related party" transaction. (Walsh Dec. Ex. YY at 14, 30-32.)** *See also* **Response to ¶ 10 above.**

20.     Ms. Locatell prepared an appraisal of the Premises dated June 17, 2019, a true copy of which is attached as Exhibit W to the Rottenberg Decl. Rottenberg Decl. ¶ 42.

**RESPONSE: Not disputed that a true copy of Ms. Locatell's June 17, 2019 letter opinion is attached as Exhibit W to the Rottenberg Declaration.**

**Disputed that Ms. Locatell prepared an appraisal of the Property dated June 17, 2019. In accordance with the Option Rent Addendum, Ms. Locatell prepared a letter opinion of the Fair Market Rental Value of the Property as of approximately April 1, 2019. (Koh Dec. Ex. FFF ("Locatell Dep. Tr.") 135:6-21; Rottenberg Dec. Ex. D; Rottenberg Dec. Ex. W at 1.)**

21.     Ms. Locatell's appraisal of the Property, dated June 17, 2019, estimated the FMV of the Premises at $350,000 per annum. Rottenberg Decl. ¶ 42.

**RESPONSE: Not disputed that Ms. Locatell concluded to a FMV of the Property of $350,000 per year in her June 17, 2019 letter opinion of value.**

**Disputed that Ms. Locatell prepared a full appraisal of the Property. In accordance with the Option Rent Addendum, Ms. Locatell prepared a letter opinion of the Fair Market Rental Value of the Property as of approximately April 1, 2019. (Locatell Dep. Tr. 135:6-21; Rottenberg Dec., Ex. D; Rottenberg Dec., Ex. W at 1.)**

22.     On June 19, 2019, representatives of McDonald's and Vanderbilt met at the offices of Vanderbilt's counsel Wachtel Missry LLP in New York City. Rottenberg Decl. ¶ 41.

**RESPONSE: Not disputed.**

23.     During the June 19, 2019 meeting, McDonald's argued that Mr. Tener's appraisal dated April 15, 2019 was improperly prepared because, among other reasons, Mr. Tener did not follow the holding of *936 Second Ave. L.P. v. Second Corp. Dev. Co.*, 10 N.Y.3d 628 (2008) in that Mr. Tener did not take into account the term of the Lease. Rottenberg Decl. ¶ 43.

**RESPONSE: Not disputed.**

24.     At the June 19, 2019 meeting, the parties agreed that Mr. Tener would prepare another appraisal of the Property, taking into account the term of the Lease. Thereafter, Mr. Tener prepared another appraisal dated July 30, 2019 (the "Final Tener Appraisal"), which took the remaining 20 years in all four optional terms of the Lease into account, a true copy of which is attached as Exhibit SS to the Rottenberg Decl. Rottenberg Decl. ¶ 45.

**RESPONSE: Disputed. Although Vanderbilt's counsel, Morris Missry, told Tener immediately after the June 19, 2019 meeting that he agreed with McDonald's that the New**

York Court of Appeals' decision in *936 Second Ave. L.P. v. Second Corp. Dev. Co.*, **10**
**N.Y.3d 628 (2008), applied and directed Tener to revise his FMV estimate to consider the**
**encumbrance of the McDonald's Lease (Koh Dec. Ex. EEE ("Tener Dep. Tr.") 210:14-**
**212:8), Vanderbilt inexplicably waited until late August 2019—nearly a month after Tener**
**issued the Final Tener Appraisal to Vanderbilt on July 30, 2019—to share this information**
**with McDonald's (Koh Dec. Ex. BBB ("Meyer Dep. Tr.") 206:22-208:9). In other words, by**
**the time Vanderbilt told McDonald's it would agree to have Tener "redo" his analysis**
**under the assumption that the holding in *936 Second Avenue* applied, Vanderbilt already**
**knew that Tener had arrived at the same FMV estimate in the Final Tener Appraisal that**
**he arrived at in his flawed April 15, 2019 letter opinion of value.**

**Further disputed to the extent that Vanderbilt implies or contends that Vanderbilt**
**agreed to have Tener redo his appraisal "without prejudice to its contention that**
**McDonald's misreads *936 Second Avenue*."  (Rottenberg Dec. ¶ 21.) McDonald's in-house**
**counsel Michael Meyer testified that Missry "concede[d]" to him during a late August 2019**
**telephone call "[t]hat the Second Avenue case applies to this situation and that the property**
**is to be valued as encumbered by the lease . . . and current zoning." (Meyer Dep. Tr.**
**206:22-208:9.)**

25.     Mr. Tener's conclusion that the annual FMV of the Property was $1,348,000 did
not change in the Final Tener Appraisal. Rottenberg Decl. ¶ 45.

**RESPONSE: Not disputed that Tener's conclusion that the annual FMV of the**
**Property was $1,348,000 did not change in the "Final Tener Appraisal."**

**Disputed to the extent that Vanderbilt implies or contends that the "Final Tener**
**Appraisal" satisfied Vanderbilt's obligations under the Option Rent Addendum or the**

parties' September 16, 2019 letter agreement to have its appraiser prepare a compliant letter opinion of value. **(Walsh Dec. Ex. YY at 5-7, 14-32.)**

26.     On September 16, 2019, McDonald's and Vanderbilt signed a letter agreement on McDonald's letterhead (the "September 2019 Agreement"), a true copy of which is attached as Exhibit AA to the Rottenberg Decl. Rottenberg Decl. ¶ 30.

**RESPONSE: Not disputed.**

27.     Ms. Locatell prepared another appraisal of the Premises dated September 20, 2019 (the "Final Locatell Appraisal"), which took into account the remaining 5 years of the first option term into account, a true copy of which is attached as Exhibit BB to the Rottenberg Decl. Rottenberg Decl. ¶¶ 48, 50.

**RESPONSE: Disputed. Locatell did not prepare "another appraisal of the Property dated September 20, 2019." Locatell issued a final letter opinion of value dated September 20, 2019 that made minor adjustments to the June 17, 2019 letter opinion of value that she had previously sent only to McDonald's. (*Compare* Rottenberg Dec. Ex. W *with* Walsh Dec. Ex. QQ.)**

**Also disputed that Exhibit BB is copy of Locatell's final September 20, 2019 letter opinion of value that she gave Tener. Locatell testified that she gave Tener the document attached as Exhibit QQ to the Walsh Declaration. (Locatell Dep. Tr. 164:11-25.) Exhibit QQ is not identical to Exhibit BB to the Rottenberg Declaration. (*Compare* Walsh Ex. QQ *with* Rottenberg Ex. BB.) Exhibit QQ to the Walsh Declaration contains a handwritten note at the top that states "Gave copy to Tom Tenner [sic] 9-27-19."**

**Further disputed to the extent that Vanderbilt implies or contends that Locatell only "took into account the remaining 5 years of the first option term." Locatell testified that**

her analysis "looked at the property assuming a 20-year holding period." (Locatell Dep. Tr. 170:17-22.)

28.     Ms. Locatell did not change her estimate of the FMV of the Premises at $350,000 per annum in the Final Locatell Appraisal. Rottenberg Decl. ¶ 48.

**RESPONSE: Not disputed.**

29.     In late September, 2019, Mr. Tener and Ms. Locatell met in Ms. Locatell's office and exchanged the Final Tener Appraisal and the Final Locatell Appraisal. Rottenberg Decl. ¶ 48.

**RESPONSE: Not disputed.**

30.     The September 2019 Agreement identifies Marc Nakleh as the agreed upon third-party appraiser and provides that the parties agree to engage Mr. Nakleh within 21 days of this agreement. The 21-day period ended on October 7, 2019. Rottenberg Decl. ¶¶ 30, 40.

**RESPONSE: Not disputed that the first sentence of Section 3 of the September 2019 Agreement states: "The parties have selected Mark Nakleh as the third appraiser pursuant to the terms of the Lease and agree to engage Mr. Nakleh within 21 days of this agreement."**

**Not disputed that October 7, 2019 was 21 days after September 16, 2019.**

**Disputed to the extent that Vanderbilt implies or contends that the parties unconditionally agreed to engage Nakleh by October 7, 2019. Section 1 of the September 2019 Agreement required Vanderbilt to have its appraiser issue a letter opinion of value estimating the "Fair Market Rental Value as defined in the Option Rent Addendum." Vanderbilt breached that obligation by failing to have its appraiser prepare a compliant letter opinion of value. (Walsh Dec. Ex. YY at 5-7, 14-32.) Vanderbilt provided its non-**

compliant letter opinion of value to McDonald's on September 27, 2019—ten days before October 7, 2019. (*See* Response to ¶¶ 27 and 29 above.) The FMV process under the Option Rent Addendum cannot proceed to a third appraiser without a compliant letter opinion of value from Vanderbilt's appraiser. (Rottenberg Dec. Ex. D.)

