# EXHIBIT YY



**840 ATLANTIC AVENUE BROOKLYN, NY 10038**



# Expert Report of Amanda Aaron, MAI, CRE

**ADDRESSED TO:**

Pashman Stein Walder Hayden, P.C.
Brendan M. Walsh, Partner
Court Plaza South, 21 Main Street, Suite 200
Hackensack, NJ 07601

**MATTER:**

McDonald's Corporation v. Vanderbilt Atlantic Holdings LLC
United States District Court, Eastern District of New York, No. 19-CV-06471



**EXHIBIT**
YY



EXPERT REPORT OVERVIEW .................................................................................... 1
    Addressed to........................................................................................................ 1
    Matter................................................................................................................... 1
    Subject Property ................................................................................................. 1
    Reports Under Review........................................................................................ 1
    Client and Intended Users of Review ............................................................... 2
    Purpose of the Review ....................................................................................... 2
    Effective Date of Appraisal Review ................................................................. 2
    Scope of Work...................................................................................................... 2
    Extraordinary Assumptions and Hypothetical Conditions ............................ 3
SUMMARY OF CONCLUSIONS .............................................................................. 4
    Lease Language and Legal Precedent ............................................................. 4
    Locatell Appraisal............................................................................................... 4
    Tener Appraisal .................................................................................................. 5
LEASE LANGUAGE FOR OPTION RENT ............................................................ 8
    Binding Legal Precedents................................................................................. 9
LOCATELL APPRAISAL ........................................................................................ 11
    Lease Comparables .......................................................................................... 11
    Check of Lease Data ........................................................................................ 11
    Locatell Adjustments, Appraisal Techniques and Value Conclusions.......... 12
TENER APPRAISAL............................................................................................... 14
    Inapplicable Fee Simple Land Sales Comparison Approach ....................... 14
    Dated and Unsupported Land Rates............................................................... 14
    Improper Highest and Best Use and Market Analysis ................................. 16
    Non-Compliant Land Residual Technique ..................................................... 18
        Land Residual Methodology ...................................................................... 19
        Hypothetical Improvements ...................................................................... 21
        Retail Market Rent ..................................................................................... 21
        Construction Costs Applied........................................................................ 25
        Construction Cost Amortization Formula Used ....................................... 26
        Omissions from Residual Calculation........................................................ 27
        Consideration of "Economic Rent" for an Owner-User.......................... 29
    Tests of Reasonableness ................................................................................. 30
        Subject Property Ground Lease................................................................. 30
CONCLUSIONS....................................................................................................... 32
ADDENDA AND EXHIBITS ................................................................................... 33
    Supporting Data ................................................................................................ 34
    Exhibit A: Facts or Data Considered .............................................................. 39
    Exhibit B: Recent Expert Testimony............................................................... 40
    Exhibit C: Statement of Compensation.......................................................... 40
    General Assumptions and Limiting Conditions ............................................. 41
    Certification ....................................................................................................... 42
    Qualifications: Amanda Aaron, MAI, CRE..................................................... 43



**A A R O N**

V A L U A T I O N

# Expert Report Overview

At your instruction, I have written an expert report involving appraisal review and analysis of two appraisal reports of the above-captioned property prepared by Sharon Locatell, MAI, CRE, MRICS of Appraisers and Planners Inc. ("Locatell") and by Thomas J. Tener, MAI and Shaun Kest, MAI of KTR Real Estate Advisors LLC ("Tener"). This expert report has been prepared in accordance with Standards 3 and 4 of the Uniform Standards of Professional Appraisal Practice ("USPAP") and in accordance with the Code of Professional Ethics of the Appraisal Institute.

## ADDRESSED TO

Pashman Stein Walder Hayden, P.C.

Brendan M. Walsh, Partner

Court Plaza South, 21 Main Street, Suite 200

Hackensack, NJ 07601

## MATTER

McDonald's Corporation v. Vanderbilt Atlantic Holdings LLC

United States District Court, Eastern District of New York, No. 19-CV-06471

## SUBJECT PROPERTY

840 Atlantic Avenue, Brooklyn, NY 11238

Borough of Brooklyn, Kings County, Block 1122, Lots 1, 68 and 71

## REPORTS UNDER REVIEW

While I have been provided copies of two appraisal reports by Locatell dated December 12, 2018 and one appraisal dated June 17, 2019, the subject of this expert report is the Restricted Appraisal Report dated September 20, 2019 with an effective date of value of April 1, 2019.

While I have been provided copies of appraisal reports by Tener dated August 30, 2018 and April 15, 2019, the subject of this expert report is the Restricted Appraisal Report dated July 30, 2019 with an effective date of value of April 8, 2019.

This review also refers to the respective contents of each appraiser's workfile provided to me including the prior appraisal reports, and to transcripts of the depositions of Sharon Locatell and Thomas Tener taken in connection with this case.

The intended use of the Tener report dated July 30, 2019 and the Locatell report dated September 20, 2019 was determination of the fair market rental value ("FMV") payable at the commencement of the first five-year renewal term pursuant to the subject property's lease



agreement ("Lease") dated March 18, 1998 between Anthony M. Musto ("Landlord") and McDonald's Corporation ("Tenant").

