are all retail stores in Brooklyn which range in size from 720 to 4,700 square feet with an average size of 1,510 square feet.

Despite the Lease instructions that "all comparable leases shall be appropriately adjusted, and the written reports shall indicate the reasons for the adjustment so made," the workfile does not include any adjustment grid at all for these or any comparables which would account for differences between these properties and the subject property in terms of market conditions, location, size, lease terms and utility factors such as construction quality, the amount of frontage, ceiling height, etc.

The comparables chosen are situated predominantly in superior locations on retail corridors that have a good amount of pedestrian foot traffic and adjacent retail development, while the subject property location on Atlantic Avenue is more accessible to vehicular traffic and has no surrounding retail improvements at all.

The subject property location is situated on a stretch of Atlantic Avenue that is defined by the subterranean Atlantic Rail Yards directly across Vanderbilt from the subject property on the south side of Atlantic Avenue. The rail yards extend approximately one mile along the south side of Atlantic Avenue from the Barclays Center and create a long dead zone along the avenue along that corridor to the subject location. The north side of Atlantic Avenue also has no occupied retail improvements along that same corridor stretching from the Atlantic Terminal Mall and Atlantic Terrace building almost one mile east to the subject location – rather, the north side is predominantly improved with large-scale affordable housing developments which do not contain any retail at grade.

As of the effective date of value, the block directly across Atlantic Avenue to the north of the subject property was underimproved with two mixed-use development sites whose buildings are currently under construction as of the date of this review. And to the east of the subject property, both sides of Atlantic Avenue are improved with automotive properties, small industrial properties, a self-storage building and a Verizon building.

Diagonally across Atlantic Avenue to the northwest of the subject property is a recently constructed office building at 470 Vanderbilt Avenue. Although the retail portion of this building was completed in 2013, the 14,795 square feet of retail space directly across Atlantic Avenue from the subject property, had <u>never been leased,</u> and the remainder of the ground-floor space at this property, which could have been improved for retail use, was instead classified as office space and leased to public agencies including NYCHA, the public housing agency and the NYC Human Resources Administration.



As of the effective date of value, the 14,795 square feet of retail space at 470 Vanderbilt was listed on Costar (a widely available real estate listing platform) as available space, and according to the broker, the asking rent at the time was $60 per square foot with modified gross lease terms. According to the broker, it was expected that the space would be leased with a $50 landlord-provided workletter to cover tenant improvements and 6 to 9 months of free rent. Assuming a 10-year lease term the <u>asking rent</u> for this space is equivalent to an effective rent of $41 to $43 per square foot compared to Tener's gross effective rent of $97.50 per square foot. No data on this listing or evidence of any general market survey of available comparables was included in the Tener workfile, and this is an important piece of market data that should have been considered and analyzed as part of this analysis.

Tener's rent comparables include 10 properties located west of the intersection of Flatbush and Atlantic Avenue at the Barclay's Center and the Atlantic Terminal mall, a wholly different and superior market area characterized by low-rise mixed-use construction with retail at grade, significantly superior transit access and high levels of pedestrian foot traffic. The remaining rent comparables are also situated on similar low-rise mixed-use corridors in Clinton Hill, Park Slope, Prospect Heights and Crown Heights.

None of the purported comparables approaches the size of the subject property with the size differential so significant that a reasonable adjustment likely could not be derived from the marketplace – small spaces under 5,000 square feet are not in competition for the same tenants as large retail buildings in excess of 20,000 square feet.

The size differential alone rules out these as reasonable comparables from which to derive a single market rent for a 21,500 square foot property. As such, the gross market rent conclusion for the hypothetical improvements is not reasonably supported and the comparables do not demonstrate any market demand for hypothetical improvements in the market area greater than 5,000 square feet.

Similarly, the conversion of the gross rent to a net rent of $80 per square foot by deducting $20 per square foot in taxes is not supported by any data presented in the workfile such as tax comparables for similar properties.

Using Costar's lease comparables database, my own search for larger retail lease comparables in Brooklyn (15,000 to 30,000 square feet) between 2017 and mid-2019 produced 13 results for the entire borough for ground-floor space with reported rental rates (asking, starting or effective). The survey, included in this report's addenda, ranged from $25 to $67 per square



foot for spaces all over the borough with varying lease terms, with no comparable approaching the $100 per square foot gross rent or the $80 per square foot net rent applied in the Tener report.

In this survey of larger retail leases, the highest lease comparable reported by Costar is Petsmart's lease of a 15,395 square foot space at 238-240 Atlantic Avenue for $67.20 per square foot, according to Costar. This comparable is located on a section of Atlantic Avenue with greater retail density and greater foot traffic than the subject property location, and the lease began in January 2017, just after the peak of the retail market in late 2015-2016, indicating that the comparable would be adjusted downward for market conditions as of the lease option effective date of April 2019.

I am also aware of a retail lease signed in November 2019, within 7 months of the subject property's date of value and at a time of generally similar market conditions, of a 17,620 square foot retail space on the block just north of the subject property, for $50 per square foot with modified gross lease terms. Although the space has inferior frontage to the subject site, the modified gross lease terms are significantly superior with the tenant only paying increases in taxes and expenses over a base year amount. The lease also included a $50 per square foot landlord workletter for landlord-paid tenant improvements and more than 13 months of rent concession on a 10-year lease. Before adjustments for frontage, this effective rent for this lease is only $42 per square foot – directly in line with the effective asking rent at 470 Vanderbilt – and 58% lower than the Tener gross market rent conclusion of $100 per square foot for a larger space.

