UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
MCDONALD'S CORPORATION,         :
           :
         Plaintiff,     :
           :
     -against-       :
           :
VANDERBILT ATLANTIC HOLDINGS LLC,   :
           :
         Defendant.   :
------------------------------------------------------------------x

**OPINION AND ORDER**
**19-cv-6471 (DLI)(ST)**

**DORA L. IRIZARRY, United States District Judge:**

On November 15, 2019, McDonald's Corporation ("Plaintiff") filed this diversity action pursuant to 28 U.S.C. § 1332(a) against Vanderbilt Atlantic Holdings LLC ("Defendant") seeking a declaratory judgment that Defendant failed to cooperate in good faith with the dispute resolution process set forth in the parties' lease agreement for calculating Plaintiff's rent obligations and, if necessary, a declaratory judgment confirming the role a third appraiser should play in that process. *See*, Complaint ("Compl."), Dkt. Entry No. 1, at ¶¶ 75-94.

On January 10, 2020, Defendant moved to dismiss the action and compel arbitration.[1]  *See*, Def.'s Mot. to Dismiss and Compel, Dkt. Entry No. 8-1.  On September 30, 2020, the Court denied Defendant's motion finding that Plaintiff's claims fell outside of the scope of the parties' arbitration agreement.  *See*, Memorandum and Order ("M&O"), Dkt. Entry No. 22.  On appeal, the Second Circuit affirmed this Court's decision and remanded the action for further proceedings. *See,* Order of USCA, Dkt. Entry No. 49; Mandate of USCA, Dkt. Entry No. 51.  On December 3, 2020, Defendant answered the Complaint and asserted a counterclaim for a declaratory judgment that Plaintiff acted in bad faith and failed to cooperate with the dispute resolution process and, if

---

[1] The Court assumes familiarity with the procedural history of this case and repeats only the procedural history directly relevant to the disposition of the motion herein.

necessary, a declaratory judgment confirming the role of a third appraiser as well. *See,* Ans. and Counterclaim, Dkt. Entry No. 28. Plaintiff answered. *See,* Ans. to Counterclaim, Dkt. Entry No. 29.

Pursuant to Federal Rule of Civil Procedure (Fed. R. Civ. P.") 56, Defendant now moves for summary judgment dismissing Plaintiff's claims and granting its counterclaim. *See,* Def.'s Mem. in Supp. of SJ Mot. ("Def.'s Mem."), Dkt. Entry No. 66-27. Plaintiff opposed the motion. *See,* Pl.'s Mem. in Opp. to Def.'s SJ Mot. ("Pl.'s Opp."), Dkt. Entry No. 68. Defendant replied. *See,* Def.'s Reply Mem. ("Def.'s Reply"), Dkt. Entry No. 69. For the reasons set forth below, Defendant's summary judgment motion is denied in its entirety.

## BACKGROUND

The following relevant facts are taken from Defendant's Local Rule 56.1 Statement of Undisputed Material Facts ("Defendant's Rule 56.1 Statement"), Plaintiff's Response to Defendant's Rule 56.1 Statement ("Plaintiff's Rule 56.1 Response"), Plaintiff's Local Rule 56.1 Statement of Additional Material Facts in Dispute ("Plaintiff's Rule 56.1 Statement"), which Defendant did not respond to, depositions, and exhibits.[2] *See,* Def.'s R. 56.1 Stmt. ("Def.'s 56.1"), Dkt. Entry No. 66-1; Pl.'s R. 56.1 Resp. ("Pl.'s 56.1 Resp."), Dkt. Entry No. 68-1; Pl.'s R. 56.1 Stmt. ("Pl.'s 56.1"), Dkt. Entry No. 68-1. Unless otherwise noted, the facts are not in dispute. As it must, the Court has considered only facts recited in the parties' respective 56.1 statements that are established by admissible evidence and has disregarded conclusory allegations and legal arguments. *See, Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here there are

---

[2] Plaintiff's Rule 56.1 Response and Plaintiff's Rule 56.1 Statement are filed as one document at Dkt. Entry No. 68-1, with Plaintiff's Rule 56.1 Statement beginning on page 19 of the document, but the Court refers to them as separate documents throughout this decision for the sake of clarity.

no[ ] citations or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion.") (internal citations omitted).

On March 18, 1998, Plaintiff, as tenant, and Anthony M. Musto ("Musto"), as landlord, entered into a twenty-year lease agreement ("Lease") under which Plaintiff became the tenant of a parcel of real property located at 840 Atlantic Avenue, Brooklyn, New York ("Property"). Def's 56.1 ¶¶ 3-4; Lease, Dkt. Entry No. 66-4. The twenty-year Lease term ran from April 9, 1999 through April 8, 2019 and, upon its expiration, Plaintiff holds the right to extend the Lease for up to four successive five-year periods through April 8, 2039 (each an "extension period" or "option term"). Def's 56.1 ¶ 6. Under the Lease terms, the Lease automatically will extend for each option term unless Plaintiff provides written notice of termination prior to the active term's expiration. Lease ¶ 13. An Option Rent Addendum ("ORA") attached to the Lease governs the process for determining Plaintiff's rent during the option terms. Def's 56.1 ¶ 11; ORA, Dkt. Entry No. 66-3.

On November 30, 2017, towards the end of the initial twenty-year Lease term, M.M.B. Associates LLC ("M.M.B."), as successor in interest to Musto, entered into a 99-year ground lease ("2017 Ground Lease") with Defendant. Def's 56.1 ¶¶ 3, 7; 2017 Ground Lease, Dkt. Entry No. 66-10. As a result of the 2017 Ground Lease, and an accompanying Assignment and Assumption of Lease under which Defendant assumed all of the rights, interests, and obligations of M.M.B. under the Lease, Defendant became Plaintiff's landlord. Def's 56.1 ¶¶ 3, 7; Pl.'s 56.1 Resp. ¶ 7; Assignment and Assumption of Lease, Dkt. Entry No. 68-29.