Additionally, the second sentence of Section 3 of the September 2019 Agreement states: "The Parties further agree that their appraisers shall jointly communicate with Mr. Nakleh that the Parties intend to retain him <u>upon agreement regarding the process set forth in the Lease</u>." (Rottenberg Dec. Ex. AA at § 3 (emphasis added).) Because the parties could not reach an agreement regarding the process for Nakleh to serve as the third appraiser, it was not possible for the parties to engage Nakleh as the third appraiser. McDonald's outside counsel specifically noted this disagreement in a November 1, 2019 pre-litigation letter to Vanderbilt's outside counsel:

> The Parties also disagree as to how the third appraiser's letter opinion of value shall be used (provided we get to this step) in determining the FMV of the Demised Premises. Landlord has taken the position that the parties' appraisers may not have any discussions with the third appraiser about the estimated FMV at any stage. Landlord contends that the third appraiser shall simply issue a letter opinion of value and, unless the FMV exactly matches the FMV of one of the other appraisers, the new rent shall be determined by averaging the three appraisers FMV calculations. McDonald's contends that the appraisers must be given an opportunity to discuss their valuations with one another before or after they issue their individual letter opinions of value to determine whether all, or a majority of the three, can reach agreement on a valuation to be included in a letter opinion of value.

(Walsh Dec. Ex. 106 at 2 n.1.) Vanderbilt did not provide a substantive response to this letter by the November 8, 2019 deadline set forth in the letter, or at any point before McDonald's filed this action on November 15, 2019. (Walsh Dec. ¶ 47.)

Vanderbilt's outside counsel, Morris Missry, confirmed the parties' pre-litigation disagreement about the role of the third appraiser at his deposition. (Koh Dec. Ex. GGG ("Missry Dep. Tr.") 193:16-21, 195:18-196:12, 197:23-198:4.) Indeed, because the parties were unable to reach an agreement on the role of the third appraiser, McDonald's complaint in this matter specifically requests a declaratory judgment from the Court concerning the role of the third appraiser, if a third appraiser is necessary. (Dkt. 1 at ¶¶ 85-94.)

31.     Thereafter, McDonald's objected to engaging Mr. Nakleh and he was not engaged. Rottenberg Decl. ¶ 29.

**RESPONSE: Not disputed that Nakleh was not engaged to serve as the third appraiser.**

**Disputed that McDonald's "objected to engaging Mr. Nakleh." Nakleh was not engaged because (a) Vanderbilt failed to issue a compliant letter opinion of value, and (b) the parties could not agree on the process for him to serve as the third appraiser. (*See* Response to ¶ 30 above.)**

32.     McDonald's did not seek a tolling order from the Court with respect to the parties' obligation in the September 2019 Agreement to engage Mr. Nakleh by October 7, 2019, either before or after that date. Rottenberg Decl. ¶ 32.

**RESPONSE: Not disputed that McDonald's did not request a "tolling order" from the Court. However, because the parties could not agree on the process for Nakleh to serve as the third appraiser, McDonald's complaint in this matter specifically requests a declaratory judgment from the Court concerning the role of the third appraiser, if a third appraiser is necessary. (Dkt. 1 at ¶¶ 85-94.)**

Disputed to the extent that Vanderbilt implies or contends that McDonald's had an unconditional obligation to engage Nakleh by October 7, 2019 or that it was required to seek a "tolling order" from the Court. (*See* Response to ¶ 30 above.)

33.     Neither Mr. Tener nor Ms. Locatell stated in sum and substance in their original or final appraisal reports that they had sought and needed but did not obtain a copy of the 2017 M.M.B.-Vanderbilt ground lease. Rottenberg Decl. ¶¶ 107, 108, 109, 110, 113.

**RESPONSE: Disputed. Tener first requested a copy of the Vanderbilt Lease in his engagement letter with Vanderbilt dated June 27, 2018. In that letter, Tener wrote: "[I]n order to initiate the assignment, the following information, if available, should be provided as soon as possible: . . . Copies of any leases that encumber the properties." (Walsh Dec. Ex. 20 at 2.) Tener again requested a copy of the Vanderbilt Lease in his engagement letter dated March 8, 2019, where he wrote: "[I]n order to initiate the assignment, the following information, if available, should be provided as soon as possible: . . . Copies of any leases that encumber the properties." (Walsh Dec. Ex. 28 at 2.)**

**Tener confirmed at his deposition that he had requested a copy of the Vanderbilt Lease from Vanderbilt and that Vanderbilt never provided him with it:**

> **Q. But Vanderbilt did not provide you a copy of its ground lease dated November 30, 2017; right?**
> **A. I don't think so. I don't recall but I don't think so. I think based on what we said we didn't have it at that time.**
> **Q. Do you know if you've ever seen it?**
> **A. I don't recall ever seeing it.**
> **. . .**
> **Q. So this is the Vanderbilt lease dated November 30, 2017. . . .**
> **Q. So this is the first time you're ever seeing this document; right?**
> **A. I don't recall. If I have it, it would be in my files.**
> **Q. And if it's not in your files, it means you don't have it; right?**
> **A. Yes, sir.**
> **. . .**

Q. And I guess again, can you explain exactly what you would have done with this information if you had had it at the time?

MR. KOH: Objection.

THE WITNESS: I would have interviewed the parties, I would have analyzed the economics, tried to understand the rationale and the reasoning for these tranched call it conditional rent provisions within it and I would have looked at how the rent, what the rent went up to. I would have tried to understand the non-arm's length nature of that lease that was reported. There would have been multiple considerations but I would have to have read the entire -- or at least the pertinent parts of the lease.

BY MR. WALSH:

Q. But you never got that chance because Vanderbilt never gave you the lease; right?

A. Yes, sir.

Q. Even though you asked for it?

A. Yes, sir.

(Tener Dep. Tr. 66:8-72:21.)

Further disputed to the extent that Vanderbilt implies or contends that Locatell needed the Vanderbilt Lease to properly prepare her letter opinion of value. At the time Locatell was working on her FMV estimate for McDonald's, she knew that Vanderbilt and M.M.B. Associates had given a $7 million valuation to the Vanderbilt Lease in public filings. (Declaration of Sharon Locatell, MAI, MRICS, CRE ("Locatell Dec.") ¶¶ 4-6.) Because this valuation was consistent with her FMV estimate, Locatell reasonably concluded that she had diligently analyzed all data available to her that would have a significant effect on the credibility of the results of her assignment. (*Id.* ¶ 8.)

Further disputed to the extent that Vanderbilt implies or contends that it would have provided the Vanderbilt Lease to Locatell even if she had asked for it. McDonald's specifically requested a copy of the Vanderbilt Lease from Vanderbilt in a letter dated December 11, 2017, but Vanderbilt declined to provide it, sending only a copy of the Memorandum of Lease and Assignment and Assumption of Lease instead. (Walsh Dec. Ex. 107; Walsh Dec. Ex. 108 at VA 022124.) McDonald's immediately followed up with

16

Vanderbilt and requested a copy of the Vanderbilt Lease a second time, stating: "Since

your lease with our former landlord becomes a "Head Lease", and our lease becomes a

sublease, we need a copy for our files. You can redact any information in that lease that

you do [not wish] to share, but we do require a copy." (Walsh Dec. Ex. 108 at VA 022123.)

Vanderbilt ultimately sent over what it referred to internally as a "highly redacted copy of

the lease" that had all financial terms, including the rent terms, blacked out. (Walsh Dec.

Ex. 108 at VA 022123; Walsh Dec. Ex. 109 (Redacted Vanderbilt Lease).)

34.     In this action, the following witnesses were deposed on the following dates:

| | |
|---|---|
| Pinchus S. Rottenberg | August 12, 2021 |
| Michael Meyer | August 17, 2021 |
| Tom Li | August 31, 2021 |
| Carol DeMarco | September 17, 2021 |
| Thomas J. Tener | September 21, 2021 |
| Sharon Locatell | September 23, 2021 |
| Morris Missry | September 30, 2021 |
| Michael Hedden | January 20, 2022 |
| Amanda Aaron | January 21, 2022 |

**RESPONSE: Not disputed that the individuals identified above were deposed on the**

**specified dates. For purposes of clarification, Rottenberg testified on August 12, 2021 in**

**both his personal capacity and as Vanderbilt's designated corporate representative**

**pursuant to Fed. R. Civ. P. 30(b)(6). (Walsh Dec. Ex. 1 (Notice of Deposition of Vanderbilt);**

**Walsh Dec. Ex. 110 (Notice of Deposition of Rottenberg).) Meyer testified on August 17,**

2021 only in his capacity as McDonald's designated corporate representative pursuant to Fed. R. Civ. P. 30(b)(6). (Walsh Dec. ¶ 19.)

35.      McDonald's commenced this action on November 15, 2019. Rottenberg Decl. ¶ 51; see also Complaint (CM/ECF Doc. No. 1]).

**RESPONSE: Not disputed.**

36.      Since May 2019, when the original term of the Lease expired, McDonald's has paid Vanderbilt Atlantic rent in the amount of $16,32.58 [sic] pr [sic] month, i.e., $192,390.96 annually. Rottenberg Decl. ¶ 52.