## CLIENT AND INTENDED USERS OF REVIEW

The client of this expert report is Pashman Stein Walder Hayden, P.C. The intended users are the client and McDonald's Corporation. The intended use is appraisal review for expert testimony in connection with litigation.

## PURPOSE OF THE REVIEW

The purpose of the expert report is to review the above-referenced appraisal reports for completeness, appropriateness and reasonableness, and for compliance with USPAP and the terms of the Lease.

## EFFECTIVE DATE OF APPRAISAL REVIEW

The effective date of value is October 28, 2021, the date of my property inspection. The date of this report is November 12, 2021.

## SCOPE OF WORK

I have performed the following scope of work for this assignment.

·   I have read the appraisal reports cited above prepared by Locatell and Tener.

·   I have reviewed and analyzed the Lease and the Option Rent Addendum dated 1998.

·   I have reviewed other documentation provided by my client including workfile contents for the Tener and Locatell appraisal reports and transcriptions of depositions of Tener and Locatell.

·   I have performed a personal inspection of the property that is the subject of this report on October 28, 2021.

·   As part of this review process, I have reviewed each report for completeness, adequacy, relevance and appropriateness of the data presented and valuation techniques applied, and the reasonableness of the value conclusions drawn; and reviewed the appraisal reports for compliance with the USPAP and the terms of the Lease. While I have performed some independent market data research, I have not performed an independent appraisal of the property, nor have I come to an independent value conclusion.



## EXTRAORDINARY ASSUMPTIONS AND HYPOTHETICAL CONDITIONS

This appraisal review expert report incorporates by reference the entire contents of the Locatell and Tener appraisal reports cited above except where expressly noted in this review appraisal. No extraordinary assumptions or hypothetical conditions were applied in this review.

Following are summaries of the overriding and most significant valuation factors underlying my conclusions.



# Summary of Conclusions

My review of the Lease along with the Tener and Locatell appraisals and supporting workfile documents has resulted in the following conclusions. All of my opinions expressed herein were reached to a reasonable degree of certainty based upon my experience and training in the field of commercial real estate appraisals and my expertise as an MAI-designated appraiser.

## LEASE LANGUAGE AND LEGAL PRECEDENT

The Lease contains clear instructions for appraisers to adjust comparable leases of vacant land as the primary valuation method. A land residual technique as defined by the American Institute of Real Estate Appraisers (currently part of the Appraisal Institute) is an acceptable methodology only if "adequate comparable leases are not available." As demonstrated by the Locatell report, which adjusts 11 comparable land leases, comparable land lease data was available as of the effective date of value, rendering a land residual analysis not only unnecessary but also a non-compliant valuation methodology under the terms of the Lease. The Lease is clear that when such leases are available, adjustment of the comparable lease data is the methodology to use.

In lease rent proceedings performed in New York State, appraisers are bound by legal precedent as outlined in cases such as New York Overnight Partners v. Gordon ("Overnight") and 936 Second Avenue, L.P. v. Second Corporate Development Co. Inc. ("Second Avenue") which clearly states that, unless the lease states otherwise, appraisers "must take into consideration all restrictions-including current zoning regulations-and encumbrances on the land, as well as the lease term" in fair market rent valuations and that "in determining the highest and best use of a property, appraisers necessarily must examine any restrictions or limitations, including long-term leases, that may impact the highest and best use for which the property may be utilized."[1]

## LOCATELL APPRAISAL

The Locatell appraisal complies with the instructions outlined in the Lease's Option Rent Addendum to adjust comparable leases of vacant land as the primary valuation method, and the terms of the 11 comparable leases, which range from 5 year renewal periods to 20 years, are similar to the remaining term of the subject property's lease encumbrance.

My own check of the comparables included in the Locatell report confirmed that 9 of the 11 comparables were leases for sites which were developed or substantially renovated

---

[1] *936 Second Avenue, L.P. v. Second Corporate Development Co. Inc.,* 891 N.E.2d 289 (2008) and *New York Overnight Partners v. Gordon,* 649 N.Y.S. 2d 928 (1996)



subsequent to the lease date. Even after eliminating two of the comparables and slightly adjusting the data for one additional comparable, the Locatell report presents a substantial amount of high quality market data demonstrating tenant demand and a consistent range of rents for retail land leases within the five years leading up to the effective date of value.

The Locatell appraisal follows the Lease instructions with regard to methodology and reporting, and it complies with USPAP with regard to the completeness, adequacy, relevance and appropriateness of the data presented and valuation techniques applied, and the reasonableness of the value conclusions drawn.

**TENER APPRAISAL**

The Tener appraisal disregards the instructions in the Lease's Option Rent Addendum to adjust comparable leases of vacant land as the valuation method without discussion or reasoning for the exclusion of such leases and when such leases are in fact available in the market area as demonstrated by the Locatell report. Rather, the primary valuation method presented in the Tener appraisal is a Sales Comparison Analysis of fee simple land sales. That method is not authorized by the Lease. Nor is it applicable or appropriate to the determination of fair market rental value for an option rent proceeding since it fully disregards the legal precedent set by Overnight and Second Avenue to consider the remaining term of the subject property's lease encumbrance in both the highest and best use determination and the fair market rental valuation.