A second Costar search of retail lease comparables including smaller spaces within a 1-mile radius of the subject property also produced no comparables approaching either the Tener report's concluded $100 per square foot on a gross basis or $80 per square foot on a net basis. The Costar lease survey of smaller comparables in a closer radius exhibited asking rents ranging from $22.50 to $54 per square foot, one starting rent at $42 per square foot triple net and one effective rent of $35 per square foot which included some lower-level space.

Comparables closer in proximity to the subject property and comparables closer in size to Tener's hypothetical improvements were not analyzed in the Tener report; however, both sets of comparables show market activity with notably lower market rents per square foot before adjustments than the conclusions Tener reached. Neither set of comparables indicates any market demand for large retail spaces greater than 5,000 square feet with rents greater than $45 per square foot in the subject property's location, as the long vacant 14,795 square foot retail space directly across the street from the subject property demonstrates.



## Construction Costs Applied

The Tener land residual formula makes an adjustment to the $80 per square foot net operating income from the hypothetical improvements to account for the cost of constructing them. The Tener workfile indicates that the valuation relies upon the Marshall & Swift Valuation Service's cost manual for its estimate of construction costs, and that the total construction costs of $2,520,000 include $1,525,000 attributable to above grade retail area of 21,500 square feet built to the "Building Class D, Building Quality: Low Cost" category; a parking basement area of 9,342 square feet costing $550,000; and a soft-cost add-on of 20% or $420,000. This total amounts to $117 per square foot of above-grade retail area.

All-in (hard and soft) construction costs of $117 per square foot are lower than any new construction costs I've seen for any property type in New York City in my 23 years as an appraiser. Typically, in addition to using a cost manual, an appraiser will provide cost comparables of recently constructed properties as support for a development cost estimate, but in this case the Tener cost conclusion is unsupported by local market data.

The under-estimation of construction costs in this analysis is likely due to the selection of "Class D, Low Cost" as the construction cost category, a construction category that I've also never seen in the New York City market. The cost manual describes Class D, Low Cost structures as follows[12]: "Class D buildings generally have wood frame, floor, and roof structure. They may have a concrete floor on grade and other substitute materials, but are considered combustible construction. This class includes the pre-engineered pole- or post-frame, hoop and arch-rib-frame buildings." This category of retail structure is described in more detail:

· <u>Exterior walls</u>: Low-cost stucco, siding, very plain exterior

· <u>Interior finish</u>: Drywall, cheap acoustic tile, asphalt tile, few partitions

· <u>Lighting, Plumbing and Mechanical</u>: Minimum lighting and outlets, minimum plumbing

· <u>Heat</u>: Forced air

Most freestanding retail structures I have seen in New York City are Class C construction. None that I'm aware of has had a wood frame or combustible construction; and most have package HVAC which is not included in this category. Likewise, none of the retail rent

---

[12] Marshall Valuation Service, Section 1, Page 4 February 2018



comparables Tener uses to establish a gross rent of $100 per square foot appears to have similar construction, and no condition or quality adjustments were made to those comparables.

If a tenant were delivered this "low cost" space without typical HVAC, Tener does not account for the cost of the interior buildout. The comparable rental analysis does not include details of tenant buildout required or workletters provided for tenant improvements, so the assumption that a tenant would be responsible for full buildout and installation of a typical HVAC system and still pay a gross market rent of $100 per square foot is further unsupported.

The construction cost estimate also excludes the cost of any elevators ($65,000 each) or escalators, even though the hypothetical improvements would have a below-grade parking basement. It is unlikely that a structure without full accessibility from the basement to the retail level would pass current building code without any escalators or elevators.

If applying a more typical "Class C, Average Quality" construction cost to the same hypothetical improvements, without accounting for the cost of a single elevator, the construction cost estimate increases 58% over Tener's numbers for the above-ground area[13]. For these reasons, the construction cost applied is significantly understated, inflating the market rental estimate.

## Construction Cost Amortization Formula Used

Earlier in this section I explained that Tener does not follow the land residual procedure/formula outlined in the Appraisal Institute textbook but rather makes an attempt to use a more streamlined "economic rent" adjustment formula to convert net operating income overall for the hypothetical improvements (the problematic $80 per square foot) into residual income to the land (annual fair market rental value to the land).

In order to do this properly, an appraiser must be able to isolate which portion of the overall net operating income is achieved by the land and which portion is achieved by the building. This is only possible when the appraiser is able to extract a building capitalization rate or a building yield rate from the marketplace and apply that rate to the value of the building. In this case, the value of the building is represented by the construction costs described above (the problematic Class D construction costs).

---

[13] Marshall Valuation Service, Section 13, Page 26 May 2018 (Cost Manual April 2019) shows Retails Stores, Class C Average construction at $85 per square foot before multipliers, which results in hard costs of $112 per square foot of above grade area before consideration of additional soft costs compared to the Class D Low Cost $71 per square foot.



The Tener appraisal uses a simple "ordinary level annuity" formula[14] (solving for "PMT" in a spreadsheet program or on a financial calculator) in order to isolate annual building income over the 20-year term. This formula relies upon the likely significantly understated construction cost input of $2,520,000 as the "present value" input which is a stand-in for the value of the building overall; a 20-year term as the "number of periods" input; and a 5% annual interest or yield rate; solving for PMT.