On April 8, 2019, Plaintiff's initial twenty-year Lease term expired and the Lease automatically extended for the first five-year period. *See*, Def's 56.1 ¶ 6. Under the ORA, Plaintiff is to pay the greater of the following rent amounts for the first extension period: (A) a monthly rent of $16,032.58; or (B) an annual rent equal to 80% "of the Fair Market Rental Value of the

[Property] at the end of [the initial twenty-year term,] exclusive of any and all improvements then existing on the [Property] (called the 'FMV'), as determined by written agreement of [the parties]." ORA at 1. For each extension period thereafter, Plaintiff's annual rent "shall be increased by an additional fifteen percent (15%) over the previous period." *Id.* To initiate the rent determination process, the ORA requires that Defendant notify Plaintiff of its "estimate of the FMV no later than one hundred eighty (180) days prior to" the end of the initial twenty-year term. *Id.* If the parties "fail to reach an agreement in writing as to the FMV within ten (10) days from [Plaintiff's] receipt of [Defendant's] estimate of the FMV," the parties are to follow a dispute resolution process for determining the FMV set forth in the ORA. *Id.* Defendant initiated the rent determination process timely when, on May 10, 2018, it sent Plaintiff a letter with its FMV estimate. *See*, Def's 56.1 ¶ 14. As documented in a letter Plaintiff sent to Defendant on April 15, 2019, the parties could not agree on the FMV within the time allotted under the ORA and commenced the ORA's dispute resolution process. *Id.* ¶ 15; Pl. Ltr. dated 4/15/19, Dkt. Entry No. 66-7.

Under that process, if the parties cannot agree on an FMV, each party must appoint an appraiser to estimate "the FMV" in "a letter opinion of value." ORA at 1. Each party has "15 days [from] the date either party notifies the other that it is unable to reach an agreement as to the [FMV]" to appoint their respective appraisers. *Id.* "If, within 20 days from their appointment, the two appraisers can agree to the FMV not differing by more than 15%, then an average of the two appraisals shall be used for the [FMV]." *Id.* However, "[i]f the two appraisals differ by more than 15%, then the two appraisers shall appoint a third appraiser." to assist in resolving the dispute. *Id.* "The three appraisers so appointed shall then, within 20 days of the date the third appraiser is appointed, estimate, by means of a letter opinion of value, the FMV." *Id.* "The decisions of the appraisers, or a majority of them, shall be binding upon the parties." *Id.* "If the appraisers, or a

majority of them, cannot agree on the FMV, it shall be determined by adding all three estimates and dividing the total of all three estimates by the number three." *Id.*

Notably, per the ORA, if either party "fails to cooperate in any way so that the process described above cannot be completed prior to 120 days of the expiration of the primary term of th[e] Lease, the FMV of the one appraiser chosen by the cooperating party shall be used to determine the rent during the extension periods." *Id.* The ORA also provides certain guidelines for the appraisers. First, it directs that "[t]he rental value shall be established based upon a definition of Fair Market Rental Value as the price which an average well-informed tenant would pay and an average well-informed landlord would accept, exclusive of Tenant's improvements, knowing all of the uses to which the property can be put, without duress on either party." Def's 56.1 ¶ 13 (quoting ORA at 2). Second, it directs the appraisers to utilize "[t]he standard market data approach technique for valuing vacant land," adding that "[a]ll comparable leases shall be appropriately adjusted, and the written reports shall indicate the reasons for the adjustment so made." ORA at 2. However, "[i]f adequate comparable leases are not available," then the appraisers must use "a land residual technique, as defined by the American Institute of Real Estate Appraisers" and "[t]he real estate income component [that they] use[ ] in the residual technique [must] be economic rental for hypothetical improvements, but in no event shall any business income be considered in the analysis." *Id.*

Upon commencing the first step in the aforementioned dispute resolution process, the parties timely appointed their respective appraisers. *See,* Compl. ¶¶ 39-40 (alleging each party timely appointed their appraisers); Answer 39-40 (admitting those allegations). Plaintiff appointed Sharon Locatell ("Locatell") and Defendant appointed Tom Tener ("Tener"). Def's 56.1 ¶¶ 16-17. Locatell estimated an FMV of $350,000 for the Property ("Locatell's Initial FMV Estimate" or

"Initial Locatell Estimate") while Tener estimated an FMV of $1,348,000 ("Tener's Initial FMV Estimate" or "Initial Tener Estimate"), amounting to a difference of more than 15% between their respective FMV estimates. *Id.* ¶¶ 19, 21; Initial Locatell Estimate, Dkt. Entry No. 66-14; Initial Tener Estimate, Dkt. Entry No. 66-13. Given this difference, Tener and Locatell followed the ORA's next step and proposed a third appraiser, Mark Nakleh. *See*, Locatell Email dated 5/9/19, Dkt. Entry No. 68-40. However, the parties did not appoint Nakleh right away, as they could not agree on the propriety of the methods Tener and Locatell had used for calculating the FMV or on the process for involving Nakleh. *Id.*; Tener Email dated 5/9/19, Dkt. Entry No. 68-41; Pl. Ltr. dated 7/23/19, Dkt. Entry No. 68-44; *See also*, Pl.'s 56.1 ¶¶ 8(a)-(i); Def's 56.1 ¶¶ 22-23.