**RESPONSE: Disputed. Since April 9, 2019, when the original term of the Lease expired, McDonald's has paid Vanderbilt rent in the amount of $16,032.58 per month, i.e., $192,390.96 annually.**

**Further disputed to the extent that Vanderbilt implies or contends that this amount is "equal to the last rent payable under the primary term." (Rottenberg Dec. ¶ 52.) To the contrary, this amount represents a 15% increase from the monthly rent in the amount of $13,941 McDonald's paid during the 5-year period from April 9, 2014 through April 8, 2019 (Rottenberg Dec. Ex. C (McDonald's Lease) at Ex. B (Rent Addendum)) and is the minimum amount of rent McDonald's could owe during the first five-year extension period running from April 9, 2019 through April 8, 2024. The Option Rent Addendum to the Lease states:**

> **The annual rental that shall be payable during the first extension period described in Article 13 of the Lease [i.e., the period from April 9, 2019 to April 8, 2024] shall be equivalent to the greater of:**
>
> **A. Eighty Percent (80%) of the Fair Market Rental Value of the Demised Premises at the end of the primary term . . . ; or**

**B. During the first five-year option, Tenant shall pay monthly rent of $16,032.58.**

(Rottenberg Dec. Ex. D (emphasis added).) In addition, in a letter dated April 2, 2019 to McDonald's, Vanderbilt stated: "Since we are both in the process of determining the rental value for the first extension period, we will accept the EFT payment tendered without prejudice or waiver of our rights in the Lease as to determining the proper rent for the first extension period." (Walsh Dec. Ex. 111 at MCD006594.) There is no evidence in the record indicating that, before 2022, Vanderbilt ever requested or demanded that McDonald's pay more than $16,032.58 per month in rent while the process of determining the rent amount for the first extension period remains ongoing. (Walsh Dec. ¶ 20.)

## MCDONALD'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE PURSUANT TO RULE 56.1(b)

In accordance with Local Rule 56.1(b), McDonald's respectfully submits the following additional material facts as to which McDonald's contends there exists a genuine issue to be tried:

1.      Vanderbilt obtained its 99-year ground Lease for the Property with the plan of quickly redeveloping the Property with a high-rise, mixed-use development and used the contractually required FMV process to try to impose an unfairly high rent on McDonald's for the last twenty years of the Lease with the hope that McDonald's would vacate the Property. *See* ¶¶ 1(a)-(oo) below; Walsh Dec. Ex. YY (Amanda Aaron Expert Report).

   a.   Vanderbilt and M.M.B. paid a $28,000 transfer tax to the City of New York following execution of the Vanderbilt Lease. The tax amount was based on a $7 million valuation that Vanderbilt and M.M.B. agreed to in November 2017 as the fair value of the ***99-year*** lease. (Rottenberg Dep. Tr. 97:16-23; 100:5-8; Walsh Dec. Ex. 112.)

19

b. McDonald's appraiser, Sharon Locatell, was aware of the $7 million valuation of the Vanderbilt Lease reported by Vanderbilt and M.M.B. when she prepared her letter opinions of value of the FMV under the Option Rent Addendum to the McDonald's Lease. (Walsh Dec. Ex. 112; Locatell Dec. ¶¶ 4-6.)

c. A McDonald's employee, Rita Nocito, asked Carol DeMarco of McDonald's for a copy of the Vanderbilt Lease on December 15, 2018. DeMarco responded: "We have a copy [of] the 99 yr lease but many paragraphs including rents are redacted." (Walsh Dec. Ex. 113.)

d. Sharon Locatell's colleague—Ellen Benjamin—sent the publicly available information about the Vanderbilt Lease, including the $7 million valuation reported by Vanderbilt and M.M.B., to DeMarco, Nocito, and Meyer (McDonald's in-house counsel) three days later on December 18, 2018. (Walsh Dec. ¶ 53 and Ex. 112.)

e. The $7 million valuation publicly reported by Vanderbilt and M.M.B. was consistent with Locatell's $350,000 annual FMV conclusion set forth in the letter opinion of value Locatell prepared for McDonald's. (Locatell Dec. ¶¶ 8-9.)

f. Despite the purported assignment of all of M.M.B.'s right and interests to the McDonald's Lease to Vanderbilt (Walsh Dec. Ex. 105), the Vanderbilt Lease itself provides that, so long as the McDonald's Lease remains in effect, Vanderbilt must pay *all rent* that McDonald's pays under the Lease to M.M.B. In other words, although Vanderbilt is nominally McDonald's Landlord and controls the FMV process under the McDonald's Lease, Vanderbilt is not permitted to keep any portion of the rent that McDonald's pays as long as the McDonalds Lease is in

effect; all McDonald's rent payments to Vanderbilt are passed 100% through to M.M.B. (Rottenberg Dep. 74:12-75:13; Rottenberg Dec. Ex. 4 at § 3.1.)

g. The Vanderbilt Lease provides that, for as long as the McDonald's Lease is in effect, Vanderbilt's rent is exactly equal to the rent McDonald's must pay under the McDonald's Lease, meaning that Vanderbilt is not required to pay any additional rent to Vanderbilt other than what McDonald's pays in rent. (Rottenberg Dec. Ex. 4 at § 3.1.)

h. The Vanderbilt Lease is "an absolutely 'net' lease." As a result, in addition to rent, Vanderbilt is responsible for paying "every item of expense, of every kind and nature whatsoever, related to or arising from the Property and/or the Improvements, or by reason of or in any manner connected with or arising from the leasing, operation, management, maintenance, repair, use, or occupancy of, or Construction affecting, the Property and/or the Improvements." (Rottenberg Dec. Ex. 4 at § 4.1.)

i. There are no revenue streams from the Property other than the rent paid by McDonald's, which, as explained above, Vanderbilt must pay over 100% to M.M.B. (Koh Dec. Ex. CCC ("Li Dep. Tr.") 188:10-189:12.)

j. The amount of the rent that Vanderbilt must pay to M.M.B. after the McDonald's Lease terminates depends primarily on whether the Property has been rezoned, which is defined as "all or a portion of the Property that is rezoned for residential purposes." (Rottenberg Dec. Ex. 4 at §§ 3.1.1-3.1.2.)

k. The Vanderbilt Lease provides that, if the McDonald's Lease terminates and the Property has ***not*** been rezoned, Vanderbilt will owe rent in the amount of $10 per

buildable square foot as of right under existing zoning (36,000 square feet) in year 1, with the rent increasing 2% per year thereafter for the first ten years or until the Property is rezoned. (Rottenberg Dec. Ex. 4 at § 3.1.1.)

l.   This means that, if McDonald's had terminated its lease on April 8, 2019 (the end of the initial term of the McDonald's Lease) and vacated the Property, Vanderbilt would have owed rent to M.M.B. in the amount of $360,000 for the first year after the McDonald's Lease terminated, with the rent increasing 2% per year thereafter for the first ten years unless and until the Property is rezoned. (Rottenberg Dep. Tr. 85:4-86:12.)

m.   The amount of rent that Vanderbilt must pay to M.M.B. after the McDonald's Lease terminates and after the Property has been rezoned is dependent on **when** the McDonald's Lease terminates. (Rottenberg Dep. Tr. 82:4-17.)

n.   If the McDonald's Lease terminates **before** November 30, 2027 and the Property has been rezoned by that time, Vanderbilt's rent will become equal to $10 per buildable square foot of the rezoned floor area, and will increase by 2% per year for the remainder of the Vanderbilt Lease. If the Property is rezoned but the McDonald's Lease does not terminate until **after** November 30, 2027, Vanderbilt's rent will be the lesser of the "Fair Market Value of the Premises" (calculated in a specific manner described in Section 3.2 of the Vanderbilt Lease) or $19 per buildable square foot of the rezoned floor area. (Rottenberg Dec. Ex. 4 at §§ 3.1.1-3.1.2; Rottenberg Dep. Tr. 82:4-84:7.)

o.   Thus, Vanderbilt can lock in a starting rent of $10 per buildable square foot of rent if the McDonald's Lease terminates before November 30, 2027. If the McDonald's

Lease terminates after November 30, 2027, Vanderbilt will need to engage in a fair

market valuation process and could be required to pay a starting rent as high as $19

per buildable square foot once the McDonald's Lease terminates. (Rottenberg Dec.