Additionally, none of the land lease rates cited is from a market transaction completed within the 10 years prior to the date of value. Much of the data appears to be from leases signed 20 to 70 years prior to the valuation date, none of which is comparable to the subject property in terms of date or location/property type, and the land rate chosen in the analysis of 8% is significantly higher than any data I am aware of in our market area in recent years.

In the Tener report dated July 30, 2019, the fee simple land analysis section appears to remain completely unchanged with regard to the writing, comparables and conclusions from a prior version of the appraisal report dated April 15, 2019, even though Tener testified at his deposition that Vanderbilt's counsel instructed him to follow the Second Avenue precedent and account for the encumbrance of the Lease for up to 20 years, rather than ownership in perpetuity, in preparing his July 30, 2019 report[2].

---

[2] Tener deposition transcript pp. 111, 116-17, and 210-12.



The only difference between the Tener reports of April 15, 2019 and July 30, 2019 is the addition of a brief discussion identified in the report as a land residual analysis. However, as more fully detailed below, this analysis is also non-compliant with the Lease instructions to adjust comparable leases, non-compliant with the Lease language to use the technique as defined by the American Institute of Real Estate Appraisers, and non-compliant with basic appraisal rules and procedures for land residuals. Therefore, the Tener report's methodology and its conclusions lack appropriateness, reasonableness and credibility.

The problems with the land residual include the following:

· The Tener land residual analysis does not follow the Lease instructions to use a land residual technique as defined by the American Institute of Real Estate Appraisers (now the Appraisal Institute) – the technique in the Tener report is not a recognized or appropriate methodology for determining a land rent and does not follow the procedures described in *The Appraisal of Real Estate*, the Appraisal Institute textbook, for residual analyses.

· The highest and best use conclusion in the Tener report names mixed-use development but the residual analysis is based upon hypothetical retail improvements which fail the basic tests of market analysis as a demonstration of demand and financial feasibility. The market shows no recently constructed or proposed improvements similar to what Tener's land residual describes (a "Low Cost Class D" 21,500 square foot freestanding retail building with basement parking) – in fact, a similarly sized retail space across from the subject property was vacant and available for more than 7 years prior to the date of value with no demand from prospective tenants, and none of the similarly zoned land sales in Tener's report transferred for retail development.

· Tener concludes to an unsupported and misleading market rent number by using retail leases that are not comparable, as they are situated in mixed-use locations with significantly greater pedestrian foot traffic; none is larger than 5,000 square feet; and none was signed with triple net lease terms. Tener makes no adjustments to those leases for these differences aside from deducting an unsupported real estate tax expense and fails to research or analyze available market rental data for comparables more similar in size and location to his hypothetical improvements – including the asking rent directly across the street from his subject property for a large space - which suggest to a significantly lower market rent number than used in his analysis.

· The construction cost data (significantly understating cost) and building yield rate selected (a rate that does not account for development risk or profit) are inappropriate and unsupported by activity in the property's market area.



· The residual analysis does not account for the time necessary to obtain pre-development permits and complete construction, the time required for leasing, brokerage fees and tenant improvement allowances, entrepreneurial incentive, vacancy and collection loss or any operating expenses other than real estate taxes, all of which are required for a valid and accurate land residual analysis.

By layering on so many unreasonable and improper assumptions, the Tener report concludes to a market rental range in the land residual analysis that is even higher than the fee simple FMV conclusion. This idea that a site encumbered for a term of 20 years would produce a similar or higher rental value than an unencumbered site held in fee simple ownership in perpetuity is mathematically impossible for any hypothetical improvements that have an economic life longer than 20 years.

The report's internal incoherence in claiming that these two analyses could produce a similar valuation conclusion is counter to any definition of reasonableness or credibility as required by USPAP and is fully unsupported by actual investor activity and data in the market area, including by a ground lease of the subject site itself which was signed one year prior to the effective date of value for an annual rent which is a fraction of Tener's value conclusion.

For these reasons, I have concluded that, while the Locatell appraisal complies with the terms and language of the Lease, legal precedent, USPAP and other standards of appraisal practice, the Tener appraisal complies with neither the Lease nor USPAP and cannot be relied upon as an indication of fair market rental value pursuant to the terms of the Lease. I have described these appraisal review conclusions in greater detail in the report below.

I reserve the right to supplement this report with any opinions or conclusions that I reach after further study, particularly if new or additional relevant information becomes available. I also reserve the right to respond to any reports or opinions that any experts retained by Vanderbilt Atlantic Holdings LLC may offer.



# Lease Language for Option Rent

Methodology and appraisal procedure for determining fair market rental value is dictated by the Lease language itself, specifically outlined in the Option Rent Addendum (Exhibit G) dated March 18, 1998.

The Option Rent Addendum defines the annual rental payment as "equivalent to the greater of:

A. Eighty percent (80%) of the Fair Market Rental Value of the Demised Premises at the end of the primary term, exclusive of any and all improvements then existing on the Demised Premises (called the 'FMV'), as determined by written agreement of Landlord and Tenant; or

B. During the first five-year option, Tenant shall pay a monthly rent of $16,032.58."

In the absence of agreement by Landlord and Tenant, the lease outlines the appraisal process in detail with a timeline.