The primary – and significant - error here is to imply without any support whatsoever that a 5% annual yield somehow properly converts building value (construction cost) into building income. Property yield rates represent return requirements for investors, and 5% is considered a very safe rate, in line with the annual yield on a bond. Typically, real estate yield requirements are much higher than those for investments such as bonds because, as an investment, real estate is riskier, illiquid and requires a much greater degree of active management. Yields for stabilized retail properties (building and land combined) ranged from 6% to 8.5% in the second quarter of 2019 for income-producing properties.

Development yields for proposed construction ranged from 10% to 20% representing the significant risk premium associated with the development process – this add-on represents "developer's profit" or entrepreneurial incentive. Although Tener's residual calculation is for proposed hypothetical retail improvements, profit or entrepreneurial incentive is not accounted for anywhere in this model. If a separate line-item for profit or entrepreneurial incentive deduction is not made, the entrepreneurial incentive or profit must be built into the discount rate or yield rate applied to the building value. The 5% building yield rate used in this model is not supported by any market data and is insufficient as a retail property yield or a development yield inclusive of profit.

## Omissions from Residual Calculation

In addition to applying an unsupported and unadjusted market rent to the hypothetical improvements (overstated), an unsupported and likely understated construction cost, and an insufficient yield rate to amortize those costs which does not account for entrepreneurial incentive or profit, the residual calculation omits the following other items:

·   <u>Vacancy and Collection Loss and Operating Expenses</u>: The Tener appraisal concludes to a
    gross rent of $100 per square foot and a net operating income of $80 per square foot,

---

[14] *The Appraisal of Real Estate, 14th ed.*, Appraisal Institute, 2013, p. 789.



with real estate taxes of $20 per square foot (also unsupported) as the only operating expense deducted. The net income calculation is missing adjustments for vacancy and collection loss and other operating expenses, implying that a single tenant occupying 21,500 square feet is so creditworthy so as not to incur any expected collection loss and with triple net lease terms where the tenant covers all operating expenses including owner's insurance, bookkeeping, miscellaneous, structural reserves, etc. My cursory market research via Costar revealed no such large credit-rated tenants leasing similar space anywhere in Brooklyn around the effective date of value, and from my own appraisal practice, I am aware of none in this market area renting space under similar terms anywhere near $80 per square foot triple net. Lease length is also typically considerably shorter than 20 years.

If, as my own research indicated and as Tener's own comparable set indicated, there is primarily demand from smaller and more local tenants in this market area, with most tenants leasing under modified gross leasing terms instead of triple net and for shorter lease terms, then the residual calculation must account for vacancy between leases, typical collection loss from non-credit-rated tenants, and other operating expenses for a multi-tenant building, likely resulting in a much lower net operating income.

· <u>Downtime for Permitting, Construction and Lease-Up</u>: Tener's residual calculation applies a net operating income of $80 per square foot on Day 1 of the land lease, implying that the hypothetical improvements are already constructed and generating rent. This is directly counter to the Lease Option Rent Addendum instructions to value the property as vacant land and "exclusive of tenant's improvements."

Obtaining permits and completing construction in the local market area typically takes 18 months or longer. In addition to downtime during construction, the Costar comparable surveys indicated that the larger rental comparables greater than 15,000 square feet spent a median time of 14 months on the market prior to leasing, with a high of 23 months on the market. This is downtime prior to the typical 6-month free rent period that Tener does deduct.

As the improvements would likely not generate any income for 2-4 years during construction and lease-up, the residual calculation must make deductions for rent loss or discount for yield requirements of a land investor over that portion of the 20-year term.

· <u>Brokerage fees</u>: Retail leasing brokers typically charge between 20% and 35% of first year's rent for 5-year to 10-year leases. For a 20-year lease, the percentage would likely be greater. The Tener calculation is missing any allowance for brokerage leasing costs.

· <u>Tenant Improvement Workletter</u>: The Tener analysis deducts no workletter expense for leasing the hypothetical retail space, despite evidence in the market area that as of mid-



2019 the market had softened to the point that retail tenants were receiving workletters between $10 and $50 per square foot. Both 470 Vanderbilt and the other large comparable within one block of the property included workletters of $50 per square foot in the lease terms either given or expected by the broker. Given the "Class D, Low Cost" construction category, it is likely that the space would require a substantial landlord-paid workletter to offset the required additional tenant build-out cost.

## Consideration of "Economic Rent" for an Owner-User

When asked in his deposition where this model accounts for entrepreneurial incentive - why anyone would build these hypothetical improvements if there is no profit to be made - Tener replied that this model does not show a "developer's return" because the residual model instead solves for an "economic rent" with a tenant paying for "what could be built there, residually" and this tenant would make profit "by operating their business there."[15]

"Economic rent" is defined by *The Dictionary of Real Estate* as "a term sometimes used as a synonym for market rent. More precisely, economic rent refers to the amount of rent necessary to provide an adequate return on development cost."[16] Whether for an owner-user or for an investor, fundamental to the concept of "economic rent" or market rent is the idea of <u>adequate return on development cost</u> and Tener's residual model does not provide for adequate return in the form of entrepreneurial incentive or otherwise.

If each of the errors and valuation issues described above were corrected and addressed – if market rental terms were lowered to the range shown by large retail comparables in the area ($40 to $50 per square foot with a $50 per square foot workletter); if costs were increased to those of a more typical category such as Class C; if the building cost amortization rate were increased to between 10% and 15% to account for development risk; and if permitting and construction downtime were accounted for - the Land Residual calculation for hypothetical improvements of 21,500 square feet likely could be even lower than the Locatell FMV conclusion of $350,000 annually.