On June 19, 2019, representatives of Plaintiff and Defendant met at Defendant's counsel's office ("June 2019 Meeting") at which Plaintiff "argued that [the Initial Tener Estimate] was improperly prepared because, among other reasons, he did not follow the holding of *936 Second Ave. L.P. v. Second Corp. Dev. Co.*, 10 N.Y.3d 628 (2008)," a New York State Court of Appeals decision requiring appraisers to include certain considerations in performing FMV analyses in New York, unless the parties have agreed otherwise. Def's 56.1 ¶¶ 22-23. *936 Second Ave.* states, in pertinent part:

> [U]nless the lease agreement provides otherwise, appraisers generally consider the highest and best use of the property in determining its value. This is true whether the property is valued as vacant or developed. But in determining the highest and best use of a property, appraisers necessarily must examine any restrictions or limitations, including long-term leases, that may impact the highest and best use [of] the property[.]
>
> [Therefore,] absent an agreement to the contrary, the effect of a net lease must be considered in valuing property for the purpose of setting rent for a renewal term. Such a rule comports with precedent, appraisal practices and common sense. If the parties to a lease desire to exclude that encumbrance in valuing property, they need only include language to that effect in their agreement.

*See*, *936 Second Ave.*, 10 N.Y.3d at 633. Specifically, Plaintiff maintained that Tener's Initial FMV Estimate did not comply with *936 Second Ave.* because "[he] did not take into account the term of the Lease," which is an encumbrance that *936 Second Ave.* requires parties to consider "absent an agreement to the contrary." *See*, Def's 56.1 ¶¶ 22-23; *936 Second Ave.*, 10 N.Y.3d at 633. Plaintiff also raised concerns that Tener's Initial FMV Estimate had used a sales comparison analysis, valuing the Property using land sales of properties with the same existing zoning, instead of a land residual analysis, valuing the FMV using rental data in comparable commercial ground leases, as the ORA requires. *See*, Pl. Ltr. dated 7/23/19 (documenting issues raised at meeting).

The parties do not dispute that Tener's Initial FMV Estimate did not apply *936 Second Ave.* or that, in doing so, his analysis ignored the encumbrance of the Lease. They also do not dispute that he used a sales comparison analysis, instead of a land residual analysis. Instead, they dispute whether Defendant instructed Tener to use the sales comparison analysis and ignore *936 Second Ave.* and, if so, whether Defendant acted improperly in giving Tener those instructions. Pl.'s 56.1 ¶ 6(a)-(i). The parties also dispute how, when, and to what extent, if any, the parties resolved Plaintiff's concerns with Tener's Initial FMV Estimate raised at the June 2019 Meeting. Defendant claims that: (1) at the June 2019 Meeting, the parties agreed Tener would prepare "another appraisal of the Property, taking into account the term of the Lease" pursuant to *936 Second Ave.*, a claim that it does not support with a citation to any evidence; and (2) while Tener did prepare this other appraisal on July 30, 2019 ("Tener's Final FMV Estimate" or "Final Tener Estimate"), his FMV estimate "did not change" from his April 2019 FMV Estimate. Def.'s 56.1 ¶¶ 24-25; Final Tener Estimate, Dkt. Entry No. 66-15.

While Plaintiff does not dispute that Tener prepared the Final Tener Estimate or that his conclusion as to the Property's FMV did not change, Plaintiff disputes that Defendant had told

Plaintiff at the June 2019 Meeting that it agreed to have Tener prepare the Final Tener Estimate. Pl.'s 56.1 Resp. ¶¶ 24-25.   Instead, Plaintiff claims that Defendant's counsel "told *Tener* immediately *after* the June 19, 2019 meeting that he agreed with [Plaintiff] that…*936 Second Ave*…applied and directed Tener to revise his FMV estimate to consider the encumbrance of the [ ] Lease" and current zoning restrictions, but did not tell Plaintiff any of this until late August 2019, almost a month after Tener had completed the Final Tener Estimate, because Defendant wanted to make sure that Tener was able to arrive at the same FMV estimate as his April 2019 FMV Estimate. *Id.* ¶¶ 23-24 (citing Meyer Dep. Tr., Dkt. Entry No. 67, at 206:22-208:9) (emphasis added); Pl.'s 56.1 ¶¶ 11, 14; Tener Dep. Tr., Dkt. Entry No. 66-22, at 210:14-212:8.   As discussed below, Plaintiff received a copy of the Final Tener Estimate in late September 2019 and it also disputes whether Tener remedied any of the issues identified in the Initial FMV Estimate.

Of relevance here, Plaintiff argues, and Defendant disputes, that Defendant had motivation to retain the high FMV estimate that Tener had reached originally.   This alleged motivation bears on whether Defendant undertook the ORA dispute resolution process in good faith.   According to Plaintiff, Defendant imposed an "unfairly high rent" on Plaintiff "with the hope that [Plaintiff] would vacate the Property" so Defendant could execute its "plan of quickly redeveloping the Property with a high-rise, mixed-use development," which it could not do if Plaintiff remained a tenant on the Property.   *See*, Pl.'s 56.1 ¶¶ 1(a)-(oo).

Plaintiff asserts that the 2017 Ground Lease, by its terms, supports its position that Defendant had motive to "force [Plaintiff] off the Property" because, among other things: (1) under the 2017 Ground Lease, as long as the Lease with Plaintiff remains in effect, "there shall be a direct pass through of base rent" from Defendant to M.M.B., Defendant's landlord under the 2017 Ground Lease, meaning Defendant must pay M.M.B. "all rent that [Plaintiff] pays to [Defendant]

so long as the [Lease with Plaintiff] remains" in effect; (2) as there are no other revenue streams from the Property aside from Plaintiff's rent, Defendant cannot generate revenue from the Property until Plaintiff leaves; and (3) "[Defendant] can lock in a lower rent for the rest of the 99-year term of its lease if [Plaintiff] terminates its [l]ease before November 30, 2027." Pl.'s 56.1 ¶¶ 1(f)-(q); 2017 Ground Lease at § 3.1; Rottenberg Dep. Tr., Dkt. Entry No. 66-19, at 74:12-75:13 (confirming same); Li Dep. Tr., Dkt. Entry No. 66-20, at 188:10-189:12 (confirming absence of other revenue streams).