Ex. 4 at §§ 3.1.1-3.1.2.)

p.   The Vanderbilt Lease has a term of 99 years from November 30, 2017, unless it

terminates sooner as provided in the lease. The termination date is not dependent

on when McDonald's leaves the Property. (Rottenberg Dec. Ex. 4 at § 2.)

q.   The Vanderbilt Lease provides that it will automatically terminate on November

30, 2047 if the Property has not been rezoned. (Rottenberg Dec. Ex. 4 at § 3.1.1.)

r.   Rottenberg explained that he and Dushinsky sought a 99-year ground lease for the

Property so they could "maximize the value of the [P]roperty." Rottenberg testified

that he does not know whether that goal can be accomplished while a McDonald's

restaurant is on the Property. (Rottenberg Dep. Tr. 48:22-51:22.)

s.   The Property is located in a six-block area that the New York City Department of

City Planning, the local community board (Community Board 8), and elected

officials have long been considering designating as a rezoning area. The potential

rezoning framework for this area, which has been modified over the years and still

has not been adopted, is referred to as the M-CROWN rezoning plan. The Property

sits at the westernmost edge of the proposed M-CROWN rezoning district. (Li

Dep. Tr. 31:8-33:2.)

t.   The proposed M-CROWN rezoning district primarily contains zoning for

commercial and industrial uses. The proposed M-CROWN rezoning plan would

23

seek to transform the area, which many community members believe has been overlooked. (Li Dep. Tr. 33:3-34:2.)

u.  At least nine months **before** Vanderbilt entered into the Vanderbilt Lease, in early February 2017, Rottenberg was having discussions with M.M.B.'s managing member, Tony Musto, about a potential rezoning of the Property and other nearby parcels. (Rottenberg Dep. Tr. 104:11-106:15; Walsh Dec. Ex. 7.)

v.  Rottenberg sent the McDonald's Lease to an attorney in late February 2017 with the request to speak with him about it, so Vanderbilt was fully aware of the Lease and had ample opportunity to consult with legal counsel about its contents before Vanderbilt entered into the Vanderbilt Lease with M.M.B. (Walsh Dec. Ex. 41.)

w.  On January 17, 2018—less than two months after Vanderbilt entered into the Vanderbilt Lease—Dushinsky retained the law firm of Slater & Beckerman to provide legal advice and lobbying services for a "rezoning of the [Property] for greater density." (Walsh Dec. Ex. 8 at VA 010386.) Lobbying records filed with the Office of City Clerk, City of New York show that Vanderbilt paid these professionals, who subsequently moved to Hirschen Singer & Epstein LLP, $234,527 in lobbying fees from 2018 through 2021. (Walsh Dec. Ex. 122.)

x.  Also on January 17, 2018 Rottenberg reached out to McDonald's for the first time to "get an understanding of McDonald's plans" for the Property. Rottenberg testified that he reached out because he was interested in understanding whether McDonald's intended to stay on the Property. (Walsh Dec. Ex. 40; Rottenberg Dep. Tr. 134:5-22.)

y.  During that first discussion, Rottenberg told McDonald's employee Katrina Rainey that he wanted to discuss "tenure as well as a potential new location" for the McDonald's restaurant on the Property. (Walsh Dec. Ex. 40.)

z.  Rottenberg and Carol DeMarco, McDonald's Asset Manager for the Property, spoke for the first time in early February 2018. Rottenberg testified that he could not remember what they discussed during that first conversation. (Rottenberg Dep. Tr. 137:5-138-20.)

aa.  DeMarco clearly recalled that Rottenberg was "very happy to tell [her] that he had a 99-year lease and that this property was a redevelopment site and [asked her] what would McDonald's do if [it] didn't like the rent for the option [term]." DeMarco explained to Rottenberg on that February 2018 call that McDonald's was on the Property "for the long-term" through 2039 and was excited to modernize the restaurant, but that Rottenberg "pivoted the conversation back to, well, this is a redevelopment site and what would you [McDonald's] do if you don't like the rent." (Koh Dec. Ex. DDD ("DeMarco Dep. Tr.") 25:18-28:3.)

bb.  DeMarco memorialized her February 2018 discussion with Rottenberg in a contemporaneous email to Rottenberg, with a copy to an in-house attorney at McDonald's, Michael Meyer. (Walsh Dec. Ex. 114.)

cc.  The following week, Vanderbilt's outside counsel, Murray Schneier, emailed Meyer to arrange a time "to discuss the renewal options in the [McDonald's] lease." (Walsh Dec. Ex. 14.)

dd.  By March 2018, despite McDonald's already having advised Vanderbilt that it intended to stay at the Property "for the long term," an architect retained by

Vanderbilt had generated concept drawings for a high-rise mixed-use building on the Property. Vanderbilt's architect also mapped out the parameters of a potential rezoning that would be needed for such a building to be approved to be built on the Property. (Walsh Dec. Ex. 43; Li Dep. Tr. 48:7-49:17.) The drawings do not identify a location on the Property that could be used as a McDonald's restaurant, nor do they identify any portion of the Property that could be used as a drive-thru lane for any type of business.

ee. In May 2018, despite having secured a 99-year ground lease for the Property for the publicly reported consideration of $7 million just six months earlier and negotiating a starting rent of $360,000 per year under existing zoning when the McDonald's Lease terminates, Vanderbilt sent a letter to McDonald's advising that it had determined that the fair market rental value of the Property is $975,000 per year and, "[t]herefore, the annual rent payable during the first extension period [beginning April 9, 2019] shall be $780,000.00 (80% of the FMV)." (Rottenberg Dec. Ex. G.)

ff. Rottenberg and DeMarco spoke on the phone on May 24, 2018—two weeks after Vanderbilt sent its notice to McDonald's that it determined the fair market rental value of the Property is $975,000 per year. DeMarco's contemporaneous notes from that call reflect that Rottenberg again asked her what McDonald's would do if it did not like the rent. DeMarco responded that it was premature to ask that question and that McDonald's wanted to start working through the formal process laid out in the Option Rent Addendum to the Lease. (Walsh Dec. Ex. 115.)

gg.  The rent proposed by Vanderbilt in May 2018 would have resulted in a more than 400% annual increase in McDonald's existing rent, which had been $13,941/month ($167,292/year) for the period from April 9, 2014 through April 8, 2019. (*Compare* Rottenberg Dec. Ex. G *with* Rottenberg Dec. Ex. C § 3 and Rent Addendum (Ex. B to McDonald's Lease).)

hh.  Days after DeMarco spoke with Rottenberg about working through the formal process for determining the FMV for the first option term of the Lease, Rottenberg met with Vanderbilt's architect and the New York City Department of City Planning about specific plans for a mixed-use building on the Property that would have hundreds of residential units. (Rottenberg Dep. Tr. 120:6-121:23.)

ii.  The redevelopment site proposed by Vanderbilt consists of the Property and a number of adjoining lots at the corner of Atlantic and Vanderbilt Avenues; Vanderbilt has control of all of the lots through ground leases. Vanderbilt obtained its ground lease for the Property first, and its ground leases for the adjoining lots after. (Li Dep. Tr. 53:25-55:5.)

jj.  Vanderbilt cannot redevelop the Property so long as McDonald's remains on the Property. (Rottenberg Dep. Tr. 136:6-9.)

kk.  By late 2018, Vanderbilt and its consultants had met with the Department of City Planning again and had begun preparing draft documents to be submitted to the Department of City Planning as part of a potential application for a private rezoning of its proposed development site at the corner of Atlantic and Vanderbilt Avenues. (Walsh Dec. Ex. 54.) The only references to McDonald's restaurant in the documents were in connection with identifying the Property's existing use; the

documents do not indicate that there would be a McDonald's restaurant on the Property or contain any plans consistent with a drive-thru lane of any type.

ll.    A draft of one such document prepared in November 2018 states that Vanderbilt anticipated beginning construction of an 18-story mixed-use residential and commercial building on the Property in 2020 or 2021, "with completion and occupancy expected to occur in 2022." The document makes no reference to McDonald's contractual right to remain on the Property through 2039. (Walsh Dec. Ex. 44 at VA 018778; Li Dep. Tr. 63:7-65:19.)

mm.   As recently as February 2021—more than a year after McDonald's filed this action—Vanderbilt submitted an Environmental Assessment Statement to the City estimating that its proposed redevelopment "would be completed and operational" by 2023. The construction schedule attached as Appendix C to the document shows constructing beginning in January 2022. (Walsh Dec. Ex. 12 at MCD006086, MCD006318.)

nn.    The following month, Vanderbilt made clear that it wanted McDonald's off the Property. In its March 4, 2021 presentation to the Community Board 8 Brooklyn Land Use Committee for its proposed redevelopment of the Property with an 18-story building, Vanderbilt told the committee: "Approval of [Vanderbilt's] land use application will facilitate redevelopment of McDonald's drive-through site on corner of Atlantic Avenue and Vanderbilt Avenue. (Walsh Dec. Ex. 121 at VA 053897; *see also* Walsh Dec. ¶ 66 and video of meeting at https://youtu.be/xS_hRoQwSlM at 1:36:15 mark (Vanderbilt's representative stating "This is the application that . . . would facilitate the redevelopment of the

well-known McDonald's drive-thru on Atlantic Avenue").) Vanderbilt stated:
"Something different belongs here. That something different is ***more housing***."
(Walsh Dec. Ex. 121 at VA 053907; *see also* Walsh Dec. ¶ 66 and video of
meeting at https://youtu.be/xS_hRoQwSlM at 1:39:10 mark (Vanderbilt's
representative stating "The primary purpose of the rezoning would be to facilitate a
new building that is predominantly residential because this location, to put it
frankly, is a fantastic location for housing").)

oo.  Vanderbilt's March 4, 2021 presentation contained a proposed rendering of the
commercial space on the ground floor of the building. The rendering did not show
a McDonald's, but a pharmacy and a bookstore instead. In that slide, Vanderbilt
stated that "in addition to ground floor commercial uses, the appropriate non-
residential use for this location is a community facility-type use serving as a
foundation of the wider community. . . . With this in mind we are currently
working with a local arts-based organization to make 840 Atlantic Avenue their
long-term headquarters, with space for classes and performances open to the
public." (Walsh Dec. Ex. 121 at VA 053914.) Vanderbilt's representative stated:
"Our team ***has always kind of had this image or vision in our heads*** of classes
and performances open to the public in big open windows on the second story . . .
so that's kind of the vision of non-residential uses." (Walsh Dec. ¶ 66 and video of
meeting at https://youtu.be/xS_hRoQwSlM at 1:51:06 mark (emphasis added).)