Pertinent to my review of the appraisals produced by Locatell and Tener is the specific methodology instructed in the Lease's Option Rent Addendum, which reads as follows:

The rental value shall be established based upon a definition of Fair Market Rental Value as the price which an average well-informed tenant would pay and an average well-informed landlord would accept, exclusive of Tenant's improvements, knowing all of the uses to which the property can be put, without duress on either party.

The standard market data approach technique for valuing vacant land shall be used by the appraisers. All comparable leases shall be appropriately adjusted, and the written reports shall indicate the reasons for the adjustment so made. If adequate comparable leases are not available, then a land residual technique, as defined by the American Institute of Real Estate Appraisers, shall be used. The real estate income component used in the residual technique shall be economic rental for hypothetical improvements, but in no event shall any business income be considered in the analysis.

Landlord and Tenant agrees to execute and deliver to each other a supplement to this Lease confirming the rent as determined by the method described in this Addendum.

The Option Rent Addendum first and specifically instructs the appraisers to adjust comparable leases of vacant land and to produce written reports which indicate the reasons for the adjustments made.



The Lease also provides for a secondary methodology to be used in the case that comparable leases are not available: the land residual technique, as defined by the American Institute of Real Estate Appraisers, an organization now known as the Appraisal Institute, following a merger in 1991. In my discussion of the Tener appraisal below, I will explain the methodology as outlined by the Appraisal Institute.

## BINDING LEGAL PRECEDENTS

Beyond the specific language included in the Lease itself, in fair market rental proceedings for renewal rent determination purposes, appraisers are bound by case law precedent which defines basic ground rules for interpretation of leases in lease rent re-set proceedings.

In the Appraisal Institute publication *Appraisers in Arbitration*, Paula K. Konikoff, JD, MAI, AI-GRS explains that "an interesting series of cases addressing New York City properties exemplifies how lease language can be interpreted in ways that the parties likely never anticipated when negotiating the lease terms" and she outlines the relevance of both the Overnight and Second Avenue cases to the valuation of land subject to rental re-set clauses.[3]

The Second Avenue case builds upon the Overnight precedent and clearly states that, unless the lease states otherwise, appraisers "must take into consideration all restrictions-including current zoning regulations-and encumbrances on the land, as well as the lease term" in the valuation and that "in determining the highest and best use of a property, appraisers necessarily must examine any restrictions or limitations, including long-term leases, that may impact the highest and best use for which the property may be utilized."

The 840 Atlantic Avenue Option Rent Addendum defines the FMV as "exclusive of any and all improvements then existing on the Demised Premises" but is silent regarding lease encumbrances. Therefore, based upon the terms of the Lease and this case law precedent, appraisers must take into consideration current zoning regulations and the lease term in both highest and best use and FMV conclusions with an appraisal methodology appropriate to the lease encumbrance.

Konikoff notes that "nothing in appraisal Standards of practice, textbooks, or other appraisal reference material helps valuation professionals understand how to value land 'subject to the

---

[3] *Appraisers in Arbitration*, Paula J. Konikoff, JD, MAI, AI-GRS with contributing author Peter T. Christensen, Esq., Appraisal Institute, 2018, pp. 39-41. Konikoff is a recognized expert in both real estate appraisal and litigation/arbitration. She holds a law degree and the MAI and AI-GRS designations from the Appraisal Institute, and she serves as an Adjunct Professor at New York Law School, a Certified USPAP Instructor, an instructor for the Appraisal Institute, and Chair of the Appraisal Institute's Professional Standards and Guidance Committee. She also served on the Appraisal Standards Board from 2003 to 2009.



remaining term' of a ground lease. The basis of land valuation is the comparison of the property being appraised to similarly located parcels of land that have been sold recently and that have the same or a similar highest and best use as the subject land. Where is the appraiser to find a transaction involving the purchase of land by someone knowing that the land can be developed and used only for a limited period of years, and then must be returned to the seller? Such sales transactions simply do not exist because that type of arrangement is a lease rather than a sale."[4]

Konikoff's analysis of the legal precedent shows us that traditional analysis of unencumbered fee simple land sales is not appropriate to the appraisal problem given case law precedent requirements to value property subject to the remaining term of the lease, and she points to comparable leases as more relevant than sales in this valuation context.

Therefore, based upon both the legal precedent and the language of the 840 Atlantic Avenue Lease itself, adjustment of comparable land leases is the appropriate and preferred methodology for fair market rental determination accounting for lease encumbrance.

---

[4] Ibid.



# Locatell Appraisal

The Locatell report uses the primary methodology outlined in the Lease. Locatell presented and adjusted 11 comparable leases of land leased for retail purposes and also presented and analyzed one comparable listing. The Locatell report provides a brief summary of the reasons adjustments were made. The report clearly complies with the methodology spelled out in the Lease and with the New York legal precedent described above.