In other words, development of these hypothetical improvements is not financially feasible and does not provide a return to the land as great as the quick service retail development exhibited by Locatell's comparable set. A survey of the Brooklyn and Outer Boroughs retail market reveals no retail chains buying or leasing land for development of retail buildings

---

[15] Tener deposition transcript p. 295:5-24.
[16] *The Dictionary of Real Estate Appraisal, 6th ed.*, Appraisal Institute, 2015, p. 72



Case 1:19-cv-06471-DLI-ST   Document 63-54   Filed 06/24/22   Page 9 of 23 PageID #: 4929

greater than the 3,000 to 4,000 square feet evident in the quick-service retail sector, so the claim that a hypothetical owner-user would undertake development of this kind of hypothetical improvements for "business profit" is not based upon any market evidence at all.

## TESTS OF REASONABLENESS

The Tener appraisal's errors and assumptions described above compound each other to produce value conclusions that fail all major tests of reasonableness.

The report concludes to a land value of $16,650,000, which amounts to $784 per buildable square foot of above-grade retail area, yet similarly zoned land, including the land sales in Tener's report, show values nowhere near these numbers. If single-story retail development exhibited the economics described in Tener's Land Residual analysis, those land sales would exist; similar improvements to the hypothetical 21,500 square foot "Class D, Low Cost" retail property Tener's appraisal describes would exist in the immediate market area; and those spaces would be leased and occupied long-term by credit-rated national tenants who paid all operating expenses with fully net leases. Instead, the immediate market area had limited to no retail development as of the date of lease renewal, and large retail spaces such as the one across the street had remained vacant for years while another space within one block of the subject property leased for 58% below Tener's rent conclusion.

### Subject Property Ground Lease

Likewise, although neither Tener nor Locatell was provided the subject property ground lease that was executed November 30, 2017 between Vanderbilt Atlantic Holdings LLC and M. M. B. Associates, LLC (the land owner), this lease, which runs for 99 years with a net present value of $7 million, provides an important data point and test of reasonableness of the Tener and Locatell conclusions.

This lease represents the value of the property <u>as encumbered</u> by the McDonald's sublease, with the sublease rent from McDonald's passed through as rent from McDonald's to the land owner. If McDonald's vacates the property prior to any rezoning of the land, the lease specifies an annual rent of $10.00 per buildable square foot (increasing 2% annually), an amount totaling $360,000 annually in the first year. This number – a market rent transaction consummated for the subject land as currently zoned – is directly in line with the Locatell appraisal's fair market rental conclusion of $350,000 per annum and is 74% below the Tener report's conclusion.



USPAP requires appraisers to "analyze and report pending and recent agreements, options, listings, and sales involving the subject property being appraised" and in an explanatory section says that

the requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process. Just as the appraiser must analyze the details of pending and recent sales of comparable properties, the appraiser must also take into account the various factors associated with all pending and recent sales of the subject property itself... Analysis of sales, offerings, etc., as referenced in Standards Rule 1-5, requires more than just stating the known facts about the transaction. Each pertinent factor should be examined individually, methodically, and in detail, to ascertain whether it has relevance to, or potential impact on, the transaction and potentially other assignment results, including the opinion of market value (if applicable). By examining (or evaluating) the specific details of all agreements of sale, options or current listings on the subject property, and all sales that occurred within the prior three years, the appraiser gains valuable (or important) insights into market trends, property and buyer characteristics.[17]

Tener testified that, if he had been provided a copy of the subject property ground lease for his appraisal assignments, he would have analyzed the economics and tried to understand the terms of the lease, as USPAP requires. However, despite requesting a copy of the lease, it was not provided by Vanderbilt.[18] By withholding the ground lease from their appraiser, Vanderbilt held back an important piece of market information and denied him the opportunity to raise important questions about the nature of the lease and its terms, which if answered, could provide the "valuable (or important) insights into market trends, property and buyer characteristics" that USPAP describes above.

USPAP Standards Rules 1-1(b) states that "an appraiser must not commit a substantial error of omission or commission that significantly affects an appraisal..." and the comments to these Standards Rules state that "diligence is required to identify and analyze the factors, conditions, data, and other information that would have a significant effect on the credibility of the assignment results."[19]

Proper analysis of the Vanderbilt ground lease would necessarily involve confronting the huge disparity between Tener's encumbered land and rental value conclusions and this lease's terms and net present value. Vanderbilt's withholding of the lease likely led to a significant "error of

---

[17] USPAP 2018-2019, eUSPAP, Appraisal Foundation, pp. 81-82.
[18] Tener deposition transcript p72:2-.
[19] USPAP 2018-2019, eUSPAP, Appraisal Foundation, p. 148.



omission" in the Tener report resulting in a "significant effect on the credibility of the assignment results."

## Conclusions

As described in this expert report, and as summarized more fully in the "Summary of Conclusions" section beginning on page 4, the Locatell appraisal follows the instructions of the Lease's Option Rent Addendum in a way that conforms to the legal precedents set by the Overnight and Second Avenue cases. The comparables presented and adjusted are examples of active market activity for sites similar to the subject site around the date of value, providing a test of reasonableness of their feasibility, and the value conclusion is in line with the rent specified in an actual ground lease of the subject property land signed within two years of the effective date of value, also supportive of the reasonableness of the conclusion. The Locatell appraisal complies with the requirements of USPAP with regard to the reasonableness and credibility of its methodology, data and value conclusions.

The Tener appraisal disregards Lease instructions with regard to methodology and reporting, uses methodology that does not properly account for the encumbrance of the Lease itself, uses inappropriate data with insufficient adjustments, and uses improper appraisal methodology.