After the June 2019 Meeting, Plaintiff's appraiser, Locatell, also prepared an updated letter opinion of value concerning her FMV analysis of the Property ("Locatell's Final FMV Estimate" or "Final Locatell Estimate"). Def's 56.1 ¶ 27; Pl.'s 56.1 Resp.¶ 27; Final Locatell Estimate, Dkt. Entry No. 68-47. Locatell's conclusion from her June 2019 FMV Estimate that the Property's FMV was $350,000 "did not change" either. Def's 56.1 ¶ 28. Then, on September 16, 2019, the parties signed an agreement ("September 2019 Agreement" or "Agreement") "to facilitate settlement discussions with respect to the determination of FMV under the Lease." *Id.* ¶ 26; Sept. 2019 Agreement, Dkt. Entry No. 66-5, ¶ 5.

Under Section 1 of the September 2019 Agreement, the parties agreed that, within three weeks of the Agreement's date, each party's appraiser would send the other party's appraiser his or her "updated letter opinion of value estimating each appraiser's Fair Market Rental Value as defined in the [ORA]." Sept. 2019 Agreement ¶ 1. Under Section 3 of the Agreement, the parties memorialized their appraisers' agreement to select Mark Nakleh as the third appraiser pursuant to the Lease's dispute resolution process and "agree[d] to engage [ ] Nakleh within 21 days of [the] agreement." *Id.* ¶ 3; Def's 56.1 ¶¶ 26, 30; Pl.'s 56.1 Resp. ¶¶ 26, 30. "The [p]arties further agree[d] that their appraisers shall jointly communicate with [ ] Nakleh that the [p]arties intend to retain

him upon agreement regarding the process set forth in the Lease." Sept. 2019 Agreement ¶ 3.  In line with Section 1 of the Agreement, Tener and Locatell exchanged their updated, and final, FMV estimates, i.e., the Final Locatell Estimate and the Final Tener Estimate, on September 27, 2019. Def's 56.1 ¶ 29.  However, the parties did not engage Nakleh.  *Id.* ¶ 31.

After receiving a copy of the Final Tener Estimate in late September 2019, Plaintiff raised concerns, which it continues to raise to date, that Tener failed to remedy any of the issues identified in the Initial FMV Estimate or otherwise comply with the law and the Lease.  The parties also dispute the reason for not engaging Nakleh as well as whether the September 2019 Agreement imposed an unconditional obligation on the parties to do so.  According to a letter sent from Plaintiff's counsel to Defendant's counsel on November 1, 2019, the parties engaged in "subsequent discussions" about these issues following the final appraisal exchange in late September, including whether the Final Tener Estimate used a compliant appraisal method and whether Defendant undertook the FMV appraisal process "in good faith."  *See,* Pl. Ltr. dated 11/1/19, Dkt. Entry No. 68-30, at 3-4; Pl.'s 56.1 Resp. ¶ 30.  The parties also remained unable to agree on Nakleh's role as the third appraiser and "how [Nakleh's] letter opinion of value shall be used[.]" Pl. Ltr. dated 11/1/19 at 2,n.1.  Plaintiff also raised a question as to the 2017 Ground Lease's relevance, suggesting that the appraisers should be considering it. *Id.* at 3.

On November 15, 2019, Plaintiff commenced this action seeking a declaratory judgment that Defendant failed to cooperate in good faith with the appraisal process, thus preventing the parties from completing the process within 120 days of the expiration of the [Lease's] primary term, because: (1) Defendant's appraiser failed to "apprais[e] FMV in accordance with the Lease, New York law, and usual and customary appraisal practices;" and (2) Defendant "refus[ed] to agree to any process that would allow the three appraisers, if necessary, to work collaboratively to

determine…[the] FMV, as the Lease requires." Pl.'s 56.1 ¶ 32; Compl. ¶¶ 38, 78, 79-81. Plaintiff also seeks a declaratory judgment, in the event the Court does not find that its appraiser's FMV should prevail, that the three appraisers may work together for that purpose. Compl. ¶ 94.

Defendant's counterclaim seeks a declaratory judgment that Plaintiff acted in bad faith and failed to cooperate with the dispute resolution process because its appraiser failed to reach her FMV estimate in compliance with the ORA and because Plaintiff "blocked" the three appraisers from estimating the FMV. Ans. and Counterclaim ¶¶ 140-42. Additionally, like Plaintiff, Defendant, in the alternative, and if necessary, seeks a declaratory judgment directing that the three appraisers collaborate to estimate the FMV. *Id.* ¶ 145.

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citations omitted). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the "difficult burden" of establishing that no genuine issues of material fact exist such that summary judgment is appropriate. *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (citation omitted). If the moving party meets its initial burden of demonstrating the absence of genuine issues of material fact, "the burden shifts to the nonmovant

to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists." *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir. 1993). The nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (internal citations omitted). Instead, the nonmoving party must set out facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 250. "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In deciding whether to grant summary judgment, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried[.]" *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986) (internal citations omitted); *See also*, *Jeffreys*, 426 F.3d at 553 ("Credibility [assessments] and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.") (internal citations omitted). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on [ ] summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## **DISCUSSION**

### I.     **Admissibility of the Sam Rottenberg Declaration**

The Court first must address Plaintiff's request that the declaration of Sam Rottenberg, Defendant's principal be rejected because it contains improper legal arguments and assertions not within Rottenberg's personal knowledge, and statements that contradict his prior deposition, including statements about matters Rottenberg claimed at the deposition he lacked knowledge of.