2.  Vanderbilt began auditioning appraisers to serve as its appraiser under the
McDonald's Lease nearly a year before the FMV process formally commenced in April 2019.
Vanderbilt used this audition process to try to identify an appraiser who would arrive at an

unfairly high valuation using an improper method and assumptions before the FMV process even began. By doing so, Vanderbilt tried to have Tener believe that the FMV should be higher than was justified under the terms of the McDonald's Lease. *See* ¶¶ 2(a)-(aa) below.

a.   On May 30, 2018, about a week after DeMarco told Rottenberg that McDonald's wanted to participate in the formal FMV process described in the Lease to determine McDonald's rent for the option terms, Vanderbilt retained BBG Real Estate Services to prepare an appraisal of the fee simple value of the Property, as well as an analysis of the projected ground rent for McDonald's. (Walsh Dec. Ex. 17 at VA 015256.)

b.   BBG issued an appraisal report dated July 9, 2018 that valued the fee simple interest in the Property under then existing zoning regulations at $18,800,000, subject to the extraordinary conditions that the Property was free and clear of all encumbrances, including the McDonald's Lease, and could be redeveloped as of right. (Walsh Dec. Ex. 18 at VA 010600-02, VA 010693 ¶ 3.)

c.   Despite BBG's engagement letter referencing an analysis of the projected ground rent for McDonald's, BBG's appraisal report did not contain an estimate of the rent to be paid by McDonald's during the option terms. (Walsh Dec. Ex. 18.)

d.   In early June 2018, while BBG was performing its appraisal work on the Property, Vanderbilt reached out to one of Tom Tener's colleagues at KTR, Theresa Nygard, about potentially performing an appraisal of the Property. Tener emailed Rottenberg on June 7, 2018 stating that "Theresa is in hearings," but explaining that he could perform the appraisal. In his email describing the appraisal requested by Rottenberg, Tener noted that Rottenberg described the Vanderbilt Lease as a

ground lease "***between related entities*** and that [Rottenberg] would like an appraisal of the Fee Simple Interest in the site without consideration of the ground lease. It is also our understanding that the lease with McDonald's will be expiring in the near term." (Walsh Dec. Ex. 19 (emphasis added).)

e.   Vanderbilt retained Tener in late June 2018. Tener's retention letter with Vanderbilt specifically notes that Vanderbilt had advised KTR that Vanderbilt's lease with McDonald's would be expiring in the near term and that the Vanderbilt Lease was between "related entities." (Rottenberg Dep. Tr. 174:3-178:11; Walsh Dec. Ex. 20 at VA 010581.)

f.   The June 2018 retention letter states that Vanderbilt retained Tener to estimate the market value of the ***fee simple interest*** of the Property under both existing zoning and under the assumption that the Property is rezoned in accordance with the most current M-CROWN redevelopment study. (Walsh Dec. Ex. 20 at VA 010581.)

g.   KTR's June 27, 2018 engagement letter specifically requested that Vanderbilt provide "Copies of any leases that encumber the properties," which would include both the McDonald's Lease and the Vanderbilt Lease, but Vanderbilt did not provide either lease to KTR in 2018. (Walsh Dec. Ex. 20 at VA 010582; Tener Dep. Tr. 52:9-22, 66:8-67:11.)

h.   When Vanderbilt hired KTR in June 2018, Vanderbilt was considering KTR to potentially serve as Vanderbilt's appraiser for the FMV process set forth in the McDonald's Lease. (Li Dep. Tr. 97:15-99:5.)

i.   Tener testified that Vanderbilt "wasn't specific" about the reason it wanted KTR to perform an appraisal of the Property in 2018. (Tener Dep. Tr. 38:13-39:12.)

j.  KTR requested a copy of the McDonald's Lease a second time in an August 9, 2018 email to Vanderbilt, but Vanderbilt did not respond. Tener testified that he wasn't "sure why they didn't give [him] a copy" of the McDonald's Lease "but they did not." (Tener Dep. Tr. 52:9-22.)

k.  KTR issued an appraisal report dated August 30, 2018 that valued the fee simple interest in the Property under then existing zoning regulations at $18,300,000. KTR's August 30, 2018 report also valued the fee simple interest in the Property at $38,800,000 under the hypothetical condition that the entire site would be rezoned in a manner consistent with the most recent M-CROWN rezoning proposal. (Walsh Dec. Ex. 22 at VA 000004.)

l.  KTR's August 30, 2018 report states that it "requested a copy of the McDonald's Lease, but was not provided with a copy. . . . The value conclusions contained herein are based on the extraordinary assumption that [McDonald's] has not exercised its renewal option and the site is available for development to its highest and best use." (Walsh Dec. Ex. 22 at VA 000009 ¶ 1.)

m.  KTR's August 30, 2018 report disclosed that a public records search revealed the existence of the Vanderbilt Lease and stated: "***According to the client, this ground lease is between related parties***. This appraisal assumes no division of interest is created by this ground lease. The values developed herein reflect the Fee Simple Estate, exclusive of the noted ground lease." (Walsh Dec. Ex. 22 at VA 000009 ¶ 2 (emphasis added).) Later in the report, Tener noted the $7 million valuation given to the Vanderbilt Lease for tax purposes, but again noted that the "ground lease is between related parties" and that, at Vanderbilt's request, he had ignored the lease

for purposes of his valuation. Tener wrote that "[t]he difference between the appraised value and the reported ground lease consideration is attributable to unknown conditions in the ground lease *which was not provided for review*." (*Id.* at VA 000016 (emphasis added).)

n.  KTR's August 30, 2018 report also contained a "Ground Rent Analysis" for the Property, without reference to either the McDonald's Lease or the Vanderbilt Lease, assuming a term of 99 years for the hypothetical ground lease. KTR concluded that the market rental value for such a lease of the Property—assuming it was unencumbered by any lease, including the McDonald's Lease—would be $1,098,000 per year. (Walsh Dec. Ex. 22 at VA 000082-83, VA 000009.)

o.  Vanderbilt engaged at least two other appraisal firms to appraise the Property before deciding to retain Tener as its appraiser for the FMV process under the Lease. *See infra* ¶¶ 2(p)-(v).

p.  In early January 2019, Vanderbilt engaged Republic Valuations to prepare an appraisal of the fee simple estate of the Property. (Walsh Dec. Ex. 23 at VA 011953-55.) Republic sent Vanderbilt a draft appraisal report on February 15, 2019 that valued the fee simple interest in the Property under then existing zoning regulations at $19,125,000, and at $56,265,000 under the hypothetical condition that the entire site would be rezoned in a manner consistent with the most recent M-CROWN rezoning proposal. Republic's draft report stated that its valuations were prepared "based on the assumption that the property is not encumbered in a lease and is ready for development." (*Id.* at VA 011951-55, VA 011970.)

q.   Rottenberg specifically requested that Republic appraise the Property as not encumbered by a lease and ready for development. (Rottenberg Dep. Tr. 206:24-207:9.)

r.   Vanderbilt retained attorney Morris Missry of Wachtel Missry LLP in late January 2019 to represent the company in the determination of fair market rental of the Property under the Lease. (Koh Dec. Ex. GGG ("Missry Dep. Tr."), 30:2-10, 37:4-15, 38:13-19.)

s.   Shortly thereafter, Vanderbilt—with Missry's involvement and assistance—engaged yet another appraisal firm, Metropolitan Valuation Services, to perform "desk reviews" of the appraisals KTR and BBG previously prepared for Vanderbilt. (Rottenberg Dep. Tr. 210:5-211:20; Missry Dep. Tr. 44:8-21; Walsh Dec. Ex. 24 at VA 011919; Walsh Dec. Ex. 25.)

t.   Vanderbilt retained Metropolitan in preparation for participating in the FMV process under the Lease. (Walsh Dec. Ex. 25; Missry Dep. Tr. 50:12-51:16.)

u.   Among other things, Metropolitan agreed to "opine on the reasonability and credibility of the reported value opinions and suggest areas (if any) where such conclusions may be impacted or clarified." (Walsh Dec. Ex. 24 at VA 011919.)

v.   Metropolitan sent Vanderbilt and Missry its report on KTR's appraisal on February 26, 2019. Metropolitan concluded that "the KTR Report in its current form is slightly more credible [than the BBG Report], though the BBG Report can get there with some minor amplification." (Walsh Dec. Ex. 25 at VA 012456.)

w.   Missry, Rottenberg, and Li interviewed Tener and other appraisers in late February 2019 before ultimately deciding in early March 2019 to engage Tener as its appraiser for the FMV process under the Lease. (Missry Dep. Tr. 76:21-82:14.)

x.   Tener testified that it seemed to him that the whole process, including his retention to perform an appraisal in 2018, "was a audition for this eventual rent decision." (Tener Dep. Tr. 183:20-184:8.)

y.   With respect to his August 2018 appraisal, Tener testified: "it felt like this was all part of leading up to [his retention in March 2019] even though [he] was not fully aware of it at the time." (Tener Dep. Tr. 183:20-184:8.)

z.   Unlike the prior engagements for appraisal work on the Property, which Vanderbilt entered into directly with the appraisal firms, Missry—and not Vanderbilt—engaged KTR to serve as Vanderbilt's appraiser for the FMV process under the Lease. (Walsh Dec. Ex. 28.)

aa.   Missry signed the KTR engagement letter as the client, and Tom Li signed on behalf of Vanderbilt "For Payment and Indemnification Purposes." (Walsh Dec. Ex. 28 at VA 015992; Li Dep. Tr. 162:3-20.)