## LEASE COMPARABLES

The Locatell report summarizes and adjusts 11 comparable leases with dates between April 2014 and May 2019. The comparable leases are for sites ranging from 7,056 to 37,501 square feet with a median site size of 18,000 square feet.

The sites are leased by national retail quick service retail and bank tenants such as TD Bank, McDonald's, Wendy's, Starbucks and Burger King. The known lease terms range from 5-year renewals to 20 years plus options, similar to the terms of the subject property Lease.

The comparables are located in the four Outer Boroughs of New York City (Brooklyn, Queens, Bronx and Staten Island) predominantly on vehicular corridors, as is the subject property.

## CHECK OF LEASE DATA

I have independently checked the lease comparables against public record data and my own appraisal files to confirm their accuracy to the extent possible and to confirm that each lease is a land lease whereby construction or renovation of the improvements is fully the tenant's responsibility.

Comparables 2, 3, 8, 10 and 11 were new construction buildings while Comparables 4, 5, 6 and 9 had substantial renovations filed for both exterior and interior work, including an enlargement of Comparable 5, subsequent to the date of lease.

I could confirm no significant construction or renovation work for Comparables 1 and 7 after the lease dates indicated.

My own research indicated that Locatell's summary of Comparable 2 (1927 Flatbush Avenue) is missing one of two tax lots that were included in the site area leased for the property. The full address of this lease comparable is 1927-1933 Flatbush Avenue, and the lease includes both tax lots 1 and 11 for this property. The corrected site area is 11,038 square feet as opposed to the 8,848 in the Locatell appraisal and the corrected rent per square foot of site



area is $19.48. Further, the lease date for this comparable was October 1, 2014 prior to the construction of the building, which received a Certificate of Occupancy on November 30, 2017.

Based upon my independent research, I would not rely upon Comparables 1 and 7 due to the absence of evidence of significant construction or renovation work on the part of the tenant, and the date and rent per square foot of site area should be altered for Comparable 2. Even eliminating these two comparables and altering the information for Comparable 2 results in a comp set including 9 signed leases and one listing, an amount of data more than adequate to form a well-supported FMV conclusion.

## LOCATELL ADJUSTMENTS, APPRAISAL TECHNIQUES AND VALUE CONCLUSIONS

The Locatell appraisal describes adjustments made to the ground lease comparables for differences in market conditions, location, site size, access and demographics.

The workfile contained a more fully detailed appraisal report dated June 17, 2019 which included an adjustment grid, full-page writeups of each comparable and a narrative explanation of adjustments and several Microsoft Excel workbooks from the June 17, 2019 and September 20, 2019 appraisals. The workfile data explains that Comparables 2 and 6 were adjusted downward because those properties were delivered with shell improvements to the tenant.

I have reviewed the adjustments made to the comparables and they are reasonable and credible – the categories of adjustments are typical for land rent comparables, and the adjustments are supported by data such as traffic counts and surrounding demographics in each comparable's location. The adjustments applied are typical and reasonable.

Further, Locatell's description of the comparables and the adjustments complies with the Lease language.

Locatell adjusted the comparables based upon whole dollar annual rent and also reported each comparable's rent per square foot of site area. Prior to adjustments the whole dollar annual rent presents a more consistent range with less variance than rent per square foot of site area, indicating that whole dollar analysis may be a more appropriate unit of comparison than price per square foot in this case[5].

---

[5] *The Appraisal of Real Estate, 14th ed.*, Appraisal Institute, 2013, p. 386-387.



Locatell's comparables ranged from $260,000 to $405,000 per annum after adjustments, and Locatell concluded to a fair market rental value of $350,000 annually. This amounts to $12 per square foot of site area for the subject site. Given the site's larger size than many of the comparables, it is appropriate that the whole dollar annual rent conclusion fall at the upper range of the comparables prior to adjustments.



# Tener Appraisal

The Tener appraisal disregards the instructions in the Lease's Option Rent Addendum to adjust comparable leases of vacant land as the valuation method without discussion or reasoning for the exclusion of such leases and when such leases are available in the market area as demonstrated by both the Locatell report and independent research typically performed by appraisers in assignments of this type. Rather, the report inexplicably presents a fee simple land sales analysis which does not comply with the Lease instructions and does not account for the encumbrance of the Lease, followed by a Land Residual discussion which has multiple errors and inconsistencies that compound one another, resulting in an unreliable and unreasonable value conclusion and an analysis that does not meet the minimum standards of USPAP and is not compliant with the language of the Lease.

## INAPPLICABLE FEE SIMPLE LAND SALES COMPARISON APPROACH

Despite the requirement established by the Overnight and Second Avenue cases for appraisers in ground lease rent re-set proceedings to account for the encumbrance of the lease itself, the majority of Tener's report is devoted to a fee simple land sales analysis which assumes ownership of the property in perpetuity. This analysis is wholly irrelevant to the appraisal problem and scope of work required for a valuation of the subject parcel in the context of an option rent reset subject to the encumbrance of the McDonald's lease, which was for a maximum period of 20 years if all four renewal options are exercised by the Tenant.