Each of these errors in the Tener appraisal compounds to make the Tener appraisal both non-compliant with the Lease and non-compliant with USPAP, and neither reasonable nor credible.



# Addenda and Exhibits

· Supporting Data

  · CoStar Market lease data

  · Additional comparables 2017-2018

  · RERC Required Return Expectations by Property Type

· Exhibit A: List of Documents Reviewed

· Exhibit B: Recent Expert Testimony

· Exhibit C: Statement of Compensation

· General Assumptions and Limiting Conditions

· Certification

· Qualifications



EXPERT REPORT ADDENDA AND EXHIBITS                          840 ATLANTIC AVENUE

## SUPPORTING DATA

COSTAR MARKET LEASE COMPARABLE DATA RETAIL STORES
15,000 TO 30,000 SQUARE FEET 2017-2019



### Lease Comps Summary

| Deals | NNN Asking Rent Per SF | NNN Starting Rent Per SF | Avg. Months On Market |
|-------|------------------------|--------------------------|-----------------------|
| 13    | $33.94                 | $55.00                   | 14                    |

**LEASE COMPARABLES**

**SUMMARY STATISTICS**

| Rent | Deals | Low | Average | Median | High |
|------|-------|-----|---------|--------|------|
| NNN Asking Rent Per SF | 3 | $25.00 | $33.94 | $35.00 | $40.00 |
| NNN Starting Rent Per SF | 1 | $55.00 | $55.00 | $55.00 | $55.00 |
| NNN Effective Rent Per SF | - | - | - | - | - |
| Asking Rent Discount | - | - | - | - | - |
| TI Allowance | - | - | - | - | - |
| Months Free Rent | - | - | - | - | - |

| Lease Attributes | Deals | Low | Average | Median | High |
|------------------|-------|-----|---------|--------|------|
| Months on Market | 7 | 8 | 14 | 14 | 23 |
| Deal Size | 13 | 15,000 | 19,929 | 20,000 | 30,000 |
| Lease Deal in Months | 8 | 36.0 | 127.0 | 132.0 | 240.0 |
| Floor Number | 13 | BSMT | 1 | 1 | 5 |

Copyrighted report licensed to Aaron Valuation - 520914

 CoStar

10/25/2021
Page 1



EXPERT REPORT ADDENDA AND EXHIBITS                                        840 ATLANTIC AVENUE

## Lease Comps Summary

| Property Name - Address | Rating | Lease | | | | Rents | |
|---|---|---|---|---|---|---|---|
| | | SF Leased | Floor | Sign Date | Type | Rent | Rent Type |
| 1 Caesar's Shopping Center 8973 Bay Pky | ★★★☆☆ | 23,792 | 1st | 6/1/2019 | Renewal | $55.00/nnn | Starting |
| 2 Prime Bushwick Retail C... 333 Troutman St | ★★★☆☆ | 17,000 | 1st | 2/26/2019 | New | $65.00/mg | Asking |
| 3 650 Broadway | ★★★☆☆ | 15,000 | 1st | 7/10/2018 | New | $45.00 | Asking |
| 4 1382-1384 Atlantic Ave | ★★☆☆☆ | 20,000 | 1st | 6/14/2018 | New | $25.00/nnn | Asking |
| 5 57 Caton Pl | ★★☆☆☆ | 20,000 | 1st | 5/29/2018 | New | $27.00/mg | Asking |
| 6 1095 E 45th St | ★★☆☆☆ | 30,000 | 1st | 11/25/2017 | New | $35.00/n | Asking |
| 7 555 5th Ave | ★★☆☆☆ | 15,900 | BSMT,1-2 | 11/1/2017 | New | $47.17 | Starting |
| 8 1601 Kings Hwy | ★★★☆☆ | 20,000 | 1-3 | 10/1/2017 | New | $41.43/mg | Effective |
| 9 1080 Linwood St | ★★★☆☆ | 20,000 | 1st | 8/2/2017 | New | $35.00/nnn | Asking |
| 10 66 Front St | ★★★☆☆ | 16,000 | 1st | 6/25/2017 | New | $49.39 | Effective |
| 11 Industry City 34 35th St | ★★★☆☆ | 20,000 | 1st | 5/22/2017 | - | $50.00 | Asking |
| 12 949 Flatbush Ave | ★★★★★ | 26,000 | 3-5 | 5/15/2017 | New | $40.00/nnn | Asking |
| 13 238-240 Atlantic Ave | ★★★☆☆ | 15,395 | GRND | 1/1/2017 | - | $67.20 | Effective |

**Lease Comps Report**

# COSTAR MARKET LEASE COMPARABLE DATA RETAIL STORES 1-MILE RADIUS 2018-2019



## SUMMARY STATISTICS

| Rent | Deals | Low | Average | Median | High |
|---|---|---|---|---|---|
| NNN Asking Rent Per SF | - | - | - | - | - |
| NNN Starting Rent Per SF | 1 | $42.27 | $42.27 | $42.27 | $42.27 |
| NNN Effective Rent Per SF | - | - | - | - | - |
| Asking Rent Discount | - | - | - | - | - |
| TI Allowance | - | - | - | - | - |
| Months Free Rent | - | - | - | - | - |

| Lease Attributes | Deals | Low | Average | Median | High |
|---|---|---|---|---|---|
| Months on Market | 8 | 1 | 9 | 5 | 23 |
| Deal Size | 9 | 2,000 | 3,866 | 4,000 | 6,000 |
| Lease Deal in Months | 5 | 36.0 | 108.0 | 120.0 | 180.0 |
| Floor Number | 9 | LL | GRND | 1 | 2 |