*See*, Pl.'s Opp. at 5-8 (citing Rottenberg Decl., Dkt. Entry No. 66-2, ¶¶ 2, 21, 22, 29-30, 52); *Compare* Rottenberg Decl. ¶ 21-27, 35-38, 76 *with* Rottenberg Dep. Tr. at 15:3-14.

"Pursuant to Local Civil Rule 7.1, legal argument is to be set forth in a memorandum of law, while factual affirmation is to be set forth in affidavits" and, under Fed. R. Civ. P. 56(c)(4), a "declaration used to support or oppose a motion must be made on personal knowledge[.]" *See, Janetos v. Home Depot U.S.A., Inc.*, 2012 WL 4049839, *7 (E.D.N.Y. Sept. 13, 2012). Moreover, under the "sham affidavit" doctrine, "'[i]t is well settled in [the Second Circuit] that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.'" *Kruger v. Virgin Atl. Airways Ltd.*, 976 F. Supp.2d 290, 309 (E.D.N.Y. 2013) (quoting *Mack v. United States*, 814 F.2d 120, 124-25 (2d Cir.1987)). However, "[t]he 'sham affidavit' principle is not absolute and will not bar an affidavit when 'an issue was not fully explored in the deposition, or the deponent's responses were ambiguous.'" *Id.* at 309 (internal citations omitted). "If a declarant's prior testimony and summary judgment declaration are not in direct contradiction, mere tensions or inconsistencies go to credibility, not admissibility, and credibility determinations are not proper at summary judgment." *FDIC v. Murex LLC*, 500 F. Supp.3d 76, 95 (S.D.N.Y. 2020).

As "[p]lacing legal argument in an affidavit is plainly improper," as is providing statements not based on personal knowledge or that contradict deposition testimony, the Court "will only consider the facts in the affidavit that are based on [Rottenberg's] personal knowledge and admissible in evidence" and will disregard statements that contradict deposition testimony. *See, Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.,* 887 F. Supp.2d 459, 465 n.3 (E.D.N.Y. 2012) (finding same) (internal citations omitted). However, to the extent the Court does not find direct contradictions, but, instead, finds inconsistencies or other disputes, the Court

declines to decide such issues at this juncture as they raise questions of credibility that are "not proper" for decision on summary judgment. *See*, *Murex*, 500 F. Supp.3d at 95.

It bears noting that this is not the first time Defendant filed a noncompliant declaration in support of its summary judgment motion. Indeed, on June 24, 2022, the parties filed their briefing on Defendant's summary judgment motion for the first time. *See*, First SJ Filing, Dkt. Entry Nos. 62-65. However, the Court struck those filings with leave to refile because, among other things, Defendant's Declaration of Sam Rottenberg contained legal argument and information outside of his personal knowledge. *See*, Electronic Order Striking Briefing dated July 6, 2022. Given this is Defendant's second attempt at filing its summary judgment motion, the issues present in the Rottenberg Declaration are particularly unacceptable.

## II.    Analysis

In its summary judgment motion, Defendant asks this Court to: (1) dismiss Plaintiff's claim for a declaratory judgment that Defendant failed to cooperate in good faith with the ORA's FMV appraisal process, preventing the parties from completing the process within the requisite 120-day window following the initial Lease term's expiration; and (2) grant its counterclaim that Plaintiff acted in bad faith and failed to cooperate with the appraisal process. As discussed below, Defendant has conceded Plaintiff's second claim seeking a declaration that the third appraiser, if necessary, shall collaborate with the parties' two appraisers. *See*, Section III.B. below.

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts."[3] *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 297 A.D.2d 630, 631 (2d Dep't 2002)*;

---

[3] As an initial matter, the Court must determine which state's law to apply here. *See*, *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999) ("Federal courts exercising diversity jurisdiction must . . . determine which state's substantive law applies."); *See also*, *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State"). Here, the parties have not raised a choice of law issue, and both parties rely on New York law in support of their respective positions. Thus, New York law applies. *See, e.g., Osagiede v. Carlo Shipping Int'l. Inc.,* 2022 WL 43750, at *3 (E.D.N.Y. Jan. 5, 2022) (applying New York law to summary judgment analysis where parties did not raise choice of

*First Niagara Bank N.A. v. Mortg. Builder Software, Inc*., 2016 WL 2962817, at \*6 (W.D.N.Y. May 23, 2016) (quoting *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004)). While "the duty here arises from an explicit good faith requirement" in the ORA, "there is no contract provision defining 'good faith,' [and, thus,] the term may be construed to have the same meaning it does in the implied covenant context." *First Niagara Bank*, 2016 WL 2962817, at \*6 (analyzing claim that a party failed to comply with contract provision requiring good faith cooperation under New York law) (internal quotation marks and citations omitted). "'[S]ince there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith.'" *Id.* (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc*., 487 F.3d 89, 98 (2d Cir. 2007)). Thus, Plaintiff bears the burden of showing Defendant breached the duty to cooperate in good faith.

This burden includes showing "intent" to harm the other contracting party or, alternatively, "a reckless disregard of" the other contracting party's rights under the contract. *Id.* at \*6, n.6 (citing *Paul v. Bank of Am. Corp*., 2011 WL 684083, at \*6 (E.D.N.Y. Feb. 16, 2011)). "The covenant of good faith may…'require affirmative steps to cooperate in achieving the contract's objective.'" *Id.* at \*7 (quoting *Tractebel Energy Mktg.,* 487 F.3d at 98). Significantly, "'[i]n determining whether a party has breached the obligation or covenant of good faith and fair dealing, a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties.'" *Id.* (quoting *Tractebel Energy Mktg.,* 487 F.3d at 98). "'Thus, whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case,

law issue and relied on New York law in their briefs) (citing *Tehran-Berkeley Civil & Envtl. Engrs. v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)).