3.   Vanderbilt ignored Tener's second request for a copy of the Vanderbilt Lease, withheld the financial terms of the Vanderbilt Lease from Tener, and incorrectly told Tener that the Vanderbilt Lease was between "related parties" so that he would ignore the $7 million valuation Vanderbilt and M.M.B. ascribed to the 99-year lease less than a year-and-a-half earlier. *See* ¶¶ 3(a)-(j) below.

a.   Like KTR's June 27, 2018 engagement letter with Vanderbilt, KTR's March 8, 2019 engagement letter specifically requested that "Copies of any leases that

encumber the properties" be "provided as soon as possible." (Walsh Dec. Ex. 28 at VA 015992.)

b. Missry testified that either he or Vanderbilt would have "provided [KTR/Tener] with the information that [KTR/Tener] requested" and that Vanderbilt would have been responsible for providing Tener with the Vanderbilt Lease "Because they were the repository of all information. They had all the information, it was their property." (Missry Dep. Tr. 94:14-97:16.)

c. Despite Tener's specific request, Vanderbilt failed to provide KTR with a copy of the Vanderbilt Lease or to provide KTR with the financial terms of the Vanderbilt Lease. (Tener Dep. Tr. 66:8-17, 72:16-21.)

d. The first time that Tener had an opportunity to review the Vanderbilt Lease was at his September 21, 2021 deposition in this matter. (Tener Dep. Tr. 67:5-11, 72:16-21, 73:13-19, 102:5-10.)

e. Tener was not aware until his deposition that Vanderbilt does not get to keep any of the rent paid to it by McDonald's. (Tener Dep. Tr. 68:17-21.)

f. Tener was not aware until his deposition that if McDonald's had terminated its lease on April 8, 2019 (the end of the initial term of the McDonald's Lease) and vacated the Property, Vanderbilt would have owed rent to M.M.B. in the amount of $360,000 for the first year after the McDonald's Lease terminated, with the rent increasing 2% per year thereafter for the first ten years unless and until the Property is rezoned. (Tener Dep. Tr. 68:22-73:19.)

g. Tener could not determine how, if at all, the $360,000 rental value for the Property under then-existing zoning that Vanderbilt and M.M.B. agreed to in the Vanderbilt

Lease would have impacted his analysis because he had not been given an opportunity to review the Vanderbilt Lease. (*Id.*)

h.  If Tener had been provided with a copy of the Vanderbilt Lease, he "would have had to analyze it within the sales history and would have had to reconcile and determine whether it was market or not." (Tener Dep. Tr. 70:21-71:6.)

i.  If Tener had been provided with a copy of the Vanderbilt Lease, he "would have interviewed the parties, [he] would have analyzed the economics, tried to understand the rationale and the reasoning for these tranched call it conditional rent provisions within it and [he] would have looked at how the rent, what the rent went up to. [He] would have tried to understand the non-arm's length nature of that lease that was reported. There would have been multiple considerations but [he] would have to have read the entire—or at least the pertinent parts of the lease." However, Tener he could not do any of these things because Vanderbilt declined to provide him with a copy of the Vanderbilt Lease even though he had asked for it. (Tener Dep. Tr. 71:19-72:21.)

j.  Tener's April 15, 2019 report did not contain any discussion, reconciliation, or analysis of the Vanderbilt Lease—which provides that Vanderbilt would have paid $360,000 per year in rent starting on April 8, 2019 if McDonald's had chosen to terminate the Lease at the end of the original term—because Vanderbilt declined Tener's multiple requests for a copy of the Vanderbilt Lease and told him it was a "related party" transaction. (Rottenberg Dec. Ex. 32; Tener Dep. Tr. 71:19-72:21.)

4.      Vanderbilt misled Tener to believe the Vanderbilt Lease was not an arm's-length transaction, and therefore not consider it in his analysis, by incorrectly telling him it was a "related party" transaction. *See* ¶¶ 4(a)-(f) below.

a.    Vanderbilt itself is not a member of, and holds no interest—directly or indirectly—in M.M.B. (Rottenberg Dep. Tr. 55:15-19.)

b.    Rottenberg, individually, does not own an interest in M.M.B. At his deposition, Rottenberg testified that 840 Atlantic Holdings, LLC is a 20% owner of M.M.B. and that he is the 100% owner of 840 Atlantic Holdings, LLC. (Rottenberg Dep. Tr. 37:9-15, 39:8-10.)

c.    The record is unclear as to when 840 Atlantic Holdings, LLC acquired an interest in M.M.B. When asked when 840 Atlantic Holdings, LLC became a member of M.M.B., Rottenberg repeatedly testified that he could not remember when that occurred. (Rottenberg Dep. Tr. 39:14-17 ("Q. Okay. When did 840 Atlantic Holdings, LLC become a member of M.M.B. Associates? A. I can't remember times."). Even after he reviewed the Vanderbilt's Lease, Rottenberg testified that he could not recall when his LLC acquired a 20% interest in M.M.B. (Rottenberg Dep. Tr. 64:11-15 ("Q. . . . [D]id you become a member of M.M.B. Associates before or after [Vanderbilt entered into its 99-year ground lease with M.M.B.]? A. You asked me that question before and I said I don't remember.").)

d.    Vanderbilt is not Rottenberg's alter ego; Rottenberg is a 50% owner of Vanderbilt, with Simon Dushinsky owning the other 50%. (Rottenberg Dep. Tr. 29:11-23; Dkt. 20 at ¶ 2 (Declaration of Pinchus Rottenberg dated Sept. 9, 2020) ("The members

of Defendant are Simon Dushinsky and me, both of whom are citizens of the State of New York, residing in Kings County.").)

e.   There is no evidence in the record indicating that Rottenberg's 50% partner in Vanderbilt—Simon Dushinsky—owns any interest in M.M.B., either directly or indirectly. (Walsh Dec. ¶ 21.)

f.   When asked repeatedly whether he was involved in the negotiation of both sides of the Vanderbilt Lease, Rottenberg refused to give a definitive response, claiming he could not recall whether he had any involvement on behalf of M.M.B. (Rottenberg Dep. Tr. 92:6-93:4 ("Q. So at the time – I guess what I'm trying to understand is, at the time of this transaction, were you on both sides of the transaction or on only the Vanderbilt side of the transaction. A. I was on the Vanderbilt side of the transaction. Q. Only? A. I don't know what means 'only.' I was on Vanderbilt. Q. So you can't answer that question? A. What is the question? I was on the Vanderbilt side of the transaction. That is my answer. Q. Were you also on the M.M.B. side of the transaction? A. Yeah, I might have been an interest in the M.M.B. side. But for this transaction I was on the Vanderbilt side. Q. Only; is that correct? A. I don't know. I can't remember [if] it was only or not only.").)

5.   In lease fair market rent value proceedings performed in New York, appraisers are bound by legal precedent as outlined in cases such as *936 Second Avenue, L.P. v. Second Corporate Development Co. Inc.*, 10 N.Y.3d 628 (2008), which states that, unless the lease states otherwise, appraisers "must take into consideration all restrictions—including current zoning regulations—and encumbrances on the land, as well as the lease term" and that "in determining the highest and best use of a property, appraisers necessarily must examine any restrictions or

limitations, including long-term leases, that may impact the highest and best use for which the property may be utilized." (Walsh Dec. Ex. YY at 4. *See also* Tener Dep. Tr. 107:17-108:21; Tener Dep. Tr. 113:23-115:4.)