This inclusion and adjustment of comparable sales also contradicts the Lease instructions contained in the Option Rent Addendum to adjust comparable <u>leases</u> of land as the primary valuation method. Tener's use of comparable <u>sales</u> owned outright in perpetuity is inappropriate and conflating fee simple and leasehold value this way is counter to USPAP's clear instructions not to present analyses or conclusions that are in any way misleading.

In the Tener report dated July 30, 2019, the fee simple land analysis section appears to remain completely unchanged with regard to the writing, comparables and conclusions from a prior version of the appraisal report dated April 15, 2019, even though Tener testified at his deposition that Vanderbilt's counsel instructed him to follow the Second Avenue precedent and account for the encumbrance of the Lease for up to 20 years, rather than ownership in perpetuity, in preparing his July 30, 2019 report. This analysis does not account for the Lease encumbrance and should not be presented.

## DATED AND UNSUPPORTED LAND RATES

Because the fee simple land sales analysis is not appropriate given the Lease instructions and the fee simple valuation, the land rates cited in the Tener report to convert fee simple land



value to an annual rent are also not applicable for this option rent reset. However, beyond the inapplicability of the whole land sale analysis, the rates cited in the Tener report are extracted from leases signed between 1950 and 2012, with most of the leases written between 20 to 70 years prior to the effective date of value. It is not clear whether the rates themselves were specified in these aged leases, or whether the rates were determined during market rent resets from leases at some later date. However, like any market data, land rates of return are sensitive to market conditions and factors such as interest rates and rates of return for alternative investments and are not static over time. The rate chosen (8%) is also above the normal range of 4% to 6% that has been fairly consistent in recent years and is supported by my own survey of recent land leases signed between 2016 and 2018.

In support of the 8% rate, the Tener report references the rates exhibited by four retail properties in the workfile which are between 18 and 25 years old without any clarity on the source of those rates (lease-specified or extracted from a proceeding at some later date) or any indication of the specific lease terms governing those rates (use restrictions, etc.). During Tener's deposition on September 21, 2021, when asked about the source of the lease comparable data and when the rates were determined or negotiated, Tener said he had not reviewed the leases himself and did not provide any clear answers about whether these rates were specified in leases negotiated 20 to 70 years prior or negotiated at proceedings at some later date.

The age of the leases alone should disqualify this data if the leases specified these rates, and even if the rates are from a more recent proceeding, appraisers have a responsibility to verify and to fully understand the data and its context when that information forms the basis of a current FMV opinion. None of that verification was done in this case, and as a result, Tener does not have the basic information needed to make appropriate adjustments.

As another justification for selecting an 8% land rate, which is higher than typical, the Tener report also cites the "significant increase in land value that would likely occur should the proposed 'M Crown' rezoning be approved in a manner that is consistent with that currently being considered." By factoring in a potential rezoning of the land into the rate selection, Tener has violated the requirement established by legal precedent (Overnight and Second Avenue) to "determine the value of the land, as if vacant and unimproved, subject to *current zoning restrictions* and contractual limitations" [emphasis mine].

Even if a purchaser of site ownership in perpetuity fee simple ownership would consider the potential of the M Crown rezoning on current value, this rezoning is completely inapplicable to the value of the site for a lease encumbrance with a maximum of 20 years. As of the date of



value, the M Crown rezoning was in early discussion and community review stages – the Department of City Planning and the local community board had not agreed upon any framework for the local rezoning. Rezoning a neighborhood takes years into decades and sometimes never occurs based upon community opposition and changing political imperatives. In fact, even today, more than 2.5 years after the value date, the M Crown rezoning process is still only a proposal being discussed between the City Planning Department and the Community Board which has not even made it onto the list of official rezoning initiatives sponsored by the City Planning Commission. Further, because mixed-use projects take multiple years of predevelopment planning and several years of construction following permitting and government approvals, and then further time to reach stabilized occupancy, even if the rezoning process happened at record speed or if the site were independently rezoned, the development of a new mixed-use building would never occur quickly enough to for a purchaser or lessor to realize any return on a large-scale mixed-use, mixed-income development over a 20-year term. For this reason, the potential rezoning is a non-factor in the site's value as encumbered.

In these ways, the rate selection, although inapplicable given the fee simple analysis, serves to further inflate the annual rent estimate in the report based upon problematic data and analysis.

## IMPROPER HIGHEST AND BEST USE AND MARKET ANALYSIS

By representing that a renewal rent for at most a 20-year period could be equivalent to or greater than a rent for a site leased or owned in perpetuity points to serious errors and inconsistencies in the Tener appraisal's highest and best use analysis. Proper highest and best use analysis is a fundamental component of any fair market value or fair market rental value determination for vacant land, and the conclusion of highest and best use directs the appraiser's choice of comparable sales or rentals towards properties that have similar potential uses.

The majority of the Tener report is devoted to a fee simple land sales comparison analysis based upon the highest and best use conclusion that the subject property could be developed for a mixed-use residential and retail building, a use which would not be financially feasible over a 20-year term. The sales used all represent market activity which is not applicable to development over a 20-year term, as the cost of multifamily construction cannot be recovered by a developer in that timeframe. I am aware of no ground leases for mixed-use development which were negotiated for shorter than a 49-year term with many extending as long as 99 years. With a 49-year to 99-year term, there is sufficient time to allow for the long permitting, construction and leasing period required for mixed-use construction; and there is sufficient



time for the recovery of the considerable construction costs associated with mixed-use development in the New York City market area. However, with the mixed-use pre-development, construction and lease-up period typically extending 3 or more years, the remainder of 17 or fewer years is not sufficient to recover costs, rendering the use of mixed-use development sales irrelevant for a rent over at most a 20-year term.