Copyrighted report licensed to Aaron Valuation - 520914

 CoStar

10/25/2021

Page 1



## Lease Comps Summary

**Lease Comps Report**

| Property Name - Address | Rating | SF Leased | Floor | Sign Date | Type | Rent | Rent Type |
|---|---|---|---|---|---|---|---|
| 1  976 Fulton St | ★★★☆☆ | 3,400 | GRND | 6/5/2019 | New | $37.05/+util | Asking |
| 2  315-317 Douglass St | ★☆☆☆☆ | 6,000 | 1st | 6/2/2019 | New | $45.00/mg | Asking |
| 3  1073 Atlantic Ave | ★★★☆☆ | 4,000 | 1-2 | 4/1/2019 | New | $22.50/mg | Asking |
| 4  900 Fulton St | ★★☆☆☆ | 4,200 | 1st | 3/14/2019 | New | $42.00/mg | Asking |
| 5  951 Dean St | ★★★☆☆ | 2,200 | 1st | 3/1/2019 | New | $42.27/nnn | Starting |
| 6  145 7th Ave | ★★★☆☆ | 2,000 | 1st | 2/7/2019 | New | $54.00 | Asking |
| 7  1250 Fulton Street 1250-1264 Fulton St | ★★☆☆☆ | 5,000 | 1st | 2/1/2019 | New | $70.00/mg | Asking |
| 8  446 Park Pl | ★★☆☆☆ | 2,000 | 1st | 1/22/2019 | New | $45.00/mg | Asking |
| 9  1242-1246 Fulton St | ★★★☆☆ | 6,000 | LL,1 | 12/29/2018 | New | $35.00/mg | Effective |

**AARON**
V A L U A T I O N

EXPERT REPORT ADDENDA AND EXHIBITS                                   840 ATLANTIC AVENUE

## EXHIBIT 43. RERC REQUIRED RETURN EXPECTATIONS BY PROPERTY TYPE[1]

| | Office | | Industrial | | | Retail | | | Apt | Student Housing | Hotel | Average All Types | RERC Port Index |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CBD | SUB | WHSE | R&D | FLEX | RGNL MALL | PWR CNTR | NEIGH/ COMM | | | | | |
| **Pre-Tax Yield Rate (IRR) (%)** | | | | | | | | | | | | | |
| Range[2] | 6.5 - 8.0 | 7.0 - 9.0 | 5.5 - 7.5 | 7.0 - 9.2 | 8.0 - 9.0 | 7.0 - 8.5 | 7.7 - 8.5 | 6.3 - 7.5 | 5.8 - 7.5 | 7.0 - 8.1 | 9.0 - 10.4 | 5.5 - 10.4 | 5.5 - 10.4 |
| Average | 7.2 | 8.0 | 6.6 | 8.1 | 8.5 | 7.8 | 8.3 | 7.0 | | | | | |
| Weighted Average[3] | 7.5 | | 6.7 | | | 7.6 | | | 6.8 | 7.7 | 9.9 | 7.8 | 7.2 |
| BPS Change[4] | 10 | 10 | 0 | 20 | 20 | 10 | 30 | 0 | 20 | 20 | 0 | 10 | 10 |
| | | 10 | | 0 | | | 10 | | | | | | |
| **Going-In Cap Rate (%)** | | | | | | | | | | | | | |
| Range[2] | 4.5 - 6.5 | 5.5 - 7.5 | 4.5 - 5.6 | 5.5 - 8.3 | 7.2 - 8.0 | 5.0 - 7.5 | 6.7 - 7.1 | 5.3 - 6.5 | 4.0 - 5.7 | 5.0 - 6.3 | 6.5 - 8.3 | 4.0 - 8.3 | 4.0 - 8.3 |
| Average | 5.6 | 6.7 | 5.0 | 6.9 | 7.5 | 6.6 | 7.0 | 5.9 | | | | | |
| Weighted Average[3] | 6.0 | | 5.1 | | | 6.4 | | | 5.0 | 5.7 | 7.6 | 6.3 | 5.7 |
| BPS Change[4] | -10 | 0 | -30 | 10 | 40 | 0 | 30 | 0 | -10 | 10 | 10 | 0 | -10 |
| | | -10 | | -30 | | | 0 | | | | | | |
| **Terminal Cap Rate (%)** | | | | | | | | | | | | | |
| Range[2] | 5.5 - 7.0 | 6.0 - 8.0 | 5.0 - 6.1 | 6.0 - 9.0 | 7.9 - 8.5 | 5.5 - 7.7 | 7.1 - 7.9 | 6.0 - 7.2 | 4.5 - 6.2 | 5.8 - 6.9 | 7.5 - 8.7 | 4.5 - 9.0 | 4.5 - 9.0 |
| Average | 6.3 | 7.4 | 5.7 | 7.2 | 8.1 | 7.0 | 7.5 | 6.5 | | | | | |
| Weighted Average[3] | 6.7 | | 5.8 | | | 6.9 | | | 5.5 | 6.3 | 8.3 | 6.9 | 6.3 |
| BPS Change[4] | 10 | 10 | -20 | -10 | 40 | 10 | 30 | 10 | -10 | 10 | 10 | 10 | 0 |
| | | 10 | | -20 | | | 10 | | | | | | |
| **Rental Growth (%)** | | | | | | | | | | | | | |
| Range[2] | 0.0 - 3.0 | 1.5 - 3.0 | 2.4 - 4.0 | 0.0 - 3.0 | 0.0 - 3.0 | 0.0 - 3.0 | 1.0 - 3.0 | 1.4 - 3.0 | 1.5 - 4.0 | 2.0 - 3.0 | 2.0 - 3.0 | 0.0 - 4.0 | 0.0 - 4.0 |
| Average | 2.2 | 2.4 | 3.0 | 1.9 | 1.8 | 1.8 | 2.0 | 2.4 | 2.7 | 2.6 | 2.3 | 2.3 | 2.5 |
| BPS Change[4] | 10 | 20 | 10 | -10 | -30 | 20 | 30 | 30 | 0 | 40 | -10 | 10 | 20 |
| **Expense Growth (%)** | | | | | | | | | | | | | |
| Range[2] | 2.0 - 3.0 | 2.4 - 3.0 | 2.4 - 3.0 | 2.0 - 3.0 | 2.0 - 3.0 | 2.6 - 3.0 | 2.0 - 3.0 | 2.0 - 3.0 | 2.0 - 3.0 | 2.5 - 3.0 | 2.0 - 2.9 | 2.0 - 3.0 | 2.0 - 3.0 |
| Average | 2.6 | 2.8 | 2.8 | 2.6 | 2.6 | 2.9 | 2.6 | 2.7 | 2.7 | 2.7 | 2.5 | 2.7 | 2.7 |
| BPS Change[4] | 0 | 20 | 10 | 0 | 0 | 10 | -20 | -10 | 0 | 0 | -30 | 0 | 0 |