and is ordinarily a question of fact to be determined by the jury or other finder of fact.'" *Id.* at 7

(quoting *Tractebel Energy Mktg.,* 487 F.3d at 98).  Additionally, when faced with questions of

contract interpretation, courts "must first consider whether the relevant provisions

[a]re…ambiguous." *29 Main Street LLC v. USPS*, 2023 WL 3243478, at *1 (2d Cir. May 4, 2023)

(summary order) (internal quotation marks and citations omitted).  "A contract is ambiguous if it

is susceptible of two different and reasonable interpretations, each of which is found to be

consistent with the contract language." *Id.*  "If contract terms are ambiguous, the weighing of

external evidence is required and the matter is not amenable to summary resolution." *Id.*

As noted above, Plaintiff bases its "failure to cooperate" claim on Defendant's alleged

failure to: (1) have its appraiser estimate the FMV in accordance with the Lease, New York law,

and the Uniform Standards of Professional Appraisal Practice ("USPAP"); and (2) agree to any

process that would allow the three appraisers, once a third appraiser became necessary, to work

collaboratively to reach an FMV estimate.  Many facts that underlie these allegations are in dispute

as is the question of whether the facts suffice to show Defendant failed to act in good faith.

For reasons discussed below, Defendant is not entitled to summary judgment because

Plaintiff has marshalled sufficient evidence from which a rational trier of fact could find that

Defendant failed to cooperate in good faith by misleading Tener to provide a noncompliant

appraisal and then again by disputing the third appraiser's role, thus preventing the parties from

completing the ORA's process within the requisite 120-day window.  For these same reasons,

among others explained below, summary judgment on Defendant's counterclaim that Plaintiff

failed to cooperate is inappropriate .  Indeed, "[t]he record in the present case is heavily fact-laden,

with disputes arising over numerous individual pieces of evidence and their import," including the

dispute as to contract interpretation and intent, "each contributing to this genuine issue of material

fact." *See, First Niagara Bank*, 2016 WL 2962817, at *7 (finding same and denying summary judgment in the context of analyzing claim that party failed to comply with contract provision requiring good faith cooperation).

**A.      Cooperation Regarding Appraisal Methodology**

While Defendant argues that its failure to have Tener apply *936 Second Ave.* or consider the 2017 Ground Lease in connection with preparing his initial FMV estimate does not constitute a failure to cooperate, Plaintiff has marshalled sufficient evidence to show that a genuine dispute of material fact exists as to this issue such that summary judgment is inappropriate.

First, Defendant claims the undisputed deposition testimony shows it interpreted *936 Second Ave.* as inapplicable, but the issue is moot because Tener ultimately applied *936 Second Ave.* when preparing his Final FMV Estimate, as Plaintiff requested. *See,* Def.'s Mem. at 1, 17-18 (citing Missry Dep. Tr., Dkt. Entry No. 66-24, at 116:18-117:3). Defendant also claims that it agreed to apply *936 Second Ave.* "as an accommodation to [Plaintiff]" only and did not concede its applicability. *Id.* at 18; Def.'s Reply at 2-3. While Defendant acknowledges that Tener's Final FMV Estimate remained the same, it claims that such a result is the product of a mere difference in opinion and that Tener properly applied *936 Second Ave.* in his Final FMV Estimate. Def.'s Mem. at 7, 12-18; *See, e.g*., Hedden Dep. Tr., Dkt. Entry No. 66-25, at 54:11-21, 181:24-182:9 (testifying that difference in opinion is not unusual).

Plaintiff has controverted these arguments with admissible evidence from which a reasonable fact finder could conclude that Tener, at Defendant's direction, misapplied *936 Second Ave.* and other Lease instructions, in both his initial and final FMV Estimates, constituting a failure to cooperate in good faith. Pl.'s Opp. at 2-3, 15-19. For example, Plaintiff has identified expert testimony establishing that Tener's initial and final estimates are unreliable as they are inconsistent

with New York law, the Lease itself, and USPAP, all of which require application of *936 Second Ave* and consideration of certain comparables to Tener's FMV analysis. *Id.* at 2-3, 17-18 (adding that the expert also found Tener's appraisal to be internally inconsistent, raising credibility concerns); Pl.'s Expert Report, Dkt 68-48, at 5-7, 9-10, 14-16, 30-32. Plaintiff also controverts Defendant's statement that it had applied *936 Second Ave.* "as an accommodation" but did not believe it applied. Pl.'s Opp. at 16.

Testimony from Plaintiff's expert also raises a triable issue as to the credibility of Tener's Final FMV Estimate as the expert opined that the internal inconsistencies throughout Tener's analysis could indicate a failure to undertake proper analyses as opposed to mere differences in opinions. Pl.'s Opp. at 19-20; Pl.'s Expert Report at 5-7, 3; Aaron Dep. Tr., Dkt. Entry No. 66-26, at 70:10-71:13. Plaintiff also cited documents and testimony showing that Tener and other consulting appraisers advised Defendant that *936 Second Ave.* applies here and that failure to apply it would impact the analysis, but that Tener, at Defendant's behest, failed to comply anyway. Pl.'s Opp. at 2-3, 15; Tener Dep. Tr. 108:5-21, 109:8-24, 110:3-111:11, 113:12-114:8, 323-9-12; Feb. 2019 Email, Dkt. Entry No. 68-17. These points raise triable issues of fact as to Defendant's good faith in the appraisal process, which goes beyond a question of mere differing opinions as to the actual FMV the appraiser calculated alone. In this respect, it bears noting that, in arguing that this matter involves a difference of opinion, Defendant submits that the matter should be determined by a third appraiser in arbitration. Def.'s Mem. at 15-16. However, as Plaintiff notes, "[b]oth this Court and the Second Circuit have already ruled against [Defendant] on that issue" when it moved to compel arbitration after Plaintiff filed the Complaint. Pl.'s Opp. at 20, n.5; *See*, Def.'s Mot. to Dismiss and Compel; M&O at 9 (denying motion to compel, finding the issue goes beyond difference of opinion or disagreement about the FMV in and of itself).