6.      In April 2019, Vanderbilt improperly instructed Tener to ignore the encumbrance of the McDonald's Lease in his valuation even though it knew at the time that the *936 Second Avenue* case required the encumbrance of the Lease and current zoning restrictions to be considered. *See* ¶¶ 6(a)-(i) below.

a.   Metropolitan advised Vanderbilt and Missry in February 2019—before it hired Tener as its appraiser for the FMV process—that Tener would need to consider the encumbrance of the McDonald's Lease on the Property if Vanderbilt intended to use Tener as its appraiser for the FMV process. Specifically, Metropolitan wrote to both Vanderbilt and Missry: "Should the [Tener] Appraisal be utilized in conjunction with the ground rent re-set [for the McDonald's Lease], ***the Highest and Best Use Analysis as improved should consider the encumbrance in place with respect to the [McDonald's] Lease***, which precludes near-term demolition. Similarly, [McDonald's] retains additional option periods which would limit any redevelopment opportunity." (Walsh Dec. Ex. 25 at VA 012456 (showing the report was sent to Rottenberg, Li, and Missry), VA 012468 § 4 (emphasis added).)

b.   With respect to the possibility of a rezoning consistent with the M-CROWN rezoning proposal, Metropolitan advised Vanderbilt and Missry that because "the proposed re-zoning initiative has not yet been approved, it is our opinion that this valuation scenario is highly speculative as of both the effective date of value, and the date of the [Tener] Report." (Walsh Dec. Ex. 25 at VA 012466.)

c.  Continuing, Metropolitan concluded that "no consideration [should] be given to any potential 'up-zoning'" of the Property when valuing FMV under the Lease because such a rezoning "would be highly speculative without formal, or at least anecdotal municipal approval." (Walsh Dec. Ex. 25 at VA 012474.)

d.  On the morning of April 1, 2019, Tener emailed Missry, with a copy to Rottenberg, and asked if he was available to discuss a question that Tener had about the language of the Lease. (Walsh Dec. Ex. 29.)

e.  Tener spoke with Missry later that day. During that conversation, Tener asked Missry about the application of the *936 Second Avenue* case to his FMV estimate. During their April 1, 2019 call, Tener told Missry that he believed the language of the Lease and the New York Court of Appeals' decision in *936 Second Avenue* required him to consider the encumbrances on the Property—including McDonald's Lease and existing zoning regulations—in performing his appraisal of the FMV for the Property. (Tener Dep. Tr. 108:5-21.)

f.  After that conversation, Tener emailed Missry a copy of the New York Court of Appeals' decision in *936 Second Avenue*. (Walsh Dec. Ex. 30.)

g.  Tener wanted to know whether to apply the rule in *936 Second Avenue* because it impacted his analysis. (Tener. Dep. Tr. 113:12-114:8.)

h.  Missry responded thirteen minutes later. Missry told Tener not to consider the encumbrance of the McDonald's Lease in his appraisal of the FMV for the Property. (Tener Dep. Tr. 109:8-24; Rottenberg Dep. Ex. 31.)

i.  Tener disagreed with Missry's conclusion and instructions, but proceeded to perform his appraisal as instructed by Missry by appraising the FMV as "free and

clear of any or all liens or encumbrances." (Tener Dep. Tr. 110:3-111:11, 145:3-7;

Rottenberg Dec. Ex. 32 at VA 001946.)

7.      Missry's instructions to Tener to ignore the encumbrance on the Property in his

FMV estimate impacted Tener's April 15, 2019 analysis because the uses to which a property

can be put over a period of twenty years are different than the uses to which a property can be

put if a property is controlled in perpetuity. (Tener Dep. Tr. 114:5-115:4.)

8.      The parties' appraisers selected Marc Nakleh of Cushman & Wakefield to serve

as the third appraiser for the FMV process under the Lease, but did not engage him because

Vanderbilt improperly refused to allow the appraisers to attempt to agree on an FMV estimate in

a single letter opinion of value, as required by the Lease. *See* ¶¶ 8(a)-(i) below.

   a.   Following preliminary communications between them to discuss timing and other

        issues relating to the FMV process, Locatell and Tener agreed on May 9, 2019 to

        select Nakleh as the third appraiser. However, both Locatell and Tener advised

        their respective clients that day that they had a disagreement about the process for

        the third appraiser. (Walsh Dec. Ex. 116; Walsh Dec. Ex. 117.)

   b.   Tener wrote to Missry and Rottenberg on May 9, 2019: "We have a disagreement

        in the logistics of the appraisal proceeding. Sharon believes that the three

        appraisers are directed to meet, share comparable information and analysis in an

        attempt to have the three (or two of the agree) agree on the FMR. I stated that it is

        my reading of the lease that each of the three appraisers are directed to estimate the

        FMR in a letter opinion of value. If there is agreement by a majority, the majority

        sets the FMR, if not than [sic] the average of the three FMRs as reported in the

        letter opinion of values sets the FMR." (Walsh Dec. Ex. 117.)

c.   Locatell wrote to DeMarco and Meyer of McDonald's on May 9, 2019: "We have

agreed to select Marc Nakleh as our 3rd appraiser, but we did not reach out to

Marc yet as we have disagreement over the language in the lease as it relates to

process. As I thought, he read the lease to say that we all have to come to the initial

meeting with a letter opinion of value. We will negotiate, but if we can't agree or

get 2 of the 3 to agree, we will average the 3 values. I suggested that we hold off

on calling Marc and we have the attorney's [sic] jump in on the process issue."

(Walsh Dec. Ex. 116.)

d.   The parties' attorneys—Meyer for McDonald's and Missry for Vanderbilt—spoke

several days later. Missry emailed Rottenberg and Tener on May 14, 2019 advising

that he spoke with Meyer stating they "have a disagreement on process. He's going

to review with his client and get back to me." (Walsh Dec. Ex. 118 at VA 001264.)

e.   Meyer and Missry continued communicating on the issue for the next several

weeks. Meyer sent Missry a proposed engagement letter for Nakleh on May 29,

2019, but Missry immediately rejected it, stating:

> this is merely a rehashment of your position, which is inconsistent
> with the terms of the lease. I won't waste our time by restating
> what the lease actually says as you know our position. If this is
> McDonald's final position please let me know. I was hoping we
> could avoid an argument about a very clear procedure set forth in
> the leases and schedule a meeting with our clients followed by the
> resumption of that procedure. If you think a meeting would be
> useful please let us know. Thank you.

(Walsh Dec. Ex. 119 at MCD006711.)

f.   Meyer responded to Missry's email later that day, stating:

> This is a compromise from our position. When we spoke, I
> proposed that the three appraisers meet and then the 3rd would
> write his report following the meeting. You were opposed to that

43

approach even though that approach is consistent with the lease. In an attempt to move this forward, we are proposing that the 3rd appraiser write his report and then the appraisers meet to see if they can agree. I understood you to be agreeable to this approach on the phone. The lease clearly requires a discussion among the appraisers. We will agree to either approach—3rd appraiser writes a report before or after the discussion among the 3 appraisers.

We are happy to meet but agree that we need to figure out process.

(Walsh Dec. Ex. 119 at MCD006710.)

g. Missry rejected Meyer's interpretation of the lease via email, writing:

Mike, while I while I appreciate your feeling that this is a compromise my client and I don't really understand why McDonald's is deviating from the process set forth in the lease. That process requires all appraisers to do separate letters of opinion of value and not a joint one. If the two appraisers' values match each other or if they are within 15% then there is a determined rent. If not, then the third appraiser issues his opinion of value and all three are added together and divided by 3 unless the third appraiser's value agrees with one or the other two. Any other process would yield a biased rent number and be collusive, which is what the lease provision intended to avoid.

Given the clear intention of the lease there is no reason to modify the provision in the way you outlined. However, as a means of moving this forward, we are happy to convene a meeting with clients, attorneys and the two primary appraisers to discuss value etc and to see if a deal can be struck. This assumes that each appraiser has already issued their respective opinion of value prior to the meeting. Please let us know if you'd like to move forward on this basis. Thank you.

(Walsh Dec. Ex. 119 at MCD006709-10.)

h. Meyer responded to Missry on May 31, 2019, stating:

Again, completely disagree regarding the lease. We are willing to meet to try and reach an agreement on value. Dates that work for us (and our appraiser) - June 10, 14, 17, 19, 20, and 21.

Let me know if any of those dates work.

(Walsh Dec. Ex. 119 at MCD006709.)

    i.   Missry confirmed the parties' position pre-litigation positions about the role of the

third appraiser at his deposition in this matter.

> Q. So is it your view that it's a purely sort of mechanical process
> of just looking at the three valuations and if they don't match to the
> penny, you need to do an averaging?
>
> A. Yes, that's what it says.
>
> . . .
>
> Q. Let me ask my question. Is it your opinion that the appraisers
> just work independently and unless their valuations match to the
> penny, they are averaged?
>
> A. Yeah. . . . The answer is yes, I think the process tries to or the
> provision of the lease tries to eliminate any funny business by
> making the three appraisers do their work independently of each
> other, not having one appraiser try to influence the other and sort
> of skew that process. So I think that the process set forth in the
> option term addendum is inherently fair and impartial so the
> answer is yes.
>
> . . .
>
> [Meyer] wanted them I believe to share – at least he conversations
> that he told me that he wanted the appraisers to share their
> thoughts. I thought it was inappropriate given the language of the
> lease.

(Missry Dep. Tr. 193:16-21, 195:18-196:12, 197:23-198:4.)

    9.   In its Answer and Amended Counterclaim filed on December 3, 2020, Vanderbilt

changed its position with respect to the role of the third appraiser. Notwithstanding its consistent

pre-litigation position that the three appraisers could not collaborate in any matter, Vanderbilt's

counterclaim requests a judgment from this Court "directing that the three appraisers, *i.e.* Mr.

Tener, Ms. Locatell, and Mr. Nakleh, or a majority of them, collaborate and estimate the FMV of

the Demised Premises within twenty days of the entry of a final judgment in this action and that

if the three appraisers, or a majority of them, cannot agree on the FMV of the Demised Premises, it shall be determined by adding all three estimates and dividing the total of all three estimates by the number three." (Dkt. 28 at p. 16.)

10.     Vanderbilt's corporate representative, Rottenberg, could not explain the reason for Vanderbilt's change in position on the role of the third appraiser nearly thirteen months after McDonald's filed this litigation. (Rottenberg Dep. Tr. 295:16-300:10.)