In the Tener appraisal's "Land Residual" analysis, Tener implies but does not analyze or clearly explain a different conclusion that the highest and best use for the property over a 20-year term would be retail development. Specifically, the hypothetical improvement would be a 21,500 square foot retail building with parking on the cellar level. I will discuss the problems with the Land Residual analysis below; however, Tener's conclusions from this analysis point to serious problems and inconsistencies with regard to highest and best use.

If the Tener appraisal is correct that a site developed for retail use over a 20-year period produces the same or even a higher value than a site developed for mixed residential and retail use in perpetuity, then by definition, the property's highest and best use would be retail development for fee simple ownership as well as for 20-year leasehold property rights, and not a mixed-use development as stated earlier in the Tener report. After testing a potential use for legal permissibility and physical possibility, the most fundamental test of highest and best use is financial feasibility: of all legally permissible and physically possible uses, that which is the most financially feasible, generating the highest residual land value, is by definition the highest and best use ("maximally productive")[6]. No rational investor/owner would choose to develop a mixed-use property, which is expensive and time consuming to build and to lease up and takes longer to recover the initial investment, if an equally or more financially feasible use would be to build a less expensive retail structure which produces the same residual value over a shorter term.

Further, if single-story retail development to the full allowable FAR for the M-zoned portion of the site area generated an equal or greater return to the land than mixed-use development, the market would demonstrate that properties with similar zoning to the subject property were being purchased for retail development. That is not the case. None of the M1-zoned sales used in the Tener analysis has been developed or is currently being developed for standalone retail use, and even though all three sales were under contract between 2015 and 2017, none has completed improvements between four and six years after the site purchase. The Tener report does not include, and I am not aware of, any land sales purchased for single-story retail

---

[6] *The Appraisal of Real Estate, 14th ed.*, Appraisal Institute, 2013, p. 335.



development – in perpetuity or for a 20-year term – for values anywhere near the conclusion of the Tener appraisal of $16,850,000 or $784 per buildable square foot of above-grade retail area. If single-story retail development exhibited the economics described in Tener's Land Residual analysis, those sales would exist and similar improvements to the hypothetical 21,500 square foot retail property Tener's appraisal describes would exist in the immediate market area. The lack of such sales and such improvements anywhere in the local market area is a strong indication that the conclusions of the Tener appraisal are wrong. In fact, as of the date of value, a 14,895 square foot retail space located on the ground floor at 470 Vanderbilt Avenue (a multi-story office building with retail at grade), directly northwest across Atlantic Avenue from the subject property, had sat vacant for over 6 years since 2013 due to lack of demand.

*The Appraisal of Real Estate* devotes an entire chapter to market analysis, explaining that all appraisals must include a "study of the economic environment in which it [a subject property] is and will be functioning, and an estimate of the subject property's proportional capture of market demand... An existing or proposed improvement under a specified use may be put to the text of maximum productivity in highest and best use analysis only after it has been demonstrated that an appropriate level of market support exists for that use."[7] The Tener appraisal's hypothetical improvements may be permitted by zoning, but the lack of similar improvements being constructed or proposed anywhere in the market area, along with the vacancy at nearby retail improvements, demonstrates the opposite: lack of demand. The market itself is showing that Tener's conclusion that single-story retail development built to the maximum permitted area produces a similar or greater value than mixed-use development cannot be correct.

## NON-COMPLIANT LAND RESIDUAL TECHNIQUE

In the absence of "adequate comparable leases," the Lease instructs the use of "a land residual technique, as defined by the American Institute of Real Estate Appraisers." The Locatell report shows that comparable leases of land for 20-year and shorter terms were available in the market area, predominantly for development of fast food and quick service retail uses, but Tener did not analyze these types of leases despite the market activity and evidence of demand for this type of property in high-traffic areas with similar zoning.

The Tener report instead retained the same fee simple land analysis from a prior appraisal report and added an abbreviated land residual calculation, which is described as "directly

---

[7] Ibid., pp. 299-300.



supportive" of the fee simple land value conclusion. As explained above, any analysis that properly accounts for the encumbrance of the Lease cannot be "directly supportive" of a fee simple land valuation analysis – especially one with a different highest and best use and different property rights – so it does not make sense for this analysis to be framed in this way.

The idea that the value of a property held for a 20-year term could be equal to or greater than the value of that same property held in perpetuity is fundamentally contradictory based upon the most basic appraisal formulas: Property Value = Value of Annual Cash Flows + Value of Reversion. The income capitalization approach is defined as "the present value of the anticipated future benefits of property ownership... A property's income and resale value upon reversion may be capitalized into a current, lump-sum value."[8] The two components of "future benefits of property ownership" for fee simple property value include income (annual cash flows) and reversion (resale) value.