[1] The RERC Investment Survey was conducted in April, May and June 2019 and reflects expected returns for 2Q 2019 investments.
[2] Ranges and other data reflect the central tendencies of respondents; unusually high and low responses have been eliminated.
[3] Weighting based upon 2Q 2019 NCREIF Portfolio market values.
[4] Change (+/-) in basis points (BPS) from quarter immediately preceding current rate.
**Source** RERC, 2Q 2019.



## EXHIBIT A: FACTS OR DATA CONSIDERED

In addition to the materials referenced in the body of my report, I considered the following materials in forming the opinions set forth in my report.

- Complaint filed by McDonald's Corp. against Vanderbilt Atlantic Holdings LLC on Nov. 15, 2019.
- Answer and Amended Counterclaim filed by Vanderbilt Atlantic Holdings LLC on Dec. 3, 2020
- VA 000001-VA 002265 (Vanderbilt's "Phase 1" Document Production)
- VA 010580-VA 010586
- VA 010599- VA 010701
- VA 011918-VA 011924
- VA 011951-VA 012047
- VA 012456-VA 012482
- VA 012503-VA 012521
- VA 015989-VA 015996
- Appraisers and Planners Inc. Documents
  - MCD000001-MCD002625
  - MCD002638-MCD002655
  - MCD002659-MCD002672
  - MCD002676
  - MCD002702
  - MCD002741-MCD002771
  - MCD002897-MCD002898
  - MCD002910-MCD002911
  - MCD002966-MCD002968
  - MCD003003
  - MCD003348-MCD005768
  - MCD005997-MCD005999
  - MCD007176-MCD007183
- Transcript of Sept. 21, 2021 Deposition of Thomas J. Tener, and all accompanying exhibits
- Transcript of Sept. 23, 2021 Deposition of Sharon Locatell, and all accompanying exhibits

I also reviewed lease data gathered in connection with my work on other assignments and considered phone conversations with owners in the general market area about lease data.



## EXHIBIT B: RECENT EXPERT TESTIMONY

Within the last 4 years I have testified as an expert at trial, or by deposition in only one matter:

Kings County Civil Court, Landlord/Tenant Division
Agudus Chasidei Chabad of the United States v Congregation Lubavitch, Inc. ("CLI"); Merkos L'Inyonei Chinuch v Congregation Lubavitch, Inc. ("CLI"); LT-106105-11; LT-106106-11; LT-106107-11
Testified August 18, 2020

## EXHIBIT C: STATEMENT OF COMPENSATION

I am being compensated for my work on this matter at a rate of $600 per hour. This compensation had no influence on the rendering of my opinions.



## GENERAL ASSUMPTIONS AND LIMITING CONDITIONS

·   Use of or reliance on this report, regardless of whether such use or reliance is known or authorized by the appraiser, constitutes acknowledgment and acceptance of these general assumptions and limiting conditions, any extraordinary assumptions or hypothetical conditions, and any other terms and conditions stated in this report.

·   This review report is meant to be presented in its entirety. If this report is presented in any form other than its complete form, it becomes invalid.

·   It is assumed that the property is in compliance with all applicable federal, state and local laws, ordinances, regulations, building standards, use restrictions and zoning unless the lack of compliance is stated in the appraisal report. Determining and reporting on such compliance were not part of the scope of work for this assignment.

·   It is assumed that all water, sewer facilities and utilities (whether existing or proposed) are or will be in good working order, are safe for use, and are or will be sufficient to serve the current or proposed uses of the subject property or any structures or other improvements. Determining and reporting on such matters were not part of the scope of work for this assignment.

·   Unless otherwise stated in this report, the past or current existence of hazardous materials or environmental contamination on, below or near the subject property was not observed or known by the appraiser. The appraiser, however, is not qualified to detect such substances or to make determinations about their presence. The presence of substances such as asbestos, urea-formaldehyde foam insulation and other potentially hazardous materials or environmental contamination may affect the value of the property. Unless otherwise stated, the value estimated is predicated on the assumption that there is no such material on, below or affecting the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering assistance required to discover them. The intended user is urged to retain an expert in this field, if desired.