Turning to whether Tener's failure to consider the 2017 Ground Lease constitutes a failure to cooperate, the record also is replete with material factual disputes. Such disputes concern the extent to which the 2017 Ground Lease serves as a relevant comparable and the role it plays in supporting or refuting Plaintiff's "failure to cooperate" claim. Pl.'s Opp. at 2, 10-14. For example, Plaintiff has marshalled evidence that Defendant rejected requests from Tener seeking "[c]opies of any leases that encumber the properties," which, would encompass a copy of the 2017 Ground Lease. Pl.'s Opp. at 2-3, 10 (citing Tener June 2018 EL, Dkt. Entry No. 68-13, at 2 and Tener March 2019 EL, Dkt. Entry No. 68-18, at 2 (two separate letters in which Tener specifically requested Defendant provide "[c]opies of any leases that encumber the properties")); Rottenberg Reply Decl., Dkt Entry No. 69-1, ¶ 5 (admitting that Tener's "engagement letter does ask for copies of any leases that encumber the Premises," but claiming that the engagement letter was a "standard form" engagement letter and the request for such leases "appear[ed] to [Rottenberg] to be simply 'boilerplate,'" particularly given that Tener "never followed up on th[e] request even though he was clearly aware" the 2017 Ground Lease existed).

Plaintiff also cites expert testimony that, among other things, Defendant's "withholding [of] the [2017 Ground Lease] likely led to a significant 'error of omission' in the Tener report resulting in a 'significant effect on the credibility of the assignment results.'" Pl.'s Opp. at 3 (quoting Pl.'s Expert Report at 31-32) (internal citations omitted). Defendant has put forth evidence that Locatell did not seek or receive a copy of the 2017 Ground Lease. Def.'s Mem. at 22. However, Plaintiff counters with competing evidence showing, for example, that Plaintiff asked Defendant for a copy of the 2017 Ground Lease and received a "highly redacted" version with all financial terms "blacked out" and that, ultimately, Locatell became aware of the 2017 Ground Lease from her firm's search of public records, from which she concluded that the

valuation was "entirely consistent" with her FMV estimate, unlike Tener whose valuation was "drastically different." Pl.'s Opp. at 12; Locatell Decl., Dkt. Entry No. 68-2, at ¶¶ 4-6, 8-9.

These pieces of evidence, among others, create a triable issue of fact as to whether Tener's noncompliant analyses resulted from intentional efforts to manipulate a result as opposed to a mere difference of opinion. Moreover, Plaintiff has put forth evidence to support a finding that Defendant did not inform Plaintiff that it had instructed Tener to revise his FMV analysis until late August 2019, weeks after the 120-day window contemplated in the ORA had expired. *See,* Pl. Ltr. dated 11/1/19; Meyer Dep. Tr. at 206:22-208:9; *See,* Pl.'s 56.1 ¶¶ 11, 14. Thus, a trier of fact could find that Defendant's "agreement" to have Tener revise his analysis does not impact whether Plaintiff can prevail on its claim, as the claim concerns whether Defendant failed to cooperate such that the parties could not complete the ORA's process within 120 days after the Lease term expired. *See*, ORA at 2.

Significantly, Plaintiff also has put forth evidence creating a triable issue of fact as to whether Defendant intentionally refrained from informing Plaintiff that it would have Tener rework his FMV estimate in accordance with the guidelines and law until it could confirm that Tener's final FMV estimate would remain the same, or at least not decrease in value. As noted above, the parties relatedly dispute whether Defendant had motivation to "corrupt the fair market rent valuation" and retain a high FMV estimate in order to "cause [Plaintiff's] rent to skyrocket" in hopes that it would "prompt [Plaintiff] to leave." Pl.'s Opp. at 1-2, 9. The inquiries as to intent and motive raise questions of fact that a trier of fact must decide at trial.

## B.     Cooperation Regarding the Third Appraiser's Role

Since this action's commencement, Defendant has conceded that the third appraiser's role is a collaborative one. Pl.'s Opp. at 3-4, 22-23. Indeed, as noted above, in its counterclaim,

20

Defendant requests a judgment that the three appraisers estimate the FMV collaboratively, just as Plaintiff requests in its second claim. *See,* Ans. and Counterclaim at Ans. ¶ 145; *Gibbs ex rel. Est. of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant[s] throughout this litigation."); *See also*, Def.'s SJ PMC Ltr., Dkt. Entry No. 58, at 2, n.1) ("Defendant has already conceded that the three appraisers should work collaboratively to try to agree on the FMV in a single letter opinion of value. Thus, this aspect of Plaintiff's complaint is moot.")

Further exemplifying the contradictions, inconsistencies, and credibility concerns present in its papers, Defendant oddly argues that no triable issue exists regarding the "collaboration issue" because the plain text of the ORA requires that the appraisers issue their FMV opinions "*non-collaboratively.*" Def.'s Mem. at 2, 19-20 (emphasis added); Missry Dep. Tr. at 187:22-24, 193:16-21, 195:18-196:12, 197:23-198:4. After Plaintiff flagged the blatant error in Defendant's argument, Defendant admitted its false representation of the issue stating: "In its brief to the Second Circuit on the appeal of this Court's decision denying [its] motion to dismiss, [Defendant] 'waived any claim that the MDR Clause requires a non-collaborative approach, and irrevocably consent[ed] to [Plaintiff's] interpretation that a collaborative approach should be followed by the three appraisers.'" Def.'s Reply at 9, n.6

Defendant's lack of candor in its papers regarding this issue is unacceptable and disconcerting. Its decision to argue an issue that it had conceded before the Circuit no less is nothing short of frivolous. Equally disturbing is Defendant's repeated attempts to relitigate issues decided by this Court in the M&O that were affirmed by the Circuit in the interlocutory appeal. These decisions are the law of the case and the Court will not entertain any further efforts by Defendant to undermine this Court's rulings. Indeed, the foregoing only adds to this Court's

credibility concerns lending further support to the conclusion that summary judgment is inappropriate here.