11.     Immediately after the June 19, 2019 meeting, Tener performed some quick calculations on his HP 12C calculator and told Vanderbilt in a private meeting that he believed he could arrive at an FMV estimate similar to the valuation reflected in his April 15, 2019 report if he supplemented his letter to include a land residual analysis for a large retail development on the Property for a period of 20 years. (Tener Dep. Tr. 221:21-222:15; 209:10-15.)

12.     Tener decided to do a land residual analysis for the Property with the hypothetical improvement of a 21,500 square foot retail building, not because his research showed that a large retail use was the highest and best use for the Property over a period of 20 years, but because he believed he could arrive approximately the same FMV estimate as his original analysis using that hypothetical use. Tener told Vanderbilt that "Comparable leases in the $90 to $100 per square foot range (about $75 NNN) **would support our concluded FMR for a 20 year term**." (Walsh Dec. Ex. 80 at VA 001083 (emphasis added).)

13.     Had Tener performed even the most basic level of market research on this area, he would have known that there was no demand for this type of large retail space at the Property. Indeed, Tener was unaware that, as of April 2019, there was 14,795 square feet of retail space located directly across Atlantic Avenue from the Property at 470 Vanderbilt Avenue that had been sitting <u>vacant</u> since 2013—a period of six years—and was listed at equivalent to an

effective rent of $41 to $43 per square foot, as compared to Tener's assumed rent of $90 to $100 per square foot range. (Walsh Dec. Ex. YY at 22-23; Tener Dep. Tr. 303:15-304:6.)

14.     On July 23, 2019, McDonald's sent Missry a letter objecting to (1) the valuation used by Tener, and (2) Tener's failure to consider the encumbrance of the McDonald's Lease in estimating the FMV. McDonald's explained that Tener's approach was inconsistent with the plain language of the McDonald's Lease and New York law, and constituted a failure to cooperate in the appraisal process. McDonald's also explained that the parties disagreed as to the role of the third appraiser. McDonald's demanded that Vanderbilt have its appraiser redo his appraisal consistent with the Lease and New York law. (Walsh Dec. Ex. 120)

15.     The next day—on July 24, 2019—Tom Li of Vanderbilt typed out some notes about the fair market rental value dispute with McDonald's, noting that even rent of $1 million per year did not create enough of a benefit to Vanderbilt and did not solve Vanderbilt's plans for the Property. He wrote: "Reason to settle. Even if we prevail at $1m/year rent, it doesn't create enough benefit. It's not so much the next few years[.] But the longer term 15 to 20 years[.]" Li is the only person who had access to the folder where the document was saved. (Li Dep. Tr. 184:16-186:14; Walsh Dec. Ex. 63.)

16.     On July 30, 2019, while McDonald's and Vanderbilt remained at odds over a path forward for McDonald's and Vanderbilt to try to reach a resolution as to the FMV of the Property, Tener sent Missry and Rottenberg a revised letter opinion of value for the Property. In his cover email, he wrote: "Attached is my revised FMV letter incorporating the Land Residual analysis, which is supportive of my original determination of the FMV." (Walsh Dec. Ex. 82; Rottenberg Dec. Ex. SS.)

17.     Tener's invoice to Vanderbilt for his work performed during this period show that he spent a total of 4.25 hours from June 19, 2019 to July 30, 2019 conducting research for his land residual analysis and revising his letter opinion of value to incorporate his residual analysis. The invoice shows that two of Tener's colleagues spent a total of 10.75 hours performing market research and analysis during that same period. (Walsh Dec. Ex. 82 at VA 001044.)

18.     Tener's revised letter opinion of value was identical in all respects to his original letter opinion of value dated April 15, 2019, except for the addition of a paragraph on the final page of his revised report entitled "Land Residual." (*Compare* Rottenberg Dec. Ex. 32 *with* Rottenberg Dec. Ex. SS.)

19.     In that new paragraph, Tener wrote that "The most probable hypothetical improvement, assuming full return on and of the investment over a 20-year term, would be retail." He explained that, based on his analysis of rent and cost data, "the estimated market rent for the hypothetical improvements results in a Fair Market Rental Value between $1,310,600 and $1,478,300 per year via the Land Residual technique, which is directly supportive of the conclusion derived via the 'standard market data approach technique' of $1,348,000 per year." (Rottenberg Dec. Ex. SS at MCD001737.)

20.     Given the results of his land residual analysis, Tener concluded that the fair market rental value of the Property as of April 8, 2019 as encumbered by the Lease remained exactly the same as it was unencumbered: $1,348,000 per year. (Rottenberg Dec. Ex. SS at MCD001737.)

21.     Tener believed he could have concluded to a ***higher*** valuation of the Property as encumbered by the 20-year term of the Lease at $1,478,300 per year, but stuck to his original

valuation of $1,348,000 per year because it was consistent with the estimate he arrived at using the land sales comparison approach. (Tener Dep. Tr. 264:21-265:17.)

22.     Tener viewed himself as an advocate for Vanderbilt and encouraged Vanderbilt to take positions which he did not agree with to "protect" Vanderbilt's positions and artificially inflate his concluded FMV of the Property. (Tener Dep. Tr. 319:22-321:14.)

23.     During a phone call in late August 2019, Missry, on behalf of Vanderbilt, conceded to Meyer of McDonald's that the rule announced in *936 Second Avenue* applied and agreed to have Tener "redo" his FMV estimate in accordance with the terms of the McDonald's Lease. (Meyer Dep. Tr. 207:19-208:9.)

24.      Tener's July 30, 2019 letter opinion of value disregarded the instructions in the McDonald's Lease to adjust comparable leases of vacant land as the valuation method without discussion or reasoning for the exclusion of such leases. The primary valuation method presented in Tener July 30, 2019 letter opinion of value is a sales comparison analysis of fee simple land sales. That method is not authorized by the Lease. Nor is it applicable or appropriate to the determination of fair market rental value for an option rent proceeding since it disregards the legal precedent set by *936 Second Avenue* to consider the remaining term of the subject property's lease encumbrance in both the highest and best use determination and the fair market rental valuation. (Walsh Dec. Ex. YY at 5; Rottenberg Dec. Ex. D (Option Rent Addendum).)

25.     Tener's purported land residual analysis in his July 30, 2019 letter opinion of value is non-compliant with the instructions in the McDonald's Lease to adjust comparable leases, non-compliant with the language in the McDonald's Lease that requires appraisers to use the technique as defined by the American Institute of Real Estate Appraisers, and non-compliant with basic appraisal rules and procedures for land residuals. (Walsh Dec. Ex. YY at 6.)

26.     The methodology used and conclusions contained in Tener's July 30, 2019 letter opinion of value lack appropriateness, reasonableness, and credibility. (Walsh Dec. Ex. YY at 6.)

27.     By layering on unreasonable and improper assumptions in his analysis, Tener's July 30, 2019 letter opinion of value concluded to a market range in his 20-year land residual analysis that is even higher than his estimate of the fee simple value of the Property. The idea that a site encumbered for a term of 20 years would produce a similar or higher rental value than an unencumbered site held in fee simple ownership in perpetuity is mathematically impossible for any hypothetical improvements that have an economic life longer than 20 years. (Walsh Dec. Ex. YY at 7.)

28.     Tener's conclusion in his July 30, 2019 letter opinion of value that these two analyses could produce a similar valuation conclusion is counter to any definition of reasonableness or credibility as required by the Uniform Standards of Professional Appraisal Practice ("USPAP") and is fully unsupported by actual investor activity and data in the market area, including by the Vanderbilt Lease itself which was signed just over a year before the effective date of value for an annual rent which is a fraction of Tener's value conclusion. (Walsh Dec. Ex. YY at 7.)

29.     Vanderbilt never produced a letter opinion of value that complies with the terms of the McDonald's Lease. (Walsh Dec. Ex. YY at 7.)

30.     On November 1, 2019, McDonald's outside counsel sent Vanderbilt's counsel a letter objecting to Vanderbilt's failure to produce a compliant letter opinion of value and further noting a continued disagreement between the parties as to the role of the third appraiser. In that letter, McDonald's demanded that Vanderbilt direct its appraiser to redo his appraisal in accordance with the terms of the Lease and New York law. McDonald's demanded that

Vanderbilt advise of its position by the close of business on November 8, 2019. (Walsh Dec. Ex. 106.)

31.    On November 8, 2019, Morris Missry sent McDonald's outside counsel an email stating: "Thank you for your letter. My client is assessing it and its position and will come back to you with it's [sic] response." Vanderbilt did not advise McDonald's of its position by the close of business on November 8, 2019, and did not provided any further response to McDonald's November 1, 2019 letter. (Walsh Dec. ¶ 47.)

32.    McDonald's filed this action on November 15, 2019, more than 220 days beyond the expiration of the initial twenty-year term of the McDonald's Lease. (Complaint, Dkt. 1 ¶ 74.)

Dated: June 10, 2022                    Respectfully submitted,

                                        /s/ Brendan M. Walsh
                                        Brendan M. Walsh, Esq.
                                        Denise Alvarez, Esq.
                                        PASHMAN STEIN WALDER HAYDEN, P.C.
                                        The Woolworth Building
                                        233 Broadway, Suite 820
                                        New York, NY 10279
                                        *Attorneys for Plaintiff McDonald's Corporation*