For a 20-year leasehold interest in vacant land, while the lessee could construct hypothetical improvements and receive annual cash flows (income) from those improvements within the 20-year period after completion of construction, there is no reversionary value since the property is returned to the lessor/land owner at the end of the 20-year term and the reversionary benefit would go to the lessor. Therefore, the market value of the property subject to a 20-year term with no reversion <u>must be less</u> than the market value of that property in perpetuity including the reversion. Tener's contention that the values are equal or that the value subject to a 20-year term could exceed fee simple value defies this most basic of appraisal concepts.

In addition to conflating two completely unrelated analyses, the Tener land residual is also unsound with regard to appraisal methodology and assumptions applied.

## Land Residual Methodology

In January 1991, the American Institute of Real Estate Appraisers merged with the Society of Real Estate Appraisers to become the Appraisal Institute. The Appraisal Institute textbook, *The Appraisal of Real Estate*, explains the land residual analysis as follows:

For any alternative use of vacant land, the cost of construction (including an estimate of entrepreneurial coordination) and the expected value of the specific property use should be known. The difference between those figures is

---

[8] Ibid., p. 59.



the land residual, which is the primary indicator of financial feasibility. If the land residual is positive, the use is considered financially feasible.[9]

In order to employ the Land Residual method as a valuation method for land value, the textbook instructs the following regarding the limitations of this approach:

The following conditions must be met:
1. Building value is known or can be accurately estimated.
2. Net operating income to the property is known or can be estimated.
3. Both building and land capitalization rates are available from the market.

Small variations in any of these variables can result in a dramatic change in the land value estimate. For this reason, courts have shown a clear disdain for the land residual method...

To apply the land residual method, an appraiser first determines what actual or hypothetical improvements represent the highest and best use of the site as those vacant. Then the net operating income (NOI or $I_O$) of the property is estimated from market rents and operating expenses as of the date of the appraisal. Next, the appraiser calculates how much of the income is attributable to the building and subtracts this amount from the net operating income. The remainder is the residual income attributable to the land, which is capitalized at a market derived land capitalization rate to provide an estimate of site value.[10]

As the passage above indicates, land residual valuations are never recommended as a primary method of valuation, because the residual method requires dozens of assumptions, all of which must be accurate and well supported in order to provide a reliable value indication, and "small variations in... variables can result in a dramatic change in the land residual estimate." The same Appraisal Institute textbook clearly states that "when a market rent estimate for the subject property is required, the appraiser gathers, compares and adjusts comparable rental data."[11] In this way, the appraisal textbook and the Lease are aligned about acceptable methods for fair market rental value determination. It does not make sense to perform a land residual analysis which requires a well-supported highest and best use analysis along with dozens of thoroughly researched and supported inputs when comparable lease data which represents actual market activity with proven demand is available for analysis and adjustment.

Tener's analysis does not meet the Appraisal Institute's stated conditions required to produce a reliable land rent or land value indication via the land residual method. The highest and best

---

[9] Ibid, p. 355
[10] Ibid., p. 383
[11] Ibid., p.466



use conclusion for the property's hypothetical improvements is flawed, as discussed previously, and no demand has been demonstrated for the hypothetical improvements. Tener's calculations include no estimate of building value for the hypothetical improvements that would be constructed on the site; rather, Tener only concludes to a rental income estimate without converting net income into property value via an overall capitalization rate; Tener's net operating income estimate is unsupported for reasons that will be detailed below; and neither recent building nor recent land capitalization rates are shown from the property's market area.

Rather than perform a land residual analysis in accordance with the methodology outlined in the Appraisal Institute textbook, as required by the Lease, Tener's analysis is a more abbreviated (and non-compliant) market rent residual which relies on only three inputs: rent to the hypothetical improvements upon completion (net operating income), amortized construction costs, and amortized free rent to derive residual income to the land.

In this way, Tener's land residual analysis suffers from two fatal errors. First, it does not comply with the requirement in the Lease that the analysis be prepared in the manner "defined by the American Institute of Real Estate Appraisers" (now known as The Appraisal Institute). Second, each input in the already non-compliant land calculation has flaws which make it wholly unreliable in any event. I will detail the flaws with the individual inputs below.

## Hypothetical Improvements

The Tener residual calculation is based upon hypothetical improvements with 21,500 square feet of retail at grade and a 9,342 square foot parking basement. It is unclear from the appraisal report and the workfile how these areas were derived, and the workfile does not provide any comparative residual calculations for other potential uses that prove these hypothetical improvements represent the highest and best use of the site.

As discussed above, proper highest and best use analysis begins with market data showing sufficient demand for a given hypothetical use, but I'm aware of no market evidence of demand for sites to develop 21,500 square feet of retail around the date of value, and Tener's report and workfile provide no support for the conclusion.

## Retail Market Rent

The Tener appraisal applies a gross market rent to the hypothetical improvements of $100 per square foot of the full above-grade area of 21,500 square feet. The workfile contains an excel spreadsheet called "Retail Rent Comps" which contains two tables of retail rental data presumably relied upon as support for the gross rent number. The 17 purported comparables