·   The reviewer assumes no responsibility for matters of a legal nature affecting the property appraised or the title thereto, nor does the appraiser render any opinion as to the title which is assumed to be good and marketable.

·   The liability of Amanda Aaron, MAI, CRE is limited to the client only and to the fee actually received without any accountability, obligation or liability to a third party. If distributed to a third party, the client shall make such party aware of all limiting conditions and assumptions resulting from the appraiser's employment and related discussion. In no manner is the appraiser responsible for any costs incurred to discover or correct any deficiencies at the property, physically, financially and/or legally.

·   This expert report constitutes a limited assignment and should not be construed as an appraisal of the subject property. All analyses, opinions and conclusions expressed by the review are limited by the scope of the review process as defined herein.

·   Unless stated otherwise in this review, the analyses, opinions and conclusions in this review are based solely on the data, analyses and conclusions contained in the appraisal reports under review. Any additional market data obtained for this review was noted. I did not personally inspect any of the comparable market leases or sales, nor did I independently research or verify the leases and sales referenced by the appraisals under review other than where noted.



## CERTIFICATION

I certify that, to the best of my knowledge and belief:

· The statements of fact contained in this report are true and correct.

· The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

· I have no present or prospective interest in the property that is the subject of the work under review and no personal interest with respect to the parties involved.

· I have performed no other services, as an appraiser or in any other capacity, regarding the property that is the subject of the work under review within the three-year period immediately preceding acceptance of this assignment.

· I have no bias with respect to the property that is the subject of the work under review or to the parties involved with this assignment.

· My engagement in this assignment was not contingent upon developing or reporting predetermined results.

· My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in this review or from its use.

· My compensation for completing this assignment is not contingent upon the development or reporting of predetermined assignment results or assignment results that favors the cause of the client, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal review.

· My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Practice.

· I have made a personal inspection of the subject of the work under review.

· No one provided significant appraisal review assistance to the person signing this certification.

· The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.

· The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

· As of the date of this report, I have completed the continuing education program for Designated Members of the Appraisal Institute.

_Amanda Aaron_                                    11 / 12 / 2021

Amanda Aaron, MAI, CRE

NY State Certified General R.E. Appraiser #46-49784



## QUALIFICATIONS: AMANDA AARON, MAI, CRE

Principal, Aaron Valuation Inc.

### Education

Columbia University, (New York, New York), B.A.

New York University Graduate School of Arts and Science, M.A.

Appraisal Institute – MAI designation and continuing education requirements

### Experience

Amanda Aaron has appraised commercial real estate since 1998 and has been the President and CEO of Aaron Valuation, Inc. since 2010. Aaron Valuation provides the full range of real estate valuation services for properties in the New York City metropolitan area. Clients of Aaron Valuation include lending institutions as well as attorneys, CPAs, property owners and developers.

Commercial property experience includes valuation of apartment buildings, condominiums and cooperative buildings, retail properties, industrial buildings, mixed-use properties, affordable housing, office buildings, hotels, senior housing facilities, proposed construction and vacant land. Competencies include market analysis and feasibility determination, property tax analysis, cash equivalency valuation of favorable financing terms and LIHTC valuation for affordable housing developments, ground-lease valuation and fractional interest valuation.

Amanda Aaron has served as either a party-appointed appraiser, a City-appointed appraiser or a neutral appraiser in approximately 30 appraisal matters for litigation, arbitration, condemnation, bankruptcy, divorce and tax certiorari purposes. Clients in legal matters have included the City of New York, landlords, tenants, developers, estates, and lenders. The subject properties of these matters have included improved and vacant land, retail stores, office buildings, rental and cooperative apartment properties, and parking garages. In these matters, Ms. Aaron has concluded to both fair market rental values for lease rent resets and overall property value.

Ms. Aaron has been qualified as an expert witness by Kings County Civil Court, Kings County Supreme Court, U. S. Bankruptcy Court and the State of Vermont Superior Court.

Ms. Aaron was the 2020 President of the New York Metropolitan Chapter of the Appraisal Institute and has served on the Board of Directors since 2013 as member at large, Education Chair, Treasurer, Secretary, 1st Vice President and Regional Representative.



Ms. Aaron is a designated Counselor of Real Estate (CRE) and a member of the National Association of Realtors (NAR). Ms. Aaron supervises both experienced and junior appraisers, performs peer appraisal review for a range of properties and regularly teaches courses for the New York Metropolitan Chapter of the Appraisal Institute.

## Professional Affiliations
·   MAI Designated Member of the Appraisal Institute and Counselor of Real Estate (CRE)

·   New York City and New York State Certified Woman-Owned Business Enterprise (WBE)

·   Metro New York Chapter of the Appraisal Institute – Chapter President 2020, Board of Directors 2013-2020, Education Chair 2013-2018, Regional Representative 2013-2015

·   Member of National Association of Realtors (NAR)

·   New York State Certified General Real Estate Appraiser #46-49784

·   New York State Approved Supervisory Appraiser

·   New York State Course Instructor and Appraisal Institute Course Instructor

## Course Instructor
·   Business Practices and Ethics (Appraisal Institute)

·   General Appraisal Sales Comparison Approach (Appraisal Institute)

·   Using the HP12C Calculator (New York Metropolitan Chapter Appraisal Institute)