Further supporting the inappropriateness of summary judgment is the fact noted by Plaintiff that Defendant's corporate representative could not explain the reason for Defendant's change in position on the third appraiser's role. Pl.'s 56.1 ¶ 10 (citing Rottenberg Dep. Tr. at 295:16-300:10). Defendant's concession as to the third appraiser's role also moots any dispute over Plaintiff's second claim in support of a declaratory judgment that, if the Court finds it necessary to appoint a third appraiser, the three appraisers must work collaboratively to determine the FMV. Compl. ¶ 94. Defendant erroneously contends that its concession warrants dismissal of Plaintiff's second claim as moot. Def.'s Reply at 9, n.6. Plaintiff's second claim is not moot and is not dismissed. Instead, the Court finds that Defendant has waived any argument against Plaintiff's second claim as the role of the third appraiser and the FMV determination process.

Defendant's arguments as to the September 2019 Agreement further support denial of its motion. *See*, Def.'s Mem. at 2-3, 23-24. Defendant's main contention, which Plaintiff disputes, is that Section 3 of the September 2019 Agreement created an "unconditional" obligation to retain Nakleh by October 7, 2019 and Plaintiff "prevented" the parties from doing so, making Plaintiff the uncooperative party and opening the door for Defendant's appraiser's FMV to govern. *Id*. at 2-3, 23-24; Pl.'s Opp. at 4, 22-24. However, Defendant has not provided uncontroverted evidence that Plaintiff "prevented" the parties from retaining Nakleh and the Agreement itself does not use the word "unconditional" nor does it state that the parties must retain Nakleh by "October 7, 2019." Moreover, the parties entered into the September 2019 Agreement after the 120-day window to complete the ORA's process had expired and Defendant has not provided uncontroverted evidence establishing that the parties intended the September 2019 Agreement to moot their preexisting

disputes or obligations to perform under the ORA. Thus, it remains unclear whether the September 2019 Agreement would excuse Defendant's failure to comply within the original 120-day window.

The September 2019 Agreement states that the parties "agree to engage [ ] Nakleh within 21 days of this agreement" and, in the following sentence, states that the parties agree their appraisers shall "communicate with [ ] Nakleh that the parties *intend* to retain him *upon agreement regarding the process set forth in the Lease*." *See*, Sept. 2019 Agreement at ¶ 3 (emphasis added). As the parties have yet to agree to "the process set forth in the Lease" and the Agreement's text "reasonably [is] susceptible to the construction placed on it by [either party]," a triable issue of fact remains as to the September 2019 Agreement's role in determining FMV and the parties' intent behind it. Under New York law, "where [ ] reasonable minds could differ on the meaning of the language used [in a contract], the meaning of the words becomes an issue of fact if there is relevant extrinsic evidence of the parties' actual intent." *Bolt Elec., Inc. v. City of New York*, 223 F.3d 146, 150 (2d Cir. 2000) (internal citations omitted); *See also, Bank v. Verde Energy USA, Inc.,* 2020 WL 5596046, at *3 (E.D.N.Y. Sept. 18, 2020) (same and finding summary judgment inappropriate under these circumstances, relying on *Palmieri v. Allstate Ins. Co*., 445 F.3d 179, 187 (2d Cir. 2006).

Lastly, on the issue of whether Tener's Final FMV Estimate is compliant with the ORA and New York law, the parties dispute whether Defendant breached the September 2019 Agreement under Section 1 that contemplates the appraisers exchange of their updated FMV analyses "estimating [the FMV] as defined in the [ORA]" and, if there is a breach, whether it operates as a precondition relieving Plaintiff of any obligation it had under Section 3. *See*, ORA at 1; Pl.'s Opp. at 24. "New York law provides that a party cannot claim a breach of a contractual condition when it has taken acts to frustrate or prevent the other party from satisfying that

condition." *CityPlace Retail, L.L.C. v. Wells Fargo Bank, N.A.,* 457 F. Supp.3d 1318, 1345, n.13 (S.D. FL. 2020) (collecting New York state law cases); *See also, ADC Orange, Inc. v. Coyote Acres, Inc.,* 7 N.Y.3d 484, 490 (2006) ("[A] party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition[.]") (internal citations omitted).

In light of the contradictory testimony and documentary evidence presented as well as the issues of contractual interpretation, intent, and credibility, Defendant "has fallen far short of fulfilling its burden of showing that no rational trier of fact could find for [Plaintiff]." *See, Kinojuz I.P. v. IRP Intern. Inc.,* 2014 WL 1271162, at *4 (E.D.N.Y. Mar. 26, 2014); *Leser v. U.S. Bank Nat'l Ass'n*, No. 09-cv-2362, 2012 WL 4472025, *4 (E.D.N.Y. Sept. 25, 2012). Taking the record as a whole, and drawing all inferences in the light most favorable to the nonmovant, Plaintiff has established the existence of genuine issues of material fact that might cause a rational trier of fact to find in its favor on all issues.  Thus, summary judgment is inappropriate.

## CONCLUSION

For the reasons set forth above, Defendant's summary judgment motion is denied in its entirety.

SO ORDERED.

Dated: Brooklyn, New York
       September 27, 2023

                                          /s/
                        _____
                              DORA L. IRIZARRY
                           United States District Judge